1  KEKER, VAN NEST & PETERS LLP
   STEVEN P. RAGLAND - # 221076
2  sragland@keker.com
   CODY S. HARRIS - # 255302
3  charris@keker.com
   CARLOS C. MARTINEZ - # 354616
4  cmartinez@keker.com
   633 Battery Street
5  San Francisco, CA 94111-1809
   Telephone:    415 391 5400
6  Facsimile:    415 397 7188

7

8  CALIFORNIA COLLABORATIVE FOR
   IMMIGRANT JUSTICE
9  PRIYA ARVIND PATEL - # 295602
   priya@ccijustice.org
10 MARIEL VILLARREAL - # 317048
   mariel@ccijustice.org
11 1999 Harrison Street #1800
   Oakland, California 94612
12 Tel: (650) 762-8990

13

14

15

16

17

   PRISON LAW OFFICE
   MARGOT MENDELSON – # 268583
   mmendelson@prisonlaw.com
   TESS BORDEN – MJP # 805022, pro hac vice
   tess@prisonlaw.com
   PATRICK BOOTH – # 328783
   patrick@prisonlaw.com
   ALISON HARDY – # 135966
   ahardy@prisonlaw.com
   RANA ANABTAWI – # 267073
   rana@prisonlaw.com
   1917 Fifth Street
   Berkeley, California 94710-1916
   Tel.: (510) 280-2621


   AMERICAN CIVIL LIBERTIES UNION
   FOUNDATION
   KYLE VIRGIEN - # 278747
   kvirgien@aclu.org
   FELIPE HERNANDEZ - # 338468
   npp_fhernandez@aclu.org
   MARISOL DOMINGUEZ-RUIZ - # 345416
   mdominguez-ruiz@aclu.org
   425 California Street, 7th Floor
   San Francisco, CA 94104
   Tel.: (415) 343-0770

   CARMEN IGUINA GONZALEZ - # 277369
   ciguinagonzalez@aclu.org
   915 15th Street, NW, 7th Floor
   Washington, DC 20005
   Tel.: (202) 393-4930

18 *Attorneys for Plaintiffs Fernando Gomez Ruiz, Fernando Viera Reyes, Jose Ruiz Canizales, Yuri*
19 *Alexander Roque Campos, Sokhean Keo, Gustavo Guevara Alarcon, Alejandro Mendiola Escutia*
   *and all others similarly situated*

20             UNITED STATES DISTRICT COURT

21            NORTHERN DISTRICT OF CALIFORNIA

22 FERNANDO GOMEZ RUIZ; FERNANDO          Case No. 3:25-cv-09757-MMC
   VIERA REYES; JOSE RUIZ CANIZALES;
23 YURI ALEXANDER ROQUE CAMPOS;           **PLAINTIFFS' NOTICE OF MOTION**
   SOKHEAN KEO; GUSTAVO GUEVARA           **AND MOTION FOR PRELIMINARY**
24 ALARCON; and ALEJANDRO MENDIOLA        **INJUNCTION; MEMORANDUM OF**
   ESCUTIA, on behalf of themselves and all   **POINTS AND AUTHORITIES IN**
25 others similarly situated,               **SUPPORT**

26             Plaintiffs,                 Date:      January 9, 2026
                                           Time:      9:00 a.m.
27        v.                               Dept.:     Ctrm. 7 – 19th Floor
                                           Judge:     Hon. Maxine M. Chesney
28 U.S. IMMIGRATION AND CUSTOMS

1   ENFORCEMENT; TODD M. LYONS,
    Acting Director, U.S. Immigration and          Date Filed:  November 12, 2025
2   Customs Enforcement; SERGIO
    ALBARRAN, Acting Director of San
3   Francisco Field Office, Enforcement and
    Removal Operations, U.S. Immigration and
4   Customs Enforcement; U.S. DEPARTMENT
    OF HOMELAND SECURITY; KRISTI
5   NOEM, Secretary, U.S. Department of
    Homeland Security,
6
            Defendants.
7

## NOTICE OF MOTION AND MOTION

### TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

**PLEASE TAKE NOTICE** that on January 9, 2026, at 9:00a.m., or as soon thereafter as may be heard before the Honorable Maxine M. Chesney in Courtroom 7 of the United States District Court for the Northern District of California, 450 Golden Gate Avenue, San Francisco, CA 94102, Plaintiffs Fernando Gomez Ruiz, Fernando Viera Reyes, Yuri Alexander Roque Campos, Jose Ruiz Canizales, Sokhean Keo, Gustavo Guevara Alarcon, and Alejandro Mendiola Escutia (collectively, "Plaintiffs") hereby move the Court pursuant to Federal Rule of Civil Procedure 65 for a preliminary injunction against Defendants: the United States Immigration and Customs Enforcement ("ICE"); Todd M. Lyons in his official capacity as Acting Director of ICE; Sergio Albarran in his official capacity as Acting Director of the San Francisco Field Office, Enforcement and Removal Operations, of ICE; the United States Department of Homeland Security; and Kristi Noem in her official capacity as Secretary of the Department of Homeland Security; and their officers, agents, servants, employees, and attorneys, and any other persons who are in active concert or participation with them.

Plaintiffs respectfully move the Court to enter a preliminary injunction to remedy ongoing violations of the constitutional rights of Plaintiffs and the putative class. A [Proposed] Order is attached to this Motion.

This motion is based on this Notice of Motion and Motion, the Memorandum of Points and Authorities, the accompanying supporting declarations and exhibits thereto, including:

1) Expert Declarations
   a. Declaration of Dan Pacholke ("Pacholke Decl.")
   b. Declaration of Dr. Todd Wilcox ("Wilcox Decl.")
2) Declarations of Detained People
   a. Declaration of Esteban Alvarez-Mora ("Alvarez-Mora Decl.")
   b. Declaration of Daniel Elias Benavides Zamora ("Benavides Zamora Decl.")
   c. Declaration of Yuri Alexander Roque Campos ("Campos Decl.")

i

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
Case No. 3:25-cv-09757-MMC

d.  Declaration of Gustavo Guevara Alarcon ("Guevara Alarcon Decl.")

e.  Declaration of Fernando Gomez Ruiz ("Gomez Ruiz Decl.")

f.  Declaration of Oneil Guthrie ("Guthrie Decl.")

g.  Declaration of Alejo Juárez Ruiz ("Juarez Ruiz Decl.")

h.  Declaration of Julio F. V. ("Julio F. V. Decl.")[1]

i.  Declaration of Sokhean Keo ("Keo Decl.")

j.  Declaration of Alfonso Leyva ("Leyva Decl.")

k.  Declaration of Yuniel Llufrio ("Llufrio Decl.")

l.  Declaration of Alejandro Mendiola Escutia ("Mendiola Escutia Decl.")

m.  Declaration of Jonathan Jair Montes-Diaz ("Montes-Diaz Decl.")

n.  Declaration of Hilario Montes Regalado ("Montes-Regalado Decl.")

o.  Declaration of Edgar Giovanni Neri Valdez ("Neri Valdez Decl.")

p.  Declaration of Camilo Orejuela Gutierrez ("Orejuela Gutierrez Decl.")[2]

q.  Declaration of Dennis Rivera-Trigueros ("Rivera-Trigueros Decl.")

r.  Declaration of Jose Ruiz Canizales ("Ruiz Canizales Decl.")

s.  Declaration of Julio Santos Avalos ("Santos Avalos Decl.")

t.  Declaration of Daler Singh ("Singh Decl.")

u.  Declaration of Fernando Viera Reyes ("Viera Reyes Decl.")

v.  Declaration of Vishal ("Vishal Decl.")[3]

3)  Declarations of Immigration Attorneys and Legal Staff

a.  Declaration of Genesis Fabian ("Fabian Decl.")

b.  Declaration of Lee Ann Felder-Heim ("Felder-Heim Decl.")

---

[1] The Declaration of Julio F. V. was originally filed as part of his individual habeas petition in the United States District Court for the Eastern District of California, *see* 1:25-cv-01432-KES-SKO, and is filed here with his consent.

[2] The Declaration of Camilo Orejuela Gutierrez was originally filed as part of his individual habeas petition in the United States District Court for the Eastern District of California, *see* 1:25-cv-01515-DAD-AC, and is filed here with his consent.

[3] The Declaration of Vishal was originally filed as part of his individual habeas petition in the United States District Court for the Eastern District of California, *see* 1:25-at-01018, and is filed here with his consent.

ii

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
Case No. 3:25-cv-09757-MMC

1         c.  Declaration of Nicole Gorney ("Gorney Decl.")

2         d.  Declaration of Sarah Goss ("Goss Decl.")

3         e.  Declaration of Hannah Kazim ("Kazim Decl.")

4         f.  Declaration of Hudson Kyle ("Kyle Decl.")

5         g.  Declaration of Stephanie Quintero ("Quintero Decl.")

6      4)  Declaration of Outside Counsel and Exhibit

7         a.  Declaration of Carlos Martinez and **Exhibit A** attached thereto – a

8  summary exhibit created for the Court's convenience, which categorizes

9  and presents key quotations included in the fact declarations listed above

10  as well as the papers, evidence, and records on file in this action, and any other written or

11  oral evidence or argument as may be presented at or before the time this motion is heard by the

12  Court. This motion is also supported by the Amended Complaint, Dkt. No. 15, as well as

13  Plaintiffs' Motion for Class Certification and the supporting papers filed contemporaneously

14  herewith.

15  Dated: December 1, 2025

16

17  Respectfully submitted,

18  /s/ *Cody S. Harris*                    /s/ *Margot Mendelson*

19  KEKER, VAN NEST & PETERS LLP     PRISON LAW OFFICE
    STEVEN P. RAGLAND                  TESS BORDEN

20  CODY S. HARRIS                      MARGOT MENDELSON
    CARLOS C. MARTINEZ               PATRICK BOOTH

21                                ALISON HARDY
                             RANA ANABTAWI

22

23  CALIFORNIA COLLABORATIVE FOR    AMERICAN CIVIL LIBERTIES UNION
    IMMIGRANT JUSTICE                 FOUNDATION

24  PRIYA ARVIND PATEL                KYLE VIRGIEN
    MARIEL VILLARREAL               FELIPE HERNANDEZ

25                                MARISOL DOMINGUEZ-RUIZ
                             CARMEN IGUINA GONZALEZ

26                                *Attorneys for Plaintiffs*

27

28

# **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ...................................................................................................1

II.   FACTS ....................................................................................................................2

    A.    The conditions at California City are as harsh or harsher than prison.....................2

    B.    Medical care at California City is grossly inadequate. .............................................5

        1.    Intake and continuity of care procedures are haphazard and deficient.................................................................................................5

        2.    If medical care is provided, it is delayed and dangerously substandard. ...................................................................................6

        3.    People with acute medical needs are at serious risk of harm.....................8

    C.    Defendants block access to timely, confidential legal advice................................9

        1.    Defendants unreasonably restrict scheduled phone and video calls. ...........9

        2.    Defendants unreasonably restrict outgoing legal calls................................9

        3.    Defendants restrict in-person legal visits.................................................10

    D.    Defendants fail to identify, assess, and accommodate disabilities. ......................11

III.  LEGAL STANDARD............................................................................................12

IV.   ARGUMENT ........................................................................................................13

    A.    Plaintiffs are likely to succeed on the merits of their claims. ...............................13

        1.    California City's punitive conditions violate the Fifth Amendment. ........13

            a.    The *Jones* presumption applies in this case. ...................................13

            b.    No legitimate or non-punitive interest justifies the conditions of confinement at California City................................15

            c.    Even if the *Jones* presumption is inapplicable, the restrictions at California City are unconstitutionally punitive. ........................................................................................16

