KEKER, VAN NEST & PETERS LLP
STEVEN P. RAGLAND - # 221076
sragland@keker.com
CODY S. HARRIS - # 255302
charris@keker.com
CARLOS C. MARTINEZ - # 354616
cmartinez@keker.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone:    415 391 5400
Facsimile:    415 397 7188

CALIFORNIA COLLABORATIVE FOR
IMMIGRANT JUSTICE
PRIYA ARVIND PATEL - # 295602
priya@ccijustice.org
MARIEL VILLARREAL - # 317048
mariel@ccijustice.org
1999 Harrison Street #1800
Oakland, California 94612
Tel: (650) 762-8990

PRISON LAW OFFICE
MARGOT MENDELSON - # 268583
mmendelson@prisonlaw.com
TESS BORDEN - MJP # 805022, *pro hac vice*
tess@prisonlaw.com
PATRICK BOOTH - # 328783
patrick@prisonlaw.com
ALISON HARDY - # 135966
ahardy@prisonlaw.com
RANA ANABTAWI - # 267073
rana@prisonlaw.com
1917 Fifth Street
Berkeley, California 94710-1916
Tel.: (510) 280-2621

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
KYLE VIRGIEN - # 278747
kvirgien@aclu.org
FELIPE HERNANDEZ - # 338468
npp_fhernandez@aclu.org
MARISOL DOMINGUEZ-RUIZ - # 345416
mdominguez-ruiz@aclu.org
425 California Street, 7th Floor
San Francisco, CA 94104
Tel.: (415) 343-0770

CARMEN IGUINA GONZALEZ - # 277369
ciguinagonzalez@aclu.org
915 15th Street, NW, 7th Floor
Washington, DC 20005
Tel.: (202) 393-4930

*Attorneys for Plaintiffs Fernando Gomez Ruiz, Fernando Viera Reyes, Jose Ruiz Canizales, Yuri Alexander Roque Campos, Sokhean Keo, Gustavo Guevara Alarcon, Alejandro Mendiola Escutia and all others similarly situated*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FERNANDO GOMEZ RUIZ; FERNANDO VIERA REYES; JOSE RUIZ CANIZALES; YURI ALEXANDER ROQUE CAMPOS; SOKHEAN KEO; GUSTAVO GUEVARA ALARCON; and ALEJANDRO MENDIOLA ESCUTIA, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. IMMIGRATION AND CUSTOMS | Case No. 3:25-cv-09757-MMC<br><br>**DECLARATION OF DAN PACHOLKE IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:        January 9, 2026<br>Time:        9:00 a.m.<br>Dept.:        Ctrm. 7 – 19th Floor<br>Judge:        Hon. Maxine M. Chesney<br><br>Date Filed:  November 12, 2025 |

1    ENFORCEMENT; TODD M. LYONS,
     Acting Director, U.S. Immigration and
2    Customs Enforcement; SERGIO
     ALBARRAN, Acting Director of San
3    Francisco Field Office, Enforcement and
     Removal Operations, U.S. Immigration and
4    Customs Enforcement; U.S. DEPARTMENT
     OF HOMELAND SECURITY; KRISTI
5    NOEM, Secretary, U.S. Department of
     Homeland Security,
6
                   Defendants.
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

I, Dan Pacholke, hereby declare:

**I.    BACKGROUND**

1.    I have more than 35 years of experience, training, and education in the field of adult institutional corrections. This experience includes over three decades as an employee of the Washington State Department of Corrections (DOC). In the Washington DOC, I worked as a Correctional Officer (2.5 years), Lieutenant (3 years), Captain (6 years), Superintendent (5 years), Director of Performance Management (4 years), and spent eight years in administration (Deputy Director Prisons, Director Prisons, Deputy Secretary, and Secretary). In the capacity of Secretary, I oversaw all aspects of the Department's operations.

2.    I have been a consultant with the National Institute of Corrections and New York University and have published a number of articles related to the field. I co-authored a book and field guide on prison safety, Keeping Prisons Safe, and co-designed the WADOC CORE training program and the Correctional Officer Achievement Program.

3.    I have also served as a consultant and expert on correctional practices in over 20 states and four jurisdictions outside of the continental United States. In that capacity, I have offered testimony about a wide range of custodial practices and issues, including the use of force, restrictive housing practices, and housing and classification practices. My resume, rate of compensation, and expert consulting experience that required deposition or courtroom testimony is attached as Appendix A.

**II.    METHODOLOGY**

4.    The following documents were reviewed in forming my opinions:

      a.    Declarations of Sokhean Keo, Jose Ruiz Canizales, Jonathan Jair Montes-Diaz, Gustavo Guevara, Fernando Viera Reyes, Esteban Alvarez Mora, Edgar Giovanni Neri Vandez, Dennis Rivera-Tigueros, Daler Singh, Alejandro Mendiola Escutia, Fernando Gomez Ruiz, Oneil Guthrie, Yuri Alexander Roque Campos, Alfonso Leyva, Alejo Juarez Ruiz, Daniel Elias Benavides Zamora, Hilario Montes Regalado, and Julio Santos Avalos

b.   CoreCivic California City Immigration Processing Center, Detainee

Handbook

c.   Commissary prices Cal City (8/30/25)

d.   National Detention Standards, Revised 2025

## III.    FINDINGS AND CONCLUSIONS

### *General Security Measures*

5.      Maintaining safety and security in a secure facility is necessary for the wellbeing of staff and detained people. Security practices and reasonable living conditions should be employed to maintain the safety of the people who live and work in the secured environment. Living conditions are broadly defined as access to health care, nutritious food, clothing that is clean and in good repair, temperature control to prevent cold or excessive heat. When living conditions are maintained in a reasonable manner, it enhances the overall security of the facility. The absence of decent living conditions can create an underlying hostility towards the staff who work and manage the facility and drive up mental health needs among the population.

