1
2
3
4

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

5

6   FERNANDO GOMEZ RUIZ; FERNANDO
    VIERA REYES; JOSE RUIZ CANIZALES;
7   YURI ALEXANDER ROQUE CAMPOS;
    SOKHEAN KEO; GUSTAVO GUEVARA
8   ALARCON; and ALEJANDRO MENDIOLA
    ESCUTIA, on behalf of themselves and all
9   others similarly situated,

10          Plaintiffs,

11      v.

12  U.S. IMMIGRATION AND CUSTOMS
    ENFORCEMENT; TODD M. LYONS,
13  Acting Director, U.S. Immigration and
    Customs Enforcement; SERGIO
14  ALBARRAN, Acting Director of San
    Francisco Field Office, Enforcement and
15  Removal Operations, U.S. Immigration and
    Customs Enforcement; U.S. DEPARTMENT
16  OF HOMELAND SECURITY; KRISTI
    NOEM, Secretary, U.S. Department of
17  Homeland Security,

18          Defendants.

Case No. 3:25-cv-09757-MMC

**DECLARATION OF DR. TODD
RANDALL WILCOX, M.D., IN SUPPORT
OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION**

Date Filed:  November 12, 2025

Trial Date:  TBD

19
20
21
22
23
24
25
26
27
28

1

**TABLE OF CONTENTS**

I.      BACKGROUND ...................................................................4

II.     MATERIALS CONSIDERED ...............................................5

III.    OPINION AND SUMMARY OF FINDINGS ......................5

IV.     DETAILED FINDINGS .......................................................8

        A.      The Medical Intake Assessment Process is Dangerously Ineffective.......8

                i.      Structure of an Effective Intake Process...........................................8

                ii.     California City's Intake Process is Inadequate ...............................9

                iii.    Initial Screenings Are Not Confidential, Timely, or Thorough.....10

                iv.     Initial Screenings Fail to Include Consistent and Adequate Screening for Tuberculosis and Fail to Result in Timely Isolation13

                v.      Initial Screenings Fail to Include Adequate Screening for Detained People's Disabilities or Their Need for Disability Accommodations ...........................................................14

                vi.     Medical Staff Conducting Screenings Fail to Establish Effective Communication........................................................17

                vii.    Initial Screenings Fail to Result in Timely and Accurate Continuation of Medications.........................................................18

                viii.   Initial Appraisals by Primary Care Providers Are Not Timely or Thorough and Do Not Result in Appropriate Treatment Plans .....20

        B.      The Sick Call Process for Episodic Care is Broken...............................25

                i.      Sick Call Should Facilitate Patients' Access to Timely Medical Attention ........................................................25

                ii.     Patients Who Submit Sick Call Slips Are Not Scheduled for Timely Appointments with Nurses or Providers ...........................26

        C.      Care for People with Chronic Illnesses is Untimely and Often Abysmal28

                i.      People with Chronic Illnesses Require a Structured Treatment Program.......................................................28

2

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

3871655

ii.     Chronic Care is Scheduled at Inappropriate Intervals and Providers Fail to Provide Necessary, Clinically Appropriate Care for Sick Patients ................................................................................29

D.     Patients are Deprived of Necessary Medications.....................................35

i.     Patients Must Receive Medications as Prescribed........................35

ii.     Medications Are Often Delivered Late or Not At All ...................35

E.     Care from Specialty Providers is not Available to Detainees.................42

F.     Medical Staff Fail to Respond Appropriately to Urgent or Emergency Medical Issues.........................................................................................46

G.     Sick People are Placed in Inappropriate and Inadequate Medical Housing ....................................................................................................48

H.     Mental Health Care is Grossly Inadequate ..............................................50

I.     Health Care Staffing is Insufficient for the Number of Detainees Currently Housed at the Facility ..............................................................53

V.     CONCLUSION.....................................................................................................54

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

3871655

I, Todd Randall Wilcox, M.D., hereby declare:

## I.   **BACKGROUND**

1.      I have worked as a physician in jails and prisons for 31 years. My opinions in this case are derived from extensive experience in the design, administration and delivery of correctional healthcare as well as the national standards that govern the field. I actively practice correctional healthcare as the Medical Director of the Salt Lake County Jail System and am frequently called upon as a consultant to assist facilities and organizations nationally in improving their delivery of care, including California Department of Corrections and Rehabilitation, Arizona Department of Corrections, Rehabilitation and Re-entry, Mississippi Department of Corrections, Maricopa County Jail (Phoenix, AZ), Santa Clara County Jail (San Jose, CA), Riverside County Jail (Riverside, California), Pima County Department of Institutional Health (Tucson, AZ), Washington County Jail (Hurricane, UT), Utah County Jail (Spanish Fork, UT), Seattle-King County Jail (Seattle, WA), the National Institute of Corrections, and the American Jail Association.

2.      I am licensed to practice medicine in Utah and Arizona. I am board-certified by exam by the American Board of Urgent Care Medicine. I also hold advanced certifications from the National Commission on Correctional Health Care as a Certified Correctional Health Professional, a Certified Correctional Health Professional Administrator, and a Certified Correctional Health Physician.

3.      I was the President of the American College of Correctional Physicians from 2015-2017, and have served on the Board of Directors for the National Commission on Correctional Health Care's Certified Correctional Health Professional program. In 2019, I was awarded the Armond Start Award from the American College of Correctional Physicians for excellence in correctional healthcare.

4.      My curriculum vitae is attached as **Appendix A**. The cases in which I have been deposed and/or given trial testimony in the last four years are listed in **Appendix B**. My rate of compensation for this case is $450 per hour.

4

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

3871655

5.      I have been asked by Plaintiffs' counsel to render opinions concerning the adequacy of health care provided to people detained at the U.S. Immigration and Customs Enforcement ("ICE") facility in California City.

**II.    <u>MATERIALS CONSIDERED</u>**

6.      In forming my opinions, I reviewed medical records that are in Plaintiffs' counsel's possession for 17 people who are or were detained at California City Detention Facility ("California City"). I understand these records were previously created and maintained by California City.

7.      Thirteen of those 17 individuals made declarations, which were prepared for filing in support of Plaintiffs' Motion for Preliminary Injunction. I also reviewed those declarations.

8.      My goal, when I prepare an expert report, is to review a sample of records for people who have serious medical conditions or injuries, to determine whether the medical systems and processes are functioning as they should. Often, I will select a sample of records to review from lists of chronic care patients, and patients who have been hospitalized or treated in the Emergency Department. I understand that Plaintiffs' counsel reached out to immigration counsel to identify people at California City who may have chronic illnesses, or who were sent offsite for health care. The 17 medical records I reviewed, coupled with the patient declarations, provided me sufficient information to opine about health care delivery at California City. Additional review with a larger sample size seems warranted in this case based on the patterns and systemic deficiencies that are evident in the initial study group.

**III.    <u>OPINION AND SUMMARY OF FINDINGS</u>**

9.      In my medical opinion, it is not safe to be sick at the California City ICE Detention facility. The healthcare delivery system at that facility is not adequate to care for patients who have serious medical and mental health needs. While the sample size in this instance is relatively small, the deficiencies that I found are consistent across many patients and they are typical of system issues found in healthcare systems that are understaffed, under-resourced, and poorly managed. As a result, increasing the population of this facility would put increasing pressure on limited resources and make this facility even more dangerous for patients

with serious medical and mental health needs. As it stands now, California City is not equipped to handle patients with complex medical care needs. Indeed, they even struggle to deliver standard of care for common uncomplicated problems. Below is a summary of the findings that are the basis for my opinion.

10. The intake assessment process is inadequate to maintain continuity of care and to protect detainees from possible harm.

- Assessments are performed by Licensed Vocational Nurses ("LVNs"), which is a function that exceeds their legal scope of practice.

- Information is recorded but the LVNs / Registered Nurses ("RNs") do not understand the implications of the information to develop a proactive treatment plan for the incoming detainees.

- Tuberculosis ("TB") and infectious disease screening protocols are inadequate to protect the safety of the institution, other detainees, and staff.

- The continuity of medications appears to be haphazard and inconsistent.

- Critical healthcare information from the Transfer Summaries is not incorporated into the facility medical record by the intake assessment nurse.

- Urgent referrals from the intake assessment are not seen within policy and procedure timelines.

- Intake assessment is not done in a timely manner to facilitate continuity of care. The assessment is often many days after the detainee has entered the facility.

- The important function of obtaining medical records from outside providers and previous facilities does not appear to be effective.

11. Physician orders are often ignored or overlooked:

- Vital signs that are ordered are not entered into the medical record.

- Accuchecks (fingerstick blood glucose checks) are missing, yet somehow the patient receives sliding scale insulin.

- Lab results do not appear to be reviewed or signed off.

6

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

3871655

• Orders are marked as complete, but they do not track to results in the chart.

12. The medical evaluation of higher acuity problems does not meet the standard of care:

- There is no discussion in the notes about the elements of a workup to suggest that the providers even know what is supposed to be done.
- The medical workups of medically significant problems are missing or grossly inadequate.
- Follow-up care seems to be absent.
- This healthcare delivery system cannot handle sicker patients with the processes and staff that they have in place.

13. The chronic care management appears to be minimalistic and superficial and not effective at managing patients to target:

- Patients who are not at target are not seen frequently enough to optimize their treatment.
- Chronic care clinical outcomes / labs are not carried out or signed off by providers and the abnormal results do not seem to prompt changes in treatment plan.
- The medication management of chronic diseases is very basic and frequently ineffective.

14. The Pharmacy and Medication process at this facility is broken:

- There is a continuity of care issue coming through the intake process just to get medications ordered.
- Many medications are out of stock.
- The medication administration process does not reliably deliver medications as ordered.
- There is no way to track medication adherence without a tedious, manual process.

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

3871655

- The medication administration record does not conform to standard documentation practices and it is exceptionally difficult to use.

15.    The process to get specialty care is not effective or timely and it puts patients at a clear risk of serious harm:

- The request / scheduling process for many routine consults is stuck in an administrative approval loop.

- In this sample of patients, there were 13 consults requested since late August and not a single consult has been accomplished.

- Clinically urgent referrals for specialty care have not been completed in a reasonable time and the medical records suggest that they are still awaiting corporate approval before the scheduling process even begins.

## IV.    DETAILED FINDINGS

### A.  The Medical Intake Assessment Process is Dangerously Ineffective

*i. Structure of an Effective Intake Process*

16.    Medical intake in a detention setting consists of two components: First, an immediate medical assessment that serves multiple purposes, including determining if there are any issues that would preclude acceptance into the facility and facilitating the immediate medical needs of the patient over the first few days. Because of the comprehensive nature of these assessments and the fact that they are performed on patients who are not established in the system, these are assessments by definition and the minimum required licensure to perform these is a Registered Nurse. The intake assessments are ideally done within a few hours of arrival. Second, after a detainee has dressed into a facility, a more thorough medical and mental health assessment is done to review the intake assessment, review the first few days of stay in the facility, and to address any long-term medical management issues like chronic care needs. This second assessment is typically done within fourteen days of admission and it is usually performed by a primary care provider and a mental health clinician.

17.    The initial intake assessment includes both a face-to-face interview using a structured questionnaire and, whenever possible, a review of the individual's prior medical

8

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

3871655

record. The questionnaire enquires into an individual's current problems and medications; past history, including hospitalizations; mental health history, including current or past suicidal ideation; symptoms of chronic illness; medication and/or food allergies; and dental problems. For female detainees, it is important to obtain a history of current and past pregnancy, as well as the date of last menstrual period.

18.    These intake assessments are necessary to identify those who arrive with urgent medical needs so that their care can be addressed, to ensure that those with known medical and/or mental health conditions receive continued care, to determine if any housing or disability accommodations need to be implemented for the patient, and to prevent the spread of contagious diseases, such as tuberculosis. For continuity of care and to protect the health of those housed and those who work in the facility, it is essential that this take place at the time the person arrives at the facility before they enter the general population setting.

19.    Delaying screening increases the risk that detained people and staff may be exposed to deadly diseases. Tuberculosis, which is transmitted by airborne droplets, is one of the world's deadliest infectious diseases. In congregate facilities like the California City, tuberculosis thrives and can spread quickly. Managing an outbreak of tuberculosis can be extremely difficult and extraordinarily expensive.

### ii. California City's Intake Process is Inadequate

20.    The CoreCivic Handbook describes a two-part intake assessment process which begins when the person enters the facility: "Each detainee entering the facility will receive an initial medical screening by the clinical staff" and detainees should discuss their health and their medications. According to the Handbook, "Some medications such as heart or diabetic medications will be continued when you arrive." A true and correct copy of the CoreCivic Handbook that I reviewed is attached as **Appendix C**.

21.    After the initial screening, the Handbook describes a "full medical examination" to be conducted within 14 days of arrival, where, again, the detainees should discuss their health and medications and, again, "[s]ome medications" will be continued.

9

---

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

22.     According to the Initial Screening template used for these encounters, for people with emergent needs, the RN will immediately consult with or refer to a provider, while a person with urgent needs will be referred to a provider within 24 hours, and someone with routine needs within two to 14 days.

23.     Based on the declarations and the health records that I have reviewed, I have concluded that California City Detention Facility does not perform adequate intake assessments on detainees upon arrival. To the extent that staff do perform intake assessments, they are often not timely, not thorough, and at times, not even in a language understood by the detained person. The process also lacks basic measures to stop the spread of infectious diseases and fails to ensure that vital medications are prescribed and administered. The failure to adequately screen incoming people places everyone at risk of serious harm.

24.     In addition, it is clear from the review of medical records that these intake assessments are sometimes performed by LVNs. This type of assessment on a new patient is outside of the scope of practice for an LVN. LVNs lack the academic preparation and training necessary to perform these assessments, and they typically miss important information because of their lack of training in performing nursing assessments.

*iii. Initial Screenings Are Not Confidential, Timely, or Thorough*

25.     Initial screenings at a detention facility should take place when the person arrives, in a private setting to ensure that the person arriving is able to disclose their personal health information confidentially. Interviewing a patient in a private setting is essential to gathering reliable patient histories. Gustavo Guevara Alarcon and Fernando Viera Reyes report their initial intake interviews occurred in a hallway or lobby, in the presence of and within earshot of other people. Guevara Alarcon Decl. ¶ 19, Viera Reyes Decl. ¶ 12. This is a dangerous practice, and may result in an incomplete and/or inaccurate health screening.

26.     The initial screening with a nurse at California City generally does not happen on the day of arrival, and may be one, two, or three days after the detainee's arrival at the facility, or even later. According to the health record of Sudesh Singh, for example, he arrived on September 5, 2025, but did not have his initial screening until September 7, 2025. Daler Singh

10

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

3871655

arrived on September 4, 2025, but did not have his initial intake screening until two days later, on September 6, 2025. Jose Ruiz Canizales and Gustavo Guevara Alarcon arrived at the facility on August 29, 2025, but were not screened by the nurse until the following day. These delays are dangerous for the patient, the staff, and other detainees, and they do not meet the standard of care in correctional health.

27.    In some cases, people endure medication lapses and inhumane living conditions while waiting overnight for their initial screening. Daniel Elias Benavides Zamora, who is an insulin dependent diabetic with low blood pressure, reports arriving at California City around 1 pm on November 5, 2025 and being placed with seven other people in a room without beds or mattresses. Benavides Zamora Decl. ¶¶ 7-9. He, as well as the others, were left there overnight to sleep on the cold, concrete floor. *Id.* ¶ 8. He only received one meal at 6 pm that night, *id.* ¶ 9, and there is no record that he had his blood sugar checked or received insulin as prescribed that first day. Julio Santos Avalos reports similar conditions, specifically being held in intake for two days in a room with a clogged toilet and no access to medication. Santos Avalos Decl. ¶¶ 7, 10.

28.    In the medical records I reviewed, the screening questions are not all answered appropriately and essential follow-up information is not documented. There are multiple questions that presumably should be answered by the patient that were left blank. Fernando Gomez Ruiz, a diabetic with a significant foot ulcer, did not have his blood sugar taken and there is no description of the history, size, or presentation of his foot ulcer on his intake documentation. Fernando Viera Reyes informed the intake LVN that he was pending a prostate biopsy to determine whether he has prostate cancer; the nurse noted "yes" to the question of whether he was pending a specialty consult but failed to document what type of consult or procedure was pending as requested on the form. Viera Reyes Decl. ¶ 11. The failure to document critical healthcare conditions—some which require time-sensitive follow-up—means that the problem could get dropped during the intake process, and appropriate follow-up and continuity of care does not reliably occur. This defeats the entire purpose of an intake assessment.

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

3871655

29.     The screening records also consistently omit critical information. Utkarshkumar Trivedi has multiple chronic conditions, including oral lesions, Benign Prostatic Hyperplasia ("BPH"), and gastroesophageal reflux disease ("GERD"); none are mentioned in his intake form although his intake form lists multiple active medications for these conditions. Alejo Juarez Ruiz told the nurse that he had high blood pressure and diabetes on arrival, and had elevated blood pressure at intake (162/94). The intake nurse should have but failed to document asking the patient about any current symptoms or problems related to his health issues. Julio Santos Avalos has a permanent foot deformity, but his intake makes no reference to his history of polio or Guillain-Barre syndrome and indicates he has no deformity. Alfonso Leyva told the nurse at intake that he had pain in his ear, head, throat, and body, at a level of 8/10. The nurse failed to document any history or details regarding his serious pain and referred him for his health appraisal on a routine basis.

30.     Patients with time-sensitive medical needs, or who present with abnormal vitals, are not timely referred to the provider. Fernando Gomez Ruiz had a blood pressure reading of 180/94 at intake but did not have his blood pressure re-taken, and was not referred to a provider urgently or emergently despite being an insulin dependent diabetic presenting with an ulcer on the sole of his foot. Careful control of blood pressure and blood glucose are important for diabetic patients because it limits the damage done to the kidneys. Esteban Alvarez Mora reports arriving at California City with five abscesses that, after the hours-long bus ride, began to leak pus and blood. He informed the RN at intake, showing her that the bandage on his glute was completely soaked with blood and pus. He was not physically examined, his wounds were not cleaned, and he was not provided with clean bandages; he was informed that he would be seen the next day by the provider. That did not happen. Alvarez Mora Decl. ¶¶ 6-10. The September 5, 2025 notes from the RN intake are sparse and fail to document any of this alarming detail but rather referred him urgently to the Primary Care Provider (PCP) for "bleeding hemorrhoids." The first reference to abscesses in his records is from September 11, 2025 when he was seen by a nurse; the PCP initial appraisal did not happen until September 22, 2025, 17 days after the initial urgent referral. Patients with open wounds are at risk for infection and should be seen timely by a

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

3871655

1    provider to assess their need for antibiotics or wound care. Open wounds also can be sources of

2    infection for other detainees or staff so proper dressings are important to limit the spread of

3    biohazardous fluids.

4    *iv. Initial Screenings Fail to Include Consistent and Adequate Screening for Tuberculosis and*

5    *Fail to Result in Timely Isolation*

6    31.    Although the CoreCivic Handbook states that "[a]ll new arrivals shall receive

7    tuberculosis (TB) screening by PPD (Mantoux method) or chest x-ray," Appendix C at 7, that

8    does not happen in practice. Instead, California City asks about symptoms and often relies on

9    patient self-reports or transfer memos from prior detention facilities to determine when they last

10    received a PPD and what those results were. There is an implied rule in the documentation that a

11    negative PPD within a year is acceptable. This is not medically sound logic in a patient

12    population that is at high risk for tuberculosis exposure. The standard practice in correctional

13    facilities is to do a PPD test on all new admissions (unless it is contraindicated) regardless of

14    how long it has been since they had their last one.

15    32.    Fernando Gomez Ruiz received an intake on October 20 or 21, 2025 (both dates

16    appear on the form), but the RN failed to screen for symptoms or test for TB. The failure to test

17    him and others on arrival at California City is reckless and endangers all people who live and

18    work at California City.

19    33.    Detainees who are at risk of having Tuberculosis are not isolated timely, if at all.

20    Esteban Alvarez Mora's RN intake documentation from September 5, 2025 does not include

21    responses to the TB intake questionnaire despite a history of latent TB.  He submitted a sick-call

22    slip around September 18, 2025 reporting, among other things, "fever, headache, and shaking,

23    face pain, cough."  Several of these symptoms correlate with symptoms of acute tuberculosis

24    infection. This patient should have been isolated in a negative pressure room while his symptoms

25    were evaluated for possible tuberculosis. He was not. He was seen by the RN on September 21,

26    2025 for an unrelated matter. He submitted another sick-call on October 14, 2025 reporting

27    "cough and pain in my chest and [lungs]. I was positive for tuberculosis." The RN noted that he

28    reportedly refused that encounter. There is no evidence he was rescheduled to be seen until he

13

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

3871655

submitted another sick-call on October 29, 2025 stating "bleeding by my nose, my ears, wet cough with pain in my [lungs]. . . ." It was noted that he was scheduled for an x-ray for October 31, 2025. He finally had a chest x-ray completed on November 3, 2025 to assess whether he had active TB; in the meantime, records reflect he remained housed in the general population despite his history and reported symptoms. This is dangerous and could have exposed other detainees and staff to TB; Mr. Alvarez Mora should have been placed in isolation while he underwent timely workup.

34.    Similarly, Julio Armenta had a chest x-ray completed on October 8, 2025 that was ordered due to his history of hypertension. The results of that chest x-ray were abnormal, requiring immediate review. However, it appears that the abnormal chest x-ray was not reviewed until October 28, 2025, at which point the patient was placed in respiratory isolation to rule out TB. Given the concern for active TB, keeping Mr. Armenta in the general population for 20 days was dangerous and could have resulted in the rapid spread of an infectious disease. Additionally, despite the fact that the abnormal x-ray pattern is not consistent with typical tuberculosis, no additional workup was completed for other causes of lung pathology including lung cancer, metastatic tumors, pneumonia, pulmonary edema, asbestosis, connective tissue disease, and others. At a minimum, more sophisticated imaging and likely a pulmonology consultation should have been ordered. The records appear to cut off before his tuberculosis labs came back so the rest of this story is unknown at this point.

*v. Initial Screenings Fail to Include Adequate Screening for Detained People's Disabilities or Their Need for Disability Accommodations*

35.    Disability screenings must be completed for all incoming detainees to ensure that patients who require devices, special housing, or other accommodations are able to receive them timely. Based on my review of declarations and medical records, it is my opinion that the initial screening at California City fails to effectively identify people with disabilities or timely provide the accommodations they require. In fact, in some cases, detainees who arrive with a documented accommodation have them confiscated during the intake process and they are told they will need a doctor's order to get it back.

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

3871655

36.    This failure to identify disabilities and promptly provide accommodations interferes with the delivery of medical care and exposes some people to the risk of harm, including physical injury.

37.    Alfonso Leyva cannot see things that are close or read without his glasses, and he gets dizzy without them. He says he was not asked about any disabilities at intake, and his eyeglasses were confiscated, over his objections. In addition, he reported to the intake nurse that he had dizziness. (Leyva Decl. ¶¶ 9-10) The glasses were returned approximately one month later, but while he was without them, he fell off the ladder to his top bunk, slipping because he could not see well. *Id*. ¶¶ 9, 13-15). Following intake, Mr. Leyva should have been provided with the simple accommodations of having his glasses and placing him on a bottom bunk because of his vision needs, his age and his dizziness, but he was not. The consequence of that is that Mr. Leyva suffered a fall from his top bunk which resulted in a significant head injury and head laceration that required two separate send-outs to the emergency department to evaluate and treat on September 16, 2025. Apparently the first emergency department he was sent to would not treat him because he lacked insurance. He ultimately had to be sent out to another emergency department after returning back to the detention facility and definitive care for his closed head injury took hours to accomplish. *Id*. ¶¶ .

38.    Days after his closed head injury, Mr. Leyva continued to complain of throbbing headaches and dizziness. He was seen by an RN on September 22, 20225, at which time the PCP was consulted and ordered ibuprofen as needed. He was again seen by an RN on September 25, 2025 after reporting ongoing symptoms. He was finally seen by a provider on September 29, 2025 who just ordered him Excedrin. He continued to report ongoing symptoms, including an earache, head swelling and tenderness, and tinnitus. He was evaluated by Dr. Hooper on October 9, 2025, who noted that his right tympanic membrane was darker than the left, and Dr. Hooper put in a routine consult to go to an Ear, Nose and Throat ("ENT") specialist for "hemotympanum (blood behind the tympanic membrane)." In the context of a serious, closed head injury and ongoing headaches increasing in frequency, the physical exam finding of hemotympanum is a basilar skull fracture until proven otherwise, and it is a medical emergency. A routine ENT

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

consult (that hasn't even been approved or scheduled yet) is gross mismanagement of this patient. He is at risk for serious medical complications and he needs immediate attention.

39.     Sokhean Keo uses hearing aids but reports that he was never asked at intake about his disability or any necessary accommodations. Keo Decl. ¶¶ 35-37. It was him that requested batteries for his hearing aid. He also has a knee injury and arrived at California City with a structured knee brace that allows him to ambulate without pain. At intake, he was informed that the knee brace is an appliance that requires a doctor's order and thus it was taken away. Weeks later and Mr. Keo still does not have his knee brace, making it challenging to go up and down the stairs. *Id*. ¶ 28. I found no records that Mr. Keo's knee injury was evaluated at California City, or that staff ever assessed his need for mobility accommodations, including an orthopedic device. Failing to take these simple steps exposed Mr. Keo to a risk for falls and further injury to his knee.

40.     Jose Ruiz Canizales's initial screening form medical records indicates that he has hearing loss. However, it also states that the "communication barrier" was overcome because staff "Obtained written responses from detainee." This is inaccurate, as Mr. Ruiz Canizales cannot effectively communicate in writing and requires sign language interpretation. Ruiz Canizales Decl. ¶ 32. Additionally, he suggests the communication barrier was not in fact overcome: he says staff did not ask him any questions when he arrived. *Id*. ¶ 18. Although his medical problem list states he is "Deaf, nonspeaking," there is no indication in his medical records that staff routinely provide sign language interpretation or have any system in place to ensure actual effective communication.

41.     Daniel Benavides Zamora arrived with custom orthopedic shoes and insoles prescribed to him due to medical and mobility issues, including multiple toe amputations and a history of toe fractures on account of walking off balance. Benavides Zamora Decl. ¶ 11. The shoes were confiscated, and he was informed he needed a doctor's order, but despite informing the RN of his needs, he was not referred to the provider on a timely basis to obtain the order. *Id*. ¶¶ 11-12. Taking a patient's custom appliances, without promptly replacing them based upon a comprehensive assessment, is medically irresponsible and places them at risk of harm from falls.

16

---

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

3871655

42.     Alejo Juarez Ruiz suffered a knee dislocation while at Golden State Annex, before arriving at California City. His knee continues to be swollen and painful. Because of his injury, he can walk only a few steps before experiencing serious pain. He requested a walking cane at California City, but the guard he spoke to told him that he was not entitled to one, because "this is a prison." Juarez Ruiz Decl. ¶¶ 6-11. This raises concerns that California City may lack a functioning system for patients to request accommodations. A diabetic, Mr. Juarez Ruiz also has impaired vision that becomes blurry when his blood sugar levels spike. At Golden State Annex, his vision was checked monthly, but no one has checked his vision at California City. *Id.* ¶ 11.

43.     Julio Santos Avalos has a permanent foot deformity and muscle weakness due to childhood polio. Santos Avalos Decl. ¶ 9. His September 6, 2025 initial intake does not document his condition or document any necessary accommodations. It was not until September 18, 2025 that he was provided with a low bunk and low tier chrono after he submitted a sick call slip; it is difficult for him to climb to a top bunk. According to Mr. Santos Avalos, he was told by the PCP that he would be documented as being on a low bunk in case "we get audited," but a low bunk was not provided until November 2025. *Id.* ¶ 12, In the interim, he hurt his ankle and knee getting to the upper bunk he was assigned to. *Id.* ¶ 13. Mr. Santos Avalos reported to mental health staff on November 5, 2025 that he finally slept "well for the first time in months due to a bunk change which supported his mobility challenges; he expressed gratitude for that and shared he was not anxious about falling out of the bed now." Santos Avalos Decl. ¶¶ 12-13. There is no reason that Mr. Santos Avalos needed to wait a month and a half to receive a low bunk as ordered. For a patient like this, California City's failure to provide a reasonable disability accommodation resulted in physical injury and mental anguish.

*vi. Medical Staff Conducting Screenings Fail to Establish Effective Communication*

44.     Medical encounters must be conducted in a language that the patient is comfortable using. If the clinician and patient are not able to communicate in the same language, a translator is essential for all medical encounters to ensure effective communication.

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

3871655

45.     Effective communication is particularly critical when people arrive at a new facility and undergo medical screening. California City fails to ensure that people arriving are screened by someone who speaks their language. Jose Ruiz Canizales communicates in American Sign Language. He was born deaf and does not speak verbally. Ruiz Canizales Decl. ¶ 5. When Mr. Ruiz Canizales had his initial intake screening on August 30, 2025, he was not provided a sign language interpreter. RN Mata acknowledged the communication barrier, and wrote that the barrier was resolved because they "obtained written responses from detainee." However, Mr. Ruiz Canizales says that he reads and writes at a third-grade level, misunderstands English words easily, and often does not understand written paperwork. *Id*. ¶ 10.

*vii. Initial Screenings Fail to Result in Timely and Accurate Continuation of Medications*

46.     Many people arrive at California City with active prescriptions for serious medical conditions. The CoreCivic Handbook states that people entering the facility will have an initial medical screening and "[s]ome medications such as heart or diabetic medications will be continued" when they arrive. Appendix C at 7. Within 14 days of arrival, according to the Handbook, people are supposed to have a "full medical examination" at which time they are to discuss "any medications . . . and any health problems . . . ." *Id*. Based on this second medical encounter, some medications, again "such as heart or diabetic medications" will be provided throughout the person's detention. *Id.*

47.     The records and declarations I reviewed reveal serious, prevalent issues with timely continuation of medication upon intake. Detainees who arrive at California City with active medications do not have them timely verified and continued, leading to dangerous lapses. These lapses occur even when people arrive with their documented medication prescriptions or medication in their possession.

48.     Yuri Roque Campos is diagnosed with pulmonary hypertension and congestive heart failure, conditions that are life-threatening and need close monitoring and appropriate management. He was taking aspirin at his previous facility but did not receive it for the first five days at California City despite two separate Emergency Room visits on the first two days of his arrival. Roque Campos Decl. ¶ 11. For some of those days, he was residing in a medical

18

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

3871655

observation unit where he was supposedly receiving specialized medical attention yet was not provided with his critical medication. Jose Franco Peña arrived at California City on September 5, 2025 and reported receiving multiple medications for hypertension and diabetes; some were not provided until three days later. *See also* Singh Decl. ¶ 8 (stomach ulcer meds delayed at intake).

49.    Based on the declarations and the records I reviewed, some people go for significant and dangerous periods of time without their prescription medications. Sometimes medication doses are changed with no explanation or documented reason. A good example of this is Julio Armenta, who has a documented deep venous thrombosis and was on Xarelto (blood thinner) to treat this. He came into the facility on September 1, 2025 and his Xarelto was continued at that time twice per day to treat his deep vein thrombosis ("DVT"). On October 14, 2025 Mr. Armenta's Xarelto dose was reduced to once per day without discussing that with him and without doing any assessment of his clot. There is a comment in the chart that Mr. Armenta's clot would be monitored by using a D-dimer test, which is not within the standard of care. D-dimer tests are used to make the initial diagnosis of a clot, but they have no use in monitoring clots long term. Nonetheless, the D-dimer test was ordered and it came back high, and there is no indication in the medical record that anybody ever noticed or signed off or explained that abnormal result that was the crux of their management plan. This care was just phoned in, changed without the patient's knowledge, and the monitoring they offered was not medically logical or followed up upon.

50.    Fernando Viera Reyes arrived at California City with an active prescription for Flomax, two tablets a day; instead, he was provided with one tablet a day until his symptoms became significantly worse and he was returned to his regular dose a month after his arrival. Similarly, Daniel Elias Benavides Zamora, a diabetic, arrived at California City on an established insulin regimen consisting of Humulin sliding scale, Lantus 30 units in the morning and Lantus 20 units in the evening, along with other medications. Without a provider encounter or documented rationale, his Lantus prescription was changed to only once in the evening with the dose fluctuating between 20 and 30 units (November 6 pm (20 units), November 7 (30 units),

November 8 (30 units), and November 9 (20 units)). Patient prescriptions should not be changed without a patient assessment and a clinical rationale; for medication like insulin, changes should be based on a patient's blood sugar readings.

