| | |
|---|---|
| KEKER, VAN NEST & PETERS LLP<br>STEVEN P. RAGLAND - # 221076<br>sragland@keker.com<br>CODY S. HARRIS - # 255302<br>charris@keker.com<br>CARLOS C. MARTINEZ - # 354616<br>cmartinez@keker.com<br>633 Battery Street<br>San Francisco, CA 94111-1809<br>Telephone:     415 391 5400<br>Facsimile:     415 397 7188<br><br>CALIFORNIA COLLABORATIVE FOR IMMIGRANT JUSTICE<br>PRIYA ARVIND PATEL - # 295602<br>priya@ccijustice.org<br>MARIEL VILLARREAL - # 317048<br>mariel@ccijustice.org<br>1999 Harrison Street #1800<br>Oakland, California 94612<br>Tel: (650) 762-8990 | PRISON LAW OFFICE<br>MARGOT MENDELSON - # 268583<br>mmendelson@prisonlaw.com<br>TESS BORDEN - MJP # 805022, *pro hac vice*<br>tess@prisonlaw.com<br>PATRICK BOOTH - # 328783<br>patrick@prisonlaw.com<br>ALISON HARDY - # 135966<br>ahardy@prisonlaw.com<br>RANA ANABTAWI - # 267073<br>rana@prisonlaw.com<br>1917 Fifth Street<br>Berkeley, California 94710-1916<br>Tel.: (510) 280-2621<br><br>AMERICAN CIVIL LIBERTIES UNION FOUNDATION<br>KYLE VIRGIEN - # 278747<br>kvirgien@aclu.org<br>FELIPE HERNANDEZ - # 338468<br>npp_fhernandez@aclu.org<br>MARISOL DOMINGUEZ-RUIZ - # 345416<br>mdominguez-ruiz@aclu.org<br>425 California Street, 7th Floor<br>San Francisco, CA 94104<br>Tel.: (415) 343-0770<br><br>CARMEN IGUINA GONZALEZ - # 277369<br>ciguinagonzalez@aclu.org<br>915 15th Street, NW, 7th Floor<br>Washington, DC 20005<br>Tel.: (202) 393-4930 |

*Attorneys for Plaintiffs Fernando Gomez Ruiz, Fernando Viera Reyes, Jose Ruiz Canizales, Yuri Alexander Roque Campos, Sokhean Keo, Gustavo Guevara Alarcon, Alejandro Mendiola Escutia and all others similarly situated*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FERNANDO GOMEZ RUIZ; FERNANDO VIERA REYES; JOSE RUIZ CANIZALES; YURI ALEXANDER ROQUE CAMPOS; SOKHEAN KEO; GUSTAVO GUEVARA ALARCON; and ALEJANDRO MENDIOLA ESCUTIA, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v. | Case No. 3:25-cv-09757-MMC<br><br>**DECLARATION OF GUSTAVO GUEVARA ALARCON IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br>Date:      January 9, 2026<br>Time:      9:00 a.m.<br>Dept.:     Ctrm 7 – 19th Floor<br>Judge:    Hon. Maxine M. Chesney<br><br>Date Filed: November 12, 2025 |

| | |
|---|---|
| 1 | U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; TODD M. LYONS, |
| 2 | Acting Director, U.S. Immigration and Customs Enforcement; SERGIO |
| 3 | ALBARRAN, Acting Director of San Francisco Field Office, Enforcement and |
| 4 | Removal Operations, U.S. Immigration and Customs Enforcement; U.S. DEPARTMENT |
| 5 | OF HOMELAND SECURITY; KRISTI NOEM, Secretary, U.S. Department of |
| 6 | Homeland Security, |
| 7 | Defendants. |

**Declaration of Gustavo Guevara Alarcon, 095663368**

1. I, Gustavo Guevara Alarcon, am currently detained at the California City Detention Facility.

2. I arrived to California City Detention Facility on about August 29, 2025, from Golden State Annex in McFarland, California, where I had been detained for about 14 months.

