| | |
|---|---|
| KEKER, VAN NEST & PETERS LLP<br>STEVEN P. RAGLAND - # 221076<br>sragland@keker.com<br>CODY S. HARRIS - # 255302<br>charris@keker.com<br>CARLOS C. MARTINEZ - # 354616<br>cmartinez@keker.com<br>633 Battery Street<br>San Francisco, CA 94111-1809<br>Telephone:     415 391 5400<br>Facsimile:     415 397 7188<br><br>CALIFORNIA COLLABORATIVE FOR IMMIGRANT JUSTICE<br>PRIYA ARVIND PATEL - # 295602<br>priya@ccijustice.org<br>MARIEL VILLARREAL - # 317048<br>mariel@ccijustice.org<br>1999 Harrison Street #1800<br>Oakland, California 94612<br>Tel: (650) 762-8990 | PRISON LAW OFFICE<br>MARGOT MENDELSON - # 268583<br>mmendelson@prisonlaw.com<br>TESS BORDEN - MJP # 805022, *pro hac vice*<br>tess@prisonlaw.com<br>PATRICK BOOTH - # 328783<br>patrick@prisonlaw.com<br>ALISON HARDY - # 135966<br>ahardy@prisonlaw.com<br>RANA ANABTAWI - # 267073<br>rana@prisonlaw.com<br>1917 Fifth Street<br>Berkeley, California 94710-1916<br>Tel.: (510) 280-2621<br><br>AMERICAN CIVIL LIBERTIES UNION FOUNDATION<br>KYLE VIRGIEN - # 278747<br>kvirgien@aclu.org<br>FELIPE HERNANDEZ - # 338468<br>npp_fhernandez@aclu.org<br>MARISOL DOMINGUEZ-RUIZ - # 345416<br>mdominguez-ruiz@aclu.org<br>425 California Street, 7th Floor<br>San Francisco, CA 94104<br>Tel.: (415) 343-0770<br><br>CARMEN IGUINA GONZALEZ - # 277369<br>ciguinagonzalez@aclu.org<br>915 15th Street, NW, 7th Floor<br>Washington, DC 20005<br>Tel.: (202) 393-4930 |

*Attorneys for Plaintiffs Fernando Gomez Ruiz, Fernando Viera Reyes, Jose Ruiz Canizales, Yuri Alexander Roque Campos, Sokhean Keo, Gustavo Guevara Alarcon, Alejandro Mendiola Escutia and all others similarly situated*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FERNANDO GOMEZ RUIZ; FERNANDO VIERA REYES; JOSE RUIZ CANIZALES; YURI ALEXANDER ROQUE CAMPOS; SOKHEAN KEO; GUSTAVO GUEVARA ALARCON; and ALEJANDRO MENDIOLA ESCUTIA, on behalf of themselves and all others similarly situated,<br><br>    Plaintiffs,<br><br>    v. | Case No. 3:25-cv-09757-MMC<br><br>**DECLARATION OF JULIO F. V. IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:    January 9, 2026<br>Time:   9:00 a.m.<br>Dept.:   Ctrm 7 – 19th Floor<br>Judge:  Hon. Maxine M. Chesney<br><br>Date Filed: November 12, 2025 |

| | |
|---|---|
| 1 | U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; TODD M. LYONS, |
| 2 | Acting Director, U.S. Immigration and Customs Enforcement; SERGIO |
| 3 | ALBARRAN, Acting Director of San Francisco Field Office, Enforcement and |
| 4 | Removal Operations, U.S. Immigration and Customs Enforcement; U.S. DEPARTMENT |
| 5 | OF HOMELAND SECURITY; KRISTI NOEM, Secretary, U.S. Department of |
| 6 | Homeland Security, |
| 7 | Defendants. |

Priya Arvind Patel, SBN 295602 (she/her)
CALIFORNIA COLLABORATIVE FOR IMMIGRANT JUSTICE
1999 Harrison Street, 18th Floor, Oakland, CA 94612
650-762-8990
priya@ccijustice.org

