| | |
|---|---|
| KEKER, VAN NEST & PETERS LLP<br>STEVEN P. RAGLAND - # 221076<br>sragland@keker.com<br>CODY S. HARRIS - # 255302<br>charris@keker.com<br>CARLOS C. MARTINEZ - # 354616<br>cmartinez@keker.com<br>633 Battery Street<br>San Francisco, CA 94111-1809<br>Telephone:     415 391 5400<br>Facsimile:     415 397 7188<br><br>CALIFORNIA COLLABORATIVE FOR IMMIGRANT JUSTICE<br>PRIYA ARVIND PATEL - # 295602<br>priya@ccijustice.org<br>MARIEL VILLARREAL - # 317048<br>mariel@ccijustice.org<br>1999 Harrison Street #1800<br>Oakland, California 94612<br>Tel: (650) 762-8990 | PRISON LAW OFFICE<br>MARGOT MENDELSON - # 268583<br>mmendelson@prisonlaw.com<br>TESS BORDEN - MJP # 805022, *pro hac vice*<br>tess@prisonlaw.com<br>PATRICK BOOTH - # 328783<br>patrick@prisonlaw.com<br>ALISON HARDY - # 135966<br>ahardy@prisonlaw.com<br>RANA ANABTAWI - # 267073<br>rana@prisonlaw.com<br>1917 Fifth Street<br>Berkeley, California 94710-1916<br>Tel.: (510) 280-2621<br><br>AMERICAN CIVIL LIBERTIES UNION FOUNDATION<br>KYLE VIRGIEN - # 278747<br>kvirgien@aclu.org<br>FELIPE HERNANDEZ - # 338468<br>npp_fhernandez@aclu.org<br>MARISOL DOMINGUEZ-RUIZ - # 345416<br>mdominguez-ruiz@aclu.org<br>425 California Street, 7th Floor<br>San Francisco, CA 94104<br>Tel.: (415) 343-0770<br><br>CARMEN IGUINA GONZALEZ - # 277369<br>ciguinagonzalez@aclu.org<br>915 15th Street, NW, 7th Floor<br>Washington, DC 20005<br>Tel.: (202) 393-4930 |

*Attorneys for Plaintiffs Fernando Gomez Ruiz, Fernando Viera Reyes, Jose Ruiz Canizales, Yuri Alexander Roque Campos, Sokhean Keo, Gustavo Guevara Alarcon, Alejandro Mendiola Escutia and all others similarly situated*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FERNANDO GOMEZ RUIZ; FERNANDO VIERA REYES; JOSE RUIZ CANIZALES; YURI ALEXANDER ROQUE CAMPOS; SOKHEAN KEO; GUSTAVO GUEVARA ALARCON; and ALEJANDRO MENDIOLA ESCUTIA, on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>    v. | Case No. 3:25-cv-09757-MMC<br><br>**DECLARATION OF ALFONSO LEYVA IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:      January 9, 2026<br>Time:      9:00 a.m.<br>Dept.:     Ctrm 7 – 19th Floor<br>Judge:     Hon. Maxine M. Chesney<br><br>Date Filed: November 12, 2025 |

| | |
|---|---|
| 1 | U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; TODD M. LYONS, Acting Director, U.S. Immigration and Customs Enforcement; SERGIO ALBARRAN, Acting Director of San Francisco Field Office, Enforcement and Removal Operations, U.S. Immigration and Customs Enforcement; U.S. DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, Secretary, U.S. Department of Homeland Security, |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | Defendants. |

**Declaration of Alfonso Leyva, 093472746**

1. I, Alfonso Leyva, am currently detained at the California City Detention Facility.

2. My A-Number is 09347276. I am 57 years old. I was born on Nov. 17, 1967.

3. I have been detained since April 30, 2025. I was first detained at Golden State Annex, and I was transferred to the California City Detention Facility [CCDF] on September 4, 2025.

4. I am housed in G-100 with one other person.

**Arrival and Intake**

5. The bus ride from Golden State Annex to California City took 8 hours. We were handcuffed for the entire ride—our feet, hands and waists were restrained. The ride was about two hours but the entire journey lasted about 8 hours because they had us wait in the CCDF parking lot for about 6 hours until we could enter the facility and be processed.

