| | |
|---|---|
| KEKER, VAN NEST & PETERS LLP<br>STEVEN P. RAGLAND - # 221076<br>sragland@keker.com<br>CODY S. HARRIS - # 255302<br>charris@keker.com<br>CARLOS C. MARTINEZ - # 354616<br>cmartinez@keker.com<br>633 Battery Street<br>San Francisco, CA 94111-1809<br>Telephone:    415 391 5400<br>Facsimile:    415 397 7188<br><br>CALIFORNIA COLLABORATIVE FOR IMMIGRANT JUSTICE<br>PRIYA ARVIND PATEL - # 295602<br>priya@ccijustice.org<br>MARIEL VILLARREAL - # 317048<br>mariel@ccijustice.org<br>1999 Harrison Street #1800<br>Oakland, California 94612<br>Tel: (650) 762-8990 | PRISON LAW OFFICE<br>MARGOT MENDELSON - # 268583<br>mmendelson@prisonlaw.com<br>TESS BORDEN - MJP # 805022, *pro hac vice*<br>tess@prisonlaw.com<br>PATRICK BOOTH - # 328783<br>patrick@prisonlaw.com<br>ALISON HARDY - # 135966<br>ahardy@prisonlaw.com<br>RANA ANABTAWI - # 267073<br>rana@prisonlaw.com<br>1917 Fifth Street<br>Berkeley, California 94710-1916<br>Tel.: (510) 280-2621<br><br>AMERICAN CIVIL LIBERTIES UNION FOUNDATION<br>KYLE VIRGIEN - # 278747<br>kvirgien@aclu.org<br>FELIPE HERNANDEZ - # 338468<br>npp_fhernandez@aclu.org<br>MARISOL DOMINGUEZ-RUIZ - # 345416<br>mdominguez-ruiz@aclu.org<br>425 California Street, 7th Floor<br>San Francisco, CA 94104<br>Tel.: (415) 343-0770<br><br>CARMEN IGUINA GONZALEZ - # 277369<br>ciguinagonzalez@aclu.org<br>915 15th Street, NW, 7th Floor<br>Washington, DC 20005<br>Tel.: (202) 393-4930 |

*Attorneys for Plaintiffs Fernando Gomez Ruiz, Fernando Viera Reyes, Jose Ruiz Canizales, Yuri Alexander Roque Campos, Sokhean Keo, Gustavo Guevara Alarcon, Alejandro Mendiola Escutia and all others similarly situated*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FERNANDO GOMEZ RUIZ; FERNANDO VIERA REYES; JOSE RUIZ CANIZALES; YURI ALEXANDER ROQUE CAMPOS; SOKHEAN KEO; GUSTAVO GUEVARA ALARCON; and ALEJANDRO MENDIOLA ESCUTIA, on behalf of themselves and all others similarly situated,<br><br>                    Plaintiffs,<br><br>         v. | Case No. 3:25-cv-09757-MMC<br><br>**DECLARATION OF ALEJANDRO MENDIOLA ESCUTIA IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br>Date:         January 9, 2026<br>Time:        9:00 a.m.<br>Dept.:       Ctrm 7 – 19th Floor<br>Judge:      Hon. Maxine M. Chesney<br><br>Date Filed:  November 12, 2025 |

| | |
|---|---|
| 1 | U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; TODD M. LYONS, Acting Director, U.S. Immigration and Customs Enforcement; SERGIO ALBARRAN, Acting Director of San Francisco Field Office, Enforcement and Removal Operations, U.S. Immigration and Customs Enforcement; U.S. DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, Secretary, U.S. Department of Homeland Security, |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | Defendants. |

**Declaration of Alejandro Mendiola Escutia, 043653382**

1. I was born in Mexico. When I was eight years old, my family lost everything in an earthquake. They decided to move to the United States and build a life here. My parents became U.S. citizens, and I have legal-permanent-resident status via them. I have a U.S. Citizen son, and a U.S. Citizen granddaughter.

2. I spent 28 years in California state prison. I was granted parole from CTF Soledad in 2024.

3. It was hard work earning my parole. I addressed all of the factors that contributed to my offense. I worked very hard to identify the root causes that resulted in my offense, and to address all of them. I took two years of therapy, two years of gang-intervention training with a psychologist, and criminal-thinking classes. I took acknowledgment training, to explore where my issues had started and identify why I acted like I did. I took anger-management training, alcoholics anonymous, and narcotics anonymous. I took victims' impact classes to learn the long-term and ripple-effect impacts of my wrongdoings, and suicide prevention classes because it also addresses ripple effects of my wrongdoing. I addressed the family that was impacted by my offense by sending them letters. As part of this work on myself, I took a dog-training program, which helped connect me with my humanity and emotions. I gathered support letters from the warden of my facility and various other officials.

4. Another part of my preparation for parole was to make sure I had work lined up for when I was released. I took a small-business class at Soledad state prison. As a part of that class, sponsors came in and incarcerated people like me pitched business ideas to them. The sponsors liked my idea and mentored me in building my ideas for my non-profit, and they committed to supporting me in building my non-profit once I received parole.

5. I plan to start my own non-profit called Paws for Teens. I know that my work training dogs was incredibly important for me personally, and I want to offer that to teens who are going through difficult times.

6. For example, I'm going through a very difficult time right now as I'm detained at California City, and whenever I feel depressed, I pull out a picture of Bentley, the first dog I ever trained. Looking at that picture helps bring me comfort. I believe that this type of program could help at-risk teens avoid harming their communities and help their own life chances.

7. I was released from California state prison on December 19, 2024. My family had driven to the prison to bring me home. We were very excited to spend Christmas together. But instead of being released to my family, I was detained at the gate of the prison by ICE.

