| | |
|---|---|
| KEKER, VAN NEST & PETERS LLP<br>STEVEN P. RAGLAND - # 221076<br>sragland@keker.com<br>CODY S. HARRIS - # 255302<br>charris@keker.com<br>CARLOS C. MARTINEZ - # 354616<br>cmartinez@keker.com<br>633 Battery Street<br>San Francisco, CA 94111-1809<br>Telephone:     415 391 5400<br>Facsimile:     415 397 7188<br><br>CALIFORNIA COLLABORATIVE FOR IMMIGRANT JUSTICE<br>PRIYA ARVIND PATEL - # 295602<br>priya@ccijustice.org<br>MARIEL VILLARREAL - # 317048<br>mariel@ccijustice.org<br>1999 Harrison Street #1800<br>Oakland, California 94612<br>Tel: (650) 762-8990 | PRISON LAW OFFICE<br>MARGOT MENDELSON - # 268583<br>mmendelson@prisonlaw.com<br>TESS BORDEN - MJP # 805022, *pro hac vice*<br>tess@prisonlaw.com<br>PATRICK BOOTH - # 328783<br>patrick@prisonlaw.com<br>ALISON HARDY - # 135966<br>ahardy@prisonlaw.com<br>RANA ANABTAWI - # 267073<br>rana@prisonlaw.com<br>1917 Fifth Street<br>Berkeley, California 94710-1916<br>Tel.: (510) 280-2621<br><br>AMERICAN CIVIL LIBERTIES UNION FOUNDATION<br>KYLE VIRGIEN - # 278747<br>kvirgien@aclu.org<br>FELIPE HERNANDEZ - # 338468<br>npp_fhernandez@aclu.org<br>MARISOL DOMINGUEZ-RUIZ - # 345416<br>mdominguez-ruiz@aclu.org<br>425 California Street, 7th Floor<br>San Francisco, CA 94104<br>Tel.: (415) 343-0770<br><br>CARMEN IGUINA GONZALEZ - # 277369<br>ciguinagonzalez@aclu.org<br>915 15th Street, NW, 7th Floor<br>Washington, DC 20005<br>Tel.: (202) 393-4930 |

*Attorneys for Plaintiffs Fernando Gomez Ruiz, Fernando Viera Reyes, Jose Ruiz Canizales, Yuri Alexander Roque Campos, Sokhean Keo, Gustavo Guevara Alarcon, Alejandro Mendiola Escutia and all others similarly situated*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FERNANDO GOMEZ RUIZ; FERNANDO VIERA REYES; JOSE RUIZ CANIZALES; YURI ALEXANDER ROQUE CAMPOS; SOKHEAN KEO; GUSTAVO GUEVARA ALARCON; and ALEJANDRO MENDIOLA ESCUTIA, on behalf of themselves and all others similarly situated,<br><br>  Plaintiffs,<br><br>  v. | Case No. 3:25-cv-09757-MMC<br><br>**DECLARATION OF JONATHAN JAIR MONTES-DIAZ IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br>Date:       January 9, 2026<br>Time:       9:00 a.m.<br>Dept.:      Ctrm 7 – 19th Floor<br>Judge:      Hon. Maxine M. Chesney<br><br>Date Filed: November 12, 2025 |

| | |
|---|---|
| 1 | U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; TODD M. LYONS, |
| 2 | Acting Director, U.S. Immigration and Customs Enforcement; SERGIO |
| 3 | ALBARRAN, Acting Director of San Francisco Field Office, Enforcement and |
| 4 | Removal Operations, U.S. Immigration and Customs Enforcement; U.S. DEPARTMENT |
| 5 | OF HOMELAND SECURITY; KRISTI NOEM, Secretary, U.S. Department of |
| 6 | Homeland Security, |
| 7 | Defendants. |

**Declaration of Jonathan Jair Montes-Diaz, 205764326**

1. I, Jonathan Jair Montes-Diaz, am currently detained at the California City Detention Facility.

2. I am 33 years old.

3. I am currently housed in a cell with one person in Unit G-300.

4. I have been detained since around May 2023. I arrived at the California City Detention Facility on September 5, 2025, from Mesa Verde Detention Facility in Bakersfield, California.

