| | |
|---|---|
| KEKER, VAN NEST & PETERS LLP<br>STEVEN P. RAGLAND - # 221076<br>sragland@keker.com<br>CODY S. HARRIS - # 255302<br>charris@keker.com<br>CARLOS C. MARTINEZ - # 354616<br>cmartinez@keker.com<br>633 Battery Street<br>San Francisco, CA 94111-1809<br>Telephone:     415 391 5400<br>Facsimile:      415 397 7188<br><br>CALIFORNIA COLLABORATIVE FOR IMMIGRANT JUSTICE<br>PRIYA ARVIND PATEL - # 295602<br>priya@ccijustice.org<br>MARIEL VILLARREAL - # 317048<br>mariel@ccijustice.org<br>1999 Harrison Street #1800<br>Oakland, California 94612<br>Tel: (650) 762-8990 | PRISON LAW OFFICE<br>MARGOT MENDELSON - # 268583<br>mmendelson@prisonlaw.com<br>TESS BORDEN - MJP # 805022, *pro hac vice*<br>tess@prisonlaw.com<br>PATRICK BOOTH - # 328783<br>patrick@prisonlaw.com<br>ALISON HARDY - # 135966<br>ahardy@prisonlaw.com<br>RANA ANABTAWI - # 267073<br>rana@prisonlaw.com<br>1917 Fifth Street<br>Berkeley, California 94710-1916<br>Tel.: (510) 280-2621<br><br>AMERICAN CIVIL LIBERTIES UNION FOUNDATION<br>KYLE VIRGIEN - # 278747<br>kvirgien@aclu.org<br>FELIPE HERNANDEZ - # 338468<br>npp_fhernandez@aclu.org<br>MARISOL DOMINGUEZ-RUIZ - # 345416<br>mdominguez-ruiz@aclu.org<br>425 California Street, 7th Floor<br>San Francisco, CA 94104<br>Tel.: (415) 343-0770<br><br>CARMEN IGUINA GONZALEZ - # 277369<br>ciguinagonzalez@aclu.org<br>915 15th Street, NW, 7th Floor<br>Washington, DC 20005<br>Tel.: (202) 393-4930 |

*Attorneys for Plaintiffs Fernando Gomez Ruiz, Fernando Viera Reyes, Jose Ruiz Canizales, Yuri Alexander Roque Campos, Sokhean Keo, Gustavo Guevara Alarcon, Alejandro Mendiola Escutia and all others similarly situated*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FERNANDO GOMEZ RUIZ; FERNANDO VIERA REYES; JOSE RUIZ CANIZALES; YURI ALEXANDER ROQUE CAMPOS; SOKHEAN KEO; GUSTAVO GUEVARA ALARCON; and ALEJANDRO MENDIOLA ESCUTIA, on behalf of themselves and all others similarly situated,<br><br>                    Plaintiffs,<br><br>        v. | Case No. 3:25-cv-09757-MMC<br><br>**DECLARATION OF HANNAH KAZIM IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:       January 9, 2026<br>Time:      9:00 a.m.<br>Dept.:      Ctrm 7 – 19th Floor<br>Judge:     Hon. Maxine M. Chesney<br><br>Date Filed:  November 12, 2025 |

1  U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; TODD M. LYONS,
2  Acting Director, U.S. Immigration and Customs Enforcement; SERGIO
3  ALBARRAN, Acting Director of San Francisco Field Office, Enforcement and
4  Removal Operations, U.S. Immigration and Customs Enforcement; U.S. DEPARTMENT
5  OF HOMELAND SECURITY; KRISTI NOEM, Secretary, U.S. Department of
6  Homeland Security,

7              Defendants.

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DECLARATION OF HANNAH KAZIM IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

**Declaration of Hannah Kazim**

1. I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently and truthfully to these matters.

2. I am an immigration attorney with the Immigrant Defenders Law Center. I have represented hundreds of individuals in their immigration cases over the course of my nearly 8 years of legal practice.

