| | |
|---|---|
| KEKER, VAN NEST & PETERS LLP<br>STEVEN P. RAGLAND - # 221076<br>sragland@keker.com<br>CODY S. HARRIS - # 255302<br>charris@keker.com<br>CARLOS C. MARTINEZ - # 354616<br>cmartinez@keker.com<br>633 Battery Street<br>San Francisco, CA 94111-1809<br>Telephone:  415 391 5400<br>Facsimile:  415 397 7188<br><br>CALIFORNIA COLLABORATIVE FOR IMMIGRANT JUSTICE<br>PRIYA ARVIND PATEL - # 295602<br>priya@ccijustice.org<br>MARIEL VILLARREAL - # 317048<br>mariel@ccijustice.org<br>1999 Harrison Street #1800<br>Oakland, California 94612<br>Tel: (650) 762-8990 | PRISON LAW OFFICE<br>MARGOT MENDELSON - # 268583<br>mmendelson@prisonlaw.com<br>TESS BORDEN - MJP # 805022, *pro hac vice*<br>tess@prisonlaw.com<br>PATRICK BOOTH - # 328783<br>patrick@prisonlaw.com<br>ALISON HARDY - # 135966<br>ahardy@prisonlaw.com<br>RANA ANABTAWI - # 267073<br>rana@prisonlaw.com<br>1917 Fifth Street<br>Berkeley, California 94710-1916<br>Tel.: (510) 280-2621<br><br>AMERICAN CIVIL LIBERTIES UNION FOUNDATION<br>KYLE VIRGIEN - # 278747<br>kvirgien@aclu.org<br>FELIPE HERNANDEZ - # 338468<br>npp_fhernandez@aclu.org<br>MARISOL DOMINGUEZ-RUIZ - # 345416<br>mdominguez-ruiz@aclu.org<br>425 California Street, 7th Floor<br>San Francisco, CA 94104<br>Tel.: (415) 343-0770<br><br>CARMEN IGUINA GONZALEZ - # 277369<br>ciguinagonzalez@aclu.org<br>915 15th Street, NW, 7th Floor<br>Washington, DC 20005<br>Tel.: (202) 393-4930 |

*Attorneys for Plaintiffs Fernando Gomez Ruiz, Fernando Viera Reyes, Jose Ruiz Canizales, Yuri Alexander Roque Campos, Sokhean Keo, Gustavo Guevara Alarcon, Alejandro Mendiola Escutia and all others similarly situated*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FERNANDO GOMEZ RUIZ; FERNANDO VIERA REYES; JOSE RUIZ CANIZALES; YURI ALEXANDER ROQUE CAMPOS; SOKHEAN KEO; GUSTAVO GUEVARA ALARCON; and ALEJANDRO MENDIOLA ESCUTIA, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v. | Case No. 3:25-cv-09757-MMC<br><br>**DECLARATION OF MASUMA KHAN IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:     January 9, 2026<br>Time:    9:00 a.m.<br>Dept.:    Ctrm 7 – 19th Floor<br>Judge:   Hon. Maxine M. Chesney<br><br>Date Filed: November 12, 2025 |

| | |
|---|---|
| 1 | U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; TODD M. LYONS, |
| 2 | Acting Director, U.S. Immigration and Customs Enforcement; SERGIO |
| 3 | ALBARRAN, Acting Director of San Francisco Field Office, Enforcement and |
| 4 | Removal Operations, U.S. Immigration and Customs Enforcement; U.S. DEPARTMENT |
| 5 | OF HOMELAND SECURITY; KRISTI NOEM, Secretary, U.S. Department of |
| 6 | Homeland Security, |
| 7 | Defendants. |

# DECLARATION OF MASUMA KHAN

# A# 075 661 322

1. My name is Masuma Khan. I am 64 years old. I am currently detained at California City Detention Facility.

2. I was born in Bangladesh and have now been in the United States for over 27 years. It is my only home. I am a resident of Altadena in Los Angeles, where I have been since I came to the United States.

**Immigration History**

3. In August 1997, I came to the United States on a B2 visitor visa. The purpose of my visit was for medical treatment for my daughter, who was nine years old at the time.

