1  KEKER, VAN NEST & PETERS LLP
STEVEN P. RAGLAND - # 221076
2  sragland@keker.com
CODY S. HARRIS - # 255302
3  charris@keker.com
CARLOS C. MARTINEZ - # 354616
4  cmartinez@keker.com
633 Battery Street
5  San Francisco, CA 94111-1809
Telephone:    415 391 5400
6  Facsimile:    415 397 7188

7
CALIFORNIA COLLABORATIVE FOR
8  IMMIGRANT JUSTICE
PRIYA ARVIND PATEL - # 295602
9  priya@ccijustice.org
MARIEL VILLARREAL - # 317048
10  mariel@ccijustice.org
1999 Harrison Street #1800
11  Oakland, California 94612
Tel: (650) 762-8990

PRISON LAW OFFICE
MARGOT MENDELSON - # 268583
mmendelson@prisonlaw.com
TESS BORDEN - MJP # 805022, pro hac vice
tess@prisonlaw.com
PATRICK BOOTH - # 328783
patrick@prisonlaw.com
ALISON HARDY - # 135966
ahardy@prisonlaw.com
RANA ANABTAWI - # 267073
rana@prisonlaw.com
1917 Fifth Street
Berkeley, California 94710-1916
Tel.: (510) 280-2621


AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
KYLE VIRGIEN - # 278747
kvirgien@aclu.org
FELIPE HERNANDEZ - # 338468
npp_fhernandez@aclu.org
MARISOL DOMINGUEZ-RUIZ - # 345416
mdominguez-ruiz@aclu.org
425 California Street, 7th Floor
San Francisco, CA 94104
Tel.: (415) 343-0770

CARMEN IGUINA GONZALEZ - # 277369
ciguinagonzalez@aclu.org
915 15th Street, NW, 7th Floor
Washington, DC 20005
Tel.: (202) 393-4930

*Attorneys for Plaintiffs Fernando Gomez Ruiz, Fernando Viera Reyes, Jose Ruiz Canizales, Yuri Alexander Roque Campos, Sokhean Keo, Gustavo Guevara Alarcon, Alejandro Mendiola Escutia and all others similarly situated*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FERNANDO GOMEZ RUIZ; FERNANDO VIERA REYES; JOSE RUIZ CANIZALES; YURI ALEXANDER ROQUE CAMPOS; SOKHEAN KEO; GUSTAVO GUEVARA ALARCON; and ALEJANDRO MENDIOLA ESCUTIA, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> U.S. IMMIGRATION AND CUSTOMS | Case No. 3:25-cv-09757-MMC <br><br> **SUPPLEMENTAL DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER** <br><br> Date:        To be set by the Court <br> Time:       To be set by the Court <br> Dept.:       Ctrm 7 – 19th Floor <br> Judge:      Hon. Maxine M. Chesney |

SUPPLEMENTAL DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER

1    ENFORCEMENT; TODD M. LYONS,
     Acting Director, U.S. Immigration and          Date Filed:  November 12, 2025
2    Customs Enforcement; SERGIO
     ALBARRAN, Acting Director of San
3    Francisco Field Office, Enforcement and
     Removal Operations, U.S. Immigration and
4    Customs Enforcement; U.S. DEPARTMENT
     OF HOMELAND SECURITY; KRISTI
5    NOEM, Secretary, U.S. Department of
     Homeland Security,
6
              Defendants.
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SUPPLEMENTAL DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS'
MOTION FOR TEMPORARY RESTRAINING ORDER

I, Todd Randall Wilcox, M.D., hereby declare:

## I.    **INTRODUCTION AND BACKGROUND**

1.      I have been retained by Plaintiffs' counsel in this matter to assess the adequacy of health care provided to people who are detained at the U.S. Immigration and Customs Enforcement ("ICE") facility in California City ("California City Detention Facility"). I previously submitted a declaration in support of Plaintiffs' Motion for Preliminary Injunction (ECF No. 22-3). That declaration is attached as **Appendix A**.

2.      Subsequently, I was asked by Plaintiffs' counsel to opine specifically on the adequacy of health care provided to two individuals, Yuri Roque Campos, who has a serious heart condition, and Fernando Viera Reyes, who likely has prostate cancer. Both men are currently detained at California City Detention Facility. While I described issues related to their health care as of early November in various sections of my initial declaration, this declaration focuses specifically on their two cases and developments since November 2025.

3.      I presented my medical background and expert qualifications in my initial declaration. I repeat them below for ease of reference.

4.      I worked as a physician in jails and prisons for 31 years. My opinions in this case are derived from extensive experience in the design, administration and delivery of correctional healthcare as well as the national standards that govern the field. I actively practice correctional healthcare as the Medical Director of the Salt Lake County Jail System and am frequently called upon as a consultant to assist facilities and organizations nationally in improving their delivery of care, including California Department of Corrections and Rehabilitation, Arizona Department of Corrections, Rehabilitation and Re-entry, Mississippi Department of Corrections, Maricopa County Jail (Phoenix, AZ), Santa Clara County Jail (San Jose, CA), Riverside County Jail (Riverside, California), Pima County Department of Institutional Health (Tucson, AZ), Washington County Jail (Hurricane, UT), Utah County Jail (Spanish Fork, UT), Seattle-King County Jail (Seattle, WA), the National Institute of Corrections, and the American Jail Association.

5.      I am licensed to practice medicine in Utah and Arizona. I am board-certified by

SUPPLEMENTAL DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER

exam by the American Board of Urgent Care Medicine. I also hold advanced certifications from the National Commission on Correctional Health Care as a Certified Correctional Health Professional, a Certified Correctional Health Professional Administrator, and a Certified Correctional Health Physician.

6.      I was the President of the American College of Correctional Physicians from 2015-2017, and have served on the Board of Directors for the National Commission on Correctional Health Care's Certified Correctional Health Professional program. In 2019, I was awarded the Armond Start Award from the American College of Correctional Physicians for excellence in correctional healthcare.

7.      My curriculum vitae is attached as **Appendix B**. The cases in which I have been deposed and/or given trial testimony in the last four years are listed in **Appendix C**. My rate of compensation for this case is $450 per hour.

## II.      <u>MATERIALS CONSIDERED</u>

8.      In forming my opinions for my initial declaration, I reviewed medical records that are in Plaintiffs' counsel's possession for 17 people who are or were detained at California City Detention Facility, including Mr. Roque Campos and Mr. Viera Reyes. I understand these records were previously created and maintained by California City Detention Facility. I also reviewed declarations for 13 of the 17 people whose medical records I reviewed. These records and declarations provided me with an understanding of the quality of health care at California City Detention Facility.

9.      In forming my opinions for this declaration, I re-familiarized myself with the materials that formed the basis of my initial declaration. I reviewed updated medical records for Mr. Roque Campos and Mr. Viera Reyes. The medical records that I reviewed for each patient begin at their intake screening at California City Detention Facility and end on December 12, 2025. Some records pre-date their arrival to California City Detention Facility. I also reviewed updated declarations by Mr. Roque Campos and Mr. Viera Reyes.

10.      My goal in reviewing these materials was to determine whether each patient is receiving appropriate health care consistent with community standards and, if not, whether each

patient is at risk of medical harm.

## III.    OPINION AND SUMMARY OF FINDINGS

11.    In my medical opinion, Yuri Roque Campos and Fernando Viera Reyes are receiving grossly inadequate medical care at California City Detention Facility. Both patients have very serious medical conditions that put them at significant risk of death and/or permanent harm. California City Detention Facility is falling dangerously short of the standard of care by failing to treat these patients' conditions with the medical urgency their conditions require. Without immediate medical intervention, either or both of these patients could suffer serious adverse health effects any day. It is imperative that they receive immediate medical interventions to prevent irreversible medical harm, or even risk of death.

12.    In my medical opinion, it is critical that each of these patients be urgently seen by a specialist, that that specialist develop a comprehensive treatment plan, and that California City Detention Facility follow that treatment plan, which may include subsequent specialist visits, to avoid the risk of immediate death or other irreversible medical harm.

## IV.    DETAILED FINDINGS

*Yuri Roque Campos*

13.    Mr. Roque Campos is a 30-year-old man who has been at California City Detention Facility for over three months. California City medical staff know he has been diagnosed with pulmonary hypertension, congestive heart failure, right atrial enlargement, and a right bundle branch block, conditions that are life-threatening and need close monitoring and appropriate management. These conditions are very unusual in such a young man. His complicated heart conditions make him a medically very high risk and an extraordinarily fragile patient. The medical care that he has received at California City Detention Facility has been grossly inadequate and places him at very high risk of sudden cardiac arrest and death.

14.    Mr. Roque Campos arrived at California City Detention Facility on September 5, 2025, and was sent to the emergency room ("ER"). He returned the same day with a directed recommendation by the ER doctor that he be seen by a specialist in right heart failure within 72 hours.

15.     The note that California City Detention Facility received from the ER about Mr. Roque Campos stated:

> Mr. Campos presented to the emergency department with complaints of chest pain. We conducted extensive testing to evaluate the possible causes of his symptoms. Unfortunately. our ability to provide comprehensive care was limited due to the lack of access to records from his recent hospitalization [and] ongoing treatment [a]nd testing performed at another [ICE] facility. . . . it appears that Mr. Campos likely has a condition known as pulmonary hypertension. This is a potentially life-threatening illness that requires close and continuous management, as it can rapidly progress to severe heart failure.
>
> **It is imperative that Mr. Campos follow up within 72 hours with a specialist in right heart failure or pulmonary hypertension. Ideally, this should be with a provider who has previously been involved in his care—either at the Bakersfield facility where he was recently treated, or at Stanford, where he has also received care**. . . .
>
> At this time, it is safe for him to be transported back to the facility, **provided that he receives daily check-ins with health officials and that arrangements are made for close follow-up with appropriate cardiology and/or pulmonology specialists.**

(emphasis added). A true and correct copy of the letter from Mr. Roque Campos's medical records is attached hereto as **Appendix D**.

16.     In my experience, it is unusual for an ER provider to write this kind of letter, separate from standard clinical notes. The creation of the letter in this case suggests to me that the provider was alarmed about Mr. Roque Campos's condition and had concerns about his return to the facility, absent the careful medical follow-up outlined in the letter.

17.     The medical records do not reflect that Mr. Roque Campos received the follow-up care that the ER physician stated was necessary for it to be safe to return him to California City. Upon his return, Mr. Roque Campos was placed in a medical observation unit but, even then, did not receive the medication recommended by the hospital or his already-prescribed aspirin. To the extent he received daily check-ins, those check-ins were therefore not medically appropriate or sufficient. He did not receive the urgent follow-up with a cardiologist or pulmonary specialist. The ER physician said it was "imperative" that this follow-up occur within 72 hours of Mr. Roque Campos's discharge from the hospital, or by September 8, 2025. Not only did that imperative specialty appointment not occur within the required three days, it has not occurred within three months. As of December 12, 2025, Mr. Roque Campos's medical records confirm he

SUPPLEMENTAL DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER

1  had still not seen a specialist in right heart failure or pulmonary hypertension, or other

2  cardiologist of any kind.

3       18.    The day after his return from the hospital, on September 6, 2025, a registered nurse

4  completed Mr. Roque Campos's intake process at California City because it could not be

5  completed upon his arrival due to his immediate transfer to the hospital. At this intake, the nurse

6  recommended that Mr. Roque Campos receive an emergent referral to the primary care provider

7  for an initial appraisal. Before he could see a primary care provider at the facility as the nurse

8  recommended, Mr. Roque Campos's symptoms became so bad that he again went to the outside

9  hospital that day for chest pain. He returned from this second hospital visit on September 6 and

10  was placed in a medical observation room the day he returned, but the record does not reflect that

11  a California City provider saw him until September 9, five days after his arrival to California City

12  and after two emergency room visits.

13       19.    In the weeks after his return from the hospital, Mr. Roque Campos received very

14  little monitoring by California City Detention Facility providers. He had one visit on October 19,

15  2025, where he reported chest discomfort. Rather than treat Mr. Roque Campos's symptoms

16  consistent with his preexisting heart condition diagnoses, the provider treated him, essentially, for

17  an acid stomach: the provider noted suspected gastroesophageal reflux disease (GERD) and

18  Omeprazole, a standard medicine for acid reflux, was prescribed. Omeprazole is not used to treat

19  heart conditions, and its prescription in this case, with this clinical history and presentation, is

20  baffling and falls below the standard of care.

21       20.    The provider acknowledged that Mr. Roque Campos has a right bundle branch

22  block and right atrial enlargement and referred him to a cardiologist on a routine basis, while

23  simultaneously treating him for GERD. The medical records show a "due date" for this

24  cardiology referral is January 16, 2026, "pending financial authorization." As of December 12, I

25  see nothing in the medical records showing that any appointment has been scheduled with a

26  cardiac specialist or that any threshold "financial authorization" has been approved. The meaning

27  of that authorization is unclear to me. Regardless, this referral should have been initiated on an

28  urgent basis at the time of Mr. Roque Campos's arrival to the facility on September 5, 2025. Mr.

5

SUPPLEMENTAL DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS'
MOTION FOR TEMPORARY RESTRAINING ORDER

Roque Campos should already have been seen. In my professional opinion, even if the cardiology appointment would actually occur by January 16, 2026, Mr. Roque Campos should not wait that long. He should have been seen soon after his arrival to California City and now, three months later, must be seen immediately.

21.    The foundational assessment tool for evaluating pulmonary hypertension and right sided heart failure is a trans-esophageal echocardiogram, which provides objective measurements of heart chamber size, wall thickness, blood flow velocities, abnormal blood flow patterns (as in the stated congenital defect that Mr. Roque Campos has reported), and ultimately the ejection fraction of the heart (the percentage of blood pumped out with each ventricular heart beat). Dr. Hooper, the primary care provider at California City, acknowledges in his consult that this critical test has never been performed. Most of the management decisions about a patient like this are based on data from the trans-esophageal echocardiogram. This test would typically be done in conjunction with a cardiology visit and would be interpreted by the cardiologist as a critical set of data necessary to develop a treatment plan. In this case, the delay in cardiology consultation seems almost purposeful because once this data is obtained it objectively justifies the necessary medical care. For instance, if the patient has a sustained ejection fraction less than 35 percent, then an implantable defibrillator is a required treatment. If the system delays or blocks the acquisition of this data by delaying the cardiology consult or by failing to order the test themselves, then they can reasonably claim that they did not know that the patient needed more advanced care.

22.    The management of pulmonary hypertension and right heart failure is extremely complicated and should be overseen by a cardiologist on a regular basis. The day-to-day management of these heart conditions involves multiple medications, some of which can only be obtained through a cardiology office because of their unique attributes and limited availability. These interventions require extensive assessment and direction from a cardiologist. The current medication profile for Mr. Roque Campos does not match the typical medication profile of a pulmonary hypertension patient with right sided heart failure. In addition, the labs required to monitor patients with this diagnosis are not being completed. One of the most effective ways to

SUPPLEMENTAL DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS'
MOTION FOR TEMPORARY RESTRAINING ORDER

track patients like this in an ambulatory setting is to obtain serial weights because heart failure frequently causes fluid overload that can be detected easily by tracking weight over time. I can find only one weight ever taken in his chart at California City.

23.     The ER physician was absolutely correct in his letter to California City stating that it was imperative Mr. Roque Campos see a cardiac specialist within 72 hours. Ignoring that informed opinion and directed referral is a willful dereliction of a physician's basic duties. The failure to do the appropriate workup puts Mr. Roque Campos at heightened and significant risk for sudden cardiac death.

24.     Medical staff at California City Detention Facility are also failing to provide Mr. Roque Campos with necessary medication to manage his heart condition, which is likely causing a deterioration in his health and increasing his risk of a cardiac event or death. The regimen he is currently prescribed is likely substantially inadequate to meet his medical needs. And even the medications he is prescribed are provided inconsistently, with inexplicable and unacceptable lapses. When Mr. Roque Campos arrived at California City Detention Facility, he was receiving aspirin and Tylenol, both prescribed for heart disease as blood thinners. His medication administration records indicate that he did not receive aspirin for the first five days at California City (even when he was held in a medical observation room), and was not given multiple doses from September 10 to September 27, when he had an active prescription. Both the aspirin and the Tylenol were then discontinued in late September 2025 without explanation. The aspirin was not restarted again until October 22, 2025 and the Tylenol was not restarted as of October 31, 2025. Missing a dose of aspirin, when used as a blood thinner in cases like Mr. Roque Campos's, significantly increases his risk of a heart attack, stroke, or even death. In his case, it was missed not just once, but for weeks and then for a whole month.

25.     In sum, Mr. Roque Campos is an extraordinarily fragile patient. Further delay in access to a full assessment by a cardiologist and compliance with a treatment plan directed by a cardiologist places Mr. Roque Campos at heightened and unnecessary risk of sudden death. If Mr. Roque Campos has an ejection fraction of less than 35 percent, then his yearly risk of sudden cardiac death is approximately one in ten without a prophylactic defibrillator.

SUPPLEMENTAL DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER

26.     While the risk of death is an ominous statistic, the risk of ongoing and increasing cardiac damage from untreated pulmonary hypertension and right heart failure is guaranteed. This is a progressive disease and failure to manage blood pressure, rate, pulmonary vascular resistance, and afterload cause ongoing and progressive damage to the heart muscle, the lungs, and the vascular system.

27.     Since I reviewed Mr. Roque Campos's medical records as part of my initial declaration, he has had another medical incident that demonstrates clearly how poorly California City manages even simple medical conditions. Mr. Roque Campos complained of swollen and painful testicles to the point that he was in extreme discomfort. He was sent to the emergency department, where they diagnosed him with epididymitis and treated him with intravenous levofloxacin. He was discharged back to California City with a prescription for levofloxacin orally. Dr. Hooper decided to change his antibiotic to ciprofloxacin, which is an inferior medication that is not recommended for epididymitis. In addition, he prescribed only seven days of ciprofloxacin, which is beneath the standard recommendation of 10 to 14 days of therapy with a recommended antibiotic. Dr. Hooper put in a consult for urology but assigned a "due date" of February 4, 2026 to deal with this acute and painful issue.

