PRISON LAW OFFICE
MARGOT MENDELSON – 268583
mmendelson@prisonlaw.com
TESS BORDEN (MJP No. 805022, *pro hac vice*)
tess@prisonlaw.com
PATRICK BOOTH – 328783
patrick@prisonlaw.com
ALISON HARDY – 135966
ahardy@prisonlaw.com
RANA ANABTAWI – 267073
rana@prisonlaw.com
1917 Fifth Street
Berkeley, California 94710-1916
Tel.: (510) 280-2621

CALIFORNIA COLLABORATIVE FOR
IMMIGRANT JUSTICE
PRIYA ARVIND PATEL (295602)
priya@ccijustice.org
MARIEL VILLARREAL (317048)
mariel@ccijustice.org
1999 Harrison Street #1800
Oakland, California 94612
Tel: (650) 762-8990

KEKER, VAN NEST & PETERS LLP
STEVEN P. RAGLAND - # 221076
sragland@keker.com
CODY S. HARRIS - # 255302
charris@keker.com
CARLOS C. MARTINEZ - # 354616
cmartinez@keker.com
633 Battery Street
San Francisco, CA 94111-1809
Tel.: 415 391 5400; Fax: 415 397 7188

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
KYLE VIRGIEN (278747)
kvirgien@aclu.org
FELIPE HERNANDEZ (338468)
npp_fhernandez@aclu.org
MARISOL DOMINGUEZ-RUIZ (345416)
mdominguez-ruiz@aclu.org
425 California Street, 7th Floor
San Francisco, CA 94104
Tel.: (415) 343-0770

CARMEN IGUINA GONZALEZ (277369)
ciguinagonzalez@aclu.org
915 15th Street, NW, 7th Floor
Washington, DC 20005
Tel.: (202) 393-4930

Attorneys for Plaintiffs *Fernando Gomez Ruiz, Fernando Viera Reyes, Jose Ruiz Canizales, Yuri Alexander Roque Campos, Sokhean Keo, Gustavo Guevara Alarcon, Alejandro Mendiola Escutia and all others similarly situated*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FERNANDO GOMEZ RUIZ; FERNANDO VIERA REYES; JOSE RUIZ CANIZALES; YURI ALEXANDER ROQUE CAMPOS; SOKHEAN KEO; GUSTAVO GUEVARA ALARCON; and ALEJANDRO MENDIOLA ESCUTIA, on behalf of themselves and all others similarly situated,<br><br>          Plaintiffs,<br><br>     v.<br><br>U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; TODD M. LYONS, Acting Director, U.S. Immigration and Customs Enforcement; SERGIO ALBARRAN, Acting Director of San Francisco Field Office, | Case No. 3:25-cv-09757-MMC<br><br>**FIRST AMENDED COMPLAINT**<br><br>**CLASS ACTION** |

Enforcement and Removal Operations, U.S.
Immigration and Customs Enforcement; U.S.
DEPARTMENT OF HOMELAND SECURITY;
KRISTI NOEM, Secretary, U.S. Department of
Homeland Security,

Defendants.

**INTRODUCTION**

1.     This lawsuit challenges the inhumane conditions of confinement at the California City Detention Facility, a previously shuttered state prison in the Mojave Desert that Defendants have repurposed as an ICE detention facility for people facing civil immigration enforcement. In their haste to warehouse hundreds of men and women in this isolated facility, Defendants have failed to provide for the basic human needs of the people for whose lives and wellbeing they are legally responsible. Defendants house people in small concrete cells without adequate clothing, food, or water. They deny people basic medical care, disability accommodations, and access to their lawyers and their loved ones. Plaintiffs in this action are seven detained individuals who seek to represent a class of all people detained at California City. They seek a court order forcing Defendants to provide constitutionally adequate conditions of confinement and enjoining Defendants from violating their legal, constitutional, and human rights on a daily basis.

2.     Over the past year, Defendants have extracted thousands of Californians from their communities and funneled them into ICE detention. As federal agents sweep the streets of California and the nation, ICE's sprawling detention network strains to keep pace. In the rush to expand capacity, ICE has cobbled together a patchwork system of county jails, private prisons, and newly converted facilities across the country. The rapid and haphazard growth of the detention system has outstripped any meaningful system of accountability or oversight. Federal agencies charged with oversight have been hollowed out.[1]

3.     In California, ICE has addressed the burgeoning demand for detention beds by hastily reopening a mothballed state prison located 75 miles east of Bakersfield in the middle of the desert. In April 2025, ICE signed a contract with the for-profit prison company CoreCivic to open the California City Detention Facility.[2] This contract, worth $130 million annually, contemplates

---

[1] Zolan Kanno-Youngs, Hamed Aleaziz, Adam Goldman, and Eileen Sullivan, *Trump Shuts Down 3 Watchdog Agencies Overseeing Immigration Crackdown*, New York Times (Mar. 21, 2025), https://www.nytimes.com/2025/03/21/us/politics/trump-civil-rights-homeland-security-deportations.html.

[2] CoreCivic, *CoreCivic Announces New Contract Awards at California City Immigration Processing Center and Midwest Regional Reception Center* (Sept. 29, 2025), https://ir.corecivic.com/news-releases/news-release-details/corecivic-announces-new-contract-awards-california-city.

1

holding up to 2,560 immigrants in the facility, making California City the largest detention facility in the state.[3]

4.    Conditions at California City Detention Facility are dire. The facility is decrepit. Sewage bubbles up from the shower drains, and insects crawl up and down the walls of the cells. People are locked in concrete cells the size of a parking space for hours on end, and officers threaten them with violence and solitary confinement. Food is paltry and people go hungry. Temperatures are frigid; those who cannot afford to buy sweatshirts from the exorbitantly priced commissary suffer in the cold, some wearing socks on their arms as makeshift sleeves. Friends and family members who travel to the Mojave Desert to see their loved ones must do so across heavy glass; people detained at California City cannot touch or hug their children. The facility sharply limits access to lawyers, leaving people bewildered and largely incommunicado.

5.    The medical care system at California City is broken at every level. People with serious medical conditions such as heart disease, diabetes, and asthma do not receive essential medications at arrival. When medications are reordered, delivery is interrupted or stopped arbitrarily. Requests for medical attention go unanswered for weeks, or are never answered at all. When people finally see a medical professional, the care they receive is dangerously poor. Providers fail to document exams, do not address abnormal lab results, and fail to order necessary treatment in a timely manner. People who require medical attention for conditions such as prostate cancer and heart failure are told that there are no contracts for such services. As a result, people in custody at California City are at severe and ongoing risk of permanent, even life-threatening harm.

6.    People with disabilities are denied basic accommodations, such as sign language interpreters and wheelchairs. The facility is structurally inaccessible for people with mobility disabilities. The broken intake and specialty referral systems mean that Defendants fail to identify and track people's disability needs, much less accommodate them. As a result, many people with disabilities struggle to perform basic functions such as bathing, dressing, eating, and drinking. Some are unable to effectively communicate with staff or friends, while others have difficulty

---

[3] *Id.*; Tyche Hendricks, *California's Newest Immigration Facility Is Also Its Biggest. Is It Operating Legally?*, KQED (Sept. 4, 2025), https://www.kqed.org/news/12054544/californias-newest-immigration-facility-is-also-its-biggest-is-it-operating-legally.

getting in and out of bed. One man, unable to judge distances even a few feet away without the glasses he needs, fell while trying to get off the top bunk and was injured so badly that he had to be hospitalized.

7. Monitors authorized under federal law to inspect detention facilities "already received numerous distressing reports" regarding conditions and conducted a site inspection.[4] The monitors found that California City "fails to meet people's basic needs," fails to "provide access to critical medical" care, and "employs staff who harass" detained people. Conditions at California City are so grim that in the short time it has been open, several people have attempted suicide. Many more have chosen to abandon their legal rights and potential remedies and instead accept deportation because they cannot withstand the conditions.

8. California City's punishing conditions, alarmingly inadequate medical care, failure to accommodate people with disabilities, and restricted access to counsel all blatantly violate the law. Plaintiffs seek to represent all people who are or will be detained at California City and, on their behalf, ask the Court to end these abuses and ensure that Defendants are held to the requirements of the Constitution and the law.

**JURISDICTION AND VENUE**

9. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under the Constitution and laws of the United States, specifically the First and Fifth Amendments to the United States Constitution and the Rehabilitation Act, 29 U.S.C. § 794. This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1346 because the United States is a defendant. Defendants have waived sovereign immunity for purposes of this action. *See* 5 U.S.C. § 702.

10. Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201–02, and the inherent equitable powers of this Court.

11. Personal jurisdiction and venue are proper in this District pursuant to 28 U.S.C. § 1391(e) because all Defendants are agencies of the United States, or officers of agencies of the United States, and at least one Defendant resides in this District.

---

[4] Disability Rights California, *Newly Opened California City ICE Detention Facility: Dangerous for Disabled People* (Nov. 3, 2025), https://www.disabilityrightsca.org/reports/california-city-ice-processing-center-a-dangerous-expansion-of-immigration-detention-in.

12.     Assignment to the San Francisco Division is proper under Civil L.R. 3-2(c) because a substantial part of Defendants' actions and/or omissions that resulted in the violation of Plaintiffs' constitutional rights occurred in the Division.

**PARTIES**

13.     **Plaintiff Fernando Gomez Ruiz** is currently detained at California City Detention Facility under the authority of DHS and ICE. In early October 2025, Mr. Gomez Ruiz was eating at a food truck outside a Home Depot when ICE agents arrested him and around ten others. Mr. Gomez Ruiz is a father of two children and lived in Los Angeles for 22 years prior to his arrest. He is also an insulin-dependent diabetic. Since arriving at California City in mid-October 2025, he has been denied regular doses of insulin, leading to elevated blood sugar levels and a large, oozing ulcer on the bottom of his foot. Mr. Gomez Ruiz has also been denied proper wound care for his ulcer, which he is forced to cover with soiled bandages and bloody shoes. Mr. Gomez Ruiz knows that his diabetes can lead to serious infection and is worried that his foot will require amputation in the absence of the medical care he needs. Because of the facility's restrictions on legal calls, he has been unable to discuss his medical needs in adequate detail with his attorney.

14.     **Plaintiff Fernando Viera Reyes** is currently detained at the California City Detention Facility under the authority of DHS and ICE. When he arrived at California City in late August 2025, he had a pending appointment for a biopsy to formally diagnose and begin treatment for prostate cancer. Despite this urgent medical need, Mr. Viera Reyes' requests to see a doctor about his health went unanswered for weeks after his arrival. Months later, he still has not seen a urologist or received the testing urgently needed to diagnose and treat his condition. Mr. Viera Reyes is experiencing increasingly abnormal bloodwork results and bleeding with urination. Although he still has not seen a specialist, these results indicate that his cancer may have metastasized while he has been waiting for an appointment. He requires an immediate medical response.

15.     **Plaintiff Jose Ruiz Canizales** is currently detained at the California City Detention Facility under the authority of DHS and ICE. He was born Deaf and communicates through American Sign Language. He cannot read lips or effectively communicate in writing. Since his

arrival at California City on August 29, 2025, Mr. Ruiz Canizales has only once interacted with staff through a sign language interpreter, via video. Without a regular interpreter, he has been left completely isolated. He cannot understand staff directions, ask for medical care, or effectively communicate with others. When he tries to communicate with staff, they often shrug their shoulders, walk away, or laugh at him. The isolation has affected Mr. Ruiz Canizales' mental health, leading to an emergency room visit for an anxiety attack.

16. **Plaintiff Yuri Alexander Roque Campos** is currently detained at the California City Detention Facility under the authority of DHS and ICE. He has a heart anomaly and other heart conditions that require daily monitoring and medication. Since arriving at California City on September 5, 2025, he has been denied his heart medications for days at a time. This has resulted in two emergency hospitalizations for severe chest pain. During the last hospitalization, a doctor told Mr. Roque Campos that he could die if this were to happen again. Mr. Roque Campos has yet to see a cardiologist and still does not consistently receive his medication.

17. **Plaintiff Sokhean Keo** is currently detained at the California City Detention Facility under the authority of DHS and ICE. Since his arrival at the facility on or around September 1, 2025, Mr. Keo has struggled emotionally with the excessively restrictive and punitive conditions at California City. He has observed some of his friends agree to deportation and even attempt suicide to escape the conditions at California City. He witnessed a suicide attempt and remains traumatized by flashbacks of his friend hanging from a rope in his cell, his body twitching. When Mr. Keo was transferred to California City, he had pending appointments with specialty doctors to address chronic medical conditions. After his transfer, medical staff at California City told him those appointments were cancelled because the facility has no contracts in place with specialty doctors. One doctor told Mr. Keo that he would simply have to live with the pain he experiences. Mr. Keo is hard of hearing and has limited mobility, but he has been denied appropriate hearing and mobility accommodations.

18. **Plaintiff Gustavo Guevara Alarcon** is currently detained at the California City Detention Facility under the authority of DHS and ICE. He arrived at California City on or around August 29, 2025. Since that time, Mr. Guevara Alarcon has experienced threats of discipline and

1  force that are disproportionate and excessive, including placement in solitary confinement for

2  asking to finish his shower. Mr. Guevara Alarcon was previously incarcerated in California state

3  prison. During that time, he had significantly more freedom of movement, activity, and

4  programming opportunities than he does now.

5      19.   **Plaintiff Alejandro Mendiola Escutia** is currently detained at the California City

6  Detention Facility under the authority of DHS and ICE. Since his arrival at California City on

7  September 5, 2025, he has experienced significant difficulty communicating with his immigration

8  attorney. Because legal calls take weeks to schedule and in-person visits involve significant delays,

9  he has limited meetings with his attorney and cannot discuss issues he wishes to raise related to

10  medical care and conditions at the facility. He has observed other people make non-confidential

11  calls to their attorneys out of desperation at the lack of access. Per the facility's visitation policies,

12  Mr. Mendiola Escutia can only see his family through thick glass and is prohibited from hugging

13  his three-year-old grandchild.

14      20.   **Defendant U.S. Immigrations and Customs Enforcement** (ICE) is a federal law

15  enforcement agency within the U.S. Department of Homeland Security. ICE is responsible for the

16  criminal and civil enforcement of immigration laws, including the detention and removal of

17  immigrants. Defendant ICE is a legal custodian of Plaintiffs and members of the putative class, and

18  it has the responsibility to ensure they are kept in conditions that comply with the Constitution and

19  the law. ICE has contracted with CoreCivic—one of the largest for-profit prison corporations in

20  the country—to run and manage the California City facility. CoreCivic facility administration,

21  staff, and other personnel are agents of Defendant ICE.

22      21.   **Defendant Todd Lyons** is the Acting Director of ICE and the current senior official

23  performing the duties of the Director of ICE. Defendant Lyons is responsible for ICE's policies,

24  practices, and procedures, including those relating to the detention and detention conditions of

25  immigrants. Defendant Lyons is a legal custodian of Plaintiffs and the members of the putative

26  class. He is sued in his official capacity.[5]

27

28  [5] All allegations against Defendant ICE in this Complaint are also alleged against Defendant Lyons
given his control over Defendant ICE.

6

22.     **Defendant Sergio Albarran** is the Acting Director of ICE's San Francisco Field Office, Enforcement and Removal Operations, which is the ICE Field Office with jurisdiction and responsibility over the California City Detention Facility. Defendant Albarran is responsible for ICE's policies, practices, and procedures, including those relating to the detention and detention conditions of immigrants. Defendant Albarran is a legal custodian of Plaintiffs and members of the putative class. He is sued in his official capacity.[6]

23.     **Defendant United States Department of Homeland Security** (DHS) is a federal executive agency responsible for, among other things, enforcing federal immigration laws and overseeing lawful immigration to the United States. Defendant DHS is a legal custodian of Plaintiffs and members of the putative class.

