1  CRAIG H. MISSAKIAN (CABN 125202)
   United States Attorney
2  PAMELA T. JOHANN (CABN 145558)
   Chief, Civil Division
3  SAVITH IYENGAR (CABN 268342)
   Assistant United States Attorney
4
       450 Golden Gate Avenue, Box 36055
5      San Francisco, California 94102-3495
       Telephone: (415) 436-7200
6      FAX: (415) 436-7234
       savith.iyengar@usdoj.gov
7
   Attorneys for Defendants
8

9                     UNITED STATES DISTRICT COURT

10                  NORTHERN DISTRICT OF CALIFORNIA

11                      SAN FRANCISCO DIVISION

12

13 FERNANDO GOMEZ RUIZ, *et al.*,          )  No. 3:25-cv-09757-MMC
                                            )
14         Plaintiffs,                      )  **DEFENDANTS' MOTION TO TRANSFER**
                                            )  **VENUE**
15     v.                                   )
                                            )  Date:      Friday, February 6, 2026
16 U.S. IMMIGRATION AND CUSTOMS            )  Time:      9:00 a.m.
   ENFORCEMENT, *et al.*,                   )  Location:  Courtroom 7, 19th Floor
17                                          )  Judge:     Hon. Maxine M. Chesney
          Defendants.                       )
18 _____ )

19

20

21

22

23

24

25

26

27

28

1

## <u>TABLE OF CONTENTS</u>

2    NOTICE OF MOTION AND MOTION TO TRANSFER ..................................................................1

3    RELIEF SOUGHT.............................................................................................................................1

4    ISSUE TO BE DECIDED ..................................................................................................................1

5    MEMORANDUM OF POINTS AND AUTHORITIES ....................................................................2

6    I.      INTRODUCTION ...................................................................................................................2

7    II.     BACKGROUND .....................................................................................................................3

8            A.      Plaintiffs' Allegations Regarding Conditions of Confinement at CCDF ..............3

9                    1.      Plaintiffs' Fifth Amendment Claim Regarding Conditions of
                             Confinement and Medical Care .................................................................4

10
                     2.      Plaintiffs' First and Fifth Amendment Claims Regarding Access to
11                           Counsel ......................................................................................................10

12                   3.      Plaintiffs' Rehabilitation Act Claim ........................................................11

13           B.      CoreCivic's Operation of CCDF in the Eastern District and Its Supervision by
                     Federal Employees in the Eastern District ...........................................................13
14
     III.    LEGAL STANDARD.............................................................................................................15
15
             A.      Transfer Under 28 U.S.C. § 1404(a) .....................................................................15
16
     IV.     ARGUMENT .........................................................................................................................17
17
             A.      Venue Is Proper in the Eastern District of California .........................................17
18
             B.      The Balance of Relevant Factors Strongly Favors Transfer to the Eastern
19                   District of California .............................................................................................17

20                   1.      Plaintiffs' Choice of Forum Has Minimal Weight Where It Lacks A
                             Significant Connection to the Allegations in the Complaint ...................17
21
                     2.      The Convenience of the Parties and Witnesses Favors Transfer to the
22                           Eastern District.........................................................................................19

23                   3.      Ease of Access to Evidence Favors Transfer to the Eastern District...................20

24                   4.      The Interests of Justice Favor Transfer to the Eastern District...............21

25    V.     CONCLUSION......................................................................................................................23

26

27

28

1

**<u>TABLE OF AUTHORITIES</u>**

Page(s)

2

<u>Cases</u>

3   *Atl. Marine Const. Co., Inc. v. U.S. Dist. Court for W. Dist. of Tex.*, 571 U.S. 49 (2013) ...................... 15

4   *Banker v. Union Pac. R.R. Co.*, No. 05-cv-04059-JW, 2006 WL 193856 (N.D. Cal. Jan. 23, 2006) ...... 20

5   *Barroca v. United States,*
      No. 19-cv-00699-MMC, 2019 WL 5722383 (N.D. Cal. Nov. 5, 2019) .................................. 17, 19, 20

6

7   *Bromlow v. D & M Carriers, LLC*, 438 F. Supp. 3d 1021 (N.D. Cal. 2020) .................................. 16, 21

    *Commodity Futures Trading Comm'n v. Savage*, 611 F.2d 270 (9th Cir. 1979) .................................... 16

8

9   *Ctr. for Biological Diversity v. Kempthorne,*
      No. 08-cv-1339-CW, 2008 WL 4543043 (N.D. Cal. Oct. 10, 2008) .................................................. 16

10  *Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834 (9th Cir. 1986) ................................... 22

11  *Doe v. Garland*, 109 F.4th 1188, 1194 (9th Cir. 2024) ........................................................ 14, 18

12  *Dulaney v. United States*, 472 F. Supp. 2d 1085 (S.D. Ill. 2006) ................................................ 21

13  *Galveston, Harrisburg & San Antonio Ry. Co. v. Gonzales*, 151 U.S. 496 (1894) ................................ 2

14  *Hatch v. Reliance Ins. Co.*, 758 F.2d 409 (9th Cir. 1985) ..................................................... 16

15  *Hoffman v. Blaski*, 363 U.S. 335 (1960) ...................................................................... 16

16  *Jones v. GNC Franchising, Inc.,* 211 F.3d 495 (9th Cir. 2000) ................................................. 16

17  *Knapp v. Wachovia Corp.*, No. 07–cv-4551-SI, 2008 WL 2037611 (N.D. Cal. 2008) .............................. 18

18  *Koval v. United States*, No. 2:13-CV-1630-HRH, 2013 WL 6385595 (D. Ariz. Dec. 6, 2013) ............. 17

19  *Lou v. Belzberg*, 834 F.2d 730, 739 (9th Cir. 1987) .......................................................... 17

20  *Morris v. Safeco Ins. Co.,*
      No. 07-cv-2890-PJH, 2008 WL 5273719 (N.D. Cal. Dec. 19, 2008) .................................. 17, 19, 22

21

22  *Oglesby v. United States,*
      No. 11-cv-100, 2012 WL 1190901 (N.D. W. Va. Apr. 10, 2012) ..................................... 21, 22

23  *Our Children's Earth Found. v. EPA,*
      No. 08-cv-01461-SBA, 2008 WL 3181583 (N.D. Cal. Aug. 4, 2008) ......................................... 15

24

25  *Park v. Dole Fresh Vegetables*, 964 F. Supp. 2d 1088 (N.D. Cal. 2013) ............................. 19, 20, 21

    *Purdy v. Munden*, 356 F. Supp. 2d 658 (E.D. Tex. 2005) ...................................................... 19

26

27  *Saleh v. Titan Corp.*, 361 F. Supp. 2d 1152 (S.D. Cal. 2005) ................................................. 20

28  *Silong v. United States,*
      No. 05-cv-55-OC-10CFJ, 2006 WL 948048 (M.D. Fla. April 12, 2006) .................................... 22

*Smith v. Corizon Health, Inc.*,
  No. 16-cv-00517-WHA, 2016 WL 1275514 (N.D. Cal. Apr. 1, 2016) .................. 3, 16, 19, 20, 21, 22

*Southard v. Kipper Tool Co.*,
  No. 15-cv-03621-JSC, 2023 WL 6959145 (N.D. Cal. Oct. 19, 2023) .................................... 15, 16, 17

*United States ex rel. Tutanes-Luster v. Broker Sols., Inc.*,
  No. 17-cv-04384-JST, 2019 WL 1024962 (N.D. Cal. Mar. 4, 2019)...................................... 20

*Van Dusen v. Barrack*, 376 U.S. 612 (1964) ....................................................................... 15

*Van Mourik v. Big Heart Pet Brands, Inc.*,
  No. 17-cv-03889-JD, 2018 WL 3549122 (N.D. Cal. July 24, 2018)...................................... 22

*Williams v. Bowman*, 157 F. Supp. 2d 1103 (N.D. Cal. 2001) ..................................................... 21

### Statutes

28 U.S.C. § 84(b) ................................................................................................. 2, 14

28 U.S.C. § 1346 ....................................................................................................... 2, 17

28 U.S.C. § 1391 ....................................................................................................... 2, 17, 18

28 U.S.C. § 1402 ....................................................................................................... 2, 17

28 U.S.C. § 1404(a) ................................................................................................... *passim*

