1  CRAIG H. MISSAKIAN (CABN 125202)
   United States Attorney
2  PAMELA T. JOHANN (CABN 145558)
   Chief, Civil Division
3  SAVITH IYENGAR (CABN 268342)
   Assistant United States Attorney
4
      450 Golden Gate Avenue, Box 36055
5     San Francisco, California 94102-3495
      Telephone: (415) 436-7200
6     FAX: (415) 436-7234
      savith.iyengar@usdoj.gov
7
   Attorneys for Defendants
8

9                    UNITED STATES DISTRICT COURT

10                 NORTHERN DISTRICT OF CALIFORNIA

11                     SAN FRANCISCO DIVISION

12

13  FERNANDO GOMEZ RUIZ, *et al.*,          )   No. 3:25-cv-09757-MMC
                                            )
14          Plaintiffs,                     )   **DEFENDANTS' OPPOSITION TO**
                                            )   **PLAINTIFFS' MOTION FOR PRELIMINARY**
15      v.                                  )   **INJUNCTION**
                                            )
16  U.S. IMMIGRATION AND CUSTOMS            )   Date:       Friday, February 6, 2026
    ENFORCEMENT, *et al.*,                  )   Time:       9:00 a.m.
17                                          )   Location:   Courtroom 7, 19th Floor
            Defendants.                     )   Judge:      Hon. Maxine M. Chesney
18  _____)

19

20

21

22

23

24

25

26

27

28

1

**<u>TABLE OF CONTENTS</u>**

2    I.    INTRODUCTION ...................................................................................................... 1

3    II.   BACKGROUND ........................................................................................................ 2

4         A.    CoreCivic's Operation of CCDF and ICE's Supervision of the Facility ........................ 2

5         B.    Plaintiffs' Allegations in the FAC Regarding Conditions of Confinement at CCDF ........ 3

6               1.    Plaintiffs' Fifth Amendment Claim Regarding Conditions of Confinement
                       and Medical Care, as Alleged in Their Motion for Preliminary Injunction ............ 4

7
8               2.    Plaintiffs' First and Fifth Amendment Claims Regarding Access to
                       Counsel, as Alleged in Their Motion for Preliminary Injunction ......................... 7

9               3.    Plaintiffs' Rehabilitation Act Claim, as Alleged in Their Motion for
                       Preliminary Injunction ................................................................................. 9

10   III.  LEGAL STANDARD ............................................................................................... 10

11   IV.   ARGUMENT .......................................................................................................... 11

12        A.    Plaintiffs' Cannot Meet Their Heavy Burden of Clearly Showing that They Are
                 Entitled to Preliminary Injunctive Relief ............................................................. 11

13
14              1.    Plaintiffs Are Unlikely to Succeed on the Merits ....................................... 11

15                    (i)    Plaintiffs Are Unlikely to Succeed on Their Fifth Amendment
                             Conditions-of-Confinement Claim ............................................. 11

16
                            (a)    The *Jones* Presumption Does Not Apply .................... 12
17
18                          (b)    The Conditions at CCDF Are Not Unconstitutionally
                                    Punitive ..................................................................... 14

19                          (c)    The Facility Does Not Provide Inadequate Medical Care
                                    Justifying Preliminary Injunctive Relief ......................... 16
20
21                    (ii)   Plaintiffs Are Unlikely to Succeed on Their First Amendment
                             Access-to-Counsel Claim .......................................................... 19

22                    (iii)  Plaintiffs Are Unlikely to Succeed on Their Fifth Amendment
                             Access-to-Counsel Claim .......................................................... 21
23
24                    (iv)   Plaintiffs Are Unlikely to Succeed on Their Rehabilitation Act
                             Claim ...................................................................................... 21

25              2.    Plaintiffs Are Unlikely to Suffer Irreparable Harm Absent Preliminary
                       Injunctive Relief ........................................................................................ 22
26
27              3.    The Balance of Equities and Public Interest Support Defendants ................ 23

28        B.    Plaintiffs Are Not Entitled to Relief for Threshold Reasons ................................... 25

1.   The Court Lacks Jurisdiction to Issue Injunctive Relief Under 8 U.S.C. § 1252(f)(1).........................................................................................25

2.   The Court Lacks Jurisdiction to Issue Injunctive Relief for Plaintiffs' Access-to-Counsel Claims ..........................................................................26

C.   Plaintiffs Should Be Required to Post Bond If Injunctive Relief Is Granted ...................27

V.   CONCLUSION................................................................................................27

## **TABLE OF AUTHORITIES**

### **Cases**

Page(s)

*J.E.F.M. v. Lynch*, 837 F.3d 1026 (9th Cir. 2016) ................................................................. 26

*Aguilar v. ICE*, 510 F.3d 1 (1st Cir. 2007) ......................................................................... 26

*Alexander v. Choate*, 469 U.S. 287 (1985) ......................................................................... 21

*All. for Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011) ....................................... 23

*Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470 (9th Cir. 1985) ............... 23

*Anderson v. United States,* 612 F.2d 1112 (9th Cir. 1979) ...................................... 1, 11, 14

*Bell v. Wolfish*, 441 U.S. 520 (1979) ................................................................. 12, 13, 16, 25

*Biden v. Texas*, 597 U.S. 785 (2022) .................................................................................. 26

*Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668 (9th Cir. 1988) ............................ 23

*Castro v. Cnty. of L.A.*, 833 F.3d 1060 (9th Cir. 2016) ................................................ 11, 12

*City of Los Angeles v. Lyons,* 461 U.S. 95, 111 (1983) ....................................................... 23

*Coleman v. Wilson*, 912 F. Supp. 1282 (E.D. Cal. 1995) ..................................................... 19

*Dayton Bd. of Ed. v. Brinkman,* 433 U.S. 406, 417 (1977) .................................................. 18

*Demore v. Kim*, 538 U.S. 510 (2003) ............................................................................ 12, 24

*Doe v. Garland*, 109 F.4th 1188 (9th Cir. 2024) .................................................................. 2

Drakes Bay Oyster Co. v. Jewell, 747 F.3d 1073 (9th Cir. 2014) ........................................ 23

*El Rescate Legal Servs., Inc. v. Exec. Office of Immigration Review,* 959 F.2d 742 (9th Cir. 1992) ....... 24

*Farris v. Seabrook*, 677 F.3d 858 (9th Cir. 2012) ............................................................... 11

*Fraihat v. ICE*, 16 F.4th 613 (9th Cir. 2021) ..................................................................... 12

*Garcia v. Google, Inc.*, 786 F.3d 733 (9th Cir. 2015) ......................................................... 10

*Garland v. Aleman Gonzalez*, 596 U.S. 543 (2022) ...................................................... 25, 26

*Global NAPs, Inc. v. Verizon New England, Inc.,* 489 F.3d 13 (1st Cir. 2007) ...................... 27

*Gordon v. Cnty. of Orange*, 888 F.3d 1118 (9th Cir. 2018) ............................................ 11, 18

*Herb Reed Enters., LLC v. Florida Entm't Mgmt., Inc.*, 736 F.3d 1239 (9th Cir. 2013) .......... 23

*Jennings v. Rodriguez*, 583 U.S. 131 (2018) ...................................................................... 12

*Jensen v. Shinn*, 609 F. Supp. 3d 789 (D. Ariz. 2022) ........................................................ 19

1  *Jones v. Blanas*, 393 F.3d 918 (2004) ................................................................................ 12

2  *Kingsley v. Hendrickson,* 576 U.S. 389 (2015) .................................................................... 11

3  *Landon v. Plasencia*, 459 U.S. 21 (1982) ........................................................................... 24

4  *Lewis v. Casey*, 518 U.S. 343 (1996) .................................................................................. 18

5  *Lopez v. Brewer*, 680 F.3d 1068 (9th Cir. 2012) ................................................................. 1

6  *Lyon v. ICE*, 171 F. Supp. 3d 961 (N.D. Cal. 2016) ........................................................... 21

7  *Madrid v. Gomez*, 889 F. Supp. 1146 (N.D. Cal. 1995) ...................................................... 19

8  *Mercado v. Noem*, No. 25-CV-6568 (LAK), 2025 WL 2658779 (S.D.N.Y. Sept. 17, 2025) ................. 14

9  *Mothershed v. Justs. of Supreme Ct.*, 410 F.3d 602 (9th Cir. 2005) ..................................... 19

10 *Nintendo of America, Inc. v. Lewis Galoob Toys, Inc.*, 16 F.3d 1032 (9th Cir. 1994) ............ 27

11 *Nken v. Holder*, 556 U.S. 418 (2009) ................................................................................... 23

12 *Noem v. Vasquez Perdomo*, 606 U.S.—, 2025 WL 2585637 (2025) .................................... 25

13 *Plata v. Schwarzenegger*, 2005 WL 2932253 (N.D. Cal. Oct. 3, 2005) ............................... 19

14 *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313 (9th Cir. 1994) ................................................... 11

15 *Stevens v. Harper*, 213 F.R.D. 358 (E.D. Cal. 2002) ......................................................... 18

16 *Stormans, Inc. v. Selecky*, 586 F.3d 1109 (9th Cir. 2009) ................................................. 24

17 *The Lands Council v. McNair*, 537 F.3d 981 (9th Cir. 2008) ............................................... 23

18 *TikTok Inc. v. Garland*, 604 U.S. 56 (2025) ....................................................................... 19

19 *Torres v. U.S. Dep't of Homeland Sec.*, 411 F. Supp. 3d 1036 (C.D. Cal. 2019) ................... 19

20 *Turner v. Safley*, 482 U.S. 78 (1987) ....................................................................... 19, 21, 24

21 *United Mine Workers of America, Dist. 12 v. Ill. State Bar Ass'n*, 389 U.S. 217 (1967) .......... 19

22 *Valdez v. Rosenbaum*, 302 F.3d 1039 (9th Cir. 2002) .................................................. 16, 19

23 *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) ................................ 1, 10, 11, 22

24 *Youngberg v. Romeo*, 457 U.S. 307, 321 (1982) ................................................................. 18

25 *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001) .................................................................... 13

## **Statutes**

27 8 U.S.C. § 1225 ............................................................................................................. 25, 26

28 8 U.S.C. § 1226 ........................................................................................................ 12, 13, 25, 26

8 U.S.C. § 1228 ............................................................................................... 12, 13, 25, 26

8 U.S.C. § 1231 ............................................................................................... 12, 13, 25, 26

8 U.S.C. § 1252 ....................................................................................................... 25, 26, 27

Rehabilitation Act .................................................................................................. 3, 9, 21, 22

1  **I.    INTRODUCTION**

2      Plaintiffs Fernando Gomez Ruiz, Fernando Viera Reyes, Jose Ruiz Canizales, Yuri Alexander

3  Roque Campos, Sokhean Keo, Gustavo Guevara Alarcon, and Alejandro Mendiola Escutia (collectively,

4  "Plaintiffs") bring this case on behalf of a proposed class of aliens detained at the California City

5  Detention Facility ("CCDF" or the "facility") during the pendency of their immigration removal

6  proceedings or while awaiting removal from the United States.  *See generally* ECF No. 15 ("FAC").

