## DECLARATION OF CHRISTOPHER CHESTNUT

I, Christopher Chestnut, state the following based upon my personal knowledge.

1.      I am over the age of 18 and am competent to testify to the matters set forth in this Declaration.

2.      I am currently the Warden at CoreCivic's California City Correctional Facility[1] ("Cal City" or "the facility"), located at 22844 Virginia Boulevard, California City, a position I have held since June 2025.

3.      The facility is owned and operated by CoreCivic. The facility currently houses federal immigration detainees pursuant to a contract with Immigration and Customs Enforcement ("ICE").

4.      Prior to transferring to Cal City, I was the Warden at Nevada Southern Detention Center and the Assistant Warden at the Northeast Ohio Correctional Center.

5.      I have been employed by CoreCivic since 1995 and have more than 27 years of corrections and detention experience, including supervisory positions at multiple facilities utilized by ICE.

6.      I make this Declaration in response to Plaintiffs' Motion for Preliminary Injunction and supporting exhibits in the matter of *Fernando Gomez Ruiz, et al. v. U.S. Immigration and Customs Enforcement, et al.*, Case No. 3:25-cv-09757-MMC, in the Northern District of California.

**Allegations and Relevant Background of the Named Plaintiffs**

7.      Plaintiff Mendiola Escutia was booked into the facility on September 4, 2025. His assessment questionnaire notes a ████████████████████████████ ████████████ He was classified as High custody based on his prior conviction for homicide and his ████████████████████████████████. In October 2024, ICE ERO

---

[1] The facility has also been variously referred to as the California City Correctional Center, California City Immigration Processing Center, and California City Detention Facility.

reviewed the case and determined he was a ███████████████████ for detention and removal. He was previously incarcerated at the California Department of Corrections and Rehabilitation ("CDCR") Correctional Training Facility. At Cal City, he applied and was approved to participate in the VWP as an AM Porter mopping floors starting on September 28, 2025.

8.    Plaintiff Roque Campos was booked into the facility on September 5, 2025 following a transfer from Mesa Verde. He was recommended for an override to ███████ ██████████ based on his I-213, which notes an arrest in Merced County for domestic violence with willful infliction of corporal injury. He was placed in the restrictive housing unit ("RHU") on November 27, 2025 for medical observation following his return from the hospital following █████████████████. He was released on November 28, 2025 and returned to general population housing.

9.    Plaintiff Guevara Alarcon was booked into the facility on August 29, 2025 following a transfer from Golden State Annex. He was classified as ██████████ based on a prior conviction for attempted murder and his ████████████████. In July 2024, ICE determined that he was a ███████████████. He was previously incarcerated by CDCR at the California Substance Abuse Treatment Facility. During intake, Guevara Alarcon reported he was in good health and had no disabilities or special vulnerabilities. Guevara Alarcon was placed in RHU on pre-hearing detention status on September 20, 2025 after being charged with Interfering with Staff Duties (198) for refusing to exit the shower during a critical incident lock-down that morning. He refused nursing assessments following the incident. During his disciplinary hearing on September 23, 2025, he admitted to not locking down when asked. His disciplinary charge was dropped to a 307 – Refusing to Obey a Direct Order, and he received a seven-day RHU sanction with credit for his prior time served. He applied and was approved for a VWP position on September 29, 2025.

10.    Plaintiff Viera Reyes was booked into the facility on August 29, 2025 following a transfer from Golden State Annex. His assessment questionnaire notes ███████ including ██████████████████████. He was classified as ████ ███████ based on a prior conviction for murder and ██████████████████. He was previously incarcerated in CDCR custody at Pelican Bay and San Quentin. On November 24, 2025, he signed a VWP agreement for a Barber position, which was approved the next day.

11.    Plaintiff Keo was booked into the facility on August 29, 2025 following a transfer from Mesa Verde. He was classified as ██████████ based on a current conviction of robbery, for which he received a 32-year sentence, a prior conviction for aggravated assault, and ██████████████████. Keo applied for a VWP position for special detail – maintenance on September 29, 2025 but was approved for a position in the laundry. He was placed in RHU on November 12, 2025 on pre-hearing detention status for disciplinary charge 213 – Engaging in a Group Demonstration, when he refused to don his full uniform and stand by his cell for an inspection. He was released from RHU on November 18, 2025. While at Mesa Verde, he submitted a habeas petition in the Eastern District of California, Case No. 1:24-cv-00919-HBK, challenging his prolonged detention. The Respondent's Motion to Dismiss was granted, finding Keo subject to mandatory detention "due to his prior conviction for aggravated felonies, including conspiracy to commit home invasion robbery, and shooting a firearm at an occupied dwelling."

12.    Plaintiff Gomez Ruiz was booked into the facility on October 20, 2025 following a transfer from Desert View Annex. He was classified as ██████████ based on no prior convictions or ██████████████. He was released from Cal City on December 4, 2025.

13.    Plaintiff Ruiz Canizales was booked into the facility on August 29, 2025 following a transfer from Golden State Annex. He was classified as ██████████ based on prior offenses of Domestic Violence (with corporal injury) and making criminal threats.

His I-213 states he "claims good health." His file notes that he is ██████ and ████████████ ████, "but can communicate in English writing." He was released from Cal City on December 4, 2025.

**Relevant Background of the Non-Plaintiff Declarants**

14.    Declarant Alvarez-Mora was booked into the facility on September 4, 2025 following a transfer from Golden State Annex. During his custody classification, he was recommended for an override to ████████████ based on his I-213, which noted he had an ████████████████████ due to a conviction in Costa Rica for Aggravated Sexual Abuse of a Minor involving the rape of an eight-year-old. The I-213 also documents additional convictions in Costa Rica of two counts of aggravated rape and one count of aggravated sexual abuse of a minor.

15.    Declarant Armenta was booked into the facility on September 1, 2025 following a transfer from Mesa Verde. During classification, he was recommended for an override to ████████████ due to pending violent charges for homicide. His I-213 notes that he is ████████████████████████████.

16.    Declarant Benavidez Zamora was booked into the facility on November 5, 2025 following a transfer from Golden State Annex. He reported a prior incarceration in CDCR custody at Pelican Bay from 2022 to 2023. He was classified as ████████████. His I-213 notes convictions for two counts of sexual battery and lewd or lascivious acts with a child under 14, for which he was sentenced to five three years, respectively, in prison. He had previously been released on Alternatives to Detention, but had two violations, which led to his remand to ICE custody.

17.    Declarant Julio F. V.[2] was booked into the facility on September 1, 2025 following a transfer from Mesa Verde. He admitted during booking to having a current or prior conviction of a violent offense and that he previously received a disciplinary sanction

_____

[22] Upon information and belief, this Declarant's name is Florez-Vargas.

for violence or sexual abuse while detained. He was classified as ████████ based on his convictions for robbery and assault, as well as his ████████████. Florez-Vargas' I-213 reflects prior convictions in 2011 (Robbery – Street-Gun – seven-year sentence); 2016 (assault by prisoner – four years consecutive); 2019 (possession of weapon by prisoner – two years consecutive); and 2020 (assault – four years). He has previously been incarcerated at Wasco State Prison and Kern Valley State Prison. His November 18, 2025 reclassification at Cal City reflects a disciplinary for engaging in a group demonstration. He applied and was approved for a shower porter position on September 22, 2025.

18.    Declarant Garcia-Romero was booked into the facility on October 7, 2025 after an October 6, 2025 arrest. Unlike the majority of the other Declarants, she did not transfer from another detention facility. She was classified as ████████ based on having no prior criminal offenses or ████████. On October 23, 2025, she applied and was approved for a VWP position cleaning floors.

19.    Declarant Llufrio (aka Illufrio) was booked into the facility on August 27, 2025. His classification file notes a 2009 conviction for burglary and no known ████, resulting in his classification as ████████. His I-213 also notes a prior misdemeanor for vehicle theft and a prior arrest for resisting an officer. He had a final order of removal issued in 2006 and was located and arrested by ICE Fugitive Operations in June 2025. On September 22, 2025, he was placed in RHU for pre-hearing detention for charge 204 – Threatening Another after he approached the Unit Manager during housing moves and said, "If you leave that guy in here I'm going to fight him." This was witnessed by two other staff members. He was released from RHU on September 25, 2025.

20.    Declarant Montes Regalado was booked into the facility on September 4, 2025 following a transfer from Golden State Annex. He was classified as ████████ based on a prior conviction for kidnapping, for which he was sentenced to 18 months in CDCR custody. ICE issued a final order of removal in 2007, and he was apprehended by

ICE in August 2023. On November 3, 2025, he applied and was approved for a VWP position as a shower porter.

21.     Declarant Orejuela Gutierrez was booked into the facility on August 29, 2025 following a transfer from Golden State Annex. He received an override to ███████ custody based on prior time served in Columbia for drug trafficking and cartel involvement. ████████████████████████████.

22.     Declarant Rivera-Trigueros was booked into the facility on September 6, 2025 following a transfer from Golden State Annex. He was classified as ████████ based on a prior conviction for murder and ██████████████████████. He was previously incarcerated in CDCR custody at Cal City. On September 11, 2025, he received a disciplinary from the Unit Manager for wearing contraband footwear, which medical confirmed had not been approved. Rivera-Trigueros continued to refuse directives from the Unit Manager and was charged with 229 – Conduct that Disrupts; 307 – Refusal to Obey; and 305 – Possession of Unauthorized Items. Following a hearing, he was sanctioned with four days of segregation with credit for time served. On September 29, 2025, he applied for a VWP position as a pod porter, which was approved on October 20, 2025. On November 12, 2025, he was returned to RHU after he refused my directive during a unit inspection to return to his cell, which delayed the inspection. He was charged with 298 – Interfere with Staff Member and 309 – Refuse Direct Order and released from RHU on November 18, 2025.

23.     Declarant Singh was booked into the facility on September 5, 2025 following a transfer from Mesa Verde. His initial custody classification notes a prior conviction for taking a vehicle without consent in 2022 and ██████████████████, resulting in classification as ███████. He was previously in ICE custody in 2019 at the Frederick County Detention Center but was released on bond before ICE became aware of an ███████ ████████. On September 19, 2025, he was placed in medical overflow housing in RHU

for meal monitoring due to declaration of a hunger strike,[3] which was reported to be based on his frustration over cancellations of scheduled ████████ at prior facilities. On September 30, 2025, he submitted a grievance alleging that a Detention Officer pushed him out of the pod, was rude, and took papers from him when requested a copy of the papers and the protocol for a hunger strike. The grievance was denied as unfounded by Assistant Chief of Security of Security Breeman, noting that staff attempted to get his attention without force, and he exited the pod of his own accord. He was placed in medical observation again on October 20, 2025 due to another declaration of a hunger strike related to his request to see a ████████ and was released on October 23, 2025. He received a disciplinary charge for fighting on October 27, 2025, which did not change his custody level.

24.    Declarant Vishal was booked into the facility on September 2, 2025 following a transfer from Golden State Annex. He was initially classified as ██████████ with no convictions or known ██████████ but was later reclassified as ██████████ based on a charge for fighting on October 27, 2025 and new information reflecting ████ ██████████. On September 19, 2025, he was placed in medical overflow housing in RHU for meal monitoring. On September 27, 2025, he was released from RHU, and on September 29, 2025, he applied and was approved for a VWP position as a special detail. He was released from Cal City on December 8, 2025.

25.    Declarant Juarez Ruiz was booked into the facility on August 29, 2025 following a transfer from Golden State Annex. He was classified as ██████████ based on prior convictions for drug trafficking (cocaine) and DUIs. His I-213 indicates that he was previously removed.

26.    Declarant Guthrie was booked into the facility on August 29, 2025 following a transfer from Golden State Annex. He was classified as ██████████ based on 2004

---

[3] A hunger strike is defined as missing more than nine meals. To date, there have been five incidents meeting this threshold, two of which were from ██████████.

convictions for distribution of cocaine and a weapons offense, for which he was sentenced to 312 months and 120 months, respectively. He was previously incarcerated by BOP at FCI Edgefield and was taken into custody by ICE in 2023 following a reduction in his sentence under the First Step Act. While at Cal City, he was approved for participation in the VWP on September 29, 2025. He was released from the facility on October 27, 2025.

27.    Declarant Khan[4] was booked into the facility on October 7, 2025 from the Bakersfield Field Office. She was classified as ███████████ with no prior convictions or ████████████. She was released from the facility on November 5, 2025.

28.    Declarant Leyva was booked into the facility on September 4, 2025 from Golden State Annex. He was classified as ████████████ based on a prior conviction for second-degree robbery. He was previously in CDCR custody at the Sierra Conservation Center in Jamestown, CA. His I-213 notes that he "claims good health." He was released from the facility on November 28, 2025.

29.    Declarant Montes-Diaz was booked into the facility on September 5, 2025 following a transfer from Mesa Verde. He was classified as ████████████ based on a prior conviction for DUI, prior charges for domestic violence and aggravated assault with a gun, and ████████████. His I-213 notes that in 2017, he was sentenced to 10 years' imprisonment for DUI causing great bodily injury (paralysis and brain injury), had misdemeanor convictions for domestic violence in 2013 (28-day sentence) and a probation violation in 2008 (60-day sentence). It also notes prior arrests and charges for cruelty towards a child in 2013, threat terroristic state offenses in 2009, and aggravated assault – gun in 2008 – all of which were described as "still pending." He was previously incarcerated in CDCR custody at Wasco State Prison and Cal City. On September 29, 2025, he applied and was approved for a VWP position as an AM Chemical Porter. On October 5, 2025, he was charged with Insolence towards Staff (308), Interfering with Count (314),

---

[4] Upon information and belief, this detainee's name is Zahan.

and Conduct that Disrupts (399) when he was one of several detainees who refused to lock down for the 11AM count. He approached Unit Manager Harper stating, "That's not how you do your job," and when told to lockdown, he said, "fuck that get the lieutenant." At the disciplinary hearing, he stated that he came over to assist another detainee who did not speak English and admitted to cussing at Unit Manager Harper and refusing to lock down until a Lieutenant was present. The disciplinary committee imposed a sanction of a seven-day commissary restriction but no RHU time for this infraction. He was later placed in RHU on November 14, 2025 for refusing orders (307) and conduct that disrupts security staff operation (299). During this incident, Montes requested to be on a lower bunk and refused orders to be on the top bunk. A staff member told Montes he was assigned to the upper bunk in the cell and needed to move there because the lower bunk was needed for a detainee with a medical bottom bunk order. He was released from RHU on November 20, 2025. While in RHU, he refused nine meals between November 16th and November 20th, but he did eat one meal a day from November 16th through November 18th. He was released from the facility on November 24, 2025.

30.    Declarant Neri Valdez was booked into the facility on September 6, 2025 following a transfer from Golden State Annex. He was classified as ▮▮▮▮▮▮ based on prior convictions for lewd acts upon a child and false imprisonment. He was previously in CDCR custody at the California State Prison in Corcoran. On September 19, 2025, he was placed in RHU for a charge of Conduct that Disrupts (299). He was released from RHU on September 25, 2025. He was released from the facility on October 24, 2025.

31.    Declarant Santos Avalos was booked into the facility on September 5, 2025 following a transfer from Mesa Verde. He was classified as ▮▮▮▮▮▮ based on a 2014 conviction of sex assault ("sexual penetration by foreign object, unconscious"). During his arrest by ICE, he claimed no medical conditions. He was released from the facility on November 13, 2025.

//

**Conditions at Cal City**

32.     The facility is not derelict as claimed by Plaintiffs. It was in continuous use, first as a federal detention center and then as a state prison, from 2000 through 2024. After the California state inmates departed, CoreCivic continued to maintain the facility with a cadre of on-site staff with the intention of reactivating it with a new customer base.

33.     CoreCivic spent significant money preparing and upgrading the facility for reopening earlier this year.

34.     Prior to reopening, the facility was inspected and passed by the California City Department of Public Safety.

35.     The first ICE detainees housed at the facility under the current contract arrived on August 27, 2025.

36.     All areas of the facility accessible to detainees have central air conditioning and heating.

37.     Temperatures in the housing areas are thermostatically controlled and maintained at a target between 68 and 72 degrees year round. Fluctuations do occur when the temperature changes drastically with the same 24-hour period; however, these temperatures are not extreme and if adjustments are needed then maintenance makes those adjustments. Air temperatures are currently measured by staff at least twice a week using a laser temperature reader; however, we have ordered new devices and will be implementing daily temperature checks at the beginning of January 2026.

38.     The hot water heaters throughout the facility are also thermostatically controlled and maintained at 120 degrees. Temperatures are tested at least weekly by staff using a thermometer, or more frequently if issues are reported. We will also be implementing daily hot water temperature checks beginning in January 2026.

39.     The water in the housing units is from the California City municipal water supply, which is subject to regular quality testing, and is the same water provided to California City residents. Facility staff also drink the water while on duty.

40.     I am aware that some Declarants allege there is sediment in the water. This is not accurate. There is no sediment coming out of the water taps, and detainees are not drinking water with sediment in it. Rather, the sediment was coming up from the drains because the joints in the pipe chases are made of iron, and they rust over time, contributing to backups.

41.     To rectify this, we brought in a plumbing company to replace drains and flush out all the plumbing lines at a cost of more than $150,000. They pulled towels, blankets, bowls, and cups out of the lines that had been flushed down the toilets. Our maintenance staff also continue to periodically find items that have been improperly flushed down toilets.

42.     However, I am not aware of any toilet clogs lasting several days in occupied cells as alleged by several Declarants. Unit management does daily cell inspections looking for cell compliance, leaks, and broken toilets. I instituted a policy that if a plumbing issue in a cell cannot be corrected by the end of the day, the occupants are moved to another cell.[5]

43.     I am aware that Orejuela Gutirrez alleges he slipped and fell in his cell due to a leak from his sink that flooded his cell and had to be sent out for medical treatment. A review of his records reflects that he was sent out to the hospital on September 29, 2025 and returned approximately two hours later. There is no record of his cell being flooded, and there were no witnesses to the slip and fall. Detainees can report a leak to the detention officers posted in their housing pod 24/7 or to unit staff or ADO staff during our daily walkthroughs. When we are alerted to a leak, we send out maintenance to repair it.

44.     While Plaintiffs allege that "harsh conditions of confinement are a deliberate feature of the [DHS] enforcement program intended to induce self-deportation and to deter

---

[5] We have on-site maintenance staff during regular business hours. After hours and on weekends, we will call in maintenance staff or a contractor for urgent issues, such as broken air conditioning or heating or issues with the hot water heaters.

illegal immigration," I direct my staff to treat all detainees in our care humanely and with respect. This is a cornerstone of our training with staff, which my staff and I constantly reiterate. I tell my staff to stay out of the politics, remember that the detainees rely on us for their care and safekeeping, and do our jobs to the best of our ability.

45.    Contrary to the allegations in the Declarations submitted by Plaintiffs in support of their Motion, there have been no deaths at the facility since it reopened. There have been two suicide attempts, both by the same detainee who refused his psychiatric medications and was transferred by ICE to an inpatient mental health facility, not "at least five" as claimed by Plaintiffs. On both occasions, staff quickly intervened and prevented the detainee from self-harming. There have been no attempted or completed escapes and no overdoses at the facility.

**Staffing and Supervision**

46.    We operate the facility on a direct supervision model, with three detention officers staffed per housing unit on each shift.

47.    Our unit management team is fully staffed up to the current detainee count. There is a unit manager for every two open housing units who each have counselors and case managers reporting to them.

48.    Administrative Duty Officer ("ADO") level staff tour the housing units daily to observe conditions and speak with staff and inmates.

49.    We hold weekly segregation meetings to discuss all detainees housed in RHU. These meetings are attended by a representative from mental health, the Assistant Warden, Chief of Unit Management, and unit management staff. I also attend when I am available.

50.    The starting salary for detention officers at Cal City is $104,083.20.

51.    We initially experienced some challenges with medical staffing as the facility reopened. We utilized corporate and regional medical providers, as well as providers from CoreCivic's Otay Mesa Detention Center in San Diego, to complete initial health

screenings and see patients on sick call. As the facility population continues to ramp up, we have steadily increased our medical staffing levels.

52.     Our mental health staffing levels are robust and significantly higher than I've had at any other facility I've worked at.

53.     Medical is staffed on-site 24/7. Mental health staff are on-site seven days a week and available on call 24/7. Dental staff are on-site five days a week. There is an on-site phlebotomist, and a contracted mobile radiologist.

54.     We contract with Hall Ambulance for emergency medical services, emergency medical transports, and medical evacuations. There are two helicopter landing areas on-site for medical evacuations.

55.     Detainees experiencing medical emergencies are typically transported to Tehachapi Hospital, Antelope Valley Medical Center, or Mercy Hospital in Bakersfield.

56.     We have contracts with Adventist Health Tehachapi Valley for imaging and specialty care.

57.     Detention and custody staff receive six weeks of initial training. Other roles receive two to three weeks of initial security training. Medical, mental health, and dental staff receive two to three weeks of initial security training, followed by additional clinical training.

**Intake and Orientation**

58.     Upon arrival at the facility, detainees go through the intake process, which includes booking, classification, a Prison Rape Elimination Act ("PREA") screening, an initial health screening, personal property processing, facility property issuance, and orientation.

59.     Detainees also receive a copy of the detainee handbook, which is available in English, Spanish, Russian, Punjabi, Persian, Hindi, French, Chinese, and Arabic and can be translated into other languages when needed.

60.     Attachment A is a true and correct copy of the English version of the facility handbook, which is a business record of CoreCivic.

61.     There are multiple 12-person holding rooms in the intake area where detainees are held as they progress through the intake stations. The rooms have toilets with privacy barriers and sinks, and detainees are provided sack meals and beverages.

62.     I am aware that several Declarants allege they experienced long waits in the intake area. In the first few days after the facility reopened, there were occasions when multiple buses arrived at the same time, resulting in longer than normal wait times. In those cases, detainees were moved to open areas in unused housing units to allow for freedom of movement, etc. We have since opened one of the unused housing units as an overflow intake processing area to allow us to process larger groups more quickly.

63.     One Declarant also alleged that he was forced to wait on a bus for more than six hours prior to entering the facility. I investigated this allegation and determined that the bus was briefly delayed in entering the facility due to a self-harm incident occurring in the facility, resulting in a Code 1 response. However, the delay was substantially less than six hours as claimed.

64.     During intake, all clothing, personal property, valuables, and funds are inventoried and accounted for on a personal property form, with a receipt provided to the detainee.

65.     The detainee handbook outlines which items detainees are permitted to retain on their person at Cal City, including legal documents and papers, up to ten photos, approved medical prostheses, personal reference materials, a radio with earphones, a wedding band, religious jewelry that has been approved by the Chaplain, up to five soft cover books, and up to five newspapers or magazines.

66.     I am aware that several Declarants allege they were denied religious property. For example, Detainee Singh alleges he was denied a steel bracelet and a wooden comb. We do not allow steel bracelets because they can be used as brass knuckles. Wooden

combs may also be disallowed depending on their length and construction, as they can be fashioned into weapons. These concerns are not merely theoretical. Detainee Singh was involved in an incident on October 27, 2025, in which he and four other detainees attacked and stabbed another detainee with homemade weapons, resulting in the other detainee being sent out to the hospital.

67.     Another detainee alleges that he was not permitted to have candles and incense. We do not allow detainees to possess candles or incense due to obvious fire and safety/security concerns, but we will allow detainees to have access to battery operated candles in the chapel if approved by the Chaplain.

68.     Property that detainees are not authorized to keep on their person will be secured in a secure storage area in the facility. Each detainee is limited to 40 pounds in storage, excluding stored legal documentation. Excess personal property can be mailed out, picked up, or disposed of.

69.     Opened hygiene and food items from another facility are not permitted and will be disposed of.  The reason detainees are not permitted to keep open hygiene, food, or clothing items issued from other facilities is to prevent the introduction of contraband, such as illicit substances or weapons which may have been secreted in those items by detainees prior to their transport.

70.     I am aware that multiple detainees have alleged they had property confiscated from them after an incident. For example, Leyva asserts that on October 28, 2025, staff searched his cell and took hygiene and food items and blankets. Guevara Alarcon alleges that his pod was temporarily moved that same day to another pod during a search. Juarez Ruiz claims that on October 29, 2025, staff threw out blankets, food, and hygiene items. All of these searches occurred in response to the October 27, 2025 stabbing incident on the recreation yard, in which the assailants had possession of three homemade shanks. The two pods involved in the stabbing incident were placed on lockdown while we conducted interviews to investigate the incident and determine who was involved. We also conducted

shakedowns of every cell to ensure there were not any additional weapons, none of which were found. While doing cell shakedowns, staff also reviewed for property compliance and discovered that many detainees had excess facility issued property, including hoarded hygiene items and blankets. In my experience, detainees who are leaving the facility will give their property to other detainees before they leave, resulting in excess property in the cells of those who remain in the facility. The late October 2025 cell searches resulted in carts full of extra property being removed from the units. Food that was confiscated during those searches was food from meal trays that detainees kept in their cells. This is not permitted due to sanitation and food safety reasons.

71.     During intake, detainees are issued uniforms that are color-coded consistent with their gender and custody level. Detainees are issued three uniform sets (each consisting of a uniform top and uniform pants), five t-shirts, five pairs of underwear, five pairs of socks, and one pair of shoes. Female detainees are also issued bras.

72.     In addition to clothing, all detainees are issued linens, including two sheets, two towels, two hand towels, one pillowcase, one blanket, and a laundry bag.

73.     All detainees have been issued jackets and an extra blanket for use in the cooler months.

74.     Detainees who arrive with gray sweatshirts and sweatpants from Golden State Annex or Mesa Verde are permitted to keep them. Detainees who do not arrive with sweatshirts and sweatpants can purchase them from the on-site commissary.

75.     Detainees are permitted all-white shoes with no laces. If they arrive to the facility with compliant shoes they are permitted to keep them.

76.     Detainees may choose to purchase additional items from the commissary.

**<u>Hygiene and Cleaning</u>**

77.     Detainees are issued hygiene supplies, including toothbrushes, toothpaste, soap, shampoo, lotion, and combs upon arrival. Female detainees are also provided

feminine hygiene items. Additional supplies of these items are available in self-service bins in the housing units that are stocked by unit team staff.

78.     Razors may be checked out during count three times a week. This is consistent with ICE National Detention Standard ("NDS") 2025 Standard 4.4, Section II(F), which states that "[t]he distribution of razors shall be strictly controlled."[6]

79.     Staff supervise use of nail clippers once a week and sanitize them in between uses. We do not issue out or permit personal nail clippers because they can be used to make weapons by carving the bunks and other metal surfaces.

80.     Barbering services are available according to the schedule posted in the housing unit dayrooms. Each pod typically has two assigned barbers. Contrary to the allegations in the Declarations, there are barber tools and appropriate sanitization supplies available for each housing unit.

81.     The laundry schedule is posted in the housing unit dayrooms.

82.     Detainees are expected to keep their own cells clean and are provided mops, mop buckets, brooms, cleaning rags and chemicals for such use.

83.     Early on after the facility reopened, we learned that some detainees were hoarding cleaning rags and chemicals, leaving others without supplies to clean their cells. We held townhalls to explain that these items needed to be shared and would be replenished as needed. We now replenish cleaning rags and chemicals four times per day.

84.     We have implemented the Voluntary Work Program ("VWP"), through which detainees can choose to work in various assignments throughout the facility and receive a stipend. VWP assignments include porters, who are assigned to clean the housing unit common areas and showers, kitchen workers, commissary workers, barbers, warehouse, and laundry workers. High custody detainees are not permitted to work outside their pods, so they are assigned positions inside the pod.

---

[6] Per contract, we are required to follow the NDS 2025 at the facility. The NDS 2025 standards are available at: https://www.ice.gov/detain/detention-management/2025.

**Mail**

85.    Detainees may send and receive correspondence through the mail. Detainees may purchase postage from the commissary. Indigent detainees may drop outgoing mail into a mailbox for mailing without charge.

