## DECLARATION OF SUSAN TIONA, M.D.

I, Susan Tiona, state the following based upon my personal knowledge.

1. I am over the age of 18 and am competent to testify to the matters set forth in this Declaration.

2. I make this Declaration based upon my own personal knowledge and review of relevant documents maintained by CoreCivic in the normal course of business, and if called as a witness, could competently testify to these facts.

3. I make this Declaration in response to Plaintiffs' Motion for Preliminary Injunction and supporting exhibits in the matter of *Fernando Gomez Ruiz, et al. v. U.S. Immigration and Customs Enforcement, et al.*, Case No. 3:25-cv-09757-MMC, in the Northern District of California.

4. I am a medical doctor licensed to practice medicine in the states of Arizona, Colorado, Kansas, Montana, Nevada, Ohio, Oklahoma, and Tennessee.

5. I graduated in 1992 from the Loyola University Stritch School of Medicine and have been board certified in family medicine since 1995.

6. Since 2004, I have practiced medicine in the correctional health care setting, including serving for two years as the chief medical officer for the Colorado Department of Corrections (CDOC), during which time I participated in drafting policy and procedure for both medical and mental health issues. As the chief medical officer, I was also responsible for mentoring providers and evaluating the medical care rendered to 18,000 inmates in the CDOC system.

7. Currently, I am both the Clinical Director for Correctional Medicine Associates and a Regional Medical Director for CoreCivic. In these capacities, I am responsible for participating in the drafting of policy and procedure as it relates to clinical aspects of medical care at all active CoreCivic facilities, and mentoring all Correctional Medicine Associates medical providers in matters of clinical treatment of inmate patients at all active CoreCivic facilities.

8. Having practiced in the correctional healthcare setting for the past 21 years, I am very familiar with standards of medical care and administrative practice in jail, prison, and community settings, including standards set forth by the American Correctional Association, the National Commission on Correctional Health Care, and the 2025 National Detentions Standards for U.S. Immigrations and Customs Enforcement.

9. My colleague, Dr. Walkitria Smith, and I performed a clinical chart review of detainees from the California City Correctional Facility who submitted Declarations in support of Plaintiffs' Motion, as well as four additional detainees who are mentioned in the Declaration of Dr. Todd Wilcox submitted in support of Plaintiffs' Motion.

10. This Declaration is intended to address those allegations, as well as provide background information related to health services processes and procedures at the facility.

## ELECTRONIC HEALTH RECORD

11. CoreCivic uses the ▮▮▮▮▮▮▮▮▮▮▮▮ which is designed to be used by providers and nursing staff from a computer display. While the system does allow records to be printed for continuity of care purposes, depending on the format options selected while printing, certain information may not be included, and certain information may be misleading to those who do not have a familiarity with the system.

12. For example, if records are printed in the Inmate Condensed Chart Report, the time at the top of the entry appears in Central Time, which is the time zone where CoreCivic's Facility Support Center (FSC) is located. The time at the top reflects the time in Central Time when the encounter record was opened or created. The time at the bottom indicates the local time when the provider or nurse closed and signed the record, which may be delayed in some instances where a provider or nurse finished entering the note into the EHR at a later time. Additional time discrepancies may occur where a provider or nurse completes the entry but does not "sign" the record until a later time.

13. Where a detainee arrives at the facility as a transfer from another facility, any records the detainee arrives with are scanned into the ▮▮▮▮▮▮ system, and scanned

records appear at the end of the Inmate Condensed Chart Report in reverse chronological order based upon the date and time they were scanned into the system. While the system does maintain an audit trail indicating who reviewed a particular record and when that review occurred, that audit trail documentation can only be viewed on screen for an individual record, and cannot be extracted from the system other than an individual screen shot for each individual record.

14. CoreCivic's outside laboratory provider has a direct connection to the ▮▮▮▮▮▮▮▮▮ so that when laboratory results are available, they are automatically loaded into the ▮▮▮▮▮▮▮▮▮, and the ordering or authorizing provider receives notification during their next login to the system that the results are available for their review.

15. While vital signs are to be recorded at each encounter when necessary and sometimes may be individually appended to a chart entry for an encounter, the most recent eight recordings of vital signs are exported with the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, which are the most relevant to ensure continuity of care. A longer history is viewable by providers and nurses from within the system.

