# EXHIBIT 1

**AMENDED DECLARATION OF CHRISTOPHER CHESTNUT**

I, Christopher Chestnut, state the following based upon my personal knowledge.

1.      I am over the age of 18 and am competent to testify to the matters set forth in this Declaration.

2.      I am currently the Warden at CoreCivic's California City Correctional Facility[1] ("Cal City" or "the facility"), located at 22844 Virginia Boulevard, California City, a position I have held since June 2025.

3.      The facility is owned and operated by CoreCivic. The facility currently houses federal immigration detainees pursuant to a contract with Immigration and Customs Enforcement ("ICE").

4.      Prior to transferring to Cal City, I was the Warden at Nevada Southern Detention Center and the Assistant Warden at the Northeast Ohio Correctional Center.

5.      I have been employed by CoreCivic since 1995 and have more than 27 years of corrections and detention experience, including supervisory positions at multiple facilities utilized by ICE.

6.      I make this Declaration in response to Plaintiffs' Motion for Preliminary Injunction and supporting exhibits in the matter of *Fernando Gomez Ruiz, et al. v. U.S. Immigration and Customs Enforcement, et al.*, Case No. 3:25-cv-09757-MMC, in the Northern District of California.

**Allegations and Relevant Background of the Named Plaintiffs**

7.      Plaintiff Mendiola Escutia was booked into the facility on September 4, 2025. His assessment questionnaire notes a ████████████████████ ████████████  He was classified as ██████████ based on his prior conviction for homicide and his ████████████████████████████. In October 2024, ICE ERO

---

[1] The facility has also been variously referred to as the California City Correctional Center, California City Immigration Processing Center, and California City Detention Facility.

reviewed the case and determined he was a ███████████████████ for detention and removal. He was previously incarcerated at the California Department of Corrections and Rehabilitation ("CDCR") Correctional Training Facility. At Cal City, he applied and was approved to participate in the VWP as an AM Porter mopping floors starting on September 28, 2025.

8.      Plaintiff Roque Campos was booked into the facility on September 5, 2025 following a transfer from Mesa Verde. He was recommended for an override to ██████ ████████ based on his I-213, which notes an arrest in Merced County for domestic violence with willful infliction of corporal injury. He was placed in the restrictive housing unit ("RHU") on November 27, 2025 for medical observation following his return from the hospital following ████████████████. He was released on November 28, 2025 and returned to general population housing.

9.      Plaintiff Guevara Alarcon was booked into the facility on August 29, 2025 following a transfer from Golden State Annex. He was classified as ███████ based on a prior conviction for attempted murder and his ███████████████. In July 2024, ICE determined that he was a ███████████████. He was previously incarcerated by CDCR at the California Substance Abuse Treatment Facility. During intake, Guevara Alarcon reported he was in good health and had no disabilities or special vulnerabilities. Guevara Alarcon was placed in RHU on pre-hearing detention status on September 20, 2025 after being charged with Interfering with Staff Duties (198) for refusing to exit the shower during a critical incident lock-down that morning. He refused nursing assessments following the incident. During his disciplinary hearing on September 23, 2025, he admitted to not locking down when asked. His disciplinary charge was dropped to a 307 – Refusing to Obey a Direct Order, and he received a seven-day RHU sanction with credit for his prior time served. He applied and was approved for a VWP position on September 29, 2025.

10.    Plaintiff Viera Reyes was booked into the facility on August 29, 2025 following a transfer from Golden State Annex. His assessment questionnaire notes ███████ including ██████████████████████. He was classified as ████ ████ based on a prior conviction for murder and ██████████████████. He was previously incarcerated in CDCR custody at Pelican Bay and San Quentin. On November 24, 2025, he signed a VWP agreement for a Barber position, which was approved the next day.

11.    Plaintiff Keo was booked into the facility on August 29, 2025 following a transfer from Mesa Verde. He was classified as █████████ based on a current conviction of robbery, for which he received a 32-year sentence, a prior conviction for aggravated assault, and ██████████████. Keo applied for a VWP position for special detail – maintenance on September 29, 2025 but was approved for a position in the laundry. He was placed in RHU on November 12, 2025 on pre-hearing detention status for disciplinary charge 213 – Engaging in a Group Demonstration, when he refused to don his full uniform and stand by his cell for an inspection. He was released from RHU on November 18, 2025. While at Mesa Verde, he submitted a habeas petition in the Eastern District of California, Case No. 1:24-cv-00919-HBK, challenging his prolonged detention. The Respondent's Motion to Dismiss was granted, finding Keo subject to mandatory detention "due to his prior conviction for aggravated felonies, including conspiracy to commit home invasion robbery, and shooting a firearm at an occupied dwelling."

12.    Plaintiff Gomez Ruiz was booked into the facility on October 20, 2025 following a transfer from Desert View Annex. He was classified as █████████ based on no prior convictions or ██████████. He was released from Cal City on December 4, 2025.

13.    Plaintiff Ruiz Canizales was booked into the facility on August 29, 2025 following a transfer from Golden State Annex. He was classified as █████████ based on prior offenses of Domestic Violence (with corporal injury) and making criminal threats.

His I-213 states he "claims good health." His file notes that he is  and

, "but can communicate in English writing." He was released from Cal City on

December 4, 2025.

**Relevant Background of the Non-Plaintiff Declarants**

14.    Declarant Alvarez-Mora was booked into the facility on September 4, 2025

following a transfer from Golden State Annex. During his custody classification, he was

recommended for an override to            based on his I-213, which noted he had an

due to a conviction in Costa Rica for Aggravated Sexual Abuse of a

Minor involving the rape of an eight-year-old. The I-213 also documents additional

convictions in Costa Rica of two counts of aggravated rape and one count of aggravated

sexual abuse of a minor.

15.    Declarant Armenta was booked into the facility on September 1, 2025

following a transfer from Mesa Verde. During classification, he was recommended for an

override to            due to pending violent charges for homicide. His I-213 notes that

he is                                         .

16.    Declarant Benavidez Zamora was booked into the facility on November 5,

2025 following a transfer from Golden State Annex. He reported a prior incarceration in

CDCR custody at Pelican Bay from 2022 to 2023. He was classified as            . His

I-213 notes convictions for two counts of sexual battery and lewd or lascivious acts with a

child under 14, for which he was sentenced to five three years, respectively, in prison. He

had previously been released on Alternatives to Detention, but had two violations, which

led to his remand to ICE custody.

17.    Declarant Julio F. V.[2] was booked into the facility on September 1, 2025

following a transfer from Mesa Verde. He admitted during booking to having a current or

prior conviction of a violent offense and that he previously received a disciplinary sanction

---

[2] Upon information and belief, this Declarant's name is Florez-Vargas.

for violence or sexual abuse while detained. He was classified as ███████ based on his convictions for robbery and assault, as well as his ██████████. Florez-Vargas' I-213 reflects prior convictions in 2011 (Robbery – Street-Gun – seven-year sentence); 2016 (assault by prisoner – four years consecutive); 2019 (possession of weapon by prisoner – two years consecutive); and 2020 (assault – four years). He has previously been incarcerated at Wasco State Prison and Kern Valley State Prison. His November 18, 2025 reclassification at Cal City reflects a disciplinary for engaging in a group demonstration. He applied and was approved for a shower porter position on September 22, 2025.

18.     Declarant Garcia-Romero was booked into the facility on October 7, 2025 after an October 6, 2025 arrest. Unlike the majority of the other Declarants, she did not transfer from another detention facility. She was classified as ███████ based on having no prior criminal offenses or ██████████. On October 23, 2025, she applied and was approved for a VWP position cleaning floors.

