1    KEKER, VAN NEST & PETERS LLP
     STEVEN P. RAGLAND - # 221076
2    sragland@keker.com
     CODY S. HARRIS - # 255302
3    charris@keker.com
     CARLOS C. MARTINEZ - # 354616
4    cmartinez@keker.com
     LISA C. LU - # 364259
5    llu@keker.com
     633 Battery Street
6    San Francisco, CA 94111-1809
     Telephone:    415 391 5400
7    Facsimile:     415 397 7188

8    CALIFORNIA COLLABORATIVE FOR
     IMMIGRANT JUSTICE
9    PRIYA ARVIND PATEL - # 295602
     priya@ccijustice.org
10   MARIEL VILLARREAL - # 317048
     mariel@ccijustice.org
11   1999 Harrison Street #1800
     Oakland, California 94612
12   Tel: (650) 762-8990

PRISON LAW OFFICE
MARGOT MENDELSON - # 268583
mmendelson@prisonlaw.com
TESS BORDEN - MJP # 805022, pro hac vice
tess@prisonlaw.com
PATRICK BOOTH - # 328783
patrick@prisonlaw.com
ALISON HARDY - # 135966
ahardy@prisonlaw.com
RANA ANABTAWI - # 267073
rana@prisonlaw.com
1917 Fifth Street
Berkeley, California 94710-1916
Tel.: (510) 280-2621

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
KYLE VIRGIEN - # 278747
kvirgien@aclu.org
FELIPE HERNANDEZ - # 338468
npp_fhernandez@aclu.org
MARISOL DOMINGUEZ-RUIZ - # 345416
mdominguez-ruiz@aclu.org
425 California Street, 7th Floor
San Francisco, CA 94104
Tel.: (415) 343-0770

CARMEN IGUINA GONZALEZ - # 277369
ciguinagonzalez@aclu.org
915 15th Street, NW, 7th Floor
Washington, DC 20005
Tel.: (202) 393-4930

18   *Attorneys for Plaintiffs Fernando Gomez Ruiz, Fernando Viera Reyes, Jose Ruiz Canizales, Yuri*
19   *Alexander Roque Campos, Sokhean Keo, Gustavo Guevara Alarcon, Alejandro Mendiola Escutia*
     *and all others similarly situated*

20                          UNITED STATES DISTRICT COURT

21                          NORTHERN DISTRICT OF CALIFORNIA

22   FERNANDO GOMEZ RUIZ; FERNANDO
     VIERA REYES; JOSE RUIZ CANIZALES;
23   YURI ALEXANDER ROQUE CAMPOS;
     SOKHEAN KEO; GUSTAVO GUEVARA
24   ALARCON; and ALEJANDRO MENDIOLA
     ESCUTIA, on behalf of themselves and all
25   others similarly situated,

26                          Plaintiffs,

27        v.

Case No. 3:25-cv-09757-MMC

**DECLARATION OF STEVEN P.
RAGLAND IN SUPPORT OF
OPPOSITION TO DEFENDANTS'
MOTION TO TRANSFER**

Date:         February 6, 2026
Time:        9:00 a.m.
Dept:        Ctrm. 7-19th Floor
Judge:      Hon. Maxine M. Chesney

28

U.S. IMMIGRATION AND CUSTOMS
ENFORCEMENT; TODD M. LYONS,
Acting Director, U.S. Immigration and
Customs Enforcement; SERGIO
ALBARRAN, Acting Director of San
Francisco Field Office, Enforcement and
Removal Operations, U.S. Immigration and
Customs Enforcement; U.S. DEPARTMENT
OF HOMELAND SECURITY; KRISTI
NOEM, Secretary, U.S. Department of
Homeland Security,

        Defendants.

Date Filed:  November 12, 2025

I, Steven P. Ragland, declare:

1.      I am a partner of the law firm of Keker, Van Nest & Peters LLP, counsel to named Plaintiffs Fernando Gomez Ruiz, Fernando Viera Reyes, Jose Ruiz Canizales, Yuri Alexander Roque Campos, Sokhean Keo, Gustavo Guevara Alarcon, and Alejandro Mendiola Escutia in this matter. I am a member of the California State Bar and admitted in the United States District Court for the Northern District of California. I have personal knowledge of the facts stated in this Declaration and, if called to testify, could and would competently testify thereto. I make this declaration in support of Plaintiffs' Opposition to Defendants' Motion to Transfer.

2.      I downloaded a map of directions from the Robert T. Matsui United States Courthouse in Sacramento to the California City Detention Facility from https://maps.app.goo.gl/z5CkFSJ4os6Zu9Nj6 on January 15, 2026. The map shows that the Courthouse and the Facility are 355 miles apart.

3.      I downloaded a map of directions from the Robert E. Coyle United States Courthouse in Fresno to the California City Detention Facility from https://maps.app.goo.gl/ardKnGcJDUwaMz1f6 on January 15, 2026. The map shows that the Courthouse and the Facility are 185 miles apart.

4.      I downloaded a map of directions from the Bakersfield Federal Courthouse to the California City Detention Facility from https://maps.app.goo.gl/vtxxw2C3NRDtrKpa9 on January 15, 2026. The map shows that the Courthouse and the Facility are 76.2 miles apart.

5.      I downloaded a map of directions from the U.S. District Court in Redding to the California City Detention Facility from https://maps.app.goo.gl/n7KVwTzjKSeb9SGt9 on January 15, 2026. The map shows that the District Court and the Facility are 513 miles apart.

6.      I downloaded a map of directions from the U.S. District Court in Yosemite to the California City Detention Facility from https://maps.app.goo.gl/bSYPxDDKsTywcca68 on January 15, 2026. The map shows that the District Court and the Facility are 279 miles apart.

7.      I downloaded a map of directions from the Robert E. Coyle United States Courthouse in Fresno to the California Correctional Institution in Tehachapi from

DECLARATION OF STEVEN P. RAGLAND IN SUPPORT OF OPPOSITION TO DEFENDANTS'
MOTION TO TRANSFER
Case No. 3:25-cv-09757-MMC

3999969

https://maps.app.goo.gl/h4jhFCta56t6gJoN8 on January 15, 2026. The map shows that the Courthouse and the Tehachapi Correction Institution are 157 miles apart.

8.    Plaintiffs' counsel has been in regular contact with Defendants' counsel, AUSA Savith Iyengar, over both phone and email, on a variety of issues, including medical care, compliance with the Court's stipulated order, attorney access, scheduling deadlines, and other matters from December 3, 2025 to the present.

9.    Attached hereto as **Exhibit 1** is a true and correct copy of a printout from the official government website for the California City Detention Facility, which is hosted by the U.S. Immigration & Customs Enforcement domain. The page was accessed at https://www.ice.gov/detain/detention-facilities/california-city-detention-facility on January 14, 2026.

