1   KEKER, VAN NEST & PETERS LLP
    STEVEN P. RAGLAND - # 221076
2   sragland@keker.com
    CODY S. HARRIS - # 255302
3   charris@keker.com
    CARLOS C. MARTINEZ - # 354616
4   cmartinez@keker.com
    LISA C. LU - # 364259
5   llu@keker.com
    633 Battery Street
6   San Francisco, CA 94111-1809
    Telephone:    415 391 5400
7   Facsimile:    415 397 7188

8

9   CALIFORNIA COLLABORATIVE FOR
    IMMIGRANT JUSTICE
    PRIYA ARVIND PATEL - # 295602
10  priya@ccijustice.org
    MARIEL VILLARREAL - # 317048
11  mariel@ccijustice.org
    1999 Harrison Street #1800
12  Oakland, California 94612
    Tel: (650) 762-8990

13

14

15

16

17

PRISON LAW OFFICE
MARGOT MENDELSON - # 268583
mmendelson@prisonlaw.com
TESS BORDEN - MJP # 805022, *pro hac vice*
tess@prisonlaw.com
PATRICK BOOTH - # 328783
patrick@prisonlaw.com
ALISON HARDY - # 135966
ahardy@prisonlaw.com
RANA ANABTAWI - # 267073
rana@prisonlaw.com
1917 Fifth Street
Berkeley, California 94710-1916
Tel.: (510) 280-2621

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
KYLE VIRGIEN - # 278747
kvirgien@aclu.org
FELIPE HERNANDEZ - # 338468
npp_fhernandez@aclu.org
MARISOL DOMINGUEZ-RUIZ - # 345416
mdominguez-ruiz@aclu.org
425 California Street, 7th Floor
San Francisco, CA 94104
Tel.: (415) 343-0770

CARMEN IGUINA GONZALEZ - # 277369
ciguinagonzalez@aclu.org
915 15th Street, NW, 7th Floor
Washington, DC 20005
Tel.: (202) 393-4930

18

19  *Attorneys for Plaintiffs Fernando Gomez Ruiz, Fernando Viera Reyes, Jose Ruiz Canizales, Yuri
    Alexander Roque Campos, Sokhean Keo, Gustavo Guevara Alarcon, Alejandro Mendiola Escutia
    and all others similarly situated*

20

21              UNITED STATES DISTRICT COURT

                NORTHERN DISTRICT OF CALIFORNIA

22

23  FERNANDO GOMEZ RUIZ; FERNANDO
    VIERA REYES; JOSE RUIZ CANIZALES;
24  YURI ALEXANDER ROQUE CAMPOS;
    SOKHEAN KEO; GUSTAVO GUEVARA
25  ALARCON; and ALEJANDRO MENDIOLA
    ESCUTIA, on behalf of themselves and all
26  others similarly situated,

27              Plaintiffs,

28         v.

Case No. 3:25-cv-09757-MMC

**PLAINTIFFS' REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY
INJUNCTION**

Date:    February 6, 2026
Time:    9:00 a.m.
Dept.:   Ctrm. 7 – 19th Floor
Judge:   Hon. Maxine M. Chesney

U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; TODD M. LYONS, Acting Director, U.S. Immigration and Customs Enforcement; SERGIO ALBARRAN, Acting Director of San Francisco Field Office, Enforcement and Removal Operations, U.S. Immigration and Customs Enforcement; U.S. DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, Secretary, U.S. Department of Homeland Security,

    Defendants.

Date Filed:  November 12, 2025

# TABLE OF CONTENTS

**Page(s)**

I.      INTRODUCTION ................................................................................................. 1

II.     FACTS ................................................................................................................. 3

III.    ARGUMENT........................................................................................................ 3

    A.      Plaintiffs are likely to succeed on the merits of their claims. ................................ 3

        1.      Punitive Conditions of Confinement .......................................................... 3

            a.      The *Jones* presumption applies in this case. .................................. 3

            b.      Plaintiffs are likely to prevail even absent the presumption. ........... 7

        2.      Inadequate Medical Care........................................................................... 7

            a.      Defendants fail to dispute Plaintiffs' claims as a matter of law. ..................................................................................................... 8

            b.      Defendants provide no evidence to rebut Plaintiffs' facts.............. 9

            c.      Adverse outcomes will continue absent judicial intervention. ..... 11

        3.      Inadequate Access to Counsel ................................................................. 14

        4.      Violations of Rehabilitation Act.............................................................. 16

    B.      Plaintiffs have established that they will suffer irreparable harm absent relief.................................................................................................................. 18

    C.      The balance of hardships and public interest tip heavily in Plaintiffs' favor. ...... 18

    D.      This Court has jurisdiction to hear Plaintiffs' claims. ......................................... 19

    E.      No security under Rule 65(c) should be required. ............................................... 20

IV.     CONCLUSION.................................................................................................. 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Al Otro Lado v. Exec. Off. for Immigr. Rev.*,
    138 F.4th 1102 (9th Cir. 2025).............................................................................. 19

*Alcantara v. Archambeault*,
    2023 WL 3589664 (S.D. Cal. May 22, 2023) ....................................................... 19

*Alexander v. Choate*,
    469 U.S. 287 (1985)............................................................................................... 16

*Armstrong v. Newsom*,
    58 F.4th 1283 (9th Cir. 2023)................................................................................ 16

*Armstrong v. Newsom*,
    724 F. Supp. 3d 886 (N.D. Cal. 2024) ................................................................. 16

*Barco Mercado v. Noem*,
    800 F. Supp. 3d 526 (S.D.N.Y. 2025) ........................................................ *passim*

*Biden v. Texas*,
    597 U.S. 785 (2022)............................................................................................... 19

*Brown v. Plata*,
    563 U.S. 493 (2011)........................................................................................... 8, 14

*Cal. Coal. for Women Prisoners v. United States*,
    723 F. Supp. 3d 712 (N.D. Cal. 2024) ................................................................. 12

*Castro v. Cnty. of L.A.*,
    833 F.3d 1060 (9th Cir. 2016)................................................................................. 8

*Doe v. Becerra*,
    732 F. Supp. 3d 1071 (N.D. Cal. 2024) ................................................................. 4

*Flores v. Bondi*,
    2025 WL 2633183 (C.D. Cal. Aug. 15, 2025) ..................................................... 19

*Fraihat v. U.S. Immigr. & Customs Enf't*,
    16 F.4th 613 (9th Cir. 2021)........................................................................4, 5, 6, 7

*Freitag v. Ayers*,
    468 F.3d 528 (9th Cir. 2006).................................................................................... 2

*Garland v. Aleman Gonzalez*,
    596 U.S. 543 (2022)............................................................................................... 19

ii

*Gordon v. Cnty. of Orange*,
888 F.3d 1118 (9th Cir. 2018) ........................................................................ 8

*Helling v. McKinney*,
509 U.S. 25 (1993) .......................................................................................... 8

*Hernandez v. Cnty. of Monterey*,
110 F. Supp. 3d 929 (N.D. Cal. 2015) ........................................................... 16

*Hernandez v. Sessions*,
872 F.3d 976 (9th Cir. 2017) .......................................................................... 18

*Hope v. Warden York Cnty. Prison*,
972 F.3d 310 (3d Cir. 2020) ............................................................................ 4

*Hoptowit v. Ray*,
682 F.2d 1237 (9th Cir. 1982), *overruled on other grounds by Sandin v.
Conner*, 515 U.S. 472 (1995) .......................................................................... 8

*Innovation L. Lab v. Nielsen*,
310 F. Supp. 3d 1150 (D. Or. 2018) ............................................................... 20

*J.E.F.M. v. Lynch*,
837 F.3d 1026 (9th Cir. 2016) ........................................................................ 20

