1  KEKER, VAN NEST & PETERS LLP
   STEVEN P. RAGLAND - # 221076
2  sragland@keker.com
   CODY S. HARRIS - # 255302
3  charris@keker.com
   CARLOS C. MARTINEZ - # 354616
4  cmartinez@keker.com
   LISA C. LU - # 364259
5  llu@keker.com
   633 Battery Street
6  San Francisco, CA 94111-1809
   Telephone:    415 391 5400
7  Facsimile:    415 397 7188

8  CALIFORNIA COLLABORATIVE FOR
   IMMIGRANT JUSTICE
9  PRIYA ARVIND PATEL - # 295602
   priya@ccijustice.org
10 MARIEL VILLARREAL - # 317048
   mariel@ccijustice.org
11 1999 Harrison Street #1800
   Oakland, California 94612
12 Tel: (650) 762-8990

PRISON LAW OFFICE
MARGOT MENDELSON - # 268583
mmendelson@prisonlaw.com
TESS BORDEN - MJP # 805022, *pro hac vice*
tess@prisonlaw.com
PATRICK BOOTH - # 328783
patrick@prisonlaw.com
ALISON HARDY - # 135966
ahardy@prisonlaw.com
RANA ANABTAWI - # 267073
rana@prisonlaw.com
1917 Fifth Street
Berkeley, California 94710-1916
Tel.: (510) 280-2621

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
KYLE VIRGIEN - # 278747
kvirgien@aclu.org
FELIPE HERNANDEZ - # 338468
npp_fhernandez@aclu.org
MARISOL DOMINGUEZ-RUIZ - # 345416
mdominguez-ruiz@aclu.org
425 California Street, 7th Floor
San Francisco, CA 94104
Tel.: (415) 343-0770

CARMEN IGUINA GONZALEZ - # 277369
ciguinagonzalez@aclu.org
915 15th Street, NW, 7th Floor
Washington, DC 20005
Tel.: (202) 393-4930

*Attorneys for Plaintiffs Fernando Gomez Ruiz, Fernando Viera Reyes, Jose Ruiz Canizales, Yuri Alexander Roque Campos, Sokhean Keo, Gustavo Guevara Alarcon, Alejandro Mendiola Escutia and all others similarly situated*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FERNANDO GOMEZ RUIZ; FERNANDO VIERA REYES; JOSE RUIZ CANIZALES; YURI ALEXANDER ROQUE CAMPOS; SOKHEAN KEO; GUSTAVO GUEVARA ALARCON; and ALEJANDRO MENDIOLA ESCUTIA, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. IMMIGRATION AND CUSTOMS | Case No. 3:25-cv-09757-MMC<br><br>**SUPPLEMENTAL DECLARATION OF DAN PACHOLKE IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date Filed:    November 12, 2025<br><br>Trial Date:  TBD |

SUPPLEMENTAL DECLARATION OF DAN PACHOLKE IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

4015097

1   ENFORCEMENT; TODD M. LYONS,
    Acting Director, U.S. Immigration and
2   Customs Enforcement; SERGIO
    ALBARRAN, Acting Director of San
3   Francisco Field Office, Enforcement and
    Removal Operations, U.S. Immigration and
4   Customs Enforcement; U.S. DEPARTMENT
    OF HOMELAND SECURITY; KRISTI
5   NOEM, Secretary, U.S. Department of
    Homeland Security,

6
                    Defendants.
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SUPPLEMENTAL DECLARATION OF DAN PACHOLKE IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

4015097

1        I, Dan Pacholke, hereby declare:

2    **I.        PURPOSE OF SUPPLEMENTAL DECLARATION**

3        1.        I submit this Supplemental Declaration in response to the Declaration of

4    Christopher Chestnut, Warden of the California City Immigration Detention Facility ("California

5    City"), filed in opposition to Plaintiffs' Motion for Preliminary Injunction.

6        2.        I have reviewed Warden Chestnut's declaration in full. My opinions below are

7    based on my more than 35 years of experience in adult corrections, including overseeing

8    facilities at all custody levels, reviewing national correctional standards, and operating

9    institutions housing people with far greater demonstrated security risks than civil immigration

10   detainees.

