1    KEKER, VAN NEST & PETERS LLP
     STEVEN P. RAGLAND - # 221076
2    sragland@keker.com
     CODY S. HARRIS - # 255302
3    charris@keker.com
     CARLOS C. MARTINEZ - # 354616
4    cmartinez@keker.com
     LISA C. LU - # 364259
5    llu@keker.com
     633 Battery Street
6    San Francisco, CA 94111-1809
     Telephone:    415 391 5400
7    Facsimile:    415 397 7188

8    CALIFORNIA COLLABORATIVE FOR
     IMMIGRANT JUSTICE
9    PRIYA ARVIND PATEL - # 295602
     priya@ccijustice.org
10   MARIEL VILLARREAL - # 317048
     mariel@ccijustice.org
11   1999 Harrison Street #1800
     Oakland, California 94612
12   Tel: (650) 762-8990

13

14

15

16

17

PRISON LAW OFFICE
MARGOT MENDELSON - # 268583
mmendelson@prisonlaw.com
TESS BORDEN - MJP # 805022, *pro hac vice*
tess@prisonlaw.com
PATRICK BOOTH - # 328783
patrick@prisonlaw.com
ALISON HARDY - # 135966
ahardy@prisonlaw.com
RANA ANABTAWI - # 267073
rana@prisonlaw.com
1917 Fifth Street
Berkeley, California 94710-1916
Tel.: (510) 280-2621

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
KYLE VIRGIEN - # 278747
kvirgien@aclu.org
FELIPE HERNANDEZ - # 338468
npp_fhernandez@aclu.org
MARISOL DOMINGUEZ-RUIZ - # 345416
mdominguez-ruiz@aclu.org
425 California Street, 7th Floor
San Francisco, CA 94104
Tel.: (415) 343-0770

CARMEN IGUINA GONZALEZ - # 277369
ciguinagonzalez@aclu.org
915 15th Street, NW, 7th Floor
Washington, DC 20005
Tel.: (202) 393-4930

18   *Attorneys for Plaintiffs Fernando Gomez Ruiz, Fernando Viera Reyes, Jose Ruiz Canizales, Yuri*
19   *Alexander Roque Campos, Sokhean Keo, Gustavo Guevara Alarcon, Alejandro Mendiola Escutia*
     *and all others similarly situated*

20                          UNITED STATES DISTRICT COURT

21                         NORTHERN DISTRICT OF CALIFORNIA

22   FERNANDO GOMEZ RUIZ; FERNANDO
     VIERA REYES; JOSE RUIZ CANIZALES;
23   YURI ALEXANDER ROQUE CAMPOS;
     SOKHEAN KEO; GUSTAVO GUEVARA
24   ALARCON; and ALEJANDRO MENDIOLA
     ESCUTIA, on behalf of themselves and all
25   others similarly situated,

26                          Plaintiffs,

27            v.

28

Case No. 3:25-cv-09757-MMC

**DECLARATION OF DR. TODD
RANDALL WILCOX, M.D., IN SUPPORT
OF REPLY TO MOTION FOR
PRELIMINARY INJUNCTION**

Judge:      Hon. Maxine M. Chesney

Date Filed: November 12, 2025

PUBLIC--REDACTS MATERIALS FROM
CONDITIONALLY SEALED RECORD

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF REPLY TO
MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

4042466

1  U.S. IMMIGRATION AND CUSTOMS
   ENFORCEMENT; TODD M. LYONS,
2  Acting Director, U.S. Immigration and
   Customs Enforcement; SERGIO
3  ALBARRAN, Acting Director of San
   Francisco Field Office, Enforcement and
4  Removal Operations, U.S. Immigration and
   Customs Enforcement; U.S. DEPARTMENT
5  OF HOMELAND SECURITY; KRISTI
   NOEM, Secretary, U.S. Department of
6  Homeland Security,

7          Defendants.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF REPLY TO
MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

4042466

I, Todd Randall Wilcox, M.D., hereby declare:

**I.     INTRODUCTION**

1.     I have been retained by Plaintiffs' counsel in this matter to assess the adequacy of health care provided to people who are detained at the U.S. Immigration and Customs Enforcement ("ICE") facility in California City ("California City Detention Facility"). I previously submitted a declaration in support of Plaintiffs' Motion for Preliminary Injunction (ECF No. 22-3) ("initial declaration") as well as a declaration in support of Plaintiffs' Motion for Temporary Restraining Order regarding denial of medical care to two specific patients (ECF No. 27-2) ("TRO declaration"). I presented my medical background and expert qualifications, which include over 30 years working as a physician in jails and prisons, in those prior declarations.

2.     I submit this declaration in support of Plaintiffs' Reply to Defendants' Opposition to the Motion for Preliminary Injunction. To form my opinions for this declaration, I reviewed Defendants' opposition brief and relevant supporting declarations, including the declaration of the California City Detention Facility warden, Christopher Chestnut and declaration of Dr. Susan Tiona, a CoreCivic Regional Medical Director (ECF Nos. 38, 38-1, 38-2); additional California City Detention Facility medical records, including records of recently arrived patients; the materials relied upon for my initial declaration and TRO declaration; and Plaintiffs' brief and the Court's order regarding the TRO (ECF Nos. 27, 36).

**II.     OPINION AND SUMMARY OF FINDINGS**

3.     My opinion remains the same after reviewing Defendants' submissions and the updated medical records: it is still not safe to be sick at California City ICE Detention Facility, and the facility remains ill-equipped to care for patients who have serious medical or mental health needs.

4.     In my initial declaration, I found failures and deficiencies across multiple components that are critical to a functioning healthcare system, including issues with intake, the sick-call process, chronic care management and treatment, medication management, specialty care, emergency care, medical housing, mental health treatment, and staffing. In response, CoreCivic's Regional Medical Director, Dr. Tiona, conducted chart reviews and appears to agree

with me about a significant number of those failures and deficiencies as they relate to systems and individual patients. In fact, she describes recommendations she made to the facility's medical leadership to address some of the patient-specific concerns I raised, acknowledges patient care errors that indicated a need for staff training, and makes concessions about the facility's challenges.

5.      Dr. Tiona spends a significant amount of her declaration focusing on CoreCivic policies and procedures. She implies that having those policies and procedures means that there are systems in place and that care at California City Detention Facility is adequate. In my experience, policies and procedures are a foundational element of a well-functioning healthcare system, but their publication does not mean that the system operates as it should or that the care being provided is adequate. In my many years of assessing correctional healthcare systems, I can confidently state that the presence of acceptable policies and procedures is no guarantee that the facility can or will implement those policies and procedures. In the vast majority of systems where I have identified deficiencies in healthcare delivery, there were policies and procedures that were facially acceptable. My initial declaration did not assess the sufficiency of California City's policies and procedures; it found that there were nonfunctional aspects of California City's health care system and that delivery of care was deficient. As a result, Dr. Tiona's description of CoreCivic policies is mostly beside the point. Dr. Tiona does not offer any objective evidence to show that policies and procedures are followed by the healthcare system. Her declaration actually suggests the contrary in that she identified multiple instances in specific patient cases where follow-up care for patients and additional training for staff was needed.

6.      Dr. Tiona states that she made recommendations as to eight patients whose care I discussed in my initial declaration.[1] For this declaration, I reviewed updated medical records for those patients who were still in custody, to confirm whether the facility provided the recommended care. Dr. Tiona does not explain her recommendations beyond a few words, but

---

[1] Dr. Tiona discusses eleven distinct patients in paragraph 57 of her declaration. Three of them were declarants on topics other than medical care whose records I did not review in my initial declaration.

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF REPLY TO
MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

4042466

even so, I can see that no relevant action was taken in most of the cases. I can clearly confirm only one patient received the recommended follow-up, in his case for "expediting offsite appointment scheduling." But that patient is Named Plaintiff Roque Campos and I expect it was expedited because of the TRO motion and court-ordered stipulation about that very appointment (ECF Nos. 27, 36), not because of Dr. Tiona. It is very concerning to me that the facility did not immediately implement Dr. Tiona's recommendations, especially because the recommendations were clearly time-sensitive but also not time-intensive: things like renewing medications and ordering lab work can be completed quickly, and none of the recommendations obviously required a patient examination. In other words, all of this could have been easily accomplished from someone's desk, even remotely. Yet despite this litigation and Dr. Tiona's CoreCivic position of authority, the facility nevertheless failed to take demonstrable action in the week or more that followed.[2]

7.      Finally, Dr. Tiona makes a number of assertions, again without patient care evidence, that things have improved since the facility opened. My initial declaration already contradicted that assertion, because it considered chart entries that were dated in October and November, two to three months after the facility opened. Still, because Defendants are claiming – without patient evidence – that healthcare service delivery has improved, I reviewed additional patient charts for this declaration, including updated medical records for patients I discussed in my first declaration and medical records for new patients, some of whom arrived in January 2026. My updated chart review unequivocally shows that the problems I discussed in my initial declaration, from intake processing and the sick call system, to management of chronic care patients and specialty service access, are ongoing.

8.      In short, Dr. Tiona's declaration not only confirms my original findings and opinions regarding California City's broken healthcare system, but raises further concerns about their ability to follow their own policies and procedures. What is even more concerning is that

---

[2] Dr. Tiona signed her declaration on December 29. The updated charts I reviewed for patients I discussed in my first declaration covered dates a week or more after that. Regardless, I expect she would have sent her recommendations before December 29.

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF REPLY TO
MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

4042466

California City appears unable to course-correct and fix known deficiencies even when they are called out to them.

