| | |
|---|---|
| KEKER, VAN NEST & PETERS LLP<br>STEVEN P. RAGLAND - # 221076<br>sragland@keker.com<br>CODY S. HARRIS - # 255302<br>charris@keker.com<br>CARLOS C. MARTINEZ - # 354616<br>cmartinez@keker.com<br>LISA C. LU - # 364259<br>llu@keker.com<br>633 Battery Street<br>San Francisco, CA 94111-1809<br>Telephone:  415 391 5400<br>Facsimile:  415 397 7188<br><br>CALIFORNIA COLLABORATIVE FOR IMMIGRANT JUSTICE<br>PRIYA ARVIND PATEL - # 295602<br>priya@ccijustice.org<br>MARIEL VILLARREAL - # 317048<br>mariel@ccijustice.org<br>1999 Harrison Street #1800<br>Oakland, California 94612<br>Tel: (650) 762-8990 | PRISON LAW OFFICE<br>MARGOT MENDELSON - # 268583<br>mmendelson@prisonlaw.com<br>TESS BORDEN - MJP # 805022, *pro hac vice*<br>tess@prisonlaw.com<br>PATRICK BOOTH - # 328783<br>patrick@prisonlaw.com<br>ALISON HARDY - # 135966<br>ahardy@prisonlaw.com<br>RANA ANABTAWI - # 267073<br>rana@prisonlaw.com<br>1917 Fifth Street<br>Berkeley, California 94710-1916<br>Tel.: (510) 280-2621<br><br>AMERICAN CIVIL LIBERTIES UNION FOUNDATION<br>KYLE VIRGIEN - # 278747<br>kvirgien@aclu.org<br>FELIPE HERNANDEZ - # 338468<br>npp_fhernandez@aclu.org<br>MARISOL DOMINGUEZ-RUIZ - # 345416<br>mdominguez-ruiz@aclu.org<br>425 California Street, 7th Floor<br>San Francisco, CA 94104<br>Tel.: (415) 343-0770<br><br>CARMEN IGUINA GONZALEZ - # 277369<br>ciguinagonzalez@aclu.org<br>915 15th Street, NW, 7th Floor<br>Washington, DC 20005<br>Tel.: (202) 393-4930 |

*Attorneys for Plaintiffs Fernando Gomez Ruiz, Fernando Viera Reyes, Jose Ruiz Canizales, Yuri Alexander Roque Campos, Sokhean Keo, Gustavo Guevara Alarcon, Alejandro Mendiola Escutia and all others similarly situated*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FERNANDO GOMEZ RUIZ; FERNANDO VIERA REYES; JOSE RUIZ CANIZALES; YURI ALEXANDER ROQUE CAMPOS; SOKHEAN KEO; GUSTAVO GUEVARA ALARCON; and ALEJANDRO MENDIOLA ESCUTIA, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. IMMIGRATION AND CUSTOMS | Case No. 3:25-cv-09757-MMC<br><br>**DECLARATION OF ANBHAV MANN IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date Filed:   November 13, 2025<br><br>Trial Date:  Not Set |

ENFORCEMENT; TODD M. LYONS, Acting Director, U.S. Immigration and Customs Enforcement; SERGIO ALBARRAN, Acting Director of San Francisco Field Office, Enforcement and Removal Operations, U.S. Immigration and Customs Enforcement; U.S. DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, Secretary, U.S. Department of Homeland Security,

        Defendants.

**Declaration of Anbhav Mann, 214987590**

1. I, Anbhav Mann, am currently detained at the California City Detention Facility.

2. I have been detained at California City since October 7, 2025. I am 30 years old. I am currently housed in F-300, where I share a cell with another person.

3. I was detained by ICE on October 6, 2025, during my family immigration interview for my I-130 petition. That day, I went to the U.S. Citizenship and Immigration Services offices in Fresno with my husband, who is a U.S. citizen, and with my attorney. The officers separated me from my husband, and called him in for an interview first. Then they called me in for my interview and made my husband leave. I went in to my interview with my attorney, without my husband. During the interview, two officers entered the office and said that they had a warrant for my arrest. With a warrant for arrest, you would have thought I had done something wrong. But I have no criminal history so this was just because of my immigration status. I was in a state of shock. They put me in handcuffs and walked me out of the USCIS office through the back door, and put me in a vehicle. They did not allow me to see my husband or say goodbye to him. My attorney had to tell my husband that I was taken away.

