# EXHIBIT 1

**From:** Iyengar, Savith (USACAN) <Savith.Iyengar@usdoj.gov>
**Sent:** Monday, January 5, 2026 3:51 PM
**To:** Tess Borden <tess@prisonlaw.com>
**Cc:** Cody S. Harris <CHarris@keker.com>
**Subject:** RE: [EXTERNAL] California City legal visits week of 1/5/26

Hi Tess,

The facility has confirmed that it can accommodate your request for "timely access to detained people, without long delays before or between legal visits." They've also noted that if you could please submit a list for staging, it would help with delays before or between legal visits.

The facility has also confirmed that it can accommodate your request to "conduct legal visits between the hours of 8am and 8pm, including weekends, as advertised on the facility webpage."

As for your third request, the facility has confirmed that it can accommodate confidential, non-contact legal visits in private areas with a glass partition.

For your fourth request, to "speak with a detained person for more than 60 minutes as needed, uninterrupted by count times," the facility has confirmed that it will make a good faith effort to accommodate, but notes that counsel may need to wait a little longer during count times if staff need to go get a detainee and the detainee is not already staged for the visit. As noted above, submitting a list for staging in advance would help with wait times.

Finally, I'm working on confirming the status of the electronic device requests and expect to have a response in advance of counsel's visits on Wednesday.

Thanks,
Savith

Savith Iyengar | Assistant U.S. Attorney
450 Golden Gate Avenue, Ninth Floor
San Francisco, CA 94102
savith.iyengar@usdoj.gov
(415) 436-7018 (office)

(415) 912-6455 (cell)

---

**From:** Tess Borden <tess@prisonlaw.com>
**Sent:** Monday, January 5, 2026 2:29 PM
**To:** Iyengar, Savith (USACAN) <Savith.Iyengar@usdoj.gov>
**Cc:** Cody S. Harris <CHarris@keker.com>
**Subject:** RE: [EXTERNAL] California City legal visits week of 1/5/26

Hi Savith,

Are you able to help us obtain a response about our electronic devices and confirmation that we'll be able to conduct legal visits on Wednesday? Some of our staff plan to drive to the facility beginning tomorrow morning and we need to prepare accordingly.

Tess

**From:** Tess Borden <tess@prisonlaw.com>
**Sent:** Monday, January 5, 2026 8:12 AM
**To:** Iyengar, Savith (USACAN) <Savith.Iyengar@usdoj.gov>
**Cc:** Cody S. Harris <CHarris@keker.com>
**Subject:** Re: [EXTERNAL] California City legal visits week of 1/5/26

Hi Savith,

I'm following up on the below. Are you able to provide us an update? As you'll see, I just wrote to the facility about our electronic device requests, which are still pending. We will be traveling to California City tomorrow and need to know today what arrangements we can expect.

Thanks,
Tess

On Wed, Dec 31, 2025 at 11:04 AM Tess Borden <tess@prisonlaw.com> wrote:

Hi Savith,

Thank you for the email yesterday evening. I'm writing just about our upcoming legal visits next week, because I know there are a number of email threads.

To clarify, the electronics issue for next week has not yet been resolved. On 12/23, the facility let me know that the request had been forwarded to the warden for approval or denial. I copied you on my reply that day and have not yet heard back.

I understand you're still working on requests 3 and 4 and appreciate that. Please do let us know as soon as you have more information. We'd also appreciate your communicating with your client to ensure requests 1 and 2 can be provided when we are on site, as delays, including but not limited to count time delays, continue to impact our legal visits.

For yours and the facility's planning purposes, I wanted to let you know that, as of right now, we plan to have our first day on site next week be Wednesday, January 7. I hope that will give you a little more time to handle these logistics. We'd appreciate an update by this Friday so we can make decisions about next steps.

Finally, I have not had additional communication with the facility about next week's visits. I will keep you cc'd on any such emails.

Wishing you a happy new year,
Tess

On Tue, Dec 30, 2025 at 7:08 PM Iyengar, Savith (USACAN) <Savith.Iyengar@usdoj.gov> wrote:

Hi Tess,


I was glad to see that the electronics issue was resolved; please let me know if there are any issues on that front.  With respect to providing access, I can confirm that – as we've been doing successfully so far – you can continue to copy me on messages to the facility as issues arise and I'll make sure to promptly convey them to the agency.  I think that addresses your first two items (obtaining timely access during advertised hours).  The third and fourth requests (visits without a glass partition and exceeding 60 minutes, uninterrupted by count times) are a little more complicated, since they appear to seek changes to existing regulations at the facility.  As a result, I'll need more time to see if/how the agency can accommodate those requests.  If you have any more information since your email (e.g., any discussions with the facility directly about allowing those changes), please let me know.  Otherwise, I'll be in touch as soon as I have more information.



Thanks,

Savith


Savith Iyengar | Assistant U.S. Attorney

450 Golden Gate Avenue, Ninth Floor

San Francisco, CA 94102

savith.iyengar@usdoj.gov

(415) 436-7018 (office)

(415) 912-6455 (cell)

---

**From:** Tess Borden <tess@prisonlaw.com>
**Sent:** Friday, December 19, 2025 7:06 PM
**To:** Iyengar, Savith (USACAN) <Savith.Iyengar@usdoj.gov>

**Cc:** Cody S. Harris <CHarris@keker.com>
**Subject:** RE: [EXTERNAL] California City legal visits week of 1/5/26

Hi Savith,

Thanks for your quick response and for reiterating that defendants are not trying to specifically limit our access. My concern is that the standard restrictions on attorney access at California City will prevent Plaintiffs from gathering evidence to prepare our reply briefing. This is because we and other attorneys: (1) routinely experience prolonged delays while waiting to see clients at the facility, (2) are routinely informed that we cannot conduct legal visits during requested hours, even when those hours fall within official visiting hours, (3) have difficulty hearing our clients because of the heavy glass in the visitation booths, and (4) are frequently informed that we must cut visits short because of count practices or time limits. These restrictions unduly limit our ability to present our case to the court on reply. For that reason, we are seeking your assistance addressing these restrictions. Does this answer your question?

We'd ask that you let us know by 12/30 whether you can provide the requested access protections and confirm, if the facility hasn't already, that our electronics will be approved.

I will send the authorization forms to the facility and forward to you for your records. Thanks for that instruction.

Best,

Tess

**From:** Iyengar, Savith (USACAN) <Savith.Iyengar@usdoj.gov>
**Sent:** Friday, December 19, 2025 5:20 PM
**To:** Tess Borden <tess@prisonlaw.com>
**Cc:** Cody S. Harris <CHarris@keker.com>
**Subject:** RE: [EXTERNAL] California City legal visits week of 1/5/26

Hi Tess,

Please send the forms directly to the facility.  I'll follow up with the agency as well, but please always reach out to the facility in the first instance regarding access.

With respect to ensuring access, as you know, we previously established the schedule for briefing based on the agency confirming that it was not trying to limit access to counsel for any persons detained at California City and was not seeking to impose a new condition with regard to access to counsel.  I can reiterate that again here.

Does your current request to seek to expand the scope of this understanding?  It would be helpful to know exactly what additional conditions plaintiffs are asking that ICE agree to in order to avoid Court intervention (i.e., what plaintiffs would be asking the Court to order).

I'll note that given the weekend, the Monday at 4p deadline, and the fact that 12/24, 12/25, and 12/26 are federal holidays, it will be very difficult to respond by 12/24.

Please let me know if this deadline is flexible given these facts, and since our opposition is not due until 1/2 (and plaintiffs will have between 1/2 and 1/16 for their reply).

Thanks,

Savith

---

**From:** Tess Borden <tess@prisonlaw.com>
**Sent:** Friday, December 19, 2025 5:07 PM
**To:** Iyengar, Savith (USACAN) <Savith.Iyengar@usdoj.gov>
**Cc:** Cody S. Harris <CHarris@keker.com>
**Subject:** [EXTERNAL] California City legal visits week of 1/5/26

Hi Savith,

I'm writing to ask your assistance ensuring that our team has access to detained people for legal visits the week of January 5 and that we are able to bring electronics into the facility with us.

