**EXHIBIT 1**

**EXHIBIT 1**

## DECLARATION OF CHRISTOPHER CHESTNUT

I, Christopher Chestnut, state the following based upon my personal knowledge.

1.      I am over the age of 18 and am competent to testify to the matters set forth in this Declaration.

2.      I am currently the Warden at CoreCivic's California City Correctional Facility[1] ("Cal City" or "the facility"), located at 22844 Virginia Boulevard, California City, a position I have held since June 2025.

3.      The facility is owned and operated by CoreCivic. The facility currently houses federal immigration detainees pursuant to a contract with Immigration and Customs Enforcement ("ICE").

4.      Prior to transferring to Cal City, I was the Warden at Nevada Southern Detention Center and the Assistant Warden at the Northeast Ohio Correctional Center.

5.      I have been employed by CoreCivic since 1995 and have more than 27 years of corrections and detention experience, including supervisory positions at multiple facilities utilized by ICE to house civil immigration detainees.

6.      I make this Declaration in response to the Court's Order Granting in Part Plaintiffs' Motions for Preliminary Injunction and Class Certification (Dkt. 72) in the matter of *Fernando Gomez Ruiz, et al. v. U.S. Immigration and Customs Enforcement, et al.*, Case No. 3:25-cv-09757-MMC, in the Northern District of California.

7.      Although the operations of the Cal City facility will be significantly impacted by the Court's Order, the Court did not have the benefit of my perspective on the current status of medical care, recreation, or access to counsel at Cal City when granting the relief requested by Plaintiffs.

---

[1] The facility has also been variously referred to as the California City Correctional Center, California City Immigration Processing Center, and California City Detention Facility.

8.    There have been significant changes and improvements at Cal City in the six months since it reopened, but these are not reflected in the evidence presented by Plaintiffs.

**Experience with ICE Detainee Populations**

9.    It is my understanding that the Court made several remarks during the February 6, 2026 hearing that CoreCivic and its employees do not have experience with managing ICE detainee populations. This is not accurate.

10.    CoreCivic was founded in 1983 as Corrections Corporation of America ("CCA").[2] CCA's first contract was to house Immigration and Naturalization Service ("INS") detainees.[3] In the more than 40 years since that first contract, CCA and CoreCivic have continued to house civil immigration detainees.

11.    Since 2008, CCA and CoreCivic have housed ICE detainees at 28 of their facilities nationwide. During that time frame, there were more than 1 million ICE detainees booked into CCA and CoreCivic facilities.

12.    Currently, CoreCivic houses ICE detainees at Adams County Correctional Facility ("Adams"), Cal City, Central Arizona Florence Complex, Cibola County Correctional Center, Eden Detention Facility, Elizabeth Detention Center, Eloy Detention Center, Houston Processing Center, Laredo Processing Center, Nevada Southern Detention Center ("Nevada Southern"), Northeast Ohio Correctional Center, Otay Mesa Detention Center, South Texas Family Residential Center, Stewart Detention Center, T. Don Hutto, Torrance County Detention Center, Webb County Detention Center, West Tennessee Detention Facility, Cimarron, Farmville, and Diamondback.

13.    Including Cal City, CoreCivic currently has a design capacity of more than 20,000 beds at facilities with ICE as its primary partner.

---

[2] CCA changed its name to CoreCivic in 2016.
[3] INS oversaw immigration until its functions were transferred to the Department of Homeland Security.

14.     This is not the first time Cal City has had an ICE detainee population. Prior to leasing the facility to the California Department of Corrections and Rehabilitation, CCA housed nearly 10,000 ICE detainees at Cal City.

15.     I personally have held supervisory positions at multiple CoreCivic facilities housing ICE detainees, including Adams, Nevada Southern, and Cal City. I was the Assistant Warden at Adams when we transitioned from a Bureau of Prisons population to ICE.

16.     In my experience, a civil immigration detainee population is not significantly different from a typical pre-trial detainee population (e.g., United States Marshals Service detainees) or sentenced prison inmate population with respect to their need for health care services. However, the level of acuity is higher with this detainee population, which is reflected in our designation as a level III medical and level III mental health facility in the contract with ICE, as well as in our staffing pattern.

**Medical and Mental Health Care**

17.     CoreCivic's contract with ICE for Cal City requires us to comply with the ICE 2025 National Detention Standards ("NDS 2025"), including with respect to health care.

18.     CoreCivic's contract also sets a required staffing pattern, including for health care and health services administration positions.

19.     ICE regularly monitors our compliance with the NDS 2025 and the contractually required health care staffing pattern.

20.     CoreCivic's policies with respect to health care at Cal City are tailored to comply with applicable NDS 2025 standards, as well as applicable standards promulgated by the National Commission on Correctional Health Care ("NCCHC") and the American

Correctional Association ("ACA"), the two most widely recognized standards and accreditation bodies for detention and correctional settings.[4]

21.     CoreCivic's policies were submitted to ICE for review and approval at the beginning of the contract at Cal City, and proposed policy revisions are also subject to review and approval by ICE.

22.     Paragraph 1 of the Court's Order does not provide objective timeframes in which the listed healthcare tasks must be completed, which makes it impossible for us to evaluate whether we are in compliance. Likewise, the use of adjectives such as "adequate" and "responsive" are highly subjective and fail to provide us with any guideposts for demonstrating compliance.

23.     An external monitor working off the Court's Order, which does not define "timely," "adequate," or "responsive," will have unfettered discretion to come up with their own standards, which are likely to conflict with or exceed the NDS 2025 and CoreCivic policies that we are required to follow.

24.     The following NDS 2025 standards, which are objective and measurable, are applicable to Paragraph 1 of the Court's Order.

25.     NDS 2025 Standard 4.3(II)(D) requires that within **12 hours** of arrival, new arrivals receive "an initial medical, dental, and mental health screening and be asked for information regarding any known acute, emergent, or pertinent past or chronic medical conditions, including history of mental illness, particularly prior suicide attempts or current suicidal/homicidal ideation or intent, and any disabilities or impairments affecting major life activities." The standard further states that a "detainee responding in the affirmative shall be sent for evaluation to a qualified, licensed health care practitioner as quickly as possible, but no later than **two working days**."[5]

---

[4] CoreCivic intends to seek NCCHC and ACA accreditation at Cal City.

[5] CoreCivic Policy 13-50: Initial Intake Screening at Cal City includes identical requirements.

26.    NDS 2025 Standard 4.3(II)(E) requires the facility to "conduct and document a comprehensive health assessment, including a physical examination and mental health screening, on each detainee within **14 days** of the detainee's arrival at the facility." The standard provides that the comprehensive health assessment "shall be performed by a physician, physician assistant, nurse practitioner, registered nurse (RN) (with documented initial and annual training provided by a physician), or other health care practitioner, as permitted by law," but if the assessment is performed by an RN, it must be reviewed by a provider.

27.    NDS 2025 Standard 4.3(II)(H) requires the facility to perform an initial dental screening exam within **14 days** of a detainee's arrival.

28.    NDS 2025 Standard 4.3(I) governs sick call and requires that the facility "have procedures to ensure that all request slips are received and triaged by the medical staff within **24 hours** of receipt of the request." The standard further provides that a "health care practitioner" must "review the request and determine when the detainee will be seen based on the acuity of the problem."

