1  Daniel P. Struck, Pro Hac Vice pending
   Dana M. Keene, CA Bar #324993
2  Shannon L. Knorr, CA Bar #300399
   STRUCK LOVE ACEDO, PLC
3  3100 West Ray Road, Suite 300
   Chandler, Arizona  85226
4  Tel.:  (480) 420-1600
   Fax:  (480) 420-1695
5  dstruck@strucklove.com
   dkeene@strucklove.com
6  sknorr@strucklove.com

7  Nicholas H. Rasmussen, Bar #285736
   McCORMICK, BARSTOW, SHEPPARD,
8  WAYTE & SMITH, LLP
   7647 North Fresno Street
9  Fresno, CA  93720
   Tel:  (559) 433-1300
10 Fax: (559) 433-2300
   nrasmussen@mccormickbarstow.com
11
   Attorneys for Intervenor CoreCivic, Inc.
12

13                  **UNITED STATES DISTRICT COURT**

14                  **NORTHERN DISTRICT OF CALIFORNIA**

15                      **SAN FRANCISCO DIVISION**

16 FERNANDO GOMEZ RUIZ, et al.,              Case No. 3:25-cv-09757-MMC

17                          Plaintiffs,      **CORECIVIC INC.'S EMERGENCY MOTION
                                             TO STAY PENDING APPEAL**
18         v.
                                             Date:    April 10, 2026
19 U.S. IMMIGRATION AND CUSTOMS              Time:    9:00 a.m.
   ENFORCEMENT, et al.,                      Dept:    Courtroom 7
20                                           Judge:   Honorable Maxine M. Chesney
                           Defendants,
21
   CORECIVIC, INC.,
22
                           Intervenor.
23

24              <u>**NOTICE OF MOTION AND MOTION**</u>

25         **TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

26         **PLEASE TAKE NOTICE** that on April 10, 2026 at 9:00 a.m., or soon as may be heard

27 before the Honorable Maxine M. Chesney in Courtroom 7 of the United States District Court for

28 the Northern District of California, 450 Golden Gate Avenue, San Francisco, CA 94103, Intervenor

1    CoreCivic, Inc. moves the Court to stay the February 10, 2026 Order granting class certification

2    and entering a preliminary injunction pending final resolution of an appeal therefrom.  CoreCivic

3    is not requesting to stay that portion of the Court's Order granting Defendants' Motion to Transfer

4    Venue.  CoreCivic agrees that the matter should be transferred to the Eastern District of California

5    without delay.

6         This Emergency Motion is based on this Notice of Motion, the Memorandum of Points and

7    Authorities, and the papers, evidence, and records on file in this action, and any other written or

8    oral evidence or argument as may be presented at or before the time this motion is heard by the

9    Court.

10        DATED this 3rd day of March 2026.

11                            STRUCK LOVE ACEDO, PLC

12

13                         By /s/ Shannon L. Knorr
                                                        Daniel P. Struck (PHV pending)
14                                                      Dana M. Keene
                                                        Shannon L. Knorr
15
                                                        Nicholas H. Rasmussen
16                                                      McCORMICK, BARSTOW, SHEPPARD,
                                                        WAYTE & CARRUTH LLP
17
                                                        *Attorneys for Intervenor CoreCivic, Inc.*
18

19

20

21

22

23

24

25

26

27

28

1

# **TABLE OF CONTENTS**

2

Page

3

TABLE OF AUTHORITIES ................................................................................. iv

4

MEMORANDUM OF POINTS AND AUTHORITIES ..................................... 1

5

6

    I.      Relevant Background ........................................................................ 1

7

           A.    The California City Detention Facility and Plaintiffs' Civil Action........... 1

8

           B.    Plaintiffs' Motion for Class Certification and Motion for Preliminary Injunction, and Defendants' Motion to Transfer Venue ............................ 3

9

10

                  1.    February 6, 2026 Hearing ................................................ 3

                  2.    February 10, 2026 Order .................................................. 11

11

12

    II.    This Court Should Stay the February 10, 2026 Order Pending Its Appeal........... 13

13

           A.    Legal Standard .......................................................................... 13

14

           B.    Success on the Merits is Likely on Appeal ................................. 14

15

                  1.    The Court Failed to Apply the Legal Standard for Granting Preliminary Injunctive Relief ........................................ 14

16

                  2.    The Preliminary Injunction Violates Rule 65 .............................. 16

17

                    3.    The Court Failed to Follow the Legal Standard in Granting Provisional Class Certification.................................... 17

18

19

           C.    CoreCivic Will Be Irreparably Harmed Absent a Stay Pending Appeal ......................................................................... 19

20

           D.    The Balance of Equities and the Public Interests Favor a Stay Pending Appeal ....................................................................... 23

21

22

    III.    Conclusion ................................................................................. 24

23

24

25

26

27

28

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*,
  148 F.4th 648 (9th Cir. 2025) .......................................................................... 13

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles*,
  559 F.3d 1046 (9th Cir. 2009) ........................................................................ 14

*Ass'n Des Éleveurs De Canards et D'Oies Du Québec v. Harris*,
  No. 2:12-CV-05735-SVW-RZ, 2012 WL 12842942 (C.D. Cal. Sept. 28, 2012) ................... 22

*Associated Gen. Contractors v. Coalition for Econ. Equity*,
  950 F.2d 1401 (9th Cir. 1991) ........................................................................ 20

*B.K. by next friend Tinsley v. Snyder*,
  922 F.3d 957 (9th Cir. 2019) .......................................................................... 18

*Castro v. Cnty. of Los Angeles*,
  833 F.3d 1060 (9th Cir. 2016) ........................................................................ 16

*Cmty. Legal Servs. in E. Palo Alto v. U.S. Dep't of Health & Hum. Servs.*,
  137 F.4th 932 (9th Cir. 2025) ........................................................................ 13

*Dayton Bd. of Ed. v. Brinkman*,
  433 U.S. 406 (1977) ....................................................................................... 16

*Doe v. Noem*,
  783 F. Supp. 3d 907 (W.D. Va. 2025) .......................................................... 22

*Drakes Bay Oyster Co. v. Jewell*,
  747 F.3d 1073 (9th Cir. 2014) ........................................................................ 23

*Ellis v. Costco Wholesale Corp.*,
  657 F.3d 970 (9th Cir. 2011) .......................................................................... 19

*Fraihat v. U.S. Immigr. & Customs Enf't*,
  16 F.4th 613 (9th Cir. 2021) ............................................................. 14, 15, 18

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  573 U.S. 258 (2014) ....................................................................................... 18

*Hernandez v. Cnty. of Monterey*,
  110 F. Supp. 3d 929 (N.D. Cal. 2015) ............................................................ 4

*Hodgers-Durgin v. de la Vina*,
    199 F.3d 1037 (9th Cir. 1999) ............................................................ 19

*Janvey v. Alguire*,
    647 F.3d 585 (5th Cir. 2011) ............................................................ 22

*Klamath-Siskiyou Wildlands Ctr. v. Grantham*,
    No. 218CV02785TLNDMC, 2019 WL 2325555 (E.D. Cal. May 31, 2019) .................... 17, 23

*Lee v. Bickell*,
    292 U.S. 415 (1934) ...................................................................... 22

*Leiva-Perez v. Holder*,
    640 F.3d 962 (9th Cir. 2011) ............................................................ 13

*Lewis v. Casey*,
    518 U.S. 343 (1996) ...................................................................... 16

*Mazurek v. Armstrong*,
    520 U.S. 968 (1997) ...................................................................... 14

*Monterey Mech. Co. v. Wilson*,
    125 F.3d 702 (9th Cir. 1997) ............................................................ 20

*Morales v. Trans World Airlines, Inc.*,
    504 U.S. 374 (1992) ...................................................................... 22

*Nken v. Holder*,
    556 U.S. 418 (2009) .................................................................. 13, 23

*Noem v. Vasquez Perdomo*,
    146 S. Ct. 1 (2025) ...................................................................... 23

*Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Tr.*,
    636 F.3d 1150 (9th Cir. 2011) ........................................................ 16, 17

*Portland Feminist Women's Health Ctr. v. Advocs. for Life, Inc.*,
    859 F.2d 681 (9th Cir. 1988) ........................................................ 16, 17

