UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

FERNANDO GOMEZ RUIZ; FERNANDO VIERA REYES; JOSE RUIZ CANIZALES; YURI ALEXANDER ROQUE CAMPOS; SOKHEAN KEO; GUSTAVO GUEVARA ALARCON; and ALEJANDRO MENDIOLA ESCUTIA, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; TODD M. LYONS, Acting Director, U.S. Immigration and Customs Enforcement; SERGIO ALBARRAN, Acting Director of San Francisco Field Office, Enforcement and Removal Operations, U.S. Immigration and Customs Enforcement; U.S. DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, Secretary, U.S. Department of Homeland Security,

Defendants.

Case No. 3:25-cv-09757-MMC

**MEMORANDUM OF DECISION**

Judge:       Hon. Maxine M. Chesney
Date Filed:  November 12, 2025

On February 10, 2026, the Court, having read and considered the papers filed in support of Plaintiffs' Motion for Preliminary Injunction (Doc. Nos. 20, 48–49) and Defendants' Opposition thereto (Doc. No. 38), the papers filed in support of Plaintiffs' Motion for Class Certification (Doc. Nos. 21, 46) and Defendants opposition thereto (Doc. No. 39), as well as the Notice of Noncompliance with Court Order (Doc. Nos. 61–62), and having considered the arguments of counsel made at the hearing held on February 6, 2026 ("February 6 hearing"),[1] issued its order Granting in Part Plaintiffs' Motions for Preliminary Injunction and Class Certification. (Doc. No. 72 ("February 10 Order").) The Court now issues this Memorandum of Decision to set forth in greater detail its reasons for that ruling.

## I.      PROCEDURAL BACKGROUND

On November 12, 2025, plaintiffs Fernando Gomez Ruiz, Fernando Viera Reyes, Jose Ruiz Canizales, Yuri Alexander Roque Campos, Sokhean Keo, Gustavo Guevara Alarcon, and Alejandro Mendiola Escutia (collectively, "Plaintiffs"), all individuals held in civil detention at the California City Detention Facility ("CCDF"), brought the above-titled action against defendants U.S. Immigration and Customs Enforcement ("ICE"); Todd Lyons, Acting Director, ICE; Sergio Albarran, Acting Director, San Francisco Field Office ICE; the U.S. Department of Homeland Security ("DHS"); and Kristi Noem, then Secretary, DHS (collectively, "Defendants"), challenging conditions of confinement at CCDF.  (See Doc. Nos. 1, 15.)

On December 1, 2025, Plaintiffs moved for a preliminary injunction and for provisional class certification, seeking to represent a class of all persons detained at CCDF and an order requiring constitutionally adequate health care, appointment of an independent and neutral "External Monitor" to assess and report thereon, changes to CCDF's attorney access policy, and a number of other policies. (See Doc. No. 22; Doc. No. 22-38 ("Proposed Order").)  Defendants opposed the motions and also moved to transfer the action to the Eastern District of California. (See Doc. Nos. 37–40, 45.)

As part of their moving papers, Plaintiffs filed opening and rebuttal expert declarations from Todd R. Wilcox, M.D., a practicing medical doctor and expert in the field of correctional

---

[1] On February 6, 2026, the Court also heard Defendants' Motion to Transfer Venue.

1

health care ("Dr. Wilcox"), opening and rebuttal expert declarations from Dan Pacholke, an expert in the field of adult institutional corrections ("Mr. Pacholke"), over two dozen declarations from individuals detained at CCDF, and eleven attorney/paralegal declarations.  In response, Defendants submitted declarations from Christopher Chestnut, Warden at CCDF ("Warden Chestnut"), Susan Tiona, M.D., Clinical Director for Correctional Medicine Associates and Regional Medical Director for CoreCivic, the private company with which ICE contracted to operate CCDF ("Dr. Tiona"), Dwan Morris, Food Service Director at CCDF, and Maxwell Walker, Regional Dietician at CCDF.

Thereafter, on December 16, 2025, Plaintiffs filed a Motion for Temporary Restraining Order ("TRO motion"), seeking urgent medical care for Fernando Viera Reyes and Yuri Alexander Roque Campos, two of the named plaintiffs. (*See* Doc. No. 27.)  As set forth therein, Mr. Viera Reyes appeared to be suffering from prostate cancer but had been unable to see a urologist, receive confirmation of a cancer diagnosis, or begin treatment, and Mr. Roque Campos was suffering from congenital heart disease that required immediate attention from a cardiologist. (*See id.*) On the following day, the Court held an emergency conference, during which the Court urged the parties to meet and confer in hopes of reaching an acceptable resolution of the urgent issues presented in the TRO motion, after which, on December 22, 2025, the parties submitted a mutually acceptable stipulated order requiring prompt treatment for both individuals, which the Court signed and issued that same date. (*See* Doc. No. 36 ("TRO Order").)