        2.    California City's inadequate medical care violates the Fifth Amendment..............................................................................................17

            a.    In the prison context, courts routinely find deficient health care systems like California City's unconstitutional. ...................18

            b.    Medical care at California City is objectively deficient. ...............20

iv

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
Case No. 3:25-cv-09757-MMC

3.  Defendants' denial of access to counsel at California City violates the First and Fifth Amendments. ..............................................22

a.  Defendants' conduct violates the First Amendment. ....................22

b.  Defendants' conduct violates the Fifth Amendment. ...................24

4.  Defendants' conduct violates the Rehabilitation Act. ...............................25

B.  Plaintiffs have established that they are suffering irreparable harm. ....................29

C.  The balance of hardships and the public interest favor an injunction. ...................30

V.  CONCLUSION ...................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*All. for the Wild Rockies v. Cottrell,*
    632 F.3d 1127 (9th Cir. 2011) ...................................................................12

*Ams. for Immigrant Just. v. U.S. DHS,*
    2023 WL 1438376 (D.D.C. Feb. 1, 2023) ...................................................25

*Ardestani v. I.N.S.,*
    502 U.S. 129 (1991)....................................................................................29

*Armstrong v. Brown,*
    857 F. Supp. 2d 919 (N.D. Cal. 2012) ..................................................26, 28

*Armstrong v. Davis,*
    275 F.3d 849 (9th Cir. 2001) .....................................................................26

*Armstrong v. Schwarzenegger,*
    622 F.3d 1058 (9th Cir. 2010) ...................................................................28

*Barco Mercado v. Noem,*
    2025 WL 2658779 (S.D.N.Y. Sept. 17, 2025)................................... *passim*

*Bell v. Wolfish,*
    441 U.S. 520 (1979)....................................................................................16

*Brown v. Plata,*
    563 U.S. 493 (2011)........................................................................18, 21, 22

*Casey v. Lewis,*
    834 F. Supp. 1477 (D. Ariz. 1993) ............................................................19

*Castro v. Cnty. of L.A.,*
    833 F.3d 1060 (9th Cir. 2016) .............................................................18, 20

*Coleman v. Wilson,*
    912 F. Supp. 1282 (E.D. Cal. 1995).....................................................18, 19

*Demery v. Arpaio,*
    378 F.3d 1020 (9th Cir. 2004) ...................................................................23

*Doe v. Becerra,*
    732 F. Supp. 3d 1071 (N.D. Cal. 2024) .....................................................13

*Doe v. Chestnut,*
    2025 WL 3240400 (E.D. Cal. Nov. 20, 2025)............................................17

*Doe v. Kelly*,
    878 F.3d 710 (9th Cir. 2017) ................................................................17

*Eng v. Cooley*,
    552 F.3d 1062 (9th Cir. 2009) .............................................................22

*Fraihat v U.S. Immigr. & Customs Enf't*,
    16 F.4th 613 (9th Cir. 2021) .....................................................13, 14, 17

*Fromer v. Cnty. of Riverside*,
    2025 WL 819719 (C.D. Cal. Feb. 4, 2025)........................................22

*Gordon v. Cnty. of Orange*,
    888 F.3d 1118 (9th Cir. 2018) .......................................................18, 21

*Guel v. Cnty. of San Bernardino*,
    2024 WL 5185331 (C.D. Cal. Oct. 23, 2024).............................20, 21, 22

*Harris v. Bd. of Supervisors, L.A. Cnty.*,
    366 F.3d 754 (9th Cir. 2004) ...............................................................30

*Helling v. McKinney*,
    509 U.S. 25 (1993)......................................................................18, 22

*Hernandez v. Cnty. of Monterey*,
    110 F. Supp. 3d 929 (N.D. Cal. 2015) ...........................................26, 30

*Hernandez v. Sessions*,
    872 F.3d 976 (9th Cir. 2017) ...............................................................29

*Hoptowit v. Ray*,
    682 F.2d 1237 (9th Cir. 1982) .......................................................18, 19

*Jensen v. Shinn*,
    609 F. Supp. 3d 789 (D. Ariz. 2022) .........................................19, 20, 21

*Johnson v. Wetzel*,
    209 F. Supp. 3d 766 (M.D. Pa. 2016) ..................................................29

*Jones v. Blanas*,
    393 F.3d 918 (9th Cir. 2004) ...................................................... *passim*

*Kansas v. Crane*,
    534 U.S. 407 (2002)............................................................................16

*King v. Cnty. of Los Angeles*,
    885 F.3d 548 (9th Cir. 2018) ...............................................................15

*Lopez v. Heckler*,
    713 F.2d 1432 (9th Cir. 1983) ..............................................................30

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
Case No. 3:25-cv-09757-MMC

*Lopez v. Smith*,
    203 F.3d 1122 (9th Cir. 2000) ....................................................................19

*Madrid v. Gomez*,
    889 F. Supp. 1146 (N.D. Cal. 1995) ...............................................18, 19, 20

*Melendres v. Arpaio*,
    695 F.3d 990 (9th Cir. 2012) ...........................................................2, 29, 30

*Moreno Gonzalez v. Noem*,
    2025 WL 3170784 (N.D. Ill. Nov. 5, 2025) .................................................2

*Payan v. Los Angeles Cmty. Coll. Dist.*,
    11 F.4th 729 (9th Cir. 2021) .......................................................................26

*Pierce v. D.C.*,
    128 F. Supp. 3d 250 (D.D.C. 2015) .......................................................26, 28

*Plata v. Schwarzenegger*,
    2005 WL 2932253 (N.D. Cal. Oct. 3, 2005) ..............................................19

*R.I.L.-R v. Johnson*,
    80 F. Supp. 3d 164 (D.D.C. 2015) .............................................................16

*Roe v. Critchfield*,
    137 F.4th 912 (9th Cir. 2025) ....................................................................30

*Roman v. Wolf*,
    977 F.3d 935 (9th Cir. 2020) ................................................................20, 22

*Russell v. Lumitap*,
    31 F.4th 729 (9th Cir. 2022) .......................................................................21

*SPLC v. U.S. Dep't of Homeland Sec.*,
    2020 WL 3265533 (D.D.C. June 17, 2020) ...............................................25

*Tater v. City of Huntington Beach*,
    2023 WL 4291656 (C.D. Cal. May 8, 2023) .............................................21

*Torres v. U.S. Dep't of Homeland Sec.*,
    411 F. Supp. 3d 1036 (C.D. Cal. 2019) ...........................................*passim*

*Turner v. Safley*,
    482 U.S. 78 (1987).................................................................................23, 24

*Tyson v. City of San Bernardino*,
    2024 WL 3468832 (C.D. Cal. Jan. 12, 2024) ...........................................30

*Unknown Parties v. Johnson*,
    2016 WL 8188563 (D. Ariz. Nov. 18, 2016) ............................................13

viii

*Updike v. Multnomah Cnty.*,
  870 F.3d 939 (9th Cir. 2017) ...................................................................................26, 28

*Valdez v. Rosenbaum*,
  302 F.3d 1039 (9th Cir. 2002) ............................................................................................22

*Vasquez Perdomo v. Noem*,
  2025 WL 3192939 (C.D. Cal. Nov. 13, 2025) ...................................................................2

*Villarreal v. Cnty. of Monterey*,
  2018 WL 11606313 (N.D. Cal. Aug. 21, 2018) ...............................................................22

*Ward v. Cnty. of San Diego*,
  2025 WL 319250 (S.D. Cal. Jan. 28, 2025).................................................................21, 22

*West v. Atkins*,
  487 U.S. 42 (1988).................................................................................................................1

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ................................................................................................................12

*Youngberg v. Romeo*,
  457 U.S. 307 (1982).......................................................................................................13, 23

*Zadvydas v. Davis*,
  533 U.S. 678 (2001).......................................................................................................13, 23

**Federal Statutes**

29 U.S.C. § 705(20)(B) ..........................................................................................................26

29 U.S.C. § 794(a) ..................................................................................................................26

42 U.S.C. § 12102 ...................................................................................................................26

Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 et seq.......................................11, 26

Rehabilitation Act of 1973, 29 U.S.C. § 701 et seq.............................................................. *passim*

**State Statutes**

Cal. Code Regs. Title 15, § 3170.1 ........................................................................................3

Cal. Code Regs. Title 15, § 3177 ..........................................................................................3

Cal. Code Regs. Title 15, § 3178 ........................................................................................25

Cal. Code Regs. Title 15, § 3178(b), (m)............................................................................11

Cal. Code Regs. Title 15, § 3282(g) ....................................................................................10

ix

**Regulations**

28 C.F.R. § 39.103 ...................................................................................................26

**Other Authorities**

Richard Luscombe, *Trump Celebrates Harsh Conditions for Detainees on Visit to 'Alligator Alcatraz'*, The Guardian, Jul. 1, 2025, https://www.theguardian.com/us-news/2025/jul/01/trump-alligator-alcatraz-immigration-florida?CMP=share_btn_url ...................................................15

*California City Detention Facility*, U.S. Immigr. and Customs Enf't (Sep. 5, 2025), https://www.ice.gov/detain/detention-facilities/california-city-detention-facility [http://web.archive.org/web/20251008233134/https://www.ice.gov/detain/detention-facilities/california-city-detention-facility] ............................................9

CDCR, Department Operations Manual ........................................................................4

*Types of Visits*, Cal. Dep't Corr. and Rehab., https://www.cdcr.ca.gov/visitors/types-of-visits/ (last visited Nov. 15, 2025) [http://web.archive.org/web/20251116004609/https://www.cdcr.ca.gov/visitors/types-of-visits/]; ...................................................................................11

ICE, *National Detention Standards, Revised 2025* (updated Jun. 18, 2025), https://www.ice.gov/doclib/detention-standards/2025/nds2025.pdf .........................4

CDCR, *SOMS-TPOP-1: Population Report as of October 25, 2023* (Oct. 25, 2023), https://www.cdcr.ca.gov/research/wp-content/uploads/sites/174/2023/10/Tpop1d231025.pdf..............................................2

CDCR, *SOMS-TPOP-1: Weekly Report of Population as of Midnight Nov. 1, 2023* (Nov. 1, 2023), https://www.cdcr.ca.gov/research/wp-content/uploads/sites/174/2023/11/Tpop1d231101.pdf..............................................2

Sara Cline, *A Notorious Louisiana Prison was Chosen for Immigrant Detainees to Urge Self-Deportation, Noem Says*, Associated Press, Sept. 3, 2025, https://apnews.com/article/louisiana-immigration-detention-noem-trump-682793a4db4757649cb78b0ea3aa051d?utm_source=copy&utm_medium=shar ...................................................................................................15

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION[4]

In August 2025, Defendants began transferring immigrants into a derelict and isolated former prison in the middle of the Mojave Desert. Operated by a private, for-profit corrections company at Defendants' direction, the California City Detention Facility ("California City") is expected to hold up to 2,560 men and women, making it the largest ICE facility in the state.[5] Today, California City is less than half full, but the circumstances are already dire. Named Plaintiffs, and members of the class they seek to represent (collectively, "Plaintiffs"), are men and women currently held in civil detention in California City. Because Defendants' practices and the conditions of confinement at California City blatantly violate the First and Fifth Amendments and the Rehabilitation Act, Plaintiffs respectfully seek an order forcing Defendants to comply with the law by providing humane custodial treatment, adequate access to health care and legal counsel, and equal access to programs, services, and activities to detained people with disabilities.

Having rushed to open the facility with inadequate infrastructure, staffing, and supplies, Defendants are operating a civil detention facility whose conditions are punitive. People are locked in their cells for prolonged periods and abused by overworked and ill-trained staff. Medical and mental health care is abysmal. Shoddy intake procedures make continuity of care nonexistent. Plaintiffs' medical requests go unanswered for weeks, if not ignored. And for more serious and urgent needs, California City largely lacks specialty services and timely emergency response. There is no functional system for identifying, providing, or sustaining disability accommodations, and the facility itself lacks accessibility for people with mobility disabilities.