6.      Unlike people in prisons, people at California City Detention Facility are detained under civil law. They are in custody solely for alleged violations of civil immigration law. From a correctional perspective, such a facility should have substantially less restrictive practices and conditions than prisons, where the population is detained subject to criminal law, either awaiting adjudication of a crime or because a court has found them guilty of a crime. The California City Detention Facility has a highly secure outer perimeter, which mitigates escape concerns while allowing the management of the facility to occur similar to a minimum-security prison.

7.      From my review of the current practices at California City, I conclude that many of the security measures undertaken at the facility are unnecessary, excessive, and potentially harmful to the people who are detained there. The practices in many cases are more extreme and restrictive than those employed in prisons, where the population is detained subject to criminal law.

8.      For example, the California City Detention Facility handbook states that all visitation at the facility takes place across a plexiglass barrier. This includes both family

DECLARATION OF DAN PACHOLKE IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION
Case No. 3:25-cv-09757-MMC

visitation and legal visitation. To my knowledge, this is a blanket policy at California City that applies to everyone in custody, regardless of individual security factors or classification status. It is my understanding that visitation at California City is limited to between 30 minutes and one hour. I also understand that the California City Handbook states that only three people over the age of two may visit at a time.

9.      The prohibition on contact visits at California City is far more restrictive than necessary and not standard even for people at high security levels in most prisons. In prisons, the use of plexiglass barriers in prisons is generally reserved for people placed in disciplinary settings for adjudicated violations of prison rules. In my experience, no-contact visits are earned through negative behavior and placement in segregation units. In a minimum-security prison yard, which one would expect to be more restrictive than a civil immigration detention facility, contact visits are routine.

10.      Restrictions on visitation are harmful and counterproductive when not necessary to maintain institutional security. Correctional administrators generally encourage contact visits where possible because contact with loved ones supports the well-being and mental health of the incarcerated population. It allows them to discuss personal issues with someone they love and respect. Being able to hug your child and maintain contact with loved ones promotes emotional wellness and can serve as a reminder that there are people on the outside who care about them. Conversely, being forced to communicate with your loved ones across glass can intensify feelings of alienation and distress. For that reason, the Washington State Department of Corrections expressly makes "reasonable efforts … to ensure visiting facilities are comfortable, pleasant, and permits informal communication and limited, appropriate physical contact." Limiting the length of visitation to one hour is not valuable from a correctional practice; it is more likely driven by resource or staffing constraints. Resource or staffing constraints are not a legitimate reason to limit visitation. Rather than limiting visitation, the facility should take steps to decrease the number of people it holds or increase staffing until the correct level of staffing exists for the current population.

DECLARATION OF DAN PACHOLKE IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

11. I understand that California City has a policy of requiring all detained people to be escorted when they are outside of their housing units. In my view, that policy is excessive for people who are civil detainees and does not meaningfully improve the safety and security of the facility. In a correctional setting, escort requirements are typically reserved for individuals who pose a demonstrated security risk based on their specific conduct. Applying this level of restriction universally—to all civil detainees, regardless of behavior or risk level—exceeds what is necessary to maintain order in a civil-detention setting. A blanket escort requirement like this facility imposes also has the effect of dramatically restricting freedom of movement, delaying access to medical appointments, limiting legal visits and calls, limiting personal visits, and reinforcing a custodial atmosphere indistinguishable from a prison. That practice also consumes significant staff resources that could be better used on active supervision, programming, and engagement.

12. Requiring escorts for any movement throughout the facility impacts detained people's ability to meet with their attorneys. From an operational perspective, communication with legal counsel and access to outside information is critical for institutional safety or order. When people in correctional settings are provided consistent and confidential attorney access, it generally reduces frustration, confusion, and distrust among detainees. Regular contact with counsel also permits people who should not be held at a facility to seek release, and improves oversight by allowing people to communicate problems at the facility to their lawyers, who can raise them with oversight agencies or the courts. People in correctional settings should be afforded a variety of ways to make regular, confidential contact with their legal counsel, including legal mail, in-person visits, video calls, and phone calls. To that end, prisons have developed formal structures to ensure that people have robust access to their attorneys.

13. I understand that California City's practice is to perform clothed body searches (pat downs) of every person who leaves the dayroom, even if they are simply going to the outdoor recreation yard that is attached to the housing unit. This is not a standard correctional practice, even in large prisons with people at high security levels. This practice is excessive and outside widely accepted practices in prisons for the subset of the population that is full minimum.

In higher classifications, with the exception of maximum, conducting random check pat searches is the more common practice to deter the introduction of contraband.

14.     A blanket practice of universal clothed body searches is unnecessary to maintain the security of the facility. It disincentives people from going outdoors because these searches are invasive. For some people, body searches trigger memories of traumatic life experiences. For these reasons, body searches should be sparingly and used where necessary based on specific information about the risk of contraband in a particular unit.

15.     Body searches are also time-consuming for staff, reducing staff's availability to supervise the population, perform security routines, facilitate programming, escort people to medical appointments, and facilitate visitation. This can harm the detained population by reducing opportunities for prosocial activity. Activity helps people manage the stress of being detained and the more people are left to themselves, the more staff must watch for signs of mental decompensation.