51.     Esteban Alvarez-Mora arrived at California City on September 5, 2025 on antibiotics for his multiple abscesses that were hot to the touch and possibly infected. He had begun a course of antibiotics the day prior to his arrival but those antibiotics were not continued until September 16, 2025. To be effective, it is critical that antibiotics be taken as prescribed; failing to do so can make treatment ineffective and cause the bacteria to become antibiotic resistant. Alvarez-Mora Decl. ¶¶ 9-10. Similarly, Fernando Chavez Lopez arrived at the facility with an ear infection and needed antibiotic ear drops. Although the intake nurse noted his active prescription for antibiotic ear drops—four drops, three times a day, at his September 1, 2025 intake screening, Mr. Chavez Lopez's prescription dosage was changed. Instead, he was ordered three drops, three to four times a day. Even that dosage administration was not honored. Instead, he received no doses until September 3, then one or two doses per day through September 9, and it appears that most doses were three drops rather than four. Again, the failure to take antibiotics as prescribed is dangerous and can result in failed therapy and possibly long-term harm from antibiotic resistance. (Unfortunately, Mr. Chavez Lopez also failed to consistently receive his medications for diabetes (Farxiga), hyperlipidemia (Atorvastatin), and major depressive disorder (Abilify) during the month of September.) Such lapses are pervasive in my review and can expose patients at California City to serious risk of harm.

*viii. Initial Appraisals by Primary Care Providers Are Not Timely or Thorough and Do Not Result in Appropriate Treatment Plans*

52.     The nurse completing the intake must make a clinical determination about how soon a patient needs to be assessed by a provider for their initial appraisal. Using a standardized intake template, the screening LVN / RN decides whether the person should see the provider on an emergent, urgent or routine basis, *i.e.*, immediately, within 24 hours, or within two to fourteen days. It is important that these encounters take place timely to address any potential lapses in care and to order any necessary labs, images, or medication on a timely basis.

53.     At California City, people are often not seen within the timeframes ordered by the screening LVN / RN, resulting in lapses in care.

54.     For example, when screened on August 30, 2025, Jose Ruiz Canizales, a 45-year-old man, was identified as needing to see a primary care provider on an "emergent" basis (*i.e.*, immediately) because he has asthma and had recently had a procedure to remove his great toenail. He was not seen, however, until four days later, when he was experiencing chest pain and shortness of breath and had to be transported to a hospital for medical clearance, due to "limited resources here." He did not have his initial appraisal with a provider until September 12, 2025. This was the only California City medical encounter at which he was provided a Sign Language Interpreter, via video relay.

55.     Utkarshkumar Trivedi was referred urgently to a PCP during his RN intake on September 6, 2025. He is diagnosed with multiple chronic conditions, including an oral lesion/ulcer for which he had a scheduled consult with the ENT and oral surgeon to rule out malignancy at his prior detention facility. His PCP initial appraisal did not happen until 11 days later on September 17, 2025.

56.     Julio Armenta was screened by an RN on September 1, 2025, where he was noted to have a heart condition, hyperlipidemia, swelling in left leg and ankle, and a condition related to his "veins and varicose." He was referred urgently to a PCP for initial appraisal, but was not seen until September 17, 2025, 16 days later.

57.     Sudesh Singh is diagnosed with multiple conditions, including high blood pressure, type 2 diabetes, hyperlipidemia, an inguinal hernia, and gallstones. He was seen for his initial screening on September 7, 2025. At that time, the RN referred him to the provider for his initial appraisal on an urgent basis. His provider appointment did not occur until nine days later, on September 16, 2025.

58.     In addition to being untimely, initial appraisals are not thorough and do not adequately address pending medical complaints. Questions on the appraisal template that should presumably be answered are left blank, and it is unclear if providers are completing physical exams, even in situations where an exam would be appropriate to assess an injury or wound.

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

3871655

When the providers at California City perform a physical examination, they often document the findings for each organ system to be "normal" if there are no abnormalities. This is not accepted medical practice. When documenting a physical examination, providers need to note specific normal findings when relevant to the patient's health problem.

59.    Review of the charting demonstrates that the intake assessments and progress notes are primarily completed using a "charting by exception" methodology. This method of charting marks things as normal by default and it is up to the healthcare staff member to go in and change that for anything that is abnormal. It is well known in healthcare that charting by exception under-documents problems and tends to downplay abnormal findings. It is a very poor choice for documenting more complex patient care and decision-making. It often leads to confusion because the default answer of "normal" is at odds with the presentation of the patient as demonstrated in the examples below.

60.    During Utkarshkumar Trivedi's initial appraisal, the PCP's review of systems was incomplete, and the documented physical exam was inconsistent with known conditions such as marking "normal" to the evaluation of his mouth and no evaluation or documentation of his lesions/ulcers. Mr. Chavez Lopez was also referred urgently to a PCP, but did not see anyone for over two weeks. When he was seen, the PCP did no review of systems, and physical exam documentation was incomplete.

61.    On September 5, 2025, Esteban Alvarez-Mora was referred urgently to a PCP for his "bleeding hemorrhoids," although Mr. Alvarez-Mora reports that it was in fact bleeding and oozing abscesses that resulted in his urgent referral. Regardless, he was not seen until September 22, 2025 for his initial appraisal with a PCP. At that encounter, the PCP noted that Mr. Alvarez-Mora had inflammation and abscesses and had been prescribed an antibiotic already; no physical exam or description of his abscesses was noted. Alvarez-Mora Decl. ¶¶ 8, 10-11.

62.    Yuri Roque Campos has a complicated heart condition that makes him a medically very high risk patient. He arrived at California City on September 5, 2025, and was sent to the emergency room right away; he returned the same day with a directed recommendation by the ER doctor that he be seen by a specialist in right heart failure within 72

22

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

3871655

hours. He completed the RN intake process the next day, where it was recommended that he receive an emergent referral to the PCP for an initial appraisal. He again went to the hospital that day for chest pain. He was placed in a medical observation room the day he returned but the record does not reflect that a California City provider saw him until September 9, 2025, days after his arrival to California City and after two emergency room visits. The 72-hour cardiology specialist visit never happened.

63.     On September 6, 2025, Julio Santos Avalos was referred urgently for a PCP evaluation due to history of polio, Guillain-Barre syndrome, accompanying foot deformity and need for medication continuity. That appointment did not take place until September 16, 2025, where the PCP failed to document a thorough review of systems. Although Mr. Santos Avalos was noted to have muscle and joint pain, it appears he did not get a physical exam because he was noted to have normal lower extremities, which is not consistent with his permanent foot deformity. He was cleared for work and regular housing. Two days later, he was seen by a different provider due to his report of right foot and ankle pain. At that encounter, his right foot deformity, muscle weakness of the right lower leg, and limping were noted. He was given a low bunk and low tier chrono and his work clearance was cancelled. The latter evaluation is in stark contrast to the initial appraisal completed two days prior, where no deformity was noted and no accommodations were provided. Inconsistent documentation in this patient's medical record raises concern that PCPs are not physically evaluating their patients.

64.     When Mr. Armenta had his September 17, 2025 appointment, he reported a history of blood clot and arthritis, including a recent hospitalization due to a blood clot. The PCP failed to obtain relevant information to understand Mr. Armenta's condition, including information about the location and type of clot, the treatment he received, whether he had any previous clots, or if there is a family history of clots. Other than stating that his lower left leg has varicosities, the PCP indicated the physical exam was "normal."

65.     When providers do order follow-up care after the initial appraisal, it is not ordered at appropriate intervals. Fernando Viera Reyes was seen for an initial appraisal on September 12, 2025 where his "review of symptoms" was left blank, including the review of "genito-urinary-

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

intestinal" although Mr. Viera Reyes was undergoing workup for prostate cancer and suffers from urinary retention. A rectal exam was deferred, which is inappropriate given Mr. Viera Reyes's elevated PSA and history. He was ordered a PSA with a due date a month out, and there is no documented follow-up ordered; he was not seen by a PCP until two weeks later when he reported blood in his stool and urine.

66. Fernando Gomez Ruiz had an elevated blood pressure (157/73 and 155/81) during his initial appraisal. In order to minimize the risk of complications such as heart disease, the American Diabetes Association recommends a blood pressure goal of <130/80 for patients with diabetes. Failure to control blood pressure down to the target range in patients who are diabetic results in accelerated damage to the kidneys, the eyes, and the smaller blood vessels of the legs. This accelerates the progression of renal failure, retinal damage, and impairs blood flow to the limbs. The end result of this progression can be the need for dialysis, blindness, and amputations. The provider further failed to document a review of systems and inappropriately referred Mr. Gomez Ruiz for diabetic follow-up in five months. As a general rule, patients with uncontrolled chronic illnesses should be seen at least every three months until they have demonstrated that their disease is stable and that their treatment plan is optimized to their condition. That determination had not yet been made in the case of Mr. Gomez Ruiz.

67. At Alejo Juarez Ruiz's initial appraisal, which took place the day after his initial screen, his blood pressure was again elevated (158/100). The provider failed to mention the elevated blood pressure the day before, or that he had a history of hypertension. Other than noting that he had joint pain from a knee injury, the provider did not document a review of systems, or an examination of his knee injury. The patient's blood pressure was significantly elevated and uncontrolled and that should prompt a comprehensive workup to determine if there is any evidence of end-organ damage from the persistently elevated blood pressures. In addition, blood pressures in this range require thoughtful medication management usually involving the up-titration of multiple medications over time. None of that was done or even considered or anticipated for the future based on the lack of meaningful follow-up.

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

3871655

68.     California City providers are often evaluating patients at their initial appraisal with no prior medical records although a significant number of patients are arriving from other ICE detention facilities. Defendants have failed to ensure the medical records maintained at the sending ICE detention facilities are transferred with the detainees to California City so that their care can be continued. Frequently patients are in the middle of workups for various conditions or have been treated definitively by prior providers. Obtaining these records and incorporating them into the medical record of their current facility is critical for understanding their medical care and for planning future management. While some patients do have "transfer summaries" in their charts, these records generally lack adequate detail and merely serve as a flag that additional important medical record information is available. In the charts that I reviewed, I saw many mentions of prior medical records but I rarely saw outside records incorporated into the active care plan.

**Summary of Opinion**: The medical intake assessment process at California City is dangerously ineffective. Initial assessments are not confidential, timely, or thorough, and some are performed by nurses who lack the credentials to perform assessments. The screenings fail to include consistent and adequate testing for tuberculosis, fail to include adequate screening for detained people's disabilities and their disability needs. Initial assessments also fail to result in timely and accurate continuation of medications. Staff conducting the assessments do not ensure that they have effectively communicated with patients. Lastly, initial appraisals with primary care providers are not timely or thorough and do not result in appropriate treatment plans.

## B. The Sick Call Process for Episodic Care is Broken

### i. Sick Call Should Facilitate Patients' Access to Timely Medical Attention

69.     To ensure the adequate delivery of episodic medical care, detention facilities must provide a formal system for detainees to request health care. Every request for health care attention must be evaluated by a qualified health professional, and, if the request includes symptoms, the person must have a face-to-face encounter with a registered nurse in a clinical setting. These sick-call encounters must be conducted at least five days a week, and people who

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

submit a sick call request must have a face-to-face encounter with a qualified health care professional (minimum licensure of Registered Nurse) within 24 hours if the request includes a symptom-based complaint. The nurse determines whether the person requires an encounter with a provider and, if so, whether to schedule it on a routine, urgent, or emergent basis.

70.    According to the CoreCivic Detainee Handbook, sick call services are provided "to all detainees from the time of admission until the time of release in order to provide continuous medical care." Appendix C at 43. Detained people who want routine medical care must complete a medical request and put it in a medical box for processing by Health Services. *Id.* These requests are supposed to be picked up each morning by Health Services staff. *Id.* The Handbook indicates the person will be evaluated by "the nursing staff" and scheduled to see "medical personnel . . . according to medical necessity." *Id.* "Most appointments are scheduled within a reasonable time." *Id.*

*ii. Patients Who Submit Sick Call Slips Are Not Scheduled for Timely Appointments with Nurses or Providers*

71.    Based on the declarations I reviewed and the limited number of handwritten sick call requests in the records provided to me, patients are not seen within 24 hours of their sick-call submission, nor are they seen within a reasonable time. (It appears that sick call slips may be submitted electronically, and those slips are not included in the health records I received.) In fact, some patients report that California City does not respond to all sick-call submissions.

72.    According to patients, sick-calls describing urgent medical symptoms can go unaddressed or unacknowledged for days or weeks, resulting in delays accessing care. Fernando Viera Reyes, a detainee with high suspicion of having prostate cancer, reports submitting multiple sick-call slips noting blood in his urine and stool because prior requests were ineffective at getting him care. Viera Reyes Decl. ¶¶ 11, 14-15. Mr. Chavez Lopez, who arrived at the facility with an ear infection, and was not provided his full course of antibiotic drops, submitted a sick call slip on September 8, 2025, and was not seen by a nurse until six days later, when he reported his hearing was impaired. Alfonso Leyva submitted a sick call on October 3, 2025 regarding ear pain, but was only seen by an LVN on October 8, 2025 (which, as discussed

26

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

3871655

elsewhere, is not appropriate). He did not see a physician until October 9, 2025. Esteban Alvarez-Mora, who arrived with multiple open abscesses, submitted a sick-call slip triaged on September 18, 2025 at 1:52 am reporting multiple concerning symptoms that could indicate an infection, including open abscesses on his bottom and legs, fever, headaches, shaking, etc. He was not seen for a face-to-face encounter with the RN until three days later on September 21, 2025, at which time the RN noted the abscesses and lesions on his penis, 10/10 pain, itching and burning and referred him urgently to the PCP due to risk of infection He was seen by the PCP the next day for his initial appraisal; the PCP only noted balanitis (no mention of lesions or ulcers) and prescribed him Bacitracin and clotrimazole.

73.    Sick-call slips reporting medication lapses or requesting medication refills do not result in timely medication continuity. Utkarshkumar Trivedi submitted multiple sick-call slips requesting medication refills. The written response, if any, would state that refills were submitted but the medication would not be refilled timely, if at all. Sometimes the sick-call slip would document how many requests he had submitted already. For instance, he submitted a sick-call on October 29, 2025, documenting that it was his second, third, and fifth requests for a refill for various medications. Among the requests was a refill of Omeprazole; he had previously requested a refill via sick-call on October 16, 2025, where it was noted in writing that a refill request was submitted. However, as of October 29, 2025, he still had not received the medication and had to submit another request for refill.

74.    It appears sick call slips are ignored even when the medical staff submit sick call slips on behalf of the patient. While Alejo Juarez Ruiz was held in a medical observation cell, it appears an RN, Golding, completed a sick call slip for him, indicating that he is diabetic, and his "extremely long and sharp and pointy" nails need trimming. Foot care is essential for people with diabetes because, among other things, they are highly susceptible to infection. I found no documentation that his nails were trimmed as requested.

75.    Patients who are seen by a nurse for a triage appointment are not timely referred to a provider for care and, even when referred, not seen timely. Esteban Alvarez-Mora was also urgently referred to a provider on September 11, 2025 by the RN on account of an "infection and

27

3871655

3 abscesses in bottom." He was not seen until September 22, 2025—and that was for his PCP initial appraisal. Julio Santos Avalos submitted a sick-call slip reporting extreme pain and swelling of his ankle due to his history of polio, and requesting a medication refill. He was seen by an LVN on October 8, 2025, who referred him routinely (2-14 days) to a PCP. That appointment did not take place until November 3, 2025 where there are minimal notes and no documented exam.

76.    Patients who request care are not always seen by an RN. Records reflect that patients are sometimes seen by LVNs to address their underlying symptoms—a task that is beyond their licensure. As noted above, LVNs are not trained to perform these assessments and typically miss important information, or may not assign conditions and symptoms the appropriate medical urgency, which can result in patient harm

77.    Without access to a well-functioning and responsive sick-call process, patients are not able to inform staff of symptoms or request timely care.

78.    Patients who disagree with or question health care decisions should have access to a functioning grievance process. Gustavo Guevara Alarcon reports that grievances go unanswered, thus depriving patients of their ability to seek medical care or challenge any denial of requested care. Guevara Alarcon Decl. ¶ 16.

**Summary of Opinion**: California City's sick call system is broken because patients submit sick call slips but are not scheduled for timely appointments with either nurses or providers. It is not uncommon for sick call slips to be entirely ignored. A broken sick call system is harmful for patients because it impedes access to care.

### C.  Care for People with Chronic Illnesses is Untimely and Often Abysmal

#### i. People with Chronic Illnesses Require a Structured Treatment Program

79.    It is essential that chronic care patients, particularly those with poorly managed conditions, are seen regularly so their condition can be assessed, including a review of completed labs, adjustments to their medication, and further ordering of workups. Patients who are new to a provider's care may require more frequent visits while the provider establishes the patient's

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

3871655

treatment plan. Patients who are not stable on medications will require visits at least every three months.

### ii. Chronic Care is Scheduled at Inappropriate Intervals and Providers Fail to Provide Necessary, Clinically Appropriate Care for Sick Patients

80.    I reviewed multiple records where follow-up encounters were ordered beyond what would be appropriate follow-up intervals given the patient's condition and presentation, if ordered at all. Even more alarming, the records show that when providers do see chronic care patients, the care that they provide often falls far below the standard of care, putting the patients at a high risk of serious harm.

81.    Alejo Juarez Ruiz is a patient with uncontrolled diabetes and dangerously uncontrolled hypertension. When seen for a chronic care appointment on September 22, 2025, his blood pressure was dangerously high, at 216/111, and remained high at 190/106 after 90 minutes. The provider gave him two, one-time doses of 10 mg of Lisinopril, and ordered 40 mg Lisinopril, blood pressure checks weekly for two weeks, and a return chronic care visit in six months. This plan is wholly inadequate to address this urgent situation, as explained further below.

82.    Not surprisingly, Mr. Juarez Ruiz continued to experience symptoms of uncontrolled hypertension. On September 29, 2025, his blood pressure was 197/107 and then 3 hours later it was 168/107. He was not seen again until October 9, 2025, when presented to an RN at around 1:37 pm with symptoms of dizziness and visual disturbances, which are typical of unmanaged and escalating hypertension. His blood pressure on that day was 180/112 and his blood sugar reading was 369. When the provider was contacted about the extremely elevated blood glucose and blood pressure, the orders back to the nurse were to give more lisinopril and more metformin and to recheck in 30-60 minutes. A repeat blood sugar check was 360 around 2:05 pm and a repeat blood pressure check was 177/111 at around 2:20 pm. The PCP was notified and cleared the patient's return to the dorm, with orders to recheck his blood pressure during the night shift, and do blood pressure checks the following Monday, Wednesday, and Friday. The records do not contain an evening blood pressure check, nor the additional ordered

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

3871655

checks. No PCP follow-up order was placed. In both instances of dangerously elevated blood pressure readings on September 29, 2025 and October 9, 2025, he was merely ordered extra doses of his already-prescribed medication and discharged back to his unit despite still having elevated readings.

83.    Furthermore, the daily maximum dose of Lisinopril is 40 mg, but on more than one occasion, Mr. Juarez Ruiz's provider ordered additional Lisinopril in an attempt to bring down his dangerously elevated blood pressure readings. On September 29, 2025, his blood pressure was 197/107 and then 168/107. He was ordered a one-time, extra dose of 80 mg Lisinopril (in addition to the 40mg he takes daily). On October 9, 2025, as discussed above, he was ordered an extra 40 mg dose of Lisinopril (in addition to the 40 mg he takes daily). Giving 80-120 mg of Lisinopril in a day is way beyond the dosing recommendations for this medication and not in compliance with any standard of care. Despite his consistently uncontrolled and dangerously high blood pressures, I can only find six readings ever taken at California City over a span of two months. Not a single reading has ever been even close to normal. Based on his records, California City is failing to medicate him properly or monitor his condition.

84.    Those orders in this clinical context are ignorant and demonstrate dangerously casual care in the face of an objective medical emergency. As a general guideline, if the combined systolic and diastolic numbers are more than 300, the patient needs to be seen in the Emergency Department for management and assessment of end-organ damage. That is suggestive of malignant hypertension and cannot be managed with oral medications. Those medications (Metformin and Lisinopril) do not work quickly, and they are not treatments for this medical emergency. There is no way those medications helped this situation. On October 9, 2025, this patient was symptomatic for both extremely high blood pressure (dizzy, headache), and high blood glucose (dizzy). Despite these objective findings of uncontrolled disease, his chronic care provider in the system ordered him to be seen in six months for follow-up. This is shockingly poor care.

85.    As it relates to his diabetes, a diabetic with a hemoglobin A1c level at 10.7 requires insulin to properly manage blood sugar levels and bring it down to a reasonable level. In

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

patients with diabetes, the hemoglobin A1c goal is < 7%. A hemoglobin A1c of 10.7% puts him

at risk of developing diabetic ketoacidosis, a serious and potentially life-threatening complication

of diabetes. Someone with Mr. Juarez Ruiz's condition is beyond what oral medications can

accomplish. Given his uncontrolled diabetes and hypertension, it is not surprising that he has an

abnormal albumin/creatinine ratio in his urine indicating that his kidneys are leaking protein.

This is typical in patients with uncontrolled hypertension and diabetes. There does not seem to be

any recognition of this abnormality and no plan to track it.

   86. When chronic care patients are seen, the notes are sparse, physical exams are not

regularly completed, and the care provided is substandard. Yuri Roque Campos is diagnosed

with multiple serious, life-threatening heart conditions that should be carefully and closely

monitored. His medical condition makes him extraordinarily medically fragile. The day he was

transferred to California City, on September 5, 2025, he did not get his prescribed aspirin and

ended up in the emergency room with chest pain. There, the emergency room doctor expressed

serious hesitation to send him back to California City. The doctor authored a detailed letter to the

detention facility health care staff stating as much – an act that is not typical of ER doctors:

> Mr. Campos presented to the emergency department with complaints of chest pain. We conducted extensive testing to evaluate the possible causes of his symptoms. Unfortunately. our ability to provide comprehensive care was limited due to the lack of access to records from his recent hospitalization. ongoing treatment. and testing performed at another facility….it appears that Mr. Campos likely has a condition known as pulmonary hypertension. This is a potentially life-threatening illness that requires close and continuous management, as it can rapidly progress to severe heart failure.

> It is imperative that Mr. Campos follow up within 72 hours with a specialist in right heart failure or pulmonary hypertension. Ideally, this should be with a provider who has previously been involved in his care-either at the Bakersfield facility where he was recently treated, or at Stanford, where he has also received care….

> At this time, it is safe for him to be transported back to the facility, **provided that he receives daily check-ins with health officials and that arrangements are made for close follow-up with appropriate cardiology and/or pulmonology specialists.**

(Emphasis added). A true and correct copy of the letter is attached hereto as **Appendix D**.

   87. The records do not reflect that appropriate management of Mr. Roque Campos's

condition happened upon his return. He was placed in a medical observation unit but, even then,

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

3871655

did not receive the medication recommended by the hospital, or his already prescribed aspirin. Roque Campos Decl. ¶¶ 22-23. He did not receive the urgent follow-up with a cardiologist or pulmonary specialist; as of November 6, 2025, he had not seen a cardiologist.

88.    Mr. Roque Campos received very little monitoring by the providers at California City. He had one visit on October 19, 2025, related to his heart condition where he reported chest discomfort, at which time the provider suspected he may have GERD and Omeprazole was prescribed. The provider acknowledged that Mr. Roque Campos has a right bundle branch block and right atrial enlargement and referred him to a cardiologist on a routine basis. This referral should have been initiated on an urgent basis at the time of his arrival on September 5, 2025, and Mr. Roque Campos should already have been seen.

89.    The management of pulmonary hypertension and right heart failure is extremely complicated medicine involving multiple medications, some of which can only be obtained through a cardiology office because of their unique attributes and limited availability. In addition, one of the common interventions for patients like this is to place an implantable defibrillator if their workup indicates a need for that. The failure to do the appropriate workup and to put this patient on the correct regimen of meds (a regimen that far exceeds the simple baby aspirin that the facility has agreed to) puts this patient at significant risk for sudden cardiac death. The ER physician was absolutely correct in his letter and ignoring that informed opinion and directed referral is willful dereliction of a physician's basic duties.

90.    Chronic care notes lack substance and show poor clinical judgment. Even when orders are placed by a provider, they are not always followed or implemented timely, undermining the ability to appropriately monitor a patient's condition. Failure to manage chronic medical conditions can have dire consequences for patients—in the case of Fernando Gomez Ruiz, for instance, it could mean a foot amputation. Mr. Gomez Ruiz, a 61-year-old diabetic with an ulcer at the bottom of his foot and a history of toe amputation, was receiving insulin and regular wound care at his previous facility. Unfortunately, the overall care he has received thus far for his foot ulcer at California City has not conformed to the prevailing standard of care for this well-known dangerous condition. California City has failed to: (1) determine whether the

ulcer is infected before placing him on antibiotics; (2) do a culture of deep tissue to inform the choice of correct antibiotics; (3) order the correct ointments for wound care and instead has him on silver sulfadiazine and neomycin, which are not standard choices for foot ulcers at all; (4) complete imaging to determine if Mr. Gomez Ruiz has osteomyelitis or lab work such as C-reactive protein or erythrocyte sedimentation rate to look for blood evidence for chronic infection; (5) refer him to a vascular surgeon to determine the most critical element which is whether there is adequate blood flow to his foot to get an ulcer to heal; (6) complete debridement or document information of the actual ulcer; and (7) exempt him from work that requires him to stand because one of the most important elements for caring for a diabetic foot ulcer is offloading the weight on the foot. Mr. Gomez Ruiz reports that his foot is swollen, the ulcer is now the size of a quarter and sometimes oozes blood, which he is attempting to manage and clean with dirty, bloody gauze he has. Gomez Ruiz Decl. ¶¶11-16. Failure to appropriately manage and treat a diabetic ulcer can result in infection, gangrene, or osteomyelitis and ultimately an amputation.

91.     Mr. Gomez Ruiz was also noted to have hypertension during his initial appraisal with the PCP. His blood pressure at intake was 180/94, and 157/73 at his initial appraisal two days later. At that encounter, his provider ordered twice weekly blood pressure checks, which are not reflected in the medical records, and failed to order a timely follow-up appointment to assess whether it would be appropriate to start Mr. Gomez Ruiz on hypertensive medication. Elevated blood pressure in an older patient with diabetes and other chronic conditions accelerates the damage to the kidneys and moves them closer to needing dialysis.

92.     Jose Franco Peña takes two different medications for hypertension. He experienced weeks-long lapses in the administration of his medication (Amlodipine and Lisinopril) from mid-September to mid-October. Although he saw the provider regarding his hypertension on September 28, 2025, there is no discussion of his missed medication. At that encounter, blood pressure checks every other day for two weeks were ordered but only one blood pressure check was documented during that period. At the September 28, 2025 encounter, a six month follow-up was ordered by the provider. The failure of medical staff at California City to

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

implement orders intended to monitor a patient's chronic condition leaves patients vulnerable to medical complications. The six-month follow-up is medically inappropriate.

93.    When bloodwork or imaging is ordered, records do not reflect that abnormal or concerning results are addressed or that appropriate action is taken in response. Yuri Roque Campos had an EKG completed on September 24, 2025 that showed concerning abnormalities; the results were signed by the provider, but there was no follow-up appointment. He continued to go without his medication, and he was not ordered any specialty follow-up. *See also* discussion of Mr. Juarez Ruiz above, ¶¶ 81-85.

94.    The same occurs with abnormal vitals. Records do not consistently reflect that repeat vitals are taken or patients are stabilized before returning to their unit, or that the provider is notified. It is important that patients are stable before being discharged into the general population. Abnormal vitals, especially in a patient who is not being treated for an underlying condition or whose condition is not yet well-managed, should trigger further workup or timely follow-up. Fernando Gomez Ruiz had a blood pressure reading of 180/94, which is clearly in the category of severe hypertension and clearly meets all criteria for medical management. At a minimum, Mr. Gomez Ruiz should have remained in intake until a repeat blood pressure reading was taken. There was no documentation of a repeat vital reading. He was discharged to the general population with a routine order to see a provider. *See also* Santos Avalos Decl. ¶ 16 (blood pressure reading of around 161/100 [163/89 according to medical records] and he was told to calm down and was returned to his unit).

95.    Patients at California City are encouraged by their provider to seek care when they return to their country of origin. This is inappropriate and irrelevant to the provision of care at the detention facility. The role of the provider is to assess the immediate needs of their patient and provide necessary care in a timely fashion and to do so in accordance with normal healthcare timelines. The providers at California City do not know how long their patients will be in their care and should treat the patients before them with the urgency that their condition warrants. Daler Singh suffers from painful stomach and tongue ulcers that cause him to cough up and vomit blood, as well as experience bloody stools. Singh. Decl. ¶¶ 5-6. During a medical

34

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

encounter with his provider, he was told he would not see a gastrointestinal specialist and should return to his country of origin to get medical care despite his ongoing pain, bloody stool, and difficulty eating. *Id.* ¶ 19. His records confirm his report, stating, "COUNTRY OF ORIGIN – INDIA. PATIENT ADVISED TO ALSO GET ACCESS TO CARE IN HOME COUNTRY FOR GASTROENTEROLOGY." Jose Franco Peña reported during a provider encounter a history of diabetes that was not being treated at California City. The provider ordered lab work to measure his average blood sugar levels and "ADVISED TO ALSO GET ACCESS TO CARE IN EL SALVADOR IF NEEDED."

**Summary of Opinion**: California City does not provide appropriate medical care to patients with chronic conditions. Medical records indicate that people who have serious medical conditions are not appropriately treated. In several of the cases that I reviewed, medical providers made clinical decisions that fell far below the acceptable standard of care and put patients at risk. In several cases, providers inappropriately recommended that detained people receive care in their country of origin. Failing to adequately manage patients' chronic care puts patients at risk of medical harm.

### D. Patients are Deprived of Necessary Medications

#### i. Patients Must Receive Medications as Prescribed

96.    Medication continuity is a critical component of a functional health care system. The risk associated with medication lapses depends on the medication prescribed but some medications, such as insulin, blood thinners, antibiotics, seizure medications, and migraine medications, should not be skipped. Missing a scheduled dose can result in increased risk of medical complications or reduce the effectiveness of the medication.

#### ii. Medications Are Often Delivered Late or Not At All

97.    Records I reviewed showed lapses in medication continuity both at intake and even after people, sometimes following significant delays, were able to obtain a renewal prescription at California City. The medication lapses in the medication administration records and that are described in the declarations raise serious concerns about the facility's ability to ensure continuity of care for patients or to manage serious medical conditions.

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC
3871655

98.     Examples include Yuri Roque Campos who has a life-threatening medical condition for which he was taking daily aspirin. Roque Campos Decl. ¶11. His medication administration records indicate that he did not get it the first five days at California City (even when he was held in a medical observation room), was not given multiple doses from September 10 to September 27, when he had an active prescription, and then went from September 27 to October 22 with no active prescription. Missing a dose of aspirin significantly increases his risk of a heart attack, stroke, or even death. Fernando Gomez Ruiz, a diabetic with complications, did not get insulin for three of the first nine days he was at California City despite having an active prescription. Missing insulin, especially for someone who is already experiencing complications like diabetic ulcers, can cause high blood sugars and further impede the healing process. These medical lapses are dangerous and unacceptable for a facility housing medically complex patients; neither of these medications are difficult to obtain and should be readily available.

99.     Once prescribed, continuous, timely administration of medication is essential to ensure its effectiveness. Some people report receiving their medication only half the time. Some say they are woken up in the middle of the night to receive their medication.

100.     Record review shows inconsistent medication distribution time, with evening medications logged at all hours of the night, which increases the likelihood that a patient will miss their medication administration. Sokhean Keo reported missing multiple days of his anti-anxiety medication, making it difficult for him to slow his racing thoughts and get sleep. At times, the medication is administered well past midnight. Keo Decl. ¶26. Fernando Viera Reyes was provided Flomax on and off the first month of his detention, making it difficult and painful to urinate. Viera Reyes Decl. ¶14.

101.     A number of records reflect "no shows" for medication at 3:05 am, but it appears those entries may be an indication that the medication was never offered. Utkarshkumar Trivedi's records indicate similar lapses in prescribed medications; for instance, he is prescribed Tamsulosin once a day at bedtime for BPH; he received the first dose on September 7, 2025 at 2:06 am but then did not get medication from September through September 14 with no

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

1  documented reason, only to receive it three times on September 15, 2025, and then not receive it

2  again on September 16, 2025.