3. I am seeking asylum in the United States.

4. I am currently housed in Unit G-200, Cell 114, in a double cell with one other detained person.

5. I served about 20 years in the California Department of Corrections and Rehabilitation (CDCR). During this time, I was incarcerated at Pelican Bay State Prison, the Substance Abuse Treatment Facility, and Pleasant Valley State Prison, among other prisons. I paroled from CDCR custody on July 11, 2024. I was detained by ICE upon my release. I have been in ICE detention ever since I paroled from state prison.

6. In my experience, the conditions at the California City Detention Facility are much more punitive and restrictive than any other state prison or detention center I have been incarcerated in.

7. For example, when I was in CDCR custody as a state prisoner, I was able to have pens to write with. At California City, I was previously only allowed a short pencil, about the third of the size of a regular pencil, and I don't have access to a pencil sharpener. On or about the week of October 13, the facility started providing pen cartridges with a flimsy plastic casing. The pens are flimsy and difficult to use. There are many other personal items that I was allowed to have at previous facilities, that I am no longer allowed to have here, such as personal shoes, television, mp3 players, and personal tablets.

8. When I was in CDCR custody as a state prisoner, I was provided jackets and beanies free of charge. At Golden State Annex, I was provided a sweatshirt, sweatpants, beanie, and shorts free of charge. Here, at California City, I was only given three jumpsuits, three shirts, boxers, and socks. Our cells are so cold at times that individuals have started using their socks to cover their arms. I asked an officer when I arrived for a sweatshirt and shorts; I was told that is not provided here and that I can purchase them at the commissary.

9. When I was in CDCR custody as a state prisoner, I was always able to have contact visits with my loved ones where we could be in the same room together and hug each other. The visits lasted several hours. I have had two visits at California City, both of which were behind glass and through a phone. My visits were ended after an hour by the officer.

Even the high security prisons where I was incarcerated, like the high security yard at Pelican Bay State Prison, gave me more visiting privileges than I have here.

10. As the population at California City increases, our food portions have gotten significantly smaller and very repetitive. The portions are inconsistent among the same meal trays: some trays will come with sufficient food, while others are minimal and insufficient. Without commissary purchases, I would be hungry. We are served potatoes every day, sometimes twice a day. We have not gotten fresh fruit the entire time we have been here; only people on special diets will get canned fruit or apple sauce.

11. While in CDCR, I was group A1A, which meant that I could access rehabilitative programming, education, religious services, recreation, and have a job. I was a programmer in prison and ran multiple self-help groups. At California City, I do not get any of that. We spend almost the entire day in our building and only leave for five to seven hours of yard that we get weekly, as well as for any scheduled appointments or visits. There is no available programming or education. The only activities available to us in the unit are shared televisions with very limited channels, an opportunity to check out books from the librarian twice a week, some board games, and shared tablets. Each tablet is assigned to four individuals who must share it during the limited dayroom hours, which average 12 hours daily given the times we must be locked in our cells. This is not enough to pass the time.

12. The only job we can have is a porter or barber in our unit. We are paid $1 a day at California City. My last job in CDCR was a caregiver, and I was making far more, averaging $3.20 per day.

13. For the past week, we are experiencing frequent periods without access to hot water. We have been told that it is a maintenance issue.

14. With regards to our hygiene, we are provided with razors only twice a week. At Golden State Annex, we could ask for razors whenever we needed them. When I was in CDCR custody, I could request one to keep with me. There is only one available hair clipper for the entire facility right now and we can go weeks without having access to it. Also, there are a limited number of nail clippers to use that are not readily available either—on a good week, they will make it to our unit. There are about five nail clippers to use among 80 or so detained people.