*Pro Bono Counsel for Petitioner*

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JULIO F. V.,<br><br>　　Petitioner-Plaintiff,<br><br>　　v.<br><br>CHRISTOPHER CHESTNUT, in official capacity as Warden of California City Detention Facility<br><br>SERGIO ALBARRAN, in official capacity, Acting San Francisco Field Office Director, U.S. Immigration and Customs Enforcement;<br><br>TODD LYONS, in official capacity, Acting Director, U.S. Immigration and Customs Enforcement;<br><br>KRISTI NOEM, in official capacity, Secretary of the U.S. Department of Homeland Security; and<br><br>PAM BONDI, in official capacity, Attorney General of the United States,<br><br>　　Respondents-Defendants. | Case No. _____<br><br>**DECLARATION OF JULIO F. V. IN SUPPORT OF PETITION/COMPLAINT AND MOTION FOR PRELIMINARY INJUNCTION** |

Decl. of Julio F. V.　　　　　　　1　　　　Case No. _____

I, Julio F. V., hereby declare as follows:

1. The facts contained in this declaration are known personally to me, and if called to testify, I could and would testify competently thereto under oath.

2. My lawyer helped me put together a declaration when I went for a bond hearing in front of the immigration judge. It talked about how I used to be gang-involved, and the people that got hurt because of it. It also talked about how the gang let me leave around 2020, when I got out of the hole in Pelican Bay and they saw that I had changed. They said that if I wanted a different life, I could have it, and of course I did.

3. I also talked about the work I did to change in my declaration. I'm proud of it. Since I was a little kid I had only ever known violence. So leaving that life behind forced me to change how I react to conflict, which there's a lot of in immigration detention.

*Mesa Verde ICE Detention Facility*

4. I've been in ICE detention since September 5, 2023. They picked me up when I got out of prison. First they took me to Golden State Annex, but after around a month they brought me to Mesa Verde in Bakersfield.

5. When ICE had me at Mesa Verde, I tried to look out for other people who were being bullied, because they didn't speak English and understand things or because of their mental health. The warden and other staff also often came to me when there were other issues in my dorm. I would help deescalate when there were conflicts between other people or with the officers. I'm shy and reserved, and don't like talking for the most part. Playing this role was stressful because of the responsibility it carried. But it also made me feel good about myself, that I could help and that other people saw this skill in me.

6. It was still really difficult to be detained at Mesa Verde, especially starting this past summer, when some laws changed and they started to fill the place. We were packed in there like sardines, and conflicts only escalated. I was brought into mediating a lot more conflicts, including with staff.

Decl. of Julio F. V.                           2                    Case No. _____

7. I was never able to get any peace and quiet. I woke up at 5am everyday so that I could have a couple hours to myself to read before everyone else got up. I started reading self-help books many years ago and doing workbooks on behavior techniques, and I would use that time for this.

8. Going outside was the only thing I looked forward to.

9. I also helped out people who didn't have lawyers with their cases, and the more I went through my own case the better I got at this. I helped a lot of people file appeals, and fill out their asylum applications. I also learned to do more complicated things. For example, I helped my dormmate from Belize file a Motion to Reopen based on ineffective assistance from his prior lawyer, which I learned how to do because my current lawyer helped me do one for myself. It was difficult, because he had gone through a lot in his country and I think he never processed it or talked about it before. When we worked on his declaration he sometimes wouldn't remember things and then would come up to me throughout the day to tell me some terrible thing he experienced that he only just remembered. I liked being able to help him, and I learned a lot from the process of talking to him about traumatic experiences.

*California City ICE Detention Facility*

10. ICE moved me out of Mesa Verde around the 1st of September, and they brought me to California City. I'm with the same people mostly that I was with at Mesa Verde, and they still come to me with problems. But it's been even more stressful. There are a lot of things that are difficult about this place.