6. After arriving at CCDF, we stayed on the bus for another 6 hours. We were told it was because they were processing a lot of other people ahead of us. We were not provided food or water during this time. We did not enter the facility until around midnight.

7. The next day, we were processed by intake staff custody. They reviewed my property and confiscated any open containers of food or hygiene materials. They also confiscated eye drops that I was prescribed and approved by GSA. I believe that these items were thrown away because they never returned to me.

8. Intake staff also confiscated legal materials. They confiscated my rosaries, which I use to practice my Catholic faith. I was told the rosaries are pretty but I could only keep one rosary. I think the rest of my rosaries are stored with other belongings but I do not have access to them.

9. Intake staff confiscated my eyeglasses. I was told I could not get them because my glasses have a metal frame. Without these eyeglasses, I cannot see clearly. I can't see things when they are close. I can see things from afar without my glasses. I get dizzy without my glasses because I can't see or read things that are close by. I started wearing my glasses about two years ago due to my history with sewing. I was given my glasses back on September 30, 2025.

10. I told the guards that I needed my glasses. I was not asked about any disabilities, medications or accommodations when I was processed.

11. Since my property was taken, I have asked staff repeatedly for my items verbally and in writing. I have yet to receive my rosaries, legal materials, or eye drops. I finally received

    my eyeglasses on September 30, 2025. The rest of my items are still missing. I was told I could buy new eye drops from the commissary.

12. I went without pain medications for my back for almost a month. I finally received my back pain medications around the end of September 2025.

**Medical Treatment at the California City Detention Facility**

13. I was injured really badly at CCDF because staff confiscated my eyeglasses.

14. When I arrived at CCDF, I was assigned to the top bunk in a two-person cell.

15. On September 16, 2025, around 5 am in the morning, I fell off of the ladder leading up to the top bunk and hit my head. I could not see well without my glasses, and I slipped. The cell is dimly lit. My head was cut and bleeding, and I also hurt my arm while trying to stop my fall.

16. When I fell, I heard my cellmate notify staff that I fell. I fell when it was breakfast time. Staff then took me to a separate room. It was a waiting room to be seen by a provider. I was left in this room until around 8 am. No one tried to assess my head during this time. They were laughing at me, and I do not think they took my injury seriously.

17. Eventually, around 8 am in the morning, staff decided to transport me to the hospital. The hospital was about one and a half hours away. My head was bleeding during the ride. A doctor at the hospital told me that I could not be treated because I did not have health insurance, even though my head was still bleeding. I was then transported another one and a half hours back to the detention facility. I was handcuffed during this entire experience.

18. I arrived back at CCDF around 10 or 11 am. I did not see medical staff when I arrived back at CCDF. I was brought back to the little room where I was waiting that morning. I was in handcuffs this time. At this point, I had not been provided food or water all day. I was in this room until 3 or 4 pm, still handcuffed.

19. Later that afternoon, I was transported to a different hospital that is about an hour away from CCDF. I was in handcuffs during this ride. There, medical staff cleaned my head injury and gave me four staples. I finally got food and water. The hospital doctor said I should come back in a week to have the staples removed.

20. When I returned to CCDF, I was placed in an observation cell. The room looked like a cell used for disciplinary segregation. The cell was very dirty. I pointed out how dirty the cell was to the nurse who brought me there and asked her if she would stay in such conditions. I felt bad being in this observation cell. I felt fear and like I was being punished.

21. I stayed in the observation cell for two days, even though the nurse told me I would only be in there for one. The cell felt like a punishment. I had to wear the same clothes throughout those two days. The shower in the cell was very dirty to the point of being unusable. Every meal was a peanut butter sandwich and cookies. I felt hungry after the meal because it was not enough food. There was no way to make phone calls. I did not get outdoor recreation or dayroom time. I did not leave the observation cell until they finally moved me out of there.