8. ICE held me from December of 2024 through September 4, 2025 at Golden State Annex, and then transferred me to California City.

9. It feels like California City opened before it was ready. I still observe people doing electrical work in the facility, and when it rains, the roofs leak.

10. The water that comes out of the tap smells foul and is a tannish color. I do not drink the tap water here. I have developed white spots on my skin and swollen spots on the back of my head. I think these may be from taking showers in the water here.

11. The facility is short-staffed, and staff are working double shifts. As a result, they are in bad moods and often lash out at us. For example, once a nurse who was working a double-shift yelled at me and kicked a cart in the exam room. I had to jump back to avoid the cart falling on me. The guard who was in the exam room told me that the nurse had been working long hours and was exhausted, and not to blame her for this outburst. Nursing staff are supposed to come to our unit before we are locked in for the evening to pass out medication, but they often do not arrive for this pill call until after midnight, when they wake the unit up.

12. When I was in California state prison, I had contact visits with my sister and son. I was able to take photos with my son, which I keep with me. I have not had any contact visits with my granddaughter yet because I do not want her to see me in a detention facility. She is very innocent, and this is a very difficult environment for someone so young to have to see. I talk with her on the phone.

13. Here at California City, they do not give us contact visits. My sister came to visit me, and a friend drove to visit me from Berkeley, California. Both times, we had a non-contact visit. We were separated by a pane of glass, and we had to speak with each other on a phone. I know that both of my visitors had to wait for hours in the lobby to see me, and we were limited to a one-hour visit. When my friend from Berkeley told me he was going to visit me, I told him that I would be so excited to see him, but that it would be selfish of me to make him travel here and wait in the lobby, just for a one-hour non-contact visit, and that he should not bother coming. He came anyway, and I am so grateful that he went through all of the trouble to see me.

14. I have a lawyer for my immigration case. I hired him around the end of March of this year. Facility staff tell me that there is a system for lawyers to schedule time slots for virtual visits, and that these time slots are readily available. But I understand that when lawyers request these time slots, they do not receive an appointment for many days, or even weeks. The only way for most people to communicate with their lawyers is to wait for a call to be scheduled, or to call from a line in the dayroom.

15. People cannot talk confidentially in the dayroom because there are others around, and many people's calls to their lawyers are on monitored lines. People are so desperate to talk to lawyers that they are making calls from the dayroom despite these confidentiality issues.

16. Today, three people in my dorm were taken to be removed. They thought they had active appeals at the Board of Immigration Appeals. They had actually lost their appeals, but staff at the facility had not informed them. As a result, they were unable

to appeal to the Ninth Circuit or to seek a stay, and they were removed. Others in my dorm became very nervous, and they used the dayroom phones to call their lawyers to make sure they were not in this situation.

17. I have talked very minimally with my lawyer about the issues I am having at California City getting appropriate medical care and with the conditions. I would like his help addressing these conditions and helping to make things better at this facility, but we do not have enough time to cover them in our limited meetings.

18. California state prisons have a grievance process. In the units where I was housed, there were grievance forms and a grievance box. If we experienced any issues with our medical treatment or with custody staff, we could fill out forms to submit grievances and place them in the grievance box. Each prison has a staff member who is assigned to be the grievance coordinator, and they would ensure we received responses within a reasonable timeframe, which was seven calendar days in the California state prison system. In that system, we would receive a tracking number and multiple copies of the grievance. Grievances can be very important. For example, if people are not receiving adequate medication, or if they do not have access to religious articles, they can submit a grievance to obtain these things.

19. I have also submitted grievances at California City, but they are not adequately addressed. Here, the grievance box is outside of our unit, so we need to hand the grievance form to staff to put it in the box. I worry about handing grievance forms to staff because I worry that will open me up to retaliation. For example, once I submitted a grievance form, and after the staff member left the unit, I observed him open the grievance and read it, and then show it to another staff member and say "what are they crying about?" The facility has not identified a grievance coordinator, and we do not receive copies of our grievances or tracking numbers. The facility is supposed to respond to grievances within five days, but many go without a response, or are not responded to for far longer.

20. Here at California City, we are locked in our cells for significant amounts of the day. We are locked in for the night between 10:00 pm and 5:00 am. During the remainder of the day, we are frequently locked in our cells while the facility performs counts. There are four counts each day during waking hours, at 7:00 am, 11:00 am, 3:00 pm, and 7:00 pm. We are locked in our cells during these counts. They regularly last between 1 and 2 hours, and sometimes last longer. For example, yesterday we were locked in our cells at 11:00 am for a count, which did not clear until 2:30 pm. We were then let out of our cells, but the next count started just half an hour later at 3:00 pm.

21. The count process at California City takes much longer than it took in California state prison. In state prison, count was conducted for each unit separately. Count normally took around 15 minutes to complete, and in rare instances it lasted up to 20 or 30 minutes. Once count for a unit was complete, we were able to leave our cells. At California City, if staff reach the wrong number for count in one unit, other units need

     to remain locked in while staff resolve this count issue. This is why we remain locked in for so much time.

22. Being locked in our cells for such a large part of each day is difficult for us. It causes stress, depression, low self-esteem, loss of sleep, and many other issues. There have been several suicide attempts in the short time this facility has been open, and I believe that the isolation we face has contributed to those suicide attempts.

23. I have also experienced significant problems getting appropriate medical care at California City. When I arrived, among my property was medication that I had been permitted to keep on my person at my former detention facility Golden State Annex, knee braces, a back brace, and specialty shoes. Staff confiscated all of this property when I arrived at the facility. I immediately requested my medication, braces, and specialty shoes from the medical department, but it took about a month and a half for me to receive my medication and braces.

I, Alejandro Mendiola Escutia, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this declaration is executed at California City, California this _11-3-25_ day of November 2025.

*[signature]*