5. I served six years in the California Department of Corrections and Rehabilitation (CDCR). I was first incarcerated at age 24. I paroled from the California City Correctional Facility (CAC) in 2023—this same facility as I am currently detained in—when the facility was being run as a state prison. I served approximately two years at CAC before my release from CDCR custody. I was taken into ICE custody immediately upon the conclusion of my prison term and sent to Golden State Annex for around 18 months, then Mesa Verde Detention Facility for approximately six months, before transferring back to this facility now that it is being run as an immigration detention center.

6. In my experience, the conditions at California City Detention Facility are much more punitive and restrictive than any other state prison or detention center I have been housed in, including when this same facility was a state prison.

7. For example, when I was in California City as a state prisoner, I was able to have a job as a kitchen worker. Now, I have a job as a chemical porter but can only work inside my housing unit. I am paid approximately half of what I was paid as a kitchen worker when I was a state prisoner here, for the same amount of work.

8. When I was in California City as a state prisoner, I was allowed to walk the grounds of the prison to get to work and class unrestrained and without an escort. Now, anytime I go anywhere outside my housing unit, one or two officers are required to escort me. Every time I leave my housing unit, I have to submit to a pat down search, and another pat down search again when I come back to my housing unit. In addition, I sometimes have to go through a metal detector too, including every time I go to yard.

9. When I was in California City as a state prisoner, I took college courses. Now, there are no college courses or in-person educational programs available.

10. When I was California City as a state prisoner, there were two daytime counts when we had to be in our cells with the doors locked. The counts took approximately one hour. At the California City Detention Facility, there are five daytime counts. The amount of time that count takes varies, but sometimes it can take up to two hours. When I am locked in my cell during the counts, I am not allowed to use the tablet.

11. When I was in California City as a state prisoner, I was allowed to have and keep my own razors, nail clippers, and hair clippers, as well as metal tweezers. At the California City Detention Facility, I am not allowed to have and keep these items. I can check them out for thirty minutes, but not every day. If I miss the scheduled time then I cannot use these items, which makes it hard for me to keep up with my personal hygiene and can be uncomfortable.

12. As a result of the lack of programming, I spend nearly all of my time in my housing unit, which has negatively impacted my mental health and increased my feelings of anxiety, depression, and stress.

13. When I arrived at California City Detention Facility, there were about 40 people in my unit. There are now approximately 80 people.

14. There were about 20 to 30 people on the bus from Mesa Verde to California City with me. During the bus ride, I was restrained with handcuffs, waist chains, and ankle restraints.

15. When we arrived to California City on or around September 5, my group was brought to a place staff called Unit F to await processing. The processing took four days to complete. Everyone I arrived with had to sleep overnight in Unit F. I was not seen by medical for an intake assessment until a few days after my arrival. Medical staff checked my vital signs and did a very short assessment, and asked if I was in pain. I do not remember being asked about my mental health during this intake assessment.

16. I fractured my right hand earlier this year while detained at Golden State Annex in McFarland, California. To accommodate and prevent further injury to my hand, I was assigned to a bottom bunk while I was housed at previous detention facilities.

17. I was not asked about my need for accommodations at intake, or any time after that. I told the nurse doing the intake assessment that my right hand is fractured, and that I had had a bottom bunk chrono at Mesa Verde. I told staff about my need for a bottom bunk because I felt it was important for them to know despite not being asked about it.

18. At Mesa Verde, I had been issued a bottom bunk chrono shortly after arriving, and I was given a paper copy of the chrono. The chrono said it was valid for a year. I received it in the spring of 2025.

19. For about two weeks at California City, I was housed with someone who also needed to be on the bottom bunk. I let my cellmate have the bottom bunk because he had more serious medical conditions than me.

20. As a result of being forced to sleep on the top bunk, I had difficulties getting safely off the bunk because it was painful to use my right hand to climb down. One morning, I jumped down from the bunk to avoid having to use my right hand and twisted my ankle.

21. During my initial health assessment, I also informed medical staff that I had other documented medical conditions at Golden State Annex and Mesa Verde, but medical staff at California City told me that they did not have access to medical information from these other detention facilities.