3. I currently represent Fernando Gomez-Ruiz, a 61-year-old man who is detained at the California City Detention Facility. He has Type 2 Diabetes. I first met my client on October 15, 2025 when he was detained at the Desert View Annex. He signed representation documents during that visit.

4. On October 20, 2025, I received a phone call from my client's daughter informing me that my client believed he was going to be transferred. I tried to locate him using the ICE Detainee Locator System on October 20, 2025 and on October 21, 2025 and on each day yielded 0 results. His family also did not hear from him on those dates and we had no way of knowing where he was located.

5. On October 22, 2025, I received notice that my client had been transferred to the California City Detention Facility.

6. On October 23, 2025, I sent an email to the facility asking to schedule a confidential video call. I didn't receive a response and so sent a follow-up email on October 27, 2025. On October 27, 2025, the facility responded and scheduled an appointment for October 31, 2025. I asked if this was the soonest possible option to schedule our meeting and was told that it was.

7. In my experience as an immigration attorney, having to wait a week to schedule a confidential legal call is excessive because it is longer than I typically have to wait to schedule a call with a detained client. Furthermore, at present, immigration judges are following the Board of Immigration Appeals' opinion in *Matter of Yahure Hurtado*, 29 I&N Dec. 216 (BIA 2025), which misconstrues the plain text of the Immigration and Nationality Act to find respondents such as my client not eligible for bond. If bond is not available, advocates must seek habeas relief in federal court, which can take several weeks. Timing is critical because any delay in accessing our clients leads to delays in their habeas petitions.

8. Until October 31, 2025, I had not spoken to my client since our initial meeting at the Desert View Annex on October 15, 2025. However, he called his family nearly every day through October 28, 2025 since his transfer to California City Detention Facility.

9. On October 23, 2025, I received a text from my client's daughter alerting me to my client's medical distress. I have heard from my client's daughter nearly every day since. My client's daughter shared with me that my client called her on Monday, October 27 and Tuesday, October 28 in extreme medical distress and was barely able to speak. My client told her that he had not received any insulin since arriving at the California City Detention Facility. His family was concerned that he was in diabetic shock and at significant risk of entering a diabetic coma. I understand that as a Type 2 diabetic the standard of care is for my client to receive insulin up to two times a day.

10. My client also has a wound on his leg which he refers to as an "ulcer" which I understand is related to his diabetes. He already had this wound while he was detained at the Desert View Annex. He did not receive medical attention for the wound until October 30, 2025.

11. Beginning on October 23, 2025, I began attempting to contact the facility to address their failure to provide my client with necessary medical care. On October 23, 2025, I called all of the listed numbers for the facility. The facility's main phone line rang but was never answered or sent to voicemail. The San Francisco Field Office's main phone line rang and then disconnected. The Field Office number listed in an automated email from ICE's Office of the Principal Legal Advisor, San Francisco was disconnected. The number to schedule a legal visit rang and was never answered or sent to voicemail. The number to call for information about a detainee went straight to a voicemail that allows for approximately 10 seconds to record a message. I shouted my name and number into the recording system in hopes of it reaching somebody but have not received any call back.

12. On October 27, 2025, I called the number listed for getting in touch with a detainee to leave an urgent message. I called and was transferred to Human Resources, placed on hold, and then hung up on. I called back and was transferred to the medical office. That call rang with no answer and no voicemail option. I called a third time and was told to call the Bakersfield ICE Field Office. Someone at the Bakersfield ICE Field Office told me to send an email to [BKIdetained@ice.dhs.gov](mailto:BKIdetained@ice.dhs.gov), which I did. For a fourth time, I called the number listed for getting in touch with a detainee to leave an urgent message and was transferred to the medical records office. I pleaded with the person who picked up that call to arrange for urgent medical attention for my client. She said that her supervisor, a HSA Miller, was out of the office but to leave my name, client's name and number, and my phone number.