4. A few months prior, in May 1997, my daughter had come with her grandparent to visit the United States. While in the United States, she had fallen seriously ill. After seeing various doctors, they determined my daughter was experiencing kidney failure and would need a transplant and peritoneal dialysis imminently. Based on a letter from a pediatric nephrologist at USC Medical Center stating the medical necessity and urgency of the situation, I was granted a B2 visitor visa in July 1997.

5. For the first few months, my daughter had to receive chemotherapy for her condition.

6. Because of the chronic and extensive nature of managing kidney failure and the long waiting list for a transplant, the doctor explained that my daughter's complex medical treatment would continue for a long time. This treatment was not readily available in Bangladesh. As a result, I remained in the United States as her primary caretaker. Her other extended family members could not care for her in the manner she needed, which

1

required constant daily care and regular medical appointments. In addition to practical support, my young daughter was emotionally reliant on me for support as her mother.

7. My daughter ended up receiving treatment at the Children's Hospital in Los Angeles from 1997-2009.

8. Sometime around 1998, I was approached by a man, Mohammed Rafikul "Rafik" Islam, in my neighborhood grocery store who told me he could help me with legalizing my immigration status and get me a green card. He was Bangladeshi like me and spoke to me in my native language of Bengali, and I had heard about him from others in my community, so I believed I could trust him. As my daughter's medical treatment continued, I was eager to legalize or extend my status to be able to remain here lawfully.

9. I signed a contract with Rafik for $10,000 worth of services and paid him $3,000 at the time. He said he could help prepare an asylum application on my behalf and attend the interview with me as an interpreter. While we only spoke in my native language of Bengali, all the paperwork was in English. I did not understand English well at the time. He did not explain or translate what was being written or submitted, he just asked me to sign in some places.

10. In 1999, Rafik notified me I had an asylum interview in Anaheim, which we went to together. At the interview, I believe I had to provide some fingerprints of my index fingers at the check-in, but not a full set of fingerprints. Rafik spoke for most of the interview. As the asylum officer spoke in English, and Rafik did not interpret everything to me, I did not fully know what was happening. When the interviewer asked me some questions, I answered truthfully that I did not know about the false facts Rafik made up about my background and denied that I was Rohingya and from Burma.

2

11. After the interview, Rafik was upset that I had not gone along with his fabricated story about my background, but he told me there was nothing else to do for now.

12. I relied on Rafik for any updates on the application, as he did not provide my address on the application, and instead used his own address to get case notices. Rafik did not inform me of any further developments in my case. I did not know I had a court hearing date scheduled or that I was required to show up. I did not know any decision had been made in my case by a judge. I stopped hearing from him at all, and since my immigration case documents were sent to him, I did not receive anything directly.

13. After I stopped hearing from Rafik, I became preoccupied with caring for my daughter who was undergoing ongoing health issues with her kidney disease that I was trying to support her through. I did not understand the legal system and did not know I would need to do anything else related to the asylum application to preserve my ability to adjust my status later. I was just wrapped up with my daughter's health issues, which were time consuming and emotionally difficult.

14. In 2014, my husband became a United States Citizen. Soon after, in 2015, he petitioned for me. We submitted an I-130 and I-485 to USCIS with the help of a preparer. I also received a work permit at this time.

15. In August 2015, my husband and I went to an interview with USCIS for this petition. At the interview, we were each separately taken to answer questions.

16. At the end of the interview, the officer said there were some issues with my interview portion, and they would send a notice with more information. They did not say the petition was denied or provide any more information at that time.

3

17. In January 2016, I received a notice from USCIS that they were administratively closing my case due to having a removal order by an Immigration Judge.

18. It was only at this time I learned that my prior asylum application was denied and I had been ordered removed.

19. I immediately attempted to address my case upon learning this information. I obtained an Attorney, Garish Sarin, to re-open my immigration removal case.

20. From 2015 to 2016, this Attorney filed a Motion to Reopen, which was denied. My case was then appealed to the BIA. The appeal was denied.