*Fernando Viera Reyes*

28.     Fernando Viera Reyes is a 50-year-old man who has a high probability of having prostate cancer. He arrived at California City on August 29, 2025, with medical indications that he needed urgent specialty care for his condition. In the three and a half months that Mr. Viera Reyes has been housed at the facility, medical staff have not taken the necessary steps to diagnose his condition in order to timely treat him, leaving him at risk of progressive, metastatic cancer. Indeed, he has prior medical records that are part of the California City medical records that demonstrate an MRI scan that is highly suspicious for prostate malignancy with sclerosis of the nearby Thoracic 12th vertebra, which is suspicious for metastatic prostate cancer. He was scheduled for a rapid biopsy on March 19, 2025, but that biopsy appears to have never been accomplished.

29.     Mr. Viera Reyes began workup for his progressively increasing prostate-specific

SUPPLEMENTAL DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER

antigen ("PSA") levels at his prior detention facility. PSA is a blood test that measures prostate-specific antigen and could be indicative of various conditions, including prostate cancer. Typically, when a PSA is elevated, steps are taken to rule out simple explanations such as a urinary tract infection or an enlarged prostate, which can be addressed through medication and will typically reduce PSA levels if that is the cause of the elevated levels. However, despite his consistently elevated PSA levels, Mr. Viera Reyes has not received appropriate testing and follow-up care at California City. His levels have continued to increase rapidly and dramatically. The rate by which his PSA is increasing, in combination with the actual PSA level, points to a high likelihood that he has cancer. In a matter of months, Mr. Viera Reyes's PSA value went from 6.3 in January 2025 at his prior facility to 74 on October 1, 2025, a month after his arrival to California City, at a rate vastly above the cutoff for concern.

30.    Once a patient has a PSA level above 10, their risk for cancer increases dramatically, so the standard medical practice is to bypass other workups once the level exceeds 10 and go straight to a prostate biopsy by a urologist for diagnosis. Mr. Viera Reyes's PSA was more than seven times the cutoff level just one month after his arrival at California City. It is essential that Mr. Viera Reyes receives that prostate biopsy in order to understand the nature of his condition and determine a plan of care. The velocity of PSA increase is clinically significant and as a prognostic factor and as a guiding principle for how rapidly the workup needs to be accomplished. In Mr. Viera Reyes's case, his velocity and magnitude are both high, which necessitates a rapid workup with definitive diagnostic steps like a biopsy.

31.    Given his increasing levels and his worrisome imaging tests, Mr. Viera Reyes had already received a recommendation by a urologist in March 2025 that a prostate biopsy be completed on an urgent basis. At the time of his arrival to California City on August 29, 2025, it had not been completed. Since his arrival at California City, he has reported progressively worsening symptoms, including urinary bleeding, urinary retention, nocturia, and extreme pain. As of December 12, 2025, Mr. Viera Reyes has still not seen a urologist and has not had a prostate biopsy completed.

32.    Mr. Viera Reyes arrived to California City with documentation of a pending

9

appointment to a urologist, but that appointment was "discontinued" at the time of his transfer. For more than a month after intake, California City failed to refer him to a urologist. It was not until early October 2025 that a referral to see a urologist was ordered. When the referral was made, it was given a "due" date of January 2026. It is unclear if this order is for a prostate biopsy or an initial consult. Since that time, an additional three referrals for urology have been placed, totaling four pending referrals with varying "due dates" from late December 2025 to February 2026. Some of the urology orders have the referrals flagged as needing further information, so it is unclear if an offsite encounter is even approved. Mr. Viera Reyes's medical records indicate that some of the urology orders are pending "financial authorization." According to Mr. Viera Reyes, as of December 15, 2025, he has not been told by medical staff that any appointments have been scheduled. Regardless, in my opinion, Mr. Viera Reyes cannot wait any longer. He should have been seen by a urologist months ago. He must  see one urgently.

33.    Given Mr. Viera Reyes's symptoms and presentation, including his already-high and rapidly increasing PSA level, this delay is unacceptable. Medical staff at his prior detention facility took initial steps to rule out other potential medical issues, like a urinary tract infection, as the cause of the very high PSA level. Therefore, the next medically necessary step is for Mr. Viera Reyes to receive a biopsy and follow-up urology care. That should have happened as soon as he arrived at California City. If his condition is in fact cancer, this delay may have caused irreversible medical harm. It increases the risk of metastatic cancer and complicates treatment, increasing his risk of death. His condition should be addressed with urgency as it is imperative to determine whether he has prostate cancer.

34.    If Mr. Viera Reyes does have cancer, he needs aggressive treatment quickly to minimize his risk of widespread disease and a much higher mortality rate. Recent hospital records from November 27 through November 28, 2025 raise concerns about a lesion on his spine that may indicate cancer has already metastasized. According to the hospital ER visit notes, the CT scan completed "does show nodular prostate and thickening of the posterior urinary bladder wall with sclerotic T12 vertebral body concerning for possible osseous aggressive lesion and severe hepatic steatosis." The ER physician notes "CT imaging concerning for possible new onset

SUPPLEMENTAL DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS'
MOTION FOR TEMPORARY RESTRAINING ORDER

malignancy." This raises serious concerns that, if cancer, it has already spread.

35.    When prostate cancer is timely detected and treated, the survival rates are exceptionally high. Treatment of localized prostate cancer has a five-year survival rate of greater than 99 percent. Failure to treat in a timely manner such that the prostate cancer spreads to bone or a distant location drops the 5 year survival rate to 30 percent and requires much more invasive treatment techniques.

36.    Mr. Viera Reyes's treatment as it relates to his prostate condition thus far at California City constitutes a complete dereliction of duty by the medical staff. Every day that he fails to receive a biopsy despite his rapidly increasing PSA level increases, this patient's risk for metastatic disease increases.

37.    It is my understanding that Mr. Viera Reyes is reporting worsening symptoms, including extreme fatigue, constant pulsating pain, muscle weakness, shortness of breath, loss of appetite, weight loss, and rectal and urinary bleeding that inhibit his ability to move and to live without serious pain.

38.    Until late November 2025, Mr. Viera Reyes was experiencing increasing symptoms of urinary retention and pain with urination. On November 27, 2025, he was sent out emergently to a hospital for a urinary and gastrointestinal bleed accompanied by urinary retention. Medical staff at the hospital completed imaging and lab work and noted an urgent need for Mr. Viera Reyes to be evaluated by a urologist.

39.    According to Mr. Viera Reyes's medical records, that hospital apparently did not have a urologist on staff at that time, so the hospital contacted California City Detention Facility to request to transfer Mr. Viera Reyes to a hospital in Hanford, California so he could be urgently evaluated by a urologist for a cystoscopy/biopsy. Instead, California City medical staff suggested that Mr. Viera Reyes be sent to a hospital that evaluates patients who are detained in ICE custody. The record does not document why Mr. Viera Reyes was not sent to Hanford but instead was sent to another local hospital where he was not seen by a urologist yet again. Medical staff at that hospital placed a catheter to address Mr. Viera Reyes's urinary blockage, and he was prescribed antibiotics for a urinary infection.

---

11

SUPPLEMENTAL DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS'
MOTION FOR TEMPORARY RESTRAINING ORDER

40.     It is entirely possible that the urinary retention that Mr. Viera Reyes is experiencing is due to growing, advancing prostate cancer.

41.     As described in my prior declaration, California City Detention Facility is also providing Mr. Viera Reyes with substandard care in numerous other ways, including by conducting an inadequate intake screening (Appendix A ¶¶ 25, 28), failing to timely provide medications (*id*. ¶¶ 49-50, 100, 109), failing to appropriately and timely respond to requests for care (*id*. ¶ 72), and failing to timely respond to urgent medical situations (*id*. ¶ 125), among others.

42.     There is no clinical justification for the prolonged delays in access to care that Mr. Viera Reyes has experienced. Based on his clinical history and presentation, Mr. Viera Reyes should be seen immediately for a biopsy in order to determine a plan of care. Based on the results of the biopsy, additional urgent action may be indicated. Further delay is medically reckless and places Mr. Viera Reyes at substantial risk of needless suffering or death. I am deeply concerned that Mr. Viera Reyes has prostate cancer that could have been identified and treated with appropriate intervention, resulting in a potential complete recovery. Instead, because of the facility's failure even to diagnose his condition, it is highly possible that Mr. Viera Reyes has cancer that has metastasized and that is no longer easily or successfully treatable. In short, it is possible that the facility has subjected him to a risk of death that was entirely avoidable.

SUPPLEMENTAL DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS'
MOTION FOR TEMPORARY RESTRAINING ORDER

1

2          I declare under penalty of perjury under the laws of the State of California and the United

3    States of America that the foregoing is true and correct. Executed this 16th day of December,

4    2025, in Salt Lake City, Utah.

5

6    Dated: December 16, 2025

7                                                    By: _____

8                                                            Todd R. Wilcox, M.D.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SUPPLEMENTAL DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS'
MOTION FOR TEMPORARY RESTRAINING ORDER

# Appendix A

1

2

3

4
UNITED STATES DISTRICT COURT<br>NORTHERN DISTRICT OF CALIFORNIA

5

| | |
|---|---|
| 6  FERNANDO GOMEZ RUIZ; FERNANDO VIERA REYES; JOSE RUIZ CANIZALES; YURI ALEXANDER ROQUE CAMPOS; SOKHEAN KEO; GUSTAVO GUEVARA ALARCON; and ALEJANDRO MENDIOLA ESCUTIA, on behalf of themselves and all others similarly situated, | Case No. 3:25-cv-09757-MMC<br><br>**DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date Filed: November 12, 2025<br><br>Trial Date: TBD |

6 FERNANDO GOMEZ RUIZ; FERNANDO
7 VIERA REYES; JOSE RUIZ CANIZALES;
YURI ALEXANDER ROQUE CAMPOS;
8 SOKHEAN KEO; GUSTAVO GUEVARA
ALARCON; and ALEJANDRO MENDIOLA
9 ESCUTIA, on behalf of themselves and all
others similarly situated,

10                    Plaintiffs,

11        v.

12 U.S. IMMIGRATION AND CUSTOMS
ENFORCEMENT; TODD M. LYONS,
13 Acting Director, U.S. Immigration and
Customs Enforcement; SERGIO
14 ALBARRAN, Acting Director of San
Francisco Field Office, Enforcement and
15 Removal Operations, U.S. Immigration and
Customs Enforcement; U.S. DEPARTMENT
16 OF HOMELAND SECURITY; KRISTI
NOEM, Secretary, U.S. Department of
17 Homeland Security,

18                    Defendants.

19

20

21

22

23

24

25

26

27

28

1<br>DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR<br>PRELIMINARY INJUNCTION<br>Case No. 3:25-cv-09757-MMC

**TABLE OF CONTENTS**

I.      BACKGROUND ....................................................................................4

II.     MATERIALS CONSIDERED .................................................................5

III.    OPINION AND SUMMARY OF FINDINGS ........................................5

IV.     DETAILED FINDINGS ..........................................................................8

        A.      The Medical Intake Assessment Process is Dangerously Ineffective.......8

                i.      Structure of an Effective Intake Process...........................................8

                ii.     California City's Intake Process is Inadequate ...............................9

                iii.    Initial Screenings Are Not Confidential, Timely, or Thorough.....10

                iv.     Initial Screenings Fail to Include Consistent and Adequate
                        Screening for Tuberculosis and Fail to Result in Timely Isolation13

                v.      Initial Screenings Fail to Include Adequate Screening for Detained
                        People's Disabilities or Their Need for Disability
                        Accommodations ...........................................................................14

                vi.     Medical Staff Conducting Screenings Fail to Establish Effective
                        Communication.............................................................................17

                vii.    Initial Screenings Fail to Result in Timely and Accurate
                        Continuation of Medications.........................................................18

                viii.   Initial Appraisals by Primary Care Providers Are Not Timely or
                        Thorough and Do Not Result in Appropriate Treatment Plans .....20

        B.      The Sick Call Process for Episodic Care is Broken...............................25

                i.      Sick Call Should Facilitate Patients' Access to Timely Medical
                        Attention ......................................................................................25

                ii.     Patients Who Submit Sick Call Slips Are Not Scheduled for
                        Timely Appointments with Nurses or Providers ...........................26

        C.      Care for People with Chronic Illnesses is Untimely and Often Abysmal28

                i.      People with Chronic Illnesses Require a Structured Treatment
                        Program.......................................................................................28

2

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

3871655

ii.     Chronic Care is Scheduled at Inappropriate Intervals and Providers
Fail to Provide Necessary, Clinically Appropriate Care for Sick
Patients ........................................................................................29

D.     Patients are Deprived of Necessary Medications ....................................35

i.     Patients Must Receive Medications as Prescribed ........................35

ii.     Medications Are Often Delivered Late or Not At All ...................35

E.     Care from Specialty Providers is not Available to Detainees ................42

F.     Medical Staff Fail to Respond Appropriately to Urgent or Emergency
Medical Issues ........................................................................................46

G.     Sick People are Placed in Inappropriate and Inadequate Medical
Housing ..................................................................................................48

H.     Mental Health Care is Grossly Inadequate ..............................................50

I.     Health Care Staffing is Insufficient for the Number of Detainees
Currently Housed at the Facility ............................................................53

V.     CONCLUSION .....................................................................................................54

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

3871655

1    I, Todd Randall Wilcox, M.D., hereby declare:

2    **I.    BACKGROUND**

3    1.    I have worked as a physician in jails and prisons for 31 years. My opinions in this

4    case are derived from extensive experience in the design, administration and delivery of

5    correctional healthcare as well as the national standards that govern the field. I actively practice

6    correctional healthcare as the Medical Director of the Salt Lake County Jail System and am

7    frequently called upon as a consultant to assist facilities and organizations nationally in

8    improving their delivery of care, including California Department of Corrections and

9    Rehabilitation, Arizona Department of Corrections, Rehabilitation and Re-entry, Mississippi

10    Department of Corrections, Maricopa County Jail (Phoenix, AZ), Santa Clara County Jail (San

11    Jose, CA), Riverside County Jail (Riverside, California), Pima County Department of

12    Institutional Health (Tucson, AZ), Washington County Jail (Hurricane, UT), Utah County Jail

13    (Spanish Fork, UT), Seattle-King County Jail (Seattle, WA), the National Institute of

14    Corrections, and the American Jail Association.

15    2.    I am licensed to practice medicine in Utah and Arizona. I am board-certified by

16    exam by the American Board of Urgent Care Medicine. I also hold advanced certifications from

17    the National Commission on Correctional Health Care as a Certified Correctional Health

18    Professional, a Certified Correctional Health Professional Administrator, and a Certified

19    Correctional Health Physician.

20    3.    I was the President of the American College of Correctional Physicians from

21    2015-2017, and have served on the Board of Directors for the National Commission on

22    Correctional Health Care's Certified Correctional Health Professional program. In 2019, I was

23    awarded the Armond Start Award from the American College of Correctional Physicians for

24    excellence in correctional healthcare.

25    4.    My curriculum vitae is attached as **Appendix A**. The cases in which I have been

26    deposed and/or given trial testimony in the last four years are listed in **Appendix B**. My rate of

27    compensation for this case is $450 per hour.

28

5.      I have been asked by Plaintiffs' counsel to render opinions concerning the adequacy of health care provided to people detained at the U.S. Immigration and Customs Enforcement ("ICE") facility in California City.

**II.      MATERIALS CONSIDERED**

6.      In forming my opinions, I reviewed medical records that are in Plaintiffs' counsel's possession for 17 people who are or were detained at California City Detention Facility ("California City"). I understand these records were previously created and maintained by California City.

7.      Thirteen of those 17 individuals made declarations, which were prepared for filing in support of Plaintiffs' Motion for Preliminary Injunction. I also reviewed those declarations.

8.      My goal, when I prepare an expert report, is to review a sample of records for people who have serious medical conditions or injuries, to determine whether the medical systems and processes are functioning as they should. Often, I will select a sample of records to review from lists of chronic care patients, and patients who have been hospitalized or treated in the Emergency Department. I understand that Plaintiffs' counsel reached out to immigration counsel to identify people at California City who may have chronic illnesses, or who were sent offsite for health care. The 17 medical records I reviewed, coupled with the patient declarations, provided me sufficient information to opine about health care delivery at California City. Additional review with a larger sample size seems warranted in this case based on the patterns and systemic deficiencies that are evident in the initial study group.

**III.      OPINION AND SUMMARY OF FINDINGS**

9.      In my medical opinion, it is not safe to be sick at the California City ICE Detention facility. The healthcare delivery system at that facility is not adequate to care for patients who have serious medical and mental health needs. While the sample size in this instance is relatively small, the deficiencies that I found are consistent across many patients and they are typical of system issues found in healthcare systems that are understaffed, under-resourced, and poorly managed. As a result, increasing the population of this facility would put increasing pressure on limited resources and make this facility even more dangerous for patients

with serious medical and mental health needs. As it stands now, California City is not equipped to handle patients with complex medical care needs. Indeed, they even struggle to deliver standard of care for common uncomplicated problems. Below is a summary of the findings that are the basis for my opinion.

10.    The intake assessment process is inadequate to maintain continuity of care and to protect detainees from possible harm.

- Assessments are performed by Licensed Vocational Nurses ("LVNs"), which is a function that exceeds their legal scope of practice.

- Information is recorded but the LVNs / Registered Nurses ("RNs") do not understand the implications of the information to develop a proactive treatment plan for the incoming detainees.