24.     **Defendant Kristi Noem** is the DHS Secretary. Defendant Noem is responsible for the administration of the immigration laws under 8 U.S.C. § 1103. Defendant Noem is a legal custodian of Plaintiffs and members of the putative class. She is sued in her official capacity.[7]

## FACTUAL ALLEGATIONS

A.     **Defendants Opened the California City Detention Facility Before They Were Ready to Safely House People There.**

25.     On or around August 27, 2025, Defendants began transferring detained migrants into a derelict facility in the middle of the Mojave Desert in California. The facility is a previously shuttered state prison that had been vacant until Defendants contracted with the for-profit prison corporation CoreCivic to reopen it as an ICE detention center earlier this year.

26.     From 2013 to 2024, CoreCivic leased the facility to the State of California, during which time it operated as a state prison managed by the California Department of Corrections and Rehabilitation ("CDCR"). By November 2023, the facility was empty and no longer operating as a

---

[6] All allegations against Defendant ICE in this Complaint are also alleged against Defendant Albarran given his control over Defendant ICE.

[7] All allegations against Defendant DHS in this Complaint are also alleged against Defendant Noem given her control over Defendant DHS.

7

1  prison;[8] the State terminated its lease with CoreCivic in March 2024.[9] For nearly two years,

2  between November 2023 and late August 2025, the facility remained empty.

3      27.   That changed when ICE entered into a letter-contract with CoreCivic in April 2025 to re-

4  open the California City prison as a migrant detention center. A few months later, the facility

5  opened "in the cover of darkness" and in apparent violation of the permitting, licensing, and public

6  notice required by local and state law.[10]

7      28.   ICE conducted a "pre-occupation" inspection of the vacant California City facility in

8  April and gave it a passing grade. Nevertheless, in late July, the facility failed a local Fire

9  Department inspection. The City Manager sent a letter to CoreCivic expressing alarm, reportedly

10  writing "that the building is unsafe and violates the fire code because its construction prevents

11  radio signals from transmitting from key areas" of the facility.[11] As a result, the City Manager

12  reported, the "[r]isks to the public's health and safety are of such significance that the City cannot

13  permit or otherwise allow for the operation of the facility at this time and in its current

14  condition."[12]

15

16  [8] *Compare* California Department of Corrections and Rehabilitation, *SOMS-TPOP-1: Population

17  Report as of October 25, 2023* (Oct. 25, 2023), https://www.cdcr.ca.gov/research/wp-
content/uploads/sites/174/2023/10/Tpop1d231025.pdf, *with* California Department of Corrections

18  and Rehabilitation, *SOMS-TPOP-1: Weekly Report of Population as of Midnight Nov. 1, 2023*
(Nov. 1, 2023), https://www.cdcr.ca.gov/research/wp-

19  content/uploads/sites/174/2023/11/Tpop1d231101.pdf (the first report listing the population of
California City Correctional Facility as 40 incarcerated people on October 25, 2023, and the second

20  report not listing California City Correctional Facility among CDCR's prisons on November 1,
2023).

21  [9] *See* California Department of Corrections and Rehabilitation, *Prison Closure, Facility
Deactivations* (Dec. 12, 2022), https://www.cdcr.ca.gov/insidecdcr/2022/12/12/prison-closure-and-

22  facility-deactivations/ (accessed Oct. 25, 2025) ("[T]he department will exit the $32 million annual
lease with CoreCivic for California City Correctional Facility (CAC). It will terminate the contract

23  in March 2024, effectively ending the use of that facility as a state prison.").

24  [10] Sarah DiNatale, *ICE began shipping immigrants to this tiny California town. Chaos has reigned
ever since.* San Francisco Chronicle (Sep. 24, 2025)

25  https://www.sfchronicle.com/politics/article/ice-california-city-deport-21055594.php; *see also*
Tyche Hendricks, *California's newest immigration facility is also its biggest. Is it operating*

26  *legally?* KQED (Sep. 4, 2025) https://www.kqed.org/news/12054544/californias-newest-
immigration-facility-is-also-its-biggest-is-it-operating-legally.

27  [11] Tyche Hendricks, *California's newest immigration facility is also its biggest. Is it operating
legally?* KQED (Sep. 4, 2025) https://www.kqed.org/news/12054544/californias-newest-

28  immigration-facility-is-also-its-biggest-is-it-operating-legally.

[12] *Id.*

8

29.    By August, the City Planning Commission continued to have concerns and refused to approve CoreCivic's business license application, with the City Planner noting in a report that a "[b]usiness license will be considered for approval once Fire & Building Dept. requirements and inspections are met."[13]

30.    Despite these warnings, and the fact that CoreCivic's permit application was still pending, Defendants began sending detained people to the California City Detention Facility in late August.

31.    Some people arrived at California City from other ICE facilities, transferred without explanation to a facility unprepared to house them. Others were swept up in immigration enforcement raids taking place throughout the state and country, forced to adjust suddenly to life in a prison cell when they were with their families days before. By the end of its first month of operation, Defendants had transferred some 500 men to the facility,[14] despite ongoing staffing vacancies, including critical healthcare and custody positions. *The Guardian* reported that people detained at California City described it as "a torture chamber" and "hell on earth," reporting that they were "confined in filthy cells and suffered medical crises without help."[15]

32.    Nevertheless, the population size continued to swell. At the start of October 2025, Defendants transferred approximately 100 women to the facility. Around that time, CoreCivic's hiring page showed 24 open categories of jobs, including physician, dentist, nine different categories of nurses, medical assistant, chaplain, investigator, meal break supervisor, accounting clerk, and maintenance supervisor.

33.    By now, more than 800 people are detained in the facility, which has a bed capacity of 2,560. CoreCivic's hiring page still shows 20 open job categories, nine of which relate to medical care. Even though the facility is still far from adequately staffed, Defendants have indicated that

---

[13] *Id.*

[14] Defendants' 2025 National Detention Standards, which California City applies, recognize only sex assigned at birth. Transgender women are also housed in the units designated for men.

[15] Sam Levin, *'Hell on earth': immigrants held in new California detention facility beg for help.* The Guardian (Sep. 27, 2025) https://www.theguardian.com/us-news/2025/sep/27/immigrants-california-detention-facility.

they plan to more than triple the number of people detained there, to reach full "activation" of the facility by early 2026.[16]

34.    At every stage, Defendants have been understaffed and unprepared to safely and humanely house the detained population.

35.    When the men first arrived, they found cells and housing units that were dirty and dusty, with trash bins full of trash and toilets with fecal matter still in them. The men were left to clean the units themselves but were not given cleaning supplies. Because of staffing shortages, they were not allowed outside for the first two weeks they were there.

36.    When the women first arrived, they were made to sleep crowded together on the unit dayroom floor rather than being assigned to individual cells. They, too, were not allowed outside for at least one week.

37.    Intake procedures at California City have remained rushed, disorganized, and dangerously incomplete since the facility's opening, resulting in inadequate medical and mental health care, the deprivation of disability accommodations, confiscation of religious property, and even the confiscation of legal mail in some cases.

38.    People detained at California City describe a crumbling infrastructure. Showers and toilets clog frequently. Raw sewage bubbles up from the drains. Mold is pervasive. Insects crawl up and down the walls of the cells. Roofs leak. Plaintiff Gustavo Guevara Alarcon's housing unit was flooded in mid-September when it rained. High-level staff at the facility, including the Warden, observed the flooding in the unit and told Mr. Guevara Alarcon that the flooding was institution-wide. In mid-October, a number of cells in one of the women's units flooded again from rain. The cells were temporarily vacated, but newly arriving women were placed back in the leaking cells almost immediately.

---

[16] CoreCivic, Inc., *CoreCivic Announces New Contract Awards at California City Immigration Processing Center and Midwest Regional Reception Center* (Sept. 29, 2025), https://ir.corecivic.com/news-releases/news-release-details/corecivic-announces-new-contract-awards-california-city (accessed on Oct. 25, 2025) (stating that California City Detention Facility has 2,560 beds and that CoreCivic "expect[s] the activation to be complete in the first quarter of 2026"). *See also* https://www.kqed.org/news/12062774/conditions-at-massive-new-california-immigration-facility-are-alarming-report-finds (reporting that CoreCivic said it expects the facility to be fully occupied by early 2026).

39.     Training for new custody and medical staff appears incomplete. Custody staff are mandated to work 12-hour shifts, and sometimes longer. Custody staff have found the new position grueling and unsustainable, resulting in many custody staff quitting in just the first two months of the facility's operation. In the first weeks of operation, some units did not have housing unit staff present for stretches of time during the day, ostensibly due to staffing shortages. Medical staff are sometimes forced to work double shifts, and some have lashed out in frustration at people detained there.

40.     Staff at the facility appear confused or unaware about the policies in place, in areas ranging from disability accommodations to legal visitation. Medical or "sick call" requests from detained people remain unanswered for weeks. Grievances go unanswered and unresolved. Legal and family visits are delayed for hours or postponed, ostensibly because there are insufficient escort staff or because officers cannot manage the "mixed" security levels that would be involved in having simultaneous movement through the facility. Staff appear easily overwhelmed by scenarios common to detention settings and respond to simple issues in the housing units with use of force, threats, and excessive discipline. In short, Defendants lack the staffing infrastructure in place to respond to the needs of the more than 800 people currently living in California City—let alone the thousands more they plan to detain in the coming months.

41.     As a result of this and many other shortcomings, omissions, and unlawful actions, Defendants have subjected and continue to subject people at California City to unconstitutional conditions of confinement. Defendants impermissibly subject people who are civilly detained to conditions constituting punishment, deny them adequate medical care and reasonable disability accommodations, and restrict their access to counsel.

42.     Defendants are on notice that they have and continue to commit these wrongful acts, among other reasons because the people they are forcing to live in these conditions have told them so. In mid-September, detained people organized themselves across multiple housing units, staging peaceful, non-violent sit-ins and refusing meals as part of a hunger strike in protest of their conditions of confinement. On September 18, they provided a list of collective demands to the facility Warden, a written copy of which was also sent to Defendants:

11

**Medical**. We have medical needs and records that prove it. Give us medical care.

**Cease oppressive behavior**. Stop threatening us with solitary confinement for requesting these basic necessities. Stop threatening us with retaliatory transfers for asserting our rights. Stop keeping us locked in our cells for the majority of the day. Let us have contact visits with our family.

**Legal resources and access**. Let us access a law library. Let us make copies of documents for our cases free of charge. Give us pens. Allow us access to our mail and phone calls.

**Hygiene and Health**. Unclog our toilets. Give us drinkable water. Clean the prison or at least give us the proper supplies to do so. Properly handle our food, and give us nutritious food.

**Property**. Give us back our property, including our books and religious items that were confiscated.

43.     Defendants' response was largely punitive. Staff sent many people who participated in the sit-ins to solitary confinement. Medical staff threatened people who refused meals, telling them they would not be provided their medications unless they quit their protest. Conditions did not substantially improve. Detained people continued to file grievances about medical care and religious property that went unanswered. They continued to be deprived of confidential phone calls with lawyers and the opportunity to hug their families. They continued to be locked in small cells for a substantial part of each day and confined in indoor dayrooms for most of the remainder, with no programming and little to do. Conditions remained bleak for people civilly detained at California City, resulting in a widespread sense of hopelessness, desperation and, in some cases, self-harm and suicidal ideation.

**B.      Life at the California City Detention Facility Is Worse Than Prison.**

44.     California City is a civil detention center. Many people there are detained while they wait for courts to decide their civil immigration cases. Others are detained while they wait for the U.S. government to make travel arrangements to remove them to other countries. In either case, they are not confined under a criminal sentence, and so their conditions of confinement cannot lawfully amount to punishment. Yet California City operates even more restrictively and punitively than a prison.

45.     Statements by Defendants and other government officials demonstrate that these punitive conditions are by design. Defendants have used detention as a threat to immigrants who decide to remain in the United States. The ICE website advertises: "If ICE arrests you because you *didn't* turn yourself in, the agency will detain and remove you — and you may have to spend several months in detention while you're awaiting removal."[17] Defendant Noem has stated that immigrants should "not come to this country or we will hunt you down, find you, and lock you up," and that if people choose to stay here to pursue their immigration claims, "there will be consequences."[18] A press release from Defendant DHS reads: "you could end up in Guantanamo Bay or CECOT.[19] Leave now."[20]

**Fear, Voluntary Departure, and Suicide Attempts**

46.     Defendants have made good on their threats: they have indeed punished immigrants detained at California City, locking them up and imposing "consequences" and conditions that might be associated with the horrors of Guantanamo Bay or CECOT.

47.     Defendants treat people detained at California City as though they pose mortal danger. As described in detail below, they routinely lock people in their small cells for hours on end, sometimes for seemingly no reason at all. They use force and impose solitary confinement arbitrarily or in response to minor infractions. Officers subject people to full body searches every time they leave the housing unit.

---

[17] *Self-Deportation*, ICE (updated July 16, 2025), https://www.ice.gov/self-deportation [https://perma.cc/KX92-UHZM] (last visited Oct. 31, 2025).

[18] Sec'y Kristi Noem (@Sec_Noem), X (Feb. 9, 2025, 12:12 PM ET), https://x.com/Sec_Noem/status/1888637061453762584 [https://perma.cc/F99Z1-CMHG]; Nicole Sganga, *Kristi Noem says "Alligator Alcatraz" to be model for ICE state-run detention centers*, CBS News (Aug. 4, 2025), https://www.cbsnews.com/news/alligator-alcatraz-model-kristi-noem-homeland-security/.

[19] The Terrorism Confinement Center, known as CECOT, is a maximum-security prison in El Salvador where the Trump administration has sent immigrants. CECOT is notorious for its brutal conditions and officer-perpetrated violence. *See e.g. Inside Trump's Deportation of Venezuelans: Four Months in a Salvadoran Prison*, The New York Times, https://www.nytimes.com/2025/11/08/world/americas/el-salvador-prison-migrants.html.

[20] Press Release, DHS, 100 Days of Fighting Fake News (Apr. 30, 2025), https://www.dhs.gov/news/2025/04/30/100days-fighting-fake-news [https://perma.cc/2SLZ-CZKN].

48.    In response to these practices, a deep sense of fear runs through the people held at California City. This is especially true for women held at California City and for the men who live in lower security units, many of whom have never been detained or incarcerated before. It is no coincidence named plaintiffs in this lawsuit are men who mostly live in the higher security units. By and large, they are the ones who have decided they can take on the risk of retaliation in making their names known, bravely on behalf of those who are too afraid. Across all housing units, dozens of people undersigned counsel interviewed expressed extreme, overwhelming fear of complaining to Defendants about their conditions of confinement. Many people said they did not file grievances, complain to staff, or even request basic disability accommodations because they feared staff's response. The vast majority were too afraid to participate in this lawsuit by name for fear of retaliation.

49.    Pervasive fear and suffering have driven many people to abandon their legal rights and agree to deportation, which according to Defendants' own statements is precisely the goal. Many people at California City have signed forms agreeing to deportation without even talking to their immigration attorneys. Many simply give up—give up their immigration claims, give up their families, give up their lives in America—and agree to deportation because they can no longer tolerate the conditions at California City.

50.    Others give up their lives in even more absolute terms: by attempting suicide.

51.    In the first six weeks of California City's operation, at least three people detained at the facility attempted suicide. Some detained people believe the number of people who have attempted suicide is even higher.