Rehabilitation Act ...................................................................................................... 4, 11

## NOTICE OF MOTION AND MOTION TO TRANSFER

PLEASE TAKE NOTICE that on Friday, February 6, 2026, at 9:00 a.m., in Courtroom 7, 19th Floor, of the United States District Court for the Northern District of California at 450 Golden Gate Avenue, San Francisco, California, before the Honorable Maxine M. Chesney, United States District Judge, defendants United States Immigration and Customs Enforcement ("ICE"); Todd M. Lyons, Acting Director, ICE; Sergio Albarran, San Francisco Field Office Director, ICE; United States Department of Homeland Security; and Kristi Noem, United States Secretary of Homeland Security (collectively, "Defendants") shall and hereby do respectfully move to transfer this action brought by plaintiffs Fernando Gomez Ruiz, Fernando Viera Reyes, Jose Ruiz Canizales, Yuri Alexander Roque Campos, Sokhean Keo, Gustavo Guevara Alarcon, and Alejandro Mendiola Escutia (collectively, "Plaintiffs") to the United States District Court for the Eastern District of California for the convenience of the parties and witnesses and in the interests of justice, pursuant to 28 U.S.C. § 1404(a).  This motion is based on this notice, the following memorandum of points and authorities, all pleadings, files and records in this action, the declaration of Acting Supervisory Detention and Deportation Officer David Landin ("(A)SDDO Landin Decl.") filed herewith, the declarations of Warden Christopher Chestnut, ECF No. 38-1 ("Warden Chestnut Decl."), Susan Tiona, M.D., ECF No. 38-2 ("Dr. Tiona Decl."), Dwan Morris, ECF No. 38-3 ("Morris Decl."), and Maxwell Walker, ECF No. 38-4 ("Walker Decl."), filed with Defendants' opposition to Plaintiffs' motion for a preliminary injunction, ECF No. 38, any other matters of which the Court takes judicial notice, and any other written or oral argument as may be presented at or before the time that the Court takes this motion under submission.

## RELIEF SOUGHT

Defendants seek an order transferring this action to the Eastern District of California and holding in abeyance all pending motions, to be ruled on by the Court to whom this case is transferred.

## ISSUE TO BE DECIDED

Whether this action should be transferred to the Eastern District of California under 28 U.S.C. § 1404(a) for the convenience of parties and witnesses and in the interests of justice.[1]

---

[1] Defendants reference the venue statutes to demonstrate that the 28 U.S.C. § 1404(a) factors apply here.  Defendants reserve the right to move to dismiss Plaintiffs' operative first amended complaint ("FAC") and/or any claim therein under Federal Rule of Civil Procedure 12(b).

1

<u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

2

**I.    INTRODUCTION**

3

Plaintiffs are aliens detained at the California City Detention Facility ("CCDF" or the "facility")

4

during the pendency of their immigration removal proceedings or while awaiting removal from the

5

United States.  Plaintiffs allege numerous issues with the facility, which is owned and operated by ICE

6

contractor CoreCivic, Inc. ("CoreCivic"), and its staff, which they claim violate ICE's detention

7

standards and deprive them of certain constitutional and statutory rights.  *See generally* ECF No. 15

8

("FAC"); Warden Chestnut Decl. ¶ 3.

9

CCDF is in Kern County, which is in the Eastern District of California and over 350 miles from

10

this Court.  *See* 28 U.S.C. § 84(b); (A)SDDO Landin Decl. ¶ 9.  So too are its staff, the ICE sub-office

11

that supervises the facility, and all material witnesses.  *Id.* ¶¶ 8–20; Warden Chestnut Decl. ¶¶ 2–3.  Yet

12

Plaintiffs bring this action in the Northern District, citing 28 U.S.C. §§ 1346 and 1391.  FAC ¶¶ 9–11.

13

As an initial matter, Plaintiffs are incorrect that this Court "has jurisdiction over this action pursuant to

14

28 U.S.C. § 1346 because the United States is a defendant."  FAC ¶ 9.  Under 28 U.S.C. § 1402, civil

15

actions against the United States under § 1346 "may be prosecuted only in the judicial district where the

16

plaintiff resides or wherein the act or omission complained of occurred."  28 U.S.C. §§ 1402(a)(1), (b).

17

Aliens who do not hold lawful permanent resident status are not considered residents of a federal

18

judicial district for venue purposes, *see* 28 U.S.C. § 1391(c)(1) (limiting residency "[f]or all venue

19

purposes" to "lawfully admitted" aliens); *Galveston, Harrisburg & San Antonio Ry. Co. v. Gonzales*,

20

151 U.S. 496, 506–07 (1894) (explaining that "[a]n alien . . . is assumed not to reside in the United

21

States"), and thus venue for such suits is proper only "in the judicial district . . . wherein the act or

22

omission complained of occurred."  28 U.S.C. § 1402(b).  Here, all such acts or omissions occurred at or

23

near the facility in the Eastern District of California.

24

To the extent Plaintiffs assert that jurisdiction and venue are proper under 28 U.S.C. § 1391(e)

25

because "at least one Defendant resides in this District," FAC ¶ 11, this Court should exercise its

26

authority to transfer this action to the Eastern District of California under § 1404(a) for the convenience

27

of the parties and witnesses and in the interests of justice because any such contact is *de minimis*, and is

28

1  eclipsed by Plaintiffs' numerous disputed factual allegations about the facility and its staff, all of which

2  arise in the Eastern District.

3        A "district court must consider both private factors, which go to the convenience of the parties

4  and witnesses, and public factors which go to the interests of justice." *Smith v. Corizon Health, Inc.*,

5  No. 16-cv-00517-WHA, 2016 WL 1275514, at *2 (N.D. Cal. Apr. 1, 2016). These factors support

6  transfer and far outweigh any *de minimis* alleged contact with this district, i.e., Plaintiffs' inclusion of

7  ICE's San Francisco Field Office Director as a defendant. *See* FAC ¶ 10. All of the events giving rise

8  to Plaintiffs' claims occurred at CCDF; all material witnesses (including outside care providers) reside at

9  or near the facility, well beyond the scope of a trial subpoena under Federal Rule of Civil Procedure 45;

10  a federal judge in the Eastern District "will be in a vastly better position to assess and gather information

11  about this case"; and the Eastern District has a strong interest in deciding controversies arising out of the

12  facility, in its district. *Corizon Health*, 2016 WL 1275514, at *2. As a result, "[t]he clear and logical

13  place for this case to be tried and for discovery into jail conditions to occur" is in the Eastern District,

14  "as that would ease access to certain evidence and witnesses and the Eastern District has an interest in

15  the local controversy." *Id.* at *3 (granting motion to transfer and holding pending motions in abeyance

16  to be "ruled on by the Court to whom this case is transferred"). Defendants thus respectfully request

17  that the Court transfer this action to the Eastern District of California and hold in abeyance all pending

18  motions to be ruled on in that district. *Id.*

19  **II.     BACKGROUND**

20        **A.     Plaintiffs' Allegations Regarding Conditions of Confinement at CCDF**

21        Plaintiffs filed this action on November 12, 2025. *See* ECF No. 1. In their operative FAC,

22  Plaintiffs allege that in April 2025, ICE contracted with CoreCivic to open CCDF, a former prison, as a

23  migrant detention center, and that in the last several months, ICE began detaining people at CCDF.

24  FAC ¶¶ 25–27, 30–33. Plaintiffs allege that detainees at CCDF are "impermissibly subject[ed] . . . to

25  conditions constituting punishment, den[ied] . . . adequate medical care and reasonable disability

26  accommodations, and restrict[ed] . . . access to counsel." *Id.* ¶ 41. Plaintiffs allege that the conditions of

27  confinement and medical care at CCDF violate their (and the proposed class members') Fifth

28  Amendment rights; that limitations on access to counsel violate their First and Fifth Amendment rights;

1  and that alleged failures to accommodate disabilities by providing equal access to phone calls, outdoor
2  recreation, medical encounters, housing units, and staff, and by denying access to auxiliary aids and
3  assistive devices, violates the Rehabilitation Act.  *Id.* ¶¶ 268–94.