7  Plaintiffs have moved for the "extraordinary and drastic remedy" of a preliminary injunction based on

8  alleged conditions of confinement, adequacy of medical care, and access to counsel at CCDF, which

9  they claim violate ICE's detention standards and deprive them of certain constitutional and statutory

10 rights.  *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012).

11     Defendants dispute substantially all of Plaintiffs' allegations and submit declarations by CCDF

12 Warden Christopher Chestnut ("Warden Chestnut Decl."); Susan Tiona, M.D., CoreCivic's Clinical

13 Director for Correctional Medicine Associates and Regional Medical Director ("Dr. Tiona Decl.");

14 Dwan Morris, Food Service Director at the facility ("Morris Decl."); and Maxwell Walker, Regional

15 Dietician ("Morris Decl.").  Defendants also rely on the declaration of Acting Supervisory Detention and

16 Deportation Officer David Landin, ECF No. 37-1 ("(A)SDDO Landin Decl."), submitted with

17 Defendants' motion to transfer this action to the Eastern District of California, ECF No. 37.

18     These declarations countervail all of Plaintiffs' material factual allegations and preclude them

19 from making the requisite "clear showing" that they are "likely to succeed on the merits" of their claims.

20 *Lopez*, 680 F.3d at 1072; *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Anderson v.*

21 *United States,* 612 F.2d 1112, 1114 (9th Cir. 1979).  They also reflect that conditions at the facility —

22 especially at present — comply with national detention standards and Plaintiffs' constitutional and

23 statutory rights, and thus that Plaintiffs (and the proposed class) are not likely to suffer irreparable harm

24 absent preliminary relief.  *Winter*, 555 U.S. at 20.  Finally, the balance of equities and public interest

25 favor Defendants' compelling interest in the steady enforcement of federal immigration laws through

26 operation of the facility, uninhibited by sweeping preliminary injunctive relief predicated on broadly

27 disputed factual allegations.  *Id.*  For each of these reasons, Defendants respectfully request that the

28 Court deny Plaintiffs' motion for a preliminary injunction.

II.    **BACKGROUND**

A.    **CoreCivic's Operation of CCDF and ICE's Supervision of the Facility**

CoreCivic, Inc. ("CoreCivic") owns and operates CCDF, located at 22844 Virginia Boulevard in California City.  Warden Chestnut Decl. ¶¶ 2–3; (A)SDDO Landin Decl. ¶ 4.  The facility houses federal immigration detainees pursuant to a contract between CoreCivic and ICE.  Warden Chestnut Decl. ¶ 3; (A)SDDO Landin Decl. ¶ 12.  CCDF Warden Christopher Chestnut has been employed by CoreCivic for 30 years and has more than 27 years of corrections and detention experience, including supervisory positions at multiple facilities utilized by ICE.  Warden Chestnut Decl. ¶ 5 ("Prior to transferring to Cal City, I was the Warden at Nevada Southern Detention Center and the Assistant Warden at the Northeast Ohio Correctional Center."); (A)SDDO Landin Decl. ¶ 12.  Warden Chestnut is based at the facility and is Plaintiffs' (and the proposed class members') immediate custodian.  *See Doe v. Garland*, 109 F.4th 1188, 1194 (9th Cir. 2024); (A)SDDO Landin Decl. ¶ 11.

CoreCivic maintains approximately 70 employees who staff CCDF and perform the following duties: ensure that the facility is operated within the National Detention Standards ("NDS") and Performance-Based National Detention Standards ("PBNDS"); oversee the provision of personnel escorts to accommodate physical inspections of and official visits to CCDF; ensure that on-site personnel assist detainees with document services; investigate detainee grievances under the NDS and PBNDS; manage and provide oversight of the physical delivery of meals, recreational activities, and medical care to detainees; oversee and document detainee placement in medical isolation when necessary; physically ensure the safety of detainees by providing on-site security and resolution of detainee misconduct or detainee altercations; conduct on-site meetings with personnel to ensure Prison Rape Elimination Act training, staff alertness, and general staff availability; oversee the supervision of medical staff and ensure adequate medical staffing; ensure that the on-site law library is readily available to detainees with functional equipment and access to legal documents; ensure detainees appear for immigration court proceedings virtually; inspect recreational areas for safety, security, and availability in accordance with the NDS; and inspect all property and equipment coming into the facility for cleanliness and functionality for use at CCDF.  (A)SDDO Landin Decl. ¶ 16.

(A)SDDO Landin is the ICE ERO representative responsible for overseeing CCDF, among other facilities within his area of responsibility. *Id.* ¶ 3. Specifically, (A)SDDO Landin oversees the facility's implementation of NDS and PBNDS, which "establish[ ] consistent confinement conditions, program operations, and management expectations within ICE's detention system." *Id.* ¶¶ 3–5. (A)SDDO Landin is based in ICE ERO's Bakersfield sub-office. *Id.* ¶ 8. There are approximately 40 ICE ERO staff members based in the Bakersfield sub-office whose duties relate to the facility, including Deportation Officers ("DOs"). *Id.* ¶¶ 10, 17. (A)SDDO Landin assigns DOs from the Bakersfield sub-office to perform the following functions at or relating to CCDF: assist detainees with document services; investigate compliance with the NDS and PBNDS and detainee grievances; oversee the performance of visual inspections of facilities for cleanliness and safety (e.g., of the segregation unit to ensure that detainees are properly tracked for placement, removal, and reasons for segregation). *Id.* ¶ 15. ICE ERO also conducts weekly inspections of CCDF. *Id.* ¶ 14. (A)SDDO Landin, Warden Chestnut, the approximately 40 ICE ERO staff members whose duties relate to the facility, and the approximately 70 CoreCivic employees who staff CCDF, are based in Kern County. *Id.* ¶¶ 10, 16–18, 20; Warden Chestnut Decl. ¶¶ 2–3.

### B.  Plaintiffs' Allegations in the FAC Regarding Conditions of Confinement at CCDF

Plaintiffs filed this action on November 12, 2025. *See* ECF No. 1. In their operative FAC, Plaintiffs allege that in April 2025, ICE contracted with CoreCivic to open CCDF, a former prison, as a migrant detention center, and that in the last several months, ICE began detaining people at CCDF. FAC ¶¶ 25–27, 30–33. Plaintiffs allege that detainees at CCDF are "impermissibly subject[ed] . . . to conditions constituting punishment, den[ied] . . . adequate medical care and reasonable disability accommodations, and restrict[ed] . . . access to counsel." *Id.* ¶ 41. Plaintiffs allege that the conditions of confinement and medical care at CCDF violate their (and the proposed class members') Fifth Amendment rights; that limitations on access to counsel violate their First and Fifth Amendment rights; and that an alleged routine failure to accommodate disabilities by providing equal access to phone calls, outdoor recreation, medical encounters, housing units, and staff, and by denying access to auxiliary aids and assistive devices, violates the Rehabilitation Act. *Id.* ¶¶ 268–94.

1

2

### 1.     Plaintiffs' Fifth Amendment Claim Regarding Conditions of Confinement and Medical Care, as Alleged in Their Motion for Preliminary Injunction

3      Plaintiffs' motion for preliminary injunction and accompanying declarations reiterate various

4  alleged conditions of confinement at the facility that they argue violate Plaintiffs' Fifth Amendment

5  rights.  *See* ECF No. 22 ("Mot.") at 2–12.  Plaintiffs allege reports of "discolored, foul smelling water";

6  "cold" temperatures "without adequate clothing or blankets"; and "withheld or unfit" items like "pencils

7  and paper, toothbrushes, and razors."  *Id.* 2–3.  Defendants dispute these allegations.  For example,

8  "[t]he water in the housing units is from the California City municipal water supply, which is subject to

9  regular quality testing"; it "is the same water provided to California City residents"; and "[f]acility staff

10  also drink the water while on duty."  Warden Chestnut Decl. ¶¶ 39–41.  Detainees are also "issued

11  pencils, pens, paper, and standard sized envelopes on request," with "pencil sharpeners mounted in the

12  housing unit dayrooms for detainee use."  *Id.* ¶ 86.  The pens are "flexible" and "specifically designed

13  for use in secure institutions, including jails, detention centers, and mental health hospitals," so that they

14  "cannot be easily converted into weapons or used for storing contraband."  *Id.* ¶ 87.