86.    Detainees are issued pencils, pens, paper, and standard sized envelopes on request. There are pencil sharpeners mounted in the housing unit dayrooms for detainee use.

87.    I am aware that several of the detainees who submitted Declarations in support of Plaintiffs' Motion complain that the pens issued to them are flimsy. We supply flexible pens specifically designed for use in secure institutions, including jails, detention centers, and mental health hospitals, that cannot be easily converted into weapons or used for storing contraband. These style pens are a routine practice in many detention facilities for safety reasons.

**Activities, Recreation, and Social Visitation**

88.    Detainees are provided access to tablets in the housing unit dayrooms. The tablet to detainee ratio established by ICE is 1:4.

89.    Detainees may send and send electronic mail through the tablets, which can also be used for video visitation.

90.    In addition to electronic mail and video visitation applications, the tablets offer library materials, audio books, movies, music, news, law library and legal resources including Lexis Nexis, wellness videos, games, religious applications, facility policies, and access to ICE and facility forms including request forms and grievances.

91.    During the initial reactivation of the facility, there were a few times that we had to cancel or curtail outdoor recreation periods. However, detainees are now permitted to go out to recreation at least one hour per day, five or more days a week with the goal of seven days a week weather permitting. This is consistent with ICE NDS 2025 Standard 5.2 Section II(A), which states that if outdoor recreation is available at the facility, detainees

must have access for at least one hour per day, five days a week or six or more hours per week, at least four days per week. That standard further states that if only indoor recreation is available, detainees must have access for at least one hour each and access to natural light.

92.     Recreation times are staggered so that housing units go out at different times on different days.

93.     Male and female detainees are not permitted to recreate outdoors at the same time. Likewise, High and Low custody levels do not recreate outdoors at the same time.

94.     The outdoor recreation yards contain basketball hoops, a track, and space for group sports, including soccer and volleyball. Handballs are provided. We plan to begin facilitating rec tournaments as the facility population expands.

95.     We also recently opened an indoor gym with exercise equipment. Currently, the female population has daily access to the indoor gym and exercise equipment. They also have access to an outdoor recreation area.

96.     Detainees are not prohibited to exercise in the dayrooms; however, they are required to be clothed with shoes, shirt, and pants/shorts.

97.     I am aware that two detainees complain in their Declarations that the recreation yards are littered with "plants with thorns" and "cactus spikes." This is not accurate. Weeds do pop up on the recreation yards, but this is primarily in areas such as against the edges of the buildings and edges of fences where detainees do not typically go.

98.     The facility Chaplain holds regular services for detainees, including group prayer, Bible study, and church/worship services. The schedule is posted in the housing unit dayrooms.

99.     Detainees are permitted to hold congregate services or prayer in the pods. For example, Muslim detainees hold Juma in the multi-purpose rooms on Fridays. Contrary to the allegation by Detainee Khan that there is not enough room for Muslims to pray, the

multi-purpose rooms can hold approximately 30 people, while there are fewer than 10 female Muslim detainees in the facility.

100.    Detainees may request Bibles and other religious literature through the librarian or Chaplain. Detainees may request religious clothing, symbols, and other religious items necessary for the practice of a particular faith by submitting a Religious Article Authorization Form to the Chaplain.

101.    Clergy visits are available and can be arranged through the Chaplain. There is also a process by which volunteers can be approved to provide religious services on site. A detainee may request to add a religious practice, service, or program that is not currently in place at the facility by submitting a Religious Practice Authorization Request form. Detainees may request a special religious service or ceremony by submitting a Request for Special Service/Ceremony to the Chaplain at least 60 days in advance of the requested service/ceremony. These procedures are outlined in the detainee handbook.

102.    Detainees may check out books, magazines, and other reading materials from the facility librarian.

103.    Detainees may also order books, magazines, and newspapers from approved publishers.

104.    Detainees are issued radios and headphones.

105.    Each of the dayrooms contains four large televisions and two play stations. There are 45 television channels available.

106.    Detainees can obtain table games, puzzles, and playing cards from facility staff.

107.    I am aware that several of the detainees who submitted Declarations in support of Plaintiffs' Motion complain that the facility does not offer college courses like they experienced as sentenced state prisoners. ICE detention centers are not intended to be long-term settings designed for rehabilitation of criminal offenders. The primary purpose of ICE detention is to safely and temporarily hold individuals while their immigration cases

are processed and pending removal. The lack of a predictable length of stay makes it impracticable for detainees to complete semester-long or year-long courses, much less multi-year college degree programs.

108.    Detainees are provided cleaning supplies, including glass cleaner, sanitizer, disinfectant, multi-purpose cleaner, brushes, squeegees, brooms, mops, and mop buckets in the housing units for cleaning their own cells. Dayroom porters are responsible for cleaning the showers and dayrooms.

109.    During the facility ramp-up period, all social visitation is non-contact. Contact visitation is more staff intensive and carries a significant risk of introduction of contraband, including drugs, weapons, and electronic devices, into the facility.

110.    This is consistent with ICE National Detention Standards ("NDS") 2025 Standard 5.5, Section II(A), which allows the facility discretion to hold non-contact visitation.

111.    Social visits are currently 60 minutes each and are available seven days a week. This exceeds NDS 2025 Standard 5.5, Section II(F)(1), which requires a minimum duration of 30 minutes and availability of visiting hours only on Saturdays, Sundays, and holidays.

112.    The facility handbook outlines visitation procedures. All detainees were also provided a memorandum regarding the procedures for Friends and Family Visits. Attachment B is a true and correct copy of the Friends and Family Visits memorandum dated November 5, 2025 and is a business record of CoreCivic.

**Safety and Security**

113.    I am aware that several of the Declarations submitted in support of Plaintiffs' Motion allege that pat searches involve groping of their genitals.

114.    This is not accurate. Pat searches are conducted consistent with the ICE NDS 2025 when detainees leave and return to the housing areas. NDS Standard 2.7, Section

II(C)(1) defines a "pat search" as "a sliding or patting of the hands over the clothed body of a detainee by staff to determine whether the individual possesses contraband."

115.    Conducting pat searches when detainees leave and return to their housing areas is also consistent with other facilities and detainee populations I have worked with over the course of my career. The purpose of these searches is to attempt to limit detainees' ability to introduce contraband into their housing areas and move contraband throughout the facility.

116.    All custody staff receive training on appropriate search procedures, including pat searches.

117.    I am also aware that several of the Declarations submitted in support of Plaintiffs' Motion complain about the number and duration of counts at Cal City.

118.    Formal and standing counts are conducted in accordance with the posted building schedule available in each pod. The schedule calls for count at least twice on day shift, twice on evening shift, and three times on night shift.

119.    CoreCivic's count policy and building schedules are reviewed and approved by ICE.

120.    The purpose of counts is to ensure that all detainees are alive, present, in the appropriate location, and safe.

121.    Detainees are expected to cooperate with staff during each count. This includes immediately returning to their cells after count is announced and remaining there until after cleared for movement. During standing counts, detainees must stand inside their cells facing the door.

122.    Showering, using the dayroom sink or microwave, sitting in the dayroom, and staying on the phone are not permitted during count time. These restrictions are clearly stated in the detainee handbook.

123.    Disruptions during count may result in a lockdown being initiated and/or disciplinary sanctions.

124.    Plaintiff Keo was involved in an incident on September 12, 2025 in which he and a group of other detainees were being loud and disruptive in the dayroom, refused staff directives to put their shirts back on, and refused to return to their cells for count. The incident turned into a demonstration involving multiple detainees, which required a staff response to get the detainees to return to their cells. The incident was resolved without the use of force. Consistent with facility policy, several detainees from the group were charged with disciplinary offenses and taken to restrictive housing for pre-hearing detention.

125.    Plaintiff Guevera Alarcon was involved in an incident on September 20, 2025, in which he refused to exit the shower despite multiple staff directives to return to his cell during a critical incident lock down, which delayed the lockdown process. When he finally exited the shower, he shouted, "This is bull shit, Chief Alvarado!" He was taken to RHU for pre-hearing detention. At the hearing, he admitted to refusing to comply with staff directives and stated that he would "be better and listen to staff."

126.    Under the NDS 2025, ICE requires CoreCivic to "promote a safe and orderly living environment for detainees by establishing a fair and equitable disciplinary system requiring detainees to comply with facility rules and regulations, and imposing disciplinary sanctions on those who do not comply." This is no different than I have experienced in any other correctional or detention system.

127.    The purpose of imposing these rules is to promote and enhance the safety and security of the institution as a whole, including but not limited to, protecting the physical safety and individual rights of other detainees and staff members.  As a result, the disciplinary system imposes sanctions commensurate with the severity of the prohibited act to encourage a non-compliant detainee to conform to the rules and regulations in the future.

128.    The delay in a detainee returning to his or her assigned cell for a count does disrupt facility operations and extend the period of the count, which impacts all detainees in the facility, as the count cannot clear and no other detainees may be released from their

cells until the count is complete. Additionally, behavior of this type can interfere with responses to emergencies and other incidents and for this reason are taken seriously.

129.    A group demonstration or refusal not only delays the count process and release of other detainees but also calls for a response by additional staff from other locations in the facility. While those staff members are attending to the group demonstration, they are less available to respond to any other incident which may occur at the facility, such as a detainee in emergent medical distress. Moreover, to the extent that certain detainees may coercively pressure detainees who do not wish to protest, their attempt to control other detainees violates those detainees' rights to refuse to engage in a demonstration.

130.    For that reason, inciting or leading a group demonstration may result in the involved detainee being given a disciplinary sanction following formal disciplinary proceedings, which include the right to a hearing on the disciplinary charge and an opportunity to call witnesses and present evidence to refute the disciplinary offense. If the detainee is found to have committed the charged infraction, the detainee may receive a disciplinary sanction of up to 30 days in restrictive housing. Detainees may also be placed in restrictive housing during investigatory and disciplinary proceedings, such as occurred with the instigators of the group demonstration mentioned above.

131.    As indicated in the NDS, these disciplinary sanctions are intended to promote pro-social behavior in an institutional environment, where detainees are cognizant of the rights of their fellow detainees and staff, including each individual's right to live or work in a safe environment. Disciplinary sanctions are not assessed as a means of retaliation against detainees.

132.    CoreCivic has a zero tolerance policy for retaliation by staff, and I enforce this policy at the facility.

133.    I am aware that Declarant Montes Diaz alleges he received a disciplinary write-up for speaking up about how staff treat detainees. This is not accurate. Montes Diaz

received a disciplinary write-up on November 15, 2025 because he refused staff directives to vacate the bottom bunk in his cell when another detainee was placed in the cell who had a medical order for a bottom bunk. Montes Diaz was assigned to the top bunk but had been using the bottom bunk because he was single celled. When staff directed him to move back to his assigned bunk, he refused and also refused to allow the other detainee to enter the cell. There was no retaliation.

134.    Several of the Declarants allege that count times range from over an hour to three-and-a-half hours. This is not typically accurate. There have been a few lengthy counts due to incidents occurring during the counts. For example, when the group of detainees engaged in a sit-in demonstration and refused to return to their cells for count, we had to bring in additional staff to facilitate getting the detainees back to their cells without any use of force. Count times may also be extended during emergency situations.

135.    When we first reopened the facility, counts took longer than normal because many staff were new, and many detainees were not accustomed to the count procedures. Count times have decreased significantly and now average between 30 and 45 minutes each.

**Restrictive Housing**

136.    Placement in segregated housing is undertaken on a case-by-case basis depending on the circumstances at issue. The restrictive housing units are used for administrative segregation, pre-hearing detention, disciplinary segregation, medical observation overflow, and protective custody.

137.    Detainees in RHU may be double celled. They are permitted to make telephone calls, use the tablets, take showers, order commissary, watch television and go to outdoor recreation.

138.    Outdoor recreation for RHU takes place in outdoor enclosures, which are located directly outside the housing units. While one of the Declarants alleges that there was a dead bird in one of the outdoor recreation enclosures, I am not aware of any such

occurrence. Contrary to Plaintiffs' allegations, the enclosures are not filthy and are cleaned daily.

139.    Placement in RHU is not intended to be punitive.

**Medical and Mental Health Services**

140.    Each detainee receives an initial health screening during intake by a nurse or provider.

141.    These screenings are not conducted in "busy hallways" as alleged by Plaintiffs. Rather, they take place in rooms or enclosures to provide privacy with the medical/mental health nurse or provider.

142.    The initial health screening covers medical, mental health, dental, and disability related concerns. Depending on the detainee's answers, he or she may be referred to be seen by a medical, mental health, and/or dental provider on an expedited basis.

143.    The initial intake also includes an inquiry into whether the detainee has any physical, mental, and intellectual disabilities.

144.    All detainees are to receive a comprehensive health evaluation within 14 days after arrival; however, there have been a few times during the initial activation period where there were some delays until additional providers were brought in to reduce the backlog.

145.    Detainees may request medical, mental health, and dental care through submission of a written sick call request. They may also make a verbal request for health care to any staff member.

146.    There is an on-site medical unit, which includes a detainee waiting area, medical exam rooms, a dental room with multiple dental chairs, a telehealth room, a lab, an x-ray room, mental health offices, four negative pressure cells, two medical observation cells, and a mental health watch cell.

147.    I am aware that Declarant Montes Regalado alleges there is no privacy in the showers in the medical observation area. This is not accurate. The medical shower has a door and provides more privacy than the showers in the housing units.

148.    Declarant Leyva alleges he was only provided peanut butter sandwiches and cookies while in medical observation. I do not know whether his specific allegation is accurate, but generally, detainees in medical housing receive a regular meal tray unless a medical provider orders a special diet. Detainees on suicide watch are generally provided a finger-food only meal with no utensils, but a provider may enter other orders.

149.    The clothing, property, and activities allowed during a stay in medical observation also depend on the reason(s) the detainee has been placed in medical housing and are reviewed/approved by a provider.

150.    Most medications are administered by medical staff during pill call, in which a nurse brings a medication cart to the housing units twice per day and distributes medications to the detainees.

151.    Detainees in RHU receive daily visits from medical and mental health staff.

**Disability Accommodations**

152.    Detainees can request disability accommodations at intake, through submission of a sick call request form to the Disability Compliance Coordinator, or during any medical encounter.

153.    The Health Services Administrator serves as the Disability Compliance Coordinator at the facility. This is consistent with NDS 2025 Standard 4.7 Section (II)(B)(2), which does not require that the Disability Compliance Coordinator have no other responsibilities.

154.    CoreCivic Policy 14-101 outlines the procedures for requesting accommodations.

155.    Detainees who are dissatisfied with the response to their requests for disability accommodations can submit a grievance using the facility grievance system.

156.    The procedures for submitting a sick call request or grievance are explained during intake and are included in the detainee handbook. Detainees who have questions about either process can ask their case management staff.

157.    If a detainee arrives at the facility with an assistive device, the intake nurse reviews the item. If the detainee has a valid medical order for the item, the detainee will be permitted to retain it on his or her person. If there is no medical order for the item, but the nurse or provider determines there is a medical need for it, the detainee will be permitted to retain it on his or her person. If there is no medical order for the item, and the nurse or provider determines there is no medical need for the item, the item will be stored in the detainee's property.

158.    I am aware that several Declarants allege they were not permitted to retain orthopedic shoes they came into the facility with. I have received several complaints related to this issue. In response, I or my unit staff have personally gone to the property room to inspect the shoes and confirm whether there is a valid order for them. In the vast majority of cases, the shoes the detainees claimed were orthopedic were not orthopedic, and instead were normal athletic sneakers that did not meet facility requirements for color and/or lack of shoestrings.

159.    Declarant Benavides Zamora has a valid order for ███████████████ that was issued on November 20, 2025, and he was provided ███████████ on November 27, 2025.

160.    Declarant Rivera Trigueros came into the facility with a pair of athletic sneakers that he claimed were medically authorized. On September 11, 2025, the Unit Manager directed him to remove the shoes, which had laces and were considered contraband, but he refused. The Unit Manager confirmed with medical that he did not have a medical order for the shoes, but he still refused to remove them, which resulted in a Code 1 response for disruption of the property inventory process for multiple detainees and halted all movement within the facility. Rivera Trigueros was taken to RHU for pre-hearing

detention. He was ████████████████████████████████████████
███████████████████████████████████████. He was later ████████████
███████████████████████████████████████, but that the specific
shoes in question (a pair of black Under Armor brand athletic sneakers with homemade
laces) were not orthopedic and therefore were not authorized.

161.    The facility has a large supply of wheelchairs and other assistive devices that
can be provided to detainees if ordered by a medical provider.

162.    I am aware that Plaintiff Keo alleges he has had difficulty obtaining
████████████████████████████████████. ███████████████████████ are stocked on
the medication carts and may be requested by detainees during daily pill call. I recently
learned that Plaintiff Keo's ██████████████████████████ than those stocked on the
medication carts. Neither his ██████████████████████ have any markings, and
Plaintiff Keo was unable to provide any information regarding the ██████████████
required, making it difficult to determine the ██████████████████. I had staff obtain
██████████████ and provide them to him. I also had staff confirm that the ████████████
██████████████████. Going forward, he will be provided ██████████████████ on a
keep on person ("KOP") basis at regular intervals.

163.    The facility uses VOYCE for interpretation services, including sign language
interpretation. VOYCE is accessible to all staff through land line phones, handheld
VOYCE devices, and a cell phone app.

164.    The detainee tablets also include access to Purple, a Video Relay Service
provider that allows detainees who are deaf or hard of hearing to make video calls with
hearing individuals by providing a video interpreter who signs with the detainee and speaks
with the called party.

165.    I am aware that Plaintiff Ruiz Canizales alleges he is unable to use the tablet
to contact his family. This is not accurate. I personally sat down with him in October 2025

to get him access to Purple and explain how to use it on the tablet. Staff continued to work with the detainee to ensure he had the access he needed.

166.    While he states in his Declaration that he had a whiteboard at his prior facility, he has not asked for one at Cal City.

**Detainee Telephone System**

167.    Each housing unit dayroom has eight telephones for detainees to place outgoing telephone calls. Four are located in a bank on the dayroom floor, and four are mounted to the wall.

168.    The following are photographs of the detainee telephones.



169.    The detainee to telephone ratio is at most 11:1 in the larger pods and 10:1 in the smaller pods if filled to capacity.[7] However, the ratio is significantly lower than that in many pods, which are not at capacity. These ratios exceed the requirement in NDS 2025 Standard 5.4, Section II(C), which mandates at least one telephone for every 25 detainees.

170.    The telephones are separated by partitions for privacy.

---

[7] Each housing unit consists of three pods: two with a capacity of 88 detainees, and one with a capacity of 80 detainees.

171.    Detainee telephones are not located near the posts for CoreCivic detention officers, and officers are not able to overhear any such conversations from inside the housing unit.

172.    The detainee telephone system is administered by Talton, a third-party contractor of ICE that manages the telephone system at ICE facilities nationwide. CoreCivic does not set the rates or receive any profit from the detainee telephone system.

173.    Upon arrival at Cal City, the processing officer issues each detainee a PIN number to use the detainee telephone system.

174.    Detainees who are indigent, as defined by the NDS 2025, are eligible to request a certain amount of free phone calls per month which may be used at their discretion for legal or prepaid calling.

175.    Detainees in restrictive housing can use a portable telephone that is brought to their cells to place outgoing calls.

176.    I am not aware of long lines to use the housing unit telephones as asserted by Plaintiffs and frequently there are multiple phones in each pod that are not being used at any given time

177.    Calls to specific telephone numbers, including consulates, embassies, and certain pro bono legal agencies, are free of charge. These telephone numbers are posted in the housing unit dayrooms, along with instructions on how to make a pro bono call. The detainee handbook also outlines the procedures. Calls to the telephone numbers posted in the housing unit dayrooms are not monitored or recorded.

178.    Attachment C is a true and correct copy of the pro bono provider list.

179.    To make an unmonitored call to a court, a legal representative, or for the purpose of obtaining legal representation, a detainee can submit a Detainee Request Form through unit management staff. Once approved, the telephone number(s) will be privatized within the Talton system, meaning that calls placed to that telephone number from the detainee telephones will not be monitored or recorded. Once a telephone number is

privatized in the system, it is privatized for any detainee at any facility utilizing the Talton system, and CoreCivic does not have access to record, monitor or otherwise change the status of that number

180.    Attorneys can also privatize their telephone numbers by contacting the facility and providing their state bar identification and a G-28 form confirming representation of at least one detainee at the facility.

181.    Attorneys who wish to ensure that their phone number is confidential for all calls placed from any ICE facility using the Talton system, including California City, should follow the instructions available at: https://www.ice.gov/doclib/detention/faq-taltonAttorney.pdf.

**Access to Counsel and Legal Materials**

182.    The dayrooms each have a legal kiosk with legal materials for detainee use. Detainees may request notary services and copies of legal materials through unit staff. Notary services and printing and copying of legal materials are free of charge.

183.    I am aware that Declarant Orejuela Gutierrez alleges there is a charge for printing legal documents. This is not accurate. I reviewed his inmate transactions, as well as a report of all detainee transactions since the facility opened, and there have been no such charges.

184.    The detainee tablets also offer legal materials and research applications, including Lexis Nexis.

185.    Detainees are informed how to schedule confidential attorney calls and virtual attorney visits ("VAVs") during orientation, and the procedures are also outlined in the detainee handbook. If they have questions regarding these procedures, Detainees can also ask case management staff.

186.    Detainees may request private legal calls through submitting a Detainee Request Form to unit management staff. After staff verify the attorney or legal

representative's credentials, these calls are facilitated in staff offices, where telephones are not monitored or recorded.

187.    There are currently 10 VAV booths. There are also 12 VTC booths that are typically used for court but can also be used for virtual attorney visits if needed.

188.    Below is a photograph of the VAV booths, including one that is designed for wheelchair access.



189.    In-person legal visits generally take place in the legal visitation area, which is non-contact but allows for passing legal documents between the participants. However, contact visits may be permitted upon request and with facility approval.

190.    VAVs, legal calls, and in-person legal visits are available between 8:00 a.m. and 8:00 p.m. daily and may be scheduled in 30 or 60-minute increments.

191.    There is no limit on the number of VAVs, legal calls, or in-person legal visits that may be requested, but a legal representative may not have more than one 60-minute appointment with the same detainee in a day. However, a detainee may have more than one

appointment in a day if scheduled with different legal representatives. For example, Plaintiff Keo had two VAVs on November 15, 2025 with different attorneys.

192.    Available time slots for VAVs, legal calls, and in-person legal visits are seldom if ever completely filled on any given day. However, the need to separate genders and custody levels can impact availability. We are working to separate the VAV booths into multiple areas to address this.

193.    The procedures for requesting VAVs, legal calls, and in-person legal visits are available at https://www.ice.gov/detain/detention-facilities/california-city-detention-facility. *See* Attachment D: California City Detention Facility, San Francisco Field Office information page, downloaded Dec. 9, 2025.

194.    Currently, VAVs, legal calls, and in-person legal visits may be scheduled by calling or emailing the facility at calcityattorneyschedule@corecivic.com.

195.    We are planning to implement an online scheduling portal to allow legal representatives to make their own appointments. This change is expected to expedite the process, as the facility currently receives a very large volume of calls and emails to schedule VAVs, legal calls, and in-person legal visits. Between August 27, 2025, when the first detainees arrived, and December 10, 2025, the calcityattorneyschedule@corecivic.com email address received 5,965 emails.

196.    Many of the requests received are duplicative, making it challenging for our staff to efficiently and timely respond.

197.    For example, paralegal Genesis Fabian of the Asian Law Caucus submitted a Declaration alleging that he works with a single detainee at Cal City; his colleague, attorney Lee Ann Felder-Heim, submitted a Declaration alleging that she has two clients at Cal City. During the above time period, Mr. Fabian and Ms. Felder-Heim sent 74 emails to calcityattorneyschedule@corecivic.com.

198.    Attorney Hannah Kazim alleges in her Declaration that she represents one client at Cal City, while her colleague, attorney Kyle Hudson, alleges that he represents

three detainees. Ms. Kazim, Mr. Hudson, and their organization, Immigrant Legal Defense, sent 122 emails to calcityattorneyschedule@corecivic.com during the relevant time.

199.    Attorney Stephanie Quintero alleges in her Declaration that she represents one client at Cal City. Ms. Quintero and her office sent 134 emails to calcityattorneyschedule@corecivic.com during the relevant time.

200.    In addition to the attorney Declarants, counsel for Plaintiffs in this matter sent a substantial volume of requests for legal calls and visits. For example, the Prison Law Office sent 221 emails to calcityattorneyschedule@corecivic.com.

201.    Another attorney who submitted a Declaration in support of Plaintiffs' Motion did not utilize the facility's procedures for scheduling a legal visit, which specify that such requests should be made at least 24 hours in advance. Attorney Sarah Goss admits in her Declaration that she did not reach out to the facility in advance before driving four hours to meet with her client. We work to accommodate legal visits even without the requisite 24-hour notice, but not following the procedures may result in longer wait times, such as Ms. Goss experienced.

202.    Ms. Goss' Declaration also notes that there was a Code 1 when she arrived at the facility. During a Code 1, all non-essential movement is halted inside the facility to allow for staff and first responders to focus on the emergency. While I understand Ms. Goss' frustration over having to wait, our first priority is to ensure the safety and wellbeing of our detainees and staff.

203.    Attorney Mario Valenzuela submitted a Declaration in which he alleges that he was unable to print documents during a legal visit to have his clients sign because he could not plug his printer into an outlet in the attorney visitation room. I am not aware that Mr. Valenzuela ever asked staff to assist him in locating an outlet, which we could have accommodated had we known of the need. We also have a dedicated email address, calcitylegaldoc@corecivic.com, for legal representatives to send legal correspondence and documents to their clients. The instructions for utilizing this procedure are outlined at

https://www.ice.gov/detain/detention-facilities/california-city-detention-facility    and should be carefully followed to ensure the confidentiality of the materials submitted.

204.    Contrary to Plaintiffs' allegations, there are not "weeks-long" delays in scheduling legal calls and visits.

205.    ███████████████████████████████████████████████████████ . The attorney requests submitted do not come close to exceeding the capacity of available slots, but what tends to happen is that an attorney or legal representative will ask for a specific date/time that is already taken, or they are not available for the options suggested by staff.

206.    Another common scenario is that an attorney or legal representative will send a request for a VAV or in-person visit a week out. For example, Declarant Kazim alleges that "[g]enerally, it has taken anywhere from 10 days to more than 2 weeks to get a call scheduled." This is not accurate. She sent an email on October 23, 2025, requesting to see her client on October 24th, October 29th before 11:00 a.m., or any time on October 30th or October 31st; staff accommodated her request and scheduled her for October 31st. On October 31, 2025, she sent another email requesting to see her client on November 7th or November 10th, which was accommodated with a November 7th appointment. On November 12th, she sent another request asking to see her client after noon on November 20th or on November 21st, which was accommodated with a November 21st appointment. There was no "delay" in scheduling—to the contrary, staff accommodated her specific requests.

207.    We do our best to respond to attorney requests for calls and visits within a day of receipt of the request, and I have not received complaints from attorneys or legal representatives regarding scheduling.

208.    A review of the VAV logs shows that there were 602 VAVs completed between October 1st and December 9th. During that period, the highest daily utilization was 23 VAVs, and the average daily utilization was 12 VAVs.

209.    The named Plaintiffs and detainee Declarants had VAVs during that period as follows:

- Plaintiff Gomez Ruiz – two VAVs (November 10th and 21st)
- Plaintiff Keo – six VAVs (October 3rd, 15th, and 30th; November 14th and two on November 15th)
- Plaintiff Roque Campos – two VAVs (October 2nd and November 24th)
- Plaintiff Viera Reyes – three VAVs (November 12th and 20th and December 1st)
- Declarant Guthrie – one VAVs (October 1st)
- Declarant Flores-Vargas – one VAV (December 2nd)
- Declarant Orejuela Gutierrez – three VAVs (October 2nd, November 11th, and December 3rd)
- Declarant Leyva – three VAVs (October 29th and 30th and November 12th)
- Declarant Montes-Regalado – one VAV (November 10th)
- Declarant Vishal – one VAV (October 15th).