16. For detainees who have orders for daily blood sugar monitoring conducted by nursing staff, rather than through a blood draw and laboratory analysis, those tests are administered as an Accu-Chek test, and results are automatically entered into the ▮▮▮▮▮▮▮ ▮▮▮ before sliding scale insulin is administered. Those results remain available for provider review through the system during encounters, but individual Accu-Chek results do not all appear in the exported and printed records.

17. While the facility conducts pill call multiple times a day to issue medications, entries are made which are recorded in the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ by nursing staff at the time the detainee is seen at pill call by nursing staff. Where a detainee does not appear for scheduled pill call, nursing staff does not make an entry in the system at that time. Rather, the following day at around 3:00AM, the system automatically

enters a "No Show" or "NS" entry for any medication which did not have an entry made relating to administration the prior day.

18. In the event the ▮▮▮▮▮ system is not available for any reason, providers and nurses may complete paper entries which are later scanned into the system. In addition, each day at around midnight, the ▮▮▮▮▮ system generates an ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮ which is emailed to the health services staff and can be printed and used to track medication administration doses and times for all detainees in the facility.

## INTAKE SCREENING

19. The 2025 National Detention Standards (NDS), like the 2016 Revisions to the ICE Performance Based National Detention Standards, require a medical screening within 12 hours of arrival for all detainees, which may be done by a nurse, other health care practitioner, or a specially trained detention officer.

20. At the facility, all detainees are initially subject to a pre-screening, which is done before the detainee is booked into the facility to identify any detainee with emergent medical needs who should be immediately transferred to a hospital or emergency room; identify any detainee with urgent, time-sensitive needs who should receive the initial priority for referral to a provider; identify detainees with non-urgent, non-time sensitive needs who should receive prioritized screening by a Registered Nurse (RN) or provider; identify detainees with a language barrier who should be prioritized to receive a full screening by a RN using interpretation services; and finally identify those detainees who have no reported or observed medical or mental health concerns who are referred for a routine intake exam.

21. These pre-screenings may include taking a basic history (e.g., Are you currently in pain? Are you taking any medications?), recording vital signs, and making basic observations of a detainee's physical condition (e.g., sweating, persistent cough, acute rash, etc.), are within the permitted scope of practice in California by a Licensed Vocational Nurse (LVN), who is under the supervision of an on-duty RN, especially where

the purpose of the screening is not as a comprehensive assessment or independent triage, but simply to assist in identifying which detainees should be prioritized for a full assessment and diagnosis by an RN and/or provider.

22. Once detainees have been prioritized for screening, the Initial Intake Screening is conducted by a nurse and includes a more detailed inquiry into allergies or medication sensitivities; physical deformities; prosthetic devices; history of alcohol/tobacco/drug use; special health care needs or current medical complaints; recent hospitalizations, operations or surgeries; previously scheduled specialty appointments; current pain; current medications; skin problems; special diets; dental issues; history and vaccination for chicken pox and shingles; and a detailed mental health screening.

23. The responses to these questions determine whether the detainee will receive an emergent, urgent, or routine referral to an RN, LIP, dental, or mental health staff. Emergent referrals are to be seen immediately, urgent referrals are seen within 24 hours, and routine referrals occur within 2-14 days.

24. Following completion of this screening, a housing disposition is made by medical staff to either direct detainees with acute needs to special housing or provide clearance for those with no acute needs for general population housing.

25. Detainees who are transferred from another facility typically come with medical transfer summaries, which provide a summary of prior diagnoses and prescribed medications, as well as a list of medications which the detainee was to be provided during transport. Until the detainee is seen by a provider for an intake examination and new medication ordered is entered, CoreCivic continues dispensing the medications provided during transport.

26. When medication orders are entered into the ▮▮▮▮▮▮ system, as long as they are on the approved formulary, those orders are automatically transmitted to CoreCivic's contracted pharmacy provider, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, to be filled. CSP typically fills orders the same day they are received and transmits them via

overnight shipping to the facility. Where a non-formulary medication is ordered, the order is automatically flagged in the ▮▮▮▮▮ system for review and approval by a CoreCivic Regional Medical Director, and once approval is made, is fulfilled.

27. When medications are needed but were not provided by the sending facility, the facility will attempt to obtain them from a backup pharmacy. Initially, facility staff had to travel to the pharmacy in Edwards, which was an hour round-trip drive from the facility, because there was no pharmacy in California City, and pharmacies in neighboring towns declined to support the mission by filling prescriptions. With the opening of the California City Pharmacy on October 27, 2025, and an agreement to stock medications commonly prescribed at the facility, backup prescriptions can now be obtained from a much more convenient location.