19.     Declarant Llufrio (aka Illufrio) was booked into the facility on August 27, 2025. His classification file notes a 2009 conviction for burglary and no known ███████, resulting in his classification as ████████. His I-213 also notes a prior misdemeanor for vehicle theft and a prior arrest for resisting an officer. He had a final order of removal issued in 2006 and was located and arrested by ICE Fugitive Operations in June 2025. On September 22, 2025, he was placed in RHU for pre-hearing detention for charge 204 – Threatening Another after he approached the Unit Manager during housing moves and said, "If you leave that guy in here I'm going to fight him." This was witnessed by two other staff members. He was released from RHU on September 25, 2025.

20.     Declarant Montes Regalado was booked into the facility on September 4, 2025 following a transfer from Golden State Annex. He was classified as ████████ based on a prior conviction for kidnapping, for which he was sentenced to 18 months in CDCR custody. ICE issued a final order of removal in 2007, and he was apprehended by

ICE in August 2023. On November 3, 2025, he applied and was approved for a VWP position as a shower porter.

21.    Declarant Orejuela Gutierrez was booked into the facility on August 29, 2025 following a transfer from Golden State Annex. He received an override to ███████ ██████ based on prior time served in Columbia for drug trafficking and cartel involvement. ██████████████████████████.

22.    Declarant Rivera-Trigueros was booked into the facility on September 6, 2025 following a transfer from Golden State Annex. He was classified as ██████████ based on a prior conviction for murder and ██████████████████. He was previously incarcerated in CDCR custody at Cal City. On September 11, 2025, he received a disciplinary from the Unit Manager for wearing contraband footwear, which medical confirmed had not been approved. Rivera-Trigueros continued to refuse directives from the Unit Manager and was charged with 229 – Conduct that Disrupts; 307 – Refusal to Obey; and 305 – Possession of Unauthorized Items. Following a hearing, he was sanctioned with four days of segregation with credit for time served. On September 29, 2025, he applied for a VWP position as a pod porter, which was approved on October 20, 2025. On November 12, 2025, he was returned to RHU after he refused my directive during a unit inspection to return to his cell, which delayed the inspection. He was charged with 298 – Interfere with Staff Member and 309 – Refuse Direct Order and released from RHU on November 18, 2025.

23.    Declarant Singh was booked into the facility on September 5, 2025 following a transfer from Mesa Verde. His initial custody classification notes a prior conviction for taking a vehicle without consent in 2022 and ██████████████████, resulting in classification as ██████████. He was previously in ICE custody in 2019 at the Frederick County Detention Center but was released on bond before ICE became aware of an ██████ ██████████. On September 19, 2025, he was placed in medical overflow housing in RHU

for meal monitoring due to declaration of a hunger strike,[3] which was reported to be based on his frustration over cancellations of scheduled ███████ at prior facilities. On September 30, 2025, he submitted a grievance alleging that a Detention Officer pushed him out of the pod, was rude, and took papers from him when requested a copy of the papers and the protocol for a hunger strike. The grievance was denied as unfounded by Assistant Chief of Security of Security Breeman, noting that staff attempted to get his attention without force, and he exited the pod of his own accord. He was placed in medical observation again on October 20, 2025 due to another declaration of a hunger strike related to his request to see a ███████ and was released on October 23, 2025. He received a disciplinary charge for fighting on October 27, 2025, which did not change his custody level.

24.     Declarant Vishal was booked into the facility on September 2, 2025 following a transfer from Golden State Annex. He was initially classified as ███████ with no convictions or known ███████ but was later reclassified as ███████ based on a charge for fighting on October 27, 2025 and new information reflecting ███ ███████. On September 19, 2025, he was placed in medical overflow housing in RHU for meal monitoring. On September 27, 2025, he was released from RHU, and on September 29, 2025, he applied and was approved for a VWP position as a special detail. He was released from Cal City on December 8, 2025.

25.     Declarant Juarez Ruiz was booked into the facility on August 29, 2025 following a transfer from Golden State Annex. He was classified as ███████ based on prior convictions for drug trafficking (cocaine) and DUIs. His I-213 indicates that he was previously removed.

26.     Declarant Guthrie was booked into the facility on August 29, 2025 following a transfer from Golden State Annex. He was classified as ███████ based on 2004

---

[3] A hunger strike is defined as missing more than nine meals. To date, there have been five incidents meeting this threshold, two of which were from ███████.

convictions for distribution of cocaine and a weapons offense, for which he was sentenced to 312 months and 120 months, respectively. He was previously incarcerated by BOP at FCI Edgefield and was taken into custody by ICE in 2023 following a reduction in his sentence under the First Step Act. While at Cal City, he was approved for participation in the VWP on September 29, 2025. He was released from the facility on October 27, 2025.

27.     Declarant Khan[4] was booked into the facility on October 7, 2025 from the Bakersfield Field Office. She was classified as ▮▮▮▮▮▮▮ with no prior convictions or ▮▮▮▮▮▮▮▮▮. She was released from the facility on November 5, 2025.

28.     Declarant Leyva was booked into the facility on September 4, 2025 from Golden State Annex. He was classified as ▮▮▮▮▮▮▮ based on a prior conviction for second-degree robbery. He was previously in CDCR custody at the Sierra Conservation Center in Jamestown, CA. His I-213 notes that he "claims good health." He was released from the facility on November 28, 2025.

29.     Declarant Montes-Diaz was booked into the facility on September 5, 2025 following a transfer from Mesa Verde. He was classified as ▮▮▮▮▮▮▮ based on a prior conviction for DUI, prior charges for domestic violence and aggravated assault with a gun, and ▮▮▮▮▮▮▮▮▮▮. His I-213 notes that in 2017, he was sentenced to 10 years' imprisonment for DUI causing great bodily injury (paralysis and brain injury), had misdemeanor convictions for domestic violence in 2013 (28-day sentence) and a probation violation in 2008 (60-day sentence). It also notes prior arrests and charges for cruelty towards a child in 2013, threat terroristic state offenses in 2009, and aggravated assault – gun in 2008 – all of which were described as "still pending." He was previously incarcerated in CDCR custody at Wasco State Prison and Cal City. On September 29, 2025, he applied and was approved for a VWP position as an AM Chemical Porter. On October 5, 2025, he was charged with Insolence towards Staff (308), Interfering with Count (314),

---

[4] Upon information and belief, this detainee's name is Zahan.

and Conduct that Disrupts (399) when he was one of several detainees who refused to lock down for the 11AM count. He approached Unit Manager Harper stating, "That's not how you do your job," and when told to lockdown, he said, "fuck that get the lieutenant." At the disciplinary hearing, he stated that he came over to assist another detainee who did not speak English and admitted to cussing at Unit Manager Harper and refusing to lock down until a Lieutenant was present. The disciplinary committee imposed a sanction of a seven-day commissary restriction but no RHU time for this infraction. He was later placed in RHU on November 14, 2025 for refusing orders (307) and conduct that disrupts security staff operation (299). During this incident, Montes requested to be on a lower bunk and refused orders to be on the top bunk. A staff member told Montes he was assigned to the upper bunk in the cell and needed to move there because the lower bunk was needed for a detainee with a medical bottom bunk order. He was released from RHU on November 20, 2025. While in RHU, he refused nine meals between November 16th and November 20th, but he did eat one meal a day from November 16th through November 18th. He was released from the facility on November 24, 2025.

30.    Declarant Neri Valdez was booked into the facility on September 6, 2025 following a transfer from Golden State Annex. He was classified as ▮▮▮▮▮▮ based on prior convictions for lewd acts upon a child and false imprisonment. He was previously in CDCR custody at the California State Prison in Corcoran. On September 19, 2025, he was placed in RHU for a charge of Conduct that Disrupts (299). He was released from RHU on September 25, 2025. He was released from the facility on October 24, 2025.