10.    Attached hereto as **Exhibit 2** is a true and correct copy of a document titled "An Important Letter to Congress from the Judges of the Eastern District of California Regarding Our Caseload Crisis," downloaded from https://www.caed.uscourts.gov/caednew/index.cfm/news-archive/important-letter-re-caseload-crisis on January 15, 2026.

11.    Attached hereto as **Exhibit 3** is a true and correct copy of the ICE Facilities Data, FY26 U.S. Immigration and Customs Enforcement (Dec. 26, 2025), downloaded from https://www.ice.gov/doclib/detention/FY26_detentionStats01082026.xlsx on January 15, 2026.

12.    Attached hereto as **Exhibit 4** is a true and correct excerpt from the U.S. Immigration and Customs Enforcement National Detention Standards, downloaded from https://www.ice.gov/doclib/detention-standards/2025/nds2025.pdf on January 15, 2026.

13.    Attached hereto as **Exhibit 5** is a true and correct excerpt from the U.S. Immigration and Customs Enforcement Performance-Based National Detention Standards, downloaded from https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf on January 15, 2026.

14.    Attached hereto as **Exhibit 6** is a true and correct copy of a printout from the official government website for the U.S. Immigration & Customs Enforcement, Bakersfield, CA, downloaded from https://www.ice.gov/node/62167 on January 14, 2026.

2

15.    Attached hereto as **Exhibit 7** is a true and correct copy of a letter from the federal district judges of the Eastern District of California dated June 19, 2018, downloaded from https://www.caed.uscourts.gov/caednew/assets/File/Judgeship%20Letter%20June%202018.pdf on January 15, 2026.

16.    Attached hereto as **Exhibit 8** is a true and correct copy of a document titled "Eastern District of California's Judicial Emergency Exacerbated by the Coronavirus Disease-2019 (COVID-19) Pandemic," downloaded from https://www.caed.uscourts.gov/CAEDnew/index.cfm/news-archive/eastern-district-of-californiae28099s-judicial-emergency-exacerbated-by-the-coronavirus-disease-2019-covid-19-pandemic/ on January 15, 2026.

17.    Attached hereto as **Exhibit 9** is a true and correct excerpt of a document titled "2021 Biennial Survey of Judgeship Needs," downloaded from https://www.caed.uscourts.gov/caednew/assets/File/EDCA%202021%20Biennial%20Survey%20of%20Judgeship%20Needs.pdf on January 15, 2026.

18.    Attached hereto as **Exhibit 10** is a true and correct copy of a Memorandum from Eastern District of California Chief District Judge Honorable Kimberly J. Mueller, dated August 1, 2022, downloaded from https://www.caed.uscourts.gov/caednew/assets/File/EDCA%20BJS%202023%20Response%20-%20Final(1).pdf on January 15, 2026.

19.    The maps accessed and the documents attached as Exhibits 1-10 were publicly available on the website at the time they were downloaded.

Executed this 16th day of January, 2026, at San Francisco, California.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

*/s/ Steven P. Ragland*
STEVEN P. RAGLAND

3

# EXHIBIT 1

An official website of the United States government    Here's how you know ✓          ⊕ En Español    □ Contact Us    ⌐ Quick Links

# U.S. Immigration and Customs Enforcement

[Search]

Call **1-866-DHS-2-ICE** to report suspicious activity    **Report Crime**

| About Us | Immigration Enforcement | Combating Transnational Crime | Newsroom |

ICE › DETAIN › DETENTION FACILITIES

## California City Detention Facility

San Francisco Field Office

| Contacting a Detainee | Legal & Case Information | Hours of Visitation | Sending Items to Detainees | Press & Media | **Feedback or Complaints** |

We strive to provide quality service to people in our custody, their family, friends, and to their official representatives. If you believe that we have not lived up to this commitment, we would like to know. If we have met or exceeded your expectations, please let us know that as well. To comment on the services provided at this office, please write to:

> Field Office Director, Enforcement and Removal Operations
> U.S. Immigration and Customs Enforcement
> 630 Sansome Street Rm 590, San Francisco, CA 94111

If you feel that an ICE employee or contract services employee mistreated you and wish to make a complaint of misconduct, you may:

Contact the Field Office Director at:

> Field Office Director, Enforcement and Removal Operations
> U.S. Immigration and Customs Enforcement
> 630 Sansome Street Rm 590
> San Francisco, CA 94111

Write the Office of Professional Responsibility:

> Director, Office of Professional Responsibility
> U.S. Immigration and Customs Enforcement
> 500 12th Street, SW
> Suite 1049
> Mailstop 5099
> Washington, DC 20536-5005

Contact the ICE OPR Integrity Coordination Center (ICC):

> 1-833-4ICE-OPR
> ICEOPRIntake@ice.dhs.gov

You may also contact the Department of Homeland Security, Office of Inspector General:

> 245 Murray Drive, Building 410 Stop: 2600
> Washington, D.C. 20528

> Phone Number: 1-800-323-8603
> Fax: 202-254-4292
> Email: DHSOIGHOTLINE@DHS.GOV

Updated: 12/16/2025

---

**ADDRESS**

22844 Virginia Boulevard
California City, CA 93505
United States

⚲ See Map

**CONTACT INFORMATION**

Facility Main Phone: (760) 491-8100
Field Office Main Phone: (415) 365-8800

**ACCESS INFORMATION**

⊘ Parking: Free public parking is available at the facility.

⊘ Accessibility for Individuals with Special Needs: The facility does not discriminate based on disability and provides detainees with disability-related accommodations, as needed, to access its programs and activities.

---

About Us    Immigration Enforcement    Combating Transnational Crime    Newsroom





**ICE Contact Center**

Report suspicious activity: 1-866-DHS-2-ICE

---

 ICE.gov
**An official website of the U.S. Department of Homeland Security**

About ICE          Archive          The White House
Accessibility      No FEAR Act Data  DHS Components
FOIA Requests      Site Links        USA.gov
Privacy Policy     Performance Reports
DHS.gov            Inspector General


National Terrorism Advisory System
NTAS
NO CURRENT ADVISORIES
Put this widget on your web page



# EXHIBIT 2

# New CAED

Home » News Archive » Important Letter RE. Caseload Crisis



**An Important Letter to Congress from the Judges of the Eastern District of California Regarding Our Caseload Crisis**

It has been four decades since the last judgeship was created in the Eastern District of California. In that period of time the population of the district has grown 220%. The judges of the Eastern District routinely carry one of the heaviest caseloads in the country. For the last decade the Judicial Conference has recommended adding up to six judges to the Eastern District bench. This continuing crisis, if left unaddressed, will soon result in serious and catastrophic consequences...

**Read the Judges' letter HERE** *<URL: /caednew/assets/File/Judgeship Letter June 2018.pdf>*.

Please contact your Senator at the links below and express your concern regarding this crisis.

Contact Dianne Feinstein: https://www.feinstein.senate.gov/public/index.cfm/e-mail-me? *<URL: https://www.feinstein.senate.gov/public/index.cfm/e-mail-me?>*
Contact Alex Padilla: https://www.padilla.senate.gov/ *<URL: https://www.padilla.senate.gov/>*

# EXHIBIT 3

These statistics are made available to the public pursuant to H.R. 1158 Sec. 230 - Department of Homeland Security Appropriations Act, 2020. The information in this report is subject to change.