*Jennings v. Rodriguez*,
583 U.S. 281 (2018) ........................................................................................ 20

*Jensen v. Shinn*,
609 F. Supp. 3d 789 (D. Ariz. 2022) ..................................................... 9, 12, 14

*Jimenez v. U.S. Immigration & Customs Enforcement*,
2024 WL 2306281 (N.D. Cal. May 20, 2024) ............................................. 3, 19

*Johnson v. Couturier*,
572 F.3d 1067 (9th Cir. 2009) ...................................................................... 2, 20

*Jones v. Blanas*,
393 F. 3d 918 (9th Cir. 2004) .............................................................. 3, 4, 6, 7, 16

*Moreno Gonzalez v. Noem*,
2025 WL 3204602 (N.D. Ill. Nov. 17, 2025) ................................................ 19

*Pablo Sequen v. Albarran*,
2025 WL 3283283 (N.D. Cal. Nov. 25, 2025) .................................. 4, 10, 14, 18

*Peralta v. Dillard*,
744 F.3d 1076 (9th Cir. 2014) ........................................................................ 13

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC
3952338

*Perdomo v. Noem*,
  2025 WL 3192939 (C.D. Cal. Nov. 13, 2025) ................................................................ 20

*Pierce v. District of Columbia*,
  128 F. Supp. 3d 250 (D.D.C. 2015) ............................................................................ 16

*Porretti v. Dzurenda*,
  11 F.4th 1037 (9th Cir. 2021) ..................................................................................... 13

*S. Poverty L. Ctr. v. U.S. Dep't of Homeland Sec.*,
  605 F. Supp. 3d 157 (D.D.C. 2022) ............................................................................ 20

*Snead v. CoreCivic of Tenn.*,
  2020 WL 6479995 (M.D. Tenn. Apr. 6, 2020) ............................................................ 10

*Torres v. U.S. Dep't of Homeland Sec.*,
  411 F. Supp. 3d 1036 (C.D. Cal. 2019) ................................................................... 4, 16

*Turner v. Safley*,
  482 U.S. 78 (1987) ....................................................................................................... 15

*Univ. of Texas v. Camenisch*,
  451 U.S. 390 (1981) ..................................................................................................... 14

*Unknown Parties v. Johnson*,
  2016 WL 8188563 (D. Ariz. Nov. 18, 2016) ................................................................ 4

*Vu v. Noem*,
  2025 WL 3114341 (E.D. Cal. Nov. 6, 2025) ................................................................ 18

*Zadvydas v. Davis*,
  533 U.S. 678 (2001) ....................................................................................................... 3

**Statutes**

8 U.S.C. § 1252 ............................................................................................................. 19, 20

California's Sexually Violent Predator Act ............................................................................ 3

Immigration and Nationality Act Part IV, 8 U.S.C. §§ 1221–1232 ........................................ 19

Rehabilitation Act ......................................................................................................... 1, 16

**Other Authorities**

Fed. Rule of Evid. 803(8) ................................................................................................. 2

# I.    INTRODUCTION[1]

Plaintiffs have presented a voluminous evidentiary record detailing the many ways in which California City Detention Facility imposes punitive conditions of confinement, denies adequate health care, impinges upon individuals' access to counsel, and denies disability accommodations in violation of the Rehabilitation Act. Defendants' opposition is an effort at distraction and misdirection: they attempt to raise disputes around particular aspects of certain declarants' experiences while leaving the key evidence *underlying the relief sought* effectively unrebutted. The Court should grant Plaintiffs' motion for a preliminary injunction.

With respect to conditions of confinement, Defendants focus on countering evidence regarding water quality, dietary provisions, and hygiene items, even though none of the relief sought concerns water, food, or hygiene. *See* ECF 22-38 ("Proposed Order"). Plaintiffs seek—and have submitted evidence supporting the need for—contact visits, increased freedom of movement, fewer daily counts, more time outdoors, opportunities for sensory stimulation, and temperature-appropriate clothing. *Id.* ¶ 10. Far from rebutting evidence regarding the blanket policies at issue, Defendants *confirm* Plaintiffs' evidence and offer no legitimate justification for those policies.

Plaintiffs' expert and percipient witness evidence regarding egregiously inadequate medical care stands unrebutted. Defendants offer a CoreCivic employee, Dr. Susan Tiona, who merely recites facility policies without grappling with the facts on the ground or Plaintiffs' extensive evidence of serious ongoing risk of harm to patients at the facility.

By Defendants' own admission, access to counsel remains severely limited at California City, with no contact visitation permitted, delays, and spotty connections. Defendants offer no compelling justification for these restrictions, which hamper detained individuals' ability to meet with legal counsel and advance their claims concerning release or conditions of confinement.

Plaintiffs' evidence regarding Rehabilitation Act violations likewise stands unrefuted. Defendants submit no evidence showing the existence of a disability tracking system or structural accessibility for people with mobility limitations. Nor do they rebut Plaintiffs' evidence of

---

[1] In all quotations appearing herein, all internal quotation marks, alterations, citations, and the like have been omitted, and all emphases added, unless otherwise noted.

1  systematic denial of access to programs, services, and activities on the basis of disability.

2      Rather than rebutting the key evidence underlying Plaintiffs' request for preliminary

3  injunctive relief, Defendants seek to tar the named Plaintiffs and other declarants as dangerous

4  criminals, highlighting criminal records that date back years if not decades. But Defendants admit

5  that "the existence of prior criminal convictions does not sanction turning civil detention into

6  punishment." ECF 40-4 ("Opp.") 13. More to the point, Defendants ignore that every Plaintiff and

7  declarant was living in freedom, had been granted parole, or had served their full sentences before

8  ICE warehoused them in California City. Defendants offer nothing beyond their say-so that these

9  individuals pose such high security risks that they justify restrictive *facility-wide* policies that

10  exceed what prisons impose. Defendants likewise ignore their own publicly available statistics,

11  which show that the vast majority of people held in California City are deemed low security risks

12  or have no criminal records at all. *See* U.S. Immigration & Customs Enforcement, Detention

13  Management, *FY 2026 ICE Statistics*, https://www.ice.gov/detain/detention-management.

14      State and federal officials who have recently toured the facility have further corroborated

15  Plaintiffs' allegations and evidence.[2] On December 19, 2025, California's Attorney General issued

16  a letter decrying the "dangerous and inadequate living conditions at California City Detention

17  Facility." *See* Decl. of Cody Harris in Supp. of Reply ("Harris Decl.") ¶ 24, Ex. 5. The Attorney

18  General confirms Plaintiffs' evidence regarding freezing temperatures, excessive counts and lock-

19  downs, and an inadequate medical system that provides specialized care. *Id.* Similarly, on January

20  5, 2026, U.S. Representative Ro Khanna toured the facility and confirmed the lack of temperature-

21  appropriate clothing, the strictly non-contact visitation policy, a lack of programming, extreme

22  lock-downs, and an "alarming" medical system that left sick-call slips unaddressed for weeks.[3]

23      All of these violations constitute irreparable harm, and the balance of equities favors

24  providing the targeted relief sought. The Court should grant the motion.

25

26  [2] These statements are admissible. The California DOJ's report is admissible under Federal Rule of Evidence 803(8). *See Freitag v. Ayers*, 468 F.3d 528, 541 n.5 (9th Cir. 2006) (admitting

27  California Inspector General's report regarding a prison under FRE 803(8)). Even if these statements were considered hearsay, "a district court may. . . consider hearsay in deciding whether

28  to issue a preliminary injunction." *Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009).

[3] Harris Decl. ¶ 25, Ex. 6 (@RepRoKhanna, X (Jan. 6, 2026, 8:20 AM), https://t.co/n1PuguU6nN).