11       3.        While Warden Chestnut describes California City's policies as necessary for

12   safety and consistent with ICE National Detention Standards ("NDS"), his declaration confirms

13   that the facility employs blanket, highly restrictive practices without individualized risk

14   assessment. From a correctional perspective, these practices are not reasonably related to

15   legitimate security needs and instead reflect exaggerated responses to perceived risks. Sound

16   correctional practice requires that restrictions placed on the detained population are necessary to

17   address a concrete security risk, applied to individuals who present that risk, and proportionate to

18   the threat presented.

19       4.        Warden Chestnut's declaration justifies restrictive policies by citing the existence

20   of some detainees with prior criminal convictions. That justification is inconsistent with accepted

21   correctional practice.

22       5.        Facilities, including California City, routinely house mixed-risk populations and

23   rely on classification, behavior-based management, and targeted controls, not universal

24   restrictions imposed on everyone, to safely manage the population. California City has

25   numerous, blanket restrictions that are not reasonably related to the risks presented by the

26   detainees, and are exaggerated and unnecessarily harsh. These include, but are not limited to:

27       • the lack of contact visits;

28       • the very limited freedom of detainee movement throughout the facility;

1

SUPPLEMENTAL DECLARATION OF DAN PACHOLKE IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

4015097

1    • the duration and number of counts conducted throughout the day;

2    • the lack of outdoor recreation time and programming; and

3    • the failure to provide weather-appropriate clothing.

4    **II.      FINDINGS AND CONCLUSIONS**

5    *<u>No-Contact Visits</u>*

6         6.      Warden Chestnut states that all visits at California City are no-contact due to

7    staffing and contraband concerns. Restricting all visitation to no-contact is a greatly exaggerated

8    and excessive response to staffing and contraband concerns.

9         7.      In my initial declaration, I stated that the prohibition on contact visits at California

10   City is far more restrictive than necessary and not standard even for people at high security levels

11   in most prisons. In prisons, the use of plexiglass barriers is generally reserved for people placed

12   in disciplinary settings for adjudicated violations of prison rules. I also stated that no-contact

13   visits are applied as the result of negative behavior and placement in segregation units. After

14   reading the warden's declaration, my opinions remain the same.

15        8.      Contact visits are routine in correctional settings, at all levels of security. The

16   benefits of contact visits greatly outweigh the warden's hypothetical concern about the

17   introduction of contraband into the facility. As I wrote in my initial declaration, contact with

18   loved ones supports the well-being and mental health of the incarcerated population. It allows

19   them to discuss personal issues with someone they love and respect. Conversely, being forced to

20   communicate with your loved ones across glass can intensify feelings of alienation and distress.

21        9.      Prohibiting contact visits based on the fear of contraband potentially being

22   introduced into the population is unnecessary and overreactive. All locked facilities must

23   consider the risk of visitors and staff introducing contraband into the facility and employ

24   reasonable practices to mitigate that risk. It is standard correctional practice to allow people in

25   prisons to have contact visits and the risk of visitors introducing contraband is not higher in

26   immigration detention centers than in prisons. It is my understanding that several of the Plaintiffs

27   in this case were allowed contact visits while in prison but are no longer allowed visits at

28   California City as civil detainees. I have reviewed the NDS 2025 standard 5.5 section II (A),

SUPPLEMENTAL DECLARATION OF DAN PACHOLKE IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

4015097

which states that "[c]ontact visits are encouraged." I have also reviewed NDS standard 5.5 section (F) (3), which indicates that contact visiting in immigration detention facilities is permitted. In my opinion, the practice of contact visiting is appropriate for the vast majority of the detainee population with the exceptions of people in the Restrictive Housing Unit (RHU) or people with visiting-related violations. The NDS anticipates that visiting is not one-size-fits-all.