9.     In the sections that follow, I (1) address some threshold issues raised by Defendants, explaining why my sample size is appropriate and how Dr. Tiona's comments about my ability to read the electronic health record are misleading and irrelevant, and correcting Defendants' misstatements regarding the date range of failures I identified in my initial declaration and the presence of adverse patient outcomes; and (2) discuss topic-specific areas of the healthcare system that Dr. Tiona states are addressed by policies and procedures, where I nevertheless find continuing failures in practice. Where relevant, I also respond to Dr. Tiona's limited chart review findings, which in fact support, rather than dispute, the majority of my findings. However, Dr. Tiona devotes a dozen paragraphs to four particular patients, none of whom I emphasized in my initial declaration and none of whom are Named Plaintiffs or exemplify the most egregious system failures. Although I address these patients in the relevant sections of this declaration, because of Dr. Tiona's disproportionate focus on them, I also respond to each of those cases in Appendix A to this declaration.

### III.     THRESHOLD ISSUES

#### A.     Sample Size

10.     For my initial declaration, I reviewed over three thousand pages of medical records across 17 patients, who presented a variety of healthcare needs. Defendants assert that the sample size I reviewed is too small to draw conclusions about the care being provided at California City. I strongly disagree. As I acknowledged at the time of my initial declaration, and repeat again here, although my sample size was small, the deficiencies were pervasive and consistent across multiple patients and they continue uncorrected to this day. These deficiencies are also replicated in the new patient charts that I reviewed that reflect care done months after the facility's startup, which contradicts Defendants' claims that things have improved since then.

11.     The process of delivering healthcare in a large system can essentially be viewed as many individual transactions strung together in a logical and temporal way. While the total number of patients in my sample size was small, the total number of individual transactions in

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF REPLY TO
MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

4042466

those medical records (every pill passed, every lab result, every vital sign taken, etc.) was large enough to draw valid conclusions. In my experience, finding so many deficiencies in such a small patient sample is not common in a well-functioning healthcare system. My initial declaration describes failures to deliver care for very sick patients, where the seriousness of the medical need should have been obvious and triggered immediate action. But it also describes patients who had less acute medical problems. Even with patients with low complexity problems that were not time-sensitive, California City medical staff frequently made mistakes in the healthcare delivery process and in clinical judgment. This system struggles to address the simplest of medical problems.

12.     Defendants seem surprised that the patients I discussed in my initial declaration were "hand-picked" and not a random sampling. In my experience, it is common for an expert to review only selected records, for people with specific medical care needs. As a general matter, when assessing the care being provided in a system, I would prioritize the charts of the sickest patients because those are the patients who test the ability of the system to provide care and who would give me assurances that patients are not at risk of harm. It was therefore consistent with expert practice to review selected records here. Because Defendants say they are unclear about my position, I will clarify: I do believe that the patients I reviewed in my initial declaration and for the present one are representative of the system failures at California City and are not merely "isolated or atypical cases" in an otherwise functional system. The additional medical records I reviewed for this declaration reinforce for me the pervasive and dangerous extent of those system failures.

13.     I am confident that if I had the opportunity to review an even larger number of records, I would identify similar concerns. In fact, Dr. Tiona discusses patient records which I myself did not review but which resulted in recommendations similar to those needed for the patients I did review. This strengthens my opinion that the systemic healthcare operational issues that I described in my initial declaration are authentic and accurate.

### B.    Electronic Health Record

14.    Dr. Tiona discusses the electronic health record (EHR) used by CoreCivic. Although she does not say anything about my findings in this context, Defendants use her discussion to suggest I may have misread some of the medical records because I did not have access to the electronic version of the records. I disagree. In my role as a correctional health professional and expert in multiple cases, I have reviewed various types of records, including those that use the same or similar electronic health record platform CoreCivic employs. Dr. Tiona's description of the information that I was unable to see does not impact my prior conclusions.

15.    Dr. Tiona explains that certain information does not translate into the condensed chart review, or printed copy, of the records, including the correct time of the encounter, whether a provider reviewed a lab, when a provider reviewed scanned records, and some of the accu-checks (blood sugar checks). Defendants suggest that access to that information might change my conclusions.

16.    I do not believe any of those possibly missing pieces of information would have altered my medical opinions. For instance, according to Dr. Tiona, all lab results automatically become part of a patient record and the provider is notified that the lab is ready for review the next time they log into the system. I cannot tell when a provider reviewed the lab results in the printed record accessible to me, but that is not a necessary part of my review. Instead, my concern is what action is taken in response to medically significant lab abnormalities. In my initial declaration, I identified issues related to follow-up care provided to patients whose lab work revealed concerning results, and those issues remain today.

17.    For example, Mr. Juarez Ruiz had a very elevated HgA1C of 10.7% which measures the 90-day average of his blood sugar levels. Based on this, there should have been a consideration of medication adjustments, which was not done. In fact, there is no commentary from the providers in the medical record about their plan to deal with this significant abnormality. So while they may have "reviewed and signed" the lab result, they did not interpret the abnormal lab result and adjust the treatment plan accordingly. When the provider reviewed the lab result

4042466

(the date I cannot see in the printed records) does not change my opinion that the provider did not take adequate steps in response to it, even months later. Dr. Tiona did not directly address my concern about the follow-up care provided to Mr. Juarez Ruiz based on this lab result except to say that she recommended he have a follow-up appointment and have new labs ordered, which supports, not contradicts, my conclusion.

18.     Dr. Tiona spends time discussing the medication administration records (MARs), essentially saying that what appears to be a missed medication is just a patient who did not report to the medication line, also known as a "no show" or NS. In my initial declaration, I expressed concern about the many 3:05 am NS entries and suggested they could indicate that the medication was never offered. According to Dr. Tiona, a 3:05 am NS entry is a reflection of a detainee who did not appear for scheduled pill call and so the system automatically entered a NS for them. This does not explain the medication administration errors I identified and does not change my medical opinion that patients are experiencing lapses in medication continuity at intake and throughout their detention at California City.

19.     Even assuming her statement is accurate and that every time a patient does not report to the pill nurse to pick up medication, an automatic 3:05 am NS entry is entered in the MAR, the medication administration process is still flawed because a pill nurse should never just accept a "no show" at face value. When a patient does not pick up their medication from the pill nurse, attempts should be made to get the patient to report for their medication; it is not acceptable to do nothing further. A MAR should include all relevant entries, including the times medications were offered to a patient and refused. If the patient refused, then a signed refusal should be in the medical record or there should be a note from the nurse explaining why they were not able to administer the medication. Thus, even if it is true that the 3:05 am entry reflects a patient no show, that is not enough to prove that the medication was offered: in the absence of signed refusals or justifiable reasons, the MAR still suggests that pill call nurses are not making attempts to ensure patients receive their medication or to understand why they are not taking their ordered medication. There are many significant healthcare reasons that a patient might not come to the pill line including that they are too sick to get out of bed, their mental health issues may

have increased, they may be experiencing side effects, and so forth. It is an imperative component of patient safety for the nurses to understand why their patients are not taking ordered medications instead of just passively allowing the computer to fill in an automated "No Show.' Given the lack of pill nurse documentation and prior reports by declarants that their medication was not available despite active prescriptions, I cannot take at face value that every NS entry means the pill nurse did in fact offer the medication.

20.     One of the reasons I suspect noncompliant nursing practices with the NS entries is because nurses seem to be failing to consistently provide prescribed medications. Recent records from December 2025 and January 2026 show that essential medication continues to be missed without explanation and without the automatic 3:05 am entries explained by Dr. Tiona. For example, Mr. Benavidez-Zamora is prescribed insulin. His MAR shows missed doses in December 2025 without automatic 3:05 am NS entries. Mr. Juarez Ruiz's MAR reflects no entries for Glipizide, which he is prescribed twice a day for his diabetes, from 12/23/25 to 12/28/25 with no entries whatsoever, including no NS entries, again indicating missed doses. Similarly, Fernando Viera Reyes' records show that he was not administered metformin on 12/7 to 12/10/25 with no entries whatsoever, including no 3:05 am NS entry. This raises questions about why some records have 3:05 NS entries and others do not. Regardless, in both scenarios, it is clear that the patient did not get their medication and there is no documented reason.

**C.     Period of System Failures Identified**

21.     Defendants claim that "all of the incidents" I relied on in my initial declaration date to approximately the first month that California City Detention Facility was operational. Defendants say there have been significant improvements at the facility since that time. My initial declaration, dated November 25, 2025, described in detail medical failures and omissions that continued well beyond the first month and into November, and was supported by declarations of detained people reporting the same. While it is true that many of the records I reviewed were from patients who entered the facility in the first month that it was operational, my conclusions involved care that was provided in the months following that and was hardly limited to intake issues that occurred in September, the first month of the facility's operation. Additionally, as

8

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF REPLY TO
MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

4042466

described below, I have now reviewed additional medical records of people who entered the facility in December 2025, when Defendants were preparing their filings. Those records do not reflect "significant improvements at the facility" since September. In fact, they paint an even bleaker picture about the delivery of medical care at California City than before. I discuss these new records and the demonstrated ongoing system issues below.

22.     Dr. Tiona also discusses issues early in the facility operation regarding pharmacy dispensing, coordinating transportation for specialty services, and other resource and logistical constraints purportedly outside the facility's control. Based on my review of updated records, some of these issues – including out-of-stock pharmacy medications, delayed initiation of medication, and access to specialty services – remain problematic four months later. I have worked in systems with resource constraints before and that is not a justification for poor care which places patients at risk of harm.

### D.     "No adverse patients outcomes"

23.     Defendants indicate that a CoreCivic medical manager reviewed the patient charts that I reviewed for my initial declaration and, although she too identified multiple deficiencies with the patient care provided by California City healthcare staff, found no adverse patient outcomes. This statement is wrong and logically flawed for a multitude of reasons.

24.     First, there have been many adverse outcomes for patients at California City as a result of poor medical care. It is not clear what Defendants consider to be adverse outcomes. In my view, an adverse outcome is a demonstrable risk of medical harm, whether or not that harm has yet materialized. Regardless, the harm has materialized for a number of patients whose chart I reviewed for my initial declaration. For example, Plaintiff Viera Reyes, who likely has prostate cancer, has gone out multiple times to the emergency room for blood in his urine and stool, and is now using a catheter to urinate due to ongoing delays by Defendants to get him the diagnosis and specialty care treatment he needs.  These delays may ultimately result in a significant preventable adverse outcome if the workup for his suspected prostate cancer reveals that the cancer has metastasized to other parts of his body.