4. The officers took me to the ICE holding facility in Fresno. At the holding facility, the officers patted me down, took my jewelry, and put waist chains and leg irons on me. They took the heels that I had been wearing, and gave me sneakers but no socks. The leg irons were on my bare ankles, and the metal rubbing on my ankles caused bruising and bleeding, and was painful. I had to wait at the ICE holding facility in Fresno for about four hours. I was placed in a small cell with another woman, which had two cement benches, and an open toilet, but no toilet paper or soap. The room was very cold. Eventually, an officer brought us an aluminum foil blanket. The only food that the officers provided had meat. I practice the Sikh faith and am therefore vegetarian, so there was nothing for me to eat. Later that evening, I was put in another vehicle, in waist and ankle chains again, and was driven to Bakersfield, and then to the California City Detention Facility. I arrived to California City very late at night, sometime around midnight. There were officers in black clothes standing on each side of the hallway staring at us blankly as we walked by. I had a whirlwind of emotions going on. I had never been to a jail or prison and

felt scared and overwhelmed.

5. I have lived in the United States for over 10 years. In addition to my U.S. citizen husband, I also have a cousin who is a U.S. citizen. I studied nursing and graduated from my program in 2025. I had been studying for the nursing licensing exam before I was detained, and had been looking forward to working as a nurse in my community.

6. I am in the low security unit at California City. Although I have no criminal history, no disciplinary infractions, and am housed in the low security women's unit, I am not able to have contact visits with family, friends, or attorneys. I am not aware of anyone who has ever had a contact visit at California City. All of my visitors have been on the other side of a large pane of plexiglass. My family has to drive three hours to get to California City to visit me, but when they get here, we are not allowed to hold hands or hug each other. We have to speak to each other using telephones, and there are often crackling sounds on the line that make it hard to hear each other. We do not get to have any more contact than we would in a video visit. My last visit with my loved ones was on Sunday, January 4, 2026, and that visit was behind glass.

7. I have also had two legal visits with my attorney since I got to California City. For these visits, I am in a small room with a large pane of plexiglass separating me from my attorney, who is in a small room on the other side of the plexiglass. It is very hard for me to hear my attorney in these rooms. Outside of the room where I meet with my attorney, there is a hallway where there is a lot of loud noise, and staff and detained people are constantly walking by. There is a small gap at the bottom of the plexiglass pane between me and my attorney. I usually have to get up and lean my head towards this gap in order to be able to hear what my attorney is saying, which is uncomfortable. Being separated from my attorney also makes it difficult for us to review documents relevant to my case. My attorney visited me on Friday January 9, 2026. He told me that he had asked the staff if we could have a contact visit, so that we could review documents that he had brought. He had brought many pages of documents for us to review, and they did not all fit through the small gap in the plexiglass. The staff did not allow us to have a contact visit. It was difficult for us to review these documents together during the legal visit because we could not easily look at the documents together or hear each other well.

8. Even though I am in the low security unit at California City, I am also subjected to clothed body searches every time I leave the housing unit, including when I go to or come back from outdoor recreation. Some officers even ask us to take our socks off during the searches too, in addition to being patted down. It is very uncomfortable to have to be searched so often. It also can take a very long time. When we come back from yard, we have to wait in a long line while staff complete the searches of every person who went out to the yard.

9. We spend the vast majority of our time inside the housing unit. When we are allowed outside, the amount is inconsistent and unpredictable, and on some days, staff do not offer any outdoor recreation time at all. The outdoor recreation yard is in bad shape. There are a lot of weeds with thorns on the outdoor yard, in the path of travel, and all over the outdoor space. The weeds make the path of travel more difficult to navigate. The thorns get stuck in the plastic sandals that we were issued to use as shoes. When we come back from the yard, we have to manually pull the thorns out of the sandals. There are still some thorns stuck in my sandals that I have not been able to pull out. We are not allowed to bring water out to yard, and unless staff bring a cooler with drinking water out to the yard, which they do not always do, there is no drinking water available while we are on the yard. The outdoor recreation yard does not have very much exercise equipment. There is a volleyball net, but the balls that are provided are usually deflated, or deflate very quickly, so they are very difficult to use in a game. I have noticed that many women do not go out to yard because there is nowhere for people to sit down on the yard, so they have to stay standing for an hour if they want to go outside. Some people sit down on the ground, but some officers do not allow people to sit down on the ground on the yard.

10. There is also an indoor basketball court, with six or seven rowing machines, where we can sometimes go, that staff refer to as a "gym." We have never been offered both outdoor recreation and time in the indoor basketball court on the same day.