I am attaching signed authorization forms for three of our staff who plan to be on site that week. We understand the facility now prohibits attorneys or legal assistants from bringing in electronic devices without this form, but has

generally been denying devices even when this form is signed on site. We are therefore sending it to you in advance and ask that you ensure the devices are approved, as required, by the warden. Please let us know if you would like us to email the forms directly to him and the facility's attorney-scheduling address, copying you.

Would you please ensure that we are able to: (1) obtain timely access to detained people, without long delays before or between legal visits, (2) conduct legal visits between the hours of 8am and 8pm, including weekends, as advertised on the facility webpage here, (3) conduct confidential, sound-private contact legal visits, without a glass partition, and (4) speak with a detained person for more than 60 minutes as needed, uninterrupted by count times? For example, if a detained person is brought to us at 9:45am, we ask that our visit not be cut short for the 11am count if we need more than the hour to meet.

**We hope to avoid the need for court intervention to ensure our access to our clients to support our reply briefing. To that end, please confirm by December 24 that you can ensure this access.** Please let me know if you have any questions about this request and if you would like us to send these forms directly to the facility.

Best,

Tess

**Tess Borden**

Supervising Staff Attorney*
Prison Law Office

1917 Fifth Street
Berkeley, CA 94710

(510) 280-2623
tess@prisonlaw.com

*Pronouns: she/her*

*Registered Legal Aid Attorney; MJP No. 805022

# EXHIBIT 2

| | |
|---|---|
| **From:** | Iyengar, Savith (USACAN) <Savith.Iyengar@usdoj.gov> |
| **Sent:** | Monday, December 22, 2025 2:09 PM |
| **To:** | Cody S. Harris; Steven Ragland |
| **Cc:** | Carlos C. Martinez; Margot Mendelson; Tess Borden; Kyle Virgien; Laura Lind; Lisa C. Lu |
| **Subject:** | RE: Ruiz, et al. v. ICE, et al., No. 25-cv-9757-MMC |

**[EXTERNAL]**

Cody, thank you, received and I've been following up.  I'll be in touch as soon as possible.  And thank you for the additional, important note.

Savith

**From:** Cody S. Harris <CHarris@keker.com>
**Sent:** Monday, December 22, 2025 1:50 PM
**To:** Iyengar, Savith (USACAN) <Savith.Iyengar@usdoj.gov>; Steven Ragland <SRagland@keker.com>
**Cc:** Carlos C. Martinez <CMartinez@keker.com>; Margot Mendelson <mmendelson@prisonlaw.com>; Tess Borden <tess@prisonlaw.com>; Kyle Virgien <kvirgien@aclu.org>; Laura Lind <LLind@keker.com>; Lisa C. Lu <LLu@keker.com>
**Subject:** [EXTERNAL] RE: Ruiz, et al. v. ICE, et al., No. 25-cv-9757-MMC

Savith,

Please see attached for the revised stipulation, which accepts your edits and makes a few more (changes in redline). Please let us know if you are in agreement, or if we should get on a phone call to discuss outstanding issues.

Please note one other thing: with respect to Mr. Viera Reyes, we have learned that to have this prostate biopsy, the patient must be on antibiotics for a week beforehand. Mr. Viera Reyes already has an order for a biopsy. The medical staff at California City should know this, but in case they don't, it is critical that he start a course of antibiotics promptly, so that he can have the biopsy performed on the date of his assessment. If he doesn't, the urologist may send him back with a prescription and a need to schedule another appointment for the biopsy. We believe this runaround has already happened once to Mr. Viera Reyes.  If it happens again, it could push his treatment out still further, while his likely cancer metastasizes. We would appreciate your attention to this matter as your client prepares for the visit to the specialist.

Thanks,
Cody

**Cody S. Harris**
Keker, Van Nest & Peters LLP
633 Battery Street
San Francisco, CA 94111-1809

# EXHIBIT 3

| From: | Iyengar, Savith (USACAN) <Savith.Iyengar@usdoj.gov> |
|---|---|
| Sent: | Friday, January 2, 2026 10:38 PM |
| To: | Cody S. Harris |
| Cc: | Margot Mendelson; Steven Ragland; Patrick Booth; Kyle Virgien; Carlos C. Martinez; Lisa C. Lu; Laura Lind; Tess Borden |
| Subject: | RE: Non-Compliance with Court Order re: Fernando Viera Reyes |

[EXTERNAL]

 **This message needs your attention**
• Some Recipients have never replied to this person.

Report this Email or Mark as Safe          Powered by Mimecast

Hi Cody,

Mr. Viera Reyes's biopsy has been confirmed for the morning of January 7, 2026.  Please note that the specific date is for **attorneys' eyes only**, and cannot be shared with Mr. Viera Reyes.  Also, please note that the government does not agree that it was or is in violation of a court order.

Thanks,
Savith

Savith Iyengar | Assistant U.S. Attorney
450 Golden Gate Avenue, Ninth Floor
San Francisco, CA 94102
savith.iyengar@usdoj.gov
(415) 436-7018 (office)
(415) 912-6455 (cell)

---

**From:** Iyengar, Savith (USACAN)
**Sent:** Wednesday, December 31, 2025 1:35 PM
**To:** Cody S. Harris <CHarris@keker.com>
**Cc:** Margot Mendelson <mmendelson@prisonlaw.com>; Steven Ragland <SRagland@keker.com>; Patrick Booth <patrick@prisonlaw.com>; Kyle Virgien <kvirgien@aclu.org>; Carlos C. Martinez <CMartinez@keker.com>; Lisa C. Lu <LLu@keker.com>; Laura Lind <LLind@keker.com>; Tess Borden <tess@prisonlaw.com>
**Subject:** RE: Non-Compliance with Court Order re: Fernando Viera Reyes

Cody, received and I followed up immediately.  I'll keep you and your team updated as I have additional information.

Thanks,
Savith

**From:** Cody S. Harris <CHarris@keker.com>
**Sent:** Wednesday, December 31, 2025 1:17 PM
**To:** Iyengar, Savith (USACAN) <Savith.Iyengar@usdoj.gov>
**Cc:** Margot Mendelson <mmendelson@prisonlaw.com>; Steven Ragland <SRagland@keker.com>; Patrick Booth <patrick@prisonlaw.com>; Kyle Virgien <kvirgien@aclu.org>; Carlos C. Martinez <CMartinez@keker.com>; Lisa C. Lu <LLu@keker.com>; Laura Lind <LLind@keker.com>; Tess Borden <tess@prisonlaw.com>
**Subject:** [EXTERNAL] Non-Compliance with Court Order re: Fernando Viera Reyes

Savith,

We write to follow up on the court-ordered medical treatment for Fernando Viera Reyes. We understand that he saw a urologist yesterday – the same urologist who he had seen previously. We also understand that the urologist was furious that the biopsy hadn't occurred yet, and to our great frustration, the biopsy did not happen at yesterday's appointment. As we told you on December 22, Mr. Viera Reyes needed to be on certain antibiotics before the biopsy to avoid unnecessary delay:

> Please note one other thing: with respect to Mr. Viera Reyes, we have learned that to have this prostate biopsy, the patient must be on antibiotics for a week beforehand. Mr. Viera Reyes already has an order for a biopsy. The medical staff at California City should know this, but in case they don't, it is critical that he start a course of antibiotics promptly, so that he can have the biopsy performed on the date of his assessment. If he doesn't, the urologist may send him back with a prescription and a need to schedule another appointment for the biopsy. We believe this runaround has already happened once to Mr. Viera Reyes.  If it happens again, it could push his treatment out still further, while his likely cancer metastasizes. We would appreciate your attention to this matter as your client prepares for the visit to the specialist.

Email from Harris to Iyengar, Dec. 22, 2025, 1:50 PM.

What we warned about is exactly what came to pass. I understand that the provider told Mr. Viera Reyes that he must be on antibiotics before the procedure. Mr. Viera Reyes had not been placed on the appropriate medication, and he was again sent back to the facility without a biopsy being performed. This is now the second time that Mr. Viera Reyes has been seen by a urologist after an urgent referral for a biopsy was ordered in March 2025, and that biopsy has yet to happen.  We have learned that, according to his medical records, Kern Medical Center set a date for a follow-up urology appointment for February 2, 2026. It is not even clear that ICE will honor that date, which is too far away in any event.