29.    NDS 2025 Standard 4.3(J) requires that the facility "have a written plan[6] for the delivery of 24-hour emergency medical and mental health care when no medical personnel are on duty at the facility, or when immediate outside medical attention is otherwise required."

30.    NDS 2025 Standard 4.3(II)(K) requires that detention and health care staff "be trained to respond to health-related emergencies within a **4-minute** response time." The training must include "recognition of signs of potential health emergencies and the required response"; "administration of first aid and cardiopulmonary resuscitation (CPR)"; "recognition of signs and symptoms of mental illness"; and "[t]he facility's established

---

[6] Our plan provides that the medical department is staffed on-site 24/7. We contract with Hall Ambulance for emergency medical services, emergency medical transports, and medical evacuations. There are two helicopter landing areas on-site for medical evacuations.

plan and procedures for providing emergency medical care including, when required, the safe and secure transfer of detainees for appropriate hospital or other medical services."

31.    NDS 2025 Standard 4.3(II)(S)(2) requires that "[a]ny detainee referred for mental health treatment shall be triaged for any emergency needs and receive an evaluation by a qualified mental health provider no later than **seven days** after the referral."

32.    NDS 2025 Standard 4.5(II)(C) requires that all detainees "receive an initial mental health screening within **12 hours** of admission by a health care practitioner or a specially trained detention officer." Standard 4.5(II)(D) further provides that "[d]etainees identified as at risk for suicide or self-harm shall be immediately referred to a mental health provider" and "[a]n evaluation shall take place within **24 hours**."

33.    In addition to the Court's Order not providing any objective metrics for compliance, it also exceeds all applicable detention standards (NDS 2025, NCCHC, and ACA) with respect to the level and credentials of personnel permitted to perform initial intake screenings.

34.    The Court's Order requires a "comprehensive, documented medical intake screening, performed by a qualified medical provider within 12 hours of a person's arrival." (Dkt. 72, Paragraph 1(b.) (Emphasis added.) "Qualified medical provider" is not defined in the Order, but typically "provider" means a Nurse Practitioner, Physician's Assistant, Physician, or a similar level of license, and does not include a Registered Nurse ("RN") or Licensed Vocational Nurse ("LVN").

35.    NDS 2025 Standard 4.3 Section (II)(D) provides that the initial intake screening may be completed by "a **health care practitioner or a specially trained detention officer**." NDS 2025 Standard 4.3 Section (II)(C) defines "health care practitioner" as "an individual who is licensed, certified, or credentialed by a state, territory, or other appropriate body to provide health care services within the scope and skills of the respective health care profession."

36.     The NCCHC issues two sets of standards—the NCCHC Standards for Health Services in Jails, which apply to jails and detention facilities, and the NCCHC Standards for Health Services in Prisons. The Jail standards are applicable to detention facilities, such as Cal City.

37.     Initial intake screenings, such those contemplated in the Court's Order at Paragraph 1(b), are discussed in NCCHC Standard J-E-02: Receiving Screening, which states: "Screening is performed on all inmates upon arrival at the intake facility to ensure that emergent and urgent health needs are met." J-E-02 provides that a receiving screening is intended to "fulfill four purposes:

> a. Identify and meet any urgent health needs of those being admitted
> b. Identify and meet any known or easily identifiable health needs that require medical intervention
> c. Identify and isolate inmates who appear potentially contagious
> d. Obtain a medical clearance when necessary.

With respect to the individuals permitted to perform the screening, J-E-02 states, "[i]n all facilities **where health staff are available, it is expected that they conduct the initial screening**. However, this standard allows receiving screening to be conducted by health-trained correctional staff members when health staff are not on duty."

38.     Initial Appraisals referenced in Paragraph 1(c) of the Court's Order correspond to NCCHC Standard J-E-04: Initial Health Assessment. Like the NDS 2025, J-E-04 requires the completion of an initial health assessment **within 14 days**. J-E-04 provides that initial health assessments include:

> a. A qualified health care professional collecting additional data to complete the medical, dental, and mental health histories, including any follow-up from abnormal findings obtained during the receiving screening and subsequent encounters
> b. A qualified health care professional recording of vital signs (including height and weight)

c. A *physical examination* (as indicated by the patient's gender, age, and risk factors) performed by a **physician, physician assistant, nurse practitioner, or RN**
d. A screening test for latent tuberculosis (e.g., PPD, chest X-ray, laboratory test), unless completed prior to the initial health assessment

39.     The NCCHC defines "qualified health care professional to include "physicians, physician assistants, nurses, nurse practitioners, dentists, mental health professionals, and others who by virtue of their education, credentials, and experience are permitted by law to evaluate and care for patients."

40.     Attachment A is a true and correct excerpt of the NCCHC Standards for Health Services in Jails, 2018.[7]

41.     The ACA Performance-Based Standards and Expected Practices for Adult Local Detention Facilities (5th ed.) applies to jails and detention facilities. The ACA also has a separate set of standards for prisons.

42.     ACA Standard 5-ALDF-4C-23: Health Screens covers intake health screenings, which correspond to the screenings contemplated in Paragraph 1(b) of the Court's Order. Standard 5-ALDF-4C-23 states: "Intake health screening for inmates commences upon the inmate's arrival at the facility and is performed by **health-trained or qualified health care personnel**. All findings are recorded on a screening form approved by the health authority."

43.     ACA Standard 5-ALDF-4C-25 – Health Appraisal covers comprehensive health appraisals, which correspond to the health appraisals contemplated in Paragraph 1(c) of the Court's Order. Standard 5-ALDF-4C-23 states in part: "A comprehensive health appraisal for each inmate is completed by **qualified health care personnel** within 14 days after arrival at the facility.

---

[7] The 2018 version was in effect at the time this lawsuit was filed.

44.    The ACA defines "qualified health care personnel" as encompassing "Health care professional OR Professional Staff or health care practitioner/provider." A "Health care professional" means "staff who perform clinical duties, such as health care practitioners, nurses, licensed professional counselors, social workers, and emergency medical technicians in accordance with each health care professional's scope of training and applicable licensing, registration, certification, and regulatory requirements." "Professional staff" means "social workers, probation officers, and other staff assigned to juvenile and adult offender cases. These individuals generally possess bachelor's degrees and advanced training in the social or behavioral sciences." "Health care practitioner/provider" means "clinicians trained to diagnose and treat patients, such as physicians, dentists, psychologists, licensed professional counselors, licensed social workers, podiatrists, optometrists, nurse practitioners, and physician assistants.

45.    Attachment B is a true and correct excerpt of the ACA Performance-Based Standards and Expected Practices for Adult Local Detention Facilities, 5th ed.

46.    At Cal City, RNs and LVNs perform the initial intake screenings, while NPs and Physicians perform the comprehensive health appraisals. We do not use detention officers to perform initial intake screenings or comprehensive health appraisals.

47.    If we are required to have NPs or above perform the initial intake screenings at Cal City, which goes well beyond any of the above detention standards, we will have to hire at least five additional NPs above the approved contractual staffing plan, at an approximate cost of **$901,250 per year** to CoreCivic. This would allow for 24/7 shift coverage with a relief factor. This is assuming that we are able to recruit that many additional NPs who are willing to work at an ICE detention facility in California City, which is highly speculative.