*Roman v. Wolf*,
    977 F.3d 935 (9th Cir. 2020) ............................................................ 23

*Schmidt v. Lessard*,
    414 U.S. 473 (1974) ...................................................................... 16

*Simmons v. Navajo Cnty.*,
    609 F.3d 1011 (9th Cir. 2010) ........................................................... 16

*Turner v. Safely*,
    482 U.S. 79 (1987) ................................................................................................ 15

*United States v. Holtzman*,
    762 F.2d 720 (9th Cir. 1985) ............................................................................... 17

*Wages & White Lion Invs., L.L.C. v. United States Food & Drug Admin.*,
    16 F.4th 1130 (5th Cir. 2021) .............................................................................. 22

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) .............................................................................................. 18

*Winter v. Nat. Res. Def. Council*,
    555 U.S. 7 (2008) .................................................................................................. 14

**Rules**

Fed. R. Civ. P. 23 ......................................................................................... 17, 18, 19

Fed. R. Civ. P. 23(a) ............................................................................. 11, 17, 18, 19

Fed. R. Civ. P. 23(b) .................................................................................................. 17

Fed. R. Civ. P. 23(b)(2) ...................................................................................... 11, 18

Fed. R. Civ. P. 65(d) ........................................................................................... 11, 16

Fed. R. Civ. P. 65(d)(1) .............................................................................................. 16

**Other Authorities**

11A C. Wright, A. Miller, & M. Kane, Federal Practice & Procedure § 2948 ............................ 14

1

### MEMORANDUM OF POINTS AND AUTHORITIES

Intervenor CoreCivic, Inc. moves this Court to stay its February 10, 2026 Order pending final resolution of the appeal from that Order.[1]  The Court should temporarily but immediately stay the Order pending CoreCivic's, if not Defendants', appeal because a challenge to the appeal will likely be successful on the merits, CoreCivic will be irreparably harmed absent a stay, and the balance of equities tips in favor of a stay pending appellate review.[2]

### I.    Relevant Background.

#### A.    The California City Detention Facility and Plaintiffs' Civil Action.

Plaintiffs are seven former and current immigration detainees who are or were housed at the California City Detention Facility ("Facility") in California City.  (Dkt. 1, ¶¶ 4–8, 13–24.)  CoreCivic owns the Facility and currently operates it under an agreement with U.S. Immigration and Customs Enforcement ("ICE") for the detention of civil immigration detainees.[3]  (Dkt. 45-1, ¶ 3.)  A civil immigration detainee population is not significantly different from a typical pre-trial detainee population (e.g., United States Marshals Service detainees) with respect to their need for health care services.  (Dkt. 82-1, Decl. Warden Chestnut, ¶¶ 15–16.)

CoreCivic's contract with ICE at the Facility requires it to comply with ICE's 2025 National Detention Standards ("NDS 2025"), including those relating to health care.  (*Id.*, ¶¶ 17–21.)  CoreCivic's contract also sets a required staffing pattern for health care and health services administration positions.  (*Id.*, ¶ 18.)  ICE regularly monitors CoreCivic's compliance with the NDS 2025 and the contractually required health care staffing pattern.  (*Id.*, ¶ 19.)  CoreCivic's health care policies at the Facility are tailored to comply with applicable NDS 2025 standards, as well as applicable standards promulgated by the National Commission on Correctional Health Care

---

[1] CoreCivic has concurrently filed a Motion to Intervene for the purpose of seeking appellate review of the Court's Order.

[2] CoreCivic is not requesting to stay that portion of the Court's Order granting Defendants' Motion to Transfer Venue.  CoreCivic agrees that the matter should be transferred to the Eastern District of California without delay.

[3] CoreCivic was founded in 1983 as Corrections Corporation of America.  Its first contract was to house Immigration and Naturalization Service ("INS") detainees.  (Dkt. 82-1, ¶ 10.)  Since 2008, CoreCivic has housed civil immigration detainees at 28 facilities nationwide with more than 1.3 million ICE detainee bookings.  (*Id.*, ¶¶ 10–11.)

1   ("NCCHC") and the American Correctional Association ("ACA"), the two most widely recognized

2   standards and accreditation bodies for detention and correctional settings.  (*Id.*, ¶ 20.)  CoreCivic's

3   policies were submitted to ICE for review and approval at the beginning of the contract at the

4   Facility, and proposed policy revisions are also subject to review and approval by ICE.  (*Id.*)

5         Plaintiffs filed this putative class action on November 12, 2025, alleging that they are or

6   were subject to unlawful conditions of confinement and provided inadequate health care and legal

7   access at the Facility.  (*Id.*, ¶¶ 4–8, 13–24.)  Defendants are United States agencies and officials

8   sued in their official capacities, including: (1) ICE; (2) U.S. Citizenship and Immigration Services

9   Acting Director Todd M. Lyons; (3) Enforcement and Removal Operations, San Francisco Field

10  Office Acting Director Sergio Albarran; (4) the Department of Homeland Security ("DHS"); and

11  (5) DHS Secretary Kristi Noem.[4]  (*Id.*, ¶¶ 20–24.)

12        Plaintiffs bring five claims:

13  - First Claim: Fifth Amendment due process right to non-punitive conditions of
14    confinement.

15  - Second Claim: Fifth Amendment due process right to adequate medical care.

16  - Third Claim: First Amendment right to hire and consult with counsel.

17  - Fourth Claim: Fifth Amendment right to hire and consult with counsel.

18  - Fifth Claim: Section 504 of the Rehabilitation Act right to disability
19    accommodation.

20  (*Id.*, ¶¶ 268–294.)  For the First through Fourth Claims, Plaintiffs sought to certify a class of "[a]ll

21  persons who are now, or in the future will be, in the legal custody of [ICE] and detained at the

22  [Facility]."  (*Id.*, ¶ 254.)  For the Fifth Claim, Plaintiffs sought to certify a subclass of "[a]ll persons

23  who are now, or in the future will be, in the legal custody of [ICE] and detained at California City

24  Detention Facility who have disabilities within the meaning of the Rehabilitation Act."  (*Id.*, ¶ 255.)

25

26        [4] Although CoreCivic is not a named Defendant, Plaintiffs allege that "ICE has contracted
    with CoreCivic … to run and manage the California City facility," and that "CoreCivic facility
27  administration, staff, and other personnel are agents of Defendant ICE."  (Dkt. 1, ¶ 20.)  CoreCivic
    is referenced throughout the Complaint in that capacity.  (*Id.*, ¶¶ 3, 20, 25, 26, 27, 28, 29, 30, 31,
28  32, 33 & nn. 2, 9, 16.)  CoreCivic has moved to intervene in this matter.  (Dkt. 82.)

1

2

**B.      Plaintiffs' Motion for Class Certification and Motion for Preliminary Injunction, and Defendants' Motion to Transfer Venue.**

3

4

5

6

7

8

9

On February 6, 2026, the Court held a hearing on Plaintiffs' Motion for Class Certification (Dkt. 21) and Motion for Preliminary Injunction (Dkt. 22) and Defendants' Motion to Transfer Venue (Dkt. 37).  On February 10, 2026, the Court entered an Order granting in part Plaintiffs' Motions and Defendants' Motion.  (Dkt. 72).  The parties have since filed competing proposals for the selection of an external monitor (Dkt. 76–77, 79), and Plaintiffs have sought to enlarge the scope of the February 10, 2026 Order.  (*Id*.)  A conference is scheduled for March 5, 2026, to discuss the appointment of an external monitor.  (Dkt. 81.)

10

**1.      February 6, 2026 Hearing.**

11

12

13

14

15

16

17

At the hearing, the Court stated that it was inclined to grant Defendants' motion to transfer the case to the Eastern District of California, noting there was "not really a practical basis for bringing [the lawsuit] here." (Dkt. 75, R.T. 2/6/26, at 46:10–47:6.)  But the Court was concerned that transferring the case might "sideline" emergency matters, even though, in a related case pending against CoreCivic in the Eastern District of California, the judge was familiar with the conditions at the Facility, found that the conditions were improving, and denied a temporary restraining order expeditiously:

18

19

20

21

> We know that Judge Thurston has looked at a case that comes out of [the Facility] … She did not necessarily find that the complaints they made were unfounded, but what she said is you haven't shown they're going to get any worse by more people coming in and, a lot of these appear to be just they really weren't set up to start up when they did and now they're --they say they're doing better, and she didn't really address, however, the specific issue, but she clearly was made familiar with the fact of what's going on down there.