On February 5, 2026, Plaintiffs filed a Notice of Noncompliance with Court Order, asserting Defendants had failed to comply with the TRO Order as to Mr. Viera Reyes, who as of that date had not received confirmation of his prostate cancer diagnosis or begun treatment (*see* Doc. No. 62), and, at the February 6 hearing, Defendants' counsel confirmed that Mr. Viera Reyes had missed a critical specialty appointment due to an "internal scheduling error" at CCDF. (*See* Doc. No. 75 ("February 6 Hr'g Tr.") at 8:14–15.)

As noted above, the Court, at the February 6 hearing, also heard Defendants' motion to transfer. After reviewing the record and considering the arguments of counsel, the Court decided to transfer the matter to the Eastern District of California. Before issuing such order, however, the

2

Court, at Plaintiffs' request, agreed to consider issuing injunctive relief as to a limited number of matters Plaintiffs deemed most urgent, and, ultimately, as noted above, issued the February 10 Order. (*See* Doc. No. 72.) As set forth therein, the Court found "Plaintiffs have demonstrated that they are likely to prevail on the merits of their claims; that they will suffer irreparable harm if the Court does not issue relief; that the balance of equities tips in their favor; that the public interest lies in issuing a preliminary injunction; and that all the requirements of Rule 23(a) and 23(b)(2) have been satisfied." (*See id.* at 1.) In light thereof, the Court directed Defendants to: (1) ensure constitutionally adequate medical care (*id.* ¶ 1); (2) provide access to an independent, third-party "External Monitor" for a period of 120 days (*id.* ¶ 2); (3) ensure that detained individuals have timely and confidential access to attorneys through in-person, contact legal visits and calls (*id.* ¶ 3); and (4) provide free temperature-appropriate clothing and at least one hour of outdoor recreation time per day (*id.* ¶ 4). [2]

The Court now sets forth its reasoning in arriving at the above decision.

## II.    PRELIMINARY INJUNCTION MOTION

### A.    Factual Background

There is no dispute that CCDF is a former California state prison located in the Mojave Desert (*see* Doc. No. 45-1 ("Chestnut Decl.") ¶¶ 2, 32), at which in late August 2025, ICE began housing federal immigration detainees pursuant to a contract with CoreCivic (*see id.* ¶¶ 3, 35). According to Defendants' publicly available statistics, most of the people detained at CCDF have no criminal record. (*See* Doc. No. 49-2 ("Suppl. Pacholke Decl.") ¶¶ 34–38.)

#### 1.    Medical Care at CCDF

In support of their preliminary injunction motion, Plaintiffs have proffered two declarations from Dr. Wilcox, a board-certified physician with more than three decades of experience as a physician in correctional facilities.  (*See* Doc. No. 22-3 ("Wilcox Decl."), Doc. No. 48-5 ("Wilcox Reply Decl.").) Dr. Wilcox's qualifications are not disputed. He currently serves as the Medical Director of the Salt Lake County Jail System and has served as President of

---

[2] The Court declined, at that time, to grant Plaintiffs all of the relief sought in their motion, instead holding in abeyance their additional requests for preliminary injunctive relief and class certification for determination after transfer to the Eastern District. (*See id.* at 3.)

the American College of Correctional Physicians and as a consultant for a variety of correctional systems in California, Arizona, Utah, and Washington State. (*See* Doc. No. 22-3 ¶¶ 1–3.) Having reviewed the relevant declarations, the Court finds Dr. Wilcox's findings and opinions are credible and supported by substantial evidence, including Defendants' own records, which reveal the deficiencies, omissions, and failures Dr. Wilcox identified and discussed. [3]

In Dr. Wilcox's opinion, Defendants "struggle to deliver standard of care for common uncomplicated problems," let alone for "patients with complex medical care needs." (*See* Doc. No. 22-3 ¶ 9.)  In particular, Dr. Wilcox found the patient intake process is "incomplete" and "haphazard." (*See id.* ¶¶ 10, 18, 25–68; Doc. No. 48-5 ¶¶ 34–45.) According to Dr. Wilcox, although Licensed Vocational Nurses ("LVNs"), "lack the academic preparation and training necessary to perform [such] assessments," they, rather registered nurses ("RNs"), typically perform the initial screenings (*see* Doc. No. 22-3 ¶ 24; Doc. No. 48-5 ¶ 37),  referrals to medical providers are delayed, even for urgent medical needs (*see* Doc. No. 22-3 ¶ 30; *see e.g.,* Doc. No. 22-4 ("Alvarez-Mora Decl.") ¶¶ 7–8), and patients who arrive with medications or prescriptions for medications experience dangerous lapses in the provision of that medication (*see* Doc. No. 22-3 ¶¶ 47, 51; Doc. No. 48-5 ¶¶ 29, 44; *see e.g.,* Doc. No. 22-4 ¶ 9).