Defendants unlawfully hinder Plaintiffs' ability to receive critical legal assistance.

---

[4] In all quotations, all internal quotation marks, citations, and alterations have been removed, and all emphases added, unless otherwise noted.

[5] Although ICE contracts with CoreCivic to operate California City, ICE, DHS, and their officials with relevant decision-making authority are the proper defendants because they exercise ultimate authority over detention conditions, medical care, and policies affecting individuals in their custody. ICE has a legal duty to provide constitutionally compliant conditions, notwithstanding the use of contractors. *West v. Atkins*, 487 U.S. 42, 56 (1988) ("Contracting out prison medical care does not relieve the State of its constitutional duty to provide adequate medical treatment to those in its custody, and it does not deprive the State's prisoners of the means to vindicate their Eighth Amendment rights.").

Scheduling confidential calls with attorneys is a logistical nightmare, extreme delays are pervasive, and calls are often marred with technical issues and cut short. Attempts at confidential in-person meetings are also a dead end. Attorneys who make the hours-long trip to the remote facility face long waits before meeting their clients, even when attorney visit rooms sit empty.

Based on the extensive evidentiary record presented here, Plaintiffs have shown that they are likely to succeed on the merits of their claims. Indeed, Plaintiffs' claims are *presumptively* meritorious because a "presumption of punitive conditions" arises when a civil detainee is "detained under conditions identical to, similar to, or more restrictive than those under which pretrial criminal detainees are held." *Jones v. Blanas*, 393 F.3d 918, 933–934 (9th Cir. 2004). Here, conditions in California City are now *worse* than when that same facility operated as a prison. District courts have recently granted preliminary relief to similar classes of individuals held in ICE detention facilities. *See, e.g.*, *Vasquez Perdomo v. Noem*, 2025 WL 3192939, at *1 (C.D. Cal. Nov. 13, 2025); *Moreno Gonzalez v. Noem*, 2025 WL 3170784, at *1 (N.D. Ill. Nov. 5, 2025); *Barco Mercado v. Noem*, 2025 WL 2658779, at *20 (S.D.N.Y. Sept. 17, 2025).

Plaintiffs will continue to suffer irreparable harm absent relief. They are entitled to—and urgently need—adequate living conditions, medical care, access to counsel, and disability accommodations. And "the deprivation of constitutional rights unquestionably constitutes irreparable injury." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012). Because the balance of hardships and the public interest also strongly favor relief, the Court should grant the motion.

## II.    FACTS

### A.    The conditions at California City are as harsh or harsher than prison.

Defendants subject Plaintiffs to punitive conditions that are similar to or worse than state prison. California City is a previously shuttered state prison.[6] Each Plaintiff lives in a shared two-person, concrete cell about nine feet by twelve feet. Orejuela Gutierrez Decl. ¶ 4. Plaintiffs have

---

[6] *Compare* CDCR, *SOMS-TPOP-1: Population Report as of October 25, 2023* (Oct. 25, 2023), https://www.cdcr.ca.gov/research/wp-content/uploads/sites/174/2023/10/Tpop1d231025.pdf (reporting 40 incarcerated individuals), *with* CDCR, *SOMS-TPOP-1: Weekly Report of Population as of Midnight Nov. 1, 2023* (Nov. 1, 2023), https://www.cdcr.ca.gov/research/wp-content/uploads/sites/174/2023/11/Tpop1d231101.pdf (no longer listing California City Correctional Facility among CDCR's prisons).

no privacy when urinating or defecating. Llufrio Decl. ¶ 10. Many people report discolored, foul-smelling water. Guevara Alarcon Decl. ¶ 22; Alvarez-Mora Decl. ¶ 15; Viera Reyes Decl. ¶ 28. People are held in the cold without adequate clothing or blankets. Leyva Decl. ¶ 34; Benavides Zamora Decl. ¶ 20; Gomez Ruiz Decl. ¶ 17. Unlike in state prisons, other necessary items, such as pencils and paper, toothbrushes, and razors, are withheld or unfit for their purpose. Guevara Alarcon Decl. ¶ 7; Ruiz Canizales Decl. ¶ 34; Orejuela Gutierrez Decl. ¶ 5; Alvarez-Mora Decl. ¶ 17; Rivera-Trigueros Decl. ¶ 17; Neri Valdez Decl. ¶ 14; Montes-Diaz Decl. ¶ 11.[7]

California City denies social interaction and sensory stimulation that is commonplace even in a penal setting. People serving prison terms can have contact visits with loved ones, in person, for hours. Guevara Alarcon Decl. ¶ 9; Cal. Code Regs. tit. 15, § 3170.1. Prisons permit overnight visits with immediate family. Cal. Code Regs. tit. 15, § 3177. At California City, grandparents cannot even hug their grandchildren: detained people are permitted only non-contact visits behind glass, through a phone installed on the wall; and visits are often cut off after 30-60 minutes after hours of waiting. Guevara Alarcon Decl. ¶ 9; Santos Avalos Decl. ¶ 17; Mendiola Escutia Decl. ¶ 13. In prison, incarcerated people are allowed several hours of outdoor recreation each day. *See* Keo Decl. ¶ 8. At California City, Plaintiffs spend at least 161 of the 168 hours in a week locked inside their concrete housing unit. *Id.*; Viera Reyes Decl. ¶ 23. They are permitted to go to a barren yard space, littered with thorns and rocks, at most once a day for an hour. Llufrio Decl. ¶ 13. Unlike in a prison setting, Plaintiffs are always escorted by guards and experience unnecessary and invasive pat-down searches every time they enter or leave their housing unit, including aggressive contact with their genitals. Montes-Regalado Decl. ¶ 8; Keo Decl. ¶ 14; Julio F. V. Decl. ¶ 29; Llufrio Decl. ¶¶ 14–15. People remain inside their units to avoid these humiliating searches. Keo Decl. ¶ 14.

There is no access to programming in California City. Guevara Alarcon Decl. ¶ 11; Montes-Diaz Decl. ¶¶ 9, 12. This stands in stark contrast to the wide range of programming, education, and religious services available in prison. Guevara Alarcon Decl. ¶ 11; Keo Decl.

---

[7] The facts presented in the declarants' declarations are summarized and categorized for the Court's convenience in Exhibit A to the Declaration of Carlos Martinez.

¶¶ 7–9; Guthrie Decl. ¶ 6. Defendants also curtail access to online information or materials. California prisons provide each incarcerated person with their own tablet, which they can use for phone calls. Guevara Alarcon Decl. ¶ 7; Campos Decl. ¶ 48. In California City, tablets are shared among four people and can be used only during limited hours. Guevara Alarcon Decl. ¶ 11. These communal tablets cannot be used in cells or during the frequent counts and lockdowns. *Id.* ¶¶ 35, 43; Montes-Diaz Decl. ¶ 10; Guthrie Decl. ¶ 31. This length of in-cell time is significant: Defendants subject Plaintiffs to four daily "counts" during waking hours and more at night. Julio F. V. Decl. ¶ 13; Rivera-Trigueros Decl. ¶ 10; Guthrie Decl. ¶ 31; Llufrio Decl. ¶ 11. By contrast, California prisons are required to hold only two counts during waking hours.[8] The net result at California City is a population desperate for any stimulation or ways to pass the hours.

A punitive culture pervades California City, which is rife with unnecessary force, abuse, and threats. Detained individuals are pepper sprayed while walking away from guards, Guevara Alarcon Decl. ¶ 36, aggressively pushed for asking for copies of facility policies, Singh Decl. ¶ 29, and threatened with severe bodily harm for expressing concern over fellow detained people in crisis, *id.* ¶ 30 (reporting a staff member brandishing a drill, warning him to get his "ass inside the cell" or "I can make a hole in your chest"). Such conduct violates ICE's own 2025 National Detention Standards ("2025 NDS"), which authorizes use of force "only after all reasonable efforts to resolve a situation have failed" and prohibits "[u]sing force against a detainee offering no resistance."[9] At California City, staff relies on force as a first response. As one lieutenant told a detained individual: "You know right here we're allowed to use force." Julio F. V. Decl. ¶ 25.

California City staff is also quick to impose solitary confinement as a "first resort." Guevara Alarcon Decl. ¶ 35. People are routinely sent to solitary confinement, or administrative segregation, for conduct that should not be punished at all. Mr. Guevara Alarcon was sent to solitary after he asked to finish his shower during a lockdown. *Id.* ¶ 38. Another individual was sent to solitary after he refused to put his shirt on while exercising in the heat. Keo Decl. ¶ 15.

---

[8] *See* CDCR, Department Operations Manual, § 52020.4.1 Frequency of Counts.

[9] ICE, *National Detention Standards, Revised 2025*, §§ 2.8.I, 2.8.II.A.2, 2.8.II.C.6, (updated Jun. 18, 2025), https://www.ice.gov/doclib/detention-standards/2025/nds2025.pdf.

1   Defendants also respond to medical and disability issues with solitary confinement. *See* Rivera-

2   Trigueros Decl. ¶ 19–23 (reporting being sent to solitary confinement for requesting

3   accommodation ordered by previous detention facility); Julio F. V. Decl. ¶ 21 (describing

4   dormmates housed in solitary confinement after fainting due to medical conditions). People in

5   solitary confinement are locked into single cells for 23 hours a day or more. Rivera-Trigueros

6   Decl. ¶ 24. They spend their single allotted hour out of their cell alone. *Id.* Their only access to

7   the outdoors is in a filthy "recreation" cage that is approximately nine by nineteen feet. *Id.* ¶ 23.

8       These conditions are unnecessary, excessive, and harmful, Pacholke Decl. ¶¶ 7–17, and

9   many violate ICE's own standards.[10] To protest these conditions, detained people staged peaceful

10  sit-ins and hunger strikes. Guthrie Decl. ¶¶ 26–27; Singh Decl. ¶¶ 13, 21. But Defendants

11  responded with more punishment, including pepper spray, solitary confinement, and threats to

12  withhold medication. Guthrie Decl. ¶ 27; Vishal Decl. ¶ 8; Singh Decl. ¶ 16. These conditions

13  have led to tragedy. Declarants believe that in under three months, as many as five suicide

14  attempts have occurred at California City. *See* Guevara Alarcon Decl. ¶ 40; Keo Decl. ¶ 17.

15      **B.       Medical care at California City is grossly inadequate.**

16      California City's health care system has catastrophic gaps, with patients suffering serious

17  harm as a result. Dr. Todd Wilcox, a nationally recognized correctional health expert who has

18  served as Medical Director at a large county jail for over 15 years, found that Defendants

19  "struggle to deliver standard of care for even common uncomplicated problems" at California

20  City. Wilcox Decl. ¶ 9. He concluded that the system is riddled with deficiencies so significant

21  that it "is not equipped to handle patients with complex medical care needs." *Id.*

22          **1.       Intake and continuity of care procedures are haphazard and deficient.**

23      People detained at California City suffer from inadequate medical care from the moment

24  they arrive. Although comprehensive intake assessments are "necessary to identify those who

25  arrive with urgent medical needs so that their care can be addressed, to ensure that those with

26

27  ───────────────
    [10] 2025 NDS §§ 2.8.I (use of force), 2.9.II.A (process for solitary confinement), 4.4.II.B, G
28  (temperature- and weather-appropriate clothing and toilet privacy), 5.3.II.A, E, H, K (religious
    activities and property), 5.5.II.F.1 (contact visits with children).