16.     I am also informed that the practice at California City is to undertake at least four counts of the population during waking hours. I understand that while count is underway, people are confined to their cells and not able to use phones or tablets because they are disallowed in cells. In corrections, formal counts, informal counts, and picture counts occur routinely in facilities. Count routines are developed so that during the day time, the facility has time to conduct hearings, meet with people in custody, allow programs to occur, etc. Excessive counting during the daytime simply limits the business that occurs during the day and can amplify frustration.

17.     It is a primary function of any 24/7 facility to keep track of the population and account for their whereabouts. It is not necessary to conduct four counts during waking hours in order to achieve that objective. Midday counts are disfavored by correctional administrators because they interfere with programming. In my experience running prisons, running one or two daytime counts has been sufficient to ensure institutional security. It is my understanding that California City is situated behind several layers of fencing and the risk of escape is extremely low for this population of civil detainees.

5

### *Basic Needs*

18.      Maintaining a clean facility in good working order is a core expectation of any detention facility. People in custody are entitled to conditions that are hygienic and safe and reflect basic decency. This means providing adequate cleaning supplies or ensuring that all parts of the facility are regularly cleaned, ensuring that plumbing and electricity are in good working order, and promptly resolving infestations of pests or insects.

19.      Ensuring that people in custody can maintain their personal hygiene is also essential. I am informed that people at California City are not permitted to have safety razors in their cells to groom themselves. This is an inexplicable restriction. Everyone at every security level gets a razor in the prisons I have overseen; the few exceptions are for people with documented safety risks or maximum-security detainees, for whom electric razors are provided as an alternative. As with anyone, people in custody feel better when they can choose to be clean-shaven, showered, and in their minds, presentable.

20.      I am informed that due to the blanket restriction on the use of safety razors in cells, people at California City share communal razors. This is dangerous and unhygienic, creates unnecessary blood and bodily fluid risks, and certainly not a standard correctional practice.

21.      Similarly, I am informed that California City only allows people to use three-inch long toothbrushes. This too is an excessive restriction. In the absence of a particularized security concern, there is no reason to think that people in civil detention cannot safely use full-sized toothbrushes. In my experience, prisons provide standard-sized toothbrushes.

22.      I understand that people in California City describe being very cold much of the time. The commissary form shows that a sweatshirt costs around $20. Weather-appropriate clothing should be standard issue, a part of the cost of detaining people. Asking detainees to purchase items to stay warm is inhumane, especially given that their families are most likely struggling financially if the detainees were a bread-winner. Given the vast amount of money the federal government is committing to detain people, the cost of appropriate and necessary clothing is miniscule in comparison. There is no defensible reason to do this, let alone

1    correctional. Not only is this cruel; it is counterproductive to the interests of a secure facility to

2    leave people cold and unable to meet their basic needs.

3        23.    I am also informed that many people at California City report being hungry

4    because of inadequate portion sizes and having concerns about the quality of the water.

5    Providing sufficient nutrition is a core function of any correctional system. There is no

6    justification for denying adequate food and clean water. When correctional systems do not

7    provide people adequate food or water, people must supplement their meals with commissary. I

8    understand that commissary prices at California City are high, which would make it difficult for

9    people to supplement their meals.

10    ***Idleness and Lack of Recreation***

11        24.    I understand that people at California City spend most of the hours of each day

12    inside their housing units. I am informed that there are very limited opportunities for

13    programming and organized recreational activity. California City reportedly does not have

14    educational or recreational programming.

15        25.    I am told that in-person religious services at California City are very limited. In

16    my career in corrections, there was never a question as to whether prisoners would have access

17    to religious services. It is their right. It is egregious and indefensible that civil detainees would

18    have less access to practice their faith than prisoners. Denying access to religious practice also

19    leads to significant issues with detainee morale.

20        26.    I understand that people detained at California City are offered between four and

21    seven hours per week of outdoor recreation, and that the yard has very limited recreational

22    activities. This is less than prisoners in segregation are offered. Here again, it is in everyone's

23    best interest, staff and detainees alike, that detained people have things to do, to boost morale

24    and help adjust to life in custody.

25        27.    I understand that tablets are available at California City, but that people share a

26    handful of communal tablets in each unit. I have been informed that the ratio is roughly one

27    tablet for every eight people. Tablets are also not permitted to be used in the cells. Here again,

28    these detainees are receiving less than they would if they were in prison, where no one would

DECLARATION OF DAN PACHOLKE IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION
Case No. 3:25-cv-09757-MMC

1  expect people to share tablets. The benefits of providing everyone a tablet far outweighs the

2  costs.

3          28.    I am informed that there are televisions in the housing units and that some

4  housing units have PlayStations. The televisions are often not accessible to all because of the

5  wide range of language needs among the population. The easiest way to rectify this problem is to

6  give everyone a tablet where they can watch programs in their language. Tablets also have

7  games, music, and educational materials to keep peoples' minds occupied. People could take

8  personal tablets into their cells, which would permit them to keep their minds occupied during

9  any times in which they are locked in their cells (although this times alone in cells should also be

10 significantly decreased, as explained elsewhere in this declaration). Access for all also helps

11 maintain the peace. In correctional settings, we know that idleness is our enemy. Occupied

12 people are better behaved and less likely to mentally decompensate.