3      102.    Julio Santos Avalos experiences pain and limited mobility, due to his foot

4  deformity resulting from childhood polio and his history of Guillen Barre. Santos Avalos Decl. ¶

5  9. He was prescribed a muscle relaxer to help with the pain but has experienced difficulty

6  continuing his muscle relaxer despite numerous sick-call requests. *Id*. ¶¶ 9-11. He was given 30

7  tablets weeks after his arrival on September 23, 2025, which if taken according to the allowed

8  dosage of 3 times a day, would last for 10 days. As of November 6, 2025, he has not been able to

9  get the medication refilled despite submitting sick-call slips in early October requesting re-fills

10  and reporting extreme pain and swelling. . In fact, on October 6, 2025, medical staff responded

11  to a sick-call slip indicating that a refill request had been submitted, but Mr. Santos Avalos did

12  not have the refill in hand as of November 6, 2025, the date his record excerpt was printed. Julio

13  Armenta's records indicate lapses in Xarelto, which is a time-sensitive medication.

14      103.    California City's Medication Administration Records (MARs) do not conform to

15  standard documentation practices, making it difficult to track appropriate medication distribution

16  and patient adherence. Below is a portion of a patient MAR—a close look will show unexplained

17  gaps in administration dates, out of stock medications, and sporadic distribution times:

18

19

20

21

22

23

24

25

26

27

28

**MAR**

A = Administe

| Medication | SIG | Authorizing Provider | Administered Date | Disp. |
|---|---|---|---|---|
| metFORMIN HCl - 1000 MG Oral Tablet | TAKE 1 TABLET TWICE DAILY. | Uche, Nnenna FNP-C | 9/11/2025  7:03:25PM | A |
| | | Uche, Nnenna FNP-C | 9/12/2025  2:59:36PM | RI |
| | | Uche, Nnenna FNP-C | 9/12/2025  11:32:41PM | A |
| | | Uche, Nnenna FNP-C | 9/13/2025  10:27:04PM | A |
| | | Uche, Nnenna FNP-C | 9/17/2025  6:14:17AM | OS |
| | | Uche, Nnenna FNP-C | 9/18/2025  10:20:42PM | A |
| Mirtazapine 30 MG Oral Tablet | TAKE 1 TABLET AT BEDTIME. | Uche, Nnenna FNP-C | 9/8/2025  2:31:14AM | A |
| | | Uche, Nnenna FNP-C | 9/8/2025  10:41:50PM | A |
| | | Uche, Nnenna FNP-C | 9/10/2025  12:12:15AM | A |
| | | Uche, Nnenna FNP-C | 9/10/2025  9:33:12PM | A |
| | | Uche, Nnenna FNP-C | 9/11/2025  7:04:24PM | A |
| | | Uche, Nnenna FNP-C | 9/12/2025  11:32:52PM | A |

**MAR**

A = Administere

| Medication | SIG | Authorizing Provider | Administered Date | Disp. | Do |
|---|---|---|---|---|---|
| Aspirin 81 MG Oral Tablet Delayed Release | TAKE 1 TABLET DAILY. | Uche, Nnenna FNP-C | 9/7/2025  12:54:46PM | A | 81 |
| | | Uche, Nnenna FNP-C | 9/9/2025  8:24:23AM | A | 81 |
| | | Uche, Nnenna FNP-C | 9/12/2025  2:59:10PM | RI | |
| Atorvastatin Calcium 20 MG Oral Tablet | TAKE 1 TABLET DAILY. | Uche, Nnenna FNP-C | 9/8/2025  4:39:33PM | OS | |
| | | Uche, Nnenna FNP-C | 9/9/2025  8:24:35AM | OS | |
| | | Uche, Nnenna FNP-C | 9/12/2025  2:59:22PM | OS | |
| Docusate Sodium 100 MG Oral Capsule | TAKE 1 CAPSULE TWICE DAILY AS NEEDED. | Uche, Nnenna FNP-C | 9/25/2025  3:43:40PM | A | #6 |
| Lisinopril 5 MG Oral Tablet | TAKE 1 TABLET DAILY. | Uche, Nnenna FNP-C | 9/8/2025  4:39:37PM | OS | |
| | | Uche, Nnenna FNP-C | 9/9/2025  8:25:09AM | A | |
| | | Uche, Nnenna FNP-C | 9/12/2025  2:59:31PM | RI | |
| metFORMIN HCl - 1000 MG Oral Tablet | TAKE 1 TABLET TWICE DAILY. | Uche, Nnenna FNP-C | 9/7/2025  12:55:18PM | A | 10 |
| | | Uche, Nnenna FNP-C | 9/8/2025  3:05:00AM | A | 10 |
| | | Uche, Nnenna FNP-C | 9/8/2025  4:39:46PM | OS | |
| | | Uche, Nnenna FNP-C | 9/8/2025  10:42:05PM | OS | |
| | | Uche, Nnenna FNP-C | 9/9/2025  8:25:12AM | A | |
| | | Uche, Nnenna FNP-C | 9/10/2025  12:12:03AM | A | 10 |
| | | Uche, Nnenna FNP-C | 9/11/2025  3:05:00AM | NS | |

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

3871655

104.    Mirroring this data into a color-coded MAR, one can readily see the number of medication lapses this patient experienced. Green represents timely administered medication; pink represents missed medication, including medication reportedly refused after 11 pm, no documented entries, or medication noted as out of stock; yellow represents medication administered after 11 pm; and grey demonstrates no active prescription:

| | 7-Sep | 8-Sep | 9-Sep | 10-Sep | 11-Sep | 12-Sep | 13-Sep | 14-Sep | 15-Sep | 16-Sep |
|---|---|---|---|---|---|---|---|---|---|---|
| Aspirin 1 tab daily RX 9/6 - 9/14 | 12:54 PM | | 8:24 AM | | | Refusal noted at 2:59 pm | | | | |
| Atorvastatin 1 tab daily  RX 9/6 | | | | | | | | | | |
| Lisinopril 1 tab daily  RX 9/6 - 9/16/25 | | | 8:25 AM | | | refusal noted at 2:59 pm | | | | |
| Metformin 1 tab (1000 mg) BID  RX 9/6 | | | | | | | | | | |
| am | 12:55 PM | | 8:25 AM | | | refusal noted at 2:59 pm | | | | |
| pm | 9/8/25  3:05 A.M. | | 9/10/25 12:12 A.M. | | 7:03 PM | 11:32 PM | 10:27 PM | | | |
| Mirtazapine 1 tab bedtime  RX 9/6 - 9/13 | 9/8/25 2:31 A.M. | 10:41 PM | 9/10/25 12:12 A.M. | 9:33 PM | 7:04 PM | 11:32 PM | | | | |

105.    Some medications appear to be administered incorrectly. Metformin, a medication for type 2 diabetes, should be administered twice daily, particularly when prescribed at higher doses. Sudesh Singh is prescribed 1000 mg of Metformin (a high dose) to be taken twice daily. His records show, however, that he received his medication only once per day or not at all for the first eleven days at the facility. It is unclear whether he was receiving one or two 1000 mg tablets. If he received only one tablet, he was being under-treated. If he was expected to take two tablets at once, this could be dangerous—he would be at risk of side effects, including a potentially life-threatening condition called lactic acidosis. Moreover, he was provided 26 tablets as KOP medications on September 18, 2025—an amount that would last him 13 days, *i.e.*, until the beginning of October. His records show that he was not provided more Metformin until November 5, 2025, so he apparently went a full month without his medication.

106.    Another diabetic, Daniel Elias Benavides Zamora, arrived at California City on November 5, 2025 with an active prescription for Lantus 30 units in the morning and 20 units in the evening, as well as a Humulin sliding scale, to address his diabetes. His records indicate that for the first few days of his arrival, he was getting Lantus mostly once a day at different doses

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

3871655

and different times (November 6: 20 units at 9:00 pm, November 8: 30 units at 5:13 am, November 8: 20 units at 11:51 pm, and November 9: 20 units at 9:56 pm). Furthermore, his Humulin sliding scale administration records do not match the order placed. For instance, he is supposed to receive Humulin based on his accucheck results, but the documented units provided do not match the units he is supposed to receive based on his documented blood sugar levels. On November 7, 2025, at 8:55 am, his accucheck (blood sugar reading) was 332, which should correspond with 8 units of Humulin being administered, but there is no record that he was administered any Humulin. On November 9, 2025, at 4:39 pm, the LVN documented providing him with 4 units of Humulin, which is supposed to correspond with a blood sugar reading of 201-250, but Mr. Benavides Zamora's only documented reading is 127 at 11:55 pm. Sporadic and inconsistent administration of insulin to a diabetic can result in elevated blood sugar levels and place the patient at risk for multiple complications, including diabetic ketoacidosis, a potentially deadly condition.

107.    Medical records also show sudden discontinuation of medications without clear explanation to the plaintiff. This can cause anxiety for the patient and have dangerous consequences for their physical health. Gustavo Guevara Alarcon is diagnosed with chronic migraines for which he is prescribed Topiramate (known by the brand name Topamax) for prevention, a medication that should be tapered off gradually to avoid serious side effects, including an increase in migraines. After experiencing lapses in the continuation of his medication upon arrival, he was able to start Topiramate again, only to have it abruptly discontinued without a taper or discussion with a provider. Yuri Roque Campos's aspirin and Tylenol, both prescribed for heart disease, were discontinued in late September 2025 without explanation. The aspirin was not restarted again until October 22, 2025 and the Tylenol was not restarted as of October 31, 2025. Daler Singh experienced sudden discontinuation of Buspirone and Hydroxyzine; both medications were abruptly stopped on September 11, 2025 and restarted again September 26, 2025. Jose Franco Peña was receiving two medications for hypertension and one for diabetes; they were provided for a few days and then suddenly stopped for weeks. He went almost a month without Amlodipine and over a month without Lisinopril. He received

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

Metformin for only four days and then his records do not reflect that his Metformin was re-ordered. His records do not reflect a provider's reasoning for any of the medication lapses.

108.    Medication should not be withheld because a patient is engaging in behavior that is not looked upon favorably by the facility. Daler Singh reports that he was told by officers and medical staff that if he did not end his hunger strike, he would not be provided with his prescribed medication. Singh Decl. ¶ 16. His medical records confirm his report. According to his provider, "Mr. Singh had asked for tylenol from nursing staff that I would agree to if he ate food with it" and "he would be getting his ensure ordered by Provider…if he ate." Sokhean Keo reports similar threats of withholding medication if patients do not follow the rules. He reported that a female nurse yelled at him and others, saying something to the effect of, "If you don't line up, you won't get any medication!" Another nurse told an officer that she did not want to give some people medications because they did not line up. Keo Decl. ¶ 13.

109.    I also saw evidence that the facility is sometimes out of stock of certain medications prescribed to detained people. A detention facility housing hundreds of patients should have sufficient standard medication in stock. Gustavo Guevara Alarcon was not provided Atorvastatin on September 1, 2025 and September 9, 2025 because it was out of stock. Mr. Chavez Lopez did not receive Atorvastatin on September 2 or September 5 and 6, Farxiga from September 3 through 17 and September 20 through 28 (with many days noted as out of stock and other dates not documented at all), and Omeprazole on September 5, 8, and 10 due to them being out of stock. Fernando Viera Reyes did not get Fenofibrate on September 4, 5, and 8 because it was out of stock. Mr. Gomez Ruiz did not receive santyl and silver sulfadiazine ointments for his diabetic ulcer because they are out of stock. Daler Singh did not get Acidophilus Probiotic between October 20 and October 30 and Ensure three times per day between October 26 and October 30 because they were "out of stock." It is not clear if Daler Singh received alternative calories to supplement his diet while the Ensure was out of stock.

**Summary of Opinion**: California City does not consistently deliver medication to patients. At times, medication is administered hours after the appropriate medication window. At other

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

3871655

times, medication is not administered at all. Even patients with serious medical conditions do not consistently receive their medication. Medications are discontinued or not renewed without a prior consultation with patients. Providers order medications that are not clinically indicated for the patients' conditions. Even common medications are not administered because California City is out of stock. The failure to timely and consistently administer medication to patients is dangerous.

### E. Care from Specialty Providers is not Available to Detainees

110.    A primary care provider should refer their patient to a specialist when the patient's condition requires more specialized knowledge or care than the PCP can provide. Specialty care must be available to patients, and it must be provided in accordance with the patient's acuity level as determined by the ordering provider. For patients with urgent needs, they may need to be seen within a week or two. Patients with routine needs could wait as long as 30-60 days.

111.    California City has no system for ensuring specialty referrals occur. People who arrive with pending referrals for specialty services do not have those timely reordered, and people who California City medical staff determine need specialty services also are left waiting for months. According to the declarations, people have been told there are no specialty contracts in place. *See, e.g.*, Keo Decl. ¶ 24. Record reviews raise concerns that California City does not have the capacity or ability to obtain timely specialty services. As a result of this apparent inability, patients with serious, time-sensitive, and critical medical needs have been unable to obtain workup for possible prostate cancer, heart failure, and diabetic wound care, among other serious medical conditions.

112.    Pending specialty encounters are not consistently honored at California City and can be discontinued with no documented reason or without a provider evaluation. Records reflect that Utkarshkumar Trivedi arrived at California City in early September from another detention facility with a scheduled oral surgeon encounter on September 8, 2025 and an ear-nose-and-throat ("ENT") encounter on September 26, 2025 for a mouth biopsy of oral lesions to rule out

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

3871655

cancer. Mr. Trivedi informed medical staff at California City in person and via sick-calls about the lesions and need for a biopsy, but as of November 6, 2025, he does not have an order for those specialty evaluations.

113.    Sokhean Keo arrived at California City from another detention facility, where he was pending specialty encounters with a neurologist, an ENT doctor, an orthopedist, a hand/finger specialist, and an ophthalmologist. All those appointments were cancelled, and he has been told by the primary care provider at California City that he will just have to live with the pain he is experiencing Keo Decl. ¶¶ 18-25. His records do not reflect that any specialty appointments have been ordered.

114.    When California City staff do order specialty appointments for detainees, they do not appear to be scheduled. In the 17 records that I reviewed, I found a total of 13 orders for specialty services for six of the detainees—each detainee had from one to four pending orders. In each case, the status of the referral order was "need information." None of the orders had been completed, although some were for very urgent medical issues.

115.    Of particular concern is Fernando Viera Reyes, who despite having a high probability of having prostate cancer, is not being addressed with the appropriate level of urgency. He began workup for his progressively increasing PSA levels at his prior detention facility. PSA is a blood test which measures prostate-specific antigen and could be indicative of various conditions, including prostate cancer. Typically, when a PSA is elevated, steps are taken to rule out simple explanations such as a urinary tract infection or an enlarged prostate, which can be addressed through medication and will typically bring PSA levels down if that is the cause of the elevated levels. However, despite these measures at the prior facility, Mr. Viera Reyes's levels have continued to increase rapidly and dramatically. The rate by which his PSA is increasing, in combination with the actual PSA level, points to a high likelihood that he has cancer. In a matter of months, Mr. Viera Reyes's PSA value went from 6.3 in January 2025 at his prior facility to 74 in October 2025, a month after his arrival to California City, at a rate vastly above the cutoff for concern. In addition, once a patient has a PSA level above 10, their risk for

3871655

1    cancer increases dramatically so other workup is bypassed and the patient goes straight to a

2    prostate biopsy for diagnosis.

3        116.    Mr. Viera Reyes was waiting to complete a prostate biopsy that was

4    recommended on an urgent basis by the urologist in March 2025. Viera Reyes Decl. ¶ 9.

5    However, at the time of his arrival to California City on August 29, 2025, it still had not been

6    completed. Since his arrival at California City, he has reported progressively worsening

7    symptoms, including urinary bleeding, nocturia, and extreme pain. *Id.* ¶ 16. It was not until early

8    October 2025 that a referral to see a urologist was placed with a "due" date of January 2026. It is

9    unclear if this order is for a prostate biopsy or an initial consult. Furthermore, the orders have the

10   appointment flagged as needing further information so it is unclear if the offsite encounter is

11   even approved. Given the rapid increase of his PSA level, this type of delay is unacceptable and,

12   if his condition is in fact cancer, increases the risk of metastatic cancer. His condition should be

13   addressed with urgency as it is imperative to determine whether he has prostate cancer or not. If

14   he does have cancer, he needs aggressive treatment quickly to minimize his risk of having

15   widespread disease and a much higher mortality rate. Mr. Viera Reyes's treatment as it relates to

16   his prostate condition thus far at California City constitutes a complete dereliction of duty by the

17   medical staff. Every day that this is delayed increases this patient's risk for metastatic disease.

18       117.    Yuri Roque Campos arrived at California City with a very serious heart condition

19   that needs consistent and timely management by a cardiologist. California City has failed to have

20   him seen by the necessary specialist since he arrived on September 5th. He is pending an

21   appointment with a cardiologist that is not due until January 19, 2025, and whose status remains

22   as "need information." It is not clear if this is approved or if he will be seen. Furthermore, the

23   reason for their referral is listed as an echocardiogram, and the attempted treatment is listed as

24   Omeprazole, a medication typically prescribed for GERD or heartburn. Mr. Roque Campos in

25   fact has heart disease and is diagnosed with pulmonary hypertension, a right bundle branch

26   block, congestive heart failure—not GERD or heartburn.

27       118.    Yuri Roque Campos also came to California City with a cardiac monitor in place

28   that was removed and mailed back to the cardiologist on September 12, 2025. The RN noted that

44

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

3871655

Mr. Roque Campos was scheduled to see the cardiologist on October 8, 2025 to review the results. That encounter did not happen. As of October 31, 2025, the records do not reflect that the results of the cardiac monitor have been obtained by California City or that Mr. Roque Campos is scheduled to return to the cardiologist to review the results.

119.    Fernando Gomez Ruiz requires an offsite wound care appointment for his chronic diabetic ulcer. An offsite wound care appointment was ordered by his provider on October 23, 2025 with a January 27, 2026 compliance date. The status of the appointment, including whether it is approved, is unknown but given the seriousness of his injury, including his history of amputation, and the inadequate and inconsistent wound care he is receiving at California City, it is critical that he be seen sooner to avoid wound complications.

120.    Alfonso Leyva was diagnosed with hearing loss and tinnitus at Golden State Annex and says he was transferred from that facility after he was assessed by an audiologist, but before he could obtain hearing aids. Leyva Decl. ¶ 31. Although he was referred to an ENT on October 9, 2025, the status of that appointment, including whether it is approved, is likewise unknown. Currently, he is suffering from ear pain in addition to suffering hearing loss. *Id.* ¶ 32.

121.    Sudesh Singh is a 55-year-old man who has a painful hernia, and says that he was scheduled for repair surgery in June, 2025, at his previous detention facility, but it did not happen. On October 1, 2025, the California City provider placed an order for a general surgery consultation, to be done by November 11, 2025. According to his record, it had not been scheduled as of November 6, 2025 and the status of the order was "need information." Mr. Singh has also been referred to specialists in podiatry (he reports 9/10 foot pain), ophthalmology and optometry. These were likewise unscheduled as of November 6, 2025, and also "need information."

**Summary of Opinion**: California City has no effective system for ensuring that patients receive medically necessary specialty care in a timely manner. Patients with serious medical conditions are not appropriately evaluated and referred for specialty care. Patients do not

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

3871655

appear to be receiving any specialty care, even where critically necessary. California City's failure to provide specialty care creates a significant risk to patient safety.

**F. Medical Staff Fail to Respond Appropriately to Urgent or Emergency Medical Issues**

122.    According to the CoreCivic Handbook, if a person has a medical emergency, they should notify their housing unit officer, who will notify the "Medical Team . . .[which] will respond immediately." Appendix C at 42.

123.    In practice, California City does not appear to have a functional system for responding to medical emergencies. When a medical or mental health emergency is called, often referred to as a "Code Blue," responses can be delayed. Requests for urgent care are not always responded to. Gustavo Guevara Alarcon reported a severe migraine to staff but was notified that medical would not see him unless it was an emergency. Guevara Alarcon Decl. ¶ 22. Daler Singh sought urgent help when he vomited blood but was told that there was no doctor available until the next morning. Singh Decl. ¶¶ 14-16. The next day, he fainted and had chest pain and was taken emergently to the medical clinic, where he expressed his need for proper medication and to be seen by a GI specialist for his stomach ulcers. He did not receive his medication that day. *Id*.

124.    Even when Defendants respond to a medical emergency, the care provided is far too often inadequate. Nurses may take the person to the medical area in the facility for assessment but the assessments are incomplete.

125.    Patients who are seen by an RN and referred urgently to a provider can experience delays before being assessed and medical issues are not addressed with the necessary urgency. Fernando Viera Reyes, who may have prostate cancer, was seen by an RN on September 21, 2025 for symptoms of painful urination and was referred urgently (within 24 hours) to a PCP. That encounter did not happen until days later when Mr. Viera Reyes saw another RN for reports of blood in his stool and was again referred to the PCP. Yuri Roque Campos, who has heart disease, was experiencing dizziness and tingling of his left upper extremity and only seen by an RN who consulted with the PCP and no treatment was provided despite an abnormal EKG. He

further reported not receiving his heart medication to an LVN on October 14, 2025 and it was noted that he would be seen the same day by the provider but was not seen until he had another medical emergency on October 19, 2025.

126.    Even when patients are seen by a provider, the notes are sparse, lacking evidence of physical exams. Julio Santos Avalos, who has a foot deformity, reports was seen by an LVN on October 9, 2025 after hurting his ankle and knee trying to climb to a top bunk. Santos Avalos Decl. ¶¶ 11-13. He was finally seen by a PCP twenty days later on November 3, 2025, where there is no physical exam of Mr. Santos Avalos's ankle noted. The note merely lists his medication and notes muscle cramps and ankle deformity.

127.    California City is so remote that when there is a medical emergency warranting an offsite hospital visit, people must be transported 45-60 minutes' drive away to the nearest hospital. This is very dangerous. The long drive and associated wait to access emergency services can place detainees at greater risk of harm. Furthermore, people are not receiving the necessary specialty services while in the hospital. Often, they receive the bare minimum assessment before returning to California City with the same concerns. Daler Singh was sent out to the hospital due to blood in his stool. Singh Decl. ¶ 20. The hospital did not appear to address his underlying concern; rather a chest x-ray and vitals were taken and Mr. Singh was returned to the facility. *Id*.

128.    In at least one case, a patient's care was delayed because he was sent to an offsite hospital, only to be refused treatment for a head injury because, he was told, he had no insurance. Alfonso Leyva fell and hit his head in his cell on September 16, 2025, early in the morning. About three hours later, he was taken to a hospital approximately 90 minutes away, but was refused care and returned to the facility. Leyva Decl. ¶¶ 15-18. He was finally taken to a different hospital at around 5 pm that day, where his head wound was cleaned and repaired with four staples, and he had a CT scan and x-ray. He reports he remained in handcuffs, and received no food or water until he reached the second hospital that evening. *Id*. ¶¶ 17-19. This type of treatment is not only grossly inhumane, it is medically risky because this patient had a significant head injury due to a fall from his top bunk and the potential for a brain bleed or other cranial

47

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

3871655

pathology due to the trauma was high. Indeed, this patient has evidence of a basilar skull fracture that was potentially missed and has yet to be worked up adequately as described above. *See,* discussion of Mr. Leyva, ¶ 38.

129.    When patients return from an offsite hospital, follow-up care at California City is inadequate and recommendations made by the hospital are delayed or disregarded. Yuri Roque Campos returned from an ER visit for his pulmonary hypertension with heart failure with an urgent recommendation to be seen by a heart specialist within 72 hours, to continue his current heart medications, including a diuretic, and to begin a new medication to address his low potassium levels. None of those recommendations were timely followed, if at all, despite a directed letter from the ER doctor to the detention center doctor that gave explicit instructions for the care that was needed for this extremely fragile patient. He went five days without his aspirin, was not prescribed potassium bicarbonate as recommended, and was not seen by a heart specialist. Jose Franco Peña was sent out to the hospital where he underwent an upper endoscopy (EGD) with biopsies and a colonoscopy. He was recommended a three week follow up with the GI in two to three weeks, a repeat EGD in eight to 12 weeks to monitor the healing of the duodenal ulcer, as well as two medications (pantoprazole and sucralfate) to address the ulcer. The medications were not administered until four days later, and there is no indication in the records that the recommended GI appointments were ordered or that the biopsy results were ever received or requested.

**Summary of Opinions**: California City does not provide adequate emergency services when responding to medical emergencies. The distance between California City and the nearest emergency hospital—reportedly between 45 and 60 minutes—makes the facility unsafe to house patients with complex medical needs.

### G. Sick People are Placed in Inappropriate and Inadequate Medical Housing

130.    In the medical records, I saw the placement of people in observation cells, but it was unclear to me whether these stays were medically necessary and/or included sufficient medical services. In declarations, people describe the lack of service delivery and the poor conditions in these cells. *See, e.g.*, Leyva Decl. ¶¶ 20-23, Roque Campos Decl. ¶¶ 21-23, 37-41,

48

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

3871655

Armenta Decl. ¶¶ 10-12. This is dangerous because these cells can be sources of infection that can spread numerous diseases if they are not cleaned between occupants.

131.    The reported conditions in these cells are unacceptable. The observation cells are reportedly dirty and appear not to have been cleaned between uses. It is inappropriate to require someone to clean their own cell, without adequate cleaning supplies besides, when they have just returned from the hospital. It is also inappropriate not to provide people with operable showers, towels, soap, or linens in these cells, as the declarations describe. I am also concerned that people describe being extremely isolated in these cells—*e.g.*, without access to any indoor or outdoor common area outside their cells, to other detained people, to their tablets or family or legal phone calls, to physical activity, or to social interaction or sensory stimulation. In the records I reviewed, some people spent up to a week in observation cells after discharge from hospital. It was not clear how medical staff determined to continue or eventually terminate their observation cell placement, and it does not appear that the medical providers round on those patients or deliver any elevated level of medical supervision.

132.    Julio Armenta reports being placed in an observation cell for approximately six days. Armenta Decl. ¶ 10. The shower was inoperable and he was not provided access to an alternate shower. *Id*. He reports developing sores on one of his legs while there. He tried to discuss his concerns about a fungal infection with the PCP, but he reports that the PCP was not interested. *Id*. He further reports the cell was small, about 10 paces along one side and six along the other side. *Id*. This is particularly concerning for someone at risk for blood clots because he needs to be able to move/walk. Mr. Armenta further reported psychological distress while in observation. *Id*. ¶ 12. He reports that he was not provided with access to any leisure activities, including reading material or a radio, and did not have access to a phone for three days. *Id*. ¶ 11.

133.    I did not see evidence of sufficient medical monitoring or provision of care while in these observation cells. I would expect to see some evidence of increased medical surveillance in the form of nursing shift notes or medical provider rounding notes. Some patients in these medical observation cells do not even receive their prescribed medications. Yuri Roque Campos was kept in a medical observation cell after returning from the hospital to monitor his heart

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

3871655

disease yet did not receive his heart medication for over half the days he was housed there. Daler Singh was being held in a medical observation cell for five days while participating in a hunger strike, but there are no documented vitals or weights during that period. Jose Franco Peña was in a medical observation cell from September 18 through September 20, 2025 after returning from the hospital, where he had an EGD and colonoscopy completed. The records are unclear as to why he needed placement in a medical observation unit upon his return, but while there, he did not get any of his previously prescribed medication for hypertension, hyperlipidemia, or diabetes, nor any of the newly recommended medications from the hospital.

**Summary of Opinion**: California City's medical observation housing does not appear to provide an elevated level of care. The reported conditions in the unit are unsanitary, and the medical care provided in those units does not meet an appropriate clinical standard.

### H.  Mental Health Care is Grossly Inadequate

134.    Detainees at California City do not have readily available access to mental health professionals or services. The declarations I reviewed describe conditions that are very isolating, including lack of structured programming and social activities, sensory stimulation, and physical activity. Combined with the possibility of imminent deportation, I would expect these conditions to cause patients to experience severe mental health distress and feelings of helplessness. For those who have never been detained before, the sudden isolation can be debilitating. For those with preexisting mental diagnoses, the isolation can cause and exacerbate psychiatric decompensation. Sokhean Keo describes a traumatizing suicide attempt he witnessed that has continued to haunt him. He describes a man hanging from his cell, his body shaking. Keo Decl. ¶¶ 17-18. Since the suicide attempt, he has received no information from staff about how to request mental health care or what mental health support resources are available. *Id*. ¶ 20. He knows people who have agreed to voluntary deportation to escape the conditions in California City Detention Facility. He said, "There is also the person who tried to kill himself because it was all too much." *Id*. ¶ 34. Julio Santos Avalos similarly reports witnessing a detainee hang himself on October 6, 2025. Santos Avalos Decl. ¶ 16. It was so upsetting that he asked to speak

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

3871655

with a doctor because his blood pressure felt high (records confirm his blood pressure was elevated). He was told to try to calm down and returned to his unit. *Id.*

135.    I see no evidence in the medical records that a psychiatrist is participating in any of the mental health care in this facility. The prescriptions for mental health medications all seem to be written by a nurse practitioner and there is evidence of a psychologist doing some assessments. I could not find any psychiatry notes or prescriptions.

136.    The lack of a psychiatrist was particularly troublesome in the case of Daler Singh, who initiated a hunger strike that was prolonged. Singh Decl. ¶¶ 13-17. One of the critical elements of caring for someone on a hunger strike is a thorough assessment by a psychiatrist to determine the presence of any psychosis or undiagnosed major mental health conditions. Another purpose is to determine competency from a mental health perspective and to monitor competency as the hunger strike progresses. This type of care was not documented, and it is a major deficiency in the care of someone on a hunger strike.

137.    Many detainees transfer into California City with pre-existing mental health conditions for which they receive medication designed to address their anxiety, depression, and associated symptoms. Some have the medication continued, others do not. Fernando Viera Reyes arrived at California City with two active mental health medications to address his anxiety and insomnia. He reports that both were continued at first, but one was discontinued shortly after his arrival, and the other in late September. He was not consulted or spoken to before either medication was discontinued. He reports that he submitted a sick-call slip requesting to continue the medication and finally spoke to a psychologist about restarting the medication on October 14, 2025, to help with his sleep and mood management. As of October 29, 2025, the medication had still not been re-ordered. Viera Reyes Decl. ¶¶ 19-21.

138.    Some patients report lapses in the administration of psychiatric medications. Julio Santos Avalos submitted multiple sick-call slips in September reporting his anti-depression medications got cut off and his "mental health is at risk." *See* Santos Avalos Decl. ¶¶ 9-10. MAR records confirm that he missed multiple doses of his MH medication with no documented reason.

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC
3871655

139.    According to Fernando Chavez Lopez's transfer form, his mental health diagnoses included depressive disorder, anxiety disorder, and auditory hallucinations. At intake, the nurse failed to reference the history of hallucinations, but nevertheless referred him for an urgent mental health exam, which should have happened on September 2, 2025. Instead, it happened two weeks later. The handwritten note by a psychologist is in places illegible, but appears to be silent regarding his medications. On October 8, 2025, he was prescribed Haldol, a powerful antipsychotic by a nurse practitioner. Oddly, there is no mental health or medical note explaining why this medication was prescribed. It appears that the patient was moved off of his Aripiprazole and onto Haldol for reasons that are not clinically explained. Likely this was a financial decision and not a clinical decision. Several weeks later, the dose of Haldol is markedly increased, from one mg two to three times a day, to five mg two to three times a day, apparently based on his report that the medication is no longer working for him. The workup to justify this significant increase is essentially nonexistent, and it fails to meet the standard of care for using a potent antipsychotic. Additionally, the prescription from the nurse practitioner makes no medical sense. The nurse practitioner has ordered a variable dose that is essentially an "as needed" dose of Haldol. That is just not done in a general population setting, and it is unclear who is determining whether the patient needs a dose two times a day or three times a day and what the clinical criteria is for making that decision.

140.    Detainees also struggle to talk to mental health professionals. Referrals to mental health upon intake can be delayed for weeks. Fernando Viera Reyes was referred on a routine basis (to be seen within 14 days) to mental health at intake but was not seen for over a month.

141.    Other patients ordered appointments with mental health staff are not seen timely. Jose Ruiz Canizales suffers from anxiety and claustrophobia that disrupts his sleep. Ruiz Canizales ¶¶ 50-51. Shortly after he arrived at California City in early September, he experienced trouble breathing and was taken to the infirmary in a wheelchair. *Id.* ¶ 60. There was no Sign Language Interpreter. He was sent offsite to an Emergency Room, where he was able to communicate through a video remote interpreter. *Id.* ¶ 62. The doctor he saw explained that he was experiencing a panic attack, and provided a shot to help him relax. *Id.* When he returned to

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

California City, a nurse told him he could see a psychiatrist the next day. *Id*. ¶65. He wants to see a psychiatrist to help him with his racing thoughts and anxiety. *Id*. ¶¶ 67-68. That appointment did not happen. That appointment probably could not happen because there does not appear to be a psychiatrist at the facility.

> **Summary of Opinion**: The provision of mental health care at California City is inadequate. The medical records do not appear to indicate that a psychiatrist is participating in patient assessments or decisions about prescription psychiatric medication. Doses of patients' mental health medications are sometimes missed, and other times, patients' medications are discontinued without prior notice.

### I.  Health Care Staffing is Insufficient for the Number of Detainees Currently Housed at the Facility

142.    Based on the documentation I have reviewed, it appears that California City may be understaffed. The facility is located in an area that makes it challenging to provide care at the level necessary given its detainee population. I understand that when California City was a state prison, it housed virtually no high-risk medical patients. I imagine this was because it would be hard to obtain specialty services contracts and sufficient healthcare staffing given this location. High-risk patients in state prison were those with a sensitive medication condition, multiple hospitalizations, multiple emergency room visits, high-risk specialty consultations, significant abnormal labs, age 65 or older, or specific high-risk diagnoses and procedures. The state prison was also not approved to house patients who required Enhanced Outpatient Program (EOP) levels of care for mental illness. I assume this is for the same reason, because that population requires additional staffing to support their mental health needs. My understanding is that, now that it is operating as an immigration detention facility, California City houses people who would fall into both the high-risk patient and potentially EOP level of care. In my opinion, this is dangerous because it puts patients with higher acuity medical and mental health problems at an elevated risk of bad outcomes due to lack of staff and lack of specialty consultations necessary to care for their conditions. The state prison system figured out that they could not house sick

patients in this facility, so it is illogical to think that ICE can safely maintain sick patients in this facility.