15. On September 18, 2025, when I was housed in H-300, our unit flooded on account of the rain. Rain water came into the cells through the windows and vents, as well as the dayroom. The Warden and Chief came into the unit and observed the flooding. We were told that the flooding was institution-wide. I am concerned that this will continue to happen as the rainy season approaches.

16. I have submitted about 12 grievances about various issues since arriving to California City, such as requests for medical care, failure to complete blood draws, failure to provide medications, failure to provide cleaning supplies, and failure to provide orthopedic shoes.

17. I am 40 years old and have chronic migraines, high cholesterol, chronic allergies, and am prediabetic. I also have a persistent fungal infection and suffer from plantar fasciitis. When I was at Golden State Annex, I was prescribed and issued several medications, including metformin, cholesterol medication, hydrocortisone, Topamax, Imitrex, Tylenol, Nasonex nasal spray, Visine eye drops, and Nystatin antifungal powder. I also have PTSD, depression, and anxiety. I am not prescribed psychiatric medications.

18. California City employees picked me up from Golden State Annex. During the bus ride to California City from Golden State Annex, I was restrained with ankle, wrist and waist chains. Prior to getting on the bus and after exiting, I was subjected to a pat down search of my body.

19. On the day that I arrived, I had a severe headache. After the search, I and other new arrivals stood in a line in the hallway to speak to two nurses who seemed to be conducting intake. These conversations took place in a busy hallway where others could hear.

20. I told the nurse that I had a headache and suffer from migraines, and that I needed my medications. The nurse told me that I would see a provider and should tell the provider what I was feeling. The nurse did not provide me with any of my migraine medication. I felt that the nurses were trying to speak and ask questions as little as possible to keep the line moving; I spoke with the nurses for less than two minutes. I did not see a provider until two to three weeks later.

21. At intake, I was not asked about disability needs or accommodations. I asked the Chief of Security and the unit counselor if there was an ADA coordinator available at California City and I was told no.

22. After the intake process, staff assigned me to housing unit F and told me to pick a cell. It appeared that the housing unit had not been cleaned. All the cells were very dusty and dirty, and the water coming from the sink was chalky and white. I was reluctant to drink that water because it did not seem clean or safe to drink.

23. My headache got worse and became a severe migraine, and I began to feel nauseous. I told an officer in the housing unit that I needed to talk to medical staff about my migraine medication. The officer told me that medical staff had said that they could not see me unless it was an emergency because they were so busy.

24. My migraine got even worse. Later that day, I asked the officer for medical attention again. The officer said he would tell medical staff about my request. The officer later came back and again told me that medical staff had said that they would not see me unless it was an emergency.

25. Staff did not provide me with my migraine medications, nor any of my other medications, on the day that I arrived. I became so ill that day that I began to vomit, but because I did not have access to clean drinking water, I forced myself to swallow my vomit. This was very embarrassing and degrading, and thinking about it still makes me feel emotional. In twenty years of incarceration in CDCR, I never experienced something like that.

26. Staff have not provided me with some of the medications that I was issued at Golden State Annex. I have not been provided with the Nystatin antifungal powder or antifungal ointment. I was given one tube of hydrocortisone but staff will not provide any more, and I was told to purchase it from the commissary.

27. Staff at California City only provided me with my migraine medication (Topamax) for a few weeks. On or around the second week of October 2025, my migraine medication was discontinued. Medical staff did not explain to me why the medication was discontinued. I have taken this medication daily for about six months, and depend on it to manage my painful migraines.

28. After the medication was discontinued, I submitted a medical request on October 6, 2025, to see the doctor to discuss my medication. I saw a nurse about my request. I told the nurse that I needed the migraine medication and wanted to discuss this with a doctor. The nurse told me they would write my request in the notes in the medical record. Since then, I still have not seen a doctor to talk about my migraine medication. Without the medication, I am experiencing an increase in headaches.