11. We don't have contact visits, meaning if our families come they have to see us through a glass.

12. When we got here it was filthy, and we had to clean everything ourselves. We had to clean not just our own cells, some of which still had feces and urine in the toilet (like mine), but also the common areas, and later on the outdoor areas. They never paid us for this. We also didn't have the proper supplies. I had to clean my cell using shampoo I had paid for in the

Decl. of Julio F. V.                              3                      Case No. _____

commissary at Mesa Verde and a ripped up towel. To this day, we've been cleaning the pod every day on our own – the common areas, the shower, everything. They hired a bunch of us as porters towards the end of September, but they didn't start paying us regularly until about a week ago. Before that, they'd only paid us three to four dollars. They're supposed to pay us a dollar for every day that the clean.

13. We've been locked in our cells for hours on end. They have seven counts a day, and we have to be locked in our cells during them. In prison we only had three.

14. We are in two person cells in a pod with 80 people. Amongst the 80, we share four TVs, and their audio doesn't always work. We don't get newspapers. They wouldn't let me keep books I brought from Mesa Verde, including my self-help workbooks. I keep asking for them to at least give me my workbooks, but they always put it off. The only thing they have available in the dayroom are the TVs and two PlayStations.

15. They don't have things the people without lawyers need to work on their cases. If someone needs appeal forms they have to wait for the law library cart to come around, and it could be three to four days. They don't give us stamps; we have to buy them from the commissary and that can take up to a week. When people can't afford stamps, me and other people who have funds buy them because the staff refuse to give them to indigent people for free. Whenever I have to help people do things urgently, like file an appeal, I have to go around and ask for these things from others in the dorm who might already have them.

16. They also don't have enough clothes or proper shoes for us. I don't have a sweater, and it's really cold all the time in our dorm. I had a bunch of shirts that I had brought with me from Mesa Verde that I had bought in the commissary there, and when I turned it in for laundry, they lost all of them. I started washing my clothes in the sink in my cell because I couldn't afford to lose any more. And the shoes that they give us are just like the rubber shoes with holes in them, crocs. We can't use them to play sports. Even if we brought closed-toe shoes that we bought from commissary at Mesa Verde aren't allowed to wear them around. We

Decl. of Julio F. V.                    4                    Case No. _____

can only get closed-toe shoes if we buy them again from the commissary here. They cost $30.

17. The portions they give us at chow time are very small, and people who can't afford to buy food through commissary go hungry.

18. The commissary prices are very high. They're around three times more than the prices in prison. It's the same commissary items in all these places.

19. We get taken to yard 5-6 times per week. Usually we are only allowed to spend 45 minutes outside each time. In prison, we got 2 hours of outdoor time every day.

20. The very worst part of being there, though, is how the staff treat us. They treat us like we're animals, like we don't deserve to live. Some are nice, but it almost doesn't matter because the poor treatment is structured.

21. For example, I've seen two people in my pod go "man down," meaning, they pass out because of a medical condition and need urgent care, they don't take them to the hospital, they take them to the hole.

22. As another example, the day we got transferred they "rushed" us. Rush meaning, they had us get off the bus and run to a wall while they were yelling at us. I'd been to two other ICE detention centers and I've been in a couple different prisons, and this had only ever happened when I was transferred to another prison to serve a term of solitary confinement as punishment.

23. Once we were all lined up against the wall, we had to keep our hands above our heads and our legs spread out so that they could search us. But during the searches, the officers were holding on to our private areas. A couple of us were asking, why are you holding on to our privates and things like that, and the officers just kept saying things like, "this is procedure," and "if you don't like it too bad." They weren't even denying that they were doing it.

24. I ran into a Lieutenant from Mesa Verde who is an assistant chief here when I got off the bus. She told me to "be careful" because this was CoreCivic, and not CDCR and not GEO.