22. They did not turn off the lights at night, only dimmed them. I could not sleep, because I could hear the men in the other observation cells crying out from pain. I was also worried that I would disappear and no one would hear from me.

23. I did not get any medical attention while I was in the observation cell. Occasionally, a guard would come by and peak through the door and would log something on a paper but no medical staff. The only nurse I saw during my stay was the one who brought me to the cell. There was a guard who called me by the wrong name, because staff had put me in a cell with someone else's name on the door. I flagged it to them that I was not that person. The staff confirmed I was not that person by looking at my identification card.

24. Since my fall, I now experience serious head pain, dizziness, and ear pain and inflammation. I get a sharp pain in my head every ten to fifteen minutes. Prior to this incident, I did not suffer from headaches. My right ear pain is sharp. I was given medication for the ear pain but it does not work. I still feel the pain.

25. I never returned to the hospital to get my staples removed. A nurse at the facility removed my staples. I was worried about this because when I got the staples the doctor told me to come back to get them removed and so he could check on me. Here, it was a nurse who removed them and I could tell she was looking for a tool to pull out the staples.

26. Since my fall, I am afraid to sleep on the top bunk of my cell. I am afraid of falling off again. I now sleep on the floor of my cell. My cellmate is 72 years old and diabetic, and I feel that he needs the lower bunk more than me.

27. On October 3, I submitted a sick call request about pain in my ear. I only saw a doctor about my earache on October 9. The doctor told me I have an ear infection and prescribed me medication, but it does not help with the pain.

28. I have repeatedly submitted sick call requests and told custody and medical staff about my head pain. I have not been seen by a neurologist.

29. On October 26, 2025, I saw a doctor to treat an infection in my right ear. I started to experience ear pain since my fall on September 16, 2025.

**Disability Needs**

30. My disabilities are not being accommodated at CCDF.

31. I also have a hearing disability that is not being accommodated. I was diagnosed with hearing loss and tinnitus at Golden State Annex. I was supposed to receive hearing aids while at GSA, but I was transferred before they could be issued.

32. When I am stressed or when things are very quiet, I hear a little ring. My left ear has a ring but my right ear feels pain. I have trouble hearing and using the phone.

**Other Conditions**

33. The meals at CCDF are inadequate. Meals are often provided late, and they never have fresh fruit. I have never had a fruit here at CCDF. At GSA, we would sometimes get fruit.

34. I am always cold at CCDF. We don't get enough blankets or clothes to keep us warm. I don't have a jacket, and I gave my spare blanket to my cellmate, who is an older man and needs it more than I do.

35. On October 28, 2025, staff searched my cell and took many of my belongings. The search happened after an incident in the yard. They took my toothbrush, a bag of coffee and a bag of rice and a bath mat that I had purchased at commissary. They took most of our blankets as well. I now cover myself with towels when I go to sleep. I gave my spare blanket that was not taken away to my elder cellmate.

36. All the visits at this facility are through glass. I have only been able to see my family through glass. The Mexican consul visited me, and even our visit was through glass. This makes me feel bad. This horrible place is not a detention center. It is a high-security prison facility. When the facility does count, count can sometimes last two hours, which means I am stuck in my cell until count is clear.

37. I am Catholic. For about two weeks now, mass has been offered in Spanish. I do not feel I can practice my faith in here because they just now started providing services in Spanish. Religion to me is beautiful because it means I have a relationship with God and gives me a sense of tranquility. In GSA, a priest would come by and visit us. Here, no priest has visited us.

38. This declaration was read for me in my native language.

I, Alfonso Levya, declare under penalty of perjury that the foregoing is true and correct and that this declaration was completed and signed on November _10_, 2025 in California City, California.

*Alfonso Leyva*

Alfonso Levya, A# 093472746

### ATTESTATION OF TRANSLATOR

I am a native Spanish speaker. On November 10, 2025, I reviewed the above declaration with Alfonso Leyva in Spanish, which Alfonso Leyva represented to me was his preferred and/or native language, and witnessed his signature.

_____          _____November 20, 2025_____

Marisol Dominguez-Ruiz, Staff Attorney          Date
ACLU NATIONAL PRISON PROJECT