22. I previously underwent a nasal reconstruction in 2010 for which I require the regular use of a nasal spray in order to breathe properly. I told medical staff that I had nasal reconstruction surgery and need to be prescribed nasal spray to help me breathe properly. I had been prescribed this nasal spray at Mesa Verde and, before that, Golden State Annex.

23. I brought my nasal spray with me when I transferred from Mesa Verde, but it was taken from me when I arrived to California City. I had also been prescribed a muscle rub for back pain at Mesa Verde and California City also took that away when I arrived. During a follow-up medical appointment with a doctor, medical staff told me they would order an inhaler for me, but I explained that I do not need an inhaler. I again told medical staff that I need nasal spray, and medical staff said that my file did not say anything about me having allergies. I tried to explain once more that I do not need the nasal spray for allergies but rather as a result of my surgery. I had been prescribed the nasal spray to help with my congestion, difficulties breathing, and the headaches I had been experiencing. The doctor told me she would order the nasal spray, but I still have not received it, approximately two weeks later. I am currently experiencing headaches without the spray.

24. When I arrived to Unit G-300 following the intake process, the toilet in my assigned cell was broken. My cellmate and I were unable to flush the toilet for four days until it was repaired. While our toilet was broken, my cellmate and I had to urinate in the broken toilet and cover it with a towel to prevent the cell from smelling like urine until we would fill up the mop bucket in our unit with water and manually flush the toilet using the bucket.

25. I told the staff in my unit that our toilet was broken and they said they would put in a maintenance order. I also put in a maintenance request myself.

26. Because of the clogged toilet, when I needed to pass a bowel movement, I had to ask other people in my unit if I could use the toilet in their cells. I felt very embarrassed having to ask other people if I could use their toilet.

27. Because the toilet in my cell was broken and we are locked down overnight, my cellmate and I did not have access to a working toilet between the hours of 10 pm and 5 am. Because not a lot of people in our unit wake up early, I had to wait until someone was awake and willing to let me use their toilet to relieve myself in the mornings. I was also concerned about asking other people to use their toilet because staff did not like me going into other people's cells when we first arrived. I heard staff telling other people in the unit that they would get disciplinary write-ups if they went in other people's cells. I had to repeatedly explain to staff that the toilet in my cell was broken further adding to the shame and embarrassment.

28. In my time at California City, I have witnessed our unit manager push an older detained person in my unit, have had staff use expletives while yelling at me, and been threatened with administrative segregation for requesting to speak to a lieutenant about the way staff treat us. Since then, I have received a disciplinary write-up about this incident that I believe is retaliation for speaking up about how staff treated detained people.

29. Because of staff's ongoing mistreatment of people in our unit, I decided to file a grievance regarding staff misconduct. I helped the older man who was pushed by our unit manager file a grievance as well. I do not know if or when I will receive a response to my grievance.

30. In my experience, when I was in CDCR, custody staff treated me more respectfully than the staff at this detention facility.

31. When we first arrived at California City, it appeared that staff were not ready to house people in the facility. For example, when we first started going out to the yard, we were only allowed to use a small outdoor space that did not have any exercise equipment or a track to walk on or a bathroom. I and others in my unit raised concerns about the outdoor recreation space, and staff eventually allowed us to use the small outdoor yard that has exercise equipment and the larger yard that has a track.

32. Commissary prices at California City are much higher than at Golden State Annex or Mesa Verde. For example, a Folgers 8 oz. jar of instant coffee costs $16.91 plus tax at California City. At Mesa Verde, a Folgers jar of instant coffee that size cost

approximately $7 or $8. Almost every item I have looked at in commissary has either cost more or, if the price was the same, been smaller than the products available for purchase at Golden State Annex and Mesa Verde.

33. My telephone funds did not transfer with me when I arrived to California City. I believe I had approximately $20 left on my telephone account when I left Mesa Verde. I have not received a refund.

I, Jonathan Jair Montes-Diaz, declare under penalty of perjury that the foregoing is true and correct and that this declaration was completed and signed on __October 8__, 2025 in California City, California.

*[signature]*

Jonathan Jair Montes-Diaz, A# 205764326