13. On October 28, 2025, I called the number listed for getting in touch with a detainee to leave an urgent message once again. After again pleading for help, I was transferred to the medical office. That call again rang with no answer and no voicemail option. I called back and was told that I would receive a call back from a Lieutenant later that afternoon. I called for a third time and was transferred to medical records again and spoke to the same person I spoke with the previous day. She gave my information again to HSA Miller and said that they would send somebody to check on my client. I called a fourth time because I had not received a call back from the Lieutenant and was transferred to an administrative line. I spoke to an Officer Martinez who took down details about my client's condition, assured me that someone would check on him, and provided their direct extension. Officer Martinez also suggested that I email BKIdetained@ice.dhs.gov. I sent a second email, replying to my email sent the previous day. I have not received a response from either email.

14. On October 29, 2025, I called Officer Martinez's direct extension multiple times, and received no response. I called the number listed for getting in touch with a detainee to leave an urgent message once again. I asked if somebody could confirm whether or not my client had received medical attention. His family had not heard from him since the previous morning and was extremely concerned about his well-being. I was transferred to medical records and a "nurse" was put on the phone who told me "I don't think he's in acute crisis because we do count every day." I persisted and she checked her records and informed me that he was "evaluated by a physician and he is not in any type of crisis." I asked if someone had checked the wound on his leg and she said "I cannot give any medical information over the phone, thank you" and hung up on me.

15. Between October 23, 2025 and October 29, 2025, I spent hours each day advocating for my client's health needs. My client was calling the only number he had, to his family, in acute distress from October 23, 2025 until October 28, 2025. He was in such distress that he was unable to request assistance through any other means besides his family members. There was no person or mechanism available for me, as his attorney, to either request medical attention for my client or to even confirm whether or not he was still alive, let alone receiving medical care.

16. On October 31, 2025, I had an hour-long confidential video call with my client. This was the first confidential meeting I have had with my client, despite representing him for more than two weeks. He was lucid and calm and reported that he has, since October 28, 2025, received some medical care, including insulin. We spent about half of my allotted hour talking about his health rather than about his case.

17. Between October 23 and October 31, 2025, I was unable to speak directly or confidentially with my client. Because there is no way for me to directly call my client, and because he was in physical distress and thus unable to call me directly, I was not able to speak with him at all. Indeed, the only way that I could communicate with my client in any capacity was by scheduling a confidential legal visit, which was not available for over a week after his transfer to the facility.. This lack of communication meant that I was not able to advocate as effectively for my client. I was unable to learn directly from him about his condition. I could not ask him questions about his interactions with medical staff or the availability of forms to request healthcare or file grievances with the facility. I was also unable to consult with him about the options he had available to address the failure of the facility to provide medical care, such as filing complaints with the Department of Homeland Security Office of Civil Rights and Civil Liberties or Office of the Immigration Detention Ombudsman, or filing a habeas petition seeking release in light of the facility's inability to provide medical treatment. As a result, he did not take these steps to seek adequate medical treatment, each of which I believe was likely available to him.

18. In my experience, at this stage of representing an individual on an immigration case, I should be having consistent communication with my client to discuss, among other topics, his options and strategy for bond or habeas. Instead of working on his case, I have spent considerable time and energy trying to make sure that he stays alive.

19. Because I was unable to meet with my client between October 15, 2025 and October 31, 2025, I had been unable to discuss his options for bond or habeas with him before our visit on October 31, 2025. During that visit, we only began to discuss these issues during the second half of our call because we spent the first half discussing his medical conditions. It was only during that visit on October 31, 2025, that I was able to discuss my client's manner of entry and the circumstances of his arrest. Both of these issues bear directly on his habeas request and were imperative for me to have knowledge of before being able to proceed on that relief option.

20. Immigration law is particularly complex and there are many decisions to be made about strategy in any given case that involve the client understanding complex issues and their options. It generally takes more than one conversation to help clients understand the process enough to make an informed decision about how they wish to proceed.

21. At this point, I still have extremely limited information about my client and his case let alone his wishes about how he wishes to proceed. There is almost nothing that I can do for him on his immigration case without more consistent communication.

      I, Hannah Kazim, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this declaration is executed at <u>Los Angeles, CA</u> this <u>6</u> day of November 2025.

_____