21. From 2016 to 2019, my case was then appealed to the Ninth Circuit Court of Appeals, and was again denied. My attorney told me he could not continue with my case.

22. In 2020, I was arrested and detained by ICE. I was handcuffed and taken to the ICE office in Downtown Los Angeles, where I was fingerprinted and asked some questions about my identity and how long I have been in the United States, which I answered honestly. I was at the ICE building for approximately two hours and then released with an Order of Supervision.

23. While I was detained by ICE in 2020, they gave me a list of attorneys for legal help. Soon after I was released, I found and hired a new attorney from this list, Judy Wood.

24. In 2020, this attorney helped me and my husband file a new I-130 petition with USCIS.

25. This petition is still pending with USCIS and is currently being appealed due to an administrative error made by USCIS. I was told by my daughter that USCIS recently cashed our check for the appeal, so they appear to be processing it.

26. Since 2020, I have regularly checked in with ICE every year, initially every six months. I have never missed a check-in appointment. There have been no issues. I am usually given

4

a notice at the window or by an officer that comes out for my next check-in date. Once or twice, I have also been taken to a room briefly to verify information.

27. During the last five years that I have been on an Order of Supervision, I was able to resume my life. This included being a home maker and continuing to care for and support my daughter, husband, ailing sister-in-law, and other members of our community; practicing my religion and being active at my mosque; and working with my attorney to regularize my immigration status.

**October 2025 Arrest at ICE Check-In**

28. On the morning of October 6, 2025, at around 8:30 AM, I arrived at my regularly scheduled check-in with ICE in Downtown Los Angeles. I expected it to be a routine check-in as had been my experience for years. However, at this check-in, I was arrested.

29. After waiting for about 2 hours, Officer Bond called me in. She took me to a room and locked the gate behind her. She brought up my 1999 deportation order and that I have been in the United States for a long time. She then told me she would need to take me into custody. I was terrified and did not understand why this was happening.

30. I asked to call my attorney and family, which Officer Bond denied. Her tone and demeanor was very assertive and got more aggressive after I asked to make calls. She told me to put my phone down and began asking me a lot of questions about my family such as my parents' names. She then had me sign a lot of paperwork. I initially tried to decline because I did not understand what I was signing and again asked for my attorney. But Officer Bond was being very aggressive, and I was scared, so I eventually signed and gave my fingerprints as asked.

31. I did not understand what I signed at any point. I was not given access to my attorney or an interpreter at any point in this entire process.

32. After she was done with this paperwork in her office, Officer Bond told me I would be taken downstairs where ICE would meet me. At this point, I again asked to make a call, and she allowed me to make short calls to my husband and my Attorney. Officer Bond spoke with Steven, an attorney at Judy Wood's office, and confirmed they were taking me into custody that day.

33. I was then handcuffed and taken to the basement and placed in a room with one other woman. I had to leave my bag behind in her office.

34. The basement room was freezing and extremely uncomfortable. We had no blankets and were just sitting on the cement floor or a small raised cement seat. We were in there for many hours. We received snacks two or three times, and a small burrito for dinner. At one point, one of the Officers got angry that we had not eaten the previous snacks, so he said he was just going to trash it all.

35. Later that day, Officer Bond came to the room I was in and asked for additional signatures and fingerprints. She also gave me a copy of a couple of documents. I was again not given an attorney or interpreter. I did not have access to my phone or any of my belongings. In looking later at one of the papers Officer Bond gave me, it said something like: "Warning to Alien Ordered Removed" and has several sets of numbers on it, including 219(a)(9), 212 and 240. It was signed by Officer Bond.

36. At some point in the night, they provided a small piece of foam to be able to put on the seat and a net blanket. It was still freezing and I was very cold. I cannot sit or lie on the floor due to my back pain, resulting from a hysterectomy in 2010.

6

37. Around 9 PM, we were told ICE was coming to transport us. I asked where we were going but the USCIS officer did not know, they said maybe Victorville or Bakersfield.

38. Sometime after, I was handcuffed at the hands, feet, and waist. I felt a lot of pain in my waist. I was then taken to a van.