- Tuberculosis ("TB") and infectious disease screening protocols are inadequate to protect the safety of the institution, other detainees, and staff.

- The continuity of medications appears to be haphazard and inconsistent.

- Critical healthcare information from the Transfer Summaries is not incorporated into the facility medical record by the intake assessment nurse.

- Urgent referrals from the intake assessment are not seen within policy and procedure timelines.

- Intake assessment is not done in a timely manner to facilitate continuity of care. The assessment is often many days after the detainee has entered the facility.

- The important function of obtaining medical records from outside providers and previous facilities does not appear to be effective.

11.    Physician orders are often ignored or overlooked:

- Vital signs that are ordered are not entered into the medical record.

- Accuchecks (fingerstick blood glucose checks) are missing, yet somehow the patient receives sliding scale insulin.

- Lab results do not appear to be reviewed or signed off.

6

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

3871655

1       • Orders are marked as complete, but they do not track to results in the chart.

2       12.     The medical evaluation of higher acuity problems does not meet the standard of

3   care:

4       • There is no discussion in the notes about the elements of a workup to suggest

5           that the providers even know what is supposed to be done.

6       • The medical workups of medically significant problems are missing or grossly

7           inadequate.

8       • Follow-up care seems to be absent.

9       • This healthcare delivery system cannot handle sicker patients with the

10          processes and staff that they have in place.

11      13.     The chronic care management appears to be minimalistic and superficial and not

12  effective at managing patients to target:

13      • Patients who are not at target are not seen frequently enough to optimize their

14          treatment.

15      • Chronic care clinical outcomes / labs are not carried out or signed off by

16          providers and the abnormal results do not seem to prompt changes in

17          treatment plan.

18      • The medication management of chronic diseases is very basic and frequently

19          ineffective.

20      14.     The Pharmacy and Medication process at this facility is broken:

21      • There is a continuity of care issue coming through the intake process just to

22          get medications ordered.

23      • Many medications are out of stock.

24      • The medication administration process does not reliably deliver medications

25          as ordered.

26      • There is no way to track medication adherence without a tedious, manual

27          process.

28

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

3871655

- The medication administration record does not conform to standard documentation practices and it is exceptionally difficult to use.

15.     The process to get specialty care is not effective or timely and it puts patients at a clear risk of serious harm:

- The request / scheduling process for many routine consults is stuck in an administrative approval loop.

- In this sample of patients, there were 13 consults requested since late August and not a single consult has been accomplished.

- Clinically urgent referrals for specialty care have not been completed in a reasonable time and the medical records suggest that they are still awaiting corporate approval before the scheduling process even begins.

## IV.     DETAILED FINDINGS

### A.  The Medical Intake Assessment Process is Dangerously Ineffective

*i. Structure of an Effective Intake Process*

16.     Medical intake in a detention setting consists of two components: First, an immediate medical assessment that serves multiple purposes, including determining if there are any issues that would preclude acceptance into the facility and facilitating the immediate medical needs of the patient over the first few days. Because of the comprehensive nature of these assessments and the fact that they are performed on patients who are not established in the system, these are assessments by definition and the minimum required licensure to perform these is a Registered Nurse. The intake assessments are ideally done within a few hours of arrival. Second, after a detainee has dressed into a facility, a more thorough medical and mental health assessment is done to review the intake assessment, review the first few days of stay in the facility, and to address any long-term medical management issues like chronic care needs. This second assessment is typically done within fourteen days of admission and it is usually performed by a primary care provider and a mental health clinician.

17.     The initial intake assessment includes both a face-to-face interview using a structured questionnaire and, whenever possible, a review of the individual's prior medical

8

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

3871655

record. The questionnaire enquires into an individual's current problems and medications; past history, including hospitalizations; mental health history, including current or past suicidal ideation; symptoms of chronic illness; medication and/or food allergies; and dental problems. For female detainees, it is important to obtain a history of current and past pregnancy, as well as the date of last menstrual period.

18.    These intake assessments are necessary to identify those who arrive with urgent medical needs so that their care can be addressed, to ensure that those with known medical and/or mental health conditions receive continued care, to determine if any housing or disability accommodations need to be implemented for the patient, and to prevent the spread of contagious diseases, such as tuberculosis. For continuity of care and to protect the health of those housed and those who work in the facility, it is essential that this take place at the time the person arrives at the facility before they enter the general population setting.

19.    Delaying screening increases the risk that detained people and staff may be exposed to deadly diseases. Tuberculosis, which is transmitted by airborne droplets, is one of the world's deadliest infectious diseases. In congregate facilities like the California City, tuberculosis thrives and can spread quickly. Managing an outbreak of tuberculosis can be extremely difficult and extraordinarily expensive.

*ii. California City's Intake Process is Inadequate*

20.    The CoreCivic Handbook describes a two-part intake assessment process which begins when the person enters the facility: "Each detainee entering the facility will receive an initial medical screening by the clinical staff" and detainees should discuss their health and their medications. According to the Handbook, "Some medications such as heart or diabetic medications will be continued when you arrive." A true and correct copy of the CoreCivic Handbook that I reviewed is attached as **Appendix C**.

21.    After the initial screening, the Handbook describes a "full medical examination" to be conducted within 14 days of arrival, where, again, the detainees should discuss their health and medications and, again, "[s]ome medications" will be continued.

9

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

3871655

22.     According to the Initial Screening template used for these encounters, for people with emergent needs, the RN will immediately consult with or refer to a provider, while a person with urgent needs will be referred to a provider within 24 hours, and someone with routine needs within two to 14 days.

23.     Based on the declarations and the health records that I have reviewed, I have concluded that California City Detention Facility does not perform adequate intake assessments on detainees upon arrival. To the extent that staff do perform intake assessments, they are often not timely, not thorough, and at times, not even in a language understood by the detained person. The process also lacks basic measures to stop the spread of infectious diseases and fails to ensure that vital medications are prescribed and administered. The failure to adequately screen incoming people places everyone at risk of serious harm.

24.     In addition, it is clear from the review of medical records that these intake assessments are sometimes performed by LVNs. This type of assessment on a new patient is outside of the scope of practice for an LVN. LVNs lack the academic preparation and training necessary to perform these assessments, and they typically miss important information because of their lack of training in performing nursing assessments.

### iii. Initial Screenings Are Not Confidential, Timely, or Thorough

25.     Initial screenings at a detention facility should take place when the person arrives, in a private setting to ensure that the person arriving is able to disclose their personal health information confidentially. Interviewing a patient in a private setting is essential to gathering reliable patient histories. Gustavo Guevara Alarcon and Fernando Viera Reyes report their initial intake interviews occurred in a hallway or lobby, in the presence of and within earshot of other people. Guevara Alarcon Decl. ¶ 19, Viera Reyes Decl. ¶ 12. This is a dangerous practice, and may result in an incomplete and/or inaccurate health screening.

26.     The initial screening with a nurse at California City generally does not happen on the day of arrival, and may be one, two, or three days after the detainee's arrival at the facility, or even later. According to the health record of Sudesh Singh, for example, he arrived on September 5, 2025, but did not have his initial screening until September 7, 2025. Daler Singh

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

arrived on September 4, 2025, but did not have his initial intake screening until two days later, on September 6, 2025. Jose Ruiz Canizales and Gustavo Guevara Alarcon arrived at the facility on August 29, 2025, but were not screened by the nurse until the following day. These delays are dangerous for the patient, the staff, and other detainees, and they do not meet the standard of care in correctional health.

27.     In some cases, people endure medication lapses and inhumane living conditions while waiting overnight for their initial screening. Daniel Elias Benavides Zamora, who is an insulin dependent diabetic with low blood pressure, reports arriving at California City around 1 pm on November 5, 2025 and being placed with seven other people in a room without beds or mattresses. Benavides Zamora Decl. ¶¶ 7-9. He, as well as the others, were left there overnight to sleep on the cold, concrete floor. *Id.* ¶ 8. He only received one meal at 6 pm that night, *id.* ¶ 9, and there is no record that he had his blood sugar checked or received insulin as prescribed that first day. Julio Santos Avalos reports similar conditions, specifically being held in intake for two days in a room with a clogged toilet and no access to medication. Santos Avalos Decl. ¶¶ 7, 10.

28.     In the medical records I reviewed, the screening questions are not all answered appropriately and essential follow-up information is not documented. There are multiple questions that presumably should be answered by the patient that were left blank. Fernando Gomez Ruiz, a diabetic with a significant foot ulcer, did not have his blood sugar taken and there is no description of the history, size, or presentation of his foot ulcer on his intake documentation. Fernando Viera Reyes informed the intake LVN that he was pending a prostate biopsy to determine whether he has prostate cancer; the nurse noted "yes" to the question of whether he was pending a specialty consult but failed to document what type of consult or procedure was pending as requested on the form. Viera Reyes Decl. ¶ 11. The failure to document critical healthcare conditions—some which require time-sensitive follow-up—means that the problem could get dropped during the intake process, and appropriate follow-up and continuity of care does not reliably occur. This defeats the entire purpose of an intake assessment.

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

3871655

29.     The screening records also consistently omit critical information. Utkarshkumar Trivedi has multiple chronic conditions, including oral lesions, Benign Prostatic Hyperplasia ("BPH"), and gastroesophageal reflux disease ("GERD"); none are mentioned in his intake form although his intake form lists multiple active medications for these conditions. Alejo Juarez Ruiz told the nurse that he had high blood pressure and diabetes on arrival, and had elevated blood pressure at intake (162/94). The intake nurse should have but failed to document asking the patient about any current symptoms or problems related to his health issues. Julio Santos Avalos has a permanent foot deformity, but his intake makes no reference to his history of polio or Guillain-Barre syndrome and indicates he has no deformity. Alfonso Leyva told the nurse at intake that he had pain in his ear, head, throat, and body, at a level of 8/10. The nurse failed to document any history or details regarding his serious pain and referred him for his health appraisal on a routine basis.

30.     Patients with time-sensitive medical needs, or who present with abnormal vitals, are not timely referred to the provider. Fernando Gomez Ruiz had a blood pressure reading of 180/94 at intake but did not have his blood pressure re-taken, and was not referred to a provider urgently or emergently despite being an insulin dependent diabetic presenting with an ulcer on the sole of his foot. Careful control of blood pressure and blood glucose are important for diabetic patients because it limits the damage done to the kidneys. Esteban Alvarez Mora reports arriving at California City with five abscesses that, after the hours-long bus ride, began to leak pus and blood. He informed the RN at intake, showing her that the bandage on his glute was completely soaked with blood and pus. He was not physically examined, his wounds were not cleaned, and he was not provided with clean bandages; he was informed that he would be seen the next day by the provider. That did not happen. Alvarez Mora Decl. ¶¶ 6-10. The September 5, 2025 notes from the RN intake are sparse and fail to document any of this alarming detail but rather referred him urgently to the Primary Care Provider (PCP) for "bleeding hemorrhoids." The first reference to abscesses in his records is from September 11, 2025 when he was seen by a nurse; the PCP initial appraisal did not happen until September 22, 2025, 17 days after the initial urgent referral. Patients with open wounds are at risk for infection and should be seen timely by a

12

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

3871655

provider to assess their need for antibiotics or wound care. Open wounds also can be sources of infection for other detainees or staff so proper dressings are important to limit the spread of biohazardous fluids.

### iv. Initial Screenings Fail to Include Consistent and Adequate Screening for Tuberculosis and Fail to Result in Timely Isolation

31.     Although the CoreCivic Handbook states that "[a]ll new arrivals shall receive tuberculosis (TB) screening by PPD (Mantoux method) or chest x-ray," Appendix C at 7, that does not happen in practice. Instead, California City asks about symptoms and often relies on patient self-reports or transfer memos from prior detention facilities to determine when they last received a PPD and what those results were. There is an implied rule in the documentation that a negative PPD within a year is acceptable. This is not medically sound logic in a patient population that is at high risk for tuberculosis exposure. The standard practice in correctional facilities is to do a PPD test on all new admissions (unless it is contraindicated) regardless of how long it has been since they had their last one.

32.     Fernando Gomez Ruiz received an intake on October 20 or 21, 2025 (both dates appear on the form), but the RN failed to screen for symptoms or test for TB. The failure to test him and others on arrival at California City is reckless and endangers all people who live and work at California City.

33.     Detainees who are at risk of having Tuberculosis are not isolated timely, if at all. Esteban Alvarez Mora's RN intake documentation from September 5, 2025 does not include responses to the TB intake questionnaire despite a history of latent TB.  He submitted a sick-call slip around September 18, 2025 reporting, among other things, "fever, headache, and shaking, face pain, cough."  Several of these symptoms correlate with symptoms of acute tuberculosis infection. This patient should have been isolated in a negative pressure room while his symptoms were evaluated for possible tuberculosis. He was not. He was seen by the RN on September 21, 2025 for an unrelated matter. He submitted another sick-call on October 14, 2025 reporting "cough and pain in my chest and [lungs]. I was positive for tuberculosis." The RN noted that he reportedly refused that encounter. There is no evidence he was rescheduled to be seen until he

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

submitted another sick-call on October 29, 2025 stating "bleeding by my nose, my ears, wet cough with pain in my [lungs]. . . ." It was noted that he was scheduled for an x-ray for October 31, 2025. He finally had a chest x-ray completed on November 3, 2025 to assess whether he had active TB; in the meantime, records reflect he remained housed in the general population despite his history and reported symptoms. This is dangerous and could have exposed other detainees and staff to TB; Mr. Alvarez Mora should have been placed in isolation while he underwent timely workup.

34.     Similarly, Julio Armenta had a chest x-ray completed on October 8, 2025 that was ordered due to his history of hypertension. The results of that chest x-ray were abnormal, requiring immediate review. However, it appears that the abnormal chest x-ray was not reviewed until October 28, 2025, at which point the patient was placed in respiratory isolation to rule out TB. Given the concern for active TB, keeping Mr. Armenta in the general population for 20 days was dangerous and could have resulted in the rapid spread of an infectious disease. Additionally, despite the fact that the abnormal x-ray pattern is not consistent with typical tuberculosis, no additional workup was completed for other causes of lung pathology including lung cancer, metastatic tumors, pneumonia, pulmonary edema, asbestosis, connective tissue disease, and others. At a minimum, more sophisticated imaging and likely a pulmonology consultation should have been ordered. The records appear to cut off before his tuberculosis labs came back so the rest of this story is unknown at this point.

*v. Initial Screenings Fail to Include Adequate Screening for Detained People's Disabilities or Their Need for Disability Accommodations*

35.     Disability screenings must be completed for all incoming detainees to ensure that patients who require devices, special housing, or other accommodations are able to receive them timely. Based on my review of declarations and medical records, it is my opinion that the initial screening at California City fails to effectively identify people with disabilities or timely provide the accommodations they require. In fact, in some cases, detainees who arrive with a documented accommodation have them confiscated during the intake process and they are told they will need a doctor's order to get it back.

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

36.     This failure to identify disabilities and promptly provide accommodations interferes with the delivery of medical care and exposes some people to the risk of harm, including physical injury.

37.     Alfonso Leyva cannot see things that are close or read without his glasses, and he gets dizzy without them. He says he was not asked about any disabilities at intake, and his eyeglasses were confiscated, over his objections. In addition, he reported to the intake nurse that he had dizziness. (Leyva Decl. ¶¶ 9-10) The glasses were returned approximately one month later, but while he was without them, he fell off the ladder to his top bunk, slipping because he could not see well. *Id*. ¶¶ 9, 13-15). Following intake, Mr. Leyva should have been provided with the simple accommodations of having his glasses and placing him on a bottom bunk because of his vision needs, his age and his dizziness, but he was not. The consequence of that is that Mr. Leyva suffered a fall from his top bunk which resulted in a significant head injury and head laceration that required two separate send-outs to the emergency department to evaluate and treat on September 16, 2025. Apparently the first emergency department he was sent to would not treat him because he lacked insurance. He ultimately had to be sent out to another emergency department after returning back to the detention facility and definitive care for his closed head injury took hours to accomplish. *Id*. ¶¶ .

38.     Days after his closed head injury, Mr. Leyva continued to complain of throbbing headaches and dizziness. He was seen by an RN on September 22, 20225, at which time the PCP was consulted and ordered ibuprofen as needed. He was again seen by an RN on September 25, 2025 after reporting ongoing symptoms. He was finally seen by a provider on September 29, 2025 who just ordered him Excedrin. He continued to report ongoing symptoms, including an earache, head swelling and tenderness, and tinnitus. He was evaluated by Dr. Hooper on October 9, 2025, who noted that his right tympanic membrane was darker than the left, and Dr. Hooper put in a routine consult to go to an Ear, Nose and Throat ("ENT") specialist for "hemotympanum (blood behind the tympanic membrane)." In the context of a serious, closed head injury and ongoing headaches increasing in frequency, the physical exam finding of hemotympanum is a basilar skull fracture until proven otherwise, and it is a medical emergency. A routine ENT

15

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

consult (that hasn't even been approved or scheduled yet) is gross mismanagement of this patient. He is at risk for serious medical complications and he needs immediate attention.

39.    Sokhean Keo uses hearing aids but reports that he was never asked at intake about his disability or any necessary accommodations. Keo Decl. ¶¶ 35-37. It was him that requested batteries for his hearing aid. He also has a knee injury and arrived at California City with a structured knee brace that allows him to ambulate without pain. At intake, he was informed that the knee brace is an appliance that requires a doctor's order and thus it was taken away. Weeks later and Mr. Keo still does not have his knee brace, making it challenging to go up and down the stairs. *Id*. ¶ 28. I found no records that Mr. Keo's knee injury was evaluated at California City, or that staff ever assessed his need for mobility accommodations, including an orthopedic device. Failing to take these simple steps exposed Mr. Keo to a risk for falls and further injury to his knee.