52.    Defendants have confirmed that one person in the men's units attempted suicide on September 9 and was transported to the hospital. Upon information and belief, by the end of September, another man had also attempted suicide. On October 9, a man hung himself in his cell in Unit G-300. Detained people saw him and called for staff assistance. It took about ten minutes for staff to cut him down. Eventually, he was transported out of the unit on a stretcher.

53.    Plaintiff Sokhean Keo was friends with the man who hung himself and saw his body hanging in the cell. After the man was transported out on a stretcher, staff did not return to check

14

on the people who had witnessed his suicide attempt, to offer them mental health services or otherwise acknowledge the trauma. Instead, staff issued disciplinary punishment to people who they said had not immediately returned to their cells after the incident, people who remain haunted by the image of their friend's body hanging in his cell.

**Use of Force and Abusive Staff Behavior**

54.     Staff routinely engage in abusive behavior and unreasonable use of force against the people detained at California City.

55.     In early October, men protesting their conditions of confinement were pepper sprayed—ostensibly for refusing to return to their cells for count. The men had been complaining to staff about their lack of medical care and lack of access to personal property such as hygiene items and writing materials. As an act of organized protest, they staged a peaceful sit-in, refusing to return to their cells but engaging in no violence. Still, officers called for back-up and put on masks. An officer then deployed pepper spray. For days after, at least one detained person experienced red, sore and itchy eyes, a burning sensation and pain in his chest, difficulty breathing, headache and dizziness, among other worsened medical conditions. His "sick call" request for medical care to address these concerns went unanswered.

56.     On October 3, 2025, inside a housing unit, an officer was attempting to talk to a detained person who does not speak English. When the detained person, who did not understand the officer, turned to walk away, the officer pepper sprayed him. Plaintiff Guevara Alarcon witnessed this incident.

57.     On September 29, 2025, several staff members entered the cell of a detained person in administrative segregation. The man was already restrained with handcuffs. The officers nevertheless hit him with riot shields, threw him to the ground, and held him down with their knees on his back.

58.     On September 30, 2025, one man asked staff if he could see provisions from ICE's 2025 National Detention Standards ("2025 NDS"), which set out the basic minimum requirements he is entitled to in detention and apply at California City. The staff member responded to the request by aggressively pushing him.

15

59.    Defendants frequently threaten to use force against detained people. For example, as described above, on October 9, 2025, a detained person tried to kill himself. People in the unit were screaming for help, and one person stepped out of his cell to see what was happening. A staff member who was holding a drill doing maintenance work approached him and his cellmate with the drill and threatened them, ordering them to get their "ass inside the cell" or "I can make a hole in your chest." The man was issued a disciplinary write-up for being outside of his cell.

60.    These practices are excessive, unnecessary, and harmful. Defendants' own standards recognize that force should not be used in the scenarios described above. The 2025 NDS permits staff to use force only in very limited circumstances, only "after all reasonable efforts to resolve a situation have failed."[21] It requires staff to "attempt to gain the detainee's willing cooperation, in a language or manner that the detainee understands, before using force" and prohibits "[u]sing force against a detainee offering no resistance."

**Excessive Solitary Confinement**

61.    Defendants impose an extreme and harsh form of solitary confinement at California City. Solitary confinement at the facility takes place in the so-called "special housing unit" (SHU, or administrative segregation). People are routinely subjected to solitary confinement for conduct that should not be punished at all, without an opportunity to hear the accusations that have been made against them or to contest their placement in solitary.

62.    For example, Plaintiff Gustavo Guevara Alarcon was sent to solitary confinement after asking to finish his shower during a lockdown.

63.    Another person was sent to solitary confinement for refusing to give up a mobility disability accommodation. Because he has a chronic foot condition, the ICE facility where he was previously detained allowed him to wear tennis shoes instead of the Crocs-style shoes that are standard-issue at California City. The man was allowed to keep his tennis shoes when he first arrived at California City but was later told that he needed to give them up. When he refused to relinquish them, explaining they were required as an accommodation for his foot problems, a

---

[21] ICE, *National Detention Standards, Revised 2025* 2.8.I (updated Jun. 18, 2025), https://www.ice.gov/doclib/detention-standards/2025/nds2025.pdf [https://perma.cc/4JRQ-PUZJ] ("2025 NDS").

1  captain and a handful of officers restrained and handcuffed him and placed him in solitary

2  confinement for two and a half weeks.

3      64.    In September, a man with serious mental illness who threatened to kill himself was sent

4  to solitary confinement. He remained there for weeks, except occasionally to cycle in and out of

5  freezing cold safety cells where he was placed in a suicide-resistant smock. A clinician noted the

6  man's struggle to cope with the isolation of solitary confinement and his ongoing auditory

7  hallucinations—a predictable outcome given the overwhelming amount of research showing the

8  particularly harmful effects of solitary confinement on those with serious mental illnesses. Upon

9  information and belief, he remains locked in a solitary confinement cell some two months later.

10     65.    Other times, people are sent to solitary confinement for minor rule infractions. For

11  example, on or around September 12, a few people were exercising in the dayroom in Plaintiff

12  Sokhean Keo's unit, because the unit had no access to the yard that day. They had taken off their

13  shirts while exercising and refused an officer's order to put them back on. Multiple officers

14  responded armed with pepper spray. Those who refused to put their shirts back on were taken to

15  solitary confinement, and the rest of the unit was placed on a lockdown lasting approximately 24

16  hours. Mr. Keo said it felt like a show of authority.

17     66.    In mid-September, more than one hundred people detained at California City organized a

18  collective action that included peaceful sit-ins and hunger strikes, to call attention to inadequate

19  medical care and other poor conditions of confinement. In response, a number of them were sent to

20  solitary confinement.

21     67.    Many people who are sent to solitary confinement are never provided an explanation of

22  the reason for their placement. Frequently, people do not know how long they will remain in

23  solitary confinement or if there is anything they can do to challenge their placement or secure

24  release from it. Some remain in solitary confinement for weeks or longer, with minimal or no

25  process.

26     68.    California City does not have specialized housing units, such as protective custody units

27  to house people who fear they might face risks in general population. Staff have told detained

28  people that California City is not "ready" to open protective custody units. As a result, people who

17

require protective custody or other specialized housing are warehoused in solitary confinement instead, subjected to conditions of sensory deprivation with no end in sight.

69. Conditions in the solitary confinement unit are extremely isolating. People are locked in a cell for 23 hours a day, with no cellmate, no group programming, no social interaction. During the one hour they are allowed in the dayroom, they are also alone. Officers prohibit them from even shouting through the walls to make contact with people in adjacent cells.

70. A few times a week, people in solitary confinement are allowed to go outside alone for one hour into a small cage. One man who was in solitary in September said the floor of the cage was covered in bird droppings and feathers such that he could not even pace back and forth in the small area. A dead bird was hanging upside down on the top of the cage. He refused the weekly outdoor recreation after that experience because he was afraid he would get sick from the filth.

71. In California prisons, the disciplinary units used for people who commit violent, in-custody assaults operate less restrictively than those at California City. The restrictive housing units in California state prisons afford people at least 20 hours out of their cells each week, including ten hours of outdoor recreation.[22] People in those units are supplied with books, magazines, and newspapers, and are permitted to make regular telephone calls.[23] They can have visits with loved ones,[24] and are allowed to participate in education, commissary, library services, social services, counseling, and religious guidance.[25] By contrast, people in the SHU at California City—often housed there for minor, nonviolent rule infractions, in retaliation for protesting the horrendous conditions of confinement, or purportedly for their own protection—are caged nearly every hour of the day.

72. The solitary confinement practices and policies at California City are excessive and dangerous. Defendants' own standards recognize that administrative or disciplinary segregation should "only be used when less restrictive housing options have been considered and determined to

---

[22] Cal. Code Regs. Tit. 15, § 3348(i).

[23] Cal. Code Regs. Tit. 15, § 3348(j) & (k).

[24] Cal. Code Regs. Tit. 15, § 3348(g).

[25] Cal. Code Regs. Tit. 15, § 3348(l).

18

be contrary to the best interests of the detainee and the security or good order of the facility."[26] Placement in administrative segregation (which includes protective custody and placement before any disciplinary findings have been made) must be for "the briefest terms" and "under the least restrictive conditions practicable."[27] These standards are routinely violated at California City.

**Celled Living**

73.   California City was built as a prison, has operated as a prison, and is designed to function as a prison. People are assigned to live in prison cells in a locked building surrounded by numerous security fences.

74.   All of the housing units contain two-person cells with large, metal doors. The facility has no open dorms. Each housing unit has 44 cells, which line the walls of the two-tier unit and surround a common area, called the "dayroom."

75.   Each cell is a cramped box made up of concrete and metal. The cells are approximately nine feet by twelve feet, about the size of a parking space. At the back of the cell, two steel shelves are bolted to the wall and run the width of the cell, one on top of the other. They serve as bunk beds, with a thin, foam mattress and, sometimes, a blanket. But they look like platforms—not beds.

---

[26] A copy of the policy obtained by undersigned counsel ACLU on April 1, 2025 is available on its website at https://www.aclu.org/documents/foia-document-review-of-the-use-of-special-management-units-for-ice-detainees.

[27] *Id.*



*Two Bunks Inside a Cell at California City Detention Facility*



*View from Inside a Cell*

76.     At the front of the cell are a toilet and sink. The toilet is next to the cell door, with no partition or privacy from the other person in the cell. The toilet is positioned such that a person sitting on it must face the bunks. If a person has to defecate while locked in their cell, they have no choice but to face their cellmate, who can get no farther than about six feet away from the defecating person. This arrangement of the toilet violates the 2025 NDS, which require a "reasonably private bathing and toileting environment."[28] The water in the toilet and from the sink is often discolored and has a foul smell.

77.     Between the toilet and bunks, rectangular shelves jut out from the wall about the width of the small toilet, perhaps meant to be a tiny desk. Other than those surfaces, there are no tables, chairs, lockers, or any space to walk or do significant physical activity.

78.     The only source of natural light is two thin slits cut into the concrete behind the bunks. The steel door has a small plexiglass window that can be peered through. When the cell door is locked shut—which it is for nearly half of every day—it is difficult to tell human beings live inside.

---

[28] 2025 NDS at 4.4.II.G.

*Immigrants Detained at California City Peer Out of Their Locked Cells*

79.    People are allowed very few items in their cells, and restrictions are often arbitrary and unnecessary, especially since many were living full lives in their communities before being rounded up and detained for civil immigration violations.

80.    For example, people detained at California City are provided only a small stub of a pencil with no eraser, with no access to pencil sharpeners. Until recently, they were prohibited from having pens of any kind. Now, following collective action in which detained people protested their conditions, they have been given flimsy pen fillers, with just the ink and ballpoint tip.

81.    Blank paper, including for legal mail, is largely unavailable. To write, some people use the margins of their legal paperwork or envelopes. These restrictions are harmful and inexplicable. When California City functioned as a state prison, people could keep pens, pencils, pencil sharpeners, legal pads, envelopes, stationery, and stamps in their cells.

82. Similarly, detained people are provided only a very small toothbrush, about three inches long, that is so small as to be effectively unusable. It is unclear how such a restriction could be necessary to ensure the safety of the population at the facility. Even when the facility operated as a state prison for people subject to criminal sentences, people were allowed to have regular sized toothbrushes, among a variety of other hygiene supplies.

83. Access to basic grooming supplies is severely restricted. People are sometimes allowed to shave only once a week, when they have to borrow the razor from staff during count and return it at the end of 30 minutes. Such a restriction is unheard of even at the highest security levels in the state prison system, where people are permitted to keep and use shaving supplies such as razors and battery-operated shavers in their cells.

**Frequent Lockdowns**

84. People detained at California City spend nearly half of their day locked in tiny cells. Despite being detained subject to civil law and held behind multiple layers of bars and fences, they are subjected to at least four daily "counts" during waking hours—at 7 am, 11 am, 3 pm, and 7 pm. During counts, officers require everyone to leave the shower, phone, or any social activity and return to their cells, where they are locked in while officers essentially take roll call. For inexplicable reasons, staff often take an hour or more to complete count. On a daily basis, therefore, detained people may be locked in their cells 10 pm–5 am, 7–8 am, 11 am–12 pm, 3–4 pm, 7–8 pm, and then again beginning at 10 pm. Count also occurs a few times at night.

85. It is unclear why California City requires such frequent counts, or why they take so long to complete. Many people recount that they have not experienced this many lockdowns at other ICE facilities. The state prison system requires only two counts during waking hours.[29]

86. In addition to seemingly endless lockdowns for count, people detained at California City are frequently subject to lockdowns for administrative reasons, apparently unrelated to any observable medical or security concern, and are provided no information about the reason for the lockdown.

---

[29] *See* California Department of Corrections and Rehabilitation (CDCR), Department Operations Manual, § 52020.4.1 Frequency of Counts (requiring two "positive counts" of each incarcerated person during waking hours—one between 4 pm and 5 pm and another between 9 pm and 11 pm— and two "positive counts" during sleeping hours—one at 12:30 am and 4:30 am).

23

87.     When locked in their cramped cells, people have little opportunity for sensory stimulation or social interaction beyond their cellmate, who may or may not speak a language they understand. In California state prisons, each person is assigned a personal tablet that allows them to place free calls to loved ones, listen to audiobooks, conduct legal research, and perform other activities. State prisoners are able to use their tablets in their cells, including during lockdowns. At California City, however, people share a limited number of tablets and are not allowed to use the tablets in their cells. Because the only way to place phone calls is through the shared tablet or dayroom wall phones, the lockdowns mean people go many hours—and sometimes several days—without access to the phone. This inability to communicate is a sharp contrast for many, who were living with their families before they were apprehended by immigration authorities or were otherwise in close contact with them. Many people have predictably fallen into despair as a result.

**Limited Access to Outdoors**

88.     Even in the general population units, people are rarely able to access fresh air. Generally, people are offered between four and seven hours of outdoor recreation per week. In other words, they spend between 23 and 24 hours per day in their housing unit, either in their cell or in the enclosed dayroom which has no windows on the walls. Sometimes, the very limited amount of outdoor recreation is offered so early in the morning that people miss it because they are still asleep. Plaintiff Sokhean Keo estimates that he spends approximately 164 hours per week (of a total 168 hours) in his housing unit.

89.     For the first two to three weeks California City was in operation, the main yard was unavailable, and people were let outside into small enclosed concrete areas with no exercise equipment and not enough space to engage in much physical activity, such as running. Men now have access to the "main yard"—a dusty space with limited exercise equipment.

90.     For the first week or longer that women were detained at the facility in early October, they did not go outside at all. Now that they are allowed outdoor time, they go to an enclosed concrete area, about a quarter the size of the main yard.

91.     When not on the yard, people are confined to their housing unit with virtually nothing to do. Detained people have access to a couple of board games, English-language books, TVs with

24

limited channels (all in English, except for one Spanish channel), and a limited number of wall-mounted phones and tablets. When people are in the dayroom, they are let out in a single group, meaning that up to 88 people must share the same items and space.

92.    By contrast, when California City was a prison, incarcerated people were generally offered between two and four hours of outdoor recreation each day. Often, people had multiple opportunities to go to the yard each day to exercise, experience the sunlight, and breathe fresh air.

**No Programming**

93.    There is no access to structured programming at California City. People detained there spend their entire days in their housing unit but for a brief period on the yard, and the occasional medical appointment, court hearing, or legal or family visit. Their days are unmarked by any structured activity provided by Defendants. There are no education programs, group classes, or organized self-help groups. People have little to do other than watch a television mounted on the wall, which plays in a language many people do not speak.