4       Defendants have responded to Plaintiffs' factual allegations with declarations by CCDF Warden
5  Christopher Chestnut; Susan Tiona, M.D., CoreCivic's Clinical Director for Correctional Medicine
6  Associates and Regional Medical Director; Dwan Morris, Food Service Director at the facility; and
7  Maxwell Walker, Regional Dietician — submitted with Defendants' opposition to Plaintiffs' motion for
8  preliminary injunction, ECF Nos. 38 & 38-1–4 — and the declaration of (A)SDDO David Landin, the
9  ICE Enforcement and Removal Operations ("ERO") representative responsible for overseeing
10 CoreCivic's operation of CCDF, submitted herewith.  (A)SDDO Landin is based in ICE ERO's
11 Bakersfield sub-office in Kern County with the approximately 40 ICE ERO employees whose duties
12 relate to the facility.  *See* (A)SDDO Landin Decl. ¶¶ 1–15.

13            1.    **Plaintiffs' Fifth Amendment Claim Regarding Conditions of Confinement
14                  and Medical Care**

15      Plaintiffs allege various conditions at the facility that they argue violate their Fifth Amendment
16 rights.  *See* FAC ¶¶ 54–183.  Plaintiffs allege that "[s]taff routinely engage in abusive behavior" like
17 hitting one detainee and "aggressively pushing" another in September, "pepper spray[ing]" detainees on
18 three occasions, and threatening to harm another in October — all of which allegedly violate
19 "Defendants' own standards."  *Id.* ¶¶ 54–60, 65.  Plaintiffs allege that detainees have been "sent to
20 solitary confinement" on unspecified dates for "asking to finish [a] shower during a lockdown"; and
21 "refusing to give up a mobility disability accommodation": "tennis shoes."  *Id.* ¶ 61–63.  Plaintiffs allege
22 similar treatment for other detainees, including one detainee for "threaten[ing] to kill himself" in
23 September; "a few people" who "had taken off their shirts while exercising" in the dayroom "and
24 refused an officer's order to put them back on"; "a number of" detainees for allegedly "call[ing]
25 attention to inadequate medical care and other poor conditions of confinement" at CCDF; and, in
26 general, detainees who require specialized housing due to an alleged lack of "specialized housing units"
27 at CCDF.  *Id.* ¶¶ 64–68.  Plaintiffs allege that these conditions also violate "Defendants' own standards."
28 *Id.* ¶ 72.

Defendants contest these allegations.  *See generally* Warden Chestnut Decl.  For example, the facility's Assistant Chief of Security investigated the detainee's claim that he was "pushed" out of a pod and denied it as unfounded because "he exited the pod of his own accord." *Id.* ¶ 23.  In October, the same detainee was charged by facility staff with fighting after he and four other detainees attacked and stabbed another detainee with homemade weapons, *id.* ¶¶ 23, 66, and other detainees were charged with insolence toward staff, interfering with count, and conduct that disrupts after they refused to lock down for the 11:00 a.m. count and at least one cursed at staff. *Id.* ¶ 29.  The detainee who allegedly "ask[ed] to finish [a] shower during a lockdown" actually "refused to exit the shower despite multiple staff directives to return to his cell during a critical incident lock down, which delayed the lockdown process," and called the directives "bull shit." *Id.* ¶ 125.  The detainee with tennis shoes had black tennis shoes with homemade laces, not the "all-white shoes with no laces" that are permitted. *Id.* ¶¶ 75, 160.  In any event, he did not have a medical order for tennis shoes, and his refusal to remove them "resulted in a Code 1 response for disruption of the property inventory process for multiple detainees and halted all movement within the facility." *Id.* ¶ 160.  The group of detainees who had taken off their shirts "were being loud and disruptive in the dayroom, refused staff directives to put their shirts back on, and refused to return to their cells for count," with the "incident turn[ing] into a demonstration involving multiple detainees, which required a staff response to get the detainees to return to their cells," but which staff "resolved without the use of force." *Id.* ¶ 124.  Several of these detainees "were charged with disciplinary offenses and taken to restrictive housing for pre-hearing detention," consistent with facility policy. *Id.*  Restrictive housing units are used only for "administrative segregation, pre-hearing detention, disciplinary segregation, medical observation overflow, and protective custody." *Id.* ¶ 136.

Plaintiffs also allege that Defendants violated the Fifth Amendment and their own standards based on "the arrangement of the toilet" in each cell, FAC ¶ 76, and include allegations relating to the housing units (e.g., that "[e]ach cell is a cramped box," the beds "look like platforms—not beds," the toilet and sink water "is often discolored and has a foul smell," that other than a rectangular shelf that is "perhaps meant to be a tiny desk," there "are no tables, chairs, lockers, or any space to walk or do significant physical activity" in each cell, and that there is limited natural light). *Id.* ¶¶ 73–78.  Plaintiffs also contest limitations on items allowed in cells, including the facility's provision of "only a small stub

1   of a pencil with no eraser," "flimsy pen fillers, with just the ink and ballpoint tip," "only a very small

2   toothbrush," and limited access to grooming supplies.  *Id.* ¶¶ 79–83.

3        Defendants dispute these allegations, too.  For example, "[t]he water in the housing units is from

4   the California City municipal water supply, which is subject to regular quality testing"; it "is the same

5   water provided to California City residents"; and "[f]acility staff also drink the water while on duty."

6   Warden Chestnut Decl. ¶¶ 39–41.  Detainees are also "issued pencils, pens, paper, and standard sized

7   envelopes on request," with "pencil sharpeners mounted in the housing unit dayrooms for detainee use."

8   *Id.* ¶ 86.  The pens are "flexible" and "specifically designed for use in secure institutions, including jails,

9   detention centers, and mental health hospitals," so that they "cannot be easily converted into weapons or

10  used for storing contraband." *Id.* ¶ 87.

11       Plaintiffs also allege that "they are subjected to at least four daily 'counts,'" which Plaintiffs

12  refer to as "lockdowns," as well as additional "lockdowns for administrative reasons," during which

13  detainees "have little opportunity for sensory stimulation or social interaction beyond their cellmate,

14  who may or may not speak a language they understand."  FAC ¶¶ 84–87.  Plaintiffs also allege "limited

15  access to outdoors," including that "the main yard was unavailable" "[f]or the first two to three weeks

16  [CCDF] was in operation," and that while male detainees "now have access to the 'main yard,'" it is "a

17  dusty space with limited exercise equipment" and female detainees are limited to a smaller enclosed

18  area.  *Id.* ¶¶ 88–90.  Plaintiffs allege a lack of "structured programming," "no operational dining hall

19  people could congregate in" "[u]ntil late October," no "religious activities" beyond "only one all-

20  purpose non-denominational Christian service approximately once a week" and a "separate room or

21  'chapel' area" that "staff have not routinely made . . . available to people of all faiths," "limited access"

22  to religious volunteers and loved ones, and the confiscation of religious property "for weeks or months

23  on end—if not indefinitely."  *Id.* ¶¶ 93–108, 118–122.  Plaintiffs allege that all of these conditions, too,

24  violate "ICE's own standards."  *Id.* ¶¶ 104, 109, 123.

25       Defendants dispute each of these allegations.  For example, the counts serve the crucial function

26  of "ensur[ing] that all detainees are alive, present, in the appropriate location, and safe."  Warden

27  Chestnut Decl. ¶ 120.  Detainees have access to "outdoor recreation yards" that "contain basketball

28  hoops, a track, and space for group sports, including soccer and volleyball;" "[h]andballs are provided";

and the facility "plan[s] to begin facilitating [recreational] tournaments as the facility population expands." *Id.* ¶ 94. Detainees in restrictive housing are permitted outdoor recreation in outdoor enclosures located directly outside the housing units. *Id.* ¶¶ 137–138. Female detainees have access to an outdoor recreation area and an indoor gym with exercise equipment. *Id.* ¶ 95. Detainees have access to various activities, including religious activities, as well as religious property. *Id.* ¶¶ 64–67, 88–107. Further, while some religious property is disallowed, those decisions are based on safety. *Id.* ¶ 66. For example, the detainee who alleges that he was denied a religious steel bracelet and wooden comb was denied those objects because steel bracelets can be used as brass knuckles, and wooden combs (depending on their length and construction) can be fashioned into weapons. *Id.* Indeed, the same detainee was involved in an incident on October 27, 2025, in which he and four other detainees attacked and stabbed another detainee with homemade weapons, causing that detainee's hospitalization. *Id.*

Plaintiffs also assert that their Fifth Amendment rights are violated by allegedly "invasive" pat-down searches, insufficient food, "tap water in Igloo coolers in the housing unit dayrooms" instead of "sealed plastic water bottles," cold temperatures, and a high cost of buying extra clothing from the commissary, whose prices are "significantly higher than other ICE facilities." FAC ¶¶ 110–117.