15      Plaintiffs also allege that the facility limits access to visitors and the outdoors, claiming that

16  "detained people are permitted only non-contact visits behind glass"; "visits are often cut off after 30-60

17  minutes after hours of waiting"; "[t]hey are permitted to go to a barren yard space, littered with thorns

18  and rocks, at most once a day for an hour"; "Plaintiffs are always escorted by guards and experience

19  unnecessary and invasive pat-down searches."  Mot. 3.  Defendants respond that "all social visitation is

20  non-contact" because "[c]ontact visitation is more staff intensive and carries a significant risk of

21  introduction of contraband, including drugs, weapons, and electronic devices, into the facility"; that

22  "[t]his is consistent with ICE National Detention Standards"; and that "[s]ocial visits are currently 60

23  minutes each and are available seven days a week," which exceeds the NDS-required "minimum

24  duration of 30 minutes and availability of visiting hours only on Saturdays, Sundays, and holidays."

25  Warden Chestnut Decl. ¶¶ 109–111.  Defendants also dispute Plaintiffs' allegations about the yard

26  space, *id.* ¶ 97, or that pat-downs are invasive.  *Id.* ¶¶ 113–116.

27      Plaintiffs also allege that there is "no access to programming" at CCDF; that they are subjected

28  to "four daily 'counts' during waking hours and more at night"; that facility staff are abusive and

"aggressively pushed" one detainee; that Plaintiff Gustavo Guevara Alarcon "was sent to solitary after he asked to finish his shower during a lockdown"; that "[a]nother individual was sent to solitary after he refused to put his shirt on while exercising in the heat"; that the facility subjects detainees with "medical and disability issues" to the restricted housing unit; and that for individuals in this unit, the "only access to the outdoors is in a filthy 'recreation' cage." Mot. 3–5.

Again, Defendants dispute these allegations. Detainees have access to "outdoor recreation yards" that "contain basketball hoops, a track, and space for group sports, including soccer and volleyball;" "[h]andballs are provided"; and the facility "plan[s] to begin facilitating [recreational] tournaments as the facility population expands." Warden Chestnut Decl. ¶ 94. Detainees in restrictive housing are permitted outdoor recreation in outdoor enclosures located directly outside the housing units that "are not filthy and are cleaned daily." *Id.* ¶¶ 137–138. Female detainees have access to an outdoor recreation area and an indoor gym with exercise equipment. *Id.* ¶ 95. Further, the counts serve the crucial function of "ensur[ing] that all detainees are alive, present, in the appropriate location, and safe." *Id.* ¶ 120. With respect to Plaintiffs' allegations of abuse, the facility's Assistant Chief of Security investigated the detainee's claim that he was "pushed" out of a pod and denied it as unfounded because "he exited the pod of his own accord." *Id.* ¶ 23. The same detainee was later charged by facility staff with fighting after he and four other detainees attacked and stabbed another detainee with homemade weapons, *id.* ¶¶ 23, 66, and other detainees were charged with insolence toward staff, interfering with count, and conduct that disrupts after they refused to lock down for the 11:00 a.m. count and at least one cursed at staff. *Id.* ¶ 29. The plaintiff who allegedly "ask[ed] to finish [a] shower during a lockdown" actually "refused to exit the shower despite multiple staff directives to return to his cell during a critical incident lock down, which delayed the lockdown process," and called the directives "bull shit." *Id.* ¶ 125. The group of detainees who had taken off their shirts "were being loud and disruptive in the dayroom, refused staff directives to put their shirts back on, and refused to return to their cells for count," with the "incident turn[ing] into a demonstration involving multiple detainees, which required a staff response to get the detainees to return to their cells," but which staff "resolved without the use of force." *Id.* ¶ 124. Several of these detainees "were charged with disciplinary offenses and taken to restrictive housing for pre-hearing detention," consistent with facility policy. *Id.* Finally, restrictive

1 │ housing units are used only for "administrative segregation, pre-hearing detention, disciplinary

2 │ segregation, medical observation overflow, and protective custody." *Id.* ¶ 136.

3 │      Plaintiffs' motion also includes various allegations that they assert reflect "inadequate" and

4 │ "substandard" medical care CCDF, in violation of their Fifth Amendment rights.  Mot. 5–8.  Plaintiffs

5 │ challenge the adequacy of "intake assessments"; claim that "[h]ealth screenings are conducted in busy

6 │ hallways"; and assert that the facility's medical staff do not "ask about or document critical

7 │ information," timely refer patients to providers, or "meet the standard of care for tuberculosis screening

8 │ and infectious disease management," and cause "dangerous lapses" in medications, including for

9 │ patients "with their documented medication prescriptions or medication in their possession." *Id.*

10 │      As an initial matter, Plaintiffs' medical declarant may have misread the facility's medical

11 │ records based on how the electronic health record system displays and prints information.  Dr. Tiona

12 │ Decl. ¶¶ 11–18.  In any event, Defendants dispute each of Plaintiffs' declarant's contentions regarding

13 │ specific patients.  *Id.* ¶¶ 9, 58–70.  Defendants also dispute Plaintiffs' general allegations about intake

14 │ assessments and health screenings and provide extensive details about intake screenings, intake physical

15 │ examinations, ongoing access to healthcare services, care for chronic conditions, and offsite referrals.

16 │ *See, e.g.*, Dr. Tiona Decl. ¶¶ 19–48, 62; Warden Chestnut Decl. ¶ 141 ("These screenings are not

17 │ conducted in 'busy hallways' as alleged by Plaintiffs.  Rather, they take place in rooms or enclosures to

18 │ provide privacy with the medical/mental health nurse or provider.").  The facility also provides

19 │ appropriate tuberculosis screening and infectious disease management.  Dr. Tiona Decl. ¶ 29.  The

20 │ facility also does, in fact, conduct pre-screenings at intake to ask detainees, among other questions, "Are

21 │ you taking any medications?"  Dr. Tiona Decl. ¶ 21.  A further screening is conducted to inquire into

22 │ "medication sensitivities" and "current medications."  *Id.* ¶ 22.  For detainees who are transferred from

23 │ another facility with "medical transfer summaries," which include "prescribed medications, as well as a

24 │ list of medications which the detainee was to be provided during transport," "CoreCivic continues

25 │ dispensing the medications provided during transport" "[u]ntil the detainee is seen by a provider for an

26 │ intake examination and new medication ordered is entered."  *Id.* ¶ 25.

27 │      Plaintiffs also allege that medical care is "delayed and dangerously substandard"; that the sick

28 │ call system is "riddled with delays and failures"; that "health records document shortages of necessary

1  medications"; that providers "demonstrate 'poor clinical judgment' and do not 'conform[] to the

2  prevailing standard of care,'" including for a patient with "dangerously uncontrolled hypertension and

3  uncontrolled diabetes"; that there are delays for specialty care; that "[m]ental health care is skeletal or

4  nonexistent"; and that facility staff cannot "timely respond to medical emergencies," citing one

5  detainee's foot ulcer.  Mot. 6–8.

6        Again, Defendants dispute each of these claims.  For example, while "when the facility first

7  opened, medication acquisition was inconsistent due to circumstances beyond the control of the facility

8  (there was no local pharmacy, and pharmacies in other towns declined to support the mission by

9  filling prescriptions)," "[t]his issue has subsequently been resolved."  Dr. Tiona Decl. ¶ 58.  The facility

10  currently "conducts pill call multiple times a day to issue medications," but if a patient does not come to

11  pill call, it will be recorded as a "no show" for that reason, and not because the medication was never

12  offered.  *Id.* ¶¶ 17, 69.  Detainees with "emergent medical needs" are identified and "immediately

13  transferred to a hospital or emergency room" at intake; are seen immediately if designated as

14  "emergency" pursuant to sick call requests; and "[t]o the extent any detainee experiences a medical

15  emergency, detention and health services staff are trained to provide an emergency response and

16  respond to the detainee within four minutes."  *Id.* ¶¶ 20, 34, 37; *see also id.* ¶ 62 (noting that the six-

17  month follow-up for one detainee's hypertension was "absolutely appropriate" because his "pressure

18  readings were consistent with good control").  CoreCivic also contracts "with Hall Ambulance to

19  provide emergency medical transports by both ground and air for detainees with emergent medical

20  conditions who must be transferred to a hospital emergency department."  *Id.* ¶¶ 44–45 ("Detainees

21  experiencing medical emergencies are typically transported to Tehachapi Hospital, Antelope Valley

22  Medical Center in Lancaster, or Mercy Hospital in Bakersfield.").

23        **2.    Plaintiffs' First and Fifth Amendment Claims Regarding Access to Counsel,**

24             **as Alleged in Their Motion for Preliminary Injunction**

25        With respect to their First and Fifth Amendment claims regarding access to counsel, Plaintiffs'

26  motion alleges various issues with the facility's personnel and configuration.  Plaintiffs claim that

27  requests for legal calls "often sit unanswered unless attorneys send follow-ups"; that times offered are

28  "typically one to three weeks out, resulting in weekslong delays between the initial request and the

1   scheduled call"; that "unreasonable limits" are imposed on the length of legal calls; that there are

2   technical issues during video and audio calls; that there are "long lines to use the phone"; that the phones

3   are "within earshot of guards and other detained individuals" and near "loud background noise"; that in-

4   person visits involve hours of waiting, citing one attorney who allegedly "after driving four hours to

5   meet her client at the facility, had to wait an additional four hours before she was allowed to visit"; that

6   a guard outside of a visiting room door might have been able to overhear communications; and that the

7   facility "has a blanket policy of no-contact visits." Mot. 9–11.