210.    In addition, Declarant Singh had a facilitated legal call on November 19, 2025.

211.    For November 2025, 167 attorneys conducted VAVs, 50 attorneys conducted facilitated legal calls, and 198 attorneys had both VAVs and facilitated legal calls. Attorney Declarant Kyle had five VAVs in November 2025, attorney Declarant Kazim had two VAVs with Plaintiff Gomez Ruiz, and attorney Declarants Gorney and Quintero each had one VAV. None of the other attorney/paralegal Declarants availed themselves of a VAV in November 2025, and none of the nine attorney/paralegal Declarants availed themselves of a facilitated legal call.

212.    Recent in-person legal visitation logs reflect the following: nine in-person legal visits on November 29, 2025, including six by attorney Declarant Mario Valenzuela;

seven in-person legal visits on December 1, 2025; five in-person legal visits on December 3, 2025, including one each with Plaintiffs Keo and Guevara Alarcon; five in-person legal visits on December 4, 2025; seven in-person legal visits on December 7, 2025; and seven in-person legal visits on December 8, 2025.

213.    I am aware that several of the Declarations submitted in support of Plaintiffs' Motion allege issues with audio quality and connectivity on the VAVs.

214.    I have not received any complaints from any of the attorney/paralegal Declarants regarding audio quality or connectivity issues.

215.    VAV systems are monitored daily to ensure adequate hardware and software functionality. Attorney complaints regarding functioning may be reported via e-mail to calcityattorneyschedule@corecivic.com or by calling (760) 491-8123 and asking to speak with the court room officer. Detainees may also report technical issues with the VAV system to the staff member supervising the area.

216.    We have had a few isolated issues with connectivity, resulting in cancellation of immigration court and VAV sessions, but these have not been widespread or consistent.

217.    We also had some issues with audio quality early on after we began utilizing the new VAV booths, but we changed out the headsets and brought in a vendor to change out the fans, and there have since been no complaints.

218.    Because the VAV systems rely upon an internet connection, issues of "lag" in audio or video may be more likely to occur in periods of high demand for internet bandwidth, as well as competing demands for bandwidth at the attorney location, where multiple devices may be connected to the same network or router, particularly home networks. We are unable to control internet connectivity issues arising outside of the facility.

219.    In addition to VAVs, legal calls, and in-person legal visits, detainees and their counsel may also communicate by legal mail. Legal mail from an attorney or legal representative should be clearly be marked as such and will be delivered unopened by

facility staff to the detainee. In the presence of the detainee, staff will open the envelope to ensure that it does not contain contraband and give the communication to the detainee. Detainees may similarly seal clearly marked legal mail and deposit it in the facility mail, where it will not be opened by facility staff.

220.   We recognize the importance of access to legal representation and do our best to timely accommodate requests for VAVs, legal calls, and in-person legal visits within the constraints of operating a secure detention facility and with the resources available to us.

[THE REMAINDER OF THIS PAGE IS LEFT INTENTIONALLY BLANK]

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

Executed on December 30, 2025.

Christopher Chestnut

# **ATTACHMENT A**



# CALIFORNIA CITY IMMIGRATION PROCESSING CENTER
# Detainee Handbook Supplement (English)

| Table of Contents | | | | |
|---|---|---|---|---|
| No Smoking Policy | 2 | Laundry | 24 |
| Introduction/Mission | 2 | Barbering Services | 25 |
| Purpose | 2 | Meals | 25 |
| Facility Mailing Address | 3 | Voluntary Work Program | 26 |
| Contacting ICE Staff & the Immigration Court | 3 | Commissary | 27 |
| Basic Detainee Responsibilities | 4 | Finances | 27 |
| Rights and Responsibilities | 4 | Detainee Money Deposits | 27 |
| Facility Rules | 5 | Religious Services | 29 |
| Detainees with Disabilities | 6 | Access to Telephones | 29 |
| Reasonable Accommodations | 7 | Pro Bono | 31 |
| Unauthorized Property | 9 | Recreation | 33 |
| Property Claim Procedures | 10 | Recreational Library | 35 |
| Inspections of Persons and/or Property | 11 | Law Library | 35 |
| Contraband | 11 | Social Visitation | 35 |
| Detainee Movement | 12 | Attorney Visits | 37 |
| Classification | 12 | Legal Orientation Program | 38 |
| Clothing | 15 | Notary Photocopying Procedures | 39 |
| Detainee Dress Code | 16 | Marriage Requests | 39 |

| The Proper Way to Wear Issued Clothing | 16 | Correspondence/Mailroom Procedures | 40 |
|---|---|---|---|
| Safety & Evacuation Drills | 17 | Release of Funds | 42 |
| Sexual Assault/PREA | 18 | Access to Medical Services | 42 |
| Official Counts | 21 | Detainee Discipline | 45 |
| Living Conditions | 22 | Grievance Procedures | 50 |
| Unit Rules | 23 | Segregation/Restrictive Housing Unit | 53 |
| Bed Area | 24 | Legal File | 54 |
| Sanitation | 24 | Notice to Persons | 54 |
| Personal Hygiene | 24 | Additional Contact Information | 55 |

## No Smoking Policy

The California City Immigration Processing Center (CCIPC) Handbook is intended to be a guide to assist you in adjusting to detention within this facility. You will be held accountable for your actions while in custody at this facility. Therefore, it is each detainee's responsibility to become familiar with the contents of the handbook. All rules listed herein are subject to change. Additional rules and regulations are posted on bulletin boards within the living areas. Any major changes made to the information contained in this handbook will be posted on your housing unit's bulletin board in a timely manner.

This handbook is available in multiple languages; however, telephonic interpretation is available to interpret the contents of this handbook.  Please contact a member of the unit team if you require this service.

This is a non-smoking facility. NO CIGARETTES, tobacco, electronic cigarettes, or smoking paraphernalia of any kind is allowed. Smoking is proven to cause significant health problems.  Smoking is not permitted during your stay at CCIPCCCIPC.  If you were a smoker, to help you cope with nicotine withdrawal we recommend the following:
1.  Delay the urge- usually 3-5 minutes.
2.  Distract yourself- play cards, talk to a friend.
3.  Drink water to fight cravings.
4.  Deep Breaths – Relax, close your eyes and take 10 slow deep breaths.
5.  Discuss your feelings with someone.
6.  Exercise.
7.  Reward yourself by thinking of it as a protective measure for your quit program and better health.
8.  Do not let nicotine withdrawal scare you.  Nicotine withdrawal is temporary.

For more information or help, please contact Health Services for assistance.

## Introduction/Mission

CoreCivic/CCIPC is a private company contracted by U.S. Immigration and Customs Enforcement (ICE). The mission of CCIPC is to provide a detention facility that is safe, clean and sanitary for detainees awaiting the outcome of their immigration cases.

ICE will answer your questions regarding the status of your travel and/or immigration documentation. The CCIPC is not a part of ICE and has no control over your present situation related to your custody status, legal status, court appearances, deportation matters, etc.

Detainees are encouraged to submit suggestions for program improvement to the Administration through the Detainee Request Form procedures. This is an effective means of bringing about change in a respectful manner. While all information supplied in this document is the most current, it is also subject to change at any time. Detainees are encouraged to periodically read all bulletin board postings and/or meet with the Recreation Specialist for program updates.

## Purpose

The purpose of this handbook is to explain to you the specific rules, regulations, policies, and procedures that must be followed while in custody at this facility. The handbook will also help provide you with a general overview of the programs and services available. You will be held responsible for your actions while in custody at this facility. Therefore, it is each detainee's responsibility to become familiar with all the contents of this handbook.

A copy of this handbook is issued to each detainee upon intake, and certain sections are posted on the bulletin boards in each housing area as well as on other bulletin boards throughout the facility. All detainees are required to acknowledge by signature receipt of this handbook. If you have any questions, please ask the officer stationed at your housing area or send a written "Detainee Information Request form "*(not to be used for sending requests for information to ICE Staff)* to the appropriate departments as listed throughout this handbook and on the bulletin board in your dorms. You may request this form from any staff member within your unit. THIS HANDBOOK WILL BE RETURNED TO THE OFFICER BEFORE YOU LEAVE THIS FACILITY. WRITING ON AND/OR DAMAGE TO THIS HANDBOOK IS PROHIBITED.

## Facility Mailing Address:

Detainee Name
Detainee's Alien Number
P.O. Box 2513
California City, CA 93505

## Contacting ICE Staff and the Immigration

## Court You may contact the San Francisco ICE
Field Office at:

Field Officer Director, ERO101630 Sansome Street
Rm 590
San Francisco, CA 94111

United States
(415) 365-8800

Executive Office for Immigration Review
Adelanto Immigration Court
10250 Rancho Road, Suite 201A
Adelanto, CA 92301
760-561-6500

The ICE Officer in Charge (OIC), the Contracting Officer's Representative (COR), and designated department heads will conduct unannounced (not scheduled) visits to your housing area. ICE officers will visit the units weekly according to the schedule provided by ICE and posted in the units. ICE staff are available to detainees Monday through Friday. The purpose of these visits is to address your personal concerns and observe your living and/or working conditions. The ICE San Francisco Field Office may be contacted Monday through Friday, excluding federal holidays, at (872) 351-3990

**Written Requests to ICE Staff**
You have the opportunity to submit written questions, requests or concerns to the ICE staff by utilizing the ICE Detainee Request Form or a sheet of paper. You may pick up request forms from staff assigned to your unit. The request form should be placed in the drop box labeled "ICE" and it will be delivered to the ICE staff without being read, altered or delayed.  You may obtain assistance from another detainee, housing officer, or other facility staff in preparing your request form. If the detainee chooses, the request may be put in an envelope that is clearly addressed with name, title, and/or office to which the request is to be forwarded. If the request is provided to CCIPC staff, the request will be delivered to ICE within 72 hours. The ICE staff receiving your request form will respond as soon as possible. If ICE's response is received by CCIPC staff, it will be delivered to the detainee within 24 hours of receipt. . This procedure is not to be used for submitting formal grievances. (See "Grievance" section.)

For contacting the Immigration Court, also known as the Executive Office for Immigration Review (EOIR), utilize the same form and process but place your request in the drop box labeled "ICE".  You can also call, free of charge, the automated EOIR number at 1-800-898-7180 or call the Adelanto Immigration Court at 760-561-6500

A detainee, including detainees with special needs, disabilities, illiterate detainees, and detainees with limited English proficiency may obtain assistance from another detainee, housing officer, or other CCIPC staff in preparing and submitting the request form. Please contact an CCIPC staff member.

## Basic Detainee Responsibilities
It is the policy of CCIPC and ICE to treat detainees with dignity and respect while maintaining a safe, secure, and sanitary detention facility. It is expected that staff will receive your full cooperation. In the simplest terms, you are expected to:

1. Follow and obey rules, laws, policies, and procedures.
2. Obey all orders as given by staff members and contract security personnel.
3. Respect staff and other detainees at all times.
4. Respect CCIPC, government property and the property of others.
5. Keep yourself, your clothing and living area clean at all times.
6. Obey all safety, security, and sanitation rules, policies, and procedures.

If you observe and comply with the above guidelines, you should have no problems while living at this facility awaiting the outcome of your hearing. When addressing staff, you should not refer to them by first name or nickname. You must refer to staff by their rank/title and last name (i.e.; Officer, Shift Supervisor, Dr., Nurse, Mr., Mrs., Ms.).
At CCIPC, detainees are not subjected to personal abuse, corporal punishment, personal injury, disease, property damage, or harassment.  Detainee property is protected.  Detainees cannot supervise, have control over or be in charge of other detainees.

The following regulations pertain to specific expectations of each detainee to ensure the safety, health and security of each person assigned to this facility. These regulations are not separate from the posted rules of discipline; therefore, any violation may result in sanctions imposed against you. The purpose of these rules is to provide you with the opportunity to be aware of specific rules imposed relating to the activities, programs and procedures related to living in the housing units.

## Rights and Responsibilities of ALL Detainees

*You have the right to be informed of the rules, procedures and schedules concerning the operation of the facility*. You have the responsibility to know and abide by them.

*You have the right to request interpretive services if you have problems communicating due to language barriers, are unable to read/understand the English language, or prior to any disciplinary hearings.*  You can request assistance by contacting a member of your Unit Team or by submitting a Detainee Information Request form.

*You have the right to freedom of religious affiliation and voluntary religious worship.* You have the responsibility to recognize and respect the rights of others in this regard.

*You have the right to health care, which includes nutritious meals, proper bedding and clothing*. A laundry schedule to wash or exchange clothing and bedding, an opportunity to shower regularly, proper ventilation for warmth and fresh air, a regular exercise period, toilet articles and medical treatment. Follow the laundry and shower schedules, maintain neat and clean-living quarters and seek medical care as needed at no cost to you.

*You have the right to contact your consular representatives or embassy.*

*You have the right to have family members and friends visit you in keeping with the facility rules and schedules*. It is your responsibility to conduct yourself properly during visits and to not accept or pass contraband.

*You have the right to unrestricted and confidential access to the courts by correspondence*. You have the responsibility to present honestly and fairly your petitions, questions and problems to the courts.

*You have the right to legal counsel from an attorney of your choice by means of interviews and correspondence at no cost to the United States Government*. It is your responsibility to obtain the services of an attorney honestly and fairly.

*You have the right to have access to reading materials for your own enjoyment.* These materials may include approved magazines. It is your responsibility to seek and utilize such materials for your personal benefit, without depriving others of the same benefit.

*You have the right to participate in the use of the law library reference materials to assist you in resolving legal problems.* You also have the right to receive help when it is available through legal assistance programs. It is your responsibility to use those resources in keeping with the procedures and schedule prescribed and to respect the rights of other detainees to the use of the materials.

*You have the right to a wide range of reading material for educational purposes and for your own enjoyment.* These materials may include magazines and newspapers sent from publishers. It is your responsibility to seek and utilize such material for personal benefit, without depriving others of their equal rights to use this material.

*You have the right to participate in a work program as far as resources are available, and in keeping with your interest, needs and abilities.* You have the responsibility of taking advantage of activities which may help you live a successful and abiding life within the facility and in the community. You will be expected to abide by the regulations governing the use of such activities.

*You have the right to access the media through telephone calls or written correspondence.*

*You have the right of freedom from discrimination based on race, religion, national origin, sex, sexual orientation, handicap, or political beliefs.*

*You have the right to request reasonable accommodation or modification to any programs offered if you have a disability, by submitting a request form stating your disability and the accommodation you are seeking.*

*You have the right to access the funds in your account to pay for legal services.*

## Facility Rules

The following regulations pertain to specific expectations of each detainee to ensure the safety, health and security of each person assigned to this facility. These regulations are not separated from the posted rules of discipline; therefore, any violation may result in sanctions imposed against you. The purpose for separating these rules is to provide you with the opportunity to be aware of specific rules relating to the activities, program and procedures related to living in the dormitory, including:

1. THEFT - No unauthorized taking of an item of any kind that belongs to someone else, including CORECIVIC/CCIPC property. You are responsible for any and all items in your possession.
2. FIGHTING - Fighting is not permitted. Sparring, boxing, wrestling, play-fighting, or horse playing is not permitted at this facility.
3. COMMISSARY - You are not authorized to take any commissary items outside of your housing unit unless authorized by the Shift Supervisor or upon release process. Plastic commissary delivery bags are to be returned to the Commissary Officer, possession of this item is considered contraband.
4. MOVEMENT - When entering and exiting pods, buildings, rec areas, etc., the movement will be at the direction of the staff during authorized movement only. Running is prohibited in all non-recreation areas. Lines for any activity will be orderly. Detainees will not crowd around staff or door entrances at any time. Detainees are responsible for being attentive and moving promptly when movement times are called for meals, activities, services and appointments.
5. HOUSING - You are only permitted to sleep by yourself, in your own assigned bunk. Under no circumstances are you permitted to relocate to any other sleeping area, cell, bunk or other area without being directed by a staff member. Detainees are only permitted to enter their assigned housing pod/unit.

6. PERSONAL HYGIENE – For the health and safety of staff, visitors and detainees, all detainees are required to maintain personal hygiene daily.

7. BED TIME - Regular bedtimes will be posted on the current building schedule. You must be in your bed at this time. You will not be allowed to visit with each other after lights are out and you must stay in your own bed, with the exception of using the restroom facilities. Loud talking, singing or other behavior that disturbs others' sleep is prohibited. No one will be allowed in the dayroom after bedtime except dorm orderlies while cleaning if directed by staff. No games of any kind are allowed in the dayrooms or bed areas after bedtime.

8. RESTRICTED AREAS - You are not permitted to contact or tamper with the bars, doors, glass window of the housing unit or the fence, walls, canopy beams, basketball poles in the outside recreation areas. You may not travel outside of your housing area without authorization.

9. GAMBLING - No gambling of any kind is allowed.

10. PERSONAL PROPERTY - You are not permitted to buy, sell, trade, borrow, lend, or otherwise barter any items of personal property with any other detainee. All personal property is required to be stored inside a provided storage bag.

11. VERBAL AND PHYSICAL ABUSE - Verbal and physical abuse toward staff, detainees or other persons is prohibited and will not be tolerated. We have a zero-tolerance policy, and any deviation will result in disciplinary actions.

12. DESTRUCTION OF CORECIVIC/CCIPC PROPERTY - Destruction, alteration, graffiti, unauthorized use or wasting of property belonging to CORECIVIC/CCIPC or to another person is not permitted. This includes clothing, bunks, walls, etc. All issued items are prohibited to be used other than for their intended purpose.

13. RADIOS - Radios played without earphones will be confiscated as contraband. Only issued or radios sold through the facility commissary are permitted. Any other radios brought in from the outside by the detainee will be considered contraband, inventoried, documented, and secured along with the detainee's personal property. Radio use is only authorized inside the housing area, during library time, and in the recreation yard. Radios taken to and from the recreation yard will remain off and, in the detainee's, uniform pocket until arriving at such location. Radios or earphones with intentional alterations will be considered a contraband item.

14. TRASH - Trash is to be disposed of in the provided trash cans and is never to be thrown on the floor or ground.

15. NOISE LEVEL - Noise from talking, conversations, games, etc. in non-recreation areas will be kept at a level that is respectful and does not disturb others. Shouting, slamming of doors, playing of music without headphones, etc. is not permitted.

16. LOITERING - Detainees are not permitted to loiter on walkways, or in any doorway, including cell doors.

17. RULES AND REGULATIONS – Other specific rules and regulations are listed below in the affected section of the handbook and in posted unit rules. You must follow all orders, either written or verbal, given by CORECIVIC staff. Any modifications will be notified to all detainees via memorandum, town hall meetings and will be posted in your housing areas.

18. TABLES - Do not sit on table tops.

19. COVERING/BLOCKING WINDOWS/LIGHTS - Windows/lights of any kind are not to be covered and/or blocked at any time.

20. TABLETS - All tablets must remain in the day room area at all times.

21. SELLING OR GIVING AWAY OF PERSONAL ARTICLES IS PROHIBITED - No black-market activities
shall take place. Selling or giving away items bought from commissary is prohibited (i.e. candy, food, clothing, radios, etc)

## Detainees with Disabilities

Policy 14-101 (Disability, Identification, Assessment and Accommodation) outlines the necessary processes to ensure that you will have an equal opportunity to participate in, access, and enjoy the benefits of the facility's programs, services, and activities. Such participation will be accomplished in the least restrictive and most integrated setting possible, through the provision of reasonable accommodations, modifications, and/or auxiliary aids and services, as necessary, and in a facility that is physically accessible.

Procedures include reasonable timelines for reviewing requests for accommodation related to a disability and for providing accommodations (including interim accommodations), modifications, and reassessments.

## Reasonable Accommodations

All detainees shall have equal access to the following services, programs, and activities, but are not limited to those outlined below:
1. Work programs;
2. Recreation;
3. Mail, telephone, visiting;
4. Library;
5. Religious programs;
6. Reception and orientation
7. Food Service;
8. Sanitation and Hygiene;
9. Health Care
10. Discipline, Grievance Procedures, and Due Process proceedings;
11. Safety and Emergency Procedures;
12. Access to media, courts, counsel, and law library;
13. Commissary

Detainees may submit a formal or informal (i.e. verbal or written) request for accommodation or assistance to the Disability Compliance Manager.  At this facility, the Disability Compliance Coordinator is the Health Services Administrator. Written requests will be submitted on -- the appropriate CoreCivic13-80A Sick Call Request Form. Requests received will be processed by the multidisciplinary team for review, or a response provided to the detainee, within twenty-four (24) hours, and the detainee seen by a Qualified Health Care Practitioner (QHCP) within the next twenty-four (24) hours (a total of seventy-two (72) hours on weekends) unless an immediate/emergency need exists.

## Americans With Disabilities Act

California City Immigration Processing Center is in full compliance with the Act. CCIPC does not discriminate based on race, color, sex, national origin, and disability in the admission, access to, treatment or employment in its programs or activities for detainees.

## Initial Admission

Medical services are provided to ensure your health is adequately maintained and those problems that occur during your stay at this facility are resolved. The medical services offered and the procedures for obtaining these services are outlined elsewhere in this handbook.

Initial Medical Intake Screening:

1. Each detainee entering the facility will receive an initial medical screening by the clinical staff. At that time, you should discuss any medications that you are taking and any physical or mental health problems that you are experiencing. Some medications such as heart or diabetic medications will be continued when you arrive.

2. All new arrivals shall receive tuberculosis (TB) screening by PPD (Mantoux method) or chest x-ray. The PPD shall be the primary screening method unless this diagnostic test is contraindicated, then a chest x-ray is obtained.

3. A full medical examination will be conducted by a member of the Health Services Department within fourteen (14) days of your arrival. At that time, you should discuss any medications that you are taking and any health problems that you may be experiencing. Some medications, such as heart or diabetic medications, will be continued throughout your detention.

Detainees are subject to a search upon admission into the facility and when there is reasonable cause to believe you may have contraband concealed on your person.

CCIPC must obtain specific information to ensure that records of your entry are adequately documented. This information will also be utilized so we may classify you as the living area most suited to your individual needs. Such information will include present residence, nationality, race, sex, medical history and criminal history, if any.

## FUNDS AND PERSONAL PROPERTY

A Forwarding Address Form shall be obtained from every detainee for use in the event that personal property, legal documentation, or valuables are lost, received or forgotten in the facility after release, transfer, or removal.

Identity documents such as passports, birth certificates, etc. cannot be kept on your person or in your property and will be inventoried and provided to ICE for placement in your file. Upon request to ICE, you shall be provided with a certified copy of your identity document.

Upon arrival, your clothes, personal property, valuables and funds will be retained by the processing officer for safekeeping. Itemized receipts will be issued to you and one (1) placed in your file for all your clothing, personal property, valuables and funds. **It is important that you retain these receipts to claim your property when you are released.** STAFF SHALL SEARCH AND INVENTORY DETAINEE PROPERTY ONLY IN THE PRESENCE OF THE DETAINEE(S) UNLESS INSTRUCTED OTHERWISE BY THE FACILITY ADMINISTRATOR.

All personal property and valuables that you bring with you will be inventoried and accounted for on a Personal Property Form. A receipt will be issued to you for these items. CCIPC is not responsible for property that did not arrive with you.

U.S. currency in your possession upon arrival at CCIPC will be inventoried; a receipt issued and then placed in an account for your use at the commissary. CCIPC will only accept cash for detainee accounts during the intake procedure. After you have entered the facility, money will only be accepted as outlined in this handbook under Detainee Money Deposits. Funds from your account may be used to pay for legal services. If this is required, contact a member of your unit team or submit a . Foreign currency will be inventoried and secured with your property.

Personal checks in your possession upon arrival at the CCIPC will be placed in your property. You will not need money on your person during your stay. If you are found with any money in your possession, it will be confiscated as contraband, and you will be subject to disciplinary action.

Only commissary products purchased from a CORECIVIC facility are allowed into CCIPC during intake.  Consumable products will be disposed of.

Upon your discharge from this facility, you are required to turn in all CCIPC property, to include this handbook to the officer assigned to the Receiving and Discharge area. Once you have confirmed that all items have been accounted for, you will be required to make restitution for lost or damaged property. This includes clothing, bedding and any recreation/leisure time equipment (i.e. games and library books). Lost or maliciously damaged ID badges will cost $5.00 in restitution.

Your property and any funds that you have remaining in your accounts will be returned to you prior to departure. You must sign for these items. Prescribed health care appliances shall be retained and maintained by you upon release.

Any property that you are not authorized to keep with you will be placed in an appropriate bag assigned to you and locked in a secure storage area. Due to space limitations, all detainees will be limited to one (1) property box to store their property not exceeding 40 Lbs. If property is received and it will not fit into the property box, it will be the detainee's responsibility to forward/mail the property. Excess personal property may also be picked up by family, friends or attorneys.  At the detainee's request, however, the staff will mail the property to a third party or may store it with the detainee's other personal property. If detainee chooses not to provide an appropriate mailing address within thirty (30) days, or is unable to pay the postage, the facility administrator, after ICE concurrence and after providing the detainee with written notice of the intent to destroy the property, may dispose of the property.

While at this facility, you are permitted to retain on your person:

1. Legal documents
2. Legal papers
3. Legal information
4. You may have up to ten (10) Photos of family, friends and associates in your possession. These photos must be 5x7 or smaller.  (Proper photos will be described later)
5. Approved medical prostheses, (i.e. eyeglasses, dentures, etc.)
6. Personal reference materials, (i.e. address/phone book and/or list of relatives, friends and/or other correspondents.
7. Radios must be used with earphones at all times, limit one (1) radio per person. No plug-in radios are permitted. No radios or earphones are permitted outside of your dormitory except during recreational periods.
8. Only a wedding band and/or religious jewelry is authorized to remain in your possession during your stay. Religious jewelry that is handmade from items that are considered contraband is prohibited. Also, religious medallions (i.e., crosses, St. Christopher Medals, etc.) may be worn, but must be on their original chain and the religious medallion will not exceed 1 ½ inches by 1 ½ inches in size. Chains used with medallions will not exceed 1/8 inch in diameter and 24 inches in length. The chain or medallion will not be visible when worn in uniform. Rosary Beads and Islamic Prayer Beads will not exceed ¼ inch in diameter and 24 inches in length. No items will be attached to the Islamic Prayer Beads.  All other jewelry will be inventoried and placed in a safe area for storage until your release. A receipt will be issued for your valuables. Religious jewelry is allowable only if it has been approved by the chaplain. See the Religious Services entry in this handbook for the actual procedures.
9. Newspapers, magazines, books and other literature are limited. In order to comply with fire safety regulations, you may only have up to five (5) soft cover books and up to five (5)

magazines or newspapers. Items may only be received directly from a bookstore or publisher. Full-frontal nudity and pornographic materials are not permitted.

All food items must be consumed upon being opened to ensure sanitation standards are met. Daily food issuance may not be stored.

You are allowed to purchase up to a total of three mugs, bowls or tumblers through the commissary. After use, these items must be cleaned and stored in your personal storage container.

Additional personal property allowed to be retained by detainees must be approved by the Chief of Unit Management prior to purchase/possession to ensure acceptable sanitation is appropriately maintained.

No items are to be attached to the bunk, wall, windows or left on windowsills/unoccupied beds. All items must be stored in their original container. Empty beds may not be used as storage. Clotheslines are not permitted.

Detainees are responsible for the loss of personal items not safeguarded or stored by CCIPC.