28. While the Medical Transfer forms have an area to indicate whether a detainee had any pending consultations for specialty care scheduled at their prior facility, as well as the type of specialist, they do not include any information relating to the identity of the specialist or date of the appointment so that CoreCivic could arrange for the detainee's transport and keep the appointment as scheduled by the originating facility.

29. While detainees arriving at the facility all receive a TB symptom screening at intake in accordance with the NDS, those who have been in continuous law enforcement custody, such as those transferred from another ICE facility who have a documented TB screening within the prior year, do not need additional TB tests if they are non-symptomatic. Detainees who arrive at the facility without a documented TB screening within the prior year are administered a tuberculin skin test or chest radiograph, which the CDC recommends be done "within 7 days of arrival."[1] Any detainee arriving at the facility who has symptoms suggestive of pulmonary TB disease and/or suspected or confirmed TB

---

[1] Centers for Disease Control and Prevention, *At-a-Glance: CDC Recommendations for Correctional and Detention Settings: Testing, Vaccination, and Treatment for HIV, Viral Hepatitis, TB, and STIs*, at 2 (August 10, 2022) (available at: https://stacks.cdc.gov/view/cdc/120256).

disease based on clinical and/or laboratory findings is immediately moved to a negative-pressure airborne isolation room and will remain there until determined by a practitioner to be noncontagious in accordance with CDC guidelines.

## INTAKE PHYSICAL EXAMINATIONS

30. The NDS 2025 requires that the facility complete a comprehensive health assessment within 14 days of a detainee's arrival at the facility. Per the NDS 2025, these assessments are to be completed by a provider (either a physician, physician assistant, or nurse practitioner) or RN (with documented initial and annual training by a physician). While CoreCivic's practice is for providers to conduct the intake physical examination, the NDS 2025 provides that if it is completed by an RN, a provider will review the results. Furthermore, the NDS 2025 provides that if there is documented evidence a detainee received a comprehensive health assessment within the previous 90 days, the provider may determine that a new assessment is not required.

31. Based upon the prioritization of the initial intake screening, detainees are seen by a provider for their initial health examination within the 14-day time period. The following chart details the length of time between the detainees' reception at the facility and their initial health examination:

| Detainee Name | Intake Date | Physical Exam Date | Days Since Intake |
|---|---|---|---|
| ▮▮▮ | 8/27/2025 | 9/4/2025 | 8 |
| ▮▮▮ | 8/29/2025 | 9/11/2025 | 13 |
| ▮▮▮ | 8/29/2025 | 9/12/2025 | 14 |
| ▮▮▮ | 8/29/2025 | 8/31/2025 | 2 |
| ▮▮▮ | 8/29/2025 | 9/10/2025 | 12 |
| ▮▮▮ | 8/29/2025 | 9/12/2025 | 14 |
| ▮▮▮ | 8/29/2025 | 9/12/2025 | 14 |

|  | 9/1/2025 | 9/17/2025 | 16 |
|---|---|---|---|
| ███████ | 9/1/2025 | 9/17/2025 | 16 |
| ███████ | 9/1/2025 | 9/24/2025 | 23 |
| ██ | 9/1/2025 | 9/17/2025 | 16 |
| ████ | 9/2/2025 | 9/23/2025 | 21 |
| ██████ | 9/4/2025 | 9/22/2025 | 18 |
| ██████ | 9/4/2025 | 9/22/2025 | 18 |
| ████████ | 9/4/2025 | 9/19/2025 | 15 |
| ███████ | 9/4/2025 | 9/25/2025 | 21 |
| ███████ | 9/4/2025 | 9/9/2025 | 5 |
| ██ | 9/5/2025 | 9/29/2025 | 24 |
| ██████ | 9/5/2025 | 9/24/2025 | 19 |
| ██████ | 9/5/2025 | 9/16/2025 | 11 |
| ████ | 9/5/2025 | 9/18/2025 | 13 |
| ████ | 9/5/2025 | 9/16/2025 | 11 |
| ███ | 9/5/2025 | 9/17/2025 | 12 |
| ██████ | 9/6/2025 | 9/26/2025 | 20 |
| ███████ | 9/6/2025 | 9/16/2025 | 10 |
| ██████ | 10/7/2025 | 10/9/2025 | 2 |
| ██ | 10/7/2025 | 10/21/2025 | 14 |
| ██████ | 10/20/2025 | 10/23/2025 | 3 |
| █████████ | 11/5/2025 | 11/20/2025 | 15 |