31.    Declarant Santos Avalos was booked into the facility on September 5, 2025 following a transfer from Mesa Verde. He was classified as ▮▮▮▮▮▮ based on a 2014 conviction of sex assault ("sexual penetration by foreign object, unconscious"). During his arrest by ICE, he claimed no medical conditions. He was released from the facility on November 13, 2025.

//

**Conditions at Cal City**

32.     The facility is not derelict as claimed by Plaintiffs. It was in continuous use, first as a federal detention center and then as a state prison, from 2000 through 2024. After the California state inmates departed, CoreCivic continued to maintain the facility with a cadre of on-site staff with the intention of reactivating it with a new customer base.

33.     CoreCivic spent significant money preparing and upgrading the facility for reopening earlier this year.

34.     Prior to reopening, the facility was inspected and passed by the California City Department of Public Safety.

35.     The first ICE detainees housed at the facility under the current contract arrived on August 27, 2025.

36.     All areas of the facility accessible to detainees have central air conditioning and heating.

37.     Temperatures in the housing areas are thermostatically controlled and maintained at a target between 68 and 72 degrees year round. Fluctuations do occur when the temperature changes drastically with the same 24-hour period; however, these temperatures are not extreme and if adjustments are needed then maintenance makes those adjustments. Air temperatures are currently measured by staff at least twice a week using a laser temperature reader; however, we have ordered new devices and will be implementing daily temperature checks at the beginning of January 2026.

38.     The hot water heaters throughout the facility are also thermostatically controlled and maintained at 120 degrees. Temperatures are tested at least weekly by staff using a thermometer, or more frequently if issues are reported. We will also be implementing daily hot water temperature checks beginning in January 2026.

39.     The water in the housing units is from the California City municipal water supply, which is subject to regular quality testing, and is the same water provided to California City residents. Facility staff also drink the water while on duty.

40.     I am aware that some Declarants allege there is sediment in the water. This is not accurate. There is no sediment coming out of the water taps, and detainees are not drinking water with sediment in it. Rather, the sediment was coming up from the drains because the joints in the pipe chases are made of iron, and they rust over time, contributing to backups.

41.     To rectify this, we brought in a plumbing company to replace drains and flush out all the plumbing lines at a cost of more than $150,000. They pulled towels, blankets, bowls, and cups out of the lines that had been flushed down the toilets. Our maintenance staff also continue to periodically find items that have been improperly flushed down toilets.

42.     However, I am not aware of any toilet clogs lasting several days in occupied cells as alleged by several Declarants. Unit management does daily cell inspections looking for cell compliance, leaks, and broken toilets. I instituted a policy that if a plumbing issue in a cell cannot be corrected by the end of the day, the occupants are moved to another cell.[5]

43.     I am aware that Orejuela Gutirrez alleges he slipped and fell in his cell due to a leak from his sink that flooded his cell and had to be sent out for medical treatment. A review of his records reflects that he was sent out to the hospital on September 29, 2025 and returned approximately two hours later. There is no record of his cell being flooded, and there were no witnesses to the slip and fall. Detainees can report a leak to the detention officers posted in their housing pod 24/7 or to unit staff or ADO staff during our daily walkthroughs. When we are alerted to a leak, we send out maintenance to repair it.

44.     While Plaintiffs allege that "harsh conditions of confinement are a deliberate feature of the [DHS] enforcement program intended to induce self-deportation and to deter

---

[5] We have on-site maintenance staff during regular business hours. After hours and on weekends, we will call in maintenance staff or a contractor for urgent issues, such as broken air conditioning or heating or issues with the hot water heaters.

illegal immigration," I direct my staff to treat all detainees in our care humanely and with respect. This is a cornerstone of our training with staff, which my staff and I constantly reiterate. I tell my staff to stay out of the politics, remember that the detainees rely on us for their care and safekeeping, and do our jobs to the best of our ability.

45.    Contrary to the allegations in the Declarations submitted by Plaintiffs in support of their Motion, there have been no deaths at the facility since it reopened. There have been two suicide attempts, both by the same detainee who refused his psychiatric medications and was transferred by ICE to an inpatient mental health facility, not "at least five" as claimed by Plaintiffs. On both occasions, staff quickly intervened and prevented the detainee from self-harming. There have been no attempted or completed escapes and no overdoses at the facility.

**Staffing and Supervision**

46.    We operate the facility on a direct supervision model, with three detention officers staffed per housing unit on each shift.

47.    Our unit management team is fully staffed up to the current detainee count. There is a unit manager for every two open housing units who each have counselors and case managers reporting to them.

48.    Administrative Duty Officer ("ADO") level staff tour the housing units daily to observe conditions and speak with staff and inmates.

49.    We hold weekly segregation meetings to discuss all detainees housed in RHU. These meetings are attended by a representative from mental health, the Assistant Warden, Chief of Unit Management, and unit management staff. I also attend when I am available.

50.    The starting salary for detention officers at Cal City is $104,083.20.

51.    We initially experienced some challenges with medical staffing as the facility reopened. We utilized corporate and regional medical providers, as well as providers from CoreCivic's Otay Mesa Detention Center in San Diego, to complete initial health

screenings and see patients on sick call. As the facility population continues to ramp up, we have steadily increased our medical staffing levels.

52.    Our mental health staffing levels are robust and significantly higher than I've had at any other facility I've worked at.

53.    Medical is staffed on-site 24/7. Mental health staff are on-site seven days a week and available on call 24/7. Dental staff are on-site five days a week. There is an on-site phlebotomist, and a contracted mobile radiologist.

54.    We contract with Hall Ambulance for emergency medical services, emergency medical transports, and medical evacuations. There are two helicopter landing areas on-site for medical evacuations.

55.    Detainees experiencing medical emergencies are typically transported to Tehachapi Hospital, Antelope Valley Medical Center, or Mercy Hospital in Bakersfield.

56.    We have contracts with Adventist Health Tehachapi Valley for imaging and specialty care.

57.    Detention and custody staff receive six weeks of initial training. Other roles receive two to three weeks of initial security training. Medical, mental health, and dental staff receive two to three weeks of initial security training, followed by additional clinical training.

**Intake and Orientation**

58.    Upon arrival at the facility, detainees go through the intake process, which includes booking, classification, a Prison Rape Elimination Act ("PREA") screening, an initial health screening, personal property processing, facility property issuance, and orientation.

59.    Detainees also receive a copy of the detainee handbook, which is available in English, Spanish, Russian, Punjabi, Persian, Hindi, French, Chinese, and Arabic and can be translated into other languages when needed.

60.    Attachment A is a true and correct copy of the English version of the facility handbook, which is a business record of CoreCivic.

61.    There are multiple 12-person holding rooms in the intake area where detainees are held as they progress through the intake stations. The rooms have toilets with privacy barriers and sinks, and detainees are provided sack meals and beverages.

62.    I am aware that several Declarants allege they experienced long waits in the intake area. In the first few days after the facility reopened, there were occasions when multiple buses arrived at the same time, resulting in longer than normal wait times. In those cases, detainees were moved to open areas in unused housing units to allow for freedom of movement, etc. We have since opened one of the unused housing units as an overflow intake processing area to allow us to process larger groups more quickly.

63.    One Declarant also alleged that he was forced to wait on a bus for more than six hours prior to entering the facility. I investigated this allegation and determined that the bus was briefly delayed in entering the facility due to a self-harm incident occurring in the facility, resulting in a Code 1 response. However, the delay was substantially less than six hours as claimed.

64.    During intake, all clothing, personal property, valuables, and funds are inventoried and accounted for on a personal property form, with a receipt provided to the detainee.