ICE Facilities Data, FY26
ICE Enforcement and Removal Operations Data, FY26
Data Source: ICE Integrated Decision Support (IIDS), 12/26/2025

This list is limited to facilities that have a population count of greater than or equal to 1 as the time of the data pull. This list does not include HOLD, HOSPITAL, JUVENILE, MDRP, or ORR facilities.

| Facility Information | | | | | | | Facility Average Length of Stay | FY26 ADP: Detainee Classification Level | | | | | | FY26 ADP: Criminality | | | | FY26 ADP: ICE Threat Level | | | FY26 ADP: Mandatory | | Contract Facility Inspection Information | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Name | Address | City | State | Zip | AOR | Type Detailed | Male/Female | FY26 ALOS | Level A | Level B | Level C | Level D | Level E | Male Crim | Male Non-Crim | Female Crim | Female Non-Crim | ICE Threat Level 1 | ICE Threat Level 2 | ICE Threat Level 3 | No ICE Threat Level | Mandatory | Guaranteed Minimum | Last Inspection Type | Last Inspection End Date | Last Inspection Standard | Last Final Rating |

# EXHIBIT 4





# National Detention Standards

Revised 2025



U.S. Immigration
and Customs
Enforcement

15. Detention facility evacuations;

16. Detainee (or Inmate)-on-Detainee Assault (i.e., any serious physical assault on an ICE detainee by another detainee or inmate);

17. Staff-on-Detainee Assaults (i.e., any incident or allegation of a physical assault on an ICE detainee perpetrated by staff, including the facility investigation); and

18. Staff Misconduct (i.e., any incident or allegation of staff misconduct if that misconduct relates to treatment of ICE detainees, to the security or safety of the facility, or to compliance with detention standards or the provisions of the facility's contract with ICE).

**Standards Notifications**

(The following notifications are listed in the standards.)

**1.2 Transportation by Land**

If a detainee's paperwork is incomplete prior to transfer. (See 1.2 Transportation by Land, A. Transportation Planning)

**2.1 Admission and Release:**

Any detainee claims of lost or damaged property and the outcomes of such claims. (See 2.1 Admission and Release, H. Missing Detainee Property, and 2.4 Funds and Personal Property, G. Lost/Damaged Property)

**2.8 Use of Force and Restraints:**

1. All uses of force involving detainees;

2. Uses of restraints; and

3. Detainees restrained using 4- or 5-point restraints for over eight hours, and every eight hours thereafter.

(These reports must be sent directly to the ICE/ERO Field Office Director (FOD).)

(See 2.8 Use of Force and Restraints, J. Documentation of Use of Force and Application of Restraints Incidents)

**2.9 Special Management Units**

1. When a detainee is placed in a Special Management Unit (SMU) for an administrative purpose, the administrative segregation order shall be immediately provided to ICE/ERO.

**5.6 Voluntary Work Program**

A detainee is injured while participating in a voluntary work program. (See 5.6 Voluntary Work Program, L. Detainee Injury and Reporting Procedures)

**6.2 Grievance System**

1.  Any detainee grievance that contains an allegation of staff misconduct. (See 6.2 Grievance System, F. Allegations of Officer Misconduct and 2.3 Facility Security)
    (This report must be sent directly to the FOD.)

2.  A detainee is determined to be filing nuisance grievances, or otherwise abusing the grievance system. (See 6.2 Grievance System, D. Retaliation)

**6.3 Law Libraries and Legal Materials**

1.  If the facility does not receive anticipated updates to the electronic library. (See 6.3 Law Libraries and Legal Materials, E. Updating/Replacing Legal Materials)

2.  A detainee requests additional legal material not available in the law library. (See 6.3 Law Libraries and Legal Materials, G. Requests for Additional Legal Materials)

**6.4 Legal Rights Group Presentations**

A legal rights group presentation is discontinued or temporarily suspended. (See 6.4 Legal Rights Group Presentations, H. Suspension or Termination)

**6.1 Detention Files**

Notification of any release of detainee medical or detention information. (See 7.1 Detention Files, F. Access to File)

**EXIGENT CIRCUMSTANCES –** Any set of temporary and unforeseen circumstances that require immediate action in order to combat a threat to the security or institutional order of a facility or a threat to the safety or security of any person.

**EMERGENCY CHANGES** – Measures immediately necessary to maintain security or to protect the health and safety of staff and detainees.

**ETA** – Estimated time of arrival.

**EXPOSURE/EXPOSED** – Subjected or potentially subjected to a hazardous substance by any means (inhalation, ingestion, skin contact, absorption, etc.).

**FACILITY ADMINISTRATOR –** A generic term for the chief executive officer of a detention facility. The formal title may vary (warden, Officer in Charge, sheriff, jail administrator, etc.).

**FIELD OFFICE DIRECTOR (FOD) –** ICE/ERO Officer with chief responsibility for facilities in an assigned geographic area.

**FLAMMABLE LIQUID** – A substance with a flash point below 100° Fahrenheit (37.8° Centigrade).

**FLASH POINT** – The minimum temperature at which the vapor of a combustible liquid can form an ignitable mixture with air.

**FOOD SERVICE ADMINISTRATOR (FSA)** – The official responsible for planning, controlling, directing and evaluating Food Service Department operations.

**FORCE** – The physical actions necessary to overcome resistance, to gain control, contain, or restrain a detainee.

**FOUR- / FIVE-POINT RESTRAINT** – A restraint system that confines an individual to a bed or bunk in either a supine or prone position. Ordered by the facility administrator when a detainee's unacceptable behavior appears likely to continue, risking injury to self or others.

**FUNDS** – Cash, checks, money orders, and other negotiable instruments.

**GENERAL CORRESPONDENCE** – All correspondence other than "special correspondence."

**GENERAL POPULATION** – Detainees whose housing and activities are not specially restricted. The term is ordinarily used to differentiate detainees in the "general population" from those in Special Housing Units.

**GRIEVANCE** – A complaint based on a circumstance or incident perceived as unjust.

# EXHIBIT 5



# Performance-Based National Detention Standards 2011



U.S. Immigration
and Customs
Enforcement

# Appendix 2.2.B: Instructions for Completing the ICE Custody Classification Worksheet

## 1. Introduction

Each facility is required to have a formal detainee classification system that starts at admission and is based on verifiable and documented information.

"Classification" and "reclassification" are initial and periodic staff reviews, not only of a detainee's custody classification, but of that detainee's general case status, disciplinary record, housing, special needs, adjustment to institutional living, opportunities for voluntary work assignments, and general well-being.

Custody classification is a process of categorizing detainees as low, medium or high custody and housing them accordingly. The ICE Custody Classification Worksheet, attached as Appendix 2.2.A, is designed to systematically document and score information about each detainee in order to produce a total custody classification score that may be used, in conjunction with professional experience and judgment, to guide classification decisions.