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

3952338

## II.    FACTS

Plaintiffs presented ample evidence in support of their Motion for Preliminary Injunction (ECF 22) and rely on those facts here. In direct response to Defendants' proffered evidence and arguments, Plaintiffs now submit supplemental reply declarations from their custody expert, medical expert, and several detained people and lawyers. Among other things, these additional declarations show that the harmful conditions Plaintiffs described in their motion persist unabated, despite Defendants' unsupported assertions to the contrary.

## III.    ARGUMENT

### A.    Plaintiffs are likely to succeed on the merits of their claims.

#### 1.    Punitive Conditions of Confinement

##### a.    The *Jones* presumption applies in this case.

Under *Jones v. Blanas*, the Court presumes punitive conditions when a civilly detained person is "confined in conditions identical to, similar to, or more restrictive than, those in which his criminal counterparts are held." 393 F.3d 918, 932 (9th Cir. 2004). Defendants contend that civil *immigration* detention is exempt from this presumption. They are wrong.

In *Jones*, the plaintiff was a civil detainee awaiting adjudication under California's Sexually Violent Predator Act (SVPA). *Id.* at 923. The Ninth Circuit emphasized that it was "the civil nature of SVPA confinement" that was dispositive, explaining that "[b]ecause [the plaintiff] is detained under civil—rather than criminal—process, an SVPA detainee is entitled to more considerate treatment than his criminally detained counterparts." *Id.* at 932. Based on this civil-criminal distinction, the court established the presumption for all individuals "confined . . . under civil process." *Id.* at 934. It did so without qualification or carveouts to specific forms of civil detention. *Id.* at 932 (holding that neither an "individual detained under civil process" nor an "individual accused but not convicted of a crime" may be subject to punitive conditions). Because immigration detention is, like all forms of civil detention, "nonpunitive in purpose and effect," *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001), the *Jones* presumption applies.

Defendants do not and cannot dispute that the individuals they are holding in California City are being civilly detained. And while the Ninth Circuit has yet to expressly apply *Jones* in the

context of federal immigration detention, it has never found the presumption inapplicable in that context and in fact "assum[ed]" that it could be invoked. *Fraihat v. U.S. Immigr. & Customs Enf't*, 16 F.4th 613, 648 (9th Cir. 2021). Several district courts have therefore applied the *Jones* presumption to civil immigration detention. *See, e.g.*, *Pablo Sequen v. Albarran*, 2025 WL 3283283, at *24 (N.D. Cal. Nov. 25, 2025); *Doe v. Becerra*, 732 F. Supp. 3d 1071, 1080 n.2 (N.D. Cal. 2024); *Torres v. U.S. Dep't of Homeland Sec.*, 411 F. Supp. 3d 1036, 1064 (C.D. Cal. 2019); *Unknown Parties v. Johnson*, 2016 WL 8188563, at *5 (D. Ariz. Nov. 18, 2016). These holdings make sense: there are strong parallels between immigration detention and the type of civil commitment at issue in *Jones*, and sound reasons for immigration detention to be run in a less restrictive way than prison. *See* Suppl. Decl. of Dan Pacholke ("Supp. Pacholke Decl.") ¶¶ 3–5).

Defendants' attempts to create an immigration-detention exception to *Jones* fail. Defendants suggest that dicta in *Fraihat* cast doubt on the presumption's applicability to immigration detention and then erroneously claim that Plaintiffs' cited district court cases "all . . . predate *Fraihat*." Opp. 12. That is incorrect. The *Fraihat* court "assum[ed]" that the *Jones* presumption could be applied to immigration detention in 2021. 16 F.4th at 648. *Doe v. Becerra* was decided in 2024 and concluded that the *Jones* presumption "applies with equal force in the immigration context." 732 F. Supp. 3d at 1080 n.2. More recently, in *Pablo Sequen v. Albarran*, another court in this district applied the presumption to a claim alleging punitive conditions at an ICE detention facility. 2025 WL 3283283, at *24. These cases align with extra-circuit authority holding that "immigration detainees . . . are entitled to the same due process protections as pretrial detainees." *Hope v. Warden York Cnty. Prison*, 972 F.3d 310, 325 (3d Cir. 2020).

Defendants next claim that Plaintiffs improperly invoke the *Jones* presumption by relying on "specific incidents" of treatment rather than "categorical" practices. Opp. 13. Not so. As Plaintiffs' expert Dan Pacholke and California City Warden Christopher Chestnut both explain, Defendants implement facility-wide policies that are similar to or more restrictive than prison in the following areas: contact visits, freedom of movement, daily counts, outdoor time, sensory stimulation, and the provision of temperature-appropriate clothing. *See* Proposed Order ¶ 10.

Next, Defendants conflate *Jones*' presumption with the objective test applied to civil

detention. *See* Opp. 13. According to them, "the question is not whether a condition resembles or exceeds prison conditions in the abstract, but whether it is objectively reasonable considering the government's legitimate interests in the particular detention context." *Id.* They are wrong. As the Ninth Circuit has repeatedly confirmed, if a civil detention condition is "identical to, similar to, or more restrictive than" prison, the presumption applies—full stop. *Fraihat*, 16 F.4th at 648.

Defendants nowhere dispute declarations—including from individuals who previously served criminal sentences **in California City** when it was a prison—attesting that the conditions now are worse than prison. *See, e.g.*, ECF 22-16 ("Montes-Diaz Decl.") ¶¶ 6–11; ECF 22-20 ("Rivera-Trigueros Decl.") ¶¶ 10–15; ECF 22-15 ("Mendiola Escutia Decl.") ¶¶ 12–13, 20–21; ECF 22-12 ("Keo Decl.") ¶¶ 5–12, 16. Defendants leave this probative evidence unrebutted.

Defendants also fail to reckon with Mr. Pacholke's expert declaration, which explains how conditions at California City are as restrictive as prison, or worse. *See* ECF 22-2 ("Pacholke Decl.") ¶¶ 8–9 (California City's "blanket policy" against contact visits is more restrictive than prison); 11–17 (California City's count, lock-down, escort, and pat-down policies are more restrictive than prison). These are hardly one-off or sporadic incidents affecting individual people; they are categorical, systemic, undisputed facility-wide policies that are, on their face, harsher than prison.

Defendants' own evidence in fact *confirms* Plaintiffs' allegations and evidence. Mr. Chestnut states that California City conducts four counts during the day and three at night and confirms that, during each count, all detained individuals must "immediately return[] to their cells" and "stand inside their cells facing the door" until the count is cleared. ECF 40-6 ("Chestnut Decl.") ¶¶ 118, 121. He nowhere disputes that counts have lasted upwards of an hour, consistent with Plaintiffs' declarations, but now states that counts "average between 30 and 45 minutes each." *Id.* ¶ 135. It is unclear whether this stated "average" includes time spent from when the count is announced to when it is cleared, but in any event, it contradicts detained peoples' experiences. *See* Supp. Decl. of Gustavo Guevara Alacorn ("Supp. Guevara Alarcon Decl.") ¶ 5; Decl. of Anbhav Mann ("Mann Decl.") ¶ 12. Nor does Mr. Chestnut dispute Plaintiffs' expert and declarant evidence that counts of that frequency and duration exceed standard policies in the criminal context. *See, e.g.*, Mendiola Escutia Decl. ¶ 21; Pacholke Decl. ¶ 17.