10.    Similarly, as I stated in my first declaration, resource or staffing constraints are not a legitimate reason to limit visitation. The facility should take steps to decrease the number of people it holds or increase staffing until the correct level of staffing exists for the current population, rather than punish detainees with limited visitation.

11.    The facility's prohibition on contact visits is a blanket rule that fails to consider individual security and classification factors. From a correctional perspective, a permanent prohibition on contact visits for every person in the facility, regardless of their security factors, is unnecessary, far too broad, and harmful to the population. The practice should be more nuanced with limited exceptions only as appropriate due to RHU placement or visiting-related rule violations.

***Universal Escorts and Pat-Down Searches***

12.    Warden Chestnut confirms that detainees are escorted and pat-searched whenever they leave or return to housing units. His declaration, however, does not identify any specific safety or security rationale for imposing this level of restriction on people held in civil detention. Because this policy applies uniformly to every detainee, regardless of custody classification, behavior, or demonstrated risk, it appears that California City does not engage in individualized risk assessments to determine who actually requires escorts or heightened security measures.

13.    Universal escort policies are not standard practice, even in prisons. As I wrote in my initial declaration, California City's policy of requiring all detained people to be escorted when they are outside of their housing units is excessive and does not meaningfully improve the safety and security of the facility. In a correctional setting, escort requirements are typically reserved for individuals who pose a demonstrated security risk based on their specific conduct. Applying this level of restriction universally—to all civil detainees, regardless of behavior or risk

3

1  level—exceeds what is necessary to maintain order in a civil-detention setting. That practice also

2  consumes significant staff resources that could be better used on active supervision,

3  programming, and engagement. My opinion remains the same.

4     14.     Likewise, the routine use of pat-down searches for all movement outside of one's

5  housing unit is exaggerated. As I wrote in my initial declaration, this is not a standard

6  correctional practice, even in large prisons with people at high security levels. This practice is

7  excessive and outside widely accepted practices in prisons for the subset of the population that is

8  full minimum.

9     15.     Although Warden Chestnut asserts that these searches are intended to limit the

10  movement of contraband, his declaration does not explain why such an expansive policy is

11  necessary to achieve that goal. In my review of NDS 2025 standards section 2.7 regarding

12  searches of detainees, this practice is not required. In my experience, correctional systems

13  address contraband risk through targeted measures such as random searches, intelligence-based

14  searches, cell searches, area searches, urinalysis testing and individualized restrictions. I am not

15  aware of any correctional system that requires every person in custody to be searched each time

16  they enter or exit their housing unit. The policy at California City is therefore far broader than

17  necessary to address contraband concerns and reflects an exaggerated security response rather

18  than a measured correctional judgment. This practice will become more problematic and less

19  feasible as the facility is filled to its operating capacity.

20  ***Lack of Outdoor Recreation and Prosocial Engagement***

21     16.     Warden Chestnut asserts that detainees receive at least one hour of outdoor

22  recreation on most days. The warden does not provide a security reason for such an extreme

23  limitation on outdoor recreation time. The policy limiting outdoor recreation applies to every

24  person, regardless of their security level.

25     17.     People in general population prison units, even people at the highest security

26  levels, are generally offered more than seven hours of outdoor recreation time a week. In my

27  initial declaration, I wrote that four to seven hours per week of outdoor recreation is less than

28

4

SUPPLEMENTAL DECLARATION OF DAN PACHOLKE IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

4015097

1   even prisoners in segregation units are offered. Outdoor recreation time boosts morale and helps

2   people adjust to life in custody. It also promotes physical wellbeing.

3       18.    This level of restriction is not reasonably related to any articulated security risk,

4   particularly in a facility with multiple secure perimeter layers that houses civil detainees.

5       19.    Warden Chestnut also does not explain the security justification for having such

6   limited prosocial engagement. He asserts that ICE detention is "temporary" and suggests that

7   robust programming is impracticable, but that position is inconsistent with correctional reality.