25.    Alcide Banegas was a completely stable diabetic managed on insulin prior to his arrival at California City where they decided to discontinue his insulin and completely destabilize his diabetes: his HgA1c, which was 6.1% three days after he arrived at California City in October, shot up to 11.2% in January after California City doctors stopped his insulin shortly after he arrived. A HgA1c level of 11.2% corresponds to an average blood glucose reading of 275 mg/dL continuously (average normal blood glucose range is 90-100 mg/dL). Such a rapid and high magnitude increase in blood glucose can harm multiple organs in his body and puts his life in jeopardy.

26.    There are many other examples of ongoing harm that I detailed in my initial declaration and TRO declaration, including ongoing and progressive damage to the heart muscle, lungs, and vascular system and risk of death for Named Plaintiff Roque Campos due to California City's failure to properly treat his very serious heart condition. I address ongoing harm throughout this declaration, including with lists of examples in the section on Access to Healthcare and Sick Call Process.

27.    Second, a number of these patients have been at California City for a short period of time. The consequences of poor medical care can take longer than a few months to become evident but can nevertheless cause irreversible harm. For instance, poorly controlled blood pressure in a diabetic can accelerate damage to the kidneys, the eyes, and the smaller blood vessels of the legs. This can accelerate the progression of renal failure, retinal damage, and impairs blood flow to the limbs, with the end result of this progression being dialysis, blindness, and amputations. Mr. Juarez Ruiz is a patient who I wrote about in my first declaration who had malignant hypertension, a severe and aggressive form of hypertension, with multiple blood pressure readings in August, September, and October 2025 (190/106, 168/107, 180/112). All of these blood pressure readings would be considered to be in the malignant hypertension range, meaning that emergency intervention is necessary to intervene and prevent end-organ damage. As a general rule, if the systolic and diastolic blood pressures added together total more than 300, the patient needs emergency blood pressure management because organ damage is occurring. Since those blood pressures were recorded, he has not been seen at all in the chronic care clinic Dr.

10

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF REPLY TO
MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

4042466

Tiona describes, and he has had only once had his blood pressure checked on November 6, 2025. He is on only one blood pressure medication which is almost certainly inadequate to control his blood pressure and there has been no attempt to monitor him appropriately through the records production date of 1/5/2026.

28. Mr. Juarez Ruiz is having end-organ damage as demonstrated by his recent labs: his albumin/creatine ratio on his blood work is high and he has protein spilling into his urine. Both of these lab results indicate ongoing damage to the kidneys. Additionally, he is diabetic and on glipizide and metformin. The combination of uncontrolled hypertension and diabetes is particularly dangerous; both conditions need to be managed tightly. In his case, they drew a HgA1c in September which came back with a very elevated level of 10.7% indicating very poor diabetic control. Additionally, his urinalysis showed 3+ urine indicating that he is spilling glucose into his urine. His diabetes is objectively out of control and yet nobody at California City has done basic chronic care management to minimize his ongoing and progressive organ damage or assess the extent of his "adverse outcomes" about which Defendants claim to be ignorant. They have not completed a retinal exam which is a standard part of chronic care for a diabetic but it is highly likely that he is having microvascular damage to his retinas as a result of both his uncontrolled hypertension and uncontrolled diabetes.

29. As another example, Patient A[3] arrived at California City on December 25, so it is too soon to confirm adverse outcomes. Patient A has HIV that was well-controlled on daily Dovato until he arrived at California City. He experienced a 9-day lapse in HIV medication in his first two weeks at the facility. This is despite the fact that he appears to have reported to the arresting or transport officers that he is HIV positive and requires Dovato, based on the transit paperwork in his medical record. California City provided him medication on December 25 and December 28 and then, without ever seeing him, a provider decided to change his HIV medication from Dovato to Biktarvy. These two medications are not interchangeable. Regardless, he did not receive Biktarvy until January 7. This grave mismanagement of an HIV patient's

---

[3] To protect this patient's identity, given the discussion of HIV status, I refer to him anonymously in my declaration. His name is provided in Appendix B, which is filed under seal.

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF REPLY TO
MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

4042466

continuity of care by California City, including lapses in critical medications, places Patient A at risk of treatment failure, including drug resistance, viral rebound and the emergence of significant medication side effects. I find this story particularly shocking: in the detention system I work in, when a patient comes into our custody who is on Dovato, we consider that medication to be a critical medication and we order and administer it with the next medication pass. If we do not have it in stock (which we normally do) we would go get it emergently from the backup pharmacy. It is well established in medicine that successful HIV treatment requires >90% compliance with medication dosing in order to avoid resistance and virologic failure (HIV replication that is not suppressed by the medication anymore). Patient A's intake into California City came nowhere near maintaining his required medication compliance.

30.     Third, California City's sparse and poor management of patient chronic conditions and minimal provider follow-up means that there is a lack of documentation related to patient conditions and minimal to no work-up such as lab work that would otherwise demonstrate worsening conditions. Even so, the patient cases I reviewed demonstrated clear adverse consequences due to poor care.

31.     Fourth, California City's utter failure to facilitate appropriate and timely specialty care means that necessary work-up and diagnoses are missing from records. That means that adverse outcomes may be undetected because California City is not enabling the patients to be tested for them. California City is simultaneously denying people appropriate diagnostic care and then claiming no adverse outcomes. If patients begin to have timely access to specialists, I am confident that the health consequences of untimely care will become abundantly evident.

32.     The argument that the care was acceptable because no adverse patient outcomes occurred conflates luck with quality. Modern healthcare quality monitoring considers near-misses as evidence of system failure and that the absence of harm does not equate to the presence of quality. Healthcare system quality is appropriately judged by the adherence to standards, not by the avoidance of harm. In any case, California City has neither adhered to standards of care nor avoided harm for the people who live at that facility.

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF REPLY TO MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

4042466

## IV.     DEFENDANTS' TOPIC-SPECIFIC CLAIMS

33.     In paragraphs 19-51 of her declaration, Dr. Tiona addresses a number of systemic topics about which I raised concerns in my initial declaration. I respond to those below.

### A.     Intake Screenings and Physical Examinations

34.     As I described in detail previously, intake within a detention facility consists of two components: (1) an initial intake screening and face-to-face interview by a registered nurse (or someone with a higher licensure), which should take place within twelve hours, in order to assess patients for urgent medical needs and ensure continuity of care, and then (2) a more comprehensive initial assessment, which should be completed by a provider within fourteen days or sooner based upon the clinical determination made at the initial intake screening.

35.     Dr. Tiona devotes a number of pages to a discussion of intake procedures. She describes a process at California City that in theory seems fine. It is generally the process that I would expect to see and it would be adequate if California City actually followed it. However, they do not, as I have delineated in my prior declaration. New records that I reviewed further demonstrate that the theoretical process Dr. Tiona describes is not what actually happens in reality. Her discussion does not alter my opinion that intake screenings at California City are not adequate, timely, or thorough.

36.     As to the initial intake screening process, I previously concluded that this process was not occurring timely based on my record reviews. In response, Dr. Tiona simply states that the National Detention Standards (NDS) require that initial screenings be completed within twelve hours. A policy expectation is meaningless for patients if the practice does not follow it.

37.     I previously explained that it is not clinically appropriate for LVNs to conduct initial intake assessments, as I found was happening at California City, because it exceeds their licensure and training. Dr. Tiona states that it is appropriate for LVNs to conduct a pre-screening for purposes of prioritization for Initial Intake screenings. She concedes that Initial Intake screenings should be completed by RNs. Her discussion of this point therefore actually supports my prior conclusion. Dr. Tiona did not discuss the quality and thoroughness of the Initial Intake screenings, which I found to be poorly completed. Despite her assertions that intake processes

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF REPLY TO
MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

4042466

have improved, even in January 2026, recent arrivals continue to have their assessments – not just pre-screenings – completed by LVNs. Jose Luis Trejo Cervantes arrived at the facility on or around 1/2/26 and had his intake assessment exam completed by an LVN on 1/3/26 – an examination that is beyond an LVN's licensure.

38.     As to the comprehensive initial assessments – which should be completed by a provider within 14 days or fewer, as clinically indicated – I previously found that these assessments are of poor quality and not thorough. Dr. Tiona does not rebut this finding but instead admits that one of the providers who was completing Initial Assessments "received detailed and ongoing training on evaluations and documentation thereof." Completing a thorough and appropriate Initial Assessment, which includes a review of systems and a physical examination, is a basic task that any provider should be able to complete; requiring ongoing training on doing so is cause for concern and supports my initial conclusion.

39.     I also previously found that these assessments were not timely completed as ordered. In response, Dr. Tiona presents a table of 29 patients (including some non-medical declarants whose charts I have not reviewed). She presents this table in the context of her claim that initial health examinations occur within a 14-day time period, which is the required period assuming they all received a routine (as opposed to urgent or emergent) referral by the intake RN. The chart proves the opposite. In fact, 13 of the 29 patients were seen beyond 14 days. She acknowledges that there are "occasional delays in the intake examinations." Nearly half of all cases being beyond the 14-day mark strikes me as more than the "occasional" delay.

40.     Furthermore, 14 days is the outer limit for completion of an intake assessment. Based on the patient's clinical presentation and the information provided by the patient, the intake nurse is supposed to make a clinical determination about how soon the patient needs to be seen for a comprehensive initial assessment by a provider. That could be emergent (immediately), urgent (next day) or routine (up to 14 days). For a number of the patients in that table, the Intake nurse had in fact ordered an urgent (e.g., Uktarsharkumar Trivedi, Sudesh, Singh) or emergent (e.g., Jose Ruiz Canizales) provider appointment, and that subsequent appointment did not occur for another week or two. If the appropriate clinical referral is used, the rate of timely completion

14

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF REPLY TO MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

4042466

1   for initial assessments in Dr. Tiona's table is even lower; the actual noncompliance rate rises to

2   over 50%.