11. We have very little to do in our housing unit. We have no groups or classes. In my housing unit, we have one PlayStation console, which only has games about basketball, one set of UNO cards, one set of playing cards, and three or four jigsaw puzzles, which were all provided by California City. We have to share all of these games with over 80 people in the unit. There are

also four televisions in the housing unit. Staff are responsible for controlling the channels and the volume. A librarian comes to the unit once every two to three weeks, so that we can check out library books. We can only check out one book at a time from the librarian, and then we have to wait weeks to exchange that book. The librarian has also brought our unit printed sheets with coloring pages and with games, like word searches, crosswords, and sudoku. She brought these materials to us around Halloween and again around Christmas. However, staff have not provided us any colored pencils or markers to use for the coloring pages. I am not aware of any way that I can order books, magazines or newspapers for myself. There are only 22 tablets in my unit, or one for every four people. Sometimes I have a hard time getting a tablet, which makes it hard to check messages and communicate with my loved ones and attorney. In order to have video calls with our loved ones, we have to put the tablet on a station in the dayroom. There are only two stations in our dayroom, for over 80 people, so it is not usually available because many people need to use it. The stations are in the center of the dayroom, and staff and detained people are walking by, so there is no privacy during video calls with our families.

12. We are locked in our cells multiple times throughout the day while staff complete four daily counts, which typically occur around 7 AM, 11 AM, 3 PM, and 7 PM. Each of those counts usually takes around 60 minutes, during which time we are locked in our cells with nothing to do. Sometimes, the counts can take as long as two hours to clear, and there have even been times where the count has taken three hours to clear. On January 12, 2026, the 3 PM count did not clear until almost 5 PM. We are not allowed to go to medical appointments, attorney visits, or social visits during count. We are not allowed to use phones or tablets during count.

13. The temperature is very cold in the building. Sometime around November, staff gave us windbreaker jackets. The jackets are very thin and unlined, have no hood, and do not keep me warm. Cold air blows out of the vents in our cells even in the winter. We have not been issued warm clothes, such as a sweatshirt, sweatpants, or beanie, by the facility. I purchased a sweatshirt, sweatpants, a thermal shirt and leggings, and a beanie from commissary at California City. Even with the clothing that I purchased, I am cold all the time. Sometimes I wear socks on my arms to try to stay warm, or wear my socks as a scarf around my neck, but staff told me that it

is against the rules to wear the socks in this way or to alter them. Some people also try to turn the socks into hats. Sometime around October 2025, officers told me and a group of women that if we didn't stop using our socks like this, they would give us disciplinary write-ups.

14. I have filed somewhere around 10 grievances at California City. I believe that I have only received one grievance response. When I first got to California City in October 2025, I filed grievances and I still have not received any response to them. I wrote one grievance about a response to a medical emergency in my housing unit that really worried me. A woman in my housing unit who had a history of cardiac arrest was having chest pain, and asking for medical care, but the staff did not want to call a code to provide an emergency medical response. I was concerned that staff did not appear to be taking her medical issues seriously. I have also filed around three or four sick call requests since I got to California City. One of the requests that I filed was for medical care for a stye in my eye. I think that it took staff about seven to 10 days to call me in to the medical clinic after I submitted that request. I have not received responses to the other sick call requests that I have filed. I have been discouraged by the lack of response to my sick call requests and have stopped using the sick call request system.

15. I have experienced weeks-long delays in receiving legal mail. I understand that the Prison Law Office mailed a letter to me on or around December 24, 2025, which I still have not received as of January 14, 2026. My attorney has also sent me legal mail that I still have not received. I understand that my attorney sent me a letter in mid-November 2025 and another letter in late December 2025, but I still have not received either of these letters. Around January 6, 2026, I asked a counselor if there was any legal mail for me, because I was expecting a letter from an attorney. The counselor told me that she did not receive any legal mail for me. She also told me that the staff member who is in charge of processing the mail still has a lot of mail to go through after the holidays.

16. Sometime at the end of November or beginning of December 2025, while I was sitting in the common area in my housing unit, next to the showers, I saw a woman in my unit fall in the shower. This woman uses a wheelchair and a walker. The showers in my unit do not have any grab bars or railings to hold on to. People always have to stand up while they are showering

1  because there is no shower bench or shower chair available. This woman had finished her shower
2  and was trying to put her clothes on, while standing in the shower area. She stumbled and fell to
3  the ground. I helped her get up after she fell, and helped her into her wheelchair. I asked the
4  officer in the housing unit to call medical staff for her.
5      I, Anbhav Mann, declare under penalty of perjury under the laws of the United States of
6  America that the foregoing is true and correct, and that this declaration is executed at California
7  City, California this 14 day of January 2026.

            /s/ Anbhav Mann
            Anbhav Mann