This is unacceptable and a violation of the Court order to which you and your clients stipulated. That order stated that "Defendants will ensure that Fernando Viera Reyes receives a comprehensive assessment by a urologist ***on the agreed-upon date . . . in order for the urologist to perform a biopsy***, if the urologist determines it to be necessary, and to develop a comprehensive treatment plan." ECF 36 at 2 (emphasis added). We told you exactly what needed to happen in order for Mr. Viera Reyes to get the biopsy he's needed for months. It now seems that Defendants will force Mr. Viera Reyes to wait another month, at a minimum, to have the biopsy, let alone begin a treatment plan.

Defendants must treat this issue with the urgency it demands, and the biopsy must happen as soon as possible. February 2 is too late. Please let us know by January 2 that the date for Mr. Viera Reyes's biopsy has been advanced to no later than January 7, 2026, and what that date is. If Defendants must send Mr. Viera Reyes to a different provider or have him admitted to a hospital to have the biopsy performed, so be

it.

If we do not receive a satisfactory response by January 2, we will raise this issue with the Court.

Regards,

Cody

---

**Cody S. Harris**
Keker, Van Nest & Peters LLP
633 Battery Street
San Francisco, CA 94111-1809
415 676 2294 direct | 415 391 5400 main
charris@keker.com | vcard | keker.com

# EXHIBIT 4

| | |
|---|---|
| **From:** | Iyengar, Savith (USACAN) <Savith.Iyengar@usdoj.gov> |
| **Sent:** | Tuesday, January 13, 2026 10:16 AM |
| **To:** | Tess Borden |
| **Cc:** | Cody S. Harris; Steven Ragland; Carlos C. Martinez; Lisa C. Lu; Carmen Iguina Gonzalez; Kyle Virgien; Marisol Dominguez-Ruiz; Felipe Hernandez; Margot Mendelson; Patrick Booth |
| **Subject:** | RE: [EXTERNAL] Error in warden declaration |

[EXTERNAL]

 **This message needs your attention**
- Some Recipients have never replied to this person.

Report this Email or Mark as Safe          Powered by Mimecast

Thanks Tess; I've followed up and will keep you updated.

Savith

**From:** Tess Borden <tess@prisonlaw.com>
**Sent:** Monday, January 12, 2026 6:07 PM
**To:** Iyengar, Savith (USACAN) <Savith.Iyengar@usdoj.gov>
**Cc:** Cody S. Harris <CHarris@keker.com>; Steven Ragland <SRagland@keker.com>; Carlos C. Martinez <CMartinez@keker.com>; Lisa C. Lu <LLu@keker.com>; Carmen Iguina Gonzalez <CIguinaGonzalez@aclu.org>; Kyle Virgien <kvirgien@aclu.org>; Marisol Dominguez-Ruiz <mdominguez-ruiz@aclu.org>; Felipe Hernandez <NPP_FHernandez@aclu.org>; Margot Mendelson <mmendelson@prisonlaw.com>; Patrick Booth <patrick@prisonlaw.com>
**Subject:** RE: [EXTERNAL] Error in warden declaration

Hi Savith,

Since you're still following up with your client about the errors in the warden's declaration, I wanted to bring a few more to your attention. We asked that your client double-check the other numbers listed in paragraphs 197 through 199. So far, we have identified the following additional errors in those paragraphs:

**Paragraph 197:**
Paragraph 197 reads in full: "For example, paralegal Genesis Fabian of the Asian Law Caucus submitted a Declaration alleging that he works with a single detainee at Cal City; his colleague, attorney Lee Ann Felder-Heim, submitted a Declaration alleging that she has two clients at Cal City. During the above time period, Mr. Fabian and Ms. Felder-Heim sent 74 emails to calcityattorneyschedule@corecivic.com."

Lee Ann Felder-Heim and Genesis Fabian reviewed their email logs and collectively sent 22 emails to calcityattorneyschedule@corecivic.com between August 27, 2025 and December 10, 2025. Of those emails, multiple were follow-up emails after they had not received a response and at least one was just an email that said "Thank you."

**Paragraph 198:**

Paragraph 198 reads in full: "Attorney Hannah Kazim alleges in her Declaration that she represents one client at Cal City, while her colleague, attorney Kyle Hudson, alleges that he represents three detainees. Ms. Kazim, Mr. Hudson, and their organization, Immigrant Legal Defense, sent 122 emails to calcityattorneyschedule@corecivic.com during the relevant time."

Hannah Kazim is employed by the Immigrant Defenders Law Center, not by Immigrant Legal Defense. She has reviewed her email logs and sent a total of 11 emails to calcityattorneyschedule@corecivic.com between August 27, 2025 and December 10, 2025. 9 of those emails related to scheduling a confidential legal call with her client across 3 separate email threads.

In addition, we assume that this paragraph refers to attorney Hudson Kyle, who provided a declaration in this case. In the interest of clarity for the Court, please correct his name or confirm whether this refers to a different attorney named Kyle Hudson.

Thank you,
Tess

---

**From:** Iyengar, Savith (USACAN) <Savith.Iyengar@usdoj.gov>
**Sent:** Monday, January 12, 2026 4:42 PM
**To:** Tess Borden <tess@prisonlaw.com>
**Cc:** Cody S. Harris <CHarris@keker.com>; Steven Ragland <SRagland@keker.com>; Carlos C. Martinez <CMartinez@keker.com>; Lisa C. Lu <LLu@keker.com>; Carmen Iguina Gonzalez <CIguinaGonzalez@aclu.org>; Kyle Virgien <kvirgien@aclu.org>; Marisol Dominguez-Ruiz <mdominguez-ruiz@aclu.org>; Felipe Hernandez <NPP_FHernandez@aclu.org>; Margot Mendelson <mmendelson@prisonlaw.com>; Patrick Booth <patrick@prisonlaw.com>
**Subject:** RE: [EXTERNAL] Error in warden declaration

Hi Tess,

Not yet, but I've been following up and will let you know as soon as I have more information.

Thanks,
Savith

---

**From:** Tess Borden <tess@prisonlaw.com>
**Sent:** Monday, January 12, 2026 2:56 PM
**To:** Iyengar, Savith (USACAN) <Savith.Iyengar@usdoj.gov>
**Cc:** Cody S. Harris <CHarris@keker.com>; Steven Ragland <SRagland@keker.com>; Carlos C. Martinez <CMartinez@keker.com>; Lisa C. Lu <LLu@keker.com>; Carmen Iguina Gonzalez <CIguinaGonzalez@aclu.org>; Kyle Virgien <kvirgien@aclu.org>; Marisol Dominguez-Ruiz <mdominguez-ruiz@aclu.org>; Felipe Hernandez <NPP_FHernandez@aclu.org>; Margot Mendelson <mmendelson@prisonlaw.com>; Patrick Booth <patrick@prisonlaw.com>
**Subject:** RE: [EXTERNAL] Error in warden declaration

Hi Savith,

Are you able to provide us an update on the corrections to the warden's declaration?

Tess

**From:** Iyengar, Savith (USACAN) <Savith.Iyengar@usdoj.gov>
**Sent:** Thursday, January 8, 2026 4:17 PM
**To:** Tess Borden <tess@prisonlaw.com>
**Cc:** Cody S. Harris <CHarris@keker.com>; Steven Ragland <SRagland@keker.com>; Carlos C. Martinez <CMartinez@keker.com>; Lisa C. Lu <LLu@keker.com>; Carmen Iguina Gonzalez <CIguinaGonzalez@aclu.org>; Kyle Virgien <kvirgien@aclu.org>; Marisol Dominguez-Ruiz <mdominguez-ruiz@aclu.org>; Felipe Hernandez <NPP_FHernandez@aclu.org>; Margot Mendelson <mmendelson@prisonlaw.com>; Patrick Booth <patrick@prisonlaw.com>
**Subject:** RE: [EXTERNAL] Error in warden declaration

Hi Tess,

Received and I will follow up.