48.    Even if we were able to recruit five additional NPs, they would still have to complete background clearances performed by DHS and credentialling, which would likely take at least four to five months, before they would be eligible to work at the facility.

They would then have to complete on-site training, which takes approximately three to four weeks, before they would be able to see patients. Thus, even if we were able to immediately secure five additional NPs, they would not be in place prior to the expiration of the 120-day monitoring period in the Court's Order. To comply with the Court's Order in the interim, we would have to attempt to fill those positions through overtime assignments, at an even greater cost to CoreCivic. There is also the potential that CoreCivic could undertake the hiring, credentialing, and training of these individuals only to have the goal posts moved due to the subject nature of the Court's Order.

49.     In addition to the cost of hiring five NPs to comply with the requirement in Paragraph 1(b) to have initial intake screenings be performed by a provider, Paragraph 1(a) of the Court's Order requiring "adequate health care staff" is likely to lead to additional staffing costs because it will be based on the subjective opinion of a monitor.

**<u>Recreation</u>**

50.     We have been consistently offering outdoor recreation for one hour a day, seven days a week prior to the Court's Order.

51.     This is more than required by the NDS 2025. Standard 5.2 Section II(A)(1) states: "If outdoor recreation is available at the facility, it shall be offered at a reasonable time of day. Weather permitting, each detainee shall have access for at least one hour per day, five days per week; or, six or more hours per week, at least four days per week." Section (A)(2) states: "If only indoor recreation is available, detainees shall have access for at least one hour each day and shall have access to natural light."

52.     Male and female detainees are not permitted to recreate together. The female detainees go to recreation on a yard adjacent to their housing unit, while the male detainees go to recreation on the main recreation yard.

53.     In addition to the outdoor recreation yards, we also have an indoor gym with cardiovascular exercise equipment.

54.    Prior to the Court's Order, we offered female detainees the choice whether to participate in recreation in the indoor gym or the outdoor recreation yard, and they generally preferred to use the indoor gym. After issuance of the Court's Order requiring outdoor recreation, however, to comply with the Order, we are no longer offering detainees the option of recreation in the indoor gym.

**<u>Access to Counsel</u>**

55.    NDS 2025 Standard 5.5 Section (II)(G)(2) states: "The facility shall permit legal visitation seven days a week, including holidays. It shall permit legal visits for a minimum of eight hours per day on regular business days, and a minimum of four hours per day on weekends and holidays."

56.    Prior to the Court's Order, our legal visitation hours were already 8:00 am to 8:00 pm daily, which exceeds the NDS 2025 requirements.

57.    In early February 2026, Cal City went live with an online scheduling system called Detention Facility Appointment Scheduler ("DFAS"), which was created by ICE to fulfill a Congressional mandate to create an online system for scheduling and managing legal visitation at detention facilities. DFAS is used by ICE at more than 30 detention centers throughout the United States to schedule legal visits, virtual attorney visits ("VAVs"), and legal calls. *See* https://www.ice.gov/eroefile/dfas.

58.    To access DFAS, attorneys register for an account through ERO eFile, submit a G-28 Notice of Entry of Appearance as Attorney or Accredited Representative, and then log in to DFAS to select an available time slot for an in-person legal visit, VAV, or legal call.

59.    DFAS is available to attorneys 24/7 for scheduling in-person legal visits, VAVs, and legal calls.

60.    Instructions for scheduling in-person legal visits, VAVs, and legal calls at Cal City are available at https://www.ice.gov/detain/detention-facilities/california-city-

detention-facility under the "Hours of Visitation" tab. That page also includes a link to ERO eFile.

61.    The Cal City "Hours of Visitation" page has been updated to reflect the requirements in the Court's Order for three-hour, contact legal visits and 90-minute VAV sessions and facilitated legal calls at Cal City.

62.    DFAS has been reconfigured by ICE for three-hour blocks for in-person legal visits and 90-minute blocks for VAVs and facilitated legal calls at the facility.

63.    Cal City currently has four rooms that can be used for contact legal visits. Due to the Court's Order requiring that in-person legal visits be three hours in duration, only four in-person legal visits can be scheduled per room per day.

64.    We have submitted a proposal to subdivide the four legal visitation rooms and install soundproofing barriers, which will create a total of eight rooms for contact legal visitation.

65.    This project is anticipated to cost CoreCivic approximately **$19,875**, not including electrical work, which is anticipated to be another **$5,000-7,000**.

66.    Once the project is complete, we will be required to staff the area with an additional officer, at an approximate cost of **$104,083.20 per year** due to the need to visually monitor the additional four contact visitation rooms.

67.    Due to the need to keep detainees separated by custody level and gender for safety and security reasons,[8] we have a weekly schedule that allocates the rooms in blocks by classification/gender combination. Each classification/gender combination is allocated at least one block per day. We rotate the blocks across a seven-day period so that attorneys will have equal access to various time slots.

---

[8] There are four classification/gender combinations at Cal City: low male (LM), high male (HM), low female (LF), and high female (HF). Each must be kept separate from the other three at all times.

68.     Below is a seven-day schedule for the Cal City VAV area. We provide the schedule to ICE for configuring DFAS.

**Day 1**

| 0800 - 0930 | LM | 1400 - 1530 | HM | |
|---|---|---|---|---|
| 1000 - 1130 | LM | 1600 - 1730 | LF | 1 |
| 1200 - 1330 | LM | 1800 – 1930 | HF | |

**Day 2**

| 0800 - 0930 | HM | 1400 - 1530 | LM | |
|---|---|---|---|---|
| 1000 - 1130 | LF | 1600 - 1730 | LM | 2 |
| 1200 - 1330 | HF | 1800 – 1930 | LM | |

**Day 3**

| 0800 - 0930 | LM | 1400 - 1530 | HF | |
|---|---|---|---|---|
| 1000 - 1130 | LM | 1600 - 1730 | HM | 3 |
| 1200 - 1330 | LM | 1800 – 1930 | LF | |

**Day 4**

| 0800 - 0930 | HF | 1400 - 1530 | LM | |
|---|---|---|---|---|
| 1000 - 1130 | HM | 1600 - 1730 | LM | 4 |
| 1200 - 1330 | LF | 1800 – 1930 | LM | |

**Day 5**

| 0800 - 0930 | LM | 1400 - 1530 | LF | |
|---|---|---|---|---|
| 1000 - 1130 | LM | 1600 - 1730 | HF | 5 |
| 1200 - 1330 | LM | 1800 – 1930 | HM | |

**Day 6**

| 0800 - 0930 | LF | 1400 - 1530 | LM | |
|---|---|---|---|---|
| 1000 - 1130 | HF | 1600 - 1730 | LM | 6 |
| 1200 - 1330 | HM | 1800 – 1930 | LM | |

**Day 7**

| 0800 - 0930 | LM | 1400 - 1530 | LF | |
|---|---|---|---|---|
| 1000 - 1130 | LM | 1600 - 1730 | HF | 5 |
| 1200 - 1330 | LM | 1800 – 1930 | HM | |

69.     The Court's Order required us to reallocate the legal visitation schedule, and DFAS had to be reconfigured by ICE accordingly. Reallocating the legal visitation schedule to comply with the Court's Order was a complicated undertaking, which took one of my staff approximately eight man hours, time that could have been allocated toward supervision of staff and detainees.

70.    The requirement that in-person legal visits be three hours in duration also means that an attorney can have legal visits with at most only four detainees per day.