22

23

> She ruled expeditiously.  It's not like the case would just be put on a back burner.

24

25

(*Id.* at 32:19–33:8, referring to *Dignity Not Detention, et al. v. City of California, et al.*, 1:25-cv-01292-KES-CDB (E.D. Cal.).)

26

27

28

The Court asked Plaintiffs' counsel to identify what relief it could grant if it "transferred the case, just so that these things are not left dangling even for a limited period of time." (*Id.* at 49:1–4.)  The Court also asked Plaintiffs' counsel: "Why do you need class certification to get the

3

1    relief you're trying to get?  Is there any way that could be put to the side and still grant the

2    preliminary injunctive relief you're looking for?  Would it not be meaningful?"  (*Id.* at 49:16–19.)

3    Plaintiffs' counsel responded, "I think Your Honor could issue a ruling without handling" the class-

4    certification issue.  (*Id.* at 49:20–21.)  Plaintiffs' counsel added that "essentially, class certification

5    is appropriate because we represent a class of people …."  (*Id.* at 49:25–50:3.)  The Court replied

6    that the issue is not whether class certification was appropriate, but "why are you trying to get it?"

7    (*Id.* at 50:7–8.)

8        Instead of answering that question directly, Plaintiffs' counsel urged the Court to grant their

9    proposed Order and preliminary injunction, direct Defendants to come up with a detailed plan to

10   comply with that injunction, and appoint a monitor to ensure compliance:

11           We share the concern. Our response was to say Your Honor
             shouldn't be doing that. They should present to Your Honor and to
12           us a detailed plan that says here is how we're going to fix these
             issues, they should do within 7 or 14 days, and then this is a case
13           that cries out for an independent monitor to have access to go down
             there and make sure that that plan is being complied with so that we
14           are not before Your Honor or the Eastern District, for that matter,
             with TRO after TRO after TRO as the problems that Your Honor
15           already heard about with respect to Mr. Viera Reyes happens over
             and over. … Let's get a plan from the defendants and then lets [sic]
16           get a monitor to monitor it."

17   (*Id.* at 50:9–15, 51:15–52:24.)[5]

18       When the Court reviewed Plaintiffs' proposed order, it was stunned by their sweeping

19   request:

20           [W]ell, I can't do this.  I mean, it's got all kinds of generic things
             well beyond what you were doing on the medical to start with.  You
21           have things like timely and responsive medical services.  There's no
             way I can make an order that's just general like that.
22
             How is anybody going to know what they have to comply with?
23           You told me there were a couple of things at the outset that you
             would deal with on the medical.
24

25   _____

26       [5] Plaintiffs' counsel claimed that their proposal was "commonly done … in prison
     contexts," citing *Hernandez v. County of Monterey*, 110 F. Supp. 3d 929 (N.D. Cal. 2015). But in
     *Hernandez*, the defendants were ordered to propose a plan to address specific findings of
27   constitutional and statutory violations. *Id*. at 959–61. Here, there were no such findings. Moreover,
     the court in *Hernandez* did not order an external monitor. *Id*. Over the course of the hearing,
28   Plaintiffs' proposal morphed into simply granting the monitor unfettered discretion.

1   (*Id.* at 61:9–19.)  Plaintiffs' counsel stated that the purpose of the monitor was to delegate the

2   authority to determine whether Defendants have complied with any ordered injunctive relief:

3              Your Honor, what we had talked about originally was that we would
               get a plan from the other side to try to -- to try to come up with these
4              exact numbers and dates and the details and then the external
               monitor would ensure compliance with the plan.  In order to shorten
5              and make this simpler, we think Your Honor can -- and there are
               precedents where courts do -- issue an order that says meet these
6              requirements, these are not controversial, these are things that the
               defendants simply ought to be -- stipulate to, they ought to be
7              providing these; timely access to care, prescribed medicines, a sick
               call system that works. These are basic functions of an adequate
8              medical plan.

9              And then the crucial part is that an external monitor -- this is
               paragraph 2 -- will ensure compliance with these things so that Your
10             Honor doesn't have to sit there and come up with it should be this
               many days before intake and you should use this system to do this
11             or that. Instead, Your Honor would simply say here is what your
               medical plan must do to comply and we'll get an external monitor
12             in there to make sure that that happens.

13  (*Id.* at 61:20–62:14.)  Plaintiffs' counsel wanted a monitor who could "get in there and have access

14  to the facilities." (*Id.* at 62:17–24.)

15         The Court stated that a monitor might work but was still concerned that the language of the

16  order was too general and proceeded to look at each item:

17             This can perhaps work if you have a monitor who is going to make
               a determination about whether they're doing it.  Otherwise, I mean,
18             there's no point in just telling someone do it right. That's what this
               boils down to do it, do it right.
19
                                        ***
20
               All right.  It says do it correctly. And ordinarily, that would not be a
21             workable, in and of itself, injunctive order because then people
               would come back we are doing it fine. We're doing the, you know,
22             et cetera, et cetera, and that's why I was looking for specifics. But if
               you have a monitor that is in a position to make determinations,
23             possibly -- but I'm not absolutely certain about that and we'll just –
               we'll take it one step at a time.
24
               As I said, particularly concerned about intake and how one could
25             tell someone how to do at intake other than just do intake right.
               Okay. But then you have all of these other problems that maybe you
26             do need some kind of a referee for – that's on the scene or can be
               there. But, again, these are very general concepts. They're not give
27             [sic] somebody X numbers of hours a day outside. Okay.

28             They aren't give them a warm jacket. Okay. So they are --- they're

                                        5

conclusions about how something should be done, okay, timely. Timely is not [sic] get somebody there are a particular time, it's do it in, you know, proper expediency. And again, without somebody there, you could never tell whether anybody was following it or not unless you had a giant hearing on every one of these.

Okay. Let's go to the other one. This has to do with attorney access. I'm not sure I even understand the first one. And I'm not -- okay. I get the point, let their lawyer be there any time they want. I don't know if that's reasonable.

Okay. So we'll go to the next one. Contact visits without glass interface there. Okay. That's at least something specific. Every time you go temporarily unrestricted -- you mean be able to have free calls for as long as you want with your lawyer?

(*Id.* at 63:2–64:16.) Plaintiffs' counsel responded, "Correct." (*Id.* at 64:17.)

The Court then proceeded to go through the items Plaintiffs requested and asked whether it could grant injunctive relief since there was no evidence to support them.  For example, it noted that Plaintiffs had asked for an order enjoining Defendants from retaliating against Plaintiffs despite the absence of any evidence to support retaliation:

The Court: Don't retaliate against any of the plaintiffs. Has that happened?

MR. HARRIS: We don't want it to happen. And I can tell you that the plaintiffs are afraid that it will happen and we'd like a court order that enjoins the defendants from taking any adverse action because they're pursuing their rights in this court.

THE COURT: I don't know if I can order something when there's no indication that it's going to happen. Okay. In other words, I can order something not happening -- you don't have to have something happen bad already. If something bad is about to happen, somebody is going to chop down the historic giant sequoia, okay.

But you -- if there's no indication, I'm not sure I can do that.

(*Id.* at 69:10–69:24.)

The Court then stated that it was not inclined to grant class certification: "Then you threw class cert in, all right, which I may not do at all because we already talked about you don't need it." (*Id.* at 70:1–3.)  Plaintiffs' counsel responded: "[W]e want to make sure that this order runs to everyone in that facility, including people who aren't there yet and who aren't named as plaintiffs," and, "We don't want to be dealing with some mischievous motion about how if all of these plaintiffs were to be suddenly transferred out to another facility or deported then the Government comes in

6

1    and says, oh, well this order is meaningless because you didn't have a provisional class cert." (*Id.*

2    at 70:4–23.)

3        The Court then asked Defendants' counsel whether they opposed Plaintiffs' requests "based

4    on there's no showing that they aren't doing it, or what's the opposition?" (*Id.* at 79:24–80:1.)