Next, Dr. Wilcox found the "sick call" system at CCDF (*see* Doc. No. 45-1 ¶ 145) suffers from systemic delays and failures, with the result that patients "are not seen within a reasonable time" and sick calls "describing urgent medical symptoms can go unaddressed or unacknowledged for days or weeks" (*see* Doc. No. 22-3 ¶¶ 71–78; *see also* Doc. No. 48-5 ¶¶ 51–56). Moreover, according to Dr. Wilcox, when care is provided, it is often deficient.  In particular, medical records showed shortages of stock medications, clinical notes revealed multiple instances of "poor clinical judgment," inadequate recordkeeping, and treatment that failed to comport with the prevailing standard of care. (*See id.* Doc. No. 22-3 ¶¶ 49, 63, 81–85, 90, 109; Doc. No. 48-5 ¶¶ 19–20, 24, 46, 59.)

---

[3] The Court is not persuaded by Defendants' argument that Dr. Wilcox reviewed an insufficient subset of patient records to allow him to reach his conclusions; rather the Court finds Dr. Wilcox has adequately explained why the deficiencies he identifies are systemwide. (*See* Doc. No. 48-5 ¶¶ 10–13.)

Further, Dr. Wilcox found CCDF "has no effective system for ensuring that patients receive medically necessary specialty care in a timely manner." (*See* Doc. No. 22-3 ¶ 121.) Of the thirteen orders for specialty care Dr. Wilcox reviewed, none had been authorized other than the two for the plaintiffs specifically referenced in the TRO Order (*see* Doc. No. 22-3 ¶ 114; Doc. No. 48-5 ¶¶ 75, 79, 82), one of whom, as noted, was not taken to his follow-up appointment despite the Court's Order.

In addition to Dr. Wilcox's findings, dozens of detained individuals have reported receiving inadequate medical care,[4] including three of the named plaintiffs who required urgent and sustained attention they did not receive, namely, Mr. Gomez Ruiz, who was suffering from a foot ulcer that put him at risk for gangrene or amputation (*see* Doc. No. 22-3 ¶ 90), Mr. Roque Campos, whose life-threating congenital heart condition put him at risk of sudden cardiac death but who could not see a cardiologist absent court intervention (*see id.* ¶¶ 86–89), and Mr. Viera Reyes, who was exhibiting symptoms and blood levels consistent with prostate cancer but did not see a urologist or get a biopsy so he could begin cancer treatment (*see id.* ¶ 116). Indeed, even after the Court ordered Defendants to ensure that Mr. Viera Reyes received prompt attention from specialists and necessary follow-up care, Defendants failed to comply with that order in a timely fashion. (*See* Doc. No. 62; Doc. No. 75 at 7:4–9:7.)

Given all of the above reasons, and others, Dr. Wilcox concluded "it is not safe to be sick at [CCDF]." (*See* Doc. No. 22-3 ¶ 9.)

Defendants did not offer their own independent medical expert to rebut or refute Dr. Wilcox's opinions. Indeed, Dr. Tiona, CoreCivic's Regional Medical Director, submitted a declaration that in many ways supports Dr. Wilcox's findings. For example, after reviewing the

---

[4] *See* Doc. No. 22-6 ("Roque Campos Decl.") ¶¶ 15–35; Doc. No. 22-24 ("Viera Reyes Decl.") ¶¶ 11–21; Doc. No. 22-8 ("Gomez Ruiz Decl.") ¶¶ 5–16; Doc. No. 22-13 ("Leyva Decl.") ¶¶ 13–29; Doc. No. 22-36 ("Khan Decl.") ¶¶ 45–56; Doc. No. 22-4 ¶¶ 6–14; Doc. No. 22-5 ("Benavides Zamora Decl.") ¶¶ 12, 17; Doc. No. 22-7 ("Guevara Alarcon Decl.") ¶¶ 19–20, 23–34; Doc. No. 22-9 ("Guthrie Decl.") ¶¶ 13–25, 28–29; Doc. No. 22-10 ("Juarez Ruiz Decl.") ¶¶ 6, 9–15; Doc. No. 22-12 ("Keo Decl.") ¶¶ 13, 20–32; Doc. No. 22-15 ("Mendiola Escutia Decl.") ¶¶ 11, 23; Doc. No. 22-16 ("Montes-Diaz Decl.") ¶¶ 15, 21–23; Doc. No. 22-17 ("Montes Regalado Decl.") ¶¶ 11, 13–19, 21–22; Doc. No. 22-18 ("Neri Valdez Decl.") ¶¶ 6–10; Doc. No. 22-19 ("Orejuela Gutierrez Decl.") ¶¶ 2, 6–10; Doc. No. 22-21 ("Ruiz Canizales Decl.") ¶¶ 51, 61, 65–68; Doc. No. 22-22 ("Santos Avalos Decl.") ¶¶ 10–12; Doc. No. 22-23 ("Singh Decl.") ¶¶ 5–23; Doc. No. 22-25 ("Vishal Decl.") ¶ 8; Doc. No. 22-33 ("Armenta Decl.") ¶¶ 9–12; Doc. No. 22-37 ("Garcia Romero Decl.") ¶ 4; Doc. No. 49-7 ("Patient A Decl.") ¶¶ 6–16.