1    known medical and/or mental health conditions receive continued care, . . . and to prevent the

2    spread of contagious diseases," intake assessments at California City are hasty, delayed,

3    incomplete, and haphazard. Wilcox Decl. ¶¶ 18, 26–68; Viera Reyes Decl. ¶¶ 12–13. Health

4    screenings are conducted in busy hallways where others can overhear conversations with medical

5    staff. Guevara Alarcon Decl. ¶ 19. Nurses fail to ask about or document critical information, such

6    as a patient's history of chronic medical conditions, or conduct medical examinations. Wilcox

7    Decl. ¶ 29. Patients are not timely referred to providers, even when they have time-sensitive

8    medical needs like abscesses leaking pus and blood. *Id.* ¶ 30; Alvarez-Mora Decl. ¶¶ 7–8. Intakes

9    are completed so poorly that they "defeat[] the entire purpose of an intake assessment." Wilcox

10    Decl. ¶ 28. Defendants fail to meet the standard of care for tuberculosis screening and infectious

11    disease management—failures which Dr. Wilcox describes as "reckless" and which "endanger[]

12    all people who live and work at California City." *Id.* ¶ 32.

13        As a result of the broken intake system, people arriving at California City experience

14    profound disruptions to their continuity of care. Dr. Wilcox found that "[d]etainees who arrive at

15    California City with active medications do not have them timely verified and continued, leading

16    to dangerous lapses." *Id*. ¶ 47. This is true even for patients "with their documented medication

17    prescriptions or medication in their possession." *Id.* Indeed, one person arrived at the facility on

18    antibiotics for multiple abscesses that were possibly infected and experienced an 11-day delay in

19    receiving his treatment. *Id.* ¶ 51. Mr. Gomez Ruiz, who has diabetes and diabetes-related

20    complications, experienced multiple lapses in the administration of insulin. *Id.* ¶ 98. These lapses

21    continue even after intake and can expose patients to "serious risk of harm." *Id.* ¶¶ 48, 51, 98–99.

22        **2.        If medical care is provided, it is delayed and dangerously substandard.**

23        The "sick call" system at California City is riddled with delays and failures. Wilcox Decl.

24    ¶¶ 71–78. People describe submitting multiple sick call requests seeking care for serious, painful

25    conditions and receiving responses weeks later, or not at all. Some sick call requests lead only to

26    evaluations by licensed vocational nurses ("LVNs")—a practice which can result in "patient

27    harm" since LVNs, unlike Registered Nurses, are not trained to assign conditions the appropriate

28    level of urgency. *Id.* ¶ 76.

When people finally do see a doctor or nurse, the care is often deficient. Although a "detention facility housing hundreds of patients should have sufficient medication in stock," health records document shortages of necessary medications. *Id.* ¶ 109. Defendants' records demonstrate frequent lapses in medication continuity due to inadequate supply. *Id.*

Quality of care can be dangerously poor. Dr. Wilcox found that provider notes demonstrate "poor clinical judgment" and do not "conform[] to the prevailing standard of care," even for well-known conditions. *Id.* ¶ 90. Inconsistent and incredible documentation in patient records "raises concern that [providers] are not physically evaluating their patients." *Id.* ¶ 63. Medications are suddenly discontinued without notice or justification; providers take actions that are not "medically logical." *Id.* ¶ 49. In one case, a patient with dangerously uncontrolled hypertension and uncontrolled diabetes presented with symptoms of dizziness and visual disturbances. *Id.* ¶¶ 81–85. Tests showed extremely elevated blood glucose and dangerously high blood pressure. *Id.* ¶ 82. The standard of care in response is to send such a patient to the Emergency Department. *Id.* ¶ 84. Instead, the provider ordered an additional dose of his medication and sent him back to his housing unit with orders for a *six-month* follow-up appointment. *Id.* ¶¶ 82–84. Dr. Wilcox determined that this medical judgment was "ignorant" and "demonstrate[s] dangerously casual care in the face of an objective medical emergency." *Id.* ¶ 84.

Patients who require specialty care wait months for necessary, time-sensitive appointments. In the health records Dr. Wilcox reviewed, there were 13 orders for specialty care; not a single one had been completed or even authorized. *Id.* ¶ 114. This was true even for people who are "extraordinarily medically fragile" and require urgent specialty care for life-threatening conditions. *Id.* ¶ 86. Dr. Wilcox concluded that the process to access medical and mental health care "is not effective or timely and . . . puts patients at a clear risk of serious harm." *Id.* ¶ 15.

Mental health care is skeletal or nonexistent. *Id.* ¶¶ 134–41. Although the harsh and isolating conditions of confinement at the facility would be "expect[ed] . . . to cause patients to experience severe mental health distress and feelings of helplessness," the mental health care provided is "grossly inadequate." *Id.* ¶ 134.

Medical staff at California City are unequipped to timely respond to medical emergencies.

7

The facility's remote location means that the nearest hospital is nearly an hour away, which is dangerous and places people at risk of harm. *Id.* ¶ 127. Custodial practices for people receiving hospital care or returning from the hospital are at times "grossly inhumane" and "medically risky." *Id.* ¶ 128. Patients describe being housed in barren and filthy cells with no towels, soap, or linens upon return from hospitalization. Montes-Regalado Decl. ¶ 17; Leyva Decl. ¶¶ 20–23.

### 3.    People with acute medical needs are at serious risk of harm

Plaintiffs face the risk of severe harm or death due to the grossly deficient medical care at California City. For example, in the case of Mr. Gomez Ruiz, Dr. Wilcox concluded that Defendants' management of his foot ulcer contravenes "the prevailing standard of care for this well-known dangerous condition" and that such failures "can result in infection, gangrene, or osteomyelitis and ultimately an amputation." Wilcox Decl. ¶ 90. In the case of Mr. Viera Reyes, whose workup thus far is consistent with prostate cancer, Dr. Wilcox concluded that Defendants' delay in scheduling an urgent urology appointment is "unacceptable" and, "if his condition is in fact cancer, increases the risk of metastatic cancer" spreading through his body. *Id.* ¶ 116.

In the case of Mr. Roque Campos, Defendants' failure to provide appropriate treatment and monitoring for his life-threatening heart condition "puts [him] at significant risk for sudden cardiac death." *Id.* ¶ 89. Defendants failed not only to provide Mr. Roque Campos with adequate treatment that meets any standard of care, but also to respond appropriately when an Emergency Room doctor sent a note to California City stating that "[i]t is imperative that Mr. Campos follow up within 72 hours with a specialist in right heart failure or pulmonary hypertension." *Id.* ¶ 86. Two and a half months later, Mr. Roque Campos has yet to see a specialist. *See id.* ¶ 117. Dr. Wilcox concluded that Defendants' act of "ignoring [the ER's doctor's] informed opinion and directed referral" is "willful dereliction of a physician's basic duties." *Id.* ¶ 89.

These risks are neither hypothetical nor sporadic. They are real and endemic. California City houses patients with very serious medical conditions whose needs the facility cannot meet and who face severe harm as a result. For these reasons, Dr. Wilcox concluded that "it is not safe to be sick at [] California City." *Id.* ¶ 9.

C.    **Defendants block access to timely, confidential legal advice.**

California City imposes extensive and arbitrary restrictions on the ability to communicate with legal counsel. These barriers prevent attorneys from adequately representing their clients and prejudice Plaintiffs through unnecessary delays that can prolong their detention.

1.    **Defendants unreasonably restrict scheduled phone and video calls.**

Restrictive legal call procedures prevent attorneys from reliably and consistently communicating with their clients. Attorneys face significant barriers in scheduling legal calls. Requests often sit unanswered unless attorneys send follow-ups. Fabian Decl. ¶¶ 4–6; Kazim Decl. ¶¶ 6, 11. When a request garners a response, the time offered is typically one to three weeks out, resulting in weekslong delays between the initial request and the scheduled call. Quintero Decl. ¶¶ 6, 9; Fabian Decl. ¶¶ 5–6; Kazim Decl. ¶ 6; Kyle Decl. ¶ 5.

Strict and unreasonable limits are imposed on how long and how often people can speak with their attorneys. Defendants' own policies forbid restrictions on the number and duration of legal calls, unless necessary for security or order.[11] Yet according to the California City website, attorneys are allowed no more than one 60-minute call with their clients in a day.[12] In practice, attorneys can speak with their clients for only a fraction of that allotted time. Attorneys report video that freezes and audio that cuts out, eliminating as much as a quarter of the allotted call time or even causing them to be rescheduled entirely. Kyle Decl. ¶ 7; Quintero Decl. ¶¶ 4, 5; Fabian Decl. ¶ 7. Other times, the attorney and client lose precious time because staff bring clients to calls late. Felder-Heim Decl. ¶ 5; Kyle Decl. ¶ 7. The delays affect evidence gathering and legal filings, prejudicing clients' cases and prolonging their detention. *See, e.g.*, Fabian Decl. ¶¶ 8–9; Kazim Decl. ¶ 7; Gorney Decl. ¶ 12.

2.    **Defendants unreasonably restrict outgoing legal calls.**

Given the inability to schedule effective legal calls, Plaintiffs have tried to call their

---

[11] 2025 NDS at 5.4.II.F.

[12] *California City Detention Facility*, U.S. Immigr. and Customs Enf't (Sep. 5, 2025), https://www.ice.gov/detain/detention-facilities/california-city-detention-facility [http://web.archive.org/web/20251008233134/https://www.ice.gov/detain/detention-facilities/california-city-detention-facility] ("California City website").

attorneys directly. Felder-Heim Decl. ¶ 7; Kyle Decl. ¶ 8; Gorney Decl. ¶ 9. This is also rife with problems. ICE policy forbids facilities from restricting the number of legal calls a detained person may make, but California City staff routinely refuse requests for legal calls. Campos Decl. ¶ 44; Montes-Regalado Decl. ¶ 18. Plaintiffs report "long lines to use the phone," with one person estimating there were only "six phones for the more than 80 women in her dorm." Kyle Decl. ¶ 8. Many calls are not toll-free. Gorney Decl. ¶ 9. Nor are they confidential: the phones are located within earshot of guards and other detained individuals, and loud background noise also makes it difficult to converse. Felder-Heim Decl. ¶ 7; Gorney Decl. ¶ 9. Defendants' own policy requires the facility "ensure privacy" for legal calls, "provide a reasonable number of telephones on which detainees can make such calls without being overheard," and "take measures to ensure . . . confidential[ity]."[13] So do California state prison regulations.[14] Lack of privacy means Plaintiffs hesitate to share sensitive information or ask questions, making it difficult for attorneys to gather facts or ensure their clients are adequately informed. Felder-Heim Decl. ¶ 9; Kyle Decl. ¶ 12.

### 3. Defendants restrict in-person legal visits.

In-person legal visits also fail to provide Plaintiffs with reliable and confidential access to counsel. After driving hours to reach the facility, attorneys may need to wait hours for a visit. One attorney, after driving four hours to meet her client at the facility, had to wait an additional four hours before she was allowed to visit. Goss Decl. ¶¶ 4-5, 13. A front desk guard told the attorney that "only one person would be allowed to visit at a time," citing "short-staffing" and concerns about "moving more than one detained person at a time." *Id.* ¶ 10. Another officer told her that visitors should arrive at 7:30am "because after 10:30am . . . it [becomes] much more difficult to get in to visit." *Id.* ¶ 9.[15] The long wait time makes it impractical for attorneys to visit their clients as often as necessary. *See id.* ¶ 21. And in-person legal visitation is not feasible for detainees whose counsel reside outside California. Kyle Decl. ¶ 3.

---

[13] 2025 NDS at 5.4.II.J.

[14] Cal. Code Regs. tit. 15, § 3282(g).

[15] In contrast, Defendants' website states that legal representatives are authorized to visit their clients from 8am to 8pm. California City website.