13         29.    I understand that detained people at California City have limited contact with the

14 outside world. There are long wait times to see in-person visitors, including lawyers. Access to

15 the phones is cut off during periods of lockdown, which are reportedly extensive. If this is the

16 case, administrators at the facility should devise a plan to address this problem. Lockdown

17 protocols should be reviewed. Lockdowns should only be used when there is a clear threat to

18 security or safety and they should be limited to the units where the threat is located and only for

19 as long as it takes to get the threat under control. If there are not enough areas to meet the in-

20 person visitation needs and for confidential visits with lawyers, prison administrators should

21 identify areas that can be repurposed and retrofitted to meet this need.

22         30.    I am told that written communication is further limited because, apparently,

23 people at California City are not permitted to have normal pens. Instead, people must use flimsy

24 pen fillers, which are difficult to use. Prisons do not typically impose blanket bans on pens, even

25 in high security housing units. Here again, civil detainees are being managed as if they were in

26 maximum security units.

27         31.    There is no correctional value to these kinds of restrictions on programming and

28 communication. To the contrary, secure facilities are safer and more harmonious when people

DECLARATION OF DAN PACHOLKE IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION
Case No. 3:25-cv-09757-MMC

are engaged in prosocial activities and not subject to long periods of idleness. This is particularly true for a population like the one at California City, where many people were removed from their families and communities suddenly and without notice and are experiencing high levels of distress. Most prisons have a variety of programming available to the population, including education, jobs, self-help and faith groups, art and music classes, and vocational training. Programming gives people purpose and helps them to work through the emotional challenges they are facing. Similarly, limiting people to only a few hours of outdoor recreation per week has no security value and is harmful. Lack of fresh air and physical movement increases institutional tensions and creates more anxiety and frustration.

32.    In my experience, a lack of programming usually results from understaffing and resource constraints. As I explained above for visitation, resource or staffing constraints are not a legitimate reason to limit programming. Rather than limiting programming, the facility should take steps to decrease the number of people it holds or increase staffing until the correct level of staffing exists for the current population.

### *Use of Force*

33.    Generally, an officer should use force only in response to an imminent threat of bodily harm or to institutional security. Refusing to enter one's cell or peacefully protesting while seated in a dayroom are not examples of threats to institutional security that require an immediate response by force. Before using force, staff should first attempt verbal de-escalation, redirection, conflict-de-escalation, or other non-physical measures. Use-of-force decisions should be driven by an objectively identifiable safety need—not noncompliance that does not pose an imminent threat.

34.    When force is necessary, staff should use the minimum amount of force required to safely resolve the situation. Professional standards reject any use of force that exceeds what is needed to address the specific threat at hand. Force is excessive when it is more than is objectively reasonable to accomplish a legitimate penological goal. Force that inflicts unnecessary pain or force that is retaliatory or punitive is prohibited in all correctional settings. We have incident review processes and grievance systems designed to identify excessive or

9

inappropriate uses of force and take appropriate actions which could include staff discipline, policy revisions, additional training, or additional camera coverage. The use of excessive force causes unnecessary harm and also undermines the legitimacy of a correctional agency.

35.    Consistent with the civil nature of immigration detention, force is a last-resort intervention—not a compliance technique, not a tool for expediency, and not a method of discipline. The expectation across modern correctional standards is that well-trained staff should be able to resolve the overwhelming majority of incidents through presence, interpersonal skill, rapport, communication, and structured de-escalation techniques before physical force becomes even a possibility.

36.    Prevailing standards require that officers use every reasonable effort to de-escalate before force is authorized. This includes slowing the situation down, increasing distance, calling for trained supervisors, using specialized crisis-intervention strategies, and allowing detainees time and space to comply. Successful de-escalation is a cornerstone of professional custody practice.

37.    The use of force, like all correctional practices, should be guided by specific, legitimate risks posed by the population. Because detained people at California City are held for administrative—rather than criminal—purposes, their custody environment must be guided by the least restrictive means necessary. Any escalation into force must be scrutinized through that lens.

38.    In my opinion, improper uses of force, including unnecessary and excessive uses of force, are more likely to occur in correctional settings that implicitly (or explicitly) authorize aggressive use of force actions and those facilities that are understaffed and where officers are undertrained and overworked. Custody staff must be led by professional custody supervisors and management and custody staff must be trained in interpersonal communication, conflict management, trauma-informed practices, crisis intervention, and tiered de-escalation approaches. When staff lack training, they escalate situations because they misinterpret anxiety, confusion, or noncompliance arising from language or cultural barriers as defiance. Similarly, officers who are fatigued and overworked have diminished patience and reduced tolerance for minor misbehavior

10

1  or slow compliance, making them more prone to escalate situations. In these correctional

2  environments, force becomes a substitute for communication and problem solving.

3  ### ***Solitary Confinement***

4      39.    Solitary confinement (also called restrictive housing, special housing,

5  administrative segregation) is the separation of a detained person from the general population, in

6  a cell or similarly confined space, with severely restricted social interaction, limited

7  environmental stimulation and personal property, and significantly reduced access to

8  programming, services, and normal human contact.

9      40.    Solitary confinement is the harshest custodial environment in a correctional

10  setting. The isolation of solitary confinement places people at heightened risk for anxiety,

11  depression, cognitive decline, emotional instability, and suicide. In my field, it is understood that

12  people in solitary confinement may experience permanent psychological harm from their

13  placement in that setting.