143.    California City Detention Facility, even at a quarter of its potential census, houses multiple high-risk medical patients. It does not appear the facility has sufficient staffing to address those patients' needs. The problems I have noted with access to specialty services provision of necessary and timely care may be due to insufficient staffing. For example, the delay in completing health care intake and initial assessments, lack of timely responses to sick-call slips, the distribution of 8 pm evening medication at 1 or 2 am, and the frequently delayed primary care appointments are all symptomatic of an understaffed system. I have serious concerns that California City is ill-positioned to expand its current population size given its current staffing levels, and they may need to implement a medical triage system to prevent sick patients from being housed at that facility.

**Summary of Opinion**: Based on the documentation I have reviewed, it appears the facility does not have a sufficiently robust healthcare system or adequate relationships with community healthcare partners to meet the needs of the current population. I am concerned that, if the population of California City were to increase, the unmet healthcare needs of the population would continue to expand, exposing more detained people to danger.

## V.    Conclusion

144.    For all of the reasons cited above, I have concluded that people detained at California City Detention Facility are being harmed, and are at risk of serious harm, including death, because the medical and mental health care are so deficient.

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC
3871655

1    I declare under penalty of perjury under the laws of the State of California and the United

2   States of America that the foregoing is true and correct.

3    Executed this **25** day of November, 2025, in Salt Lake City, Utah.

4

5

6   Dated:

7                                    By: _____

8                                         Todd R. Wilcox, M.D.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

# Appendix A

# Todd Randall Wilcox, MD, MBA, FACCP

ADDRESS: 4760 S. Highland Drive, # 105
Salt Lake City, UT  84117
(801) 424-1500
trwilcox@wellcon.net

EMPLOYMENT: **Chief Executive Officer**, Wellcon, Inc.
May 1996 to present

**Medical Director**, Salt Lake County Jail System
May 1996 to present

**Attending Physician**, After Hours Medical
August 2001 to October 2016

**Senior Consultant**, Phase 2 Consulting
January 2003 to December 2009

**Medical Director**, Maricopa County Jail System
November 2004 to February 2006

**Attending Physician,** Wasatch Physician Services
July 1996 to January 2000

**Attending Physician**, State of Utah Department of Corrections
August 1997 to January 1999

**Staff Physician**, Salt Lake County Jail
June 1994 to May 1996

EDUCATION: M. B. A.
**University of Utah David Eccles School of Business**
 Salt Lake City, UT
 September 1996 to June 1998

Residency in Orthopaedic Surgery
**University of Utah**
 July 1993 to July 1996

Internship in General Surgery
**University of Utah**
    July 1992 to June 1993

M.D.
**Vanderbilt University School of Medicine**
    Nashville, TN
    August 1988 to May 1992

B.S.
**Duke University**
    Durham, NC
    Major:  Biological Psychology
    August 1984 to May 1988

MEDICAL
LICENSURE:    Utah
    Arizona

BOARD
CERTIFICATIONS:  American Board of Urgent Care Medicine—certification by exam 2006, recertified by exam 2014 and 2020

ADVANCED
CERTIFICATIONS:  Fellow, American College of Correctional Physicians--2015
American Academy of HIV Medicine—2009, 2013 recertified by exam
Advanced Certified Correctional Health Care Provider (CCHP-A)—certification by exam 2007, recertified 2015
Advanced Certified Correctional Health Care Physician (CCHP-P)—certification by exam 2015
Buprenorphine certified--2013

FACULTY
APPOINTMENTS:  Medical School Admissions Committee, University of Utah School of Medicine
Faculty Instructor, Correctional Crisis Intervention Team Academy, Salt Lake County, UT
Adjunct Instructor of Medicine, University of Utah School of Medicine
Adjunct Professor of Chemistry, Salt Lake Community College
Faculty Instructor, University of Utah School of Nursing

PROFESSIONAL
APPOINTMENTS:  Past-President, American College of Correctional Physicians, 2017-present

President, American College of Correctional Physicians, 2015-2017

Chairman, Physician Certification Committee, National Commission on Correctional Health Care, 2012-2013

Board of Directors, National Commission on Correctional Health Care—Certified Correctional Healthcare Professional Board

Chairman, Electronic Medical Records Taskforce for the National Commission on Correctional Healthcare, 2002

Treasurer, Society of Correctional Physicians, 2012

Medical School Admissions Committee, University of Utah School of Medicine, 2012-13

HONORS:

Armond Start Award from American College of Correctional Physicians, 2019

Medical Director for National Commission on Correctional Healthcare Facility of the Year, 2001

Angier B. Duke Memorial Scholarship

Boettcher Foundation Scholar

Jostens Foundation Scholar

PROFESSIONAL MEMBERSHIPS:

American Medical Association

American College of Emergency Physicians

American Jail Association

Society of Correctional Physicians

American Correctional Health Services Association

American Academy of Urgent Care Medicine

American Academy of HIV Medicine

CORRECTIONAL CONSULTING:

American Jail Association

National Institute of Corrections

California Department of Corrections

Maricopa County Correctional Health Care, AZ

Pima County Department of Institutional Health, Tucson, AZ

Santa Clara County Jail System, CA

Washington County Jail, UT

Utah County Jail, UT

Seattle-King County Jail System, WA

Mississippi Department of Corrections

National Commission on Correctional Healthcare

PUBLICATIONS:    Wilcox, TR.  President's Column.  *Corrdocs*.  Chicago:  American College of Correctional Physicians, Spring 2016.  19:1, 2.

Wilcox, TR.  How I Practice:  Assessing Weight Loss in Correctional Facilities.  *Corrdocs*.  Chicago:  American College of Correctional Physicians, Spring 2016.  19:1, 8.

Wilcox, TR.  Poising the College for Continued Success.  *Corrdocs*.  Chicago:  American College of Correctional Physicians, Winter 2015.  18:4, 4.

Wilcox, TR.  How I Practice:  Managing Diabetics on Commissary Day.  *Corrdocs*.  Chicago:  American College of Correctional Physicians, Winter 2015.  18:4, 9.

Wilcox, TR.  Dealing with Orthopedic Hardware.  *Corrdocs*.  Chicago:  Society of Correctional Physicians, Fall 2014.  17:3, 4-5.

Wilcox TR.  Critical Commandments in Correctional Health Care:  Part 3.  *CorrectCare*.  Chicago:  National Commission on Correctional Health Care, Fall 2013.  27:4, 16.

Wilcox TR.  Critical Commandments in Correctional Health Care:  Part 2.  *CorrectCare*.  Chicago:  National Commission on Correctional Health Care, Summer 2013.  27:3, 19.

Wilcox TR.  Critical Commandments in Correctional Health Care:  Part 1.  *CorrectCare*.  Chicago:  National Commission on Correctional Health Care, Spring 2013.  27:2, 20.

<u>Wilcox TR</u>.  Developing an Effective Alcohol Withdrawal Protocol.  *Correctional Health Care Report*.  Civic Research Institute, Inc., May 2003:  49-50, 63-64.

Goble EM, Kane SM, <u>Wilcox TR</u>, Doucette SA.  Meniscal Allografts.  In:  McGinty JB, ed. *Operative Arthroscopy*.  Philadelphia:  Lippincott-Raven Press; 1996:  317-31.

Goble EM, Kane SM, <u>Wilcox TR</u>, Olsen RE.  Advanced Arthroscopic Instrumentation.  In:  McGinty JB, ed.  *Operative Arthroscopy*.  Philadelphia:  Lippincott-Raven Press; 1996:  7-12.

<u>Wilcox TR</u>, Goble EM.  Indications for meniscal allograft reconstruction.  *American J of Knee Surgery* 9:  35-6, 1996.

<u>Wilcox TR</u>, Goble EM, Doucette SA.  Goble technique of meniscus transplantation.  *American J of Knee Surgery* 9:  37-42, 1996.

Goble EM, Downey DJ, <u>Wilcox TR</u>.  Positioning of the tibial tunnel for ACL reconstruction.  *J Arthroscopy*  12:  415-18, 1995.

Morris JA, <u>Wilcox TR</u>, Reed GW, et al.  Safety of the blood supply:  surrogate testing and transmission of hepatitis C in patients after massive transfusion.  *Annals of Surgery*  219:  517-26, 1994.

<u>Wilcox TR</u>, Morris JA, Green NE.  Case report:  Pediatric ankle fractures.  *Tennessee Medical Journal*.  85:  217-19, 1992.

Morris JA, <u>Wilcox TR</u>, Frist WH.  Pediatric organ donation:  the paradox of organ shortage despite the remarkable willingness of families to donate.  *Pediatrics*  89:  411-15, 1992.

Morris JA, <u>Wilcox TR</u>, Noreuil T, and Frist WH.  Organ donation:  a university hospital experience.  *Southern Medical Journal* 83:  884-88, 1990.

Cogbill TH, Moore EE, Feliciano DV, <u>Wilcox TR</u>, et al.  Conservative management of duodenal trauma:  a multicenter perspective.  *Journal of Trauma*  30:  1469-75, 1990.

Morris JA, Moore EE, Feliciano DV, <u>Wilcox TR</u>, et al.  Post-traumatic renal failure:  a multicenter study.  *Journal of Trauma* 31:  1584-90, 1991.

<u>Wilcox TR</u>, contributing author to <u>The Admissions Essay</u> by Helen W. Power and Robert DiAntonio.  Lyle Stuart, Inc., Seacausus, NJ, 1987, pp. 116-7, 197, 206-8, 219-20.

PRESENTATIONS:    National Commission on Correctional Healthcare Jail Standards
                             Course
                             Abdominal Pain
                             Chronic Disease Management in Correctional Facilities
                             Pain Management in Correctional Healthcare
                             Alcohol Withdrawal Syndrome
                             Drug Withdrawal Syndromes
                             Effective Correctional Medical / Mental Health Intake Screening
                             Endocrine Emergencies
                             Excited Delirium and Sudden In-Custody Death Syndrome
                             Hematologic Emergencies

Safe Restraint and Intensive Medical Management Practices
Medical Effects of Mental Health Medications
Neurological Emergencies
Effective Nursing Triage in Correctional Settings
Orthopedic Emergencies
Point of Care Laboratory in Correctional Healthcare
Managing Hypertension in Correctional Healthcare
Seizure Assessment and Treatment
How To Work Well with EMS
Effective Wound Care Practices in Correctional Healthcare
14-day Assessments in Corrections
Electronic Health Records for Institutional Medicine

EXPERT
PANELS:        Rand Corporation Expert for Modified Delphi Process to
               Determine Quality Measures for Correctional Healthcare—June
               2009

               American Jail Association / National Institute of Corrections
               Expert for Mental Health in Jails Focus Group and National
               Satellite Broadcast—June 2009

PATENTS:       United States Patent 5,681,289
               Chemical Dispensing System
               Issued October 28, 1997

               United States Patent 5,891,101
               Chemical Dispensing System Methodology
               Issued April 17, 1999

               United States Patent 5,895,375
               Chemical Dispensing System Components
               Issued April 17, 1999

# Appendix B

Expert Testimony List 2025
Todd R. Wilcox, MD, MBA, FACCP

| Case | Date | Location | Topic | Role |
|---|---|---|---|---|
| Lee v Turn Key | 2022 | OK | Opiate withdrawal / GI bleed | Plaintiff Expert |
| Sacco v Braga | 2022 | NH | Opiate withdrawal vs chronic renal failure | Defense Expert |
| Cruz-Sanchez v. US | 2022 | CA | Pneumonia | Plaintiff Expert |
| Yarbrough v. GA | 2023 | GA | Diabetic Ketoacidosis | Plaintiff Expert |
| Ellis v. Ottawa County | 2023 | OK | EMT Supervision | Plaintiff Expert |
| Ellis v. Ottawa County | 2023 | OK | Pneumonia | Plaintiff Expert |
| Maney v. Oregon | 2023 | OR | COVID issues | Defense Expert |
| Maney v. Oregon | 2023 | OR | COVID, Institutional Response | Defense Expert |
| Burgess v. USA | 2024 | NC | Anticoagulation / DVT | Plaintiff Expert |
| White v. Turn Key | 2024 | OK | COVID | Plaintiff Expert |
| Chestnut v. Yes Care | 2025 | FL | Splenomegaly | Defense Expert |
| Lewis v. After Hours | 2025 | UT | Healthcare administration | Plaintiff Expert |

# Appendix C



# CALIFORNIA CITY IMMIGRATION PROCESSING CENTER
# Detainee Handbook Supplement (English)

| Table of Contents | | | |
|---|---|---|---|
| No Smoking Policy | 2 | Laundry | 24 |
| Introduction/Mission | 2 | Barbering Services | 25 |
| Purpose | 2 | Meals | 25 |
| Facility Mailing Address | 3 | Voluntary Work Program | 26 |
| Contacting ICE Staff & the Immigration Court | 3 | Commissary | 27 |
| Basic Detainee Responsibilities | 4 | Finances | 27 |
| Rights and Responsibilities | 4 | Detainee Money Deposits | 27 |
| Facility Rules | 5 | Religious Services | 29 |
| Detainees with Disabilities | 6 | Access to Telephones | 29 |
| Reasonable Accommodations | 7 | Pro Bono | 31 |
| Unauthorized Property | 9 | Recreation | 33 |
| Property Claim Procedures | 10 | Recreational Library | 35 |
| Inspections of Persons and/or Property | 11 | Law Library | 35 |
| Contraband | 11 | Social Visitation | 35 |
| Detainee Movement | 12 | Attorney Visits | 37 |
| Classification | 12 | Legal Orientation Program | 38 |
| Clothing | 15 | Notary Photocopying Procedures | 39 |
| Detainee Dress Code | 16 | Marriage Requests | 39 |
| The Proper Way to Wear Issued Clothing | 16 | Correspondence/Mailroom Procedures | 40 |
| Safety & Evacuation Drills | 17 | Release of Funds | 42 |
| Sexual Assault/PREA | 18 | Access to Medical Services | 42 |
| Official Counts | 21 | Detainee Discipline | 45 |
| Living Conditions | 22 | Grievance Procedures | 50 |
| Unit Rules | 23 | Segregation/Restrictive Housing Unit | 53 |
| Bed Area | 24 | Legal File | 54 |
| Sanitation | 24 | Notice to Persons | 54 |
| Personal Hygiene | 24 | Additional Contact Information | 55 |

## No Smoking Policy

The California City Immigration Processing Center (CCIPC) Handbook is intended to be a guide to assist you in adjusting to detention within this facility. You will be held accountable for your actions while in custody at this facility. Therefore, it is each detainee's responsibility to become familiar with the contents of the handbook. All rules listed herein are subject to change. Additional rules and regulations are posted on bulletin boards within the living areas. Any major changes made to the information contained in this handbook will be posted on your housing unit's bulletin board in a timely manner.

This handbook is available in multiple languages; however, telephonic interpretation is available to interpret the contents of this handbook.  Please contact a member of the unit team if you require this service.

This is a non-smoking facility. NO CIGARETTES, tobacco, electronic cigarettes, or smoking paraphernalia of any kind is allowed. Smoking is proven to cause significant health problems.  Smoking is not permitted during your stay at CCIPCCCIPC.  If you were a smoker, to help you cope with nicotine withdrawal we recommend the following:

1.  Delay the urge- usually 3-5 minutes.
2.  Distract yourself- play cards, talk to a friend.
3.  Drink water to fight cravings.
4.  Deep Breaths – Relax, close your eyes and take 10 slow deep breaths.
5.  Discuss your feelings with someone.
6.  Exercise.
7.  Reward yourself by thinking of it as a protective measure for your quit program and better health.
8.  Do not let nicotine withdrawal scare you.  Nicotine withdrawal is temporary.

For more information or help, please contact Health Services for assistance.

## Introduction/Mission

CoreCivic/CCIPC is a private company contracted by U.S. Immigration and Customs Enforcement (ICE). The mission of CCIPC is to provide a detention facility  that is safe, clean and sanitary for detainees awaiting the outcome of their immigration cases.

ICE will answer your questions regarding the status of your travel and/or immigration documentation. The CCIPC is not a part of ICE and has no control over your present situation related to your custody status, legal status, court appearances, deportation matters, etc.

Detainees are encouraged to submit suggestions for program improvement to the Administration through the Detainee Request Form procedures. This is an effective means of bringing about change in a respectful manner. While all information supplied in this document is the most current, it is also subject to change at any time. Detainees are encouraged to periodically read all bulletin board postings and/or meet with the Recreation Specialist for program updates.

## Purpose

The purpose of this handbook is to explain to you the specific rules, regulations, policies, and procedures that must be followed while in custody at this facility. The handbook will also help provide you with a general overview of the programs and services available. You will be held responsible for your actions while in custody at this facility. Therefore, it is each detainee's responsibility to become familiar with all the contents of this handbook.

A copy of this handbook is issued to each detainee upon intake, and certain sections are posted on the bulletin boards in each housing area as well as on other bulletin boards throughout the facility. All detainees are required to acknowledge by signature receipt of this handbook. If you have any questions, please ask the officer stationed at your housing area

or send a written "Detainee Information Request form "*(not to be used for sending requests for information to ICE Staff)* to the appropriate departments as listed throughout this handbook and on the bulletin board in your dorms. You may request this form from any staff member within your unit. THIS HANDBOOK WILL BE RETURNED TO THE OFFICER BEFORE YOU LEAVE THIS FACILITY. WRITING ON AND/OR DAMAGE TO THIS HANDBOOK IS PROHIBITED.

## Facility Mailing Address:

Your Name: _____
Your Alien Number: _____
Your Housing Location: _____
**California City Immigration Processing Center**

**22844 Virginia Blvd**
**California City, CA 93505**

## Contacting ICE Staff and the Immigration Court
You may contact the San Francisco ICE Field Office at:

Field Officer Director, ERO101630 Sansome Street
Rm 590
San Francisco, CA 94111
United States
(415) 365-8800

Executive Office for Immigration Review
Adelanto Immigration Court
10250 Rancho Road, Suite 201A
Adelanto, CA 92301
760-561-6500

The ICE Officer in Charge (OIC), the Contracting Officer's Representative (COR), and designated department heads will conduct unannounced (not scheduled) visits to your housing area. ICE officers will visit the units weekly according to the schedule provided by ICE and posted in the units. ICE staff are available to detainees Monday through Friday. The purpose of these visits is to address your personal concerns and observe your living and/or working conditions. The ICE San Francisco Field Office may be contacted Monday through Friday, excluding federal holidays, at (872) 351-3990

### Written Requests to ICE Staff
You have the opportunity to submit written questions, requests or concerns to the ICE staff by utilizing the ICE Detainee Request Form or a sheet of paper. You may pick up request forms from staff assigned to your unit. The request form should be placed in the drop box labeled "ICE" and it will be delivered to the ICE staff without being read, altered or delayed. You may obtain assistance from another detainee, housing officer, or other facility staff in preparing your request form. If the detainee chooses, the request may be put in an envelope that is clearly addressed with name, title, and/or office to which the request is to be forwarded. If the request is provided to CCIPC staff, the request will be delivered to ICE within 72 hours. The ICE staff receiving your request form will respond as soon as possible. If ICE's response is received by CCIPC staff, it will be delivered to the detainee within 24 hours of receipt. . This procedure is not to be used for submitting formal grievances. (See "Grievance" section.)

For contacting the Immigration Court, also known as the Executive Office for Immigration Review (EOIR), utilize the same form and process but place your request in the drop box labeled "ICE". You can also call, free of charge, the automated EOIR number at 1-800-898-7180 or call the Adelanto Immigration Court at 760-561-6500

A detainee, including detainees with special needs, disabilities, illiterate detainees, and detainees with limited English proficiency may obtain assistance from another detainee, housing officer, or other CCIPC staff in preparing and submitting the request form. Please contact an CCIPC staff member.

## Basic Detainee Responsibilities
It is the policy of CCIPC and ICE to treat detainees with dignity and respect while maintaining a safe, secure, and sanitary detention facility. It is expected that staff will receive your full cooperation. In the simplest terms, you are expected to:

1. Follow and obey rules, laws, policies, and procedures.
2. Obey all orders as given by staff members and contract security personnel.
3. Respect staff and other detainees at all times.
4. Respect CCIPC, government property and the property of others.
5. Keep yourself, your clothing and living area clean at all times.
6. Obey all safety, security, and sanitation rules, policies, and procedures.

If you observe and comply with the above guidelines, you should have no problems while living at this facility awaiting the outcome of your hearing. When addressing staff, you should not refer to them by first name or nickname. You must refer to staff by their rank/title and last name (i.e.; Officer, Shift Supervisor, Dr., Nurse, Mr., Mrs., Ms.).
At CCIPC, detainees are not subjected to personal abuse, corporal punishment, personal injury, disease, property damage, or harassment.    Detainee property is protected.  Detainees cannot supervise, have control over or be in charge of other detainees.

The following regulations pertain to specific expectations of each detainee to ensure the safety, health and security of each person assigned to this facility. These regulations are not separate from the posted rules of discipline; therefore, any violation may result in sanctions imposed against you. The purpose of these rules is to provide you with the opportunity to be aware of specific rules imposed relating to the activities, programs and procedures related to living in the housing units.

## Rights and Responsibilities of ALL Detainees
*You have the right to be informed of the rules, procedures and schedules concerning the operation of the facility.* You have the responsibility to know and abide by them.

*You have the right to request interpretive services if you have problems communicating due to language barriers, are unable to read/understand the English language, or prior to any disciplinary hearings.*  You can request assistance by contacting a member of your Unit Team or by submitting a Detainee Information Request form.

*You have the right to freedom of religious affiliation and voluntary religious worship.* You have the responsibility to recognize and respect the rights of others in this regard.

*You have the right to health care, which includes nutritious meals, proper bedding and clothing.* A laundry schedule to wash or exchange clothing and bedding, an opportunity to shower regularly, proper ventilation for warmth and fresh air, a regular exercise period, toilet articles and medical treatment. Follow the laundry and shower schedules, maintain neat and clean-living quarters and seek medical care as needed at no cost to you.

*You have the right to contact your consular representatives or embassy.*

*You have the right to have family members and friends visit you in keeping with the facility rules and schedules.* It is your responsibility to conduct yourself properly during visits and to not accept or pass contraband.

*You have the right to unrestricted and confidential access to the courts by correspondence.* You have the responsibility to present honestly and fairly your petitions, questions and problems to the courts.

*You have the right to legal counsel from an attorney of your choice by means of interviews and correspondence at no cost to the United States Government.* It is your responsibility to obtain the services of an attorney honestly and fairly.

*You have the right to have access to reading materials for your own enjoyment.* These materials may include approved magazines. It is your responsibility to seek and utilize such materials for your personal benefit, without depriving others of the same benefit.

*You have the right to participate in the use of the law library reference materials to assist you in resolving legal problems.* You also have the right to receive help when it is available through legal assistance programs. It is your responsibility to use those resources in keeping with the procedures and schedule prescribed and to respect the rights of other detainees to the use of the materials.

*You have the right to a wide range of reading material for educational purposes and for your own enjoyment.* These materials may include magazines and newspapers sent from publishers. It is your responsibility to seek and utilize such material for personal benefit, without depriving others of their equal rights to use this material.

*You have the right to participate in a work program as far as resources are available, and in keeping with your interest, needs and abilities.* You have the responsibility of taking advantage of activities which may help you live a successful and abiding life within the facility and in the community. You will be expected to abide by the regulations governing the use of such activities.

*You have the right to access the media through telephone calls or written correspondence.*

*You have the right of freedom from discrimination based on race, religion, national origin, sex, sexual orientation, handicap, or political beliefs.*

*You have the right to request reasonable accommodation or modification to any programs offered if you have a disability, by submitting a request form stating your disability and the accommodation you are seeking.*

*You have the right to access the funds in your account to pay for legal services.*

## Facility Rules

The following regulations pertain to specific expectations of each detainee to ensure the safety, health and security of each person assigned to this facility. These regulations are not separated from the posted rules of discipline; therefore, any violation may result in sanctions imposed against you. The purpose for separating these rules is to provide you with the opportunity to be aware of specific rules relating to the activities, program and procedures related to living in the dormitory, including:

1. THEFT - No unauthorized taking of an item of any kind that belongs to someone else, including CORECIVIC/CCIPC property. You are responsible for any and all items in your possession.
2. FIGHTING - Fighting is not permitted. Sparring, boxing, wrestling, play-fighting, or horse playing is not permitted at this facility.
3. COMMISSARY - You are not authorized to take any commissary items outside of your housing unit unless authorized by the Shift Supervisor or upon release process. Plastic commissary delivery bags are to be returned to the Commissary Officer, possession of this item is considered contraband.
4. MOVEMENT - When entering and exiting pods, buildings, rec areas, etc., the movement will be at the direction of the staff during authorized movement only. Running is prohibited in all non-recreation areas. Lines for any activity will be orderly. Detainees will not crowd around staff or door entrances at any time. Detainees are responsible for being attentive and moving promptly when movement times are called for meals, activities, services and appointments.
5. HOUSING - You are only permitted to sleep by yourself, in your own assigned bunk. Under no circumstances are you permitted to relocate to any other sleeping area, cell, bunk or other area without being directed by a staff member. Detainees are only permitted to enter their assigned housing pod/unit.

6. PERSONAL HYGIENE – For the health and safety of staff, visitors and detainees, all detainees are required to maintain personal hygiene daily.
7. BED TIME - Regular bedtimes will be posted on the current building schedule. Times will be extended on Friday and Saturday and the day before an CCIPC observed Holiday. You must be in your bed at this time. You will not be allowed to visit with each other after lights are out and you must stay in your own bed, with the exception of using the restroom facilities. Loud talking, singing or other behavior that disturbs others' sleep is prohibited. No one will be allowed in the dayroom after bedtime except dorm orderlies while cleaning if directed by staff. No games of any kind are allowed in the dayrooms or bed areas after bedtime.
8. RESTRICTED AREAS - You are not permitted to contact or tamper with the bars, doors, glass window of the housing unit or the fence, walls, canopy beams, basketball poles in the outside recreation areas. You may not travel outside of your housing area without authorization.
9. GAMBLING - No gambling of any kind is allowed.
10. PERSONAL PROPERTY - You are not permitted to buy, sell, trade, borrow, lend, or otherwise barter any items of personal property with any other detainee. All personal property is required to be stored inside a provided storage bag.
11. VERBAL AND PHYSICAL ABUSE - Verbal and physical abuse toward staff, detainees or other persons is prohibited and will not be tolerated. We have a zero-tolerance policy, and any deviation will result in disciplinary actions.
12. DESTRUCTION OF CORECIVIC/CCIPC PROPERTY - Destruction, alteration, graffiti, unauthorized use or wasting of property belonging to CORECIVIC/CCIPC or to another person is not permitted. This includes clothing, bunks,walls, etc. All issued items are prohibited to be used other than for theirtheir intended purpose.
13. RADIOS - Radios played without earphones will be confiscated as contraband. Only issued or radios sold through the facility commissary are permitted. Any other radios brought in from the outside by the detainee will be considered contraband, inventoried, documented, and secured along with the detainee's personal property. Radio use is only authorized inside the housing area, during library time, and in the recreation yard. Radios taken to and from the recreation yard will remain off and, in the detainee's, uniform pocket until arriving at such location. Radios or earphones with intentional alterations will be considered a contraband item.
14. TRASH - Trash is to be disposed of in the provided trash cans and is never to be thrown on the floor or ground.
15. NOISE LEVEL - Noise from talking, conversations, games, etc. in non-recreation areas will be kept at a level that is respectful and does not disturb others. Shouting, slamming of doors, playing of music without headphones, etc. is not permitted.
16. LOITERING - Detainees are not permitted to loiter on walkways, or in any doorway, including cell doors.
17. RULES AND REGULATIONS – Other specific rules and regulations are listed below in the affected section of the handbook and in posted unit rules. You must follow all orders, either written or verbal, given by CORECIVIC staff. Any modifications will be notified to all detainees via memorandum, town hall meetings and will be posted in your housing areas.
18. TABLES - Do not sit on table tops.
19. COVERING/BLOCKING WINDOWS/LIGHTS - Windows/lights of any kind are not to be covered and/or blocked at any time.
20. TABLETS - All tablets must remain in the day room area at all times.
21. SELLING OR GIVING AWAY OF PERSONAL ARTICLES IS PROHIBITED - No black-market activities shall take place. Selling or giving away items bought from commissary is prohibited (i.e. candy, food, clothing, radios, etc)

## Detainees with Disabilities

Policy 14-101 (Disability, Identification, Assessment and Accommodation) outlines the necessary processes to ensure that you will have an equal opportunity to participate in, access, and enjoy the benefits of the facility's programs, services, and activities. Such participation will be accomplished in the least restrictive and most integrated setting possible, through the provision of reasonable accommodations, modifications, and/or auxiliary aids and services, as necessary, and in a facility that is physically accessible.

Procedures include reasonable timelines for reviewing requests for accommodation related to a disability and for providing accommodations (including interim accommodations), modifications, and reassessments.

## Reasonable Accommodations

All detainees shall have equal access to the following services, programs, and activities, but are not limited to those outlined below:

1. Work programs;
2. Recreation;
3. Mail, telephone, visiting;
4. Library;
5. Religious programs;
6. Reception and orientation
7. Food Service;
8. Sanitation and Hygiene;
9. Health Care
10. Discipline, Grievance Procedures, and Due Process proceedings;
11. Safety and Emergency Procedures;
12. Access to media, courts, counsel, and law library;
13. Commissary

Detainees may submit a formal or informal (i.e. verbal or written) request for accommodation or assistance to the Disability Compliance Manager. At this facility, the Disability Compliance Coordinator is the Health Services Administrator. Written requests will be submitted on -- the appropriate CoreCivic13-80A Sick Call Request Form. Requests received will be processed by the multidisciplinary team for review, or a response provided to the detainee, within twenty-four (24) hours, and the detainee seen by a Qualified Health Care Practitioner (QHCP) within the next twenty-four (24) hours (a total of seventy-two (72) hours on weekends) unless an immediate/emergency need exists.

## Americans With Disabilities Act

California City Immigration Processing Center is in full compliance with the Act. CCIPC does not discriminate based on race, color, sex, national origin, and disability in the admission, access to, treatment or employment in its programs or activities for detainees.

## Initial Admission

Medical services are provided to ensure your health is adequately maintained and those problems that occur during your stay at this facility are resolved. The medical services offered and the procedures for obtaining these services are outlined elsewhere in this handbook.

Initial Medical Intake Screening:

1. Each detainee entering the facility will receive an initial medical screening by the clinical staff. At that time, you should discuss any medications that you are taking and any physical or mental health problems that you are experiencing. Some medications such as heart or diabetic medications will be continued when you arrive.

2. All new arrivals shall receive tuberculosis (TB) screening by PPD (Mantoux method) or chest x-ray. The PPD shall be the primary screening method unless this diagnostic test is contraindicated, then a chest x-ray is obtained.

3. A full medical examination will be conducted by a member of the Health Services Department within fourteen (14) days of your arrival. At that time, you should discuss any medications that you are taking and any health problems that you may be experiencing. Some medications, such as heart or diabetic medications, will be continued throughout your detention.

Detainees are subject to a search upon admission into the facility and when there is reasonable cause to believe you may have contraband concealed on your person.

CCIPC must obtain specific information to ensure that records of your entry are adequately documented. This information will also be utilized so we may classify you as the living area most suited to your individual needs. Such information will include present residence, nationality, race, sex, medical history and criminal history, if any.

## FUNDS AND PERSONAL PROPERTY

A Forwarding Address Form shall be obtained from every detainee for use in the event that personal property, legal documentation, or valuables are lost, received or forgotten in the facility after release, transfer, or removal.

Identity documents such as passports, birth certificates, etc. cannot be kept on your person or in your property and will be inventoried and provided to ICE for placement in your file. Upon request to ICE, you shall be provided with a certified copy of your identity document.

Upon arrival, your clothes, personal property, valuables and funds will be retained by the processing officer for safekeeping. Itemized receipts will be issued to you and one (1) placed in your file for all your clothing, personal property, valuables and funds. **It is important that you retain these receipts to claim your property when you are released.** STAFF SHALL SEARCH AND INVENTORY DETAINEE PROPERTY ONLY IN THE PRESENCE OF THE DETAINEE(S) UNLESS INSTRUCTED OTHERWISE BY THE FACILITY ADMINISTRATOR.

All personal property and valuables that you bring with you will be inventoried and accounted for on a Personal Property Form. A receipt will be issued to you for these items. CCIPC is not responsible for property that did not arrive with you.