29. Staff at California City have provided my medications at very inconsistent times. I think I am supposed to get my morning medications between 6 and 7 in the morning. Sometimes, staff do not provide me with my morning medications until 11 am. Sometimes, staff do not provide noon medications until around 3 pm. I think that evening medications are supposed to be provided between 6 to 8 pm, but there have been times when staff have not brought me my evening medications until 2 in the morning. I would sometimes be woken up in the middle of the night to receive my medication.

30. When I first arrived to California City, staff told us that there was an application on the tablet that we could use to submit requests for medical care. However, the application did not work, so I could not submit requests for medical care on the tablets. Staff provided us paper forms that we could use to make medical requests instead. I completed several paper medical request forms to request medication refills and to see the provider. I had to give the paper forms to custody staff to have them turn the forms in to medical staff for

me because there is only one box in the hallway that I do not have readily available access to. I felt uncomfortable having to give my medical requests to custody staff because my medical information is very personal and should be private. It took a few weeks for the medical request application on the tablet to start working, but staff have advised us to continue to use the paper forms because it is a faster process.

31. I have flat feet and have experienced chronic foot pain since I was in my early 20s; my doctor in CDCR diagnosed me with plantar fasciitis. When I was in CDCR custody, I was issued orthopedic shoes and custom insoles to help me stand and walk without pain. When I arrived at Golden State Annex, I was allowed to wear my personal shoes, which were Nike tennis shoes. Staff at Golden State Annex issued me insoles that I could wear inside my tennis shoes for additional support.

32. When I arrived to California City, staff would not allow me to keep my personal shoes and insoles. I was told it was not allowed. Staff gave me a pair of plastic orange sandals, similar to Crocs, to wear instead. These plastic sandals do not provide any arch support. It is difficult for me to get around while wearing them because it is quite painful. The grip on the bottom of the shoes has also worn out. I have a particularly hard time walking around on the outdoor yard, because the dirt terrain has many large rocks and sharp thorns from the plants surrounding us, and the sandals do not adequately protect my feet from the rocks.

33. On or around October 1, 2025, while wearing the plastic sandals, I fell on the yard and landed on my back. I was in pain from this fall for several days. I have seen others fall on account of the shoes. I have told the staff, including the Warden, Chiefs and ICE representatives, about my concerns with the shoes that we are issued. I was told that is what is provided here and that you can purchase shoes in the commissary, but those too are not supportive.

34. Since arriving to California City, I have filed several medical requests and grievances about my need for different shoes. I have not received any response to the grievances that I filed. I filed grievances using the paper grievance form, and on the tablet. About two weeks after I arrived to California City, I had an appointment with medical staff and discussed these concerns. The medical staff member told me that she would schedule me for x-rays of my feet. These x-rays still have not happened so I submitted a sick-call request on October 6, 2025, asking about the status of the x-rays but the nurse did not have any additional information.

35. Staff are very punitive here. Rather than using administrative segregation and lock-ups as a last resort, they use it as a first resort. For instance, there was an incident in our unit in early September 2025 in which a detained person who was not receiving his necessary diabetic medication and antibiotics had a medical emergency where he passed out in his cell. His cellmate, as well as others in the unit, called for help. Everyone was worried

about him so we waited to see what the outcome was. Officers ordered us to return to our cells. I did so right away but some individuals did not want to lock-up until they knew what was going on. Later, staff sent a handful of detained people to administrative segregation for not locking up as ordered and the rest of the unit was placed on lock-down in their cells for not responding "fast enough." We remained locked up in our cells with no access to phones, tablets, or anything else, for at least ten hours.

36. On October 3, 2025, at around 10:00 or 10:30 in the morning, an officer used pepper spray on a detained person who lived in my housing unit, G-200. I saw the officer and the detained person trying to talk to each other while the detained person's cell was being searched. I recognized the detained person, and understand from my own interactions with him that he does not speak English. I saw the detained person start to walk away from the officer. I saw the officer pepper spray the detained person while he was walking away from the officer. I did not see the officer use a video camera to record his actions. I did not see other officers in the unit using a camera to record the use of pepper spray either. During my twenty years in CDCR custody, I had never seen staff use pepper spray on an incarcerated person when they were walking away from staff. Watching staff behave this way makes me nervous because there appears to be no staff accountability here.