Decl. of Julio F. V.                         5                    Case No. _____

25. When the officers were searching me, there was a captain behind them. After the officers were done searching me, she ordered them to search me again, saying something like, "we know he has something." I turned around and asked what was going on, why are you all treating us like this? The captain said that they would put me in the hole for getting "smart" with them, and then another lieutenant walked by and asked what was going on. I told her that her staff was being disrespectful, and treating us like we're prisoners. And her response to that was, You know right here we're allowed to use force. She also asked me what state prison I was coming from. When I didn't answer, she said that she would keep an eye on me and that she would have to count me a few times every time she went back (meaning, everytime she was responsible for count in my pod, she would "count" me a few times).

26. During processing they threw away a lot of our property, including dry goods we brought from Mesa Verde. They ended up taking around $40 worth of my food.

27. When one of my friends was going through processing, the officer going through his property asked, "Why do you have so much property if you're going to get deported anyway?" She had also said, "I'm a Trump supporter, so you know how I feel about you guys." My friend is pretty quiet, but he asked her, "Why would you say that?" And her response was, "So you guys know what to expect."

28. During my first week or so here an elderly guy I was sitting with noticed that there was an uneaten tray of food, so I went up to the officer to ask if he could have it (because one tray of food isn't enough). The officer didn't say anything, but just looked at me, grabbed the tray, and threw it in the trashcan.

29. They pat us down anytime we leave the pod and are coming back, including yard and attorney visits. I don't like leaving the pod because of that, because you could get an officer that pats you down in an aggressive way. As an example, one officer who is very tall presses his knees on our buttocks while patting us down, and pats us down in a very aggressive way. A few weeks ago one of my podmates during the patdown was like, Sir can you please reduce the way you pat us down? And the officer got really mad, and started

Decl. of Julio F. V.               6               Case No. _____

yelling things like, "I'm going to do what I'm going to, and you ain't got nothing to do about it." I tried to intervene and said something like, Sir there's no need to speak to him like that he's only asking. And he got really mad. After the pat search was over and we started walking away, he yelled out, "well I'm still here, and nobody did nothing about it." The whole experience was so degrading, and it's the sort of thing we deal with every day.

30. As the weeks have gone on I've tried to just stay to myself and avoid interactions with the staff. But they still mess with me and other people in my dorm. And most of the time I feel like it's my responsibility to help. I haven't gotten any disciplinary write-ups here, but I worry that the more I try to intervene to deescalate situations, it'll come.

31. As one example, recently an officer came in and got mad because someone had burned their popcorn and it smelled. As soon as he started yelling about the smell the guy who had burned popcorn came over and tried to apologize, but the officer got mad and accused us of smoking, and he opened the doors of all ten of the bathroom stalls. In a detention or prison setting that's a pretty disrespectful thing to do, I've never seen officers do that before. The people in the stalls started throwing names, a lot of them take medications because they are mentally unwell. He started yelling back, "Who just called me a fucking bitch?" I went over to try to deescalate because things were so tense and I was worried it would become violent, which would be really bad for the people in the dorm. But he got mad and yelled, "What the fuck are you gonna do about it?" I asked him to please call his supervisor, and he did. While we were waiting for the supervisor, he kept yelling, "I'll call my fucking supervisor, they don't know who they're fucking with." The supervisor came and got the officer out of the dorm, and said to the him, I don't know why you come messing with these people. The officer still works here.

32. When I first came to the prison, during processing they separated everyone they thought was gang affiliated and made us answer questions. When they got to me, the officer started by asking, did you get jumped into your gang? I asked why that had anything to do with this, and that I was just here fighting my case. He said something like, We know you're

Decl. of Julio F. V.                  7                  Case No. _____

fighting your case but this is just for personal knowledge. I told him that I didn't want to talk about it, but he kept saying that they would send me to the hole if I didn't answer. He never asked me whether I was still gang-involved, it seemed like the only thing that mattered to him was whether I ever had been in the past.