**Detention at California City Detention Facility**

39. Around 1:30 AM, we arrived at California City Detention Center. I was extremely nauseous during the entire ride to the detention center. When we first arrived, the driver left the car and took the keys. We were locked inside without any air for what felt like an hour. I heard the other men trying to knock to get someone's attention, but we were in an enclosed van without windows. I heard several of the men struggling to breathe and screaming that they couldn't breathe.

40. Once we were taken inside for processing, I had a brief medical intake where I had to give a urine sample and they asked for some of my identity information. It was the middle of the night and I was not feeling well.

41. I was then placed in a room with four women. It was extremely cold and freezing. We were each given one small blanket and everyone was sitting or lying on the cement floor. I asked for another blanket, but they did not provide anything. There were no pillow or foam pieces to sit on.

42. In this room, I felt symptoms of very high blood pressure and extreme nausea, and was freezing. The officers periodically offered water but I was too afraid to throw up and did not even have water.

43. I did not sleep much through this night. The next morning, they moved me to a cell, at which point they provided me with one uniform. I am currently housed in F-300, #116(L).

44. I have not seen or met with anyone from ICE during my continued detention.

**Medical Conditions**

45. Prior to detention, I had regular medical appointments with approximately six or seven doctors including a primary care physician, dentist, podiatrist, orthopedic doctor, optometrist, ophthalmologist, and a mental health therapist. Since being detained, I have not been able to make and attend subsequent appointments for my ongoing care. I have an open referral to do a CT scan of my brain but have not been able to schedule it since I am detained.

46. I take many daily medications for various underlying health conditions, which include hypertension, asthma, back pain, peripheral arterial disease (PAD), hypothyroidism, pre-diabetes mellitus, general anxiety disorder, and lens implants.

47. During the initial medical intake at the detention facility, I was asked about and told them about my various medical needs and daily medications. However, at this time, they only took a urine sample and did not provide any medications.

48. I did not receive any medications for the first four days of my detention. I notified the guards and made requests on the tablet daily. My daughter also consistently advocated for me with the guards and visitation officers.

49. After four days, I was given a few medications. This included medication for my pre-diabetes, aspirin for pain, and cholesterol medication. I was given a 14-day supply of these, so these will run out around October 24, 2025.

50. I did not receive medication for my high blood pressure until 7 days into my detention. At that time, they gave me a 30-day supply of two of my three medications for high blood pressure, and one of my thyroid medications. I am still missing one of my blood pressure medications.

51. I am experiencing a lot of symptoms due to the conditions of being detained and due to not having access to my daily medications. My health has significantly deteriorated. Specifically, I experienced very high blood pressure for several days. On or around October 12, 2025, my blood pressure got as high as 169/103. This day, I felt extreme symptoms including chest pain, trouble breathing, and shaking. I felt as if I might be having a stroke.

52. As of the date of this declaration, I have requested for and am still missing the following medications: Fluticasone, Montelukast, Systane Balance, Zaditor, Voltaren, and knee pads.

53. I need Montelukast for my asthma. Because I have been without it the entire duration of my detention, I have been wheezing and experiencing shortness of breath. I am also struggling to walk because of swelling in my legs.

54. My vision is also blurry and I am experiencing pain in my eyes because they refuse to provide me with all of my eye drops.

55. I have made a request for mental health services but have not yet received anything.

56. On October 19, 2025 I met with a doctor for the first time. His name was Dr. Hooper. He asked what country I was from and I said Bangladesh. He was very aggressive with me and asked why I do not return to my country and receive my medications there. I was very upset by this. I also asked him about and reiterated my need for the medications I

9

have not yet received. He responded that my family needed to purchase those for me from commissary, and did not confirm whether medical would be providing them to me. On October 21, 2025, they drew some blood, but refused to provide me with the reason for this blood sample.