40.    Jose Ruiz Canizales's initial screening form medical records indicates that he has hearing loss. However, it also states that the "communication barrier" was overcome because staff "Obtained written responses from detainee." This is inaccurate, as Mr. Ruiz Canizales cannot effectively communicate in writing and requires sign language interpretation. Ruiz Canizales Decl. ¶ 32. Additionally, he suggests the communication barrier was not in fact overcome: he says staff did not ask him any questions when he arrived. *Id*. ¶ 18. Although his medical problem list states he is "Deaf, nonspeaking," there is no indication in his medical records that staff routinely provide sign language interpretation or have any system in place to ensure actual effective communication.

41.    Daniel Benavides Zamora arrived with custom orthopedic shoes and insoles prescribed to him due to medical and mobility issues, including multiple toe amputations and a history of toe fractures on account of walking off balance. Benavides Zamora Decl. ¶ 11. The shoes were confiscated, and he was informed he needed a doctor's order, but despite informing the RN of his needs, he was not referred to the provider on a timely basis to obtain the order. *Id*. ¶¶ 11-12. Taking a patient's custom appliances, without promptly replacing them based upon a comprehensive assessment, is medically irresponsible and places them at risk of harm from falls.

16

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

3871655

42.     Alejo Juarez Ruiz suffered a knee dislocation while at Golden State Annex, before arriving at California City. His knee continues to be swollen and painful. Because of his injury, he can walk only a few steps before experiencing serious pain. He requested a walking cane at California City, but the guard he spoke to told him that he was not entitled to one, because "this is a prison." Juarez Ruiz Decl. ¶¶ 6-11. This raises concerns that California City may lack a functioning system for patients to request accommodations. A diabetic, Mr. Juarez Ruiz also has impaired vision that becomes blurry when his blood sugar levels spike. At Golden State Annex, his vision was checked monthly, but no one has checked his vision at California City. *Id.* ¶ 11.

43.     Julio Santos Avalos has a permanent foot deformity and muscle weakness due to childhood polio. Santos Avalos Decl. ¶ 9. His September 6, 2025 initial intake does not document his condition or document any necessary accommodations. It was not until September 18, 2025 that he was provided with a low bunk and low tier chrono after he submitted a sick call slip; it is difficult for him to climb to a top bunk. According to Mr. Santos Avalos, he was told by the PCP that he would be documented as being on a low bunk in case "we get audited," but a low bunk was not provided until November 2025. *Id.* ¶ 12, In the interim, he hurt his ankle and knee getting to the upper bunk he was assigned to. *Id.* ¶ 13. Mr. Santos Avalos reported to mental health staff on November 5, 2025 that he finally slept "well for the first time in months due to a bunk change which supported his mobility challenges; he expressed gratitude for that and shared he was not anxious about falling out of the bed now." Santos Avalos Decl. ¶¶ 12-13. There is no reason that Mr. Santos Avalos needed to wait a month and a half to receive a low bunk as ordered. For a patient like this, California City's failure to provide a reasonable disability accommodation resulted in physical injury and mental anguish.

*vi. Medical Staff Conducting Screenings Fail to Establish Effective Communication*

44.     Medical encounters must be conducted in a language that the patient is comfortable using. If the clinician and patient are not able to communicate in the same language, a translator is essential for all medical encounters to ensure effective communication.

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

3871655

45.     Effective communication is particularly critical when people arrive at a new facility and undergo medical screening. California City fails to ensure that people arriving are screened by someone who speaks their language. Jose Ruiz Canizales communicates in American Sign Language. He was born deaf and does not speak verbally. Ruiz Canizales Decl. ¶ 5. When Mr. Ruiz Canizales had his initial intake screening on August 30, 2025, he was not provided a sign language interpreter. RN Mata acknowledged the communication barrier, and wrote that the barrier was resolved because they "obtained written responses from detainee." However, Mr. Ruiz Canizales says that he reads and writes at a third-grade level, misunderstands English words easily, and often does not understand written paperwork. *Id*. ¶ 10.

*vii. Initial Screenings Fail to Result in Timely and Accurate Continuation of Medications*

46.     Many people arrive at California City with active prescriptions for serious medical conditions. The CoreCivic Handbook states that people entering the facility will have an initial medical screening and "[s]ome medications such as heart or diabetic medications will be continued" when they arrive. Appendix C at 7. Within 14 days of arrival, according to the Handbook, people are supposed to have a "full medical examination" at which time they are to discuss "any medications . . . and any health problems . . . ." *Id*. Based on this second medical encounter, some medications, again "such as heart or diabetic medications" will be provided throughout the person's detention. *Id*.

47.     The records and declarations I reviewed reveal serious, prevalent issues with timely continuation of medication upon intake. Detainees who arrive at California City with active medications do not have them timely verified and continued, leading to dangerous lapses. These lapses occur even when people arrive with their documented medication prescriptions or medication in their possession.

48.     Yuri Roque Campos is diagnosed with pulmonary hypertension and congestive heart failure, conditions that are life-threatening and need close monitoring and appropriate management. He was taking aspirin at his previous facility but did not receive it for the first five days at California City despite two separate Emergency Room visits on the first two days of his arrival. Roque Campos Decl. ¶ 11. For some of those days, he was residing in a medical

18

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

3871655

observation unit where he was supposedly receiving specialized medical attention yet was not provided with his critical medication. Jose Franco Peña arrived at California City on September 5, 2025 and reported receiving multiple medications for hypertension and diabetes; some were not provided until three days later. *See also* Singh Decl. ¶ 8 (stomach ulcer meds delayed at intake).

49.     Based on the declarations and the records I reviewed, some people go for significant and dangerous periods of time without their prescription medications. Sometimes medication doses are changed with no explanation or documented reason. A good example of this is Julio Armenta, who has a documented deep venous thrombosis and was on Xarelto (blood thinner) to treat this. He came into the facility on September 1, 2025 and his Xarelto was continued at that time twice per day to treat his deep vein thrombosis ("DVT"). On October 14, 2025 Mr. Armenta's Xarelto dose was reduced to once per day without discussing that with him and without doing any assessment of his clot. There is a comment in the chart that Mr. Armenta's clot would be monitored by using a D-dimer test, which is not within the standard of care. D-dimer tests are used to make the initial diagnosis of a clot, but they have no use in monitoring clots long term. Nonetheless, the D-dimer test was ordered and it came back high, and there is no indication in the medical record that anybody ever noticed or signed off or explained that abnormal result that was the crux of their management plan. This care was just phoned in, changed without the patient's knowledge, and the monitoring they offered was not medically logical or followed up upon.

50.     Fernando Viera Reyes arrived at California City with an active prescription for Flomax, two tablets a day; instead, he was provided with one tablet a day until his symptoms became significantly worse and he was returned to his regular dose a month after his arrival. Similarly, Daniel Elias Benavides Zamora, a diabetic, arrived at California City on an established insulin regimen consisting of Humulin sliding scale, Lantus 30 units in the morning and Lantus 20 units in the evening, along with other medications. Without a provider encounter or documented rationale, his Lantus prescription was changed to only once in the evening with the dose fluctuating between 20 and 30 units (November 6 pm (20 units), November 7 (30 units),

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

November 8 (30 units), and November 9 (20 units)). Patient prescriptions should not be changed without a patient assessment and a clinical rationale; for medication like insulin, changes should be based on a patient's blood sugar readings.

51.     Esteban Alvarez-Mora arrived at California City on September 5, 2025 on antibiotics for his multiple abscesses that were hot to the touch and possibly infected. He had begun a course of antibiotics the day prior to his arrival but those antibiotics were not continued until September 16, 2025. To be effective, it is critical that antibiotics be taken as prescribed; failing to do so can make treatment ineffective and cause the bacteria to become antibiotic resistant. Alvarez-Mora Decl. ¶¶ 9-10. Similarly, Fernando Chavez Lopez arrived at the facility with an ear infection and needed antibiotic ear drops. Although the intake nurse noted his active prescription for antibiotic ear drops—four drops, three times a day, at his September 1, 2025 intake screening, Mr. Chavez Lopez's prescription dosage was changed. Instead, he was ordered three drops, three to four times a day. Even that dosage administration was not honored. Instead, he received no doses until September 3, then one or two doses per day through September 9, and it appears that most doses were three drops rather than four. Again, the failure to take antibiotics as prescribed is dangerous and can result in failed therapy and possibly long-term harm from antibiotic resistance. (Unfortunately, Mr. Chavez Lopez also failed to consistently receive his medications for diabetes (Farxiga), hyperlipidemia (Atorvastatin), and major depressive disorder (Abilify) during the month of September.) Such lapses are pervasive in my review and can expose patients at California City to serious risk of harm.

*viii. Initial Appraisals by Primary Care Providers Are Not Timely or Thorough and Do Not Result in Appropriate Treatment Plans*

52.     The nurse completing the intake must make a clinical determination about how soon a patient needs to be assessed by a provider for their initial appraisal. Using a standardized intake template, the screening LVN / RN decides whether the person should see the provider on an emergent, urgent or routine basis, *i.e.*, immediately, within 24 hours, or within two to fourteen days. It is important that these encounters take place timely to address any potential lapses in care and to order any necessary labs, images, or medication on a timely basis.

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

3871655

53.    At California City, people are often not seen within the timeframes ordered by the screening LVN / RN, resulting in lapses in care.

54.    For example, when screened on August 30, 2025, Jose Ruiz Canizales, a 45-year-old man, was identified as needing to see a primary care provider on an "emergent" basis (*i.e.*, immediately) because he has asthma and had recently had a procedure to remove his great toenail. He was not seen, however, until four days later, when he was experiencing chest pain and shortness of breath and had to be transported to a hospital for medical clearance, due to "limited resources here." He did not have his initial appraisal with a provider until September 12, 2025. This was the only California City medical encounter at which he was provided a Sign Language Interpreter, via video relay.

55.    Utkarshkumar Trivedi was referred urgently to a PCP during his RN intake on September 6, 2025. He is diagnosed with multiple chronic conditions, including an oral lesion/ulcer for which he had a scheduled consult with the ENT and oral surgeon to rule out malignancy at his prior detention facility. His PCP initial appraisal did not happen until 11 days later on September 17, 2025.

56.    Julio Armenta was screened by an RN on September 1, 2025, where he was noted to have a heart condition, hyperlipidemia, swelling in left leg and ankle, and a condition related to his "veins and varicose." He was referred urgently to a PCP for initial appraisal, but was not seen until September 17, 2025, 16 days later.

57.    Sudesh Singh is diagnosed with multiple conditions, including high blood pressure, type 2 diabetes, hyperlipidemia, an inguinal hernia, and gallstones. He was seen for his initial screening on September 7, 2025. At that time, the RN referred him to the provider for his initial appraisal on an urgent basis. His provider appointment did not occur until nine days later, on September 16, 2025.

58.    In addition to being untimely, initial appraisals are not thorough and do not adequately address pending medical complaints. Questions on the appraisal template that should presumably be answered are left blank, and it is unclear if providers are completing physical exams, even in situations where an exam would be appropriate to assess an injury or wound.

21

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

3871655

When the providers at California City perform a physical examination, they often document the findings for each organ system to be "normal" if there are no abnormalities. This is not accepted medical practice. When documenting a physical examination, providers need to note specific normal findings when relevant to the patient's health problem.

59. Review of the charting demonstrates that the intake assessments and progress notes are primarily completed using a "charting by exception" methodology. This method of charting marks things as normal by default and it is up to the healthcare staff member to go in and change that for anything that is abnormal. It is well known in healthcare that charting by exception under-documents problems and tends to downplay abnormal findings. It is a very poor choice for documenting more complex patient care and decision-making. It often leads to confusion because the default answer of "normal" is at odds with the presentation of the patient as demonstrated in the examples below.

60. During Utkarshkumar Trivedi's initial appraisal, the PCP's review of systems was incomplete, and the documented physical exam was inconsistent with known conditions such as marking "normal" to the evaluation of his mouth and no evaluation or documentation of his lesions/ulcers. Mr. Chavez Lopez was also referred urgently to a PCP, but did not see anyone for over two weeks. When he was seen, the PCP did no review of systems, and physical exam documentation was incomplete.

61. On September 5, 2025, Esteban Alvarez-Mora was referred urgently to a PCP for his "bleeding hemorrhoids," although Mr. Alvarez-Mora reports that it was in fact bleeding and oozing abscesses that resulted in his urgent referral. Regardless, he was not seen until September 22, 2025 for his initial appraisal with a PCP. At that encounter, the PCP noted that Mr. Alvarez-Mora had inflammation and abscesses and had been prescribed an antibiotic already; no physical exam or description of his abscesses was noted. Alvarez-Mora Decl. ¶¶ 8, 10-11.

62. Yuri Roque Campos has a complicated heart condition that makes him a medically very high risk patient. He arrived at California City on September 5, 2025, and was sent to the emergency room right away; he returned the same day with a directed recommendation by the ER doctor that he be seen by a specialist in right heart failure within 72

22

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

3871655

hours. He completed the RN intake process the next day, where it was recommended that he receive an emergent referral to the PCP for an initial appraisal. He again went to the hospital that day for chest pain. He was placed in a medical observation room the day he returned but the record does not reflect that a California City provider saw him until September 9, 2025, days after his arrival to California City and after two emergency room visits. The 72-hour cardiology specialist visit never happened.

63.     On September 6, 2025, Julio Santos Avalos was referred urgently for a PCP evaluation due to history of polio, Guillain-Barre syndrome, accompanying foot deformity and need for medication continuity. That appointment did not take place until September 16, 2025, where the PCP failed to document a thorough review of systems. Although Mr. Santos Avalos was noted to have muscle and joint pain, it appears he did not get a physical exam because he was noted to have normal lower extremities, which is not consistent with his permanent foot deformity. He was cleared for work and regular housing. Two days later, he was seen by a different provider due to his report of right foot and ankle pain. At that encounter, his right foot deformity, muscle weakness of the right lower leg, and limping were noted. He was given a low bunk and low tier chrono and his work clearance was cancelled. The latter evaluation is in stark contrast to the initial appraisal completed two days prior, where no deformity was noted and no accommodations were provided. Inconsistent documentation in this patient's medical record raises concern that PCPs are not physically evaluating their patients.

64.     When Mr. Armenta had his September 17, 2025 appointment, he reported a history of blood clot and arthritis, including a recent hospitalization due to a blood clot. The PCP failed to obtain relevant information to understand Mr. Armenta's condition, including information about the location and type of clot, the treatment he received, whether he had any previous clots, or if there is a family history of clots. Other than stating that his lower left leg has varicosities, the PCP indicated the physical exam was "normal."

65.     When providers do order follow-up care after the initial appraisal, it is not ordered at appropriate intervals. Fernando Viera Reyes was seen for an initial appraisal on September 12, 2025 where his "review of symptoms" was left blank, including the review of "genito-urinary-

23

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

intestinal" although Mr. Viera Reyes was undergoing workup for prostate cancer and suffers from urinary retention. A rectal exam was deferred, which is inappropriate given Mr. Viera Reyes's elevated PSA and history. He was ordered a PSA with a due date a month out, and there is no documented follow-up ordered; he was not seen by a PCP until two weeks later when he reported blood in his stool and urine.

66.    Fernando Gomez Ruiz had an elevated blood pressure (157/73 and 155/81) during his initial appraisal. In order to minimize the risk of complications such as heart disease, the American Diabetes Association recommends a blood pressure goal of <130/80 for patients with diabetes. Failure to control blood pressure down to the target range in patients who are diabetic results in accelerated damage to the kidneys, the eyes, and the smaller blood vessels of the legs. This accelerates the progression of renal failure, retinal damage, and impairs blood flow to the limbs. The end result of this progression can be the need for dialysis, blindness, and amputations. The provider further failed to document a review of systems and inappropriately referred Mr. Gomez Ruiz for diabetic follow-up in five months. As a general rule, patients with uncontrolled chronic illnesses should be seen at least every three months until they have demonstrated that their disease is stable and that their treatment plan is optimized to their condition. That determination had not yet been made in the case of Mr. Gomez Ruiz.

67.    At Alejo Juarez Ruiz's initial appraisal, which took place the day after his initial screen, his blood pressure was again elevated (158/100). The provider failed to mention the elevated blood pressure the day before, or that he had a history of hypertension. Other than noting that he had joint pain from a knee injury, the provider did not document a review of systems, or an examination of his knee injury. The patient's blood pressure was significantly elevated and uncontrolled and that should prompt a comprehensive workup to determine if there is any evidence of end-organ damage from the persistently elevated blood pressures. In addition, blood pressures in this range require thoughtful medication management usually involving the up-titration of multiple medications over time. None of that was done or even considered or anticipated for the future based on the lack of meaningful follow-up.

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

3871655

68.     California City providers are often evaluating patients at their initial appraisal with no prior medical records although a significant number of patients are arriving from other ICE detention facilities. Defendants have failed to ensure the medical records maintained at the sending ICE detention facilities are transferred with the detainees to California City so that their care can be continued. Frequently patients are in the middle of workups for various conditions or have been treated definitively by prior providers. Obtaining these records and incorporating them into the medical record of their current facility is critical for understanding their medical care and for planning future management. While some patients do have "transfer summaries" in their charts, these records generally lack adequate detail and merely serve as a flag that additional important medical record information is available. In the charts that I reviewed, I saw many mentions of prior medical records but I rarely saw outside records incorporated into the active care plan.

**Summary of Opinion**: The medical intake assessment process at California City is dangerously ineffective. Initial assessments are not confidential, timely, or thorough, and some are performed by nurses who lack the credentials to perform assessments. The screenings fail to include consistent and adequate testing for tuberculosis, fail to include adequate screening for detained people's disabilities and their disability needs. Initial assessments also fail to result in timely and accurate continuation of medications. Staff conducting the assessments do not ensure that they have effectively communicated with patients. Lastly, initial appraisals with primary care providers are not timely or thorough and do not result in appropriate treatment plans.