94.    Until late October, there was no operational dining hall people could congregate in. Several weeks ago, Defendants began offering at least one lower security unit some meals in a dining hall. However, even for those individuals, many of their meals are still served in the unit. For everyone else—the vast majority of people at California City—Defendants do not allow anyone outside their housing units for meals.

95.    These long stretches of empty time and stark conditions are jarring and distressing—especially for the many detained people who were engaged in busy working lives before being swept up in immigration raids. Even in state prison, incarcerated people have access to a wide variety of programming to help pass the time. People in prison can generally have a work assignment, be enrolled in education courses, learn a technical trade, and participate in self-help groups, among other activities.

96.    For example, Plaintiff Sokhean Keo was previously incarcerated at California City when it was a state prison. He participated in college courses and got an Associate's degree in psychology while in prison, in addition to taking vocational classes and maintaining a job as a porter. Between his recreation time, college and vocational classes, and porter job, Mr. Keo was

able to spend much of his day outside his housing unit. During his prison term, Plaintiff Gustavo Guevara Alarcon participated in education and work assignments and even led self-help groups. Now both men spend their days largely confined to their housing units and struggle with the idleness.

**No Religious Activities**

97.    California City houses people of many religions, including Christians, Jews, Muslims, Sikhs, and Rastafarians, among others. Defendants have made little effort to provide religious activities for these groups and have instead created conditions so isolating and restrictive that people do not feel safe engaging in group worship that they might organize themselves.

98.    California City offers only one all-purpose non-denominational Christian service approximately once a week. For everyone else, including Christians who seek a different type of congregate worship, Defendants do not facilitate any kind of religious activity. Although California City has a separate room or "chapel" area, staff have not routinely made it available to people of all faiths; it is unclear how or whether it is used on most days.

99.    For example, a Rastafarian man has sought and been denied a dedicated religious space to engage in group prayer with the three other Rastafarians he knows at California City, despite speaking to the facility chaplain about it. Jewish people have been denied a place to engage in congregate worship, including a place to study, pray and receive services on the Sabbath together, despite having made those requests of facility staff.  People of the Sikh religion have also been deprived of congregate prayer and services that were available to them at prior ICE facilities.

100.  Muslims, who are required to pray five times a day, are only allowed to use the facility's prayer space once a week for Friday afternoon (*jummah*) prayer—and the women, who Defendants prohibit from congregating with men, are offered that space only on Friday mornings, four or five hours before they are required to engage in *jummah* prayer. But for that one prayer on Fridays, Muslim people—both men and women—must pray in their housing units, for 34 of the 35 daily prayer times each week.

101.  Without any religious offerings from the facility, many people would like to organize group prayer themselves, but they have no place to do it. Officers prohibit people from gathering in

26

their cells together, and the dayroom is not a viable alternative. Many people find they cannot pray in the dayroom because it is too crowded and noisy to concentrate, with 88 people milling about with nowhere else to go. Others do not engage in group prayer in the dayroom because the heavy security protocols, frequent lockdowns, and officers' aggressive behaviors make them feel uncomfortable or unsafe expressing themselves in prayer in that space.

102.  Many people give up on group prayer and pray alone in their cells. This is especially difficult for Muslims, who are not supposed to pray near a toilet. Muslims must also face West, toward Mecca, when they pray. For many people, because of the configuration and small size of their cell, this means bowing on the ground with their head at the base of the toilet five times a day.

103.  California City also does not offer regular clergy visits or even facilitate the entry of religious volunteers. One man speaks on the phone with a volunteer from a religious organization who used to visit him at another immigration facility but is unable to visit at California City because of its restrictive visitation policies. When other religious volunteers attempted a visit, he said staff made them wait for more than five hours.

104.  These restrictions on religious activities are unnecessary, excessive, and punitive. ICE's own standards clearly provide that "[d]etainees will have the opportunity to engage in group religious activities, limited only by a documented threat to the safety, security, and orderly operation of the facility" and require the facility to "designate adequate space for religious activities that can equitably meet the needs of the detainee population."[30] Defendants offer no security or operations justification for not facilitating these activities, especially when a "chapel" space is available.

**Limited Access to Loved Ones**

105.  People like Plaintiff Fernando Gomez Ruiz were living busy lives in their communities when they were swept up in mass immigration enforcement actions and found themselves suddenly behind bars. Now, at California City Detention Facility, they are forced to live largely incommunicado.

---

[30] 2025 NDS at II.E, II.H.

27

106.  Religious volunteers are not the only visitors made to wait so long that they give up. People whose loved ones are able to travel to the Mojave Desert to visit them are often made to wait hours, sometimes only permitted to see their family members when legal visits and consular visits are not occurring. When they finally see their family members, all visits occur through thick glass. To hear each other's voices through the glass, people have to use telephones attached to the walls. By policy, parents may not hug their children. People are allowed to have only up to three visitors at a time, including any child over the age of two. If multiple family members are in the visiting booth, only one of them can hear the detained person's voice at a time because it is relayed through a telephone receiver. Visits are limited to an hour.

107.  One family member recalled the experience of visiting her father in detention. She was unable to locate him in ICE's online locator system, so she drove two hours to California City to see him. She was made to wait for nearly three hours in a lobby, where flies swarmed overflowing trash cans. When she finally saw her father through the glass of the visiting booth, she gasped. "He looks defeated. He is stressed and losing weight. He looks a lot older and sad," she told reporters.[31]

108.  These restrictions are as baffling as they are harmful. People sentenced to lengthy penal custody terms in state prison have far more access to their families than people detained at California City. Generally, people in California prisons are allowed frequent contact visits with their loved ones and up to five visitors at a time are permitted during those visits.[32] When he was in state prison, Plaintiff Gustavo Guevara Alarcon spent hours visiting and talking with his loved ones. Now, in civil detention at California City, the closest he can get to his family is on the other side of glass and a telephone.

109.  These blanket restrictions on contact with loved ones are not necessary for any legitimate government purpose, especially for people detained pursuant to civil law. Defendants' own standards acknowledge this is excessive. The 2025 NDS specifically requires contact visits with

---

[31] Marina Peña, *Man detained at CA's largest ICE facility alleges 'horrible negligence' after injury*, Yahoo News (Nov. 2, 2025), https://www.yahoo.com/news/articles/man-detained-ca-largest-ice-170000479.html.

[32] *See* Cal. Code Regs. tit. 15, § 3170.1(c)(1) (2023). People in state prison are also permitted to have overnight visits with their family. For no cost, immediate family members are allowed to stay in private rooms with their incarcerated loved one for a night on the prison grounds. *See* Cal. Code Regs. tit. 15, § 3177.

detained people's children, mandating "a contact visit . . . within the first 30 days," and a "transfer, when possible, to a facility that will allow such visitation" or "monthly visits, if transfer is not approved."[33]

**Limited Freedom of Movement, Over-Use of Restraints and Pat-Downs**

110.  People detained at California City are subjected to invasive body searches ("pat-downs") every time they enter or leave their housing units, including going to outdoor recreation. This leads many to refuse those limited outdoor opportunities. Many men describe that the pat-down searches involve "groping" their genitals and that such searches did not occur at other ICE facilities or state prisons where they were previously held. Searches at California City are uncomfortable and humiliating.

111.  People are not allowed to go to any other part of the facility without a staff escort. The facility is severely understaffed, so this puzzling security measure means that people must wait hours for escort staff simply to walk them to an empty room where their lawyers or loved ones await them on the other side of glass—further compounding the isolation and sensory deprivation that they experience.

112.  One person recalled that as a state prisoner at California City, he could move without an escort throughout the facility, including going to visitation, medical clinic, group therapy, and his college classes in different buildings. He remembers only one pat-down search during the approximately three years he spent as a state prisoner at California City. Now, this person who is civilly detained in the same facility is subject to invasive searches every time he leaves the dayroom.

**Inadequate Clothing, Food and Water**

113.  The sense of isolation and sensory deprivation people experience is heightened by the cold temperatures and inadequate food and water provided by Defendants.

114.  Defendants have a policy and practice of keeping temperatures in the housing units excruciatingly cold, while simultaneously depriving detained people of adequate clothing and blankets. One person requested an extra blanket on multiple occasions but was never provided one.

---

[33] 2025 NDS at 5.5.II.F.1. *See also* U.S. ICE, *ICE Directive 11064.4: Detention and Removal of Alien Parents and Legal Guardians of Minor Children* (July 2, 2025).

He explained that the cold makes his health conditions, which require him to use a wheelchair, worse and more painful. People who have complained about the cold have been told they can buy extra clothing from commissary, but sweatshirts and sweatpants cost approximately $20 each. By contrast, people were issued sweatshirts and sweatpants for free when California City was a state prison. Now, those who can afford the $20 sweatshirts and sweatpants at California City sleep in them. Those who cannot afford the commissary prices go cold.

115. Detained people also go hungry: food portions are small, and people cannot afford to supplement them with food from the commissary. Like many others, Plaintiff Fernando Viera Reyes is hungry most of the time because Defendants do not provide enough food and he cannot afford food from the commissary.

116. Many people are afraid to drink the water in their cells, which smells bad and is discolored. On at least one occasion, Defendants distributed sealed plastic water bottles and told people not to drink the tap water. Defendants now provide tap water in Igloo coolers in the housing unit dayrooms. They did not explain why it was safe to resume drinking tap water when they stopped passing out bottles.

117. At intake, people's property, including hygiene supplies and unopened dry goods, is routinely thrown away, even though those items were allowed at their previous ICE facility, and Defendants refuse to replace them. Commissary prices at California City are prohibitively, even punitively, high—significantly higher than other ICE facilities and significantly higher than state prison. As a result, many detained people cannot afford to buy the extra food, clothing, personal hygiene, or medical or disability supplies they need, which Defendants fail to provide them.

**Confiscation of Religion Property**

118. Defendants have a policy and practice of confiscating all kinds of property at intake—hygiene supplies and dry goods as discussed above, medications and disability accommodations as discussed below, and even religious items and religious texts.

119. Separated from their families and communities, and locked up in cells, many detained people turn to their faith. But Defendants routinely confiscate religious property from people of all

30

faiths and deprive them of these items for weeks or months on end—if not indefinitely—making it difficult for people to engage in their religious practice.

120. People of many different religions have experienced these deprivations. Defendants confiscate religious property that Sikhs are required to wear as part of their faith, including *kanga* (a small wooden comb often worn in a turban), *kara* (a steel or iron bracelet), and *kachera* (special cotton undergarments). They confiscate prayer mats, prayer beads, forehead rests, head coverings, and perfumed prayer oil from Muslims; prayer beads from Hindus; head coverings, incense and colored candles from Rastafarians; and *tzitzit* (ritual fringes or tassels that are specially knotted to represent the Torah's commandments) from Jews.

121. Defendants' policy and practice of denying religious property also extends to religious texts. Although standard size Bibles are available to the detained population, other religious texts are not provided. For example, one detained person attempted and was unable to obtain a Quran. A number of Evangelical Christians transferred to California City with their large study Bibles, made of a thicker material like cardboard. Although these Bibles were permitted at prior ICE facilities, Defendants prohibited the men from keeping their study Bibles at California City. A Sikh man was not permitted to retain his holy book. And a Christian man was made to give up his Bible at intake because staff told him there was a limit on the number of books people could have, which confused him because his Bible was the only book he had.

122. When people ask for the return of their religious items, Defendants frequently do not return them and offer no explanation or justification for the denial. A Muslim woman requested her *hijab* when she arrived at California City and again a week later, including through a written grievance on her tablet, and still had not received a response, or the *hijab* itself, two weeks later. A Rastafarian had a turban removed upon transfer to California City. Despite repeatedly asking for its return, the detained person had not received a replacement turban over a month later.

123. The 2025 NDS requires that detained people have "access to personal religious property, consistent with facility security" and that "[a]ny denial of access to personal religious property and the reason for it shall be documented and placed in the detention file or maintained in a retrievable

electronic format."[34] By and large, staff do not provide justification for confiscating these items, let alone document the justification. They do not cite individualized security concerns or other reasons when denying the property. And it is unclear how they could: people were allowed to retain these items at other ICE facilities and would be allowed to have them in state prison.[35] Defendants' denial of religious property is as harmful and cruel as it is unnecessary.

## C.     Health Care at the California City Detention Facility Is Grossly Inadequate.

124. People detained at California City are effectively locked in their housing units and forgotten: they are subjected to punishing and overly restrictive conditions, and they are deprived of minimally adequate medical and mental health care that might enable them to live more safely in such poor conditions. People are often deprived of the medications and treatment they require. They file sick call slips and healthcare grievances that go unanswered. They experience medical and psychiatric emergencies without adequate response. They are uniformly denied specialty care referrals.

125. Even worse, when seriously ill people are seen by a provider, the care that they receive is at times shockingly deficient. In multiple cases, as described below, providers see patients with very serious conditions, including life-threatening illnesses, and fail to provide them with necessary treatment.

126. Defendants' failure to provide basic health care subjects people at California City to serious risk of harm, including death and medical and mental health decompensation.

**Inadequate Intake Procedures**

127. When people arrive at California City, they are not seen for an initial health care screening in a private setting, as is standard practice in detention facilities. This initial screening is necessary to identify people with urgent health care needs, screen for infectious diseases, and ensure continuity of care, including of medications.

---

[34] 2025 NDS at 5.3.II.K.

[35] *See also* 15 Cal. Code Regs. §§ 3190(c), 3213(b) (guaranteeing access to approved religious property).

32

128.  At California City, nurses conduct screenings in non-private settings, including hallways and lobbies; fail to collect necessary information; fail to identify people with and respond to urgent medical concerns; fail to effectively communicate; fail to consistently continue verified, necessary medications; and in some cases fail to screen for tuberculosis, despite elevated risk of people being infected with that illness in a detained setting.

129.  People do not timely see a primary care provider when they raise medical or mental health issues at intake, including when they make requests to continue their chronic care and essential medications. They sometimes wait several weeks to see a provider despite repeated requests. Even when a patient is referred to a provider for urgent care, that appointment does not happen in a timely fashion. When they are seen, their intake assessments are not thorough or adequate and such inadequate assessments further delay the care they need.

130.  For example, Plaintiff Jose Ruiz Canizales had his initial screening with a nurse the day after he arrived at California City. Although the nurse documented that Mr. Ruiz Canizales should see a provider immediately due to his asthma and recent medical procedure, he did not see a primary care provider until two weeks after he arrived at California City. These kinds of lengthy delays are typical at California City; wait times for an initial appointment with a provider are often two weeks or more. When that appointment does occur, patients' vaccination history is not reviewed and they are not offered basic vaccinations, including for influenza and COVID, despite the heightened risk of contracting these viruses in detained settings.

131.  Another detained person arrived at California City after recently undergoing knee surgery. A nurse screened him the day after his arrival and noted that he was still in pain, using a crutch, and needed medications and a follow-up appointment to evaluate his recovery from surgery. The nurse directed that he should see the provider the next day. But his health assessment with a provider did not happen until twelve days later. As a result, he was left to suffer in pain following knee surgery without any medication for nearly two weeks after his arrival at the facility.

132.  Almost immediately upon his arrival at California City, Plaintiff Yuri Roque Campos was sent to the emergency room due to his presentation and his complicated history of heart disease. He returned with multiple alarming diagnoses, including a right branch bundle blockage,

33

congestive heart failure, and pulmonary hypertension. These conditions, according to the emergency room physician who treated him, are potentially life-threatening and require close and continuous management because they can rapidly progress to severe heart failure.