Defendants dispute that pat-downs are invasive as Plaintiffs allege. Warden Chestnut Decl. ¶¶ 113–116. Defendants also dispute Plaintiffs' allegations about water and food services. *Id.* ¶¶ 39–41; *see generally* Morris Decl. (explaining that he personally inspects portions and "eat[s] the same meals as the detainees on my shifts") & Walker Decl. (explaining that he creates menus that are nutritionally adequate and varied). Temperatures in the facility's housing areas are also "thermostatically controlled and maintained at a target between 68 and 72 degrees year round," with air temperatures "measured by staff at least twice a week using a laser temperature reader" and with new devices ordered that will allow "daily temperature checks at the beginning of January 2026." Warden Chestnut Decl. ¶¶ 36–37 ("All areas of the facility accessible to detainees have central air conditioning and heating.").

Plaintiffs also include various allegations that they assert reflect inadequate "health care at the California City Detention Facility," in violation of their Fifth Amendment rights. FAC 32. Plaintiffs allege that arriving detainees "are not seen for an initial health care screening in a private setting, as is standard practice in detention facilities." *Id.* ¶ 127. They allege that one plaintiff "did not see a primary

1    care provider until two weeks after he arrived at [CCDF]" despite the nurse at CCDF documenting the

2    need to "see a provider immediately due to his asthma and recent medical procedure," and another

3    unspecified detainee's health assessment took "twelve days" despite "[t]he nurse direct[ing] that he

4    should see the provider the next day." *Id.* ¶¶ 130–131.

5         Defendants acknowledge some delays during the initial activation period of the facility, but note

6    that all detainees do "receive[ ] an initial health screening during intake by a nurse or provider" and "a

7    comprehensive health evaluation within 14 days after arrival." Warden Chestnut Decl. ¶¶ 140–144; *see*

8    *generally* Dr. Tiona Decl. Several of Plaintiffs' claims are also predicated on allegedly delayed care for

9    detainees who were actually erroneously documented as needing "urgent" care, despite screenings

10   justifying only "routine" referrals. Dr. Tiona Decl. ¶¶ 60, 65, 68.

11        Plaintiffs include several allegations relating to medical care provided to Plaintiffs Fernando

12   Viera Reyes and Yuri Alexander Roque Campos, FAC ¶¶ 132–137, 156–162, and previously moved this

13   Court for a temporary restraining order that would require "Defendants to immediately ensure that Mr.

14   Roque Campos sees a cardiologist and Mr. Viera Reyes sees a urologist, and that both men receive

15   appropriate medical treatment and follow-up." ECF No. 27 at 2. Plaintiffs withdrew their motion, ECF

16   No. 36, after Defendants ███████████████████████████████████████████, following

17   extensive efforts coordinating with the government contractor, facility personnel, and third-party

18   healthcare providers (with limited availability) located over 300 miles away. *See* (A)SDDO Landin

19   Decl. ¶¶ 17–20.

20        Plaintiffs also allege that Plaintiff Jose Ruiz Canizales "was deprived of his asthma inhaler upon

21   arrival"; another detainee who had been "prescribed antibiotics at another ICE facility for multiple, open

22   wounds . . . was not provided the antibiotics until 11 days after he arrived at [CCDF], placing him at an

23   increased risk of sepsis"; and a third detainee "went multiple days without medication for his

24   hypertension and diabetes." FAC ¶ 140. Plaintiffs also challenge the facility's responses to one

25   detainee's repeated "sick-call slips," its failure to identify another detainee's high blood sugar test result,

26   and the alleged infrequency of care provided to Plaintiff Fernando Gomez Ruiz in connection with

27   hypertension, diabetes, and a diabetes-related open wound. *Id.* ¶¶ 141–150.

28        Defendants dispute these allegations and provide details about intake screenings, intake physical

1    examinations, ongoing access to healthcare services, care for chronic conditions, and offsite referrals.

2    *See, e.g.*, Dr. Tiona Decl. ¶¶ 19–48, 62 (noting that the six-month follow-up for one detainee's

3    ████████ was "absolutely appropriate" because his "████████████████████████████████

4    █████").

5         Plaintiffs also allege several "medication continuity failures," including, "at times," medication

6    being "out of stock," being "distributed in the middle of the night, requiring the patient to be woken up

7    from their sleep," or being "suddenly discontinued with no explanation." FAC ¶¶ 151–155. Plaintiffs

8    allege that "[CCDF fails to timely and appropriately respond to acute medical emergencies or provide

9    care with the urgency that the medical situation requires" in violation of the detainee handbook,

10   including because "the nearest hospital . . . is approximately 45 to 60 minutes away" and follow-up care

11   after a patient returns from the hospital is allegedly delayed. *Id.* ¶¶ 163–169. Plaintiffs also generally

12   allege "inadequate medical housing," "inadequate staffing" for detainees with "high medical needs," and

13   "inadequate mental health care services." *Id.* ¶¶ 170–183.

14        Defendants have responded to these factual allegations as well. The facility conducts a pre-

15   screening at intake to ask detainees, among other questions, "Are you taking any medications?" Dr.

16   Tiona Decl. ¶ 21. A further screening is conducted to inquire into "medication sensitivities" and

17   "current medications." *Id.* ¶ 22. For detainees who are transferred from another facility with "medical

18   transfer summaries," which include "prescribed medications, as well as a list of medications which the

19   detainee was to be provided during transport," "CoreCivic continues dispensing the medications

20   provided during transport" "[u]ntil the detainee is seen by a provider for an intake examination and new

21   medication ordered is entered." *Id.* ¶ 25. The facility also "conducts pill call multiple times a day to

22   issue medications," but if a patient does not come to pill call, it will be recorded as a "no show" for that

23   reason, and not because the medication was never offered. *Id.* ¶¶ 17, 69. Further, detainees with

24   "emergent medical needs" are identified and "immediately transferred to a hospital or emergency room"

25   at intake; are seen immediately if designated as "emergency" pursuant to sick call requests; and "[t]o the

26   extent any detainee experiences a medical emergency, detention and health services staff are trained to

27   provide an emergency response and respond to the detainee within four minutes." *Id.* ¶¶ 20, 34, 37.

28   CoreCivic also contracts "with Hall Ambulance to provide emergency medical transports by both

1    ground and air for detainees with emergent medical conditions who must be transferred to a hospital

2    emergency department."  *Id.* ¶¶ 44, 45 ("Detainees experiencing medical emergencies are typically

3    transported to Tehachapi Hospital, Antelope Valley Medical Center in Lancaster, or Mercy Hospital in

4    Bakersfield.").

5                    **2.    Plaintiffs' First and Fifth Amendment Claims Regarding Access to Counsel**

6        With respect to their First and Fifth Amendment claims regarding access to counsel, Plaintiffs

7    allege various issues with the facility's personnel and configuration.  For virtual attorney visits and legal

8    calls, Plaintiffs allege that "the facility fails to schedule a call at all until an attorney sends follow-up

9    requests"; "technical issues" during calls and virtual visits; delays in facility staff initiating clients' calls;

10   a 60-minute limit on virtual attorney visits; some calls taking place from "loud, crowded areas"; "long

11   lines to use the telephones"; and the facility providing tablets without headphones.  FAC ¶¶ 184–193.

12   For in-person attorney visits, Plaintiffs allege "significant delays" before visits begin; difficulty hearing

13   "through a glass wall with only a small gap at the bottom of the glass" and concrete walls that "caus[e]

14   an echo"; concern with staff "overhear[ing] conversations" from their position "outside of the visiting

15   room door"; "no telephone or cell phone service in these visiting rooms"; and a potential new

16   requirement of advance appointments for attorney visits.  *Id.* ¶¶ 194–198.