8       Defendants dispute these contentions. For example, as Warden Chestnut explains, "[d]etainees

9   are informed how to schedule confidential attorney calls and virtual attorney visits ("VAV") during

10  orientation"; "the procedures are also outlined in the detainee handbook"; detainees can also ask

11  questions of case management staff; "[d]etainees may request private legal calls" using a form for unit

12  management staff; and staff verify the legal representative's credentials before facilitating private legal

13  calls "in staff offices, where telephones are not monitored or recorded." Warden Chestnut Decl. ¶¶ 182–

14  186. There are "10 VAV booths," and "12 VTC booths that are typically used for court but can also be

15  used for [VAVs] if needed." *Id.* ¶¶ 187, 188 (providing photograph of several VAV booths, including

16  one that provides for wheelchair access). "VAV systems are monitored daily to ensure adequate

17  hardware and software functionality." *Id.* ¶ 215. In-person legal visits occur in a legal visitation area

18  that "is non-contact but allows for passing legal documents between the participants," and "contact visits

19  may be permitted upon request and with facility approval." *Id.* ¶ 189. Further, "VAVs, legal calls, and

20  in-person legal visits are available between 8:00 a.m. and 8:00 p.m. daily and may be scheduled in 30 or

21  60-minute increments," and a detainee may have multiple 60-minute appointments in a day if scheduled

22  with different legal representatives. *Id.* ¶ 191 (noting that Plaintiff Sokhean Keo had two VAVs on

23  November 15, 2025 with different attorneys). Detainees' confidential calls are not overheard by facility

24  staff. *Id.*; *see also id.* ¶¶ 170–181. The need to separate genders and custody levels does impact the

25  availability of time slots for VAVs, legal calls, and in-person legal visits, and the facility is currently

26  "working to separate the VAV booths into multiple areas to address this." *Id.* ¶ 192.

27      Legal representatives can and do schedule VAVs, legal calls, and in-person legal visits by calling

28  or emailing the facility. *Id.* ¶¶ 194–220 (detailing the numerous emails sent by Plaintiffs' declarants;

1  confirming no "weeks-long" delays in scheduling legal calls and visits; disputing specific claims relating

2  to VAVs and in-person visits; and documenting the numerous VAVs, legal calls and in-person visits for

3  Plaintiffs and declarants between October 1 and December 9, 2025). Indeed, the declarant who alleges a

4  long wait before an in-person visit "did not utilize the facility's procedures for scheduling a legal visit,

5  which specify that such requests should be made at least 24 hours in advance." *Id.* ¶¶ 201–202 (noting

6  that the facility nonetheless "work[s] to accommodate legal visits even without the requisite 24-hour

7  notice, but not following the procedures may result in longer wait times"). As the declarant also

8  concedes, "there was a Code 1 when she arrived at the facility," which means that "all non-essential

9  movement is halted inside the facility to allow for staff and first responders to focus on the emergency."

10  *Id.* (explaining the need to do so to "ensure the safety and wellbeing of our detainees and staff").

### 3. Plaintiffs' Rehabilitation Act Claim, as Alleged in Their Motion for Preliminary Injunction

13  With respect to their Rehabilitation Act claim, Plaintiffs' motion alleges that CCDF "has no

14  discernable process for addressing the needs of detained individuals with disabilities"; that intake "fails

15  to adequately screen for and identify disability needs"; that "continuity of disability accommodations . . .

16  appear[s] nonexistent"; that detainees "have been deprived of eyeglasses, hearing aid batteries, and

17  custom orthopedic footwear"; and that they are "inaccessibly housed, forced to walk up stairs or climb

18  onto a top bunk they cannot safely occupy." Mot. 11–12.

19  Defendants dispute these allegations and explain the various ways in which detainees may

20  request disability accommodations, including at intake. *See* Warden Chestnut Decl. ¶¶ 152–166; Dr.

21  Tiona Decl. ¶¶ 21–22, 49–51. Warden Chestnut's declaration details staff's challenges with Plaintiff

22  Sokhean Keo's ███████, which require an ███████; their efforts to obtain ███████

23  ███████; and their confirmation that ███████ and that "he will be provided ███████

24  ███████ on a keep on person [ ] basis at regular intervals." Warden Chestnut Decl. ¶ 162. Eyeglasses,

25  orthopedic shoes, and wheelchairs — of which the facility has a "large supply," along with other

26  assistive devices — are available and provided to detainees if ordered by a provider. *Id.* ¶ 161; Dr.

27  Tiona Decl. ¶ 50 ("Accommodations for disabilities and other conditions are available when medically

28  necessary. The facility has an ample supply of durable medical equipment, including wheelchairs,

1    walkers, crutches, canes, oxygen, and CPAP machines, which are provided when indicated.").  Items

2    that providers have not ordered, i.e., "comfort items, such as neoprene sleeves and elastic back braces,

3    are not medically necessary and are not recommended for long-term use."  Dr. Tiona Decl. ¶ 51.

4    Further, the detainee with tennis shoes, which Plaintiffs appear to refer to as "custom orthopedic

5    footwear," had black tennis shoes with homemade laces, not the "all-white shoes with no laces" that are

6    permitted in the facility.  *Id.* ¶¶ 75, 160.  In any event, he did not have a medical order for such

7    footwear, and his refusal to remove them "resulted in a Code 1 response for disruption of the property

8    inventory process for multiple detainees and halted all movement within the facility."  *Id.* ¶ 160.

9         The facility's health services staff also can and do "order lower tier and low-bunk restrictions to

10   ensure that detainees with medical needs are assigned to a housing location which is safe."  *Id.* ¶ 50.  At

11   least one detainee — one of Plaintiffs' own declarants — refused to permit his cellmate to use such an

12   accommodation despite facility staff's efforts.  *See* Warden Chestnut Decl. ¶¶ 29, 133.  That declarant

13   "received a disciplinary write-up on November 15, 2025 because he refused staff directives to vacate the

14   bottom bunk in his cell" and occupy the top bunk, to which he was assigned, "when another detainee

15   was placed in the cell who had a medical order for a bottom bunk," and refused to let the detainee even

16   enter the cell.  *Id.*  Indeed, the facility ensures that "[a]ll detainees at the facility have an equal

17   opportunity to participate in services, programs, and activities, in the least restrictive and most integrated

18   setting possible."  Dr. Tiona Decl. ¶¶ 49–51; Warden Chestnut Decl. ¶¶ 152–166.  This also includes

19   approving the applications of many detainees (including Plaintiffs and declarants with alleged

20   disabilities) for voluntary work programs.  *Id.* ¶¶ 7, 9–11 (Plaintiffs Alejandro Mendiola Escutia,

21   Gustavo Guevara Alarcon, Fernando Viera Reyes, and Sokhean Keo); *id.* ¶¶ 18, 20, 22, 24, 26, 29

22   (various declarants).

## III.    LEGAL STANDARD

24        "A preliminary injunction is an 'extraordinary remedy' that is never awarded as of right."

25   Winter, 555 U.S. at 24.  "A plaintiff seeking a preliminary injunction must show that: (1) she is likely to

26   succeed on the merits, (2) she is likely to suffer irreparable harm in the absence of preliminary relief, (3)

27   the balance of equities tips in her favor, and (4) an injunction is in the public interest."  *Garcia v.*

28   *Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (citing *Farris v. Seabrook*, 677 F.3d 858, 864 (9th Cir.

2012) and *Winter*, 555 U.S. at 20).  A preliminary injunction is "an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Lopez*, 680 F.3d at 1072.  And where a petitioner seeks mandatory injunctive relief — seeking to alter the status quo — "courts should be extremely cautious."  *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1319–20 (9th Cir. 1994).  A mandatory injunction "goes well beyond simply maintaining the status quo pendente lite and is particularly disfavored."  *Id.* at 1320 (internal quotations and alteration omitted).  A mandatory injunction "should not be issued unless the facts and law clearly favor the moving party." *Anderson,* 612 F.2d at 1114.

## IV.    ARGUMENT

### A.    Plaintiffs' Cannot Meet Their Heavy Burden of Clearly Showing that They Are Entitled to Preliminary Injunctive Relief

#### 1.    Plaintiffs Are Unlikely to Succeed on the Merits

##### (i)    Plaintiffs Are Unlikely to Succeed on Their Fifth Amendment Conditions-of-Confinement Claim

Plaintiffs are unlikely to prevail on their Fifth Amendment claim because they cannot show that Defendants have been "objectively unreasonable" in maintaining the conditions at CCDF.  To the extent that immigration detainees may challenge the conditions of their detention under the Fifth Amendment's Due Process Clause, such claims are considered under an "objective reasonableness" standard, which is less demanding for plaintiffs than the Eighth Amendment's subjective "deliberate indifference" inquiry, but identical to the standard governing conditions-of-confinement claims brought by state pretrial detainees under the Fourteenth Amendment.  *See Kingsley v. Hendrickson,* 576 U.S. 389, 352-54 (2015).

The Ninth Circuit has analyzed such conditions-of-confinement claims under an objective deliberate indifference standard.  *See Castro v. Cnty. of L.A.*, 833 F.3d 1060, 1071 (9th Cir. 2016) (en banc) (adopting objective deliberate indifference standard to evaluate failure-to-protect claim brought by pretrial detainee); *Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1124–25 (9th Cir. 2018) (applying *Castro*'s objective deliberate indifference test to pretrial detainee's claim that jail violated right to adequate medical care).  The elements of a conditions-of-confinement claim are: (1) the defendant made an intentional decision with respect to the conditions plaintiff challenges; (2) those conditions put the plaintiff at substantial risk of suffering serious harm; (3) the defendant did not take reasonable available

1   steps to abate that risk; and (4) by not taking such measures, the defendant caused the plaintiff's injuries.

2   *Castro*, 833 F.3d at 1071.  Plaintiffs do not satisfy this standard.

3                    **(a)    The *Jones* Presumption Does Not Apply**

4          As an initial matter, Plaintiffs are mistaken that the presumption created by *Jones v. Blanas*, 393

5   F.3d 918 (2004) — whereby courts may "presume" a civil "detainee is being subjected to punishment"

6   when he is "confined in conditions identical to, similar to, or more restrictive than, those in which his

7   criminal counterparts are held," Mot. 18 (quoting *Jones*, at 932) — applies here such that they may

8   avoid establishing the elements of their claim, as required by *Kingsley*.  Mot. 18–19.