Clean linens are provided for each person entering the facility to include: two (2) sheets, two (2) towels, two (2) hand towels, one (1) pillowcase, one (1) blanket and one (1) laundry bag

## Unauthorized Property

Items not considered inherently illegal but are considered contraband when possessed by a detainee or visitor within the facility, includes, but is not limited to:

1. Any approved item, which, though approved, is more than the quantity permitted.
2. Unauthorized personal property received through the mail will be returned to the sender at the detainee's expense. All detainees must have prior approval from the Unit Manager or above, before the property is received. If authorized, the property will be inventoried on the G-589 or equivalent then stored in your property box until released.

3.     The facility shall permit detainees to retain all personal legal material upon admittance to the general population or the Special Housing Unit unless such material creates a safety, security, and/or sanitation hazard. The facility may require detainees with a large amount of personal legal material to place some of the material in a personal property storage area, with access permitted during designated hours. The facility shall grant requests for access to such stored legal material as soon as possible, but not later than 24 hours after receipt of the detainee's request, unless documented security concerns preclude action within this time frame.

## Property Claims Procedures

Admission/Release – When a newly arrived detainee claims their property has been lost, damaged or left behind, CCIPC staff will complete an ICE Form I-387 and forward it to the ICE Contracting Officer's Representative (COR) for prompt response. A detainee being transferred, released, or removed from the country with a property claim will be permitted to initiate the claim before leaving the country. The Warden will forward the result of the claim to the claimant's forwarding address (provided upon admission or in conjunction with the claim).  It is your responsibility to inform CCIPC staff during out-processing if your forwarding address has changed.

You have the right to file a claim for lost, stolen or damaged property. You may also file a grievance. Please see grievance procedures detailed in this handbook. Only those items outlined on the 14-6DD Allowable Personal Property Inventory List will be eligible for a claim investigation.

If any personal property is missing during your release/transfer process, report immediately to processing staff, and Supervisory personnel shall be notified when properly receipted detainee property is reported missing or damaged. Supervisory staff shall investigate and, if necessary, take prompt action to prevent further loss. If the property is not recovered or is recovered, but in damaged condition, staff shall prepare a report for the facility administrator, providing:  a description of any damage; the circumstances under which the property was last seen; the circumstances under which the loss or damage was discovered; and sworn statements from the detainee and all witnesses. All facilities shall report and turn over to ICE all detainee abandoned property. Contraband shall be handled in accordance with facility policy/standard. Property that is of minimal value, broken, or clearly abandoned shall be discarded.  Because property obtained through non appropriated funds cannot be donated, donations of abandoned property to charitable organizations is prohibited.

Property that has been stolen due to CoreCivic employee negligence is eligible for an investigation. If a detainee claims allowable personal property was stolen, the detainee may request a claim investigation by completing Page 1 of the 146D Lost/Damaged/Stolen Personal Property Claim form and forwarding it to the Property Officer or designee.  All claims must be submitted within seven (7) calendar days of the incident. The facility will attempt to recover property stolen by other detainees. However, the facility will not be responsible for the reimbursement of those property items unless it is proven through investigation to be facility negligence.

Lost/Damaged - Property that has been lost or damaged due to CoreCivic employee negligence is eligible for an investigation.  If a detainee wishes to request an investigation of property that has been lost or damaged due to CoreCivic employee negligence, the detainee must complete Page 1 of the 14-6D Lost/Damaged/Stolen Property Claim and forward it to the Property Officer or designee.  All claims must be submitted within seven (7) calendar days of the incident. Verification of proof of ownership and value must occur immediately upon investigation for both stolen and/lost/damaged property. You may file a claim even after you are released from the facility.

Investigation - Verification of proof of ownership and value must occur immediately upon investigation. If the claim proves valid and reimbursement/replacement is recommended, it will be forwarded to the Warden or Administrative Duty Officer who will be the final authority in the award of any compensation.   The Warden or Administrative Duty Officer shall review and approve/disapprove the recommendation within seven (7) calendar days of receipt.  In the event a claim does not prove valid, and replacement/reimbursement is denied, the detainee may submit a 14-6 E Denied Property Claim Appeal form to the Warden.

Denied Property Claim Appeals - In the event a detainee chooses to appeal a denied property claim, the detainee may file a grievance in accordance with grievance procedures or must complete a 14-6E Denied Property Claim Appeal and forward it to the Property Officer or designee within seven (7) calendar days of receipt of the denied claim.  The Property Officer or designee will forward all 14-6E's received to the Warden for review and response.  The Warden will provide a response within fifteen (15) calendar days of submission.  The response will be forwarded to the Property Officer or designee to ensure that the appeal is appropriately logged, filed, and returned to the detainee.  The Warden's decision is final and concludes the claim process, unless otherwise specified in the facility management contract.

## Inspections of Persons and/or Property

Routine unscheduled searches of the facility, detainee's persons, and property are conducted when deemed necessary.

Searches are conducted when:
1. Entering or leaving the housing units.
2. Entering or leaving the visit area; and 3. Entering or leaving a building or area.

Searches are conducted for the purpose of:
1. Detecting and prevent the introduction of contraband (i.e.; weapons, drugs, unauthorized clothing items, etc.).
2. Ensuring that safe and sanitary conditions exist within the facility.
3. Recovering lost, missing or stolen property.
4. Preventing escapes and other disturbances.

Searches will be conducted in a manner that avoids unnecessary force, embarrassment or indignity to the detainee, and are not intended to be punitive in nature.

Metal detectors are located at various locations and doorway points throughout the facility. Clearance of these detectors is mandatory. Detainees must remove any items from their pockets that would cause the detector to alert. Detainees are not to touch or tamper with these devices. Failure to comply with clearance of metal detectors will result in disciplinary action. Failure to successfully clear a metal detector will necessitate a more detailed search as outlined below.

Types of Searches Performed at CCIPC:
1. Visual Inspection: A search of a detainee or an area for contraband without physical contact.
2. Frisk or Pat Search: A search conducted by placement of hands on the detainee's clothing to feel for weapons/contraband. A thorough search of all pockets, collars, jackets, waistbands and shoes will be completed. Shoes are removed to check socks and bottom of feet.

3. Strip Search: Upon a reasonable suspicion that a detainee is concealing contraband, search of a detainee that requires all clothing to be removed during the search.
4. Shakedown: A physical search of a specific area of the facility.

## CONTRABAND

All contraband (hard and soft) will be seized. In the event that contraband is not illegal to possess under criminal statutes and would not otherwise pose a threat to security, staff shall inventory and provide a receipt for the property. Items which are considered to be detrimental to the safe and orderly operation of the facility are prohibited.

All items of Contraband are taken from a detainee or found on CoreCivic property are to be confiscated and if appropriate, turned over to the proper authorities for appropriate action.

Contraband items include but are not limited to:
1. Any dangerous drug, narcotic drug, marijuana, intoxicating liquor of any kind, deadly weapons, dangerous instruments, explosives or any other article that, if used or possessed, would endanger the preservation of order in the facility.
2. Any item which could be used as an aid to escape.
3. Any item which could be used to disguise or alter the appearance of a detainee.
4. Any article of clothing or item for personal use or consumption which has not been cleared first through the OIC or purchased by a detainee from the commissary.
5. Any normally approved item, clothing or apparel that has been intentionally altered from the original design or condition.
6. Cameras, video, audio, or related equipment that can be used to make unauthorized photographs or audio, or audio/video recordings of detainees, staff or government property.
7. Cigarettes, tobacco or smoking paraphernalia, alcoholic beverages, cardboard boxes and excessive magazines.
8. Pictures of that have been placed on dormitory/cell walls.
9. Cellular phones, smart phones, smart watches and unauthorized tablets.
10. Laptops, computers or televisions.
11. Any item not purchased through authorized channels.
12. Possession and/or use of another resident's PIN number is also considered possession of contraband. Do not lend or borrow your personal PIN number.

"Dry cells" shall be used for contraband detection, with proper authorization and in accordance with required procedures, only when there is a reasonable suspicion of concealment.

## Detainee Movement

When entering and exiting housing units, buildings, rec areas, etc., the movement will be at the direction of the staff during authorized movement only. Running is prohibited in all non-recreation areas. Detainees will walk on the right side of the walkway going and coming. Lines for any activity will be orderly. Detainees will not crowd around staff or door entrances at any time. Detainees are responsible for being attentive and moving promptly when movement times are called for activities, services and appointments.

## Classification

All detainees are classified upon arrival, before being admitted into the general population. The classification system will ensure that you are placed in the appropriate category and physically separated from detainees in other categories. You will be protected from harm, as you will be assigned housing with people of similar backgrounds and criminal history. The classification

system assigns detainees to the least restrictive housing unit consistent with facility safety and security. You will be housed according to your classification level and issued color-appropriate uniforms and ID cards. Any detainee who cannot be classified because of missing information at the time of admission into the facility (e.g., the results of a criminal record check) shall be kept separate from the general population. Once the needed information is obtained, classification shall be expedited, and the detainee may be housed in the general population, if warranted.

**Classification Process:**

During the classification process, staff shall reference facts and other objective, credible evidence documented in the detainee's A-file, work-folders, ICE automated records systems, criminal history checks, or other objective sources of information. Relevant considerations include any current criminal offense(s), past criminal offense(s), escape(s), institutional disciplinary history, documented violent episode(s) and/or incident(s), medical information or a history of victimization. Special consideration is given to any factor that would raise the risk of vulnerability, victimization or assault. Detainees who may be at risk of victimization or assault include but are not limited to: those with risk(s) of victimization or persons with disabilities, persons who are elderly, pregnant, or nursing, suffering from a serious medical or mental illness, and victims of torture, trafficking, abuse, or other crimes of violence. Personal opinions, including opinions based on profiling, familiarity or personal experience, may not be considered in detainee classification.

**Low Custody Detainees:**

Low custody detainees may not be comingled with high custody detainees.

May not include any detainee with an arrest or conviction that included an act of physical violence, or any detainee with a history of assaultive behavior.

May not include any detainee with a felony conviction for an offense that is listed under the "High" or "Highest" section of the severity of offense scale below.

May include detainees with minor criminal histories and non-violent felony charges and convictions.

**Medium Custody Detainees:**

Medium-low custody detainees are those with no history of violent or assaultive charges or convictions, no institutional misconduct, and no gang affiliation. Medium-high and high custody detainees are those with a history of violent or assaultive charges, convictions, institutional misconduct, or those with a gang affiliation. Under no circumstance may a medium custody detainee with a history of assaultive or combative behavior be placed in a low custody housing unit.

Medium custody detainees may not ordinarily be co-mingled with high or low custody detainees, except as specified below.

May not include a detainee whose most recent conviction was for any offense listed under the "Highest" section of the severity of offense scale.

May not include any detainee with a history or pattern of violent assaults.

May not include a detainee convicted for assault on a correctional officer while in custody or where a previous institutional record suggests a pattern of assaults while in custody.

**High Custody Detainees:**

Medium-high and high custody detainees are those with a history of violent or assaultive charges, convictions, institutional misconduct, or those with a gang affiliation. High custody detainees are considered high-risk, require medium-to maximum-security housing, are always monitored and escorted, and may not be co-mingled with low custody detainees. In addition, high custody detainees shall not be assigned work duties outside their assigned living area.

**Housing Restrictions**:

High custody detainees may not be housed with low custody detainees

Low and Medium Low detainees may be housed together (unless there is a history of assaultive or combative behavior). Medium and Medium/High detainees may be housed together. Low and Medium/High or High custody detainees are never housed together.

Medium/High will be escorted outside the housing area and may only be in specified common areas with other detainees of the same classification level.

Under no circumstance may a medium custody detainee with a history of assaultive or combative behavior be placed in a low custody housing unit
All housing, work assignments and programmatic activities will be decided by the level of classification received.

All detainees will be escorted outside the housing area and may only be in specified common areas with other classifications of detainees.

All housing, work assignments and available activities will be dictated by the level of classification received.

After your initial classification, your case will be reviewed (called "classification reassessment") in 60 to 90 days from the date of your arrival at CCIPC. Subsequent reassessments will be completed in 90-to-120-day intervals from the first reassessment. Your classification level may be changed (reclassified) based on your institutional behavior, disciplinary action, additional charges or information received, attempted escape or upon release from segregation status.

APPEALS: All new arrivals classified as medium or high may appeal to their classification designation by submitting their appeal request on a Detainee Information Request Form to the Classification Supervisor. Written notification of the outcome of the appeal will be made within ten (10) business days. The Classification Supervisor's decision may be appealed in the same manner to the Warden. Detainees may also file a grievance to adjust their classification level. Please see grievance procedures detailed in this handbook.

## Severity of Offense Scale:

I. HIGHEST

Aiding Escape
Aggravated
Battery with Deadly Weapon
Armed Robbery (Multiple with injury)
Burglary with Assault
Escape (Secure Facility)
Inciting Riot
Kidnapping
Murder (1st, 2nd degree)
Sexual Battery (with violence upon a minor)

II.HIGH
Aggravated Assault
Aggravated Battery
Aggravated Child Abuse
Arson
Battery Law Enforcement Officer
Burglary (Armed)
Extortion
False Imprisonment
False Report of Bombings
Controlled Substances (Importation, Trafficking)
Introduction of Contraband into Detention
Facility
Manufacture of Explosives
Robbery (armed, strong armed)
Sexual Battery (other than capital or life felony)

III. MODERATE
Armed Trespass
Burglary
Carrying Concealed Firearm
Forgery
Grand Theft
Manslaughter
Sale, Delivery, Possession of Controlled Substance
Tampering with Witness
Worthless Checks (felony)
Welfare Fraud (felony)
Escape (Non-secure Facility)

IV. LOW

Driving under the Influence
Leaving the scene of Accident
Battery (Simple Assault)
Carrying Concealed Weapon (other than firearm)

Disorderly Conduct
Gambling
Offering to Commit Prostitution
Possession Marijuana (misdemeanor)
Possession Drug Paraphernalia
Petit Theft
Trespass
Worthless Check (misdemeanor)

## Clothing

Clothing items that are appropriate for the facility environment and local weather conditions will be issued. The basic detainee uniform for daily living and work assignments shall be distinctive in appearance in order to easily identify detainees according to their security level. In CCIPC, the basic uniform colors are:

| UNIFORM COLOR | CUSTODY | |
|---|---|---|
| BROWN | High | Male |
| KHAKI | Mod-High | Male |
| GREEN - FORREST | Mod-Low | Male |
| BLUE | Low | Male |
| RED | High | Female |
| PINK | Mod-High | Female |
| GREEN - LIME | Mod-Low | Female |
| GRAY | Low | Female |
| YELLOW | RHU | Male |
| RED + | RHU | Female |
| ORANGE | Transport | |
| WHITE | Kitchen | |

*White uniforms will be the work uniform for kitchen workers only. In the housing units, the kitchen workers will wear the appropriate color uniforms.

Initial issue of clothing/linens will include: Three (3) uniform sets (pants and shirts); one (1) pair of shoes (personal shoes are not permitted unless authorized); three (3) t-shirts, three (3) pairs of underwear, and three (3) pairs of socks. The detainee will sign for each item issued and will be held liable for any damage or loss of facility issued property in excess of normal wear and use. Items shall be replaced on a one (1) for one (1) exchange basis. When a facility issued property item becomes unusable, a detainee may request an exchange by sending a Detainee Clothing Request Form (14-6H) to the Property Officer or designee. Any items exceeding these amounts is considered contraband. Allowable quantities of clothing items include any items purchased in the commissary.

## Detainee Dress Code

You are required to keep yourself clean and wear proper clothing/footwear during all activities. You are reminded that poor hygiene, poor sanitation, and wearing improper clothing and footwear may cause conflict with your peers and others and can have a negative impact upon your health and safety, as well as the health of those around you. Failure to comply with the dress code and grooming standards will ultimately become an issue that requires staff intervention in the form of appropriate disciplinary action to correct the situation.

Ordinarily, detainees may wear any hairstyle with the following exceptions:

1. For safety and hygiene reasons, kitchen workers and detainee workers operating machinery will keep their hair in a neat, clean, commonly acceptable style. ALL kitchen workers will wear a hairnet and/or beard net when working in the kitchen.
2. Hairstyles will not interfere with safety and hygiene requirements.
3. No numbers or symbols will be permitted to be part of a detainee's hairstyle.

Ordinarily, facial hair may be grown without restriction; however, for safety reasons, detainee workers operating machinery may be expected to be clean-shaven at all times. These restrictions are required for employment in the above-described work assignments, and accepting a job in these areas denotes acceptance of the grooming standards for the above-described work **assignments. There will be no exceptions to these requirements, even for medical reasons.**

Complete uniforms (pants, shirts, shoes and ID card) are required to be worn daily when outside the dormitory; however, T-shirts (with sports bra for female detainees) and shower shoes are permitted to be worn in the dayroom areas and the recreation yard. No towels, sheets or blankets will be permitted as clothing and or used for cleaning unless designated by staff as such.

Religious apparel may only be worn as approved by the Chaplain.

## The Proper Way to Wear Facility-Issued Clothing

These requirements are essential to ensure compliance with security, hygiene, and conduct. All issued clothing and IDs will be worn as specified in the following instructions and in no other manner:

1. CoreCivic issued detainee ID badges must be visibly displayed on your pocket at all times. If your ID becomes torn or broken, notify the housing officer that you need a new one and send a Detainee Information Request form to the correctional counselor.
2. Clothing must be clean and not torn when worn. Intentionally damaging or altering your clothing in any way may result in disciplinary action and the payment of restitution equal to the cost of the clothing item(s) damaged.
3. Only kitchen workers are authorized to wear white uniforms, and only while performing services in the kitchen.
   All other detainee workers will wear their assigned and provided color coded uniform.
4. The wearing of mixed colored uniforms is prohibited.
5. Undergarments may be worn without outer garments only while inside the sleeping quarters or in the restroom/shower areas. NO EXCEPTIONS!
6. CCIPC-issued shoes will be worn at all times when outside the housing units. Personal shoes are prohibited unless medically required or authorized by the Chief of Security. Shower shoes will not be worn outside the unit, to attend services or to go to any appointments, to include appointments with staff within the unit.
7. Detainees will wear a complete uniform (shirts, pants, shoes) at all times while outside the dormitory.

8.  The pants will be worn at a point about the waist that prevents the crease of the buttocks from showing.
9.  Undershirts must be tucked into the pants.
10. You are not to walk about the facility with your hands inside the waistband of your pants, regardless of weather conditions.
11. No article of clothing will be worn in a manner not normally intended for that item (using a shirt as a headband or head cover, etc.) This also includes the rolling up of sleeves or pants legs on only one side of a garment or any gang related wearing of clothing.
12. Only those religious items approved by Religious Services will be authorized to be worn in general population. (Religious headgear, Rosaries, etc.).
13. Detainees are not permitted to use any type of makeup items for facial enhancements. This includes the alteration of any item to be used for this reason.

## **Safety and Evacuation Drills**

The staff at CCIPC will make every effort to help ensure your safety while you are here. You must assume some responsibility for helping to make this facility safe. Signs are available to mark hazardous areas wherever they occur. If you spill something, then clean it up. If you encounter a possible hazard, tell the officer in your area. Don't assume that problems have been reported. Pay attention to warning signs and take reasonable care in potentially hazardous situations such as where wet floor signs are visible.

- Detainees must follow all safety regulations, signs, instructions, directions, labels and any training provided.

- All detainees must attend all safety/emergency training.  Detainees must be trained before doing any hazardous task.

- Detainees must wear personal protective equipment when handling cleaning or other chemicals.

- Detainees cannot alter items or use an item for other than its intended purpose. Altered items are contraband and will be confiscated.

- Do not remove the blade from disposable razors.

- Detainees must immediately clean up any liquid spilled or stay clear of the area until it can be cleaned up.

- Detainees injured in the housing unit, on the recreation yard, or anywhere else in the facility, must immediately report the injury to the employee on duty in that area.

- Detainees will not tamper with, prop open, block, or disable any locking device and/or door.

- Detainees will not hang shirts on the Recreation Yard.

- Detainees will not reach into the razor wire for any reason.

- Detainees will not climb any fence for any reason.

Per local, state and federal laws, we are required to perform evacuation drills. At this facility, we perform at least one drill every month on various shifts. Evacuation drills are not designed to inconvenience you, but rather to ensure that you know where the exits are located in case of an actual danger such as a fire, gas leak, civil disaster, or other dangers. You are expected to participate in these drills. In your housing area there is a diagram showing you the location of all fire exits and which exits to use. Study this diagram located in your housing area carefully; your life may depend on it. If a fire or other emergency in the dormitory should occur, be sure the Detention Officer on duty is notified, and follow his/her instructions quickly and calmly. Disruptions during evacuation drills may result in a lock-down being initiated and/or disciplinary sanctions.

## Prison Rape Elimination Act (PREA) - Sexual Abuse and Assault Prevention and Intervention

The Prison Rape Elimination Act (PREA), a federal law enacted in 2003, was created to eliminate sexual abuse in confinement. CoreCivic recognizes the inherent dignity of the human person and the need to treat every individual with respect. Part of treating our detainees with respect is giving them a safe place to live. We believe in safeguarding their rights, including protecting them from being subjected to personal abuse/injury and harassment.

Regardless of your age, race, size, ethnicity, or sexual orientation, detainees should have the opportunity to serve their detention with dignity. **THERE IS A ZERO-TOLERANCE POLICY FOR SEXUAL ASSAULT AT THIS FACILITY.**

This facility utilizes multiple strategies for prevention of sexual abuse and intervention to respond to sexual abuse. These include, but are not limited to, screening to identify victims and abusers, appropriate numbers of staff on the units, video surveillance, and trained investigators and trained medical and mental health staff.

### Definitions and Examples of Sexual Abuse

**All forms of sexual abuse and assault by a detainee against another detainee(s) are prohibited. If another detainee forces you or tries to force you to engage in a sex act, touches the sexual parts of your body, forces you or tries to force you to touch the sexual parts of their body, or uses threats or intimidations to pressure you to engage in sex, it is sexual abuse. The following are the definitions of Detainee-on-Detainee Sexual Abuse and/or Assault found in DHS Standards:**

**Sexual abuse of a detainee by another detainee** includes any of the following acts by one or more detainees who, by force, coercion, or intimidation, or if the victim did not consent or was unable to consent or refuse, engages in or attempts to engage in:

1. Contact between the penis and the vagina or anus and, for purposes of this subparagraph, contact involving the penis upon penetration, however slight;
2. Contact between the mouth and the penis, vagina or anus;
3. Penetration, however slight, of the anal or genital opening of another person by a hand or finger or by any object;
4. Touching of the genitalia, anus, groin, breast, inner thighs or buttocks, either directly or through the clothing, with an intent to abuse, humiliate, harass, degrade or arouse or gratify the sexual desire of any person; or  5. Threats, intimidation, or other actions or communications by one or more detainees aimed at coercing or pressuring another detainee to engage in a sexual act.

**All forms of sexual acts between a detainee and a staff member (including contract guards, medical professionals, and volunteers) are prohibited and against the law, regardless of**

**whether they are consensual. If a staff member tries to or actually does have sex with you, intentionally touches you in a sexual manner, makes sexual advances or repeated sexual comments, displays his or her genitals, or engages in voyeurism, it is sexual abuse. The following are the definitions of Staff-on-Detainee Sexual Abuse and/or Assault found in DHS PREA Standards:**

**<u>Staff-on-Detainee Sexual Abuse</u>** includes any of the following acts, if engaged in by one or more staff members, volunteers, or contract personnel who, with or without the consent of the detainee, engages in or attempts to engage in:

1. Contact between the penis and the vagina or anus and, for purposes of this paragraph, contact involving the penis upon penetration, however slight;
2. Contact between the mouth and the penis, vagina or anus;
3. Penetration, however slight, of the anal or genital opening of another person by a hand or finger or by any object that **is unrelated to official duties** or where the staff member, contractor, or volunteer has the intent to abuse, arouse, or gratify sexual desire;
4. Intentional touching of the genitalia, anus, groin, breast, inner thighs or buttocks, either directly or through the clothing, that is unrelated to official duties or where the staff member, contractor, or volunteer has the intent to abuse, arouse, or gratify sexual desire;
5. Threats, intimidation, harassment, indecent, profane or abusive language, or other actions or communications aimed at coercing or pressuring a detainee to engage in a sexual act;
6. **Repeated** verbal statements or comments of a sexual nature to a detainee;
7. Any display of his or her uncovered genitalia, buttocks, or breast in the presence of a detainee, or;
8. Voyeurism, which is defined as the inappropriate visual surveillance of a detainee for reasons **unrelated to official duties**. Where not conducted for reasons relating to official duties, the following are examples of voyeurism: staring at a detainee who is using a toilet in his or her cell to perform bodily functions; requiring a detainee to expose his or her buttocks, genitals, or breasts; or taking images of all or part of a detainee's naked body or of a detainee performing bodily functions

**<u>The acts listed above are prohibited by CCIPC policy and violators will be subject to disciplinary actions or prosecution.</u>**

Staff sexual misconduct is forbidden at CCIPC.  Staff sexual misconduct is sexual behavior between any CCIPC staff member and any detainee under the care of CCIPC.  This includes contractors and other agents of the contracting agencies. Staff sexual misconduct is forbidden, even if it is consensual. Consensual sexual conduct between detainees is also prohibited and subject to disciplinary sanctions.

You do not have to tolerate sexual pressure, harassment, manipulation, assault or attempts to engage in sexual conduct.  Every detainee has a responsibility to eliminate sexual assault and sexual activity.  If you are approached, pressured, or assaulted–**<u>report it immediately</u>**. You will be offered immediate protection from the assailant and will get medical attention.  You will not be subjected to retaliation, reprisal, harassment, or disciplinary for truthfully reporting abuse or signs of abuse observed. Reporting these types of abuse will not create conflicts with your immigration status or case.

To ensure that your environment is safe, if you are aware of another offender being sexually assaulted or involved in sexual behavior, report it immediately. All reports will be taken seriously and investigated immediately.

**Retaliation**

You have the right to be protected from retaliation by staff and other detainees for making reports of sexual abuse. You will not be placed in segregation solely because you have made a report or are a victim of sexual abuse. A staff person will be assigned to conduct retaliation monitoring. This person will meet with you after the report has been made and at least 90 days after to ensure that you have not been the victim of retaliation from staff or other detainees for making the report. Retaliation monitoring will stop if the allegation is determined to be unfounded.


You can take steps to protect yourself from being sexually assaulted:

- Do not accept gifts from others. Gifts and favors usually have strings attached
- Do not gamble or enter games of skill or chance
- Do not use, possess, trade, purchase, or hold drugs, alcohol, or tobacco products
- Do not become indebted to anyone either monetarily or for favors
- Choose your associates wisely. Do not become involved in gangs or hate groups. Look for people doing positive things to change their lives such as programs, religious activities, etc.
- Do not accept another detainee's offers to protect you
- Stay in well-lit areas where staff can see you
- Always carry yourself in a confident manner. Do not permit your emotions such as fear and anxiety to be obvious to others
- Trust your instincts. If a situation seems dangerous, it probably is. If you fear for your safety, report it to a staff member.

If you feel your life is in danger, you can request to be sent to the Special Housing Unit for Protective Custody to your Unit Manager or Shift Supervisor. If you need to talk to a staff counselor or a mental health professional, you can do so by filling out an ICE - sick call slip. If you fill out a sick call slip, make sure to specify you want to speak to clinical staff.

**Tips For Self-Protection and Avoiding Sexual Abuse**

If you are sexually assaulted there are several things you should not do, including:

- Do not bathe, shower or wash off
- Do not go to the bathroom
- Do not brush your teeth
- Do not change your clothing
- Do not eat or drink

These actions would eliminate important forensic evidence. It is important that evidence be collected to assist in your attacker's prosecution. Physical evidence is important because law enforcement relies heavily on the information. After you reported the assault, an examination would occur privately and professionally in conjunction with community resources.

Engaging in or pressuring others to engage in sexual activities is not permitted. Criminal or Disciplinary Charges will be filed. Educational Materials regarding these acts are provided upon entry to the facility, included as and part of this handbook, and are posted in each dormitory.