32.  While there have been occasional delays in the intake examinations, changes which have occurred at the facility, including improvements in staffing patterns, changes in health services administration, and increased training and oversight of nursing and on-

site physician staff, as well as the ability of CoreCivic to dispatch additional providers from other facilities, have resulted in a decrease in these times. Additionally, the effectiveness of the screening and prioritization process has continued to ensure that those detainees with urgent needs are seen by a provider most quickly.

33. While the facility has many bilingual staff, where bilingual staff are not available for interpretation, interpretation services are obtained through VOYCE and documented in the ▉▉▉▉▉ system by facility health services staff.

## ACCESS TO HEALTH CARE

34. Detainees at the facility can access health services by submitting a paper Sick Call Request form and submitting it in the locked box in their housing unit. These are collected by health services personnel each night and are triaged to determine if a face-to-face encounter is needed, and if so, to determine the priority for nursing sick call or provider referral. Sick call requests are classified as "Emergency" to be seen immediately; "Urgent" to be seen within 24 hours; and "Routine" to be seen by a nurse within 3 days or a provider within 2 to 14 days. Detainees often fill out sick call requests which do not require a referral, such as seeking medication refills or medical records, which are also noted during triage and returned to the detainee.

35. Detainees who are housed in a Restricted Housing Unit are seen by medical staff who make daily rounds in those units and may advise staff of any requests for medical, mental health, or dental care.

36. In addition, because pill call is conducted multiple times a day by health services staff in each housing unit, detainees have the opportunity to report urgent concerns directly to medical staff.

37. To the extent any detainee experiences a medical emergency, detention and health services staff are trained to provide an emergency response and respond to the detainee within four minutes.

## CHRONIC CARE

38.     Detainees with chronic medical conditions (cardiovascular disease, pulmonary disease, diabetes, infectious disease, seizure disorder, sickle cell, other medical conditions, and mental illness) are identified during intake through a review of intake records, intake screening, initial health appraisal, sick call, or other health encounters, and are enrolled in a Chronic Care Clinic for their respective condition(s).

39.     When chronic conditions are identified through the intake screening process and a provider orders medication as part of the treatment for the chronic condition, enrollment into the corresponding Chronic Care Clinic occurs at intake, and the first appointment will be conducted as part of the Initial Health Appraisal or physical examination.

40.     When chronic conditions are initially identified during the Initial Health Appraisal, enrollment into the corresponding clinic(s) occurs on the date of the provider's referral.

41.     CoreCivic policy is that patients enrolled in Chronic Care Clinics receive an initial visit within 30 days of enrollment.  During the initial visit, the provider takes a targeted history and physical examination of the patient and places orders for any necessary medications, vaccinations, monitoring, diagnostic studies, laboratory tests, or specialty care referrals.

42.     All patients enrolled in Chronic Care Clinics are required to be seen for follow-up appointments with a provider at least every six months, which include a full history and physical examination.  Providers have the discretion to order follow-up appointments more frequently based upon the level of control of the condition.

43.     Providers have the discretion to order a follow-up, for example to review laboratory results and speak with the patient to adjust medications, without scheduling a targeted physical examination, which may not be immediately warranted.

## OFF-SITE REFERRALS

44. CoreCivic has an arrangement with Hall Ambulance to provide emergency medical transports by both ground and air for detainees with emergent medical conditions who must be transferred to a hospital emergency department.

45. Detainees experiencing medical emergencies are typically transported to Tehachapi Hospital, Antelope Valley Medical Center in Lancaster, or Mercy Hospital in Bakersfield.

46. We have contracts with Adventist Health Tehachapi Valley for imaging and specialty care. We also recently established a relationship with Kern County Medical Center in Bakersfield, California for specialty care and have pending cardiology and urology consults scheduled for Plaintiffs Roque Campos and Viera Reyes, respectively, at that location.

47. The facility continues to experience some difficulties in scheduling specialty appointments due to the lack of ICE-contracted specialists near the facility, which is in a remote location. CoreCivic is actively working to rectify this issue through a collaborative effort with ICE to expand the contracted specialist panel.