65.    The detainee handbook outlines which items detainees are permitted to retain on their person at Cal City, including legal documents and papers, up to ten photos, approved medical prostheses, personal reference materials, a radio with earphones, a wedding band, religious jewelry that has been approved by the Chaplain, up to five soft cover books, and up to five newspapers or magazines.

66.    I am aware that several Declarants allege they were denied religious property. For example, Detainee Singh alleges he was denied a steel bracelet and a wooden comb. We do not allow steel bracelets because they can be used as brass knuckles. Wooden

combs may also be disallowed depending on their length and construction, as they can be fashioned into weapons. These concerns are not merely theoretical. Detainee Singh was involved in an incident on October 27, 2025, in which he and four other detainees attacked and stabbed another detainee with homemade weapons, resulting in the other detainee being sent out to the hospital.

67.     Another detainee alleges that he was not permitted to have candles and incense. We do not allow detainees to possess candles or incense due to obvious fire and safety/security concerns, but we will allow detainees to have access to battery operated candles in the chapel if approved by the Chaplain.

68.     Property that detainees are not authorized to keep on their person will be secured in a secure storage area in the facility. Each detainee is limited to 40 pounds in storage, excluding stored legal documentation. Excess personal property can be mailed out, picked up, or disposed of.

69.     Opened hygiene and food items from another facility are not permitted and will be disposed of.  The reason detainees are not permitted to keep open hygiene, food, or clothing items issued from other facilities is to prevent the introduction of contraband, such as illicit substances or weapons which may have been secreted in those items by detainees prior to their transport.

70.     I am aware that multiple detainees have alleged they had property confiscated from them after an incident. For example, Leyva asserts that on October 28, 2025, staff searched his cell and took hygiene and food items and blankets. Guevara Alarcon alleges that his pod was temporarily moved that same day to another pod during a search. Juarez Ruiz claims that on October 29, 2025, staff threw out blankets, food, and hygiene items. All of these searches occurred in response to the October 27, 2025 stabbing incident on the recreation yard, in which the assailants had possession of three homemade shanks. The two pods involved in the stabbing incident were placed on lockdown while we conducted interviews to investigate the incident and determine who was involved. We also conducted

shakedowns of every cell to ensure there were not any additional weapons, none of which were found. While doing cell shakedowns, staff also reviewed for property compliance and discovered that many detainees had excess facility issued property, including hoarded hygiene items and blankets. In my experience, detainees who are leaving the facility will give their property to other detainees before they leave, resulting in excess property in the cells of those who remain in the facility. The late October 2025 cell searches resulted in carts full of extra property being removed from the units. Food that was confiscated during those searches was food from meal trays that detainees kept in their cells. This is not permitted due to sanitation and food safety reasons.

71.    During intake, detainees are issued uniforms that are color-coded consistent with their gender and custody level. Detainees are issued three uniform sets (each consisting of a uniform top and uniform pants), five t-shirts, five pairs of underwear, five pairs of socks, and one pair of shoes. Female detainees are also issued bras.

72.    In addition to clothing, all detainees are issued linens, including two sheets, two towels, two hand towels, one pillowcase, one blanket, and a laundry bag.

73.    All detainees have been issued jackets and an extra blanket for use in the cooler months.

74.    Detainees who arrive with gray sweatshirts and sweatpants from Golden State Annex or Mesa Verde are permitted to keep them. Detainees who do not arrive with sweatshirts and sweatpants can purchase them from the on-site commissary.

75.    Detainees are permitted all-white shoes with no laces. If they arrive to the facility with compliant shoes they are permitted to keep them.

76.    Detainees may choose to purchase additional items from the commissary.

**Hygiene and Cleaning**

77.    Detainees are issued hygiene supplies, including toothbrushes, toothpaste, soap, shampoo, lotion, and combs upon arrival. Female detainees are also provided

feminine hygiene items. Additional supplies of these items are available in self-service bins in the housing units that are stocked by unit team staff.

78.    Razors may be checked out during count three times a week. This is consistent with ICE National Detention Standard ("NDS") 2025 Standard 4.4, Section II(F), which states that "[t]he distribution of razors shall be strictly controlled."[6]

79.    Staff supervise use of nail clippers once a week and sanitize them in between uses. We do not issue out or permit personal nail clippers because they can be used to make weapons by carving the bunks and other metal surfaces.

80.    Barbering services are available according to the schedule posted in the housing unit dayrooms. Each pod typically has two assigned barbers. Contrary to the allegations in the Declarations, there are barber tools and appropriate sanitization supplies available for each housing unit.

81.    The laundry schedule is posted in the housing unit dayrooms.

82.    Detainees are expected to keep their own cells clean and are provided mops, mop buckets, brooms, cleaning rags and chemicals for such use.

83.    Early on after the facility reopened, we learned that some detainees were hoarding cleaning rags and chemicals, leaving others without supplies to clean their cells. We held townhalls to explain that these items needed to be shared and would be replenished as needed. We now replenish cleaning rags and chemicals four times per day.

84.    We have implemented the Voluntary Work Program ("VWP"), through which detainees can choose to work in various assignments throughout the facility and receive a stipend. VWP assignments include porters, who are assigned to clean the housing unit common areas and showers, kitchen workers, commissary workers, barbers, warehouse, and laundry workers. High custody detainees are not permitted to work outside their pods, so they are assigned positions inside the pod.

---

[6] Per contract, we are required to follow the NDS 2025 at the facility. The NDS 2025 standards are available at: https://www.ice.gov/detain/detention-management/2025.

**Mail**

85.    Detainees may send and receive correspondence through the mail. Detainees may purchase postage from the commissary. Indigent detainees may drop outgoing mail into a mailbox for mailing without charge.

86.    Detainees are issued pencils, pens, paper, and standard sized envelopes on request. There are pencil sharpeners mounted in the housing unit dayrooms for detainee use.

87.    I am aware that several of the detainees who submitted Declarations in support of Plaintiffs' Motion complain that the pens issued to them are flimsy. We supply flexible pens specifically designed for use in secure institutions, including jails, detention centers, and mental health hospitals, that cannot be easily converted into weapons or used for storing contraband. These style pens are a routine practice in many detention facilities for safety reasons.

**Activities, Recreation, and Social Visitation**

88.    Detainees are provided access to tablets in the housing unit dayrooms. The tablet to detainee ratio established by ICE is 1:4.

89.    Detainees may send and send electronic mail through the tablets, which can also be used for video visitation.

90.    In addition to electronic mail and video visitation applications, the tablets offer library materials, audio books, movies, music, news, law library and legal resources including Lexis Nexis, wellness videos, games, religious applications, facility policies, and access to ICE and facility forms including request forms and grievances.

91.    During the initial reactivation of the facility, there were a few times that we had to cancel or curtail outdoor recreation periods. However, detainees are now permitted to go out to recreation at least one hour per day, five or more days a week with the goal of seven days a week weather permitting. This is consistent with ICE NDS 2025 Standard 5.2 Section II(A), which states that if outdoor recreation is available at the facility, detainees

must have access for at least one hour per day, five days a week or six or more hours per week, at least four days per week. That standard further states that if only indoor recreation is available, detainees must have access for at least one hour each and access to natural light.

92.    Recreation times are staggered so that housing units go out at different times on different days.

93.    Male and female detainees are not permitted to recreate outdoors at the same time. Likewise, High and Low custody levels do not recreate outdoors at the same time.

94.    The outdoor recreation yards contain basketball hoops, a track, and space for group sports, including soccer and volleyball. Handballs are provided. We plan to begin facilitating rec tournaments as the facility population expands.

95.    We also recently opened an indoor gym with exercise equipment. Currently, the female population has daily access to the indoor gym and exercise equipment. They also have access to an outdoor recreation area.