The factors considered for custody classification closely align with the "public safety factors" that are part of the broader ICE intake risk assessment and classification process that often begins even before a detainee's arrival at a detention facility.

While the protection of detainees, staff, contractors, volunteers and the community from harm is an important consideration in determining a detainee's custody classification, a decision about where and how to house a detainee is also based on the detainee's physical and mental health and other important factors relating to a detainee's special needs, which are referred to as "special vulnerabilities" or "management concerns."

## 2. Specific Instructions for Completing the

## ICE Custody Classification Worksheet

### A. Basic Information – Part 1

Check the appropriate box to indicate whether the form is being completed for:

- Initial classification

- Reclassification. (The first reclassification assessment should be completed 60 to 90 days after the initial classification. Subsequent reclassification assessments should be completed at 90 to 120-day intervals.)

- Special reclassification (see standard "2.2 Custody Classification System").

Enter the Field/Sub Office, facility and date.

Enter the name of the classification officer and the language(s) used during the interview.

Enter the detainee's alien number, last name, first name, date of birth, and gender.

### B. Special Vulnerabilities and Management Concerns – Part 2

Special vulnerabilities and management concerns should be taken into account in assigning levels of detention custody.

The classification officer should inquire about and remain alert to signs of any special vulnerability or management concern that may affect the custody determination. Special vulnerabilities may include disability, serious medical or mental health needs, risk based on sexual orientation or gender identity, advanced age, pregnancy, nursing, sole caretaking responsibilities, or victimization, including individuals who may be eligible for relief related to the Violence Against Women Act (VAWA), victims of crime (U visa), or victims of human trafficking (T visa). (To detain individuals confirmed to have vulnerabilities, ICE Officers must prior to the individual's arrival at the facility have obtained concurrence from the Field Office Director (FOD)

schedule. For searches of areas with specialized equipment or supplies, the respective department head shall be present to ease access to locked areas and to help determine the status of any questionable items.

Staff shall document these searches in a logbook maintained by the shift supervisor.

## G. Detainee-on-Detainee Physical Assaults

The facility administrator shall ensure that the FOD is notified of any physical assault on an ICE detainee by another detainee or inmate housed at the facility.  This includes one or more detainees or inmates engaging in an act of violence against another ICE detainee or the intentional attempt to harm that detainee through force or violence, regardless of whether injury results or a weapon is used.  The facility shall ensure a thorough investigation of any incidents of physical assault perpetrated on an ICE detainee, consistent with the requirements of Standard 3.1 "Disciplinary System."

## H. Staff-on-Detainee Physical Assaults

The facility administrator shall ensure that the FOD is notified of any incident or allegation of a physical assault perpetrated by staff against a detainee.  This includes any incident or allegation of facility staff engaging in an act of violence against a detainee, or any intentional attempt to harm that detainee through force or violence, regardless of whether injury results or a weapon is used.  The facility shall ensure a thorough investigation of any incident or allegation of staff-on-detainee physical assault, and staff determined to have perpetrated a physical assault on a detainee shall be appropriately disciplined; the results of the investigation shall be transmitted to the FOD.

## I. Staff Misconduct

The facility administrator shall ensure that the FOD is promptly notified of any incident or allegation of staff misconduct if that misconduct relates to treatment of ICE detainees, to the security or safety of the facility, or to compliance with detention standards or the provisions of the facility's contract with ICE.  Note that Standard 6.2 "Grievance System" also requires that ICE be notified of <u>any</u> allegation of staff misconduct that is contained in a detainee grievance.

# EXHIBIT 6

 An official website of the United States government

 **Official websites use .gov**
A **.gov** website belongs to an official government organization in the United States.

 **Secure .gov websites use HTTPS**
A **lock** (🔒) or **https://** means you've safely connected to the .gov website. Share sensitive information only on official, secure websites.

🌐 En Español   📱 Contact Us   🔗 Quick Links

 **U.S. Immigration and Customs Enforcement**

Search

Call 1-866-DHS-2-ICE     Report Crime

ICE    NODE

# Bakersfield, CA

**Area Coverage:** Kern County; Inyo County; Mono County; Southern half of Tulare County

**Appointment Times:** Tuesday, Thursday, Friday, 8 a.m.-3 p.m.

**Email:** SanFrancisco.Outreach@ice.dhs.gov

Enforcement and Removal Operations

Field Office Location
800 Truxtun Avenue
Bakersfield, CA 93301
United States
(661) 281-6500

Field Office Name
San Francisco Field Office

## ADDRESS

📍 500 12th St SW
Washington, DC
20536

📞 Report Crimes:
Call 1-866-DHS-2-ICE

## RELATED INFORMATION

Mission

Who We Are

ICE Leadership

Career Opportunities

News Releases and Statements

## CONTACT US

General Information

ICE Field Offices

HSI International Offices

Media Inquiries

Small Business

**About Us**

**Combating Transnational Crime**

**Immigration Enforcement**

**Newsroom**

    





**ICE Contact Center**

Report suspicious activity: 1-866-DHS-2-ICE


ICE.gov
**An official website of the U.S. Department of Homeland Security**

| | | |
|---|---|---|
| About ICE | Archive | Inspector General |
| Accessibility | No FEAR Act Data | The White House |
| FOIA Requests | Site Links | DHS Components |
| Privacy Policy | Performance Reports | USA.gov |
| DHS.gov | | |

# National Terrorism Advisory System

# EXHIBIT 7

## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF CALIFORNIA

2500 Tulare Street
Room 1501
Fresno, CA 93721



**LAWRENCE J. O'NEILL**
Chief United States District Judge

**Tel:** 559-499-5680
**Fax:** 559-499-5959
**Calendaring:** 559-499-5682

June 19, 2018

### PREFACE/PURPOSE

The purpose of this letter to the members of the Senate and the House of Representatives within the Eastern District of California is to provide notice of a current crisis and an upcoming exacerbation of that crisis that will have serious and catastrophic consequences if left unaddressed. The most serious consequence to inaction will be the inaccessibility to the Federal Courts by the more than 8 million people who reside within the Eastern District. We are 19 months away from that inevitability.

### SIZE OF THE DISTRICT

The geographical size of the Eastern District of California (EDCA) is mammoth, and the corresponding judicial responsibilities are equally enormous. The Eastern District encompasses 87,010 square miles, some 55% of the land mass of the entire state of California. Thirty-four of the fifty-eight counties within California sit under the jurisdiction of the Federal Court in the Eastern District. If the Eastern District of California were itself a separate state, forty-one of the states in the Country would be smaller in size than our judicial area.

In addition to the vast geographical size and a population of 8,094,480 persons (based on Census Bureau estimates,[1] which is greater than the population of thirty-eight states), there are other challenges faced by the District Court Judges. The federal judicial responsibilities in the Eastern District of California include 4 federal prisons, 188 federal buildings, 13 national forests, 9 national parks (including Yosemite, Kings Canyon and Sequoia), 19 state prisons, and 923,000 acres of military land.