It is likewise undisputed that "all social visitation is non-contact" at California City, Chestnut Decl. ¶ 109, and that pat searches occur whenever people "leave and return to their housing areas," *id.* ¶ 115. Routine pat-downs are "not a standard correctional practice, even in large prisons with people at high security levels." Supp. Pacholke Decl. ¶ 14. Mr. Chestnut also nowhere denies that detained people are permitted no more than one hour a day of outdoor recreation, and instead vaguely hedges that they "are now permitted to go out to recreation at least one hour per day." Chestnut Decl. ¶ 91. That is unnecessarily punitive, as "even people at the highest security levels" in prison generally receive more outdoor time than that. Supp. Pacholke Decl. ¶ 17. Mr. Chestnut confirms that the facility offers no programming, unlike prison. Chestnut Decl. ¶ 107. And he nowhere rebuts Plaintiffs' evidence that people were left shivering in the cold for months, until Defendants issued "jackets" to "use in the cooler months." *Id.* ¶ 73. He nowhere claims that these jackets are temperature appropriate, and in fact, they are paper-thin windbreakers that provide no warmth. *See* Supp. Guevara Alarcon Decl. ¶ 6; Mann Decl. ¶ 13. There is "no defensible reason to not provide people with weather-appropriate clothing." Supp. Pacholke Decl. ¶ 22.

In short, Defendants have corroborated the mountain of evidence demonstrating that California City employs similar or worse restrictions than prison in terms of contact visits, freedom of movement, daily counts, outdoor time, opportunities for sensory stimulation, and the provision of temperature appropriate clothing. *See* Proposed Order ¶ 10. The *Jones* presumption applies.

Once the presumption is triggered, Defendants must show "(1) legitimate, non-punitive interests justifying the conditions of the detainee's confinement and (2) that the restrictions imposed are not excessive in relation to these interests." *Fraihat*, 16 F.4th at 648. Defendants make neither showing. Their attempts to justify the policies as a security measure in light of Plaintiffs' criminal histories are a smokescreen. Opp. 13. As is true with civil immigration detention generally, to the extent some of the Plaintiffs were previously incarcerated, they each completed their sentences and were deemed fit to be released into the public before ICE detained them. *See* Supp. Pacholke Decl. ¶¶ 29–33. There is no legitimate reason to impose punitive policies on those Plaintiffs, much less across the entire facility, where the vast majority of detained persons are deemed low security risks or have no criminal records at all. *Id.* ¶ 30. Such blanket policies "without individualized risk

1  assessment . . . reflect exaggerated responses" inconsistent with civil detention. *Id.* ¶ 3.

2    Defendants' meager attempts at explaining their punitive policies also belie "correctional

3  reality." Supp. Pacholke Decl. ¶ 19. Defendants cite safety concerns to justify many of the

4  restrictions, but as Mr. Pacholke explains, none of the draconian restrictions are legitimate

5  responses to safety concerns. *Id.* ¶¶ 6, 9, 12–13, 18–19, 21–22, 24–25. And Mr. Chestnut's

6  suggestion that providing programming would be "impracticable," Chestnut Decl. ¶ 107, ignores

7  that "[f]acilities routinely operate programming even where length of stay is uncertain," Supp.

8  Pacholke Decl. ¶ 19. In fact, other ICE detention facilities in the same county offer more prosocial

9  and recreation opportunities than California City. Supp. Guevara Alarcon Decl. ¶¶ 11–12.

10    **b.**  **Plaintiffs are likely to prevail even absent the presumption.**

11    Even without the *Jones* presumption, Plaintiffs are likely to succeed on their claim that the

12  pervasive conditions at California City are unconstitutionally punitive. A restriction is punitive

13  where it is: (1) "intended to punish," (2) "excessive in relation to its non-punitive purpose," or (3)

14  "employed to achieve objectives that could be accomplished in so many alternative and less harsh

15  methods." *Fraihat*, 16 F.4th at 647. With respect to intent, Defendants seek to explain away high-

16  level official statements demonstrating a clear *federal* policy of harsh detention conditions designed

17  to force people to abandon their legal claims and self-deport, arguing that such statements may

18  apply to some ICE immigration facilities and not others. Opp. 14. There is no sound reason to

19  construe those statements so narrowly. But in any event, and as explained above, Defendants'

20  restrictions are excessive in relation to their supposed non-punitive purpose. Prisons regularly

21  employ less harsh methods to achieve the same objectives. Pacholke Decl. ¶¶ 11–13; Supp.

22  Pacholke Decl. ¶ 5. And other nearby detention facilities employ less intrusive count and search

23  policies, allow contact visits, provide free weather-appropriate clothing, offer structured

24  programming, and provide more outdoor recreation. Supp. Guevara Alarcon Decl. ¶¶ 10–13.

25    **2.**  **Inadequate Medical Care**

26    Plaintiffs have presented declarations from dozens of patients describing desperate efforts

27  to obtain medical care at California City. Plaintiffs have also presented the expert opinion of Dr.

28  Todd Wilcox, who reviewed over three thousand pages of California City medical records and

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

concluded that the system is in crisis, failing to meet patients' medical needs in even the most basic ways.[4] He identified systemic deficiencies in intake procedures, the sick call process, chronic care, medication administration, specialty care, emergency care, medical housing, mental health care, and healthcare staffing. *See* ECF 22-3 ("Wilcox Decl."); ECF 22-1 (summarizing declarations from detained people). In response to this searching and detailed analysis, Defendants offer a series of deflections and distractions. Rather than engage with the extensive evidence of harm—or the established case law—Defendants recite their policies on paper and assert, without citation and against the evidence, that everything is fixed now. These empty assertions cannot disturb clear and vastly unrebutted evidence of serious, ongoing failures in medical care. Patients have been and remain at grave risk of harm in the absence of court-ordered relief.

### a.  Defendants fail to dispute Plaintiffs' claims as a matter of law.

When the government takes a person into custody, it has a constitutional obligation to provide adequate medical care. *Helling v. McKinney*, 509 U.S. 25, 32 (1993). Under the Eighth Amendment, adequate medical care must include "a system of ready access," in which patients can "make their medical problems known to the medical staff" and staff is competent enough to diagnose and "treat medical problems or to refer [patients] to others who can." *Hoptowit v. Ray*, 682 F.2d 1237, 1253 (9th Cir. 1982), *overruled on other grounds by Sandin v. Conner*, 515 U.S. 472 (1995); *see also Brown v. Plata*, 563 U.S. 493, 510–11 (2011). Under the Fifth Amendment, a civil detainee is entitled to at least this much and need not show that government officials are "subjectively aware" that their actions are unreasonable. *Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1120, 1122–25 (9th Cir. 2018); *Castro v. Cnty. of L.A.*, 833 F.3d 1060, 1067 (9th Cir. 2016) (deprivations of medical care that violate the rights of people in prison *a fortiori* violate the rights of people in civil detention). Plaintiffs' extensive evidence shows that the system the Constitution demands is lacking at California City. Indeed, Defendants nowhere argue that Plaintiffs have failed to satisfy the elements of their constitutional claim. Defendants' conclusory assertion that they dispute Plaintiffs' facts, despite never engaging with Plaintiffs' evidence or with Dr. Wilcox's

---

[4] Defendants' suggestion, Opp. 6, that Dr. Wilcox may have misread the medical records based on the way the print function works is meritless. *See* Wilcox Reply Decl. ¶¶ 15–16.

extensive, detailed, and well-supported conclusions, does not defeat Plaintiffs' entitlement to relief.