8   Facilities routinely operate programming even where length of stay is uncertain. To increase

9   prosocial engagement, the facility could offer education classes, activity books, language classes,

10  indoor games like table tennis or cornhole, structured recreation like stretching or exercise

11  classes, or volunteer- or detainee-led activities.

12      20.    From a correctional perspective, the lack of meaningful programming at

13  California City makes the environment unnecessarily punitive and undermines institutional

14  safety.

15  ***Failure to Provide Temperature-Appropriate Clothing***

16      21.    Warden Chestnut's declaration states that detainees are not provided with

17  sweatshirts or sweatpants, and that people who do not have sweatshirts or sweatpants can buy

18  them from commissary. His declaration does not provide a security justification for refusing to

19  provide people with temperature-appropriate clothing. The NDS 2025 standards section 2.1 (II)

20  (D) indicates that clothing and bedding should be appropriate for the facility environment and

21  local weather conditions. Similarly, section 4.4 (II) (B) states that facilities must issue additional

22  clothing as necessary for changing weather conditions or as seasonally appropriate.

23      22.    As I wrote in my initial declaration, there is no defensible reason to not provide

24  people with weather-appropriate clothing. Refusing to meet people's basic needs and leaving

25  them cold is counterproductive and does not serve any correctional purpose. Providing weather-

26  appropriate clothing is essential to maintaining a basic, decent, condition of confinement, not a

27  privilege.

28

SUPPLEMENTAL DECLARATION OF DAN PACHOLKE IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

4015097

***Excessive Counts and Daily Disruption***

23.    Warden Chestnut confirms that California City conducts multiple standing and formal counts throughout the day, during which detainees are locked in cells and denied access to phones, tablets, and other programming opportunities.

24.    As I stated in my initial declaration, excessive counting during the daytime limits the business that occurs during the day and can amplify frustration. It is not necessary to conduct four counts during waking hours in order to keep track of the population and account for their whereabouts. Additionally, midday counts are disfavored by correctional administrators because they interfere with programming.

25.    It is also unnecessary to cease all movement for many hours of the day during facility counts. Generally in prisons, a limited number of incarcerated people can be present in program areas during typical counts, and those people are "out-counted." This practice allows some degree of activity for medical appointments, legal visits, and other priority appointments during facility counts. I understand that at California City, all movement, including legal calls and visits, is prohibited for the duration of the counts. This, combined with the frequency of the counts, substantially limits access to programming at the facility. This practice is an exaggerated response to the security needs of the facility, is excessive, and is unnecessary given the actual risk of the population.

26.    In my experience running prisons, conducting one or two daytime counts has been sufficient to ensure institutional security. That level of monitoring should be more than adequate in a civil detention facility such as California City, which is already secured by multiple physical perimeter controls. The frequency of counts described by Warden Chestnut reflects an exaggerated security posture rather than a measured correctional response to actual risk. The NDS 2025 standards section 2.3 (II) (E) provides flexibility on count times to include formal and informal counts.

***Risk Assessment***

27.    From a correctional perspective, California City's blanket restrictions related to basic conditions—complete lack of contact visits, extreme limitations on people's freedom of

6

SUPPLEMENTAL DECLARATION OF DAN PACHOLKE IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

4015097

1    movement, excessive lockdowns, and the lack of programming and recreation time—are wholly

2    inappropriate and unjustified for people who are in civil detention, including people who served

3    terms in long terms in state prisons for serious criminal offenses. Even in stand-alone supermax

4    prisons, privileges and programs are graduated, based on behavior rather than one-size-fits-all.

5            28.     Warden Chestnut's declaration describes the criminal offenses and alleged

6    security threat group affiliation for the named Plaintiffs and for other detained people who

7    submitted declarations in support of Plaintiffs' motion for preliminary injunction. I understand

8    this information to be offered as justification for the facility's highly restrictive policies.