3        41.    While acknowledging the "occasional" delays, Dr. Tiona claims that this issue has

4   been remedied with additional staff, changes in health services administration, and increased

5   training and oversight. Yet new records I have reviewed reveal that delays continue and this issue

6   has not been remedied. For example, Gabino Chavez-Benitez arrived at California City on

7   12/4/25. He reported a history of hypertension. He was referred urgently to the PCP to be

8   assessed for his medication needs. According to California City's own policy, he was supposed to

9   be seen within 24 hours, but was not seen until 12 days later on 12/16/25, at which time

10  medications were finally initiated. Similarly, Roberto Valera Chuquillanqui arrived at California

11  City on 12/4/25 and was referred urgently to the PCP for an initial assessment. He was not seen

12  until 15 days later, on 12/19/25. Patient A, an HIV positive patient who arrived at the facility on

13  12/25/25, was referred on a routine basis to the provider for an initial assessment. A California

14  City provider decided to change his HIV medication prescription five days after his arrival with

15  no corresponding evaluation or consultation. As of 1/13/26, nineteen days after his arrival, he had

16  not seen a provider or had an initial assessment or labs completed.

17       42.    Dr. Tiona only discusses four patients in detail in her report (see my Appendix A).

18  Three of those patients had urgent (next day) referrals for an initial assessment that were not

19  timely completed. She defends this by claiming that the RN's decision to refer the patient to the

20  provider on an urgent basis at Intake was in error. This rationalization is flawed and irrelevant to

21  the question of timely scheduling for two reasons: (1) the referring nurse did a physical exam of

22  the patient and, within their licensure, determined the need for an urgent referral, so it is not

23  relevant if Dr. Tiona now believes that the urgency was not warranted, based only on a chart

24  review and without physically examining the patient; and (2) whether or not the urgency of the

25  referral was clinically necessary, California City was unable to schedule the ordered encounter

26  timely. Nothing in those three charts indicates that the urgent referral had been voided at the time.

27       43.    I previously concluded that TB screenings at intake were not handled appropriately

28  given the unique characteristics that make this patient population at high risk for tuberculosis

exposure. Dr. Tiona describes what an appropriate TB screening should look like according to the NDS. I have no problem with what she cites as a resource from the CDC, but in the cases I cited, they did not follow those guidelines. Defendants do not address or dispute the examples I presented in my initial declaration. For instance, I discussed a patient who arrived at California City with latent TB and reported symptoms but remained in the general population for weeks, potentially exposing others to a highly infectious disease, until a confirmatory x-ray was completed. This decision was dangerous and placed all detainees and staff at risk of exposure.

44.     Dr. Tiona indicates that previously prescribed medications are not ordered within their system until the patients are seen by a medical provider for the comprehensive medical examination. As I have demonstrated and as Dr. Tiona's own chart indicates, this appointment generally takes upwards of 24 days to occur, during which time the patient is not receiving their continuity of care medication. Dr. Tiona indicates that they continue to administer medication sent with the detainee, but in the federal system transport protocols require a standard 7 day supply of medications.  Clearly CoreCivic's reliance on transport medications is inadequate if the intake provider appointment takes 24 days.  This is an illogical and broken process; it results in patients not being able to maintain the continuity of their medication treatment plan, which can be dangerous.

45.     Dr. Tiona also indicates that the transfer forms have an area to indicate whether a detainee has any pending consultations for specialty care scheduled, but she says that there is just no way to know who the specialist is or the date of the appointment, so CoreCivic cannot honor those appointments. All it takes is a phone call to the sending facility to get that information. In my opinion, in many cases, it is medically irresponsible not to make that call.

**B.     Medication Administration and Pharmacy Issues**

46.     Another issue I identified was widespread lapses in medication for newly arrived patients. Defendants attribute that to challenges they faced getting medications filled at local pharmacies and say that has been resolved by a new contract. I am alarmed that Defendants opened a detention facility without having an adequately stocked pharmacy available to them. In fact, they state that it took until October 27, two months after they began to accept detainees into

16

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF REPLY TO MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

4042466

their facility, to establish a relationship with a local pharmacy that agreed to stock medications commonly prescribed at the facility. This is a deceptive statement. As Dr. Tiona states, CoreCivic has another contracted, mail-order pharmacy provider. Defendants filed that name under seal in Paragraph 26 of her declaration so I do not repeat it here, but I know it to be a full service national pharmacy with extensive experience in correctional facilities. They could have stocked California City literally overnight if California City had requested it. A fully stocked pharmacy is a critical part of a well-functioning healthcare system and should have been established before the facility opened. It was clinically dangerous to accept patients into the facility before that was established.

47. Defendants offer no proof that medication administration failures have in fact been remedied or that medications are now being administered timely. By contrast, updated chart reviews demonstrate ongoing failures to timely fill prescribed medication and to timely and consistently administer medications. For instance, Patient A was prescribed a critical HIV medication on 12/30/25, but the first administration of the medication was not until 1/7/26. That alone is damning proof that their pharmacy is unable to procure and administer medications to patients timely, even when it is life-sustaining medication like Patient A's.

48. Dr. Tiona spends a lot of time talking about setting up a relationship with a backup pharmacy and the challenges of that, and says that the issue has been remedied by a new local pharmacy contract. But that source of medications should account for only a tiny fraction of the total medication burden. A successful pharmaceutical practice in a correctional facility requires three levels of pharmacy supply: an in-house stock pharmacy where commonly used medications are held, a contract pharmacy service that sends medications via express overnight mail (the national pharmacy described above), and a relationship with a local pharmacy to handle emergency backup needs. The first two levels should supply 95% of all medications needed in the facility and Defendants should have had these relationships already worked out prior to California City opening. This suggests that the lack of a local pharmacy did not account for the extent of the serious problems with medication supply and administration at California City that I identified

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF REPLY TO
MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

4042466

previously. Indeed, updated records show that this issue persists even after the local pharmacy contract was put in place.

49.     Chart reviews demonstrate lapses in medication renewals and delays in obtaining newly prescribed medication well after October 27 when the relationship with the local pharmacy was supposedly finally established. For instance, Plaintiff Viera Reyes returned from the emergency room in late November with a prescription for antibiotics twice daily. He received one dose the evening of 11/28/25 but received no doses on 11/29/25. Mr. Benavidez-Zamora was also prescribed antibiotics on 11/20/25, but did not receive the first dose until a week later on 11/27/25. Mr. Guevara Alarcon had Topiramate renewed after he experienced a lapse from 10/3 to 12/11/25. Even after it was renewed, the medication was noted as out of stock from 12/13 to 12/19/25. It is evident that a contract with a local pharmacy was not the only cause of the medication deficiencies. Unfortunately, patients remain at risk of harm due to delays in medication administration.

50.     Warden Chestnut and Dr. Tiona state that medical staffing levels have improved, but medication administration records suggest otherwise. Records also show that the time that medications are administered vary drastically from day to day, and sometimes medications are administered too close in time. Mr. Benavidez-Zamora is prescribed insulin in a long-acting formulation twice a day, but sometimes has doses administered only a few hours apart, such as receiving the evening dose at 11:04 PM on 1/3/26 and the morning dose at 5:03 AM on 1/4/26, then the evening dose again at 10:57 PM and the 1/5/26 morning dose at 4:52 AM. Many medications are time-sensitive. Insulin is a prime example of this. It has to be dosed in a consistent manner and failure to do so can create large swings in blood glucose levels. If you dose insulin too close together, you can drive the blood sugar down to dangerous low levels. If you dose insulin too far apart, the patient's blood glucose can increase to dangerous high levels. There are many other medications where the time of administration is actually medically meaningful. Common examples of time-sensitive medications include high blood pressure medication, anticonvulsants, anticoagulants, and antibiotics. In most healthcare settings, the allowable variance in medication administration time is 30 minutes. It is clear from the Medication

18

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF REPLY TO
MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

4042466

Administration Records that the medication practices at California City do not conform to generally accepted nursing practice. In my experience, inadequate staffing is one of the reasons systems experience this type of irregular medication administration.

C.    **Access to Healthcare and the Sick Call Process**

51.    Defendants claim that Dr. Tiona's chart review shows "all sick call requests at the facility are currently processed in a timely manner, resulting in same-day responses for all 'urgent' requests and responses within 72 hours for all other requests." As an initial matter, that is not what Dr. Tiona asserts: Dr. Tiona states that she and a colleague reviewed 29 records, so read in context, her assertion that based on their clinical chart review "sick call requests are now being processed timely" means that, for those records, they found the sick call requests were timely processed. She does not claim to have completed a chart review for all patients at the facility or that all requests receive a timely response, as implied. Regardless, I have reviewed the same charts she has. They show the opposite.

52.    Mr. Trivedi, a patient whose chart Dr. Tiona discussed in detail, clearly demonstrates recent failures of the sick-call process and medication management at California City. Mr. Trivedi submitted a sick-call slip on 11/29/25 requesting a refill of three medications for his chronic conditions. The RN noted on 12/1/25 "your medication has been refilled." However, there is no indication that medication was administered so it is unclear if this was in error. Five days later, on 12/6/25, another sick-call was submitted requesting the same medications, as well as two additional ones. The RN noted on 12/8/25 that a refill request was submitted. Mr. Trivedi's MAR shows a 12/17 refill of Colace and a 12/30/25 refill of Loratadine (one of the medications requested) – nine days and a month respectively after the initial sick call requests – and no refill of the remaining three medications as of January 5, 2026. Mr. Trivedi also submitted multiple sick call slips on 11/15/25 reporting itching, toe pain, and vision problems; he was seen on 11/17/25 by an RN who assessed only his rash and referred him on a routine basis to a provider. Having not seen the provider weeks later, Mr. Trivedi submitted additional sick-call slips on 12/3/25 and 12/18/25 reporting ongoing itching, toe pain, and vision problems, and asking about the status of his appointment with the provider. He was assessed yet again by the RN on 12/23/25

19

4042466

for itching but his additional complaints about his vision and toe pain were again not discussed.