Thanks,
Savith

Savith Iyengar | Assistant U.S. Attorney
450 Golden Gate Avenue, Ninth Floor
San Francisco, CA 94102
savith.iyengar@usdoj.gov
(415) 436-7018 (office)
(415) 912-6455 (cell)

---

**From:** Tess Borden <tess@prisonlaw.com>
**Sent:** Thursday, January 8, 2026 4:12 PM
**To:** Iyengar, Savith (USACAN) <Savith.Iyengar@usdoj.gov>
**Cc:** Cody S. Harris <CHarris@keker.com>; Steven Ragland <SRagland@keker.com>; Carlos C. Martinez <CMartinez@keker.com>; Lisa C. Lu <LLu@keker.com>; Carmen Iguina Gonzalez <CIguinaGonzalez@aclu.org>; Kyle Virgien <kvirgien@aclu.org>; Marisol Dominguez-Ruiz <mdominguez-ruiz@aclu.org>; Felipe Hernandez <NPP_FHernandez@aclu.org>; Margot Mendelson <mmendelson@prisonlaw.com>; Patrick Booth <patrick@prisonlaw.com>
**Subject:** [EXTERNAL] Error in warden declaration

Savith,

We're writing to request a correction to paragraphs 195 and 200 of Warden Chestnut's declaration, signed on December 30, 2025 (ECF No. 38-1).

Paragraph 200 reads in full: "In addition to the attorney Declarants, counsel for Plaintiffs in this matter sent a substantial volume of requests for legal calls and visits. For example, the Prison Law Office sent 221 emails to calcityattorneyschedule@corecivic.com." It is unclear what time period this paragraph refers to, but we assume it is to the time period "[b]etween August 27, 2025, when the first detainees arrived, and December 10, 2025," during which time the warden states that the "email address received 5,965 emails." Chestnut Decl. ¶ 195.

Based on a review of emails sent from Prison Law Office employees during that time period, I believe the "221 emails" reference to be inaccurate and wildly exaggerated.

I have searched for all emails I have sent to "calcityattorneyschedule@corecivic.com." The total number of emails I sent to that address between August 27 and December 10, 2025 is 20. Those 20 include emails that do not require any action by the facility (e.g. that read only "Thank you.") and others that clarify or ask for follow-up when the facility had not responded to my request. I have no reason to think that any relevant sent emails have been deleted, and I am confident they were not.

Between December 11 and the date of the warden's declaration, I sent an additional 11 emails regarding legal calls with Mr. Viera Reyes and Mr. Roque Campos related to the TRO motion, all of which you were cc'd on (in one of these, the email address was in the cc line, not the to line). Again, those 11 include emails that do not require any action (e.g. that read only "Thank you very much.") and others that clarify or ask for follow-up. I also sent one email requesting electronic device authorization and one automatic out-of-office response. I sent four emails directly to you in which the calcityattorneyschedule@corecivic.com address was cc'd. I have sent no emails to that address since December 30, or before August 27.

During the time period identified in paragraph 195, my colleagues at the Prison Law Office sent four additional emails, from Rana Anabtawi and Patrick Booth, related to legal calls and visits and electronic device authorization. Additionally, Rana sent six emails on December 23 related to Zoom issues while trying to complete a call with Mr. Viera Reyes related to the TRO motion.

**In total, that means that the Prison Law Office sent 24 emails to calcityattorneyschedule@corecivic.com between August 27 and December 10, not 221 as the warden claims.** These emails *related to* requests for legal calls and visits. They were not 24 distinct requests *for* legal calls and visits, as Mr. Chestnut suggests the 221 figure indicates. Additionally, in total, Prison Law Office employees sent 23 emails to calcityattorneyschedule@corecivic.com between December 11 and the date of the warden's declaration, including my automatic out-of-office response. Thus, **without any date limitation, the total number of emails sent to calcityattorneyschedule@corecivic.com at any time is still only 47, not 221.**

In light of the above, I ask that you speak with your client. Please either provide us proof of 221 emails sent from the Prison Law Office to calcityattorneyschedule@corecivic.com or else file a correction to the warden's declaration which corrects the number of emails referenced in paragraph 195 and changes the number of emails in paragraph 200 from 221 to 23.

I also request that you ask your client to double-check the other numbers listed in paragraphs 197 through 199. If Mr. Chestnut's count was off by a factor of ten for the Prison Law Office, then it is worth checking the other numbers he referenced in his declaration. I would also ask that you confirm that the number of emails referenced are in fact substantive requests for calls or meetings and exclude pleasantries, out-of-office emails, follow-ups regarding electronics, and the like. Including such messages would be extremely misleading to the Court.

Thank you,
Tess


**Tess Borden**
Supervising Staff Attorney*
Prison Law Office
1917 Fifth Street
Berkeley, CA 94710
(510) 280-2623
tess@prisonlaw.com
*Pronouns: she/her*
*Registered Legal Aid Attorney; MJP No. 805022

# EXHIBIT 5

CALIFORNIA
**DEPARTMENT OF JUSTICE**

**Rob Bonta**
**Attorney General**

300 SOUTH SPRING STREET, SUITE 1702
LOS ANGELES, CA 90013-1230

Public: (213) 269-6000
Telephone: (213) 269-6280
Facsimile: (916) 731-2129
E-Mail: Michael.Newman@doj.ca.gov

December 19, 2025

The Honorable Kristi Noem
Secretary of Homeland Security
U.S. Department of Homeland Security
2707 Martin Luther King Jr. Ave. SE
Washington, D.C. 20528

Todd M. Lyons
Senior Official Performing the Duties of the Director
U.S. Immigration and Customs Enforcement
500 12th St. SW
Washington, D.C. 20536

Department of Homeland Security Office of the Inspector General
Attn: Office of Investigations
245 Murray Lane SW
Washington, D.C. 20528

RE:    *California City Detention Facility (CCDF) Preliminary Findings*

Dear Secretary Noem, Mr. Lyons, and Office of the Inspector General:

We write regarding the dangerous and inadequate living conditions at California City Detention Facility (CCDF). Earlier this year Immigration and Customs Enforcement (ICE) opened this new facility in California, the largest in the state, without ensuring that the facility was adequately prepared to receive civil immigration detainees. After inspecting the facility, the California Department of Justice (Cal DOJ) has grave concerns about the conditions at the facility and the lack of adequate medical care. The United States has a legal duty to assure the safety of these detainees, and the contractor it has retained to execute this duty is manifestly not meeting a minimum standard of care for them.

CCDF is a civil immigration detention facility located at 22844 Virginia Blvd. in California City, California and is privately operated by CoreCivic, Inc. CCDF has been accepting civil immigrant detainees since August 27, 2025, pursuant to (1) an April 1, 2025, letter contract between

December 19, 2025
Page 2

CoreCivic and ICE; and (2) a September 1, 2025, contract between CoreCivic and ICE.[1] CoreCivic has stated that the total annual revenue for this facility is expected to be approximately $130 million.[2]

On November 20–21, 2025, a team from Cal DOJ traveled to the facility to conduct an initial inspection pursuant to California Assembly Bill 103 (AB 103), codified at California Government Code section 12532. AB 103 provides for review of conditions of confinement, due process, and standard of care at civil immigration detention facilities operated in California. During the inspection, Cal DOJ staff toured the facility, interviewed facility personnel and detained individuals, and reviewed medical and detention files.

Cal DOJ identified the following conditions, which appear to violate numerous ICE National Detention Standards (NDS) 2025, as noted below.

## I.    CCDF Opened Prematurely and Was Not Prepared to Handle the Needs of the Incoming Population.

CCDF opened abruptly without being prepared for all areas of facility operations to perform adequately. This lack of preparation has had harmful results to civil immigrant detainees, and Cal DOJ is concerned that such harms will only increase as the facility population grows from over 900 to its reported full capacity of 2,560 beds.

Key staff positions at CCDF remained unfilled at the time of Cal DOJ's site visit nearly three months after opening. For example, an assistant warden, with numerous other duties, is acting as both a grievance coordinator and the Prison Rape Elimination Act (PREA) coordinator. In addition, as noted below, the facility does not have enough medical doctors for its detainee population size. Staff responsible for the day-to-day supervision of detainees appear to be inexperienced and lack basic understanding of civil detention management principles. This is likely because post orders for detention officers are still in production, contrary to ICE detention standards. (See U.S. Immig. and Customs Enforcement, National Detention Standards (2025) Standard 2.6 (Post Orders) ("Each officer will have written post orders that specifically govern his or her current duties.") (hereafter NDS 2025).) Detainees reported to the inspection team that they are being treated like criminal inmates as opposed to civil detainees, noting that their treatment at CCDF is inferior in most respects compared to other detention facilities in California from which they had been transferred. Due to the significant number of staffing vacancies, CCDF reports being unable to provide contact visitation to any detainees, regardless of security classification level, which is a significant deprivation of support during a period of confinement, especially at a time when detainees are facing removal.