71.    We have already received complaints from two attorneys who wish to visit more detainees than the Court's Order allows for. Given the long distance many of the attorneys must travel from their offices to the facility, those who have multiple clients in the facility often prefer to see all of their clients in a single visit, but following the Court's Order, they will no longer be able to do so.

72.    We have also already had an attorney attempt to circumvent the system by trying to book multiple contact visitation rooms at the same time to allow him to move from room to room to see multiple detainees back-to-back instead of a single detainee for 90 minutes.

73.    The facility currently has 10 VAV booths which are installed in one room. Due to the need to separate detainees by classification level and gender, only one classification/gender combination can be scheduled in the VAV area at a time.

74.    We have submitted a project to separate the VAV booths into two areas, each with five VAVs, to allow for two different classification/gender combinations to be scheduled for VAVs at a time. We have also submitted a project to create two new VAV booths in the female housing unit, which will allow for additional VAV availability. These projects are expected to cost CoreCivic approximately **$69,395**.

75.    To comply with the Court's Order requiring 90-minute legal calls, we will have to staff an additional 2.5 officers at an approximate cost of **$260,208 per year** to monitor the two separated VAV areas in the main VAV area and the new VAV booths in the female housing unit.

76.    The Cal City population is currently exclusively ICE civil immigration detainees. However, the facility will also begin housing United States Marshal Service ("USMS") pre-trial detainees.

77. ICE and USMS detainees must be kept separate at all times. Once the USMS population arrives, the VAV booths will also be used for USMS detainees, which will impact scheduling blocks.

78. Due to the lack of a physical location for a detainee to have a facilitated private legal call, the VAV rooms are also used for facilitated legal calls.

79. Detainees are still able to place unmonitored legal calls using the detainee telephone system if their attorneys register to receive unmonitored calls.

80. CoreCivic is concerned that an increase in contact visits may facilitate the introduction of contraband, which poses safety and security risks to detainees and staff.

[THE REMAINDER OF THIS PAGE IS LEFT INTENTIONALLY BLANK]

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

Executed on March 02, 2026.

_____

Christopher Chestnut

**ATTACHMENT A**

**ATTACHMENT A**



National Commission
on Correctional Health Care

# Standards for Health Services in Jails

## 2018

National Commission on Correctional Health Care

**J-E-02**
*essential*

**RECEIVING SCREENING**

**Standard**

Screening is performed on all inmates upon arrival at the intake facility to ensure that emergent and urgent health needs are met.

**Compliance Indicators**

1. Reception personnel ensure that persons who are unconscious, semiconscious, bleeding, mentally unstable, severely intoxicated, exhibiting symptoms of alcohol or drug withdrawal, or otherwise urgently in need of medical attention are referred immediately for care and *medical clearance* into the facility.
   a. If they are referred to a community hospital and then returned, admission to the facility is predicated on written medical clearance from the hospital.
2. A *receiving screening* takes place as soon as possible upon acceptance into custody.
3. The receiving screening form is approved by the responsible health authority and inquires as to the inmate's:
   a. Current and past illnesses, health conditions, or special health requirements (e.g., hearing impairment, visual impairment, wheelchair, walker, sleep apnea machine)
   b. Past infectious disease
   c. Recent communicable illness symptoms (e.g., chronic cough, coughing up blood, lethargy, weakness, weight loss, loss of appetite, fever, night sweats)
   d. Past or current mental illness, including hospitalizations
   e. History of or current suicidal ideation
   f. Dental problems (decay, gum disease, abscess)
   g. Allergies
   h. Dietary needs
   i. Prescription medications (including type, amount, and time of last use)
   j. Legal and illegal drug use (including type, amount, and time of last use)
   k. Current or prior withdrawal symptoms
   l. Possible, current, or recent pregnancy
   m. Other health problems as specified by the responsible physician
4. The form also records reception personnel's observations of the inmate's:
   a. Appearance (e.g., sweating, tremors, anxious, disheveled)
   b. Behavior (e.g., disorderly, appropriate, insensible)
   c. State of consciousness (e.g., alert, responsive, lethargic)
   d. Ease of movement (e.g., body deformities, gait)
   e. Breathing (e.g., persistent cough, hyperventilation)
   f. Skin (including lesions, jaundice, rashes, infestations, bruises, scars, tattoos, and needle marks or other indications of drug abuse)
5. The disposition of the inmate (e.g., immediate referral to an appropriate health care service, placement in the general population) is appropriate to the findings of the receiving screening and is indicated on the receiving screening form.
6. Receiving screening forms are dated and timed immediately on completion and

include the name, signature, and title of the person completing the form.

7.  All immediate health needs are identified through the screening and properly addressed by qualified health care professionals.
8.  Potentially infectious inmates are isolated from the general inmate population.
9.  If a woman is pregnant, an opiate history is obtained.
10. If a woman reports current opiate use, she is immediately offered a test for pregnancy to avoid opiate withdrawal risks to fetus.
11. When health-trained correctional personnel perform the receiving screening, they have documented training by the responsible physician or designee in early recognition of medical, dental, and mental health conditions requiring clinical attention.
12. Health staff regularly monitor receiving screenings to determine the safety and effectiveness of this process.
13. All aspects of the standard are addressed by written policy and defined procedures.

**Definitions**

*Medical clearance* is a documented clinical assessment of medical, dental, and mental status before an individual is admitted into the facility. The medical clearance may come from on-site health staff or may require sending the individual to the hospital emergency room.

*Receiving screening* is a process of structured inquiry and observation intended to identify potential emergency situations among new arrivals and to ensure that patients with known illnesses and those on medications are identified for further assessment and continued treatment.

*Medication-assisted treatment* is the use of medications in combination with counseling and behavioral therapies to provide a "whole patient" approach to the treatment of substance use disorders.

**Discussion**

Receiving screening is to fulfill four purposes:
a.  Identify and meet any urgent health needs of those being admitted
b.  Identify and meet any known or easily identifiable health needs that require medical intervention
c.  Identify and isolate inmates who appear potentially contagious
d.  Obtain a medical clearance when necessary

In all facilities where health staff are available, it is expected that they conduct the initial screening. However, this standard allows receiving screening to be conducted by health-trained correctional staff members when health staff are not on duty. The training for correctional officers depends on the role they are expected to play in the receiving screening process. At a minimum, they receive instruction on how to take a medical history; make the required medical, dental, and mental health observations;

determine the appropriate disposition of an inmate based on responses to questions and observations; and document their findings on the receiving screening form. Training is based on a curriculum approved by the responsible physician.

Receiving screenings must be conducted as soon as possible and without unnecessary delay. The standard recognizes that at times correctional facilities receive newly arriving inmates in large groups, making it impossible to screen each inmate immediately. In such cases, reception personnel should quickly perform a medical clearance to determine who may be too ill to wait for receiving screening or be admitted. Receiving screening personnel meet with each person until all are processed. Individuals should not be released from the intake area until the receiving screening is completed.

Facilities that do not routinely act as intake/receiving facilities must perform a receiving screening for newly arrived probation and/or parole violators.