5    Defendants' counsel stated "there absolutely is an opposition to it, … and it's been set forth in the

6    … sworn declarations" in support of their oppositions to Plaintiffs' Motions. (*Id.* at 80:5–12.) The

7    Court clarified that it was not asking about the evidence in the case, but whether it was unreasonable

8    for someone—outside this litigation—to request the things that Plaintiffs demanded:

9            No. No. Forget there's any kind of court action. Somebody just
10           comes up to you and they say can we agree that the people here
             should be entitled to these things. Would you say, no, I think it's an
             unreasonable demand as to any of them and -- that's my first point.
11           Now we're not in court, all right, just somebody saying, you know,
             can we work this out in some way, we've had some concerns, can
12           we agree these are all what should be done?

13    (*Id.* at 80:13–20.) Defendants' counsel explained that the parties were supposed to meet and confer

14    to identify Plaintiffs' most urgent medical needs before the case was transferred, and that

15    appointing a monitor undermined that purpose:

16           Our understanding was we were looking at identifying the most
             urgent medical needs that the parties would address during the brief
17           period that this case is being transferred to the Eastern District,
             issues like Mr. Viera Reyes or Mr. Leyva, who we mentioned
18           earlier. And the external monitor is one good example of that, Your
             Honor.
19
             Having an external monitor that the parties propose to this court in
20           14 days is not consistent with addressing immediate medical
             concerns during the period of transfer. And that's what they're
21           asking for is we come back to this court in 14 days with a proposed
             external monitor. I think the parameters that we were prepared to
22           discuss in good faith are things that are big and obvious and
             straightforward for the Court to do. And we are very sensitive to --
23           and responsive to immediate medical needs. We have proven that
             we can work together to address them.
24
             I think to the extent the demand is for broad relief, I think that is
25           concerning. It also goes towards the kind of ultimate relief on the
             merits you get after a lengthy evidentiary hearing or a trial. And I
26           also think that with respect to the specific items that we have gone
             through, the Court has to evaluate them under the appropriate
27           standard here which is will they suffer irreparable harm in the
             absence of that specific item of relief.
28

7

1

2    Of course they have to also show that they're clearly entitled to succeed on the merits of their claim as to that allegation but we can just focus on irreparable harm for now and we were prepared to do so in good faith, focus just on what are the items that they're telling us that these individuals would be irreparably harmed by, what are the conditions they would be irreparably harmed by unless my client agrees to ensure that certain things happen. And that hasn't really happened today and I think none of these items are things that pose an immediate risk of harm during the brief period between now and when the case is picked up by the Eastern District judge.

3

4

5

6

(*Id.* at 82:8–84:3.)

7    The Court stated that it was hoping to get "specifics as opposed to generics" from Plaintiffs

8    and "wanted to see if [it] could do something that -- if I transfer it -- that I don't leave people with

9    really no -- no immediate response." (*Id.* at 84:16–85:7.) The Court recognized, "I don't think it's

10   going to happen," and, "There has been no showing that would happen with this case," (*id.* at

11   85:5n–9), but was concerned about a "sloppy system":

12

13   The concern is that there are people with all manner of health problems, they're not going to necessarily die from them. It's not like the two that were called to my attention, but it's still harm if you're not getting the care you need and, therefore are not -- they're still suffering from something that could be dealt with or be less painful or not lapse and have you have like some kind of relapse or get worse. And it's not so much that each individual there is going to need medical care. They can go through any kind of sloppy system and they'll be fine because there's nothing wrong with them.

14

15

16

17

18   But there are enough people there who at least may need some type of help. It can be acute, it can be chronic, and that's what the harm is, if you will, as I see it. But I'm not sure that I want to start saying, all right, let's just plug in a monitor.

19

20   (*Id.* at 86:6–21.) The Court repeated that it was inclined to transfer venue but wanted to make sure

21   that a transfer did not cause issues:

22   So -- and there's a good chance I'm going to transfer it, and I just don't want to dump and unwheel the set of requests on an already, you know, burdened judiciary or have your clients not get what they need in the interval. And I don't think it will be a long delay, but I am concerned if there are things that are really important and I can help you out, I want to do it in advance of sending it.

23

24

25   (*Id.* at 87:8–14.) But the Court also recognized that some of Plaintiffs' evidence was "cherry

26   picked" and disputed, and that certain issues caused by "insurmountable barriers" have since been

27   remedied. (*Id.* at 89:23–90:17.)

28

8

1    After further argument, the Court stated its concern that it would be unable to grant Plaintiffs

2    any relief if the case was transferred, even though Defendants were "doing their best" and were not

3    being deliberately indifferent to detainees' medical needs:

> Here is one of the problems just logistically, I guess. If I were to make any kind of order, I hadn't really anticipated that it would require any kind of delay in transfer but it could. We can wait. I can make -- because once -- if I transfer, once I do that, I can't be making orders anymore here.
>
> So it would have to be something I would have to do in advance. And if I were to order a monitor, for example, if I were, and it doesn't have to be you have to come up with a name in 14 days but you can, as long as I'm overseeing the case, it hasn't gone into some kind of temporary limbo, and if that's too soon, for example, if counsel thought that was just too quick, fine, we could pick some other time frame or what have you. But if I were going to order that, I just want to be very sure that we are not just looking at they can't really deal with the hard cases.
>
> Okay. If it's just a question of they can't deal with the hard cases because they're really not set up to deal with these really, really sick people on a -- they just came in out of nowhere really sick, as opposed to let's say you had a regular prison and people start getting older and they start getting various conditions that go with getting older, they see it coming. They deal with it.
>
> It isn't like somebody -- you know showed up on their doorstep half dead already so it's really a very, very different circumstance. I can understand how it can be difficult to deal with. In other words, that the people at this facility may be doing their best but just not really understanding how much was involved when they agreed to take on this particular assignment.
>
> *And so I'm just saying that I'm not finding there are any really bad people here, if I make certain findings. And it looks to me like they're trying to do their best as opposed to saying I don't care about these people, let this guy just rot away with his diabetic ulcers or whatever, that they are trying to do their best, but it's just beyond them at the moment and that they may need some help in how they're going to deal with it.*
>
> Now if you had a monitor, is this monitor somebody who is just going to be saying you're not doing, you're not doing, or is it somebody that really understands how things should be done and can give constructive suggestions?

(*Id.* at 102:11–103:4, emphasis added.)  For the remainder of the hearing, the Court focused on

whether Plaintiffs' request was reasonable, rather than whether Plaintiffs had established that

injunctive relief was warranted.  (*Id.* at 114:3–156:1.)

9

CORECIVIC'S EMERGENCY MOTION TO STAY PENDING APPEAL        CASE NO. 3:25-CV-09757-MMC

After further discussion, the Court revealed that it initially had not considered granting any

preliminary injunctive relief: "I didn't come out here planning to do any of this. It struck me while

we were talking but that's beside the point." (*Id.* at 157:20–21.) The Court then ruled that it was

not going to transfer the case immediately because it could not then grant Plaintiffs relief:

> I am going to transfer the case. I'm not issuing that order now because if I do it, that's it. I don't have -- you know, I don't have authority to do anything.
>
> So I will hold on to it for the purpose of you getting me the monitor and giving me an order to appoint the monitor.
>
> My only question is if there have been instances where a monitor has been appointed for some limited period of time, does anybody have any exemplars of what that might be?

(*Id.* at 159:20–160:3.) Defendants' counsel objected that he was "not aware of a court in a different

district ordering a monitor of a facility[,] located over 350 miles away in this case[,] in a separate

district. (*Id.* at 160:4–7.) The Court nonetheless stated that it would order a monitor even though

the transferee court may not even want a monitor:

> I can order it and then any reports though are going to have to be delivered to somebody other than me.
>
> And we haven't talked here at all about how the monitor would contact the Court to let them know. And I don't know if ordinarily that's provided for in any way in an order of – in the preliminary injunction or only in the order appointing the monitor in which it may be and the monitor -- so you might want to talk about that.
>
> And I think thinking of limiting of the amount of time though because as Mr. Iyengar says, *for all we know, whoever gets the case doesn't even want a monitor.* So at least we could make it that if somebody warrants to extend the monitor, then they could based on whatever reports are coming in.