same patient records Dr. Wilcox reviewed, Dr. Tiona acknowledged delays in "offsite appointment scheduling" and issues pertaining to ordering/renewing medications, adjusting dosage, scheduling follow-up appointments, establishing chronic care appointments, ordering/scheduling lab tests, ordering medical diets, and scheduling evaluations for possible accommodations related to eleven patients, as to all of which she avers she made specific recommendations for improvement. (*See* Doc. No. 40-7 ("Tiona Decl.") ¶¶ 56–57.) According to Dr. Wilcox, as of the date of the hearing, i.e., more than a month after Dr. Tiona's declaration was filed, none of those recommendations had been implemented. (*See* Doc. No. 48-5 ¶¶ 7, 63; Doc. No. 75 at 99:11–17.) Dr. Tiona also confirmed substantial delays in patient intake screening at CCDF (*see* Doc. No. 40-7 ¶ 31), identified nursing errors and the need for remedial training (*see, e.g.*, *id.* ¶¶ 64, 68), and acknowledged systemwide, ongoing "difficulties in scheduling specialty appointments due to the lack of ICE-contracted specialists near the facility" (*see id.* ¶ 47). Although Dr. Tiona stated changes in staffing and training had been made to deal with various of the above-listed concerns (*see* Doc. No. 40-7 ¶¶ 32, 55; *see also* Doc. No. 45-1 ¶¶ 51–56), Dr. Wilcox found the deficiencies he noted continued to persist (*see* Doc. No. 49-3 ¶ 7).

Although Dr. Tiona also stated that none of the delays in patient care "resulted in adverse patient outcomes" (*see* Doc. No. 40-7 ¶ 53), Dr. Wilcox has identified a number of "adverse outcomes" for patients at CCDF "as a result of poor medical care" (*see* Doc. No. 48-5 ¶ 24; *see, e.g.*, *id.* ¶ 25 (dangerously high blood glucose levels), ¶ 28 ("ongoing and progressive organ damage"), ¶¶ 60–61 ("kidney damage"), ¶¶ 72–73 (increased "risk of a stroke")).

### 2.    Attorney Access at CCDF

There is no dispute that, given the facility's remote location, many legal visits take place over the phone or through Virtual Attorney Visits ("VAVs"). (*See* Doc. No. 45-1 ¶¶ 187, 190–95.) Plaintiffs have submitted the declarations of a considerable number of legal representatives who have reported difficulties communicating with their clients held at CCDF.[5]  For example, scheduling proved difficult, with some attorneys waiting weeks to have telephonic or video call

---

[5] *See* Doc. No. 22-26 ("Fabian Decl."); Doc. No. 22-27 ("Felder-Heim Decl."); Doc. No. 22-28 ("Gorney Decl."); Doc. No. 22-29 ("Goss Decl."); Doc. No. 22-30 ("Kazim Decl."); Doc. No. 22-31 ("Kyle Decl."); Doc. No. 22-32 ("Quintero Decl."); Doc. No. 22-34 ("Narayanan Decl."); Doc. No. 22-35 ("Valenzuela Decl.").

6

contact with their clients (*see* Doc. No. 22-31 ¶ 5; Doc. No. 22-32 ¶¶ 6–7, 9), and then having those calls limited to 60 minutes (*see* Doc. No. 45-1 ¶¶ 190–91), which many attorneys found too short to allow meaningful consultation (*see, e.g.*, Doc. No. 22-30 ¶¶ 16, 19; Doc. No. 22-31 ¶ 12). Although Warden Chestnut states CoreCivic is "planning" to implement an online scheduling portal to allow legal representatives to make their own appointments, there is no evidence of that system having been implemented, nor does it address any of the other difficulties described by counsel.  (*See* Doc. No. 45-1 ¶ 195.)

Further, although attorneys may also visit their clients in person at the facility (*see id.* ¶ 189), all attorney visits take place in a non-contact setting, with attorneys on one side of a pane of glass, the client on the other, and a small opening at the bottom (*see, e.g.*, Doc. No. 22-29 ¶ 15; Doc. No. 22-34 ¶ 8; Doc. No. 22-35 ¶ 5), constituting restrictive conditions under which attorneys have difficulty hearing and speaking to their clients (*see, e.g.*, Doc. No. 22-29 ¶ 16; Doc. No. 22-34 ¶ 10; Doc. No. 49-1 ("Harris Decl.") ¶ 9). Although, according to Warden Chestnut, legal contact visits "may be permitted upon request with facility approval" (*see* Doc. No. 45-1 ¶ 189), as of the time of the February 6 hearing, all in-person attorney visits had been non-contact, regardless of a detained person's security status, and Defendants have acknowledged allowing contact visits would require "changes to existing regulations at the facility" (*see* Doc. No. 49-1 ¶¶ 10–11).