The facility also impairs confidential communication. Defendants' policies provide that legal visits "are confidential and shall not be subject to auditory supervision."[16] But one attorney has reported that, during her visit, "the door on [the client's] side of the room was open and . . . a guard was standing just outside the door." Goss Decl. ¶ 16. California City additionally has a blanket policy of no-contact visits, meaning that all visits take place across a glass barrier, no matter the individual's security factors or classification level. Pacholke Decl. ¶ 8. This unnecessary restriction hinders effective communication. Goss Decl. ¶ 16. By contrast, in prisons, contact visits are the default, even for high-security individuals. Pacholke Decl. ¶ 9. The California prison system broadly permits confidential contact attorney visits, where the attorney and client can sit together at a table without a partition separating them.[17]

### D. Defendants fail to identify, assess, and accommodate disabilities.

California City has no discernable process for addressing the needs of detained individuals with disabilities. The intake process is deficient and fails to adequately screen for and identify disability needs. Keo Decl. ¶ 37 (no disability questions at intake despite telling staff about need for hearing aid batteries); Guevara Alarcon Decl. ¶ 21 (no disability questions at intake, informed no ADA coordinator at California City); Montes-Diaz Decl. ¶ 17 (no disability questions at intake or any time thereafter, despite reporting right hand injury and lower bunk need); Ruiz Canizales Decl. ¶ 18 (staff walked away when told he is Deaf). Procedures to ensure continuity of disability accommodations likewise appear nonexistent. Durable medical equipment and other reasonable accommodations are frequently confiscated at intake and then not replaced. Detained individuals have been deprived of eyeglasses, hearing aid batteries, and custom orthopedic footwear. Leyva Decl. ¶¶ 9, 15–17; Benavides Zamora Decl. ¶¶ 7, 11; Keo Decl. ¶ 33.

Although people can in theory use the sick call process to request disability accommodations, that process is unavailing in practice: sick call slips are routinely unanswered,

---

[16] 2025 NDS at 5.5.II.G.8.

[17] *Types of Visits*, Cal. Dep't Corr. and Rehab., https://www.cdcr.ca.gov/visitors/types-of-visits/ (last visited Nov. 15, 2025) [http://web.archive.org/web/20251116004609/https://www.cdcr.ca.gov/visitors/types-of-visits/]; *see also* Cal. Code Regs. tit. 15, § 3178(b), (m).

(Wilcox Decl. ¶¶ 72, 74, 76; Singh Decl. ¶ 12), people do not know they can file disability requests that way (Ruiz Canizales Decl. ¶ 99), and Defendants fail to provide the requested accommodations (Juarez Ruiz Decl. ¶ 9). As a result, California City employs no functional system for allowing detained people to request disability accommodations or file disability grievances. *Id.*; *see also* Benavides Zamora Decl. ¶ 13; Keo Decl. ¶ 29; Leyva Decl. ¶ 10; Wilcox Decl. ¶¶ 35–43 (expressing concern about same). For two months, Mr. Ruiz Canizales has been forced to live without sign language interpretation or anyone he can effectively communicate with—despite repeated requests for accommodations. Ruiz Canizales Decl. ¶¶ 29–47. People are inaccessibly housed, forced to walk up stairs or climb onto a top bunk they cannot safely occupy. Montes-Diaz Decl. ¶ 20; Benavides Zamora Decl. ¶ 15; Santos Avalos Decl. ¶ 13. As a result, some with vision and mobility disabilities sleep on the floor. Leyva Decl. ¶ 26. Other disabilities that affect daily life activities go unaddressed. *See* Keo Decl. ¶¶ 28–29; Benavides Zamora Decl. ¶ 16; Guevara Alarcon Decl. ¶¶ 32-34; Juarez Ruiz Decl. ¶ 11; Gomez Ruiz Decl. ¶ 16. These failures have significant effects: Mr. Ruiz Canizales misses out on outdoor recreation and access to medical care—however inadequate—since no one communicates the timing and procedures with him. Ruiz Canizales Decl. ¶¶ 37, 42, 58, 62–65. And the failure to accommodate Mr. Benavides Zamora's mobility disability renders him essentially bedridden. Benavides Zamora Decl. ¶ 16.

## III.    LEGAL STANDARD

A preliminary injunction must issue if Plaintiffs establish that (1) they are "likely to succeed on the merits"; (2) they are "likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in [their] favor"; and (4) "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). In the Ninth Circuit, a stronger showing on one element may offset a weaker showing on another. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). Thus, if Plaintiffs satisfy the irreparable harm and public interest factors, they need only raise "serious questions going to the merits" and show that the "balance of hardships tips sharply in [their] favor." *Id.* at 1135.

IV.    **ARGUMENT**

    A.    **Plaintiffs are likely to succeed on the merits of their claims.**

        1.    **California City's punitive conditions violate the Fifth Amendment.**

Plaintiffs can show worse treatment than their counterparts held in prisons, triggering a presumption of unconstitutional punishment that Defendants cannot rebut. And based on the evidence presented, Plaintiffs would prevail even without the presumption.

Defendants hold Plaintiffs in "civil, not criminal" immigration detention, which must be "nonpunitive in purpose and effect." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). But the detention conditions in California City are similar to or more restrictive than those in state prison. This violates the Fifth Amendment Due Process Clause because those in civil detention "are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Youngberg v. Romeo*, 457 U.S. 307, 322 (1982); *see also Jones*, 393 F.3d at 933 ("[A] civil detainee . . . is entitled to conditions of confinement that are not punitive.").

In Fifth Amendment challenges alleging unconstitutionally punitive detention conditions, courts "presume" a civil "detainee is being subjected to punishment" when he is "confined in conditions identical to, similar to, or more restrictive than, those in which his criminal counterparts are held." *Jones*, 393 F.3d at 932; *see also Doe v. Becerra*, 732 F. Supp. 3d 1071, 1080 n.2 (N.D. Cal. 2024) (concluding *Jones* "applies with equal force in the immigration context"); *Torres v. U.S. Dep't of Homeland Sec.*, 411 F. Supp. 3d 1036, 1064 (C.D. Cal. 2019) (applying *Jones* as the "controlling case" in immigration detention); *Unknown Parties v. Johnson*, 2016 WL 8188563, at *5 (D. Ariz. Nov. 18, 2016) (same). To determine whether the presumption applies, the Court may consider "the relevant conditions of confinement as a whole," including "recreational activities, phone calls, time out of cell, and so on." *Fraihat v U.S. Immigr. & Customs Enf't*, 16 F.4th 613, 649 (9th Cir. 2021).

        a.    **The *Jones* presumption applies in this case.**

Plaintiffs have introduced a thorough evidentiary record showing punitive treatment across all relevant metrics, satisfying the *Jones* presumption: Defendants subject the people they

13

detain at California City to conditions of confinement that are similar to or more restrictive than state prison. As explained above and as set forth in the accompanying declarations, California City is more isolating than prison. *See supra* II.A. Freedom of movement throughout the facility is severely restricted at all levels, and Plaintiffs are locked in small cells all night and for many hours throughout the day. *Id.* During these lock-ins, they lack access to phone calls, tablets, or much of anything to occupy their minds. *Id.* Access to loved ones and the outdoors is severely restricted. *See id.* Visitors drive to the isolated facility and then wait for hours in the lobby, just for a visit through a pane of glass and a telephone that may be cut off after just half an hour. *Id.* To utilize the little outdoors time available, people detained at California City must worry about being groped and humiliated by invasive pat-downs. *See id.*

There are no meaningful educational opportunities, religious services, or programming. *See id.* As several declarants who have spent time in prison directly attest, those in prison benefit from much more programming, social interaction, and sensory stimulation. *See id.* What's more, those detained at California City must survive without basic necessities. *See supra* II.A. For example, the only way to obtain warm clothing is to buy it from the facility's for-profit operator. *See* Guevara Alarcon Decl. ¶ 8. Those who cannot afford it are left shivering in the cold, wearing socks on their arms as makeshift sleeves. *See id.*; Leyva Decl. ¶ 34; Benavides Zamora Decl. ¶ 20; Gomez Ruiz Decl. ¶ 17. Those in prison do not endure the same shortages. *See* Guevara Alarcon Decl. ¶ 8; Rivera-Trigueros Decl. ¶ 15. California City staff also enforce an atmosphere of fear by unnecessarily pepper-spraying and shoving Plaintiffs, and even threatening to use a drill to "make a hole in your chest"—all of which would be improper in a penal setting. *See supra* II.A. Defendants impose solitary confinement to punish those who speak out or for minor infractions. *See* Juarez Ruiz Decl. ¶ 22; Guevara Alarcon Decl. ¶ 37. Even prisons do not use solitary confinement in such a manner. Pacholke Decl. ¶ 43. People at even the lowest security levels are escorted by guards and subjected to body searches any time they leave the housing unit. Llufrio Decl. ¶¶ 7, 14, 15. Such practices are excessive and unusual even in high security prisons. *See* Pacholke Decl. ¶¶ 11–13.

Because people in civil detention are entitled to more considerate treatment than people in

14

1  prison, this mountain of evidence documenting the needlessly harsh conditions in California

2  City—whether borne from malice, incompetence, inadequate staffing and preparation, or some

3  mixture of all these—is more than sufficient to trigger the *Jones* presumption. 393 F.3d at 934.

**b.    No legitimate or non-punitive interest justifies the conditions of confinement at California City.**

6  Where, as here, the *Jones* presumption applies, "the burden shifts to the defendant to show

7  (1) legitimate, non-punitive interests justifying the conditions of . . . confinement and (2) that the

8  restrictions imposed . . . [are] not excessive in relation to these interests." *King v. Cnty. of Los*

9  *Angeles*, 885 F.3d 548, 557 (9th Cir. 2018). Defendants can show neither.

10  To start, Defendants can show no legitimate purpose because they have admitted their

11  purpose is illegitimate. "Statements from senior [government] officials suggest that harsh

12  conditions of confinement are a deliberate feature of the [DHS] enforcement program intended to

13  induce self-deportation and to deter illegal immigration." *Barco Mercado*, 2025 WL 2658779, at

14  *33. Defendants and their political allies have made little secret of their desire to make life as

15  miserable as possible for people in immigration detention, encouraging them to "self-deport" to

16  escape the harsh conditions. Standing alongside Defendant Noem while opening the so-called

17  "Alligator Alcatraz" ICE detention facility in Florida, Governor Ron DeSantis said, "You'll have

18  a lot of people that will deport on their own because they don't want to end up in an Alligator

19  Alcatraz, or some of these other places."[18] President Trump agreed, saying he "couldn't care less"

20  about the conditions in the facility. *Id.* According to the *Associated Press*, Defendant Noem later

21  explained that the federal government "purposefully chose a notorious Louisiana prison to hold

22  immigration detainees as a way to encourage people in the U.S. illegally to self-deport."[19]

23  Thus, the punitive conditions at California City are hardly accidental. They reflect an

[18] Richard Luscombe, *Trump Celebrates Harsh Conditions for Detainees on Visit to 'Alligator Alcatraz'*, The Guardian, Jul. 1, 2025, https://www.theguardian.com/us-news/2025/jul/01/trump-alligator-alcatraz-immigration-florida?CMP=share_btn_url.

[19] Sara Cline, *A Notorious Louisiana Prison was Chosen for Immigrant Detainees to Urge Self-Deportation, Noem Says*, Associated Press, Sept. 3, 2025, https://apnews.com/article/louisiana-immigration-detention-noem-trump-682793a4db4757649cb78b0ea3aa051d?utm_source=copy&utm_medium=share.

express intent to use detention as a deterrent mechanism of immigration enforcement policy. This deterrent purpose demonstrates unconstitutional punishment. *Bell v. Wolfish*, 441 U.S. 520, 539 n.20 (1979) ("Retribution and deterrence are not legitimate nonpunitive governmental objectives."); *Kansas v. Crane*, 534 U.S. 407, 412 (2002) (civil detention cannot be a "mechanism for retribution or general deterrence"); *R.I.L.-R v. Johnson*, 80 F. Supp. 3d 164, 183, 188–89 (D.D.C. 2015) (immigration detention "for the sake of sending a message of deterrence" is "out of line" with Supreme Court precedent).