14      41.    Because solitary confinement is known to cause people harm, it should be used

15  very sparingly, and generally only in response to violent behavior. When solitary confinement is

16  used, it should be for the shortest duration possible.

17      42.    Solitary confinement is not an appropriate response to minor rule violations or

18  mental health decompensation. It should not be used as a response to acts of peaceful protest,

19  requests for information or support, threats of self-harm, or delayed responses to routine orders.

20  It should also not be used as a first resort.

21      43.    In immigration detention, there is no justification for using solitary confinement

22  as a routine management tool or as a form of punishment. When restrictive housing is overused

23  or used for reasons unrelated to immediate safety, the detention environment becomes punitive in

24  both nature and effect. In prisons, we say that people are sent to prison as their punishment, not

25  to be punished. In California City, detainees are not serving a sentence. The vast majority have

26  not been found guilty of violating civil immigration law, yet they are housed and managed in

27  worse conditions than if they were criminally convicted and found to have committed a major

28  infraction in prison.

DECLARATION OF DAN PACHOLKE IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION
Case No. 3:25-cv-09757-MMC

44.     I understand that people in the Security Housing Unit at California City are confined to their cells 23 hours per day. This is an extraordinary degree of sensory deprivation which is not justified even in cases of serious misconduct. It is unnecessary and harmful to expose people to such extensive deprivations, especially in a civil detention setting. It undermines the management of safe and secure facilities because it results in mental destabilization and despair, which can lead to unwanted behaviors, to include harm to self and others.

***Contract Detention Services***

45.     The California City Detention Facility is a previously closed prison that has been repurposed to function as an ICE detention facility for people facing civil immigration enforcement. ICE has contracted CoreCivic, a for-profit prison company, to operate the facility. In my experience with for-profit prisons, when WADOC tried to deal with overcrowding through a short-lived contract for prison beds in Colorado and through subsequent expert consulting work, I have witnessed facilities being operated below contracted staffing levels in security, mental health, medical, and food service. Despite what was promised contractually, in reality, correctional services operating for profit often have lower staffing levels, programs that are not fully operational, or mental health and medical staff positions that are not filled. Decreased staffing levels can result in various problems across a facility's operations. Facilities with population levels that outstrip available staffing generally respond by decreasing programming, recreation, visitation, or out-of-cell time, all of which negatively impact the well-being and health of the people detained at the facility and consequently harm its secure operation. Likewise, staffing shortages often require staff to work overtime, leading to frustration among staff that often results in poor treatment of the people held at the facility. This can happen in government-run facilities as well, but in for-profit corrections, these deficits generate greater revenue for the companies and their shareholders. When profit is the goal, and the client is the government rather the people subjected to their services, fiscal performance is inherently prioritized over safety and appropriate care for those in custody. In my experience as a

government contractor, it was necessary to constantly scrutinize for-profit prison contractors to ensure compliance with contract terms, particularly when it came to adequate staffing levels.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed this 20th day of November, 2025, in Olympia, Washington.

By: _____

Dan Pacholke

DECLARATION OF DAN PACHOLKE IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

# Appendix A

## DAN PACHOLKE

**PROFILE**

Served the Washington State Department of Corrections for 33 years, starting as a Correctional Officer and retiring as Secretary. Leader in segregation reform and violence reduction in prisons. Extensive experience in program development and implementation, facility management, and marshaling and allocating resources. Proven ability to make change.  Led efforts resulting in a 30% reduction in violence and a 52% reduction in use of segregation in Washington State Prisons. Co-founder of Sustainability in Prisons Project. Champion of humanity, hope and legitimacy in corrections.

**EMPLOYMENT HISTORY**

**Principal, Dan Pacholke Consulting, LLC.** 2018 to Present
Offers consulting work in the field of corrections. After serving the WADOC for 33 yrs., I worked for New York University Marron Institute and today I provide investigative consulting, and expert testimony. My clients include the US Department of Justice Civil Rights Division, American Civil Liberties Union, Southern Poverty Law Center, and Roderick and Solange MacArthur Justice in addition to others.

I have provided opinions on conditions of confinement, segregation/restricted housing/solitary confinement, death row placement, wrongful death, use of force, religious freedom, and the management of incarcerated transgender people and operational issues concerning the management of people with mental health issues in restricted housing.

I have a deep understanding of correctional practices. In addition, I worked closely with Researchers in problem solving and improving practice throughout my career at WADOC. I now work alongside academics, lawyers, and practitioner experts in support of safe, humane, and rehabilitative operations.

**New York University, Litmus at Marron Institute of Urban Management**
**Associate Director** 2016-2017
Collaborate with researchers and practitioners to develop alternatives to segregation and transform corrections management. Advance stakeholder-led research and innovation by soliciting, supporting, and disseminating the best new strategies to create safer, more rehabilitative corrections environments.

**Washington State Department of Corrections**
**Secretary** 2015-2016
Governor appointee providing executive oversight of the agency with a yearly operating budget of 850 million and 8,200 full time employees. Reorganized agency to allow for greater emphasis on effective reentry. Led department through response and recovery from a crisis resulting from the discovery of a sentencing calculation error that had occurred for over 13 years.

**Deputy Secretary** 2014-2015
Oversight over operations divisions: Offender Change; Correctional Industries; Community Corrections (16 Work Releases and 150 field offices); Prisons (15 facilities); and Health Services.  These combined operations had a yearly operating budget of 700 million and

7,166 full time employees.  Emphasis on core correctional operations, violence reduction, and performance management leadership to affect positive and sustainable system wide change.