U.S. currency in your possession upon arrival at CCIPC will be inventoried; a receipt issued and then placed in an account for your use at the commissary. CCIPC will only accept cash for detainee accounts during the intake procedure. After you have entered the facility, money will only be accepted as outlined in this handbook under Detainee Money Deposits. Funds from your account may be used to pay for legal services. If this is required, contact a member of your unit team or submit a . Foreign currency will be inventoried and secured with your property.

Personal checks in your possession upon arrival at the CCIPC will be placed in your property. You will not need money on your person during your stay. If you are found with any money in your possession, it will be confiscated as contraband, and you will be subject to disciplinary action.

Only commissary products purchased from a CORECIVIC facility are allowed into CCIPC during intake. Consumable products will be disposed of.

Upon your discharge from this facility, you are required to turn in all CCIPC property, to include this handbook to the officer assigned to the Receiving and Discharge area. Once you have confirmed that all items have been accounted for, you will be required to make restitution for lost or damaged property. This includes clothing, bedding and any recreation/leisure time equipment (i.e. games and library books). Lost or maliciously damaged ID badges will cost $5.00 in restitution.

Your property and any funds that you have remaining in your accounts will be returned to you prior to departure. You must sign for these items. Prescribed health care appliances shall be retained and maintained by you upon release.

Any property that you are not authorized to keep with you will be placed in an appropriate bag assigned to you and locked in a secure storage area. Due to space limitations, all detainees will be limited to one (1) property boxbox to store their property not exceeding 40 Lbs. If property is received and it will not fit into the property boxbox, it will be the detainee's responsibility to forward/mail the property. Excess personal property may also be picked up by family, friends or attorneys. At the detainee's request, however, the staff will mail the property to a third party or may store it with the detainee's other personal property. If detainee chooses not to provide an appropriate mailing address within thirty (30)

days, or is unable to pay the postage, the facility administrator, after ICE concurrence and after providing the detainee with written notice of the intent to destroy the property, may dispose of the property.

While at this facility, you are permitted to retain on your person:

1. Legal documents
2. Legal papers
3. Legal information
4. You may have up to ten (10) Photos of family, friends and associates in your possession. These photos must be 5x7 or smaller. (Proper photos will be described later)
5. Approved medical prostheses, (i.e. eyeglasses, dentures, etc.)
6. Personal reference materials, (i.e. address/phone book and/or list of relatives, friends and/or other correspondents.
7. Radios must be used with earphones at all times, limit one (1) radio per person. No plug-in radios are permitted. No radios or earphones are permitted outside of your dormitory except during recreational periods.
8. Only a wedding band and/or religious jewelry is authorized to remain in your possession during your stay. Religious jewelry that is handmade from items that are considered contraband is prohibited. Also, religious medallions (i.e., crosses, St. Christopher Medals, etc.) may be worn, but must be on their original chain and the religious medallion will not exceed 1 ½ inches by 1 ½ inches in size. Chains used with medallions will not exceed 1/8 inch in diameter and 24 inches in length. The chain or medallion will not be visible when worn in uniform. Rosary Beads and Islamic Prayer Beads will not exceed ¼ inch in diameter and 24 inches in length. No items will be attached to the Islamic Prayer Beads. All other jewelry will be inventoried and placed in a safe area for storage until your release. A receipt will be issued for your valuables. Religious jewelry is allowable only if it has been approved by the chaplain. See the Religious Services entry in this handbook for the actual procedures.
9. Newspapers, magazines, books and other literature are limited. In order to comply with fire safety regulations, you may only have up to five (5) soft cover books and up to five (5) magazines or newspapers. Items may only be received directly from a bookstore or publisher. Full-frontal nudity and pornographic materials are not permitted.

All food items must be consumed upon being opened to ensure sanitation standards are met. Daily food issuance may not be stored.

You are allowed to purchase up to a total of three mugs, bowls or tumblers through the commissary. After use, these items must be cleaned and stored in your personal storage container.

Additional personal property allowed to be retained by detainees must be approved by the Chief of Unit Management prior to purchase/possession to ensure acceptable sanitation is appropriately maintained.

No items are to be attached to the bunk, wall, windows or left on windowsills/unoccupied beds. All items must be stored in their original container. Empty beds may not be used as storage. Clotheslines are not permitted.

Detainees are responsible for the loss of personal items not safeguarded or stored by CCIPC.

Clean linens are provided for each person entering the facility to include: two (2) sheets, two (2) towels, two (2) hand towels, one (1) pillowcase, one (1) blanket and one (1) laundry bag

## Unauthorized Property
Items not considered inherently illegal but are considered contraband when possessed by a detainee or visitor within the facility, includes, but is not limited to:
1. Any approved item, which, though approved, is more than the quantity permitted.
2. Unauthorized personal property received through the mail will be returned to the sender at the detainee's expense. All detainees must have prior approval from the Unit Manager or above, before the property is

received. If authorized, the property will be inventoried on the G-589 or equivalent then stored in your property boxbox until your release.
3. The facility shall permit detainees to retain all personal legal material upon admittance to the general population or the Special Housing Unit unless such material creates a safety, security, and/or sanitation hazard. The facility may require detainees with a large amount of personal legal material to place some of the material in a personal property storage area, with access permitted during designated hours. The facility shall grant requests for access to such stored legal material as soon as possible, but not later than 24 hours after receipt of the detainee's request, unless documented security concerns preclude action within this time frame.

## Property Claims Procedures

Admission/Release – When a newly arrived detainee claims theirtheir property has been lost, damaged or left behind, CCIPC staff will complete an ICE Form I-387 and forward it to the ICE Contracting Officer's Representative (COR) for prompt response. A detainee being transferred, released, or removed from the country with a property claim will be permitted to initiate the claim before leaving the country. The Warden will forward the result of the claim to the claimant's forwarding address (provided upon admission or in conjunction with the claim). It is your responsibility to inform CCIPC staff during out-processing if your forwarding address has changed.

You have the right to file a claim for lost, stolen or damaged property. You may also file a grievance. Please see grievance procedures detailed in this handbook. Only those items outlined on the 14-6DD Allowable Personal Property Inventory List will be eligible for a claim investigation.

If any personal property is missing during your release/transfer process, report immediately to processing staff, and Supervisory personnel shall be notified when properly receipted detainee property is reported missing or damaged. Supervisory staff shall investigate and, if necessary, take prompt action to prevent further loss. If the property is not recovered or is recovered, but in damaged condition, staff shall prepare a report for the facility administrator, providing: a description of any damage; the circumstances under which the property was last seen; the circumstances under which the loss or damage was discovered; and sworn statements from the detainee and all witnesses. All facilities shall report and turn over to ICE all detainee abandoned property. Contraband shall be handled in accordance with facility policy/standard. Property that is of minimal value, broken, or clearly abandoned shall be discarded. Because property obtained through non appropriated funds cannot be donated, donations of abandoned property to charitable organizations is prohibited.

Property that has been stolen due to CoreCivic employee negligence is eligible for an investigation. If a detainee claims allowable personal property was stolen, the detainee may request a claim investigation by completing Page 1 of the 14-6D Lost/Damaged/Stolen Personal Property Claim form and forwarding it to the Property Officer or designee. All claims must be submitted within seven (7) calendar days of the incident. The facility will attempt to recover property stolen by other detainees. However, the facility will not be responsible for the reimbursement of those property items unless it is proven through investigation to be facility negligence.

Lost/Damaged - Property that has been lost or damaged due to CoreCivic employee negligence is eligible for an investigation. If a detainee wishes to request an investigation of property that has been lost or damaged due to CoreCivic employee negligence, the detainee must complete Page 1 of the 14-6D Lost/Damaged/Stolen Property Claim and forward it to the Property Officer or designee. All claims must be submitted within seven (7) calendar days of the incident. Verification of proof of ownership and value must occur immediately upon investigation for both stolen and/lost/damaged property. You may file a claim even after you are released from the facility.

Investigation - Verification of proof of ownership and value must occur immediately upon investigation. If the claim proves valid and reimbursement/replacement is recommended, it will be forwarded to the Warden or Administrative Duty Officer who will be the final authority in the award of any compensation. The Warden or Administrative Duty Officer shall review and approve/disapprove the recommendation within seven (7) calendar days of receipt. In the event a claim does not prove valid, and replacement/reimbursement is denied, the detainee may submit a 14-6 E Denied Property Claim Appeal form to the Warden.

Denied Property Claim Appeals - In the event a detainee chooses to appeal a denied property claim, the detainee may file a grievance in accordance with grievance procedures or must complete a 14-6E Denied Property Claim Appeal and forward it to the Property Officer or designee within seven (7) calendar days of receipt of the denied claim. The Property Officer or designee will forward all 14-6E's received to the Warden for review and response. The Warden will provide a response within fifteen (15) calendar days of submission. The response will be forwarded to the Property Officer or designee to ensure that the appeal is appropriately logged, filed, and returned to the detainee. The Warden's decision is final and concludes the claim process, unless otherwise specified in the facility management contract.

## Inspections of Persons and/or Property

Routine unscheduled searches of the facility, detainee's persons, and property are conducted when deemed necessary.

Searches are conducted when:
1. Entering or leaving the housing units.
2. Entering or leaving the visit area; and
3. Entering or leaving a building or area.

Searches are conducted for the purpose of:
1. Detecting and prevent the introduction of contraband (i.e.; weapons, drugs, unauthorized clothing items, etc.).
2. Ensuring that safe and sanitary conditions exist within the facility.
3. Recovering lost, missing or stolen property.
4. Preventing escapes and other disturbances.

Searches will be conducted in a manner that avoids unnecessary force, embarrassment or indignity to the detainee, and are not intended to be punitive in nature.

Metal detectors are located at various locations and doorway points throughout the facility. Clearance of these detectors is mandatory. Detainees must remove any items from their pockets that would cause the detector to alert. Detainees are not to touch or tamper with these devices. Failure to comply with clearance of metal detectors will result in disciplinary action. Failure to successfully clear a metal detector will necessitate a more detailed search as outlined below.

Types of Searches Performed at CCIPC:
1. Visual Inspection: A search of a detainee or an area for contraband without physical contact.
2. Frisk or Pat Search: A search conducted by placement of hands on the detainee's clothing to feel for weapons/contraband. A thorough search of all pockets, collars, jackets, waistbands and shoes will be completed. Shoes are removed to check socks and bottom of feet.
3. Strip Search: Upon a reasonable suspicion that a detainee is concealing contraband, search of a detainee that requires all clothing to be removed during the search.
4. Shakedown: A physical search of a specific area of the facility.

## CONTRABAND

All contraband (hard and soft) will be seized. In the event that contraband is not illegal to possess under criminal statutes and would not otherwise pose a threat to security, staff shall inventory and provide a receipt for the property. Items which are considered to be detrimental to the safe and orderly operation of the facility are prohibited.

All items of Contraband are taken from a detainee or found on CoreCivic property are to be confiscated and if appropriate, turned over to the proper authorities for appropriate action.

Contraband items include but are not limited to:

1. Any dangerous drug, narcotic drug, marijuana, intoxicating liquor of any kind, deadly weapons, dangerous instruments, explosives or any other article that, if used or possessed, would endanger the preservation of order in the facility.
2. Any item which could be used as an aid to escape.
3. Any item which could be used to disguise or alter the appearance of a detainee.
4. Any article of clothing or item for personal use or consumption which has not been cleared first through the OIC or purchased by a detainee from the commissary.
5. Any normally approved item, clothing or apparel that has been intentionally altered from the original design or condition.
6. Cameras, video, audio, or related equipment that can be used to make unauthorized photographs or audio, or audio/video recordings of detainees, staff or government property.
7. Cigarettes, tobacco or smoking paraphernalia, alcoholic beverages, cardboard boxes and excessive magazines.
8. Pictures of that have been placed on dormitory/cell walls.
9. Cellular phones, smart phones, smart watches and unauthorized tablets.
10. Laptops, computers or televisions.
11. Any item not purchased through authorized channels.
12. Possession and/or use of another resident's PIN number is also considered possession of contraband. Do not lend or borrow your personal PIN number.

"Dry cells" shall be used for contraband detection, with proper authorization and in accordance with required procedures, only when there is a reasonable suspicion of concealment.

## Detainee Movement
When entering and exiting housing units, buildings, rec areas, etc., the movement will be at the direction of the staff during authorized movement only. Running is prohibited in all non-recreation areas. Detainees will walk on the right side of the walkway going and coming. Lines for any activity will be orderly. Detainees will not crowd around staff or door entrances at any time. Detainees are responsible for being attentive and moving promptly when movement times are called for activities, services and appointments.

## Classification
All detainees are classified upon arrival, before being admitted into the general population. The classification system will ensure that you are placed in the appropriate category and physically separated from detainees in other categories. You will be protected from harm, as you will be assigned housing with people of similar backgrounds and criminal history. The classification system assigns detainees to the least restrictive housing unit consistent with facility safety and security. You will be housed according to your classification level and issued color-appropriate uniforms and ID cards. Any detainee who cannot be classified because of missing information at the time of admission into the facility (e.g., the results of a criminal record check) shall be kept separate from the general population. Once the needed information is obtained, classification shall be expedited, and the detainee may be housed in the general population, if warranted.

### Classification Process:
During the classification process, staff shall reference facts and other objective, credible evidence documented in the detainee's A-file, work-folders, ICE automated records systems, criminal history checks, or other objective sources of information. Relevant considerations include any current criminal offense(s), past criminal offense(s), escape(s), institutional disciplinary history, documented violent episode(s) and/or incident(s), medical information or a history of victimization. Special consideration is given to any factor that would raise the risk of vulnerability, victimization or assault. Detainees who may be at risk of victimization or assault include but are not limited to: those with risk(s) of victimization or persons with disabilities, persons who are elderly, pregnant, or nursing, suffering from a serious medical or mental illness, and victims of torture, trafficking, abuse, or other crimes of violence. Personal opinions, including opinions based on profiling, familiarity or personal experience, may not be considered in detainee classification.

**Low Custody Detainees:**

Low custody detainees may not be comingled with high custody detainees.

May not include any detainee with an arrest or conviction that included an act of physical violence, or any detainee with a history of assaultive behavior.

May not include any detainee with a felony conviction for an offense that is listed under the "High" or "Highest" section of the severity of offense scale below.

May include detainees with minor criminal histories and non-violent felony charges and convictions.

**Medium Custody Detainees:**

Medium-low custody detainees are those with no history of violent or assaultive charges or convictions, no institutional misconduct, and no gang affiliation. Medium-high and high custody detainees are those with a history of violent or assaultive charges, convictions, institutional misconduct, or those with a gang affiliation. Under no circumstance may a medium custody detainee with a history of assaultive or combative behavior be placed in a low custody housing unit.

Medium custody detainees may not ordinarily be co-mingled with high or low custody detainees, except as specified below.

May not include a detainee whose most recent conviction was for any offense listed under the "Highest" section of the severity of offense scale.

May not include any detainee with a history or pattern of violent assaults.

May not include a detainee convicted for assault on a correctional officer while in custody or where a previous institutional record suggests a pattern of assaults while in custody.

**High Custody Detainees:**

Medium-high and high custody detainees are those with a history of violent or assaultive charges, convictions, institutional misconduct, or those with a gang affiliation. High custody detainees are considered high-risk, require medium-to maximum-security housing, are always monitored and escorted, and may not be co-mingled with low custody detainees. In addition, high custody detainees shall not be assigned work duties outside their assigned living area.

**Housing Restrictions**:

High custody detainees may not be housed with low custody detainees

Low and Medium Low detainees may be housed together (unless there is a history of assaultive or combative behavior). Medium and Medium/High detainees may be housed together. Low and Medium/High or High custody detainees are never housed together.

Medium/High will be escorted outside the housing area and may only be in specified common areas with other detainees of the same classification level.

Under no circumstance may a medium custody detainee with a history of assaultive or combative behavior be placed in a low custody housing unit

All housing, work assignments and programmatic activities will be decided by the level of classification received.

All detainees will be escorted outside the housing area and may only be in specified common areas with other classifications of detainees.

All housing, work assignments and available activities will be dictated by the level of classification received.

After your initial classification, your case will be reviewed (called "classification reassessment") in 60 to 90 days from the date of your arrival at CCIPC. Subsequent reassessments will be completed in 90-to-120-day intervals from the first reassessment. Your classification level may be changed (reclassified) based on your institutional behavior, disciplinary action, additional charges or information received, attempted escape or upon release from segregation status.

APPEALS: All new arrivals classified as medium or high may appeal to their classification designation by submitting their appeal request on a Detainee Information Request Form to the Classification Supervisor. Written notification of the outcome of the appeal will be made within ten (10) business days. The Classification Supervisor's decision may be appealed in the same manner to the Warden. Detainees may also file a grievance to adjust their classification level. Please see grievance procedures detailed in this handbook.

## Severity of Offense Scale:

I. HIGHEST

Aiding Escape
Aggravated
Battery with Deadly Weapon
Armed Robbery (Multiple with injury)
Burglary with Assault
Escape (Secure Facility)
Inciting Riot
Kidnapping
Murder (1st, 2nd degree)
Sexual Battery (with violence upon a minor)

II. HIGH
Aggravated Assault
Aggravated Battery
Aggravated Child Abuse
Arson
Battery Law Enforcement Officer
Burglary (Armed)
Extortion
False Imprisonment
False Report of Bombings
Controlled Substances (Importation, Trafficking)
Introduction of Contraband into Detention
Facility
Manufacture of Explosives
Robbery (armed, strong armed)
Sexual Battery (other than capital or life felony)

III. MODERATE

Armed Trespass
Burglary
Carrying Concealed Firearm
Forgery
Grand Theft
Manslaughter
Sale, Delivery, Possession of Controlled Substance
Tampering with Witness
Worthless Checks (felony)
Welfare Fraud (felony)
Escape (Non-secure Facility)


IV. LOW

Driving under the Influence
Leaving the scene of Accident
Battery (Simple Assault)
Carrying Concealed Weapon (other than firearm)
Disorderly Conduct
Gambling
Offering to Commit Prostitution
Possession Marijuana (misdemeanor)
Possession Drug Paraphernalia
Petit Theft
Trespass
Worthless Check (misdemeanor)


## Clothing

Clothing items that are appropriate for the facility environment and local weather conditions will be issued. The basic detainee uniform for daily living and work assignments shall be distinctive in appearance in order to easily identify detainees according to their security level. In CCIPC, the basic uniform colors are:

| UNIFORM COLOR | CUSTODY | |
|---|---|---|
| BROWN | High | Male |
| KHAKI | Mod-High | Male |
| GREEN - FORREST | Mod-Low | Male |
| BLUE | Low | Male |
| RED | High | Female |
| PINK | Mod-High | Female |
| GREEN - LIME | Mod-Low | Female |
| GRAY | Low | Female |
| YELLOW | RHU | Male |
| RED + | RHU | Female |
| ORANGE | Transport | |
| WHITE | Kitchen | |

\*White uniforms will be the work uniform for kitchen workers only. In the housing units, the kitchen workers will wear the appropriate color uniforms.

Initial issue of clothing/linens will include: Three (3) uniform sets (pants and shirts); one (1) pair of shoes (personal shoes are not permitted unless authorized); three (3) t-shirts, three (3) pairs of underwear, and three (3) pairs of socks. The detainee will sign for each item issued and will be held liable for any damage or loss of facility issued property in excess of normal wear and use. Items shall be replaced on a one (1) for one (1) exchange basis. When a facility issued property item becomes unusable, a detainee may request an exchange by sending a Detainee Clothing Request Form (14-6H) to the Property Officer or designee. Any items exceeding these amounts is considered contraband. Allowable quantities of clothing items include any items purchased in the commissary.

## Detainee Dress Code

You are required to keep yourself clean and wear proper clothing/footwear during all activities. You are reminded that poor hygiene, poor sanitation, and wearing improper clothing and footwear may cause conflict with your peers and others and can have a negative impact upon your health and safety, as well as the health of those around you. Failure to comply with the dress code and grooming standards will ultimately become an issue that requires staff intervention in the form of appropriate disciplinary action to correct the situation.

Ordinarily, detainees may wear any hairstyle with the following exceptions:
1. For safety and hygiene reasons, kitchen workers and detainee workers operating machinery will keep their hair in a neat, clean, commonly acceptable style. ALL kitchen workers will wear a hairnet and/or beard net when working in the kitchen.
2. Hairstyles will not interfere with safety and hygiene requirements.
3. No numbers or symbols will be permitted to be part of a detainee's hairstyle.

Ordinarily, facial hair may be grown without restriction; however, for safety reasons, detainee workers operating machinery may be expected to be clean-shaven at all times. These restrictions are required for employment in the above-described work assignments, and accepting a job in these areas denotes acceptance of the grooming standards for the above-described work **assignments. There will be no exceptions to these requirements, even for medical reasons.**

Complete uniforms (pants, shirts, shoes and ID card) are required to be worn daily when outside the dormitory; however, T-shirts (with sports bra for female detainees) and shower shoes are permitted to be worn in the dayroom areas and the recreation yard. No towels, sheets or blankets will be permitted as clothing and or used for cleaning unless designated by staff as such.

Religious apparel may only be worn as approved by the Chaplain.

## The Proper Way to Wear Facility-Issued Clothing

These requirements are essential to ensure compliance with security, hygiene, and conduct. All issued clothing and IDs will be worn as specified in the following instructions and in no other manner:
1. CoreCivic issued detainee ID badges must be visibly displayed on your pocket at all times. If your ID becomes torn or broken, notify the housing officer that you need a new one and send a Detainee Information Request form to the correctional counselor.
2. Clothing must be clean and not torn when worn. Intentionally damaging or altering your clothing in any way may result in disciplinary action and the payment of restitution equal to the cost of the clothing item(s) damaged.
3. Only kitchen workers are authorized to wear white uniforms, and only while performing services in the kitchen. All other detainee workers will wear their assigned and provided color coded uniform.
4. The wearing of mixed colored uniforms is prohibited.
5. Undergarments may be worn without outer garments only while inside the sleeping quarters or in the restroom/shower areas. NO EXCEPTIONS!

6. CCIPC-issued shoes will be worn at all times when outside the housing units. Personal shoes are prohibited unless medically required or authorized by the Chief of Security. Shower shoes will not be worn outside the unit, to attend services or to go to any appointments, to include appointments with staff within the unit.
7. Detainees will wear a complete uniform (shirts, pants, shoes) at all times while outside the dormitory.
8. The pants will be worn at a point about the waist that prevents the crease of the buttocks from showing.
9. Undershirts must be tucked into the pants.
10. You are not to walk about the facility with your hands inside the waistband of your pants, regardless of weather conditions.
11. No article of clothing will be worn in a manner not normally intended for that item (using a shirt as a headband or head cover, etc.) This also includes the rolling up of sleeves or pants legs on only one side of a garment or any gang related wearing of clothing.
12. Only those religious items approved by Religious Services will be authorized to be worn in general population. (Religious headgear, Rosaries, etc.).
13. Detainees are not permitted to use any type of makeup items for facial enhancements. This includes the alteration of any item to be used for this reason.

## Safety and Evacuation Drills

The staff at CCIPC will make every effort to help ensure your safety while you are here. You must assume some responsibility for helping to make this facility safe. Signs are available to mark hazardous areas wherever they occur. If you spill something, then clean it up. If you encounter a possible hazard, tell the officer in your area. Don't assume that problems have been reported. Pay attention to warning signs and take reasonable care in potentially hazardous situations such as where wet floor signs are visible.

- Detainees must follow all safety regulations, signs, instructions, directions, labels and any training provided.

- All detainees must attend all safety/emergency training. Detainees must be trained before doing any hazardous task.

- Detainees must wear personal protective equipment when handling cleaning or other chemicals.

- Detainees cannot alter items or use an item for other than its intended purpose. Altered items are contraband and will be confiscated.

- Do not remove the blade from disposable razors.

- Detainees must immediately clean up any liquid spilled or stay clear of the area until it can be cleaned up.

- Detainees injured in the housing unit, on the recreation yard, or anywhere else in the facility, must immediately report the injury to the employee on duty in that area.

- Detainees will not tamper with, prop open, block, or disable any locking device and/or door.

- Detainees will not hang shirts on the Recreation Yard.

- Detainees will not reach into the razor wire for any reason.

- Detainees will not climb any fence for any reason.

Per local, state and federal laws, we are required to perform evacuation drills. At this facility, we perform at least one drill every month on various shifts. Evacuation drills are not designed to inconvenience you, but rather to ensure that you know where the exits are located in case of an actual danger such as a fire, gas leak, civil disaster, or other dangers. You are expected to participate in these drills. In your housing area there is a diagram showing you the location of all fire exits and which exits to use. Study this diagram located in your housing area carefully; your life may

depend on it. If a fire or other emergency in the dormitory should occur, be sure the Detention Officer on duty is notified, and follow his/her instructions quickly and calmly. Disruptions during evacuation drills may result in a lock-down being initiated and/or disciplinary sanctions.

## Prison Rape Elimination Act (PREA) - Sexual Abuse and Assault Prevention and Intervention

The Prison Rape Elimination Act (PREA), a federal law enacted in 2003, was created to eliminate sexual abuse in confinement. CoreCivic recognizes the inherent dignity of the human person and the need to treat every individual with respect. Part of treating our detainees with respect is giving them a safe place to live. We believe in safeguarding their rights, including protecting them from being subjected to personal abuse/injury and harassment.

Regardless of your age, race, size, ethnicity, or sexual orientation, detainees should have the opportunity to serve their detention with dignity. **THERE IS A ZERO-TOLERANCE POLICY FOR SEXUAL ASSAULT AT THIS FACILITY.**

This facility utilizes multiple strategies for prevention of sexual abuse and intervention to respond to sexual abuse. These include, but are not limited to, screening to identify victims and abusers, appropriate numbers of staff on the units, video surveillance, and trained investigators and trained medical and mental health staff.

### Definitions and Examples of Sexual Abuse

**All forms of sexual abuse and assault by a detainee against another detainee(s) are prohibited. If another detainee forces you or tries to force you to engage in a sex act, touches the sexual parts of your body, forces you or tries to force you to touch the sexual parts of their body, or uses threats or intimidations to pressure you to engage in sex, it is sexual abuse. The following are the definitions of Detainee-on-Detainee Sexual Abuse and/or Assault found in DHS Standards:**

**Sexual abuse of a detainee by another detainee** includes any of the following acts by one or more detainees who, by force, coercion, or intimidation, or if the victim did not consent or was unable to consent or refuse, engages in or attempts to engage in:

1. Contact between the penis and the vagina or anus and, for purposes of this subparagraph, contact involving the penis upon penetration, however slight;
2. Contact between the mouth and the penis, vagina or anus;
3. Penetration, however slight, of the anal or genital opening of another person by a hand or finger or by any object;
4. Touching of the genitalia, anus, groin, breast, inner thighs or buttocks, either directly or through the clothing, with an intent to abuse, humiliate, harass, degrade or arouse or gratify the sexual desire of any person; or
5. Threats, intimidation, or other actions or communications by one or more detainees aimed at coercing or pressuring another detainee to engage in a sexual act.

**All forms of sexual acts between a detainee and a staff member (including contract guards, medical professionals, and volunteers) are prohibited and against the law, regardless of whether they are consensual. If a staff member tries to or actually does have sex with you, intentionally touches you in a sexual manner, makes sexual advances or repeated sexual comments, displays his or her genitals, or engages in voyeurism, it is sexual abuse. The following are the definitions of Staff-on-Detainee Sexual Abuse and/or Assault found in DHS PREA Standards:**

Staff-on-Detainee Sexual Abuse includes any of the following acts, if engaged in by one or more staff members, volunteers, or contract personnel who, with or without the consent of the detainee, engages in or attempts to engage in:
1. Contact between the penis and the vagina or anus and, for purposes of this paragraph, contact involving the penis upon penetration, however slight;
2. Contact between the mouth and the penis, vagina or anus;

---

3. Penetration, however slight, of the anal or genital opening of another person by a hand or finger or by any object that **is unrelated to official duties** or where the staff member, contractor, or volunteer has the intent to abuse, arouse, or gratify sexual desire;

4. Intentional touching of the genitalia, anus, groin, breast, inner thighs or buttocks, either directly or through the clothing, that is unrelated to official duties or where the staff member, contractor, or volunteer has the intent to abuse, arouse, or gratify sexual desire;

5. Threats, intimidation, harassment, indecent, profane or abusive language, or other actions or communications aimed at coercing or pressuring a detainee to engage in a sexual act;

6. **Repeated** verbal statements or comments of a sexual nature to a detainee;

7. Any display of his or her uncovered genitalia, buttocks, or breast in the presence of a detainee, or;

8. Voyeurism, which is defined as the inappropriate visual surveillance of a detainee for reasons **unrelated to official duties**. Where not conducted for reasons relating to official duties, the following are examples of voyeurism: staring at a detainee who is using a toilet in his or her cell to perform bodily functions; requiring a detainee to expose his or her buttocks, genitals, or breasts; or taking images of all or part of a detainee's naked body or of a detainee performing bodily functions

**The acts listed above are prohibited by CCIPC policy and violators will be subject to disciplinary actions or prosecution.**

Staff sexual misconduct is forbidden at CCIPC. Staff sexual misconduct is sexual behavior between any CCIPC staff member and any detainee under the care of CCIPC. This includes contractors and other agents of the contracting agencies. Staff sexual misconduct is forbidden, even if it is consensual. Consensual sexual conduct between detainees is also prohibited and subject to disciplinary sanctions.

You do not have to tolerate sexual pressure, harassment, manipulation, assault or attempts to engage in sexual conduct. Every detainee has a responsibility to eliminate sexual assault and sexual activity. If you are approached, pressured, or assaulted–**report it immediately**. You will be offered immediate protection from the assailant and will get medical attention. You will not be subjected to retaliation, reprisal, harassment, or disciplinary for truthfully reporting abuse or signs of abuse observed. Reporting these types of abuse will not create conflicts with your immigration status or case.

To ensure that your environment is safe, if you are aware of another offender being sexually assaulted or involved in sexual behavior, report it immediately. All reports will be taken seriously and investigated immediately.

Retaliation
You have the right to be protected from retaliation by staff and other detainees for making reports of sexual abuse. You will not be placed in segregation solely because you have made a report or are a victim of sexual abuse. A staff person will be assigned to conduct retaliation monitoring. This person will meet with you after the report has been made and at least 90 days after to ensure that you have not been the victim of retaliation from staff or other detainees for making the report. Retaliation monitoring will stop if the allegation is determined to be unfounded.

You can take steps to protect yourself from being sexually assaulted:
- Do not accept gifts from others. Gifts and favors usually have strings attached
- Do not gamble or enter games of skill or chance
- Do not use, possess, trade, purchase, or hold drugs, alcohol, or tobacco products
- Do not become indebted to anyone either monetarily or for favors
- Choose your associates wisely. Do not become involved in gangs or hate groups. Look for people doing positive things to change their lives such as programs, religious activities, etc.
- Do not accept another detainee's offers to protect you
- Stay in well-lit areas where staff can see you
- Always carry yourself in a confident manner. Do not permit your emotions such as fear and anxiety to be obvious to others

- Trust your instincts. If a situation seems dangerous, it probably is. If you fear for your safety, report it to a staff member.

If you feel your life is in danger, you can request to be sent to the Special Housing Unit for Protective Custody to your Unit Manager or Shift Supervisor. If you need to talk to a staff counselor or a mental health professional, you can do so by filling out an ICE - sick call slip. If you fill out a sick call slip, make sure to specify you want to speak to clinical staff.

## Tips For Self-Protection and Avoiding Sexual Abuse
If you are sexually assaulted there are several things you should not do, including:
- Do not bathe, shower or wash off
- Do not go to the bathroom
- Do not brush your teeth
- Do not change your clothing
- Do not eat or drink

These actions would eliminate important forensic evidence. It is important that evidence be collected to assist in your attacker's prosecution. Physical evidence is important because law enforcement relies heavily on the information. After you reported the assault, an examination would occur privately and professionally in conjunction with community resources.

Engaging in or pressuring others to engage in sexual activities is not permitted. Criminal or Disciplinary Charges will be filed. Educational Materials regarding these acts are provided upon entry to the facility, included as and part of this handbook, and are posted in each dormitory.

## How to Report
Because reporting sexual assault can be difficult, it is important that you understand there are several ways that you can report it, including:

1. Verbally telling any staff member you trust, to include detention officers, deportation officers, chaplains, medical staff or supervisors, the DHS Office of Inspector General, and the Joint Intake Center. Staff members will keep your information confidential and only discuss it with the appropriate officials on a need-to-know basis.

2. Writing a letter to the Warden/Administrator or medical, sealing and marking it "CONFIDENTIAL".

3. Calling or writing to someone outside the facility who can notify facility administrative staff.

4. Call at no expense to you the DHS Office of Inspector General (OIG) at the phone number - 1-800-323-8603 / 1-844-889-4357-TTY

5. Contacting your consular official.

6. Contacting the ICE Detention Reporting and Information Line: 1-888-351-4024 or 9116# or #5663. Language assistance is available.