37. During the 20 years that I spent in CDCR custody, I was never sent to administrative segregation and only received one disciplinary write up when I did not report to work during a massive, state-wide prison hunger-strike and work-stoppage over conditions. At California City, I was sent to administrative segregation for about a week in September 2025. I believe that I was sent to administrative segregation in retaliation for speaking up about the conditions and asking to be treated better.

38. On or around September 20, 2025, I and two other people were taking a shower when there was an incident in the housing unit. Staff yelled that everyone needed to lockdown in their cells. Because we had only just started our showers, I asked staff if we could please finish our showers. The officers told us we had to leave the shower immediately. I calmly explained to the officers that I would like to be allowed to finish my shower, but they insisted that we get out. I ultimately left the shower and returned to my cell, as staff had ordered. Later that day, officers came into the housing unit with video cameras. They told me that they were going to handcuff me. I asked them why they were handcuffing me, and they told me because I was being taken to "the hole" or administrative segregation. I asked the officers why I was being taken to administrative segregation, and they told me that they did not know. I was issued a disciplinary write up.

39. My experience in administrative segregation was very dehumanizing. I was confined to a cell for at least 22 hours a day. I had limited contact with other people and could only talk to the officers who approached my cell. I was allowed recreation time on most days for about an hour a day in a cage outdoors. My cell was freezing cold and all I had was a

blanket. I talked to some journalists about my experiences being sent to administrative segregation. I was afraid that staff might retaliate against me for talking about how I have been treated. But I think it is important to speak up about what has happened to me and others.

40. I have heard from other detained people that there have been at least 5 suicide attempts by people detained here at California City. About three weeks ago, there was a suicide attempt in a unit near mine, in G-300. I was told that a person who recently went to suicide watch tried to hang himself. When I was in CDCR, these types of stories were extremely rare compared to what I have experienced in my short stay here so far. Even when I was at Golden State Annex, I heard two to three stories of this nature during my one year stay.

41. A family member sent me a copy of the report that California Attorney General Rob Bonta and the California Department of Justice issued in April 2025 about the conditions at the six locked immigration detention facilities that were in operation in California at the time. I read this report. In my opinion, the conditions at California City are much worse than the conditions described in the Department of Justice report. I suffer from PTSD, depression, and anxiety, and I believe that the majority of the population here at California City also suffers from these conditions. It feels like the staff here do not care about our suffering and are indifferent to our mental health needs.

42. Detention has been a challenging experience. I was brought to the United States when I was six years old, which was not a choice I made for myself. Being subjected to these conditions just because I was not born in this country is very dehumanizing and hard to grasp.

43. On October 27, at around 10:00 in the morning, the facility was locked down. I was outside for recreation, and everyone outside was escorted back into the facility. As of the time of this writing, I am still on lockdown. We have been in our cells for the past 24 hours, with no access to outdoor recreation, showers, phones, tablets, or the dayroom. On or around the morning of October 28, my housing unit was escorted to and rehoused in another empty unit. I asked the sergeant performing the escort why we were on lockdown. The sergeant made a vague reference to an incident that occurred on the 27th. I asked when the lockdown would lift, and the sergeant said she had no idea. Having been recently housed in administrative segregation, I feel that lockdown is much more restrictive, as we have no access to showers or recreation. I feel that I am being punished for an incident that I had nothing to do with. I am worried about how long the lockdown will last. The lockdown is triggering my anxiety, depression, and PTSD. It is keeping me from the activities that help manage my mental health, like regular exercise and talking with my loved ones.

I, Gustavo Guevara, declare under penalty of perjury that the foregoing is true and correct and that this declaration was completed and signed on October 28 2025 in California City, California.