33. They also took pictures of my tattoos. I have the letter "C" on my chest from when I belonged to the street gang in L.A., and a tattoo known as the G Shield on my arm that is known in prisons as showing membership with the Sureños and being close to the Mexican Mafia. They didn't say anything while taking the photos, but when they got to the G Shield the officer taking the photos smiled. At the end of all of this they had me hold up a sign and took a picture of me. I was so upset by this point that I didn't even notice what the sign said, I was just trying to make it through the process as fast as possible. Later I learned that others who had the same experience had to hold up signs that said "SS" - meaning "South Sider." South Sider means Sureños.

34. Someone tried to kill himself in my pod earlier this month. We found him hanging in his cell. I don't know how long he had been there. We called for help and it took a while for staff to come in and cut him down. When they took him out he was unconscious, and I don't know whether he made it. Seeing that was hard on all of us. After it, staff came in and said it was our fault for how long it took them to respond, because we were crowded around him.

35. The hardest part right now for me though is that some of the officers are trying to get us to react. At least three separate staff members have told me and some of my other podmates that they aren't going to leave us alone until we become violent. The podmates that they've targeted are the ones who advocate for other people, like me.

36. As one example, I tried to buy shoes from the commissary several weeks ago. They took money out of my account, but for weeks I never got the shoes–they would keep bringing me sizes I didn't ask for, and they wouldn't give me my money back either. When I brought it up to an officer, the officer actually said something like, "They wanna burn you, and

Decl. of Julio F. V.   8   Case No. _____

where you come from you don't let anyone burn you right?" I was surprised to hear that ("where you come from" was referring to the fact that I was in a gang). I asked what that had to do with anything, that I was just fighting my case and that I'm a regular detainee. He just laughed at me and said, "You're a man, you're going to have to do what you gotta do."

37. We tried to talk to a supervisor about these issues. The supervisor said something like, "we keep telling them to stop coming in here to mess with you all and leave you alone but they won't" (referring to the officers).

38. I've changed a lot, but I've never been tested in this way before. I'm trying my best to be patient, but I still have at least another year left on my case (and even more if I win my appeal) and I don't know how I can live through these conditions for much longer. Before I got to California City I was already struggling at Mesa Verde, unsure of how much longer I could handle it. But I'd take anything over this. I asked my lawyer to ask ICE to transfer me to there, or Golden State, or Adelanto. She told me that Adelanto had a TB outbreak but I'd rather take that risk than be here.

* * *

39. I've been locked up for around fifteen years now, and a lot of my time in prison was hard, especially before I got the opportunity to leave the gang. But in a lot of ways, it's worse in ICE detention.

40. There's nothing to do. No classes, no group therapy, no training.

41. You have to pay for everything—phone calls, shoes, the radio, stamps.

42. One thing I never felt in prison was degraded, or made to feel like an animal, like I'm made to feel everyday here. I get flashbacks to back when I was in prison in Delano. (That was a time when there was so much violence and even death around me, I had started turning to drugs to escape.) I see the violence, I see the silent stillness, and I get the feeling again that I had there–that anything could come. I feel frustration and stress every day. And I sleep worse–every ICE detention center I've been at, my sleep gets worse and worse.

Decl. of Julio F. V.                                9                        Case No. _____

43. Part of it is the psychology of it. You did everything you could in order to change, but it doesn't matter. You're still locked up.

44. I don't like talking about this stuff either because I don't want to complain, and I want to stay positive. But one thing I feel is that society doesn't want to see me changed. For a while now I've been trying to prove that I'm a different person, that I've changed, and that I'm not the violent person I used to be when I was in a gang. But it's like this place won't let me, it refuses to see me that way.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct to the best of my knowledge, memory, and understanding.

Dated: October 27, 2025              */s/ Julio F. V.* _____
                                      Julio F. V.
                                      (original signature retained by attorney Priya Patel)

Decl. of Julio F. V.                10                Case No. _____