**General Conditions in California City Detention Facility**

57. When I arrived, there were approximately 19 people in my unit. Today, there are about 55 people.

58. In my unit, I am the only Muslim and the only Bengali.

59. I notified the officers that I was Muslim and can only eat Halal food. Initially, they kept mixing up the meals and provided me with a vegetarian meal. I then filled out some request forms on the tablet, and they have since provided Halal meals. However, the meals are usually insufficient given my various medical conditions. They mostly contain canned and processed foods. I have made requests for some fruits but they have not provided any fresh fruits.

60. The food is often room temperature and we all wait in line to microwave our food if we want to get it warmer.

61. There is no private space for me to regularly pray. The chaplain did visit me and informed me that there is prayer time for Muslims in the facility chapel on Friday mornings. When I attended this weekly prayer, there was not enough space for me and the other Muslims to do our full prayers. There was no Muslim religious leader, and I am not aware of access to one at the facility.

62. We are sometimes allowed to go outside. However, many people do not go outside because the cactus spikes are so painful and it is hard to walk around. Not being able to go outside is impacting my anxiety and mental health.

63. The spaces inside the facility are extremely cold. I am often freezing. I have noticed that the officers and guards are also getting sick. I have seen many of them sneezing, coughing, and showing other symptoms. I overheard that they are short staffed because some employees are out sick. Most people, the other people detained and the staff, do not wear masks. I wear a mask as often as I can. I have also been experiencing some coughing and watery eyes.

64. On October 18, 2025, I saw someone experiencing a medical emergency. They had vomited and their blood pressure was very high. I believe they were taken to medical and kept overnight. Another person in my cell, who is elderly and uses a wheelchair, also fell in the shower and had to be taken to medical. In general, I witness a lot of people around me having medical issues on a daily basis, and I am concerned that they, like me, are not receiving their medications.

65. Despite the freezing temperatures, they have only provided most of us with one blanket.

66. For the first six days I was detained, I wore the same clothes. I only had one uniform and no undershirts or other layers. I made several requests by submitting forms on the tablet. I received a XL uniform on the sixth day, but this was too large for me. About eleven days into my detention, they finally provided me with more clothes.

67. They have not provided any long sleeves or sweaters. They have told us to purchase those through the commissary. I currently wear two shirts under my uniform and use socks on my arms to keep them warmer.

11

68. In recent rain, I saw water leaking in a nearby unit (115) through cracks in the wall. That person was transferred to another cell.

69. I have submitted requests and filled out the internal inquiry form on the tablet multiple times a day every day for various issues.

**Ties to Local Community and United States**

70. The United States is my home. I have my entire family and community here.

71. I have lived in Los Angeles for 27 years.

72. My daughter still suffers from her condition of kidney failure and many related chronic health conditions. In addition, I help care for my sister-in-law in Los Angeles who has breast cancer.

73. Because of how long I have been in Los Angeles, I have a very extensive community. I am involved in my local Masjid and am part of the Bengali Muslim community.

74. I am a pillar of support for my husband, family, and many members of my community.

75. Many of these community members have attempted to visit me while I have been here. However, due to the distance, it is very difficult for my family and community to be able to see me as often as they would like.

76. I have no intention of leaving Los Angeles or the United States. As I have done for many years, I am willing to keep checking in with ICE and appear at any interviews and hearings that I am notified of.

77. If I were to be deported to Bangladesh, I would not be able to support my daughter or be around my family. She would not be able to visit me because of her health condition.

78. I am especially afraid of being deported to Burma, where I have never been and do not know anyone.

12

79. I am praying to be released so I can return to my family, address my ongoing health needs, and continue to pursue my immigration case.

**CERTIFICATE OF INTERPRETATION**

I, <u>SUMOUNI BASU</u>, am competent in <u>BENGALI</u> and <u>ENGLISH</u>, and certify that interpretation of this document was provided to <u>MASUMA KHAN</u> to the best of my abilities on <u>October 19, 2025.</u>

<u>/s/ Sumouni Basu</u>

*Signature of Translator*

<u>SUMOUNI BASU</u>

*Name of Translator*

I, __MASUMA KHAN__, declare under penalty of perjury that the foregoing is true and correct and that this declaration was completed and signed on __Oct 19__, 2025 in California City, California.

_/s/ Khan 10/19/25_