### B.  The Sick Call Process for Episodic Care is Broken

*i. Sick Call Should Facilitate Patients' Access to Timely Medical Attention*

69.     To ensure the adequate delivery of episodic medical care, detention facilities must provide a formal system for detainees to request health care. Every request for health care attention must be evaluated by a qualified health professional, and, if the request includes symptoms, the person must have a face-to-face encounter with a registered nurse in a clinical setting. These sick-call encounters must be conducted at least five days a week, and people who

3871655

submit a sick call request must have a face-to-face encounter with a qualified health care professional (minimum licensure of Registered Nurse) within 24 hours if the request includes a symptom-based complaint. The nurse determines whether the person requires an encounter with a provider and, if so, whether to schedule it on a routine, urgent, or emergent basis.

70.     According to the CoreCivic Detainee Handbook, sick call services are provided "to all detainees from the time of admission until the time of release in order to provide continuous medical care." Appendix C at 43. Detained people who want routine medical care must complete a medical request and put it in a medical box for processing by Health Services. *Id.* These requests are supposed to be picked up each morning by Health Services staff. *Id.* The Handbook indicates the person will be evaluated by "the nursing staff" and scheduled to see "medical personnel . . . according to medical necessity." *Id.* "Most appointments are scheduled within a reasonable time." *Id*.

*ii. Patients Who Submit Sick Call Slips Are Not Scheduled for Timely Appointments with Nurses or Providers*

71.     Based on the declarations I reviewed and the limited number of handwritten sick call requests in the records provided to me, patients are not seen within 24 hours of their sick-call submission, nor are they seen within a reasonable time. (It appears that sick call slips may be submitted electronically, and those slips are not included in the health records I received.) In fact, some patients report that California City does not respond to all sick-call submissions.

72.     According to patients, sick-calls describing urgent medical symptoms can go unaddressed or unacknowledged for days or weeks, resulting in delays accessing care. Fernando Viera Reyes, a detainee with high suspicion of having prostate cancer, reports submitting multiple sick-call slips noting blood in his urine and stool because prior requests were ineffective at getting him care. Viera Reyes Decl. ¶¶ 11, 14-15. Mr. Chavez Lopez, who arrived at the facility with an ear infection, and was not provided his full course of antibiotic drops, submitted a sick call slip on September 8, 2025, and was not seen by a nurse until six days later, when he reported his hearing was impaired. Alfonso Leyva submitted a sick call on October 3, 2025 regarding ear pain, but was only seen by an LVN on October 8, 2025 (which, as discussed

elsewhere, is not appropriate). He did not see a physician until October 9, 2025. Esteban Alvarez-Mora, who arrived with multiple open abscesses, submitted a sick-call slip triaged on September 18, 2025 at 1:52 am reporting multiple concerning symptoms that could indicate an infection, including open abscesses on his bottom and legs, fever, headaches, shaking, etc. He was not seen for a face-to-face encounter with the RN until three days later on September 21, 2025, at which time the RN noted the abscesses and lesions on his penis, 10/10 pain, itching and burning and referred him urgently to the PCP due to risk of infection He was seen by the PCP the next day for his initial appraisal; the PCP only noted balanitis (no mention of lesions or ulcers) and prescribed him Bacitracin and clotrimazole.

73.     Sick-call slips reporting medication lapses or requesting medication refills do not result in timely medication continuity. Utkarshkumar Trivedi submitted multiple sick-call slips requesting medication refills. The written response, if any, would state that refills were submitted but the medication would not be refilled timely, if at all. Sometimes the sick-call slip would document how many requests he had submitted already. For instance, he submitted a sick-call on October 29, 2025, documenting that it was his second, third, and fifth requests for a refill for various medications. Among the requests was a refill of Omeprazole; he had previously requested a refill via sick-call on October 16, 2025, where it was noted in writing that a refill request was submitted. However, as of October 29, 2025, he still had not received the medication and had to submit another request for refill.

74.     It appears sick call slips are ignored even when the medical staff submit sick call slips on behalf of the patient. While Alejo Juarez Ruiz was held in a medical observation cell, it appears an RN, Golding, completed a sick call slip for him, indicating that he is diabetic, and his "extremely long and sharp and pointy" nails need trimming. Foot care is essential for people with diabetes because, among other things, they are highly susceptible to infection. I found no documentation that his nails were trimmed as requested.

75.     Patients who are seen by a nurse for a triage appointment are not timely referred to a provider for care and, even when referred, not seen timely. Esteban Alvarez-Mora was also urgently referred to a provider on September 11, 2025 by the RN on account of an "infection and

27

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

3871655

3 abscesses in bottom." He was not seen until September 22, 2025—and that was for his PCP initial appraisal. Julio Santos Avalos submitted a sick-call slip reporting extreme pain and swelling of his ankle due to his history of polio, and requesting a medication refill. He was seen by an LVN on October 8, 2025, who referred him routinely (2-14 days) to a PCP. That appointment did not take place until November 3, 2025 where there are minimal notes and no documented exam.

76.     Patients who request care are not always seen by an RN. Records reflect that patients are sometimes seen by LVNs to address their underlying symptoms—a task that is beyond their licensure. As noted above, LVNs are not trained to perform these assessments and typically miss important information, or may not assign conditions and symptoms the appropriate medical urgency, which can result in patient harm

77.     Without access to a well-functioning and responsive sick-call process, patients are not able to inform staff of symptoms or request timely care.

78.     Patients who disagree with or question health care decisions should have access to a functioning grievance process. Gustavo Guevara Alarcon reports that grievances go unanswered, thus depriving patients of their ability to seek medical care or challenge any denial of requested care. Guevara Alarcon Decl. ¶ 16.

**Summary of Opinion**: California City's sick call system is broken because patients submit sick call slips but are not scheduled for timely appointments with either nurses or providers. It is not uncommon for sick call slips to be entirely ignored. A broken sick call system is harmful for patients because it impedes access to care.

## C. Care for People with Chronic Illnesses is Untimely and Often Abysmal

### i. People with Chronic Illnesses Require a Structured Treatment Program

79.     It is essential that chronic care patients, particularly those with poorly managed conditions, are seen regularly so their condition can be assessed, including a review of completed labs, adjustments to their medication, and further ordering of workups. Patients who are new to a provider's care may require more frequent visits while the provider establishes the patient's

treatment plan. Patients who are not stable on medications will require visits at least every three months.

***ii. Chronic Care is Scheduled at Inappropriate Intervals and Providers Fail to Provide Necessary, Clinically Appropriate Care for Sick Patients***

80.     I reviewed multiple records where follow-up encounters were ordered beyond what would be appropriate follow-up intervals given the patient's condition and presentation, if ordered at all. Even more alarming, the records show that when providers do see chronic care patients, the care that they provide often falls far below the standard of care, putting the patients at a high risk of serious harm.

81.     Alejo Juarez Ruiz is a patient with uncontrolled diabetes and dangerously uncontrolled hypertension. When seen for a chronic care appointment on September 22, 2025, his blood pressure was dangerously high, at 216/111, and remained high at 190/106 after 90 minutes. The provider gave him two, one-time doses of 10 mg of Lisinopril, and ordered 40 mg Lisinopril, blood pressure checks weekly for two weeks, and a return chronic care visit in six months. This plan is wholly inadequate to address this urgent situation, as explained further below.

82.     Not surprisingly, Mr. Juarez Ruiz continued to experience symptoms of uncontrolled hypertension. On September 29, 2025, his blood pressure was 197/107 and then 3 hours later it was 168/107. He was not seen again until October 9, 2025, when presented to an RN at around 1:37 pm with symptoms of dizziness and visual disturbances, which are typical of unmanaged and escalating hypertension. His blood pressure on that day was 180/112 and his blood sugar reading was 369. When the provider was contacted about the extremely elevated blood glucose and blood pressure, the orders back to the nurse were to give more lisinopril and more metformin and to recheck in 30-60 minutes. A repeat blood sugar check was 360 around 2:05 pm and a repeat blood pressure check was 177/111 at around 2:20 pm. The PCP was notified and cleared the patient's return to the dorm, with orders to recheck his blood pressure during the night shift, and do blood pressure checks the following Monday, Wednesday, and Friday. The records do not contain an evening blood pressure check, nor the additional ordered

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

3871655

checks. No PCP follow-up order was placed. In both instances of dangerously elevated blood pressure readings on September 29, 2025 and October 9, 2025, he was merely ordered extra doses of his already-prescribed medication and discharged back to his unit despite still having elevated readings.

83.     Furthermore, the daily maximum dose of Lisinopril is 40 mg, but on more than one occasion, Mr. Juarez Ruiz's provider ordered additional Lisinopril in an attempt to bring down his dangerously elevated blood pressure readings. On September 29, 2025, his blood pressure was 197/107 and then 168/107. He was ordered a one-time, extra dose of 80 mg Lisinopril (in addition to the 40mg he takes daily). On October 9, 2025, as discussed above, he was ordered an extra 40 mg dose of Lisinopril (in addition to the 40 mg he takes daily). Giving 80-120 mg of Lisinopril in a day is way beyond the dosing recommendations for this medication and not in compliance with any standard of care. Despite his consistently uncontrolled and dangerously high blood pressures, I can only find six readings ever taken at California City over a span of two months. Not a single reading has ever been even close to normal. Based on his records, California City is failing to medicate him properly or monitor his condition.

84.     Those orders in this clinical context are ignorant and demonstrate dangerously casual care in the face of an objective medical emergency. As a general guideline, if the combined systolic and diastolic numbers are more than 300, the patient needs to be seen in the Emergency Department for management and assessment of end-organ damage. That is suggestive of malignant hypertension and cannot be managed with oral medications. Those medications (Metformin and Lisinopril) do not work quickly, and they are not treatments for this medical emergency. There is no way those medications helped this situation. On October 9, 2025, this patient was symptomatic for both extremely high blood pressure (dizzy, headache), and high blood glucose (dizzy). Despite these objective findings of uncontrolled disease, his chronic care provider in the system ordered him to be seen in six months for follow-up. This is shockingly poor care.

85.     As it relates to his diabetes, a diabetic with a hemoglobin A1c level at 10.7 requires insulin to properly manage blood sugar levels and bring it down to a reasonable level. In

patients with diabetes, the hemoglobin A1c goal is < 7%. A hemoglobin A1c of 10.7% puts him

at risk of developing diabetic ketoacidosis, a serious and potentially life-threatening complication

of diabetes. Someone with Mr. Juarez Ruiz's condition is beyond what oral medications can

accomplish. Given his uncontrolled diabetes and hypertension, it is not surprising that he has an

abnormal albumin/creatinine ratio in his urine indicating that his kidneys are leaking protein.

This is typical in patients with uncontrolled hypertension and diabetes. There does not seem to be

any recognition of this abnormality and no plan to track it.

86.     When chronic care patients are seen, the notes are sparse, physical exams are not

regularly completed, and the care provided is substandard. Yuri Roque Campos is diagnosed

with multiple serious, life-threatening heart conditions that should be carefully and closely

monitored. His medical condition makes him extraordinarily medically fragile. The day he was

transferred to California City, on September 5, 2025, he did not get his prescribed aspirin and

ended up in the emergency room with chest pain. There, the emergency room doctor expressed

serious hesitation to send him back to California City. The doctor authored a detailed letter to the

detention facility health care staff stating as much – an act that is not typical of ER doctors:

> Mr. Campos presented to the emergency department with complaints of chest pain.
> We conducted extensive testing to evaluate the possible causes of his symptoms.
> Unfortunately. our ability to provide comprehensive care was limited due to the
> lack of access to records from his recent hospitalization. ongoing treatment. and
> testing performed at another facility….it appears that Mr. Campos likely has a
> condition known as pulmonary hypertension. This is a potentially life-threatening
> illness that requires close and continuous management, as it can rapidly progress to
> severe heart failure.
>
> It is imperative that Mr. Campos follow up within 72 hours with a specialist in
> right heart failure or pulmonary hypertension. Ideally, this should be with a
> provider who has previously been involved in his care-either at the Bakersfield
> facility where he was recently treated, or at Stanford, where he has also received
> care….
>
> At this time, it is safe for him to be transported back to the facility, **provided that
> he receives daily check-ins with health officials and that arrangements are
> made for close follow-up with appropriate cardiology and/or pulmonology
> specialists.**

(Emphasis added). A true and correct copy of the letter is attached hereto as **Appendix D**.

87.     The records do not reflect that appropriate management of Mr. Roque Campos's

condition happened upon his return. He was placed in a medical observation unit but, even then,

31

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

3871655

1    did not receive the medication recommended by the hospital, or his already prescribed aspirin.

2    Roque Campos Decl. ¶¶ 22-23. He did not receive the urgent follow-up with a cardiologist or

3    pulmonary specialist; as of November 6, 2025, he had not seen a cardiologist.

4        88.    Mr. Roque Campos received very little monitoring by the providers at California

5    City. He had one visit on October 19, 2025, related to his heart condition where he reported chest

6    discomfort, at which time the provider suspected he may have GERD and Omeprazole was

7    prescribed. The provider acknowledged that Mr. Roque Campos has a right bundle branch block

8    and right atrial enlargement and referred him to a cardiologist on a routine basis. This referral

9    should have been initiated on an urgent basis at the time of his arrival on September 5, 2025, and

10   Mr. Roque Campos should already have been seen.

11       89.    The management of pulmonary hypertension and right heart failure is extremely

12   complicated medicine involving multiple medications, some of which can only be obtained

13   through a cardiology office because of their unique attributes and limited availability. In

14   addition, one of the common interventions for patients like this is to place an implantable

15   defibrillator if their workup indicates a need for that. The failure to do the appropriate workup

16   and to put this patient on the correct regimen of meds (a regimen that far exceeds the simple

17   baby aspirin that the facility has agreed to) puts this patient at significant risk for sudden cardiac

18   death. The ER physician was absolutely correct in his letter and ignoring that informed opinion

19   and directed referral is willful dereliction of a physician's basic duties.

20       90.    Chronic care notes lack substance and show poor clinical judgment. Even when

21   orders are placed by a provider, they are not always followed or implemented timely,

22   undermining the ability to appropriately monitor a patient's condition. Failure to manage chronic

23   medical conditions can have dire consequences for patients—in the case of Fernando Gomez

24   Ruiz, for instance, it could mean a foot amputation. Mr. Gomez Ruiz, a 61-year-old diabetic with

25   an ulcer at the bottom of his foot and a history of toe amputation, was receiving insulin and

26   regular wound care at his previous facility. Unfortunately, the overall care he has received thus

27   far for his foot ulcer at California City has not conformed to the prevailing standard of care for

28   this well-known dangerous condition. California City has failed to: (1) determine whether the

32

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

3871655

ulcer is infected before placing him on antibiotics; (2) do a culture of deep tissue to inform the choice of correct antibiotics; (3) order the correct ointments for wound care and instead has him on silver sulfadiazine and neomycin, which are not standard choices for foot ulcers at all; (4) complete imaging to determine if Mr. Gomez Ruiz has osteomyelitis or lab work such as C-reactive protein or erythrocyte sedimentation rate to look for blood evidence for chronic infection; (5) refer him to a vascular surgeon to determine the most critical element which is whether there is adequate blood flow to his foot to get an ulcer to heal; (6) complete debridement or document information of the actual ulcer; and (7) exempt him from work that requires him to stand because one of the most important elements for caring for a diabetic foot ulcer is offloading the weight on the foot. Mr. Gomez Ruiz reports that his foot is swollen, the ulcer is now the size of a quarter and sometimes oozes blood, which he is attempting to manage and clean with dirty, bloody gauze he has. Gomez Ruiz Decl. ¶¶11-16. Failure to appropriately manage and treat a diabetic ulcer can result in infection, gangrene, or osteomyelitis and ultimately an amputation.

91.    Mr. Gomez Ruiz was also noted to have hypertension during his initial appraisal with the PCP. His blood pressure at intake was 180/94, and 157/73 at his initial appraisal two days later. At that encounter, his provider ordered twice weekly blood pressure checks, which are not reflected in the medical records, and failed to order a timely follow-up appointment to assess whether it would be appropriate to start Mr. Gomez Ruiz on hypertensive medication. Elevated blood pressure in an older patient with diabetes and other chronic conditions accelerates the damage to the kidneys and moves them closer to needing dialysis.

92.    Jose Franco Peña takes two different medications for hypertension. He experienced weeks-long lapses in the administration of his medication (Amlodipine and Lisinopril) from mid-September to mid-October. Although he saw the provider regarding his hypertension on September 28, 2025, there is no discussion of his missed medication. At that encounter, blood pressure checks every other day for two weeks were ordered but only one blood pressure check was documented during that period. At the September 28, 2025 encounter, a six month follow-up was ordered by the provider. The failure of medical staff at California City to

33

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

3871655

implement orders intended to monitor a patient's chronic condition leaves patients vulnerable to medical complications. The six-month follow-up is medically inappropriate.

93.     When bloodwork or imaging is ordered, records do not reflect that abnormal or concerning results are addressed or that appropriate action is taken in response. Yuri Roque Campos had an EKG completed on September 24, 2025 that showed concerning abnormalities; the results were signed by the provider, but there was no follow-up appointment. He continued to go without his medication, and he was not ordered any specialty follow-up. *See also* discussion of Mr. Juarez Ruiz above, ¶¶ 81-85.