133.  The emergency room doctor indicated that Mr. Roque Campos needed to be seen by a specialist within 72 hours. The doctor even drafted a letter to Mr. Roque Campos and "the responsible health official at [California City]" in which he raised alarm about Mr. Roque Campos' continued placement at California City, indicating that he should only return to that facility if he receives his medications, daily check-ins with medical staff, and close follow-up with necessary specialists. Because Mr. Roque Campos was sent to the emergency department immediately upon his arrival to California City, his initial intake at the facility was delayed until he returned from the emergency room. At this intake assessment at California City on the day after his return from the emergency room, the intake nurse referred him to a provider on an emergent basis. He again went to the hospital that day for chest pain and returned the same day. When he returned to California City, he did not have an appointment with a provider until three days later; he did not receive his prescribed heart medications until six days after his arrival; and he was not seen by the heart specialist as recommended by the emergency room doctor. He remains at serious risk.

**Lack of Continuity of Care at Intake**

134.  Defendants fail to ensure that people's health care records follow them when they transfer from other ICE facilities to California City. Instead, they inappropriately put the onus on detained immigrants to sign a request that these records be turned over from their prior facilities. Defendants' delay in or failure to obtain health care records results in significant lapses in care and causes serious harm to people's health.

135.  Plaintiff Viera Reyes, for example, likely has cancer. The failure to receive his complete medical record from his prior facility has contributed to significant delays in him receiving necessary and time-sensitive care.

136.  Prior to his transfer to California City, Mr. Viera Reyes was detained at Golden State Annex. While at that facility, he received test results that indicated he likely has prostate cancer. He then underwent additional tests, and a urologist made an urgent appointment for a biopsy. That

biopsy did not happen as scheduled because he was transferred to California City before it was performed. When he arrived at California City, he required urgent medical attention to determine whether he had prostate cancer. Instead, he was not provided an appointment with a doctor at California City until more than three weeks after his arrival. At that appointment, the doctor did not appear to have received or reviewed his healthcare records from Golden State Annex and did not address his needs with the appropriate urgency. The doctor informed Mr. Viera Reyes that he would need to re-order the same initial series of tests instead of getting him a biopsy on an urgent basis, delaying his access to time-sensitive and potentially life-saving cancer treatment.

137. Mr. Viera Reyes still has not had a biopsy two months after his arrival to California City. He is in constant, agonizing pain, frequently has blood in his urine and stool since arriving at California City, and his lab results raise significant concern that, if it is cancer, it has likely metastasized.

138. Many of the people detained at California City to date have been transferred from other ICE detention facilities, where many had records of diagnoses and treatment plans that are in Defendants' possession as well as pending specialty care. Yet Defendants have failed to ensure the medical care they were receiving at those facilities is continued at California City. This is true even when people arrive with their active prescriptions and medication in hand. Many people spend days or weeks without their medications, including mental health medications, heart medications, and other critical prescriptions, resulting in increased symptoms or risk of life-threatening medical complications. Some people have their medication discontinued without explanation or assessments.

139. As described above, Plaintiff Yuri Roque Campos arrived at California City with a known heart condition, for which he was receiving medication and being managed by a cardiologist at a prior ICE facility. Defendants failed to provide him with his medication for several days, even when he was housed in a medical observation unit at California City.

140. Plaintiff Jose Ruiz Canizales was deprived of his asthma inhaler upon arrival at the facility. Another detained person was prescribed antibiotics at another ICE facility for multiple, open wounds. When he arrived at California City, he was not provided the antibiotics that he

1   needed. He repeatedly requested his necessary medication over the next week and a half, and he

2   was not provided the antibiotics until 11 days after he arrived at California City, placing him at

3   increased risk for sepsis. Another patient went multiple days without medication for his

4   hypertension and diabetes.

5   **Barriers to Access to Care**

6       141.  Detained people at California City are unable to timely access medical care. The process

7   by which people request care—the "sick call" process—is fundamentally broken. As it operates,

8   the process violates California City's own Detainee Handbook and leaves patients with no reliable

9   mechanism to get medical care.

10       142.  People submit sick call requests by completing a paper form or through the shared

11   tablets. But Defendants do not provide timely or meaningful responses to requests for care,

12   regardless of the form of submission. People's requests for care are not answered for weeks, and

13   frequently not answered at all. When people are finally seen, their underlying concerns remain

14   unaddressed and the care provided, if any, is inadequate. As a result, people with serious, chronic

15   conditions do not receive necessary follow-up care even when they repeatedly ask for it, putting

16   them at serious risk of harm.

17       143.  One detained person arrived at California City with a painful hernia that made it difficult

18   for him to walk without assistance. He submitted at least seven sick-call slips in a 20-day period,

19   pleading for pain management and treatment for his known hernia. During that timeframe, he was

20   seen once by a licensed vocational nurse, who merely recommended that he submit a sick-call slip

21   if he required pain management or needed to have an appointment with a doctor. The purpose of

22   that appointment, however, was to respond to the numerous sick-call slips that the detained person

23   had *already* submitted pleading for help. His remaining pleas were merely met with a written

24   response that he would be seen by a doctor.

25       144.  As described above, Plaintiff Fernando Viera Reyes arrived at California City pending a

26   prostate biopsy to confirm his diagnosis of prostate cancer and begin any necessary cancer

27   treatment. Since his arrival at California City, he has repeatedly reported through the sick call

28   process that he is experiencing severe pain and blood in his urine and stool. A doctor did not see

36

1 him until three weeks after his arrival, and he still has not had the biopsy that is necessary to

2 diagnose his condition, let alone receive treatment for what is likely prostate cancer, two months

3 later.

4      145.  Unable to obtain care through the sick-call process, some people resort to asking housing

5 unit staff and nursing staff who pass through the unit on pill call, or whom they encounter for other

6 reasons, about their medical needs. This does not result in health care needs being addressed.

7 Others resort to submitting health care grievances, but those too go unanswered and people's

8 requests for medical or mental health care remain unaddressed.

9 **Deficient Quality of Care**

10      146.  When patients are finally able to see a nurse or medical provider at California City, the

11 care is often grossly substandard. In any setting, for patients with stable, chronic medical

12 conditions, regular medical monitoring is important. For patients at California City, it is critical

13 given the dysfunctional medical system in place, which leaves patients exposed to medication

14 lapses, difficulty accessing medical providers, difficulty seeing specialists, and challenges having

15 medical orders honored. Patients who arrive at California City stable are placed at serious risk of

16 harm because their care is often not appropriately continued. These deficiencies can be life-

17 threatening for patients who are not stable.

18      147.  Provider care at California City is failing in many regards: providers do not see patients

19 timely; their notes are sparse; they do not conduct thorough physical exams or make appropriate

20 clinical decisions. One detained person, who has poorly controlled hypertension and diabetes, had

21 blood sugar test results at the end of September that demonstrated a high average blood sugar over

22 the previous two to three months. This test result should have triggered immediate medical

23 attention from a provider, including consideration for insulin treatment initiation. However, this

24 person was not seen by a provider in the month after the test result, and there is no indication in the

25 health record that his provider was even aware of this critical lab value.

26      148.  Two weeks after that test result, the patient saw a nurse for dizziness, likely a symptom of

27 his high blood sugar and/or high blood pressure, and presented with both high blood pressure and

28

high blood sugar based on a fingerstick reading. Even after consulting with a provider, the nurse still did not order appropriate treatment to address his extremely high blood sugar level.

149.  Plaintiff Fernando Gomez Ruiz has likewise received very poor quality medical care. He suffers from diabetes and hypertension, has a large diabetic ulcer on the bottom of his foot, and is prescribed insulin. He presented at intake with an elevated blood pressure reading and only received insulin once in his first three days at California City. The provider did not see him until three days after his intake assessment, despite his serious conditions. During that initial appointment with the provider, Mr. Gomez Ruiz's blood pressure was again elevated. The provider failed to review Mr. Gomez Ruiz's history of hypertension, which is a standard practice with a patient demonstrating these symptoms, and failed to document other basic clinical information.

150.  Given Mr. Gomez Ruiz's repeated elevated blood pressure and diabetic history, the provider should have had a follow-up diabetes appointment relatively soon after to assess his stability. Instead, the provider scheduled a follow-up appointment related to his diabetes six months later. When the provider next met with Mr. Gomez Ruiz, reportedly to evaluate his wound, the provider did not document Mr. Gomez Ruiz's vitals, did not document that he examined Mr. Gomez Ruiz's ulcer, did not acknowledge that several previously-ordered blood pressure checks and wound care appointments never happened, and did not document Mr. Gomez Ruiz's elevated blood sugar levels. Such documentation is a basic clinical requirement. Mr. Gomez Ruiz has not even received antiseptic or clean bandages to care for his open wound, and he must continue to wrap it with dirty bandages.

**Medication Continuity Failures**

151.  California City fails to ensure that people have access to the medications they need upon arrival and throughout their detention, leading to dangerous lapses and sudden discontinuation of medications.

152.  Even when people, after significant delays, are able to obtain a renewal prescription for their necessary medication, continuity of the medication is not guaranteed, and lapses continue. Sometimes medication is distributed in the middle of the night, requiring the patient to be woken up from their sleep. These lapses and delays in medication administration are documented in

California City's own electronic medical records. The records also reflect that, at times, detained people do not receive their prescribed medication because the medication is "out of stock." These medical lapses are dangerous and unacceptable, especially for a facility housing medically complex patients.

153. As described above, Plaintiff Yuri Roque Campos has experienced multiple lapses in his heart medication, resulting in symptoms of chest pain and serious risk of further harm.

154. Plaintiff Fernando Gomez Ruiz has diabetes and was not provided with multiple doses of insulin, increasing his chances of life-threatening complications. Mr. Gomez Ruiz was also prescribed two antibiotic ointments to treat his diabetic ulcer and reduce the possibility of infection. His records indicate that both ointments were not consistently provided to him because they were out of stock. These lapses in medication, and Defendants' failure to maintain a supply of essential medications, put detained people at a serious risk of harm.

155. People who have received medication at California City also have their medication suddenly discontinued with no explanation. Plaintiff Gustavo Guevara Alarcon is diagnosed with chronic migraines for which he is prescribed Topamax, a medication that, when discontinued, should be tapered off gradually to avoid serious side effects. After experiencing lapses in the continuation of his medication upon arrival at California City, he was provided Topamax for a short period of time before Defendants abruptly discontinued it without tapering or having him meet with a provider. Another detained person at California City had been receiving two medications—one for hypertension and one for diabetes—both of which were suddenly stopped without explanation or clinical justification documented in his medical record.

**Lack of Specialty Services**

156. Defendants fail to ensure that people who require care from specialists, such as cardiologists, oncologists, and gastroenterologists, are provided that care. Even when doctors order specialty appointments, those orders remain in a "need authorization" status in the medical records while people desperately await necessary medical care.

157. Detained people who arrived with pending specialty orders from prior ICE detention facilities have those orders cancelled. Plaintiff Yuri Roque Campos, who has heart disease, arrived

at California City on a cardiac monitor that was ordered by a cardiologist he saw when he was detained at another detention facility. After a few days, the monitor was removed and mailed back to the cardiologist. A nurse entered a notation in the medical records that Mr. Roque Campos would be following up with the specialist to review the results of the monitor reading; no such appointment was ever scheduled or ever occurred.

158.  Similarly, Plaintiff Sokhean Keo arrived at California City from another detention facility with pending specialty appointments with a neurologist, an ear-nose-and-throat (ENT) doctor, an orthopedist, a hand/finger specialist, and an ophthalmologist. All those appointments were cancelled, and the primary care provider at California City told Mr. Keo that he would just have to live with the pain he is experiencing. Nurses at California City told Mr. Keo and other detained people that the facility does not have contracts with specialists.

159.  Other detained people who are ordered specialty services are not provided those specialty appointments by the recommended compliance date set out in the medical records. Despite repeated pleas, one detained person has been unable to see a surgeon to address and repair his painful, worsening hernia. While at his prior detention facility, he was evaluated and notified that he would receive the procedure, but he was transferred to California City before it could be completed. A surgical consult order was placed at California City with a compliance date in early October 2025. Over a month later, the specialty appointment remains unscheduled and flagged as needing authorization.

160.  At other times, Defendants order specialty appointments on a timeline that is dramatically slower than the urgent medical condition requires. Even if those appointments occurred as scheduled, the appointments would be weeks or months too late, subjecting individuals to a very serious risk of harm.

161.  As described above, an emergency room doctor recommended that Plaintiff Yuri Roque Campos receive close monitoring by a cardiologist or pulmonary specialist. Defendants made the referral, however, a month and a half after the emergency room doctor made his recommendation, and with a compliance date that was three months later, in January 2026. The referral was made on a "routine" basis instead of an "urgent" or "emergent" basis. Instead of being evaluated by a

40

cardiologist in days or weeks of his emergency room visit, as recommended by the emergency room doctor, Mr. Roque Campos might be seen around four months later, and only if California City meets its internal compliance deadline.

162. Similarly, Plaintiff Fernando Viera Reyes, who has a high probability of having metastasized prostate cancer and began work-up for his condition at his prior detention facility in Kern County, has repeatedly asked to be referred to a urologist to obtain the previously-ordered biopsy. Despite the urgency of Mr. Viera Reyes's condition and the high likelihood of his condition worsening, Defendants placed his urology consult order weeks after his arrival as a "routine" order, with a compliance date of January 2026. Meanwhile, his condition has progressively and rapidly deteriorated.

**Failure to Timely Respond to Urgent and Emergent Medical Issues**

163. California City fails to timely and appropriately respond to acute medical emergencies or provide care with the urgency that the medical situation requires.

164. Defendants fail to provide an adequate or functional system for responding to medical emergencies. According to the Detainee Handbook, if a person has a medical emergency, they should notify their housing unit officer, who will notify the "Medical Team …[which] will respond immediately." In reality, housing unit staff fail to respond or fail to timely alert medical staff of emergencies, or when they do, medical staff fail to timely arrive or do not arrive at all.

165. For example, when one detained person told a nurse that he was vomiting blood, the nurse responded that there was no doctor available until the morning. The next morning, the detained person experienced severe chest pains and then fainted. Only then did staff bring him to the medical clinic. At the clinic, he waited for two to three hours but was not provided appropriate medical treatment and was returned to his housing unit. He was not provided with his prescribed medication that night.

166. Even when staff respond to a medical emergency, the care provided is often inadequate. Nurses may take the person to the medical area in the facility for assessment, but the assessments are incomplete. One detained person experienced dizziness, nausea, tremors, and blurry vision. He fell and lost consciousness. A nurse took him to the medical clinic area but provided no treatment

or medication for about half an hour. The nurse took no vitals. In fact, the first time any vitals were taken was when firefighters arrived onsite for the man's transport to the hospital, at which time his blood pressure and blood sugar levels were very low. It was the firefighters—not the California City nurse—who provided the man with a sugar packet to help raise his blood sugar to safer levels. Hospital staff later informed the man that his blood sugar had gone down to 40, which can be life-threatening.

167.  People who experience a medical emergency warranting an offsite hospital visit are transported to the nearest hospital, which is approximately 45 to 60 minutes away. Depending on the seriousness of the situation, such a long wait to access emergency services can place detained people at risk of harm.

168.  The follow-up care provided at California City when a patient returns from an emergency room visit is inadequate and places people at risk. Defendants do not implement the recommended treatment plan that emergency room doctors order. As described above, Plaintiff Yuri Roque Campos was diagnosed with serious heart conditions, including pulmonary hypertension, right bundle branch blockage, and congestive heart failure, for which the hospital recommended an urgent cardiology appointment, a continuation of his heart medication, and a new medication to help with his low potassium levels. He was not given his heart medication for days, the recommended medication was never ordered, and he has yet to be seen by a heart specialist almost two months later.