17       Again, Defendants dispute these contentions.  As Warden Chestnut explains, "[d]etainees are

18   informed how to schedule confidential attorney calls and virtual attorney visits ("VAV") during

19   orientation"; "the procedures are also outlined in the detainee handbook"; detainees can also ask

20   questions of case management staff; "[d]etainees may request private legal calls" using a form for unit

21   management staff; and staff verify the legal representative's credentials before facilitating private legal

22   calls "in staff offices, where telephones are not monitored or recorded."  Warden Chestnut Decl. ¶¶ 182–

23   186.  There are "10 VAV booths," and "12 VTC booths that are typically used for court but can also be

24   used for [VAVs] if needed."  *Id.* ¶¶ 187, 188 (providing photograph of several VAV booths, including

25   one that provides for wheelchair access).  In-person legal visits occur in a legal visitation area that "is

26   non-contact but allows for passing legal documents between the participants," and "contact visits may

27   be permitted upon request and with facility approval."  *Id.* ¶ 189.  Further, "VAVs, legal calls, and in-

28   person legal visits are available between 8:00 a.m. and 8:00 p.m. daily and may be scheduled in 30 or

1   60-minute increments," and a detainee may have multiple 60-minute appointments in a day if scheduled

2   with different legal representatives.  *Id.* ¶ 191 (noting that Plaintiff Sokhean Keo had two VAVs on

3   November 15, 2025 with different attorneys).  Detainees' confidential calls are not overheard by facility

4   staff.  *See id.*; *see also id.* ¶¶ 170–181.  The need to separate genders and custody levels does impact the

5   availability of time slots for VAVs, legal calls, and in-person legal visits, and the facility is currently

6   "working to separate the VAV booths into multiple areas to address this."  *Id.* ¶ 192.

7           Legal representatives can and do schedule VAVs, legal calls, and in-person legal visits by calling

8   or emailing the facility.  *Id.* ¶¶ 194–220 (detailing the numerous emails sent by Plaintiffs' declarants;

9   confirming no "weeks-long" delays in scheduling legal calls and visits; disputing specific claims relating

10  to VAVs and in-person visits; and documenting the numerous VAVs, legal calls and in-person visits for

11  Plaintiffs and declarants between October 1 and December 9, 2025).

12                    **3.     Plaintiffs' Rehabilitation Act Claim**

13          With respect to their Rehabilitation Act claim, Plaintiffs allege that despite the facility's detainee

14  handbook and "Disability, Identification, Assessment and Accommodation" policy, facility staff did not

15  ask either Plaintiff Sokhean Keo or Plaintiff Jose Ruiz Canizales "questions about his hearing disability"

16  or "explain to him how to request disability accommodations"; "staff confiscated one person's

17  eyeglasses at intake," leading to an injury; denied another detainee a wheelchair; denied Plaintiff

18  Sokhean Keo's "elbow brace and structured knee brace . . . at intake" despite their alleged approval "at a

19  prior ICE facility"; "staff confiscated custom orthopedic shoes and insoles from a man with a mobility

20  disability" on November 6, 2025; medical staff failed to repair or replace broken hearing aids; and

21  medical staff allegedly denying Plaintiff Sokhean Keo medical care for a broken finger on the erroneous

22  ground that the facility does not contract with outside specialists.  FAC ¶¶ 203–220.  Plaintiffs also

23  allege that some detainees have inaccessible housing assignments, e.g., top bunks or "upper tier cells."

24  *Id.* ¶¶ 229–232.  Plaintiffs allege further that when Plaintiff Jose Ruiz Canizales has attempted to

25  communicate with facility staff, "[s]taff get flustered and walk away"; and that staff denied another

26  detainee a cane for his mobility disability.  *Id.* ¶¶ 233–234.

27          Defendants have explained the various ways in which detainees may request disability

28  accommodations, including at intake.  *See* Warden Chestnut Decl. ¶¶ 152–166; Dr. Tiona Decl. ¶¶ 21–

22, 49–51.  Warden Chestnut's declaration details staff's challenges with Plaintiff Sokhean Keo's ███████, which require ███████████; their efforts to obtain multiple ███████████; and their confirmation that ███████████" and that "he will be provided ███████████ on a keep on person [ ] basis at regular intervals."  Warden Chestnut Decl. ¶ 162.  Eyeglasses, orthopedic shoes, and wheelchairs — of which the facility has a "large supply," along with other assistive devices — are available and provided to detainees if ordered by a provider.  *Id.* ¶ 161; Dr. Tiona Decl. ¶ 50 ("Accommodations for disabilities and other conditions are available when medically necessary.  The facility has an ample supply of durable medical equipment, including wheelchairs, walkers, crutches, canes, oxygen, and CPAP machines, which are provided when indicated.").  Items that providers have not ordered, i.e., "comfort items, such as neoprene sleeves and elastic back braces, are not medically necessary and are not recommended for long-term use."  Dr. Tiona Decl. ¶ 51.  Further, the facility's health services staff can and do "order lower tier and low-bunk restrictions to ensure that detainees with medical needs are assigned to a housing location which is safe."  *Id.* ¶ 50.  At least one detainee — one of Plaintiffs' own declarants — refused to permit his cellmate to use such an accommodation despite facility staff's efforts.  *See* Warden Chestnut Decl. ¶¶ 29, 133.  That declarant "received a disciplinary write-up on November 15, 2025 because he refused staff directives to vacate the bottom bunk in his cell" and occupy the top bunk, to which he was assigned, "when another detainee was placed in the cell who had a medical order for a bottom bunk," and refused to even let the detainee enter the cell.  *Id.*

Plaintiffs also allege that the facility's "physical structure is inaccessible" to people with serious disability needs.  FAC ¶ 235.  Plaintiffs allege that "the cells are not wide enough for people to navigate wheelchairs inside"; "[t]he toilets in the cells are not equipped with grab bars, rendering them inaccessible to many people with mobility disabilities"; "[t]he showers in the housing units do not have level entrances, such that people who use wheelchairs or other mobility devices cannot safely enter the shower area"; "[t]he showers . . . lack critical accessibility features, such as shower benches or shower wands"; and "[t]he common areas in the buildings have objects affixed to the walls that make those areas inaccessible to people with vision disabilities who use a white cane."  *Id.*  Plaintiffs also allege that the "few programs, services, and activities at [CCDF] . . . that are offered are not equally accessible" to many detainees with disabilities.  *Id.* ¶ 238.  Plaintiffs allege that Plaintiff Jose Ruiz Canizales "often

1  misses outdoor recreation" and lacks equal access to religious services due to his hearing disability; one

2  detainee cannot "access the limited programming available in his unit" due to his mobility disability;

3  other detainees are provided only the corner of the dayroom for group prayer, which is allegedly

4  inaccessible for people who cannot stand for extended periods; Plaintiff Jose Ruiz Canizales has had

5  multiple medical appointments with "no indication of how" they communicated; and one detainee was

6  denied "a job picking up trash or working as a janitor" by facility staff "because he has diabetes and [ ]

7  cannot walk because of his knee." *Id.* ¶¶ 235, 238–245.

8       Defendants dispute these allegations. *See* Dr. Tiona Decl. ¶¶ 49–51 ("All detainees at the facility

9  have an equal opportunity to participate in services, programs, and activities, in the least restrictive and

10 most integrated setting possible."); Warden Chestnut Decl. ¶¶ 152–166. Warden Chestnut also details

11 the numerous Plaintiffs and declarants — including those who Plaintiffs allege have disabilities — who

12 have applied to and been approved by the facility for voluntary work programs. *Id.* ¶¶ 7, 9–11

13 (Plaintiffs Alejandro Mendiola Escutia, Gustavo Guevara Alarcon, Fernando Viera Reyes, and Sokhean

14 Keo); *id.* ¶¶ 18, 20, 22, 24, 26, 29 (various declarants).

15                               *    *    *    *    *

16       With respect to all of Plaintiffs' claims, Plaintiffs generally allege that "Defendants have been

17 and are aware of the conditions and deprivations complained of" in the FAC, or otherwise "have acted

18 with deliberate indifference and reckless disregard regarding the conduct and conditions described

19 herein." *Id.* ¶ 250. Plaintiffs allege that San Francisco Field Office Director Albarran — the only

20 defendant located in this district — presides over "the ICE Field Office with jurisdiction and

21 responsibility over [CCDF]," "is responsible for ICE's policies, practices, and procedures, including

22 those relating to the detention and detention conditions of immigrants," and "is a legal custodian of

23 Plaintiffs and members of the putative class." *Id.* ¶ 22. Defendants discuss the actual operations and

24 oversight of the facility, substantially all of which occur in the Eastern District of California, below.