9          First, the Ninth Circuit has not extended the *Jones* presumption to federal immigration detainees.

10  *See Fraihat v. ICE*, 16 F.4th 613, 648 (9th Cir. 2021) ("Plaintiffs have not identified authority from this

11  Court extending *Jones*'s presumption to the context of federal immigration detainees.").  Indeed, in

12  support of their theory, Plaintiffs cite only a trio of district court cases, Mot. 13, all of which predate

13  *Fraihat*, and none of which grapple with the fact that federal immigration detention and criminal pretrial

14  detention are doctrinally distinct.  These three district court cases — *Torres v. DHS*, *Unknown Parties v.*

15  *Johnson*, and *Doe v. Becerra* — do not address mandatory detention under 8 U.S.C. §§ 1226(c), 1228,

16  or 1231; do not consider Congress's decision to eliminate release as a management tool; and do not

17  address Supreme Court precedent recognizing the distinct purposes of immigration detention.  *See*

18  *Demore v. Kim*, 538 U.S. 510 (2003); *Jennings v. Rodriguez*, 583 U.S. 131 (2018).  Absent controlling

19  authority, this Court should decline Plaintiffs' invitation to apply a presumption that would

20  fundamentally alter the Fifth Amendment analysis.  The proper framework remains the objective

21  reasonableness inquiry articulated in *Bell v. Wolfish*, 441 U.S. 520 (1979) and *Kingsley*, without any

22  threshold presumption of punishment.

23         Second, Plaintiffs rely on disputed factual assertions in their declarations — not categorical

24  treatment — to argue that conditions at CCDF are more restrictive than prison, and thus to invoke *Jones*.

25  But *Jones* does not hold that such disputed factual assertions give rise to a presumption of punishment.

26  Rather, the presumption applies where a civil detainee is *categorically* subjected to the same penal

27  regime as sentenced prisoners.  *Jones*, 393 F.3d at 932.  In *Jones*, the plaintiff was a civil detainee

28  awaiting adjudication under California's Sexually Violent Predator Act who was housed in a county jail

1    and confined under equally or more restrictive conditions compared to convicted criminal inmates.  *Id.*

2    at 923–25.  That categorical equivalence — not disputed factual allegations about specific incidents —

3    is what gave rise to the presumption.  *Id.* at 934 (noting that the plaintiff was confined with the jail's

4    general criminal population).

5         Indeed, allowing the *Jones* presumption despite disputed factual allegations would collapse the

6    threshold inquiry into the merits and effectively eliminate Plaintiffs' burden to show objective

7    unreasonableness.  Neither *Jones* nor *Fraihat* endorses such a result.  Moreover, under *Bell* and

8    *Kingsley*, the question is not whether a condition resembles or exceeds prison conditions in the abstract,

9    but whether it is objectively reasonable considering the government's legitimate interests in the

10   particular detention context.  That inquiry is context-dependent where, as here, many detainees at CCDF

11   are subject to mandatory detention under 8 U.S.C. §§ 1226(c), 1228, or 1231 based on serious criminal

12   convictions.  Restrictions that might appear excessive in a criminal pretrial setting can therefore be

13   reasonable and nonpunitive in civil immigration detention.  *See, e.g.*, Warden Chestnut Decl. ¶¶ 7

14   (noting that Plaintiff Mendiola Escutia is classified as ███████████ based on a homicide conviction

15   and a ████████████████████████████████), 8 (Plaintiff Roque Campos classified as

16   ████████████ based on domestic violence arrest), 9 (Plaintiff Guevara Alarcon classified as ████

17   based on attempted murder conviction and ████████████████████), 10 (Plaintiff Viera Reyes

18   classified as ██████ based on murder conviction and ████████████████), 11 (Plaintiff Keo

19   classified as █████ based on convictions for robbery and aggravated assault and ████████████

20   ███████████), 13 (Plaintiff Ruiz Canizales classified as ██████ based on offenses of domestic violence

21   with corporal injury and making criminal threats); *see also id.* ¶ 12 (reflecting that the only remaining

22   plaintiff, Plaintiff Gomez Ruiz, was classified as ██████ but released from CCDF on December 4, 2025).

23        To be clear, Defendants acknowledge that the existence of prior criminal convictions does not

24   sanction turning civil detention into punishment.  *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001).  But

25   detainees' criminal histories — which here include convictions for murder, gun violence and terrorism,

26   Warden Chestnut Decl. ¶¶ 7–31 — are relevant to security, safety and facility management.  *See id.*;

27   *Bell*, 441 U.S. at 546 ("[M]aintaining institutional security and preserving internal order and discipline

28   are essential goals that may require limitation or retraction of the retained constitutional rights of both

convicted prisoners and pretrial detainees."). In other words, while due process forbids punishment, it does not prohibit the government from adopting reasonable measures tailored to the risks presented by mandatorily detained populations. At a minimum, these context-specific considerations preclude any presumption of punishment at the preliminary-injunction stage, where the Court must resolve disputed facts in Defendants' favor and Plaintiffs bear the burden of showing a clear likelihood of success. *Anderson,* 612 F.2d at 1114.

### (b)    The Conditions at CCDF Are Not Unconstitutionally Punitive

Plaintiffs argue that Defendants have admitted that conditions at CCDF are intentionally punitive and illegitimate. Mot. 15-16. That is plainly untrue. In support of their claim, Plaintiffs first cite language in a February 2025 district court decision by the Southern District of New York that "[s]tatements from senior officials suggest that harsh conditions of confinement are a deliberate feature of the enforcement program intended to induce self-deportation and to deter illegal immigration." *Mercado v. Noem*, No. 25-CV-6568 (LAK), 2025 WL 2658779, at *33 (S.D.N.Y. Sept. 17, 2025). But that statement was supported only by links to DHS and ICE advertisements advising that "aliens who choose not to self-deport and are detained by ICE may have to spend months in detention." *Id*. at *33 n.286. Plaintiffs next cite statements by Florida Governor Ron DeSantis about a detention facility in Florida; by the President about the same Florida facility; and by Secretary Noem about a facility in Louisiana. Mot. 15. These statements are quoted without context and, in any event, statements by government officials about *other* facilities do not support Plaintiffs' claim that Defendants have admitted that conditions at CCDF are intended to be punitive.

To the contrary, Defendants' declarations reflect that the facility is operated by an experienced warden and supervised by ICE with the shared goal of ensuring compliance with the NDS. *See generally* Warden Chestnut Decl., Dr. Tiona Decl., Morris Decl., Walker Decl. & (A)SDDO Landin Decl. These declarations confirm that conditions at CCDF are not punitive and are supported by legitimate security and safety concerns. CoreCivic follows the NDS and PBNDS, which "establish[ ] consistent confinement conditions, program operations, and management expectations within ICE's detention system." (A)SDDO Landin Decl. ¶¶ 3–5; Chestnut Dec. ¶ 78 n.6. Under the NDS, CoreCivic must "promote a safe and orderly living environment for detainees by establishing a fair and equitable

1  disciplinary system requiring detainees to comply with facility rules and regulations, and imposing

2  disciplinary sanctions on those who do not comply."  Chestnut Dec. ¶ 126.

3      CoreCivic maintains approximately 70 employees who staff CCDF and perform numerous

4  duties, including but not limited to ensuring the facility's compliance with the NDS and PBNDS;

5  investigating detainee grievances under the NDS and PBNDS; overseeing provision of meals,

6  recreational activities, and medical care; physically ensuring the safety of detainees and resolving

7  detainee misconduct or altercations; overseeing the supervision of medical staff; inspecting recreational

8  areas for compliance with the NDS; and inspecting all property and equipment coming into the facility

9  for cleanliness and functionality for use at CCDF.  (A)SDDO Landin Decl. ¶ 16.  ICE ERO also

10  maintains approximately 40 staff members based in the Bakersfield sub-office whose duties relate to the

11  facility, including Deportation Officers who (A)SDDO Landin assigned to perform tasks at the facility,

12  including investigating compliance with the NDS and PBNDS and detainee grievances and overseeing

13  visual inspections of the facility for cleanliness and safety.  *Id.* ¶¶ 10, 15, 17.  ICE ERO also conducts

14  weekly inspections of CCDF.  *Id.* ¶ 14.

15      Consistent with these responsibilities and the NDS, the facility assigns detainees security

16  classifications at intake based in part on the severity of any prior criminal offenses.  Warden Chestnut

17  Decl. ¶¶ 7–31, 58, 71.  For security and safety reasons, detainees of different genders or custody levels

18  are not permitted to recreate outdoors at the same time.  *Id.* ¶ 93.  The facility allows the majority of

19  detainees — who are not assigned to restrictive or medical housing — to eat in a dining hall, and facility

20  staff eat the same meals on their shift.  Morris Dec. ¶¶ 10, 18.  To the extent staff conduct pat searches,

21  they do so with the purpose of limiting the introduction and movement of contraband into housing areas

22  and throughout the facility, including items fashioned into weapons, and in compliance with the NDS.

23  Warden Chestnut Decl. ¶¶ 23, 66, 78–79, 115.  The facility's detainee counts are also motivated by

24  "ensur[ing] that all detainees are alive, present, in the appropriate location, and safe."  *Id.* ¶ 120.