**How to Report**

Because reporting sexual assault can be difficult, it is important that you understand there are several ways that you can report it, including:

1. Verbally telling any staff member you trust, to include detention officers, deportation officers, chaplains, medical staff or supervisors, the DHS Office of Inspector General, and the Joint Intake Center. Staff members will keep your information confidential and only discuss it with the appropriate officials on a need-to-know basis.

2. Writing a letter to the Warden/Administrator or medical, sealing and marking it "CONFIDENTIAL".

3. Calling or writing to someone outside the facility who can notify facility administrative staff.

4. Call at no expense to you the DHS Office of Inspector General (OIG) at the phone number - 1-800-323-8603 / 1-844-889-4357-TTY

5. Contacting your consular official.

6. Contacting the ICE Detention Reporting and Information Line: 1-888-351-4024 or 9116# or #5663. Language assistance is available.

7. Writing letter to Security or Unit Management Staff, sealing and marking it "CONFIDENTIAL".

8. Writing to the Managing Director, Facility Operations at the following address:

   CoreCivic Managing Director
   5501 Virginia Way
   Brentwood, Tennessee, 37027

9. Call, at no expense to you, the Office of the Inspector General at the phone number posted in your dorm.
Detainees that are hearing impaired may contact the OIG Hotline using the TTY telephones. Any member of the Unit
staff can assist you. OIG TTY HOTLINE 1-800-377-4950. Writing the Office of Inspector General (OIG) at the following address:

   Office of the Inspector General/ Mail
   Stop 0305 245 Murray Lane. S.W.
   Washington, DC 20528
   1-800-323-8603, TTY 1-844-889-4357, Toll free

Information will be available to you through your unit staff and through postings in your unit containing instructions for reporting sexual assault. Included in that information is a sexual abuse / misconduct hotline in which reports can be made anonymously from any detainee dorm phone. These calls are not monitored and are provided free of charge.

To ensure that your environment is safe, if you are aware of another detainee being sexually assaulted or involved in sexual behavior**, report it immediately.** Deliberate false allegations can result in disciplinary action and/or prosecution.
Another avenue of reporting a PREA complaint is that you may file a formal grievance related to sexual abuse at any time during, after, or in lieu of lodging an informal grievance or complaint. Time limits will not be applied when a detainee submits a grievance regarding an allegation of sexual abuse. Third parties, including fellow detainees, employees, family members, attorneys, and outside advocates, shall be permitted to assist detainees in filing requests for administrative remedies relating to allegations of sexual abuse or to file such requests on behalf of detainees. After receiving an emergency grievance alleging that a detainee is subject to a substantial risk of imminent sexual abuse, the facility will immediately forward the grievance to an ADO-level

employee who can initiate immediate corrective action as needed. Facility staff will bring medical emergencies to the immediate attention of proper medical personnel for further assessment. **\*Remember any method that you use other than reporting directly to a staff member delays you getting help.\***

**Indicators of Sexual Abuse**
Please be aware of any fellow detainees who display signs of having been sexually abused. These would include, but are not limited to the following:
• Concentration difficulties
• Emotional outbursts
• Memory loss
• Restlessness
• Anger issues
• Stress
• Suicidal Thoughts
• Depression
• Difficulty with daily routines

## Official Counts

In order to maintain proper accountability of detainees at this facility, official counts are conducted at posted times. The purpose of the count is not only to ensure all detainees are present and in the proper location, but also to ensure they are safe.
1. Formal and standing counts are conducted both day and night, according to the posted building schedule. Unscheduled counts may be conducted according to the security needs of the facility.
2. When staff announce preparation for the count, all detainees are to immediately cease any non-count related activity and proceed to their bunk. Showering, using the dayroom sink or microwave, sitting in the dayrooms/game rooms, staying on the phone or remaining in the restroom are prohibited.
3. Detainees are expected to cooperate during each count. The televisions will be turned off, and no movement is permitted while the count is being conducted. When officers are counting, detainees must return to and remain at their bunk until cleared for movement by the officer. During counts, no talking is permitted. Disruptions during counts may result in a lock-down being initiated and/or disciplinary sanctions.
4. During formal count, all detainees are to be in their assigned bed unless they are at approved job assignments, court, asylum, visitation or other approved activities.
5. Detainees that are at approved job assignments, court, asylum, visitation or other approved activities during count will be counted at that location. Detainees may not move from an assigned area until the count is cleared.
6. Movement will not resume until the total facility count is verified and cleared, unless otherwise authorized by the shift supervisor. Detainees will be counted multiple times by staff for verification. Detainees must follow these posted rules for each staff member counting. Once staff have completed a count in that specific area, detainees may go to and from the restroom.
7. During a standing count, the detainee will stand inside the cell facing the door. The detainee must stand for each staff member counting. Failure to stand or cooperate with the standing count will result in disciplinary action.
8. Detainees cannot be counted based on observation of parts of clothing, hair, shoes, or appearance of the human form. The back of the head, shoulders, or hair is not acceptable.
9. Detainees are not to cover their entire body or to prevent observation of "living, breathing flesh" in any way. If detainees choose to cover their eyes, they must leave the skin of

another portion of their body (arm, face, leg, etc.) exposed. Failure to comply will result in being awakened and, if intentional, disciplinary action.
10. Flashlights will be used judiciously by staff at night.
11. Informal Counts are conducted at irregular, unannounced times. Detainees are expected to comply with these as well.


## Living Conditions

You are temporally being held at the CCIPC.  You will stay at the facility until ICE determines it is time to transfer you to another facility.  The CCIPC cannot make any determinations regarding your release or transfer.

Detainees are required to keep their assigned living areas clean at all times. It is in your best interest to maintain a clean-living area and avoid many of the problems associated with unsanitary living conditions.

We expect your cooperation by showing other detainees the respect you wish to receive and respecting the property of others. You are also asked to respect the need to share common equipment such as telephones, tables, televisions, and recreational games.

There may be only one detainee per bed.

**Inspections:**
Housing unit inspections will be conducted Monday-Friday according to posted times. The purpose of inspections is to verify the condition, safety and sanitation of the pod and individual cells, as well as the safety of each detainee.

The Unit Officer will provide a 5-minute announcement prior to beginning inspections. Dayroom activity will cease, and detainees will stand outside the door of the cell. Detainees are required to be in a properly worn complete uniform, to include footwear, with ID fixed on their shirt. Detainees will not be permitted to use the shower, microwave, phone or tablets visits during inspections. Inspections will not interfere with recreation or lunch meal.

Items inspected include, but are not limited to:

- All surfaces must be free of graffiti (walls, bunks, bathrooms, showers, etc.)
- Bunk areas must be neat with property in bag and no excess facility issued items
- Bunks are not tented, no clotheslines, nothing tied to bed
- Windows are not blocked, to include front and cell door windows
- Lights, windows, intercoms and vents are clean
- Showers are clean and free from trash, soap scum and drains are clean
- Floors, tables, dayrooms, microwaves, toilets and sinks are clean
- Pictures are only in the permitted posting area and are limited to family and friends (no magazine cut outs)
- Chemical bottles and community items (games, recreation equipment, etc.) are not kept at bunks
- Food trays are not in units except during mealtimes in units where satellite meals are served
- Common rooms such as porter closets and multipurpose rooms are clean and neat



## <u>Unit Rules</u>

- Trash is to be disposed of in the provided trash cans and is never to be thrown on the floor or ground.
- Noise from talking, conversations, games, etc. in the housing units will be kept at a level that is respectful and does not disturb others. Shouting, slamming of doors, playing of music without headphones, etc. is not permitted.
- The tops of tables are not to be used for sitting, standing, personal cleaning, nail care or footrest. Chairs are not to be used for footrests.
- Plastic chairs must be returned to the storage area/stack after use.
- The hanging of sheets, blankets or clothing from bars, overhead lights or beds is not permitted. Clotheslines are not permitted.  If there is a window and/or food slot in your door it may not be covered or blocked at any time.  Air vents and sprinkler heads will remain uncovered at all times. The hanging of towels is only permitted in the absence of a hanger. The hanging of towels must be in a designated area and do not obstruct the viewing of sleeping areas nor cause any security or sanitation concerns.

- Detainees must clean up after themselves after use of tables, sinks, toilets, urinals and shower areas after showering.
- Bathroom sinks are for facial shaving, hand and face washing, and brushing teeth, and are not to be used to wash feet or other body parts.
- Dayroom sinks may not be used for shaving, face or body washing, or brushing teeth.
- Body washing is only to be done in the showers.
- Detainees are not permitted to possess or store cardboard. Boxes that commissary items are packaged in are not to be stored after the contents are used.
- Detainees are not permitted to wash clothing, bedding, linens, tennis shoes, or other items in the living units.
- For sanitation reasons, detainees are not permitted to wear shoes in bed.
- Exercising is not permitted in the dayroom. (pull ups on stairs, push-ups and/or any other type or form of exercise)
- In celled units, detainees are not permitted to loiter on the top tier or under/on the stairs.
- Detainees are not permitted to loiter in any doorway, including cell doors.
- Personal effects, including hygiene items, are to be stored in your container. Do not place items on windowsills, windows, bunks, lockers, under a mattress, etc. These items will be confiscated as contraband and removed when left in unauthorized areas. If a disciplinary

report is made then the confiscated items will only be returned after a disciplinary hearing, and at the hearing officer's discretion.
- Shower caps and do-rags may only be worn inside your cell/in bunk area. Hair nets are only permitted while working in the kitchen (no dayroom)
- Spitting on any surface is prohibited, including the ground, walls, walkways, floors, sinks, and trash cans.

## Bed Area

You are required to keep your bed and immediate area clean and neat. You are also required to make your bed daily when it is not in use. It is acceptable to sleep under your cover during free time in your housing unit. However, you must make your bed after your nap and before reporting to any scheduled activities (such as recreation, meals... etc.).

## Sanitation

To ensure cleanliness, you will be asked to participate in cleaning of the housing areas, which includes the dayroom, sleeping areas, restrooms and showers. While we realize your stay at this facility is temporary, it is your home during this time, and we expect your cooperation to keep it safe and clean.

- The housing areas are to be cleaned daily or as directed by a staff member, including after each meal, to ensure proper sanitation and safety.
- A staff member will issue all equipment, supplies and instructions.
- All cleaning supplies will be placed in appropriate storage locations when not in use.

## Personal Hygiene

You will be living in a housing area with other individuals, so personal hygiene is essential. You are expected to bathe daily and to keep your hair and nails clean. Personal hygiene items for both male and female detainees, such as soap, toothpaste, toothbrushes, combs, and other items will be issued to you upon admission. Should you run out of an item, see your housing officer to provide additional hygiene items at no charge. Toothbrushes/toothpaste will be issued on a one-for-one exchange basis only.

Special personal hygiene items for female detainees will be available upon request to the housing officer.

Disposable razors will be issued on an as needed basis for shaving facial hair.  Disposable razors will not be used by more than one detainee for health and safety reasons meant to protect the detainees and staff.  Also, detail workers and detainees who had to miss shower times due to medical, court, or visitation appointments will be allowed to take showers at appropriate times of exception. Showering may not interfere with normal operations and are not permitted during count times. Failure to adhere to procedures will result in disciplinary action. Any revisions to shower schedules will be posted within the housing unit.

Detainees in restricted housing will be afforded the opportunity to shave and shower at least three (3) times per week.
Shaving equipment will be issued upon detainee's request and will be returned to staff upon completion of shower.  Staff will inspect the razor for any type of tampering or alteration. Once refused by the detainee, no further consideration will be given for that day.

## Laundry

In order to ensure an adequate supply for all detainees, hoarding of clothing is prohibited. The laundry schedule will be posted on the bulletin board.

All units will be responsible for having their laundry bags ready for pickup according to the posted schedule.
Do not overfill your laundry bag. Ensure that the bags are tightly tied. Leave enough room in the bag for soap and water to flow through as well as heat from the dryer.

All detainee volunteer Food Service workers will be required to exchange outer garments on a daily basis. All other volunteer workers may exchange outer garments when necessary.

**DETAINEES ARE NOT PERMITTED TO WASH CLOTHING, BEDDING, LINENS, TENNIS SHOES, OR OTHER ITEMS IN THE LIVING UNITS.**

## Barbering Services

General population and eligible restricted housing unit detainees will receive access to the barber according to the schedule posted on the bulletin boards in your housing area. Detainees are not allowed to provide or receive hair care in any location other than the designated barber areas.

Sanitation in barber operations is imperative because of the possible transfer of diseases through direct contact or by towels, combs, and clippers. For sanitary reasons, cutting hair in the dormitory is strictly prohibited. It is also prohibited to possess cut hair or clippings, either your own or others. Issued barbering equipment is required to be properly sanitized with the available Barbicide/sanitizing equipment between each use.

Pulling of hair from head, ears, nostrils, eyebrows, and moustaches/facial is prohibited.

No barber or beautician will service any detainee with the presence skin inflamed, scaling, pus, or erupted lesions to face, neck, or scalp. Service of such detainee requires approval in accordance with specific documented authorization of the Chief Medical Officer.  Please see the full barbering regulations posted in the barbershop.

Ordinarily, detainees may wear any hairstyle with the following exceptions:
- For safety and hygiene reasons, kitchen workers and detainee workers operating machinery will keep their hair in a neat, clean, commonly acceptable style. ALL kitchen workers will wear a hairnet when working in the kitchen.
- Hairstyles will not interfere with the safety and hygiene requirements. • No numbers or symbols will be permitted to be part of a detainee's hairstyle.

## Meals

All meals are nutritionally balanced, pork-free, dietician approved, properly prepared and attractively served in wholesome, clean and safe surroundings.

Three types of diets are available: Regular, Medical, and Religious. Upon arriving in intake, detainees will be given the opportunity to request something other than a Regular Menu meal should they have a special, religious dietary need. In order to receive religious diets, you need to submit an Appendix 4.1A Authorization for Common Fare Participation and a 20-4D Request for Religious Diet form to the Chaplain, who will promptly process all requests. Detainees will automatically be served a Regular Menu meal unless authorized to receive another meal selection.

The completed Appendix 4.1.A Authorization for Common Fare Participation Form and 20-4D Request for Religious Diet Form will be presented to the Chaplain or will be placed in the box marked "request". A detainee who has been approved must notify the Chaplain in writing if he/she wishes to withdraw from the religious diet. The Chaplain may recommend withdrawal from a religious diet if the detainee is documented as being in violation of the terms of the religious diet program to which he/she has agreed in writing, i.e., refusing five (5) consecutive Vegetarian meals or purchasing food items inconsistent with the program through the facility's commissary program. Detainees who participate in the religious diet program will sign a 20-4J, Religious Diet Agreement in recognition of their understanding of the religious diet program expectations and requirements, removal and reinstatement.

A copy of the written authorization for Vegetarian and Kosher meals will be given to the Food Service Manager by the Chaplain. In the event that request forms are revised, the Chaplain shall have the detainee sign the new agreement. The original Appendix 4.1.A Authorization for Common Fare Participation Form of all requests, whether approved or disapproved, will be sent by the Chaplain to the detainee's detention file with one copy kept on file in the Chaplain's office and one copy given to the detainee. Both the Chaplain and the Food Service Manager will maintain separate lists of detainees approved to receive Vegetarian and Kosher meals. To ensure accuracy, these lists will be reconciled weekly.

Medical diets may only be approved by a qualified health care provider, which are closely tracked. Approvals for medical diets are provided to the Trinity Manager by medical staff throughout the week. For those detainees with medical related diets restrictions, special diets may be requested through Health Services. To be considered, notify the nurse by Sick Call procedures. They will then make an appointment for you to see the facility physician, who will evaluate your request. Prescribed medical diets take priority over all other religious diets.

Partaking of another diet: Detainees receiving special diets who are observed partaking of another diet or giving their approved food to another detainee will be reported to the Food Service Manager.  He/she will notify the Chaplain (if Vegetarian or Kosher has been approved) or medical department if a medical diet was involved. It will be the responsibility of the approving official, with ICE's concurrence, to rescind the detainee's authorization to receive special meals. Please see the Chaplain, Food Service Manager or AW (Support) if you have any questions.

The use of food as a disciplinary measure or reward is prohibited. You will be issued appropriate eating and drinking utensil(s) during each meal and should be returned at the end of each meal. Menus are posted on the bulletin board in your dorm. CCIPC is a pork-free facility.

CCIPC will provide you with three (3) meals per day; Mealtimes will be posted on the bulletin board. You are to follow the rules of the officers. Detainees will be called out and escorted from the housing area to the dining hall and will be given ample time to eat.  All detainees will return to their housing unit after eating. You are only permitted one (1) tray per meal.
1. All food is to be eaten at the tables provided in the dayroom. NO MEALS MAY BE CONSUMED IN THE BED AREA.
2. No food will be permitted in the dorm other than that provided through the commissary facilities or authorized by medical or unit management staff.
3. DO NOT put meal trays in the microwaves. DO NOT put foil or metal items in the microwaves.
4. Microwaves shall be cleaned after each use.

Detainees in restricted housing will receive the same portions and types of meals served to the general population. Detainees will be provided food in their cells.

All detainees will receive satellite meals (meals delivered to the housing unit) and will be given 30 minutes to consume the meal. There can be no storage of meals after this time.

## Voluntary Work Program

Every effort will be made to provide you with an opportunity to participate in the voluntary work program.

The positions available are Barber, Unit Orderly, Commissary, Food Service, Laundry, Medical Orderly, Administration Orderly,  and Recreation Orderly.

Compensation will be no less than $1.00 per day completed based on the work assignment. You should speak to your Unit Manager regarding specific pay rates of jobs.  You will not be permitted to work in excess of eight (8) hours daily. In most positions, detainee pay will be submitted daily.

You will be required to sign a **19-100B Detainee Voluntary Work Program Agreement, 19-100C Detainee Safety Rules, 19-100A Detainee Volunteer Criteria Checklist, and a 8-5A Workplace Safety Orientation** prior to assuming a work assignment. You will be required to participate in all work-related orientation and training which includes safety rules, use of Personal Protective Equipment (PPE), use of hazardous chemicals and the purpose/location of Material Safety Data Sheets (MSDS). Detainees must adhere to all safety regulations and to all medical and grooming standards associated with the work assignment.

Detainees who participate in the Volunteer Work Program are required to work according to an assigned work schedule, and unexcused absence from work or unsatisfactory work performance could result in removal from the Voluntary Work Program. No detainee will have supervision/control over any other detainee. Any disciplinary reports you receive may result in your removal from a job assignment or prevent you from being granted a job assignment. A detainee may be removed from the Voluntary Work Program for cause.

You are asked to perform tasks associated with the daily operation of the facility. Such tasks may include general sanitation, working in Food Service, Laundry as well as other tasks. Under no circumstances will you be forced to take part in the Voluntary Work Program.

Your eligibility to work is determined by ICE and CCIPC. If you desire to be assigned to the Voluntary Work Program, send a Detainee Request Form to the responsible correctional counselor who will forward your name for consideration. Please remember that there are not enough job assignments for each person; therefore, we ask for your patience and cooperation.

## Commissary

Commissary orders are to be completed using a tablet or kiosk in your housing area. Commissary items are subject to limitations and/or changes without notification.

Commissary will be delivered between Monday and Friday according to a rotating schedule. If your housing unit changes before receiving your order, it will be delivered to your new unit by Friday of that week. If a detainee is moved from one dorm to another dorm, the detainee will not be able to use the kiosk machine until the next day.

Any item bought from the commissary by a detainee must be for his own use. All purchased items and products are nonrefundable, non-exchangeable, and final. A transaction is final when the detainee checks his merchandise and signs the receipt. Once issued to the detainee, all products become the detainee's responsibility.

Unit Managers or higher have the authority to suspend commissary privileges.

## Finances

Within a reasonable time after your arrival, the Business Office initiates an account for you. Your alien number (Anumber) will be your account number. If you have U.S. currency in your possession when you arrive, you will be given a receipt, and the money will be placed in your account the next business day. Currency of any type found in your possession after the intake process is complete will be considered contraband. The currency will be confiscated, and disciplinary action may be taken. No currency will be accepted through the mail. Any currency received will be returned to the addressee. No currency will be accepted through visitation.

All transactions have to be verified before being posted to your account. This process can take up to 24 hours, Monday to Thursday, excluding weekends and holidays.

Funds from your account may be used to pay for legal services. If this is required, contact a member of your unit team or submit a release of funds.

## Detainee Money Deposits

### Instructions for Depositing Money into Detainee Trust via Wachovia Lockbox

1. Obtain money orders and / or cashier's checks made payable to detainee. Personal checks and cash are **not** accepted.
2. Mail money orders and / or cashier's checks in envelopes addressed in the following manner:

   > Core Civic Detainee Trust
   > (Detainee Last Name, Detainee First Name / Detainee Commissary #)
   > Facility: California City Immigration Processing Center
   > P.O. Box 16545 Atlanta, GA 30321-0545

3. Make sure the sender's first and last name and return address is on the envelope.
4. Do **NOT** include correspondence such as letters, cards, pictures, packages with a money order or cashier's check. None of these items sent to this address will be forwarded to the detainee or returned to the sender.

---

# Instructions for Depositing Money into Detainee Trust via Western Union

1. You can send money via Western Union by using the Internet, by phone or by a Walk-in Cash Payment. The website for internet is www.westernunion.com/corrections. The phone number for phone quick collect is 1-800-634-3422.

2. To send money via a Western Union Walk-In Cash Payment Location the following is a sample of a quick collect form. First Example is Spanish / Second Example is English.





## Religious Services

All detainees will have access to religious resources, services, instructions and counseling on a voluntary basis. All detainees will be provided with the amount of freedom and opportunity necessary for pursuing any legitimate religious belief or practice within the constraints of security and safety conditions.

Religious services are provided through the Chaplaincy Office and through services provided by community volunteers. These services may include individual counseling, group prayer, bible study and various religious organizational church/worship services. A schedule of the days and times of each regularly scheduled service is posted on the bulletin board in your housing unit. Please remain alert for the announced religious services offering as scheduled. Failed alertness may result in postponement until the next scheduled turn.

Religious materials from various faiths are available through the facilities chaplain and/or from religious volunteers.  Detainees may request religious clothing, symbols, and/or other religious items required for the practice of a particular faith by completing and submitting a 20-4A, Religious Article Authorization Request form directly to the facility chaplain. The facility's Chaplain must approve/disapprove these requests within ten working days of receipt of the request. If a religious practice/service/program is not in place in the institution, a detainee may request to add the practice/service/program by submission of a 20-4B, Religious Practice Authorization Request. Detainees may request religious publications. Detainees may request a special religious service or ceremony by submitting a 20-4E, Request for Special Service/Ceremony to the Chaplain at least sixty (60) days in advance of the requested date for the service/ceremony. The detainee making the request should provide documentation and/or reference concerning the requirement

of his/her faith group for the requested service/ceremony and how such can be reasonably put in place within the facility.

## Access to Telephones

The housing units and restrictive housing have all been equipped with telephones. These telephones have been provided so you can communicate essential business and contact friends and/or relatives. Incoming calls will not be received on these telephones, nor are there three (3)-way calling available. Any problems or technical issues with facility telephones can be reported to the housing unit staff via written or verbal means.

To respect the privacy of others, we ask that you quietly wait your turn, as the telephones will be used on a first-comefirst-serve basis. If you need assistance, ask the officer assigned to your area.

**Legal and Family Calls** - Approval will be on an individual basis determined by need. If detainees need to make a legal call and do not have funds, they can request the call through any staff member. All family calls are subject to being monitored. If a detainee wishes to make an unmonitored call to court, a legal representative or for the purposes of obtaining legal representation, please contact a staff member.

TTY telephone machines are available for the hearing impaired.

When telephone demand is high, you are expected to limit your telephone calls to twenty (20) minutes to permit others the same telephone privileges.

The telephones are available for use during waking hours, excluding count times.

In case of an emergency, such as an illness or death in your family, your Housing Officer can assist you in making telephone calls when access to telephones would not normally be available. Routine telephone calls to attorneys are not considered to be emergencies.

If the facility receives any emergency calls from family members, we will notify you of the message upon verification of the caller's identity.

The telephone numbers to inquire about the status of your case as well as the numbers to a majority of consulates have been made available to you at no charge. (Consult your living area bulletin board for a list of current numbers and specific instructions on how to dial them). Instructions on how to use the telephones in your dormitory are as follows:
1. Pick up the telephone and dial "1" for English or "2" for Spanish.
2. Follow the operator's instructions.
3. The "volume" bar controls the volume.
4. Calls are limited to 20 minutes per call.
5. All calls may be recorded and monitored.
6. If you have any questions, please ask your housing unit officer or a supervisor for help.

**Incoming Calls** - Staff will take telephone calls for detainees and advise the caller that they will notify the detainee of the call. The message will be delivered to detainees as promptly as possible. If an emergency call is received, the caller's name will be taken and delivered to the detainees as soon as possible. The detainee will be permitted to return the emergency call within the constraints of security and safety. If the detainee is indigent, staff will assist them in returning the call.
**Restrictive Housing Unit Telephone Access**

- Detainees in administrative segregation may have telephone access similar to detainees in the general population, but in a manner consistent with the special security and safety requirements of detainees in these units. Collect legal calls to the detainee's attorney of record can be made with approval from the Shift Supervisor/Unit Manager or higher authority.
- Detainees in disciplinary segregation will be allowed emergency personal calls and unlimited, collect legal calls to the detainee's attorney of record upon approval from the Shift Supervisor/Unit Manager or higher authority.   Detainees held in disciplinary segregation for a period exceeding sixty (60) days are afforded the same telephone privileges as detainees in Administrative Segregation. Staff shall permit ICE detainees to make direct and/or free legal calls as outlined in Policy 16-100, except in the event of compelling and documented reasons of threats to the safety, security, and good order of the facility.

Should a detainee be released from CCIPC, prior to release, the detainee shall be provided an opportunity to make a free phone call to facilitate release arrangements.

**Indigent Detainees**
Indigent detainees may request a call to immediate family or others in personal or family emergencies or on an asneeded basis. Ordinarily, a detainee is considered "indigent" if he or she has less than $15.00 in his or her account for ten days. The facility shall make a timely effort to determine indigence.

## Pro Bono Calls
Current speed dial numbers to consulates, embassies, and certain Pro bono legal agencies are provided free of charge to all ICE detainees. Please refer to your housing unit information board for Pro bono numbers and instructions on how to make a Pro bono call.  All phone calls are subject to monitoring and/or recording for security reasons. To obtain an unmonitored call to a court, a legal representative, or for the purposes of obtaining legal representation, submit a Detainee Request Form through your unit staff and they will submit it to the Telephone Information Officer.

## Talton Phone Services
Upon your arrival, the Processing Officer will issue you a PIN number. This pin number will be active throughout your stay at CCIPC.

To activate your pin, you need to have access to the detainee telephone system either in the Intake old room or in your assigned housing unit.

All detainees are required to set up a voice password prior to completing their first phone call. This system is designed to make sure no other detainee can access your prepaid account. Prepaid accounts are your responsibility; you must protect your Voice Biometrics in order to protect your funds.

Voice Biometric Set-up:
1. Enter (1) for English or (2) for Spanish. Enter your PIN. The system will prompt you to enroll your voice password.
2. State your full name and the facility name (CCIPC-ICE) slowly and clearly, each time the system asks until it states the enrollment is completed. This could take up to 10 times.
3. Repeat your name and facility (CCIPC-ICE) the same each time you make a call. (You must say this exactly the same each time).
4. If you believe your recording does not match, you can request a reset.
5. A reset will be done within 4 hours as long as:

a.  You have not completed a call using general funds in the last 72 hours.
b.  The name, facility and voice match the original recording.