48. Nonetheless, during the first three months after the facility was reactivated, CoreCivic completed 65 offsite medical transports.

## DISABILITY ACCOMMODATIONS

49. All detainees at the facility have an equal opportunity to participate in services, programs, and activities, in the least restrictive and most integrated setting possible. Detainees requesting an accommodation should submit a verbal or written request to the Health Services Administrator, who serves as the Disability Compliance Coordinator, through the Sick Call Process.

50. Accommodations for disabilities and other conditions are available when medically necessary. The facility has an ample supply of durable medical equipment, including wheelchairs, walkers, crutches, canes, oxygen, and CPAP machines, which are

provided when indicated. Additionally, the health services staff can order lower tier and low-bunk restrictions to ensure that detainees with medical needs are assigned to a housing location which is safe. Additional medical devices, such as orthopedic shoes or eyeglasses, are available following an order from a provider.

51. Providers ultimately make the decision as to which items are medically necessary and prescribed, as well as where a detainee request is not medically necessary and may do more long-term harm than good. For example, most detainee requests for comfort items, such as neoprene sleeves and elastic back braces, are not medically necessary and are not recommended for long-term use.

## CLINICAL CHART REVIEW OBSERVATIONS

52. Unsurprisingly, our clinical chart review identified instances in which there were delays related to the timing of sick call submissions and the completion of certain administrative requests, including housing or bunk-related accommodations. These occurrences were primarily associated with the initial operational period following the opening of the facility. New facility activation can involve transitional challenges, including onboarding of new staff, supply chain delays, and the implementation and alignment of workflows and procedures.

53. Importantly, our review did not reveal any findings that resulted in adverse patient outcomes. Throughout the period in question, the patients continued to receive ongoing clinical monitoring and engagement, including regular touchpoints with the medical and behavioral health teams to assess wellbeing, ensure continuity of care, and advocate for patient needs.

54. Since September 2025, many improvements in patient care access at the facility have been addressed, and delays have been rectified. Sick call requests are now being processed timely, and detainees whose requests are classified as "urgent" are being seen the same day the sick call request is received. All other patients are being seen within 72 hours of submitting a sick call request.

55. Deficiencies that were identified in the initial weeks of the facility's operation have since been corrected through improved medical personnel staffing patterns, change in health services administration, training of nurses in sick call protocols, and training of the on-site medical doctor regarding patient care responsibilities and documentation.

56. In addition, I sent specific recommendations to the on-site physician and Health Services Administrator from my review of the charts of the named Plaintiffs and other detainees who submitted Declarations in support of Plaintiffs' Motion and who are still housed at the facility.

57. These recommendations included expediting offsite appointment scheduling (███); ordering/renewing medications or adjusting medication dosing (███); scheduling follow-up appointments (███); establishing chronic care appointments (███); ordering/scheduling labs (███); ordering medical diets (███) and scheduling evaluations for possible accommodations (███).

58. As noted above, I also reviewed the medical records from four detainees who are mentioned in Dr. Wilcox's report but did not submit Declarations in support of Plaintiffs' Motion. Dr. Wilcox is critical that ███ experienced gaps in receiving his ███ and ███ in September 2025. As noted above, when the facility first opened, medication acquisition was inconsistent due to circumstances beyond the control of the facility (there was no local pharmacy, and pharmacies in other towns declined to support the mission by filling prescriptions). This issue has subsequently been resolved. In reviewing ███ chart, no adverse medical sequelae occurred as a result of difficulties in obtaining

his medication. ▓▓▓▓▓▓▓▓ has an ▓▓▓▓▓▓ indicating ▓▓▓▓▓▓▓▓▓▓▓▓.

59. Dr. Wilcox notes that ▓▓▓▓▓▓ received an ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ during his intake but was not seen until two weeks later. The ▓▓▓▓▓▓▓▓▓▓▓▓▓▓ was in error, as the issues with which ▓▓▓▓▓▓ presented required only ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. The provider ▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓ has subsequently received detailed and ongoing training on evaluations and documentation thereof.

60. Dr. Wilcox also notes that the intake nurse ▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. Upon review of the chart, he was ▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. At the time of the initial screening intake by nursing, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓. That note was handwritten, which generally occurs when the electronic health record has a temporary service disruption. On that note, the provider ▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. As a result, ▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. ▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓. For this reason, h▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓. When a medication is ordered "as needed," the patient is expected to initiate the request at the pill call line to the nurse for that medication. There is nothing unusual about ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. Patients with ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

███████. The issue of ████████████████████████████████████ has been addressed with the ████████████████████.