96.    Detainees are not prohibited to exercise in the dayrooms; however, they are required to be clothed with shoes, shirt, and pants/shorts.

97.    I am aware that two detainees complain in their Declarations that the recreation yards are littered with "plants with thorns" and "cactus spikes." This is not accurate. Weeds do pop up on the recreation yards, but this is primarily in areas such as against the edges of the buildings and edges of fences where detainees do not typically go.

98.    The facility Chaplain holds regular services for detainees, including group prayer, Bible study, and church/worship services. The schedule is posted in the housing unit dayrooms.

99.    Detainees are permitted to hold congregate services or prayer in the pods. For example, Muslim detainees hold Juma in the multi-purpose rooms on Fridays. Contrary to the allegation by Detainee Khan that there is not enough room for Muslims to pray, the

multi-purpose rooms can hold approximately 30 people, while there are fewer than 10 female Muslim detainees in the facility.

100. Detainees may request Bibles and other religious literature through the librarian or Chaplain. Detainees may request religious clothing, symbols, and other religious items necessary for the practice of a particular faith by submitting a Religious Article Authorization Form to the Chaplain.

101. Clergy visits are available and can be arranged through the Chaplain. There is also a process by which volunteers can be approved to provide religious services on site. A detainee may request to add a religious practice, service, or program that is not currently in place at the facility by submitting a Religious Practice Authorization Request form. Detainees may request a special religious service or ceremony by submitting a Request for Special Service/Ceremony to the Chaplain at least 60 days in advance of the requested service/ceremony. These procedures are outlined in the detainee handbook.

102. Detainees may check out books, magazines, and other reading materials from the facility librarian.

103. Detainees may also order books, magazines, and newspapers from approved publishers.

104. Detainees are issued radios and headphones.

105. Each of the dayrooms contains four large televisions and two play stations. There are 45 television channels available.

106. Detainees can obtain table games, puzzles, and playing cards from facility staff.

107. I am aware that several of the detainees who submitted Declarations in support of Plaintiffs' Motion complain that the facility does not offer college courses like they experienced as sentenced state prisoners. ICE detention centers are not intended to be long-term settings designed for rehabilitation of criminal offenders. The primary purpose of ICE detention is to safely and temporarily hold individuals while their immigration cases

are processed and pending removal. The lack of a predictable length of stay makes it impracticable for detainees to complete semester-long or year-long courses, much less multi-year college degree programs.

108.    Detainees are provided cleaning supplies, including glass cleaner, sanitizer, disinfectant, multi-purpose cleaner, brushes, squeegees, brooms, mops, and mop buckets in the housing units for cleaning their own cells. Dayroom porters are responsible for cleaning the showers and dayrooms.

109.    During the facility ramp-up period, all social visitation is non-contact. Contact visitation is more staff intensive and carries a significant risk of introduction of contraband, including drugs, weapons, and electronic devices, into the facility.

110.    This is consistent with ICE National Detention Standards ("NDS") 2025 Standard 5.5, Section II(A), which allows the facility discretion to hold non-contact visitation.

111.    Social visits are currently 60 minutes each and are available seven days a week. This exceeds NDS 2025 Standard 5.5, Section II(F)(1), which requires a minimum duration of 30 minutes and availability of visiting hours only on Saturdays, Sundays, and holidays.

112.    The facility handbook outlines visitation procedures. All detainees were also provided a memorandum regarding the procedures for Friends and Family Visits. Attachment B is a true and correct copy of the Friends and Family Visits memorandum dated November 5, 2025 and is a business record of CoreCivic.

**Safety and Security**

113.    I am aware that several of the Declarations submitted in support of Plaintiffs' Motion allege that pat searches involve groping of their genitals.

114.    This is not accurate. Pat searches are conducted consistent with the ICE NDS 2025 when detainees leave and return to the housing areas. NDS Standard 2.7, Section

II(C)(1) defines a "pat search" as "a sliding or patting of the hands over the clothed body of a detainee by staff to determine whether the individual possesses contraband."

115.    Conducting pat searches when detainees leave and return to their housing areas is also consistent with other facilities and detainee populations I have worked with over the course of my career.  The purpose of these searches is to attempt to limit detainees' ability to introduce contraband into their housing areas and move contraband throughout the facility.

116.    All custody staff receive training on appropriate search procedures, including pat searches.

117.    I am also aware that several of the Declarations submitted in support of Plaintiffs' Motion complain about the number and duration of counts at Cal City.

118.    Formal and standing counts are conducted in accordance with the posted building schedule available in each pod. The schedule calls for count at least twice on day shift, twice on evening shift, and three times on night shift.

119.    CoreCivic's count policy and building schedules are reviewed and approved by ICE.

120.    The purpose of counts is to ensure that all detainees are alive, present, in the appropriate location, and safe.

121.    Detainees are expected to cooperate with staff during each count. This includes immediately returning to their cells after count is announced and remaining there until after cleared for movement. During standing counts, detainees must stand inside their cells facing the door.

122.    Showering, using the dayroom sink or microwave, sitting in the dayroom, and staying on the phone are not permitted during count time. These restrictions are clearly stated in the detainee handbook.

123.    Disruptions during count may result in a lockdown being initiated and/or disciplinary sanctions.

124.    Plaintiff Keo was involved in an incident on September 12, 2025 in which he and a group of other detainees were being loud and disruptive in the dayroom, refused staff directives to put their shirts back on, and refused to return to their cells for count. The incident turned into a demonstration involving multiple detainees, which required a staff response to get the detainees to return to their cells. The incident was resolved without the use of force. Consistent with facility policy, several detainees from the group were charged with disciplinary offenses and taken to restrictive housing for pre-hearing detention.

125.    Plaintiff Guevera Alarcon was involved in an incident on September 20, 2025, in which he refused to exit the shower despite multiple staff directives to return to his cell during a critical incident lock down, which delayed the lockdown process. When he finally exited the shower, he shouted, "This is bull shit, Chief Alvarado!" He was taken to RHU for pre-hearing detention. At the hearing, he admitted to refusing to comply with staff directives and stated that he would "be better and listen to staff."

126.    Under the NDS 2025, ICE requires CoreCivic to "promote a safe and orderly living environment for detainees by establishing a fair and equitable disciplinary system requiring detainees to comply with facility rules and regulations, and imposing disciplinary sanctions on those who do not comply." This is no different than I have experienced in any other correctional or detention system.

127.    The purpose of imposing these rules is to promote and enhance the safety and security of the institution as a whole, including but not limited to, protecting the physical safety and individual rights of other detainees and staff members.  As a result, the disciplinary system imposes sanctions commensurate with the severity of the prohibited act to encourage a non-compliant detainee to conform to the rules and regulations in the future.

128.    The delay in a detainee returning to his or her assigned cell for a count does disrupt facility operations and extend the period of the count, which impacts all detainees in the facility, as the count cannot clear and no other detainees may be released from their

cells until the count is complete. Additionally, behavior of this type can interfere with responses to emergencies and other incidents and for this reason are taken seriously.

129.    A group demonstration or refusal not only delays the count process and release of other detainees but also calls for a response by additional staff from other locations in the facility. While those staff members are attending to the group demonstration, they are less available to respond to any other incident which may occur at the facility, such as a detainee in emergent medical distress. Moreover, to the extent that certain detainees may coercively pressure detainees who do not wish to protest, their attempt to control other detainees violates those detainees' rights to refuse to engage in a demonstration.

130.    For that reason, inciting or leading a group demonstration may result in the involved detainee being given a disciplinary sanction following formal disciplinary proceedings, which include the right to a hearing on the disciplinary charge and an opportunity to call witnesses and present evidence to refute the disciplinary offense. If the detainee is found to have committed the charged infraction, the detainee may receive a disciplinary sanction of up to 30 days in restrictive housing. Detainees may also be placed in restrictive housing during investigatory and disciplinary proceedings, such as occurred with the instigators of the group demonstration mentioned above.