---

[1] Administrative Office of the U.S. Courts

## JUDGESHIPS, CASELOADS and HISTORY

*Currently* (huge change to come within the next year and one-half), there are 6 District Judges, 3 Senior District Judges, 12 Magistrate Judges, and 6 Bankruptcy Judges. Each District Judge handles an average of approximately 900 cases at any given time, more than double the nationwide average caseload for District Judges, which is 425 cases.

Put in modern historical context, the last new District Judgeship created in the EDCA occurred in 1978 (now some 4 decades ago), when the population of the district was approximately 2.5 million people. Though the population has grown 220%, no new District Court Judgeships have been created in the Eastern District of California. For comparison purposes, the Northern District of California, with roughly the same population (less than a 4% difference) as the Eastern District of California, has 133% more District Judges (14 judges vs. 6 judges).

It is not debatable that the resources of our District have been deficient for three decades. For more than a decade, the Administrative Office of the Courts has recommended to the Judicial Conference that 4 to 6 new District Judges be added to the EDCA. Now, the judicial crisis rooted in the understaffing of District Court Judges is coming to fruition. Two of our six District Judges have given retirement dates that will occur in the next nineteen months. Neither has stated they intend to continue serving in senior status.

In addition, one of our three Senior District Judges has given notice of his intended retirement (departure from senior status service). Of the remaining two Senior District Judges, one judge turned 80 years old, and the other is no longer taking criminal cases and maintains a 50% civil caseload, which he may reduce further. The "shock-absorber" effect of senior-status judges filling in for the lack of new judgeship creation as the population in the District has more than doubled is rapidly becoming non-existent.[2]

---

[2] Historically, district court judges elect to continue in senior status, assisting with the normal workload in a district, at no additional salary. Due to the stress and weight of the current caseload, neither of the two upcoming retirees has indicated that they will continue to serve as senior-status judges. In addition, still another District Judge has given the Chief Judge notice that he will be leaving the Court in 2022 and will not take senior status. This is not because they have a lack of regard or compassion for the six authorized District Court Judges, but is indicative of how the more-than-double average caseload has worn down these dedicated members of the judiciary.

SPECIFIC RESULTS TO BE FELT IN
19 MONTHS ABSENT CONGRESSIONAL ACTION

Should the two District Judges, one Senior District Judge, and one recalled Magistrate Judge leave the Court as anticipated, in 19 months more than 2000 cases will need to be distributed among the remaining 4 District Judges.  An **additional** 500 cases to each of the district judges (who already are handling twice the national average of caseload per judge) will result in an inescapable consequence of being wholly unable to handle civil matters.

The United States Attorney for the Eastern District of California has recently announced that they will be filling all vacant and newly created lawyer positions in their offices across the District.  The total of new Assistant U.S. Attorney prosecutors will be 12 in number.  The anticipated consequences are twofold: 1) a serious and substantial uptick in the number of indictments to be sought and filed; and 2) an insistence that the time from indictment to disposition of criminal cases (now three times the national average) will be cut severely.  Both have immediate and obvious consequences on the Court's ability to conduct civil matters due to the statutory and Constitutional mandates that result in giving priority to criminal cases over civil ones.

REMEDIES TRIED/REMEDIES SOUGHT

Both the Administrative Office of the Courts (AO) and the Chief Judge of the Ninth Circuit have done everything possible to help the Eastern District of California's courts due to the overburdened caseloads that have become routine. The unprecedented ratio of Magistrate Judges to District Judges (two to one) is one example of that effort by the AO.  The district judges have made certain that each Magistrate Judge is being utilized to the maximum benefit under law.  A second example of continued help and effort is the accepted offer of loaning visiting judges to the district over the last 15 years.  For reasons that are apparent, the continued and temporary short-term approach to addressing a long term and chronic problem will fall far short of being an honest or effective solution.

The District Judges of the Eastern District of California suggest and request the following two solutions:

1.  When the two District Judges submit their letters to the President that give the required notice of leaving their current positions (one notice in December of this year, and the other in January of 2019), that there be an immediate commitment to act on the nomination and confirmation process to enable there to be a seamless

transition so that the new judges can be sworn into the court, one in December of 2019, and the other in January of 2020; and

2. The EDCA members of Congress unanimously introduce an emergency bill for the creation of a minimum of the five new judgeship positions that have been recommended year after year.

Any judge on this Court will make himself or herself available to talk with, or meet with, any member of Congress at any time or at any place to discuss this dire problem in an attempt to avoid the inevitable consequences should the issue remain unaddressed. Any of us will speak or testify, upon request, before any group or committee given even minimal notice.

With Concern and Respect,


Lawrence J. O'Neill
Chief District Judge

Dale A. Drozd
District Judge

Morrison C. England
District Judge


John A. Mendez
District Judge

Kimberly J. Mueller
District Judge

Troy L. Nunley
District Judge


Garland E. Burrell
Senior District Judge

Anthony W. Ishii
Senior District Judge

William B. Shubb
Senior District Judge

# EXHIBIT 8

Case 3:25-cv-09757-MMC    Document 47-1    Filed 01/16/26    Page 32 of 44

# New CAED

---

Home » News Archive » Eastern District of California's Judicial Emergency Exacerbated by the Coronavirus Disease-2019 (COVID-19) Pandemic

## Eastern District of California's Judicial Emergency Exacerbated by the Coronavirus Disease-2019 (COVID-19) Pandemic



As the Senate Judiciary Committee meets Tuesday, June 30, 2020 to address the Judicial Conference's recommendation for more judgeships, the Eastern District of California continues to experience a long-standing judicial emergency now exacerbated by the COVID-19 pandemic.

Detailed in the Eastern Districts most recent Biennial Judgeship Survey *<URL: /caednew/assets/File/EDCA 2021 Biennial Survey of Judgeship Needs.pdf>*, the Eastern District continues to struggle with the long standing judgeship crisis. This presentation *<URL: /caednew/assets/File/EasternDistrictJudgeshipCrisis_2_6_20.pdf>* lays out the urgency for additional judgeships in California's Eastern District. While the judgeship imbalance is worse than ever, it is not a new problem for the Eastern District; rather, it is a problem that has been worsening for nearly 40 years.

The need for judgeships is so great that Chief Judge Kimberly J. Mueller recently declared a Judicial Emergency that was approved by the Judicial Council of the Ninth Circuit *<URL: /caednew/assets/File/Judicial Council Ea Cal Emergency Decl_ 04_16_2020.pdf>*. This Judicial Emergency has been exacerbated by two pending vacancies and the COVID-19 pandemic as detailed in these letters from the Judges of the Eastern District of California to Senator Dianne Feinstein *<URL: /caednew/assets/File/SenatorFeinstein_EDCal_6_22_20.pdf>*, Senator Kamala Harris *<URL: /caednew/assets/File/SenatorHarris_EDCal_6_22_20.pdf>*, and Speaker Nancy Pelosi and Minority Leader Kevin McCarthy *<URL: /caednew/assets/File/SpeakerPelosi_MinorityLeaderMcCarthy_EDCal_6_22_20.pdf>*.