Defendants wrongly claim that Plaintiffs' evidence is limited to "isolated delays, individual dissatisfaction with care, or anecdotal accounts" and that the sample size is too small to justify systemwide relief. Opp. 17–18. As Dr. Wilcox explains, the "deficiencies" he found "were pervasive and consistent across multiple patients and they continue uncorrected to this day," and "the total number of individual transactions in those medical records (every pill passed, every lab result, every vital sign taken, etc.) was large enough to draw valid conclusions." Wilcox Reply Decl. ¶¶ 10–11. Defendants' suggestion that Plaintiffs cherrypicked records is a red herring. When assessing the adequacy of a medical system, it "makes sense to look to prisoners with serious needs, and particularly those who suffer adverse outcomes," because "healthy patients are not an indicator of a system's capabilities." *Jensen v. Shinn*, 609 F. Supp. 3d 789, 833–34 (D. Ariz. 2022); *see also* Wilcox Reply Decl. ¶ 12 (explaining "it is common for an expert to review only selected records" and "the sickest patients" are the ones "who test the ability of the system to provide care"). Dr. Wilcox's conclusions are also consistent with dozens of patient declarations describing the same deficiencies, and the concerns expressed by non-profit, state, and federal observers after site visits in September, November, and January, respectively.[5]

### b. Defendants provide no evidence to rebut Plaintiffs' facts.

Rather than rebutting the detailed evidence of harm Plaintiffs presented, Defendants point to CoreCivic's policies on paper. CoreCivic's regional medical director, Dr. Susan Tiona, expounds at length on facility policies relating to intake, sick calls, chronic care, specialty appointments, and disability accommodations. ECF 40-7 ("Tiona Decl.") ¶¶ 30–51. But this description of how the system *should* function does nothing to rebut Plaintiffs' extensive evidence regarding how the system functions *in fact*. Defendants nowhere demonstrate that these policies are being implemented or that they result in clinically appropriate care.[6] To the contrary, Dr. Wilcox's initial

---

[5] *See* Harris Decl. ¶¶ 24–26, Exs. 5–7.

[6] Attempting to rebut Plaintiffs' medical claims, Defendants present a table showing 45% *noncompliance* in intake health examinations. Tiona Decl. ¶ 31. It is unclear whether Defendants present this table to concede system failure or to refute it. Regardless, the chart is misleading. The true noncompliance rate for the listed patients is over 50%. Wilcox Reply Decl. ¶ 40.

finding—that, regardless of any policy, patient care is dangerously substandard—remains undisturbed. The mere existence of CoreCivic policies hardly undermines those findings. *See Pablo Sequen*, 2025 WL 3283283, at *9 ("The fact that ICE policies may provide for certain conditions does not, however, demonstrate that ICE is actually complying with those such policies . . . ."); *Snead v. CoreCivic of Tenn.*, 2020 WL 6479995 at *19–23 (M.D. Tenn. Apr. 6, 2020) (similar); *see also* Wilcox Reply Decl. ¶ 5 ("[T]he presence of acceptable policies and procedures is no guarantee that the facility can or will implement those policies and procedures.").

Defendants purport to dispute Dr. Wilcox's patient-specific findings yet fail to substantively engage with most of them. Dr. Tiona claims she and her colleague reviewed patient charts for 29 people, including each of the people discussed in Dr. Wilcox's report. Tiona Decl. ¶ 9. But she nowhere challenges any of Dr. Wilcox's findings with respect to most of those patients. In fact, she never even discusses the care provided to Named Plaintiffs or other patients Dr. Wilcox identified as exemplifying the most egregious system failures. Instead, without explaining why, Dr. Tiona discusses just four patients in her "clinical chart review observations." Tiona Decl. ¶¶ 58–70. Her discussion ignores the vast majority of Dr. Wilcox's patient findings, both because it excludes 13 of those patients and because it does not address the systemic issues he deduced from patient records. What's more, for each of the four patients, she admits some error in care delivery. *See id.*; *see also* Wilcox Reply Decl. Appendix A (addressing same four patients). In the end, Dr. Wilcox made careful, detailed findings as to 17 patients in his 50-page report; Dr. Tiona partially discusses only four, and Defendants rely on that discussion to claim they have "countervailed" *all* of Dr. Wilcox's patient-specific findings.[7]

In fact, Defendants' declarant appears to *agree* with many of Dr. Wilcox's conclusions. Having reviewed the same charts he did, Dr. Tiona identified issues in at least 11 of the 17 cases. She sent recommendations to the California City medical leadership for 11 patients on a wide range of issues:[8] she recommended that the facility expedite specialty off-site appointments, order and

---

[7] Defendants claim that Dr. Tiona's partial discussion of these four patients somehow "dispute each" of Dr. Wilcox's findings for 17 patients and also "countervailed" his findings about seven entirely different patients. Opp. 6, 18. These citations are misleading.

[8] Dr. Tiona uses one last name to describe two people here. *See* Wilcox Reply Decl. ¶ 5 n.1.

1    renew medications, adjust medication dosing, schedule follow-up appointments, establish chronic

2    care appointments, order and schedule labs, order medical diets, and schedule evaluations for

3    disability accommodations. Tiona Decl. ¶ 57. She also identified the need for remedial training and

4    recognizes nursing errors in three additional patient cases. *Id.* ¶¶ 59, 62, 64, 65, 68.

5        These issues—identified by Defendants' own declarant—raise "concerns about [the

6    facility's] ability to follow their own policies and procedures." Wilcox Reply Decl. ¶ 8. And

7    notably, Defendants failed to immediately implement Dr. Tiona's recommendations, even though

8    many of the actions were as simple as renewing medications or ordering lab work. *Id.* ¶ 6

9    (describing the recommended actions as time-sensitive but not time-intensive). As Dr. Wilcox

10    concludes, "California City appears unable to course-correct and fix known deficiencies even when

11    they are called out to them." *Id.* ¶ 8.

12        **c.    Adverse outcomes will continue absent judicial intervention.**

13        Defendants concede shortcomings in medical care in the facility's initial operational period

14    but claim to have fixed those issues. But Defendants provide no evidence that these supposed fixes

15    have in fact resolved the systemic patient care issues Dr. Wilcox identified. Opp. 17–18. Indeed,

16    his review of updated medical records identified "substantial, systemic, and ongoing deficiencies,"

17    leading him to conclude that the "system is egregiously inadequate and poses a clear and present

18    danger to patients." Wilcox Reply Decl. ¶ 86.

19        Defendants concede that there were delays in processing sick calls slips "[in] the first three

20    months" of the facility's operation.[9] However, they claim that, "[b]ased on Dr. Tiona's chart

21    review, all sick call requests at the facility are currently processed in a timely manner." Opp. 17.

22    Not so. Dr. Wilcox reviewed the same charts, and they revealed untimely sick call responses

23    through December 2025, when Dr. Tiona signed her declaration. Wilcox Reply Decl. ¶¶ 49–52

24    (listing patient cases). Moreover, new patient records show ongoing problems with sick call

25    responsiveness. For example, a patient with uncontrolled diabetes filed a sick call slip on January

26

27    ─────────────────────

    [9]  Defendants wrongly assert that "all of the incidents" Dr. Wilcox relies upon "date to

28    approximately the first month that CCDF was operational." Opp. 18. In fact, Dr. Wilcox identified
    problems that continued through November, and Dr. Tiona also recommended follow-up regarding
    issues that arose after that initial month. *See* Tiona Decl. ¶ 57.

3, 2026, reporting pain in his foot. No nurse or provider saw this patient in response to the sick call slip, despite the serious danger of foot ulcers in diabetics. *Id.* ¶ 54; Wilcox Decl. ¶ 90. Instead, the patient was referred to a provider for follow-up "due" in May 2026, *four months* later. Wilcox Reply Decl. ¶ 54. Another patient arrived at the facility on December 25, 2025, with a month's supply of his daily HIV medication. Despite filing multiple sick call slips stating he needed his medication, in the first 13 days he was at the facility, he received his daily HIV medications only twice. Patient A Decl. ¶ 8; Wilcox Reply Decl. ¶ 29.