9            29.     Reliance on years-old—and in some cases decades-old—criminal history, as well

10   as unverified or generalized security threat group affiliations, reflects outdated and unsound

11   correctional risk assessment. Modern correctional practice recognizes that institutional risk is

12   driven by present behavior, recent conduct in custody, and demonstrated patterns of compliance

13   or noncompliance. Using historical labels alone to justify sweeping restrictions imposed on all

14   detainees is inconsistent with accepted correctional judgment and results in exaggerated security

15   responses that are not reasonably tailored to the actual risks presented.

16           30.     Based on the warden's declaration, I understand that several of the named

17   Plaintiffs in this case are classified as "High Custody" because of criminal offenses that occurred

18   over 20 years ago. After serving prison sentences, those individuals were granted parole by

19   California Board of Parole Hearings. In my experience, people in prison are granted parole only

20   after a rigorous, individualized assessment determines that they no longer pose an unreasonable

21   risk to public safety. Parole boards typically maintain a high threshold for determining whether a

22   person still presents a risk to public safety.

23           31.     For example, I have reviewed the parole transcript for Gustavo Guevara Alarcon,

24   one of the Named Plaintiffs. Mr. Guevara Alarcon was sentenced to prison for a crime that he

25   committed in 2004, when he was 19 years old. At his parole suitability hearing in March 2024,

26   the California Board of Parole Hearings determined that Mr. Guevara Alarcon did not pose an

27   unreasonable risk to society and should be released to the community. The Board concluded that

28   Mr. Guevara presented "humble" and "open," that he was committed to developing "into a better

SUPPLEMENTAL DECLARATION OF DAN PACHOLKE IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

4015097

person today," and that he "truly established … a strong reputation, a positive reputation within the institution, that shows that [he] found [him]self to the place where [he] recognize [his] own self-worth and the worth of others as well." That reputation, according to the Board, is "reflected in the way [Mr. Guevara Alarcon] treat[s] others and the way others view [him]." The Board identified "strong evidence" of his "growth and maturity." The Board acknowledged that Mr. Guevara Alarcon's work to improve himself was "very broad and robust" and included an "excellent work history," hundreds of hours in self-help programming, certifications in masonry, welding, and janitorial program, and numerous commendations in his file from high-ranking custody staff members. He even has records in his prison file of charitable donations. In making its decision to release Mr. Guevara Alarcon to the community, the Board considered his life before his incarceration, his behavior in county jail and prison, his disciplinary history in prison, his commitment offense, his level of insight and remorse, and his post-release plans. The Board ultimately concluded that, given the long period of time since the beginning of his incarceration and his lengthy period of rehabilitated programming, his commitment offense no longer indicates a current risk of danger and found him suitable for release from prison.

32.     I also reviewed Mr. Guevara Alarcon's supplemental declaration. In his supplemental declaration, he describes how he was initially classified at a high custody level when he entered prison. Over his years in prison, his custody level was lowered as a result of his good behavior and positive engagement in prison programming. His declaration states that by the time he was granted parole and left prison, he was at the lowest possible security level. At California City, he is classified as high custody.

33.     From a correctional perspective, categorically classifying people as "High Custody" because of their years-old criminal offenses, even after a parole board has meticulously analyzed that person's risk to society, is inconsistent with evidence-based risk assessments that are standard in corrections today. California City's approach to classification relies on static, historical labels, resulting in classification decisions that significantly overestimate people's risk factors. Detainees like Mr. Guevara Alarcon, who worked for nearly two decades to mitigate his risk factors through positive programming, self-help classes, and job-training, are subject to

SUPPLEMENTAL DECLARATION OF DAN PACHOLKE IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

4015097

unnecessarily restrictive conditions that are not justified by the actual security needs of a civil detention facility.

***California City's Population***

34.     I reviewed ICE's statistics about the detained population at California City. Based on my review, it appears that the majority of detained people at the facility do not have a criminal history. In light of that fact, the extreme restrictions that the facility imposes on the detained population are even more exaggerated and unnecessary.