Almost a month and a half after the 11/17/25 RN referral to the provider, Mr. Trivedi had still not

been seen by a provider, including for concerns relating to a potential vision disability.

53.    Similarly:

- Julio Armenta submitted a sick-call slip on 12/26/25, which was marked received on 12/28/25, noting extremely red, teary, and bloodshot eyes. As of 1/5/26, Mr. Armenta had not been seen by a RN for a face-to-face assessment or by a provider.

- Mr. S. Singh submitted a sick-call on 11/18/25 reporting heel pain; the sick-call "disposition" notes that an appointment with the provider would be scheduled. Instead, however, he was seen by an LVN five days later. After consulting with a nurse practitioner, the LVN made a routine referral to a provider. Mr. Singh submitted another sick-call slip on 12/3/25 reporting similar concerns, and the sick-call "disposition" again noted that he would see a provider. He was not seen by a provider until his chronic care appointment for diabetes on 12/23/25, a month after he filed the sick call slip. It should not take a month for a patient reporting such concerns to be seen by a provider.

- Named Plaintiff Viera Reyes may have metastatic prostate cancer and has, for months, reported pain and bleeding from his rectum. He submitted two sick-call slips on 1/2/26 stating (1) that he is feeling intense pain in his anal area and needs pain management and (2) he is having severe issues using the bathroom and requests stool softener. He is not seen regarding his concern and instead the written disposition states he was already seen on 12/30/25 by the provider. He clearly submitted this sick-call slip after his encounter with the provider so the disposition here is medically inappropriate and not consistent with California City policy timeframes. Moreover, the 12/30/25 provider "visit" was actually an encounter that took place in the waiting room, per the provider's note, following

20

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF REPLY TO
MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

4042466

Mr. Viera Reyes's return from the hospital, and was entirely unrelated to his rectal pain.

54.    Other patients who were not discussed in my initial declaration demonstrate California City's ongoing failure to address sick call requests in a timely manner, contrary to Dr. Tiona's assertion that all such requests are responded to within 72 hours. For example:

- Blas Martinez Gutierrez arrived at California City in early November 2025 with an active prescription for risperidone, an anti-psychotic often prescribed for conditions such as schizophrenia or bipolar disorder. The medication was continued for a month until 12/6/25, but then expired on 12/6/25 without a documented rationale for why it was not renewed or "bridged" so he could be assessed by a medical or mental health provider to determine whether it needed to be continued. Mr. Martinez Gutierrez submitted a sick-call slip on 12/13/25 stating "I would like to know why I am not receiving my medication. I am not feeling too well. I feel like I need it to balance me out. Thank you. Please let me know as soon as possible." In response, he was scheduled to see the RN on 12/23/25, far beyond 72 hours. The record states that he reportedly refused but does not contain a signed refusal from the patient verifying he did in fact refuse and there are no documented attempts to reschedule him. He remains without his anti-psychotic medication as of 1/9/26.

- Jesus Alcides Banegas, an uncontrolled diabetic, submitted a sick-call on 1/3/26 reporting pain in his feet. He was not seen by a nurse or provider in response; instead, the written disposition states that he has a pending appointment with a provider and can discuss it then. His record reflects two active provider encounters with "due dates"[4] on May 11, 2026. If this is the encounter that is being referred to by the RN, which appears to be the case based on the lack of other appointments

---

[4] As I explained in my TRO declaration, these "due dates" do not mean appointments have been scheduled in fact.

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF REPLY TO MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

4042466

1    pending, scheduling a provider appointment for four months out is not an

2    appropriate response. This clearly does not comply with the sick call response

3    times that Dr. Tiona says the institution follows. Foot care is incredibly important

4    for patients with diabetes because they frequently develop ulcers and infections.

5    Diabetic foot ulcers are notorious for being extremely difficult to treat and they

6    frequently result in amputations and more serious systemic infections. The failure

7    to examine him and to instead defer his care into the future puts him at significant

8    risk, especially since his glucose is not being well controlled in the institution.

9        55.    Dr. Tiona repeatedly claims that staffing levels have increased and addressed

10   delays in care. But recent records demonstrate continued and extensive delays in PCP follow-up.

11   For example:

12   •    Mr. Oscar Rodriguez Lopez submitted multiple sick-call slips reporting ongoing

13        hip pain as a result of a prior accident which necessitated hip surgery. He was seen

14        on 11/23/25 by an LVN (rather than an RN), who completed an assessment (a

15        function beyond the scope of their licensure) and referred him on a routine basis

16        (2-14 days) to the PCP. He was seen again by an LVN on 12/6/25, who noted

17        limited range of motion in his extremities, an inability to bear weight, and

18        challenges performing his ADLs or completing self-care. (These issues have

19        significant disability implications and should have been addressed promptly.) Mr.

20        Rodriguez Lopez was again referred to the PCP on a routine basis and was not

21        seen timely by a PCP. He submitted another sick-call and was seen on 12/23/25 by

22        an RN, who referred him for the third time to the PCP on a routine basis. As of

23        1/9/25, a month and a half after the first routine referral, Mr. Rodriguez Lopez has

24        yet to have a PCP assessment completed. This is a clear example of the hurdles

25        patients experience accessing care at California City and shows ongoing

26        noncompliance with policy.

27

28   •    Mr. Rodriguez Lopez also submitted a sick-call slip reporting shortness of breath

22
DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF REPLY TO
MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

4042466

and wheezing. He was fully assessed by an LVN rather than an RN on 12/9/25, and referred to a PCP for an evaluation and confirmation of asthma and need for an inhaler. As of 1/9/26, he has not been seen.

● Mr. Roberto Adonay Galan-Martinez has been waiting since 11/11/25 to see a PCP after being referred by the RN on a routine (within 14 days) basis for reports of painful urination, testicular pain, and swelling. That appointment did not happen. He submitted another sick-call slip on 11/23/25 stating this was his fourth sick-call regarding "pain while I urine. There's been blood and very painful while I urine. Please I need to see the doctor ASAP." He was not assessed by any medical staff; a written disposition stated he would be seen by the provider on 11/25/25. That appointment did not happen. He submitted another sick-call on 12/8/25 reporting pain and blood with urination. The RN entered a note that he reportedly refused because it was just another RN appointment and he wanted to see the PCP. He was seen by an RN on 1/8/26 and reported that he was having a hard time urinating and seeing blood in his urine. He was told he would be seen the following day. I do not know if he was seen, but under no circumstances it is acceptable to have a patient reporting such serious, ongoing symptoms for over a month and a half without being assessed by a provider.

56.    Additionally, Defendants describe the sick call process at California City as a primary method for detainees with disabilities to access disability accommodations. Evidence that the sick call system continues to be riddled with delays and fails to comprehensively address patients' needs indicates that the process is ill-suited to address disability needs in a timely and appropriate manner.

**D.    Chronic Care**

57.    I previously found that chronic care is poorly managed at California City: Follow-up encounters are ordered beyond appropriate timeframes given the patient's condition and

1   presentation, and the care provided falls below the standard of care. In response, Defendants

2   again rely on an overview of policy expectations to defend their chronic care practices.

3       58.     Dr. Tiona describes a policy whereby patients are enrolled in a Chronic Care

4   Clinic (at the initial intake screening or the initial appraisal) and providers then manage follow-up

5   encounters based on their discretion and the patient's level of control of the condition. The

6   existence of a chronic care management policy is commonplace in any correctional health care

7   setting, and its mere existence does not counter my finding that in practice chronic care is poorly

8   managed at California City. In fact, Dr. Tiona's own review of patient records demonstrated that

9   the policy is not being followed by California City providers. She identified multiple deficiencies

10  in her chart reviews for which she made recommendations for remediation, including scheduling

11  follow-up provider appointments for many patients, ordering necessary labs, and adjusting

12  medications.

13      59.     My medical opinion has not changed: chronic care management at California City

14  is far too often inadequate in frequency and incompetent in delivery. Updated medical record

15  reviews for patients I discussed in my initial report also demonstrate that chronic care

16  management remains untimely and inadequate.

17      60.     For example, Mr. Benavidez-Zamora has poorly controlled diabetes with blood

18  sugar readings that fluctuate drastically from 53 (very low) to 336 (very high) in the span of one

19  week (12/30/25 through 1/5/26). His A1C is 8.9%, which is an indication of poorly controlled

20  diabetes. Dr. Tiona reviewed his record and recommended that a chronic care appointment be

21  scheduled for him. That appointment should have already been scheduled at the time of his Initial

22  Assessment on November 20, 2025, according to CoreCivic's chronic care management policy.

23  The fact that it had not been is just one of many examples of the way the policies Dr. Tiona

24  describes in her declaration do not translate into practice. Although Dr. Tiona recommended that

25  a chronic care appointment finally be scheduled for him, Mr. Benavides-Zamora's medical

26  records, as of 1/5/25, do not show that any chronic care encounter took place since November 20,

27  or that any chronic care encounter was pending despite his abnormal labs from November 21,

28

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF REPLY TO
MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC
4042466

2025 (HgA1C at 8.9,% Creatinine at 1.44 mg/dL and eGFR at 55), fluctuating blood sugar

readings, and a recent foot infection that required antibiotics.

61.     The above labs put Mr. Benavidez-Zamora into the category of an uncontrolled

diabetic (HgA1c of 8.9%) with hypertension and chronic kidney disease (elevated creatinine and

GFR less than 60). A patient like this should be on a medication from the family of ACE

inhibitors to slow down the kidney damage and to help protect the kidney from additional

damage. The purpose of a chronic care clinic visit would be to review his medications and to

adjust them to meet the standard of care. As of January 5, Mr. Benavidez-Zamora had not been

prescribed any ACE inhibitor which is an unequivocal deviation from the standard of care. Mr.