---

[1] CoreCivic, Inc., *CoreCivic Announces New Contract Awards At California City Immigration Processing Center and Midwest Regional Reception Center* (Sept. 29, 2025) <https://ir.corecivic.com/node/24926/pdf> (as of Dec. 17, 2025).

[2] *Id.*

December 19, 2025
Page 3

In addition, detention files were incomplete for individuals who arrived at the facility when it initially opened. Documentation that normally evidences that detainees received an orientation, handbook about facility rules, and other important information, was incomplete. (NDS 2025 Standard 2.1(II)(A) (New Arrivals).) This further demonstrates that the facility was not adequately prepared to meet even minimum documentation standards for ICE detention facilities.

Detainees reported that the facility does not have an adequate system in place to protect their constitutional due process rights. The team heard reports of limited access to confidential calls with attorneys, resulting in detainees only being able to access the monitored phone lines within their pods to speak to counsel, to the detriment of their immigration cases.

Further, the reception and discharge area where detainees are processed for intake, departures, and temporary transportation is extremely small for the number of detainees being processed in and out of the facility. Each of the four cells has a purported capacity of 12 people but each cell is approximately 12x12 feet. While the facility has found a work-around by using an empty housing unit to process intakes, this option will not be available when the facility is full, which is anticipated to occur in early 2026.

## II.    The Living Conditions at CCDF are Unsafe and Unsanitary.

Detainees reported leaks from rainwater and/or plumbing that infiltrated their living spaces. The inspection team observed leaks consistent with these reports.

Detainees reported, and Cal DOJ staff noted during its tour, that the air conditioning is kept at an extremely low temperature in housing units. Detainees reported receiving insufficient clothing and blankets to keep them warm, and until recently, detainees were only issued short sleeve items and were forced to purchase sweaters. Detainees also described being threatened with write-ups if they covered vents to prevent cold air from entering their cells. In one housing pod, elderly female detainees reportedly were modifying facility-issued socks to create scarves and sleeves for themselves to endure the low temperatures but were told that they would be written up if they continued to do so. Facility staff confirmed that altering socks constitutes "destruction of property." While the facility just recently issued windbreakers, the housing units are still too cold and the failure to provide weather-appropriate clothing to detainees violates the applicable standard. (See NDS 2025 Standard 4.4(II)(B) (Issuance of Clothing) ("At no cost to the detainee, all new detainees shall be issued clean, indoor/outdoor, temperature-appropriate, presentable clothing during in-processing. … Additional clothing shall be issued as necessary for changing weather conditions or as seasonally appropriate.").)

The facility conducts seven counts each day and each can take up to 90 minutes. During this time individuals are locked in their cells. In addition, women and individuals with higher security classifications eat their meals in the housing units instead of going to the dining hall. Recreation time is only offered one hour a day, five days a week. This practice means that some detainees spend 23–24 hours a day in their housing unit.

December 19, 2025
Page 4

The facility also appears to be engaged in potentially unlawful discriminatory conduct against female detainees and detainees who are members of religious minorities. Female detainees are not allowed regular time outdoors, and the large outdoor recreation space in the facility is used exclusively by male detainees. The sole outdoor space intermittently provided to female detainees is full of weeds and has no usable equipment. (See NDS 2025 Standard 5.2(II)(C) (Program Content) ("Exercise areas shall offer a variety of fixed and movable equipment.").)

Detainees reported that accommodations for dietary requirements, like food that is compliant with religious laws, are inadequate, or at times simply unavailable. We also received a report that religious headwear has been taken away from detainees. (See NDS 2025 Standard 5.3 (Religious Practices) (discussing facility obligations with respect to religious property and dietary requirements).)

There is no apparent system in place for detainees to attend know-your-rights presentations. (NDS 2025 Standard 6.4 (Legal Rights Group Presentations) ("Facilities shall permit authorized persons to make presentations to groups of detainees for the purpose of informing them of U.S. immigration law and procedures, consistent with the security and orderly operation of each facility.").) There appears to be a designated space for such events at CCDF, but the facility had not started facilitating these presentations as of the date of the site visit.

### III.    The Healthcare at the Facility Is Inadequate and Endangering Detainees.

Notwithstanding the ongoing, large influx of detainees, the facility does not have an adequate system in place for providing healthcare to these detainees. (NDS 2025 Standard 4.3(II)(A) (General) ("Facilities will employ sufficient medical staff to perform basic exams and treatments for all detainees.").) The facility only has one doctor and despite occasions of filling in additional medical care with physicians from other facilities, it was obvious that the only doctor onsite is overburdened and always on call, resulting in triaging instead of providing the necessary medical care. Healthcare staff acknowledged being behind standard timeline requirements for routine health assessments, and file review confirmed this fact. (NDS 2025 Standard 4.3(II)(E) (Comprehensive Health Assessment).)

In addition, CCDF began receiving female detainees before obtaining basic supplies for providing women's health care, contrary to multiple ICE standards. (See NDS 2025 Standards 4.3(II)(B) (Facilities) and 4.3(II)(U) (Women's Medical Care), inter alia.) This lack of preparedness for the detainee population's medical needs was reinforced during detainee interviews. File review also revealed that detainees' paper requests for medical care are not processed in a timely manner. (See NDS 2025 Standard 4.3(II)(I) (Sick Call).) Detainees reported that healthcare requests are not acted on unless the situation is a medical emergency. Detainees also stated that they are widely unable to access care from specialists.

December 19, 2025
Page 5

### IV.     CoreCivic Is Engaged in an Ongoing Course of Conduct that Violates ICE Detention Standards.

The aforementioned conditions constitute numerous violations of the NDS 2025, with which (based on prior private ICE detention contracts) CoreCivic is presumably required to comply as a term of its contract with the United States. "ICE detention standards ensure that detainees are treated humanely; protected from harm; provided appropriate medical and mental health care; and receive the rights and protections to which they are entitled." (NDS 2025 Foreword.) The United States and its contractor CoreCivic are legally required to assure the safety of these detainees and must comply with applicable detention standards and the Constitution.

We urge you to take action to address these issues.

Sincerely,

MICHAEL L. NEWMAN
Senior Assistant Attorney General
VILMA PALMA-SOLANA
Supervising Deputy Attorney General
KELLY M. BURNS
EMILIA P. E. MORRIS
ALYSSA ZHANG
Deputy Attorneys General

For     ROB BONTA
        Attorney General

cc via Email:

San Francisco ICE ERO Field Office
CoreCivic, Inc.
Senator Alex Padilla
Senator Adam Schiff
Representative Pete Aguilar
Representative Nanette Barragán
Representative Ami Bera
Representative Julia Brownley
Representative Ken Calvert
Representative Salud Carbajal
Representative Judy Chu

December 19, 2025
Page 6


Representative Gilbert Cisneros
Representative J. Luis Correa
Representative Jim Costa
Representative Mark DeSaulnier
Representative Vince Fong
Representative Laura Friedman
Representative John Garamendi
Representative Robert Garcia
Representative Jimmy Gomez
Representative Adam Gray
Representative Josh Harder
Representative Jared Huffman
Representative Darrell Issa
Representative Sara Jacobs
Representative Sydney Kamlager-Dove
Representative Ro Khanna
Representative Kevin Kiley
Representative Young Kim
Representative Doug LaMalfa
Representative Mike Levin
Representative Sam Liccardo
Representative Ted Lieu
Representative Zoe Lofgren
Representative Doris Matsui
Representative Tom McClintock
Representative Dave Min
Representative Kevin Mullin
Representative Jay Obernolte
Representative Jimmy Panetta
Representative Nancy Pelosi
Representative Scott Peters
Representative Luz Rivas
Representative Raul Ruiz
Representative Linda Sánchez
Representative Brad Sherman
Representative Lateefah Simon
Representative Eric Swalwell
Representative Mark Takano
Representative Mike Thompson
Representative Norma Torres
Representative Derek Tran
Representative David Valadao
Representative Juan Vargas
Representative Maxine Waters
Representative George Whitesides

December 19, 2025
Page 7

# EXHIBIT 6

1/16/26, 11:30 AM
Rep. Ro Khanna on X: "I might be the first Member of Congress to enter alongside a staff member who took detailed notes to tour …
Case 3:25-cv-09757-MMC   Document 51   Filed 01/20/26   Page 28 of 49





**Rep. Ro Khanna** ✔ 🅰️
@RepRoKhanna

···

I might be the first Member of Congress to enter alongside a staff member who took detailed notes to tour the ICE California City Detention Center.