Receiving screening should be conducted using a form and language fully understood by the inmate, who may not speak English or may have a physical (e.g., speech, hearing, sight) or mental disability. Screeners are to make adequate efforts to explore the potential for suicide. The screener should review with the inmate any history of suicidal behavior and visually observes the inmate's behavior (delusions, hallucinations, communication difficulties, speech, posture, impaired consciousness, disorganization, memory defects, depression, or evidence of self-mutilation). In addition, the screener must look for symptoms of withdrawal from alcohol and other drugs. These approaches, coupled with training in aspects of mental health and chemical dependency, enable staff to intervene early to treat withdrawal and to prevent most suicides (see B-05 Suicide Prevention and Intervention and F-04 Medically Supervised Withdrawal and Treatment).

Attention is to be paid to signs of trauma or a reported history of trauma. Inmates arriving with signs of recent trauma are referred immediately for medical observation and treatment. Staff members have a responsibility to report suspected abuse of persons in custody to the authorities. A history of trauma may warrant follow-up care by mental health professionals.

Inmates with mental disorders are often unable to give complete or accurate information in response to health status inquiries. Therefore, it is good practice for mental health staff to be involved in training staff who do the intake screening.

When inmates indicate they are under treatment for a medical, dental, mental health, or substance use problem, health staff should initiate a request for a health summary from community prescribers after receiving a signed release from the inmate. This will help ensure that health records are present at the time of the health assessment and verify needed medications.

For patients enrolled in a community substance abuse program, consideration should be given to continuing *medication-assisted treatment*.

National Commission on Correctional Health Care

J-E-04
*essential*

## INITIAL HEALTH ASSESSMENT

**Standard**

Inmates receive initial *health assessments*.

There are two options for implementing and demonstrating compliance with this standard. The "full population assessment" option involves performing assessments on 100% of inmates. The "individual assessment when clinically indicated" option involves performing assessments on only those determined to be at high risk for significant health problems.

**Compliance Indicators: Full Population Assessment (1-9)**

1. Receiving screening results are reviewed within 14 days.
2. All inmates receive an initial health assessment as soon as possible, but no later than 14 calendar days after admission.
3. If the health assessment is deferred because of a documented health assessment within the last 12 months, documentation in the health record must confirm that the new receiving screening shows no change in health status.
   a. If the receiving screening shows a change in health status, the initial health assessment is repeated.
4. The responsible physician determines the components of an initial health assessment.
5. Initial health assessments include, at a minimum:
   a. A qualified health care professional collecting additional data to complete the medical, dental, and mental health histories, including any follow-up from abnormal findings obtained during the receiving screening and subsequent encounters
   b. A qualified health care professional recording of vital signs (including height and weight)
   c. A *physical examination* (as indicated by the patient's gender, age, and risk factors) performed by a physician, physician assistant, nurse practitioner, or RN
   d. A screening test for latent tuberculosis (e.g., PPD, chest X-ray, laboratory test), unless completed prior to the initial health assessment
6. All abnormal findings (i.e., history and physical, screening, and laboratory) are reviewed by the provider.
7. Specific problems are integrated into an initial problem list.
8. Diagnostic and therapeutic plans for each problem are developed as clinically indicated.
9. All aspects of the standard are addressed by written policy and defined procedures.

**Compliance Indicators: Individual Assessment When Clinically Indicated (10-16)**

10. Inmates identified with *clinically significant findings* as the result of a comprehensive receiving screening receive an initial health assessment as soon as possible, but no later than 2 working days after admission. To qualify for this option, a facility:
    a. Has 24-hour, 7-day on-site health staff coverage
    b. Allows only licensed health care personnel to conduct a comprehensive receiving screening on inmates
    c. Includes in its comprehensive receiving screening all elements of the receiving screening standard plus:
        i. Further inquiry into past medical history and symptoms of chronic diseases
        ii. Finger stick on individuals with diabetes
        iii. Vital signs (including pulse, respirations, blood pressure, and temperature)
        iv. Further inquiry into medication and dosages where possible
        v. A screening test for latent tuberculosis (e.g., PPD, chest X-ray, laboratory test)
11. If the health assessment is deferred because of a documented health assessment within the last 12 months, documentation must confirm that the new receiving screening shows no change in health status.
    a. If the comprehensive receiving screening shows a change in health status, the initial health assessment is repeated.
12. The responsible physician determines the components of an initial health assessment.
13. Individual health assessments include, at a minimum:
    a. A review of comprehensive receiving screening results
    b. A qualified health care professional collecting additional data to complete the medical, dental, and mental health histories, including any follow-up from abnormal findings obtained during the comprehensive receiving screening and subsequent encounters
    c. A qualified health care professional recording of vital signs (including height and weight)
    d. A physical examination (as indicated by the patient's gender, age, and risk factors) performed by a provider
    e. Laboratory and/or diagnostic tests for disease, such as peak flow for asthma patients and blood work for diabetes patients
14. Specific problems are integrated into an initial problem list.
15. Diagnostic and therapeutic plans for each problem are developed as clinically indicated.
16. All aspects of the standard are addressed by written policy and defined procedures.

**Definitions**

The *health assessment* is the process whereby an individual's health status is evaluated, including questioning the patient about symptoms. The extent of the health assessment is defined by the responsible physician but should include at least the steps noted in this standard.

A *physical examination* is an objective, hands-on evaluation of an individual. It involves the inspection, palpation, auscultation, and/or percussion of a patient's body to determine the presence or absence of physical signs of illness.

*Clinically significant findings* are any deviation from the normal that significantly impacts the health and safety of the patient.

**Discussion**

The responsible health authority ensures that qualified health care professionals identify a patient's health needs and establish a plan for meeting those needs.

There are two options for accomplishing this. Each has advantages and disadvantages. The choice should be based on data regarding the general health status of the admitting population, available staff, and where resources should be committed.

The full population health assessment commits resources on the back end of the process. All arriving inmates are screened and an initial health assessment is completed as soon as possible, but no later than 14 calendar days after admission. It is appropriate to complete the assessment much earlier for acutely ill or much more complex patients (e.g., those with type 1 diabetes). The full population health assessment provides an excellent opportunity to initiate preventive medicine practices and provide health education.

The individual health assessment option, which focuses staff energy and time on those who have chronic or acute health needs, makes sense in a high-risk, high-volume setting. This option requires that resources are committed to receiving screening (front end) to identify those in need of the health assessment, and that the individual health assessment is performed within 2 days of arrival. Staff can concentrate their efforts to detect health problems early in the process. Another advantage is that correctional health services administrators and health staff can organize their limited resources in a way that yields the best return. The disadvantage of this option is that some individuals may be released without receiving a health assessment. Of course, this method does not mean to imply that health assessments could not be done on more inmates than those found to have problems during receiving screening.

The responsible physician should determine the content of the initial health assessment based on the evaluation of the needs of the facility's or community's population. In some instances, a history could include current or past history of carcinoma, chronic diseases, communicable diseases, and so forth. The physical exam and treatments ordered should be based on the patient's history.

It is important to review past health records, including those from community medical, mental health, and substance abuse treatment providers. If these records have not been received at the time of the initial health assessment, they should be requested after receiving a signed release from the inmate.

When various parts of the assessment are done by different health staff, the responsible physician should establish a procedure to ensure that the patient evaluations are integrated.

Oral screening and mental health screening, if completed at the same time as the initial health assessment, must be done with every admission, including when initial health assessments are deferred.

# Glossary

ACCESS TO CARE means that, in a timely manner, a patient is seen by a qualified health care professional, is rendered a clinical judgment, and receives care that is ordered.