(*Id.* at 160:8–21, emphasis added.)

Defendants' counsel argued that the transferee judge would be in a better situation to

appoint a monitor and decide the length of supervision. (*Id.* at 162:22–163:5.) The Court

responded, however, that it will appoint a monitor now because, otherwise, the order would be "too

loosey-goosey," and it wanted to grant Plaintiffs "some immediate relief":

> In other words, I either don't do anything or I do this with a monitor. And I can't say in effect that -- I don't know if there's a way to write it that there will be a monitor provided, there's a monitor that

10

1

2

3

> everybody agrees to, and it's -- if you can think of a way that could
> be written -- and you don't have to tell me tonight – if you think of
> a way that it can be written that I will say a monitor goes in there
> because *otherwise I can't issue this order. It's just too loosey-
> goosey.*

4

\*\*\*

5

6

7

8

9

10

> [I]f I am going to grant the transfer but I am going to give them some
> immediate relief that they can start using, the only way item one is
> workable is with a monitor and the fastest way is for me to appoint
> one and not have some kind of conditional it's like I'm appointing a
> monitor but then it will be picked by the judge in the Eastern District
> at some point and then whatever. And in the meantime we have this
> sort of unmonitored thing going on All right. I will order this and I
> will consider a length of time -- it may be on the shorter side with
> the idea that you're -- as you point out, a judge down there ought to
> decide more about how this should go. All right. So I may put some
> limitations on it.

11

(*Id.* at 163:6–164:15.)

12

**2.      February 10, 2026 Order.**

13

On February 10, 2026, the Court entered an Order granting in part Plaintiffs' Motion for a

14

Preliminary Injunction and Motion for Class Certification. (Dkt. 72.) It made no factual findings

15

of a constitutional violation or otherwise, instead merely adopting Plaintiffs' proposed conclusory

16

statement that it "finds" Plaintiffs have demonstrated the requirements for a preliminary injunction

17

and class certification:

18

19

20

21

22

> Pursuant to Federal Rules of Civil Procedure 65 and 23, and having
> reviewed the Parties' filings and the argument of counsel, the Court
> finds that Plaintiffs have demonstrated that they are likely to prevail
> on the merits of their claims; that they will suffer irreparable harm
> if the Court does not issue relief; that the balance of equities tips in
> their favor; that the public interest lies in issuing a preliminary
> injunction; and that all the requirements of Rule 23(a) and 23(b)(2)
> have been satisfied.

23

(*Compare* Dkt. 72 at 4, *with* Dkt. 66 at 8.)    The preliminary injunction generically ordered

24

Defendants to "ensure" the following:

25

26

27

28

> a.  adequate health care staffing;
> b.  comprehensive, documented medical intake screening,
>     performed by a qualified medical provider within 12 hours of a
>     person's arrival;
> c.  thorough Initial Appraisals performed timely by a primary care
>     provider;
> d.  timely approval and access to medical specialists;
> e.  timely and responsive emergency services;

11

1                f.  continuity of medical care upon intake and thereafter, including
2                    timely completion of active medical orders, access to scheduled
                    provider appointments, and consistent provision of medication;

a. f. continuity of medical care upon intake and thereafter, including timely completion of active medical orders, access to scheduled provider appointments, and consistent provision of medication;
g. timely access to prescribed medications; and
h. a responsive "sick call" request system.

(Dkt. 72 at 3.)  To "ensure compliance" with the above, the Court further ordered Defendants "to provide access to a qualified, independent, third-party monitor ("External Monitor") for a period of 120 days, subject to renewal by court order":

> The External Monitor will ensure compliance with this Order and will monitor its implementation, including through review of medical records and on-site inspection and interviews with patients and staff. The parties will meet and confer regarding the selection of the External Monitor and will present their proposal(s) to the Court within 14 days of this Order. If the Parties are unable to agree upon the selection, the Court will resolve the dispute and appoint the External Monitor. Defendants are ordered to pay the External Monitor's reasonable rate.

(*Id.* at 3–4.)

The Court then ordered Defendants to "to ensure that detained individuals have timely and confidential access to attorneys, including but not limited to by allowing" the following:

> a. in-person legal visitation seven days per week from 8:00 a.m. to 8:00 p.m., in private and confidential settings, with each legal visit lasting up to three (3) hours in length;
> b. contact attorney visits that do not take place through a pane of glass, absent documented security grounds to deny such contact;
> c. scheduling of confidential legal calls with legal representatives of up to 90 minutes each, to take place within two (2) business days of a request; and
> d. provision of written information regarding protocols for attorney-client communication to all individuals detained at California City.

(*Id*. at 4.)  The Court further ordered Defendants "to ensure that detained individuals are provided with the following, with exceptions only where necessary for individualized, documented security concerns":

> a. Temperature-appropriate clothing and blankets free of charge;
> b. Reasonable, consistent, and adequate access to adequate outdoor recreation spaces, for at least 1 hour per day, 7 days per week.

(*Id.* at 4.)

The Court also provisionally certified a class defined as: "All persons who are now, or in the future will be, in the legal custody of U.S. Immigration and Customs Enforcement ('ICE') and

12

1   detained at [the Facility]." (*Id.* at 4.)  It stated that "[t]he Provisional Class is certified as to the

2   practices and relief identified in this Order."  (*Id.*)  The Court appointed the named Plaintiffs as

3   class representatives and their counsel as class counsel.  (*Id.* at 5.)

4   **II.    This Court Should Stay the February 10, 2026 Order Pending Its Appeal.**

5          It is not yet known whether Defendants intend to appeal the Court's February 10, 2026

6   Order.  Regardless, CoreCivic intends to appeal that Order.  Thus, a stay should be entered until

7   the appeal is finally resolved.

8          **A.    Legal Standard.**

9          Courts consider four factors to determine whether a stay pending appeal should be granted:

10  "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits;

11  (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay

12  will substantially injure the other parties interested in the proceeding; and (4) where the public

13  interest lies." *Nken v. Holder*, 556 U.S. 418, 434 (2009) (citation modified); *accord Am. Fed'n of

14  *Gov't Emps., AFL-CIO v. Trump*, 148 F.4th 648, 654–56 (9th Cir. 2025) (applying *Nken* factors to

15  grant stay of preliminary injunction pending appeal).  "The first two factors ... are the most critical."

16  *Cmty. Legal Servs. in E. Palo Alto v. U.S. Dep't of Health & Hum. Servs.*, 137 F.4th 932, 937 (9th

17  Cir. 2025) (citation modified).

18         The Ninth Circuit uses a "sliding scale" approach that balances these factors, such "that a

19  stronger showing of one element may offset a weaker showing of another." *Leiva-Perez v. Holder*,

20  640 F.3d 962, 966 (9th Cir. 2011).  Moreover, it has explained that "[a]lthough a stay pending

21  appeal certainly has some functional overlap with an injunction, stays are typically less coercive

22  and less disruptive than are injunctions."  *Id.* (citation modified).  "Whereas 'the extraordinary

23  remedy of injunction' is the means by which a court 'directs the conduct of a party ... with the

24  backing of its full coercive powers,' a stay operates only 'upon the judicial proceeding itself ...

25  either by halting or postponing some portion of the proceeding, or by temporarily divesting an order

26  of enforceability.'"  *Id.* (citation omitted).  Thus, "a flexible approach is even *more* appropriate in

27  the stay context."  *Id.*  Here, all four *Nken* factors weigh in favor of staying the Court's Order

28  pending its appeal.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

B.      **Success on the Merits Is Likely on Appeal.**

1.      **The Court Failed to Apply the Legal Standard for Granting Preliminary Injunctive Relief.**

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (quoting 11A C. Wright, A. Miller, & M. Kane, Federal Practice & Procedure § 2948, pp. 129–30). A preliminary injunction "cannot issue merely because it is possible that there will be an irreparable injury to the plaintiff." *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (citing *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008)). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20. A district court commits error if it applies any lesser standard. *See Am. Trucking Ass'ns*, 559 F.3d at 1052.