Moreover, although Warden Chestnut states "in-person legal visits are available between 8:00 a.m. and 8:00 p.m. daily" (*see* Doc. No. 45-1 ¶ 190), attorneys reported CCDF has ended legal visits prematurely before 8:00 p.m. (*see, e.g.*, Doc. No. 22-35 ¶¶ 16, 18), as well as significant visitation delays due to daily counts (*see id.* ¶¶ 12, 16, 18) and insufficient staffing (*see* Doc. No. 22-29 ¶ 10), making it impracticable for attorneys to visit clients as often as they typically would (*see id.* ¶ 21).

### 3.    Other Conditions at CCDF

Plaintiffs submitted two declarations from Mr. Pacholke, an expert with more than 35 years' experience in the field of adult institutional corrections, including holding leadership positions in the Washington State Department of Corrections and serving as a consultant for, *inter*

7

*alia,* the National Institute of Corrections and New York University. (*See* Doc. No. 22-2 ("Pacholke Decl.") ¶¶ 1–3.)  Mr. Pacholke found the detainees at CCDF are not provided adequate clothing or adequate outdoor access. (*See id.* ¶¶ 22, 26; Doc. No. 49-5 ¶¶ 16–18, 21–22.) Defendants did not offer an independent expert to rebut Mr. Pacholke's findings, relying instead on Warden Chestnut's declaration. Having reviewed the relevant declarations, the Court finds Mr. Pacholke's findings and opinions are credible and supported by substantial evidence.

In addition to Mr. Pacholke's declarations, Plaintiffs submitted the declarations of a number of detainees who describe the facility as being very cold (*see, e.g.*, Doc. No. 22-8 ¶ 17; Doc. No. 22-37 ¶ 5; Doc. No. 22-5 ¶ 20; Doc. No 22-13 ¶ 34; Doc. No. 22-36 ¶ 63), with some detained people resorting to fashioning their socks into sleeves or beanies to keep warm (*see* Doc. No. 22-7 ¶ 8; Doc. No. 22-37 ¶¶ 5, 15; Doc. No. 22-36 ¶ 67; Doc. No. 49-6 ("Mann Decl.") ¶ 13). There is no dispute that Defendants provide no sweatshirts, sweatpants, or similar protective clothing (*see* Doc. No. 45-1 ¶ 74), and many detainees reported they could not afford to buy sweatshirts at the commissary (*see, e.g.,* Doc. No. 22-8 ¶ 17; Doc. No. 22-14 ("Llufrio Decl.") ¶ 20). In Mr. Pacholke's opinion, with which the Court agrees, "[w]eather-appropriate clothing should be standard issue, [as] a part of the cost of detaining people." (*See* Doc. No. 22-2 ¶ 22.)

Although Warden Chestnut states that, at some point, CCDF began providing "jackets" to detained people (*see* Doc. No. 45-1 ¶ 73), Plaintiffs have submitted declarations that show those items of clothing do not provide adequate warmth (*see e.g.,* Doc. No. 49-5 ("Suppl. Guevara Alarcon Decl.") ¶ 6 (stating "[t]he windbreakers are very thin, have no hood, and do not retain heat"; further stating "[t]hey do not provide warmth"); Doc. No. 49-6 ¶ 13 (describing jackets as "very thin and unlined, [with] no hood"; stating they "do not keep me warm")). Defendants have offered no descriptions to the contrary.

Moreover, a review of the declarations submitted by a number of detainees reflects an inconsistent practice as to outdoor access, with the times varying between four and seven hours of outdoor recreation per week, i.e., one hour per day at most (*see, e.g.,* Doc. No. 22-20 ("Rivera-Trigueros Decl.") ¶ 13; Doc. No. 22-24 ¶ 23; Doc. No. 22-12 ¶ 8, Doc. No. 22-33 ¶ 14; Doc. No. 22-14 ¶¶ 13, 20; Doc. No. 22-11 ("Julio F.V. Decl.") ¶ 19; Doc. No. 22-37 ¶ 11), which according

8

to Mr. Pacholke, is "less than prisoners in segregation are offered" (*see* Doc. No. 22-2 ¶ 26).

Given all of the above reasons, and others, Mr. Pacholke concluded CCDF's restrictions, including, inter alia, "the lack of outdoor recreation time . . .and the failure to provide weather appropriate clothing" are "exaggerated and unnecessarily harsh." (*See* Doc. No. 49-5 ¶ 5.)