The record also shows that Defendants can name no legitimate or non-punitive interest to justify the conditions Plaintiffs challenge. Plaintiffs present a declaration from Dan Pacholke, a nationally recognized custody expert who has run a state prison system. Pacholke Decl. He opines that California City "should have substantially less restrictive practices and conditions than prisons, where the population is detained subject to criminal law." *Id.* ¶ 6. Accordingly, "many of the security measures undertaken at [California City] are unnecessary, excessive, and potentially harmful to the people who are detained there." *Id.* ¶ 7; *see also id.* ¶¶ 8–17. Mr. Pacholke describes other restrictions on basic needs—such as the razor restrictions—as "inexplicable," given that the same restrictions do not exist in prison. *Id.* ¶ 19. And "[t]here is no correctional value to [the] restrictions on programming and communication" at California City. *Id.* ¶ 31. Similarly, Defendants' use of force is unjustified: because detained people at California City are held for administrative—rather than criminal—purposes, their custody environment must be guided by the least restrictive means necessary. *Id.* ¶ 37. Defendants' use of force is clearly excessive under that standard. Their use of solitary confinement is even more so: "there is no justification for using solitary confinement as a routine management tool or as a form of punishment" in immigration detention*, id.* ¶ 43, which is precisely what Defendants do here.

### c.    Even if the *Jones* presumption is inapplicable, the restrictions at California City are unconstitutionally punitive.

Even without the *Jones* presumption, Plaintiffs are likely to succeed on their claim that the conditions at California City are unconstitutionally punitive. A restriction is punitive where it is: (1) "intended to punish," (2) "excessive in relation to its non-punitive purpose," or (3) "employed

16

1    to achieve objectives that could be accomplished in so many alternative and less harsh methods."

2    *Fraihat*, 16 F.4th at 647. The harsh conditions in California City satisfy all three definitions.

3    **First**, the conditions at California City are intentionally punitive. Petty acts of punishment

4    and cruelty pervade California City. *See supra* II.A. As explained above, Defendants have

5    admitted an improper, punitive purpose. *See supra* IV.A.1.b.

6    **Second**, Defendants employ restrictions that are excessive in relation to any non-punitive

7    purpose. As explained above, Mr. Pacholke carefully details how Defendants' harsh conditions

8    are untethered from any legitimate governmental purpose. *See supra* IV.A.1.b.

9    **Third**, alternative and less harsh methods are available to achieve whatever legitimate

10    objectives Defendants have. Defendants' own detention standards (the 2025 NDS) provide ways

11    to ensure order without the harsh methods Defendants employ at California City. *See Torres*, 411

12    F. Supp. 3d at 1065 (finding the detention standards for a facility offered "an example of less

13    restrictive alternative measures"); *see also supra* II.A. And prisons regularly operate without

14    resorting to the conditions at California City detailed herein. *Id.*; Pacholke Decl. ¶¶ 11–13.

15    As one district court recently put it when granting a habeas petition based, in part, on the

16    conditions of confinement at California City, "the evidence now before the Court at least suggests

17    several important ways in which the conditions at California City are not only inherently harsh

18    but also worse than the conditions [the plaintiff] faced in state prison." *Doe v. Chestnut*, 2025 WL

19    3240400, at *22 (E.D. Cal. Nov. 20, 2025). The court credited unrebutted evidence regarding,

20    among other things, onerous and unnecessary counts, inadequate time outdoors, filthy and

21    unsanitary conditions, and lack of programming. *Id.* at *21–22. Plaintiffs are likely to succeed on

22    the merits of their claim that Defendants are violating their Fifth Amendment rights by housing

23    them in punitive conditions of confinement.

24          **2.**      **California City's inadequate medical care violates the Fifth
25                 Amendment.**

26    "There is no question that [ICE] detainees are entitled to adequate medical care." *Doe v.*

27    *Kelly*, 878 F.3d 710, 722 (9th Cir. 2017). A civil detainee alleging a violation of that entitlement

28    need not show that the relevant government officials are "subjectively aware that their [actions

are] unreasonable," as a convicted prisoner would under the Eighth Amendment. *Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1120, 1122-25 (9th Cir. 2018). Instead, under the Fifth Amendment, civil detainees' claims of inadequate medical care are assessed under an objective standard. *Id.*

Because the Eighth Amendment sets a higher bar than the Fifth (and Fourteenth) Amendment, deprivations of medical care that violate the rights of people in prison *a fortiori* violate the rights of people in civil detention. *See Castro v. Cnty. of L.A.*, 833 F.3d 1060, 1067 (9th Cir. 2016). These constitutional protections extend to "future harm," including a "condition of confinement that is sure or very likely to cause serious illness and needless suffering in the next week, month, or year." *Helling v. McKinney*, 509 U.S. 25, 33 (1993).

Here, the pervasive and dangerous deficiencies in Defendants' health care system would plainly violate either constitutional standard, and thus Plaintiffs are likely to succeed on their Fifth Amendment medical care challenge.

> a.    **In the prison context, courts routinely find deficient health care systems like California City's unconstitutional.**

Decades ago, the Ninth Circuit set forth the basic requirements for a constitutionally sufficient prison health care system: A prison must "provide a system of ready access to adequate medical care," one in which patients are able "to make their medical problems known to the medical staff," and one where staff is competent enough to diagnose and "treat medical problems or to refer [patients] to others who can." *Hoptowit v. Ray*, 682 F.2d 1237, 1253 (9th Cir. 1982), *overruled on other grounds by Sandin v. Conner*, 515 U.S. 472 (1995); *see also Brown v. Plata*, 563 U.S. 493, 510-11 (2011). When a prison's system for providing health or mental health care fails to meet those basic requirements, courts have no trouble finding an Eighth Amendment violation.

Courts, for example, agree that, to comply with the Constitution, correctional institutions must conduct adequate medical and mental health screenings to identify individuals' health needs and risk factors. *See Coleman v. Wilson*, 912 F. Supp. 1282, 1298 n.10 (E.D. Cal. 1995) (obligations include "a systematic program for screening and evaluating inmates to identify those in need of mental health care"); *Madrid v. Gomez*, 889 F. Supp. 1146, 1205 (N.D. Cal. 1995)

1  (citing "grossly inadequate" intake physical health screenings). Prisons also must ensure that their

2  health care systems support continuity of care, including by providing patients with necessary

3  medications and medical devices. *See Lopez v. Smith*, 203 F.3d 1122, 1132 (9th Cir. 2000)

4  (failure to provide medications violates Eighth Amendment); *Coleman*, 912 F. Supp. at 1309-10

5  ("[D]efendants' supervision of the use of medication is completely inadequate; prescriptions are

6  not timely refilled, there is no adequate system to prevent hoarding of medication, there is no

7  adequate system to ensure continuity of medication, inmates on psychotropic medication are not

8  adequately monitored, and it appears that some very useful medications are not available because

9  there is not enough staff to do necessary post-medication monitoring.").

10  A prison's health care system also must function to timely respond to routine or emergent

11  health care needs to pass muster under the Eighth Amendment. *See Hoptowit*, 682 F.2d at 1253

12  (detention facilities must "provide a system of ready access to adequate medical care," including

13  a means for patients "to make their medical problems known to the medical staff"); *Madrid*, 889

14  F. Supp. at 1206-07, 1257 (concluding prison's sick call system, with significant delays in

15  obtaining access to care or outright denials, utterly failed to ensure "serious medical problems are

16  regularly treated in a timely fashion"). To that end, prison facilities must also have adequate and

17  qualified staff to deliver medical and mental health services to patients. *Plata v. Schwarzenegger*,

18  2005 WL 2932253, at *5-12 (N.D. Cal. Oct. 3, 2005); *Madrid*, 889 F. Supp. at 1257; *Jensen v.

19  Shinn*, 609 F. Supp. 3d 789, 864 (D. Ariz. 2022). Where prison staff cannot meet certain medical

20  needs, they must "refer prisoners to others who can" and such referrals must be "reasonably

21  speedy." *Casey v. Lewis*, 834 F. Supp. 1477, 1544 (D. Ariz. 1993).

22  Plaintiffs' medical expert, Dr. Wilcox, has identified serious, systemic failures in each of

23  these areas: Defendants (1) fail to conduct adequate physical and mental health screenings at

24  intake, *see* Wilcox Decl. ¶¶ 23–68; (2) have no system to ensure that Plaintiffs receive continuity

25  of care, such as continuity of prescription medication for serious conditions, *see id.* ¶¶ 97–109;

26  (3) have no functional process by which Plaintiffs can seek and receive timely non-emergency or

27  emergency medical and mental health care, even when patients require care for urgent health

28  needs, *see id.* ¶¶ 123–29; (4) have failed to staff California City with adequate, qualified staff to

deliver medical and mental health services to patients, as evinced by rushed and disorganized intake screenings, long delays in access to providers, and errors in medical judgment, *see id.* ¶¶ 142–43; and (5) have no means to provide "reasonably speedy" specialty care, *see id.* ¶¶ 111–21.

Where a prison's health care system fails to provide such basic requirements on a systemic level, courts in this Circuit have no trouble finding violations of the Eighth Amendment. *See, e.g.*, *Madrid*, 889 F. Supp. at 1256-57; *Jensen*, 609 F. Supp. 3d at 864. Because Plaintiffs are subject only to civil detention, the deficiencies in California City's health care system more than suffice to show a violation of the Fifth Amendment's less stringent standard. *See Castro*, 833 F.3d at 1067. Plaintiffs are likely to succeed on the merits of this claim.

### b. Medical care at California City is objectively deficient.

Even without relying on Eighth Amendment precedent, Plaintiffs meet the less stringent, objective test applied in the civil detention context. Under that test, Plaintiffs must show:

> (1) [the government] ma[kes] an intentional decision with respect to the conditions under which the plaintiff was confined; (2) those conditions put the plaintiff at substantial risk of suffering serious harm; (3) the [government] did not take reasonable available measures to abate that risk, even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved—making the consequences of the [government's] conduct obvious; and (4) by not taking such measures, the [government] caused the plaintiff's injuries.

*Castro*, 833 F.3d at 1071; *see also Roman v. Wolf*, 977 F.3d 935, 943 (9th Cir. 2020).

As to the first element, a failure to act with respect to a known condition "may constitute an intentional decision." *Guel v. Cnty. of San Bernardino*, 2024 WL 5185331, at *3 (C.D. Cal. Oct. 23, 2024); *see also Castro*, 833 F.3d at 1071 n.4 (first element could be met "where a defendant actually knew of a substantial risk of serious harm and consciously took no action"). Here, the evidence shows that Defendants know detained people need, but are not receiving, adequate care. They have in their possession records of diagnoses and treatment plans for people who have been transferred to California City from other ICE detention facilities. Yet people spend days or weeks without their medications and do not receive previously recommended treatment. For example, even when an emergency room doctor wrote a letter informing Defendants that Mr. Roque Campos urgently needed to see a specialist for his life-threatening

heart conditions, Defendants failed to provide the care—not within the recommended 72 hours, and not at all. Wilcox Decl. ¶¶ 86–89. Defendants also receive sick call requests but do not meaningfully respond, either failing to answer for weeks or not answering at all. *Id*. ¶¶ 71–78. Inconsistent medication, nonexistent specialty services, untimely responses to medical emergency, and inappropriate medical housing all result from Defendants' intentional decision-making. *See, e.g.*, *Ward v. Cnty. of San Diego*, 2025 WL 319250, at *8 (S.D. Cal. Jan. 28, 2025) (failure to screen for and treat medical and mental health care needs on arrival to jail constitute intentional decisions); *Tater v. City of Huntington Beach*, 2023 WL 4291656, at *13 (C.D. Cal. May 8, 2023) (similar).