**Director, Prisons Division** 2011-2014

Oversight over 15 institutions and contract relationships with jails and out of state institutions incarcerating approximately 18,000 offenders.  Also responsible for providing emergency response and readiness oversight to all facilities and field offices of all divisions. Advanced multi-faceted violence reduction strategy to include the development and implementation of the "Operation Ceasefire" group violence reduction strategy for application in close custody units in prisons. Expanded Sustainability in Prisons Project programs to all prison facilities. Implemented classroom-setting congregant programming in intensive management units.

**Deputy Director, Prisons Division** 2008-2011

Administrator over 6 major facility prisons, multi-custody level for adult male offenders with a biennial budget of 290 million. Provided leadership and appointing authority decision making to six facility Superintendents. Through Great Recession implemented staffing reductions, offender movement alterations and cost savings initiatives while maintaining safety and security. Represented the Department in legal issues, labor relations, media, staff discipline hearings, union relations and bargaining. Oversaw statewide operations of Emergency Preparedness and Response, Intelligence & Investigations, Intensive Management Units, Offender Grievance Program, Offender Disciplinary Program, Food Service, Sustainability and Close Custody Operations. Implemented statewide system of security advisory councils and security forums to improve staff safety.

**Monroe Correctional Complex**
**Interim Superintendent** 2008

Led a 2,486-bed, multi-custody facility for adult male offenders.

**Stafford Creek Corrections Center**
**Superintendent** 2007-2008

Led a 2,000-bed, multi-custody facility for adult male offenders with a biennial budget of 39 million. Implemented Sustainability in Prisons Project initiatives to include large scale composting to include zero-waste garbage sorting. Initiated first dog training programs for male offenders.

**Cedar Creek Corrections Center**
**Superintendent** 2003-2007

Led a 400-bed, minimum-security adult male correctional facility, with a biennial budget of 7.3 million. Directed operational and related program activities to include security and custody programs, medical services, plant maintenance, education, and food service. Co-founded the Sustainability in Prisons Project with Nalini Nadkarni, PhD.

**Monroe Correctional Complex**
**Special Assignment Deputy Superintendent** 2002

Formulated new strategic direction in order to enhance operations and security at the Complex, which consists of four separate units and houses approximately 2,300 adult male felons. Managed unit operations and security. Supervised the Intelligence Investigative Unit and Offender Grievance System. Developed and implemented capital construction initiatives at the Special Offender Unit and the Washington Reformatory Unit to enhance security of these Units.

**Headquarters**
**Performance System Administrator** 1999-2002

Led the development and implementation shift from staff training department to an organizational performance system. Administered staff performance academies, supervised five regional teams, four Program Managers and provided leadership for policy development to support this department wide program. Administered the Department's Emergency Response Plan, Emergency Operations, Officer Safety Program and Firearms Training Unit.

**Headquarters**
**Emergency Response Manager** 1995-1999

Developed and implemented statewide emergency response system. Directed the development of departmental policy, emergency response team academies and response protocols. Managed emergencies and security events. Directed Critical Incident Review Teams in the post incident analysis of critical incidents department wide. Led development of security plans for the management of high-risk operations to include 400 offenders out of state, Y2K, and execution security.

**Clallam Bay Corrections Center**
**Correctional Captain** 1989-1995

Responsible for the security management of a maximum, close, and medium custody male facility. Oversaw facility mission changes including: close custody conversion; implementation of blind feeding; facility double bunking; opening of an intensive management unit; opening of first direct supervision unit; and developed the facility's Emergency Response Plan.

**Clallam Bay Corrections Center**
**Correctional Lieutenant** 1986 -1989

**Washington Corrections Center**
**Correctional Sergeant** 1985-1986

**McNeil Island Corrections Center**
**Correctional Officer** 1982-1985

**PUBLICATIONS**

Useem, Bert, Dan Pacholke, and Sandy Felkey Mullins. "Case Study–The Making of an Institutional Crisis: The Mass Release of Inmates by a Correctional Agency." *Journal of Contingencies and Crisis Management* (2016)

Pacholke, Dan (2016, July 27). Change is relative to where you begin. Vera Institute of Justice. Think Justice Blog. https://www.vera.org/blog/addressing-the-overuse-of-segregation-in-u-s-prisons-and-jails/change-is-relative-to-where-you-begin

Pacholke, Dan and Sandy Felkey Mullins. *More Than Emptying Beds: A Systems Approach to Segregation Reform.* Washington, DC: U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Assistance, 2016. NCJ 249858.

Pacholke, D. (2014, March). Dan Pacholke: How prisons can help inmates lead meaningful lives [Video file]. Retrieved from

https://www.ted.com/talks/dan_pacholke_how_prisons_can_help_inmates_live_meaningful_lives?language=en

Young, C., Dan Pacholke, Devon Schrum, and Philip Young. *Keeping Prisons Safe: Transforming the Corrections Workplace*. 2014.

Aubrey, D., LeRoy, C. J., Nadkarni, N., Pacholke, D. J., & Bush, K. Rearing endangered butterflies in prison: Incarcerated women as collaborating conservation partners. 2012.

**AWARDS**

Olympia Rotary Club, Environmental Protection Award, 2013
Governor's Distinguished Managers Award, 2012
Secretary of State, Extra Mile Award, 2007
Governor's Sustaining Leadership Award, 2003

**CONSULTING**

Her Majesty's Prison Service, U.K.
2020
      Presented at a summit in the U.K., toured H.M. Prison Pentonville in London, and advised prison leadership in U.S. correctional innovations.