7. Writing letter to Security or Unit Management Staff, sealing and marking it "CONFIDENTIAL".

8. Writing to the Managing Director, Facility Operations at the following address:

   CoreCivic Managing Director
   5501 Virginia Way
   Brentwood, Tennessee, 37027

9. Call, at no expense to you, the Office of the Inspector General at the phone number posted in your dorm. Detainees that are hearing impaired may contact the OIG Hotline using the TTY telephones. Any member of the Unit

staff can assist you. OIG TTY HOTLINE 1-800-377-4950. Writing the Office of Inspector General (OIG) at the following address:

> Office of the Inspector General/ Mail Stop 0305
> 245 Murray Lane. S.W.
> Washington, DC 20528
> 1-800-323-8603, TTY 1-844-889-4357, Toll free

Information will be available to you through your unit staff and through postings in your unit containing instructions for reporting sexual assault. Included in that information is a sexual abuse / misconduct hotline in which reports can be made anonymously from any detainee dorm phone. These calls are not monitored and are provided free of charge.

To ensure that your environment is safe, if you are aware of another detainee being sexually assaulted or involved in sexual behavior, **report it immediately.** Deliberate false allegations can result in disciplinary action and/or prosecution. Another avenue of reporting a PREA complaint is that you may file a formal grievance related to sexual abuse at any time during, after, or in lieu of lodging an informal grievance or complaint. Time limits will not be applied when a detainee submits a grievance regarding an allegation of sexual abuse. Third parties, including fellow detainees, employees, family members, attorneys, and outside advocates, shall be permitted to assist detainees in filing requests for administrative remedies relating to allegations of sexual abuse or to file such requests on behalf of detainees. After receiving an emergency grievance alleging that a detainee is subject to a substantial risk of imminent sexual abuse, the facility will immediately forward the grievance to an ADO-level employee who can initiate immediate corrective action as needed. Facility staff will bring medical emergencies to the immediate attention of proper medical personnel for further assessment. **\*Remember any method that you use other than reporting directly to a staff member delays you getting help.\***

### Indicators of Sexual Abuse
Please be aware of any fellow detainees who display signs of having been sexually abused. These would include, but are not limited to the following:
- Concentration difficulties
- Emotional outbursts
- Memory loss
- Restlessness
- Anger issues
- Stress
- Suicidal Thoughts
- Depression
- Difficulty with daily routines

## Official Counts

In order to maintain proper accountability of detainees at this facility, official counts are conducted at posted times. The purpose of the count is not only to ensure all detainees are present and in the proper location, but also to ensure they are safe.
1. Formal and standing counts are conducted both day and night, according to the posted building schedule. Unscheduled counts may be conducted according to the security needs of the facility.
2. When staff announce preparation for the count, all detainees are to immediately cease any non-count related activity and proceed to their bunk. Showering, using the dayroom sink or microwave, sitting in the dayrooms/game rooms, staying on the phone or remaining in the restroom are prohibited.
3. Detainees are expected to cooperate during each count. The televisions will be turned off, and no movement is permitted while the count is being conducted. When officers are counting, detainees must return to and remain at their bunk until cleared for movement by the officer. During counts, no talking is permitted. Disruptions during counts may result in a lock-down being initiated and/or disciplinary sanctions.

4. During formal count, all detainees are to be in their assigned bed unless they are at approved job assignments, court, asylum, visitation or other approved activities.
5. Detainees that are at approved job assignments, court, asylum, visitation or other approved activities during count will be counted at that location. Detainees may not move from an assigned area until the count is cleared.
6. Movement will not resume until the total facility count is verified and cleared, unless otherwise authorized by the shift supervisor. Detainees will be counted multiple times by staff for verification. Detainees must follow these posted rules for each staff member counting. Once staff have completed a count in that specific area, detainees may go to and from the restroom.
7. During a standing count, the detainee will stand inside the cell facing the door. The detainee must stand for each staff member counting. Failure to stand or cooperate with the standing count will result in disciplinary action.
8. Detainees cannot be counted based on observation of parts of clothing, hair, shoes, or appearance of the human form. The back of the head, shoulders, or hair is not acceptable.
9. Detainees are not to cover their entire body or to prevent observation of "living, breathing flesh" in any way. If detainees choose to cover their eyes, they must leave the skin of another portion of their body (arm, face, leg, etc.) exposed. Failure to comply will result in being awakened and, if intentional, disciplinary action.
10. Flashlights will be used judiciously by staff at night.
11. Informal Counts are conducted at irregular, unannounced times. Detainees are expected to comply with these as well.

## Living Conditions

You are temporally being held at the CCIPC. You will stay at the facility until ICE determines it is time to transfer you to another facility. The CCIPC cannot make any determinations regarding your release or transfer.

Detainees are required to keep their assigned living areas clean at all times. It is in your best interest to maintain a clean-living area and avoid many of the problems associated with unsanitary living conditions.

We expect your cooperation by showing other detainees the respect you wish to receive and respecting the property of others. You are also asked to respect the need to share common equipment such as telephones, tables, televisions, and recreational games.

There may be only one detainee per bed.

**Inspections:**
Housing unit inspections will be conducted Monday-Friday according to posted times. The purpose of inspections is to verify the condition, safety and sanitation of the pod and individual cells, as well as the safety of each detainee.

The Unit Officer will provide a 5-minute announcement prior to beginning inspections. Dayroom activity will cease, and detainees will stand outside the door of the cell. Detainees are required to be in a properly worn complete uniform, to include footwear, with ID fixed on their shirt. Detainees will not be permitted to use the shower, microwave, phone or tablets visits during inspections. Inspections will not interfere with recreation or lunch meal.

Items inspected include, but are not limited to:

- All surfaces must be free of graffiti (walls, bunks, bathrooms, showers, etc.)
- Bunk areas must be neat with property in bag and no excess facility issued items
- Bunks are not tented, no clotheslines, nothing tied to bed
- Windows are not blocked, to include front and cell door windows
- Lights, windows, intercoms and vents are clean
- Showers are clean and free from trash, soap scum and drains are clean

- Floors, tables, dayrooms, microwaves, toilets and sinks are clean
- Pictures are only in the permitted posting area and are limited to family and friends (no magazine cut outs)
- Chemical bottles and community items (games, recreation equipment, etc.) are not kept at bunks
- Food trays are not in units except during mealtimes in units where satellite meals are served
- Common rooms such as porter closets and multipurpose rooms are clean and neat



## Unit Rules
- Trash is to be disposed of in the provided trash cans and is never to be thrown on the floor or ground.
- Noise from talking, conversations, games, etc. in the housing units will be kept at a level that is respectful and does not disturb others. Shouting, slamming of doors, playing of music without headphones, etc. is not permitted.
- The tops of tables are not to be used for sitting, standing, personal cleaning, nail care or footrest. Chairs are not to be used for footrests.
- Plastic chairs must be returned to the storage area/stack after use.
- The hanging of sheets, blankets or clothing from bars, overhead lights or beds is not permitted. Clotheslines are not permitted. If there is a window and/or food slot in your door it may not be covered or blocked at any time. Air vents and sprinkler heads will remain uncovered at all times. The hanging of towels is only permitted in the absence of a hanger. The hanging of towels must be in a designated area and do not obstruct the viewing of sleeping areas nor cause any security or sanitation concerns.

- Detainees must clean up after themselves after use of tables, sinks, toilets, urinals and shower areas after showering.
- Bathroom sinks are for facial shaving, hand and face washing, and brushing teeth, and are not to be used to wash feet or other body parts.
- Dayroom sinks may not be used for shaving, face or body washing, or brushing teeth.
- Body washing is only to be done in the showers.
- Detainees are not permitted to possess or store cardboard. Boxes that commissary items are packaged in are not to be stored after the contents are used.
- Detainees are not permitted to wash clothing, bedding, linens, tennis shoes, or other items in the living units.
- For sanitation reasons, detainees are not permitted to wear shoes in bed.
- Exercising is not permitted in the dayroom. (pull ups on stairs, push-ups and/or any other type or form of exercise)
- In celled units, detainees are not permitted to loiter on the top tier or under/on the stairs.
- Detainees are not permitted to loiter in any doorway, including cell doors.

- Personal effects, including hygiene items, are to be stored in your container. Do not place items on windowsills, windows, bunks, lockers, under a mattress, etc. These items will be confiscated as contraband and removed when left in unauthorized areas. If a disciplinary report is made then the confiscated items will only be returned after a disciplinary hearing, and at the hearing officer's discretion.
- Shower caps and do-rags may only be worn inside your cell/in bunk area. Hair nets are only permitted while working in the kitchen (no dayroom)
- Spitting on any surface is prohibited, including the ground, walls, walkways, floors, sinks, and trash cans.

## Bed Area

You are required to keep your bed and immediate area clean and neat. You are also required to make your bed daily when it is not in use. It is acceptable to sleep under your cover during free time in your housing unit. However, you must make your bed after your nap and before reporting to any scheduled activities (such as recreation, meals... etc.).

## Sanitation

To ensure cleanliness, you will be asked to participate in cleaning of the housing areas, which includes the dayroom, sleeping areas, restrooms and showers. While we realize your stay at this facility is temporary, it is your home during this time, and we expect your cooperation to keep it safe and clean.

- The housing areas are to be cleaned daily or as directed by a staff member, including after each meal, to ensure proper sanitation and safety.
- A staff member will issue all equipment, supplies and instructions.
- All cleaning supplies will be placed in appropriate storage locations when not in use.

## Personal Hygiene

You will be living in a housing area with other individuals, so personal hygiene is essential. You are expected to bathe daily and to keep your hair and nails clean. Personal hygiene items for both male and female detainees, such as soap, toothpaste, toothbrushes, combs, and other items will be issued to you upon admission. Should you run out of an item, see your housing officer to provide additional hygiene items at no charge. Toothbrushes/toothpaste will be issued on a one-for-one exchange basis only.

Special personal hygiene items for female detainees will be available upon request to the housing officer.

Disposable razors will be issued on an as needed basis for shaving facial hair. Disposable razors will not be used by more than one detainee for health and safety reasons meant to protect the detainees and staff. Also, detail workers and detainees who had to miss shower times due to medical, court, or visitation appointments will be allowed to take showers at appropriate times of exception. Showering may not interfere with normal operations and are not permitted during count times. Failure to adhere to procedures will result in disciplinary action. Any revisions to shower schedules will be posted within the housing unit.

Detainees in restricted housing will be afforded the opportunity to shave and shower at least three (3) times per week. Shaving equipment will be issued upon detainee's request and will be returned to staff upon completion of shower. Staff will inspect the razor for any type of tampering or alteration. Once refused by the detainee, no further consideration will be given for that day.

## Laundry

In order to ensure an adequate supply for all detainees, hoarding of clothing is prohibited. The laundry schedule will be posted on the bulletin board.

All units will be responsible for having their laundry bags ready for pickup according to the posted schedule.
Do not overfill your laundry bag. Ensure that the bags are tightly tied. Leave enough room in the bag for soap and water to flow through as well as heat from the dryer.

All detainee volunteer Food Service workers will be required to exchange outer garments on a daily basis. All other volunteer workers may exchange outer garments when necessary.

**DETAINEES ARE NOT PERMITTED TO WASH CLOTHING, BEDDING, LINENS, TENNIS SHOES, OR OTHER ITEMS IN THE LIVING UNITS.**

## Barbering Services
General population and eligible restricted housing unit detainees will receive access to the barber according to the schedule posted on the bulletin boards in your housing area. Detainees are not allowed to provide or receive hair care in any location other than the designated barber areas.

Sanitation in barber operations is imperative because of the possible transfer of diseases through direct contact or by towels, combs, and clippers. For sanitary reasons, cutting hair in the dormitory is strictly prohibited. It is also prohibited to possess cut hair or clippings, either your own or others.  Issued barbering equipment is required to be properly sanitized with the available Barbicide/sanitizing equipment between each use.

Pulling of hair from head, ears, nostrils, eyebrows, and moustaches/facial is prohibited.

No barber or beautician will service any detainee with the presence skin inflamed, scaling, pus, or erupted lesions to face, neck, or scalp. Service of such detainee requires approval in accordance with specific documented authorization of the Chief Medical Officer.  Please see the full barbering regulations posted in the barbershop.

Ordinarily, detainees may wear any hairstyle with the following exceptions:
- For safety and hygiene reasons, kitchen workers and detainee workers operating machinery will keep their hair in a neat, clean, commonly acceptable style. ALL kitchen workers will wear a hairnet when working in the kitchen.
- Hairstyles will not interfere with the safety and hygiene requirements.
- No numbers or symbols will be permitted to be part of a detainee's hairstyle.

## Meals
All meals are nutritionally balanced, pork-free, dietician approved, properly prepared and attractively served in wholesome, clean and safe surroundings.

Three types of diets are available: Regular, Medical, and Religious. Upon arriving in intake, detainees will be given the opportunity to request something other than a Regular Menu meal should they have a special, religious dietary need. In order to receive religious diets, you need to submit an Appendix 4.1A Authorization for Common Fare Participation and a 20-4D Request for Religious Diet form to the Chaplain, who will promptly process all requests. Detainees will automatically be served a Regular Menu meal unless authorized to receive another meal selection.

The completed Appendix 4.1.A Authorization for Common Fare Participation Form and 20-4D Request for Religious Diet Form will be presented to the Chaplain or will be placed in the box marked "request". A detainee who has been approved must notify the Chaplain in writing if he/she wishes to withdraw from the religious diet. The Chaplain may recommend withdrawal from a religious diet if the detainee is documented as being in violation of the terms of the religious diet program to which he/she has agreed in writing, i.e., refusing five (5) consecutive Vegetarian meals or purchasing food items inconsistent with the program through the facility's commissary program. Detainees who participate in the religious diet program will sign a 20-4J, Religious Diet Agreement in recognition of their understanding of the religious diet program expectations and requirements, removal and reinstatement.

A copy of the written authorization for Vegetarian and Kosher meals will be given to the Food Service Manager by the Chaplain. In the event that request forms are revised, the Chaplain shall have the detainee sign the new agreement. The original Appendix 4.1.A Authorization for Common Fare Participation Form of all requests, whether approved or disapproved, will be sent by the Chaplain to the detainee's detention file with one copy kept on file in the Chaplain's office and one copy given to the detainee. Both the Chaplain and the Food Service Manager will maintain separate

lists of detainees approved to receive Vegetarian and Kosher meals. To ensure accuracy, these lists will be reconciled weekly.

Medical diets may only be approved by a qualified health care provider, which are closely tracked. Approvals for medical diets are provided to the Trinity Manager by medical staff throughout the week. For those detainees with medical related diets restrictions, special diets may be requested through Health Services. To be considered, notify the nurse by Sick Call procedures. They will then make an appointment for you to see the facility physician, who will evaluate your request. Prescribed medical diets take priority over all other religious diets.

Partaking of another diet: Detainees receiving special diets who are observed partaking of another diet or giving their approved food to another detainee will be reported to the Food Service Manager. He/she will notify the Chaplain (if Vegetarian or Kosher has been approved) or medical department if a medical diet was involved. It will be the responsibility of the approving official, with ICE's concurrence, to rescind the detainee's authorization to receive special meals. Please see the Chaplain, Food Service Manager or AW (Support) if you have any questions.

The use of food as a disciplinary measure or reward is prohibited. You will be issued appropriate eating and drinking utensil(s) during each meal and should be returned at the end of each meal. Menus are posted on the bulletin board in your dorm. CCIPC is a pork-free facility.

CCIPC will provide you with three (3) meals per day; Mealtimes will be posted on the bulletin board. You are to follow the rules of the officers. Detainees will be called out and escorted from the housing area to the dining hall and will be given ample time to eat.  All detainees will return to their housing unit after eating. You are only permitted one (1) tray per meal.
1. All food is to be eaten at the tables provided in the dayroom. NO MEALS MAY BE CONSUMED IN THE BED AREA.
2. No food will be permitted in the dorm other than that provided through the commissary facilities or authorized by medical or unit management staff.
3. DO NOT put meal trays in the microwaves. DO NOT put foil or metal items in the microwaves.
4. Microwaves shall be cleaned after each use.

Detainees in restricted housing will receive the same portions and types of meals served to the general population. Detainees will be provided food in their cells.

All detainees will receive satellite meals (meals delivered to the housing unit) and will be given 30 minutes to consume the meal. There can be no storage of meals after this time.

## Voluntary Work Program
Every effort will be made to provide you with an opportunity to participate in the voluntary work program.

The positions available are Barber, Unit Orderly, Commissary, Food Service, Laundry, Medical Orderly, Administration Orderly,  and Recreation Orderly.

Compensation will be no less than $1.00 per day completed based on the work assignment. You should speak to your Unit Manager regarding specific pay rates of jobs.  You will not be permitted to work in excess of eight (8) hours daily. In most positions, detainee pay will be submitted daily.

You will be required to sign a **19-100B Detainee Voluntary Work Program Agreement, 19-100C Detainee Safety Rules, 19-100A Detainee Volunteer Criteria Checklist, and a 8-5A Workplace Safety Orientation** prior to assuming a work assignment. You will be required to participate in all work-related orientation and training which includes safety rules, use of Personal Protective Equipment (PPE), use of hazardous chemicals and the purpose/location of Material Safety Data Sheets (MSDS). Detainees must adhere to all safety regulations and to all medical and grooming standards associated with the work assignment.

Detainees who participate in the Volunteer Work Program are required to work according to an assigned work schedule, and unexcused absence from work or unsatisfactory work performance could result in removal from the Voluntary Work Program. No detainee will have supervision/control over any other detainee. Any disciplinary reports you receive may result in your removal from a job assignment or prevent you from being granted a job assignment. A detainee may be removed from the Voluntary Work Program for cause.

You are asked to perform tasks associated with the daily operation of the facility. Such tasks may include general sanitation, working in Food Service, Laundry as well as other tasks. Under no circumstances will you be forced to take part in the Voluntary Work Program.

Your eligibility to work is determined by ICE and CCIPC. If you desire to be assigned to the Voluntary Work Program, send a Detainee Request Form to the responsible correctional counselor who will forward your name for consideration. Please remember that there are not enough job assignments for each person; therefore, we ask for your patience and cooperation.

## Commissary

Commissary orders are to be completed using a tablet or kiosk in your housing area. Commissary items are subject to limitations and/or changes without notification.

Commissary will be delivered between Monday and Friday according to a rotating schedule. If your housing unit changes before receiving your order, it will be delivered to your new unit by Friday of that week. If a detainee is moved from one dorm to another dorm, the detainee will not be able to use the kiosk machine until the next day.

Any item bought from the commissary by a detainee must be for his own use. All purchased items and products are nonrefundable, non-exchangeable, and final. A transaction is final when the detainee checks his merchandise and signs the receipt. Once issued to the detainee, all products become the detainee's responsibility.

Unit Managers or higher have the authority to suspend commissary privileges.

## Finances

Within a reasonable time after your arrival, the Business Office initiates an account for you. Your alien number (A-number) will be your account number. If you have U.S. currency in your possession when you arrive, you will be given a receipt, and the money will be placed in your account the next business day. Currency of any type found in your possession after the intake process is complete will be considered contraband. The currency will be confiscated, and disciplinary action may be taken. No currency will be accepted through the mail. Any currency received will be returned to the addressee. No currency will be accepted through visitation.

All transactions have to be verified before being posted to your account. This process can take up to 24 hours, Monday-Thursday, excluding weekends and holidays.

Funds from your account may be used to pay for legal services. If this is required, contact a member of your unit team or submit a .

## Detainee Money Deposits

## Instructions for Depositing Money into Detainee Trust via Wachovia Lockbox

1. Obtain money orders and / or cashier's checks made payable to detainee. Personal checks and cash are **not** accepted.
2. Mail money orders and / or cashier's checks in envelopes addressed in the following manner:
   Core Civic Detainee Trust
   (Detainee Last Name, Detainee First Name / Detainee Commissary #)

Facility: California City Immigration Processing Center
P.O. Box 16545 Atlanta, GA 30321-0545

3. Make sure the sender's first and last name and return address is on the envelope.
4. Do **NOT** include correspondence such as letters, cards, pictures, packages with a money order or cashier's check. None of these items sent to this address will be forwarded to the detainee or returned to the sender.

---

# Instructions for Depositing Money into Detainee Trust via Western Union

1. You can send money via Western Union by using the Internet, by phone or by a Walk-in Cash Payment. The website for internet is www.westernunion.com/corrections. The phone number for phone quick collect is 1-800-634-3422.
2. To send money via a Western Union Walk-In Cash Payment Location the following is a sample of a quick collect form. First Example is Spanish / Second Example is English.





## Religious Services

All detainees will have access to religious resources, services, instructions and counseling on a voluntary basis. All detainees will be provided with the amount of freedom and opportunity necessary for pursuing any legitimate religious belief or practice within the constraints of security and safety conditions.

Religious services are provided through the Chaplaincy Office and through services provided by community volunteers. These services may include individual counseling, group prayer, bible study and various religious organizational church/worship services. A schedule of the days and times of each regularly scheduled service is posted on the bulletin board in your housing unit. Please remain alert for the announced religious services offering as scheduled. Failed alertness may result in postponement until the next scheduled turn.

Religious materials from various faiths are available through the facilities chaplain and/or from religious volunteers. Detainees may request religious clothing, symbols, and/or other religious items required for the practice of a particular faith by completing and submitting a 20-4A, Religious Article Authorization Request form directly to the facility chaplain. The facility's Chaplain must approve/disapprove these requests within ten working days of receipt of the request. If a religious practice/service/program is not in place in the institution, a detainee may request to add the practice/service/program by submission of a 20-4B, Religious Practice Authorization Request. Detainees may request religious publications. Detainees may request a special religious service or ceremony by submitting a 20-4E, Request for Special Service/Ceremony to the Chaplain at least sixty (60) days in advance of the requested date for the service/ceremony. The detainee making the request should provide documentation and/or reference concerning the requirement of his/her faith group for the requested service/ceremony and how such can be reasonably put in place within the facility.

## Access to Telephones

The housing units and restrictive housing have all been equipped with telephones. These telephones have been provided so you can communicate essential business and contact friends and/or relatives. Incoming calls will not be

received on these telephones, nor are there three (3)-way calling available. Any problems or technical issues with facility telephones can be reported to the housing unit staff via written or verbal means.

To respect the privacy of others, we ask that you quietly wait your turn, as the telephones will be used on a first-come-first-serve basis. If you need assistance, ask the officer assigned to your area.

**Legal and Family Calls** - Approval will be on an individual basis determined by need. If detainees need to make a legal call and do not have funds, they can request the call through any staff member. All family calls are subject to being monitored. If a detainee wishes to make an unmonitored call to court, a legal representative or for the purposes of obtaining legal representation, please contact a staff member.

TTY telephone machines are available for the hearing impaired.

When telephone demand is high, you are expected to limit your telephone calls to twenty (20) minutes to permit others the same telephone privileges.

The telephones are available for use during waking hours, excluding count times.

In case of an emergency, such as an illness or death in your family, your Housing Officer can assist you in making telephone calls when access to telephones would not normally be available. Routine telephone calls to attorneys are not considered to be emergencies.

If the facility receives any emergency calls from family members, we will notify you of the message upon verification of the caller's identity.

The telephone numbers to inquire about the status of your case as well as the numbers to a majority of consulates have been made available to you at no charge. (Consult your living area bulletin board for a list of current numbers and specific instructions on how to dial them). Instructions on how to use the telephones in your dormitory are as follows:
1. Pick up the telephone and dial "1" for English or "2" for Spanish.
2. Follow the operator's instructions.
3. The "volume" bar controls the volume.
4. Calls are limited to 20 minutes per call.
5. All calls may be recorded and monitored.
6. If you have any questions, please ask your housing unit officer or a supervisor for help.

**Incoming Calls** - Staff will take telephone calls for detainees and advise the caller that they will notify the detainee of the call. The message will be delivered to detainees as promptly as possible. If an emergency call is received, the caller's name will be taken and delivered to the detainees as soon as possible. The detainee will be permitted to return the emergency call within the constraints of security and safety. If the detainee is indigent, staff will assist them in returning the call.

**Restrictive Housing Unit Telephone Access**
- Detainees in administrative segregation may have telephone access similar to detainees in the general population, but in a manner consistent with the special security and safety requirements of detainees in these units. Collect legal calls to the detainee's attorney of record can be made with approval from the Shift Supervisor/Unit Manager or higher authority.
- Detainees in disciplinary segregation will be allowed emergency personal calls and unlimited, collect legal calls to the detainee's attorney of record upon approval from the Shift Supervisor/Unit Manager or higher authority. Detainees held in disciplinary segregation for a period exceeding sixty (60) days are afforded the same telephone privileges as detainees in Administrative Segregation. Staff shall permit ICE detainees to make direct and/or free legal calls as outlined in Policy 16-100, except in the event of compelling and documented reasons of threats to the safety, security, and good order of the facility.

Should a detainee be released from MRCC, prior to release, the detainee shall be provided an opportunity to make a free phone call to facilitate release arrangements.

**Indigent Detainees**
Indigent detainees may request a call to immediate family or others in personal or family emergencies or on an as-needed basis. Ordinarily, a detainee is considered "indigent" if he or she has less than $15.00 in his or her account for ten days. The facility shall make a timely effort to determine indigence.

## Pro Bono Calls
Current speed dial numbers to consulates, embassies, and certain Pro bono legal agencies are provided free of charge to all ICE detainees. Please refer to your housing unit information board for Pro bono numbers and instructions on how to make a Pro bono call. All phone calls are subject to monitoring and/or recording for security reasons. To obtain an unmonitored call to a court, a legal representative, or for the purposes of obtaining legal representation, submit a Detainee Request Form through your unit staff and they will submit it to the Telephone Information Officer.

## Talton Phone Services
Upon your arrival, the Processing Officer will issue you a PIN number. This pin number will be active throughout your stay at CCIPC.

To activate your pin, you need to have access to the detainee telephone system either in the Intake old room or in your assigned housing unit.

All detainees are required to set up a voice password prior to completing their first phone call. This system is designed to make sure no other detainee can access your prepaid account. Prepaid accounts are your responsibility; you must protect your Voice Biometrics in order to protect your funds.

Voice Biometric Set-up:
1. Enter (1) for English or (2) for Spanish. Enter your PIN. The system will prompt you to enroll your voice password.
2. State your full name and the facility name (Midwest-ICE) slowly and clearly, each time the system asks until it states the enrollment is completed. This could take up to 10 times.
3. Repeat your name and facility (Midwest-ICE) the same each time you make a call. (You must say this exactly the same each time).
4. If you believe your recording does not match, you can request a reset.
5. A reset will be done within 4 hours as long as:
a. You have not completed a call using general funds in the last 72 hours.
b. The name, facility and voice match the original recording.

Once activated, you are entitled to an initial five (5) minute free phone call within twenty-four hours of your arrival at the facility.

## Three (3) way calls are not permitted and will be blocked

Call acceptance prompts *(this is what the receiving party hears)* prepaid, free, collect:

"This is an Intelmate automated operator with a [PREPAID, FREE, COLLECT] from [DETAINEE'S NAME] at [FACILITY NAME]. This call is subject to recording and monitoring except for privileged communications between an attorney and client. Press one or star to accept this call. To deny this call press (2), or (3) to block all future calls from this detainee. Thank you for using Talton Communications."

*ADVANCE PREPAY*
This is a free one-minute call from [DETAINEE'S NAME] at [FACILITY NAME]. Your phone does not accept collect

calls. Talton as a courtesy has provided this call for friends and family. You cannot receive additional calls from this detainee until you set up a prepaid account. We can take your credit or debit card information over the phone and connect you immediately back to your call. This call is subject to recording and monitoring except for privileged communications between an attorney and client. Press (1) or * to accept this call. To deny this call, press (2), or (3) to block all future calls from this detainee. Thank you for using Talton Communications.

## Customer Service for Detainee Phone Issues – 211#

Detainees may leave a voicemail for customer service by entering their pin number & dialing 211#. Please note at this time you will not hear a response to your request; however, the phone company will receive your request and respond to you. Hang up after leaving your message! Please allow up to 24 hours, then check one of the available phones, enter your PIN and listen for a voice mail response to the problem you called in previously.

1) **Dropped Calls**: Please dial 211#, and then press one (1) AND FOLLOW THE PROMPTS to report a dropped call.
- *Collect Calls:* Lost or dropped calls will be credited as one free call (equal to the number of minutes lost) to the phone number dialed.
- *Detainee Prepaid*: A credit for lost calls will be added to the detainee's prepaid account and may be used to make future calls. The credit will equal the minutes lost.
- *Friends & Family Prepaid*: Lost calls will be credited to the friends and family prepaid account. The next call to the phone number will be free for the number of minutes lost.

2) **General Phone Issues**: Please dial 211#, then press two (2) AND FOLLOW THE PROMPTS to report any other issue you may have concerning your ability to complete a call or a problem with the telephone equipment. If a particular phone is "out of order," go to a working phone and follow the procedures above. Identify the phone number located above the keyboard (ex. 4) and state the housing unit (ex. B-1) and then hang up. You do not need to state your name. Notify the Unit Officer if a phone is out of order. Normally, phones will be repaired within 48 hours, once Talton is aware of the problem.

3) **Voice Reset Request**: Please dial 211#, then press (3) AND FOLLOW THE PROMPTS to report a voice verification error. The system will ask you to listen to your voice recording and re-record it several times to obtain a match. If no match, a report will go to customer service, who will review the recordings, verify it is the authorized person requesting the reset and that they qualify for a reset. You will not be able to reset your voice if you had a successful call within 72 hours. If you cannot get 211# to work, please fill out a and submit it to the unit officer.

4) **Voice Mail** - Each detainee has a personal voice mailbox accessible by entering the PIN number.
- Detainees receive automated voice mail message when a person purchase prepaid on their behalf.
- Customer service sends pre-recorded messages to detainees in response to an issue reported via 211#
- Friends and family can also leave detainees a 3-minute voice mail message for a small fee paid by family.

5) **Prepaid Calling for Friends & Family** - Friends & family can set up a prepaid account for you.
- Talton Customer Service at 1-866-348-6231
- www.talton.com website
- Lobby KIOSK (Cash and Credit)

6) **Refunds**
Once released, if you purchased your own phone time and have credit of $50 or less remaining on your account, you can call 541-889-8900 (international) or 866-348-6231(domestic) to obtain a PIN for a phone card you can use where you live, at a rate equal to the rates posted inside facility.

Once released, if your family/friends purchased phone time for you, they can call the customer service number (1-866-348-6231) and arrange for a credit to their account.

## 7) Confidential Legal Telephone Calls, Privacy and Use of Alternative Telephones

Detainees who wish to exercise their Attorney confidentiality privileges while utilizing the detainee telephones must submit a Detainee Request Form addressed to Unit Team which shall include the attorney's name and verifiable firms' landline number. Once the number is confirmed it will then be excluded from the taping/ monitoring system. Pro-bono Attorneys listed as Free Legal Service Providers" are free and unmonitored when utilizing detainee telephones.

Additionally, detainees requesting their legal calls in a private environment or requiring alternative telephone access, due to experiencing difficulties utilizing the detainee telephones for attorney legal calls, should submit a Detainee Request Form.

Note: All Attorney telephone calls initiated from staff telephones will be collect. The attorney's name and firm landline number must be verifiable. Once the number is confirmed it will then be excluded from the taping.

Prior to initiating the call, Unit Managers and/or Correctional Counselors receiving these requests will verify the number as a legitimate legal call. Once verified they may approve the calls. The staff telephones which are not recorded or monitored will only be used by detainees for the above-defined purposes or under specific circumstances such as family emergencies etc. or as determined by staff.

### TABLETS
Tablets will be available on a 1:8 ratio in the housing units. The tablets offer free programming, ability to message friends/family, library materials, audio books, movies, music, news, photo gallery, law library, wellness videos, games, religious applications, detainee requests, grievances, email capability, PREA resources, and legal materials.

## Emergency Phone Messages
The facility shall take and deliver emergency telephone messages to detainees as promptly as possible.
- The facility phone number utilized for emergency messages is **(913) 727-3246**. When the facility staff receives an emergency telephone call for a detainee, the caller's name and telephone number will be obtained and given to the detainee as soon as possible.
- The detainee shall be permitted to return the emergency call as soon as reasonably possible, within the constraints of security and safety.
- The facility shall enable indigent detainees to make a free return emergency call.

## Security Threat Groups (STG) (Gangs)
It is the policy of CoreCivic to pro-actively manage STG through ZERO-TOLERANCE and suppression of all STG activity at CoreCivic facilities. Detainees are prohibited from participating in such groups and will not be allowed to intimidate and control other detainees, staff or the public while in CoreCivic custody.

---

**REPORT GANG ACTIVITY**
**DETAINEE CRIME TIP HOTLINE**
**0*911**
**CALLS ARE FREE, COMPLETELY CONFIDENTIAL, AND CAN BE MADE AT ANY TIME**
**(Please No Personal Phone Calls!)**

---

## Recreation
Recreational activities are provided as a means to release built-up energy and to help you keep in good physical condition.