94.     The same occurs with abnormal vitals. Records do not consistently reflect that repeat vitals are taken or patients are stabilized before returning to their unit, or that the provider is notified. It is important that patients are stable before being discharged into the general population. Abnormal vitals, especially in a patient who is not being treated for an underlying condition or whose condition is not yet well-managed, should trigger further workup or timely follow-up. Fernando Gomez Ruiz had a blood pressure reading of 180/94, which is clearly in the category of severe hypertension and clearly meets all criteria for medical management. At a minimum, Mr. Gomez Ruiz should have remained in intake until a repeat blood pressure reading was taken. There was no documentation of a repeat vital reading. He was discharged to the general population with a routine order to see a provider. *See also* Santos Avalos Decl. ¶ 16 (blood pressure reading of around 161/100 [163/89 according to medical records] and he was told to calm down and was returned to his unit).

95.     Patients at California City are encouraged by their provider to seek care when they return to their country of origin. This is inappropriate and irrelevant to the provision of care at the detention facility. The role of the provider is to assess the immediate needs of their patient and provide necessary care in a timely fashion and to do so in accordance with normal healthcare timelines. The providers at California City do not know how long their patients will be in their care and should treat the patients before them with the urgency that their condition warrants. Daler Singh suffers from painful stomach and tongue ulcers that cause him to cough up and vomit blood, as well as experience bloody stools. Singh. Decl. ¶¶ 5-6. During a medical

34

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

encounter with his provider, he was told he would not see a gastrointestinal specialist and should return to his country of origin to get medical care despite his ongoing pain, bloody stool, and difficulty eating. *Id*. ¶ 19. His records confirm his report, stating, "COUNTRY OF ORIGIN – INDIA. PATIENT ADVISED TO ALSO GET ACCESS TO CARE IN HOME COUNTRY FOR GASTROENTEROLOGY." Jose Franco Peña reported during a provider encounter a history of diabetes that was not being treated at California City. The provider ordered lab work to measure his average blood sugar levels and "ADVISED TO ALSO GET ACCESS TO CARE IN EL SALVADOR IF NEEDED."

> **Summary of Opinion**: California City does not provide appropriate medical care to patients with chronic conditions. Medical records indicate that people who have serious medical conditions are not appropriately treated. In several of the cases that I reviewed, medical providers made clinical decisions that fell far below the acceptable standard of care and put patients at risk. In several cases, providers inappropriately recommended that detained people receive care in their country of origin. Failing to adequately manage patients' chronic care puts patients at risk of medical harm.

### D. Patients are Deprived of Necessary Medications

#### i. Patients Must Receive Medications as Prescribed

96.     Medication continuity is a critical component of a functional health care system. The risk associated with medication lapses depends on the medication prescribed but some medications, such as insulin, blood thinners, antibiotics, seizure medications, and migraine medications, should not be skipped. Missing a scheduled dose can result in increased risk of medical complications or reduce the effectiveness of the medication.

#### ii. Medications Are Often Delivered Late or Not At All

97.     Records I reviewed showed lapses in medication continuity both at intake and even after people, sometimes following significant delays, were able to obtain a renewal prescription at California City. The medication lapses in the medication administration records and that are described in the declarations raise serious concerns about the facility's ability to ensure continuity of care for patients or to manage serious medical conditions.

98.     Examples include Yuri Roque Campos who has a life-threatening medical condition for which he was taking daily aspirin. Roque Campos Decl. ¶11. His medication administration records indicate that he did not get it the first five days at California City (even when he was held in a medical observation room), was not given multiple doses from September 10 to September 27, when he had an active prescription, and then went from September 27 to October 22 with no active prescription. Missing a dose of aspirin significantly increases his risk of a heart attack, stroke, or even death. Fernando Gomez Ruiz, a diabetic with complications, did not get insulin for three of the first nine days he was at California City despite having an active prescription. Missing insulin, especially for someone who is already experiencing complications like diabetic ulcers, can cause high blood sugars and further impede the healing process. These medical lapses are dangerous and unacceptable for a facility housing medically complex patients; neither of these medications are difficult to obtain and should be readily available.

99.     Once prescribed, continuous, timely administration of medication is essential to ensure its effectiveness. Some people report receiving their medication only half the time. Some say they are woken up in the middle of the night to receive their medication.

100.     Record review shows inconsistent medication distribution time, with evening medications logged at all hours of the night, which increases the likelihood that a patient will miss their medication administration. Sokhean Keo reported missing multiple days of his anti-anxiety medication, making it difficult for him to slow his racing thoughts and get sleep. At times, the medication is administered well past midnight. Keo Decl. ¶26. Fernando Viera Reyes was provided Flomax on and off the first month of his detention, making it difficult and painful to urinate. Viera Reyes Decl. ¶14.

101.     A number of records reflect "no shows" for medication at 3:05 am, but it appears those entries may be an indication that the medication was never offered. Utkarshkumar Trivedi's records indicate similar lapses in prescribed medications; for instance, he is prescribed Tamsulosin once a day at bedtime for BPH; he received the first dose on September 7, 2025 at 2:06 am but then did not get medication from September through September 14 with no

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

3871655

documented reason, only to receive it three times on September 15, 2025, and then not receive it again on September 16, 2025.

102.     Julio Santos Avalos experiences pain and limited mobility, due to his foot deformity resulting from childhood polio and his history of Guillen Barre. Santos Avalos Decl. ¶ 9. He was prescribed a muscle relaxer to help with the pain but has experienced difficulty continuing his muscle relaxer despite numerous sick-call requests. *Id*. ¶¶ 9-11. He was given 30 tablets weeks after his arrival on September 23, 2025, which if taken according to the allowed dosage of 3 times a day, would last for 10 days. As of November 6, 2025, he has not been able to get the medication refilled despite submitting sick-call slips in early October requesting re-fills and reporting extreme pain and swelling. . In fact, on October 6, 2025, medical staff responded to a sick-call slip indicating that a refill request had been submitted, but Mr. Santos Avalos did not have the refill in hand as of November 6, 2025, the date his record excerpt was printed. Julio Armenta's records indicate lapses in Xarelto, which is a time-sensitive medication.

103.     California City's Medication Administration Records (MARs) do not conform to standard documentation practices, making it difficult to track appropriate medication distribution and patient adherence. Below is a portion of a patient MAR—a close look will show unexplained gaps in administration dates, out of stock medications, and sporadic distribution times:

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

3871655

**MAR**

A = Administe

| Medication | SIG | Authorizing Provider | Administered Date | Disp. |
|---|---|---|---|---|
| metFORMIN HCl - 1000 MG Oral Tablet | TAKE 1 TABLET TWICE DAILY. | Uche, Nnenna FNP-C | 9/11/2025  7:03:25PM | A |
| | | Uche, Nnenna FNP-C | 9/12/2025  2:59:36PM | RI |
| | | Uche, Nnenna FNP-C | 9/12/2025  11:32:41PM | A |
| | | Uche, Nnenna FNP-C | 9/13/2025  10:27:04PM | A |
| | | Uche, Nnenna FNP-C | 9/17/2025  6:14:17AM | OS |
| | | Uche, Nnenna FNP-C | 9/18/2025  10:20:42PM | A |
| Mirtazapine 30 MG Oral Tablet | TAKE 1 TABLET AT BEDTIME. | Uche, Nnenna FNP-C | 9/8/2025  2:31:14AM | A |
| | | Uche, Nnenna FNP-C | 9/8/2025  10:41:50PM | A |
| | | Uche, Nnenna FNP-C | 9/10/2025  12:12:15AM | A |
| | | Uche, Nnenna FNP-C | 9/10/2025  9:33:12PM | A |
| | | Uche, Nnenna FNP-C | 9/11/2025  7:04:24PM | A |
| | | Uche, Nnenna FNP-C | 9/12/2025  11:32:52PM | A |

**MAR**

A = Administere

| Medication | SIG | Authorizing Provider | Administered Date | Disp. | Do |
|---|---|---|---|---|---|
| Aspirin 81 MG Oral Tablet Delayed Release | TAKE 1 TABLET DAILY. | Uche, Nnenna FNP-C | 9/7/2025  12:54:46PM | A | 81 |
| | | Uche, Nnenna FNP-C | 9/9/2025  8:24:23AM | A | 81 |
| | | Uche, Nnenna FNP-C | 9/12/2025  2:59:10PM | RI | |
| Atorvastatin Calcium 20 MG Oral Tablet | TAKE 1 TABLET DAILY. | Uche, Nnenna FNP-C | 9/8/2025  4:39:33PM | OS | |
| | | Uche, Nnenna FNP-C | 9/9/2025  8:24:35AM | OS | |
| | | Uche, Nnenna FNP-C | 9/12/2025  2:59:22PM | OS | |
| Docusate Sodium 100 MG Oral Capsule | TAKE 1 CAPSULE TWICE DAILY AS NEEDED. | Uche, Nnenna FNP-C | 9/25/2025  3:43:40PM | A | #6 |
| Lisinopril 5 MG Oral Tablet | TAKE 1 TABLET DAILY. | Uche, Nnenna FNP-C | 9/8/2025  4:39:37PM | A | |
| | | Uche, Nnenna FNP-C | 9/9/2025  8:25:09AM | A | |
| | | Uche, Nnenna FNP-C | 9/12/2025  2:59:31PM | RI | |
| metFORMIN HCl - 1000 MG Oral Tablet | TAKE 1 TABLET TWICE DAILY. | Uche, Nnenna FNP-C | 9/7/2025  12:55:18PM | A | 10 |
| | | Uche, Nnenna FNP-C | 9/8/2025  3:05:00AM | A | 10 |
| | | Uche, Nnenna FNP-C | 9/8/2025  4:39:46PM | OS | |
| | | Uche, Nnenna FNP-C | 9/8/2025  10:42:05PM | OS | |
| | | Uche, Nnenna FNP-C | 9/9/2025  8:25:12AM | A | |
| | | Uche, Nnenna FNP-C | 9/10/2025  12:12:03AM | A | 10 |
| | | Uche, Nnenna FNP-C | 9/11/2025  3:05:00AM | NS | |

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

3871655

104.     Mirroring this data into a color-coded MAR, one can readily see the number of medication lapses this patient experienced. Green represents timely administered medication; pink represents missed medication, including medication reportedly refused after 11 pm, no documented entries, or medication noted as out of stock; yellow represents medication administered after 11 pm; and grey demonstrates no active prescription:



| | 7-Sep | 8-Sep | 9-Sep | 10-Sep | 11-Sep | 12-Sep | 13-Sep | 14-Sep | 15-Sep | 16-Sep |
|---|---|---|---|---|---|---|---|---|---|---|
| Aspirin 1 tab daily RX 9/6 - 9/14 | 12:54 PM | | 8:24 AM | | | Refusal noted at 2:59 pm | | | | |
| Atorvastatin 1 tab daily RX 9/6 | | | | | | | | | | |
| Lisinopril 1 tab daily RX 9/6 - 9/16/25 | | | 8:25 AM | | | refusal noted at 2:59 pm | | | | |
| Metformin 1 tab (1000 mg) BID RX 9/6 | | | | | | | | | | |
| am | 12:55 PM | | 8:25 AM | | | refusal noted at 2:59 pm | | | | |
| pm | 9/8/25 3:05 A.M. | | 9/10/25 12:12 A.M. | | 7:03 PM | 11:32 PM | 10:27 PM | | | |
| Mirtazapine 1 tab bedtime RX 9/6 - 9/13 | 9/8/25 2:31 A.M. | 10:41 PM | 9/10/25 12:12 A.M. | 9:33 PM | 7:04 PM | 11:32 PM | | | | |

105.     Some medications appear to be administered incorrectly. Metformin, a medication for type 2 diabetes, should be administered twice daily, particularly when prescribed at higher doses. Sudesh Singh is prescribed 1000 mg of Metformin (a high dose) to be taken twice daily. His records show, however, that he received his medication only once per day or not at all for the first eleven days at the facility. It is unclear whether he was receiving one or two 1000 mg tablets. If he received only one tablet, he was being under-treated. If he was expected to take two tablets at once, this could be dangerous—he would be at risk of side effects, including a potentially life-threatening condition called lactic acidosis. Moreover, he was provided 26 tablets as KOP medications on September 18, 2025—an amount that would last him 13 days, *i.e.*, until the beginning of October. His records show that he was not provided more Metformin until November 5, 2025, so he apparently went a full month without his medication.

106.     Another diabetic, Daniel Elias Benavides Zamora, arrived at California City on November 5, 2025 with an active prescription for Lantus 30 units in the morning and 20 units in the evening, as well as a Humulin sliding scale, to address his diabetes. His records indicate that for the first few days of his arrival, he was getting Lantus mostly once a day at different doses

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

3871655

and different times (November 6: 20 units at 9:00 pm, November 8: 30 units at 5:13 am,

November 8: 20 units at 11:51 pm, and November 9: 20 units at 9:56 pm). Furthermore, his

Humulin sliding scale administration records do not match the order placed. For instance, he is

supposed to receive Humulin based on his accucheck results, but the documented units provided

do not match the units he is supposed to receive based on his documented blood sugar levels. On

November 7, 2025, at 8:55 am, his accucheck (blood sugar reading) was 332, which should

correspond with 8 units of Humulin being administered, but there is no record that he was

administered any Humulin. On November 9, 2025, at 4:39 pm, the LVN documented providing

him with 4 units of Humulin, which is supposed to correspond with a blood sugar reading of

201-250, but Mr. Benavides Zamora's only documented reading is 127 at 11:55 pm. Sporadic

and inconsistent administration of insulin to a diabetic can result in elevated blood sugar levels

and place the patient at risk for multiple complications, including diabetic ketoacidosis, a

potentially deadly condition.

107.    Medical records also show sudden discontinuation of medications without clear

explanation to the plaintiff. This can cause anxiety for the patient and have dangerous

consequences for their physical health. Gustavo Guevara Alarcon is diagnosed with chronic

migraines for which he is prescribed Topiramate (known by the brand name Topamax) for

prevention, a medication that should be tapered off gradually to avoid serious side effects,

including an increase in migraines. After experiencing lapses in the continuation of his

medication upon arrival, he was able to start Topiramate again, only to have it abruptly

discontinued without a taper or discussion with a provider. Yuri Roque Campos's aspirin and

Tylenol, both prescribed for heart disease, were discontinued in late September 2025 without

explanation. The aspirin was not restarted again until October 22, 2025 and the Tylenol was not

restarted as of October 31, 2025. Daler Singh experienced sudden discontinuation of Buspirone

and Hydroxyzine; both medications were abruptly stopped on September 11, 2025 and restarted

again September 26, 2025. Jose Franco Peña was receiving two medications for hypertension

and one for diabetes; they were provided for a few days and then suddenly stopped for weeks. He

went almost a month without Amlodipine and over a month without Lisinopril. He received

40

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

3871655

Metformin for only four days and then his records do not reflect that his Metformin was re-ordered. His records do not reflect a provider's reasoning for any of the medication lapses.

108.     Medication should not be withheld because a patient is engaging in behavior that is not looked upon favorably by the facility. Daler Singh reports that he was told by officers and medical staff that if he did not end his hunger strike, he would not be provided with his prescribed medication. Singh Decl. ¶ 16. His medical records confirm his report. According to his provider, "Mr. Singh had asked for tylenol from nursing staff that I would agree to if he ate food with it" and "he would be getting his ensure ordered by Provider…if he ate." Sokhean Keo reports similar threats of withholding medication if patients do not follow the rules. He reported that a female nurse yelled at him and others, saying something to the effect of, "If you don't line up, you won't get any medication!" Another nurse told an officer that she did not want to give some people medications because they did not line up. Keo Decl. ¶ 13.

109.     I also saw evidence that the facility is sometimes out of stock of certain medications prescribed to detained people. A detention facility housing hundreds of patients should have sufficient standard medication in stock. Gustavo Guevara Alarcon was not provided Atorvastatin on September 1, 2025 and September 9, 2025 because it was out of stock. Mr. Chavez Lopez did not receive Atorvastatin on September 2 or September 5 and 6, Farxiga from September 3 through 17 and September 20 through 28 (with many days noted as out of stock and other dates not documented at all), and Omeprazole on September 5, 8, and 10 due to them being out of stock. Fernando Viera Reyes did not get Fenofibrate on September 4, 5, and 8 because it was out of stock. Mr. Gomez Ruiz did not receive santyl and silver sulfadiazine ointments for his diabetic ulcer because they are out of stock. Daler Singh did not get Acidophilus Probiotic between October 20 and October 30 and Ensure three times per day between October 26 and October 30 because they were "out of stock." It is not clear if Daler Singh received alternative calories to supplement his diet while the Ensure was out of stock.

**Summary of Opinion**: California City does not consistently deliver medication to patients. At times, medication is administered hours after the appropriate medication window. At other

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

times, medication is not administered at all. Even patients with serious medical conditions do not consistently receive their medication. Medications are discontinued or not renewed without a prior consultation with patients. Providers order medications that are not clinically indicated for the patients' conditions. Even common medications are not administered because California City is out of stock. The failure to timely and consistently administer medication to patients is dangerous.

### E. Care from Specialty Providers is not Available to Detainees

110.    A primary care provider should refer their patient to a specialist when the patient's condition requires more specialized knowledge or care than the PCP can provide. Specialty care must be available to patients, and it must be provided in accordance with the patient's acuity level as determined by the ordering provider. For patients with urgent needs, they may need to be seen within a week or two. Patients with routine needs could wait as long as 30-60 days.

111.    California City has no system for ensuring specialty referrals occur. People who arrive with pending referrals for specialty services do not have those timely reordered, and people who California City medical staff determine need specialty services also are left waiting for months. According to the declarations, people have been told there are no specialty contracts in place. *See, e.g.*, Keo Decl. ¶ 24. Record reviews raise concerns that California City does not have the capacity or ability to obtain timely specialty services. As a result of this apparent inability, patients with serious, time-sensitive, and critical medical needs have been unable to obtain workup for possible prostate cancer, heart failure, and diabetic wound care, among other serious medical conditions.