169.  Another detained person was sent urgently to the hospital, where he underwent an endoscopy with biopsies and a colonoscopy. He returned with a recommendation for medication, an endoscopy in eight to 12 weeks, and a follow-up with the gastrointestinal specialist in two to three weeks to review the results of the biopsies. But he was not provided with the recommended medication for several days, and his records do not reflect that the facility ever ordered the recommended gastrointestinal specialty appointment or endoscopy. Facility medical staff never even obtained his biopsy results.

**Inappropriate and Inadequate Medical Housing**

170.  Defendants maintain a policy and practice of placing people in "medical observation cells" to monitor their medical status after an acute medical episode. The conditions in these cells, and the lack of medical care people receive in them, have caused significant psychological and emotional distress and have risked interfering with recovery and causing medical complications.

171.  The observation cells are dirty and appear not to have been cleaned between uses. Despite having just been released from the hospital, people are left to clean the cells on their own, without cleaning supplies. In some cases, the observation cells smell foul and the shower is inoperable. People are not provided with towels, soap, or linens.

172.  In the observation cells, people do not have access to a dayroom or outdoor space, tablets, family or legal phone calls, or any physical activity, social interaction with other detained people or sensory stimulation. Some people remain in the observation cell for several days after returning from the hospital— in conditions of extreme solitary confinement, apparently for no reason other than their medical condition.

173.  Medical monitoring while in these observation cells is sporadic and inadequate. Plaintiff Yuri Roque Campos was placed in an observation cell for seven days; although he was seen by a nurse daily, his records reflect that he did not get his heart medication for multiple days. Another detained person was in observation for three days. When he tried to summon help by pressing his in-cell call button, no one responded. He saw a primary care provider only on the day of discharge, and the provider did not even examine him.

**Inadequate Staffing for High Medical Needs**

174.  In January 2023, when California City operated as a state prison, it housed no high-risk medical patients, likely because of its isolated location and the associated challenges with specialty services access and healthcare staffing. High-risk patients were considered those with a sensitive medication condition, multiple hospitalizations, multiple emergency room visits, high risk specialty consultations, significant abnormal labs, age 65 or older, or specific high-risk diagnoses and procedures. The state prison was also not approved to house seriously mentally ill patients who

43

required intensive mental health care because of the staffing challenges required to meet their mental health needs.

175.  California City Detention Facility, even at a third of its potential census, currently houses multiple high-risk medical patients. The concerns that prevented the State of California from housing high-risk patients in this facility when it was a prison persist. Defendants fail to maintain adequate health care staff available to provide necessary and timely care. Their inadequate staffing levels cause delays in completing health care intake assessments, late responses to sick-call slips, distribution of medication at all hours of the night, and failures to see patients timely.

**Inadequate Mental Health Care Services**

176.  The problems that plague the health care system at California City also prevent the detained population from accessing adequate mental health care services.

177.  As noted above, California City did not house people with very serious mental health diagnoses or who were experiencing acute mental health decompensation when it operated as a state prison. People with those heightened mental health needs were instead housed in prisons located in geographical areas with greater capacity to recruit and retain qualified staff and faster access to hospitals in emergent situations. By contrast, California City now houses people with very serious mental health needs, including those who suffer from schizoaffective disorders and take antipsychotic medications.

178.  Many people currently detained at the facility experience severe mental health distress, both as a consequence of preexisting mental health conditions and because of the conditions they are now subject to—the sudden isolation from their families; deprivation of prosocial activities, sensory stimulation, and physical activity; the lack of access to information and legal counsel; and the inadequate healthcare and disability services. Plaintiff Jose Ruiz Canizales described experiencing anxiety and racing thoughts and being unable to sleep. He was sent to the emergency room, where he learned he was having a panic attack. Mr. Ruiz Canizales asked to be assessed for medication for his anxiety and racing thoughts but has yet to see a psychiatrist.

179.  Medication shortages and failures in medication administration lead to dangerous lapses for people who require antipsychotic medications. Medical records show missed medication doses

and doses administered in the middle of the night. One detained person failed to receive his antidepressant medication for three days in a row. Plaintiff Fernando Viera Reyes reported that his mental health medications were discontinued without notice, causing him rising anxiety and inability to sleep, and Defendants have still not yet renewed his medication.

180.  Detained people's requests for mental health care are often ignored, and when appointments are scheduled, they are often delayed. Mr. Viera Reyes was referred on a "routine" basis (to be seen within 14 days) to mental health at intake but was not seen for over a month.

181.  Defendants house people in severe mental health distress in conditions of isolation, which heightens their distress. One detained person with schizoaffective disorder, auditory hallucinations, and a history of suicide attempts has spent weeks in solitary confinement, where he is locked in his cell in conditions of sensory deprivation all but an hour or two each day. These conditions are well known to cause and exacerbate psychiatric decompensation.

182.  Defendants are ill-prepared to respond to the predictable range of mental health needs presented by the population in their custody. This has resulted in significant harm and multiple suicide attempts at the facility since it opened, including one that Plaintiff Sokhean Keo witnessed firsthand. People who express suicidal ideation are placed alone in small concrete safety cells, where they are stripped of their clothing. The safety cells are bitingly cold.

183.  In the case of the suicide attempt Mr. Keo observed, the man was carried out on a stretcher. Mr. Keo saw the man hanging from his cell, his body shaking. Mr. Keo had flashbacks to the image of a man's body shaking, hanging from a rope in his cell. Since the suicide attempt, he has received no information from staff about how to request mental health care or what mental health support resources are available. He knows people who have agreed to deportation to escape the conditions at California City. He said, "There is also the person who tried to kill himself because it was all too much."

**D.     Access to Counsel.**

184.  People detained at California City experience extraordinary difficulty meeting with and speaking to their retained or prospective counsel.

185.  For many people, access to their attorneys is of primary importance while detained. Torn from their daily lives, they find themselves detained subject to a complex web of civil immigration laws. Faced with harmful and dangerous conditions of confinement, many seek legal counsel to assist them with basic functions like accessing health care or challenging denials of disability accommodations, or seeking release from detention.

186.  Indeed, there are only three ways for detained clients to have purportedly unmonitored conversations with their attorneys: (1) legal calls or virtual visits, (2) calls from phones or tablets from the dayroom in the housing unit, which are shared among the 88 detained people in a unit and which must occur without privacy, in the presence of staff and other detained individuals, or (3) in-person visits. Each form of communication is hindered by pervasive delays and operational problems that render it exceptionally difficult to have timely and confidential attorney-client communications. When facility staff give a reason for these delays and operational problems, they often point to short-staffing.

**Weeks-Long Delays for Legal Calls and Virtual Visits**

187.  The facility frequently takes between one and two weeks to schedule legal calls and virtual attorney visits (VAVs). At times, the facility fails to schedule a call at all until an attorney sends follow-up requests.

188.  ICE has an Online Detainee Locator System that is supposed to show all people in ICE's detention network. However, some people at California City do not show up on this system. These people's attorneys cannot set up calls with them until the system officially registers their arrival at California City, which can take more than a week.

189.  When calls and virtual visits do occur, they frequently are interrupted by technical issues. Attorneys report video that freezes and audio that cuts out, which can cut a 60-minute visit by 10-15 minutes. Attorneys also report that clients are brought to calls late, which also decreases the time available for the visit. Some visits are rescheduled entirely because of technical issues.

190.  According to Defendants' website, attorneys are not allowed more than a 60-minute VAV in a single day. Thus, if a detained person does not finish discussing their case with their

1    attorney, they must wait another week or two before another call can be scheduled. The result

2    requires people to reengage in difficult and complex conversations across multiple days.

3        191.  By contrast, the California state prison system regularly permits attorneys to schedule

4    confidential phone calls with their clients, with no significant scheduling delays.

5    **Confidentiality Concerns for Dayroom Calls**

6        192.  Attorneys can set up attorney lines so that their detained clients can call them from the

7    dayroom on a telephone or tablet. Although these lines are purportedly not recorded, detained

8    clients must place the calls from loud, crowded areas, where they are within earshot of officers and

9    other detained people. As a result, detained people—who often need to discuss highly private and

10   sensitive matters with their attorneys—are unable to talk freely and privately on these calls.

11       193.  People report long lines to use the telephones during the limited times they are allowed

12   out of their cell between lockdowns for count. Like the wall-mounted phones, tablets are limited in

13   supply, only available in the dayroom, and must be shared among people. As a result, there are

14   often long delays to use them, too. Tablets are not allowed in people's cells, so having a private

15   conversation away from nearly 90 people milling around a dayroom is not possible. Defendants do

16   not provide headphones for the tablets, so people must place tablet calls on speaker phone or buy

17   headphones from the commissary. Background noise impedes the quality of the audio connection,

18   further straining the attorney-client communication.[36]

19   **Long Waits for In-Person Legal Visits, which Are Not Confidential**

20       194.  Until recently, Defendants have nominally had a policy of allowing attorneys to visit their

21   clients by arriving at the facility between 8am and 8pm and requesting a visit. But significant

22   issues have rendered this option ineffective.

23       195.  Attorneys report that, even after they drive hours to the remote facility, they must wait

24   many hours for a visit. One attorney arrived at the facility at 2:30pm for a legal visit and had to

25   wait until 6:30pm for the visit to start. Another reports such significant delays that he is unable to

26   meet with many of the clients he intends to meet in a day at the facility.

27   _____

28   [36] By contrast, in state prison, each individual has their own tablet which they may bring into their
     cell, and they may place free calls from early in the morning until late at night on headsets that are
     issued for free.

196.  When the attorney and client do finally meet, it is hard for them to hear each other. The visit occurs through a glass wall with only a small gap at the bottom of the glass, presumably intended to pass paper back and forth. The walls are concrete, causing an echo that makes it difficult to hear, particularly through the glass wall. Staff are positioned outside of the visiting room door, where they can readily overhear conversations. There is no telephone or cell phone service in these visiting rooms, making it impossible to call an interpreter when that is necessary for client communication.

197.  California City staff stated that beginning the week of November 10, 2025, the facility would no longer permit in-person attorney-client visits without an advance appointment. If such a requirement were implemented, it would further complicate the already flawed system for in-person visits.

198.  In contrast to California City, the California state prison system regularly permits contact attorney visits, where the attorney and client can sit together at a table and share documents.

**The Importance of Legal Access**

199.  Consistent, clear, and readily available legal calls are extremely important to those in immigration detention. Immigrants who seek legal counsel or assistance must speak about difficult, traumatic, and highly personal issues in the course of their representation, and they can only do this if they feel comfortable that their conversations with attorneys are confidential. People making calls from non-confidential settings may not provide detailed accounts or ask follow-up questions because they may be afraid of others overhearing. Working with attorneys, detained people often have to prepare sworn declarations, and poor connections and difficult-to-hear environments create an unacceptable risk of misunderstandings in discussing the content of these declarations.

200.  The issues with attorney access at California City have harmed the people detained there. Despite Plaintiff Alejandro Mendiola Escutia's attorney's significant efforts to visit in person, he has only been able to have limited visits due to delays in visits. As a result, Mr. Mendiola Escutia has been unable to discuss conditions issues at the facility or to obtain his attorney's help in addressing them.

201.  Plaintiff Gomez Ruiz has experienced delays in discussing his options for bond or habeas with his lawyer, and difficulties in obtaining his lawyer's assistance to advocate for the facility to address his serious medical condition.

202.  One detained person experienced an approximately one-week delay in filing a habeas petition because of a delay in scheduling a virtual attorney visit. Another person has type-2 diabetes and has gone days without receiving insulin. Without up-to-date information about her situation, her attorney has experienced challenges advocating for her to receive proper medical care. Another person has a removal order and limited time available to pursue options such as seeking release, and delays in communications risk her removal before her attorney can fully address these options with her. Two other people have mental health needs, and their attorney worries that if they have mental health crises, the attorney's difficulties communicating with them will prevent him from effectively advocating on their behalf for appropriate healthcare or seeking their release via habeas petitions.

**E.**    **People Civilly Detained at California City Are Denied Reasonable Disability Accommodations.**

203.   Defendants operate California City Detention Facility as though there are no people with disabilities there. They systematically fail to accommodate people with disabilities. On November 3, 2025, Disability Rights California (DRC) issued a report, following an inspection it had conducted pursuant to its statutory authority as the designated Protection and Advocacy system for people with disabilities in California.[37] It concluded that Defendants are "subjecting people with disabilities to abuse and neglect."[38]

204.  The California City Detainee Handbook states: "Americans with Disabilities Act[:] California City Immigration Processing Center is in full compliance with the Act."[39] It also

---

[37] *See* 42 U.S.C. §§ 15001 et seq. ("Developmental Disabilities Assistance and Bill of Rights Act"); 29 U.S.C. §§ 794e et seq. ("Protection and Advocacy of Individual Rights Act"); 42 U.S.C. §§ 10801 et seq. ("Protection and Advocacy for Individuals with Mental Illness Act"); Cal. Welf. & Inst. Code §§ 4900 et seq. ("Protection and Advocacy Agency").

[38] Disability Rights California, *Newly-Opened California City ICE Detention Facility: Dangerous for Disabled People,* https://www.disabilityrightsca.org/reports/california-city-ice-processing-center-a-dangerous-expansion-of-immigration-detention-in.

[39] In fact, the Rehabilitation Act, not the Americans with Disabilities Act, applies to California City Detention Facility.

purports to have a policy on "Disability, Identification, Assessment and Accommodation" which lays out "processes to ensure . . . equal opportunity" to the facility's programs, services and activities, delivered in the least restrictive and most integrated setting possible, "through the provision of reasonable accommodations, modifications, and/or auxiliary aids and services, as necessary, and in a facility that is physically accessible."[40]

205.  To the people detained at California City, these policy provisions might as well not exist.

206.  In practice, Defendants have implemented no functional system for disability "identification, assessment and accommodation," either at intake or through any disability grievance or request process. They have no structure for ensuring continuity of disability accommodations, such as durable medical equipment or auxiliary aids, that a person has when they arrive at California City, or for providing new accommodations when those needs arise during the person's detention there. They lack a mechanism for ensuring that detained people can be evaluated by specialists to assess their disability needs and recommend appropriate disability accommodations. On top of all that, Defendants have taken no demonstrated action to ensure housing units are accessible to people with disabilities, despite the fact that these very same housing units had been deemed inappropriate for housing people with serious mobility and vision disabilities when the facility was operated as a state prison.

**No System for Disability Screening**

207.  California City has no meaningful disability screening at intake.  Such screening is necessary to ensure that people with disabilities are identified and issued the accommodations and auxiliary aids and services that they require.

208.  People detained at California City do not recall being asked any questions related to disability when they arrived at the facility, whether or not they had an obvious disability need or arrived with an assistive device or auxiliary aid. When people self-report disability needs, Defendants appear not to add them to any tracking system, and no dedicated disability services staff follow up with those individuals to ensure they receive the accommodations they need.

---

[40] California City Immigration Processing Center Detainee Handbook at 6 (July 29, 2025).

209.  For example, Plaintiff Sokhean Keo is hard of hearing and uses hearing aids. When he arrived at California City, he was not asked any questions about his hearing disability, and staff did not explain to him how to request disability accommodations.

210.  Plaintiff Jose Ruiz Canizales is Deaf, does not speak, and does not effectively communicate in written English. His sole language is American Sign Language (ASL). He has had access to an interpreter only once, via video, in two months of detention at California City. When he arrived at the facility, neither custody nor medical staff asked him questions about his disability, or any questions at all that he was aware of. Defendants did not provide a sign language interpreter to conduct an intake screening or attempt to communicate with him. Eventually, his friend explained to staff that Mr. Ruiz Canizales is Deaf. Staff looked at Mr. Ruiz Canizales and then walked away without asking him any questions. They did not seek to understand the nature of his disability or how to accommodate it, and did not explain to him how to request disability accommodations. Since then, Mr. Ruiz Canizales has lived in near-total communication isolation.