25 **B.    CoreCivic's Operation of CCDF in the Eastern District and Its Supervision by
        Federal Employees in the Eastern District**

26

27       CoreCivic owns and operates CCDF, located at 22844 Virginia Boulevard in California City,

28 Kern County, in the Eastern District of California. Warden Chestnut Decl. ¶¶ 2–3; (A)SDDO Landin

Decl. ¶ 4; 28 U.S.C. § 84(b).  The facility houses federal immigration detainees pursuant to a contract between CoreCivic and ICE.  Warden Chestnut Decl. ¶ 3; (A)SDDO Landin Decl. ¶ 12.  CCDF Warden Chestnut has been employed by CoreCivic for 30 years and has more than 27 years of corrections and detention experience, including supervisory positions at multiple facilities utilized by ICE.  Warden Chestnut Decl. ¶ 5 ("Prior to transferring to Cal City, I was the Warden at Nevada Southern Detention Center and the Assistant Warden at the Northeast Ohio Correctional Center."); (A)SDDO Landin Decl. ¶ 12.  Warden Chestnut is based at the facility and is the Plaintiffs' (and proposed class members') immediate custodian.  *See Doe v. Garland*, 109 F.4th 1188, 1194 (9th Cir. 2024); (A)SDDO Landin Decl. ¶ 11.

        CoreCivic maintains approximately 70 employees who staff CCDF and perform the following duties: ensure that the facility is operated within the National Detention Standards ("NDS") and Performance-Based National Detention Standards ("PBNDS"); oversee the provision of personnel escorts to accommodate physical inspections of and official visits to CCDF; ensure that on-site personnel assist detainees with document services; investigate detainee grievances under the NDS and PBNDS; manage and provide oversight of the physical delivery of meals, recreational activities, and medical care to detainees; oversee and document detainee placement in medical isolation when necessary; physically ensure the safety of detainees by providing on-site security and resolution of detainee misconduct or detainee altercations; conduct on-site meetings with personnel to ensure Prison Rape Elimination Act training, staff alertness, and general staff availability; oversee the supervision of medical staff and ensure adequate medical staffing; ensure that the on-site law library is readily available to detainees with functional equipment and access to legal documents; ensure detainees appear for immigration court proceedings virtually; inspect recreational areas for safety, security, and availability in accordance with the NDS; and inspect all property and equipment coming into the facility for cleanliness and functionality for use at CCDF.  (A)SDDO Landin Decl. ¶ 16.

        (A)SDDO Landin is the ICE ERO representative responsible for overseeing CCDF, among other facilities within his area of responsibility.  *Id.* ¶ 3.  Specifically, (A)SDDO Landin oversees the facility's implementation of NDS and PBNDS, which "establish[ ] consistent confinement conditions, program operations, and management expectations within ICE's detention system."  *Id.* ¶¶ 3–5.  (A)SDDO

1    Landin is based in ICE ERO's Bakersfield sub-office, which is in Kern County. *Id.* ¶ 8. ICE ERO's

2    Bakersfield sub-office is several blocks from the Bakersfield Federal Courthouse and approximately 76

3    miles from CCDF. *Id.* ¶ 9. There are approximately 40 ICE ERO staff members based in the

4    Bakersfield sub-office whose duties relate to the facility, including Deportation Officers ("DOs"). *Id.*

5    ¶¶ 10, 17. (A)SDDO Landin assigns DOs from the Bakersfield sub-office to perform the following

6    functions at or relating to CCDF: assist detainees with document services; investigate compliance with

7    the NDS and PBNDS and detainee grievances; and oversee the performance of visual inspections of

8    facilities for cleanliness and safety (e.g., of the segregation unit to ensure that detainees are properly

9    tracked for placement, removal, and reasons for segregation). *Id.* ¶ 15. ICE ERO also conducts weekly

10   inspections of CCDF. *Id.* ¶ 14. (A)SDDO Landin, Warden Chestnut, the approximately 40 ICE ERO

11   staff members whose duties relate to the facility, and the approximately 70 CoreCivic employees who

12   staff CCDF, are all based in Kern County, in the Eastern District of California. *Id.* ¶¶ 10, 16–18, 20;

13   Warden Chestnut Decl. ¶¶ 2–3; 28 U.S.C. § 84(b).

14   **III.    LEGAL STANDARD**

15       **A.    Transfer Under 28 U.S.C. § 1404(a)**

16       28 U.S.C. § 1404(a) provides that:

17       For the convenience of parties and witnesses, in the interest of justice, a district court may
         transfer any civil action to any other district or division where it might have been brought
18       or to any district or division to which all parties have consented.

19   *See also Atl. Marine Const. Co., Inc. v. U.S. Dist. Court for W. Dist. of Tex.*, 571 U.S. 49, 62–63 (2013).

20   "Section 1404(a) was designed to protect litigants, witnesses and the public against unnecessary

21   inconvenience and expense[,] ensure systemic integrity and fairness in the judicial process, and the

22   efficient administration of the court system." *Our Children's Earth Found. v. EPA*, No. 08-cv-01461-

23   SBA, 2008 WL 3181583, at *4 (N.D. Cal. Aug. 4, 2008) (cleaned up); *see also Southard v. Kipper Tool

24   Co.*, No. 15-cv-03621-JSC, 2023 WL 6959145, at *3 (N.D. Cal. Oct. 19, 2023) ("Section 1404(a) exists

25   to 'prevent the waste of time, energy, and money and to protect litigants, witnesses and the public

26   against unnecessary inconvenience and expense.'") (quoting *Van Dusen v. Barrack*, 376 U.S. 612, 616

27   (1964)).

28       In analyzing a transfer motion under § 1404(a), a court must determine, as a threshold matter, if

1    the action subject to the motion to transfer "might have been brought" in the transferee district (i.e., the

2    district to which the moving party seeks to transfer the action). *Hoffman v. Blaski*, 363 U.S. 335, 343–

3    44 (1960). Next, the court must analyze whether the transfer would serve "the convenience of parties

4    and witnesses" and "the interest of justice." *Hatch v. Reliance Ins. Co.*, 758 F.2d 409, 414 (9th Cir.

5    1985). This analysis considers "both private factors, which go to the convenience of the parties and

6    witnesses, and public factors which go to the interests of justice." *Corizon Health*, 2016 WL 1275514,

7    at *2. The "private convenience and fairness factors" include "relative ease of access to sources of

8    proof, the availability of compulsory process for unwilling witnesses, the cost of obtaining the

9    attendance of willing witnesses, and other practical considerations that make resolving a case easy,

10   expeditious, and inexpensive"; and the "public-interest factors" include "relative degrees of court

11   congestion, local interest in deciding local controversies, potential conflicts of laws, and burdening

12   citizens of an unrelated forum with jury duty." *Id.*

13            Accordingly, in undertaking this analysis, courts in the Ninth Circuit weigh and consider various

14   case-specific factors, including:

15            (1) plaintiffs' choice of forum, (2) convenience of the parties, (3) convenience of the
         witnesses, (4) ease of access to the evidence, (5) familiarity of each forum with the
16       applicable law, (6) feasibility of consolidation with other claims, (7) any local interest in
         the controversy, and (8) the relative court congestion and time to trial in each forum.

17

18   *Southard*, 2023 WL 6959145, at *3 (quoting *Jones v. GNC Franchising, Inc.,* 211 F.3d 495, 498–99 (9th

19   Cir. 2000)).

20            "No single factor is dispositive, and a district court has broad discretion to adjudicate motions for

21   transfer on a case-by-case basis." *Ctr. for Biological Diversity v. Kempthorne*, No. 08-cv-1339-CW,

22   2008 WL 4543043, at *2 (N.D. Cal. Oct. 10, 2008). The moving party bears the burden of establishing

23   that the proposed transfer is appropriate. *Commodity Futures Trading Comm'n v. Savage*, 611 F.2d 270,

24   279 (9th Cir. 1979). In evaluating a motion under § 1404(a), a court may consider the allegations of the

25   complaint as well as declarations submitted by the parties. *See Bromlow v. D & M Carriers, LLC*, 438

26   F. Supp. 3d 1021, 1026 (N.D. Cal. 2020).

27

28

1

## IV.    ARGUMENT

### A.    Venue Is Proper in the Eastern District of California

Section 1404(a) permits transfer to any district where the case "might have been brought."  28 U.S.C. § 1404(a).  Here, Plaintiffs could have filed this action in the Eastern District of California because that is where "a substantial part of the [alleged] events or omissions [purportedly] giving rise to the claim[s] occurred."  28 U.S.C. § 1391(b)(2); *see, e.g.*, *Barroca v. United States*, No. 19-cv-00699-MMC, 2019 WL 5722383, at *3 (N.D. Cal. Nov. 5, 2019) (granting motion to transfer venue under § 1404(a) in Federal Tort Claims Act case where the majority of the allegations in plaintiff's complaint occurred in the transferee state); *Koval v. United States*, No. 2:13-CV-1630-HRH, 2013 WL 6385595, at *4 (D. Ariz. Dec. 6, 2013) (granting motion to transfer from District of Arizona to Eastern District of California where "[t]he only connection that this case has to Arizona is that plaintiff happened to move there sometime after the events upon which his claims are based occurred").