25      The facility's judgment relating to preserving internal order and discipline and to maintain

26  institutional security "are peculiarly within the province and professional expertise of corrections

27  officials, and, in the absence of substantial evidence in the record to indicate that the officials have

28  exaggerated their response to these considerations, courts should ordinarily defer to their expert

judgment in such matters." *Bell*, 441 U.S. at 547–48.  Further, any challenged restrictions need only be reasonably related to the government's interest, and do not need to be the "least restrictive alternative," as Plaintiffs suggest, Mot. 16.  *Valdez v. Rosenbaum*, 302 F.3d 1039, 1046 (9th Cir. 2002) (adding that "[a] reasonable relationship between the governmental interest and the challenged restriction does not require an 'exact fit'").  Nor does it matter whether a court agrees that a "policy does in fact advance the jail's legitimate interest"; instead, "[t]he only question . . . is whether the defendants' judgment was 'rational,' that is, whether the defendants might reasonably have thought that the policy would advance its interests."  *Id.* at 1046.  Accordingly, based on Defendants' detailed declarations, this Court should reject Plaintiffs' claim that the conditions at the facility are intentionally punitive and illegitimate.

### (c)    The Facility Does Not Provide Inadequate Medical Care Justifying Preliminary Injunctive Relief

Plaintiffs' motion alleges that Defendants fail to conduct adequate physical and mental health screenings at intake; have no system to ensure that Plaintiffs receive continuity of care, including with respect to prescription medication; have no process by which Plaintiffs can seek and receive timely medical care; have failed to hire adequate, qualified medical staff; and have no means to deliver prompt specialty care.  Mot. 19–20.  These allegations are factually incorrect, *see supra* Part II.B.1, and even if accepted, fail to establish that Defendants' conduct is objectively unreasonable or amounts to impermissible punishment under the Fifth Amendment.  Plaintiffs thus cannot demonstrate a likelihood of success on the merits warranting extraordinary injunctive relief.

First, as a general matter of policy and practice, Plaintiffs' allegations are factually incorrect.  *Id.* The facility's standard intake process includes an initial health screening by a provider in a private room or enclosure that "covers medical, mental health, dental, and disability related concerns."  Warden Chestnut Decl. ¶¶ 140–142; Dr. Tiona Decl. ¶¶ 19–23 (describing the medical and mental health pre-screening and intake procedures).  The facility has an on-site medical unit with examination rooms, an x-ray room, and negative pressure cells.  Warden Chestnut Decl. ¶ 146.  Further, CCDF permits detainees to make a verbal request for medical or mental health care to any staff member, or a written sick call request.  *Id.* ¶ 145; *see also* Dr. Tiona Dec. ¶¶ 34–36.

1    The facility also has routine policies and procedures in place to ensure continuity of care for

2    prescription medications.  *See* Dr. Tiona Dec. ¶¶ 25–28.  Detainees arriving at CCDF from other

3    detention facilities "typically come with medical transfer summaries which provide a summary of prior

4    diagnoses and prescribed medications, as well as a list of medications which the detainee was to be

5    provided during transport."  *Id.* ¶ 25.  CCDF staff continue to dispense detainees' existing prescriptions

6    until intake evaluation by a medical provider, at which time orders for prescription medications deemed

7    necessary for inmate treatment and on the approved formulary are transmitted for overnight delivery

8    from CoreCivic's contracted pharmacy. *Id.* ¶ 26.  Similar procedures exist for non-formulary

9    medications.  *Id.* ¶ 26.  Where medications are unavailable from the original pharmacy, CCSF staff

10   attempt to obtain them from a back-up pharmacy.  *Id.* ¶ 27.  This process has also improved since the

11   opening of a nearby pharmacy, with whom the facility now has an agreement to stock medications

12   commonly prescribed at the facility.  *Id.*

13   The facility's on-site medical staff is available to detainees 24 hours a day, 7 days a week.

14   Warden Chestnut Decl. ¶ 53.  Mental health staff are on-site seven days a week and on call 24 hours a

15   day, 7 days a week.  *Id.*  Current medical and mental health staffing levels have increased since the

16   facility first opened, when CoreCivic relied on corporate and regional providers and its own medical

17   staff from another facility.  *Id.* ¶ 51.  However, any delays processing sick call requests at CCDF during

18   its first three months holding ICE detainees do not appear to have resulted in any adverse medical

19   outcomes.  Dr. Tiona Decl. ¶ 53.  Based on Dr. Tiona's chart review, all sick call requests at the facility

20   are currently processed in a timely manner, resulting in same-day responses for all "urgent" requests and

21   responses within 72 hours for all other requests.  *Id.* ¶ 54.  CCDF also has a contract with Adventist

22   Health Tehachapi Valley for specialty care services and medical imaging; a contract with Hall

23   Ambulance for emergency medical transports by ground and air; and typically transports detainees

24   experiencing medical emergencies to Tehachapi Hospital, Antelope Valley Medical Center, or Mercy

25   Hospital in Bakersfield.  *Id.* ¶¶ 44–45, 54–56.

26   By contrast, Plaintiffs' medical declarant purports to opine on the adequacy of medical care at

27   CCDF as a whole despite having reviewed medical records for only 17 individuals out of a detained

28   population of approximately 3,000.  *See* ECF No. No. 22-3 at ¶ 6.  Those records were also hand-picked

1  for him by Plaintiffs' counsel, and he does not say whether they are representative of the broader

2  population, or whether they reflect anything other than isolated or atypical cases. *Id.* ¶¶ 6–8. Such a

3  limited, non-random review cannot support conclusions about systemic practices or justify facility-wide

4  injunctive relief, especially given Defendants' declarations about medical care at the facility. Indeed,

5  even Plaintiffs' declarant admits that "the sample size in this instance is relatively small." *Id.* ¶ 9.

6  Further, all of the incidents that Plaintiffs' declarant relies upon — from the 17 health records — date to

7  approximately the first month that CCDF was operational. As Defendants have explained, there have

8  been significant improvements at the facility since that time, including improved medical personnel

9  staffing patterns; enhanced training and oversight of nursing and on-site physician staff; increased

10  oversight by managerial personnel; improved ability to dispatch additional providers from other

11  facilities; increased effectiveness of the screening and prioritization process; and improved patient care

12  access at the facility, including same-day processing of urgent sick call requests and 72-hour processing

13  for the remainder. *Id.* ¶¶ 32, 54–55, 62, 64.

14      Additionally, while Plaintiffs have pointed to individual cases where their medical declarant

15  disagrees with the level of care provided or its timeliness, *see* ECF No. 22-3 ¶¶ 27–30, 37–43,

16  Defendants have countervailed these contentions. *See* Dr. Tiona Decl. ¶¶ 9, 11–18, 58–70. In any

17  event, the Fifth Amendment does not require optimal care, adherence to best practices, or medical

18  protocols a plaintiff would prefer. *See Youngberg v. Romeo*, 457 U.S. 307, 321 (1982); *Gordon*, 888

19  F.3d at 1125. Further, where, as here, Plaintiffs seek sweeping, facility-wide injunctive relief, they must

20  present evidence of a systemic or ongoing constitutional violation, not just isolated incidents. *Lewis v.*

21  *Casey*, 518 U.S. 343, 358 (1996). Allegations of isolated delays, individual dissatisfaction with care, or

22  anecdotal accounts cannot support the conclusion that Defendants' medical system as a whole is

23  objectively unreasonable. *See Dayton Bd. of Ed. v. Brinkman,* 433 U.S. 406, 417 (1977) ("[O]nly if

24  there has been a systemwide impact may there be a systemwide remedy."); *Stevens v. Harper*, 213

25  F.R.D. 358, 373 (E.D. Cal. 2002) (explaining that injunctive relief to remedy allegations of institutional

26  failure requires proof of more than discrete and isolated incidents of harm).

27      The cases Plaintiffs cite, where courts issued facility-wide injunctions, Mot. 18–20, do not

28  suggest otherwise. Those cases involved systemwide failures — such as the absence of any meaningful

1   intake screening, chronic and extreme delays in access to care, pervasive medication lapses, or severe

2   staffing shortages — resulting in routine denial of basic medical services across an entire institution.

3   *See Coleman v. Wilson*, 912 F. Supp. 1282, 1298–1310 (E.D. Cal. 1995); *Madrid v. Gomez*, 889 F.

4   Supp. 1146, 1205–07, 1256–57 (N.D. Cal. 1995); *Plata v. Schwarzenegger*, 2005 WL 2932253, at *5–

5   12 (N.D. Cal. Oct. 3, 2005); *Jensen v. Shinn*, 609 F. Supp. 3d 789, 864 (D. Ariz. 2022).  They were also

6   decided in very different procedural postures.  *Madrid* followed a lengthy trial in which 57 witnesses

7   testified and 6,000 exhibits were admitted into evidence, 889 F. Supp. At 1156; *Planta* followed a six-

8   day evidentiary hearing, 2005 WL 2932253 at *1; *Jensen* followed a 15-day trial, 609 F. Supp. 3d at

9   796; and *Coleman* likewise followed trial.  912 F. Supp. 1299–1300.