Once activated, you are entitled to an initial five (5) minute free phone call within twenty-four hours of your arrival at the facility.
**<u>Three (3) way calls are not permitted and will be blocked</u>**

Call acceptance prompts *(this is what the receiving party hears)* *prepaid, free, collect:*

"This is an Intelmate automated operator with a [PREPAID, FREE, COLLECT] from [DETAINEE'S NAME] at [FACILITY NAME]. This call is subject to recording and monitoring except for privileged communications between an attorney and client.  Press one or star to accept this call.  To deny this call press (2), or (3) to block all future calls from this detainee. Thank you for using Talton Communications."

*ADVANCE PREPAY*
This is a free one-minute call from [DETAINEE'S NAME] at [FACILITY NAME].  Your phone does not accept collect calls. Talton as a courtesy has provided this call for friends and family.  You cannot receive additional calls from this detainee until you set up a prepaid account.  We can take your credit or debit card information over the phone and connect you immediately back to your call. This call is subject to recording and monitoring except for privileged communications between an attorney and client.  Press (1) or * to accept this call.  To deny this call, press (2), or (3) to block all future calls from this detainee.  Thank you for using Talton Communications.

### Customer Service for Detainee Phone Issues – 211#
Detainees may leave a voicemail for customer service by entering their pin number & dialing 211#. Please note at this time you will not hear a response to your request; however, the phone company will receive your request and respond to you. Hang up after leaving your message! Please allow up to 24 hours, then check one of the available phones, enter your PIN and listen for a voice mail response to the problem you called in previously.

1) **Dropped Calls**: Please dial 211#, and then press one (1) AND FOLLOW THE PROMPTS to report a dropped call.
   * *Collect Calls:*  Lost or dropped calls will be credited as one free call (equal to the number of minutes lost) to the phone number dialed.
   * *Detainee Prepaid*: A credit for lost calls will be added to the detainee's prepaid account and may be used to make future calls.  The credit will equal the minutes lost.
   * *Friends & Family Prepaid*: Lost calls will be credited to the friends and family prepaid account.  The next call to the phone number will be free for the number of minutes lost.

2) **General Phone Issues**: Please dial 211#, then press two (2) AND FOLLOW THE PROMPTS to report any other issue you may have concerning your ability to complete a call or a problem with the telephone equipment. If a particular phone is "out of order," go to a working phone and follow the procedures above. Identify the phone number located above the keyboard (ex. 4) and state the housing unit (ex. B-1) and then hang up. You do not need to state your name. Notify the Unit Officer if a phone is out of order. Normally, phones will be repaired within 48 hours, once Talton is aware of the problem.

3) **Voice Reset Request**: Please dial 211#, then press (3) AND FOLLOW THE PROMPTS to report a voice verification error. The system will ask you to listen to your voice recording and re-record it several times to obtain a match. If no match, a report will go to customer service, who

will review the recordings, verify it is the authorized person requesting the reset and that they qualify for a reset. You will not be able to reset your voice if you had a successful call within 72 hours. If you cannot get 211# to work, please fill out a  and submit it to the unit officer.

**4) Voice Mail** - Each detainee has a personal voice mailbox accessible by entering the PIN number.
- Detainees receive automated voice mail message when a person purchase prepaid on their behalf.
- Customer service sends pre-recorded messages to detainees in response to an issue reported via 211# •    Friends and family can also leave detainees a 3-minute voice mail message for a small fee paid by family.

**5) Prepaid Calling for Friends & Family** - Friends & family can set up a prepaid account for you.
- Talton Customer Service at 1-866-348-6231
- www.talton.com website
- Lobby KIOSK (Cash and Credit)

**6) Refunds**

Once released, if you purchased your own phone time and have credit of $50 or less remaining on your account, you can call 541-889-8900 (international) or 866-348-6231(domestic) to obtain a PIN for a phone card you can use where you live, at a rate equal to the rates posted inside facility.

Once released, if your family/friends purchased phone time for you, they can call the customer service number (1-866-348-6231) and arrange for a credit to their account.

**7) Confidential Legal Telephone Calls, Privacy and Use of Alternative Telephones**

Detainees who wish to exercise their Attorney confidentiality privileges while utilizing the detainee telephones must submit a Detainee Request Form addressed to Unit Team which shall include the attorney's name and verifiable firms' landline number. Once the number is confirmed it will then be excluded from the taping/ monitoring system. Pro-bono Attorneys listed as Free Legal Service Providers" are free and unmonitored when utilizing detainee telephones.

Additionally, detainees requesting their legal calls in a private environment or requiring alternative telephone access, due to experiencing difficulties utilizing the detainee telephones for attorney legal calls, should submit a Detainee Request Form.

Note: All Attorney telephone calls initiated from staff telephones will be collect. The attorney's name and firm landline number must be verifiable.  Once the number is confirmed it will then be excluded from the taping.

Prior to initiating the call, Unit Managers and/or Correctional Counselors receiving these requests will verify the number as a legitimate legal call.  Once verified they may approve the calls.  The staff telephones which are not recorded or monitored will only be used by detainees for the above-defined purposes or under specific circumstances such as family emergencies etc. or as determined by staff.

**TABLETS**

Tablets will be available on a 1:8 ratio in the housing units. The tablets offer free programming, ability to message friends/family, library materials, audio books, movies, music, news, photo

gallery, law library, wellness videos, games, religious applications, detainee requests, grievances, email capability, PREA resources, and legal materials.

## Emergency Phone Messages

The facility shall take and deliver <u>emergency</u> telephone messages to detainees as promptly as possible.

- The facility phone number utilized for emergency messages is (760) 491-8150   When the facility staff receives an emergency telephone call for a detainee, the caller's name and telephone number will be obtained and given to the detainee as soon as possible.
- The detainee shall be permitted to return the emergency call as soon as reasonably possible, within the constraints of security and safety.
- The facility shall enable indigent detainees to make a free return emergency call.

## Security Threat Groups (STG) (Gangs)

It is the policy of CoreCivic to pro-actively manage STG through <u>ZERO-TOLERANCE</u> and suppression of all STG activity at CoreCivic facilities.  Detainees are prohibited from participating in such groups and will not be allowed to intimidate and control other detainees, staff or the public while in CoreCivic custody.

> **REPORT GANG ACTIVITY**
> **DETAINEE CRIME TIP HOTLINE**
> **0*911**
> **CALLS ARE FREE, COMPLETELY CONFIDENTIAL, AND CAN BE MADE AT ANY TIME**
> **(Please No Personal Phone Calls!)**

## Recreation

Recreational activities are provided as a means to release built-up energy and to help you keep in good physical condition.

Indoor recreation can take place whenever a unit is scheduled to be in its dayroom or during scheduled outdoor recreation times in cases where adverse weather prevents detainees from going outside.

Televisions have been placed in each dorm for your entertainment and should be shared to ensure each person has an opportunity to view programs of interest. While we have no specific rules governing what programs will be viewed, we expect each of you to be considerate (i.e.; Spanish/English language programs) and avoid unnecessary problems regarding its usage. In the event a problem develops, the officer in your dorm will resolve the problem and may decide to discontinue usage until the situation can be resolved.

1. Television viewing may begin at the posted building schedule wake-up time and will end at the posted bedtime. You are cautioned not to begin viewing a program that will end after the designated viewing hours, because the television will be turned off at the designated time.
2. Televisions may be turned off during official counts, cleaning of housing areas, and when they interfere with other facility operations.

3. At the end of a program, a vote may be taken to choose which program to watch next. The majority vote rules. The channel will not be changed during a program if someone is watching the television. Do not vote on a program and then leave the area.
4. Detainees are strictly prohibited from touching the televisions in any manner. A programmable remote control will be made available to operate the television. Tampering or removing batteries from the remote control is prohibited and will result in disciplinary action.
5. The volume of the televisions will be muted so as not to disturb other detainees or facility operations. Detainees must use the FM radio station provided on their radio to listen to the television.

This facility provides leisure time activities in the housing areas for your entertainment as well as physical and mental development. Leisure time activities include table games, cards, television, etc. You are asked to handle these items with care and to be considerate of others who may wish to use them. Persons that have been discovered abusing these items may be disciplined in accordance with specific guidelines established by this facility and be required to make restitution for damaged items.

1. The use of these leisure time items will be on a first-come, first-serve basis to ensure that each person has an equal opportunity to use them.
2. To obtain additional recreational supplies, a request must be submitted to Unit Team.
3. We expect you to take care of supplies and equipment issued and for you to return the items after use. You will be held accountable for any recreational or leisure time item until it has been returned.

Access to Outside Recreation - All detainees, weather permitting, will be provided at a minimum, one (1) hour of outdoor recreation, five days per week or six or more hours per week, at least four days per week. Outdoor recreation schedules are posted on each housing unit's bulletin board.

1. Outdoor recreation activities may include basketball, soccer, and volleyball.
2. Towels, washcloths and sheets are prohibited in the recreation area.
3. A cup or a bottle with a top on it may be brought to recreation empty.
4. No Commissary items are permitted on outside recreation area with the exception of a drink.
5. Detainees are only allowed to wear one pair of shoes when coming to outside recreation.
6. Socks may not be worn over shoes.
7. Shirts and shoes must be worn at all times during outdoor recreation.
8. Basketballs and volleyballs are not to be kicked.
9. You are subject to disciplinary action and/or will be charged for damaged equipment or clothing.
10. Do not sit against the fence or hang clothes from the fences when you are at outside recreation.
11. The posted recreation schedule is rotated for fair and equal access. You will be advised when it is your housing area's turn to go.
12. Detainees are not permitted to wear excessive clothing outside to recreation.
13. No mail or legal documents.
14. No religious services conducted on outside recreation areas during outdoor recreation time.
15. Any horse playing or rough playing during recreation periods may result in removal from recreation, to include disciplinary action.

Recreation may be cancelled at any time for security reasons or adverse weather. Your cooperation is appreciated.

Detainees in the Special Housing Unit shall be offered at least one hour of recreation per day, outside their cells and scheduled at a reasonable time, at least five days per week unless documented security, safety, or medical considerations dictate otherwise.

## Recreational Library

This facility uses mobile library carts containing standard library materials found in a school or community library. The needs, interests and abilities of the majority of detainees are carefully considered, and the library collection is developed accordingly. You may check out books or other materials for your reading pleasure.

## Law Library

Detainees have access to law library carts in the pod whenever the dayrooms are open. A private law library space is available upon request.  This information is also accessible on the detainee tablets in the Lexis/Nexis Program.  Detainees or other volunteers may assist other detainees in researching and preparing legal documents upon request, except when such assistance poses a security risk. Such assistance is voluntary; no detainee shall be allowed to charge a fee or accept anything of value for assistance. Requests for assistance from another detainee must be submitted to the detainee's assigned Unit Manager in writing. Denials may only be appealed by using the CCIPC grievance procedures.

Facility staff shall provide assistance to detainees in accessing legal materials where needed (e.g., orientation to written or electronic media and materials; assistance in accessing related programs, forms and materials).

Detainees with disabilities, detainees with limited English proficiency, and illiterate detainees who wish to pursue a legal claim related to their immigration proceedings or detention, and who request assistance or otherwise indicate difficulty accessing or comprehending the legal materials, shall be provided assistance. Please contact facility staff verbally or via a Detainee Request Form should you need such assistance.

Paper, writing materials, printing, and copying resources are available to enable you to prepare legal documents and conduct research. Detainees will not be charged for printing a reasonable amount of legal materials.  Requests for photocopies of legal material may be denied only if:

1. The document(s) might pose a risk to the security and orderly operation of the detention facility;
2. There are other legitimate security reasons;
3. Copying would constitute a violation of any law or regulation; or
4. The request is clearly abusive or excessive.

Staff may not read a document clearly related to a legal proceeding involving the detainee.

If you are placed in the Restrictive Housing Unit then you should submit a Detainee Request Form to the Restrictive Housing Unit staff in order to request access to the law library on tablet.

To request a legal reference or other legal materials not maintained in the Law Library or on the tablet, please submit a Detainee Request Form to the Detention Counselor listing the desired reference materials. The Law Library Counselor may forward the request to the appropriate ICE staff for further review/assistance if necessary. In this case, the Law Library Officer shall advise you of the status of the request in a timely manner.

All policies that are accessible to detainees will be available in the Unit Team office.

## Social Visitation

1. Visits are a minimum of 30 minutes in duration and are non-contact using telephone communication systems.
2. The maximum number of visitors for any detainee is three (3), including children over the age of two (2).
3. Social visitation occurs on Saturdays, Sundays, holidays, and at least one weekday in accordance with the
   visitation schedule posted in the housing unit.
4. Special/Extended visits may only be approved by Assistant Warden or Warden.
   a. Ordinarily, to be considered, the family members must provide proof of travel 200 miles or more.
   b. Absent exigent circumstances, special/extended visits should be submitted no less than seven (7) days prior to visit.
5. It is the detainee's responsibility to complete a visiting list and provide it to his/her Counselor prior to the visit.
6. Detainees are allowed to have a total of five (5) visitors on their list, this does not include attorneys.
7. Detainees will not be allowed visitors until the list is received and approved.
8. Detainees will only be allowed to visit those individuals on his/her approved visitation list.
9. Visitation forms must be filled out completely providing all information.


## Identification of Visitors:

1. All visitors eighteen (18) years of age or older will be required to show proper photo identification.

   a. Minors, seventeen (17) years of age or younger must remain under the direct supervision of an adult visitor(s).
   b. Visitors unable to identify themselves properly will not be permitted to visit. Proper ID includes valid driver's license, military ID, passports, photo visa, state issued, etc.

2. All visitors will be subjected to electronic screening.

   a. Any visitor who cannot pass the metal detector will not be allowed to enter the institution.

3. Any visitors who arrive at this facility with inappropriate attire such as "see-through" clothing, dresses, skirts, or shorts more than three (3) inches above the knee, will be denied entry.

   a. Minor children (under the age of twelve (12)) are permitted to wear shorts.
   b. Orange clothing, spandex or tank tops/halter tops are not allowed.
   c. It is the detainee's responsibility to inform their family members of the visitation rules.

4. Prior to entering the visiting room, all detainees are subject to a pat search.

   a. Detainees are required to wear a complete uniform and be neatly dressed.
   b. Detainees are not permitted to wear t-shirts, thermals, tank tops slippers, or shower shoes in the visiting room.

    c. The only authorized items allowed in the visiting room are one religious medal, religious head gear and a wedding band.

5. No detainee or visitor will be permitted to engage in such actions or conduct that disturbs or otherwise disrupts the good order of the visiting room. The visiting room officer will issue a warning for violations of this rule, and repeated offenses will result in visit termination and possible disciplinary action, including suspension of visitation privileges for the detainee.

6. Children may not wander around the visiting room or be left unattended.

    a. If parents cannot or will not supervise their children, the visit will be terminated. Detainees and visitors are to remain at their assigned seating area and are not to wander or visit with other detainees or their visitors.

7. Visitors are not permitted to leave anything at the facility for any detainee. 8. No food or drink is allowed in the visitation room.
    a. Only those items needed for an infant's care will be authorized in the visiting room.
    b. This includes the following items:
    i. One diaper
    ii. one 24 oz. bottle of formula/milk

9. Members of the clergy who wish to visit with a detainee on a professional basis must make a request to the Chaplain or designee prior to visit.

    a. The Warden may require written proof of the person's clergy certification from the church, ministry or the like.
    b. Visiting clergy will not be counted against the detainee's visiting hours.
    c. Any member of the clergy who wishes to visit regularly as a friend rather than in his/her official capacity must make application to be placed on the detainee's regular visiting list.

## Visitation Restricted Housing Unit

1. Only visitors on the detainee's approved visitation list will be authorized to visit.
2. Visitors are required to give no more than one (1) week and no less than forty-eight (48) hours' notice by calling the facility to schedule a visitation time.
3. If a visitor or detainee is observed tampering with any part of the video visitation equipment or anything in the visitation room, the visit will be terminated and the visitor suspended as follows:
    a. first offense six (6) months
    b. second offense one (1) year.
    c. Any damage (causing the video visitation equipment to be inoperable) by a visitor will automatically result  in an indefinite suspension and the visitor will be held financially responsible for the cost of repairs to the equipment.

## Attorney Visitation

An attorney is any person who is a member in good standing of the bar of the highest court of any state, possession, territory, commonwealth or the District of Columbia, and is not under an order of any court suspending, enjoining, restraining, disbarring or otherwise restricting him or her in the practice of law. A legal representative is an attorney or other person representing another in a matter of law, including law students or law graduates not yet admitted to the bar

under certain conditions; Executive Office for Immigration Review accredited representatives; and accredited officials and attorneys licensed outside the United States. See 8 C.F.R. § 292.1 for more detailed definitions of these terms. Upon presentation of a letter of authorization from the legal representative under whose supervision he or she is working, an unaccompanied legal assistant may meet with a detainee during legal visitation hours. The letter shall state that the named legal assistant is working on behalf of the supervising legal representative for purposes of meeting with the detainee(s). Attorneys and other legal representatives may call ahead in advance of a visit to determine whether a particular individual is detained at the facility.

1. During normal hours, attorneys and other legal representatives (i.e. investigators, paralegals and law students) are permitted to visit detainees in reasonable numbers for business purposes seven days per week, including holidays.

2. Each attorney must present appropriate identification, such as a bar card from any state, a document demonstrating partial or full accreditation from EOIR, and matching identification, such as a driver's license

3. Detainees and attorneys may also visit virtually utilizing the Virtual Attorney Visitation (VAV) protocol. Attorneys must contact the facility at least 24 hours in advance of their desired teleconference time to schedule the meeting.

4. Translators and attorney representatives must have a letter of authorization from the attorney on file at the facility.

5. Attorneys do not count against the number of visitors allowed.

6. Messengers, who are not legal representatives or legal assistants, may deliver document to and from the facility, but not to visit with detainees.

A list of approved pro bono (free) legal organizations will be posted on all detainee housing area bulletin boards and in other facility designated appropriate areas. If you wish to see a representative or paralegal from that organization, it is your responsibility to contact them for an appointment. You may contact them by mail or phone to request their assistance.
Legal representatives may exchange legal documentation with detainees; however, documents will be searched, but not read, for contraband.

If you have questions concerning the status of your case, you may call the Board of Immigration Appeals line directly at 1-800-898-7180 or dial #802 from the dorm phones.  You may also submit a Detainee Information Request form to ICE and place it in the ICE mailbox.

Detainees who are on the court docket will be allowed to shower and/or shave early in the morning (on the day of court) before appearing in Court.

**Directions to the Facility:**

The driving distance from Los Angeles International Airport (LAX) to the facility is approximately **115 miles**, and the drive typically takes around **2 to 2.5 hours**, depending on traffic conditions.  **Driving Directions from LAX Start** from Los Angeles International Airport (LAX), Los Angeles, CA 90045. Get on **I-105 E** from S Sepulveda Blvd. Take **I-405 S** and **I-5 N** to CA-14 N in Los Angeles County. Follow **CA-14 N** (Antelope Valley Fwy) for approximately 65 miles to the California City Blvd exit. Take the **California City Blvd** exit and turn right onto California City Blvd. Continue on California City Blvd for about 10 miles. Turn left onto **Virginia Blvd**. The destination, 22844 Virginia Blvd, California City, CA 93505, will be on your right.

Most major airlines have flights to Los Angeles International Airport (LAX). Major bus lines and rail lines (Amtrak) have terminals in Lancaster, Ca. Additionally, bus service is available from Lancaster, CA to California City, CA. Using Kern Transit's Route 250 is available five times a day on weekdays. Departures from Lancaster are at 8:50 AM, 10:35 AM, 1:45 PM, 4:35 PM, and 6:40 PM, with arrivals in California City at 10:30 AM, 12:15 PM, 3:31 PM, 6:15 PM, and 8:32 PM respectively. A full list of stops in Lancaster, Rosamond, Mojave, and California City is available on the Kern Transit website. Taxi and shuttle service is also available. Motel and hotel accommodation are available in the surrounding areas.

## LEGAL ORIENTATION PROGRAM AND LEGAL RIGHTS GROUP PRESENTATIONS

Detainees shall have access to group legal rights group presentations from organizations, including EOIR accredited representatives, if approved by the government . Topics may include s U.S. immigration law and procedures, and other relevant issues related to the immigration court, appeals and removal processes, including on detainee's legal rights. They are not intended to provide specific legal advice. During these presentations, detainees are able to communicate and correspond with representatives and have access to informational materials provided by the legal groups. Detainees will also have access to presentations by diplomatic representatives. Oral interpretation or assistance will be provided to any detainee who speaks another language in which material has not been translated or who is illiterate. Accommodation will be made for detainees with disabilities. Detainees housed in the Restrictive Housing Unit (RHU) are permitted to attend. Detainees will not be subject to reprisals, retaliation or penalties for attending any such presentations.

Notification of these presentations will be posted in the units at least 48 hours in advance. A sign-up sheet will be made available in each housing unit, and you will be given the opportunity to attend. Presentations are open to all detainees, regardless of the presenter's intended audience, except when a particular detainee's attendance would pose a security risk. For detainees who pose a threat to facility security, staff will make arrangements for a separate presentation and individual consultation to the detainee, should the detainee desire to attend.

Upon the request of a legal service provider (or assistant), the facility may permit a confidential meeting (with no officer present) involving the requester and two or more detainees.

## Notary and Photocopying Procedures

**Notary** - Notary assistance may be obtained by sending a request to the detention counselor. You will be contacted as soon as possible to accomplish the task.

**Copies** - Request for copies of legal material should be forwarded to the unit detention counselor.

Detainees can obtain photocopies of legal material at no cost when such copies are reasonable and necessary for a legal proceeding involving the detainee. Requests for copies will be in writing, submitted on a Detainee Information Request form to the unit staff. The Law Library officer will be responsible for making the legal copies. Detainees shall also be permitted to photocopy grievances and letters regarding conditions of confinement.  Detainees shall not be prohibited from photocopying disciplinary decisions, special needs forms, photographs, newspaper articles or other documents that are relevant to the presentation of any type of immigration proceeding. The number of copies of documents to be filed with a particular court and one copy for the detainee's personal use will determine the number of photocopies required. Requests for photocopies of legal material shall be denied only if:
   1. The document(s)might pose a risk to the security and orderly operation of the detention facility;

2. There are other legitimate security reasons;
3. Copying would constitute a violation of any law regulation; or,
4. The request is clearly abusive or excessive.
5. Law Library staff will inspect documents offered for photocopying to ensure that they comply with these rules.

## Marriage Requests

Detainees or their legal representatives must submit a request for permission to marry to the Warden or the ICE Field Office Director. A detainee will use the Detainee Request Form. The request must specifically address that the detainee is legally eligible to be married in the State of California and must be accompanied by the intended spouse's written affirmation of intent to marry the detainee.

All expenses and required documentation in connection with the marriage are the responsibility of the detainee and the intended spouse. Expenses include, but are not limited to, direct costs in providing transportation and security for the ceremony, cost of license and any health testing required by state law.

If approved, the ceremony shall take place inside the facility; the detainee may not leave the facility to make arrangements. The ceremony shall be private with no media publicity. Only individuals essential for the marriage ceremony, such as required witnesses, may attend.

The Warden will consider each marriage request on a case-by-case basis. A detainee's request to marry will generally be denied if:
1. Not legally eligible to be married.
2. Not mentally competent as determined by a qualified medical practitioner. CoreCivic medical does not have the authority to make this determination.
3. The intended spouse has not affirmed, in writing, his/her intent to marry the detainee.
4. The marriage would present a threat to the security or orderly operations of the facility.
5. There are compelling government interests for denying the request.

If denied by the Warden, the detainee may file an appeal to the ICE Field Office Director.

Only if the detainee requests a ceremony will the Form 14-7A Detainee Marriage Request be completed and submitted to the Warden.

The Chaplain may be assigned by the Warden or designee to coordinate (but not perform) the marriage ceremony.

Final approval of marriages must be obtained from the Field Office Director. The facility administrator or Field Office Director reserves the right of final approval concerning the time, place, and manner of all arrangements. If the request is denied, ICE officials will notify the detainee in writing of the reason(s) within 30 days from the date of the request.

## Correspondence/Mailroom Procedures

All incoming and outgoing mail must be properly addressed and include your name, Immigration A# and housing unit/bed number. If all information is not included, mail will be returned.  See below example:

Sender's First & Last Name
Return Address

California City Immigration Processing Center
Detainee Name
Detainee's Alien Number
P.O. Box 2513
California City, CA 93505

Detainee Name
Detainee's Alien Number
P.O. Box 2513
California City, CA 93505

Addresse's Name
Addresse's Address
City, State, Zip code

Drawing on the front of your outgoing envelopes is prohibited due to postal regulations.

As long as you bear the mailing cost, there is no limit on the volume of correspondence that you can send/receive or on the length, language, content, or source of correspondence or publications except when it is a clear violation of this policy. The facility may not impose this prohibition as to whom you may correspond. You may seal your outgoing letters and place them in the box in the housing unit marked "Outgoing MAIL." Mail will be picked up and delivered Monday – Friday (excluding holidays).

## General Correspondence

Staff shall open and inspect incoming general correspondence (including packages and publications) to inspect for contraband and to intercept cash, checks and money orders unless otherwise authorized by the facility.

Outgoing general correspondence may be inspected and/or read if the addressee is another detainee or if there is reason to believe that the item might present a threat to the safe, secure or orderly operation of the facility, and detainees will be notified in writing if correspondence is confiscated or withheld in part or full. The detainee will receive a receipt for the confiscated or withheld item(s). Reading of mail, which requires approval of the facility administrator, may be conducted at random. Mail may also be read when a specific security concern arises with respect to an individual detainee, including, but not limited to obtaining information such as escape plots, plans to commit illegal acts and plans to violate institution rules.

Barring extraordinary circumstances, incoming correspondence shall be distributed to detainees within 24 hours of receipt by the facility.

Outgoing general correspondence and other mail may be inspected or read if:

    a. the addressee is another detainee; or
    b. there is evidence the item might present a threat to the facility's secure or orderly operation, endanger the recipient or the public or facilitate criminal activity.

If the need exists, the detainee must be present when the correspondence or other mail, including packages, is inspected. Outgoing correspondence shall be delivered to the postal service no later than the day after it is received by facility staff or placed by the detainee in a designated mail depository, excluding weekends and holidays,

**Special Correspondence or Legal Mail**

"Special correspondence" is defined as written communication to or from the President and the Vice President of the United State; the U.S. Department of Justice; U.S. Public of Health Service; Secretaries of the Army, Navy, or Air

Force; U.S. Courts (including probation offices); Members of Congress; embassies and consulates; State governors; State Attorney General, prosecuting attorneys; director of state departments of corrections; state parole offices; state legislatures; state courts; state probation officers; other federal and state law enforcement offices; personal attorneys; representatives of the news media; Department of Homeland Security (DHS); U.S. Immigration and Customs Enforcement (ICE); ICE Health Service Corps (IHSC); DHS Civil Rights and Civil Liberties (CRCL); DHS Office of the Inspector General (OIG); outside health care providers; and administrators of grievance systems.

Outgoing legal mail or special correspondence (as defined above) will not be read, inspected or copied. However, if a need exists, it may be inspected in your presence for the purpose of detecting physical contraband (see below) and confirming that any enclosures qualify as special correspondence or legal mail. Outgoing correspondence shall only be treated as special correspondence or legal mail if the title and office of the sender (for incoming correspondence) or addressee (for outgoing correspondence) are unambiguously identified on the envelope, and the envelope is labeled "special correspondence" or "legal mail."

If you receive incoming special correspondence or legal mail, it will be opened in your presence and inspected for physical contraband (see below). Staff will neither read nor copy special correspondence. If you do not accept the letter or permit the letter to be inspected in your presence, it will be returned to the sender. **It is your responsibility to inform senders of the labeling requirement for special correspondence and legal mail.**

You will not be allowed to receive or send packages without advance arrangements and prior approval from the Unit Team or designee. The postage for sending packages and oversized or overweight mail will be your responsibility.