61.   Dr. Wilcox is critical that ████████████ experienced ████████ ████████████████████████████████████████████████████. ████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████. ████████████████████ ████████████████████████. ████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████. ████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ███████.

62.   Dr. Wilcox asserts that ordering a six-month follow-up for ████████ ████████████████ was "medically inappropriate." As noted above, ████████ ████████████████████████████████████. Therefore, a six-month follow-up was absolutely appropriate. In regard to the ████████████████████████, this issue has subsequently been rectified with enhanced nursing training and improved nursing staffing patterns.

63.   Dr. Wilcox also questions why ████████████████████████████████ ████████████████████████████████████████████████████████████

████████████████████████████████████. It is usual and customary, and, indeed, medically indicated, for a patient to be observed in medical observation for a period of time whenever they return from ████████████████████████████████████. This ensures that the patient remains stable and has no further ██████████ prior to returning to general population. ████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ██████████. Typically, ████████████████ takes place four to six months after an initial procedure, barring any evidence for ████████████████████, as it takes some time for a ██████████████████████.

64.  Dr. Wilcox is critical that ████████████████████████████████████████████████████████████. This is reflective of challenges early on in the course of the Cal City activation processes. These difficulties have, as previously discussed, been rectified through training, improved staffing patterns, and ongoing oversight by managerial personnel.

65.  Dr. Wilcox notes that during his intake screening, ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████. Nurses have subsequently been trained on the proper use of "urgent" vs. "routine" referrals.

66.  Dr. Wilcox asserts that ████████████████████████████████████████████████████. ████████████████████. In my opinion, ████████████████████████████.

67.  Dr. Wilcox identifies several pending offsite specialty consultations for ██ ██ for ████████████████████████████████. None of these

appointments are "urgent." Nonetheless, these have been addressed with the facility to work on getting them scheduled as soon as possible.

68. Dr. Wilcox is critical that the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. As with ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, the nurse ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. As noted above, nurses have subsequently been trained on the appropriate use of "urgent" vs. "routine" referrals.

69. Dr. Wilcox contends that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. If a patient does not come to pill call for their medication, it will be recorded as a "no show." If a medication is not available, it will be noted as such. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

70. Dr. Wilcox asserts that pending offsite encounters are not "honored" following a transfer to the facility. When a patient arrives at the facility, all pending specialty evaluations, ▮▮▮▮▮▮▮▮▮▮▮, must be re-initiated, as the transportation and funding for these appointments differ from facility to facility.

71. As with the other detainee charts I reviewed, while there were some isolated issues with delays in care and/or medication administration, particularly early on after the facility was reactivated, I did not identify any adverse patient outcomes as a result of these delays.

## NEXT STEPS

72. CoreCivic remains fully committed to maintaining and exceeding standards of care. To that end, multiple corrective and supportive measures have been implemented and remain ongoing. These include the sustained on-site presence of nurse trainers to support staffing needs and provide targeted education, reinforcement of clinical workflows, and adherence to established protocols.

73.	Additionally, the CoreCivic Regional Director has spent significant time onsite and will be supplemented by additional regional leadership support in the coming weeks to ensure continued compliance with administrative responsibilities and alignment with applicable NDS and NCCHC standards. The Chief Nursing Officer, to whom the nurse trainers report, is scheduled to visit the facility to evaluate current processes, procedures, and adherence to organizational standards and guidelines.

74.	The CoreCivic Regional Medical Director has also been present both onsite and remotely on multiple occasions over the past several weeks and has directly supported patient care activities to ensure continuity and address any potential gaps. The primary onsite physician has received enhanced training and support through collaboration with the Chief Population Health Officer, Nurse Informatics leadership, and the Professional Oversight Clinical Director.

75.	I am pleased to report that the majority of nursing vacancies have now been filled. Additional mid-level providers are scheduled to begin in the near term, and an additional physician is anticipated to onboard within the coming weeks. I am confident these staffing enhancements will further strengthen our ability to deliver timely, high-quality care and sustain operational stability.

76.	CoreCivic remains steadfast in its commitment to patient safety, professional excellence, and continuous quality improvement.

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

Executed on December 29, 2025.

Susan Tiona, M.D.