131.    As indicated in the NDS, these disciplinary sanctions are intended to promote pro-social behavior in an institutional environment, where detainees are cognizant of the rights of their fellow detainees and staff, including each individual's right to live or work in a safe environment. Disciplinary sanctions are not assessed as a means of retaliation against detainees.

132.    CoreCivic has a zero tolerance policy for retaliation by staff, and I enforce this policy at the facility.

133.    I am aware that Declarant Montes Diaz alleges he received a disciplinary write-up for speaking up about how staff treat detainees. This is not accurate. Montes Diaz

received a disciplinary write-up on November 15, 2025 because he refused staff directives to vacate the bottom bunk in his cell when another detainee was placed in the cell who had a medical order for a bottom bunk. Montes Diaz was assigned to the top bunk but had been using the bottom bunk because he was single celled. When staff directed him to move back to his assigned bunk, he refused and also refused to allow the other detainee to enter the cell. There was no retaliation.

134.    Several of the Declarants allege that count times range from over an hour to three-and-a-half hours. This is not typically accurate. There have been a few lengthy counts due to incidents occurring during the counts. For example, when the group of detainees engaged in a sit-in demonstration and refused to return to their cells for count, we had to bring in additional staff to facilitate getting the detainees back to their cells without any use of force. Count times may also be extended during emergency situations.

135.    When we first reopened the facility, counts took longer than normal because many staff were new, and many detainees were not accustomed to the count procedures. Count times have decreased significantly and now average between 30 and 45 minutes each.

**Restrictive Housing**

136.    Placement in segregated housing is undertaken on a case-by-case basis depending on the circumstances at issue. The restrictive housing units are used for administrative segregation, pre-hearing detention, disciplinary segregation, medical observation overflow, and protective custody.

137.    Detainees in RHU may be double celled. They are permitted to make telephone calls, use the tablets, take showers, order commissary, watch television and go to outdoor recreation.

138.    Outdoor recreation for RHU takes place in outdoor enclosures, which are located directly outside the housing units. While one of the Declarants alleges that there was a dead bird in one of the outdoor recreation enclosures, I am not aware of any such

occurrence. Contrary to Plaintiffs' allegations, the enclosures are not filthy and are cleaned daily.

139.    Placement in RHU is not intended to be punitive.

**Medical and Mental Health Services**

140.    Each detainee receives an initial health screening during intake by a nurse or provider.

141.    These screenings are not conducted in "busy hallways" as alleged by Plaintiffs. Rather, they take place in rooms or enclosures to provide privacy with the medical/mental health nurse or provider.

142.    The initial health screening covers medical, mental health, dental, and disability related concerns. Depending on the detainee's answers, he or she may be referred to be seen by a medical, mental health, and/or dental provider on an expedited basis.

143.    The initial intake also includes an inquiry into whether the detainee has any physical, mental, and intellectual disabilities.

144.    All detainees are to receive a comprehensive health evaluation within 14 days after arrival; however, there have been a few times during the initial activation period where there were some delays until additional providers were brought in to reduce the backlog.

145.    Detainees may request medical, mental health, and dental care through submission of a written sick call request. They may also make a verbal request for health care to any staff member.

146.    There is an on-site medical unit, which includes a detainee waiting area, medical exam rooms, a dental room with multiple dental chairs, a telehealth room, a lab, an x-ray room, mental health offices, four negative pressure cells, two medical observation cells, and a mental health watch cell.

147.    I am aware that Declarant Montes Regalado alleges there is no privacy in the showers in the medical observation area. This is not accurate. The medical shower has a door and provides more privacy than the showers in the housing units.

148.    Declarant Leyva alleges he was only provided peanut butter sandwiches and cookies while in medical observation. I do not know whether his specific allegation is accurate, but generally, detainees in medical housing receive a regular meal tray unless a medical provider orders a special diet. Detainees on suicide watch are generally provided a finger-food only meal with no utensils, but a provider may enter other orders.

149.    The clothing, property, and activities allowed during a stay in medical observation also depend on the reason(s) the detainee has been placed in medical housing and are reviewed/approved by a provider.

150.    Most medications are administered by medical staff during pill call, in which a nurse brings a medication cart to the housing units twice per day and distributes medications to the detainees.

151.    Detainees in RHU receive daily visits from medical and mental health staff.

**Disability Accommodations**

152.    Detainees can request disability accommodations at intake, through submission of a sick call request form to the Disability Compliance Coordinator, or during any medical encounter.

153.    The Health Services Administrator serves as the Disability Compliance Coordinator at the facility. This is consistent with NDS 2025 Standard 4.7 Section (II)(B)(2), which does not require that the Disability Compliance Coordinator have no other responsibilities.

154.    CoreCivic Policy 14-101 outlines the procedures for requesting accommodations.

155.    Detainees who are dissatisfied with the response to their requests for disability accommodations can submit a grievance using the facility grievance system.

156.    The procedures for submitting a sick call request or grievance are explained during intake and are included in the detainee handbook. Detainees who have questions about either process can ask their case management staff.

157.    If a detainee arrives at the facility with an assistive device, the intake nurse reviews the item. If the detainee has a valid medical order for the item, the detainee will be permitted to retain it on his or her person. If there is no medical order for the item, but the nurse or provider determines there is a medical need for it, the detainee will be permitted to retain it on his or her person. If there is no medical order for the item, and the nurse or provider determines there is no medical need for the item, the item will be stored in the detainee's property.

158.    I am aware that several Declarants allege they were not permitted to retain orthopedic shoes they came into the facility with. I have received several complaints related to this issue. In response, I or my unit staff have personally gone to the property room to inspect the shoes and confirm whether there is a valid order for them. In the vast majority of cases, the shoes the detainees claimed were orthopedic were not orthopedic, and instead were normal athletic sneakers that did not meet facility requirements for color and/or lack of shoestrings.

159.    Declarant Benavides Zamora has a valid order for ████████████ that was issued on November 20, 2025, and he was provided ████████████ on November 27, 2025.

160.    Declarant Rivera Trigueros came into the facility with a pair of athletic sneakers that he claimed were medically authorized. On September 11, 2025, the Unit Manager directed him to remove the shoes, which had laces and were considered contraband, but he refused. The Unit Manager confirmed with medical that he did not have a medical order for the shoes, but he still refused to remove them, which resulted in a Code 1 response for disruption of the property inventory process for multiple detainees and halted all movement within the facility. Rivera Trigueros was taken to RHU for pre-hearing

detention. He was ███████████████████████████████████████

████████████████████████████████████. He was later ████████████████████

██████████████████████████████████, but that the specific

shoes in question (a pair of black Under Armor brand athletic sneakers with homemade

laces) were not orthopedic and therefore were not authorized.

161.    The facility has a large supply of wheelchairs and other assistive devices that

can be provided to detainees if ordered by a medical provider.

162.    I am aware that Plaintiff Keo alleges he has had difficulty obtaining

██████████████████████. ██████████████████████ are stocked on

the medication carts and may be requested by detainees during daily pill call. I recently

learned that Plaintiff Keo's ████████████████████████ than those stocked on the

medication carts. Neither his ████████████████████ have any markings, and

Plaintiff Keo was unable to provide any information regarding the ██████████████████

required, making it difficult to determine the ██████████████. I had staff obtain

████████████████ and provide them to him. I also had staff confirm that the ████████████

████████████████. Going forward, he will be provided ████████████████ on a

keep on person ("KOP") basis at regular intervals.