# EXHIBIT 9

## 2021 BIENNIAL SURVEY OF JUDGESHIP NEEDS

### U.S. DISTRICT COURTS APPLICATION

Please complete the form even if your court is not requesting additional Article III judgeships, conversion of an existing temporary judgeship to permanent status, or extension of a temporary judgeship. Space provided for answers will expand as needed.

- If your court **is not** requesting any change to the current number of authorized judgeships, you need only complete Question 1 below.

- If your court **is** requesting additional judgeships or conversion/extension of a temporary judgeship, please skip Question 1 and complete the remainder of the survey.

District    **Eastern District of California**

Indicate the number of additional permanent judgeships and/or conversion or extension of temporary judgeships your court is requesting (**include any requested in prior surveys that you believe are still required**):

| | |
|---|---|
| **5** | Permanent judgeships |
| **0** | Conversion of temporary judgeship to permanent |
| **0** | Extension of temporary judgeship |

1  **If your court is not requesting any change to its current number of authorized judgeships, please indicate what factors, if any, influenced your decision (e.g., weighted filings are below the general standard of 430 per judgeship with an additional judgeship or below the standard of 500 per judgeship for small courts, or significant contributions provided by senior judges).**

N/A

## 2021 BIENNIAL SURVEY OF JUDGESHIP NEEDS

### U.S. DISTRICT COURTS APPLICATION

2 **If your court is requesting a change to its current number of authorized judgeships, please explain all factors that justify your request**

The Eastern District of California is requesting five (5) permanent judgeships.

The Eastern District of California first exceeded the judicial caseload standard for additional judgeships in 1994. For each of the twenty-five (25) years following that first instance, our weighted caseload has remained among the top ten (10) in the nation and the top three (3) in the circuit. Today, at 730 filings per six (6) authorized judgeships we continue to strain to meet the demands of our caseload. Our situation is exacerbated exponentially by two (2) current vacant judgeships in our district. These vacancies, which have now lasted over a combined four (4) months, have had the effect of increasing our current weighted caseload to 1095 per active judgeship, with no nominations pending to fill our vacancies. Due to our current judgeship situation, our ongoing heavy caseload, our large population base, significant contributions demanded of our decreasing number of senior judges and diminished additional resources, we are requesting five (5) additional judgeships.

In recent years, our weighted filings have been surpassed by districts that have caseloads heavily influenced by influxes of MDL Litigation. MDL cases create a temporary burden on the receiving district as opposed to the continuing burden that has existed in the Eastern District for many years. These Districts include four currently in the top 10, Louisiana Eastern, Indiana Southern, New Jersey and Arizona. Districts such as Texas Western and Arizona have also seen a non-typical influx of immigration litigation over the last few years thus pushing their filings upward. Even though our Eastern District filings have decreased slightly over the last five years, due to a state policy resulting in a decrease in prisoner filings, our combined civil and criminal filings remain significantly above the set judicial standard.

| Rank | District | Judges | Weighted Filings [1] |
|------|----------|--------|---------------------|
| 1 | LAE | 12 | 1,200 |
| 2 | INS | 5 | 1,148 |
| 3 | DE | 4 | 1,127 |
| 4 | NJ | 17 | 1,044 |
| 5 | FLN | 4 | 950 |
| 6 | TXW | 13 | 839 |
| 7 | AZ | 13 | 800 |
| 8 | FLS | 18 | 758 |
| 9 | OHS | 8 | 745 |
| **10** | **CAE** | **6** | **730** |
| National Average | | 7.50 | 535 |

## 2021 BIENNIAL SURVEY OF JUDGESHIP NEEDS

### U.S. DISTRICT COURTS APPLICATION

[1]*Federal Court Management Statistics - FY2019 and CM/ECF for JPML – JPML Litigation Statistics by MDL – 1/15/2020*

With full utilization of all the current resources available to us, processing times for our civil cases are insurmountable.   This is directly attributable to our longstanding need for additional judgeships.   Caseload pressure remains so severe that there appears to be no impending respite in the case processing delays of our District. At 13.6%, the number of civil cases over three years old, in our court, ranks seventy fifth (75) in the nation.   Over the last 5 years we have maintained rankings between 74 and 81, despite consistently ranking near the top nationwide in terminations per judgeship.   When comparing the cases over three years for districts in the top ten weighted filings, we have the second highest percentage of cases waiting to be processed. With such delays and tapped out judicial resources, it's difficult to dispute that we are in dire need of a more permanent solution to repair the long-deferred maintenance of our judicial infrastructure.

| CAE National Rank/ Number of Cases over 3 years | 2019 | 2018 | 2017 | 2016 | 2015 |
|---|---|---|---|---|---|
| | 75 | 74 | 80 | 79 | 81 |

| National Rank Weighted Filings | District | Judges | National Rank Civil Cases over 3 Years |
|---|---|---|---|
| 1 | LAE | 12 | 88 |
| 10 | CAE | 6 | 75 |
| 3 | DE | 4 | 59 |
| 2 | INS | 5 | 57 |
| 7 | AZ | 13 | 50 |
| 9 | OHS | 8 | 40 |
| 6 | TXW | 13 | 29 |
| 8 | FLS | 18 | 8 |
| 4 | NJ | 17 | 3 |
| 5 | FLN | 4 | 1 |

*Source - Federal Court Management Statistics - FY2019*

Based on the Administrative office data, the last Article III Judgeship created in the Eastern District of California was in 1978 when the population of the District was about 2.5 million. Our District encompasses 55% of the geographical size of California. It includes thirty-four (34) counties of the fifty-eight (58) counties in the State. Our Judicial resources are now spread over an excess of 8,000,000 people and is estimated to reach nearly 10,000,000 by 2031.   Essentially, we have only one judge serving 1,333,333 people.   At six (6) Article III judges, we are working with 57% less judges than the Northern District of California which has fourteen (14) judges at roughly the same population size.   (See Attachment).

**2021 BIENNIAL SURVEY OF JUDGESHIP NEEDS**

**U.S. DISTRICT COURTS APPLICATION**

The ongoing Judicial Emergency in our District has been exacerbated by two recent judicial vacancies.  Our current request for five (5) additional Judges comes while operating under intensified caseload strain following the recent Inactive Senior Status of Judge Lawrence J. O'Neill and Senior Status of Judge Morrison C. England. Judge England took Active Senior Status on December 17, 2019 and Judge O'Neill took Inactive Senior Status on February 2, 2020. Concurrently, Senior Judge Garland E. Burrell assumed Inactive Senior Status effective December 31, 2019.   Judge Mendez will become eligible for senior status on April 17, 2022 and has communicated he may assume inactive senior status in 2023.