Dr. Tiona also concedes the facility initially had difficulty stocking medication, but suggests that a new pharmacy contract has addressed those issues. Tiona Decl. ¶ 27. She also concedes initial challenges with the timeliness of intake assessments but asserts, without evidence, that those challenges have been addressed with improvements to staffing patterns and other changes. *Id.* ¶ 32; Opp. 18. In fact, Dr. Wilcox has concluded that all of these issues have persisted. Wilcox Reply Decl. ¶¶ 40, 47 (indicating medications remain out of stock in mid-December and noting continued delays in initial intake assessments). Dr. Tiona also concedes ongoing "difficulties in scheduling specialty appointments due to the lack of ICE-contracted specialists near the facility, which is in a remote location." Tiona Decl. ¶ 47.[10] This alone would warrant relief by this Court. *See Cal. Coal. for Women Prisoners v. United States*, 723 F. Supp. 3d 712, 738–40 (N.D. Cal. 2024) (granting preliminary injunction on plaintiffs' class action medical care claims because prison's inability to provide timely specialist appointments likely constituted deliberate indifference to serious medical needs). Yet Defendants would have this Court deny relief on nothing more than Dr. Tiona's assurance that "CoreCivic is actively working to rectify this issue." Tiona Decl. ¶ 47.

The Constitution demands more. Defendants must do more than *try* to meet their constitutional obligations; they must meet them in fact. *See Jensen*, 609 F. Supp. 3d at 873. Resource and geographic constraints are irrelevant. If Defendants choose to operate an ICE

---

[10] Dr. Tiona states that 65 offsite medical transports have occurred at the facility. Tiona Decl. ¶ 48. It is not clear that she means 65 *specialty* appointments. These offsite transports were likely to hospitals. Wilcox Reply Decl. ¶ 76. Dr. Tiona identifies only two specialty care appointments that have been scheduled—the two for which Plaintiffs sought court intervention. Tiona Decl. ¶ 46.

detention facility in a "remote location," they must find a way to provide constitutionally adequate care at that location. It is no excuse that neighboring pharmacies do not support ICE's "mission," Tiona Decl. ¶ 27, and that nearby specialists are not ICE-contracted: Defendants must find a pharmacy and available specialists and must do so *before* they begin detaining people who will inevitably need medical care. The law is clear that there is no exemption from the obligation to provide adequate medical care simply because doing so would be expensive or logistically complicated. *See, e.g.*, *Porretti v. Dzurenda*, 11 F.4th 1037, 1046 (9th Cir. 2021); *Peralta v. Dillard*, 744 F.3d 1076, 1083 (9th Cir. 2014) (*en banc*).

As though to wave away their concessions, Defendants essentially claim no harm no foul. That argument fails. Defendants assert that any delays in sick call processing in the period covered by Dr. Wilcox's initial declaration resulted in no "adverse medical outcomes." Opp. 17. It is unclear how they can know that, since Dr. Tiona does not purport to have reviewed all patients who submitted sick call slips at the facility during those three months. But just as remarkably, Dr. Tiona asserts that her chart review for 29 patients revealed no adverse outcomes at all. Tiona Decl. ¶ 53. These assertions are "wrong and logically flawed." Wilcox Reply Decl. ¶ 23. Dr. Wilcox described significant adverse outcomes to patients in his initial declaration. *See, e.g.,* Wilcox Decl. ¶¶ 30, 33, 37–38, 48, 51, 62, 66, 81–86, 89, 91, 98, 106, 115-16, 128 (describing *inter alia* failure to treat dizziness and vision needs, resulting in head injury; laceration and symptoms consistent with basilar skull fracture; failures regarding wound care, latent tuberculous, antibiotic needs, diabetes, heart condition, and likely prostate cancer). Dr. Wilcox points to adverse outcomes again now. Wilcox Reply Decl. ¶¶ 24–26 (failure to provide specialty care resulting in catheter placement; discontinuation of insulin causing diabetes destabilization; lack of cardiology care causing ongoing and progressive damage to the heart muscle, lungs, and vascular system). He also cautions that many patients are at high risk of adverse outcomes, but those outcomes may not have presented yet. *Id.* ¶¶ 27, 29 (lapse in daily HIV medication causing risk of treatment failure, drug resistance and viral rebound; poorly controlled blood pressure risking progression to dialysis, blindness, and amputations). Finally, he notes that the denial of appropriate diagnostic care makes other adverse outcomes hard to identify. *See id.* ¶¶ 31 ("California City is simultaneously denying people

1    appropriate diagnostic care and then claiming no adverse outcomes.").

2        This is not a fight over "optimal" care, as Defendants would like to characterize it. Opp. 18.

3    Nor is it a battle of the experts.[11] Defendants have failed to rebut Plaintiffs' evidence, and that

4    evidence justifies relief. *See Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) (a party "is not

5    required to prove his case in full at a preliminary-injunction hearing").

6        Defendants claim *preliminary* relief is inappropriate because other cases resulting in

7    *permanent* relief involved lengthy trials and evidentiary hearings. *See* Opp. 19. But Plaintiffs cited

8    *Coleman*, *Madrid*, *Plata*, and *Jensen* to explain why they are likely to prevail on the merits. ECF

9    22 ("Mot.") 18–20. Plaintiffs do not ask the Court to reach the merits today; they ask only that,

10   based on that likelihood of success in a future trial, the Court grant preliminary relief so that patients

11   do not continue to suffer risk of harm and death while this case proceeds. Courts routinely order

12   such preliminary relief against ICE on less developed records and without the benefit of expert

13   testimony. *See, e.g.*, *Pablo Sequen*, 2025 WL 3283283, at *7, *9 (granting preliminary injunction

14   based on detainee declarations and finding that "the mere existence of [ICE's] policies is

15   insufficient to rebut the many declarations from detainees and attorneys describing present

16   conditions"); *Barco Mercado v. Noem*, 800 F. Supp. 3d 526, 542 (S.D.N.Y. 2025).

17                        **3.    Inadequate Access to Counsel**

18       Defendants neither rebut Plaintiffs' showing regarding violations of Plaintiffs' right to

19   counsel, nor identify any legitimate interest reasonably related to the challenged restrictions.

20   Instead, they offer at most conclusory assertions, or no justification at all.

21       Defendants concede that in-person legal visits are by default non-contact, in contrast to the

22   confidential contact attorney visits broadly permitted by the correctional system. Chestnut Decl. ¶

23   189; Supp. Pacholke Decl. ¶ 8. Although Mr. Chestnut claims that legal "contact visits may be

24   permitted upon request and with facility approval," Chestnut Decl. ¶ 189, no such approvals were

25   identified, and Defendants' counsel admits that to do so would require a change in policy. Harris

26   Decl. ¶ 11, Ex. 1. Confidential contact attorney visits are standard in criminal detention; Defendants

27   have offered no persuasive reason why they are categorically unavailable at California City.

28
─────────────────────────────────────────
[11] Dr. Tiona is a CoreCivic employee and is not offered as a defense expert.

Although Defendants claim there are no weeks-long delays in scheduling, Chestnut Decl. ¶ 204, they nowhere contest multiple attorney accounts of delays. Mr. Chestnut blames one of these attorneys for the delays she experienced, claiming she requested dates over a week in the future. *Id.* ¶ 206.[12] But the attorney offered a range of dates because she knew the facility was unwilling to schedule appointments sooner. Suppl. Decl. of Hannah Kazim ("Supp. Kazim Decl.") ¶¶ 6–8. Defendants also complain about the number of emails they supposedly received from declarants' organizations. This claim is false; based on the organizations' review, Mr. Chestnut's original numbers were wildly inflated, and Mr. Chestnut's corrected declaration continues to misleadingly inflate those numbers. *See* ECF 45; Harris Decl. ¶¶ 20–23, Ex. 4; Supp. Kazim Decl. ¶ 5; Suppl. Decl. of Lee Ann Felder-Heim ("Supp. Felder-Heim Decl.") ¶¶ 4–6. More to the point, if Defendants wish to house thousands of people at California City, they must be equipped to handle emails from their lawyers.