35.     To reach my conclusion about the population's criminal history, I reviewed ICE's "Detention Statistics." This data is from ICE's "Detention Management" webpage, which I accessed at: https://www.ice.gov/detain/detention-management. On January 6, 2026, I downloaded the Excel file titled, "Detention FY 2026 YTD, Alternatives to Detention FY 2026 YTD and Facilities FY 2026 YTD, Footnotes (221 KB)." The Excel file is a spreadsheet that lists data for each of ICE's detention facilities, including whether people detained at the facility have criminal history. Row 32 of the spreadsheet lists data for "CALIFORNIA CITY IMMIGRATION PROCESSING CENTER." Column N is titled, "Male Crim," which I assume is the total number of people at the facility who are identified as male and have a criminal history. Column O is titled, "Male Non-Crim," which I assume is the total number of people at the facility who are identified as male and do not have a criminal history. Similarly, Column P is titled, "Female Crim," and Column Q is titled, "Female Non-Crim." According to Row 5 of the spreadsheet, the data was last updated on December 11, 2025.

36.     A summary of that data is included below:

| Total Population at California City | | |
|---|---|---|
| | *Total* | *Percentage* |
| People with Criminal History | 272 | 32.11 % |
| People without Criminal History | 575 | 67.89 % |
| **TOTAL POPULATION** | 847 | 100 % |

SUPPLEMENTAL DECLARATION OF DAN PACHOLKE IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

4015097



* * * * *

| Male Population at California City | | |
|---|---|---|
| | *Total* | *Percentage* |
| Males with Criminal History | 252 | 37.33 % |
| Males without Criminal History | 423 | 62.67 % |
| **MALE POPULATION** | 675 | 100 % |



* * * * *

SUPPLEMENTAL DECLARATION OF DAN PACHOLKE IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

4015097

| Female Population at California City | | |
|---|---|---|
| | *Total* | *Percentage* |
| Females with Criminal History | 20 | 11.63 % |
| Females without Criminal History | 152 | 88.37 % |
| **FEMALE POPULATION** | 172 | 100 % |



* * * * *

37.     Similarly, in immigration detention more broadly than California City, the vast majority of people who are being detained have no criminal history. This conclusion is supported by ICE's data, which shows that the proportions listed above are typical of other ICE detention facilities. It is also supported by an analysis by the Cato Institute entitled, "5% of People Detained By ICE Have Violent Convictions, 73% No Convictions," dated November 24, 2025. The analysis is available at: https://www.cato.org/blog/5-ice-detainees-have-violent-convictions-73-no-convictions. I accessed the analysis on January 11, 2026.

38.     The analysis is based on ICE data and other corroborating data sources. It finds that, of people booked into ICE custody this fiscal year (since October 1, 2025): nearly three in four (73 percent) had no criminal conviction; nearly half had no criminal conviction nor even any pending criminal charges; only 8 percent had a violent or property criminal conviction; only

4015097

1  5 percent had a violent criminal conviction; and a majority of criminal convicts had vice,

2  immigration, or traffic convictions. This data involves the percentage of people booked into ICE

3  detention during this time period, as opposed to the percentage of people held in ICE detention

4  during this time period, but it is nonetheless a useful approximation for the typical population at

5  California City. My conclusion that it is an appropriate approximation is supported by the fact

6  the data for the population held at California City on December 11, 2025 lists a similar

7  percentage of people with no criminal history (approximately 68 percent) to that listed in the

8  Cato Institute analysis (73 percent).

9          39.     This data further supports my conclusion that the population at California City is,

10  in general, low security and should not require the kinds of extreme restrictions that the facility

11  has in place. If one were to run the type of risk assessment score commonly used in prison

12  facilities on the population at California City, the large majority, with no criminal conviction or a

13  relatively minor criminal conviction, would be assigned to a low security level or to work

14  release. This is a significant difference from prison systems, where all people held in the system

15  have criminal convictions and many enter with criminal histories that result in risk assessment

16  scores that result in initially stricter initial assignments.