Benavidez-Zamora's medical records explicitly states that he has no known allergies so there is

no recorded reason not to prescribe this medication. This is as basic of chronic care management

as there is in medicine. A third year medical student would be expected to know this because it is

so critically important for diabetic management. This is a prime example of why chronic care

clinics are so important and why the facility's failure to have him seen for his chronic disease

management causes ongoing harm.

62.     In my initial declaration, I discussed the very poor and dangerous chronic care

management received by another patient, Alejo Juarez Ruiz, who has uncontrolled diabetes and

dangerously uncontrolled hypertension. He is another example that undermines Defendants'

suggestion that the chronic care clinic at California City functions well. He has a hemoglobin A1c

of 10.7%, which puts him at risk of developing diabetic ketoacidosis, a serious and potentially

life-threatening complication of diabetes. Given his uncontrolled diabetes, standard of care would

be to place him on insulin because he is beyond what oral medications can accomplish.

Defendants' only response to my previous findings is an indication from Dr. Tiona that she

recommended that Mr. Juarez Ruiz have a follow-up encounter scheduled, as well as lab draws

completed. But even after that recommendation, the chronic care system still failed him: a recent

record review demonstrates ongoing poor and untimely care, including no recent changes to his

prescribed medication, no blood pressure or blood sugar checks since early November 2025, and

no active lab orders, despite Dr. Tiona's statement that she recommended it. Furthermore, Mr.

4042466

Juarez Ruiz only has one active order for a chronic care evaluation for his diabetes and cardiac condition, with a "due date" in late February 2026. As explained in my TRO declaration, nothing in the medical records indicates that this "due date" means an appointment will actually be scheduled.

63.     The facility has failed to provide adequate care for Mr. Juarez Ruiz even after being notified by the plaintiffs, by Dr. Tiona, and by a urinalysis that shows that his kidneys are leaking protein and that his HgA1C is above 10.% This failure indicates that California City's healthcare system continues to fail to deliver even the most obvious and basic healthcare for common diagnoses. The fact that my criticisms and Dr. Tiona's recommendations have not yet accomplished a chronic care visit is almost unbelievable and solidifies my opinion that this system is operating on vapors and is poorly equipped to handle sick patients of any acuity.

64.     Plaintiff Roque Campos is yet another counter-example to Dr. Tiona's discussion of how the chronic care clinic is supposed to work. He is diagnosed with pulmonary hypertension and congestive heart failure, which, as I pointed out in my initial declaration, are life-threatening conditions that require close monitoring and appropriate management. Unfortunately, Mr. Roque Campos has not received either of those. He had only had two contacts with health care staff at California City – both RNs  – in the month of December 2025. The first encounter was 12/1/25 for testicular pain and cough. The second was for chest pain on 12/10/25. The RN notes that Mr. Roque Campos has no prior history of heart disease, which is an alarming error given his serious cardiac history noted throughout his medical records, including on his problem list. An EKG was completed which was abnormal, including a right bundle branch block and sinus rhythm with first degree AV block. The presence of the first degree AV block can be an objective marker of the severity of underlying structural cardiac disease (as suspected by the ER physician) and should prompt an expedited evaluation by a cardiologist.

65.     Mr. Roque Campos just saw a cardiologist for the first time since being detained at California City on January 13, 2026, despite a recommendation made by the ER doctor in early September 2025 that he be seen in 72 hours. As discussed elsewhere in this declaration, I wrote a supporting declaration in December to obtain an order from the Court to ensure that Mr. Roque

26

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF REPLY TO
MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

4042466

Campos would see a cardiologist emergently to receive a comprehensive assessment and treatment plan. Let me be clear: this assessment and treatment plan should have been completed months ago – and they have occurred now, it appears only because of Plaintiffs' counsel's intervention and the Court's assistance. I discuss Mr. Roque Campos further below with regard to offsite referrals. However, in the context of chronic care management, it is critical to note the facility's failures with respect to both his hypertension and his congestive heart failure. Dr. Tiona suggests that the facility's Chronic Care Clinic ensures patient follow up at the "discretion" of the providers; those providers have failed woefully here.

66. Jose Franco-Pena was one of the four patients who Dr. Tiona spent significant time discussing. She acknowledges that the provider order for regular blood pressure checks to monitor his hypertension was not followed, noting that the issue has "subsequently been rectified with enhanced nursing training and improved staffing patterns." Yet she offers no evidence that the issue was in fact rectified. She also acknowledges the failure of the providers to order recommended medication upon Mr. Franco-Pena's return from the specialist and to order appropriate follow-up with the specialist, noting that the failures have been discussed with the onsite providers. These failures of basic functions of a healthcare system – to follow provider orders and to offer appropriate aftercare when patients return from the emergency room  – raise serious questions about California City's ability to manage complex health issues.

67. New patient records I reviewed highlight California City's ongoing struggle to provide even basic medical management of chronic care conditions, further undermining Defendants' claims with respect to chronic care. Mr. Alcides Banegas arrived at California City on or around 10/18/25 with well-controlled diabetes. He reported to staff that he uses insulin, but did not receive it at California City. Instead, for an unexplained reason, he was prescribed metformin in the lowest dose for an adult (500 mg twice per day) on 11/3/25. From a medical perspective, if a patient's diabetes is so severe as to require insulin to manage it, there is no justification to stop that insulin and revert to oral management without a substantial change in the patient's condition, such as massive weight loss. Even then, that conversion would require very tight monitoring to make sure that it was medically safe. None of that occurred in this case, and it

27

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF REPLY TO
MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

4042466

is beyond medical logic to understand why the facility felt it was appropriate to stop his insulin and put him on low-dose oral medication. That plan was guaranteed to fail.

68.    Mr. Alcides Banegas was seen the following week, on 11/11/25 by the same provider. On the date of that visit and in the prior days, Mr. Alcides Benegas' blood sugar readings were elevated, but there was no discussion of that finding. His metformin was continued, and he was ordered a 6-month follow-up despite evidence demonstrating that he needed closer monitoring and management, particularly given that a new diabetic medication regimen was recently implemented.

69.    Mr. Alcides Banegas was seen again by a provider on 12/23/25 for a chronic care visit. In the interim weeks, he received only one blood sugar check, when he should have had frequent checks to  determine whether the new medication prescribed was adequately controlling his diabetes. At the 12/23/25 encounter, the provider did not have any recent information to conclude that Mr. Alcides Banegas' condition was well-controlled. He reportedly relied on an outdated HgA1C (a measure that averages blood sugar readings from the prior 90 days) of 6.1% from mid-October, a week after Mr. Alcides Banegas' arrival, when he was still feeling the benefits of his recent management with insulin, and a handful of blood sugar readings from early November, all of which were elevated. There is no objective exam documented. The provider failed even to check Mr. Alcides Banegas' blood sugar levels the day of his encounter.

70.    Labs drawn on January 5, 2026, shortly after his chronic care encounter, show an alarming increase to his HgA1C level,  at 11.2%, and a blood glucose level of 431 mg/dL, demonstrating severe hyperglycemia. This means that Mr. Alcides Benegas' condition has been deteriorating since he was placed on metformin and he did not have the benefit of adequate medical monitoring so that medication adjustments could be made. As of January 13, 2026, no provider has acknowledged or addressed the significant increase in his blood glucose level or evaluated his need for insulin. This is dangerously poor medical care for a chronic condition.

71.    Another example of egregiously and dangerously poor chronic disease management is the management of Patient A's HIV. Patient A arrived at California City with a transfer memo that noted he takes Dovato, a medication to manage HIV. He informed the RN at

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF REPLY TO
MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

4042466

intake about his diagnosis and medication but, despite his serious medical condition, he was referred on a routine basis to the provider for an initial assessment. Chronic management of HIV treatment requires laboratory assessment of multiple body functions. Decisions about medications and treatment protocol changes cannot be made without those lab results. As of 1/13/26, no labs had been drawn on him and his records do not reflect that any have been ordered. As noted earlier, his HIV medication was changed without a consult, assessment, laboratory results or patient consent. Even with the medication change, he did not receive over half of his daily medications from 12/25/25 to 1/12/26. He has no pending chronic care appointment and, as of 1/13/26, 19 days after his arrival, he had yet to see a provider.

72.     Jesus Contreras Jimenez is diagnosed with multiple chronic care diseases, including malignant hypertension and a seizure disorder as a result of a recent traumatic head injury. The management of a patient's blood pressure is very well within the parameters of what a primary care provider should be able to do, but nonetheless seems beyond the abilities of California City. Recent records from December 2025 reflect dangerously elevated blood pressure readings and multiple incidents of hypertensive crisis, placing Mr. Contreras Jimenez at real risk of organ damage based on his reported symptoms.

73.     Since at least early December, almost every medical encounter Mr. Contreras Jimenez has had has been rife with questionable medical judgment and medical decision-making that placed him at greater risk of harm and failed to meaningfully address his extremely high blood pressure. On 12/5/25, his blood pressure was 169/100 and he was experiencing facial sagging and arm numbness. He was given a dose of lisinopril (which is not a fast acting blood pressure medication) and sent out to the emergency room to rule out a brain tumor. It is not clear why that was the working diagnosis of the provider. A brain tumor was ruled out and he was brought back to the facility; he was cleared to return to his housing unit with no subjective exam noted and no vitals taken to ensure he was stable. His care continues in the same fashion:

- 12/9/25: Reported to the clinic with elevated blood pressure and nausea, and he was given nausea medication. He did not receive appropriate care.

- 12/13/25: Reported to the clinic with extreme chest pain with radiation to the extremities, elevated blood pressure (169/102) and low O2 levels (94%). Blood pressure continued to worsen (194/125 and 189/110), reaching hypertensive crisis levels that would warrant an emergency room visit, but he was not sent out. He did not receive appropriate care.

- 12/14/25: Reported to the clinic with chest pain and dangerously elevated blood pressure (166/111 and 172/98). He reported taking extra doses of Lisinopril (a long-acting blood pressure medication) in an attempt to bring down his blood pressure. In the clinic, he was given a dose of clonidine and aspirin. Aspirin is a poor medication to administer to a patient who is already experiencing elevated blood pressure as it interferes with the ability of their blood to clot which increases his risk of a stroke. An EKG was ordered, but could not be completed because the machine was out of paper and was malfunctioning. He again received dangerously poor care.