This is the largest detention facility in the state of California. I left with a profound sense of urgency, concern, and moral responsibility. What we witnessed cannot be ignored, excused, or normalized.

I want to recognize my staff, Yvonne Inciarte and @SamElghanayan, for coordinating this visit at the onset of 2026 to shine a necessary light on conditions that demand immediate oversight.

This visit was inspired by a constituent from Sunnyvale who was beaten, unlawfully detained, and held at this very facility before being deported.

As Yvonne and I arrived, we saw families pulling into the parking lot, preparing to visit loved ones. When we spoke with them, they described inadequate food, visible mold, and water that tastes like metal.

They shared these details cautiously, often stopping themselves mid sentence because detainees have no privacy when using phones on visits and families live in constant fear of retaliation for speaking out. Fear, not transparency, defines this environment.

The facility is operated by CoreCivic, whose staff of six, including the warden, escorted us through a stark, cold detention center located in the California desert near Nevada.

On the day of our visit, temperatures were in the 40s on a sunny clear day. When we asked when laundry is performed, we received no defined schedule, leaving it unclear how many times individuals receive clean clothing. Furthermore, there was no policy for providing jackets in freezing temperatures, only a statement that detainees are given blankets.

We were told the facility currently holds 1,428 detainees, including 215 women. This center's contract began in September 2025, yet the Office of Detention Oversight has not conducted a single inspection. No Performance-Based National Detention Standards (PBNDS) audit has occurred, and compliance with PREA and ADA requirements remains entirely unverified. Oversight is not merely delayed; it is functionally absent.

Visitation remains strictly non-contact, forcing families to speak through glass. When asked why, the warden cited "introduction of contraband," yet when we asked how many detainees were held for crimes committed versus civil immigration matters, the answer was unknown. People are being treated like high-security criminals without explanation or due process. Much of the personnel we encountered had only three to four months of experience, coming from private security backgrounds rather than specialized correctional or humanitarian training. It was explained that "bed space," not necessity or risk, was the primary reason individuals were transferred to this remote location.

Medical care was the most alarming failure of our visit. While there are ADA coordinators, they were not on-site during our tour. We observed

New to X?

Sign up now to get yo

1/16/26, 11:30 AM

Case 3:25-cv-09757-MMC   Document 51   Filed 01/30/26   Page 29 of 48

Rep. Ro Khanna on X: "I joined members of Congress to tour San Diego's ICE staff manager who took detailed notes to tour …





← Post

locked boxes labeled "sick call" and "grievance," but we were not allowed to view whether these requests were ever answered. Staff admitted that a "sick call" request might sit in the box for one to two weeks before a medical response is initiated. Detained individuals told us a different story: when they ask for help, they may wait up to 20 days, often being placed in a room by themselves to sit and wait without care.

For illnesses like the flu, medicine is rarely provided, at best, a ibuprofen is given, but more often detainees are told to buy basic medicine from the commissary at exaggerated, unaffordable prices. With reportedly only one doctor for hundreds of people, the neglect is structural. We spoke to a man urinating blood who has still not received care, and a detainee transferred from Adelanto after having molars removed who was left in agony without any pain medication.

The warden enthusiastically described one hour of daily outdoor recreation, gyms, and tablets for attorney calls, yet we walked through empty rooms and saw untouched game consoles. We saw education booths in rows of four, each with a tablet and monitor, but not a single detained individual was using them. We were never shown the law library or computers containing LexisNexis. There is no GED programming, no substance abuse support, and no religious services unless outside volunteers make the trip to the desert.

Pro bono attorney lists are taped to the walls, but since only one immigration judge is assigned to the facility, cases face six-month extensions. Some are so desperate they ask to be deported, yet remain detained for months due to court backlogs.

We spoke directly with 47 individuals from countries including Afghanistan, Armenia, Bangladesh, Colombia, El Salvador, Honduras, India, Mexico, Nepal, Venezuela, and others. Most said they were never told why they were detained.

They described being treated like animals, locked in cells for seven hours a day, and fed undercooked beans that frequently contain rocks. Older detainees are at heightened risk because they are rarely given fresh fruits or vegetables. We met a lawful permanent resident who lived in the U.S. for 45 years, now detained for an issue from nearly three decades ago.

We met Afghan detainees who assisted the U.S. military and now have no country to be deported to, and a student who should be graduating this summer whose future is stalled. We listened to a skilled journeyman that diligently appeared at every required ICE check in who was unexpectedly detained during a check in, was moved to tears as he was taken into custody over being forcibly separated from his infant child with no explanation.

We heard from a business owner from Orlando, Florida who worked on U.S. military bases, detained at work despite legal authorization through political asylum. We even found a young man detained alongside his 58-year-old mother; they were separated upon arrival and have been unable to locate one another.

Under the "volunteer" jobs, detainees are paid only $1.75 to $2.50 an hour. The outdoor areas bring in mud into walking paths into the detention center. The water was repeatedly described as non-potable and lacking filtration. In the kitchen, staff claimed the food is compliant but could provide no records or logs to prove it.

Sign u
Sign
Creat
By signing up, you agre
Privacy Policy, includin

What's happe

Trending in Germany
Tatsachenbehaup

Politics · Trending
Insurrection Act

Trending in Germany
Teller

Trending in Germany
Frosta

Show more

Terms of Service | Priv
Accessibility | Ads info



America can enforce its laws without abandoning its humanity. What we saw at the California City Detention Center is systemic neglect. A detention-industrial complex that operates without transparency or accountability does not put American values first; it puts profit first. Human rights violations hidden in remote deserts must never be tolerated.

Congress has a duty to act, to investigate, and to reform. The lives and dignity of over a thousand human beings depend on it.



8:20 AM · Jan 6, 2026 · **91.2K** Views

356          836          2.3K          217

Read 356 replies

# EXHIBIT 7





# Dangerous for Disabled People

Disability Rights California (DRC) conducted a monitoring visit at the California City Immigration and Customs Enforcement (ICE) Immigration Processing Center (California City) in September 2025, shortly after the facility began confining people. Despite being open for about four weeks before DRC's monitoring, DRC had already received numerous distressing reports that people with disabilities were experiencing poor

medical care and substandard living conditions at California City. The facility, a former prison, is located in a desolate area of the Mojave Desert in Kern County, California and is operated by CoreCivic, a private company that contracts with ICE to provide custody services.

Disability Rights California is the designated protection and advocacy system for people with disabilities in California. DRC is charged under federal and state laws with protecting and advocating for the rights of people with disabilities, including through the monitoring of facilities that provide care and treatment to such individuals.[1]

During the monitoring visit, DRC investigated the reports it had received and sought to determine whether ICE and CoreCivic are subjecting people with disabilities to abuse and neglect.[2] DRC toured all areas of the facility accessible to the people detained there, including areas used for intake, food preparation, housing, segregation, medical and mental health care, recreation, and visitation. DRC also spoke with CoreCivic representatives, ICE officials, and California City staff, and interviewed 17 individuals detained at the facility.

Based on the conditions DRC observed, its interviews with leadership and individuals held at California City, and reviews of related information, DRC finds that ICE and CoreCivic are subjecting people with disabilities to abuse and neglect.

**In particular, DRC finds that California City:**

1. Fails to provide access to critical medical and mental health care;

2. Fails to process and address disability-related requests in a timely manner;

3. Fails to meet people's basic needs, including adequate food, water, and clothing;

4. Employs staff who harass detainees, and;

1/15/26, 4:39 PM Newly Opened California City Detention Facility: Dangerous for Disabled People — Disability Rights California

Case 3:25-cv-09757-MMC Document 51 Filed 01/20/26 Page 34 of 48

5. Utilizes solitary confinement unnecessarily.

Disability Rights California protects and advocates for the rights of all people with disabilities in the State of California, regardless of their ethnicity, cultural background, language, or immigration status.