ACTIVITIES OF DAILY LIVING (ADL) generally refers to ambulation, bathing, dressing, feeding, and toileting.

ADMINISTRATIVE REVIEW is an assessment of correctional and emergency response actions surrounding an inmate's death.

ADVANCE DIRECTIVES are expressions of the patient's wishes as to how future care should be delivered or declined, including decisions that must be made when the patient is not capable of expressing those wishes. Advance directives are useful for terminally ill patients but can be used by any inmate regardless of health status.

ADVERSE CLINICAL EVENT is an injury or death caused by medical management rather than by the patient's disease or condition.

AIDS TO REDUCE EFFECTS OF IMPAIRMENT include, but are not limited to, eyeglasses, hearing aids, canes, crutches, sleep apnea machines, and wheelchairs.

CLINICAL ENCOUNTERS are interactions between patients and health staff that involve an assessment, examination, treatment, and/or an exchange of protected health information.

CLINICAL MORTALITY REVIEW is an assessment of the clinical care provided and the circumstances leading up to a death.

CLINICAL PERFORMANCE ENHANCEMENT is the process of having a health professional's clinical work reviewed by another professional of at least equal training in the same general discipline, such as the review of the facility's physicians by the responsible physician.

CLINICAL SECLUSION is a therapeutic intervention initiated by medical or mental health staff to use rooms designed to safely limit a patient's mobility. Communicable disease isolation is not considered seclusion for the purpose of this standard.

CLINICAL SETTING refers to an examination or treatment room appropriately supplied and equipped to address the patient's health care needs.

CLINICALLY ORDERED RESTRAINT is a therapeutic intervention initiated by medical or mental health staff to use devices designed to safely limit a patient's mobility.

**National Commission on Correctional Health Care**

PROVIDER is defined as a nurse practitioner, physician assistant, or physician.

PSYCHOLOGICAL AUTOPSY, sometimes referred to as a psychological reconstruction or postmortem, is a written reconstruction of an individual's life with an emphasis on factors that led up to and may have contributed to the death. It is usually conducted by a psychologist or other qualified mental health professional.

QUALIFIED HEALTH CARE PROFESSIONALS include physicians, physician assistants, nurses, nurse practitioners, dentists, mental health professionals, and others who by virtue of their education, credentials, and experience are permitted by law to evaluate and care for patients.

QUALIFIED MENTAL HEALTH PROFESSIONALS include psychiatrists, psychologists, psychiatric social workers, psychiatric nurses, and others who by their education, credentials, and experience are permitted by law to evaluate and care for the mental health needs of patients.

QUALITY IMPROVEMENT COMMITTEE consists of health staff from various disciplines (e.g., medicine, nursing, mental health, dentistry, health records, pharmacy, laboratory, custody staff). The committee designs quality improvement monitoring activities, discusses the results, and implements corrective action. Additional participants may be included, depending on the issues being addressed.

QUALITY IMPROVEMENT STUDIES

OUTCOME QUALITY IMPROVEMENT STUDIES examine whether expected outcomes of patient care were achieved by (1) identifying a patient clinical care problem (e.g., poor asthma control, poor diabetes control, high volume of off-site visits), (2) determining a threshold based on the problem identified (3) conducting a baseline study, (4) developing and implementing a clinical corrective plan, and (5) restudying the problem to assess the effectiveness of the corrective action plan.

PROCESS QUALITY IMPROVEMENT STUDIES examine the effectiveness of the health care delivery process by (1) identifying a health system concern (e.g., delayed sick-call appointments, discontinuity of medications, lack of follow-up on abnormal lab values), (2) conducting a baseline study (e.g., task analysis, root cause, staffing plan), (3) developing and implementing a corrective plan, and (4) restudying the problem to assess the effectiveness of the corrective action plan.

REASONABLE SUPPLY includes a combination of medications and prescriptions to allow the patient time to arrange for follow-up in the community.

RECEIVING SCREENING is a process of structured inquiry and observation intended to identify potential emergency situations among new arrivals and to ensure that patients with known illnesses and those on medications are identified for further assessment and continued treatment.

156

**ATTACHMENT B**

**ATTACHMENT B**

# Performance-Based Standards and Expected Practices for Adult Local Detention Facilities

## Fifth Edition



COMMISSION ON ACCREDITATION FOR CORRECTIONS

AMERICAN CORRECTIONAL ASSOCIATION

- **Consultation and referral to appropriate specialists is provided when medically necessary.**

*Comment*: Emergent—life threatening.
Urgent—interfere with normal daily activities (toothache).
Routine—not of immediate attention.
Agency policy and procedures should be consistent with the American Dental Association.

*Protocols:* Written policy and procedure. Dental screening and examination forms.

*Process Indicators*: Dental records. Admission logs. Referral and consultation records. Dental request forms. Staff interviews.

## Health Education

**5-ALDF-4C-22**
**(Ref. 4-ALDF-4C-21)**

**Health education and wellness information is provided to all inmates.**

*Comment*: Health education and wellness topics may include but are not to be limited to information on access to health care services, dangers of self-medication, personal hygiene and dental care, prevention of communicable diseases, education, smoking cessation, family planning, self-care for chronic conditions, self-examination, relapse prevention regarding mental illness, coping with mental illness, healthy lifestyle choices and the benefits of physical fitness.

*Protocols*: Written policy and procedure.

*Process Indicators*: Documentation of program availability. Program and class schedules. Attendance rosters. Interviews. Curriculum and lesson plans. Examples of pamphlets, brochures, or other written handouts.

## Health Screens

**5-ALDF-4C-23**
**(Ref. 4-ALDF-4C-22)**

**(MANDATORY) Intake health screening for inmates commences upon the inmate's arrival at the facility and is performed by health-trained or qualified health care personnel. All findings are recorded on a screening form approved by the health authority. The screening includes at least the following:**

**Inquiry into:**
- **Any past history of serious infectious or communicable illness, and any treatment or symptoms and medications.**
- **Current illness and health problems, including communicable diseases and mental illness.**
- **Dental problems.**
- **Use of alcohol and other drugs, including type(s) of drugs used, mode of use, amounts used, frequency used, date or time of last use, and history of any problems that may have occurred after ceasing use.**
- **The possibility of pregnancy.**
- **History of problem.**

- **Other health problems designated by the responsible physician.**
- **Any past history of mental illness, thoughts of suicide or self-injurious behavior attempts.**

**Observation of the following:**
- **Behavior, including state of consciousness, mental status, appearance, conduct, tremor, and sweating.**
- **Body deformities and other physical abnormalities.**
- **Ease of movement.**
- **Condition of the skin, including trauma markings, bruises, lesions, jaundice, rashes, and infestations, recent tattoos, and needle marks or other indications of drug abuse.**

**Medical disposition of the inmate:**
- **Refusal of admission until inmate is medically cleared.**
- **Cleared for general population.**
- **Cleared for general population with prompt referral to appropriate health care service.**
- **Referral to appropriate health care service for emergency treatment.**

**Inmates, who are unconscious, semiconscious, bleeding, or otherwise obviously in need of immediate medical attention, are referred. When they are referred to an emergency department, their admission or return to the facility is predicated on written medical clearance. When screening is conducted by trained custody staff, a subsequent review of positive findings by the licensed health care staff is required. The responsible physician, in cooperation with the facility manager, establishes protocols.**

**Facilities that have reception and diagnostic units or a holding room conduct receiving screening on all inmates on their arrival at the facility as part of the admission procedures.**

*Comment*: Health screening is a system of structured inquiry and observation to prevent newly arrived inmates who pose a health or safety threat to themselves or others from being admitted to the general population and to identify inmates who require immediate medical attention. Receiving screening can be performed at the time of admission by health care personnel or by a health trained correctional officer. Examples of symptoms of serious, infectious or communicable diseases include a chronic cough, lethargy, weakness, weight loss, loss of appetite, fever, or night sweats that are suggestive of such illness.