Here, the Court failed to hold Plaintiffs to the correct legal standard. Although it stated in conclusory fashion that "Plaintiffs have demonstrated that they are likely to prevail on the merits of their claims; that they will suffer irreparable harm if the Court does not issue relief; that the balance of equities tips in their favor; that the public interest lies in issuing a preliminary injunction" (Dkt. 72 at 3), it never analyzed or made findings supporting any of the *Winter* factors. Indeed, when Defendants' counsel objected that Plaintiffs have not met their burden to show that they were entitled to preliminary injunctive relief, the Court sidestepped the inquiry ("No. No. Forget there's any kind of court action."). (Dkt. 75, R.T. 2/6/26, at 80:13–20; 82:8–87:14.) The Court instead focused on giving Plaintiffs some immediate relief before it transferred the case in the event Plaintiffs needed it. (*Id.* at 163:16–164:15.) That speculative concern does not satisfy Plaintiffs burden under *Winters*.

To prevail on a due process claim of deliberate indifference to their serious medical needs, Plaintiffs were required to show that Defendants recklessly disregarded their serious medical needs. *Fraihat v. U.S. Immigr. & Customs Enf't*, 16 F.4th 613, 636–37 (9th Cir. 2021). This "reckless

1    disregard standard is a formidable one."  It requires Plaintiffs to establish that Defendants made

2    intentional decisions with respect to the Facility conditions, which put them at a substantial risk of

3    serious harm, Defendants recklessly disregarded that risk by not taking reasonable measures to

4    abate it, and by not taking such measures caused their injuries.  *Id.* at 636 (citation modified).

5    "Neither 'mere lack of due care,' nor 'an inadvertent failure to provide adequate medical care,' nor

6    even 'medical malpractice,' without more, is sufficient to meet this standard."  *Id.* (citations

7    omitted).  "Instead, a plaintiff must show that the defendant "disregard[ed] an excessive risk" to

8    the plaintiff's health and safety by failing to take "reasonable and available measures" that could

9    have eliminated that risk."  *Id.*

10        The Court did not apply this legal standard or make any findings establishing that Plaintiffs

11    were likely to succeed on their claim.  The Court also did not find that Plaintiffs would likely be

12    irreparably harmed, only the mere possibility of such harm.  (Dkt. 75, R.T. 2/6/26, at 86:6–21.)

13    Indeed, the Court found that Defendants were not recklessly disregarding any risk of harm to

14    detainees but, rather, doing their best to mitigate any such risk.  (*Id.* at 102:11–103:4.)  It also stated

15    that "it sounded like the defendants -- the expert or the doctor -- was trying to get things done but

16    had some amount of insurmountable barriers or problems herself recognizing certain things weren't

17    done right saying, well, those have been remedied, but of course you can only do those so often"

18    (*id.* at 90:5–11), and that "they weren't prepared for this" (*id.* at 90:24).

19        To prevail on their First Amendment claims regarding access to counsel, Plaintiffs were

20    required to show that the alleged restrictions on attorney visitation were not reasonably related to

21    legitimate government interests under the four factors the Supreme Court adopted in *Turner v.*

22    *Safely*, 482 U.S. 79 (1987).  The Court did not consider any of the *Turner* factors.

23        Nor did the Court address the merits of Plaintiffs' Rehabilitation Act claim.  To the contrary,

24    the Court's comments show, at most, that it believed Plaintiffs or others were subjected to an

25    inadequate medical system, not that they were discriminated against "solely by reason" of their

26    disability.  *See Fraihat*, 16 F.4th at 650 ("Plaintiffs at most demonstrated that they were subjected

27    to inadequate national policies that they claimed reflected deliberate indifference to COVID-19;

28    they did not show they were treated differently from other detainees 'solely by reason' of their

15

disabilities."); *see also Simmons v. Navajo Cnty.*, 609 F.3d 1011, 1022 (9th Cir. 2010) ("The ADA prohibits discrimination because of disability, not inadequate treatment for disability."), *overruled in part on other grounds by Castro v. Cnty. of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016).

Plaintiffs also failed to establish that they were likely to succeed on the merits of all these claims because their allegations of systemic failures were insufficiently based on anecdotes of isolated and sporadic incidents at one facility, which has only been open since September 2026 (five months). *See Lewis v. Casey*, 518 U.S. 343, 358 (1996); *Dayton Bd. of Ed. v. Brinkman*, 433 U.S. 406, 417 (1977) ("[O]nly if there has been a systemwide impact may there be a systemwide remedy.").

The Court also erred by relying on the mere possibility of harm to other immigration detainees. Not only is harm to others not an irreparable injury to Plaintiffs, but speculation of such harm is legally insufficient. (Dkt. 38 at 28–29.) *Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Tr.*, 636 F.3d 1150, 1160 (9th Cir. 2011) ("An injunction will not issue if the person … seeking injunctive relief shows a mere 'possibility of some remote future injury' or a 'conjectural or hypothetical injury.'") (internal citation omitted).

The Court also made no attempt to balance the equities and public interest, both of which tip sharply in favor of Defendants. (*Id.* at 29–31.) The Court's ruling is especially problematic because it failed to consider Defendants' arguments that it lacked authority to grant the preliminary injunction that Plaintiffs requested. (*Id.* at 31–33.)

## 2. The Preliminary Injunction Violates Rule 65.

Rule 65(d) "requires that injunctions 'shall be specific in terms; [and] shall describe in reasonable detail ... the act or acts sought to be restrained.'" *Portland Feminist Women's Health Ctr. v. Advocs. for Life, Inc.*, 859 F.2d 681, 685 (9th Cir. 1988) (quoting Fed. R. Civ. P. 65(d)(1)). "The Supreme Court has indicated that the policy behind the rule is 'to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood.'" *Id.* (quoting *Schmidt v. Lessard,* 414 U.S. 473, 476 (1974)). The Ninth Circuit has "interpreted the rule and its policy to require that 'the language of injunctions ... be reasonably clear so that ordinary persons will know precisely what

16

1   action is proscribed.'"  *Id.* (quoting *United States v. Holtzman,* 762 F.2d 720, 726 (9th Cir. 1985)).

2   An injunction must also be narrowly tailored to address the specific injury alleged.  *Park Village*,

3   636 F.3d at 1160.  Where, as here, the injunction is mandatory (i.e., it requires something to be

4   done), a preliminary injunction is particularly disfavored.  *See id.*

5          Here, the Court entered the preliminary injunction despite acknowledging that it was too

6   general for anyone "to know what they have to comply with."  (Dkt. 75, R.T. 2/6/26, at 61:9–19.)

7   The Order's use of undefined and vague terms, such as "adequate," "thorough," "timely," and

8   "responsive," grants unfettered discretion to the monitor to subjectively define and enforce. (Dkt.

9   72, Paragraph 1.)  This ambiguity leaves CoreCivic no objective criteria to determine how it should

10  act or not act to comply with the Court's Order.   (Dkt. 82-1, ¶¶ 22, 23.)  The Court's Order is

11  effectively a vague "obey the law" instruction with no benchmarks or standards for compliance.

12         The Order is also not narrowly tailored to address a specific harm alleged because it

13  encompasses virtually all aspects of medical care at the Facility.  For example, despite not finding

14  any specific harms relating to health care staffing, emergency medical services, or sick call

15  responses, the Court has ordered the provision of "adequate health care staffing," "timely and

16  responsive emergency medical services," and a "responsive 'sick call' request system."  (Dkt. 72,

17  Paragraph 1(a).)  The appointment of the monitor does not cure these defects because the Order

18  still lacks reasonable specificity and fails to describe in detail what CoreCivic must do or restrain

19  from doing to comply with the Order.  *See id.*

20         Because success is likely on appeal, this Court should stay the Order pending appeal.  *See,*

21  *e.g.*, *Klamath-Siskiyou Wildlands Ctr. v. Grantham*, No. 218CV02785TLNDMC, 2019 WL

22  2325555, at *1 (E.D. Cal. May 31, 2019) (granting stay pending appeal of preliminary injunction,

23  finding the appeal raised serious questions regarding the likelihood of success on the merits of the

24  appeal and the balance of equities tipped in favor of stay).