### B.    Legal Standard

Parties seeking a preliminary injunction must show that (1) they are "likely to succeed on the merits" of their claim; (2) they are "likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in [their] favor"; and (4) "an injunction is in the public interest." *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). A stronger showing on one element may offset a weaker showing on another. *See All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). Accordingly, a plaintiff satisfying the irreparable harm and public interest factors need only raise "serious questions going to the merits" and show that the "balance of hardships tips sharply in [such plaintiff's] favor." *Id.* at 1135.[6]

### C.    Discussion

#### 1.    Plaintiffs are likely to succeed on their Fifth Amendment claim for inadequate medical care.

"There is no question that [civil immigration] detainees are entitled to adequate medical care." *See Doe v. Kelly*, 878 F.3d 710, 722 (9th Cir. 2017) (internal quotations and citations omitted). Because Plaintiffs are civil detainees rather than convicted prisoners, the Fifth Amendment governs the analysis rather than the Eighth Amendment, and the Court employs an objective standard to determine whether medical care is adequate. *See Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1120, 1122–25 (9th Cir. 2018). Conduct that would violate the higher Eighth Amendment standard for inadequate medical care necessarily violates the lower Fifth Amendment standard. *See Castro v. Cnty. of L.A.*, 833 F.3d 1060, 1067 (9th Cir. 2016).

Immigration detention is civil in nature and must be "nonpunitive in purpose and effect."

---

[6] To the extent Defendants contend 8 U.S.C. § 1252(f)(1) is applicable, "which bars courts from enjoining or restraining the operation of relevant statutory provisions of the [Immigration and Nationality Act]," s*ee Jimenez v. U.S. Immigr. & Customs Enf't*, 2024 WL 2306281, at *4 (N.D. Cal. May 20, 2024) (internal quotation and citation omitted), the Court disagrees. By the instant action, Plaintiffs in no way seek to challenge any detainee's removal, nor do they otherwise raise any issue pertaining to any removal proceedings.

*See Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). Plaintiffs citing *Jones v. Blanas*, 393 F.3d 918, 932 (9th Cir. 2004), invoke the presumption set forth therein and argue punitive conditions are presumed when a civilly detained person is "confined in conditions identical to, similar to, or more restrictive than, those in which his criminal counterparts are held." Defendants dispute the presumption's applicability to civil immigration detainees. The Court need not resolve said dispute at this juncture, however, as even assuming, *arguendo*, the *Jones* presumption is not applicable, Plaintiffs have shown they are likely to prevail on the aspects of their claims covered by the Court's February 10 Order.

A condition of confinement is deemed unconstitutionally punitive where "intended to punish, where it is excessive in relation to its non-punitive purpose or is employed to achieve objectives that could be accomplished in . . . alternative and less harsh methods." *See Fraihat v. U.S. Immigr. & Customs Enf't*, 16 F.4th 613, 647 (9th Cir. 2021) (internal quotation and citation omitted).

Correctional facilities must "provide a system of ready access to adequate medical care," in which patients can alert medical staff to their problems and the staff is competent enough to diagnose and treat those problems or refer the patients to others who can. *See Hoptowit v. Ray*, 682 F.2d 1237, 1253 (9th Cir. 1982). To comply with the constitution, correctional institutions must conduct adequate medical screenings to identify individuals' health needs and risk factors; ensure that their health care systems support continuity of care, including by providing patients with necessary medications and medical devices; timely respond to routine or emergent health care needs; and have adequate and qualified staff to deliver medical services to patients. *See, e.g.*, *Madrid v. Gomez*, 889 F. Supp. 1146, 1205 (N.D. Cal. 1995) (intake screening); *Lopez v. Smith*, 203 F.3d 1122, 1132 (9th Cir. 2000) (timely provision of medication); *Hoptowit*, 682 F.2d at 1253 (functional sick call system); *Jensen v. Shinn*, 609 F. Supp. 3d 789, 864 (D. Ariz. 2022) (adequate and qualified staff). Where the facility's medical staff cannot meet certain medical needs, they must refer patients to those who can on a "reasonably speedy" basis. *See Hoptowit*, 682 F.2d at 1253; *see also, e.g.*, *Casey v. Lewis*, 834 F. Supp. 1477, 1544 (D. Ariz. 1993) (finding one month delay for serious medical problem not "reasonably speedy").

Given Plaintiffs factual showing as to the inadequacy of health care provided at CCDF, the Court finds Plaintiffs have established they are likely to succeed on their claim that medical care at CCDF violates the Fifth Amendment or, at the very least, they have raised serious questions going to the merits of that claim. By its February 10 Order, the Court has set out what it has determined Defendants are required to do in order to provide adequate health care under the Fifth Amendment, and said order's provision for appointment of an independent, third-party monitor reflects this Court's determination that the Court would benefit from such individual's assessment with regard to the provision of constitutionally adequate health care at CCDF. *See, e.g.*, *Cal. Coal. for Women Prisoners v. United States*, 723 F. Supp. 3d 712, 719 (N.D. Cal. 2024) (appointing special master to "assist the [c]ourt to ensure compliance" with preliminary injunction order); *Jensen*, 609 F. Supp. 3d at 913–14 (requiring parties to nominate proposed experts "to assist with crafting an injunction that remedies constitutional violations").