The second element—requiring a substantial risk of serious harm—is the same under the subjective and objective deliberate indifference standards. *Russell v. Lumitap*, 31 F.4th 729, 739 (9th Cir. 2022). Just as courts have concluded in the Eighth Amendment context, the widespread deficiencies in the current California City "system for the provision of medical and mental health care exposes all [detained people] to a substantial risk of serious harm." *Jensen*, 609 F. Supp. 3d at 872; *see also Brown*, 563 U.S. at 505 n.3 ("Plaintiffs rely on systemwide deficiencies in the provision of medical and mental health care that, taken as a whole, subject sick and mentally ill prisoners in California to substantial risk of serious harm."). Indeed, Dr. Wilcox has expressly opined that the process to access care "is not effective or timely and it puts patients at clear risk of harm." Wilcox Decl. ¶ 15. To the extent patients do receive "care," it is dangerously substandard, with shortages of necessary medications, *id*. ¶ 109, providers who demonstrate "poor judgment" and a failure to "conform[] to the prevailing standard of care," *id*. ¶ 90, and patients in need of specialty care—even those who are "extraordinarily fragile"—not receiving it, *id*. ¶¶ 86, 129.

The third element asks whether a defendant's conduct was "objectively unreasonable" based "on the facts and circumstances of each particular case." *Gordon*, 888 F.3d at 1125 & n.4. While lack of due care is insufficient, a plaintiff need not allege actual awareness of the level of risk. *Id*. A decision to ignore "medical needs, even for less than 24 hours, despite repeated warnings of the severity of [the person's] injury," is sufficient to show objective unreasonableness. *Guel*, 2024 WL 5185331, at *4. Here, Defendants' broken health care system

21

1    has resulted in numerous patients' medical needs being ignored for far longer than 24 hours—in

2    some cases months—despite repeated requests for care. *See supra* II.B.2. Such conduct is

3    objectively unreasonable. *See Ward*, 2025 WL 319250, at *9 (failure to order mental health

4    medications and to take any action despite obvious signs of deterioration was objectively

5    unreasonable); *Fromer v. Cnty. of Riverside*, 2025 WL 819719, at *4 (C.D. Cal. Feb. 4, 2025)

6    (year-long delay in care despite multiple grievances was objectively unreasonable); *Villarreal v.

7    Cnty. of Monterey*, 2018 WL 11606313, at *9 (N.D. Cal. Aug. 21, 2018) (denial of "a meaningful

8    medical assessment" when defendant "knew that [patient] was erratic and was begging for help"

9    was objectively unreasonable).

10        To satisfy the fourth element, a plaintiff need only allege "a sufficiently imminent danger,

11    because a remedy for unsafe conditions need not await a tragic event." *Roman*, 977 F.3d at 943;

12    *Guel*, 2024 WL 5185331, at *5. That makes sense: It "would be odd to deny an injunction to

13    inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that

14    nothing yet had happened to them." *Helling*, 509 U.S. at 33, 34; *see also Brown*, 563 U.S. at 531-

15    32 ("[A]ll prisoners in California are at risk so long as the State continues to provide inadequate

16    care."). Here, based on a thorough and detailed analysis, Dr. Wilcox concluded that "it is not safe

17    to be sick at [] California City." Wilcox Decl. ¶ 9. The risk of harm is clear and present.

18        **3.    Defendants' denial of access to counsel at California City violates the
           First and Fifth Amendments.**

19

20        **a.    Defendants' conduct violates the First Amendment.**

21        Defendants' limitations on attorney-client communications are unreasonable restrictions

22    that infringe on the First Amendment rights of the Plaintiffs. Detained individuals retain their

23    First Amendment rights, *see Valdez v. Rosenbaum*, 302 F.3d 1039, 1048 (9th Cir. 2002), which

24    includes the "right to hire and consult an attorney," *Eng v. Cooley*, 552 F.3d 1062, 1069 (9th Cir.

25    2009), and "the right to communicate with persons outside prison walls." *Valdez*, 302 F.3d at

26    1048. Defendants' "overly restrictive" policies that hinder detained immigrants' ability to "hire

27    and consult with an attorney" violate their First Amendment right to "communicate with the

28    outside world." *Torres*, 411 F. Supp. 3d at 1067. The facts here—weeks-long delays in

scheduling legal calls, long wait times for in-person visits, time-limited calls, lack of information provided to Plaintiffs on how to schedule confidential attorney calls, and lack of confidentiality, all documented by numerous declarations, *see supra* II.C—establish that Defendants are imposing an inappropriate burden on the attorney-client relationship, in violation of the First Amendment.

In the prison context, courts employ the four-factor test set out in *Turner v. Safley*, 482 U.S. 78, 89–91 (1987), to determine whether prison restrictions on communication are "reasonably related to legitimate penological interests" such that they do not violate the First Amendment. *Turner* does not apply in civil detention.[20] But even under the more restrictive *Turner* test, Defendants' conduct violates Plaintiffs' First Amendment rights.

***First***, no legitimate government interest supports the extensive restrictions imposed by Defendants at California City, nor can Defendants show a "rational connection" between the restrictions and any legitimate interest. *Turner*, 482 U.S. at 89. To start, Defendants' own standards allow (and *require*) greater access. *See supra* II.C.1. But standards aside, such severe communication restrictions lack a reasonable relationship to governmental interests in order and security, the oft-invoked governmental interests in these cases. Other courts that have looked at attorney access restrictions in immigration settings have concluded as much. In *Torres*, for example, people in immigration detention challenged restrictions similar to those imposed here: denial of confidentiality during legal calls, limitations on the duration of calls, phone connectivity issues, and long wait times for attorney visits. *See* 411 F. Supp. 3d at 1045. The court there "discern[ed] only a weak connection between the alleged restrictions and legitimate security concerns." *Id.* at 1068; *see Barco Mercado*, 2025 WL 2658779, at *35 (no legitimate interest justifying the facility's severe phone restrictions, which blocked detainees from obtaining "appropriate, timely, and confidential legal assistance"). Indeed, consistent and confidential

---

[20] *Turner* concerned the rights of convicted prisoners. As the Supreme Court has consistently held, immigration proceedings—including detention—are civil rather than criminal proceedings. *See Zadvydas*, 533 U.S. at 690. And the Supreme Court has unequivocally held that civil detainees "are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Youngberg*, 457 U.S. at 321–22. Employing the *Turner* test to the constitutional rights of civil immigration detainees would violate the careful distinction the Supreme Court has drawn between civil detainees and those serving criminal sentences. *See Demery v. Arpaio*, 378 F.3d 1020, 1028–29 (9th Cir. 2004).

communication with counsel is "critical for institutional safety or order." Pacholke Decl. ¶ 12.

Nor can Defendants blame inadequate staffing or facilities for the lack of access to counsel. As the court in *Barco Mercado* explained, ICE "may not properly choose a facility that is unfit for a particular purpose and then use the inadequacies of the facility as a justification to deprive detainees of meaningful, confidential access to legal counsel to the extent demanded by the Constitution." 2025 WL 2658779, at *34.

*Second*, the conditions at California City make it impossible for detained people to consult attorneys in a timely and confidential manner, *see supra* II.C, such that Plaintiffs lack "alternative means" to exercise their First Amendment rights. Similar widespread restrictions across telephone access and in-person legal visits led the *Torres* court to conclude that the second factor favored Plaintiffs. *Torres*, 411 F. Supp. 3d at 1067-68. This case is no different.

*Third*, obvious alternatives exist. Defendants' own policies serve as "ready alternatives." *Turner*, 482 U.S. at 90; *see generally* 2025 NDS at 5.4-5.5. As the *Torres* court explained, these detention standards "provide less restrictive policies that would allow [immigration detainees] to exercise their communication rights and would also satisfy legitimate government interests in order and security." 411 F. Supp. 3d at 1068.

*Fourth*, these alternatives would negligibly impact resource allocation. *See id*. If Defendants argue that complying with their own standards would cause them to expend more resources, that argument fails. *See Barco Mercado*, 2025 WL 2658779, at *35.

### b. Defendants' conduct violates the Fifth Amendment.

Defendants' restrictions on attorney access are also punitive and as such violate the substantive due process rights of the Plaintiffs under the Fifth Amendment. As set out above, *see supra* IV.A.1, the test for determining whether a condition of confinement—here, restricted attorney access—constitutes punishment asks whether a presumption of punitive detention has been established by showing a defendant holds a plaintiff in civil detention "in conditions identical to, similar to, or more restrictive than, those in which his criminal counterparts are held," and if so, whether the government can show a legitimate non-punitive interest justifying those conditions. *Jones*, 393 F.3d at 932. In the alternative, Plaintiffs can succeed on this claim if they

24

1    can show that the restrictions are "employed to achieve objectives that could be accomplished in

2    so many alternative and less harsh methods." *Jones*, 393 F.3d at 932.

3          Here, Plaintiffs present facts that raise a presumption of punitiveness because the access

4    restrictions here are less "considerate" than those at criminal facilities. *See Torres*, 411 F. Supp.

5    3d at 1064-65. The California state prison system allows for greater attorney access through both

6    contact attorney visits and confidential legal consultations. *See supra* II.C.3; *see also generally*

7    Cal. Code Regs. tit. 15, § 3178. By contrast, California City has a blanket policy against contact

8    attorney visits, fails to ensure confidentiality, fails to tell detained people how to schedule legal

9    calls, and imposes long delays in scheduling legal visits. *See supra* II.C. The *Jones* presumption is

10    therefore triggered. Of note, several courts, when weighing similar access challenges brought by

11    people in immigration detention, have also applied the *Jones* presumption. *See Torres*, 411 F.

12    Supp. 3d at 1064 ("Plaintiffs' allegations are sufficient to create a presumption of punitiveness.");

13    *SPLC v. U.S. Dep't of Homeland Sec.*, 2020 WL 3265533, at *30 (D.D.C. June 17, 2020)

14    (defendants' failure to argue that "current restrictions and conditions surrounding access to

15    counsel are less restrictive than those" applicable to prisons supported conclusion that "that these

16    conditions are likely to be punitive").

17          Defendants cannot rebut the presumption. As explained in detail above in connection with

18    the First Amendment access to counsel claim, *see supra* IV.A.3.a, no legitimate governmental

19    purpose supports the facility's restrictions on attorney access. And here, again, several courts

20    have concluded that the existence of these alternatives, including Defendants' own 2025 National

21    Detention Standards, satisfy the showing of punitive conditions under the Fifth Amendment. *See*

22    *Torres*, 411 F. Supp. 3d at 1065; *SPLC*, 2020 WL 3265533, at *28–30; *Ams. for Immigrant Just.*

23    *v. U.S. DHS*, 2023 WL 1438376, at *14, *16–17 (D.D.C. Feb. 1, 2023).

24          Even in the absence of the *Jones* presumption, these facts establish that the attorney access

25    restrictions at California City are "employed to achieve objectives that could be accomplished in

26    so many alternative and less harsh methods." 393 F.3d at 932.

27          **4.    Defendants' conduct violates the Rehabilitation Act.**

28    Defendants' failure to ensure people with disabilities are appropriately accommodated in

25

detention violates Section 504 of the Rehabilitation Act, 29 U.S.C. § 794. Section 504 requires a Plaintiff to show that: "(1) he is an individual with a disability; (2) he is otherwise qualified to receive the benefit; (3) he was denied the benefits of the program [or activity] solely by reason of his disability; and (4) the program [or activity] receives federal financial assistance." *Updike v. Multnomah Cnty.*, 870 F.3d 939, 949 (9th Cir. 2017).

Elements (1), (2) and (4) are easily met here. The putative subclass is defined so all members are individuals with disabilities under the Act. *See* 29 U.S.C. § 705(20)(B); 42 U.S.C. § 12102; Am. Complaint, Doc. 15, ¶¶ 255, 291. Putative subclass members are "otherwise qualified" to receive the services and benefits of California City Detention Facility operations so long as they are detained at the facility. *See* 28 C.F.R. § 39.103; *Updike*, 870 F.3d at 951 (noting parties' agreement that "as a detainee at the detention facility" an individual with a disability was "otherwise qualified" under the Rehabilitation Act "to receive the services and benefits of the public entity"); *Hernandez v. Cnty. of Monterey*, 110 F. Supp. 3d 929, 954–55 (N.D. Cal. 2015).[21] The fourth factor is met where the program or activity is "conducted by any Executive agency," such as Defendant ICE. 29 U.S.C. § 794(a).