Sustainability in Prisons Project, Co-Director
2004-2015

U.S. White House
2015
      Presented on a panel on arts, innovation, and reentry at an event hosted at the Eisenhauer Building of the White House.

Mexican Consulate
2015
      Toured and reviewed a program at the Santa Marta Penitentiary in Mexico City.

Nebraska Department of Correctional Services
2015
      With Bert Useem, PhD, provided system assessment following May 2015 disturbance at Tecumseh State Correctional Institution in which two inmates were killed. Identified underlying causal factors and provided recommendations.

National Institute of Corrections
1998-2002

      Provided training and consultation services in seventeen states, the US Commonwealth of Saipan, and the US Territory of Guam in Security Management, Entry Level Supervisions, Emergency Preparedness Assessment, Disturbance Management and Basic Security.

Defensive Technology Corporation
Senior Instructor

1995 to 1998
> Provided tactical and specialty munitions training to correctional and law enforcement personnel throughout the U.S.

Security Auditing & Critical Incident Reviews
Lead Auditor
> Completed security audits and critical incident fact finding reviews in facilities throughout the Washington State Department of Corrections and two correctional jurisdictions in other states, one of which involved multi-jurisdictional entities.

**EDUCATION:**
> The Evergreen State College, BA, Olympia, Washington

Supplemental Information: Dan Pacholke

Compensation:

- $250.00 dollars an hour for research, report writing, and all associated casework. $125.00 dollars an hour for travel and $300.00 dollars an hour for courtroom testimony and depositions.

Expert consulting experience that required a deposition or courtroom testimony:

1. Gregory Strange v. The District of Columbia (Civil No. 2016 CA 001250 B. Superior Court of the District of Columbia Civil Division)—Deposition

2. Deon Hampton v. Jacqueline Lashbrook, et al (Civil No. 3:17-cv-00936-DRH. United States District Court for the Southern District of Illinois)—Courtroom Testimony, twice.

3. Darrick Hall v. John Wetzel, et al (Civil No. 17-CV-4738 United States District Court for the Eastern District of Pennsylvania)—Courtroom Testimony

4. Fransisca Flores as the Personal Representative of the Estate of Lino Flores v. Stephen Morris, et al (No. 16-02756 (D.AZ) In the United States District Court for the District of Arizona)—Deposition

5. Terry White v. William Stephens, et al (Case No. A16CV059 In the United States District Court for the Western District of Texas, Austin Division) – Courtroom Testimony

6. Imhotep H'Shaka v. James O'Gorman, et al (Case No. 9:17-cv-00108-GTS-ATB In the United States District Court Northern District of New York) – Deposition 03/2019 & Courtroom Testimony

7. Jay F. Vermillion, Plaintiff, v. Mark E. Levenhagan, et al., (Case No. 1:15-cv-605-RLY-TAB) Southern District Court, Southern District of Indiana, Indianapolis Division. Plaintiff's Third Amended Compliant Under Title 42 U.S.C 1983 – Deposition o5/31/19

8. Tay Tay v. John Baldwin, et al., (Case No. 19-cv-501); Tate vs. Wexford Health Services, INC., et. al., Case No. 16-cv-92 In the United States District Court for The Southern District of Illinois – Deposition 12/20/19

9. Cordell Sanders v. Andrea Moss, et. al., (Case No. 16-cv-01366-JBM) In the United States District Court for The Central District of Illinois – Deposition 01/17/20

10. Janiah Monroe v. John Baldwin, Director Illinois Department of Corrections (Case No. 19-cv-01060). In the United States District Court for the Central District of Illinois – Deposition 01/29/20

11. Deon Hampton v. John Baldwin, Director Illinois Department of Corrections (Case No.: 3:18-CV-00550) et. al. –Deposition 08/18/20

12. Thomas B. Fletcher v. Julian C. Whittington, et al., (Case No. 5:18-cv-01153-SMH-KLH (W.D. of L.A.) –Deposition 12/18/20

13.  Jac'quann (Admire) Harvard, et al., v. Mark Inch, et al., (Case No.: 4:19-cv-00212-mw-cas. – Courtroom Testimony 01/15/21

14. Anthony Tellis and Bruce Charles v. James M. Le Blanc, Secretary, et al., Civil Action No.: 5:18-cv-00541-EEF-MLH. – Deposition 03/23/21, 12/15/23, Courtroom Testimony 1/25-26/2022, 1/18-19/23

15. Jac'quann (Admire) Harvard, et al., v. Mark Inch, et al., (Case No.: 4:19-cv-00212-mw-cas. – Deposition 07/21/21

16. William H. Melendez v. Mark Inch et al., (Civil Action No.:  3:20-cv-01023) – Courtroom Testimony 1/20/22

17. Disability Montana, Inc., vs. Gootkin & Salmonsen., (Civil Action No.: 2-15-cv-000-DWM) – Deposition 2/11/22

18. William Thorpe, et al., v. Virginia Department of Corrections, et al., (Civil Case No. 2:20-cv-00007-JPJ-PMS – Deposition 7/20/22, 8/11/23

19. Kevin Korte as Personal Representative for Jennifer Hopkins v. NMCD, et al., (Case No. D-101-CV-2018-01141— Deposition 8/30/22 & 10/7/22

20. Henry Davis, et al., v. Rob Jeffreys, (Case No. 3:16-cv-00600-MAB) United States District Court. Southern District of Illinois, East St. Louis Division. – Deposition 8/17/23, Courtroom Testimony 10/21/25