Indoor recreation can take place whenever a unit is scheduled to be in its dayroom or during scheduled outdoor recreation times in cases where adverse weather prevents detainees from going outside.

Televisions have been placed in each dorm for your entertainment and should be shared to ensure each person has an opportunity to view programs of interest. While we have no specific rules governing what programs will be viewed, we expect each of you to be considerate (i.e.; Spanish/English language programs) and avoid unnecessary problems regarding its usage. In the event a problem develops, the officer in your dorm will resolve the problem and may decide to discontinue usage until the situation can be resolved.

1. Television viewing may begin at the posted building schedule wake-up time and will end at the posted bedtime. You are cautioned not to begin viewing a program that will end after the designated viewing hours, because the television will be turned off at the designated time.
2. Televisions may be turned off during official counts, cleaning of housing areas, and when they interfere with other facility operations.
3. At the end of a program, a vote may be taken to choose which program to watch next. The majority vote rules. The channel will not be changed during a program if someone is watching the television. Do not vote on a program and then leave the area.
4. Detainees are strictly prohibited from touching the televisions in any manner. A programmable remote control will be made available to operate the television. Tampering or removing batteries from the remote control is prohibited and will result in disciplinary action.
5. The volume of the televisions will be muted so as not to disturb other detainees or facility operations. Detainees must use the FM radio station provided on their radio to listen to the television.

This facility provides leisure time activities in the housing areas for your entertainment as well as physical and mental development. Leisure time activities include table games, cards, television, etc. You are asked to handle these items with care and to be considerate of others who may wish to use them. Persons that have been discovered abusing these items may be disciplined in accordance with specific guidelines established by this facility and be required to make restitution for damaged items.

1. The use of these leisure time items will be on a first-come, first-serve basis to ensure that each person has an equal opportunity to use them.
2. To obtain additional recreational supplies, a request must be submitted to Unit Team.
3. We expect you to take care of supplies and equipment issued and for you to return the items after use. You will be held accountable for any recreational or leisure time item until it has been returned.

Access to Outside Recreation - All detainees, weather permitting, will be provided at a minimum, one (1) hour of outdoor recreation, five days per week or six or more hours per week, at least four days per week. Outdoor recreation schedules are posted on each housing unit's bulletin board.

1. Outdoor recreation activities may include basketball, soccer, and volleyball.
2. Towels, washcloths and sheets are prohibited in the recreation area.
3. A cup or a bottle with a top on it may be brought to recreation empty.
4. No Commissary items are permitted on outside recreation area with the exception of a drink.
5. Detainees are only allowed to wear one pair of shoes when coming to outside recreation.
6. Socks may not be worn over shoes.
7. Shirts and shoes must be worn at all times during outdoor recreation.
8. Basketballs and volleyballs are not to be kicked.
9. You are subject to disciplinary action and/or will be charged for damaged equipment or clothing.
10. Do not sit against the fence or hang clothes from the fences when you are at outside recreation.
11. The posted recreation schedule is rotated for fair and equal access. You will be advised when it is your housing area's turn to go.
12. Detainees are not permitted to wear excessive clothing outside to recreation.
13. No mail or legal documents.
14. No religious services conducted on outside recreation areas during outdoor recreation time.
15. Any horse playing or rough playing during recreation periods may result in removal from recreation, to include disciplinary action.

Recreation may be cancelled at any time for security reasons or adverse weather. Your cooperation is appreciated.

Detainees in the Special Housing Unit shall be offered at least one hour of recreation per day, outside their cells and scheduled at a reasonable time, at least five days per week unless documented security, safety, or medical considerations dictate otherwise.

## Recreational Library
This facility uses mobile library carts containing standard library materials found in a school or community library. The needs, interests and abilities of the majority of detainees are carefully considered, and the library collection is developed accordingly. You may check out books or other materials for your reading pleasure.

## Law Library
Detainees have access to law library carts in the pod whenever the dayrooms are open. A private law library space is available upon request. This information is also accessible on the detainee tablets in the Lexis/Nexis Program.
Detainees or other volunteers may assist other detainees in researching and preparing legal documents upon request, except when such assistance poses a security risk. Such assistance is voluntary; no detainee shall be allowed to charge a fee or accept anything of value for assistance. Requests for assistance from another detainee must be submitted to the detainee's assigned Unit Manager in writing. Denials may only be appealed by using the CCIPC grievance procedures.

Facility staff shall provide assistance to detainees in accessing legal materials where needed (e.g., orientation to written or electronic media and materials; assistance in accessing related programs, forms and materials).

Detainees with disabilities, detainees with limited English proficiency, and illiterate detainees who wish to pursue a legal claim related to their immigration proceedings or detention, and who request assistance or otherwise indicate difficulty accessing or comprehending the legal materials, shall be provided assistance. Please contact facility staff verbally or via a Detainee Request Form should you need such assistance.

Paper, writing materials, printing, and copying resources are available to enable you to prepare legal documents and conduct research. Detainees will not be charged for printing a reasonable amount of legal materials. Requests for photocopies of legal material may be denied only if:

1. The document(s) might pose a risk to the security and orderly operation of the detention facility;
2. There are other legitimate security reasons;
3. Copying would constitute a violation of any law or regulation; or
4. The request is clearly abusive or excessive.

Staff may not read a document clearly related to a legal proceeding involving the detainee.

If you are placed in the Restrictive Housing Unit then you should submit a Detainee Request Form to the Restrictive Housing Unit staff in order to request access to the law library on tablet.

To request a legal reference or other legal materials not maintained in the Law Library or on the tablet, please submit a Detainee Request Form to the Detention Counselor listing the desired reference materials. The Law Library Counselor may forward the request to the appropriate ICE staff for further review/assistance if necessary. In this case, the Law Library Officer shall advise you of the status of the request in a timely manner.

All policies that are accessible to detainees will be available in the Unit Team office.

## Social Visitation
1. Visits are a minimum of 30 minutes in duration and are non-contact using telephone communication systems.
2. The maximum number of visitors for any detainee is three (3), including children over the age of two (2).
3. Social visitation occurs on Saturdays, Sundays, holidays, and at least one weekday in accordance with the



visitation schedule posted in the housing unit.

4. Special/Extended visits may only be approved by Assistant Warden or Warden.

 a. Ordinarily, to be considered, the family members must provide proof of travel 200 miles or more.

 b. Absent exigent circumstances, special/extended visits should be submitted no less than seven (7) days prior to visit.

5. It is the detainee's responsibility to complete a visiting list and provide it to his/her Counselor prior to the   visit.

6. Detainees are allowed to have a total of five (5) visitors on their list, this does not include attorneys.

7. Detainees will not be allowed visitors until the list is received and approved.

8. Detainees will only be allowed to visit those individuals on his/her approved visitation list.

9. Visitation forms must be filled out completely providing all information.

## Identification of Visitors:

1. All visitors eighteen (18) years of age or older will be required to show proper photo identification.

 a. Minors, seventeen (17) years of age or younger must remain under the direct supervision of an adult visitor(s).

 b. Visitors unable to identify themselves properly will not be permitted to visit. Proper ID includes valid driver's license, military ID, passports, photo visa, state issued, etc.

2. All visitors will be subjected to electronic screening.

 a. Any visitor who cannot pass the metal detector will not be allowed to enter the institution.

3. Any visitors who arrive at this facility with inappropriate attire such as "see-through" clothing, dresses, skirts, or shorts more than three (3) inches above the knee, will be denied entry.

 a. Minor children (under the age of twelve (12)) are permitted to wear shorts.

 b. Orange clothing, spandex or tank tops/halter tops are not allowed.

 c. It is the detainee's responsibility to inform their family members of the visitation rules.

4. Prior to entering the visiting room, all detainees are subject to a pat search.

 a. Detainees are required to wear a complete uniform and be neatly dressed.

 b. Detainees are not permitted to wear t-shirts, thermals, tank tops slippers, or shower shoes in the visiting room.

 c. The only authorized items allowed in the visiting room are one religious medal, religious head gear and a wedding band.

5. No detainee or visitor will be permitted to engage in such actions or conduct that disturbs or otherwise disrupts the good order of the visiting room. The visiting room officer will issue a warning for violations of this rule, and repeated offenses will result in visit termination and possible disciplinary action, including suspension of visitation privileges for the detainee.

6. Children may not wander around the visiting room or be left unattended.

 a. If parents cannot or will not supervise their children, the visit will be terminated. Detainees and visitors are to remain at their assigned seating area and are not to wander or visit with other detainees or their visitors.

7. Visitors are not permitted to leave anything at the facility for any detainee.8. No food or drink is allowed in the visitation room.

a. Only those items needed for an infant's care will be authorized in the visiting room.
b. This includes the following items:
i. One diaper
ii. one 24 oz. bottle of formula/milk

9. Members of the clergy who wish to visit with a detainee on a professional basis must make a request to the Chaplain or designee prior to visit.

a. The Warden may require written proof of the person's clergy certification from the church, ministry or the like.
b. Visiting clergy will not be counted against the detainee's visiting hours.
c. Any member of the clergy who wishes to visit regularly as a friend rather than in his/her official capacity must make application to be placed on the detainee's regular visiting list.

## Visitation Restricted Housing Unit

1. Only visitors on the detainee's approved visitation list will be authorized to visit.
2. Visitors are required to give no more than one (1) week and no less than forty-eight (48) hours' notice by calling the facility to schedule a visitation time.
3. If a visitor or detainee is observed tampering with any part of the video visitation equipment or anything in the visitation room, the visit will be terminated and the visitor suspended as follows:
   a. first offense six (6) months
   b. second offense one (1) year.
   c. Any damage (causing the video visitation equipment to be inoperable) by a visitor will automatically result in an indefinite suspension and the visitor will be held financially responsible for the cost of repairs to the equipment.

## Attorney Visitation

An attorney is any person who is a member in good standing of the bar of the highest court of any state, possession, territory, commonwealth or the District of Columbia, and is not under an order of any court suspending, enjoining, restraining, disbarring or otherwise restricting him or her in the practice of law. A legal representative is an attorney or other person representing another in a matter of law, including law students or law graduates not yet admitted to the bar under certain conditions; Executive Office for Immigration Review accredited representatives; and accredited officials and attorneys licensed outside the United States. See 8 C.F.R. § 292.1 for more detailed definitions of these terms. Upon presentation of a letter of authorization from the legal representative under whose supervision he or she is working, an unaccompanied legal assistant may meet with a detainee during legal visitation hours. The letter shall state that the named legal assistant is working on behalf of the supervising legal representative for purposes of meeting with the detainee(s). Attorneys and other legal representatives may call ahead in advance of a visit to determine whether a particular individual is detained at the facility.

1. During normal hours, attorneys and other legal representatives (i.e. investigators, paralegals and law students) are permitted to visit detainees in reasonable numbers for business purposes seven days per week, including holidays.

2. Each attorney must present appropriate identification, such as a bar card from any state, a document demonstrating partial or full accreditation from EOIR, and matching identification, such as a driver's license

3. Detainees and attorneys may also visit virtually utilizing the Virtual Attorney Visitation (VAV) protocol. Attorneys must contact the facility at least 24 hours in advance of their desired teleconference time to schedule the meeting.

4. Translators and attorney representatives must have a letter of authorization from the attorney on file at the facility.

5. Attorneys do not count against the number of visitors allowed.

6. Messengers, who are not legal representatives or legal assistants, may deliver document to and from the facility, but not to visit with detainees.

A list of approved pro bono (free) legal organizations will be posted on all detainee housing area bulletin boards and in other facility designated appropriate areas. If you wish to see a representative or paralegal from that organization, it is your responsibility to contact them for an appointment. You may contact them by mail or phone to request their assistance.

Legal representatives may exchange legal documentation with detainees; however, documents will be searched, but not read, for contraband.

If you have questions concerning the status of your case, you may call the Board of Immigration Appeals line directly at 1-800-898-7180 or dial #802 from the dorm phones. You may also submit a Detainee Information Request form to ICE and place it in the ICE mailbox.

Detainees who are on the court docket will be allowed to shower and/or shave early in the morning (on the day of court) before appearing in Court.

### Directions to the Facility:

FROM Kansas City AIRPORT: Leave airport grounds traveling East to 1-29 North (left exit). I-29 North to Exit for Highway 92. Exit right to stop light and then left (west) on Highway 92 to Leavenworth. Approximately 10 miles on a two lane highway. Cross the Missouri River, a big blue bridge, at first stop light after crossing bridge, turn left (South). You are now on Highway US73/K-7, also known as 4th Street. Stay on 4th Street through Leavenworth to Muncie Road, eight traffic lights. Turn left (East) on Muncie two blocks to Brewer. Turn right (South) on Brewer one block to Highway Terrace. Turn left (East) on Highway Terrace, and the street ends on CORECIVIC property.

FROM Kansas City, MO., KANSAS CITY, KS. OR TOPEKA, KS: Leave Kansas City on I-70 traveling west to US73/K-7 Exit (Bonner Springs exit). Turn North on US73/K-7 approximately 10 miles to Muncie Road. Turn right (East) on Muncie two blocks to Brewer. Turn right (South) on Brewer one block to Highway Terrace. Turn left (East) on Highway Terrace, and the street ends on CORECIVIC property. Leave Topeka on I-70 traveling East to US73/K-7 Exit (Bonner Springs exit). Turn North on US73/K-7 approximately 10 miles to Muncie Road. Turn right (East) on Muncie two blocks to Brewer. Turn right (South) on Brewer one block to Highway Terrace. Turn Left (East) on Highway Terrace the street ends on CORECIVIC property.

Most major airlines have flights to the Kansas City International Airport. Major bus lines and rail lines (Amtrak) have terminals in Kansas City, Missouri. Additionally, bus service is available to Kansas City, Missouri (which is approximately 30 miles from Leavenworth). Taxi and shuttle service is also available. Motel and hotel accommodations are available in Leavenworth, Kansas City, Kansas, and Kansas City, Missouri

## LEGAL ORIENTATION PROGRAM AND LEGAL RIGHTS GROUP PRESENTATIONS

Detainees shall have access to group legal rights group presentations from organizations, including EOIR accredited representatives, if approved by the government . Topics may include s U.S. immigration law and procedures, and other relevant issues related to the immigration court, appeals and removal processes, including on detainee's legal rights. They are not intended to provide specific legal advice. During these presentations, detainees are able to communicate and correspond with representatives and have access to informational materials provided by the legal groups. Detainees will also have access to presentations by diplomatic representatives. Oral interpretation or assistance will be provided to any detainee who speaks another language in which material has not been translated or who is illiterate. Accommodation will be made for detainees with disabilities. Detainees housed in the Restrictive Housing Unit (RHU) are permitted to attend. Detainees will not be subject to reprisals, retaliation or penalties for attending any such presentations.

Notification of these presentations will be posted in the units at least 48 hours in advance. A sign-up sheet will be made available in each housing unit, and you will be given the opportunity to attend. Presentations are open to all detainees, regardless of the presenter's intended audience, except when a particular detainee's attendance would pose a security risk. For detainees who pose a threat to facility security, staff will make arrangements for a separate presentation and individual consultation to the detainee, should the detainee desire to attend.

Upon the request of a legal service provider (or assistant), the facility may permit a confidential meeting (with no officer present) involving the requester and two or more detainees.

## Notary and Photocopying Procedures

**Notary** - Notary assistance may be obtained by sending a request to the detention counselor. You will be contacted as soon as possible to accomplish the task.

**Copies** - Request for copies of legal material should be forwarded to the unit detention counselor.

Detainees can obtain photocopies of legal material at no cost when such copies are reasonable and necessary for a legal proceeding involving the detainee. Requests for copies will be in writing, submitted on a Detainee Information Request form to the unit staff. The Law Library officer will be responsible for making the legal copies. Detainees shall also be permitted to photocopy grievances and letters regarding conditions of confinement. Detainees shall not be prohibited from photocopying disciplinary decisions, special needs forms, photographs, newspaper articles or other documents that are relevant to the presentation of any type of immigration proceeding. The number of copies of documents to be filed with a particular court and one copy for the detainee's personal use will determine the number of photocopies required. Requests for photocopies of legal material shall be denied only if:
1. The document(s)might pose a risk to the security and orderly operation of the detention facility;
2. There are other legitimate security reasons;
3. Copying would constitute a violation of any law regulation; or,
4. The request is clearly abusive or excessive.
5. Law Library staff will inspect documents offered for photocopying to ensure that they comply with these rules.

## Marriage Requests

Detainees or their legal representatives must submit a request for permission to marry to the Warden or the ICE Field Office Director. A detainee will use the Detainee Request Form. The request must specifically address that the detainee is legally eligible to be married in the State of California and must be accompanied by the intended spouse's written affirmation of intent to marry the detainee.

All expenses and required documentation in connection with the marriage are the responsibility of the detainee and the intended spouse. Expenses include, but are not limited to, direct costs in providing transportation and security for the ceremony, cost of license and any health testing required by state law.

If approved, the ceremony shall take place inside the facility; the detainee may not leave the facility to make arrangements. The ceremony shall be private with no media publicity. Only individuals essential for the marriage ceremony, such as required witnesses, may attend.

The Warden will consider each marriage request on a case-by-case basis. A detainee's request to marry will generally be denied if:
1. Not legally eligible to be married.
2. Not mentally competent as determined by a qualified medical practitioner. CoreCivic medical does not have the authority to make this determination.
3. The intended spouse has not affirmed, in writing, his/her intent to marry the detainee.
4. The marriage would present a threat to the security or orderly operations of the facility.
5. There are compelling government interests for denying the request.

If denied by the Warden, the detainee may file an appeal to the ICE Field Office Director.

Only if the detainee requests a ceremony will the Form 14-7A Detainee Marriage Request be completed and submitted to the Warden.

The Chaplain may be assigned by the Warden or designee to coordinate (but not perform) the marriage ceremony.

Final approval of marriages must be obtained from the Field Office Director. The facility administrator or Field Office Director reserves the right of final approval concerning the time, place, and manner of all arrangements. If the request is denied, ICE officials will notify the detainee in writing of the reason(s) within 30 days from the date of the request.

## Correspondence/Mailroom Procedures

All incoming and outgoing mail must be properly addressed and include your name, Immigration A# and housing unit/bed number. If all information is not included, mail will be returned.  See below example:

| |
|---|
| Sender's First & Last Name<br>Return Address<br><br><br>California City Immigration Processing Center<br>Your Name<br>Your Immigration A Number<br>22844 Virginia Blvd<br>California City, CA 93505 |

| |
|---|
| Your Name<br>Your A Number<br>100 Highway Terr<br>Leavenworth, KS 66048<br><br>Addresse's Name<br>Addresse's Address<br>City, State, Zip code |

Drawing on the front of your outgoing envelopes is prohibited due to postal regulations.

As long as you bear the mailing cost, there is no limit on the volume of correspondence that you can send/receive or on the length, language, content, or source of correspondence or publications except when it is a clear violation of this policy. The facility may not impose this prohibition as to whom you may correspond. You may seal your outgoing letters and place them in the box in the housing unit marked "Outgoing MAIL." Mail will be picked up and delivered Monday – Friday (excluding holidays).

### General Correspondence

Staff shall open and inspect incoming general correspondence (including packages and publications) to inspect for contraband and to intercept cash, checks and money orders unless otherwise authorized by the facility.

Outgoing general correspondence may be inspected and/or read if the addressee is another detainee or if there is reason to believe that the item might present a threat to the safe, secure or orderly operation of the facility, and detainees will be notified in writing if correspondence is confiscated or withheld in part or full. The detainee will receive a receipt for the confiscated or withheld item(s). Reading of mail, which requires approval of the facility administrator, may be conducted at random. Mail may also be read when a specific security concern arises with respect to an

individual detainee, including, but not limited to obtaining information such as escape plots, plans to commit illegal acts and plans to violate institution rules.

Barring extraordinary circumstances, incoming correspondence shall be distributed to detainees within 24 hours of receipt by the facility.

Outgoing general correspondence and other mail may be inspected or read if:

a. the addressee is another detainee; or
b. there is evidence the item might present a threat to the facility's secure or orderly operation, endanger the recipient or the public or facilitate criminal activity.

If the need exists, the detainee must be present when the correspondence or other mail, including packages, is inspected. Outgoing correspondence shall be delivered to the postal service no later than the day after it is received by facility staff or placed by the detainee in a designated mail depository, excluding weekends and holidays,

**Special Correspondence or Legal Mail**
"Special correspondence" is defined as written communication to or from the President and the Vice President of the United State; the U.S. Department of Justice; U.S. Public of Health Service; Secretaries of the Army, Navy, or Air Force; U.S. Courts (including probation offices); Members of Congress; embassies and consulates; State governors; State Attorney General, prosecuting attorneys; director of state departments of corrections; state parole offices; state legislatures; state courts; state probation officers; other federal and state law enforcement offices; personal attorneys; representatives of the news media; Department of Homeland Security (DHS); U.S. Immigration and Customs Enforcement (ICE); ICE Health Service Corps (IHSC); DHS Civil Rights and Civil Liberties (CRCL); DHS Office of the Inspector General (OIG); outside health care providers; and administrators of grievance systems.

Outgoing legal mail or special correspondence (as defined above) will not be read, inspected or copied. However, if a need exists, it may be inspected in your presence for the purpose of detecting physical contraband (see below) and confirming that any enclosures qualify as special correspondence or legal mail. Outgoing correspondence shall only be treated as special correspondence or legal mail if the title and office of the sender (for incoming correspondence) or addressee (for outgoing correspondence) are unambiguously identified on the envelope, and the envelope is labeled "special correspondence" or "legal mail."

If you receive incoming special correspondence or legal mail, it will be opened in your presence and inspected for physical contraband (see below). Staff will neither read nor copy special correspondence. If you do not accept the letter or permit the letter to be inspected in your presence, it will be returned to the sender. **It is your responsibility to inform senders of the labeling requirement for special correspondence and legal mail.**

You will not be allowed to receive or send packages without advance arrangements and prior approval from the Unit Team or designee. The postage for sending packages and oversized or overweight mail will be your responsibility.

Contraband includes, but is not limited to, the following: materials that depict, describe or encourage activities that could lead to physical violence, such as materials dealing with the subjects of martial arts or survival, weaponry, armaments, explosives or incendiary devices; information regarding the production of drugs or alcohol; sexually explicit material; threats, extortion, obscenity or gratuitous profanity; a code; stamps, envelopes and blank paper; phone cards; money; photos larger than 5x7, nude/sexually explicit photos or any Polaroid photos; plastic or metal items, musical cards; stickers, taped or glued items; games or playing cards; jewelry; necklaces and bracelets of any material; drawings on CCIPC property (pillow cases, sheets, uniforms, trash bags, etc.); books and magazines (if approved, they must be received directly from the publisher); and other contraband as outlined in this handbook. A package without prior approval will be returned to the sender.

Identity documents such as passports, birth certificates, marriage license, etc., will be forwarded to ICE by mailroom staff. Mailroom staff will provide the detainee with a receipt advising them of what was sent to ICE. You are not permitted

to keep an identity document in your possession. Upon request to ICE, you will be provided with a copy of the document, certified by an ICE Officer to be a true and correct document.

### Rejection of Mail and Packages
Incoming and outgoing general correspondence and other mail may be rejected to protect the security, good order or discipline of the institution; to protect the public; or to deter criminal activity. When incoming or outgoing mail is confiscated or withheld (in whole or in part), you will be notified and given a receipt. Rejected mail will be considered as contraband and handled in accordance with the standards; however, some contraband may be returned to the sender. A detainee may appeal rejection of correspondence through the detainee grievance system.

When you are released from the facility, your incoming mail will be sent to the forwarding address you provide to the officers during your intake/release. If you do not provide a forwarding address, your mail will be endorsed, "No Forwarding Address, Return to Sender." All such mail will be returned to the U.S. Post Office.

### Writing Implements and Supplies
CCIPC will provide writing paper, writing implements and standard sized envelopes at no cost. Supplies cannot be mailed to you. You may submit a Detainee Information Request for paper, writing implements and envelopes from the Unit Manager or Detention Counselor. Postage stamps may be purchased from the commissary for outgoing mail. Indigent detainees can drop their mail in the mailbox across from the dining hall.

Indigent detainees will be provided with a sufficient number of supplies (i.e. paper and writing utensils) to maintain community ties and write legal mail or special correspondence. Indigent detainees will also be provided postage in an amount equal to three (3) one (1) ounce letters per week for general correspondence and an unlimited amount for special correspondence or legal mail, within reason. The facility will not be responsible for providing additional postal services (e.g. registered mail, certified mail, insured mail, etc.). Ordinarily, a detainee is considered "indigent" if he or she is without funds, or with only nominal funds, less than $15.00 in his or her account for the past 10 days. Mailroom staff will verify that the detainee is indigent. If the detainee is not indigent the mail will be returned to the detainee with a notice of postage due. Any detainee wishing to obtain free materials for legal correspondence should see a member of the unit staff.

When you are released from the facility, your incoming mail will be sent to the forwarding address you provide to the officers during your release. If you do not provide a forwarding address, your mail will be endorsed, "No Forwarding Address, Return to Sender." All such mail will be returned to the Post Office.

## Release of Funds
Request for a release of funds is to be completed by submitting a Detainee Request Form to your Housing Unit Officer or the Mail Officer for approval. You will not be allowed to send or transfer money from your account to other detainees' accounts within CORECIVIC/CCIPC. You are permitted to use your funds to pay for legal services.

## Access to Medical Services
CCIPC provides medical care to detainees at this facility. If it is a medical emergency, you must immediately notify your housing unit officer, who will contact then announce "Medical Emergency" - giving the location and nature of the emergency. The Medical Team will be notified of the medical emergency and will respond immediately.

**Emergency Medical Services** - If you are experiencing an emergency medical problem, notify the officer stationed in your area. The nursing staff will be notified, and appropriate action will be taken by them to resolve your medical problems. Trained staff are available to administer emergency first aid and life-saving techniques. Doctors are always available.

**Routine Medical Services** - If you are experiencing non-emergency medical problems, you will have to complete a medical request and drop it in the medical box inside your pod. You will be called by the Detention Officer when Health Services has processed your request. You will be evaluated by the nursing staff. If the need exists, they will

schedule you to see medical personnel. Appointments are scheduled according to medical necessity. Requests for copies of your medical records should be made using the Medical Request Form.

**Chronic Care Services** - The clinic provides chronic care services to those detainees who require medication renewals, treatments and follow-up care for specific illnesses (i.e. high blood pressure, diabetes, heart conditions, asthma, etc.). These services are provided on a regular basis.

**Sick Call Services** - Sick call at CCIPC is provided by CoreCivic medical staff to all detainees from the time of admission until the time of release in order to provide continuous medical care. There is no medical co-pay for health care services. In order to be examined at sick call, a detainee shall submit a written Sick Call Request and place it in the Sick Call Box located in each housing unit. Medical staff are available twenty-four (24) hours a day, seven days per week. The sick call schedule is posted in your housing areas. A detainee who suddenly becomes ill must report his/her illness to the Supervisor/Unit Officer.

Detainees who are not in urgent need of Sick Call services, but want to request an appointment, must complete and submit a Detainee Medical Request in a secured box identified "medical" located inside each housing unit. The enclosed requests will be picked up by Health Services staff every morning (including weekends and holidays). The request should be specific about why an appointment is needed, as it will assist the Health Care Services in scheduling the appointment with the correct Health Services Provider. Medical requests are available on post to be deposited in the Medical Request identified wall box. Medical grievances will be submitted through the detainee tablet. A paper grievance will only be used during tablet service interruptions and medical grievances can be deposited in the Medical Request box in the pod, .

The system separates daily Sick Calls from scheduled medical appointments. It allows detainees who need appointments to be scheduled in a timely manner with the appropriate provider. Most appointments are scheduled within a reasonable time.

**Mental Health Services** - If you are experiencing mental health problems, follow the procedures outlined above under routine/emergency services. You will be seen by a health care provider who will determine if a mental health referral is needed.

**Dental Services** - If you are experiencing dental health problems, follow the procedures outlined above under routine/emergency medical services. You will be seen by the health care provider who will determine if a dental referral is needed. Provisions will be made for emergency dental needs.

Scheduled appointment times will be posted on the unit call-out board. Specific medical information will never be posted. An issued facility identification card is required before any medication is distributed. Detainees must be fully dressed in shoes and with their issued ID in their possession. Any disorderly/disruptive behavior will be addressed immediately and seriously resulting in disciplinary action.

Detainees who request medical, dental, or mental health services, and for whom services have been scheduled, may refuse such services; however, they must appear in the Health Services Unit at the appointed time and sign the necessary refusal form. For security reasons, you will not be informed of the date and time of outside appointments. Any abuse and/or misuse of medical services, medications, and/or equipment will result in disciplinary action.

Detainees will be escorted to the Health Services Unit when called by Health Services staff.

Detainees are subject to all facility rules when in the medical department. Failure to comply with said rules will result in disciplinary action. Failure to attend a sick call appointment on time may result in the loss of your appointment and may result in disciplinary action. It is your responsibility to come to appointments and with the required items. If you choose not to attend or refuse to attend a scheduled appointment, you must go to the medical department and sign a 13-49B Refusal Form.

DO NOT come to the clinic without prior permission. The officer in your dorm must call the clinic first to obtain prior approval for you to visit the clinic.

## Medication

1. Keep on Person (KOP) medications are medications that detainees are allowed to keep in their possession. KOP medication must be stored and secured in your property bag. Medications found in your property that was not prescribed to you will be confiscated as contraband and disciplinary action will be taken. Detainees found to be not taking their medications as instructed will be taken off KOP status and will be placed on the pill line list, where their medication will be administered under supervision of the security staff. Medication removed from the KOP package will be confiscated as contraband.

2. Non-KOP medications are dispensed at pill call daily at schedule times. The scheduled pill call times will be posted on housing unit bulletin boards. You must have your facility issued detainee picture ID card available for medical staff to check at all pill calls. Detainees scheduled to attend pill call shall report when called. If you do not wish to receive medication from pill call, you must report to the pill call nurse during pill call and sign a refusal form. Failure to attend pill call and sign the refusal form will result in disciplinary action for failure to follow instructions.

   If you miss your scheduled pill call due to a court appearance or other staff-mandated reason, you may request your medicine as soon as you are available to take it. However, detainees may not substitute one scheduled pill time for another. Only medication that you receive on a routine basis will be dispensed during pill call. Detainees not in compliance, abusing or leaving medication at the reach of other detainees, will lose the privilege to keep medication on their person and will have to pick up their medication during pill call. The detainee will be subject to disciplinary action.

3. Unannounced shakedowns will be conducted inside pods. If a detainee is found to have in his/her possession medication prescribed to another detainee or using medication for exchange of any items, the one responsible will lose his/her privilege of keeping the medication on his/her person on a permanent basis and disciplinary action will be given.

4. Over the Counter (OTC) medications are available for your purchase through the facility commissary.

## LIVING WILLS AND ADVANCE DIRECTIVES

CORECIVIC/CCIPC uses the State Advance Directive Form for implementation of living wills and advance directives. All detainees who wish to have a living will different from the generic document and/or authorize or refuse permission to perform extraordinary measures to prolong his/her life, can have their private attorneys prepare such documents.

## INFECTIOUS DISEASE CONTROL

We are all concerned about infectious disease control in an institutional setting. CCIPC has an infectious disease control program that monitors all communicable diseases to include chicken pox (varicella), influenza and others that could affect everyone's well-being. In order to assist you and us, be sure and report any and all incidents that result in body fluid spills to your Unit Officer or area supervisor if you are not in your housing unit. Hygiene and grooming are important and are needed to maintain disease control. The most common infectious diseases are described below.

Tuberculosis (TB) is a disease that is spread from person to person through the air. TB usually affects the lungs but can also affect other parts of the body. TB is put into the air when a person coughs, sneezes, or laughs.

Human Immunodeficiency Virus (HIV) is a virus that causes AIDS, a disease that destroys a person's immune system. HIV is transmitted through blood, semen, vaginal secretions, breast milk, items such as contaminated syringes and needles and unprotected sex.

Hepatitis is a very common disease caused by one of several viruses that attack the liver. Hepatitis "A" is excreted in feces and is transmitted by direct or indirect contact. Washing your hands and practicing good hygiene will help to prevent an infection. Hepatitis "B" and "C" is found in all body fluids. It may be transmitted by blood, sexual contact, puncture of the skin with contaminated instruments such as those used for tattooing, ear piercing, acupuncture, dental and medical procedures.

Sexual Transmitted Disease (STD) formerly called "venereal disease" or VD refers to several serious contagious diseases, (Gonorrhea, Syphilis, Herpes, and Chlamydia) usually spread by sexual contact. Sexually active people face an increased risk of infection since sexual partners can have STD, not know it, and infect others with it. Prevention includes abstinence, or protected sex.

AIDS/HIV Education / Testing - Testing for AIDS/HIV is available, and education services are provided to all detainees. You may request these services from the medical staff at sick call sign-up.

Additional information may be requested from the Health Services staff on any of the aforementioned infectious diseases.