112.    Pending specialty encounters are not consistently honored at California City and can be discontinued with no documented reason or without a provider evaluation. Records reflect that Utkarshkumar Trivedi arrived at California City in early September from another detention facility with a scheduled oral surgeon encounter on September 8, 2025 and an ear-nose-and-throat ("ENT") encounter on September 26, 2025 for a mouth biopsy of oral lesions to rule out

cancer. Mr. Trivedi informed medical staff at California City in person and via sick-calls about the lesions and need for a biopsy, but as of November 6, 2025, he does not have an order for those specialty evaluations.

113.    Sokhean Keo arrived at California City from another detention facility, where he was pending specialty encounters with a neurologist, an ENT doctor, an orthopedist, a hand/finger specialist, and an ophthalmologist. All those appointments were cancelled, and he has been told by the primary care provider at California City that he will just have to live with the pain he is experiencing Keo Decl. ¶¶ 18-25. His records do not reflect that any specialty appointments have been ordered.

114.    When California City staff do order specialty appointments for detainees, they do not appear to be scheduled. In the 17 records that I reviewed, I found a total of 13 orders for specialty services for six of the detainees—each detainee had from one to four pending orders. In each case, the status of the referral order was "need information." None of the orders had been completed, although some were for very urgent medical issues.

115.    Of particular concern is Fernando Viera Reyes, who despite having a high probability of having prostate cancer, is not being addressed with the appropriate level of urgency. He began workup for his progressively increasing PSA levels at his prior detention facility. PSA is a blood test which measures prostate-specific antigen and could be indicative of various conditions, including prostate cancer. Typically, when a PSA is elevated, steps are taken to rule out simple explanations such as a urinary tract infection or an enlarged prostate, which can be addressed through medication and will typically bring PSA levels down if that is the cause of the elevated levels. However, despite these measures at the prior facility, Mr. Viera Reyes's levels have continued to increase rapidly and dramatically. The rate by which his PSA is increasing, in combination with the actual PSA level, points to a high likelihood that he has cancer. In a matter of months, Mr. Viera Reyes's PSA value went from 6.3 in January 2025 at his prior facility to 74 in October 2025, a month after his arrival to California City, at a rate vastly above the cutoff for concern. In addition, once a patient has a PSA level above 10, their risk for

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

3871655

cancer increases dramatically so other workup is bypassed and the patient goes straight to a prostate biopsy for diagnosis.

116.    Mr. Viera Reyes was waiting to complete a prostate biopsy that was recommended on an urgent basis by the urologist in March 2025. Viera Reyes Decl. ¶ 9. However, at the time of his arrival to California City on August 29, 2025, it still had not been completed. Since his arrival at California City, he has reported progressively worsening symptoms, including urinary bleeding, nocturia, and extreme pain. *Id.* ¶ 16. It was not until early October 2025 that a referral to see a urologist was placed with a "due" date of January 2026. It is unclear if this order is for a prostate biopsy or an initial consult. Furthermore, the orders have the appointment flagged as needing further information so it is unclear if the offsite encounter is even approved. Given the rapid increase of his PSA level, this type of delay is unacceptable and, if his condition is in fact cancer, increases the risk of metastatic cancer. His condition should be addressed with urgency as it is imperative to determine whether he has prostate cancer or not. If he does have cancer, he needs aggressive treatment quickly to minimize his risk of having widespread disease and a much higher mortality rate. Mr. Viera Reyes's treatment as it relates to his prostate condition thus far at California City constitutes a complete dereliction of duty by the medical staff. Every day that this is delayed increases this patient's risk for metastatic disease.

117.    Yuri Roque Campos arrived at California City with a very serious heart condition that needs consistent and timely management by a cardiologist. California City has failed to have him seen by the necessary specialist since he arrived on September 5th. He is pending an appointment with a cardiologist that is not due until January 19, 2025, and whose status remains as "need information." It is not clear if this is approved or if he will be seen. Furthermore, the reason for their referral is listed as an echocardiogram, and the attempted treatment is listed as Omeprazole, a medication typically prescribed for GERD or heartburn. Mr. Roque Campos in fact has heart disease and is diagnosed with pulmonary hypertension, a right bundle branch block, congestive heart failure—not GERD or heartburn.

118.    Yuri Roque Campos also came to California City with a cardiac monitor in place that was removed and mailed back to the cardiologist on September 12, 2025. The RN noted that

44

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

3871655

Mr. Roque Campos was scheduled to see the cardiologist on October 8, 2025 to review the results. That encounter did not happen. As of October 31, 2025, the records do not reflect that the results of the cardiac monitor have been obtained by California City or that Mr. Roque Campos is scheduled to return to the cardiologist to review the results.

119.    Fernando Gomez Ruiz requires an offsite wound care appointment for his chronic diabetic ulcer. An offsite wound care appointment was ordered by his provider on October 23, 2025 with a January 27, 2026 compliance date. The status of the appointment, including whether it is approved, is unknown but given the seriousness of his injury, including his history of amputation, and the inadequate and inconsistent wound care he is receiving at California City, it is critical that he be seen sooner to avoid wound complications.

120.    Alfonso Leyva was diagnosed with hearing loss and tinnitus at Golden State Annex and says he was transferred from that facility after he was assessed by an audiologist, but before he could obtain hearing aids. Leyva Decl. ¶ 31. Although he was referred to an ENT on October 9, 2025, the status of that appointment, including whether it is approved, is likewise unknown. Currently, he is suffering from ear pain in addition to suffering hearing loss. *Id*. ¶ 32.

121.    Sudesh Singh is a 55-year-old man who has a painful hernia, and says that he was scheduled for repair surgery in June, 2025, at his previous detention facility, but it did not happen. On October 1, 2025, the California City provider placed an order for a general surgery consultation, to be done by November 11, 2025. According to his record, it had not been scheduled as of November 6, 2025 and the status of the order was "need information." Mr. Singh has also been referred to specialists in podiatry (he reports 9/10 foot pain), ophthalmology and optometry. These were likewise unscheduled as of November 6, 2025, and also "need information."

**Summary of Opinion**: California City has no effective system for ensuring that patients receive medically necessary specialty care in a timely manner. Patients with serious medical conditions are not appropriately evaluated and referred for specialty care. Patients do not

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

3871655

appear to be receiving any specialty care, even where critically necessary. California City's failure to provide specialty care creates a significant risk to patient safety.

### F. Medical Staff Fail to Respond Appropriately to Urgent or Emergency Medical Issues

122.    According to the CoreCivic Handbook, if a person has a medical emergency, they should notify their housing unit officer, who will notify the "Medical Team . . .[which] will respond immediately." Appendix C at 42.

123.    In practice, California City does not appear to have a functional system for responding to medical emergencies. When a medical or mental health emergency is called, often referred to as a "Code Blue," responses can be delayed. Requests for urgent care are not always responded to. Gustavo Guevara Alarcon reported a severe migraine to staff but was notified that medical would not see him unless it was an emergency. Guevara Alarcon Decl. ¶ 22. Daler Singh sought urgent help when he vomited blood but was told that there was no doctor available until the next morning. Singh Decl. ¶¶ 14-16. The next day, he fainted and had chest pain and was taken emergently to the medical clinic, where he expressed his need for proper medication and to be seen by a GI specialist for his stomach ulcers. He did not receive his medication that day. *Id.*

124.    Even when Defendants respond to a medical emergency, the care provided is far too often inadequate. Nurses may take the person to the medical area in the facility for assessment but the assessments are incomplete.

125.    Patients who are seen by an RN and referred urgently to a provider can experience delays before being assessed and medical issues are not addressed with the necessary urgency. Fernando Viera Reyes, who may have prostate cancer, was seen by an RN on September 21, 2025 for symptoms of painful urination and was referred urgently (within 24 hours) to a PCP. That encounter did not happen until days later when Mr. Viera Reyes saw another RN for reports of blood in his stool and was again referred to the PCP. Yuri Roque Campos, who has heart disease, was experiencing dizziness and tingling of his left upper extremity and only seen by an RN who consulted with the PCP and no treatment was provided despite an abnormal EKG. He

46

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

3871655

further reported not receiving his heart medication to an LVN on October 14, 2025 and it was noted that he would be seen the same day by the provider but was not seen until he had another medical emergency on October 19, 2025.

126.    Even when patients are seen by a provider, the notes are sparse, lacking evidence of physical exams. Julio Santos Avalos, who has a foot deformity, reports was seen by an LVN on October 9, 2025 after hurting his ankle and knee trying to climb to a top bunk. Santos Avalos Decl. ¶¶ 11-13. He was finally seen by a PCP twenty days later on November 3, 2025, where there is no physical exam of Mr. Santos Avalos's ankle noted. The note merely lists his medication and notes muscle cramps and ankle deformity.

127.    California City is so remote that when there is a medical emergency warranting an offsite hospital visit, people must be transported 45-60 minutes' drive away to the nearest hospital. This is very dangerous. The long drive and associated wait to access emergency services can place detainees at greater risk of harm. Furthermore, people are not receiving the necessary specialty services while in the hospital. Often, they receive the bare minimum assessment before returning to California City with the same concerns. Daler Singh was sent out to the hospital due to blood in his stool. Singh Decl. ¶ 20. The hospital did not appear to address his underlying concern; rather a chest x-ray and vitals were taken and Mr. Singh was returned to the facility. *Id*.

128.    In at least one case, a patient's care was delayed because he was sent to an offsite hospital, only to be refused treatment for a head injury because, he was told, he had no insurance. Alfonso Leyva fell and hit his head in his cell on September 16, 2025, early in the morning. About three hours later, he was taken to a hospital approximately 90 minutes away, but was refused care and returned to the facility. Leyva Decl. ¶¶ 15-18. He was finally taken to a different hospital at around 5 pm that day, where his head wound was cleaned and repaired with four staples, and he had a CT scan and x-ray. He reports he remained in handcuffs, and received no food or water until he reached the second hospital that evening. *Id*. ¶¶ 17-19. This type of treatment is not only grossly inhumane, it is medically risky because this patient had a significant head injury due to a fall from his top bunk and the potential for a brain bleed or other cranial

47

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

3871655

pathology due to the trauma was high. Indeed, this patient has evidence of a basilar skull fracture that was potentially missed and has yet to be worked up adequately as described above. *See,* discussion of Mr. Leyva, ¶ 38.

129.     When patients return from an offsite hospital, follow-up care at California City is inadequate and recommendations made by the hospital are delayed or disregarded. Yuri Roque Campos returned from an ER visit for his pulmonary hypertension with heart failure with an urgent recommendation to be seen by a heart specialist within 72 hours, to continue his current heart medications, including a diuretic, and to begin a new medication to address his low potassium levels. None of those recommendations were timely followed, if at all, despite a directed letter from the ER doctor to the detention center doctor that gave explicit instructions for the care that was needed for this extremely fragile patient. He went five days without his aspirin, was not prescribed potassium bicarbonate as recommended, and was not seen by a heart specialist. Jose Franco Peña was sent out to the hospital where he underwent an upper endoscopy (EGD) with biopsies and a colonoscopy. He was recommended a three week follow up with the GI in two to three weeks, a repeat EGD in eight to 12 weeks to monitor the healing of the duodenal ulcer, as well as two medications (pantoprazole and sucralfate) to address the ulcer. The medications were not administered until four days later, and there is no indication in the records that the recommended GI appointments were ordered or that the biopsy results were ever received or requested.

**Summary of Opinions**: California City does not provide adequate emergency services when responding to medical emergencies. The distance between California City and the nearest emergency hospital—reportedly between 45 and 60 minutes—makes the facility unsafe to house patients with complex medical needs.

### G.  Sick People are Placed in Inappropriate and Inadequate Medical Housing

130.     In the medical records, I saw the placement of people in observation cells, but it was unclear to me whether these stays were medically necessary and/or included sufficient medical services. In declarations, people describe the lack of service delivery and the poor conditions in these cells. *See, e.g.*, Leyva Decl. ¶¶ 20-23, Roque Campos Decl. ¶¶ 21-23, 37-41,

48

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

3871655

Armenta Decl. ¶¶ 10-12. This is dangerous because these cells can be sources of infection that can spread numerous diseases if they are not cleaned between occupants.

131.    The reported conditions in these cells are unacceptable. The observation cells are reportedly dirty and appear not to have been cleaned between uses. It is inappropriate to require someone to clean their own cell, without adequate cleaning supplies besides, when they have just returned from the hospital. It is also inappropriate not to provide people with operable showers, towels, soap, or linens in these cells, as the declarations describe. I am also concerned that people describe being extremely isolated in these cells—*e.g.*, without access to any indoor or outdoor common area outside their cells, to other detained people, to their tablets or family or legal phone calls, to physical activity, or to social interaction or sensory stimulation. In the records I reviewed, some people spent up to a week in observation cells after discharge from hospital. It was not clear how medical staff determined to continue or eventually terminate their observation cell placement, and it does not appear that the medical providers round on those patients or deliver any elevated level of medical supervision.

132.    Julio Armenta reports being placed in an observation cell for approximately six days. Armenta Decl. ¶ 10. The shower was inoperable and he was not provided access to an alternate shower. *Id*. He reports developing sores on one of his legs while there. He tried to discuss his concerns about a fungal infection with the PCP, but he reports that the PCP was not interested. *Id*. He further reports the cell was small, about 10 paces along one side and six along the other side. *Id*. This is particularly concerning for someone at risk for blood clots because he needs to be able to move/walk. Mr. Armenta further reported psychological distress while in observation. *Id*. ¶ 12. He reports that he was not provided with access to any leisure activities, including reading material or a radio, and did not have access to a phone for three days. *Id*. ¶ 11.

133.    I did not see evidence of sufficient medical monitoring or provision of care while in these observation cells. I would expect to see some evidence of increased medical surveillance in the form of nursing shift notes or medical provider rounding notes. Some patients in these medical observation cells do not even receive their prescribed medications. Yuri Roque Campos was kept in a medical observation cell after returning from the hospital to monitor his heart

49

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

3871655

disease yet did not receive his heart medication for over half the days he was housed there. Daler Singh was being held in a medical observation cell for five days while participating in a hunger strike, but there are no documented vitals or weights during that period. Jose Franco Peña was in a medical observation cell from September 18 through September 20, 2025 after returning from the hospital, where he had an EGD and colonoscopy completed. The records are unclear as to why he needed placement in a medical observation unit upon his return, but while there, he did not get any of his previously prescribed medication for hypertension, hyperlipidemia, or diabetes, nor any of the newly recommended medications from the hospital.

**Summary of Opinion**: California City's medical observation housing does not appear to provide an elevated level of care. The reported conditions in the unit are unsanitary, and the medical care provided in those units does not meet an appropriate clinical standard.

### H.  Mental Health Care is Grossly Inadequate

134.    Detainees at California City do not have readily available access to mental health professionals or services. The declarations I reviewed describe conditions that are very isolating, including lack of structured programming and social activities, sensory stimulation, and physical activity. Combined with the possibility of imminent deportation, I would expect these conditions to cause patients to experience severe mental health distress and feelings of helplessness. For those who have never been detained before, the sudden isolation can be debilitating. For those with preexisting mental diagnoses, the isolation can cause and exacerbate psychiatric decompensation. Sokhean Keo describes a traumatizing suicide attempt he witnessed that has continued to haunt him. He describes a man hanging from his cell, his body shaking. Keo Decl. ¶¶ 17-18. Since the suicide attempt, he has received no information from staff about how to request mental health care or what mental health support resources are available. *Id.* ¶ 20. He knows people who have agreed to voluntary deportation to escape the conditions in California City Detention Facility. He said, "There is also the person who tried to kill himself because it was all too much." *Id.* ¶ 34. Julio Santos Avalos similarly reports witnessing a detainee hang himself on October 6, 2025. Santos Avalos Decl. ¶ 16. It was so upsetting that he asked to speak

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

with a doctor because his blood pressure felt high (records confirm his blood pressure was elevated). He was told to try to calm down and returned to his unit. *Id.*

135.    I see no evidence in the medical records that a psychiatrist is participating in any of the mental health care in this facility. The prescriptions for mental health medications all seem to be written by a nurse practitioner and there is evidence of a psychologist doing some assessments. I could not find any psychiatry notes or prescriptions.

136.    The lack of a psychiatrist was particularly troublesome in the case of Daler Singh, who initiated a hunger strike that was prolonged. Singh Decl. ¶¶ 13-17. One of the critical elements of caring for someone on a hunger strike is a thorough assessment by a psychiatrist to determine the presence of any psychosis or undiagnosed major mental health conditions. Another purpose is to determine competency from a mental health perspective and to monitor competency as the hunger strike progresses. This type of care was not documented, and it is a major deficiency in the care of someone on a hunger strike.

137.    Many detainees transfer into California City with pre-existing mental health conditions for which they receive medication designed to address their anxiety, depression, and associated symptoms. Some have the medication continued, others do not. Fernando Viera Reyes arrived at California City with two active mental health medications to address his anxiety and insomnia. He reports that both were continued at first, but one was discontinued shortly after his arrival, and the other in late September. He was not consulted or spoken to before either medication was discontinued. He reports that he submitted a sick-call slip requesting to continue the medication and finally spoke to a psychologist about restarting the medication on October 14, 2025, to help with his sleep and mood management. As of October 29, 2025, the medication had still not been re-ordered. Viera Reyes Decl. ¶¶ 19-21.

138.    Some patients report lapses in the administration of psychiatric medications. Julio Santos Avalos submitted multiple sick-call slips in September reporting his anti-depression medications got cut off and his "mental health is at risk." *See* Santos Avalos Decl. ¶¶ 9-10. MAR records confirm that he missed multiple doses of his MH medication with no documented reason.