211.  Without any established disability screening system, it is no surprise that Defendants systemically overlook the disability needs of detained people. Upon information and belief, nobody keeps a list of all people in the facility with disabilities, or if they do, it is woefully inadequate and based only on anecdotal reports. As a result, people detained at California City go without accommodations that should have been readily identifiable at intake.

**No System for Continuing Previously Issued Accommodations**

212.  Defendants also fail to continue disability accommodations that detained people were already issued prior to their arrival at California City.  When people arrive at the facility with accommodations like durable medical equipment and assistive devices in hand, intake staff confiscate those items. They then refuse to provide replacements in a timely manner, or at all. These accommodations are reasonable and would require no fundamental alteration of the facility's operation or undue burden upon Defendants—indeed, many people were already receiving these accommodations at a previous ICE facility.

213.  For example, staff confiscated one person's eyeglasses at intake. Without them, he had difficulty seeing objects in front of him. He was assigned to top a bunk, and with his limited

vision, he misjudged the edge of the bed and fell off of the bunk. When he fell, he hit his head, and he was sent to a hospital over an hour away for treatment. He was in handcuffs during the entire transport while bleeding from his head. Upon arriving to the hospital, medical staff refused to treat him because he did not have health insurance. He was transported back to California City without receiving treatment. He was eventually transported to a second hospital, where he received four stitches. After returning from the hospital, he slept on the floor in his assigned cell because he was too afraid to climb up to the top bunk again.

214.  Another detained person was denied a wheelchair at California City even though he had been issued one at his previous ICE facility due to a hernia and significant pain when walking. He filed numerous grievances seeking help and complaining of tremendous pain, all directly related to an ongoing mobility disability and accommodation need. Nothing in his medical records suggest these sick calls were understood to raise disability accommodation needs. For three weeks, he was forced to navigate the facility without a wheelchair. Finally, on the second day of DRC's visit, he was provided a wheelchair.[41]

215.  Similarly, Plaintiff Sokhean Keo arrived at California City with an elbow brace and structured knee brace to accommodate limited mobility and ongoing pain in his elbow and knee. Both braces were confiscated at intake. He was told that they were medical devices that needed to be approved by a doctor, despite them having been approved by a doctor at a prior ICE facility. California City did not timely schedule him with a doctor to approve those devices. It took over a month for his elbow brace to be approved, and he never received his structured knee brace back. Without it, he has difficulty exercising and ambulating up and down stairs.

216.  As recently as November 6, 2025, California City staff confiscated custom orthopedic shoes and insoles from a man with a mobility disability. He has amputated toes, which cause an imbalance when he walks. He previously fractured his remaining toes from walking with that imbalance, leading his podiatrist in the community to order these accommodations for him. He spoke to both an officer and a nurse at California City to request the custom shoes and insoles as a disability accommodation, but neither provided them.

---

[41] https://www.disabilityrightsca.org/reports/california-city-ice-processing-center-a-dangerous-expansion-of-immigration-detention-in#footnoteref15_u1lqnmg.

217.  Multiple other people had their mobility accommodations confiscated at intake and never returned or replaced. Defendants' failure to allow or provide these accommodations forces people to navigate the facility in pain, potentially limits their access to the dayroom and outdoor recreation space, and creates a risk of falls and injury.

**No System for Conducting Disability Evaluations**

218.  Defendants have no system in place for evaluating people's disability needs when they raise those needs to facility staff, and as a result Defendants fail to ensure that people with disabilities receive the accommodations and auxiliary aids and services that they require. The on-site doctors at California City do not routinely review and approve requested disability accommodations, and they do not refer people out for specialists—such as ophthalmologists and audiologists—to evaluate disability needs and assess people for appropriate accommodations. In this way, Defendants' failure to provide access to specialists not only leaves people without adequate medical care, as described above; it also means people who have disability needs cannot get those needs evaluated and subsequently accommodated.

219.  For example, one person's hearing aids broke when he was at a prior ICE facility. At intake at California City, he was told by medical staff that they could give him batteries for the broken hearing aids, but they could not replace or repair the hearing aids. They also apparently did not schedule him with an audiologist to re-evaluate and confirm his need for auxiliary aids. He was led to believe he could get hearing aid batteries but given no information about how to obtain the device that uses those batteries.

220.  Plaintiff Sokhean Keo had been told at his prior ICE facility that he had an appointment scheduled with a hand specialist to evaluate a broken finger. That appointment was cancelled when he was transferred to California City. Medical staff told him it was because the facility does not contract with outside specialists. Some five months after his initial injury, he still cannot bend his finger without significant pain and has difficulty using his hand to complete activities of daily living, including washing and putting on clothes. Staff at California City have not offered him any accommodations for this upper extremity disability. One doctor told Mr. Keo that he would just have to live with the pain and discomfort.

53

221. Other detained people have asked Defendants for accommodations for their disabilities only to be told to purchase the accommodation from commissary. One detained person has difficulty walking and standing for extended periods of time without shoes that provide arch support. He arrived at California City with appropriate shoes to accommodate his mobility disability, which were approved as an accommodation at a prior ICE facility. California City staff confiscated those shoes and instead provided him with plastic, orange sandals. Several weeks after staff confiscated his shoes, he had an appointment with a doctor at California City. The doctor told the him to schedule an appointment with a podiatrist after he is released from ICE custody, and to buy different shoes from commissary to accommodate his foot condition. The availability of commissary (to those who have sufficient funds to afford it) is no substitute for Defendants' obligation to provide appropriate specialty care and accommodations.

**No System for Considering and Addressing Disability Requests**

222. Defendants have no functional disability grievance process or other coordinated system by which detained people can self-report disability needs or request disability accommodations, no process to ensure that people with disabilities who make such a report or request receive the accommodations and auxiliary aids and services that they require, and no trained and dedicated Disability Compliance Coordinator who reviews disability requests and ensures that people are appropriately accommodated.

223. In lieu of a dedicated disability specialist and disability request system, the Detainee Handbook states that the facility's Health Services Administrator and sick call system serve those roles. This effectively means that people's disability needs are only recognized as adjacent to their medical conditions. And, as described above, there are extreme deficiencies in healthcare administration and the sick call process, such that it does not result in people receiving the disability accommodations they request there—if they know to request them at all.

224. Many detained people do not know how to seek accommodations for disability needs beyond repeatedly asking staff for help, often to no avail. Many are not aware that the sick call process can also be used for disability needs, or that they can consider their disability needs as

separate from their medical conditions. As a result, unless they have previously received disability accommodations, few people even know what to request on a sick call form.

225.  Because people do not know how to file disability requests, they often resort to asking staff for the accommodations they need. However, these verbal requests are also fruitless. Defendants appear to have no system for tracking such requests and ensuring they are appropriately responded to. Instead, staff often dismiss the requests and take no action.

226.  Plaintiff Jose Ruiz Canizales has been forced to live for the past two months without sign language interpretation or anyone he can effectively communicate with, despite repeated requests to staff for accommodations. When he asks for assistance, staff often shrug. He says that asking staff for help "doesn't seem to work. I don't know what else I can do. Is there a form I can fill out that will work better? Is there someone in charge of disability issues? I don't think there is, but I don't know, and I don't know where to get that information." Upon information and belief, there are at least two Deaf people at California City. Despite having Deaf people in their custody at California City for at least two months, Defendants have taken no steps to ensure Mr. Ruiz Canizales knows how to request assistance—or to accommodate him when he does.

227.  As a result, Mr. Ruiz Canizales lives in total isolation. He has begun experiencing anxiety for the first time in his life and a sense of claustrophobia and deep loneliness. After the first days at California City, without anyone to speak to, he was hospitalized for a panic attack. He believes he had a panic attack because he was so stressed about not being able to communicate. Two months later, Defendants have still not provided Mr. Ruiz Canizales accommodations that allow him to communicate.

228.  Although Mr. Ruiz Canizales is one of just two Deaf people at the facility, his experience is simply a more pronounced version of what everyone with disability needs at California City experience: a systematic failure by staff to understand disability needs and by Defendants to create a system to address those needs and to train staff accordingly. When people ask for help—whether it is because they cannot hear, cannot walk, or cannot dress themselves—Defendants fail to provide reasonable accommodations.

229.  For example, multiple people have complained to staff that their housing assignment is inaccessible—that they are assigned to an upper bunk that they cannot climb onto safely or to an upper tier that requires them to go up stairs they cannot climb without pain. Despite their many verbal complaints, their housing assignment has not been changed and they have not received indication that they are on any kind of disability needs list.

230.  One person had a low bunk "chrono" (paperwork documenting his disability need) at his prior ICE facility due to a hand injury. He informed staff about this at intake, but they did not renew his chrono or otherwise accommodate his disability need. Instead, they assigned him a cellmate who also needed a lower bunk. He later injured himself jumping down from the top bunk because he could not climb down with his hand injury. Another person who complained about needing a lower bunk was told he could not have one, but the staff member said they would note in his record that he was given a lower bunk "in case we're ever audited."

231.  At intake, the woman told staff about her difficulty with stairs, and she was told she had to go where she was assigned: that assignment was an upper bunk on an upper tier. She subsequently reported to staff that she was unable to walk upstairs to her upper tier cell without excruciating pain due to a medical condition. Staff did not evaluate her or provide her with any housing accommodations. Instead, they told her that if someone wanted to switch rooms with her, she could move to the bottom tier. Otherwise, she would continue to be housed on the upper tier, which is accessible only by stairs. Over a month later, that assignment had not changed. She still experiences pain every time she climbs the stairs to her cell.

232.  On November 6, a man with a mobility disability resulting from amputated toes was assigned an upper bunk even though his disability makes it difficult for him to climb up to it. When he explained his concerns to the housing officer, the officer told him there was nothing the officer could do and that the man would need to wait for a bottom bunk to become available.

233.  Despite repeated requests to various staff members through various means, Plaintiff Sokhean Keo has not been provided hearing aid batteries, so he cannot use his hearing aids. He has verbally asked officers, nurses, and a security chief, but he has still not received the batteries. Although the California City Detainee Handbook provides that people can request disability

accommodations verbally or in writing, some staff have referred him to the sick call process when he has asked them for batteries. He has also been unsuccessful there. Like Mr. Keo, many other people who brought hearing aids from their prior ICE facilities have stopped being able to use those hearing aids when the batteries they arrived with ran out.

234.  Staff members' dismissive responses to people with disabilities reveals a non-existent disability services program, a pervasive failure to accommodate and, in many cases, outright disability discrimination. For example, when staff speak to Plaintiff Jose Ruiz Canizales, he often points to his ears to try to say he cannot hear. Staff get flustered and walk away. When a person with a mobility disability asked an officer for a cane to help him walk, the officer told him that "this is a prison" and he was not entitled to a cane. Later, still without a cane, the same man asked staff if he could have a job picking up trash or working as a janitor. Staff told him he could not because he has diabetes and because he cannot walk because of his knee.

**Inaccessible Facility Structure**

235.  Defendants cannot safely house people with such serious disability needs at the facility because its physical structure is inaccessible. When California City operated as a prison, it did not house people who use wheelchairs, people who use walkers, or people who are blind or have significant vision disabilities, because the facility is physically inaccessible. For example, the cells are not wide enough for people to navigate wheelchairs inside. The toilets in the cells are not equipped with grab bars, rendering them inaccessible to many people with mobility disabilities. The showers in the housing units do not have level entrances, such that people who use wheelchairs or other mobility devices cannot safely enter the shower area. The showers also lack critical accessibility features, such as shower benches or shower wands. The common areas in the buildings have objects affixed to the walls that make those areas inaccessible to people with vision disabilities who use a white cane.

236.  Although Defendants have engaged in some construction with the reopening of the facility as an immigration detention facility, that construction does not appear to include accessibility renovations. At a minimum, such construction was not undertaken or clearly planned in the six housing units that first opened at the facility, where numerous people with disabilities,

including the wheelchair user, were detained. Instead, Defendants appear to take the same approach to the physical accessibility of the facility as they do to all other categories of disability needs described above: proceed as though people with disabilities do not live at California City. As a result, people with serious mobility and vision disabilities are forced to live in cells that would not be approved for their disability needs if they were state prisoners.

**Denial of Equal Access to Programs, Services, and Activities**

237.  As a result of their failures to screen for, accommodate, and respond to people's stated disability needs, Defendants systematically deny equal access to programs, services, and activities to people with disabilities at California City.

238.  Defendants offer very few programs, services, and activities at California City, but the few that are offered are not equally accessible to many people with disabilities because of Defendants' failure to accommodate. For example, Plaintiff Jose Ruiz Canizales often misses outdoor recreation because he cannot understand the daily schedule or the announcements in his housing unit.

239.  A man with a mobility disability whose custom orthopedic shoes and insoles were confiscated at intake has been unable to access the limited programming available in his unit in the week since he arrived at California City, because he cannot safely ambulate in the standard-issue sandals Defendants provide. He cannot go to the yard because it is too far a walk, and he spends little time in the dayroom because of the pain and instability he experiences walking without his accommodations. Instead, because he is deprived of accommodations, he mostly stays in bed.

240.  Defendants also fail to ensure people with disabilities have equal access to religious services. Plaintiff Jose Ruiz Canizales is a deeply religious Apostolic Christian, but Defendants have made no attempts to make the in-person Christian services available to him or to offer him an equally effective alternative, despite the 2025 NDS requirement that the facility provide "accommodations … to detainees with disabilities to provide them with equal access to religious services."[42] Without his faith, Mr. Ruiz Canizales experiences even more isolation and emotional distress in detention.

---

[42] *Id.* at II.A. *See also* 15 Cal. Code Regs. § 3210(c) (guaranteeing "reasonable time and accommodation" for people to participate in religious service" in prison).

241. Defendants have forced other religious people to pray in spaces without chairs or other mobility accommodations. For example, more than two dozen Evangelical Christians in one housing unit wish to engage in group prayer, but Defendants have provided them no regular space to do that. Instead, they are left to do what then can in the corner of the dayroom, away from the tables and chairs occupied by the other sixty people in the room. Elderly people and those with conditions that make them unable to stand for extended periods of time cannot join because there is no space for them to sit where they are forced to gather.

242. Medical care—however inadequate—is also a program or service under disability law, of which Defendants deprive Plaintiff Jose Ruiz Canizales equal access. Mr. Ruiz Canizales' "initial appraisal" with a doctor, two weeks after intake, was assisted by video remote interpreting. However, four days before that, his medical records reflect a mental health evaluation where there is no mention of his hearing disability or indication about how the mental health clinician achieved effective communication. At the end of September, the medical record also indicates a medical appointment where he is alleged to have said he does not have medical complaints, but there is no indication of how this was communicated.

243. But for that first doctor's appointment, Mr. Ruiz Canizales has never been accommodated in his access to medical care, and so he cannot fully participate in medical encounters or ask for the care he needs. Even during an emergency medical situation when Mr. Ruiz Canizales, who is asthmatic, had trouble breathing and was brought to the medical clinic at the facility, he was forced to communicate with the nurse by passing written notes back and forth, even though he is unable to effectively communicate in writing.

244. Only recently, Defendants have begun offering porter and other menial jobs to people, for extremely minimal pay. As described above, one person requested to work a job but was denied because he has diabetes and a mobility disability. Upon information and belief, Defendants have not ensured equal access to jobs or work assignments for people with disabilities.