### B.    The Balance of Relevant Factors Strongly Favors Transfer to the Eastern District of California

Convenience and fairness factors likewise weigh heavily in favor of transfer to the Eastern District of California.

#### 1.    Plaintiffs' Choice of Forum Has Minimal Weight Where It Lacks A Significant Connection to the Allegations in the Complaint

Any deference to a plaintiff's choice of forum "is slight, if any, when . . . the plaintiff's chosen forum lacks a significant connection to the events that gave rise to the complaint."  *Morris v. Safeco Ins. Co.*, No. 07-cv-2890-PJH, 2008 WL 5273719, at *3 (N.D. Cal. Dec. 19, 2008); *see also Southard*, 2023 WL 6959145, at *3 ("'If the operative facts have not occurred within the forum and the forum has no interest in the parties or subject matter,' the plaintiff's forum choice is entitled to only minimal consideration.") (quoting *Lou v. Belzberg*, 834 F.2d 730, 739 (9th Cir. 1987)).

Here, Plaintiffs' alleged connection to this district is *de minimis*.  First, Plaintiffs mistakenly argue this Court "has jurisdiction over this action pursuant to 28 U.S.C. § 1346 because the United States is a defendant."  FAC ¶ 9.  However, § 1402 permits civil actions against the United States "only in the judicial district where the plaintiff resides or wherein the act or omission complained of occurred."  28 U.S.C. §§ 1402(a)(1), (b).  Here, Plaintiffs are not considered residents of a judicial

1   district for venue purposes, *see* 28 U.S.C. § 1391(c)(1); *Galveston*, 151 U.S. at 506–07, and all acts or

2   omissions complained of occurred in the Eastern District of California.

3       Second, Plaintiffs are incorrect that jurisdiction and venue are appropriate under § 1391(e)

4   because "at least one Defendant resides in this District," FAC ¶ 11, i.e., San Francisco Field Office

5   Director Albarran, and because Director Albarran allegedly presides over "the ICE Field Office with

6   jurisdiction and responsibility over [CCDF]," "is responsible for ICE's policies, practices, and

7   procedures, including those relating to the detention and detention conditions of immigrants," and "is a

8   legal custodian of Plaintiffs and members of the putative class." *Id.* ¶ 22.  In fact, (A)SDDO Landin is

9   the ICE ERO representative responsible for overseeing CCDF, including the facility's compliance with

10  ICE's national standards "establish[ing] consistent confinement conditions, program operations, and

11  management expectations within ICE's detention system." (A)SDDO Landin Decl. ¶¶ 3–5.  (A)SDDO

12  Landin is based in ICE ERO's Bakersfield sub-office, in Kern County. *Id.* ¶ 8.  The approximately 40

13  ICE ERO staff members whose duties relate to the facility, including DOs, are based in the Bakersfield

14  sub-office. *Id.* ¶¶ 10, 17.  Warden Chestnut, and not Director Albarran (or (A)SDDO Landin), is the

15  immediate custodian of Plaintiffs and the proposed class members, and supervises the approximately 70

16  CoreCivic employees who staff CCDF.  *Id.* ¶¶ 11, 16; *Doe v. Garland*, 109 F.4th at 1194.  (A)SDDO

17  Landin assigns DOs from the Bakersfield sub-office to perform various functions at or relating to

18  CCDF, including investigating compliance with the NDS and PBNDS and detainee grievances, and

19  overseeing visual inspections of facilities for cleanliness and safety.  *Id.* ¶ 15.  Accordingly, any

20  connection to the Northern District based on the San Francisco Field Office Director is *de minimis*.  The

21  federal official with immediate and percipient responsibilities over the facility, including ensuring

22  complaint detention conditions, is (A)SDDO Landin, who is in the Eastern District.

23      Indeed, Plaintiffs' scant allegations about Director Albarran are eclipsed by their hundreds of

24  disputed factual allegations about issues with the facility and staff, which Plaintiffs allege are

25  inconsistent with NDS and PBNDS, and which underlie all of Plaintiffs' claims.  *See supra* Parts II.A.1–

26  3 (citing FAC ¶¶ 54–245).  Because substantially all of the events giving rise to this litigation occurred

27  outside of Plaintiffs' chosen forum, their choice of venue is entitled to "considerably less weight."

28  *Knapp v. Wachovia Corp.*, No. 07–cv-4551-SI, 2008 WL 2037611, at *2 (N.D. Cal. 2008)); *cf. Corizon*

*Health*, 2016 WL 1275514, at *2 (convenience and fairness factors favor transfer where all of the events giving rise to an inmate's malpractice and negligence claim occurred outside of the chosen forum); *Barroca*, 2019 WL 5722383, at *3 (plaintiff's contacts with the Northern District of California, where he resided prior to incarceration and would reside following release, were much more attenuated than contacts with Kansas, which were "directly related to his claims"); *Morris*, 2008 WL 5273719, at *4 (little deference or consideration given to plaintiff's choice of forum where it "lacks a significant connection to the events that gave rise to the complaint").

### 2. The Convenience of the Parties and Witnesses Favors Transfer to the Eastern District

Plaintiffs (and proposed class members) are detainees at CCDF, in the Eastern District. The facility, its warden and staff, ICE ERO's representative that oversees the facility, and the ICE ERO staff he supervises, are all located in the Eastern District. (A)SDDO Landin Decl. ¶ 8. Litigating this case in the Northern District thus creates complexity and inefficiencies in the coordination and management of Defendants' defense. Further, the United States Attorney's Office for this district is located over 350 miles from the facility, while the Eastern District has an office in Bakersfield. The Eastern District's proximity to the facility, its detainees, and over 100 federal employees and CoreCivic staff — witnesses critical to the defense of this matter — will facilitate access to sources of proof and make it significantly less difficult for Defendants to manage this litigation than if schedules, meetings, and travel need to be coordinated across hundreds of miles. *Id.* ¶ 20.

The convenience of parties factor also takes into consideration the relative cost of litigation in each forum. "Generally, litigation costs are reduced when venue is located near the most witnesses expected to testify." *Park v. Dole Fresh Vegetables*, 964 F. Supp. 2d 1088, 1095 (N.D. Cal. 2013); *Barroca*, 2019 WL 5722383, at *3; *Purdy v. Munden*, 356 F. Supp. 2d 658, 660 (E.D. Tex. 2005) (("[t]he evidence critical to establishing, and defending, negligence claims is generally found at or near the scene of the [alleged negligence]"). Proximity to CCDF would permit access to witnesses and sources of proof that would decrease the cost of litigation and benefit the parties and the Court. As discussed below, the witnesses in this case are concentrated in Kern County. Regardless of where this case proceeds, if these witnesses are deposed, the depositions will likely be in Kern County. *See*

1  *Barroca*, 2019 WL 5722383, at *3; Fed. R. Civ. Proc. 45(c)(1).  Plaintiffs' counsel will need to travel to

2  Kern Couty whether the case proceeds there or not; by contrast, Defendants will be represented by the

3  undersigned Assistant United States Attorney in San Francisco only if the case continues in this district;

4  otherwise, it will be transferred to an Assistant United States Attorney in the Eastern District, and the

5  cost and inconvenience to Defendants would decrease significantly.