10              **(ii)    Plaintiffs Are Unlikely to Succeed on Their First Amendment Access-
11                      to-Counsel Claim**

12          The right to hire and consult an attorney is protected by the First Amendment.  *Mothershed v.*

13  *Justs. of Supreme Ct.*, 410 F.3d 602, 611 (9th Cir. 2005); *United Mine Workers of America, Dist. 12 v.*

14  *Ill. State Bar Ass'n*, 389 U.S. 217, 221-22 (1967).  In the context of civilly detained aliens, the

15  restrictions on access to and communication with counsel must be related to the government's legitimate

16  interests in affecting the removal of alien detainees.  *See Turner v. Safley*, 482 U.S. 78 (1987).[1]

17          As described above, CCDF's policies and practices regarding detainees' communications with

18  counsel are not directed at the substance of those communications, and Plaintiffs do not contend

19  otherwise.  *See TikTok Inc. v. Garland*, 604 U.S. 56, 66–67 (2025) (noting differing limitations on

20  regulations aimed at content of speech versus content-neutral limitations); *see also Turner*, 482 U.S. at

21  90 ("We have found it important to inquire whether prison regulations restricting inmates' First

22

23          [1] Plaintiffs contend that *Turner* applies only in the prison setting and not to civilly detained
    detainees.  Mot. 23 n.20.  But this is an open question in the Ninth Circuit.  While no published Ninth
24  Circuit decision has expressly held that *Turner* governs First Amendment access-to-counsel claims by
    immigration detainees, district courts within this Circuit have evaluated restrictions on attorney access in
25  immigration detention under reasonableness frameworks closely tracking *Turner*, balancing detainees'
    constitutional interests against legitimate governmental and institutional concerns such as security,
26  order, and resource constraints.  *See, e.g., Torres v. U.S. Dep't of Homeland Sec.*, 411 F. Supp. 3d 1036,
    1049–52 (C.D. Cal. 2019) (evaluating access-to-counsel restrictions in immigration detention by
27  weighing burden on First Amendment rights against asserted governmental interests).  Further, the test
    has been applied by the Ninth Circuit in the context of pretrial detainees.  *See Valdez*, 302 F.3d at 1045–
28  47, *cert. denied*, 538 U.S. 1047 (2003).  Presumably for that reason, Plaintiffs analyze their Fifth
    Amendment claims under *Turner*.  Mot. 23–24.

Amendment rights operated in a neutral fashion, without regard to the content of the expression."). Rather, the instant limitations on communication are content-neutral time, place or manner restrictions on when and how detainees may engage with counsel, grounded in the government's legitimate interest in maintaining the safe and orderly operation of the facility.

Indeed, CCDF's procedures for detainees' access to counsel are reasonably designed to balance detainees' needs for legal services with this legitimate governmental interest. The procedures are publicly available on ICE's website. *See* Warden Chestnut Decl. ¶ 193. All detainees are familiarized with access-to-counsel and legal research procedures at the facility through an initial orientation and detainee handbook. *Id.* ¶¶ 184–185. Detainees are granted an unlimited number of attorney calls, legal visits, and VAVs, although subject to operational limits on the concurrent use of facilities by detainees of different genders and security classifications, limitations on multiple same-attorney appointments per day. *Id.* ¶ 192. VAV systems are also "monitored daily to ensure adequate hardware and software functionality." *Id.* ¶ 215. In-person legal visits are in a non-contact area but "contact visits may be permitted upon request and with facility approval." *Id.* ¶ 189. Further, "VAVs, legal calls, and in-person legal visits are available between 8:00 a.m. and 8:00 p.m. daily," and detainees' confidential calls are not overheard by facility staff. *Id.* ¶¶ 170–181, 191.

CCSF staff manage attorney access requests through an email inbox and are in the process of implementing an online self-scheduling portal. *Id.* ¶¶ 194–220 (detailing the numerous emails received; confirming no "weeks-long" delays in scheduling legal calls and visits; disputing specific claims relating to VAVs and in-person visits; and documenting the numerous VAVs, legal calls and in-person visits for Plaintiffs and declarants between October 1 and December 9, 2025). Counsel's duplicative requests and failures to follow facility procedures requiring advance notice have slowed response times by CCDF staff. *Id.* ¶ 196. Staff nonetheless attempt to respond to all attorney requests within a day of submission. *Id.* ¶¶ 206–207 (explaining that Plaintiffs' declarant inaccurately claims that it takes between 10 days and more than two weeks to schedule a legal call, where CCDF staff granted her requests on dates and times that she specifically requested). Defendants' provision of access to counsel is thus grounded in content-neutral time, place or manner restrictions, the government's reasonable goals, and the facility's operational needs.

1

2

### (iii)    Plaintiffs Are Unlikely to Succeed on Their Fifth Amendment Access-to-Counsel Claim

3

For the same reasons, Plaintiffs' claim that the facility's limitations on detainees' access to

4    counsel violate their Fifth Amendment due process rights fails.  As with First Amendment claims, courts

5    generally uphold detention regulations as long as they are "reasonably related to legitimate . . .

6    interests," considering (1) whether there is a "valid, rational connection between the [prison] regulation

7    and a legitimate and neutral governmental interest put forward to justify it"; (2) "whether there are

8    alternative means of exercising the asserted constitutional right that remain open to prison inmates"; (3)

9    "the impact accommodation of the asserted constitutional right will have on guards and other inmates,

10   and on the allocation of prison resources generally"; and (4) "the absence of ready alternatives." *Turner*,

11   482 U.S. at 89.  As noted above, detainees at CCDF have reasonable access to legal calls and VAVs.  In-

12   person visits are also permitted, even though they are not constitutionally required when other means of

13   communication are available. *Lyon v. ICE*, 171 F. Supp. 3d 961, 983 (N.D. Cal. 2016) (challenging only

14   protocols for telephone access because the location of the facilities makes in-person visits "impractical

15   at best," making telephonic access "critical").[2]

16

### (iv)    Plaintiffs Are Unlikely to Succeed on Their Rehabilitation Act Claim

17

Plaintiffs' Rehabilitation Act claim is also ill-suited for preliminary injunctive relief.  At this

18   stage, Plaintiffs must make a clear showing of likely success on each element of a § 504 claim, including

19   that any alleged denial of services occurred *by reason of disability* and not pursuant to neutral policies or

20   individualized circumstances. *See generally Alexander v. Choate*, 469 U.S. 287 (1985).  Section 504

21   requires only reasonable accommodations — not optimal or preferred services — and does not impose

22   strict liability for isolated lapses. *Id.* at 300–01.  Because Plaintiffs' theory depends on highly

23   individualized determinations regarding disability, notice, and accommodation, it cannot support the

24   sweeping, facility-wide injunctive relief Plaintiffs seek on a limited preliminary injunction record.

25

In any event, the record contradicts Plaintiffs' claims.  Defendants have explained the various

26   ways detainees may request disability accommodations, including at intake. *See* Warden Chestnut Decl.

27

---

28   [2] Plaintiffs again rely on the *Jones* presumption here, but as set forth in Part IV.A.1.i.a, above, the presumption does not apply.

¶¶ 152–166; Dr. Tiona Decl. ¶¶ 21–22, 49–51.  Defendants have highlighted unique circumstances posed by some incidents.  *See, e.g.*, Warden Chestnut Decl. ¶ 162 (detailing challenges with Plaintiff Sokhean Keo's ███████████████).  And Defendants have detailed the extensive efforts the facility makes to accommodate detainees' disabilities, including disciplining detainees who interfere with the provision of those accommodations.  *Id.* ¶ 161 (explaining that the facility has a "large supply" of eyeglasses, orthopedic shoes, and wheelchairs and other assistive devices, and provides them to detainees if ordered by a provider); Dr. Tiona Decl. ¶ 50 ("Accommodations for disabilities and other conditions are available when medically necessary.  The facility has an ample supply of durable medical equipment, including wheelchairs, walkers, crutches, canes, oxygen, and CPAP machines, which are provided when indicated."); *id.* (explaining that health services staff "order lower tier and low-bunk restrictions to ensure that detainees with medical needs are assigned to a housing location which is safe"); Warden Chestnut Decl. ¶¶ 29, 133 (explaining how one detainee, one of Plaintiffs' declarants, was disciplined for refusing to permit his cellmate to access an accommodation).  Indeed, facility staff are committed to ensuring that "[a]ll detainees at the facility have an equal opportunity to participate in services, programs, and activities, in the least restrictive and most integrated setting possible."  Dr. Tiona Decl. ¶¶ 49–51.

*    *    *    *    *

For these reasons, Plaintiffs cannot make the requisite clear showing that they are likely to succeed on the merits of their Fifth Amendment conditions-of-confinement claim, First or Fifth Amendment access-to-counsel claims, or Rehabilitation Act claim.  This Court should deny their request for preliminary injunctive relief for this reason alone.

### 2.    Plaintiffs Are Unlikely to Suffer Irreparable Harm Absent Preliminary Injunctive Relief

The Supreme Court's "frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction."  *Winter,* 555 U.S. at 22 (emphasis in original).  "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Id.*  Conclusory or speculative

1    allegations are not enough to establish a likelihood of irreparable harm.  *Herb Reed Enters., LLC v.*

2    *Florida Entm't Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013); *see also Caribbean Marine Servs. Co.*

3    *v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) ("Speculative injury does not constitute irreparable injury

4    sufficient to warrant granting a preliminary injunction."); *Am. Passage Media Corp. v. Cass Commc'ns,*

5    *Inc.*, 750 F.2d 1470, 1473 (9th Cir. 1985) (finding irreparable harm not established by statements that

6    "are conclusory and without sufficient support in facts").  In short, to obtain injunctive relief, Plaintiffs

7    must establish that they were wronged and that there is a sufficient likelihood that they will be wronged

8    again in a similar way.  *City of Los Angeles v. Lyons,* 461 U.S. 95, 111 (1983).

9         Plaintiffs have not done so here.  Instead, Plaintiffs generally allege potential harm related to

10   potential health issues and individual detainees' pre-existing health conditions.  Mot. 29–30.  This is

11   largely conjecture and speculation, as Plaintiffs provide no specific facts or evidence establishing that

12   detainees broadly face irreparable injury.  Indeed, Plaintiffs' allegations relating to conditions of

13   confinement and access to medical and mental health care are refuted by Defendants' declarations,

14   including the urgency of specific detainees' health conditions.  *See* Dr. Tiona Decl. ¶¶ 9, 58–70.  The

15   record also reflects that the *current* quality of medical and mental health care at the facility does not

16   pose a risk of irreparable injury to Plaintiffs that would require a sweeping preliminary injunction.  *Id.*

17   ¶¶ 32, 54–55, 62, 64 (explaining the significant improvements to medical personnel staffing patterns,

18   training and oversight of medical personnel, oversight, dispatching additional providers from other

19   facilities, screening and prioritization, patient care access, including sick call requests).  Petitioners thus

20   cannot demonstrate that irreparable harm is "likely" absent the "extraordinary and drastic" remedy of a

21   preliminary injunction.