Contraband includes, but is not limited to, the following: materials that depict, describe or encourage activities that could lead to physical violence, such as materials dealing with the subjects of martial arts or survival, weaponry, armaments, explosives or incendiary devices; information regarding the production of drugs or alcohol; sexually explicit material; threats, extortion, obscenity or gratuitous profanity; a code; stamps, envelopes and blank paper; phone cards; money; photos larger than 5x7, nude/sexually explicit photos or any Polaroid photos; plastic or metal items, musical cards; stickers, taped or glued items; games or playing cards; jewelry; necklaces and bracelets of any material; drawings on CCIPC property (pillow cases, sheets, uniforms, trash bags, etc.); books and magazines (if approved, they must be received directly from the publisher); and other contraband as outlined in this handbook. A package without prior approval will be returned to the sender.

Identity documents such as passports, birth certificates, marriage license, etc., will be forwarded to ICE by mailroom staff. Mailroom staff will provide the detainee with a receipt advising them of what was sent to ICE. You are not permitted to keep an identity document in your possession. Upon request to ICE, you will be provided with a copy of the document, certified by an ICE Officer to be a true and correct document.

**Rejection of Mail and Packages**

Incoming and outgoing general correspondence and other mail may be rejected to protect the security, good order or discipline of the institution; to protect the public; or to deter criminal activity. When incoming or outgoing mail is confiscated or withheld (in whole or in part), you will be notified and given a receipt. Rejected mail will be considered as contraband and handled in accordance with the standards; however, some contraband may be returned to the sender.  A detainee may appeal rejection of correspondence through the detainee grievance system.

When you are released from the facility, your incoming mail will be sent to the forwarding address you provide to the officers during your intake/release. If you do not provide a forwarding address, your mail will be endorsed, "No Forwarding Address, Return to Sender." All such mail will be returned to the U.S. Post Office.

**Writing Implements and Supplies**

CCIPC will provide writing paper, writing implements and standard sized envelopes at no cost. Supplies cannot be mailed to you. You may submit a Detainee Information Request for paper, writing implements and envelopes from the Unit Manager or Detention Counselor. Postage stamps may be purchased from the commissary for outgoing mail. Indigent detainees can drop their mail in the mailbox across from the dining hall.

Indigent detainees will be provided with a sufficient number of supplies (i.e. paper and writing utensils) to maintain community ties and write legal mail or special correspondence. Indigent detainees will also be provided postage in an amount equal to three (3) one (1) ounce letters per week for general correspondence and an unlimited amount for special correspondence or legal mail, within reason. The facility will not be responsible for providing additional postal services (e.g. registered mail, certified mail, insured mail, etc.).  Ordinarily, a detainee is considered "indigent" if he or she is without funds, or with only nominal funds, less than $15.00 in his or her account for the past 10 days. Mailroom staff will verify that the detainee is indigent. If the detainee is not indigent the mail will be returned to the detainee with a notice of postage due. Any detainee wishing to obtain free materials for legal correspondence should see a member of the unit staff.

When you are released from the facility, your incoming mail will be sent to the forwarding address you provide to the officers during your release. If you do not provide a forwarding address, your mail will be endorsed, "No Forwarding Address, Return to Sender." All such mail will be returned to the Post Office.

## Release of Funds

Request for a release of funds is to be completed by submitting a Detainee Request Form to your Housing Unit Officer or the Mail Officer for approval. You will not be allowed to send or transfer money from your account to other detainees' accounts within CORECIVIC/CCIPC. You are permitted to use your funds to pay for legal services.

## Access to Medical Services

CCIPC provides medical care to detainees at this facility. If it is a medical emergency, you must immediately notify your housing unit officer, who will contact then announce "Medical Emergency" - giving the location and nature of the emergency. The Medical Team will be notified of the medical emergency and will respond immediately.

**Emergency Medical Services** - If you are experiencing an emergency medical problem, notify the officer stationed in your area. The nursing staff will be notified, and appropriate action will be taken by them to resolve your medical problems. Trained staff are available to administer emergency first aid and life-saving techniques. Doctors are always available.

**Routine Medical Services** - If you are experiencing non-emergency medical problems, you will have to complete a medical request and drop it in the medical box inside your pod. You will be called by the Detention Officer when Health Services has processed your request. You will be evaluated by the nursing staff. If the need exists, they will schedule you to see medical personnel. Appointments are scheduled according to medical necessity. Requests for copies of your medical records should be made using the Medical Request Form.

**Chronic Care Services** - The clinic provides chronic care services to those detainees who require medication renewals, treatments and follow-up care for specific illnesses (i.e. high blood pressure, diabetes, heart conditions, asthma, etc.). These services are provided on a regular basis.

**Sick Call Services** - Sick call at CCIPC is provided by CoreCivic medical staff to all detainees from the time of admission until the time of release in order to provide continuous medical care. There is no medical co-pay for health care services. In order to be examined at sick call, a detainee shall submit a written Sick Call Request and place it in the Sick Call Box located in each housing unit. Medical staff are available twenty-four (24) hours a day, seven days per week. The sick call schedule is posted in your housing areas. A detainee who suddenly becomes ill must report his/her illness to the Supervisor/Unit Officer.

Detainees who are not in urgent need of Sick Call services, but want to request an appointment, must complete and submit a Detainee Medical Request in a secured box identified "medical" located inside each housing unit. The enclosed requests will be picked up by Health Services staff every morning (including weekends and holidays). The request should be specific about why an appointment is needed, as it will assist the Health Care Services in scheduling the appointment with the correct Health Services Provider. Medical requests are available on post to be deposited in the Medical Request identified wall box. Medical grievances will be submitted through the detainee tablet. A paper grievance will only be used during tablet service interruptions and medical grievances can be deposited in the Medical Request box in the pod, .

The system separates daily Sick Calls from scheduled medical appointments. It allows detainees who need appointments to be scheduled in a timely manner with the appropriate provider. Most appointments are scheduled within a reasonable time.

**Mental Health Services** - If you are experiencing mental health problems, follow the procedures outlined above under routine/emergency services. You will be seen by a health care provider who will determine if a mental health referral is needed.

**Dental Services** - If you are experiencing dental health problems, follow the procedures outlined above under routine/emergency medical services. You will be seen by the health care provider who will determine if a dental referral is needed. Provisions will be made for emergency dental needs.

Scheduled appointment times will be posted on the unit call-out board. Specific medical information will never be posted. An issued facility identification card is required before any medication is distributed. Detainees must be fully dressed in shoes and with their issued ID in their possession. Any disorderly/disruptive behavior will be addressed immediately and seriously resulting in disciplinary action.

Detainees who request medical, dental, or mental health services, and for whom services have been scheduled, may refuse such services; however, they must appear in the Health Services Unit at the appointed time and sign the necessary refusal form.  For security reasons, you will not be informed of the date and time of outside appointments. Any abuse and/or misuse of medical services, medications, and/or equipment will result in disciplinary action.

Detainees will be escorted to the Health Services Unit when called by Health Services staff.

Detainees are subject to all facility rules when in the medical department. Failure to comply with said rules will result in disciplinary action. Failure to attend a sick call appointment on time may result in the loss of your appointment and may result in disciplinary action.  It is your responsibility to come to appointments and with the required items. If you choose not to attend or refuse to attend a scheduled appointment, you must go to the medical department and sign a 13-49B Refusal Form.

DO NOT come to the clinic without prior permission. The officer in your dorm must call the clinic first to obtain prior approval for you to visit the clinic.

### Medication

1. Keep on Person (KOP) medications are medications that detainees are allowed to keep in their possession. KOP medication must be stored and secured in your property bag. Medications found in your property that was not prescribed to you will be confiscated as contraband and disciplinary action will be taken. Detainees found to be not taking their medications as instructed will be taken off KOP status and will be placed on the pill line list, where their medication will be administered under supervision of the security staff. Medication removed from the KOP package will be confiscated as contraband.

2. Non-KOP medications are dispensed at pill call daily at schedule times. The scheduled pill call times will be posted on housing unit bulletin boards. You must have your facility issued detainee picture ID card available for medical staff to check at all pill calls. Detainees scheduled to attend pill call shall report when called. If you do not wish to receive medication from pill call, you must report to the pill call nurse during pill call and sign a refusal form. Failure to attend pill call and sign the refusal form will result in disciplinary action for failure to follow instructions.

   If you miss your scheduled pill call due to a court appearance or other staff-mandated reason, you may request your medicine as soon as you are available to take it. However, detainees may not substitute one scheduled pill time for another. Only medication that you receive on a routine basis will be dispensed during pill call. Detainees not in compliance, abusing or leaving medication at the reach of other detainees, will lose the privilege to keep medication on their person and will have to pick up their medication during pill call. The detainee will be subject to disciplinary action.

3. Unannounced shakedowns will be conducted inside pods.  If a detainee is found to have in his/her possession medication prescribed to another detainee or using medication for exchange of any items, the one responsible will lose his/her privilege of keeping the medication on his/her person on a permanent basis and disciplinary action will be given.

4. Over the Counter (OTC) medications are available for your purchase through the facility commissary.

**LIVING WILLS AND ADVANCE DIRECTIVES**
CORECIVIC/CCIPC uses the State Advance Directive Form for implementation of living wills and advance directives. All detainees who wish to have a living will different from the generic document and/or authorize or refuse permission to perform extraordinary measures to prolong his/her life, can have their private attorneys prepare such documents.

**INFECTIOUS DISEASE CONTROL**
We are all concerned about infectious disease control in an institutional setting. CCIPC has an infectious disease control program that monitors all communicable diseases to include chicken pox (varicella), influenza and others that could affect everyone's well-being. In order to assist you and us, be sure and report any and all incidents that result in body fluid spills to your Unit Officer or area supervisor if you are not in your housing unit. Hygiene and grooming are important and are needed to maintain disease control. The most common infectious diseases are described below.

Tuberculosis (TB) is a disease that is spread from person to person through the air. TB usually affects the lungs but can also affect other parts of the body. TB is put into the air when a person coughs, sneezes, or laughs.

Human Immunodeficiency Virus (HIV) is a virus that causes AIDS, a disease that destroys a person's immune system. HIV is transmitted through blood, semen, vaginal secretions, breast milk, items such as contaminated syringes and needles and unprotected sex.

Hepatitis is a very common disease caused by one of several viruses that attack the liver. Hepatitis "A" is excreted in feces and is transmitted by direct or indirect contact. Washing your hands and practicing good hygiene will help to prevent an infection. Hepatitis "B" and "C" is found in all body fluids. It may be transmitted by blood, sexual contact, puncture of the skin with contaminated instruments such as those used for tattooing, ear piercing, acupuncture, dental and medical procedures.

Sexual Transmitted Disease (STD) formerly called "venereal disease" or VD refers to several serious contagious diseases, (Gonorrhea, Syphilis, Herpes, and Chlamydia) usually spread by sexual contact. Sexually active people face an increased risk of infection since sexual partners can have STD, not know it, and infect others with it. Prevention includes abstinence, or protected sex.

AIDS/HIV Education / Testing - Testing for AIDS/HIV is available, and education services are provided to all detainees. You may request these services from the medical staff at sick call sign-up.

Additional information may be requested from the Health Services staff on any of the aforementioned infectious diseases.

# Detainee Discipline
In a facility where many individuals live together in a relatively small amount of space, it is extremely important that order and discipline be maintained. Discipline and order are not only for the benefit of the staff, but also for the safety and welfare of you and all other detainees. While many problems can be solved informally through counseling, disciplinary measures must occasionally be imposed. At all steps in the disciplinary process, any sanctions imposed shall be commensurate with the severity of the committed prohibited act and intended to encourage the detainee to conform with rules and regulations in the future.

**Notice of Offenses and Penalties:** A copy of offenses and penalties are listed below. Any changes in the rules will be communicated to the detainees in writing. A copy of these offenses and penalties are posted on each dorm bulletin board.

## Detainee Disciplinary Severity Scale (Sanctions) and Prohibited Acts

| "GREATEST" OFFENSE CATEGORY | | |
|---|---|---|
| CODE | PROHIBITED ACTS | SANCTIONS |
| 100 | Killing | A. Initiate criminal proceedings |
| 101 | Assaulting any person (includes sexual assault) | |
| 102 | Escape from escort; Escape from a secure facility | B. Disciplinary transfer (recommend) |
| 103 | Setting a fire (charged with this act in this category only when found to pose a threat to life or a threat to serious bodily harm or in furtherance of a prohibited act of greatest severity, e.g., a riot or an escape; otherwise the charge is classified as Code 219 or 322. | C. Disciplinary segregation (up to 60 days) |
| 104 | Possession or introduction of a gun, firearm, weapon, sharpened instrument, knife, dangerous chemical, explosive, escape tool, device or ammunition | D. Make monetary restitution, if funds are available |
| 105 | Rioting | E. Loss of privileges (e.g., commissary, vending |
| 106 | Inciting others to riot | |
| 107 | Hostage-taking | |
| 108 | Assaulting a staff member or any law enforcement officer | |
| 109 | Threatening a staff member or any law enforcement officer with bodily harm. | |
| *198 | Interfering with a staff member in the performance of duties (conduct must be of the greatest severity). This charge is to be used only if another charge of greatest severity is not applicable. | machines, movies, recreation, etc.) |
| *199 | Conduct that disrupts or interferes with the security or orderly running of the facility (conduct must be of the greatest severity). This charge is to be used only if another charge of greatest severity is not applicable. | |

**\* When the prohibited act is interfering with a staff member in the performance of duties (Code 198, 298, 398 or 498) or conduct that disrupts (Code 199, 299, 399, or 499), the Disciplinary Committee should specify in its findings the severity-level of the conduct, citing a comparable offense in that category. For example, "We find the act to be of high severity, most comparable to Code 213 (engaging in a group demonstration)."**

| "HIGH" OFFENSE CATEGORY | | |
|---|---|---|
| CODE | PROHIBITED ACTS | SANCTIONS |

| | | |
|---|---|---|
| 200 | Escape from unescorted activities, open or secure facility, without violence | A.    Initiate criminal proceedings |
| 201 | Fighting, boxing, wrestling, sparring and any other form of physical encounter, including horseplay, that causes or could cause injury to another person; except when part of an approved recreational or athletic activity | B.    Disciplinary transfer (recommend) |
| 202 | Possession or introduction of an unauthorized tool | |
| 203 | Loss, misplacement, or damage of any restricted tool | C.    Disciplinary segregation (Up to 30 days) |
| 204 | Threatening another with bodily harm | |
| 205 | Extortion, blackmail, protection: demanding or receiving money or anything of value in return for protection against others, avoiding bodily harm, or avoiding a threat being informed against | D.    Make monetary restitution, if funds are available |
| 206 | Engaging in sexual acts | |
| 207 | Making sexual proposals or threats | |
| 208 | Wearing a disguise or mask | E.    Loss of privileges: commissary, movies, recreation, etc. |
| 209 | Tampering with or blocking any lock device | |
| 210 | Adulteration of food or drink | |
| 211 | Possession, introduction, or use of narcotics, narcotic paraphernalia, or drugs not prescribed for the individual by medical staff | F.    Change housing |
| 212 | Possessing an officer's or staff member's clothing | |
| 213 | Engaging in or inciting a group demonstration | G.    Remove from program and/or group activity |
| 214 | Encouraging others to participate in a work stoppage or to refuse to work | |
| 215 | Refusing to provide a urine sample or to otherwise cooperate in a drug test | H.    Loss of job |
| 216 | Introducing alcohol into the facility | |
| 217 | Giving or offering an official or staff member a bribe or anything of value | I.    Impound and store detainee's personal property |
| 218 | Giving money to, or receiving money from, any person for an illegal or prohibited purpose, such as introducing/conveying contraband | J.    Confiscate contraband |
| 219 | Destroying, altering, or damaging property (government or another person's) worth more than $100 | |
| 220 | Being found guilty of any combination of three or more high moderate or low moderate offenses within 90 days | K.    Restrict to housing unit |
| 222 | Possessing or introducing an incendiary device, e.g., matches, a lighter, etc. | |
| 223 | Any act that could endanger person(s) and/or property | L.    Warning |
| *298 | Interfering with a staff member in the performance of duties (conduct must be of highest severity). This charge is to be | |

| | | |
|---|---|---|
| | used only when no other charge of highest severity is applicable. | |
| *299 | Conduct that disrupts or interferes with the security or orderly operation of the facility (conduct must be of highest severity). This charge is to be used only when no other charge of highest severity is applicable. | |

| "HIGH MODERATE" OFFENSE CATEGORY | | |
|---|---|---|
| CODE | PROHIBITED ACTS | SANCTIONS |
| 300 | Indecent exposure | A.     Initiate criminal proceedings |
| 301 | Stealing (theft) | |
| 302 | Misuse of authorized medication | |
| 303 | Loss, misplacement, or damage of a less restricted tool | B.     Disciplinary transfer (recommend) |
| 304 | Lending property or other item of value for profit/increased return | |
| 305 | Possession of item(s) not authorized for receipt or retention; not issued through regular channels | C.     Disciplinary segregation (Up to 72 hours) |
| 306 | Refusal to clean assigned living area | |
| 307 | Refusing to obey a staff member/officer's order (may be categorized and charged as a greater or lesser offense, depending on the kind of disobedience: continuing to riot is Code 105—Rioting: Continuing to fight, Code 201—Fighting: refusing to provide a urine sample, Code 215 | D.     Make monetary restitution |
| 308 | Insolence toward a staff member | E.     Loss of privileges: commissary, movies, recreation, etc. |
| 309 | Lying or providing false statement to staff | |
| 310 | Counterfeiting, forging, or other unauthorized reproduction of money or other official document or item, e.g. security document, identification card, etc. (may be categorized as greater or lesser offense, depending on the nature and purpose of the reproduction, e.g., counterfeiting release papers to effect escape—Code 102 or 200) | F.     Change housing |
| 311 | Participating in an unauthorized meeting or gathering | G.     Remove from program |
| 312 | Being in an unauthorized area | |
| 313 | Failure to stand count | H.     Loss of job |
| 314 | Interfering with count | |
| 315 | Making, possessing, or using intoxicant(s) | I.      Impound and store detainee's personal property |
| 316 | Refusing a breathalyzer test or other test of alcohol consumption | |
| 317 | Gambling | J.     Confiscate contraband |
| 318 | Preparing or conducting a gambling pool | |
| 319 | Possession of gambling paraphernalia | |

| 320 | Unauthorized contact with public | K.    Restrict to housing unit |
| 321 | Giving money or another item of value to, or accepting money or another item of value from anyone, including another detainee, without staff authorization | |
| 322 | Destroying, altering, or damaging property (government or another person's) worth less than $100 | L.    Reprimand |
| 323 | Signing, preparing, circulating, or soliciting support for prohibited group petitions | M.    Warning |
| *398 | Interfering with a staff member in the performance of duties (conduct must be of highest severity). This charge is to be used only when no other charge of highest severity is applicable. | |
| *399 | Conduct that disrupts or interferes with the security or orderly operation of the facility (conduct must be of highest severity). This charge is to be used only when no other charge of highest severity is applicable. | |

NOTE: Any combination of high moderate and low moderate offenses during a 90-day period shall constitute a high offense.

| "LOW MODERATE" OFFENSE CATEGORY | | |
|---|---|---|
| CODE | PROHIBITED ACTS | SANCTIONS |
| 400 | Possession of property belonging to another person | E.    Loss of privileges: commissary, movies, recreation, etc. |
| 401 | Possessing unauthorized clothing | |
| 402 | Malingering, feigning illness | |
| 403 | Smoking where prohibited | |
| 404 | Using abusive or obscene language | F.    Change housing |
| 405 | Tattooing, body piercing, or self-mutilation | |
| 406 | Unauthorized use of mail or telephone (with restriction or temporary suspension of the abused privileges often the appropriate sanction | G.    Remove from program |
| 407 | Conduct with a visitor in violation of rules and regulations (with restriction or temporary suspension of visiting privileges often the appropriate sanction) | H.    Loss of job |
| 408 | Conducting a business | |
| 409 | Possession of money or currency, unless specifically authorized | I.    Impound and store detainee's personal property |
| 410 | Failure to follow safety or sanitation regulations | |
| 411 | Unauthorized use of equipment or machinery | J.    Confiscate contraband |
| 412 | Using equipment or machinery contrary to posted safety standards | |
| 413 | Being unsanitary or untidy, failing to keep self and living area in accordance with posted standards | K.    Restrict to housing unit |

| *498 | Interfering with a staff member in the performance of duties (conduct must be of highest severity). This charge is to be used only when no other charge of highest severity is applicable. | L. | Reprimand |
| *499 | Conduct that disrupts or interferes with the security or orderly operation of the facility (conduct must be of highest severity). This charge is to be used only when no other charge of highest severity is applicable. | M. | Warning |

CCIPC's investigation of detainee disciplinary reports will commence within 24 hours of receipt of a disciplinary report and will be completed within 72 hours, barring exceptional circumstances. The investigating officer shall have had no prior involvement in the incident, either as witness or officer at the scene.

Low or Moderate level disciplinary infractions will take place before a Unit Disciplinary Committee (UDC) comprised of between one and three members, at least one of whom is a supervisor, as determined by the facility. The UDC shall not include the reporting officer, the investigating officer, or an officer who witnessed or was directly involved in the incident, except in the unlikely event that every available officer witnessed or was directly involved in the incident.

The UDC shall have authority to:

1. Conduct hearings and resolve incidents involving high moderate or low moderate charges;
2. Consider written reports, statements and physical evidence;
3. Hear pleadings on the part of the detainee;
4. Make findings that a detainee did or did not commit the rule violation(s) or prohibited act(s) as charged, based on the preponderance of evidence; and
5. Impose minor sanctions in accordance with the table of prohibited acts and associated sanctions later in this document; minor sanctions are those listed sanctions other than initiation of criminal proceedings, recommended disciplinary transfer, disciplinary segregation, or monetary restitution.

The detainee in UDC proceedings shall have the right to due process, which includes the rights to:

1. Remain silent at any stage of the disciplinary process;
2. Have a UDC hearing within 24 hours after the conclusion of the investigation, unless the detainee:
    a. waives the notification period and requests an immediate hearing, or
    b. requests more time to gather evidence or otherwise prepare a defense.
3. If there is a UDC hearing, then the IDP hearing must be held within 48 hours after the conclusion of the UDC hearing.
4. Attend the entire hearing (excluding committee deliberations), or waive the right to appear. If security considerations   prevent detainee attendance, the committee must document the security considerations and, to the extent possible, facilitate the detainee's participation in the process via telephonic testimony, document submission, written statements or questions to be asked of witnesses;
5. Present statements and evidence, including witness testimony on his/her own behalf;
6. Appeal the committee's determination through the detainee grievance process; and 7.   Be advised by the UDC of your rights in a language or manner that you understand.

Greatest and High rule violations will take place before an Institutional Disciplinary Panel (IDP). The IDP will consist of three members, including a chairperson. The OIC or Warden will appoint three members of the panel. The panel may not include the reporting officer, the investigating officer, any member of the referring UDC, or anyone who witnessed or was directly involved in the incident. Exceptions may occur only if the number of officers required for the panel cannot be filled due their direct involvement in the incident. IDP panels will receive reports from the facility's UDC.

As a detainee charged with a prohibited act(s), if referred to the Institution Disciplinary Panel (IDP) for disposition, you will have the following rights:

1.    The right to have a written copy of the charge(s) against you at least 24 hours prior to appearing before the
IDP.
2.    The right to have a full-time member of staff who is reasonably available to assist you or the option to receive assistance from another detainee of your selection, rather than a staff member before the IDP. Subject to approval from the Warden.
3.    The right to call witnesses and present documentary evidence in your behalf provided institutional safety would not be jeopardized.
4.    The right to remain silent. Your silence may be used to draw an adverse inference against you. However, your silence alone may not be used to support a finding that you committed a prohibited act.
5.    The right to be present throughout the IDP decision, except during committee deliberations and where institutional safety would be in jeopardy.
6.    The right to be advised of the IDP decision in writing and the facts supporting the panel's decision, except where institutional safety would be jeopardized.
7.    The right to appeal the decision of the IDP by means of the Detainee Grievance Procedure to the Warder/Administrator, within 15 days of the notice of the panel's decision and disposition.

IDP hearings will be conducted on the first business day after receiving the UDC's referral, unless the detainee waives the 24-hour notification. The facility may delay hearings if they document the reason. If the detainee is housed in the Special Housing Unit, the delay will not exceed 72 hours, barring an emergency.

Detainees may request a staff representative to assist them in a disciplinary hearing; however, this request must be approved by the Warden and will be based upon the comprehension skills of the detainee making the request or his ability to collecting and presenting essential evidence. Detainees with limited English proficiency (LEP) shall receive translation or interpretation services, and detainees with disabilities shall receive appropriate accommodations in order to meaningfully participate in the investigative, disciplinary, and appeal process. Hearings may be postponed. The reason for the postponement will be documented accordingly.

You will be advised of the following rights when served with disciplinary action:

1.    The right to protection from personal abuse, corporal punishment, unnecessary or excessive use of force, personal injury, disease, property damage and harassment.
2.    The right of freedom from discrimination based on race, religion, national origin, color, , sex, age, sexual orientation, disability or political belief.
3.    The right to appeal the decision; A Detainee may appeal decisions of the UDC and IDP through the formal grievance process.

4. The right to correspond with persons or organizations, consistent with safety, security, and the orderly operation of the facility; and the right to due process, including the prompt resolution of a disciplinary matter (in accordance with the rules, procedures and sanctions provided in the handbook).

5. The right to due process, including the prompt resolution of a disciplinary matter in accordance with the rules, procedures, and sanctions and procedures for appealing disciplinary findings provided in this handbook.

Sanctions range from the withholding of privilege(s) to disciplinary segregation. The duration of sanctions shall be within established limits. Neither the panel recommending sanctions nor the facility administrator making the final decision shall impose sanctions arbitrarily, beyond these limits. Disciplinary segregation shall only be ordered when alternative dispositions may inadequately regulate the detainee's behavior. Time in segregation or the withholding of privileges after a hearing shall generally not exceed 30 days per incident, except in extraordinary circumstances, such as violations of offenses 100 through 109 listed in the "Greatest" offense category. While a detainee may be charged with multiple prohibited acts and may receive multiple sanctions for one incident, sanctions arising from a single incident shall run concurrently. Time served in segregation pending the outcome of the proceedings shall be credited to the number of days to be spent in the Restricted Housing Unit after an adverse decision is announced. A detainee's good behavior subsequent to the rule violation or prohibited act should be given consideration when determining the appropriate sanction.

Disciplinary action may not be capricious or retaliatory. Staff may not impose or allow imposition of the following sanctions: corporal punishment; deviations from food services or availability of water; deprivation of clothing, bedding, or items of personal hygiene; deprivation of correspondence privileges; deprivation of legal visitation, legal mail, access to the law library, and the removal of legal papers; or deprivation of physical exercise unless such activity creates an unsafe condition.

The facility shall not hold a detainee accountable for his or her conduct if a medical authority finds him or her mentally incompetent. The disciplinary process shall consider whether a detainee's cognitive impairment, disability, or mental illness contributed to his or her behavior when determining what type of sanction, if any, should be imposed.

## Confidential Informants
The UDC or IDP shall disclose as much confidential information as may be disclosed without jeopardizing the safety and security of facility staff and other persons and shall include in the hearing record the factual basis for finding the information reliable before it is considered in disciplinary proceedings.

## Criminal Misconduct
CCIPC, in coordination with the ICE Field Office Director, shall work with prosecutors and other law enforcement officials to ensure that detainees who engage in serious criminal activity, including violence against staff and other detainees, face criminal prosecutions when appropriate.

## Grievance Procedures
CCIPC provides a means for all detainees to address complaints regarding facility conditions, treatment, medical care and policies and procedures. Detainees may file both informal and formal grievances, which shall receive timely responses, relating to any aspect of their detention. It is the policy of CCIPC to encourage informal resolution of complaints at the lowest level since grievances should be, whenever possible, resolved through direct contact with staff responsible for the particular problem area and with two-way communication encouraged

between staff and detainees. However, all detainees have access to formal grievance procedures any time the informal process has not provided successful resolution of the complaint. Most matters can and should be resolved directly and promptly between the detainee and staff. You can invoke the grievance process regardless of disciplinary, classification, or other administrative decisions to which you may be subject.