163.    The facility uses VOYCE for interpretation services, including sign language

interpretation. VOYCE is accessible to all staff through land line phones, handheld

VOYCE devices, and a cell phone app.

164.    The detainee tablets also include access to Purple, a Video Relay Service

provider that allows detainees who are deaf or hard of hearing to make video calls with

hearing individuals by providing a video interpreter who signs with the detainee and speaks

with the called party.

165.    I am aware that Plaintiff Ruiz Canizales alleges he is unable to use the tablet

to contact his family. This is not accurate. I personally sat down with him in October 2025

to get him access to Purple and explain how to use it on the tablet. Staff continued to work with the detainee to ensure he had the access he needed.

166.    While he states in his Declaration that he had a whiteboard at his prior facility, he has not asked for one at Cal City.

**Detainee Telephone System**

167.    Each housing unit dayroom has eight telephones for detainees to place outgoing telephone calls. Four are located in a bank on the dayroom floor, and four are mounted to the wall.

168.    The following are photographs of the detainee telephones.



169.    The detainee to telephone ratio is at most 11:1 in the larger pods and 1:10 in the smaller pods if filled to capacity.[7] However, the ratio is significantly lower than that in many pods, which are not at capacity. These ratios exceed the requirement in NDS 2025 Standard 5.4, Section II(C), which mandates at least one telephone for every 25 detainees.

170.    The telephones are separated by partitions for privacy.

---

[7] Each housing unit consists of three pods: two with a capacity of 88 detainees, and one with a capacity of 80 detainees.

171.    Detainee telephones are not located near the posts for CoreCivic detention officers, and officers are not able to overhear any such conversations from inside the housing unit.

172.    The detainee telephone system is administered by Talton, a third-party contractor of ICE that manages the telephone system at ICE facilities nationwide. CoreCivic does not set the rates or receive any profit from the detainee telephone system.

173.    Upon arrival at Cal City, the processing officer issues each detainee a PIN number to use the detainee telephone system.

174.    Detainees who are indigent, as defined by the NDS 2025, are eligible to request a certain amount of free phone calls per month which may be used at their discretion for legal or prepaid calling.

175.    Detainees in restrictive housing can use a portable telephone that is brought to their cells to place outgoing calls.

176.    I am not aware of long lines to use the housing unit telephones as asserted by Plaintiffs and frequently there are multiple phones in each pod that are not being used at any given time

177.    Calls to specific telephone numbers, including consulates, embassies, and certain pro bono legal agencies, are free of charge. These telephone numbers are posted in the housing unit dayrooms, along with instructions on how to make a pro bono call. The detainee handbook also outlines the procedures. Calls to the telephone numbers posted in the housing unit dayrooms are not monitored or recorded.

178.    Attachment C is a true and correct copy of the pro bono provider list.

179.    To make an unmonitored call to a court, a legal representative, or for the purpose of obtaining legal representation, a detainee can submit a Detainee Request Form through unit management staff. Once approved, the telephone number(s) will be privatized within the Talton system, meaning that calls placed to that telephone number from the detainee telephones will not be monitored or recorded. Once a telephone number is

privatized in the system, it is privatized for any detainee at any facility utilizing the Talton system, and CoreCivic does not have access to record, monitor or otherwise change the status of that number

180.    Attorneys can also privatize their telephone numbers by contacting the facility and providing their state bar identification and a G-28 form confirming representation of at least one detainee at the facility.

181.    Attorneys who wish to ensure that their phone number is confidential for all calls placed from any ICE facility using the Talton system, including California City, should follow the instructions available at: https://www.ice.gov/doclib/detention/faq-taltonAttorney.pdf.

**Access to Counsel and Legal Materials**

182.    The dayrooms each have a legal kiosk with legal materials for detainee use. Detainees may request notary services and copies of legal materials through unit staff. Notary services and printing and copying of legal materials are free of charge.

183.    I am aware that Declarant Orejuela Gutierrez alleges there is a charge for printing legal documents. This is not accurate. I reviewed his inmate transactions, as well as a report of all detainee transactions since the facility opened, and there have been no such charges.

184.    The detainee tablets also offer legal materials and research applications, including Lexis Nexis.

185.    Detainees are informed how to schedule confidential attorney calls and virtual attorney visits ("VAVs") during orientation, and the procedures are also outlined in the detainee handbook. If they have questions regarding these procedures, Detainees can also ask case management staff.

186.    Detainees may request private legal calls through submitting a Detainee Request Form to unit management staff. After staff verify the attorney or legal

representative's credentials, these calls are facilitated in staff offices, where telephones are not monitored or recorded.

187.    There are currently 10 VAV booths. There are also 12 VTC booths that are typically used for court but can also be used for virtual attorney visits if needed.

188.    Below is a photograph of the VAV booths, including one that is designed for wheelchair access.



189.    In-person legal visits generally take place in the legal visitation area, which is non-contact but allows for passing legal documents between the participants. However, contact visits may be permitted upon request and with facility approval.

190.    VAVs, legal calls, and in-person legal visits are available between 8:00 a.m. and 8:00 p.m. daily and may be scheduled in 30 or 60-minute increments.

191.    There is no limit on the number of VAVs, legal calls, or in-person legal visits that may be requested, but a legal representative may not have more than one 60-minute appointment with the same detainee in a day. However, a detainee may have more than one

appointment in a day if scheduled with different legal representatives. For example, Plaintiff Keo had two VAVs on November 15, 2025 with different attorneys.

192.    Available time slots for VAVs, legal calls, and in-person legal visits are seldom if ever completely filled on any given day. However, the need to separate genders and custody levels can impact availability. We are working to separate the VAV booths into multiple areas to address this.

193.    The procedures for requesting VAVs, legal calls, and in-person legal visits are available at https://www.ice.gov/detain/detention-facilities/california-city-detention-facility. *See* Attachment D: California City Detention Facility, San Francisco Field Office information page, downloaded Dec. 9, 2025.

194.    Currently, VAVs, legal calls, and in-person legal visits may be scheduled by calling or emailing the facility at calcityattorneyschedule@corecivic.com.

195.    We are planning to implement an online scheduling portal to allow legal representatives to make their own appointments. This change is expected to expedite the process, as the facility currently receives a very large volume of calls and emails to schedule VAVs, legal calls, and in-person legal visits. Between August 27, 2025, when the first detainees arrived, and December 8, 2025, the calcityattorneyschedule@corecivic.com email address received 5,014 emails, with 3,467 attachments.

196.    Many of the requests received are duplicative, making it challenging for our staff to efficiently and timely respond.

197.    For example, paralegal Genesis Fabian of the Asian Law Caucus submitted a Declaration alleging that he works with a single detainee at Cal City; his colleague, attorney Lee Ann Felder-Heim, submitted a Declaration alleging that she has two clients at Cal City. During the above time period, Mr. Fabian and Ms. Felder-Heim and individuals affiliated with the Asian Law Caucus transmitted 74 files, consisting of both parent emails and attachments, to calcityattorneyschedule@corecivic.com.

198.    Attorney Hannah Kazim alleges in her Declaration that she represents one client at Cal City, and attorney Hudson Kyle alleges that he represents three detainees. Ms. Kazim, Mr. Kyle, and their organizations, Immigrant Defenders Law Center and Immigrant Legal Defense, transmitted 122 files, consisting of both parent emails and attachments, to calcityattorneyschedule@corecivic.com during the relevant time.

199.    Attorney Stephanie Quintero alleges in her Declaration that she represents one client at Cal City. Ms. Quintero and her office transmitted 134 files, consisting of both parent emails and attachments, to calcityattorneyschedule@corecivic.com during the relevant time.