With no nominations made and no indication of when these two vacancies in our district will be filled, workload stress levels are heightened for our existing judges and the administration of justice in our Court is affected in ways that we can no longer adequately mitigate. Of our six (6) Article III seats, two (2) preside in our Fresno Division. With the departure of Judge O'Neill, who worked in the Fresno Division, this leaves us with a single district judge in that office.   Approximately 450 civil cases and 300 criminal defendants that were previously assigned to Judge O'Neill, are currently unassigned while awaiting the appointment and confirmation of a new district judge.   Under the current circumstances, our District has been compelled to issue temporary emergency procedures in an attempt to stretch our critically low resources across our heavy caseload, while prioritizing felony criminal cases in an effort to avoid Speedy Trial dismissals. Unassigned civil cases with trial dates through the end of 2021 will most likely be delayed, associated pretrial conferences will be affected and parties will be highly encouraged to consent. While our court is taking steps to encourage consent, our Magistrate Judges already carry a heavy caseload and they will be unable to take on significantly more without an impact on productivity elsewhere.

Our urgent need for five (5) additional judges cannot be more apparent as history appears to be repeating itself.   Extended judicial vacancies over the past twelve years have intensified the congestion in our court.   The first vacancy, following the resignation of Judge David Levi in 2007, lasted eleven months until the appointment of Judge John A. Mendez in 2008.   A second vacancy, lasting nearly two years, occurred when Judge Frank C. Darrell, Jr. took Senior Status in January 2009.   Judge Kimberly J. Mueller was appointed in late December 2010 to replace him.   Judge Garland E. Burrell, Jr., took senior status in 2012, creating a nine-month vacancy until the appointment of Judge Troy N. Nunley in 2013.   Finally, Judge Anthony W. Ishii assumed senior status in November 2012.   His vacancy lasted over three years until December 2015, when Judge Dale A. Drozd filled the vacancy. Unfortunately, these long waiting periods between judgeships mean that caseload delays accrue and follow a new judge once they are appointed for significant period of time, as he or she is also receiving an equal share of newly filed cases.

The amount of work that our judges are expected to perform during their active tenure is a deterrent for some when it comes to considering senior status, as an active senior judge

**2021 BIENNIAL SURVEY OF JUDGESHIP NEEDS**

**U.S. DISTRICT COURTS APPLICATION**

who takes half a caseload in our district still carries close to the average weighted caseload of an active district judge in other districts. Our District has gone from having the assistance of six (6) senior judges to three (3).   In the past, our senior judges carried full caseloads to help alleviate the heavy caseload. Now each carries a half caseload. We currently have only two (2) recalled magistrate judges. We do not anticipate that these judges will continue beyond 2022.

To attempt to compensate for our lack of district judgeships, the Judicial Conference has authorized the appointment of twelve (12) full-time magistrate judges for our district. We continue to maximize the utilization of our magistrate judges by referring prisoner cases, social security cases and civil cases for pretrial proceedings to the greatest extent possible. We also encourage parties in regular civil cases to consent to our magistrate judges.   While our consent rate is very high at 16%, the greatest caseload burden continues to fall upon our active district judgeships.

# EXHIBIT 10

MEMORANDUM

Date:          August 1, 2022

To:            Ninth Circuit Judicial Council

From:          Honorable Kimberly J. Mueller
               Chief Judge, United States District Court for the Eastern District of California

RE:            RESPONSE TO 2023 BIENNIAL SURVEY OF ARTICLE III JUDGESHIP NEEDS
               PRELIMINARY RECOMMENDATION

The United States District Court for the Eastern District of California (Eastern District)
submits this Response to the 2023 Biennial Survey of Article III Judgeship Needs Preliminary
Recommendation for the Eastern District dated July 5, 2022 (Preliminary Recommendation -
attached).   The Eastern District respectfully requests the Recommendation for the Eastern
District be changed from four (4) permanent judgeships to five (5) permanent judgeships based
on our previously submitted Biennial Survey of Judgeship Needs (2023 BJS – attached) and:

    (1) The ongoing caseload crisis in the Eastern District which has existed for 22 years, and
    has only been exacerbated by the COVID-19 pandemic,

    (2) The persistent effects of longstanding and persistent judicial vacancies in the Eastern
    District, which continue to impact caseloads even after vacancies are filled, and

    (3) The continued growth in the Eastern District, measured in both population and
    caseload, which is projected to trend upward in the upcoming years.

As stated in our 2023 BJS and the Preliminary Recommendation, the Judicial Conference
has recommended at least two (2) and as many as seven (7) additional judgeships for the Eastern
District for the last 22 years.   Over this period the Judicial Conference's average
recommendation for the Eastern District has been 4.7 additional judgeships, which equates to
nearly 80 percent of our current bench of six (6) active district judges. This is the highest average
of any district in the United States over the last 22 years. While the current Preliminary
Recommendation correctly analyzes in narrow mathematical terms the current need of the
Eastern District based on last year's filings alone, it does not take into account the cumulative
effect of our increasingly burdensome caseloads that have been growing for 22 years, the impact
of these caseloads on the judges of the court and the certainty that caseloads will continue rising
in the future.   In short the current recommendation does not reflect what is required to bring the
Eastern District of California closer to the average caseload carried by district judges nationally,
allowing us to achieve long overdue parity.

## Ongoing Caseload Crisis

Over the last 22 years, the pending caseload per judgeship for the Eastern District has
averaged nearly 200 percent of the national average.   For the same time period, we have had the
highest pending caseload in the Ninth Circuit, every year.   We also have ranked in the top 10

districts nationwide, every year, averaging the third highest pending caseload anywhere.   These rankings are particularly stark given that we have declined MDL referrals, to the detriment of litigants in our district and loss of professional satisfaction for our judges; it is an unhappy consequence of our heavy caseloads that we are an MDL "sender" district.

| U.S. District Court - Judicial Caseload Profile | | | | | |
| California Eastern | | | | | |
| Actions Per Judgeship | | | | | |
| 12 month Period Ending Sep 30 | Pending Cases | All Districts Average Pending | % of National Average | Numerical Standing Within | |
| | | | | U.S. | Circuit |
| 2021 | 1322 | 1094 | 121% | 6 | 1 |
| 2020 | 1262 | 970 | 130% | 6 | 1 |
| 2019 | 1209 | 675 | 179% | 6 | 1 |
| 2018 | 1239 | 688 | 180% | 7 | 1 |
| 2017 | 1216 | 628 | 194% | 6 | 1 |
| 2016 | 1274 | 659 | 193% | 3 | 1 |
| 2015 | 1263 | 629 | 201% | 2 | 1 |
| 2014 | 1306 | 625 | 209% | 3 | 1 |
| 2013 | 1351 | 579 | 233% | 3 | 1 |
| 2012 | 1427 | 540 | 264% | 2 | 1 |
| 2011 | 1319 | 542 | 243% | 3 | 1 |
| 2010 | 1427 | 557 | 256% | 3 | 1 |
| 2009 | 1357 | 587 | 231% | 3 | 1 |
| 2008 | 1305 | 570 | 229% | 3 | 1 |
| 2007 | 1247 | 479 | 260% | 2 | 1 |
| 2006 | 1176 | 456 | 258% | 2 | 1 |
| 2005 | 1060 | 478 | 222% | 4 | 1 |
| 2004 | 895 | 503 | 178% | 3 | 1 |
| 2003 | 869 | 459 | 189% | 4 | 1 |
| 2002 | 806 | 471 | 171% | 5 | 1 |
| 2001 | 803 | 447 | 180% | 3 | 1 |
| 2000 | 835 | 443 | 188% | 3 | 1 |
| 22 YEAR AVG | 1180 | 594.5 | 198% | 3.7 | 1 |

The relentlessness of our caseload dynamic creates enormous pressure for our active judges. Our cases reflect the range of issues arising from our 34 counties, spanning Redding to Bakersfield, embracing the state capital, the California Water Project, thousands of acres of national parks, federal grazing lands and forests, huge expanses of agricultural operations, and many state prison facilities.   On the merits, five (5) additional judgeships are necessary to bring a measure of long-term stability to the vast Central Valley's federal trial court, and allow our bench to dig out from our caseload avalanche, which will take a significantly long period of time – even as we expect the population of our 34 inland counties, and correspondingly our caseload, to grow exponentially.   Our caseload management burden has been exacerbated by long periods during which our small bench has endured multiple judicial vacancies, and most recently by the backing up of trials delayed due to the COVID-19 pandemic.

**Effect of Judicial Vacancies and COVID-19 Pandemic**

It is rare for the Eastern District of California to enjoy a full bench of active district judges.   Most recently, for most of the last two and a half years, we have been performing our essential duties with two (2) Article III vacancies at any given time.   While this small number may seem insignificant at first glance, on close inspection it illustrates our serious infrastructure problem: with only six (6) authorized Article III judgeships, two vacancies account for 33 percent of our entire bench.



*In only 7 of the last 19 years has the EDCA had a full complement of judges.

Vacant district judgeship months in 2020, 2021 and 2022 have had a direct impact on our court's actual caseload per judge, a challenge that cost-effective staffing resources can help address only in part.   In February 2020, former Chief Judge Lawrence J. O'Neill assumed inactive senior status.   Judge Morrison C. England, Jr. took active senior status on December 17, 2019, and Judge John A. Mendez assumed active senior status on April 17, 2022.   Additionally, Senior Judge Garland E. Burrell assumed inactive senior status effective January 1, 2020.   Due to these departures and status changes, in 2020 we experienced a total of 22.19 vacant judgeship months; in 2021, we experienced 24 vacant judgeship months; and year to date 2022, 11 vacant judgeship months. Given our 6 active district judgeships to begin with, our long-term vacancies effectively

eviscerated one-third of our district court bench, with one full civil caseload in our Fresno courthouse placed on a minimal maintenance status.   Every day a judicial position goes unfilled, our actual pending caseload per judgeship continues to rise.   While we are thrilled to finally have two new district judges as of this writing, one appointed only very recently, we still have one to fill and cannot say our crippling cycle of vacancies has ceased given that two members of our Article III bench will attain senior status within the next two and three years, respectively.

The most recent March 2022 statistics from the Administrative Office help demonstrate our dire circumstances, showing the Pending Cases per authorized Judgeship at 1,317 for our district.   Even without accounting for vacancies, our caseload put us first in the Ninth Circuit and seventh in the country – and we are the only district in the top 7 currently not accepting MDL cases.   Taking account of our effective two vacancies as of this writing, given that Judge Mendez's successor has not been appointed (only just nominated) and Judge England's successor while appointed will not receive her case assignments for several weeks yet, our actual circumstances on the ground mean our average caseload for each of our four current active judges, including our Chief Judge who takes no reduction in case assignments, is 1,976 per judge.   On their face, our numbers continue to be simply jaw-dropping.

As the Judicial Council knows, our staggering pending caseloads have been exacerbated by the effects of the COVID-19 pandemic.   While our filings have slightly decreased, temporarily, they are reasonably expected to rise.   Our active judges are in back-to-back-to-back trials since our reopening for jury proceedings, with most trials affected and often extended by COVID-19 exposures that lead to delays.   While trials help resolve cases they are of course time consuming, especially now, and other case resolutions are pushed out as a result.   California in general, and the Eastern District in particular, continue to be severely impacted by COVID-19 virus, impeding our ability to meaningfully whittle down our massive backlogs.

## Continued Growth of the Eastern District in Population and Caseload

While the current population figures and caseloads for all the District Courts in California are profound, the Eastern District stands out as an anomaly. Current populations charts show the Eastern District is growing at the fastest rate in California, with by far the lowest number of judges per population.   Population figures provide a meaningful way of assessing access to justice, given that demography as well as geography drive caseloads.

| 2020 US Census Citizen*  California Districts' Population and Judgeships | | | |
|---|---|---|---|
| District | Population | Authorized Judgeships | Judgeships per Population |
| California Southern | 3,504,550 | 13 | 1 DJ per 269,581 |
| California Northern | 8,351,845 | 14 | 1 DJ per 596,560 |
| California Central | 19,284,434 | 28 | 1 DJ per 688,730 |
| **California Eastern** | **8,105,194\*\*** | **6** | **1 DJ per 1,358,366** |

\* Source – AO Census Citizen Population Tables https://jnet.ao.dcn/court-services/district-clerks-offices/jury-management/juror-usage-and-statistics/census-2020-citizen-population-tables

\*\* California Department of Finance Projections indicate the Eastern District will surpass the Northern District by 2023.

In light of U.S. Census Citizen Data, nationally the average is 1 District Judge per 489,500 population.   The Eastern District's ratio is nearly three (3) times the national average, with the highest population per judge in the nation.   As noted, the population in the Eastern District is only expected to grow, at a rate much higher than the other California Districts and the nation. According to the California Department of Finance, the population of the inland areas in the State of California, most of which the Eastern District comprises, will grow at higher rates



than the rest of the State, continuing a decades-long trend.   Specifically, the Inland Empire, the Sacramento region, and the San Joaquin Valley will outpace other areas of the state with no end in sight.   To fulfill our burgeoning population's expectation of access to justice in the federal trial court, it is paramount that there be an adequate number of district judgeships created to hear federal cases in the first instance. That minimally adequate number, we respectfully submit, is 5 if the size of our bench is to be equal to our current task and also prepared to handle the inevitable upward caseload trends.

**<u>Conclusion</u>**

The pending and future caseloads in the Eastern District of California demand minimally adequate judicial resources so that our judges can fulfill their solemn constitutional responsibilities and do their part in maintaining the rule of law. We respectfully request the Recommendation for the Eastern District be changed from four (4) permanent judgeships to five (5) permanent judgeships.   If those 5 judgeships are created and filled any time soon, our district will undoubtedly by then have attained the caseload numbers to justify more as well.