Defendants describe access to attorney calls and visits as "unlimited" while conceding the limitations imposed on that access in the same breath. Opp. 20; Chestnut Decl. ¶¶ 190–91. Defendants concede that technical issues have affected attorney-client calls and offer no explanation for cutting calls short when staff brings clients to calls late. Chestnut Decl. ¶ 216; ECF 22-27 ("Felder-Heim Decl.") ¶ 5; ECF 22-31 ("Kyle Decl.") ¶ 7. Mr. Chestnut nowhere disputes that the frequent counts at the facility impede in-person legal visits. He also blames attorneys unable to visit in person for "not utiliz[ing] the facility's procedures" available online, which require notice "at least 24 hours in advance." Chestnut Decl. ¶¶ 193, 201. This is false: the online materials nowhere mention advance notice for *in-person* visits. *Id.*, Att. D at 3; Decl. of Saralyn Olson-Wagner ("Olson-Wagner Decl.") ¶ 9. And Defendants nowhere deny that in-person legal visits occur within earshot of facility staff. ECF 22-29 ("Goss Decl.") ¶ 16; Mann Decl. ¶ 7.

Defendants must show that these extensive restrictions on attorney access are rationally connected to a legitimate interest. *Turner v. Safley*, 482 U.S. 78, 89 (1987). At most, they say the restrictions are "grounded in the government's legitimate interest in maintaining the safe and

---

[12] Mr. Chestnut misattributes Mr. Kyle's statement regarding delays to Ms. Kazim, thereby failing to rebut the multiple reports of weeks-long scheduling delays. *See* Kyle Decl. ¶ 5.

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC
3952338

orderly operation of the facility." Opp. 20; *accord* Chestnut Decl., ¶ 220 (referencing "the constraints of operating a secure detention facility"). Courts have rejected such conclusory statements, particularly where Defendants fail to specify how the restrictions relate to those interests. *Torres*, 411 F. Supp. 3d at 1068; *Barco Mercado*, 800 F. Supp. 3d at 577–78. Tellingly, Mr. Chestnut's declaration offers no safety-related justifications in the section on access restrictions; he cites only the facility's lack of resources. *See* Chestnut Decl. ¶¶ 192, 196. But resource inadequacies are no justification for inadequate access to counsel. *Barco Mercado*, 800 F. Supp. 3d at 577–78. Defendants are also silent as to why they could not accomplish the less restrictive conditions raised in Plaintiffs' Motion or Proposed Order. *Turner*, 482 U.S. at 90 ("ready alternatives"); *Jones*, 393 F.3d at 932 ("alternative and less harsh methods").

### 4.    Violations of Rehabilitation Act

Defendants' obligations under Section 504 of the Rehabilitation Act are expansive. Defendants must provide "meaningful access" to programs, services, and activities, including by providing reasonable accommodations and auxiliary aids, modifying policies and procedures, and making physical or programmatic adjustments, *Alexander v. Choate*, 469 U.S. 287, 300–01 (1985); proactively identify and track detained people's disability needs, *see, e.g.*, *Pierce v. District of Columbia*, 128 F. Supp. 3d 250, 272 (D.D.C. 2015); establish processes to effectively communicate with detained people who have communication disabilities, *Armstrong v. Newsom*, 724 F. Supp. 3d 886, 915 (N.D. Cal. 2024); ensure that the facility is structurally accessible, *Hernandez v. Cnty. of Monterey*, 110 F. Supp. 3d 929, 935, 954 (N.D. Cal. 2015); and adequately train staff to fulfill these requirements, *Armstrong v. Newsom*, 58 F.4th 1283, 1298 (9th Cir. 2023).

The undisputed record is replete with failures to comply with these obligations. Defendants fail even to allege the existence of a disability tracking system sufficient to meet their legal obligations or that the facility in which they house people with disabilities is structurally accessible. They also nowhere rebut nearly a dozen accounts of denial of access to programs, services, and activities on the basis of disability. *See generally* ECF 22-21 ("Ruiz Canizales Decl.") (denied equal access to medical appointments, intake process, clean clothes, outdoor recreation, communication with staff, and phones, among other services, because Defendants systematically failed to provide

sign language interpretation ("SLI")); ECF 22-10 ("Juarez Ruiz Decl.") ¶¶ 7, 11 (denied access to outdoor recreation because staff denied his request for a cane, without justification); ECF 22-22 ("Santos Avalos Decl.") ¶¶ 12–13 (denied access to safe, accessible housing); ECF 22-13 ("Leyva Decl.") ¶ 32 (denied access to communication by phone and in person because of failure to accommodate hearing disability). This includes extensive testimony that people have been housed in beds that are inaccessible due to their disabilities. *See, e.g.,* Leyva Decl. ¶¶ 9–10, 13–19 (required stitches after injuring his head climbing off the top bunk because staff confiscated his eyeglasses during intake and did not provide a replacement); ECF 22-5 ("Benavides Zamora Decl.") ¶¶ 13-15 (told to sleep on the floor after requesting a lower bunk because of his disability); Montes-Diaz Decl. ¶ 18–20 (injured himself climbing off of the top bunk because he had an upper extremity disability that made the top bunk inaccessible).

Defendants fail to contest evidence of lengthy and harmful delays in providing necessary disability accommodations, conceding in some cases that people with disabilities still have not received necessary accommodations. *See* Chestnut Decl. ¶ 162 (confirming that he "recently learned" Plaintiff Keo requires specific hearing aid batteries, months after Keo's arrival, and that Keo was not provided an interim disability accommodation for months while the facility failed to replace his batteries); *id.* ¶ 160 (confirming that Rivera-Trigueros required, but was not provided, orthopedic shoes); *id.* ¶ 159 (not disputing that Benavides Zamora required orthopedic shoes for diabetic neuropathy and amputated toes but that staff confiscated his shoes for three weeks, during which time he was unable to go to yard); *id.* ¶ 163–66 (not disputing that Plaintiff Ruiz Canizales was only provided SLI one time over a three-month period).

Defendants do not dispute Plaintiffs' significant evidence that there is no functional system at California City to request disability accommodations. *See* Mot. 11–12 (citing Wilcox Decl. ¶¶ 72, 74, 76; Singh Decl. ¶ 12, Ruiz Canizales Decl. ¶ 99, Juarez Ruiz Decl. ¶ 9). Defendants cite the theoretical availability of a system via their sick call or grievance processes, *see* Opp. 16; Chestnut Decl. ¶ 152; Tiona Decl. ¶ 49, but ignore overwhelming evidence that both systems fail to produce timely or adequate responses. Wilcox Decl. ¶ 72 ("[S]ick-calls describing urgent medical symptoms can go unaddressed or unacknowledged for days or weeks, resulting in delays accessing care.");

Wilcox Reply Decl. ¶ 54 (finding "ongoing failure" to address sick-calls "in a timely manner"), ¶ 78 (Leyva asked for hearing aids several times, but was told that "hearing aides and amplifier is [sic] not available [onsite]"). Reciting policies, without providing evidence of their operation, fails to rebut Plaintiffs' evidence. Defendants cannot claim an adequate system to request disability accommodations based on paper policies that are not followed on the ground.

**B.    Plaintiffs have established that they will suffer irreparable harm absent relief.**

Without the requested relief, Plaintiffs will continue to suffer immediate and irreparable harm. Defendants wrongly claim that Plaintiffs "generally allege potential harm," Opp. 23, but they ignore the many facility-wide policies that continue to harm Plaintiffs, *see supra* III.A. Though Defendants "claim that they have made some improvements . . . there are ample reasons to believe that these and any other modest improvements would not continue were a preliminary injunction denied." *Barco Mercado*, 800 F. Supp. 3d at 567–68; *see also Hernandez v. Sessions*, 872 F.3d 976, 994–95 (9th Cir. 2017) (explaining that "subpar medical and psychiatric care in ICE detention facilities" constitute "irreparable harms"). Defendants' generalized declarations fail to squarely address Plaintiffs' evidence of specific harms existing since August 2025. *See Pablo Sequen*, 2025 WL 3283283, at *27 ("The loss or threatened infringement upon [constitutional] rights for even minimal periods of time unquestionably constitutes irreparable injury.").

**C.    The balance of hardships and public interest tip heavily in Plaintiffs' favor.**

Defendants fail to demonstrate any legitimate hardship in enforcing immigration law that would stem from providing the relief sought, and the final two factors weigh heavily in Plaintiffs' favor. Defendants' interest in immigration enforcement does not translate into any legally cognizable harm from being required to follow the law. *Vu v. Noem*, 2025 WL 3114341, at *9 (E.D. Cal. Nov. 6, 2025). They devote considerable ink to the deference this Court should afford them, all while ignoring that "deference is not permissible in the face of continuing constitutional violations." *Barco Mercado*, 800 F. Supp. 3d at 579. Defendants conclusorily assert that following the law "would prevent Defendants from effectively managing operations at the facility," Opp. 24, but they offer no evidentiary support of that extraordinary claim. Indeed, any purported difficulty in constitutionally managing California City would be "self-inflicted" based

on Defendants' rush to open the facility prematurely. *Barco Mercado*, 800 F. Supp. 3d at 579.

### D. This Court has jurisdiction to hear Plaintiffs' claims.

Defendants make two efforts to contest this Court's jurisdiction to grant relief in this case: they claim that 8 U.S.C. § 1252(f)(1) strips the Court of jurisdiction and that 8 U.S.C. § 1252(b)(9) channels Plaintiffs' claims to the Board of Immigration Appeals. Both arguments fail.

Section 1252(f)(1) bars classwide injunctions that would "enjoin or restrain the operation of" the provisions in Part IV of the Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1221–1232; *see also Garland v. Aleman Gonzalez*, 596 U.S. 543, 550 (2022). Attempting to apply that bar to this case, Defendants stretch it beyond its reasonable meaning. None of the covered INA provisions address detention conditions. *See Flores v. Bondi*, 2025 WL 2633183, at *4 (C.D. Cal. Aug. 15, 2025) (the sections specified in § 1252(f)(1) "include the sources of DHS's authority to detain class members, not the conditions of detention"). Defendants concede as much, relying only on statutes "authoriz[ing]" or "compel[ling]" detention, and arguing that by barring judicial oversight of whether individuals may be confined in the first place, Congress gave Defendants carte blanche to hold them in any conditions whatsoever, with no classwide judicial review. Opp. 25–26. Courts regularly reject this argument. *Jimenez v. U.S. Immigration & Customs Enforcement*, 2024 WL 2306281, at *4 (N.D. Cal. May 20, 2024) (classwide preliminary injunction "directing specific medical services . . . for immigration detainees" did not "in any way remotely resembl[e]" the type of injunction barred by § 1252(f)(1)); *Alcantara v. Archambeault*, 2023 WL 3589664, at *2–3 (S.D. Cal. May 22, 2023) (not applying § 1252(f)(1) to class claims "challenging the conditions of confinement"); *Moreno Gonzalez v. Noem*, 2025 WL 3204602, at *5 (N.D. Ill. Nov. 17, 2025) (finding § 1252(f)(1) does not apply in "a conditions case").[13]

Defendants complain that they may be so unprepared to meet constitutional standards that an injunction could require them to close California City, thus implicating their detention authority. Opp. 26. That is mere speculation. And such an effect would be collateral at most. *See Al Otro*

---

[13] Neither *Aleman Gonzalez* nor *Biden v. Texas*, 597 U.S. 785 (2022), addressed injunctions involving conditions of confinement. *See Aleman Gonzalez*, 596 U.S. at 551 (whether the government may detain people without bond hearing); *Biden*, 597 U.S. at 794, 797 (whether a "mandatory detention" provision required the government to return to Mexico those it did not detain).

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

3952338

*Lado v. Exec. Off. for Immigr. Rev.*, 138 F.4th 1102, 1125 (9th Cir. 2025) (Section 1252(f)(1) "does not prohibit an injunction simply because of collateral effects on a covered provision").

Section 1252(b)(9) also has no bearing here. That provision channels review of "questions of law and fact . . . arising from any action taken or proceeding brought to remove an alien" into the Board of Immigration Appeals and strips district courts of jurisdiction to decide issues "arising from" removal proceedings. *See Jennings v. Rodriguez*, 583 U.S. 281, 292 (2018). Plaintiffs in no way challenge issues arising from class members' removal proceedings. Instead, they challenge access to counsel for purposes of bond, habeas, and conditions of confinement. *See* ECF 15 ¶¶ 13, 19, 185, 199–202; Mot. 9–11; *see also*, *e.g.*, Goss Decl. ¶¶ 4–5, 13 (reporting barriers to discussing conditions claims); Mendiola Escutia Decl. ¶ 17 (same). These claims are "collateral to, or independent of, the removal process" and are properly heard in district court. *J.E.F.M. v. Lynch*, 837 F.3d 1026, 1032 (9th Cir. 2016). Courts regularly find they have jurisdiction over such claims involving access to counsel for purposes other than removal defense. *Innovation L. Lab v. Nielsen*, 310 F. Supp. 3d 1150, 1160 (D. Or. 2018) ("Detainee[s'] right to access attorneys pending their asylum proceedings" falls outside (b)(9) because asylum proceedings "are distinct from removal proceedings"); *S. Poverty L. Ctr. v. U.S. Dep't of Homeland Se*c., 605 F. Supp. 3d 157, 167–69 (D.D.C. 2022) (finding jurisdiction over claim that "centers on . . . representation in bond proceedings").

### E.    No security under Rule 65(c) should be required.

District courts have broad discretion to dispense with the bond requirement. *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009). Waiver or imposition of a nominal security is appropriate where, as here, Plaintiffs are individuals detained without income. *See, e.g.*, *Perdomo v. Noem*, 2025 WL 3192939, at *13 (C.D. Cal. Nov. 13, 2025); *Barco Mercado*, 800 F. Supp. 3d at 580 (setting bond at $10 where the government "made no effort to quantify the security desired").

### IV.    CONCLUSION

For the foregoing reasons, the Court should grant the relief Plaintiffs have sought.

Dated:  January 16, 2026

Respectfully submitted,

s/Cody S. Harris                                              s/Margot Mendelson
KEKER, VAN NEST & PETERS LLP        PRISON LAW OFFICE
STEVEN P. RAGLAND                             MARGOT MENDELSON
CODY S. HARRIS                                     TESS BORDEN
CARLOS C. MARTINEZ                            PATRICK BOOTH
LISA C. LU                                              ALISON HARDY
                                                              RANA ANABTAWI

CALIFORNIA COLLABORATIVE FOR
IMMIGRANT JUSTICE                             AMERICAN CIVIL LIBERTIES UNION
PRIYA ARVIND PATEL                            FOUNDATION
MARIEL VILLARREAL                             KYLE VIRGIEN
                                                              FELIPE HERNANDEZ
                                                              MARISOL DOMINGUEZ-RUIZ
                                                              CARMEN IGUINA GONZALEZ

                                                              Attorneys for Plaintiffs

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

3952338