17          40.     Other fundamental differences exist between the population detained at California

18  City and the populations detained in prison. These differences underscore that people detained at

19  California City should be subjected to less harsh restrictions than those in criminal custody.

20          41.     For instance, an important principle in correctional management is legitimacy.

21  That is, the restrictions placed on a population should feel logical and just to that population. If a

22  population finds the restrictions placed on it to be logical and just, it can generally be managed in

23  a more orderly way; if a population finds the restrictions placed on it to be illegitimate—meaning

24  illogical or unjust—it will be more difficult to maintain order. The determination whether to

25  sentence someone to prison time involves a significant amount of due process over the course of

26  a person's criminal case. As a result, people generally enter prison with a feeling that they

27  received a certain degree of consideration by the judicial system and acceptance that they may

28  logically and justly face a certain level of restrictions. By contrast, the determination whether to

SUPPLEMENTAL DECLARATION OF DAN PACHOLKE IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

4015097

1    place someone in immigration detention involves much less due process. People in immigration

2    detention may find it illogical or unjust to be placed under significant restrictions. From the

3    standpoint of correctional management, it is best to avoid applying significant restrictions on a

4    population that will not find those restrictions to be logical or just. Thus, in immigration

5    detention, prudent correctional management dictates applying the least restrictive environment

6    possible, which will generally involve fewer restrictions than a prison environment.

7         42.    Another significant difference between prison and immigration detention is that

8    people in immigration detention are likely to feel significant desperation that is particular to the

9    immigration detention environment. Most people in immigration detention have current claims to

10   legal status in the country and are currently litigating those claims in immigration court. These

11   claims require access to attorneys, to law libraries, and to family members. Restrictions on these

12   functions central to people's ability to assert legal claims could lead to a significant sense of

13   desperation as people risk being unable to fully assert their legal claims. Other restrictions will

14   cause some people to feel that they are being pressured by poor conditions to abandon their

15   claims to legal status and leave the country. Likewise, some people in immigration detention fled

16   to the U.S. because they face persecution in their country of origin. They may reasonably have

17   unique fears that they will face similar persecution in immigration detention or that their family

18   members are at heightened risk of persecution. Depriving these people of access to their families

19   and counsel could likewise create a significant sense of desperation. This type of desperation is

20   inconsistent with the orderly management of a facility, and correctional management practices

21   dictate that immigration detention facilities should particularly avoid practices that might

22   generate feelings of desperation.

23        43.    There are some parallels between immigration detention and civil commitment of

24   people deemed to be sexually dangerous. Such civil commitment is intended to be preventative

25   of future sexual offenses, in contrast to prison, which is intended to serve a correctional and

26   rehabilitative function. Likewise, immigration detention is intended to prevent a risk of flight or

27   danger to the community, rather than to serve any correctional or rehabilitative function. Civil

28   commitment also involves fewer due-process protections, and as a result it should involve a less

SUPPLEMENTAL DECLARATION OF DAN PACHOLKE IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

4015097

1    restrictive detention environment. So too with immigration detention, which also involves fewer

2    due-process protections and should consequently involve a less restrictive detention

3    environment. In fact, these justifications for less restrictive environments are more extreme in

4    immigration detention than they are in civil commitment.

5    ***Conclusion***

6         44.    The policies described above are broadly applied without individualized

7    assessment, disproportionate to the security risks presented, and counterproductive to safe and

8    humane facility operation. From a correctional expert perspective, these conditions are not

9    reasonably tailored to legitimate governmental objectives and instead reflect exaggerated

10   responses inconsistent with accepted correctional practice for civil detention.

11        I declare under penalty of perjury under the laws of the United States of America that the

12   foregoing is true and correct.

13        Executed this 14th day of January, 2026, in Olympia, Washington.

14

15

16                              By:  _____

17                                   Dan Pacholke

18

19

20

21

22

23

24

25

26

27

28

SUPPLEMENTAL DECLARATION OF DAN PACHOLKE IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

4015097