- 12/17/25: Reported to the clinic with chest pain and alarmingly elevated blood pressure (191/117 and 199/133). He was inappropriately given doses of Lisinopril and aspirin and ordered an EKG, which showed left atrial enlargement. He was finally given a dose of amlodipine 5 mg and sent to the emergency room. The ER recommended that he start an additional blood pressure medication, metoprolol ER 50 MG 1 tablet a day, which he finally started on 12/20/25, and resumed on 12/22/25. No blood pressure was taken before he returned to his unit.

- 12/19/25: He was wheeled to the medical clinic on a gurney after being found lying on the floor. He reported "blacking out," and his blood pressure was elevated (160/84). He was given a medical lay-in, but no work-up as to why he blacked out. This too is inappropriate care.

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF REPLY TO
MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

4042466

- 12/20/25: Reported to the clinic because he did not feel well, his whole body hurt, and he was getting spots in his eyes that typically happen with a seizure. His blood pressure was elevated (162/108). He was prescribed medication for a bacterial infection, including prednisone, although it is not clear how that diagnosis was reached. This too is inappropriate care. Prednisone is a dangerous medication to use in a patient with uncontrolled hypertension because it increases blood pressure and he is on ibuprofen; those two medications should not be given together.

- 12/22/25: Submitted sick call slip reporting chest pain and numbness in left arm. Reported to the clinic with difficulty breathing. The RN noted that his right leg was shaking while he was lying on the gurney. No work-up or additional treatment was ordered. He was told to return to the clinic if he was not feeling better the next day. Records reflect that he fell backwards when he reached to brace himself on the back of a chair on his way out of the clinic. Nothing was done aside from paperwork documenting the fall. This is completely inappropriate care.

- 12/25/25: Reported to the clinic because he believed he had a seizure. An EEG, a test that measures brain activity to diagnose seizures, is ordered with a 3/25/26 compliance date. This is inappropriate care.

74.    Overall, this series of healthcare encounters for malignant hypertension with end-organ symptoms has been incredibly mismanaged. California City gave Mr. Contreras Jimenez medications that are ineffective and contraindicated for his condition and failed to work up his condition or appropriately monitor him. Nurses inappropriately provided most of the care for this patient with acute problems that require physician assessment and treatment. The entire sequence falls below the standard of care and undermines any claim that health care is appropriately managed at this facility.

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF REPLY TO
MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

4042466

### E.    Off-Site Referrals and Specialty Care

75.    As I explained in my initial declaration, specialty care must be available to patients when the patient requires more specialized care than a primary care provider can provide. Dr. Tiona states that the facility "continues to experience some difficulties in scheduling specialty appointments" and "is actively working to rectify this issue" and "to expand the contracted specialist panel." By her own admission, California City is not able to provide all necessary specialty services. Yet she seems to imply that nevertheless some specialty care is occurring. Dr. Tiona and the facility warden both reference contracts that California City has in place with local hospitals and specialists. Both also reference offsite medical transports. Notwithstanding, my prior conclusion that California City does not have a system in place to ensure specialty services are timely and appropriately provided remains just as true today. In fact, the facility's failure to provide specialty services is even more alarming now given that more time has passed. The patients I referenced in my initial declaration continue to wait for much needed care.

76.    Dr. Tiona states that in the first three months of the facility's operation, there were 65 offsite medical transports. She does not offer any information about what types of transports those were. It is very important to clarify that those do not appear to be offsite transports for the purpose of obtaining specialty care. Based on my chart reviews, I suspect them to be primarily emergency room visits, likely because California City did not have ready access to specialists, as Dr. Tiona acknowledges continues to be a problem. Emergency room access is not a substitute for specialty services. The purpose of an emergency room visit is very different from the types of specialty service needs I discussed in my initial declaration. The role of the healthcare providers in an emergency room is to assess and stabilize patients with acute or traumatic illness, not to complete significant work-ups and recommend treatment options that are better handled by specialists. A case in point is that of Mr. Roque Campos who went out to the emergency room twice in his first days at California City for urgent cardiac concerns and returned with a directed recommendation from the Emergency Department Physician to be seen by a cardiac specialist urgently. In other words, the emergency room visit does not suffice to offer the services that specialty providers can provide. He was only seen by a cardiologist four months later after

4042466

1    lawyers sought court intervention due to the severity of his condition and California City's failure

2    to meet his urgent health care needs.

3        77.    Another telling example of the limitations of an emergency room visit is the case

4    of Mr. Viera Reyes, who arrived at California City with an urgent need for a prostate biopsy.

5    Records document occasions in which the California City provider attempted to get a urology

6    consult for Mr. Viera Reyes by sending him to the emergency room. As a result, he was not seen

7    by the appropriate specialist, but only by an ER doctor who addressed time-sensitive issues and

8    discharged him back to the facility. For example, Mr. Viera Reyes reported to the clinic at

9    California City on 12/13/25 with bright red blood with visible sedimentation in his catheter bag.

10   At this point, Mr. Viera Reyes had been waiting over three and a half months for California City

11   to obtain a urology appointment for him. On 12/13/25, the California City provider ordered Mr.

12   Viera Reyes to be sent to the emergency room for a "possible catheter removal and urology

13   evaluation." It is inappropriate to rely on the use of emergency room visits to address conditions

14   that likely require careful work-up and continuity of care from a specialist. Mr. Viera Reyes likely

15   has prostate cancer that may have metastasized and needs the continuous care of a urologist to

16   diagnose and coordinate his care. Dr. Tiona and the warden point to ambulance contracts,

17   relationships with hospitals, and offsite transports. These are no substitute for the specialty care

18   so many patients need.

19       78.    Dr. Tiona responds to my concern that pending specialty encounters are not

20   consistently honored at California City and are discontinued without a documented reason or

21   provider evaluation. She explains that when a patient arrives to the facility with a pending

22   specialty evaluation, it must be re-initiated because transportation and funding for those

23   appointments differs from facility to facility. As a preliminary matter, this explanation does not

24   contradict my prior findings; it supports it. More importantly, a lack of funding or transportation

25   is not an excuse to not provide necessary medical services. The provider should acknowledge the

26   pending specialty encounter and assess the medical need for the appointment. In making this

27   assertion, Dr. Tiona refers to Mr. Trivedi who arrived at the facility with pending appointments

28   with an oral surgeon and ENT to rule out malignancy of his oral lesions. His records do not

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF REPLY TO
MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

4042466

reflect that California City healthcare staff engaged in any discussion about his need for those pending appointments and provide no explanation for why they were not honored by California City. She references his case without acknowledging that the policy she just described results in this failure to provide appropriate care. Even in the case where a detained person had a specialty appointment at a previous ICE facility and the specialist ordered follow up, California City does not consistently follow those orders. For example, when Mr. Leyva arrived at California City in early September 2025, he had already seen an audiologist for his hearing loss. He requested hearing aids multiple times, but medical records indicate that "hearing aides and amplifier is [sic] not available." The subsequent request for referral remained in a status of "financial authorization requested" until Mr. Leyva left the facility on November 28.

79.    In my initial declaration, I discussed a number of patients who required specialist appointments. A couple of those, like Mr. Leyva, are no longer in custody. Mr. D. Singh and Mr. S. Singh are still detained, but still do not appear to have seen specialists as of 1/5/26. From my review, only two of the still-detained patients I discussed in my initial declaration have seen specialists, both after court intervention. Mr. Viera Reyes has seen a specialist for what is likely undiagnosed prostate cancer. My understanding is that his appointment with a urologist took place on December 30, 2025, as a result of a court order for which I submitted a declaration. Likewise, Mr. Roque Campos saw a cardiologist on January 13, 2026, as a result of the same court order. I believe that without legal intervention, both patients might still be waiting to see specialists for their urgent medical needs. These continuing delays and inaction suggest that there are more than "some difficulties" in the facility's ability to obtain specialty care for patients.

80.    Dr. Tiona discusses the case of Mr. Franco-Pena, who went out to the emergency room, where he underwent an upper endoscopy with biopsies and a colonoscopy. She admits the failure of the California City providers to order him the necessary follow-up procedure with the specialist (but fails to discuss the failure of California City to obtain the biopsy results from the hospital). As of 1/5/26, his records still did not reflect a specialty appointment has been ordered.

81.    She further discusses Mr. S. Singh, noting he has several pending offsite appointments for general surgery, podiatry, ophthalmology, and optometry. She indicates that

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF REPLY TO
MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

4042466

none of them are urgent and that they are being addressed by the facility. As of 1/5/26, Mr. S. Singh's active orders show that the ophthalmology appointment has been voided and the other three remain pending, with two of them overdue even by California City's own compliance dates.

82.    Other patients who I discussed in my initial declaration are still waiting to be seen as of early- to mid-January: Mr. Viera Reyes is waiting to see an optometrist and have an ultrasound completed; Mr. D. Singh is waiting to see a gastroenterologist (GI); Mr. S. Singh is waiting to see a general surgeon, podiatrist, ophthalmologist, and optometrist.

83.    Dr. Tiona briefly touches on medical observation housing, but only when discussing Mr. Franco-Pena, who went to the ER for a gastrointestinal bleed. She states that it is customary and medically-indicated for a patient to be observed in medical observation for a period of time when returning from the ER with that particular condition. While this may be correct, my concern was not with the decision to medically observe a patient in a controlled environment when they return from an emergency room to ensure they are stable before returning to their housing unit. Rather, I was concerned with how long they remain in that setting and, more importantly, the conditions and care provided while there.

84.    Mr. Viera Reyes provides another example of my concerns. He returned from the emergency room on 11/28/25 with a newly placed indwelling catheter to assist with his urinary retention and a urinary tract infection diagnosis. He was placed in a medical observation housing when he returned and remained in medical housing until 12/6/25, when it was finally decided that he could be released to his housing unit because his catheter bag no longer posed a custody concern. While in the medical housing – where he reportedly receives regular nurse monitoring – he did not receive three of the four prescribed doses of antibiotics from 11/28 through 11/29, where it was noted that he was a "no show." It makes no sense to flag him as a "no show" when he was under the monitoring of medical staff. Furthermore, there appears to be no medical justification for keeping him in a segregated unit under more restrictive conditions for over a week. He went out again on 12/13/25 and was placed in medical observation housing when he returned until he could be seen by a provider on 12/14/25. Similarly, he did not get two doses of the prescribed antibiotics on 12/14/25 while under the direct monitoring of medical staff.

35
DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF REPLY TO
MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

4042466

85. Dr. Tiona said she conducted a chart review for Mr. Viera Reyes. All of these things happened two weeks before Dr. Tiona signed her declaration, so it is baffling that she still made the assertion about medical housing. The failure, at a minimum, to make sure patients get their prescribed medications while in medical observation housing is a testament to the futility of that housing and undermines Dr. Tiona's assertion that medical observation ensures that the "patient remains stable" before returning to the general population.

## V.    <u>CONCLUSION</u>

86. My opinion about the quality of care at California City remains unchanged after reviewing Defendants' filings and updated health care records. This system is egregiously inadequate and poses a clear and present danger to patients. As time goes on, more patients are exposed to the risk of severe harm due to substantial, systemic, and ongoing deficiencies in the provision of health care at California City. I remain gravely concerned about patient safety at California City in the absence of timely and comprehensive remedial action.

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF REPLY TO
MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

4042466

1    I declare under penalty of perjury under the laws of the State of California and the United

2    States of America that the foregoing is true and correct.

3    Executed this *16th* day of January, 2026, in Salt Lake City, Utah.

4

5

6    By: _____

7    Todd R. Wilcox, M.D.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# APPENDIX A

Paragraphs 58-70 of Dr. Susan Tiona's declaration discusses four particular patients. Although I address these patients in the relevant sections of the preceding declaration, because of Dr. Tiona's disproportionate focus on them, I also respond in detail below.

### Paragraphs 58-60 of Tiona Declaration

In this case, I was critical of California City for not seeing the patient on the timeline established by their own policies and procedures. He was referred for "urgent" referrals to a primacy care provider and to mental health. Those referrals did not happen in accordance with the standard of care or California City's own internal timelines. Dr. Tiona responds that those referrals were inappropriate and he really did not need to be seen urgently. She reclassifies the care retrospectively without the benefit of having actually seen the patient. She is essentially moving the goalposts, and her comments miss the point of my criticism. It really does not matter if the referrals were appropriate or not; what matters is that their nurses in real time activated their urgent referral system and it did not work as described in their policies and procedures.

With respect to the patient's mental health care, a nurse practitioner prescribed Haldol (a powerful antipsychotic) on 10/8/25, apparently after he reported auditory hallucinations. The medical record does not contain  a clinical note documenting the clinical justification for the initiation of this medication. Prescribing a powerful antipsychotic without a comprehensive note establishing a diagnosis and justifying this treatment plan is shocking. Moreover, the nurse practitioner prescribed it on an as-needed basis as determined by the patient. Dr. Tiona says this is routine care and there is "nothing unusual" about dosing Haldol this way. I strongly disagree. I have never seen Haldol given as-needed where the patient determines the necessity for this medication. The only time I have ever seen Haldol used as-needed is in an acute hospital or inpatient setting for acute and severe agitation, where the healthcare staff has a much closer observation on the patient than here.  Nothing about this medication initiation and prescription plan meets the standard of care.

The patient was seen again by the nurse practitioner on 10/29/2025 and his Haldol was increased to the maximum recommended dose of up to 15 mg per day (written again as-needed as

1

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF REPLY TO
MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

4042466

determined by the patient). The note justifying this massive increase in dosing is so sparse as to not meet any contemporary standard of mental health documentation. Haldol has serious and sometimes permanent side effects in high doses, and the records indicate no plan in place to monitor for those side effects.

In addition, the patient is on a maximum dose of Aripiprazole (30 mg per day), another potent antipsychotic medication. There is no justification in the medical record for why he needs this aggressive treatment. The nurse practitioner did not even assign him a diagnosis on either visit to justify these medications.

The only two mental health problems listed in his master problem list are depression and anxiety. There is no diagnosis in his master problem list that justifies the use of high dose Haldol. Aripiprazole is sometimes used for Major Depressive Disorder, but only as adjunct therapy to a primary antidepressant medication and not as monotherapy. The patient is not on an antidepressant. Dr. Tiona admitted in her note that his Sertraline expired and was mistakenly not continued. Despite that admission, as of the records produced on 1/6/2026, the patient has not had his Sertraline restarted.

Both of these medications can cause tardive dyskinesia or akathisia, which are very serious. Patients on these medications should be assessed on a regular basis for these symptoms. In fact, there is a prompt in CoreCivic's mental health note for that assessment, but the nurse practitioner did not perform the AIMS (the Abnormal Involuntary Movement Scale) assessment as directed. This is a deviation from the standard of care.

Review of the full set of medical records produced on 1/6/2025 indicates that the patient has never been seen again by mental health prescriber since his Haldol was increased on 10/29/25. He has been seen by a psychologist, but her notes do not address any medication-related issues or initiate any of the chronic care monitoring needed for patients on high-dose antipsychotics.

In summary, it is surprising that Dr. Tiona chose this patient to discuss and to suggest that his care was fine because analysis of his chart shows that the totality of his care is a complete mess that deviates from the standard of care in multiple ways. It also shows that their scheduling

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF REPLY TO
MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

4042466

and follow-up process is not working as Dr. Tiona described. At this point, my recommendations for this patient are for him to be seen by a psychiatrist and for him to be given a proper diagnosis after a thorough mental health workup. Once that is done, his medications should be adjusted to address his actual underlying mental health condition instead of tranquilizing him with maximum dose antipsychotics with no monitoring.

**Paragraphs 61-63 of Tiona Declaration**

In this case, I was critical of the lack of continuity of care for this patient's diabetes medication, Metformin. Dr. Tiona responded that the patient does not have a diagnosis of diabetes. She apparently did not review their own master problem list where "Diabetes" is the first diagnosis on the list. Dr. Tiona assigned him a diagnosis of pre-diabetes, but that is her own construct. It is unclear how she arrived at that idea because the diagnosis of pre-diabetes does not appear anywhere in his medical record. To the contrary, the diagnosis of diabetes appears in multiple places including, most importantly, the patient informing the staff that he was diagnosed with diabetes at his previous facility.

I do agree that his HgA1c lab on 10/10/2025 showed a borderline value of 5.8%. However, given that this lab is a 90-day look-back at glucose control and given that he had been on metformin at his previous facility, it is entirely possible that this almost normal value actually represents successful medication management of his diabetes. The only way to parse out the distinction between actual diabetes and pre-diabetes would be to repeat his HgA1c at least 90 days after stopping that medication. That lab has never been ordered and her diagnosis of pre-diabetes is unsupported by actual patient data.

It was critical that this patient did not receive his medication timely and that he did not get the blood pressure checks ordered by the provider. Dr. Tiona agrees with both of these statements but indicates that the delayed medication did not impact him and that staff has received training regarding following orders so that has been fixed. It is unclear how she can be certain as to both things. Timely receipt of medication and following PCP orders for blood pressure checks are very basic aspects of a functioning healthcare system, so needing to train staff on such an elementary level function is alarming.

3

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF REPLY TO
MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

4042466

I was also concerned about the inappropriate follow-up care this patient received after returning from the emergency room where he had a colonoscopy and EGD with biopsies completed. Dr. Tiona implicitly acknowledges that the aftercare the patient received after he returned from the emergency room was not handled well. She says that aftercare was discussed with providers to ensure that meds are ordered and that the patient has a follow-up procedure timely. However, Dr. Tiona is silent as to biopsy results and why those were not obtained. Obtaining and reviewing biopsy results are a critical part of a procedure in order to ensure that potential diagnoses are not missed.

**Paragraphs 64-67 of Tiona Declaration**

In this case, I was critical of California City's failure to follow their own policies and procedures in referral timelines. Dr. Tiona confirms those failures.

I was also critical of their failure to schedule outside specialty appointments for this patient that were already in process at his prior facility. Dr. Tiona confirms those delays and merely indicates that they are working on it.

As of the records produced on 1/5/2026, my criticisms remain. Dr. Tiona again suggests that a patient who is currently managed with metformin and has a borderline high HgA1c value of 5.8% is not diabetic. California City has not obtained sufficient data to make that statement, and it is entirely likely that the correct description of his status is that he is successfully managing his hyperglycemic state with metformin. Additional data would be necessary to determine his true status.

**Paragraphs 68-70 of Tiona Declaration**

In this case, I was critical of the obvious fact that the patient was not receiving his medications, as clearly shown on the Medication Administration Record. Dr. Tiona attempts to draw a distinction between whether a patient appears at the pill call window or whether a medication is out of stock. My criticism was of a medication administration system that resulted in the patient not getting his ordered medication. The reason is of administrative concern maybe, but the end result is the patient is not getting his medication.

Dr. Tiona does not address my concern that none of the patient's chronic conditions were

4

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF REPLY TO
MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

4042466

noted on his intake form.

Dr. Tiona is also silent on my main criticism of their failure to get him to his specialty consults with an ENT surgeon / oral surgeon to investigate whether he has head and neck cancer. As of the record production date of 1/5/2026, he still has not been seen by these specialists for an appropriate workup of a medically serious and potentially life-threatening problem.

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF REPLY TO
MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

4042466

1

**APPENDIX B**

2         ████████████ is the person described in this declaration as "Patient A."

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF DR. TODD RANDALL WILCOX, M.D., IN SUPPORT OF REPLY TO
MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:25-cv-09757-MMC

4042466