# Background

Before re-opening its doors in September 2025 as an ICE detention facility, California City functioned as both a federal and state correctional facility. CoreCivic (formerly Corrections Corporation of America) built the facility in 1998.[3] In 2000, federal officials contracted with CoreCivic to use California City to house federal prisoners.[4] In 2013, the California Department of Corrections and Rehabilitation (CDCR) took over operations of the facility to use it as a state prison.[5] In 2023, CDCR stopped using California City as a prison.[6] The facility remained vacant until it was repurposed as an immigration detention facility by ICE and CoreCivic.

On the dates of DRC's monitoring inspection, ICE was detaining approximately 500 men at the facility. At the time, two general population housing dorms were in use, each consisting of three pods with the capacity for 80 detained individuals, as well as one pod on a separate dorm for segregated housing. DRC understands that the population at the facility has grown and now includes men and women, with a maximum operating capacity of over 2,500.[7]



*A general population unit at California City.*

# Findings

## Failure to Provide Critical Medical and Mental Health Care

Although facility staff told DRC that they take measures to meet the healthcare needs of detainees, nearly every detained individual DRC interviewed reported significant disability related concerns, including issues accessing medical care.

> "This is the worst medical care I've ever experienced. It's medical negligence and incompetence. They are understaffed and underprepared. The medical staff are not abiding by their oath."

## Disruptions in critical surgeries

Multiple individuals reported extreme delays to critical surgeries as a result of their abrupt transfers to California City without adequate continuity of care. For context, everyone DRC interviewed transferred to California City from another ICE facility, primarily Golden State Annex and Mesa Verde. One individual reported that his previous detention facility, Mesa Verde, had scheduled a surgery to prevent blood clots. However, ICE then transferred him to California City, where he had gone weeks without the surgery, despite following up with health care staff repeatedly about it.[8] Another individual reported that Golden State Annex had scheduled surgery for a large hernia, but ICE then transferred him to California City. When DRC met with this individual, his surgery had not been rescheduled.[9] He was in so much pain that he needed assistance moving around the facility.



*The inside of a typical cell at California City.*

# Inadequate medication management

Many individuals reported not receiving needed medication, even though facility staff claimed that Licensed Practical Nurses distribute medications daily in the units.[10] One individual reported that prior to his detention, he regularly took medication three times a day to manage his seizures. At California City, he was forced to go without medication for days at a time.[11] Another individual reported going seven days without diabetes medications, during which time he felt physically unstable. He also reported not receiving high blood pressure or migraine medications to manage these conditions, despite reportedly submitting written requests regarding these issues.[12]

Another individual reported that he was given medication to manage a mental health disability, but he did not know what type of medication the facility staff provided him, despite asking for such information. He also reported that the medications the facility provided were not working, resulting in severe mental health symptoms. He had serious concerns about his worsening mental health due to conditions at California City.

Individuals also stated that medication distribution often happens very late, when individuals are likely to be sleeping. People also reported not having access to "Keep on Person (KOP)" items, such as nasal sprays, fungal powder, and eyedrops.



*The inside of a safety cell, used for acute mental health situations.*

## Lack of timely responses to sick call requests

Several individuals reported submitting sick call requests but not receiving responses or medical care in a timely manner. For example, one individual reportedly requested medical care for blood in his urine, but remained without a medical evaluation for days. It was not until the day before DRC's visit that he reportedly received Advil, but no other medical care.[13] Another individual reported having a thyroid condition that requires regular blood testing for monitoring and medication management, which he was receiving at Mesa Verde. Although he submitted written requests for evaluations at California City, he had not received a response nor any blood tests.[14] When DRC interviewed him, he had a visibly enlarged lump on his neck and stated that he felt physically weak. One individual even showed DRC multiple copies of written requests he had submitted, none of which California City staff had responded to.



*A mental health observation cell.*

# Poor mental health crisis management

1/15/26, 4:39 PM    Newly Opened California City ICE Detention Facility: Dangerous for Disabled People | Disability Rights California

Case 3:25-cv-09757-MMC   Document 51   Filed 01/30/26   Page 40 of 48

During our monitoring visit, people also shared concerns about the mental health care provided at California City. One individual reported being placed in a mental health observation cell for four days and not having access to a working toilet, shower, blanket, or toothpaste. While in the observation cell, he did not receive any psychological services. Instead, custodial staff only briefly checked on him every fifteen minutes. He reported that the harsh conditions led him to withhold the severity of his mental health symptoms to avoid staying in that cell.

# Failure to Process and Address Disability-Related Requests

During our visit, DRC met with people who reported not receiving responses to their disability-related needs. Furthermore, facility staff informed DRC that California City does not employ a dedicated disability or accommodations specialist.[15]

One individual managing a hernia reported difficulties walking, showering, and accessing the recreation yard. After making several requests over approximately three weeks for a wheelchair, staff finally provided him with one during the second day of DRC's monitoring visit. He remained concerned that the wheelchair would be taken away at any moment. People also reported that staff are denying requests for supportive footwear.[16] One individual shared that a prior ICE facility issued him orthopedic shoes, but that California City only provided him with oversized rubber clogs, which caused him significant pain throughout his feet and limited his ability to walk. Despite many requests for supportive footwear, his requests were reportedly ignored.[17]



*Medical and grievance boxes in one of the housing units.*

# Failure to Address People's Basic Needs

## Unsuitable and dirty housing units

People reported to DRC that California City was unprepared for them upon first arrival, such that they were forced to sleep on the floor of a cafeteria without any mattress or pad. After sleeping on the floor, staff reportedly took people to units that were unsuitable and dirty. According to our interviewees, the units initially did not have working sinks or toilets.[18] Several individuals also reported significant flooding in the housing units due to a rainstorm, with water pouring from the walls and filling the units. People also reported that just days prior to DRC's visit, California City began offering detained individuals jobs to clean the housing units. The work program at California City pays detained individuals just two dollars per day.

People also expressed concerns about dust in their units. One person reported significant dust built up in the air vents. Individuals were concerned that they were being exposed to dirt and stated that they had been getting cold-like symptoms that seemed to spread throughout the units quickly. Several individuals reported that they had resorted to blocking the vents in their cells to limit the flow of dust.

Many people also reported a lot of trash and bird feces in the recreation yards, such that they were not allowed to use the recreation yard.[19] During DRC's visit, we observed the

1/15/26, 4:39 PM   Newly-opened California City Detention Facility: Dangerous for Disabled People | Disability Rights California

Case 3:25-cv-09757-MMC   Document 51   Filed 01/30/26   Page 42 of 48

recreation areas and saw only one area being used. The other recreation areas had construction material and trash that had yet to be cleared.

## Unsanitary water

Many people who spoke with DRC reported unsanitary tap and drinking water. People described the tap water as brown with an unpleasant taste. One individual even reported that he observed small metal particles in the tap water. Drinking water was provided in large jugs, which facility staff confirmed was tap water.[20] One water jug that was opened for refill reportedly contained black mold. One detained individual stated that the water from faucets and water jugs had worsened his gastritis to such an extent that he was resorting to purchasing bottled water from the commissary. However, people reported commissary prices being very high, even when compared to other ICE detention facilities and state prisons, which resulted in this individual reportedly becoming dehydrated due to the limited access to potable water.

## Inadequate clothing supplies

People reported long delays in the distribution of clothing, such that they had resorted to cleaning their clothes in sinks.[21] One individual reported that, initially, the facility was exchanging laundry, but they had stopped. According to this individual, even though there was a bin for laundry, staff did not take the bin for laundry exchange. He reported that staff told him this was due to the increase in population. He further reported that he made a request for new clothing and, two weeks later, he was still waiting to receive it. As of the time of this report, this individual states he is currently washing his clothing in the sink of his cell. People further reported that the lack of clothing exchange was affecting their health, as the housing units are kept very cold, but the facility did not provide people with extra clothing to keep warm.[22] Many people reported cold- and flu-like symptoms that were difficult to manage without access to adequate clothing.



*Holding cell.*

# Low-quality and insufficient food

People detained at California City reported inedible or low-quality food.[23] For example, multiple people told DRC that they received cold, hard beans and potatoes, which they had to throw away. Other individuals reported that the quantity of food was insufficient, such that at least one person lost a considerable amount of weight since their arrival at the facility. One person also reported that they received a special diet at their previous facility to help manage a medical condition, but they had not received that special diet at California City.[24]

> Most of the people DRC met reported being treated inhumanely, with at least one stating that "they are treating us like animals." Generally, individuals said that staff were running the facility like a high-security prison, often resorting to threats of violence.

## Harassment by staff

One individual reported having his head forcefully pushed into a wall.[25] Others described staff walking through housing units wearing gas masks and threatening to pepper-spray individuals. Another person described seeing a staff member spit in his food, explaining that he had not eaten for two days for fear that the staff were contaminating his food. Many also reported that staff regularly yelled and screamed at them in response to basic questions. Interviewees even reported that some staff threatened to put them in solitary confinement for requesting medical assistance.

People reported that the conditions resulted in people not asking for assistance due to fear of retaliation. One individual shared that based on the staff's lack of response and threats, he decided to keep quiet and to himself, even though he was dealing with unanswered medical needs.

1/15/26, 4:39 PM Newly Opened California City ICE Detention Facility: Dangerous for Disabled People | Disability Rights California

Case 3:25-cv-09757-MMC Document 51 Filed 01/20/26 Page 45 of 48



*Inside a restrictive housing unit cell, looking out to the day room.*

# Unnecessary use of solitary confinement

When DRC visited, 27 people were held in solitary confinement at California City. They are confined in their cells nearly every hour of the day.[26] This is a highly restrictive unit that is no different from a solitary confinement unit in a criminal detention facility. People in this unit have limited access to a caged outdoor area and reported that prior to DRC's arrival, these outdoor areas were filthy with animal feces and dead birds.[27]

During our visit, there was a group of individuals who reported being placed in the segregation unit in retaliation for requesting improved medical care and conditions. They shared that they were not provided with a written explanation for their placement

and had only been told that their actions were under investigation.[28] They did not know when they would be released from isolation.[29] Some were also participating in a hunger strike.

DRC followed up with several people with disability related concerns inside the solitary confinement units over a month after our visit, and they reported that the conditions remained the same. They reported that the facility did not permit them to access the dayroom, and they were regularly locked in their cells for all but a short period each day.

# Conclusion

The conditions that DRC observed at California City on September 22-23, 2025, and the reports it received, are alarming. Based on the monitoring visit and related interviews, DRC finds that conditions at California City result in the abuse and neglect of people with disabilities.

DRC urges DHS, ICE, and Core Civic to immediately address the issues detailed in this report and ensure the following:

- Access to appropriate medical and mental health care;

- Processes that address disability-related needs in a timely manner;

- Access to basic needs, including adequate food, water, and clothing;

- An end to harassment by staff; and

- An end to the unnecessary or retaliatory use of solitary confinement.

DRC has serious concerns about what appears to be a rush to open the California City facility and the abuse and neglect individuals with disabilities are facing there. The conditions at California City add to mounting evidence that the current system of detention is dangerous and inadequate for all people, especially those with disabilities.

---

1. See 42 U.S.C. §§ 15001 et seq. ("Developmental Disabilities Assistance and Bill of Rights Act"); 29 U.S.C. §§ 794e et seq. ("Protection and Advocacy of Individual Rights Act"); 42 U.S.C. §§ 10801 et seq. ("Protection and Advocacy for Individuals with Mental Illness Act"); Cal. Welf. & Inst. Code §§ 4900 et seq. ("Protection and Advocacy Agency").

2.  "Abuse" and "neglect" are defined in federal and state law and their implementing regulations. See 42 C.F.R. § 51.2; 45 C.F.R. § 1326.19; Cal. Welf. & Inst. Code § 4900.

3.  Daniel B. Wood, Private Prisons, Public Doubts, Christian Sci. Mon. (July 21, 1998), https://www.csmonitor.com/1998/0721/072198.us.us.1.html.

4.  CoreCivic, Corrections Corporation of America Receives Federal Inmates in California and New Mexico, (Oct. 23, 2000), https://ir.corecivic.com/news-releases/news-release-details/corrections-corporation-america-receives-federal-inmates.

5.  Christine Bedell, Cal City prison to house state inmates, Bakersfield.com, (Oct. 25, 2013), https://www.bakersfield.com/news/cal-city-prison-to-house-state-inmates/article_41af12cd-3acf-5a21-9485-30b7ce8af4cb.html.

6.  Claudia Elliot, State removes all inmates from Cal City prison, remaining staff working to close facility. Bakersfield.com, (Nov. 19, 2023), https://www.bakersfield.com/news/state-removes-all-inmates-from-cal-city-prison-remaining-staff-working-to-close-facility/article_df159a52-8670-11ee-b1f7-db87ce7a3737.html.

7.  CoreCivic, CoreCivic Announces New Contract Awards at California City Immigration Processing Center and Midwest Regional Reception Center, (Sept. 29, 2025), https://ir.corecivic.com/news-releases/news-release-details/corecivic-announces-new-contract-awards-california-city

8.  See U.S. Immigration & Customs Enf't, National Detention Standards § 4.3.II.D., (2025), https://www.ice.gov/doclib/detention-standards/2025/nds2025.pdf (discussing medical screenings and continuity of care for new arrivals) (hereinafter NDS).

9.  See id.

10. See id. § 4.3.II.L. (requiring medication be distributed in accordance with health care provider's instructions and procedures).

11. See id.

12. See id.

13. See id. § 4.3.II.A. (requiring detainees be provided access to medically necessary and appropriate medical care).

14. See id.

15. See id. § 4.7.II.B. (requiring a facility to designate a Disability Compliance Coordinator).

16. See id. § 4.7.II.D.2. (stating that detainees with disabilities shall generally be permitted to keep assistive devices with them at all times); 6 C.F.R. § 15.30 (providing general prohibitions against discrimination in programs or activities conducted by the Department of Homeland Security).

17. See NDS, supra note 8, § 4.7.II.B.1. (requiring the facility to develop a process with reasonable timelines to review detainees' requests for accommodations related to a disability and for providing accommodations).

18. See id. § 4.4.II.G. (describing how a detainee should be provided with a reasonably private bathing and toileting environment).

19. See id. § 5.2.II.A.1. (requiring detainees have access to outdoor recreation, weather permitting, for at least one hour per day, five days per week; or six, or more hours per week, at least four days per week).

20. See id. § 1.1.II.I.1. (requiring the facility ensure appropriate water quality).

21. See id. § 2.1 (II) (B) (requiring detainees be given clean institutional clothing, bedding, towels, and personal hygiene items during intake).

22. See id. (requiring the facility ensure appropriate temperatures).

23. Sen. Bill 1132, 2023-2024 Reg. Sess., ch. 183, 2024 Cal. Stat. https://leginfo.legislature.ca.gov/faces/billNavClient.xhtml?bill_id=202320240SB1132 (authorizes a county or city health officer to investigate a private detention facility); NDS § 4.1.I. (requiring the facility provide nutritious meals).

24. See NDS, supra note 8, § 4.1.II.G.1. (stating detainees with medical conditions shall be described special diets as appropriate by authorized medical staff).

25. See id. § 2.8.II. (restricting when staff can use force against detainees).

26. The unnecessary and retaliatory use of solitary confinement is of serious concern. Many studies have found that solitary confinement results in long-term detrimental effects on people's psychological, neurological, and physiological well-being. See e.g., Kayla James & Elena Vanko, The Impacts of Solitary Confinement, Vera Inst. (April 2021), https://vera-institute.files.svdcdn.com/production/downloads/publications/the-impacts-of-solitary-confinement.pdf?dm=1617381199.

27. See NDS, supra note 8, § 2.9.II.V. (requiring detainees in segregation be offered at least one hour of recreation per day, at least five days a week).

28. See id. § 2.9.II.B.2. (describing how a disciplinary segregation order detailing the reasons for placing the detainee in disciplinary segregation shall be provided to the detainee).

29. See id.



Contact Us
Get Help
Careers
Website Accessibility
Disclaimer
Funding
Privacy Policy
Employee Login

**Disability Rights California** (DRC) is a nonprofit organization founded in 1978 that defends, advances, and strengthens the rights and opportunities of people with disabilities.

© 2025 Disability Rights California