*Protocols*: Written policy and procedure. Screening protocols.

*Process Indicators*: Health records. Completed screening forms. Transfer logs. Interviews.

**5-ALDF-4C-24**
**(Ref. 4-ALDF-4C-23)**

**(MANDATORY) All intrasystem transfer inmates receive a health screening by health-trained or qualified health care personnel, which commences on their arrival at the facility. All findings are recorded on a screening form approved by the health authority. At a minimum, the screening includes the following:**

**Inquiry into:**
- **Whether the inmate is being treated for a medical or dental problem.**
- **Whether the inmate is presently on medication.**
- **Whether the inmate has a current medical or dental complaint.**

**Observation of:**
- **General appearance and behavior.**
- **Physical deformities.**
- **Evidence of abuse or trauma.**

**Medical disposition of inmates:**
- **Cleared for general population.**
- **Cleared for general population with appropriate referral to health care service.**
- **Referral to appropriate health care service for emergency treatment.**

*Comment*: Health screening of intrasystem transfers is necessary to detect inmates who pose a health or safety threat to themselves or others and who may require immediate health care.

*Protocols*: Written policy and procedure. Screening form.

*Process Indicators*: Health records. Completed screening forms. Transfer logs. Interviews.

## Health Appraisal

**5-ALDF-4C-25**
**(Ref: 4-ALDF-4C-24)**

**(MANDATORY) A comprehensive health appraisal for each inmate is completed by qualified health care personnel within 14 days after arrival at the facility. If there is documented evidence of a health appraisal and evidence of review by qualified staff within the previous 90 days, a new health appraisal is not required except as determined by the designated health authority. Health appraisal data collection and recording includes the following:**

1. **A uniform process as determined by the health authority.**
2. **Documentation of review of the earlier receiving screening.**
3. **Recording of height, weight, pulse, blood pressure, and temperature by health-trained or qualified health personnel.**
4. **Collection of additional data to complete the medical, dental, mental health, and immunization histories by health-trained or qualified health personnel.**
5. **Medical examination, including review of mental and dental status by qualified health personnel.**
6. **Laboratory and/or diagnostic tests to detect communicable disease, including sexually transmitted disease and tuberculosis.**

7. **Other tests and examinations as appropriate.**
8. **Development and implementation of treatment plan, including recommendations concerning housing, job assignment, and program participation.**
9. **Initiation of therapy, when appropriate.**
10. **Review of the results of the medical examination, tests, and identification of problems by a physician or mid-level practitioner, as allowed by law.**

*Comment*: Test results, particularly for communicable diseases, should be received and evaluated before an inmate is assigned to housing in the general population. Information regarding the inmate's physical and mental status also may dictate housing and activity assignments. When appropriate, additional investigation should be conducted into alcohol and drug abuse and other related problems.

*Protocols*: Written policy and procedure. Health appraisal form.

*Process Indicators*: Health records. Completed health appraisal forms. Transfer logs. Interviews.

**Interpretation: The criterion for testing for venereal diseases is at the discretion of the agency's/facility's health authority.**

# Periodic Examinations

**5-ALDF-4C-26**
**(Ref. 4-ALDF-4C-26)** **The health authority determines the conditions for periodic health examinations for inmates.**

*Comment*: Inmates incarcerated for more than 12 months should be placed on a schedule for periodic health exams and should be examined prior to release to protect both the inmate and the public.

*Protocols*: Written policy and procedure.

*Process Indicators*: Health records. Completed annual health appraisal forms. Interviews.

# Mental Health Program

**5-ALDF-4C-27**
**(Ref. 4-ALDF-4C-27)** **(MANDATORY) Mental health services include at a minimum:**

1. **Mental health services and activities are approved by the appropriate mental health authority.**
2. **Crisis intervention and the management of acute psychiatric episodes.**
3. **Stabilization of the mentally ill and the prevention of psychiatric deterioration in the correctional setting.**
4. **Referral to outpatient services for the detection, diagnosis, and treatment of mental illness.**
5. **Referral and admission to licensed mental health facilities for inmates whose psychiatric needs exceed the treatment capability of the facility.**
6. **Obtaining and documenting informed consent.**

# Personnel Qualifications

**5-ALDF-4D-03**
**(Ref. 4-ALDF-4D-03)**

**(MANDATORY) If the facility provides health care services, they are provided by qualified health care personnel whose duties and responsibilities are governed by job descriptions that include qualifications and specific duties and responsibilities. Job descriptions are on file in the facility and are approved by the health authority. If inmates are treated at the facility by health care personnel other than a licensed provider, the care is provided pursuant to written standing or direct orders by personnel authorized by law to give such orders.**

*Comment*: Standing medical orders are for the definitive treatment of identified conditions and for the on-site emergency treatment of any person having such condition. Direct orders are those written specifically for the treatment of one person's particular condition.

*Protocols*: Written policy and procedures. Job descriptions. Standing orders.

*Process Indicators*: Copies of credentials or licensure. Documentation of compliance with standing orders. Health record entries. Interviews.

**5-ALDF-4D-04**
**(Ref. 4-ALDF-4D-04)**

**A health-trained staff member coordinates the health delivery services under the joint supervision of the responsible health authority and facility administrator, when qualified health care personnel are not on duty.**

*Comment*: Duties may include reviewing receiving screening forms for needed follow-up, readying inmates and their records for sick call, and assisting in carrying out orders regarding such matters as diets, housing, and work assignments.

*Protocols*: Written policy and procedures. Job description for health-trained personnel. Training curriculum.

*Process Indicators*: Health records. Observation. Interviews. Training records.

# Credentials

**5-ALDF-4D-05**
**(Ref. 4-ALDF-4D-05)**

**(MANDATORY) All professional staff comply with applicable state and federal licensure, certification, or registration requirements. Verification of current credentials is on file in the facility.**

*Comment*: None.

*Protocols*: Written policy and procedure. Copies of licensure requirements.

*Process Indicators*: Personnel records. Documentation of licensure, certification, or registration. Documentation of current credentials.

# Glossary

**Absconder** – an individual who fails to report for probation, parole, or aftercare supervision or leaves supervision of correctional or assigned staff.

**Access to Care** – offender seen in a timely manner by health care professional and professional care using clinical judgment.

**Accreditation cycle** – the three-year cycle between audits.

**Accreditation manager** – an agency employee designated by the agency administrator to supervise the planning and implementation of accreditation activities in the agency. He/she has comprehensive knowledge of the agency and sufficient authority within the agency to design and administer a successful accreditation strategy.

**Accreditation panel** – the subunit of the Commission on Accreditation for Corrections empowered to review applications and make final decisions on agency accreditation.

**Accredited status** – the three-year period during which the agency maintains and improves upon its standards compliance levels that were achieved at the time of the accreditation award.

**Acute Psychiatric Episode** – a brief, short term episode of mental illness lasting for approximately one month or less. This may be due to experiencing a stressful event.

**Adjudicatory hearing** – a hearing to determine whether the allegations of a petition are supported by the evidence beyond a reasonable doubt or by the preponderance of the evidence.

**Administrative status** – a form of separation from the general population administered by the classification committee or other authorized group when the continued presence of the inmate in the general population would pose a serious threat to life, property, self, staff, or other inmates or to the security or orderly running of the institution. Inmates pending investigation for trial on a criminal act or pending transfer also can be included. (See Protective custody, disciplinary detention.)

**Administrator** – *see* Program director.

**Administrator of field services** – the individual directly responsible for directing and controlling the operations of the adult probation and/or parole field services program. This person may be a division head in a large correctional agency, a chief probation officer answering to a judge, or the administrative officer of a court or parole authority with responsibility for the field services program.

**Admission** – the process of entry into a program. During admission processing, the juvenile or adult offender receives an orientation to program goals, rules, and regulations. Assignment to living quarters and to appropriate staff also is completed at this time.

**Health agency** – an organization that provides health care services to an institution or a system of institutions.

**Health Appraisal** – a health assessment that includes a review of previous health records, collection of data including any laboratory results or diagnostic tests, vital signs and other information necessary to provide care.

**Health authority** – the health administrator, or agency responsible for the provision of health care services at an institution or system of institutions; the responsible physician may be the health authority.

**Health care** – a system of preventative and therapeutic services that provide for the physical and mental well-being of a population. It includes, but is not limited to: medical services, dental services, behavioral health services, nursing services, pharmaceutical services, personal hygiene, dietary services, and environmental conditions.

**Health Care Administration** – *see* Health Authority.

**Health care personnel** – individuals whose primary duty is to provide health services to juveniles or adult inmates in keeping with their respective levels of health care training, licensure, or experience.

**Health care practitioner/provider** – clinicians trained to diagnose and treat patients, such as physicians, dentists, psychologists, licensed professional counselors, licensed social workers, podiatrists, optometrists, nurse practitioners, and physician assistants.

**Health care professional** – staff who perform clinical duties, such as health care practitioners, nurses, licensed professional counselors, social workers, and emergency medical technicians in accordance with each health care professional's scope of training and applicable licensing, registration, certification, and regulatory requirements.

**Health care provider** – an individual licensed in the delivery of health care.

**Health care services** – a system of preventative and therapeutic services that provide for the physical and mental well-being of a population. Includes, but not limited to: medical services, dental services, behavioral health services, nursing services, pharmaceutical services, personal hygiene, dietary services, and environmental conditions.

**Health Care Staff** – see Health Care Personnel.

**Health Care Supervision** – health care services provided to an individual who needs health care treatment.

**Health/medical screen** – a structured inquiry and observation to prevent offenders who pose a health or safety threat to themselves or others from being admitted to the general population and to identify offenders who require immediate medical attention. The screen can be initiated at the time of admission, at scheduled intervals, or other times as appropriate, by health care personnel or by a health-trained correctional officer.

**Health-trained personnel/Medically trained personnel** – correctional officers or other correctional personnel who may be trained and appropriately supervised to carry out specific duties with regard to the administration of health care.

**Placing authority** – agency or body with the authority to order a juvenile into a specific dispositional placement. This may be the juvenile court, the probation department, or another duly constituted and authorized placement agency.

**Policy** – course or line of action adopted and pursued by an agency that guides and determines present and future decisions and actions. Policies indicate the general course or direction of an organization within which the activities of the personnel must operate. They are statements of guiding principles that should be followed in directing activities toward the attainment of objectives. Attainment may lead to compliance with standards and compliance with the overall goals of the agency or system.

**Population center** – geographical area containing at least 10,000 people, along with public safety services, professional services, employment and educational opportunities, and cultural/recreational opportunities.

**Preliminary hearing** – hearing to determine whether probable cause exists to support an allegation of parole violation pending a revocation hearing by the parole authority.

**Pretrial release** – procedure whereby an accused individual who had been taken into custody is allowed to be released before and during his or her trial.

**Preventive maintenance** – a system designed to enhance the longevity and or usefulness of buildings or equipment in accordance with a planned schedule.

**Private agency** – the contracting agency of the governing authority that has direct responsibility for the operation of a corrections program.

**Probation** – court-ordered disposition alternative through which a convicted adult offender or an adjudicated delinquent is placed under the control, supervision, and care of a probation field staff member.

**Probationary period** – a period of time designated to evaluate and test an employee to ascertain fitness for the job.

**Procedure** – detailed and sequential actions that must be executed to ensure that a policy is fully implemented. It is the method of performing an operation or a manner of proceeding on a course of action. It differs from a policy in that it directs action in a particular situation to perform a specific task within the guidelines of policy.

**Process indicators** – documentation and other evidence that can be examined periodically and continuously to determine that practices are being properly implemented.

**Professional association** – collective body of individuals engaged in a particular profession or vocation.

**Professional staff** – social workers, probation officers, and other staff assigned to juvenile and adult offender cases. These individuals generally possess bachelor's degrees and advanced training in the social or behavioral sciences.

**Program** – plan or system through which a correctional agency works to meet its goals. This program may require a distinct physical setting, such as a correctional institution, community residential facility, group home, or foster home.

Glossary

**Program Administrator** – *see* Program Director.

**Program director** – individual directly in charge of the program.

**Prosthesis** – functional or cosmetic artificial device that substitutes for a missing body part such as an arm, leg, eye, or tooth.

**Protective custody** – form of separation from the general population for inmates requesting or requiring protection from other inmates for reasons of health or safety. The inmate's status is reviewed periodically by the classification committee or other designated group. (See Administrative status; Disciplinary detention.)

**Protocols** – written instructions that guide implementation of expected practices, such as policies and procedures, training curriculum, offender handbooks, diagrams, and internal forms and logs.

**Psychological Autopsy** – a reconstructive psychological profile of the decedent based on the evaluation of risk factors and motivational analysis for the purpose of determining the mode of death. It should be completed by a psychologist, or in their absence, another qualified mental health professional. It is sometimes referred to as a psychological reconstruction or post mortem.

**Psychotropic medication** – medications that are used to treat diagnosed mental disorders.

**Public agency** – the governing authority that has direct responsibility for the operation of a corrections program.

**Qualified Health Care Personnel** – *see* Health care professional or Professional staff or Health care practitioner/provider.

**Qualified Health Care Professional** – see Health care Professional or Professional staff or Health care practitioner/provider.

**Qualified Health Care Provider** – see Health care professional or Professional Staff or Health care practitioner/provider.

**Qualified Health Care Staff** – *see* Health care professional or Professional staff or Health care practitioner/provider.

**Qualified medical person** – *see* Health care professional.

**Qualified mental health person** – *see* Mental health care practitioner/provider/professional.

**Qualified Mental Health Professional** – *see* Mental Health Care Practitioner/Provider/Professional

**Quality assurance** – formal, internal monitoring program that uses standardized criteria to insure quality and consistency. The program identifies opportunities for improvement, develops improvement strategies, and monitors effectiveness.

**Quality Assurance Program** – *see* Quality assurance.