25              **3.    The Court Failed to Follow the Legal Standard in Granting Provisional**
                        **Class Certification.**
26
27         "If the preliminary injunction is infirm, the class certification order necessarily falls as well,

28  regardless of whether class certification was otherwise proper under Federal Rule of Civil

17

1  Procedure 23." *Fraihat*, 16 F.4th at 635.  Nonetheless, CoreCivic will also likely succeed on the

2  merits of its appeal of the Court's Order granting provisional class certification because it failed to

3  apply the legal standards that govern class certification.

4      "The class action is 'an exception to the usual rule that litigation is conducted by and on

5  behalf of the individual named parties only.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348

6  (2011).  To justify a departure from that rule, the plaintiff must establish that class certification is

7  appropriate under all the requirements of Federal Rule of Civil Procedure 23(a) and at least one

8  requirement under Rule 23(b).  *See id.* at 345.  "Actual, not presumed conformance with Rule 23(a)

9  remains … indispensable." *Id.* at 351 (citation omitted).  "[P]laintiffs wishing to proceed through

10 a class action must actually *prove*—not simply plead—that their proposed class satisfies each

11 requirement of Rule 23." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 275 (2014).

12 This is because "Rule 23 does not set forth a mere pleading standard." *Dukes*, 564 U.S. at 350.  "A

13 party seeking class certification must affirmatively demonstrate his compliance with the Rule—

14 that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common

15 questions of law or fact, etc." *Id.*

16     Before a court may certify a class, it must conduct a "rigorous analysis," which will

17 frequently "entail some overlap with the merits of the plaintiff's underlying claim." *Id.* "That

18 cannot be helped," because "the class determination generally involves considerations that are

19 enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Id.* (citation

20 modified).  Class "certification is proper only if the … court is satisfied, after a rigorous analysis,

21 that the prerequisites of Rule 23(a) have been satisfied." *Id.* (citation modified and citations

22 omitted).

23     Here, the Court's adoption of Plaintiffs' conclusory statement "that all the requirements of

24 Rule 23(a) and 23(b)(2) have been satisfied" does not satisfy its obligation to conduct a rigorous

25 analysis to determine whether they met their burden to establish—through significant proof—that

26 all of Rule 23(a)'s elements (commonality, typicality, numerosity, and adequacy) are met. *See B.K.*

27 *by next friend Tinsley v. Snyder*, 922 F.3d 957, 977 (9th Cir. 2019) (vacating and remanding class

28 certification order where "the district court did not make factual findings").  Nor does that statement

1  satisfy the Court's obligation to make a threshold finding under Rule 23(b)(2) that Plaintiffs will

2  likely suffer an injury absent a preliminary injunction. *See Hodgers-Durgin v. de la Vina*, 199 F.3d

3  1037, 1045 (9th Cir. 1999) ("[S]ystem-wide injunctive relief is not available based on alleged

4  injuries to unnamed members of a proposed class.").

5          To the contrary, the Court did not conduct any analysis of any of these elements, much less

6  a rigorous one.  The Court certified instead on the mere possibility of harm to a hypothetical

7  detainee, who it assumed was different than prisoners because he or she could be taken into custody

8  with serious medical illnesses that might go undetected and untreated at the Facility.   But

9  speculative harm to unnamed class members does not satisfy Rule 23. *See id.*  Even Plaintiffs'

10  counsel believed certification was a mere formality.  (Dkt. 75, R.T. 2/6/26, at 49:1–19; 70:1–23.)

11  Rule 23 requires much more.  The Court's failure to apply the applicable legal standard is an abuse

12  of discretion. *See, e.g.*, *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 983 (9th Cir. 2011) (finding

13  the district court applied "impermissible legal criteria" by accepting the allegations in the complaint

14  as true, rather than "resolving the critical factual disputes" overlapping with the Rule 23(a)

15  requirements.).  Because a successful challenge to the Court's class certification order is likely, the

16  Court should stay the Order pending that appeal.

17          **C.     CoreCivic Will Be Irreparably Harmed Absent a Stay Pending Appeal.**

18          Absent a stay pending an appeal, CoreCivic will be irreparably harmed because the Court's

19  overbroad and vague Order not only impairs its ability to operate the Facility according to the terms

20  and standards under its Agreement with ICE, but it requires it to incur significant resources to

21  implement the preliminary injunction.

22          The Court's preliminary injunction irreparably harms CoreCivic by impairing its operation

23  and management of the facility pursuant to these terms.  For instance, the Court's Order does not

24  provide objective timeframes in which the listed healthcare tasks must be completed, which makes

25  it impossible for CoreCivic to evaluate whether it is in compliance.  (Dkt. 82-1, ¶ 22.)  Likewise,

26  the use of adjectives such as "adequate" and "responsive" are highly subjective and fail to provide

27  CoreCivic with any guide posts for demonstrating compliance. (*Id.*, ¶ 23.)  An external monitor

28  working off the Court's Order, which does not define "timely," "adequate," or "responsive," will

19

1    have unfettered discretion to come up with their own standards, which are likely to conflict with or

2    exceed the NDS 2025 and CoreCivic policies, which were tailored to ensure compliance with those

3    standards.  (*Id.*, ¶¶ 23–50.)  The injunction also irreparably harms and substantially impairs

4    CoreCivic's operations by requiring that initial intake screenings be conducted by a "provider"

5    rather than a nurse as permitted by the NDS 2025, NCCHC, and ACA standards (*id.*, ¶¶ 34–36, 39,

6    42, 44, 47–48), and by requiring CoreCivic to expend resources and money to purchase equipment,

7    reconfigure portions of the Facility, and alter its scheduling practices for attorney visitation (*id.*,

8    ¶¶ 56–78).  These harms are compounded by the fact that the preliminary injunction subjects

9    CoreCivic to supervision by an external monitor with unfettered discretion to determine compliance

10   with its overbroad and vague terms.  *Id.*  All of this was foisted on CoreCivic without affording it

11   due process.

12        In addition, the Court's preliminary injunction violates CoreCivic's constitutional rights by

13   enjoining it as a non-party to implement policy and procedural changes without due process of

14   law. *See Monterey Mech. Co. v. Wilson*, 125 F.3d 702, 715 (9th Cir. 1997) ("Monterey Mechanical

15   showed two kinds of harm: (1) loss of the contract, and (2) unconstitutional discrimination in the

16   bidding process based on race and sex. While money damages might remedy the first harm, it is

17   not apparent to us how they would remedy the second.") (citing *Associated Gen. Contractors v.*

18   *Coalition for Econ. Equity*, 950 F.2d. 1401, 1412 (9th Cir. 1991).  The violation of a constitutional

19   right is in itself an irreparable harm.  *Associated Gen. Contractors*, 950 F.2d at 1412 ("We have

20   stated that an alleged constitutional infringement will often alone constitute irreparable harm.").

21        Further, several portions of the Court's preliminary injunction inflict irreparable harm upon

22   CoreCivic by directing it to perform work without compensation under its agreement with ICE.

23   For example, Paragraph 1(b) of the Order requires a "comprehensive, documented medical intake

24   screening, performed by a *qualified medical provider* within 12 hours of a person's arrival." (Dkt.

25   72, Paragraph 1(b) [emphasis added].)  "Qualified medical provider" is not defined in the Order,

26   but typically "provider" means a Nurse Practitioner, Physician's Assistant, Physician, or a similar

27   level of license, and does not include a Registered Nurse or Licensed Vocational Nurse.  (Dkt. 82-

28   1, ¶ 34.)  This requirement is far beyond what is required by the NDS 2025 or applicable NCCHC

and ACA standards.  (*Id.*, ¶¶ 35, 37, 42, 44.)  The cost to CoreCivic to hire five additional Nurse Practitioners to complete intake screenings, without any examination, exceeds $900,000 per year, assuming qualified individuals willing to work at the Facility can be located and approved by ICE for detainee contact.  (*Id.*, ¶¶ 47–48.)

The preliminary injunction requiring three-hour legal contact visits and 90-minute legal calls also requires CoreCivic to incur additional unreimbursed costs to modify the Facility physical plant as well as interjects confusion relating to the scheduling and availability of legal visits.  (*Id.*, ¶¶ 63–75.)  Because the Facility houses male and female detainees of multiple custody levels, which cannot intermix under the NDS, additional spaces are required for visits lasting longer than 60 minutes.  (*Id.*, ¶¶ 67, 69, 73–74.)  To accommodate lengthier contact visits, CoreCivic must subdivide existing rooms to create additional spaces for in-person attorney visits, which is expected to cost approximately $19,875, not including electrical work, which is anticipated to be another $5,000-$7,000.  (*Id.*, ¶¶ 63–65.)  CoreCivic will also need to add an additional officer to visually monitor the contact visitation area, at a cost to CoreCivic of $104,083.20 per year.  (*Id.*, ¶ 66.)  CoreCivic is also concerned that an increase in contact visits may facilitate the introduction of contraband, which could pose a life-safety hazard to detainees and staff.  (*Id.*, ¶ 80.)

Under the online scheduling system (Detention Facility Appointment Scheduler) that ICE is required to use for scheduling legal visits and calls pursuant to a Congressional mandate, implementing a three-hour scheduling block for legal visits means that shorter appointments cannot be scheduled, even if requested by the detainee's attorney.  (*Id.*, ¶¶ 57, 62, 71.)  As a result, only four visits can be scheduled per room per day.  (*Id.*, ¶ 70.)  Although the new time blocks have only recently gone live, one attorney has already attempted to circumvent the system by booking all four contact visit rooms at the same time so he can visit with more than one detainee during the three-hour block.  (*Id.*, ¶ 70.)

Similarly, the mix of different detainee sexes and custody levels also forced CoreCivic to incur additional expenses to accommodate lengthier (90 minutes versus 60 minutes) legal calls. (*Id.*, ¶¶ 73–74.)  Due to the lack of a physical location for a detainee to have a facilitated private legal call, only the Virtual Attorney Visitation ("VAV") rooms can be used for facilitated legal

21

1  calls.[6]  (*Id.*, ¶ 78.)  In order to separate detainees by classification level and sex, providing 90-

2  minute calls requires physical plant changes to add VAV rooms at an estimated cost of $69,395.

3  (*Id.*, ¶ 74.)  Further, given the different locations of these additional areas, CoreCivic will need to

4  provide additional security staff at an estimated cost of $260,208 per year.  (*Id.*, ¶ 75.)

5      As a non-party, CoreCivic's expenditure of the resources and monies stated above to

6  comply with the Court's preliminary injunction constitutes irreparable harm because CoreCivic

7  likely cannot recover them at the conclusion of this litigation.  *See Janvey v. Alguire*, 647 F.3d 585,

8  600 (5th Cir. 2011) (noting that "courts have found that a remedy at law is inadequate if legal

9  redress may be obtained only by pursuing a multiplicity of actions") (citing *Lee v. Bickell*, 292 U.S.

10  415, 421 (1934) ("As to this we are not in doubt, the multiplicity of actions necessary for redress

11  at law being sufficient, without reference to other considerations, to uphold the remedy by

12  injunction.")); *see also, e.g.*, *Ass'n Des Éleveurs De Canards et D'Oies Du Québec v. Harris*, No.

13  2:12-CV-05735-SVW-RZ, 2012  WL  12842942, at *3  (C.D. Cal. Sept. 28, 2012) (finding

14  irreparable harm because damages were not recoverable against the state due to Eleventh

15  Amendment immunity) (citing cases); *Doe v. Noem*, 783 F. Supp. 3d 907, 927 n.10 (W.D. Va.

16  2025) ("Because money damages are not recoverable in this case, ... Doe's threatened financial

17  losses can support a finding of irreparable harm.").

18      In addition, forcing CoreCivic to choose between the cost of compliance and exposure to

19  potential contract liability to ICE for noncompliance with the preliminary injunction is also an

20  irreparable harm.  *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992) (finding

21  irreparable harm where respondents were "were faced with a Hobson's choice: continually violate

22  the Texas law and expose themselves to potentially huge liability; or violate the law once as a test

23  case and suffer the injury of obeying the law during the pendency of the proceedings and any further

24  review"); *cf. Wages & White Lion Invs., L.L.C. v. United States Food & Drug Admin.*, 16 F.4th

25  1130, 1142 (5th Cir. 2021) ("Indeed, complying with an agency order later held invalid almost

26

27
_____
28      [6] Detainees are still able to place unmonitored legal calls using the detainee telephone system if their attorneys register to receive unmonitored calls.  (*Id.*, ¶ 79.)

22

1  *always* produces the irreparable harm of nonrecoverable compliance costs.") (internal quotation
2  omitted)).

3        Finally, the Court's appointment and charge to the monitor to "ensure compliance"
4  presumes that detainees are not receiving constitutionally adequate health care; however, the Court
5  fails to define the parameters of constitutionally adequate care.  The monitor may impose more
6  stringent requirements relating to timelines for patient interactions, medication administration, or
7  health services staffing over and above the contractually required levels.  This subjects CoreCivic
8  to additional unknown and likely to be unreimbursed expenditures.  Moreover, Plaintiffs' new
9  proposal that they be permitted to have ex parte communications with the monitor, to attend and
10  participate in the monitor's site inspection, and to review and comment on a draft of the monitor's
11  report (Dkt. 77 at 19–22), not only far exceeds the scope of the Court's Order but it casts doubt on
12  the independence and neutrality of the monitor.

13        **D.**    **The Balance of Equities and the Public Interests Favor a Stay Pending Appeal.**

14        "Once an applicant satisfies the first two factors, the traditional stay inquiry calls for
15  assessing the harm to the opposing party and weighing the public interest." *Nken*, 556 U.S. at 435–
16  36.  "When the government is a party, these last two factors merge." *Drakes Bay Oyster Co. v.*
17  *Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) (citing *Nken,* 556 U.S. at 435).

18        Here, Defendants opposed Plaintiffs' Motion for a Preliminary Injunction, arguing these
19  factors weigh in Defendants' favor because: (1) the United States has both a sovereign and a
20  compelling government interest in steady enforcement of its immigration laws; and (2) the Supreme
21  Court has advised courts to defer to the management of facilities to facility administrators.  (Dkt.
22  38 at 31–33.)  *See Noem v. Vasquez Perdomo*, 146 S. Ct. 1, 5 (2025) (Kavanagh, J., concurring in
23  the grant of a stay pending appeal) ("Especially in an immigration case like this one, it is also
24  important to stress the proper role of the Judiciary.  The Judiciary does not set immigration policy
25  or decide enforcement priorities."); *Roman v. Wolf*, 977 F.3d 935, 946 (9th Cir. 2020) (holding "the
26  district court should, to the extent possible, avoid imposing provisions that micromanage the
27  Government's administration of conditions at Adelanto" immigration detention facility).

28

1    A stay will also not irreparably harm Plaintiffs .  Indeed, CoreCivic seeks appellate review

2    in part because Plaintiffs failed to show a sufficient likelihood that they would suffer irreparable

3    harm absent a preliminary injunction, and the Court relied on the mere possibility of harm to others

4    to grant relief.  *Cf. Grantham*, 2019 WL 2325555, at *6 (granting Federal defendant's and

5    intervenor defendant's motion to stay preliminary injunction pending appeal despite finding

6    "[t]here is clearly injury to Plaintiffs should the Court grant a stay.").  Nonetheless, the Court

7    granted a preliminary injunction as a precaution to avoid the mere possibility of harm that might

8    arise before the case is transferred.  (Dkt. 75, R.T. 2/6/26 at 10:9–12:21; 84:16–22, 86:6–21.)  A

9    stay of the Order would not prevent the Court from addressing a motion for a temporary restraining

10   order if such issues were to arise and, if necessary and appropriate, grant relief to a specific

11   individual.

12   **III.    Conclusion.**

13       For these reasons, the Court should stay the February 10, 2026 Order pending an appeal.

14       DATED this 3rd day of March, 2026.

15                               STRUCK LOVE ACEDO, PLC

16

17                               By /s/ Shannon L. Knorr
                                     Daniel P. Struck (PHV pending)
18                                   Dana M. Keene
                                     Shannon L. Knorr
19
                                     Nicholas H. Rasmussen
20                                   McCORMICK, BARSTOW, SHEPPARD,
                                     WAYTE & CARRUTH LLP
21
                                 *Attorneys for Intervenor CoreCivic, Inc.*
22

23

24

25

26

27

28