**2. Plaintiffs are likely to succeed on their First and Fifth Amendment claims regarding attorney access.**

Detained individuals retain their First Amendment rights, *see Valdez v. Rosenbaum*, 302 F.3d 1039, 1048 (9th Cir. 2002), which rights include the "right to hire and consult an attorney," *see Eng v. Cooley*, 552 F.3d 1062, 1069 (9th Cir. 2009). "[O]verly restrictive" policies that hinder a detainee's ability to "hire and consult with an attorney" violate such detainee's First Amendment right to "communicate with the outside world." *See Torres v. Dep't of Homeland Sec.*, 411 F. Supp. 3d 1036, 1067–68 (C.D. Cal. 2019). Restrictions on access to counsel may also be challenged under the Fifth Amendment. *See id.* at 1044–45, 1064–65 (finding civil immigration detainees sufficiently alleged First and Fifth Amendment violations where contact with counsel was subject to significant restrictions in terms of timing, duration, access to confidential space, and promptness).

As discussed above, Defendants employ an essentially blanket policy preventing in-person, contact visits between detained persons and their lawyers. Defendants have not provided adequate justification for such a restriction, nor have defendants adequately explained the need for any of the other delays and restrictions that are impeding attorneys' ability to consult with and

11

represent their clients.

Given Plaintiffs' showing, the Court finds Plaintiffs are likely to succeed on their claim that Defendants' overly restrictive policies regarding attorney visits and legal calls violate Plaintiffs' First and Fifth Amendment rights. By its February 10 Order, the Court has set forth what it has determined Defendants are required to do in order to provide constitutionally adequate access to counsel under the First and Fifth Amendments.

### 3. Plaintiffs are likely to succeed on their Fifth Amendment claim regarding other conditions of confinement.

The Court finds Plaintiffs have shown the lack of temperature-appropriate clothing and insufficient outdoor recreation time are both excessive in relation to any non-punitive purpose and employed to achieve objectives that could be achieved by other, less harsh methods. Defendants have not proffered, and the Court cannot conceive of, a non-punitive reason to deny temperature-appropriate clothing, and Plaintiffs have submitted undisputed evidence that prisons, as well as other ICE detention facilities, provide sweatshirts and sweatpants free of charge. (*See* Doc. No. 49-2 ¶¶ 21–22; Doc. No. 22-20 ¶ 15; Doc. No. 22-7 ¶ 8.)[7]

The Court also finds Plaintiffs should receive, weather permitting, a minimum of one hour of outdoor access per day seven days a week. Although Defendants acknowledge such access is their "goal" (*see* Doc. No. 45-1 ¶ 91), the evidence discussed earlier herein demonstrates such goal is not being accomplished. Although various concerns may occasionally arise and interfere with the provision of outdoor access, those concerns are likely to be much the same as those encountered in prison settings, and, as noted, the amount of outdoor time CCDF detainees receive is less than even prisoners held in solitary confinement receive. (*See* Doc. No. 22-2 ¶ 26.)

Given Plaintiffs' showing, the Court finds Plaintiffs have demonstrated they are likely to succeed on their claim that they are being subjected to punitive conditions of confinement pertaining to climatic exposure and outdoor access.

### 4. Plaintiffs have shown they are suffering irreparable harm.

Based on the factual findings set forth above, the Court finds Plaintiffs have adequately

---

[7] Although, as noted, Defendants state they have provided "jackets," the unrebutted evidence is that those jackets do not provide adequate warmth. (*See* Doc. No. 49-5 ¶ 6; Doc. No. 49-6 ¶ 13.)

shown they are suffering irreparable harm at CCDF. It is "well established that the deprivation of constitutional rights unquestionably constitutes irreparable injury." *Melendres v. Arapaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (internal quotation and citation omitted). Here, as discussed above, Plaintiffs have shown the deprivation of adequate medical care and imposition of other punitive conditions of confinement at CCDF have resulted in past, ongoing, and in all likelihood if not enjoined, continuing irreparable harm to detainees at CCDF. Moreover, the denial of meaningful access to counsel likewise constitutes irreparable harm, particularly given "the complexity of immigration procedures, and the enormity of the interests at stake." *See Ardestani v. I.N.S.*, 502 U.S. 129, 138 (1991).

### 5.    The balance of equities and the public interest favor an injunction.

"The third and fourth factors, harm to the opposing party and weighing the public interest, merge when the Government is the opposing party." *See Roe v. Critchfield*, 137 F.4th 912, 922 (9th Cir. 2025) (internal quotation and citation omitted). In that regard, the Court first notes, "it is always in the public interest to prevent the violation of a party's constitutional rights." *See Melendres*, 699 F.3d at 1002 (internal quotation and citation omitted). Next, the Court finds avoiding "preventable human suffering" outweighs any administrative or financial concerns that Defendants may have. *See Harris v. Bd. of Supervisors, L.A. Cnty.*, 366 F.3d 754, 766 (9th Cir. 2004). As the Ninth Circuit has observed, "[o]ur society as a whole suffers when we neglect the [vulnerable], or when we deprive them of their rights or privileges." *See Lopez v. Heckler*, 713 F.2d 1432, 1437 (9th Cir. 1983).

## III.    CLASS CERTIFICATION MOTION

### A.    Plaintiffs have satisfied the requirements of Rule 23(a).

A party seeking class certification must first meet the requirements of Rule 23(a), under which such party must "prove that there are in fact sufficiently numerous parties, common questions of law or fact, typicality of claims or defenses, and adequacy of representation." *See Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013).  The Court addresses each such element in turn.

First, the proposed class is sufficiently numerous. *See* Fed. R. Civ. P. 23(a)(1). The record

13

demonstrates that, at the time that Plaintiffs filed for class certification, there were at least 800 individuals detained at CCDF. (*See* Doc. No. 21 at 17; Doc. No. 46 at 4); *see also Rannis v. Recchia,* 380 App'x 646, 651 (9th Cir. 2010) (noting "[i]n general, courts find the numerosity requirement satisfied when a class includes at least 40 members"). Given such numbers, the Court finds requiring either separate lawsuits or joinder of individual class members would be impracticable.

Second, Plaintiffs have demonstrated commonality. *See* Fed. R. Civ. P. 23(a)(2). As set forth above in detail, Plaintiffs challenge systemic policies and practices governing medical care, access to counsel, and conditions of confinement at CCDF that apply to all detainees, and, in support thereof, have submitted the declarations of Dr. Wilcox and Mr. Pacholke, as well as numerous declarations by detainees, all attesting to Defendants' operation of CCDF in a manner that subjects detainees to systemwide unconstitutional policies and practices. Under such circumstances, the Court finds individual factual differences pose no obstacle to commonality. *See Parsons v. Ryan*, 754 F.3d 657, 682 (9th Cir. 2014) (collecting cases).

Third, Plaintiffs have established typicality. *See* Fed. R. Civ. P. 23(a)(3). Typicality is satisfied where the class representatives and other class members "have the same or similar injury," where "the action is based on conduct which is not unique to the named plaintiffs," and where "other class members have been injured by the same course of conduct." *See Parsons*, 754 F.3d at 685 (internal quotation and citation omitted). The injuries need only be similar, not identical. *See id.* Here, as discussed above, the named plaintiffs declare that they, like all other members of the putative class, are being exposed to substantial risk of serious harm by the challenged policies and practices existing at CCDF.  "The named plaintiffs thus allege the same or [a] similar injury as the rest of the putative class; they allege that this injury is a result of a course of conduct that is not unique to any of them; and they allege that the injury follows from the course of conduct at the center of the class claims." *See id.* (internal quotation and citation omitted).

Fourth, the Court finds the adequacy requirement is satisfied as to the named plaintiffs and their counsel. *See* Fed. R. Civ. P. 23(a)(4). In determining adequacy, courts ask "(1) do the named

plaintiffs and their counsel have any conflicts of interest with other class members; and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *See Jane Doe 1 v. Nielsen*, 357 F. Supp. 3d 972, 990 (N.D. Cal. 2018). Here, no conflict of interest has been identified as to any plaintiff or plaintiffs' attorney nor is any such conflict apparent, and Plaintiffs and their counsel have consistently demonstrated a commitment to vigorously prosecuting the action on behalf of the class.

**B.    Plaintiffs have satisfied the requirements of Rule 23(b).**

The Court next finds Plaintiffs have met the additional requirement that they satisfy at least one of the three subsections of Rule 23(b). In particular, Plaintiffs have demonstrated they meet the requirements of Rule 23(b)(2), which requires a showing that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." *See* Fed. R. Civ. P. 23(b)(2). As discussed above, Plaintiffs' challenge is to facility-wide policies and practices governing medical care, access to counsel, and conditions of confinement; their alleged injuries arise from the same policies and practices affecting all detainees; and those injuries are capable of being addressed through uniform injunctive and declaratory relief.

## IV.    CONCLUSION

For the foregoing reasons, the Court issued the relief set forth in its February 10 Order. Nothing herein is intended to alter, expand, or limit the Court's previous ruling.

Dated: March 27, 2026

_____
Maxine M. Chesney
United States District Judge

15