Defendants systematically deny Plaintiffs disability accommodations, preventing them from accessing California City's programs, activities, and operations, and satisfying the third element of the Rehabilitation Act claim. Defendants do this in at least four ways.

***First***, Defendants do not have a functional system for identifying and tracking disability needs. Disability law imposes "an affirmative duty to assess the potential accommodation needs of inmates with known disabilities who are taken into custody and to provide the accommodations that are necessary for those inmates to access the prison's programs and services." *Pierce v. D.C.*, 128 F. Supp. 3d 250, 272 (D.D.C. 2015) (Brown Jackson, J.); *see also Armstrong v. Brown*, 857 F. Supp. 2d 919, 933 (N.D. Cal. 2012) (finding that a system-wide failure to identify and track the disability needs of state prisoners held in county jails resulted in widespread violations of disability rights), *aff'd*, 732 F.3d 955 (9th Cir. 2013); *Armstrong v.*

---

[21] *Hernandez* addressed the Americans with Disabilities Act, which is interpreted "coextensively" with Section 504. *Payan v. Los Angeles Cmty. Coll. Dist.*, 11 F.4th 729, 737 (9th Cir. 2021).

*Davis*, 275 F.3d 849, 859 (9th Cir. 2001) (upholding injunction requiring parole board "to identify . . . which prisoners have a disability, create and maintain a system for tracking disabled prisoners and parolees, and provide them with accommodations"), *abrogated on other grounds by Johnson v. California*, 543 U.S. 499 (2005). Defendants disregard this duty. Dr. Wilcox concluded that "the initial screening at California City fails to effectively identify people with disabilities or timely provide the accommodations they require." Wilcox Decl. ¶ 35; *see supra* II.D. Defendants cannot avoid their obligation to provide disability accommodations by refusing to collect information about disability needs.

In many cases, Defendants fail to identify disability needs at all. For example, Alfonso Leyva was not asked any questions about his disability needs at intake, and his eyeglasses were confiscated even though he explained his need for them. Leyva Decl. ¶¶ 9–10. Without them, he was unable to see directly in front of him. He was provided no other vision accommodation and assigned to an inaccessible top bunk. As Dr. Wilcox explained, "Mr. Leyva should have been provided with the simple accommodations of having his glasses and placing him on a bottom bunk . . . The consequence of [not doing so] is that Mr. Leyva suffered a fall from his top bunk which resulted in a significant head injury and head laceration," which medical records indicate is likely a "basilar skull fracture" that puts Mr. Leyva at "at risk for serious medical complications" and "required two separate send-outs to the emergency department." Wilcox Decl. ¶¶ 37–38.

Even when Defendants note people's disabilities in medical records (which they do inconsistently and non-comprehensively), they fail to (a) ensure the information is accurate, (b) circulate that information to staff, and (c) ensure those disability needs are accommodated. For example, Mr. Ruiz Canizales' medical records indicate that he is "Deaf, nonspeaking." But they also state that the "communication barrier" is overcome because staff "Obtained written responses from detainee." Wilcox Decl. ¶¶ 40, 45. This is false; Mr. Ruiz Canizales requires sign language interpretation and does not effectively communicate in writing. Ruiz Canizales Decl. ¶ 32. As Dr. Wilcox concluded, "there is no indication in his medical records that staff routinely provide sign language interpretation or have any system in place to ensure actual effective communication." Wilcox Decl. ¶ 40. Indeed, Mr. Ruiz Canizales reports that some staff do not

27

know he is Deaf, and others simply shrug or walk away when he indicates he cannot understand them or asks for an interpreter. Ruiz Canizales Decl. ¶¶ 27–28, 38.

**Second**, Defendants lack a functional disability grievance or request system, preventing people from accessing the disability accommodations they need. *See supra* II.D. Indeed, where Plaintiffs manage to request accommodations in writing and verbally, Defendants have ignored or denied them, resulting in a denial of the accommodations they need. *See id.* This Court has found that the lack of a functioning grievance system led to violations of disability rights. *Armstrong*, 857 F. Supp. 2d at 932–33. The failure to respond to disability requests may also constitute intentional discrimination against people with disabilities. *See Updike*, 870 F.3d at 954.

**Third**, even when people self-report disability needs, California City lacks a system to evaluate those needs and assess and provide appropriate accommodations. For example, Mr. Keo arrived at California City with a self-reported knee injury that impacted his mobility. Dr. Wilcox "found no records that Mr. Keo's knee injury was evaluated at California City, or that staff ever assessed his need for mobility accommodations, including an orthopedic device." Wilcox Decl. ¶ 39. In fact, Mr. Keo arrived to California City from another ICE facility where he had pending specialty encounters with a neurologist, an ear-nose-and-throat doctor, an orthopedist, a hand/finger specialist, and an ophthalmologist. *Id.* ¶ 113. Each of these conditions has associated disability accommodation needs. However, all of these specialty appointments were cancelled when Mr. Keo came to California City and he was told by the doctor that he would have to live with the pain he is experiencing. *Id.*; Keo Decl. ¶¶ 21–27. As then-Judge Ketanji Brown Jackson has held, the government "violate[s] Section 504 . . . as a matter of law when it fail[s] to evaluate [a person's] need for accommodation," notwithstanding factual disputes about what his requests and needs are. *Pierce*, 128 F. Supp. 3d at 267–68.

**Fourth**, as a result of these system failures, Defendants have left Plaintiffs and class members without the hearing, vision, mobility, and other accommodations they require to participate in the "fundamentals of life" in detention and to navigate the structurally inaccessible facility. *Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1068 (9th Cir. 2010). People with mobility disabilities are denied canes, special shoes, braces and other accommodations such that

28

they cannot walk without pain, and are forced to forego outdoor recreation and even remain in their cells most of the day. People with hearing disabilities are denied hearing aid batteries and sign language interpreters, meaning people like Mr. Ruiz Canizales miss announcements and live in total communication isolation. People with vision and mobility disabilities are assigned to the top bunk, forcing them to choose between sleeping on the floor or risking serious injuries from falls. *See supra* II.D. Each of these Plaintiffs and putative subclass members has suffered from Defendants' systematic failure to implement appropriate systems to identify, track, and accommodate disabilities that would allow them to live safely and participate in the daily operations of the facility. Thus, Plaintiffs satisfy the third element of the Rehabilitation Act claim and are likely to succeed on the merits of that claim.

### B. Plaintiffs have established that they are suffering irreparable harm.

People detained at California City suffer irreparable harm each day they are subjected to its dangerous and punitive conditions. The deprivation of constitutional rights itself "unquestionably constitutes irreparable injury." *Melendres*, 695 F.3d at 1002. But Plaintiffs also suffer severe physical harms from the denial of critical treatment and services. "[S]ubpar medical and psychiatric care in ICE detention facilities" constitute "irreparable harms" for detained immigrants like Plaintiffs, putting some in literal life-or-death situations. *Hernandez v. Sessions*, 872 F.3d 976, 994–95 (9th Cir. 2017). The risk of such irreparable harm is heightened for Plaintiffs, who face "imminent risk to their health, safety, and lives." *Barco Mercado*, 2025 WL 2658779, at *24. For example, Defendants' denial of Mr. Roque Campos' medication puts him at risk of heart attack, stroke, or sudden death. Wilcox Decl. ¶ 90. Their denial of Mr. Viera-Reyes's specialist appointment risks his likely cancer spreading throughout his body. *Id.* ¶ 116. And their failure to manage Mr. Gomez Ruiz's chronic medical conditions risks an amputation of his foot. *Id.* ¶ 89. Punitive detention also irreparably harms Plaintiffs and may cause psychological and physical injury. *See Johnson v. Wetzel*, 209 F. Supp. 3d 766, 781 (M.D. Pa. 2016).

Plaintiffs face irreparable harm from Defendants' denial of meaningful access to counsel, which is critical given "the complexity of immigration procedures, and the enormity of the interests at stake." *Ardestani v. I.N.S.*, 502 U.S. 129, 138 (1991).

29

1    Likewise, Defendants' failures to accommodate people with disabilities causes

2  "irreparable harm through access exclusion and lack of sign language interpreters." *Cnty. of*

3  *Monterey*, 110 F. Supp. 3d at 956. Dr. Wilcox concluded that these failures "interfere[] with the

4  delivery of medical care" and have "resulted in physical injury and mental anguish." Wilcox

5  Decl. ¶¶ 36, 43. In the case of Mr. Leyva, Defendants' refusal to provide a bottom bunk to

6  accommodate his disability led him to fall, causing him to exhibit symptoms of a basilar skull

7  fracture and "the potential for a brain bleed or other cranial pathology due to the trauma." *Id.*

8  ¶ 128. In addition, courts will find irreparable harm sufficient to issue an injunction under the

9  Rehabilitation Act where, as here, Plaintiffs have "declared that they submitted requests for

10  reasonable accommodations" to officials who "never responded." *Tyson v. City of San*

11  *Bernardino*, 2024 WL 3468832, at *7 (C.D. Cal. Jan. 12, 2024).

12    **C.    The balance of hardships and the public interest favor an injunction.**

13    The third and fourth factors—the balance of hardships and the public interest—"merge

14  when the Government is the opposing party." *Roe v. Critchfield*, 137 F.4th 912, 922 (9th Cir.

15  2025). "[I]t is always in the public interest to prevent the violation of a party's constitutional

16  rights." *Melendres*, 695 F.3d at 1002. Whatever Defendants' excuses and justifications for the

17  conditions in California City may be, the grave risks Plaintiffs face significantly outweigh any

18  government interests. *See Harris v. Bd. of Supervisors, L.A. Cnty.*, 366 F.3d 754, 766 (9th Cir.

19  2004) (holding the interest in avoiding "preventable human suffering" "decidedly" outweighs the

20  government's "financial concerns"). Moreover, those held in immigration detention "are

21  members of the community, and their interests, too, must be included in assessing the public

22  interest." *Tyson*, 2024 WL 3468832, at *8 (discussing people experiencing homelessness). And as

23  the Ninth Circuit has held, "[o]ur society as a whole suffers when we neglect" the most

24  vulnerable people in our community, "or when we deprive them of their rights or privileges."

25  *Lopez v. Heckler*, 713 F.2d 1432, 1437 (9th Cir. 1983).

26  **V.    CONCLUSION**

27    For the foregoing reasons, Plaintiffs respectfully request that the Court enter the

28  [Proposed] Order Granting Plaintiffs' Motion for Preliminary Injunction, filed herewith.

Dated:  December 1, 2025

Respectfully submitted,

| /s/ *Cody S. Harris* | /s/ *Margot Mendelson* |
|---|---|
| KEKER, VAN NEST & PETERS LLP | PRISON LAW OFFICE |
| STEVEN P. RAGLAND | TESS BORDEN |
| CODY S. HARRIS | MARGOT MENDELSON |
| CARLOS C. MARTINEZ | PATRICK BOOTH |
| | ALISON HARDY |
| | RANA ANABTAWI |
| | |
| CALIFORNIA COLLABORATIVE FOR | AMERICAN CIVIL LIBERTIES UNION |
| IMMIGRANT JUSTICE | FOUNDATION |
| PRIYA ARVIND PATEL | KYLE VIRGIEN |
| MARIEL VILLARREAL | FELIPE HERNANDEZ |
| | MARISOL DOMINGUEZ-RUIZ |
| | CARMEN IGUINA GONZALEZ |

*Attorneys for Plaintiffs*

31