21. Reggie Caswell v. Donald Uhler, et al., (Case No. 9:19-CV-00141 (LEK/ATB) United States for the Northern District of New York. –Deposition 12/8/23, Courtroom Testimony 9/10/25

22. Demetrius Ross, et al., v. Greg Gossett, et al., (Case No. 3:15-CV-00309 (SMY/SCW) United States District Court. Southern District of Illinois, East St. Louis Division. –Deposition 12/18/23, -Courtroom 4/8/25

23. State of Washington v. Miguel Gaitan, 93-1-01018-0. Yakima Superior Court—Resentencing pursuant to Miller v. Alabama, 567 U.S. 460 (2012)—Courtroom Testimony 2/5/24

24. Huffman v. Dunn, et al. (Civ. A. No.: 4:20-CV-01293-CLM) United States District for the Northern District of Alabama—Deposition 4/11/24

25. Mark Duke, et al., Plaintiffs; v. Jefferson s. Dunn, et al., Defendants (Civil No. 4 :14-cv-01952-RDP – Deposition 4/16/24

26. Ezell, as a representative of the Estate of Terrence Andrews, Plaintiff v. Jefferson Dunn, et al. (Case No.:4:20-cv-02058-ACA) –Deposition 1/21/24

27. Carol Guy, as representative of the Estate of Steven Mullins, Plaintiff v. Jefferson Dunn, et al. (Case No.:4:21-cv-00264-ACA) Deposition-- 1/21/25

28. Janiah Monroe vs. Latoya Hughes, In her official capacity as Acting Director of DOC (Case No.;19-1060-JEH) Deposition – 1/22/25

29. Disability Rights Connecticut, INC., Plaintiff v. Connecticut Department of Corrections; Angel Quiros, Commissioner, Defendant (Civil Action No. 3:21-cv-00146) Deposition – 4/22/25

30. T. Montana Bell; Ronnie E. Johnson; Angel Maldonado; Kareem Mazyck; Xavier Pagan, et al., Plaintiffs, v. Pennsylvania DOC; Laurel Harry, Secretary, PDOC, et al. (Case No. 2:22-cv-01516-CRE. United States District Court for the Western District of Pennsylvania) Deposition 10/9/25

31. Anthony Parish and Jeffrey Wagner, Plaintiffs v. Warden William Hyatte, in his individual capacity; Deputy Warden George Payne, Jr., in his individual capacity. (No. 3:21-160 United States District Court Northern District of Indiana South Bend Division) Deposition 10/16/25


Additional expert experience- report only:

32. Angel Goff v. State of Arizona, Juan Ignacio Ramirez, Charles Ryan, Carson McWilliams, & Berry Larson. 9/30/18

33. Ernest Porter v. John Wetzel, et al., (Civil Action No. 17-763. United States District Court, W.D. Pennsylvania) 3/27/18

34. Shawnfaee Bridges v. John Wetzel, et al., 3/16/18

35. Earl Barnes v. The District of Columbia (CA 007305. Superior Court of the District of Columbia, Civil Division) 5/11/19

36. Damon Thomas v. The District of Columbia (Case No. 18-0005482. Superior Court of the District of Columbia, Civil Division) 8/9/19

37. Marcus Hunter v. The District of Columbia (Case No. 18-0002937. Superior Court of the District of Columbia, Civil Division) 11/28/18

38. Timothy Finley v. Erica Huss & Susan Schroeder (Case No. 2:18-cv-00100. The United States District Court for the Western District of Michigan, Northern Division) 9/17/19

39. Mohamed Dirsche v. The Geo Group, Inc. (Case No:2019CV30695. District Court Adams County Colorado) 2/17/20

40. Tawna Z. Nealman v. Robert Maben, et al., (Case No. 1:15-cv-01579-CCC. In the United States District Court for the Middle District of Pennsylvania) 6/25/18

41. Alicia Barraza v. The State of New York (Claim No. 126830) 6/19/18

42. Nicholas Reyes v. Harold Clarke et al., (Case No. 2:19-CV-00035 (W.D. Va.) 8/15/20

43. Wood v Dunn, et al. (Civ. A. No.: 2:19-CV-511-MHT, WC) 5/13/22

44. Huffman v. Dunn, et al. (Civ. A. No.: 4:20-CV-01293-CLM) 12/12/22

45. Community Legal Aid Society, Inc. Monitoring and Investigation of Treatment of Inmates with Mental Illness with Delaware Department of Corrections 2/23/24

46. Lisa Johnson v. Wexford Health Sources Inc.; The Illinois Department of Corrections; Rob Jefferies, et al. (Civil Action No. 1:21-cv-01234-CSB-EIL) 7/12/24

47. Carol Guy v. Jefferson Dunn, et al. (Case No:4:21-cv-00264-ACA) 11/17/24

48. Ezell v. Jefferson Dunn, et al. (Case No:4:20-cv-02058-ACA) 11/20/24

Investigation consultation:

49. United States of Justice, Civil Rights Division. Investigation of Massachusetts Department of Corrections. Reviewed use of restricted housing and suicide watch procedures. 11/17/20

50. United States Department of Justice, Civil Rights Division. Investigation of Mississippi State Penitentiary (MSP). 4/20/21

51. United States Department of Justice, Civil Rights Division. Investigation of Mississippi Department of Corrections (CMCF, SMCI, WCCF). 10/25/22