## Detainee Discipline

In a facility where many individuals live together in a relatively small amount of space, it is extremely important that order and discipline be maintained. Discipline and order are not only for the benefit of the staff, but also for the safety and welfare of you and all other detainees. While many problems can be solved informally through counseling, disciplinary measures must occasionally be imposed. At all steps in the disciplinary process, any sanctions imposed shall be commensurate with the severity of the committed prohibited act and intended to encourage the detainee to conform with rules and regulations in the future.

**Notice of Offenses and Penalties:** A copy of offenses and penalties are listed below. Any changes in the rules will be communicated to the detainees in writing. A copy of these offenses and penalties are posted on each dorm bulletin board.

## Detainee Disciplinary Severity Scale (Sanctions) and Prohibited Acts

| "GREATEST" OFFENSE CATEGORY | | |
|---|---|---|
| CODE | PROHIBITED ACTS | SANCTIONS |
| 100 | Killing | A. Initiate criminal proceedings |
| 101 | Assaulting any person (includes sexual assault) | |
| 102 | Escape from escort; Escape from a secure facility | |
| 103 | Setting a fire (charged with this act in this category only when found to pose a threat to life or a threat to serious bodily harm or in furtherance of a prohibited act of greatest severity, e.g., a riot or an escape; otherwise the charge is classified as Code **219 or 322.** | B. Disciplinary transfer (recommend) |
| 104 | Possession or introduction of a gun, firearm, weapon, sharpened instrument, knife, dangerous chemical, explosive, escape tool, device or ammunition | C. Disciplinary segregation (up to 60 days) |
| 105 | Rioting | D. Make monetary restitution, if funds are available |
| 106 | Inciting others to riot | |
| 107 | Hostage-taking | |
| 108 | Assaulting a staff member or any law enforcement officer | E. Loss of privileges (e.g., commissary, vending |
| 109 | Threatening a staff member or any law enforcement officer with bodily harm. | |

| | | |
|---|---|---|
| *198 | Interfering with a staff member in the performance of duties (conduct must be of the greatest severity). This charge is to be used only if another charge of greatest severity is not applicable. | machines, movies, recreation, etc.) |
| *199 | Conduct that disrupts or interferes with the security or orderly running of the facility (conduct must be of the greatest severity). This charge is to be used only if another charge of greatest severity is not applicable. | |

**\* When the prohibited act is interfering with a staff member in the performance of duties (Code 198, 298, 398 or 498) or conduct that disrupts (Code 199, 299, 399, or 499), the Disciplinary Committee should specify in its findings the severity-level of the conduct, citing a comparable offense in that category. For example, "We find the act to be of high severity, most comparable to Code 213 (engaging in a group demonstration)."**

| "HIGH" OFFENSE CATEGORY | | |
|---|---|---|
| **CODE** | **PROHIBITED ACTS** | **SANCTIONS** |
| 200 | Escape from unescorted activities, open or secure facility, without violence | A. Initiate criminal proceedings |
| 201 | Fighting, boxing, wrestling, sparring and any other form of physical encounter, including horseplay, that causes or could cause injury to another person; except when part of an approved recreational or athletic activity | B. Disciplinary transfer (recommend) |
| 202 | Possession or introduction of an unauthorized tool | C. Disciplinary segregation (Up to 30 days) |
| 203 | Loss, misplacement, or damage of any restricted tool | |
| 204 | Threatening another with bodily harm | |
| 205 | Extortion, blackmail, protection: demanding or receiving money or anything of value in return for protection against others, avoiding bodily harm, or avoiding a threat being informed against | D. Make monetary restitution, if funds are available |
| 206 | Engaging in sexual acts | |
| 207 | Making sexual proposals or threats | E. Loss of privileges: commissary, movies, recreation, etc. |
| 208 | Wearing a disguise or mask | |
| 209 | Tampering with or blocking any lock device | |
| 210 | Adulteration of food or drink | |
| 211 | Possession, introduction, or use of narcotics, narcotic paraphernalia, or drugs not prescribed for the individual by medical staff | F. Change housing |
| 212 | Possessing an officer's or staff member's clothing | G. Remove from program and/or group activity |
| 213 | Engaging in or inciting a group demonstration | |
| 214 | Encouraging others to participate in a work stoppage or to refuse to work | |
| 215 | Refusing to provide a urine sample or to otherwise cooperate in a drug test | H. Loss of job |
| 216 | Introducing alcohol into the facility | I. Impound and store detainee's personal property |
| 217 | Giving or offering an official or staff member a bribe or anything of value | |
| 218 | Giving money to, or receiving money from, any person for an illegal or prohibited purpose, such as introducing/conveying contraband | J. Confiscate contraband |
| 219 | Destroying, altering, or damaging property (government or another person's) worth more than $100 | K. Restrict to housing unit |
| 220 | Being found guilty of any combination of three or more high moderate or low moderate offenses within 90 days | L. Warning |
| 222 | Possessing or introducing an incendiary device, e.g., matches, a lighter, etc. | |
| 223 | Any act that could endanger person(s) and/or property | |

| | | |
|---|---|---|
| *298 | Interfering with a staff member in the performance of duties (conduct must be of highest severity). This charge is to be used only when no other charge of highest severity is applicable. | |
| *299 | Conduct that disrupts or interferes with the security or orderly operation of the facility (conduct must be of highest severity). This charge is to be used only when no other charge of highest severity is applicable. | |

| "HIGH MODERATE" OFFENSE CATEGORY | | |
|---|---|---|
| CODE | PROHIBITED ACTS | SANCTIONS |
| 300 | Indecent exposure | A. Initiate criminal proceedings |
| 301 | Stealing (theft) | |
| 302 | Misuse of authorized medication | |
| 303 | Loss, misplacement, or damage of a less restricted tool | B. Disciplinary transfer (recommend) |
| 304 | Lending property or other item of value for profit/increased return | |
| 305 | Possession of item(s) not authorized for receipt or retention; not issued through regular channels | C. Disciplinary segregation (Up to 72 hours) |
| 306 | Refusal to clean assigned living area | |
| 307 | Refusing to obey a staff member/officer's order (may be categorized and charged as a greater or lesser offense, depending on the kind of disobedience: continuing to riot is Code 105—Rioting: Continuing to fight, Code 201—Fighting: refusing to provide a urine sample, Code 215 | D. Make monetary restitution |
| 308 | Insolence toward a staff member | E. Loss of privileges: commissary, movies, recreation, etc. |
| 309 | Lying or providing false statement to staff | |
| 310 | Counterfeiting, forging, or other unauthorized reproduction of money or other official document or item, e.g. security document, identification card, etc. (may be categorized as greater or lesser offense, depending on the nature and purpose of the reproduction, e.g., counterfeiting release papers to effect escape—Code 102 or 200) | F. Change housing |
| 311 | Participating in an unauthorized meeting or gathering | G. Remove from program |
| 312 | Being in an unauthorized area | |
| 313 | Failure to stand count | H. Loss of job |
| 314 | Interfering with count | |
| 315 | Making, possessing, or using intoxicant(s) | I. Impound and store detainee's personal property |
| 316 | Refusing a breathalyzer test or other test of alcohol consumption | |
| 317 | Gambling | |
| 318 | Preparing or conducting a gambling pool | J. Confiscate contraband |
| 319 | Possession of gambling paraphernalia | |
| 320 | Unauthorized contact with public | K. Restrict to housing unit |
| 321 | Giving money or another item of value to, or accepting money or another item of value from anyone, including another detainee, without staff authorization | L. Reprimand |
| 322 | Destroying, altering, or damaging property (government or another person's) worth less than $100 | M. Warning |
| 323 | Signing, preparing, circulating, or soliciting support for prohibited group petitions | |
| *398 | Interfering with a staff member in the performance of duties (conduct must be of highest severity). This charge is to be used only when no other charge of highest severity is applicable. | |
| *399 | Conduct that disrupts or interferes with the security or orderly operation of the facility (conduct must be of highest severity). This charge is to be used only when no other charge of highest severity is applicable. | |

NOTE: Any combination of high moderate and low moderate offenses during a 90-day period shall constitute a high offense.

| "LOW MODERATE" OFFENSE CATEGORY | | |
|---|---|---|
| CODE | PROHIBITED ACTS | SANCTIONS |
| 400 | Possession of property belonging to another person | E. Loss of privileges: commissary, movies, recreation, etc. |
| 401 | Possessing unauthorized clothing | |
| 402 | Malingering, feigning illness | |
| 403 | Smoking where prohibited | |
| 404 | Using abusive or obscene language | F. Change housing |
| 405 | Tattooing, body piercing, or self-mutilation | |
| 406 | Unauthorized use of mail or telephone (with restriction or temporary suspension of the abused privileges often the appropriate sanction | G. Remove from program |
| 407 | Conduct with a visitor in violation of rules and regulations (with restriction or temporary suspension of visiting privileges often the appropriate sanction) | H. Loss of job

I. Impound and store detainee's personal property |
| 408 | Conducting a business | |
| 409 | Possession of money or currency, unless specifically authorized | |
| 410 | Failure to follow safety or sanitation regulations | J. Confiscate contraband |
| 411 | Unauthorized use of equipment or machinery | |
| 412 | Using equipment or machinery contrary to posted safety standards | K. Restrict to housing unit |
| 413 | Being unsanitary or untidy, failing to keep self and living area in accordance with posted standards | |
| *498 | Interfering with a staff member in the performance of duties (conduct must be of highest severity). This charge is to be used only when no other charge of highest severity is applicable. | L. Reprimand

M. Warning |
| *499 | Conduct that disrupts or interferes with the security or orderly operation of the facility (conduct must be of highest severity). This charge is to be used only when no other charge of highest severity is applicable. | |

CCIPC's investigation of detainee disciplinary reports will commence within 24 hours of receipt of a disciplinary report and will be completed within 72 hours, barring exceptional circumstances. The investigating officer shall have had no prior involvement in the incident, either as witness or officer at the scene.

Low or Moderate level disciplinary infractions will take place before a Unit Disciplinary Committee (UDC) comprised of between one and three members, at least one of whom is a supervisor, as determined by the facility. The UDC shall not include the reporting officer, the investigating officer, or an officer who witnessed or was directly involved in the incident, except in the unlikely event that every available officer witnessed or was directly involved in the incident.

The UDC shall have authority to:

1. Conduct hearings and resolve incidents involving high moderate or low moderate charges;
2. Consider written reports, statements and physical evidence;
3. Hear pleadings on the part of the detainee;
4. Make findings that a detainee did or did not commit the rule violation(s) or prohibited act(s) as charged, based on the preponderance of evidence; and
5. Impose minor sanctions in accordance with the table of prohibited acts and associated sanctions later in this document; minor sanctions are those listed sanctions other than initiation of criminal proceedings, recommended disciplinary transfer, disciplinary segregation, or monetary restitution.

The detainee in UDC proceedings shall have the right to due process, which includes the rights to:

1. Remain silent at any stage of the disciplinary process;
2. Have a UDC hearing within 24 hours after the conclusion of the investigation, unless the detainee:
   a. waives the notification period and requests an immediate hearing, or
   b. requests more time to gather evidence or otherwise prepare a defense.
3. If there is a UDC hearing, then the IDP hearing must be held within 48 hours after the conclusion of the UDC hearing.
4. Attend the entire hearing (excluding committee deliberations), or waive the right to appear. If security considerations prevent detainee attendance, the committee must document the security considerations and, to the extent possible, facilitate the detainee's participation in the process via telephonic testimony, document submission, written statements or questions to be asked of witnesses;
5. Present statements and evidence, including witness testimony on his/her own behalf;
6. Appeal the committee's determination through the detainee grievance process; and
7. Be advised by the UDC of your rights in a language or manner that you understand.

Greatest and High rule violations will take place before an Institutional Disciplinary Panel (IDP). The IDP will consist of three members, including a chairperson. The OIC or Warden will appoint three members of the panel. The panel may not include the reporting officer, the investigating officer, any member of the referring UDC, or anyone who witnessed or was directly involved in the incident. Exceptions may occur only if the number of officers required for the panel cannot be filled due their direct involvement in the incident. IDP panels will receive reports from the facility's UDC.

As a detainee charged with a prohibited act(s), if referred to the Institution Disciplinary Panel (IDP) for disposition, you will have the following rights:

1. The right to have a written copy of the charge(s) against you at least 24 hours prior to appearing before the IDP.
2. The right to have a full-time member of staff who is reasonably available to assist you or the option to receive assistance from another detainee of your selection, rather than a staff member before the IDP. Subject to approval from the Warden.
3. The right to call witnesses and present documentary evidence in your behalf provided institutional safety would not be jeopardized.
4. The right to remain silent. Your silence may be used to draw an adverse inference against you. However, your silence alone may not be used to support a finding that you committed a prohibited act.
5. The right to be present throughout the IDP decision, except during committee deliberations and where institutional safety would be in jeopardy.
6. The right to be advised of the IDP decision in writing and the facts supporting the panel's decision, except where institutional safety would be jeopardized.
7. The right to appeal the decision of the IDP by means of the Detainee Grievance Procedure to the Warder/Administrator, within 15 days of the notice of the panel's decision and disposition.

IDP hearings will be conducted on the first business day after receiving the UDC's referral, unless the detainee waives the 24-hour notification. The facility may delay hearings if they document the reason. If the detainee is housed in the Special Housing Unit, the delay will not exceed 72 hours, barring an emergency.

Detainees may request a staff representative to assist them in a disciplinary hearing; however, this request must be approved by the Warden and will be based upon the comprehension skills of the detainee making the request or his ability to collecting and presenting essential evidence. Detainees with limited English proficiency (LEP) shall receive translation or interpretation services, and detainees with disabilities shall receive appropriate accommodations in order to meaningfully participate in the investigative, disciplinary, and appeal process. Hearings may be postponed. The reason for the postponement will be documented accordingly.

You will be advised of the following rights when served with disciplinary action:

1. The right to protection from personal abuse, corporal punishment, unnecessary or excessive use of force, personal injury, disease, property damage and harassment.
2. The right of freedom from discrimination based on race, religion, national origin, color, , sex, age, sexual orientation, disability or political belief.
3. The right to appeal the decision; A Detainee may appeal decisions of the UDC and IDP through the formal grievance process.
4. The right to correspond with persons or organizations, consistent with safety, security, and the orderly operation of the facility; and the right to due process, including the prompt resolution of a disciplinary matter (in accordance with the rules, procedures and sanctions provided in the handbook).
5. The right to due process, including the prompt resolution of a disciplinary matter in accordance with the rules, procedures, and sanctions and procedures for appealing disciplinary findings provided in this handbook.

Sanctions range from the withholding of privilege(s) to disciplinary segregation. The duration of sanctions shall be within established limits. Neither the panel recommending sanctions nor the facility administrator making the final decision shall impose sanctions arbitrarily, beyond these limits. Disciplinary segregation shall only be ordered when alternative dispositions may inadequately regulate the detainee's behavior. Time in segregation or the withholding of privileges after a hearing shall generally not exceed 30 days per incident, except in extraordinary circumstances, such as violations of offenses 100 through 109 listed in the "Greatest" offense category. While a detainee may be charged with multiple prohibited acts and may receive multiple sanctions for one incident, sanctions arising from a single incident shall run concurrently. Time served in segregation pending the outcome of the proceedings shall be credited to the number of days to be spent in the Restricted Housing Unit after an adverse decision is announced. A detainee's good behavior subsequent to the rule violation or prohibited act should be given consideration when determining the appropriate sanction.

Disciplinary action may not be capricious or retaliatory. Staff may not impose or allow imposition of the following sanctions: corporal punishment; deviations from food services or availability of water; deprivation of clothing, bedding, or items of personal hygiene; deprivation of correspondence privileges; deprivation of legal visitation, legal mail, access to the law library, and the removal of legal papers; or deprivation of physical exercise unless such activity creates an unsafe condition.

The facility shall not hold a detainee accountable for his or her conduct if a medical authority finds him or her mentally incompetent. The disciplinary process shall consider whether a detainee's cognitive impairment, disability, or mental illness contributed to his or her behavior when determining what type of sanction, if any, should be imposed.

## Confidential Informants
The UDC or IDP shall disclose as much confidential information as may be disclosed without jeopardizing the safety and security of facility staff and other persons and shall include in the hearing record the factual basis for finding the information reliable before it is considered in disciplinary proceedings.

## Criminal Misconduct
CCIPC, in coordination with the ICE Field Office Director, shall work with prosecutors and other law enforcement officials to ensure that detainees who engage in serious criminal activity, including violence against staff and other detainees, face criminal prosecutions when appropriate.

## Grievance Procedures
CCIPC provides a means for all detainees to address complaints regarding facility conditions, treatment, medical care and policies and procedures. Detainees may file both informal and formal grievances, which shall receive timely responses, relating to any aspect of their detention. It is the policy of CCIPC to encourage informal resolution of complaints at the lowest level since grievances should be, whenever possible, resolved through direct contact with staff responsible for the particular problem area and with two-way communication encouraged between staff and detainees. However, all detainees have access to formal grievance procedures any time the informal process has not provided successful resolution of the complaint. Most matters can and should be resolved directly and promptly

between the detainee and staff. You can invoke the grievance process regardless of disciplinary, classification, or other administrative decisions to which you may be subject.

No harassment, punishment, or disciplinary action will result to a detainee who seeks resolution of legitimate complaints in good faith. However, if it is determined by the Warden that you are deliberately abusing the grievance system through excessive filing of grievances and/or repeated refusal to follow procedures, the Warden may suspend your right to file additional grievances until all pending grievances have been resolved. Continued abuse may result in an adverse action initiated against you

A detainee may not submit a grievance on behalf of another detainee/resident; however, assistance from a staff member or detainee may be provided when necessary to communicate the problem on the grievance form.

Grievances are considered special correspondence. If a sealed envelope is labeled "Grievance" and addressed to the Grievance Officer, it will not be opened for inspection unless there is reasonable suspicion that the sealed envelope contains contraband.

You have the opportunity to file a formal complaint which is considered a grievance. The process will be explained below. It is important that the procedures be followed correctly in order to ensure adequate and appropriate resolutions. Grievances filed improperly will be returned without review.

### Informal Process
All detainees have access to an informal resolution process to resolve their complaints. At any time, the informal resolution process has not provided successful resolution of the complaint or in the event of an emergency grievance, detainees may use the formal grievance process. All complaints will be assessed in a fair and impartial manner. Resolution in the best interest of the detainee and the facility is the primary goal.

Informal Resolution forms are available to you on the tablets that will ensure notification of the proper CCIPC official in order to process a complaint informally. A response will be returned to you as soon as possible. If you are dissatisfied with the response, you may appeal to the Warden. The Warden will respond as soon as possible.

While you are free to bypass or terminate the informal grievance process, and proceed directly to the formal grievance stage, you are encouraged to utilize the informal process and allow the complaint to be resolved at the lowest level. Complaints should be, whenever possible, resolved through direct contact with the staff responsible for the particular issue and with two-way communication encouraged between staff and detainees. If you are not satisfied with the results of the informal resolution process, please see below:

### Formal Process
If you are not satisfied with the results of the informal resolution process, you may file a formal grievance to the Grievance Officer using the tablets. A paper system will only be used during tablet service interruptions by submitting a 14-5B, Detainee Grievance Form. You must document if an informal resolution process was attempted and with whom.

The appropriate department head will act on the grievance within five (5) working days through informal or formal resolution and provide you with a response. If you do not accept the department head's solution, you may appeal the decision. The Grievance Appeal Board (GAB) will convene to study the grievance within five (5) working days of the detainee's appeal. Within five (5) days of reaching a decision, the GAB will provide you with a response to the grievance, in writing. If the grievance involves a medical issue, at least one member of the GAB shall be a medical professional.

If you disagree with the GAB, you may appeal to the Warden. The Warden, after reviewing the finding of the GAB, will provide you with a written decision within five (5) days of receiving the appeal. The Warden will render a written decision on the appeal within five (5) days of receipt. This decision is considered final to any matter. However, if you are

dissatisfied with the Warden's response to your grievance or you fear retaliation, you may appeal or communicate directly with ICE.

**Procedures to Appeal Grievances Directly to ICE**
Submit your concerns to the ICE staff by utilizing the ICE Detainee Request Form. You may pick up request forms from staff assigned to your unit. The request form should be placed in the box labeled "ICE" and it will be delivered to the ICE staff with no reading, altering or delay. You may obtain assistance from another detainee, housing officer or other facility staff in preparing your request form. The ICE staff receiving your request form will respond as soon as possible but not later than within 72 hours of receiving your request. Detainees shall report allegations of abuse and civil rights violations, along with violations of officer misconduct, directly to ICE or the DHS Office of the Inspector General (OIG).

A copy of all grievances will be maintained in your detention file.

Neither employees nor detainees will be subject to retaliation, reprisal, harassment or discipline for the use or participation in grievance procedures. Any allegations of this nature will be thoroughly investigated by the Warden and reviewed by the CoreCivic-Facility Support Center.

**Medical/Dental Grievance Procedures** – All grievances concerning medical and dental services must be placed in the medical grievance box by the detainee. A grievance form may be requested from/provided by a Restricted Housing Unit staff member and must be given directly by the detainee to medical staff. CCIPC staff members are not permitted to accept medical grievances from detainees.

**Emergency Grievance Procedures** - Emergency grievances may be brought by a detainee to a designated grievance officer (GO) or directly to the facility administrator or their designee. If these personnel are not available, a shift supervisor may be informed of the complaint. The 14-5B, detainee Grievance, form must be utilized to file an emergency grievance. The detainee will complete Page 1 of the 14-5B and place it in a sealed envelope marked "Emergency Grievance". Sealed envelopes may be placed in the grievance mailbox. If the Facility Grievance Officer, after reviewing the grievance, determines that an emergency exists, immediate action will be taken to resolve the grievance. The Facility Grievance Officer will give you a written decision within seventy-two (72) hours of receipt of the emergency grievance. If it is determined that the grievance is not an emergency, standard grievance procedures shall apply.

If you feel that the issue is sensitive or that your safety or well-being would be jeopardized if others in the facility learned of the grievance, you may seal the grievance in an envelope, clearly mark the envelope "sensitive" and submit it directly to the Warden. You have the opportunity to file a complaint about officer misconduct directly to the Department of Homeland Security (please see below).

The opportunity at any point to file a complaint directly to the Department of Homeland Security (DHS), Office of the Inspector General (OIG) about staff misconduct, physical or sexual abuse or civil rights violations; complaints may be filed by calling the DHS OIG Hotline at 800-323-8603, Speed Dial Number 518#, which is programmed into the dorm telephones as a free call. Follow the toll-free instructions located in each pod bulletin board. You may also contact the OIG by writing to:

Department of Homeland Security
245 Murray Lane, SW, Mail Stop 0305
Washington, DC 20528.
Attn: Office of the Inspector General

**Non-Grievable Matters -** The following matters cannot be grieved by detainees through the grievance procedure:
1. State and federal court decisions
2. State and federal laws and regulations
3. Final decisions on grievances (please see note below)

4. ICE policies, procedures, decisions or matters (i.e., institutional transfers, release/deportation decisions, etc.)

Note: A detainee dissatisfied with the facility's response to a grievance or those fearing retaliation are able to appeal or communicate directly with ICE/ERO.

To file a grievance via the tablet:

- Log into the tablet
- Select free
- Select "Grievance"
- Select "CoreCivic"
- Select the reason or department. If you are unsure, then select "Other"
- Once the form comes up, complete the following:
    o Summary: What is the grievance about? (Examples: Religion, Food, Officer, Recreation).
    o Unit: Select the unit number you are in.
    o The next box is to submit what the problem or issue is that is being reported.
    o The last box is the "Resolution", this is where you must put what it is you want to happen or how you want the issue resolved.

## Segregation/Restrictive Housing Unit

Prior to placement in the segregation or the restrictive housing unit, you will be taken to Health Services to be screened by a qualified healthcare professional. Upon placement, your property will be secured. You will be allowed to maintain those items on the 10-1AA Authorized In-Cell Property List. All other items will be placed in storage until you are released back into general population. Prior to storage, clothing/linens will be laundered. Searches will be conducted on all detainees upon admission.

Administrative Segregation is intended for detainees with special management requirements:

1. Pending investigation/hearing of prohibited acts(s)
2. Need for medical observation
3. Pending a transfer or release within twenty-four (24) hours
4. Security risks
5. Protective custody

Disciplinary Segregation is a Special Housing Unit for detainees who have received a sanction by the Institutional Disciplinary Panel. Once sanctioned, these detainees may have fewer or limited privileges than other detainees in either the general population or administrative segregation.

### Programs and Services

1. Programs and Services as offered to general population are available to administrative segregation.
2. Detainees in the segregation for administrative reasons shall be offered at least one hour of recreation per day, outside their cells and scheduled at a reasonable time, at least seven days per week unless documented security, safety, or medical considerations dictate otherwise. Detainees in the Segregation for disciplinary reasons shall be offered at least one hour of recreation per day, outside their cells and scheduled at a reasonable time, at least five days per week unless documented security, safety, or medical considerations dictate otherwise.
3. Telephone use:
    • Detainees in administrative segregation may have telephone access similar to detainees in the general population, but in a manner consistent with the special security and safety requirements of detainees in these units. Collect legal calls to the detainee's attorney of record can be made with approval from the Shift Supervisor/Unit Manager or higher authority.
    • Detainees in disciplinary segregation will be allowed emergency personal calls and unlimited, collect legal calls to the detainee's attorney of record upon approval from the Shift Supervisor/Unit Manager or higher authority. Detainees held in disciplinary segregation for a period exceeding sixty (60) days are afforded the same telephone privileges as detainees in Administrative Segregation. Staff shall

permit ICE detainees to make direct and/or free and legal calls as outlined in Policy 16-100, except in the event of compelling and documented reasons of threats to the safety, security, and good order of the facility.

4. Detainees housed in the segregation will be provided library services a minimum of one (1) day per week for the circulation of books to include religious materials and for requests for legal materials.

5. Detainees housed in the segregation should submit an Information Request form to the Special Housing Unit staff in order to request access to the law library.

6. Medical Care/Sick Call for segregated detainees will be provided by medical staff through daily rounds in the Special Housing.

7. Mail will be picked up from the segregation daily, except on holidays. Mail will be handled for the segregated detainees in the same manner as general population detainees.

8. While in administrative or disciplinary segregation status, a detainee ordinarily retains visiting privileges and will be permitted visits in accordance with the posted schedule unless security reasons dictate other times. Visitation for administrative or disciplinary segregation status will generally be non-contact unless prior approval is obtained from the Chief of Security. Disruptive conduct by either party will result in the termination of the visit and may have an adverse effect on future visits.

9. The Chaplain will minister to detainees in segregation. Upon special request and considering security concerns, arrangements can be made for religious volunteers of your faith to conduct one-on-one services.

10. Laundry will be picked up from, washed and returned to the segregated detainees according to the same schedule as set for general population.

11. Personal hygiene items are available upon request from the segregation officer at no charge

12. Segregated detainees will be afforded the opportunity to shave and shower at least three (3) times per week. Shaving equipment will be issued upon detainee's request and will be returned to staff upon completion of shower. Staff will inspect the razor for any type of tampering or alteration. Once refused by the detainee, no further consideration will be given for that day.

13. Detainees in the segregation will be permitted to attend Group Legal Rights Presentations, if security is not compromised. If it becomes necessary, presentations may be made to individuals in segregation, pending agreement with the presenter and security can be maintained. If a detainee in the segregation cannot attend for this reason, and both he/she and the presenter(s) so request, alternative arrangements will be made.

14. Prior to being released from segregation detainees will be re-evaluated/reclassified to ensure that they have been properly classified and are housed in an appropriate dorm.

15. All other services not specifically mentioned in this section regarding segregation will be subject to the same access procedures as outlined for general population detainees.

## Detention File

A detention file is maintained by the CCIPC for each detainee and contains no less than the following documents:

1. Facility disciplinary actions
2. Behavior reports
3. Funds, valuables and property receipts
4. Detainee written requests, complaints and issues
5. Response to the aforementioned requests
6. Segregation records

## Legal File

Your legal file is an Immigration legal record commonly called an "A-file" maintained by ICE for each individual detainee. The A-file contains your legal transactions and documentation pertaining to your case. CCIPC does not have possession of you're a-file. Please direct all inquiries regarding you're a-file to ICE using the Detainee Request Form..

## Notice to Those Persons Who have Been Ordered Removed or Allowed to Voluntarily Depart

You will be afforded a one-time opportunity to have your personal effects delivered to the detention facility prior to your removal. You are responsible for making arrangements for the delivery of personal effects (clothing type only) which can only be received within seventy-two (72) hours after receipt of your notice. You will not be able to receive property

without making advance arrangements and getting prior approval from your Unit Manager by filling out and submitting a Detainee Package Request form. The contents of the travel bag/suitcase will be inspected for contraband and to ensure compliance. Property will not be accepted at the San Francisco ICE Field office.

The facility may allow family members to mail in three (3) sets of clothing for use on your release. These items are for release only and the detainee will not be permitted to possess the items within the facility. There is no restriction regarding the source of clothing received from family members for this purpose. Release clothing may be received at the facility within fourteen (14) calendar days of the release between the hours of 8:00am and 4:00pm. No belongings will be received the day of departure by ICE or CCIPC staff.

Personal effects must be inside a non-locking duffle bag, backpack, or luggage. No boxes or plastic bags will be accepted. Only one (1) standard bag no larger than twenty (20) inches wide by ten (10) inches deep, weighing no more than forty (40) pounds will be accepted.  NO EXCEPTIONS.

**Please direct any questions regarding this handbook and any procedures therein to your unit team.**

## Additional Contact Information

**Department of Health and Human Services, Office of the Inspector General (OIG)**
Office of Inspector General
U.S. Department of Health & Human Services
ATTN: HOTLINE PO Box 23489
Washington, DC 20026
Phone: (800) HHS-TIPS [(800) 447-8477]
Fax: (800) 223-8164
TTY: (800) 377-4950

**DOJ Office of Professional Responsibility (OPR)**
U.S. Department of Justice
Office of Professional Responsibility
950 Pennsylvania Ave, NW, Suite 3266
Washington, DC 20530-0001
By Phone: 202-514-3365
By Fax: 202-514-5050
By Email: opr.complaints@usdoj.gov
Website: https://www.justice.gov/opr

**DHS Office of the Inspector General (OIG)**
DHS Office of the Inspector General/Mail Stop 0305
Attn: Office of Investigations-Hotline
245 Murray Lane, SW Washington, DC 20528-0305
By phone: 1-800-323-8603 or 1-844-889-4357 (TTY)
By fax: 1-202-254-4297
Accessing the online DHS OIG Complaint/Allegation Form at http//:hotline.oig.dhs.gov/hotline/hotline.php

**JIC-Joint Intake Center for ICE**
Calling the toll-free Joint Intake Center Hotline at 1-877-2INTAKE or sending a fax to (202) 344-3390; • Sending an e-mail message to Joint.Intake@dhs.gov;
Writing to the Joint Intake Center at P.O. Box 14475, 1200 Pennsylvania Avenue, NW, Washington, D.C. 20044;

# Appendix D



Dear Mr. Campos and the responsible health official at his detention facility,

Mr. Campos presented to the emergency department with complaints of chest pain. We conducted extensive testing to evaluate the possible causes of his symptoms. Unfortunately, our ability to provide comprehensive care was limited due to the lack of access to records from his recent hospitalization, ongoing treatment, and testing performed at another facility.

Based on our conversation and the limited records available, along with the results of our diagnostic workup, it appears that Mr. Campos likely has a condition known as pulmonary hypertension. This is a potentially life-threatening illness that requires close and continuous management, as it can rapidly progress to severe heart failure.

It is imperative that Mr. Campos follow up within 72 hours with a specialist in right heart failure or pulmonary hypertension. Ideally, this should be with a provider who has previously been involved in his care—either at the Bakersfield facility where he was recently treated, or at Stanford, where he has also received care.

We performed a CT scan, which did not reveal any signs of blood clots but did show mild indications of congestive heart failure. Additionally, his potassium level was slightly low, and I have prescribed medication to help restore it to a healthier range.

Mr. Campos should continue taking his usual medications as previously prescribed, which may include a diuretic. However, we do not currently have access to the exact dosages.

Thank you for your patience today and for allowing us the privilege of contributing to Mr. Campos's care. At this time, it is safe for him to be transported back to the facility, provided that he receives daily check-ins with health officials and that arrangements are made for close follow-up with appropriate cardiology and/or pulmonology specialists.

Sincerely, Dr. Kimon

**Imaging**

CT Pulmonary Angiogram &Chest w/Contrast

09/05/25 18:38:55
IMPRESSION:
1. No emboli through the level of the segmental pulmonary arteries. A more distal embolus is not excluded.
2. Markedly dilated main pulmonary artery measuring 47 mm in diameter and dilated right and left pulmonary arteries, consistent with pulmonary hypertension.
3. Markedly dilated right atrium and right ventricle. No pericardial effusion.
4. Mosaic attenuation of the lung parenchyma, consistent with small-vessel or small airways

*CH*
CHARLES HOOPER D.O.
CA LIC# 20A5310
DEA# BH02
·