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

3871655

139.    According to Fernando Chavez Lopez's transfer form, his mental health diagnoses included depressive disorder, anxiety disorder, and auditory hallucinations. At intake, the nurse failed to reference the history of hallucinations, but nevertheless referred him for an urgent mental health exam, which should have happened on September 2, 2025. Instead, it happened two weeks later. The handwritten note by a psychologist is in places illegible, but appears to be silent regarding his medications. On October 8, 2025, he was prescribed Haldol, a powerful antipsychotic by a nurse practitioner. Oddly, there is no mental health or medical note explaining why this medication was prescribed. It appears that the patient was moved off of his Aripiprazole and onto Haldol for reasons that are not clinically explained. Likely this was a financial decision and not a clinical decision. Several weeks later, the dose of Haldol is markedly increased, from one mg two to three times a day, to five mg two to three times a day, apparently based on his report that the medication is no longer working for him. The workup to justify this significant increase is essentially nonexistent, and it fails to meet the standard of care for using a potent antipsychotic. Additionally, the prescription from the nurse practitioner makes no medical sense. The nurse practitioner has ordered a variable dose that is essentially an "as needed" dose of Haldol. That is just not done in a general population setting, and it is unclear who is determining whether the patient needs a dose two times a day or three times a day and what the clinical criteria is for making that decision.

140.    Detainees also struggle to talk to mental health professionals. Referrals to mental health upon intake can be delayed for weeks. Fernando Viera Reyes was referred on a routine basis (to be seen within 14 days) to mental health at intake but was not seen for over a month.

141.    Other patients ordered appointments with mental health staff are not seen timely. Jose Ruiz Canizales suffers from anxiety and claustrophobia that disrupts his sleep. Ruiz Canizales ¶¶ 50-51. Shortly after he arrived at California City in early September, he experienced trouble breathing and was taken to the infirmary in a wheelchair. *Id.* ¶ 60. There was no Sign Language Interpreter. He was sent offsite to an Emergency Room, where he was able to communicate through a video remote interpreter. *Id.* ¶ 62. The doctor he saw explained that he was experiencing a panic attack, and provided a shot to help him relax. *Id.* When he returned to

52

3871655

California City, a nurse told him he could see a psychiatrist the next day. *Id*. ¶65. He wants to see a psychiatrist to help him with his racing thoughts and anxiety. *Id*. ¶¶ 67-68. That appointment did not happen. That appointment probably could not happen because there does not appear to be a psychiatrist at the facility.

> **Summary of Opinion**: The provision of mental health care at California City is inadequate. The medical records do not appear to indicate that a psychiatrist is participating in patient assessments or decisions about prescription psychiatric medication. Doses of patients' mental health medications are sometimes missed, and other times, patients' medications are discontinued without prior notice.

## I. Health Care Staffing is Insufficient for the Number of Detainees Currently Housed at the Facility

142.    Based on the documentation I have reviewed, it appears that California City may be understaffed. The facility is located in an area that makes it challenging to provide care at the level necessary given its detainee population. I understand that when California City was a state prison, it housed virtually no high-risk medical patients. I imagine this was because it would be hard to obtain specialty services contracts and sufficient healthcare staffing given this location. High-risk patients in state prison were those with a sensitive medication condition, multiple hospitalizations, multiple emergency room visits, high-risk specialty consultations, significant abnormal labs, age 65 or older, or specific high-risk diagnoses and procedures. The state prison was also not approved to house patients who required Enhanced Outpatient Program (EOP) levels of care for mental illness. I assume this is for the same reason, because that population requires additional staffing to support their mental health needs. My understanding is that, now that it is operating as an immigration detention facility, California City houses people who would fall into both the high-risk patient and potentially EOP level of care. In my opinion, this is dangerous because it puts patients with higher acuity medical and mental health problems at an elevated risk of bad outcomes due to lack of staff and lack of specialty consultations necessary to care for their conditions. The state prison system figured out that they could not house sick

patients in this facility, so it is illogical to think that ICE can safely maintain sick patients in this facility.

143.    California City Detention Facility, even at a quarter of its potential census, houses multiple high-risk medical patients. It does not appear the facility has sufficient staffing to address those patients' needs. The problems I have noted with access to specialty services provision of necessary and timely care may be due to insufficient staffing. For example, the delay in completing health care intake and initial assessments, lack of timely responses to sick-call slips, the distribution of 8 pm evening medication at 1 or 2 am, and the frequently delayed primary care appointments are all symptomatic of an understaffed system. I have serious concerns that California City is ill-positioned to expand its current population size given its current staffing levels, and they may need to implement a medical triage system to prevent sick patients from being housed at that facility.

**Summary of Opinion**: Based on the documentation I have reviewed, it appears the facility does not have a sufficiently robust healthcare system or adequate relationships with community healthcare partners to meet the needs of the current population. I am concerned that, if the population of California City were to increase, the unmet healthcare needs of the population would continue to expand, exposing more detained people to danger.

## V.    <u>Conclusion</u>

144.    For all of the reasons cited above, I have concluded that people detained at California City Detention Facility are being harmed, and are at risk of serious harm, including death, because the medical and mental health care are so deficient.

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

3871655

1       I declare under penalty of perjury under the laws of the State of California and the United

2 States of America that the foregoing is true and correct.

3       Executed this 25 day of November, 2025, in Salt Lake City, Utah.

4

5

6 Dated:

7                            By:

8                                 Todd R. Wilcox, M.D.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

55

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

# Appendix B

# Todd Randall Wilcox, MD, MBA, FACCP

ADDRESS:     4760 S. Highland Drive, # 105
             Salt Lake City, UT  84117
             (801) 424-1500
             trwilcox@wellcon.net

EMPLOYMENT:  **Chief Executive Officer**, Wellcon, Inc.
             May 1996 to present

             **Medical Director**, Salt Lake County Jail System
             May 1996 to present

             **Attending Physician**, After Hours Medical
             August 2001 to October 2016

             **Senior Consultant**, Phase 2 Consulting
             January 2003 to December 2009

             **Medical Director**, Maricopa County Jail System
             November 2004 to February 2006

             **Attending Physician,** Wasatch Physician Services
             July 1996 to January 2000

             **Attending Physician**, State of Utah Department of Corrections
             August 1997 to January 1999

             **Staff Physician**, Salt Lake County Jail
             June 1994 to May 1996

EDUCATION:   M. B. A.
             **University of Utah David Eccles School of Business**
                  Salt Lake City, UT
                  September 1996 to June 1998

             Residency in Orthopaedic Surgery
             **University of Utah**
                  July 1993 to July 1996

Internship in General Surgery
**University of Utah**
July 1992 to June 1993

M.D.
**Vanderbilt University School of Medicine**
Nashville, TN
August 1988 to May 1992

B.S.
**Duke University**
Durham, NC
Major: Biological Psychology
August 1984 to May 1988

MEDICAL
LICENSURE:       Utah
Arizona

BOARD
CERTIFICATIONS: American Board of Urgent Care Medicine—certification by exam
2006, recertified by exam 2014 and 2020

ADVANCED
CERTIFICATIONS: Fellow, American College of Correctional Physicians--2015
American Academy of HIV Medicine—2009, 2013 recertified by
exam
Advanced Certified Correctional Health Care Provider (CCHP-
A)—certification by exam 2007, recertified 2015
Advanced Certified Correctional Health Care Physician (CCHP-
P)—certification by exam 2015
Buprenorphine certified--2013

FACULTY
APPOINTMENTS: Medical School Admissions Committee, University of Utah School
of Medicine
Faculty Instructor, Correctional Crisis Intervention Team
Academy, Salt Lake County, UT
Adjunct Instructor of Medicine, University of Utah School of
Medicine
Adjunct Professor of Chemistry, Salt Lake Community College
Faculty Instructor, University of Utah School of Nursing

PROFESSIONAL
APPOINTMENTS: Past-President, American College of Correctional Physicians,
2017-present

President, American College of Correctional Physicians, 2015-2017

Chairman, Physician Certification Committee, National Commission on Correctional Health Care, 2012-2013

Board of Directors, National Commission on Correctional Health Care—Certified Correctional Healthcare Professional Board

Chairman, Electronic Medical Records Taskforce for the National Commission on Correctional Healthcare, 2002

Treasurer, Society of Correctional Physicians, 2012

Medical School Admissions Committee, University of Utah School of Medicine, 2012-13

HONORS:  Armond Start Award from American College of Correctional Physicians, 2019

Medical Director for National Commission on Correctional Healthcare Facility of the Year, 2001

Angier B. Duke Memorial Scholarship

Boettcher Foundation Scholar

Jostens Foundation Scholar

PROFESSIONAL
MEMBERSHIPS:  American Medical Association

American College of Emergency Physicians

American Jail Association

Society of Correctional Physicians

American Correctional Health Services Association

American Academy of Urgent Care Medicine

American Academy of HIV Medicine

CORRECTIONAL
CONSULTING:  American Jail Association

National Institute of Corrections

California Department of Corrections

Maricopa County Correctional Health Care, AZ

Pima County Department of Institutional Health, Tucson, AZ

Santa Clara County Jail System, CA

Washington County Jail, UT

Utah County Jail, UT

Seattle-King County Jail System, WA

Mississippi Department of Corrections

National Commission on Correctional Healthcare

PUBLICATIONS:    Wilcox, TR.  President's Column.  *Corrdocs*.  Chicago:  American College of Correctional Physicians, Spring 2016.  19:1, 2.

Wilcox, TR.  How I Practice:  Assessing Weight Loss in Correctional Facilities.  *Corrdocs*.  Chicago:  American College of Correctional Physicians, Spring 2016.  19:1, 8.

Wilcox, TR.  Poising the College for Continued Success.  *Corrdocs*.  Chicago:  American College of Correctional Physicians, Winter 2015.  18:4, 4.

Wilcox, TR.  How I Practice:  Managing Diabetics on Commissary Day.  *Corrdocs*.  Chicago:  American College of Correctional Physicians, Winter 2015.  18:4, 9.

Wilcox, TR.  Dealing with Orthopedic Hardware.  *Corrdocs*.  Chicago:  Society of Correctional Physicians, Fall 2014.  17:3, 4-5.

Wilcox TR.  Critical Commandments in Correctional Health Care:  Part 3.  *CorrectCare*.  Chicago:  National Commission on Correctional Health Care, Fall 2013.  27:4, 16.

Wilcox TR.  Critical Commandments in Correctional Health Care:  Part 2.  *CorrectCare*.  Chicago:  National Commission on Correctional Health Care, Summer 2013.  27:3, 19.

Wilcox TR.  Critical Commandments in Correctional Health Care:  Part 1.  *CorrectCare*.  Chicago:  National Commission on Correctional Health Care, Spring 2013.  27:2, 20.

Wilcox TR.  Developing an Effective Alcohol Withdrawal Protocol.  *Correctional Health Care Report*.  Civic Research Institute, Inc., May 2003:  49-50, 63-64.

Goble EM, Kane SM, Wilcox TR, Doucette SA.  Meniscal Allografts.  In:  McGinty JB, ed. *Operative Arthroscopy*.  Philadelphia:  Lippincott-Raven Press; 1996:  317-31.

Goble EM, Kane SM, Wilcox TR, Olsen RE.  Advanced Arthroscopic Instrumentation.  In:  McGinty JB, ed.  *Operative Arthroscopy*.  Philadelphia:  Lippincott-Raven Press; 1996:  7-12.

Wilcox TR, Goble EM.  Indications for meniscal allograft reconstruction.  *American J of Knee Surgery* 9:  35-6, 1996.

Wilcox TR, Goble EM, Doucette SA.  Goble technique of meniscus transplantation. *American J of Knee Surgery* 9:  37-42, 1996.

Goble EM, Downey DJ, Wilcox TR.  Positioning of the tibial tunnel for ACL reconstruction. *J Arthroscopy* 12:  415-18, 1995.

Morris JA, Wilcox TR, Reed GW, et al.  Safety of the blood supply:  surrogate testing and transmission of hepatitis C in patients after massive transfusion. *Annals of Surgery* 219:  517-26, 1994.

Wilcox TR, Morris JA, Green NE.  Case report:  Pediatric ankle fractures. *Tennessee Medical Journal*.  85:  217-19, 1992.

Morris JA, Wilcox TR, Frist WH.  Pediatric organ donation:  the paradox of organ shortage despite the remarkable willingness of families to donate. *Pediatrics* 89:  411-15, 1992.

Morris JA, Wilcox TR, Noreuil T, and Frist WH.  Organ donation:  a university hospital experience. *Southern Medical Journal* 83:  884-88, 1990.

Cogbill TH, Moore EE, Feliciano DV, Wilcox TR, et al.  Conservative management of duodenal trauma:  a multicenter perspective. *Journal of Trauma* 30:  1469-75, 1990.

Morris JA, Moore EE, Feliciano DV, Wilcox TR, et al.  Post-traumatic renal failure:  a multicenter study. *Journal of Trauma* 31:  1584-90, 1991.

Wilcox TR, contributing author to The Admissions Essay by Helen W. Power and Robert DiAntonio.  Lyle Stuart, Inc., Seacausus, NJ, 1987, pp. 116-7, 197, 206-8, 219-20.

PRESENTATIONS:  National Commission on Correctional Healthcare Jail Standards Course
Abdominal Pain
Chronic Disease Management in Correctional Facilities
Pain Management in Correctional Healthcare
Alcohol Withdrawal Syndrome
Drug Withdrawal Syndromes
Effective Correctional Medical / Mental Health Intake Screening
Endocrine Emergencies
Excited Delirium and Sudden In-Custody Death Syndrome
Hematologic Emergencies

Safe Restraint and Intensive Medical Management Practices
Medical Effects of Mental Health Medications
Neurological Emergencies
Effective Nursing Triage in Correctional Settings
Orthopedic Emergencies
Point of Care Laboratory in Correctional Healthcare
Managing Hypertension in Correctional Healthcare
Seizure Assessment and Treatment
How To Work Well with EMS
Effective Wound Care Practices in Correctional Healthcare
14-day Assessments in Corrections
Electronic Health Records for Institutional Medicine

EXPERT
PANELS:            Rand Corporation Expert for Modified Delphi Process to
                  Determine Quality Measures for Correctional Healthcare—June
                  2009

                  American Jail Association / National Institute of Corrections
                  Expert for Mental Health in Jails Focus Group and National
                  Satellite Broadcast—June 2009

PATENTS:          United States Patent 5,681,289
                  Chemical Dispensing System
                  Issued October 28, 1997

                  United States Patent 5,891,101
                  Chemical Dispensing System Methodology
                  Issued April 17, 1999

                  United States Patent 5,895,375
                  Chemical Dispensing System Components
                  Issued April 17, 1999

# Appendix C

Expert Testimony List 2025
Todd R. Wilcox, MD, MBA, FACCP

| Case | Date | Location | Topic | Role |
|---|---|---|---|---|
| Lee v Turn Key | 2022 | OK | Opiate withdrawal / GI bleed | Plaintiff Expert |
| Sacco v Braga | 2022 | NH | Opiate withdrawal vs chronic renal failure | Defense Expert |
| Cruz-Sanchez v. US | 2022 | CA | Pneumonia | Plaintiff Expert |
| Yarbrough v. GA | 2023 | GA | Diabetic Ketoacidosis | Plaintiff Expert |
| Ellis v. Ottawa County | 2023 | OK | EMT Supervision | Plaintiff Expert |
| Ellis v. Ottawa County | 2023 | OK | Pneumonia | Plaintiff Expert |
| Maney v. Oregon | 2023 | OR | COVID issues | Defense Expert |
| Maney v. Oregon | 2023 | OR | COVID, Institutional Response | Defense Expert |
| Burgess v. USA | 2024 | NC | Anticoagulation / DVT | Plaintiff Expert |
| White v. Turn Key | 2024 | OK | COVID | Plaintiff Expert |
| Chestnut v. Yes Care | 2025 | FL | Splenomegaly | Defense Expert |
| Lewis v. After Hours | 2025 | UT | Healthcare administration | Plaintiff Expert |

# Appendix D



Dear Mr. Campos and the responsible health official at his detention facility,

Mr. Campos presented to the emergency department with complaints of chest pain. We conducted extensive testing to evaluate the possible causes of his symptoms. Unfortunately, our ability to provide comprehensive care was limited due to the lack of access to records from his recent hospitalization, ongoing treatment, and testing performed at another facility.

Based on our conversation and the limited records available, along with the results of our diagnostic workup, it appears that Mr. Campos likely has a condition known as pulmonary hypertension. This is a potentially life-threatening illness that requires close and continuous management, as it can rapidly progress to severe heart failure.

It is imperative that Mr. Campos follow up within 72 hours with a specialist in right heart failure or pulmonary hypertension. Ideally, this should be with a provider who has previously been involved in his care—either at the Bakersfield facility where he was recently treated, or at Stanford, where he has also received care.

We performed a CT scan, which did not reveal any signs of blood clots but did show mild indications of congestive heart failure. Additionally, his potassium level was slightly low, and I have prescribed medication to help restore it to a healthier range.

Mr. Campos should continue taking his usual medications as previously prescribed, which may include a diuretic. However, we do not currently have access to the exact dosages.

Thank you for your patience today and for allowing us the privilege of contributing to Mr. Campos's care. At this time, it is safe for him to be transported back to the facility, provided that he receives daily check-ins with health officials and that arrangements are made for close follow-up with appropriate cardiology and/or pulmonology specialists.

Sincerely, Dr. Kimon

**Imaging**

CH
CHARLES HOOPER D.O.
CA LIC# 20A5310
DEA# BH025
.....

CT Pulmonary Angiogram &Chest w/Contrast

09/05/25 18:38:55
IMPRESSION:
1. No emboli through the level of the segmental pulmonary arteries. A more distal embolus is not excluded.
2. Markedly dilated main pulmonary artery measuring 47 mm in diameter and dilated right and left pulmonary arteries, consistent with pulmonary hypertension.
3. Markedly dilated right atrium and right ventricle. No pericardial effusion.
4. Mosaic attenuation of the lung parenchyma, consistent with small-vessel or small airways