245. Defendants also deprive people with disabilities of equal access to programs, services and activities by forcing them to rely on their peers for accommodations that should be systematically provided by the facility instead. For example, because Defendants refuse to accommodate Mr.

Ruiz Canizales' disability, his friends must act as interpreters and disability aid workers for him. Even if those friends were paid to perform this labor, they provide a woefully inadequate alternative to a certified sign language interpreter and do not achieve effective communication with staff, since they do not speak American Sign Language and must interpret through gestures only.

## INJUNCTIVE RELIEF

246.  Plaintiffs re-allege and incorporate by reference paragraphs 1-245 of this Complaint as if fully set out herein.

247.  Plaintiffs and the putative class are entitled to preliminary and permanent injunctive relief.

248.  Defendants have acted, and threaten to act, to deprive Plaintiffs, and the others they seek to represent, of their constitutional and statutory rights.

249.  Plaintiffs and those similarly situated have suffered irreparable physical and psychological injury and the loss of fundamental due process and First Amendment rights. They have been and will continue to be subjected to serious risk of irreparable harm as the result of imprisonment at the California City Detention Facility.

250.  Defendants have been and are aware of the conditions and deprivations complained of herein. In the alternative, Defendants have acted with deliberate indifference and reckless disregard regarding the conduct and conditions described herein.

251.  Plaintiffs and putative class members have no plain, adequate, or speedy remedy at law.

## CLASS ACTION ALLEGATIONS

252.  Plaintiffs re-allege and incorporate by reference paragraphs 1-245 of this Complaint as if fully set out herein.

253.  Plaintiffs Fernando Gomez Ruiz, Fernando Viera Reyes, Jose Ruiz Canizales, Yuri Alexander Roque Campos, Sokhean Keo, Gustavo Guevara Alarcon, and Alejandro Mendiola Escutia bring this lawsuit as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(2) on behalf of themselves and all other persons who are similarly situated.

254.  With respect to the First, Second, Third and Fourth Claims herein, Plaintiffs seek to represent a class consisting of: "All persons who are now, or in the future will be, in the legal

60

custody of the U.S. Immigrations and Customs Enforcement ('ICE') and detained at the California City Detention Facility" ("the Class").

255. With respect to the Fifth Claim herein, Plaintiff Jose Ruiz Canizales and Plaintiff Sokhean Keo also seek to represent a subclass consisting of: "All persons who are now, or in the future will be, in the legal custody of U.S. Immigrations and Customs Enforcement ('ICE') and detained at California City Detention Facility who have disabilities within the meaning of the Rehabilitation Act" ("the Subclass").

256. The putative Class and putative Subclass are so numerous that joinder of all members would be impracticable. There are currently over 800 people detained at California City, an estimated 50 or more of whom have disabilities.[43] The putative Class and Subclass are also fluid, with people being brought to and removed from California City every day, making joinder of all members not just impracticable but impossible.

257. Many common questions of law and fact apply to all putative Class members. These common questions of law and fact include, but are not limited to:

    a.    Whether the conditions of detention at California City are unnecessarily restrictive and/or punitive, such that they violate the Fifth Amendment to the United States Constitution;

    b.    Whether the poor medical and mental health care available to people detained at California City creates a risk of harm that violates the Fifth Amendment to the United States Constitution;

    c.    Whether Defendants' policies and practices with respect to attorney visitation impermissibly burden or interfere with access to counsel or to retain prospective counsel at California City, in violation of the First and Fifth Amendments to the United States Constitution.

258. As to the Subclass, there are common questions of law and fact, including but not limited to:

---

[43] The precise size of the Subclass is difficult to ascertain, among other reasons because Defendants do not track and/or do not report detained people's disability needs.

a.  Whether Defendants have systems sufficient to identify and assess the disability needs of people detained at California City;

b.  Whether Defendants have a sufficient process at intake to ensure that people with disabilities receive the accommodations and auxiliary aids and services that they require;

259.  Whether Defendants fail to continue disability accommodations that detained people were already issued prior to their arrival at California City;

260.  Whether Defendants have a policy or practice of failing to respond to requests for disability accommodations made by Plaintiffs and members of the Subclass;

261.  Whether Defendants have a sufficient process to ensure that people with disabilities receive the accommodations and auxiliary aids and services that they require in response to requests;

262.  Whether Defendants deny Plaintiffs and members of the Subclass equal access to programs, services and activities at California City by failing to accommodate their disabilities;

263.  Whether the aforementioned results in violations of Section 504 of the Rehabilitation Act.

264.  Prosecution of separate actions by individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of other members not parties to the individual adjudications or would substantially impair their ability to protect their interests.

265.  The claims of the Plaintiffs are typical of the claims of the putative Class and Subclass. Each of the Plaintiffs, like all putative class members in the Class, is civilly detained at California City, subject to the same conditions of confinement challenged here. Plaintiffs who are representatives of the Subclass, like other members of the Subclass, have disabilities that entitle them to accommodations, auxiliary aids and/or services. The claims of the Plaintiffs arise from the

same policies, practices, and courses of conduct, and their claims are based on the same theory of law as the Class and Subclass' claims.

266.  Plaintiffs will fairly and adequately represent the interests of all members of the putative Class and Subclass because they seek relief on behalf of the class they represent as a whole and have no interest antagonistic to other members of the class. The Plaintiffs are represented by counsel from the Prison Law Office; Keker, Van Nest & Peters LLP; the California Collaborative for Immigrant Justice; and the American Civil Liberties Union Foundation National Prison Project. Counsel are experienced in class action, complex litigation, detention and prisoners' rights litigation, disability law, immigration law, and constitutional law generally.

267.  Prosecution of separate actions by individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of other members not parties to the individual adjudications or would substantially impair their ability to protect their interests.

### CLAIMS FOR RELIEF

### FIRST CLAIM
**(Violation of the Fifth Amendment to the United States Constitution)**
**(Conditions Constituting Punishment)**
**(By All Plaintiffs Against All Defendants)**

268.  Plaintiffs re-allege and incorporate by reference paragraphs 1-245 of this Complaint as if fully set out herein.

269.  Due process prohibits the use of detention as a means of punishing those who are civilly detained. As the United States Court of Appeals for the Ninth Circuit has held, "[A civil] detainee is entitled to 'more considerate treatment' than his criminally detained counterparts. . . .  Therefore, when a [civil] detainee is confined in conditions identical to, similar to, or more restrictive than those in which criminal counterparts are held, we presume that the detainee is being subjected to 'punishment.'" *Jones v. Blanas*, 393 F.3d 918, 932 (9th Cir. 2004) (citations omitted).

270.  The conditions in the California City Detention Facility are similar or more restrictive than they were when the same facility was run as a state prison, and similar or more restrictive than conditions in other state prisons. The *Jones* presumption of punishment is therefore triggered.

271.  In addition, conditions of confinement that are expressly intended to punish, that are not reasonably related to a legitimate governmental objective, or that are excessive in relation to that objective, constitute punishment in violation of the due process clause.

272.  Defendants severely limit Plaintiffs' reasonable access to outdoor recreation time, prosocial programming, visits from their loved ones, weather-appropriate clothing, hygiene and grooming supplies, adequate amounts of food, and potable water.

273.  Defendants subject Plaintiffs to overly restrictive security and search practices, unnecessary and excessive use of force, and the unnecessary use of solitary confinement.

274.  Defendants subject Plaintiffs to unreasonable restrictions on their access to religious property.

275.  Defendants subject Plaintiffs to unreasonable restrictions on their access to counsel.

276.  The conditions described herein, which are illustrative and not exhaustive, violate the Due Process clause because they, individually and collectively: (a) are identical to, similar to, or more restrictive than those in which persons convicted of criminal offenses are confined; (b) are expressly intended to punish; (c) are not reasonably related to legitimate, non-punitive governmental objectives; and/or (d) are excessive in relation to those objectives.

**SECOND CLAIM**
**(Violation of the Due Process Clause of the Fifth Amendment**
**to the United States Constitution)**
**(Inadequate Medical Care)**
**(By All Plaintiffs Against All Defendants)**

277.  Defendants have deprived and continue to deprive Plaintiffs and putative class members detained at California City of adequate and necessary health care by, without limitation:

a.   Failing to provide sufficient medical and mental health screenings to people upon their arrival at California City. As a result of Defendants' actions, Plaintiffs and others at California City have not received adequate medical or mental health care

64

for conditions existing at the time they arrived at California City, or that have

arisen since their detention there.

    b.    Failing to ensure continuity of care, such as continuity of prescription medication,

including from people's previous immigration detention facilities;

    c.    Failing to provide a functional process by which Plaintiffs and others can seek and

receive non-emergency medical or mental health care;

    d.    Failing to adequately respond to Plaintiffs' or others' urgent and emergent medical

and mental health care issues;

    e.    Failing to provide timely and adequate medical and mental health care, including

for conditions that require specialty care;

    f.    Failing to staff California City with adequate numbers of qualified medical and

mental health care providers and custody staff to facilitate the provision of medical

care; and

    g.    Failing to provide adequate and appropriate medical and mental health housing.

278.  Defendants have made an intentional decision to detain Plaintiffs and the Class on conditions where, based on Defendants' practices and policies, they are exposed to a significant risk of serious harm. Defendants have not taken reasonable available measures to abate this risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved. By not taking such measures, Defendants have caused Plaintiffs and the Class to face a significant risk of harm. These actions violate Plaintiffs' rights under the Due Process clause of the Fifth Amendment.

**THIRD CLAIM**
**(Violation of the First Amendment to the United States Constitution)**
**(Right to Hire and Consult Counsel)**
**(By All Plaintiffs Against All Defendants)**

279.  Plaintiffs re-allege and incorporate by reference paragraphs 1-245 of this Complaint as if fully set out herein.

280.  The First Amendment guarantees Plaintiffs and the putative Class members the right to hire, consult, and communicate with an attorney. The government may not unreasonably restrict this right.

281.  By unreasonably restricting Plaintiffs and the putative Class members from retaining, consulting, and communicating with counsel, Defendants have violated and continue to violate their rights under the First Amendment.

### FOURTH CLAIM
**(Violation of the Fifth Amendment to the United States Constitution)**
**(Right to Hire and Consult Counsel)**
**(By All Plaintiffs Against All Defendants)**

282.  Plaintiffs re-allege and incorporate by reference paragraphs 1-245 of this Complaint as if fully set out herein.

283.  The Due Process Clause of the Fifth Amendment guarantees detained people the right to be represented by counsel of their choice at no expense to the government.

284.  Defendants' conduct has violated and continues to violate the Fifth Amendment substantive due process rights of Plaintiffs and putative Class members by preventing people who are detained at California City from finding, retaining, and communicating effectively with counsel. Defendants' conduct also violates the Fifth Amendment rights of Plaintiffs and putative Class members by preventing them from collecting evidence and confidentially communicating with potential witnesses and experts, as is necessary for unrepresented detained noncitizens to meaningfully prepare and present their legal cases.

285.  As the United States Court of Appeals for the Ninth Circuit has held, "[A civil] detainee is entitled to 'more considerate treatment' than his criminally detained counterparts. . . .  Therefore, when a [civil] detainee is confined in conditions identical to, similar to, or more restrictive than those in which criminal counterparts are held, we presume that the detainee is being subjected to 'punishment.'" *Jones*, 393 F.3d at 932 (citations omitted).

286.  The limitations on access to counsel in the California City Detention Facility are similar or more restrictive than conditions in other state prisons. The *Jones* presumption of punishment is therefore triggered.

287.  In addition, conditions of confinement that are expressly intended to punish, that are not reasonably related to a legitimate governmental objective, or that are excessive in relation to that objective, constitute punishment in violation of the due process clause. Defendants' policies and practices of interfering with Plaintiffs' and putative Class members' access to counsel are not

66

rationally connected to a non-punitive government interest but are instead an exaggerated response to facility conditions.

288.  Individual Plaintiffs and the putative Class members have suffered and will suffer injury as a proximate result of Defendants' violation of their right to a full and fair hearing, their right to be represented by counsel of their choice at no expense to the government, and their right to competent counsel.

289.  The conditions described herein, which are illustrative and not exhaustive, violate the Due Process clause because they, individually and collectively: (a) are identical to, similar to, or more restrictive than those in which persons convicted of criminal offenses are confined; (b) are expressly intended to punish; (c) are not reasonably related to legitimate, non-punitive governmental objectives; and/or (d) are excessive in relation to those objectives.

**FIFTH CLAIM**
**(Violation of Section 504 of the Rehabilitation Act)**
**(By Plaintiffs Jose Ruiz Canizales and Sokhean Keo Against All Defendants)**

290.  The Rehabilitation Act requires entities that receive federal funding, such as ICE and California City Detention Facility, not to discriminate against people with disabilities. Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, requires entities such as California City to reasonably accommodate people with disabilities in all programs and services for which people with disabilities are otherwise qualified.

291.  Plaintiffs and putative members of the Subclass are qualified individuals with disabilities under the meaning of the Rehabilitation Act.

292.  Defendants routinely and continually deprive Plaintiffs and putative members of the Subclass equal access to programs, services and activities, including but not limited to phone calls, outdoor recreation, and medical encounters, the ability to safely navigate their housing units with independence, and effective communication with staff.

293.  Defendants also routinely and continuously deny Plaintiffs and putative members of the Subclass access to sign language interpretation, functional hearing aids and other auxiliary aids, wheelchairs and other mobility assistive devices, prescription glasses and other vision accommodations, and other reasonable accommodations.

294.  By depriving Plaintiffs and putative members of the Subclass of equal access to programs services, services and activities, effective communication, and access to appropriate reasonable accommodations, Defendants violate the Rehabilitation Act.

<strong>PRAYER FOR RELIEF</strong>

WHEREFORE, Plaintiffs respectfully ask this Court to exercise its jurisdiction over this actual controversy and:

a)  Certify the Class and the Subclass as proposed above, appoint the Named Plaintiffs to serve as representatives of the Class and Subclass, and appoint undersigned counsel to represent the Class and Subclass;

b)  Declare that conditions of confinement at California City Detention Facility are unconstitutional because those conditions amount to punishment of people civilly detained and deprive them of minimally adequate health care in violation of the Fifth Amendment, and deny them the ability to retain, consult and communicate with attorneys in violation of the First and Fifth Amendments;

c)  Declare that Defendants' policy and practice of failing to accommodate the disabilities of the Subclass violates Section 504 of the Rehabilitation Act;

d)  Preliminarily and permanently enjoin Defendants from engaging in the unlawful conduct complained of herein;

e)  Preliminarily and permanently enjoin Defendants from retaliating against Plaintiffs and other named participants in this litigation;

f)  Award Plaintiffs their attorneys' fees and costs; and

g)  Enter such other and further relief as the Court deems just and proper.

Dated: November 20, 2025

Respectfully submitted,

_/s/ Margot Mendelson_                                  _/s/ Steven P. Ragland_

PRISON LAW OFFICE
TESS BORDEN
MARGOT MENDELSON
PATRICK BOOTH
ALISON HARDY
RANA ANABTAWI


CALIFORNIA COLLABORATIVE FOR
IMMIGRANT JUSTICE
PRIYA ARVIND PATEL
MARIEL VILLARREAL

KEKER, VAN NEST & PETERS LLP
STEVEN P. RAGLAND
CODY S. HARRIS
CARLOS C. MARTINEZ


AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
KYLE VIRGIEN
FELIPE HERNANDEZ
MARISOL DOMINGUEZ-RUIZ
CARMEN IGUINA GONZALEZ

*Attorneys for Plaintiffs*