6       The convenience of the witnesses also weighs heavily in favor of transfer.  "'The convenience of

7  witnesses is often the most important factor in resolving a motion to transfer.'"  *Park*, 964 F. Supp. 2d at

8  1095 (citing *Banker v. Union Pac. R.R. Co.*, No. 05-cv-04059-JW, 2006 WL 193856, *2 (N.D. Cal. Jan.

9  23, 2006)).  In analyzing this factor, courts consider the convenience to all witnesses but give "more

10 weight to the convenience of non-party witnesses."  *Saleh v. Titan Corp.*, 361 F. Supp. 2d 1152, 1160

11 (S.D. Cal. 2005).  Here, if this case proceeds in the Northern District, it would significantly impede the

12 operation and oversight of the facility and inconvenience all witnesses by requiring them to coordinate

13 schedules, meetings, and travel — including the approximately 40 ICE ERO staff members (out of a

14 total of 70) who are assigned to the Bakersfield sub-office, the approximately 70 CoreCivic employees

15 who staff the facility, and outside healthcare providers in Kern County.  (A)SDDO Landin Decl. ¶ 20.

16      Further, in evaluating the relative-convenience-of-witnesses factor, "'courts must consider not

17 only the number of witnesses, but also the nature and quality of their testimony.'"  *United States ex rel.*

18 *Tutanes-Luster v. Broker Sols., Inc.*, No. 17-cv-04384-JST, 2019 WL 1024962, at *5 (N.D. Cal. Mar. 4,

19 2019) (quoting *Saleh*, 361 F. Supp. 2d at 1160).  Here, the nature and quality of testimony by witnesses

20 based in the Eastern District far outweigh any alleged *de minimis* connection to the Northern District.

21           **3.    Ease of Access to Evidence Favors Transfer to the Eastern District**

22      If the case proceeds to trial in this district, relevant witnesses will be well beyond the 100-mile-

23 scope of a trial subpoena under Rule 45, impeding access to crucial evidence.  *Corizon Health*, 2016 WL

24 1275514, at *2.  Further, because Plaintiffs' claims rely on alleged issues with the facility itself — e.g.,

25 the actions of facility staff, FAC ¶¶ 54–68, adequacy of specific writing materials and grooming

26 supplies, *id.* ¶ 79–83, the color and smell of water, *id.* ¶¶ 73–78, the nature of the outdoor recreation

27 space, *id.* ¶¶ 88–90, the location of religious activities and types of religious property permitted, *id.*

28 ¶¶ 93–108, 118–122, the temperatures in the facility, *id.* ¶¶ 110–117, the adequacy of certain health

1  assessments and care provided to individual detainees, *id.* ¶¶ 127, 130–137, 140–169, the process for

2  scheduling attorney calls and virtual visits and reception issues, *id.* ¶¶ 184–198, the sound quality during

3  in-person attorney visits, *id.* ¶¶ 194–198, and the facility's accessibility for detainees in wheelchairs or

4  with other disabilities, *id.* ¶¶ 229–238 — the parties' and the Court's access to and ability to tour the

5  facility are crucial in this litigation but will be difficult or impossible if the case proceeds in the Northern

6  District. *See Corizon Health*, 2016 WL 1275514, at *3 (finding that "[t]he clear and logical place for

7  this case to be tried and for discovery into jail conditions to occur" is in the Eastern District, "as that

8  would ease access to certain evidence and witnesses and the Eastern District has an interest in the local

9  controversy"); *Williams v. Bowman*, 157 F. Supp. 2d 1103, 1109 (N.D. Cal. 2001). The Eastern District

10  is also the "clear and logical" venue to the extent that Plaintiffs request as preliminary injunctive relief

11  ongoing judicial supervision of the facility through the appointment of a monitor. *Id.*; ECF No. 22-38.

12  Further, other relevant and necessary sources of proof, including third party records from outside

13  care providers, are also located in the Eastern District. *See Park*, 964 F. Supp. 2d at 1095 (granting

14  motion for transfer; finding that "[a]lthough developments in electronic conveyance have reduced the

15  cost of document transfer somewhat, costs of litigation can still be substantially lessened if the venue is

16  in the district in which most of the documentary evidence is stored"); *see also Dulaney v. United States*,

17  472 F. Supp. 2d 1085, 1086 (S.D. Ill. 2006) (transferring medical malpractice case where it was "highly

18  likely that critical evidence and witnesses, including non-party witnesses and witnesses not within this

19  Court's subpoena power, are located in the" transferee district where the malpractice was alleged to have

20  occurred); *Oglesby v. United States*, No. 11-cv-100, 2012 WL 1190901, at *3 (N.D. W. Va. Apr. 10,

21  2012) (noting that the district where alleged malpractice occurred "is an exceedingly less costly and

22  more convenient venue for the witnesses likely to be involved").

23  **4.    The Interests of Justice Favor Transfer to the Eastern District**

24  The "interests of justice" consideration under § 1404(a) comprises "public-interest factors such

25  as relative degrees of court congestion, local interest in deciding local controversies, potential conflicts

26  of laws, and burdening citizens of an unrelated forum with jury duty." *Corizon Health*, 2016 WL

27  1275514, at *2. "The convenience of parties and witnesses is subordinate to the interest of justice,

28  which is the 'predominant' consideration." *Bromlow*, 438 F. Supp. 3d at 1026. The relevant interest-of-

1   justice considerations here weigh strongly in favor of transfer to the Eastern District.

2         The Eastern District's clear interest "in deciding controversies arising out of" CCDF and "the

3   interest of burdening citizens in our forum with jury duty both weigh in favor of transfer" here.  *Corizon*

4   *Health*, 2016 WL 1275514, at *2; *Williams*, 157 F. Supp. 2d at 1109–10.  In *Corizon Health*, "[t]he

5   thrust of plaintiff's case surround[ed] the sufficiency of the mental health facilities at the Fresno County

6   Jail during his 22-month stay there.  For that reason, a federal judge in Fresno will be in a vastly better

7   position to assess and gather information about this case."  2016 WL 1275514, at *2.  So too here.  The

8   thrust of Plaintiffs' case surrounds the sufficiency of the facility, its staff, federal oversight, and health

9   providers located in Kern County.  As a result, the Eastern District's interest is high; any jury duty in the

10  Northern District would involve an "unrelated forum"; and a federal judge in the Eastern District "will

11  be in a vastly better position to assess and gather information about this case."  *Id.*

12        Further, while in some cases the Northern District has an interest in protecting its residents, this

13  case involves no such residents, and the district otherwise "has little interest in the subject matter of the

14  litigation given that all of the specific events giving rise to the claims" occurred outside of this forum.

15  *Morris*, 2008 WL 5273719, at *4.  By contrast, the Eastern District has an interest in resolving cases

16  involving facilities located, owned, operated, and supervised within that district.  *See, e.g.*, *Van Mourik*

17  *v. Big Heart Pet Brands, Inc.*, No. 17-cv-03889-JD, 2018 WL 3549122, at *1 (N.D. Cal. July 24, 2018)

18  (noting the "local interest in having localized controversies decided at home") (quoting *Decker Coal Co.*

19  *v. Commonwealth Edison Co.*, 805 F.2d 834, 843 (9th Cir. 1986)); *see also Oglesby*, 2012 WL 1190901,

20  at *4 ("[T]he plaintiff's claim arose exclusively from acts or omissions that occurred at the DC VAMC.

21  Consequently, the District of Columbia has a clear interest in resolving the case locally where the DC

22  VAMC is located."); *Silong v. United States*, No. 05-cv-55-OC-10CFJ, 2006 WL 948048, at *3 (M.D.

23  Fla. April 12, 2006) ("There is a local interest in having localized controversies decided at home.").

24        The convenience of the parties and witnesses and interests of justice thus all weigh heavily in

25  favor of transfer to the Eastern District.

26

27  ///

28  ///

1    **V.    CONCLUSION**

2         For the foregoing reasons, Defendants respectfully request that the Court transfer this action to

3    the Eastern District of California under 28 U.S.C. § 1404(a), and hold in abeyance all pending motions

4    to be ruled on by the Court to whom this case is transferred.

5

6                                          Respectfully submitted,

7                                          CRAIG H. MISSAKIAN
                                           United States Attorney
8

9    Dated: January 2, 2026         By:    _/s/ Savith Iyengar_____
                                           SAVITH IYENGAR
10                                         Assistant United States Attorney

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28