22         **3.     The Balance of Equities and Public Interest Support Defendants**

23         When the government is a party, the balance of equities and public interest merge.  Drakes Bay

24   Oyster Co. v. Jewell, 747 F.3d 1073, 1092 (9th Cir. 2014) (citing *Nken v. Holder*, 556 U.S. 418, 435

25   (2009)).  Further, where a moving party only raises "serious questions going to the merits," the balance

26   of hardships must "tip sharply" in their favor.  *All. for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35

27   (9th Cir. 2011) (quoting *The Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008)).

28

1    These factors weighs heavily in Defendants' favor.  First, the government has a compelling

2  interest in the steady enforcement of its immigration laws.  *See, e.g.*, *Demore*, 538 U.S. at 523;

3  *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1140 (9th Cir. 2009) (holding that the court "should give due

4  weight to the serious consideration of the public interest" in enacted laws).  Indeed, "[c]ontrol over

5  immigration is a sovereign prerogative."  *El Rescate Legal Servs., Inc. v. Exec. Office of Immigration*

6  *Review,* 959 F.2d 742, 750 (9th Cir. 1992); *see also Landon v. Plasencia*, 459 U.S. 21, 34 (1982) ("[I]t

7  must weigh heavily in the balance that control over matters of immigration is a sovereign prerogative,

8  largely within the control of the executive and the legislature.").

9    Further, in the context of detention, the Supreme Court has recognized that "the problems of

10  prisons . . . require expertise, comprehensive planning, and the commitment of resources, all of which

11  are peculiarly within the province of the legislative and executive branches of government."  *Procunier*

12  *v. Martinez*, 416 U.S. 396, 404–05 (1973).  "[C]ourts," by contrast, "are ill equipped to deal with the

13  increasingly urgent problems of prison administration and reform."  *Id*. at 405.  Running a prison (or in

14  this case, a civil immigration detention facility) "is an inordinately difficult undertaking that requires

15  expertise, planning, and the commitment of resources, all of which are peculiarly within the province of

16  the legislative and executive branches of government."  *Turner*, 482 U.S. at 85.  The "formidable task of

17  running a prison" falls to those other two branches, and "separation of powers concerns counsel a policy

18  of judicial restraint" and "deference to the appropriate prison authorities."  *Id*.

19    Here, the preliminary injunctive relief Plaintiffs seek would prevent Defendants from effectively

20  managing operations at the facility.  Plaintiffs' list of demands span staffing levels, intake procedures,

21  requirements for medical emergencies, access to medical specialists, medical complaint processing

22  procedures, disability screening requirements and hiring requirements, the purchasing of durable

23  medical equipment, implementation of disability grievance system, the creation of programs and

24  activities, phone access, visitor access, body search practices, outdoor recreation parameters, safety

25  procedures, sensory stimulation, socio-emotional programming, and recreational activities.  *See* ECF

26  No. 22-38.  Such relief would require ongoing judicial supervision of the facility's operation.  And

27  indeed, Plaintiffs also request appointment of a monitor.  *Id.*  Yet courts are particularly reluctant to

28  impose such intrusive remedies at the preliminary injunction stage absent a clear constitutional violation.

*See Bell*, 441 U.S. at 547–48 (explaining that courts should defer to facility administrators in matters of institutional management). And here, Plaintiffs' list of demands would limit the facility's ability to manage the often-short-term detention of its detainees, Warden Chestnut Decl. ¶ 107, and effectively preclude Defendants' ongoing enforcement of immigration laws, in contravention of the government's compelling interests in steadily enforcing immigration laws and remedying problems caused by illegal immigration. *See Noem v. Vasquez Perdomo*, 606 U.S.—, 2025 WL 2585637, at *4–5 (2025) (Kavanaugh, J., concurring). The balance of equities and public interest thus favor denying Plaintiffs' motion for preliminary injunctive relief.

### B.    Plaintiffs Are Not Entitled to Relief for Threshold Reasons

#### 1.    The Court Lacks Jurisdiction to Issue Injunctive Relief Under 8 U.S.C. § 1252(f)(1)

Under 8 U.S.C. § 1252(f)(1), "[r]egardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of" the specified provisions, with one exception not relevant here. The specified provisions include 8 U.S.C. §§ 1225(b), 1226(c), 1228(a), and 1231(a). The Supreme Court recently explained that § 1252(f)(1)'s reference to "the 'operation of' the relevant statutes is best understood to refer to the Government's efforts to enforce or implement them." *Garland v. Aleman Gonzalez*, 596 U.S. 543, 550 (2022).

Here, the preliminary injunction Plaintiffs seek runs afoul of § 1252(f). Sections 1225, 1226, 1228 and 1231 authorize the government to arrest and detain removable aliens. Section 1225 compels the arrest and detention of certain inadmissible aliens pending removal proceedings. *See* 8 U.S.C. § 1225(b)(1)(B)(ii). Section 1226 authorizes the arrest and detention of aliens in removal proceedings pending a decision on removability, 8 U.S.C. § 1226(a), and compels the arrest and detention of aliens who have committed certain criminal offenses, *id.* § 1226(c). Section 1228(a) compels the arrest and detention of certain aliens who have committed aggravated felonies. 8 U.S.C. § 1228(a)(2). Section 1231 compels the detention and removal of noncitizens who have been ordered removed. 8 U.S.C. § 1231. Section 1231(a)(2) further provides that "under no circumstances" may certain noncitizens found removable on particular grounds be released from custody during the removal period.

CCDF holds aliens subject to detention pursuant to these sections.  Indeed, many aliens detained at the facility are subject to *mandatory* detention.  For example, Plaintiff Fernando Viera Reyes is detained under § 1228 following his conviction for first degree murder and attempted second degree robbery; Plaintiff Sokhean Keo is detained under § 1231 following his convictions for assault with a firearm, conspiracy to commit robbery, attempted home invasion, burglary, shooting, and association with a street gang; and Plaintiff Gustavo Guevara Alarcon is detained at CCDF pursuant to § 1226(c) following his conviction for murder.  *See* Warden Chestnut Decl. ¶¶ 7–13.  Thus, while Plaintiffs characterize their request as regulating conditions of confinement and access to services, the injunction would in practice restrain the government's operation of the mandatory detention statutes, contrary to Supreme Court precedent holding that § 1252(f)(1) bars injunctions that interfere with the government's "efforts to enforce or implement" the detention statutes.  *Aleman Gonzalez*, 596 U.S. at 550; *Biden v. Texas*, 597 U.S. 785 (2022).  Here, the wide-ranging conditions Plaintiffs seek would limit ICE's ability to continue housing detainees at the facility and require transfer or release if certain conditions cannot be met, thus restraining the operation of §§ 1225, 1226, 1228, and 1231 — including provisions that mandate detention for inadmissible and criminal aliens and "under no circumstances" permit release.

### 2.     The Court Lacks Jurisdiction to Issue Injunctive Relief for Plaintiffs' Access-to-Counsel Claims

This Court also lacks jurisdiction to grant Plaintiffs' request for injunctive relief on their access-to-counsel claims because Congress has "channel[ed] judicial review of all immigration decisions" into the petition-for-review process, 8 U.S.C. § 1252(a)(5), and "[j]udicial review of all questions of law and fact, including interpretation and application of constitutional . . . provisions, arising from any action taken or proceeding brought to remove an alien . . . shall be available only in judicial review of a final order[.]"  *Id.* § 1252(b)(9).  In *J.E.F.M. v. Lynch*, the Ninth Circuit held that right-to-counsel claims are "part and parcel" of removal and therefore must be raised through petitions for review — not in district court — even when framed as a policy-and-practice challenge.  837 F.3d 1026, 1031–36 (9th Cir. 2016) (quoting *Aguilar v. ICE*, 510 F.3d 1, 13 (1st Cir. 2007)).

Plaintiffs' "access" theory arises from removal-related actions (i.e., initial detention, processing, and charging) and seeks relief that would regulate those proceedings.  That places the claim squarely

within § 1252(b)(9)'s "breathtaking" sweep.  *Id*. at 1031–35.  And channeling these claims through the petition-for-review process preserves meaningful review, as immigration judges and the Board of Immigration Appeals can address attorney-access issues, and courts of appeals can review any due-process errors on a developed record.  *Id*.  Accordingly, the Court need not reach the merits of Plaintiffs' access-to-counsel claims, and should instead deny injunctive relief under § 1252.

### C.    Plaintiffs Should Be Required to Post Bond If Injunctive Relief Is Granted

Federal Rule of Civil Procedure 65(c) provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  A bond posted for a preliminary injunction is viewed as a contract in which "the court and the plaintiff 'agree' to the bond amount as the 'price' of a wrongful injunction."  *Global NAPs, Inc. v. Verizon New England, Inc.,* 489 F.3d 13, 20–21 n.5 (1st Cir. 2007) (internal citation omitted).  As a result of the posting of the bond, a presumption arises that damages will be awarded from those posted bond amounts for defendants "to receive compensation for their damages in cases where it is later determined that a party was wrongfully enjoined."  *Nintendo of America, Inc. v. Lewis Galoob Toys, Inc.*, 16 F.3d 1032, 1036 (9th Cir. 1994).  Because the risk of harm here is not insubstantial if the Court grants preliminary injunctive relief, the Court should require that Plaintiffs post security of an appropriate amount during the pendency of the Court's order, in the event that it is later determined that Defendants were wrongfully enjoined.

## V.    CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court deny Plaintiffs' motion for preliminary injunction.

Respectfully submitted,

CRAIG H. MISSAKIAN
United States Attorney

Dated: January 2, 2026          By:    */s/ Savith Iyengar*
                                        SAVITH IYENGAR
                                        Assistant United States Attorney