No harassment, punishment, or disciplinary action will result to a detainee who seeks resolution of legitimate complaints in good faith. However, if it is determined by the Warden that you are deliberately abusing the grievance system through excessive filing of grievances and/or repeated refusal to follow procedures, the Warden may suspend your right to file additional grievances until all pending grievances have been resolved. Continued abuse may result in an adverse action initiated against you

A detainee may not submit a grievance on behalf of another detainee/resident; however, assistance from a staff member or detainee may be provided when necessary to communicate the problem on the grievance form.

Grievances are considered special correspondence.  If a sealed envelope is labeled "Grievance" and addressed to the Grievance Officer, it will not be opened for inspection unless there is reasonable suspicion that the sealed envelope contains contraband.

You have the opportunity to file a formal complaint which is considered a grievance. The process will be explained below. It is important that the procedures be followed correctly in order to ensure adequate and appropriate resolutions. Grievances filed improperly will be returned without review.

### Informal Process
All detainees have access to an informal resolution process to resolve their complaints.  At any time, the informal resolution process has not provided successful resolution of the complaint or in the event of an emergency grievance, detainees may use the formal grievance process.  All complaints will be assessed in a fair and impartial manner.  Resolution in the best interest of the detainee and the facility is the primary goal.

Informal Resolution forms are available to you on the tablets that will ensure notification of the proper CCIPC official in order to process a complaint informally. A response will be returned to you as soon as possible. If you are dissatisfied with the response, you may appeal to the Warden. The Warden will respond as soon as possible.

While you are free to bypass or terminate the informal grievance process, and proceed directly to the formal grievance stage, you are encouraged to utilize the informal process and allow the complaint to be resolved at the lowest level. Complaints should be, whenever possible, resolved through direct contact with the staff responsible for the particular issue and with two-way communication encouraged between staff and detainees.  If you are not satisfied with the results of the informal resolution process, please see below:

### Formal Process
If you are not satisfied with the results of the informal resolution process, you may file a formal grievance to the Grievance Officer using the tablets. A paper system will only be used during tablet service interruptions by submitting a 14-5B, Detainee Grievance Form.  You must document if an informal resolution process was attempted and with whom.

The appropriate department head will act on the grievance within five (5) working days through informal or formal resolution and provide you with a response. If you do not accept the department

head's solution, you may appeal the decision. The Grievance Appeal Board (GAB) will convene to study the grievance within five (5) working days of the detainee's appeal.  Within five (5) days of reaching a decision, the GAB will provide you with a response to the grievance, in writing. If the grievance involves a medical issue, at least one member of the GAB shall be a medical professional.

If you disagree with the GAB, you may appeal to the Warden. The Warden, after reviewing the finding of the GAB, will provide you with a written decision within five (5) days of receiving the appeal. The Warden will render a written decision on the appeal within five (5) days of receipt. This decision is considered final to any matter. However, if you are dissatisfied with the Warden's response to your grievance or you fear retaliation, you may appeal or communicate directly with ICE.

**Procedures to Appeal Grievances Directly to ICE**
Submit your concerns to the ICE staff by utilizing the ICE Detainee Request Form. You may pick up request forms from staff assigned to your unit. The request form should be placed in the box labeled "ICE" and it will be delivered to the ICE staff with no reading, altering or delay.  You may obtain assistance from another detainee, housing officer or other facility staff in preparing your request form. The ICE staff receiving your request form will respond as soon as possible but not later than within 72 hours of receiving your request. Detainees shall report allegations of abuse and civil rights violations, along with violations of officer misconduct, directly to ICE or the DHS Office of the Inspector General (OIG).

A copy of all grievances will be maintained in your detention file.

Neither employees nor detainees will be subject to retaliation, reprisal, harassment or discipline for the use or participation in grievance procedures. Any allegations of this nature will be thoroughly investigated by the Warden and reviewed by the CoreCivic-Facility Support Center.

**Medical/Dental Grievance Procedures** – All grievances concerning medical and dental services must be placed in the medical grievance box by the detainee.  A grievance form may be requested from/provided by a Restricted Housing Unit staff member and must be given directly by the detainee to medical staff.  CCIPC staff members are not permitted to accept medical grievances from detainees.

**Emergency Grievance Procedures** - Emergency grievances may be brought by a detainee to a designated grievance officer (GO) or directly to the facility administrator or their designee. If these personnel are not available, a shift supervisor may be informed of the complaint. The 14-5B, detainee Grievance, form must be utilized to file an emergency grievance.  The detainee will complete Page 1 of the 14-5B and place it in a sealed envelope marked "Emergency Grievance". Sealed envelopes may be placed in the grievance mailbox. If the Facility Grievance Officer, after reviewing the grievance, determines that an emergency exists, immediate action will be taken to resolve the grievance. The Facility Grievance Officer will give you a written decision within seventy-two (72) hours of receipt of the emergency grievance. If it is determined that the grievance is not an emergency, standard grievance procedures shall apply.

If you feel that the issue is sensitive or that your safety or well-being would be jeopardized if others in the facility learned of the grievance, you may seal the grievance in an envelope, clearly mark the envelope "sensitive" and submit it directly to the Warden. You have the opportunity to file a complaint about officer misconduct directly to the Department of Homeland Security (please see below).

The opportunity at any point to file a complaint directly to the Department of Homeland Security (DHS), Office of the Inspector General (OIG) about staff misconduct, physical or sexual abuse or civil rights violations; complaints may be filed by calling the DHS OIG Hotline at 800-323-8603, Speed Dial Number 518#, which is programmed into the dorm telephones as a free call. Follow the toll-free instructions located in each pod bulletin board.  You may also contact the OIG by writing to:

Department of Homeland
Security 245 Murray Lane, SW,
Mail Stop 0305 Washington,
DC 20528.
Attn: Office of the Inspector General

**Non- Grievable Matters -** The following matters <u>cannot</u> be grieved by detainees through the grievance procedure:
1. State and federal court decisions
2. State and federal laws and regulations
3. Final decisions on grievances (please see note below)
4. ICE policies, procedures, decisions or matters (i.e., institutional transfers, release/deportation decisions, etc.)

Note: A detainee dissatisfied with the facility's response to a grievance or those fearing retaliation are able to appeal or communicate directly with ICE/ERO.

To file a grievance via the tablet:

- Log into the tablet
- Select free
- Select "Grievance"
- Select "CoreCivic"
- Select the reason or department. If you are unsure, then select "Other"  -  Once the form comes up, complete the following:  o Summary: What is the grievance about? (Examples: Religion, Food, Officer, Recreation). o Unit: Select the unit number you are in. o The next box is to submit what the problem or issue is that is being reported.
    o The last box is the "Resolution", this is where you must put what it is you want to happen or how you want the issue resolved.

## Segregation/Restrictive Housing Unit
Prior to placement in the segregation or the restrictive housing unit, you will be taken to Health Services to be screened by a qualified healthcare professional. Upon placement, your property will be secured.  You will be allowed to maintain those items on the 10-1AA Authorized In-Cell Property List. All other items will be placed in storage until you are released back into general population.  Prior to storage, clothing/linens will be laundered. Searches will be conducted on all detainees upon admission.

Administrative Segregation is intended for detainees with special management requirements:
1. Pending investigation/hearing of prohibited acts(s)
2. Need for medical observation
3. Pending a transfer or release within twenty-four (24) hours
4. Security risks
5. Protective custody

Disciplinary Segregation is a Special Housing Unit for detainees who have received a sanction by the Institutional Disciplinary Panel. Once sanctioned, these detainees may have fewer or limited privileges than other detainees in either the general population or administrative segregation.

**Programs and Services**

1. Programs and Services as offered to general population are available to administrative segregation.
2. Detainees in the segregation for administrative reasons shall be offered at least one hour of recreation per day, outside their cells and scheduled at a reasonable time, at least seven days per week unless documented security, safety, or medical considerations dictate otherwise. Detainees in the Segregation for disciplinary reasons shall be offered at least one hour of recreation per day, outside their cells and scheduled at a reasonable time, at least five days per week unless documented security, safety, or medical considerations dictate otherwise.
3. Telephone use:
   - Detainees in administrative segregation may have telephone access similar to detainees in the general population, but in a manner consistent with the special security and safety requirements of detainees in these units. Collect legal calls to the detainee's attorney of record can be made with approval from the Shift Supervisor/Unit Manager or higher authority.
   - Detainees in disciplinary segregation will be allowed emergency personal calls and unlimited, collect legal calls to the detainee's attorney of record upon approval from the Shift Supervisor/Unit Manager or higher authority. Detainees held in disciplinary segregation for a period exceeding sixty (60) days are afforded the same telephone privileges as detainees in Administrative Segregation. Staff shall permit ICE detainees to make direct and/or free and legal calls as outlined in Policy 16-100, except in the event of compelling and documented reasons of threats to the safety, security, and good order of the facility.
4. Detainees housed in the segregation will be provided library services a minimum of one (1) day per week for the circulation of books to include religious materials and for requests for legal materials.
5. Detainees housed in the segregation should submit an Information Request form to the Special Housing Unit staff in order to request access to the law library.
6. Medical Care/Sick Call for segregated detainees will be provided by medical staff through daily rounds in the Special Housing.
7. Mail will be picked up from the segregation daily, except on holidays. Mail will be handled for the segregated detainees in the same manner as general population detainees.
8. While in administrative or disciplinary segregation status, a detainee ordinarily retains visiting privileges and will be permitted visits in accordance with the posted schedule unless security reasons dictate other times. Visitation for administrative or disciplinary segregation status will generally be non-contact unless prior approval is obtained from the Chief of Security. Disruptive conduct by either party will result in the termination of the visit and may have an adverse effect on future visits.
9. The Chaplain will minister to detainees in segregation. Upon special request and considering security concerns, arrangements can be made for religious volunteers of your faith to conduct one-on-one services.
10. Laundry will be picked up from, washed and returned to the segregated detainees according to the same schedule as set for general population.
11. Personal hygiene items are available upon request from the segregation officer at no charge
12. Segregated detainees will be afforded the opportunity to shave and shower at least three (3) times per week. Shaving equipment will be issued upon detainee's request and will be

returned to staff upon completion of shower.  Staff will inspect the razor for any type of tampering or alteration. Once refused by the detainee, no further consideration will be given for that day.

13. Detainees in the segregation will be permitted to attend Group Legal Rights Presentations, if security is not compromised. If it becomes necessary, presentations may be made to individuals in segregation, pending agreement with the presenter and security can be maintained. If a detainee in the segregation cannot attend for this reason, and both he/she and the presenter(s) so request, alternative arrangements will be made.

14. Prior to being released from segregation detainees will be re-evaluated/reclassified to ensure that they have been properly classified and are housed in an appropriate dorm.

15. All other services not specifically mentioned in this section regarding segregation will be subject to the same access procedures as outlined for general population detainees.

## Detention File

A detention file is maintained by the CCIPC for each detainee and contains no less than the following documents:

1. Facility disciplinary actions
2. Behavior reports
3. Funds, valuables and property receipts
4. Detainee written requests, complaints and issues
5. Response to the aforementioned requests
6. Segregation records

## Legal File

Your legal file is an Immigration legal record commonly called an "A-file" maintained by ICE for each individual detainee. The A-file contains your legal transactions and documentation pertaining to your case.  CCIPC does not have possession of you're a-file.  Please direct all inquiries regarding you're a-file to ICE using the Detainee Request Form..

## Notice to Those Persons Who have Been Ordered Removed or Allowed to Voluntarily Depart

You will be afforded a one-time opportunity to have your personal effects delivered to the detention facility prior to your removal. You are responsible for making arrangements for the delivery of personal effects (clothing type only) which can <u>only</u> be received within seventy-two (72) hours after receipt of your notice. You will not be able to receive property without making advance arrangements and getting prior approval from your Unit Manager by filling out and submitting a Detainee Package Request form. The contents of the travel bag/suitcase will be inspected for contraband and to ensure compliance. Property will not be accepted at the San Francisco ICE Field office.

The facility may allow family members to mail in three (3) sets of clothing for use on your release. These items are for release only and the detainee will not be permitted to possess the items within the facility. There is no restriction regarding the source of clothing received from family members for this purpose. Release clothing may be received at the facility within fourteen (14) calendar days of the release between the hours of 8:00am and 4:00pm. No belongings will be received the day of departure by ICE or CCIPC staff.

Personal effects must be inside a non-locking duffle bag, backpack, or luggage. No boxes or plastic bags will be accepted. Only one (1) standard bag no larger than twenty (20) inches wide

by ten (10) inches deep, weighing no more than forty (40) pounds will be accepted.   NO EXCEPTIONS.

**Please direct any questions regarding this handbook and any procedures therein to your unit team.**

## Additional Contact Information

**Department of Health and Human Services, Office of the Inspector General (OIG)**  Office of Inspector General
U.S. Department of Health & Human Services
ATTN: HOTLINE PO Box 23489
Washington, DC 20026
Phone: (800) HHS-TIPS [(800) 447-8477]
Fax: (800) 223-8164
TTY: (800) 377-4950

**DOJ Office of Professional Responsibility (OPR)**
U.S. Department of Justice
Office of Professional Responsibility
950 Pennsylvania Ave, NW, Suite 3266
Washington, DC 20530-0001
By Phone: 202-514-3365
By Fax: 202-514-5050
By Email: opr.complaints@usdoj.gov
Website: https://www.justice.gov/opr

**DHS Office of the Inspector General (OIG)**
DHS Office of the Inspector General/Mail Stop 0305
Attn: Office of Investigations-Hotline
245 Murray Lane, SW Washington, DC 20528-0305
By phone: 1-800-323-8603 or 1-844-889-4357 (TTY)
By fax: 1-202-254-4297
Accessing    the    online    DHS    OIG    Complaint/Allegation    Form    at http://:hotline.oig.dhs.gov/hotline/hotline.php

**JIC-Joint Intake Center for ICE**
Calling the toll-free Joint Intake Center Hotline at 1-877-2INTAKE or sending a fax to (202) 344-3390; • Sending an e-mail message to Joint.Intake@dhs.gov;
Writing to the Joint Intake Center at P.O. Box 14475, 1200 Pennsylvania Avenue, NW, Washington, D.C. 20044;

# ATTACHMENT B



**CAL CITY IMMIGRATION PROCESSING CENTER**

To:         Detainee Population

From:       C. Pfeiffer, Assistant Warden of Operations

Re:         Friends and Family Visits

Date:       November 5, 2025

Effective Monday, November 10, 2025, all social visits will need to be scheduled as indicated on the ICE website at https://www.ice.gov/detain/detention-facilities/california-city-detention-facility.

Visitation hours will be 8:00am through 8:00pm each day. Visitors will need to call (760) 491-8126, Monday through Friday, between the hours of 12:00pm and 2:00pm to request and schedule an available (1) one-hour appointment. All appointments must be made 24-hours in advance of the date and time of appointment.

- All visitors are required to be present in the facility lobby 30 minutes prior to scheduled visit. If visitors arrive late for the scheduled visit time, their appointment will be forfeited.
- Visits are limited to (1) one-hour.
- Visitors unaccompanied must be at least 18 years of age.
- Persons under 18 must be accompanied by a parent or guardian.
- Proof of the parent/guardian relationship will be required (proof may be a birth certificate or court ordered guardianship).
- Visitors will have a government issued photo identification with them.
- Each detainee will receive two (2) one-hour blocks of visitation time per week. Each visit, regardless of duration, will count as one (1) hour.
- Visit times are subject to change, based on the needs of the facility and approval of the on-duty Shift Supervisor.
- Under no circumstances may visitors give any item(s) directly to a detainee.
- *NOTE: Introduction of contraband will result in denial of visits.*

Visiting Restrictions
- All family or other social visits are non-contact.
- No firearms or weapons of any kind are permitted in the facility.
- If visitors are or appear to be intoxicated, visitation will not be allowed.
- All visitors are subject to search while in the facility.
- Visitors are not allowed to pass or attempt to pass any items to detainees.
- Visitors are not allowed to carry any items into the visitation area.

# **ATTACHMENT C**

* Non-Profit Organization
** Referral Service
*** Private Attorney

## List of Pro Bono Legal Service Providers

Updated July 2025

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

### Los Angeles Immigration Courts

| Los Angeles, California (page 1 of 2) | |
|---|---|
| **Catholic Charities of Los Angeles, Archdiocese of Los Angeles, Inc. Main Office\***<br><br>Catholic Charities of Los Angeles<br>1530 James M Wood Blvd.<br>Los Angeles, CA 90015<br>Tel: (213) 251-3505<br>Fax: (213) 487-0986<br>www.esperanza-la.org<br><br>• Monday-Friday, 8:30AM-5:30PM<br>• Serving counties of Los Angeles, Orange, Riverside, San Bernardino, Ventura, Kern, & Santa Barbara<br>• Assist in various forms of immigration relief, victims of crime<br>• Reduced fee, nominal fee, or pro bono depending on need and grant availability<br>• Languages: Spanish or interpreter services<br>• **Families** on dedicated dockets may call or text Catholic Charities of Los Angeles at (323) 362-2767 for **free information** about the immigration court process, possible legal options, and how to find legal representation. | **El Rescate\***<br><br>1605 West Olympic Blvd., Suite 516<br>Los Angeles, CA 90031<br>Tel: (213) 387-3284<br>www.elrescate.org |
| | **OikosNow Not For Profit\***<br><br>332 South Michigan Avenue, Suite #121-Z300<br>Chicago, IL 60604<br>Tel: (815) 549-5678<br>immigration@oikosnow.com<br>www.oikosnow.org<br><br>• Please call for an appointment<br>• Languages: Mandarin Chinese, Cantonese 中文 |
| | **International Institute of Los Angeles\***<br><br>3845 Selig Place<br>Los Angeles, CA 90031<br>Tel: (323) 264-6217<br>Fax: (323) 264-6418<br>ireception@iilosangeles.org<br>www.iilosangeles.org<br><br>• Open Monday-Friday, 8:30AM-5PM<br>• Services include: removal defense and affirmative petitions<br>• No walk-ins<br>• By appointment only (solo con cita)<br>• Languages: English and Spanish, other languages available upon request |
| **Refugee Support Network\***<br><br>2301 Findlay Avenue<br>Monterey Park, CA 91754<br>Tel: (626) 323-1495<br>refugeeunitedstates@gmail.com<br>www.refugeeunitedstates.com<br><br>• No walk-ins, please call for an appointment<br>• Languages: English, Spanish, and Mandarin | |

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

**Disclaimer:** As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

* Non-Profit Organization
** Referral Service
*** Private Attorney

**List of Pro Bono Legal Service Providers**

Updated July 2025

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Los Angeles Immigration Courts

| Los Angeles, California (page 2 of 2) | |
|---|---|
| **ABA Commission on Immigration Detention Information Hotline\*\***<br><br>1050 Connecticut Avenue, NW, Unit 400<br>Washington, DC 20036<br>Tel: (202) 662-1000<br>immcenter@americanbar.org<br>www.americanbar.org/groups/public_interest/immigration/<br><br>• Pro se case assistance for detained respondents only<br>• Respondents detained at Immigration and Customs Enforcement (ICE) or Bureau of Prisons (BOP) facilities should contact our speed dial at 2150#<br>• To contact on behalf of an individual detained by ICE or BOP, call (202) 442-3363 or email immcenter@americanbar.org<br>• Respondents detained at Department of Defense (DOD) military facilities (including Guantanamo) should contact our toll-free hotline at 1 (855) 641-6081 | **Human Rights First\*\***<br><br>3680 Wilshire Blvd., Suite PO4-414<br>Los Angeles, CA 90010<br>Tel: (213) 205-0468<br>laprobono@humanrightsfirst.org<br>www.humanrightsfirst.org/asylum.asylum-seekers-and-potential-clients<br><br>• Represents indigent individuals and families seeking asylum<br>• No walk-ins accepted<br>• Languages: Spanish and others as needed |
| | **Kids In Need of Defense (KIND) - Los Angeles\***<br><br>801 S. Grand Avenue, Suite 550<br>Los Angeles, CA 90017<br>Tel: (213) 274-0170<br>infolosangeles@supportkind.org<br>www.supportkind.org<br><br>• Children's cases/UACs only, SIJS, Asylum, U/T visas<br>• Staff is Spanish speaking<br>• No walk-ins, by appointment only |
| **Immigrant Defenders Law Center\***<br><br>634 S. Spring Street, 10th floor<br>Los Angeles, CA 90014<br>Tel: (213) 634-0999<br>Fax: (213) 282-3133<br>info@immdef.org<br>www.immdef.org<br><br>• Low income respondents<br>• Priority given to Los Angeles County residents<br>• Unaccompanied minors<br>• Languages: Spanish and other languages available upon request | **Community Lawyers, Inc.\***<br><br>1216 East Compton Blvd.<br>Compton, CA 90221<br>Tel: (310) 635-8181<br>clinics@community-lawyers.org<br>www.community-lawyers.org<br><br>• No walk-ins<br>• By appointment only (solo con cita)<br>• Languages: English, Spanish, and other languages available upon request |

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

* Non-Profit Organization
** Referral Service
*** Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2025

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Los Angeles Immigration Courts Juvenile Docket

| Los Angeles, California | |
|---|---|
| **International Institute of Los Angeles\*** <br><br> 3845 Selig Place <br> Los Angeles, CA 90031 <br> Tel: (323) 264-6217 <br> Fax: (323) 264-6418 <br> ireception@iilosangeles.org <br> www.iilosangeles.org <br><br> • Open Monday-Friday, 8:30AM-5PM <br> • Services include: removal defense and affirmative petitions <br> • No walk-ins <br> • By appointment only (solo con cita) <br> • Languages: English and Spanish, other languages available upon request | **Kids In Need of Defense (KIND) - Los Angeles\*** <br><br> 801 S. Grand Avenue, Suite 550 <br> Los Angeles, CA 90017 <br> Tel: (213) 274-0170 <br> infolosangeles@supportkind.org <br> www.supportkind.org <br><br> • Children's cases/UACs only, SIJS, Asylum, U/T visas <br> • Staff is Spanish speaking <br> • No walk-ins, by appointment only <br><br> **Immigrant Defenders Law Center\*** <br><br> 634 S. Spring Street, 10th floor <br> Los Angeles, CA 90014 <br> Tel: (213) 634-0999 <br> Fax: (213) 282-3133 <br> info@immdef.org <br> www.immdef.org <br><br> • Unaccompanied minors only <br> • Languages: Spanish |

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

# ATTACHMENT D

 An official website of the United States government

**Official websites use .gov**
A **.gov** website belongs to an official government organization in the United States.

 **Secure .gov websites use HTTPS**
A **lock** ( 🔒 ) or **https://** means you've safely connected to the .gov website. Share sensitive information only on official, secure websites.

🌐 En Español    📞 Contact Us    🔗 Quick Links

 U.S. Immigration and Customs Enforcement

Search

Call 1-866-DHS-2-ICE    Report Crime

ICE    DETAIN    DETENTION FACILITIES

# California City Detention Facility
# San Francisco Field Office

➕ Contacting a Detainee

If you need information about a detainee that is housed at this facility, you may call (760) 491-8104 between the hours of 8 a.m. - 4 p.m. When you call, please have the alien's biographical information ready, including first, last and hyphenated names, any aliases he or she may use, date of birth and country of birth.

Detainees cannot receive incoming calls. If you need to get in touch with a detainee to leave an urgent message, you must call (760) 491-8150 and leave the detainee's full name, alien registration number and your name and telephone number where you can be reached. The detainee will be given your message.

➕ Legal & Case Information

# Immigration Court

For information about a matter before the immigration court, you may call 1-800-898-7180 to speak with them directly. Applications for relief from removal and other applications requested by the immigration judge must be filed directly with the immigration court.

# Board of Immigration Appeals (BIA)

For information about a matter before the Board of Immigration Appeals (BIA), you may call (703) 605-1007 where you can obtain automated information or speak with a live representative during office hours.

Click the link for a list of pro bono representatives nationwide who might be able to assist you.

# To Post a Departure or Delivery Bond

Delivery bonds are posted when a person has been taken into ICE custody and placed into removal proceedings while in the United States.

Post a Bond

# Submitting a G-28

G-28s filed on behalf of detained aliens at this facility can now be accepted through the online platform ERO eFile. Facility staff will not have access to ERO eFile at this time; legal representatives should download copies of their submitted G-28 for any in-person or remote legal visit.

# Sending Non-Confidential Messages to Detained Aliens

This facility has tablets. You can access information on how to send a non-confidential message at: www.gettingout.com.

# Other Legal Access Related Communications

Requests for case information pertaining to aliens detained at California City Detention Facility can be sent to SanFrancisco.Outreach@ICE.DHS.GOV. Please note that this mailbox does not accept applications for Stay of Removal or Case Appeals.

# Contacting the Deportation Officer

To ascertain the identity of your client's Deportation Officer, contact the San Francisco Field Office to obtain that information at the San Francisco Outreach email, SanFrancisco.Outreach@ICE.DHS.GOV. Please note that a G-28 must be on file for any information to be disclosed.

● Hours of Visitation

# Friends and Family Visits

Please call (760) 491-8126 to schedule visits with a detainee.

- Visitors unaccompanied must be at least 18 years of age.
- Persons under 18 must be accompanied by a parent or guardian.
- Proof of the parent/guardian relationship will be required (proof may be a birth certificate or court ordered guardianship).
- Visitors will have a government issued photo identification with them.
- Each detainee will receive two (2) one-hour blocks of visitation time per week. Each visit, regardless of duration, will count as one (1) hour.

# Attorney Visits

Legal representatives are authorized to visit their clients during the following hours:

8 a.m. - 8 p.m.

Legal calls can be scheduled by contacting the main office at (760) 491-8123.

A list of pro bono (free) legal organizations will be posted in all detainee housing units and other appropriate areas. This list shall be updated quarterly. If a detainee wishes to see a representative or paralegal from that organization, it is the detainee's responsibility to contact them for an appointment.

# Legal Calls or Virtual Attorney Visits (VAV)

Legal calls can be scheduled by contacting the main office at (760) 491-8123. Accommodations will be made for any available time slots.

Legal representatives may request virtual attorney visits (VAV) or confidential legal phone calls with their clients or prospective clients by email at: calcityattorneyschedule@corecivic.com. The California City Detention Facility court officers will email back with a confirmed date and time.

The email should include:

- Legal representative's full name
- Legal representative's contact information, including phone number(s), and email address
- Detainee's name
- Detainee's alien number
- A few proposed times/dates for the requested VAV session
- A scan of the legal representative's government issued identification
- A scan of the legal representative's identification or documentation reflecting their status as an active legal representative, such as a state bar card, attorney license, paralegal license, or similar legal status.
- A scan of the attorney's DHS Form G-28 (unless this is a pre-representational)
- If a legal assistant is the only legal representative to join the call, the email should also attach a letter of authorization on the firm's/organization's letterhead and a scan of the assistant's identification.

Legal representatives may also schedule VAV meetings or calls by dialing (760) 491-8123 for the court room officer responsible for scheduling.

All appointments for VAV meetings or phone calls should be made 24 hours prior to the desired appointment time. Appointments are scheduled 8 a.m. - 8 p.m., and are in 30 to 60 minute increments. Legal representatives are not limited on the number of VAV appointments they can request, but no legal representative is permitted more than one 60-minute appointment with a detainee in a single day.

The same guidelines for in-person attorney/client visits will apply to VAV meetings and legal calls. Only legal representatives, legal assistants, and interpreters will be allowed; no family or friends of the clients are permitted. The attorney and/or his/her agents may contact outside interpretation services during the call or session. The sessions will be confidential; a visitation officer will be stationed outside of the confidential room to ensure security by standing out of earshot but within eyeshot. The officer will knock 5 minutes before the cut off time.