200.    In addition to the attorney Declarants, counsel for Plaintiffs in this matter sent a substantial volume of requests for legal calls and visits. For example, the Prison Law Office, ACLU, and California Coalition for Immigrant Justice sent 188 emails to calcityattorneyschedule@corecivic.com through December 8, 2025.

201.    Another attorney who submitted a Declaration in support of Plaintiffs' Motion did not utilize the facility's procedures for scheduling a legal visit, which specify that such requests should be made at least 24 hours in advance. Attorney Sarah Goss admits in her Declaration that she did not reach out to the facility in advance before driving four hours to meet with her client. We work to accommodate legal visits even without the requisite 24-hour notice, but not following the procedures may result in longer wait times, such as Ms. Goss experienced.

202.    Ms. Goss' Declaration also notes that there was a Code 1 when she arrived at the facility. During a Code 1, all non-essential movement is halted inside the facility to allow for staff and first responders to focus on the emergency. While I understand Ms. Goss' frustration over having to wait, our first priority is to ensure the safety and wellbeing of our detainees and staff.

203.    Attorney Mario Valenzuela submitted a Declaration in which he alleges that he was unable to print documents during a legal visit to have his clients sign because he

could not plug his printer into an outlet in the attorney visitation room. I am not aware that Mr. Valenzuela ever asked staff to assist him in locating an outlet, which we could have accommodated had we known of the need. We also have a dedicated email address, calcitylegaldoc@corecivic.com, for legal representatives to send legal correspondence and documents to their clients. The instructions for utilizing this procedure are outlined at https://www.ice.gov/detain/detention-facilities/california-city-detention-facility      and should be carefully followed to ensure the confidentiality of the materials submitted.

204.    Contrary to Plaintiffs' allegations, there are not "weeks-long" delays in scheduling legal calls and visits.

205.    ███████████████████████████████████████████████████. The attorney requests submitted do not come close to exceeding the capacity of available slots, but what tends to happen is that an attorney or legal representative will ask for a specific date/time that is already taken, or they are not available for the options suggested by staff.

206.    Another common scenario is that an attorney or legal representative will send a request for a VAV or in-person visit a week out. For example, Declarant Kazim alleges that "[g]enerally, it has taken anywhere from 10 days to more than 2 weeks to get a call scheduled." This is not accurate. She sent an email on October 23, 2025, requesting to see her client on October 24th, October 29th before 11:00 a.m., or any time on October 30th or October 31st; staff accommodated her request and scheduled her for October 31st. On October 31, 2025, she sent another email requesting to see her client on November 7th or November 10th, which was accommodated with a November 7th appointment. On November 12th, she sent another request asking to see her client after noon on November 20th or on November 21st, which was accommodated with a November 21st appointment. There was no "delay" in scheduling—to the contrary, staff accommodated her specific requests.

207.    We do our best to respond to attorney requests for calls and visits within a day of receipt of the request, and I have not received complaints from attorneys or legal representatives regarding scheduling.

208.    A review of the VAV logs shows that there were 602 VAVs completed between October 1st and December 9th. During that period, the highest daily utilization was 23 VAVs, and the average daily utilization was 12 VAVs.

209.    The named Plaintiffs and detainee Declarants had VAVs during that period as follows:

- Plaintiff Gomez Ruiz – two VAVs (November 10th and 21st)
- Plaintiff Keo – six VAVs (October 3rd, 15th, and 30th; November 14th and two on November 15th)
- Plaintiff Roque Campos – two VAVs (October 2nd and November 24th)
- Plaintiff Viera Reyes – three VAVs (November 12th and 20th and December 1st)
- Declarant Guthrie – one VAVs (October 1st)
- Declarant Flores-Vargas – one VAV (December 2nd)
- Declarant Orejuela Gutierrez – three VAVs (October 2nd, November 11th, and December 3rd)
- Declarant Leyva – three VAVs (October 29th and 30th and November 12th)
- Declarant Montes-Regalado – one VAV (November 10th)
- Declarant Vishal – one VAV (October 15th).

210.    In addition, Declarant Singh had a facilitated legal call on November 19, 2025.

211.    For November 2025, 167 attorneys conducted VAVs, 50 attorneys conducted facilitated legal calls, and 198 attorneys had both VAVs and facilitated legal calls. Attorney Declarant Kyle had five VAVs in November 2025, attorney Declarant Kazim had two

VAVs with Plaintiff Gomez Ruiz, and attorney Declarants Gorney and Quintero each had one VAV. None of the other attorney/paralegal Declarants availed themselves of a VAV in November 2025, and none of the nine attorney/paralegal Declarants availed themselves of a facilitated legal call.

212.    Recent in-person legal visitation logs reflect the following: nine in-person legal visits on November 29, 2025, including six by attorney Declarant Mario Valenzuela; seven in-person legal visits on December 1, 2025; five in-person legal visits on December 3, 2025, including one each with Plaintiffs Keo and Guevara Alarcon; five in-person legal visits on December 4, 2025; seven in-person legal visits on December 7, 2025; and seven in-person legal visits on December 8, 2025.

213.    I am aware that several of the Declarations submitted in support of Plaintiffs' Motion allege issues with audio quality and connectivity on the VAVs.

214.    I have not received any complaints from any of the attorney/paralegal Declarants regarding audio quality or connectivity issues.

215.    VAV systems are monitored daily to ensure adequate hardware and software functionality. Attorney complaints regarding functioning may be reported via e-mail to calcityattorneyschedule@corecivic.com or by calling (760) 491-8123 and asking to speak with the court room officer. Detainees may also report technical issues with the VAV system to the staff member supervising the area.

216.    We have had a few isolated issues with connectivity, resulting in cancellation of immigration court and VAV sessions, but these have not been widespread or consistent.

217.    We also had some issues with audio quality early on after we began utilizing the new VAV booths, but we changed out the headsets and brought in a vendor to change out the fans, and there have since been no complaints.

218.    Because the VAV systems rely upon an internet connection, issues of "lag" in audio or video may be more likely to occur in periods of high demand for internet bandwidth, as well as competing demands for bandwidth at the attorney location, where

multiple devices may be connected to the same network or router, particularly home networks. We are unable to control internet connectivity issues arising outside of the facility.

219.    In addition to VAVs, legal calls, and in-person legal visits, detainees and their counsel may also communicate by legal mail. Legal mail from an attorney or legal representative should be clearly be marked as such and will be delivered unopened by facility staff to the detainee. In the presence of the detainee, staff will open the envelope to ensure that it does not contain contraband and give the communication to the detainee. Detainees may similarly seal clearly marked legal mail and deposit it in the facility mail, where it will not be opened by facility staff.

220.    We recognize the importance of access to legal representation and do our best to timely accommodate requests for VAVs, legal calls, and in-person legal visits within the constraints of operating a secure detention facility and with the resources available to us.

221.    Revisions made in this Amended Declaration correct minor errors in names and associations, as well as provide additional clarity relating to certain assumptions made during the initial drafting of this Declaration.  Information contained in paragraphs 195 to 200 was not based upon my personal count of email messages I had received, but rather upon data provided by CoreCivic's Sr. Manager of eDiscovery Programs, which may be relied upon in the normal course of CoreCivic's business operations.  During the initial reporting, certain assumptions relating to result counts were made that further investigation of the actual messages revealed were misconstrued.  I can now confirm that the counts initially provided included not only parent emails, but also attachments (which sometimes also include additional email messages).  In addition, with respect to paragraph 200, the paragraph omitted several of Plaintiffs' counsel and also included emails from a domain which is not associated with counsel for Plaintiffs, resulting in a reduction of that number.

[THE REMAINDER OF THIS PAGE IS LEFT INTENTIONALLY BLANK]

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

Executed on January 15, 2026.

Christopher Chestnut

Christopher Chestnut

Signature: